**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **DAVID SETH WORMAN, et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1-17-CV-10107-WGY** |
| | ) | |
| **MAURA HEALEY, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiffs David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost (collectively, "Plaintiffs"), by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby submit this Statement of Undisputed Facts in Support of Their Motion for Summary Judgment.

**A.   Massachusetts' 1998 Ban of "Assault Weapons" and "Large Capacity Feeding Devices" and the Attorney General's 2016 Notice of Enforcement.**

1.   Massachusetts' statutory ban prohibiting firearms, G. L. c. 140, §§ 121–131P, replicates the now-repealed federal prohibition against "assault weapons" and "large capacity feeding devices." *See* Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. § 921(a)(30) (1994) (the "Federal Ban").

2.   Massachusetts law defines the term "assault weapon" to have the same meaning as the term "semiautomatic assault weapon" as defined in the Federal Ban, and prohibits by name some of the most popular rifles and firearms in the country, including:

(i)     Avtomat Kalashnikov (AK) (all models);
(ii)    Action Arms Israeli Military Industries UZI and Galil;
(iii)   Beretta Ar70 (SC-70);
(iv)    Colt AR-15;
(v)     Fabrique National FN/FAL, FN/LAR, and FNC;
(vi)    SWD M-10, M-11, M-11/9, and M-12;
(vii)   Steyr AUG;
(viii)  INTATEC TEC-9, TEC-10, TEC-DC9, and TEC-22; and
(ix)    revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12 .

(the "Enumerated Banned Firearms"), as well as their "copies or duplicates" that have two or more specified features (collectively, the "Banned Firearms"). G. L. C. 140 § 121; *see also* Klein Dep., Ex. 17 at 31:17–21.

3.      The phrase "copies or duplicates" is not defined in the Challenged Laws, nor is it defined elsewhere in Massachusetts law. *See* G. L. C. 140 § 121. The phrase also was included in the Federal Ban but was not defined under federal law either. *See* 18 U.S.C. § 921(a)(30) (1994).

4.      As the Federal Ban was debated, however, Senator Joseph Biden of Delaware made clear that the term "copy" did not refer to any similarity of the firearm's operating system but to selling a named banned rifle under another name: "To avoid the so-called copycat problem – where manufacturers simply rename guns to avoid State assault weapon legislation – the amendment makes clear that replicas and duplicates of the listed firearms are covered as well." 139 Cong. Rec. S15459, Ex. 22. "Senator Biden stated further that 'to make clear that this ban applies only to military style assault weapons, this ban would apply only to semiautomatic rifles and pistols that can attach detachable magazines that have at least two of the following characteristics: A grenade launcher; a flash suppressor; a bayonet mount; a folding stock; or a pistol grip.'" *Id.* This "features test" thus qualified what was prohibited either as an Enumerated Banned Firearm or as a copy or duplicate of an Enumerated Banned Firearm.

5.      A "large capacity feeding device" is defined by Massachusetts law as "a fixed or detachable magazine . . . capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition . . . ." G. L. c. 140 § 121 (the "Banned Magazines").

6.      The Massachusetts law prohibits possession and transfer of the Banned Firearms and Magazines, and imposes severe penalties for any violation:

> No person shall sell, offer for sale, transfer or possess an assault weapon or large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Whoever not being licensed under the provisions of section 122 violates the provisions of this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000, or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than five years nor more than 15 years, or by both such fine and imprisonment.

G. L. c. 140 § 131M. Collectively, Massachusetts General Laws, chapter 140, sections 121 and 131M, shall be referred to herein as the "Challenged Laws." The Challenged Laws do not ban the sale, transfer, or possession of Banned Firearms and Magazines lawfully possessed prior to September 13, 1994. *See* G. L. c. 140 § 131M.

7.      After the enactment of the Challenged Laws, and for a period of 18 years, Defendants approved the transfer of tens of thousands of firearms as compliant under Massachusetts law ("Massachusetts Compliant Firearms"). *See* Press Release, AG Healey Announces Enforcement of Ban on Copycat Assault Weapons (July 20, 2016), available at http://www.mass.gov/ago/news-and-updates/press-releases/2016/2016-07-20-assault-weapons-enforcement.html, Ex. 23 at p. 1. ("Despite the law, an estimated 10,000 [Banned Firearms] were sold in Massachusetts last year alone."); *see also* Deposition of Alan Zani, Commander, Massachusetts State Police Crime Gun Unit, Ex. 20 at 11:10–14, 11:16–19 (defining the term "Massachusetts Compliant Firearm" as a "firearm that was compliant to the Massachusetts General

Laws prior to July 20, 2016"), 11:21–24, 12:1–2, 4 (confirming transfers of Massachusetts Compliant Firearms "were considered lawful").

8.      Nearly twenty years after the enactment of the Challenged Laws, Defendant Attorney General Maura Healey issued the Notice of Enforcement, which became effective as of July 20, 2016. *See* Notice of Enforcement, available at http://www.mass.gov/ago/public-safety/assault-weapons-enforcement-notice.pdf (last visited Dec. 14, 2017), Ex. 25 at p. 1.

9.      The Notice of Enforcement purports to provide "guidance on the identification of weapons that are 'copies' or 'duplicates' of the enumerated Assault weapons that are banned under Massachusetts law." *Id.* at p. 1.

10.     The Notice of Enforcement expands the firearms prohibition established in the Challenged Laws to also forbid the ownership and transfer of Massachusetts Compliant Firearms, as well as other popular firearms commonly kept for lawful purposes. *See id.* at p. 1–4. Because nearly all semiautomatic firearms employ a similar operating system, *See* Declaration of James Supica, Director of the NRA Firearms Museum and firearms historian, Ex. 13 at p. 1, ¶ 2 Att. A at p. 24, there is a wholesale ban of nearly all semiautomatic firearms in the Commonwealth of Massachusetts.

11.     To determine if a firearm is a "copy or duplicate," the Notice of Enforcement establishes two tests: a "Similarity Test" and an "Interchangeability Test." *See* Notice of Enforcement, Ex. 25 at pp. 3–4. These tests provide that a firearm is a copy or duplicate of a Banned Firearm if

   i.      "its internal functional components are substantially similar in construction and configuration to those of an [Enumerated Banned Firearm]. Under this test, a weapon is a Copy or Duplicate, for example, if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the [Enumerated Banned Firearm]"; or

ii.   "it has a receiver that is the same as or interchangeable with the receiver of an [Enumerated Banned Firearm.] A receiver will be treated as the same as or interchangeable with the receiver on an [Enumerated Banned Firearm] if it includes or accepts two or more operating components that are the same as or interchangeable with those of an [Enumerated Banned Firearm]. Such operating components may include, but are not limited to: 1) the trigger assembly; 2) the bolt carrier or bolt carrier group; (3) the charging handle; (4) the extractor or extractor assembly; or (5) the magazine port."

*See id.*

12.   The Notice of Enforcement also states that a firearm that qualifies as "copy or duplicate" under one of these two tests will remain a "copy or duplicate," even if it is altered to no longer meet those tests. *Id.* at p. 4.

13.   In addition, the Notice of Enforcement provides that a manufacturer's advertising of a firearm is "relevant" in determining whether a firearm is a "copy or duplicate" of an assault weapon. *Id.*

14.   The Notice of Enforcement provides a prospective limitation for "dealers licensed under G. L. c. 140, § 122":

The Guidance will not be applied to future possession, ownership or transfer of Assault weapons by dealers, provided that the dealer has written evidence that the weapons were transferred to the dealer in the Commonwealth prior to July 20, 2016, and provided further that a transfer made after July 20, 2016, if any, is made to persons or businesses in states where such weapons are legal.

*Id.*

15.   The Notice of Enforcement provides no exception to its application to dealers for transfers made *before* July 20, 2016. *See id.*

16.   For "individual gun owners," by contrast, the Notice of Enforcement provides both retroactive and prospective limitation: "The Guidance will not be applied to possession, ownership, or transfer of an Assault weapon obtained prior to July 20, 2016." *Id.*

17.     The Notice of Enforcement explicitly states that "[t]he [Attorney General's Office] reserves the right to alter or amend this guidance," leaving open the scope of the Challenged Laws as well as the resulting criminal liability. *Id.*

18.     Neither the Challenged Laws nor the Notice of Enforcement provides a safe harbor or exception for the transfer and possession of Banned Firearms and Magazines by responsible, law-abiding citizens for self-defense. *See id.*

**B.     The Plaintiffs.**

19.     David Seth Worman, a licensed orthopedic surgeon, is a responsible, law-abiding citizen and resident of Massachusetts. *See* Worman Decl., Ex. 1 at p. 1, ¶ 2. After the enactment of the Challenged Laws but before the issuance of the Notice of Enforcement, Dr. Worman purchased firearms which may be classified as a "copy or duplicate" of an "assault weapon" under the tests set forth in the Notice of Enforcement. *Id.* at p. 1, ¶ 3. As such, his weapons may now be prohibited. *Id.* Dr. Worman also owns several pistols that are designed for, and come standard with, detachable magazines that hold in excess of ten rounds, and he lawfully owns multiple detachable magazines which hold in excess of ten rounds. *Id.* He primarily owns these firearms and magazines for defense of his home and family, and he also keeps them for recreational target shooting and as collector's items. *Id.* at pp. 1–2, ¶ 4. Dr. Worman is a responsible firearms owner, having taken numerous safety and training courses, including training focused on self-defense, and he secures his firearms in a locked safe in his home. *Id.* at p. 2, ¶ 6. Dr. Worman would like to purchase additional semiautomatic firearms with standard detachable magazines holding in excess of ten rounds, if the law permitted him to do so. *Id.* at p. 2, ¶ 5. He cannot, however, currently determine if the firearms he wishes to purchase are "copies or duplicates" of an "assault weapon." *Id.* He cannot make this determination because of the vague and confusing manner in which "copies or duplicates" is defined in the Notice of Enforcement, and because of the uncertainty of

how Defendants will interpret the phrase "copies or duplicates." *Id*. at p. 2, ¶¶ 5, 7. Because the Office of the Attorney General "reserves the right to amend th[e] guidance" in the Notice of Enforcement, Dr. Worman lives in fear that his possession of firearms will become criminalized. *Id*. at p. 2, ¶ 7. He believes that the Challenged Laws and Notice of Enforcement violate his civil rights. *Id*.

20.     Jason William Sawyer served five years of active duty and an additional three years of inactive reserves in the Marine Corps. *See* Sawyer Decl., Ex. 3 at p. 1, ¶ 2. He achieved the rank of Corporal (E-4) during his service. *Id.* He now works in the software industry as an engineer and is a responsible, law-abiding citizen and resident of Massachusetts. *Id.* at p. 2, ¶¶ 6–7. While serving, Mr. Sawyer was issued an M-16A2 and an M9 service pistol and received extensive training with various firearms. *Id.* at p. 1, ¶ 2. Since leaving the military, Mr. Sawyer has taken numerous firearms courses, has become a certified NRA instructor and a certified Massachusetts State Police instructor, and is well-versed on how to safely and properly own and use firearms. *Id.* at pp. 1–2, ¶¶ 2, 7. He keeps his firearms in a locked safe in his home. *Id.* at p. 2, ¶ 7. Mr. Sawyer, a nationally ranked competitive shooter, uses AR-15 platform rifles in competitive shooting events – firearms which may be banned as "copies or duplicates" under the tests set forth in the Notice of Enforcement. *Id.* at pp. 1–2, ¶ 4. Mr. Sawyer also possesses these firearms for self-defense and defense of his home. *Id.* at p. 2, ¶ 5. Mr. Sawyer purchased these firearms after the enactment of the Challenged Laws but before Defendant Healey issued the Notice of Enforcement. *Id.* at pp. 1–2, ¶ 4. He also owns several pistols that are designed for, and come standard with, detachable magazines which hold in excess of ten rounds and lawfully owns several detachable magazines which hold in excess of ten rounds. *Id.* at p. 2, ¶ 4. Mr. Sawyer would like to purchase certain additional firearms that may be classified as "copies or duplicates" of Enumerated Banned

Firearms but cannot do so because of the uncertainty of how Defendants will interpret the phrase "copies or duplicates." *Id.*

21.     Anthony Linden has polyarthritis, a type of arthritis that involves five or more joints simultaneously. *See* Linden Decl., Ex. 2 at p. 1, ¶ 4. As a result of this disease, it is difficult for him to operate certain firearms quickly and effectively. *Id.* AR-15 platform rifles and full-capacity magazines allow him to fully utilize his firearms at the practice range and while hunting, and they ensure his ability to defend himself in his home, if necessary. *Id.* Accordingly, Mr. Linden owns an AR-15 platform firearm that he built himself. *Id.* at p. 1, ¶ 3. He purchased the parts for this firearm and assembled it after the enactment of the Challenged Laws but before Defendant Healey issued the Notice of Enforcement. *Id.* This firearm was designed for detachable magazines which hold in excess of ten rounds, and he in fact lawfully owns several detachable magazines which hold in excess of ten rounds. *Id.* Mr. Linden plans to purchase additional full-sized semiautomatic firearms with standard detachable magazines holding in excess of ten rounds in the future, if he is permitted to do so by law. *Id.* at p. 1, ¶ 5. Mr. Linden is a responsible, law-abiding citizen and resident of Massachusetts and has taken numerous safety and training courses; he also secures his firearms in locked safes in his home. *Id.* at pp. 1–2, ¶¶ 2, 7.

22.     Paul Chamberlain, also a responsible, law-abiding citizen and resident of Massachusetts, does not currently own any Banned Firearms. *See* Chamberlain Decl., Ex. 4 at ¶¶ 2, 5. He does, however, lawfully own several detachable magazines which hold in excess of ten rounds, which he keeps, along with his firearms, in a safe in his home. *Id.* at ¶ 5. Mr. Chamberlain wishes to purchase firearms that are banned under the Challenged Laws and Notice of Enforcement for self-defense in his home, and would do so, but for the prohibition. *Id.* Even though Mr. Chamberlain has experience interpreting complex regulations due to his career as a safety

manager, Mr. Chamberlain cannot determine whether the firearms he wishes to purchase are prohibited by the Notice of Enforcement. *Id.* at ¶¶ 3-4. He believes the Notice of Enforcement is vague and is uncertain how Defendants will interpret "copies or duplicates." *Id.* at ¶ 4.

23.     Gun Owners' Action League, Inc. ("GOAL") is a non-profit corporation dedicated to promoting safe and responsible firearms ownership, marksmanship competition, and hunter safety throughout Massachusetts. *See* Wallace Decl., Ex. 5 at p. 1, ¶ 3. For over 40 years, GOAL has helped protect and preserve Massachusetts citizens' Second Amendment rights. *Id.* It is the leading advocate in Massachusetts for its more than 15,000 members, which include current and future gun owners, hunters, conservationists, as well as firearm and marksmanship clubs. *Id.* GOAL possesses a number of firearms-related licenses, including a federal firearms license and a Massachusetts License to Sell Ammunition. *Id.* at p. 1, ¶ 5. To aid in its firearms safety classes, GOAL keeps firearms, which may now be classified as a "copy or duplicate" of an "assault weapon" under the tests set forth in the Notice of Enforcement. *Id.* at p. 1, ¶ 4. GOAL also owns pistols that are designed for, and come standard with, detachable magazines which hold in excess of ten rounds, and in fact lawfully possesses multiple magazines holding in excess of ten rounds. *Id.* As a licensed dealer, GOAL lawfully owns and, after the enactment of the Challenged Laws but before the Notice of Enforcement was issued, sold firearms which may be classified as a "copy or duplicate" of an "assault weapon" under the tests set forth in the Notice of Enforcement. *Id.* at pp. 1–2, ¶ 5. GOAL and its membership are harmed by the combination of the Notice of Enforcement and the Challenged Laws because they cannot acquire the most popular semiautomatic rifles and standard capacity magazines sold today. *Id*. at p. 2, ¶ 6. Additionally, the Notice of Enforcement asserts that what had been accepted, lawful behavior was in fact illegal. *Id.*

24.     On Target Training, Inc. ("On Target") is a family-owned retail gun store and training facility. *See* O'Leary Decl., Ex. 6 at p. 1, ¶ 3. On Target is a federal firearms licensed dealer, and is also licensed in Massachusetts to perform services as a gunsmith; to sell, rent or lease firearms, rifles, shotguns, or machine guns; and to sell ammunition. *Id.* Until the effective date of the Notice of Enforcement, On Target sold firearms that may now be banned under the tests set forth in the Notice of Enforcement. *Id.* at pp. 1–2, ¶ 4. Before Attorney General Healey issued the Notice of Enforcement, On Target was never informed that its transfers were or may have been illegal. *Id.* At no time was any action taken against it by any law enforcement agency to halt or prevent these transactions; Defendants instead approved them. *Id.* On Target relied upon this approval and believed it was engaging in legal activity. *Id.* On Target believes that these prior transactions made before the issuance of the Notice of Enforcement have been retroactively deemed illegal by Defendants, particularly given the fact that the Notice of Enforcement provides no guarantee that such transactions are in fact legal and Attorney General Healey's remarks make clear that she believes "these weapons are illegal." *Id.* at p. 2, ¶ 6; *see also* Remarks of Attorney General Maura Healey, available at [http://www.mass.gov/ago/public-safety/remarks-from-assault-weapons-press-conference.pdf](http://www.mass.gov/ago/public-safety/remarks-from-assault-weapons-press-conference.pdf) (July 20, 2016), Ex. 24 at p. 3. If these transactions are construed as illegal, On Target could be in violation of federal law and lose its federal firearms license and other firearm-related licenses. *See* O'Leary Decl., Ex. 6 at p. 2, ¶ 6. On Target is also being harmed because, as a result of the Notice of Enforcement, it is losing money. *Id.* at p. 2, ¶ 5. Rifle sales have almost completely ceased, sales of pre-1994 large capacity magazines are down about 50%, and ammunition sales are also down significantly. *Id.* On Target suffers ongoing economic harm because it can no longer sell the firearms and magazines banned under the Notice of Enforcement. *Id.* On Target also suffers harm because of the vagueness of the Notice of

Enforcement, which prevents it from knowing which firearms it can and cannot lawfully sell. *Id.* If not for the credible threat of prosecution under the Challenged Laws and Notice of Enforcement, On Target would continue to sell these firearms and magazines. *Id.* at pp. 1–2, ¶ 4.

25.     Overwatch Outpost ("Overwatch") is a federal firearms licensed dealer, and is also licensed in Massachusetts to perform services as a gunsmith; to sell, rent, or lease firearms, rifles, shotguns, or machine guns; and to sell ammunition. *See* Ricko Decl., Ex. 7 at p. 1, ¶ 3. Approximately 70% of Overwatch's revenue comes from firearms sales. *Id.* Until the effective date of the Notice of Enforcement, Overwatch sold certain firearms that may now be banned under the Notice of Enforcement. *Id.* at pp. 1–2, ¶¶ 3, 4. Prior to the Notice of Enforcement, no law enforcement agency informed Overwatch that its transfers were or may be illegal. *Id.* Instead, Defendants approved them. *Id.* Overwatch Outpost relied upon this approval and believed it was engaging in legal activity. *Id.* at pp. 1–2, ¶¶ 3, 4. Overwatch fears that the hundreds if not thousands of presumptively-legal and then-accepted transactions have now been declared retroactively to be in violation of Massachusetts law at the time these transactions occurred. *Id.* If these transactions are construed as illegal, Overwatch could be in violation of federal law and lose its federal firearms license and other firearm-related licenses. *Id.* at p. 2, ¶ 4. Overwatch continues to suffer economic harm because it cannot sell these firearms and magazines, and also because of the vagueness of the Notice of Enforcement, which prevents Overwatch from what knowing which firearms it can and cannot lawfully sell. *Id.* at p. 2, ¶ 5. Overwatch would continue to sell these firearms and magazines, if not for the credible threat of prosecution under the Challenged Laws and Enforcement Notice. *Id.*

### C.     The Banned Firearms and Magazines Are Commonly Possessed.

26.     The Challenged Laws and Notice of Enforcement target firearms that are semiautomatic, meaning that they fire only once with each pull of the trigger, no matter how long

the trigger is held. *See* Supica Decl. Ex. 13, at p. 4, ¶¶ 10–11; *see also* Deposition of Gary Klein, representative witness for the Office of the Attorney General, Ex. 17 at 31:17-21.

27.    The Banned Firearms and Magazines are commonly possessed. *See* Declaration of James Curcuruto, Director of Marketing and Research at the National Shooting Sports Foundation, Ex. 9 at pp. 2–4, ¶¶ 5–10.

28.    Firearms with a capacity of more than 10 rounds have been owned by civilians for centuries. *See* Supica Decl., Ex. 13 at p. 2, ¶ 6. Throughout the 17th and 18th centuries, many commercially available firearms had a capacity of more than 10 rounds, including the Kalthoff repeater which had up to a 30 shot capacity and the Belton repeating flintlock which had a 16 or 20 shot capacity. *Id*. The Founders were familiar with multiple shot repeating firearms at the time the Second Amendment was drafted. *Id*. Semiautomatic firearms with detachable magazines have been used by the civilian population for over a century, and there is no evidence demonstrating a historic prohibition on their ownership. *Id.* at p. 3, ¶ 8.

29.    The Banned Firearms include some of the most popular and commonly owned firearms today: AR- and AK-platform rifles. *See* Curcuruto Decl., Ex. 9 at p. 2, ¶ 6.

30.    Between 1990 and 2015, approximately 13.7 million rifles based on these platforms were manufactured or imported into the United States. *See id*. at pp. 2–4, ¶¶ 6–9. Because AR- and AK-platform rifles have been sold to civilians in the U.S. since the late 1950s, even more of these rifles were manufactured in or imported to the U.S. before 1990. *See id.* at pp. 2–3, ¶ 6.

31.    Modern Sporting Rifles (a term used in the industry to describe modern semiautomatic rifles such as the AR-15, *see* Declaration of Buford Boone, former Director of the FBI Ballistics Laboratory, Ex. 8 at p. 1, ¶ 2 Att. A, p. 5; Curcuruto Decl., Ex. 9 at p. 1, ¶ 2 Att. A, p. 3; *see also* Supica Decl., Ex. 13 at p. 1 ¶ 2 Att. A at p. 21) are growing in popularity. *See*

Curcuruto Decl., Ex. 9 at p. 3, ¶ 7. As of 2013, more than 4,800,000 people, most of whom are married with some college education and a household income greater than $75,000, own at least one Modern Sporting Rifle. *Id.* at p. 3, ¶ 8. Even more people use these firearms: according to a 2016 report published by the National Shooting Sports Foundation (NSSF) about Sport Shooting Participation in the United States, approximately 14,000,000 people participated in target shooting with a modern sporting rifle in 2016, a 57% increase from 2009. *Id.* at p. 4, ¶ 9.

32.     In 2015 alone, more than 1,500,000 Modern Sporting Rifles were manufactured in or imported into the United States. *Id.* at p. 3, ¶ 7. By way of comparison, in 2015, the number of Modern Sporting Rifles manufactured in or imported to the U.S. was nearly double the number of the most commonly sold vehicle in the United States (the Ford F-series pick-up trucks (including F-150, F-250, F-350, F-450 and F-550), of which a total of 780,354 were sold). *Id.*

33.     Modern Sporting Rifles – not shotguns, or traditionally styled rifles – are the most frequently-sold long gun in America. *Id.* at p. 3, ¶ 8. According to a 2017 survey of 324 firearm retailers across the United States, these firearms accounted for 17.9% of all firearm sales, whereas shotguns and traditionally-styled rifles accounted for only 11.5% and 11.3% of all firearm sales, respectively. *Id.*

34.     The Banned Firearms include the most popular rifles in the United States. *Id.* at pp. 3–4, ¶¶ 7–9.

35.     Magazines capable of holding more than 10 rounds of ammunition are likewise commonly possessed. *Id.* at p. 4, ¶ 10. Tens of millions of people across the country possess magazines capable of holding more than 10 rounds of ammunition. *Id.* Between 1990 and 2015, Americans owned approximately 114,700,000 of these magazines, accounting for approximately 50% of all magazines owned during this time (approximately 230,000,000). *Id.*

36.     It is reasonable to assume that many more such magazines were purchased in the United States prior to 1990 and that even more people possess a magazine capable of holding more than 10 rounds of ammunition. *Id.* This is particularly likely given the fact that these Banned Magazines are provided as standard equipment for many semiautomatic rifles and pistols sold in the United States. *Id.*

> **D.     The Banned Firearms and Magazines Are Possessed for Lawful Purposes and Are Rarely Used in Crime.**

37.     The Banned Firearms and Magazines are owned and used for a variety of lawful purposes, including recreational and competitive target shooting, home defense, hunting, and collecting. *See* Curcuruto Decl., Ex. 9 at p. 2, ¶ 6.

38.     Purchasers of the Banned Firearms report that one of the most important reasons for their purchase of such firearms is self-defense. *See id.* at p. 3, ¶ 8.

39.     The Bureau of Alcohol, Tobacco, and Firearms ("ATF") confirmed over twenty-five years ago that the Banned Firearms were useful in self-defense. *See* Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles, at 11–12 (July 6, 1989), Ex. 28.

40.     There are several reasons why an individual would choose a Banned Firearm for self-defense. *See* Declaration of Gary Roberts, dental surgeon and law enforcement Wound Ballistics Instructor, Ex. 11 at pp. 3–5, ¶¶ 8–14; Boone Decl., Ex. 8 at pp. 3–6, ¶¶ 5–11.

41.     First, Banned Firearms based on the AR-15 platform are the most ergonomic, safe, readily available, and effective firearms for civilian defensive shooting. *See* Roberts Decl., Ex. 11 at p. 3, ¶ 8; *see also* Boone Decl., Ex. 8 at pp. 3–5, ¶¶ 5–8. Effective defensive shooting requires stopping the human aggressor as quickly as possible, *see* Boone Decl., Ex. 8 at p. 4, ¶ 6, and semiautomatic rifles like the Banned Firearms offer superior accuracy, less recoil, greater effective

range, faster reloading, potentially reduced downrange hazard, better ergonomics, and a larger ammunition capacity than other types of firearms, such as handguns and shotguns, *see* Roberts Decl., Ex. 11 at p. 3, ¶ 8.

42.     These firearms are also relatively lightweight, are available with a telescoping/adjustable stock, have a vertical pistol grip, can be fired with one hand, are chambered for .223/5.56 cartridges that can be effective while having relatively mild recoil, and utilize magazines with a standard capacity of 20 or 30 rounds. *See* Boone Decl., Ex. 8 at pp. 4–5, ¶¶ 7–8. These characteristics make Banned Firearms such as the AR-15 and its copies appropriate for close-quarter encounters, and are among the easiest to shoot accurately. *Id.* at p. 4, ¶ 7. They are also generally easier to operate one-handed, in case of injury, compared to other shoulder fired weapons. *See* Roberts Decl., Ex. 11 at p. 3, ¶ 8.

43.     The ammunition typically used by the Banned Firearms, specifically the .223 Remington or the very similar 5.56mm, is also more effective and reliable at stopping human attackers, and is more humane to those attackers, than typical handgun ammunition. *Id.* at p. 4, ¶ 10; *see also* Boone Decl., Ex. 8 at p. 4, ¶ 6. .223 Remington rounds penetrate human tissue at the depth in which the FBI determined to be most desirable – between 12 and 18 inches. *See* Roberts Decl., Ex. 11 at p. 4, ¶¶ 9-10; Boone Decl., Ex. 8 at p. 4, ¶ 6. This is important because under-penetration or over-penetration of human tissue reduces the ammunition's effectiveness at stopping an attacking individual. *See* Roberts Decl., Ex. 11 at p. 4, ¶¶ 10–11. In comparison, effective shotgun ammunition's penetration range is unnecessarily deep, practically guaranteeing pass-thru shots that pose considerable danger to others in the area. *See* Boone Decl., Ex. 8 at p. 6, ¶ 11.

44.     Accurate and effective munitions also reduce the need for multiple shots, decreasing the chance of shots missing the intended hostile aggressor and striking innocent bystanders. *See* Roberts Decl., Ex. 11 at p. 4, ¶ 11. In addition, .223 Remington rounds cause smaller and fewer wounds as compared to ammunition fired from other less effective firearms, such as handguns or shotguns, reducing the scope of medical care needed. *Id.* at pp. 4–5, ¶¶ 12–13.

45.     In contrast, handguns are much more difficult to fire accurately than semiautomatic rifles because they are more difficult to steady, absorb less recoil, and are more sensitive to shooter technique. *See* Boone Decl., Ex. 8 at p. 5, ¶10; Rossi Decl., Ex. 12 at p. 1, ¶ 2 Att. A at p. 12. These factors combine to make handguns substantially more difficult to fire accurately, especially under stress. *See* Declaration of Guy Rossi, self-defense instructor and former law enforcement agent, Ex. 12 at p. 1, at ¶ 2 Att. A at p. 12.

46.     Shotguns also have significantly more recoil than semiautomatic rifles, and it is more difficult to fire repeat shots accurately with a shotgun. *See* Boone Decl., Ex. 8 at pp. 5–6, ¶ 11. A common misunderstanding is that the "spread" of shotgun pellets make accuracy less critical when using a shotgun. *Id.* This is not the case, as the most common defensive shotgun rounds, for instance a 00 buckshot used in a 2 3/4" 12 gauge shotgun, typically spread beyond the scoring area of the FBI target, which is based on the size of a human torso, even when fired from a distance of only 21 feet. *Id.* This means that the increase in hit probability is accompanied by the likelihood that some projectiles will miss. This only increases the risk to unintended targets (namely, innocent people). *Id.*

47.     The suitability of the Banned Firearms for defensive use is highlighted by the fact that they are the most commonly used and recommended rifles by law enforcement, including the

FBI, who may only discharge their firearms for defensive purposes. *See* Roberts Decl., Ex. 11 at p. 5, ¶ 14; Boone Decl., Ex. 8 at pp. 5–6, ¶¶ 9, 12; *see also* Klein Dep., Ex. 17 at 153:14-18 (noting that law enforcement officers "are armed with AR-15s in most cases"). Across the country, over one million law enforcement personnel have qualified on the AR-15. *See* Roberts Decl., Ex. 11 at p. 5, ¶ 14.

48.     The Banned Firearms and Magazines, which Plaintiffs seek to own and use for defensive purposes, are used by Massachusetts law enforcement officers. *See* Klein Dep., Ex. 17 at 53:4-7, 53:8-10, 153:17-18, 173:9-10. As Dr. Gary Roberts explained, "private citizens who wish to own a firearm for self- and home defense should use a semiautomatic rifle – most likely the same firearm and ammunition chosen by police in their community." *See* Roberts Decl., Ex. 11 at p. 5, ¶ 14. This is because the degree of force required to stop a violent felon does not change whether confronted by a law enforcement officer or a private citizen. *Id.* The violent felon's anatomy, physiology, and incapacitation potential does not change depending on the intended victim's profession. *Id.*

49.     Many semiautomatic firearms, including the Banned Firearms that the Notice of Enforcement purports to criminalize, are manufactured to accept magazines with standard capacities greater than ten rounds. *See* Rossi Decl., Ex. 12 at p. 1, ¶ 2 Att. A, p. 3; Curcuruto Decl., Ex. 9 at p. 1, ¶ 2 Att. A; *id.* at pp. 4–5; ¶ 4; Roberts Decl., Ex. 11 at p. 6, ¶ 16; *id.* at p. 1, ¶ 2 Att. A, p. 4.

50.     These magazines are necessary for effective self-defense, particularly in situations where more than 10 shots are needed to stop a threat, which is often the case. *See* Rossi Decl., Ex. 12 at pp. 3–4, ¶ 8; Roberts Decl., Ex. 11 at p. 3, 5–6, ¶¶ 7, 15; Supica Decl., Ex. 13 at p. 1, ¶ 2 Att. A, p. 19; Declaration of Gary Kleck, Professor of Criminology and researcher of firearms

bans, Ex. 10 at p. 1, ¶ 2 Att. A, pp. 4–5. Very few, if any, instances in which the use of a firearm is necessary for self-defense afford the time necessary to reload. *See* Rossi Decl., Ex. 12 at p. 5, ¶ 10. For instance, in the well-known Tueller Drill used in police training, it is emphasized that an attacker who is 21 feet away can close the entire distance between himself and the victim in only 1.5 seconds. *Id.*

51.     The most recently released New York Police Department (NYPD) "Annual Firearms Discharge Report," which includes data from 2015, states that, in 35% of NYPD Intentional Discharge-Adversarial Conflict cases, officers needed to fire more than 5 shots to stop the threat, and in 17% of the cases, officers needed more than 10 shots to end the violent encounter – including one case where 84 shots were required. *See* Roberts Decl., Ex. 11 at p. 5–6, ¶ 15; *see also* Rossi Decl., Ex. 12 at pp. 3–4, ¶ 8.

52.     Because trained law enforcement officers often require more than 10 rounds of ammunition for defensive shooting (*i.e.*, "shooting to stop"), *see* Roberts Decl., Ex. 11 at pp. 5–6, ¶ 15; *see also* Rossi Decl., Ex. 12 at pp. 3–4, ¶ 8; *see also* Boone Decl., Ex. 8 at pp. 6–7, ¶ 12, nearly all law enforcement agencies, including the FBI, issue their officers magazines capable of holding more than 10 rounds of ammunition, with 30 round magazines being the norm for rifles. *See* Boone Decl., Ex. 8 at pp. 5, 6–7, ¶¶ 9, 12. Mr. Boone, a retired Supervisory Special Agent of the FBI, firearms instructor, and ballistic laboratory director, is unaware of any law enforcement agency that issues pistol magazines that are restricted below standard capacity "to some arbitrary limit like 10." *Id.* at pp. 1–3, 7, ¶¶ 3, 12.

53.     This is because reloading a semiautomatic firearm with a detachable magazine – a 12-step process – is time-consuming, even under ideal circumstances. Rossi Decl., Ex. 12 at p. 4, ¶ 9. When considering factors such as distractions, noise, multiple assailants, lighting conditions,

nervousness, and fatigue, the time to reload decelerates. *Id.* Reloading is especially time consuming if the victim is handicapped, disabled, or injured. *Id.* at pp. 3, 5–6, ¶¶ 7, 12.

54.     Reloading a firearm is also physically and mentally demanding. *Id.* at p. 5, ¶ 11. It requires two hands (one to hold the firearm and one to load the magazine), limiting a victim's ability to escape, fend off an attacker, call 911, or give physical aid or direction to others. *Id.* Reloading a firearm requires focus and therefore distracts the victim from the assailant and her surroundings. *Id.* This distraction increases the likelihood of a missed shot. *Id.*

55.     Greater magazine capacity reduces the need to reload in situations requiring more than 10 rounds of ammunition to stop an attacker. *Id.* at p. 3, ¶ 7. As a result, higher capacity magazines allow individuals to better protect themselves. *Id.*

56.     A limit on a magazine's capacity may hinder law-abiding citizens' ability to defend themselves, others, and their homes. *See* Roberts Decl., Ex. 11 at pp. 5–6, ¶ 15; Kleck Decl., Ex. 10 at pp. 3–4, ¶ 8; Rossi Decl., Ex. 12 at pp. 3, 6, ¶¶ 7, 13.

57.     The prohibition of the Banned Magazines can be the difference in surviving or not surviving a self-defense situation. *See* Roberts Decl., Ex. 11 at pp. 5–6, ¶ 15; *see also* Rossi Decl., Ex. 12 at pp. 4, 6, ¶¶ 8, 13. Civilians, unlike police officers, likely have no body armor, no radio, no partner, no cover units, and no duty belt with extra magazines. *See* Roberts Decl., Ex. 11 at pp. 5–6, ¶ 15. Yet, civilians can be targets of opportunity for criminals and are confronted by the same violent felons as are the police. *Id.* Because highly trained and experienced police officers require the use of at least 11 rounds in 17% of their close range encounters to subdue an aggressive assailant, it follows that an untrained civilian gun owner would need at least that many rounds. *See* Rossi Decl., Ex. 12 at pp. 3–4, 6, ¶¶ 8, 13.

58.     The desire to have more rounds of ammunition available without reloading is not new; it has driven firearm design and development for centuries. *See* Supica Decl., Ex. 13 p. 1, ¶ 2 Att. A, p. 3. An early firearm with a capacity of more than 10 rounds was available around 1580, and throughout the 17th and 18th centuries, many commercially available firearms had a capacity of more than 10 rounds. Supica Decl., Ex. 13 at p. 2, ¶ 6. Commercially available firearms with a capacity of more than 10 rounds became even more widespread after the Second Amendment was ratified. *Id.* at pp. 2–3, ¶ 7.

59.     Likewise, semiautomatic firearms with detachable magazines have been available and in wide use for well over a century. *Id.* at p. 3, ¶ 8. The magazines most commonly possessed by civilians hold more than 10 rounds of ammunition. *See* Roberts Decl., Ex. 11 at p. 6, ¶ 16; Curcuruto Decl., Ex. 9 at p. 4, ¶ 10. By "limiting magazine capacity to 10 rounds or less," Plaintiffs are "denie[d] . . . the benefits of modern technology and force[d] . . . to use defensive tools from a bygone era." *See* Roberts Decl., Ex. 11 at p. 7, ¶ 16.

60.     The Banned Firearms, being semiautomatic, are distinct from military weapons, which are fully automatic. *See* Supica Decl., Ex. 13 at p. 4, ¶ 10; Roberts Decl., Ex. 11 at P. 1, ¶ 2 Att. A, pp. 6–8. The semiautomatic AR-15, for example, is acknowledged even by Defendants to be the "civilian version" of the military's M-16 rifle. *See* Klein Dep., Ex. 17 at 153:24-154:4.[1]

---

[1] For most of American history, civilians owned the same firearms that were used by the military. Supica Decl., Ex. 13 at pp. 4–5, ¶ 12. For instance, from the Revolutionary War through World War I, Americans owned the same muskets, flint-lock rifles, six-shooters, and bolt action rifles that were used or issued by the military. *Id.* It was the development of the automatic firearm that changed this, with automatic weapons being largely reserved for the military, and their semiautomatic versions being used by civilians. *Id.; see also Staples v. U.S.,* 511 U.S. 600, 602 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon.").

61.     Unlike automatic firearms, semiautomatic firearms will fire only one round with a single trigger pull, the same as a single shot, double barrel, bolt action, pump action, lever action, or revolving firearm. *See* Supica Decl., Ex. 13 at p. 4, ¶¶ 10–11. To fire a subsequent round, the trigger must be released and pulled again. *Id.* at p. 4, ¶ 11. Although many semiautomatic rifles may bear a cosmetic appearance to fully automatic rifles,[2] they are dissimilar in their basic modes of operation. *Id.* Rather, the Banned Firearms are functionally identical to other, more traditional looking commercial semiautomatic rifles. *Id.* Assuming similar launch velocity and barrel twist rate, a projectile launched by an AR-15 rifle is no more or less injurious than if launched by a bolt, pump, lever action, or single-shot rifle. Boone Decl.*,* Ex. 8 at p. 7, ¶ 13. Because semiautomatic firearms shoot only as quickly as the operator can pull the trigger, the Banned Firearms shoot no more quickly than any other semiautomatic firearm, including those explicitly exempted from the Challenged Laws. Some common firearms that are not prohibited by the Challenged Laws fire a greater number of lethal projectiles faster than the Banned Firearms. *See* Supica Decl., Ex. 13 at p. 1 ¶ 2, Att. A at p. 23.

62.     Historical evidence shows that the Challenged Laws will have virtually no effect in combatting crime in Massachusetts. *See* Kleck Decl., Ex. 10 at p. 5, ¶ 10. Homicides committed using a rifle of any kind (much less a Banned Firearm) are extremely rare in Massachusetts and nationally. *See id.*

---

[2] Throughout history, advances in the development of individual firearms for military use and those for civilian use have, for the most part, been the same, causing firearms in the separate sectors to bear some similarities. *See* Supica Decl., Ex. 13 at ¶ 9. For example, improvements in firearm technology tend to be adopted for both military and civilian use. *Id.* As a result, soldiers who become familiar with a particular type of firearm in the service tend to seek out similar type firearms for personal use after leaving the military. *Id.*

63.     FBI Uniform Crime Reporting data indicates that no murders were committed using a rifle in Massachusetts in 2010, 2011, 2012, and 2014. *Id*. Only one murder was committed using a rifle of any kind in 2005, 2007, and 2015, and only two murders were committed using any rifle in 2006, 2008, and 2013. *Id*. In some years (2006, for instance) more than twice as many people were murdered with "hands and feet." *Id*. In sum, a total of eleven individuals were killed with a rifle of any kind from 2005 through 2015 in Massachusetts. *Id*.; *see also* Deposition of David Solet, representative of the Executive Office of Public Safety and Security, Ex. 18 at 51:9-57:7, Ex. 26 (FBI Uniform Crime Reporting data on homicides from 2005 to 2015); *see also* Klein Dep., Ex. 17 at 17:5-8, 49:3-24, 50:1-6, 170:19-21; *see also* Deposition of Michael Halpin, General Counsel for the Massachusetts State Police, Ex. 16 at 49:14-24, 45:24-47:8, Ex. 27 at 5 (Massachusetts State Police statistical data showing that, in 2016, Banned Firearms comprised only 1.5% of total crime guns seized; and in 2015, Banned Firearms comprised only .75% of total crime guns seized); Zani Dep., Ex. 20 at 21:17–22:12.

64.     Defendants acknowledge that they have no comprehensive police data or records system that reflects a link between the Banned Firearms and Magazines and crime, s*ee* Halpin Dep., Ex. 16 at 12:20–13:10, nor do they have proof that the Banned Magazines are used to commit violent crimes in Massachusetts. *See* Klein Dep., Ex. 17 at 52:7-14. Defendants have not identified any reported incidents where Banned Firearms and Magazines have been used in assaults or shootings directed at law enforcement in Massachusetts. *See* Klein Dep., Ex. 17 at 86:23-24; 171:20–21.

65.     A ban on standard capacity magazines holding more than ten rounds will not reduce the number of homicides and violent crimes committed in Massachusetts. *See* Kleck Decl., Ex. 10 at p. 2, ¶ 5 ("My research has found no link between a limit on magazine capacity and the number

of homicides or violent crimes, and no such link can be found in the literature."). Nor will such a ban cause any significant reduction in the number of gun-violence victims. *Id.* at p. 2, ¶ 6.

66.     This is because criminals rarely actually discharge their firearm but rather use the gun only to threaten the victim. *Id.* When criminals do fire their weapons, they usually fire very few rounds. *Id.* at p. 3, ¶ 7. For instance, in a sample of Philadelphia gun homicides, the average number of rounds fired was 2.7 for attacks committed with semiautomatic pistols, and 2.1 for those with revolvers. *Id.* Thus, in the vast majority of instances in which an attacker fires his weapon, the unavailability of magazines with capacities greater than ten rounds would be inconsequential to the number of shots fired by the attacker and also to the number of victims. *Id.*

67.     As a result, "the Challenged Laws aim to fix a small (perhaps non-existent problem) by hindering the self-defense capabilities and endangering the lives of every law-abiding Massachusetts citizen." *Id.* at p. 5, ¶ 10.

**E.     The Notice of Enforcement Broadens the Ban to Apply to Prior Transactions of Firearms That Were Lawful at the Time They Occurred.**

68.     Massachusetts law requires Defendants to inspect records of all firearm transfers each year for violations of law. G. L. c. 140, § 123.

69.     Until the issuance of the Notice of Enforcement, transfers of Massachusetts Compliant Firearms, which were "compliant to the Massachusetts General Laws prior to July 20, 2016," were "considered lawful" by Defendants. *See* Zani Dep., Ex. 20 at 11:10–14, 16–19, 21–24, 12:1–4. Before the Notice of Enforcement was issued, neither Defendants nor any other law enforcement agency took action to halt the transfers of Massachusetts Compliant Firearms. *See* Zani Dep., Ex. 20 at 13:19–14:6; *see also* O'Leary Decl., Ex. 6 at pp. 1–2, ¶ 4; Ricko Decl., Ex. 7 at p. 1, ¶ 3. In fact, between 7,000 and 12,000 "copies or duplicates" were sold in Massachusetts in 2015, Klein Dep., Ex. 17 at 62:8–16, without legal repercussions, *see* Deposition of David

Bolcome, Senior Investigatory for the Office of the Attorney General, Ex. 14 at 22:9–17. Similar

sales occurred in 2013 and 2014. *Id.* at 25:7–9, 16–14; 37:14–17; 38:15–16. At the time, the Notice

of Enforcement had not yet been issued. *See* Klein Dep., Ex. 17 at 72:3–9.

70.     Prior to issuance of the Notice of Enforcement, Plaintiffs were never informed that

the purchase or sale of Massachusetts Compliant Firearms was illegal, and at no time was any

action taken against Plaintiffs by Defendants or any law enforcement agency despite the mandated

records inspection. *See* O'Leary Decl., Ex. 6 at pp. 1–2, ¶ 4; Ricko Decl., Ex. 7 at pp. 1–2, ¶ 3;

Wallace Decl., Ex. 5 at p. 1–2, ¶ 5. Instead, Plaintiffs' transactions of Massachusetts Compliant

Firearms were repeatedly approved. *See* O'Leary Decl., Ex. 6 at pp. 1–2, ¶ 4; Ricko Decl., Ex. 7

at pp. 1–2, ¶ 3; Wallace Decl., Ex. 5 at pp. 1–2, ¶ 5.

71.     Plaintiffs relied upon Defendants' repeated confirmation to ensure that the firearms

they bought and sold were compliant with Massachusetts law. *See* O'Leary Decl., Ex. 6 at pp. 1–

2, ¶ 4; Ricko Decl., Ex. 7 at pp. 1–2, ¶ 3; Wallace Decl., Ex. 5 at pp. 1–2, ¶ 5. Plaintiffs believed

they were engaging in legal transactions. *See* O'Leary Decl., Ex. 6 at pp. 1–2, ¶ 4; Ricko Decl.,

Ex. 7 at pp. 1–2, ¶ 3; Wallace Decl., Ex. 5 at pp. 1–2, ¶ 5.

72.     Plaintiffs' prior transactions of Massachusetts Compliant Firearms consummated

before the effective date of the Notice of Enforcement were in good faith compliance with all

Massachusetts laws and were processed with Defendants' approval at the time they occurred. Klein

Dep., Ex. 17 at 161:16–162:4.

73.     The Notice of Enforcement provides no exception to its application to dealers for

transfers made before July 20, 2016. *See* Notice of Enforcement, Ex. 25 at p. 4.

74.     As a result, all previous transactions consummated by GOAL, On Target, and

Overwatch involving Massachusetts Compliant Firearms now banned under the Notice of

Enforcement could be found to have been illegal sales of firearms under Massachusetts law, as well as federal law that criminalizes sales of firearms not in compliance with state law. *See* 18 U.S.C. § 922(b)(2).

75.     The Notice of Enforcement does not declare that individual owners or licensed dealers who engaged in these transactions were complying with the law at the time they sold Massachusetts Compliant Firearms, nor does it declare that dealers are immune from prosecution or loss of license for selling those firearms. *See* Notice of Enforcement, Ex. 25 at p.4 (stating only that "[t]he Guidance will not be applied to future possession, ownership, or transfer of Assault weapons by dealers, provided that the dealer has written evidence that the weapons were transferred to the dealer in the Commonwealth prior to July 20, 2016" and that "[t]he Guidance will not be applied to possession, ownership or transfer of an Assault weapon obtained prior to July 20, 2016.").

76.     Plaintiffs fear they will be subject to criminal prosecution for their possession and transfer of the Massachusetts Compliant Firearms prior to issuance of the Notice of Enforcement, even though the transactions were legal when they occurred, because of the Notice of Enforcement's retroactive interpretation of the Challenged Laws. *See* Wallace Decl., Ex. 5 at pp. 1–2, ¶¶ 5–6; O'Leary Decl., Ex. 6 at pp. 1–3, ¶¶ 4, 6; *see also* Linden Decl., Ex. 2 at p. 2, ¶ 8; Worman Decl., Ex. 1 at p. 2, ¶ 7; Sawyer Decl., Ex. 3 at pp. 2–3, ¶ 8.

**F.      The Phrase "Copies or Duplicates" As Used in the Ban Is Subject to Differing Interpretations.**

77.     The phrase "copies or duplicates" in the Challenged Laws is not defined in the law itself, nor is the phrase defined in the Federal Ban on which the statute is based or in any other state law or court decision. *See* Klein Dep., Ex. 17 at 123:8-11, 131:1–2.

78.     Massachusetts law requires Defendants to inspect records of all firearm transfers for violations. *See* G. L. c. 140, § 123. By continuously inspecting firearms records and processing tens of thousands of applications for Massachusetts Compliant Firearms from 1998 up until the issuance of the Notice of Enforcement – a period of 18 years – the scope of the phrase "copies or duplicates" in the Challenged Laws was interpreted by Defendants through practice and custom to exclude Massachusetts Compliant Firearms. *See* Remarks of Attorney Gen. Maura Healey, Assault Weapons Ban Press Conference as Prepared for Delivery (July 20, 2016), Ex. 24 at p. 3 (stating that over 10,000 Massachusetts Compliant Firearms were sold in 2015 alone).

79.     The Notice of Enforcement provides two circumstances under which a firearm is a "copy or duplicate" of an Enumerated Banned Firearm. *See supra* at ¶ 11. Massachusetts has no written protocol for determining whether a weapon is a copy or duplicate, other than the Attorney General's Notice of Enforcement. Solet Dep., Ex. 18 at 73:7–12.

80.     No single government official has "primary responsibility" for determining when a weapon constitutes a copy or duplicate. *Id.* at 72:10–12. When asked for the identities of people involved in developing the Notice of Enforcement, Defendants could not pinpoint anyone affiliated with the Massachusetts State Police who was involved in determining whether particular firearms were copies or duplicates. Halpin Dep., Ex. 16 at 18:16–19:5.

81.     The Notice of Enforcement's proposed guidance on the definition of "copies or duplicates" does not clarify the statutory phrase. Political Science professor Robert Spitzer, Defendants' expert in firearms policy could not articulate what certain phrases in the guidance mean, nor could he identify whether one of his own firearms was a "copy or duplicate" under Massachusetts law. *See* Deposition of Robert Spitzer, Ex. 19 at 122:5–18.; 122:13–125:5 ("[T]hat depends on how that phrase is interpreted under the law."). Instead, he stated that he would contact

the Massachusetts State Police to ask them whether a firearm was banned. *Id.* at 127:9–128:7. But, the Massachusetts State Police stated that it does not answer such questions. *See* Halpin Dep., Ex. 16 at 24:9–25:6.

82.     Defendants' witnesses described procedures for determining when a firearm qualifies as a copy or duplicate, ranging from a visual inspection coupled with extensive training to the examination of admittedly incomplete digital records. *Compare* Solet Dep., Ex. 18 at 76:1– 9, Deposition of Michaela Dunne, Director of the Firearms Records Bureau, Ex. 15, 18:11–14 ("Any other firearm that could be considered an assault weapon under the Federal assault weapons definition we wouldn't be able to tell, because we'd have to physically inspect the firearm."), *with* Solet Dep., Ex. 18 at 22:19–23:7 ("[T]here's never been an entry made [in the state records] that says this is a copy or duplicate, this is not a copy or duplicate. There's no tab that you could click that would say give me all the copies or duplicates[.]").

83.     To make an accurate determination of whether a firearm is a "copy or duplicate," a person would need to inspect a weapon's inner workings and various parts, rendering a purely visual assessment incomplete. Bolcome Dep., Ex. 14 at 12:9–11, 49:5–9, 51:17–21; *see also* Halpin Dep., Ex. 16 at 61:21-62:8, 65:14-15, 65:18-66:3 (explaining that determining whether a weapon is "substantially similar" to an Enumerated Banned Firearm requires an analysis of "the internal structure and mechanism of the weapon"). Thus, a person would also need extensive knowledge of every Enumerated Banned Firearm to make an accurate determination.

84.     Most citizens' only resource for clarification is the Commonwealth's website. Klein Dep., Ex. 17 at 118:5–7. If the website cannot provide a clear answer (which happens "[i]n some cases," *see id.* at 178:12–16), Massachusetts requires the person to rely on the seller—or even the manufacturer—to determine whether a particular gun is a copy or duplicate of a banned

firearm. *Id.* at 147:10–20. (Q: How does the citizen wishing to purchase a semi-automatic rifle determine whether or not the internal functional components are substantially similar in construction and configuration to those of an enumerated weapon? A: We expect in the first instance that the gun seller is going to help them make that determination and that the gun seller knows whether the gun, for example, is effectively an AR-15 for all intents and purposes, but if there was any doubt, the manufacturer would know."). Yet, Defendant Healey has accused the gun industry of "openly def[ying]" Massachusetts laws "for nearly two decades." *See* Press Release, AG Healey Announces Enforcement of Ban on Copycat Assault Weapons (July 20, 2016), Ex. 23 at p. 1. Defendant Healey made clear in her remarks when issuing the Notice of Enforcement that the reason the Notice of Enforcement was necessary was because the Defendants do not agree with the determinations made by firearms sellers and manufacturers: "[T]he gun industry has taken it upon itself to interpret our assault weapons ban . . . . My office's action today will give us the full protection of the state assault weapons ban – and not leave it to gun manufacturers' self-appointed interpretation." *See* Remarks of Attorney Gen. Maura Healey, Assault Weapons Ban Press Conference as Prepared for Delivery (July 20, 2016), Ex. 24 at pp. 3–4.

85.    The Attorney General will not answer questions on the issue. *See* Bolcome Dep., Ex. 14 at 40:10–13 (confirming it is not the position of the Attorney General to answer questions about whether a Smith and Wesson MP-15 .22 would be considered a "copy or duplicate" under the Notice of Enforcement).

86.    Even Defendants and their witnesses have difficulty determining how to apply the above-cited tests. For example, in his deposition testimony, the Attorney General's Office was unable to say whether a semiautomatic rifle chambered in a different caliber would be banned under the similarity test. *Id.* at 18:21–22. And the Attorney General's Office was unable to answer

whether a weapon would be banned if it was rendered incapable of semiautomatic fire. Klein Dep., Ex. 17 at 135:23–136:4. Furthermore, police departments in Massachusetts have no policy or written guidance for determining substantial similarity. Halpin Dep., Ex. 16 at 67:15–20, 68:9–15. Because not all officers are "trained on the internal components of the enumerated banned firearms," individual officers without training on the Banned Firearms will be called upon to apply the Notice of Enforcement's technical "similarity" test to determine when probable cause for an arrest exists. *See id*. at 68:23–69:6, 69:8–11, 69:13–18.

87.     The Notice of Enforcement provides that a manufacturer's advertising of a particular firearm will be "relevant" in determining whether it is a "copy or duplicate." *See* Notice of Enforcement, Ex. 25 at 4. But the Notice of Enforcement does not articulate what "relevant" means or how relevance will be used to determine if a firearm is a "copy or duplicate." *Id.* Most police officers do not receive training on the marketing of firearms. Halpin Dep., Ex. 16 at 72:3–7.

88.     The Notice of Enforcement also states that a firearm that qualifies as a "copy or duplicate" will remain a "copy or duplicate," even if it is altered to no longer meet these tests. *See* Notice of Enforcement, Ex. 25 at 4. Plaintiffs cannot even rely on the current configuration of the firearm when trying to determine if a firearm is a banned "copy or duplicate," but must also be aware of the firearm's historical configuration. *See id*. ("If a weapon, as manufactured or originally assembled, is a Copy or Duplicate under one or both of the applicable tests, it remains a prohibited Assault weapon even if it is altered by the seller.").

89.     Plaintiffs are uncertain whether their firearms, or firearms they wish to purchase, constitute a "copy or duplicate" of an "assault weapon," because of the lack of clarity in the Challenged Laws and the Notice of Enforcement. *See* Ricko Decl., Ex. 7 at p. 2, ¶ 5; Chamberlain

Decl., Ex. 4 at p. 1, ¶ 4; O'Leary Decl., Ex. 6 at p. 2, ¶ 5; Worman Decl., Ex. 1 at p. 2, ¶¶ 5, 7;

Sawyer Decl., Ex. 3 at p. 2, ¶ 4.

Dated: December 15, 2017

Respectfully submitted,

/s/ James M. Campbell
James M. Campbell (BBO#541882)
Richard P. Campbell (BBO # 071600)
Campbell Campbell Edwards & Conroy
One Constitution Center
Boston, MA 02129
(617) 241-3000
jmcambpell@campbell-trial-lawyers.com

/s/ John Parker Sweeney
John Parker Sweeney (admitted *Pro Hac Vice*)
T. Sky Woodward (admitted *Pro Hac Vice*)
James W. Porter, III (admitted *Pro Hac Vice*)
Marc A. Nardone (admitted *Pro Hac Vice*)
Connor M. Blair (admitted *Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs, David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost*

**TABLE OF EXHIBITS TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Exhibit No.    Exhibit Title

1.    Declaration of David Seth Worman

2.    Declaration of Anthony Linden

3.    Declaration of Jason William Sawyer

4.    Declaration of Paul Nelson Chamberlain

5.    Declaration of James Wallace

6.    Declaration of Edward O'Leary

7.    Declaration of Charles Ricko

8.    Declaration of Buford Boone

    A.    Expert Report of Buford Boone

9.    Declaration of James Curcuruto

    A.    Expert Report of James Curcuruto

    B.    AFMER Report

    C.    NSSF 2013 Modern Sporting Rifle Comprehensive Consumer Report

    D.    NSSF Firearms Retailer Survey Report 2017 Edition

    E.    NSSF Sports Shooting Participation in the U.S. in 2016 Report

    F.    NSSF Data Compiled and Released in 2017

10.    Declaration of Gary Kleck

    A.    Expert Report of Gary Kleck

    B.    Gary Kleck and Karen McElrath, The Effects of Weaponry On Human Violence, SOCIAL FORCES, 69(3): 669-92 (1991)

C. Reedy, D.C. & Koper, C.S., Impact of handgun types on gun assault outcomes: A comparison of gun assaults involving semiautomatic pistols and revolvers. Injury Prevention, 9, 151-55 (2003)

D. McGonigal, M.D., Cole, J., Schwab, C.W., Kauder, D.R., Rotondo, M.F., and Allgood, P.B., Urban firearm deaths: a five-year perspective, The Journal of Trauma, 35:532-37 (1993)

E. Gary Kleck, Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages, Justice Research and Policy, 17(1) 28-47 (2016)

11. Declaration of Gary Roberts

A. Expert Report of Gary Roberts

B. 2015 New York City Police Department Annual Firearms Discharge Report

12. Declaration of Guy Rossi

A. Expert Report of Guy Rossi

B. 2015 New York City Police Department Annual Firearms Discharge Report

C. Management of Aggressive Behavior Instructor Manual, MOAB Training International

D. Bill Lewinski, Stress Reactions of Lethal Forces Encounters, THE POLICE MARKSMAN, May/June 2002

E. N. Konttinen, D.M. Landers, & H. Lyytinen, Aiming Routines and Their Electrocortical Concomitants Among Competitive Rifle Shooters, 10 SCANDANAVIAN J. MED. & SCI. IN SPORT 169 (2000)

13. Declaration of James W. Supica

A. Expert Report of James W. Supica

14. Transcript of the Deposition of David Bolcome, August 29, 2017

15. Transcript of the Deposition of Michaela Dunne, August 30, 2017

16. Transcript of the Deposition of Michael Halpin, September 15, 2017

17. Transcript of the Deposition of Gary Klein, August 29, 2017

18.     Transcript of the Deposition of David Solet, August 30, 2017

19.     Transcript of the Deposition of Robert Spitzer, October 26, 2017

20.     Transcript of the Deposition of Alan Zani, September 15, 2017

21.     18 U.S.C. 921 (1994)

22.     Legislative History, 139 Cong. Rec. S15459

23.     Press Release of Attorney General Maura Healey dated July 20, 2016

24.     Remarks of Attorney General Maura Healey, Assault Weapons Ban Press
        Conference, As Prepared for Delivery July 20, 2016

25.     Notice of Enforcement

26.     FBI Uniform Crime Reporting Data on Homicides from 2005-2015, Solet EOPSS
        Deposition Exhibit 5

27.     Massachusetts State Police Statistical Data, Halpin Deposition Exhibit 6

28.     Report and Recommendation of the ATF Working Group on the Importability of
        Certain Semiautomatic Rifles

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of December, 2017, that Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment was served on Defendants' counsel via CM/ECF system that will forward copies to Counsel of Record.

/s/ James M. Campbell
James M. Campbell (BBO#541882)
Richard P. Campbell (BBO # 071600)
Campbell Campbell Edwards & Conroy
One Constitution Center
Boston, MA 02129
(617) 241-3000
jmcambbell@campbell-trial-lawyers.com

/s/ John Parker Sweeney
John Parker Sweeney (admitted *Pro Hac Vice*)
T. Sky Woodward (admitted *Pro Hac Vice*)
James W. Porter, III (admitted *Pro Hac Vice*)
Marc A. Nardone (admitted *Pro Hac Vice*)
Connor M. Blair (admitted *Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs, David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost*