```
                                          Volume I
                                          Pages 1-80

       IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS


                                   No. 1:17-cv-10107-WGY

DAVID SETH WORMAN, et al.,
     Plaintiffs,
vs.
CHARLES D. BAKER, et al.,
     Defendants.




            DEPOSITION OF MICHAEL HALPIN
       Friday, September 15, 2017 at 9:40 a.m.
         Campbell, Campbell, Edwards & Conroy
              One Constitution Center
            Boston, Massachusetts 02129




     ----------Jennifer A. Doherty, CSR--------------
              Certified Shorthand Reporter


                   C. J. REPORTING
                   P.O. Box 1373
                 Andover, MA  01810
                    617.763.1725
                 www.cjreporting.com
```

```
 1  Exhibit 2.  What I would like to do here is go
 2  through and just confirm.  Have you seen these
 3  responses before?
 4       A.   Yes, I have.
 5       Q.   And what I would like to do is go through
 6  and confirm the current status of most of these
 7  responses to make sure nothing has changed since
 8  they were originally signed.  I think the best way
 9  to do it is go through one by one here.
10            If you can take a look at the first
11  interrogatory, it asks for incidents in which banned
12  firearms or magazines have been used to commit a
13  crime in Massachusetts.  If you look at Page 3, the
14  response there at the top is that after a number of
15  objections:  "Without limitation, the Colonel states
16  that the murder of seven individuals on December 26,
17  2000 in Wakefield, Massachusetts at Edgewater
18  Technology, Inc., was committed with guns that
19  appear to have included a banned AKA 47 copycat."
20            Am I correct that the Massachusetts
21  State Police does not maintain comprehensive records
22  regarding the number of crimes that have been
23  committed?
24       A.   We do not aggregate them.  We do have
```

1   access to incident reports and other specific
2   documents -- case-specific documents that would help
3   you indicate that, but we don't aggregate or collect
4   that information as a statistic.
5       Q.   No database is maintained of a general
6   information?
7       A.   Correct.  The only closest thing we would
8   have to that is we have an arrest log.  It wouldn't
9   necessarily give you the precise answer to this
10  question.  It would be all crimes, and the
11  information is, were they arrested, what their
12  charge was and their address.
13           That's the public kind of log
14  information that's collected, and that's all kind
15  of -- that would only show you what they were
16  arrested for.  If there were charges amended or
17  whatever brought later, that would be in a different
18  record.
19      Q.   Essentially it would be the reporting
20  officer's log of what the initial charges were?
21      A.   The reporting officer does an incident
22  report, usually.  The arrest log is something
23  different.  That's a database collected by the
24  department.  We have what's called an administrative

1       A.    I would say they should be, and generally,
2   yes.
3       Q.    As we sit here today, you're not aware of
4   any incidents in which a banned firearm or magazine
5   was used in a shooting that was determined to be in
6   self-defense?
7       A.    I am not.
8       Q.    If you can go on to Interrogatory No. 4,
9   it asked for investigations, arrests, or convictions
10  of persons for a possession of a banned firearm or
11  magazine, and the Colonel's response is the incident
12  marked in Interrogatory No. 1 that we discussed.  Do
13  you have any additional information that would be
14  responsive to that interrogatory?
15      A.    No.
16      Q.    The next interrogatory asked for the
17  identity of person or persons responsible for or
18  participated and determined whether a particular
19  firearm is a copy or duplicate of an enumerated
20  banned firearm.
21            After objections, the Colonel's
22  response is he's unaware of any persons employed
23  with the Massachusetts State Police who were
24  responsible for development of the Attorney

1   General's Enforcement Notice.  Is that accurate?
2        A.   Yes, I believe it is.
3        Q.   As we sit here today, are you aware of
4   anyone that was involved?
5        A.   No, I am not.
6        Q.   The next interrogatory asks for any person
7   or persons responsible for participating in the
8   preparing of a list of guns that are not assault
9   weapons and related questions and answers published
10  by the Attorney General.
11            Are you familiar with the list of
12  guns that are not assault weapons and the related
13  questions and answers that are currently on the
14  Attorney General's website?
15       A.   Yes, I am familiar with it.
16       Q.   The Colonel's response is that he's not
17  aware of anyone that was responsible or participated
18  in a substantial way with the creation of that list
19  and the answers to the questions.  Is that accurate
20  as we sit here today?
21       A.   Yes.
22       Q.   The next interrogatory asks for the person
23  or persons responsible for the 2016 review that led
24  the Attorney General to issue the Notice of

Michael Halpin
September 15, 2017

24

```
 1   limited to the Notice of Enforcement.
 2              And the Colonel's response here is
 3   that no particular person at the Massachusetts State
 4   Police is responsible for responding to such
 5   questions, but a number of Massachusetts State
 6   Police personnel could receive random inquiries to
 7   which they would respond.  So I have a number of
 8   questions about that.
 9              Number one, are individual
10   Massachusetts State Police Troopers or Officers
11   permitted to answer questions about the scope of
12   this law?
13      A.   We generally discourage our officers from
14   giving out legal advice to people; that being said,
15   you know, we have 2,300-plus members, and when
16   citizens come in and ask questions, I think they do
17   try to be as helpful as they can.
18              If a matter is very clear and can be
19   explained to somebody, I think they will sometimes
20   offer a piece of advice.  Sometimes they will direct
21   them to other people within the agencies.  We
22   sometimes get people referred from a barracks to the
23   legal section and we generally tell people, We're
24   not your lawyers, we can't give you legal advice.
```

1  That's all meant to prevent, you know, somebody
2  violating the law and using the department as the
3  justification for why they did what they did.
4            So we generally discourage it, both
5  our civilians and our uniform members from giving
6  what we could consider legal advice.
7      Q.   Are you aware of any inquiries that have
8  come in to anyone within the Massachusetts State
9  Police about the scope of the challenged laws or the
10 Notice of Enforcement?
11     A.   I am not.
12     Q.   Hopefully that will streamline the rest of
13 what we're going to go through here today since we
14 did that up front.
15           What I want to talk to you about
16 right now are some of the attributes of the banned
17 firearms and banned magazines.  And just so we're
18 clear, when I refer to banned firearms, I'm talking
19 about firearms that are banned under Massachusetts
20 law as either assault weapons, copies or duplicates
21 or that failed the features test that's incorporated
22 in federal law.  Does that make sense to you?
23     A.   Yes.
24     Q.   Does the Massachusetts State Police have a

1   crime but to hopefully prevent it.
2           But this particular function was
3   given to the Fusion Center to read a report of the
4   end of each year specifying, you know, pursuant to
5   what was submitted by local law enforcement and the
6   State Police certain statistics on firearms and
7   firearms activity.
8       Q.   So this report represents then an
9   accumulation of data by the law enforcement agencies
10  throughout Massachusetts, at least those who have
11  participated in this?
12      A.   Yes.  Again, it's a little bit like the
13  RAM system.  It's dependent on the participation of
14  those providing the data.
15      Q.   Do you know if all law enforcement
16  agencies are required to participate?
17      A.   I believe I would have to look
18  specifically, if I may.  I think MGL 140, Section
19  131Q.  The statute does say "shall" and requires all
20  licensing authorities to report statistical data.
21      Q.   So theoretically there should be a
22  comprehensive report?
23      A.   Yes.
24      Q.   If I could turn your attention to Page 5,

```
 1   which is Bates numbered AGO015307.  In the third
 2   paragraph on that page it states that:  "In 2016,
 3   shotguns and rifles accounted for 13 percent or 178
 4   guns, and assault rifles comprised 1.5 percent or 22
 5   guns of the total crime guns seized."  Do you see
 6   that?
 7        A.   Yes.
 8        Q.   Do you know what it means when it says
 9   "total crime guns seized"?
10        A.   I'm a little embarrassed to say, maybe I
11   don't.
12        Q.   I didn't either.  Don't feel embarrassed.
13        A.   I have what I believe to be an
14   understanding of it, but I think, again, the crime
15   guns refers to, I believe, any weapon that is
16   required to be statistically reported on.  I think
17   that's what that reference means, but I didn't
18   produce this report and I didn't write the report
19   and I would qualify my answer as saying that's my
20   understanding of what it is.
21        Q.   So we don't know whether the guns that
22   were seized were used in a violent crime or whether
23   there was a possessory offense and they were seized
24   as a result of that?
```

```
 1        A.   I believe that would be true.  Again,
 2   that's my understanding.  My understanding is that
 3   the statistics are of all weapons seized regardless
 4   of the circumstances.  So my belief would be that
 5   crime gun seized just means it was seized because it
 6   was either unlawfully possessed, potentially used in
 7   a crime, whatever it gets reported.  That would be
 8   my understanding of it.
 9        Q.   Who would know exactly what that
10   includes?
11        A.   I think Lieutenant Zani presently -- Alan
12   Zani presently runs the crime gun unit.  His
13   subordinates and his superiors at the Division of
14   Investigative Services would be the people who had a
15   hand in drafting and authorizing this document,
16   would probably be better equipped to answer that.
17        Q.   And this document comes out every year?
18        A.   It has since I believe 2015 or '16.  I'm
19   not even sure.  I think it was -- there may have
20   been one in '14.
21             I know the first years were pretty
22   sparse and incomplete because of the logistics
23   surrounding reporting from everyone and getting that
24   centralized diffusion, so I don't recall if it was
```

1    A.   He may have.  He's potentially an end user
2  of that data, not somebody that's involved in the
3  logistics of it, but I think he may be able to shed
4  more light on it than I can.
5              MR. PORTER:  Excuse me, just a
6  reminder to let Mr. Nardone finish before you start,
7  just for the benefit of the court reporter.
8              MR. NARDONE:  Thank you.
9  BY MR. NARDONE:
10   Q.   In that same paragraph it states that
11  under --
12              MR. PORTER:  Can you identify it for
13  the record?
14   Q.   On Page 5 of what has been marked as
15  Exhibit No. 6, in the third paragraph of Page 5 it
16  states that in 2016 assault rifles comprised 1.5
17  percent of total crime guns seized, and in 2015
18  those percentages -- the percentage for assault
19  rifles was .75 percent.  To your knowledge, are
20  those numbers accurate?
21   A.   I have no knowledge of the accuracy of the
22  numbers.  Again, my belief is it's what's reported.
23  The department -- I have no reason to disbelieve the
24  department received those statistical numbers.

1  be more difficult or less difficult than others but
2  it's still the same test that they need to employ;
3  meaning every officer has to run through the statute
4  to see if the elements of a crime are met or
5  compliance has been met.
6      Q.   Was there a written definition of what
7  constitutes a copy or duplicate prior to the Notice
8  of Enforcement?
9              MR. PORTER:  Objection.
10     A.   I don't recall what the statute says about
11 copy or duplicate and how it uses that terminology,
12 and I think that the federal -- I don't recall
13 what's in the federal statute, but I do believe
14 there may be use of the word "copy or duplicate" of
15 any caliber, I think is the phraseology.  So then
16 obviously you have the tests about internal
17 mechanisms and their shared features.
18              So, again, it's a difficult analysis,
19 but it's an analysis that has to be done in order to
20 determine if there was a violation.
21     Q.   You said there was an internal analysis
22 component.  I don't want to put words in your mouth.
23 What exactly did you mean with that?
24     A.   Again, I haven't committed the statute to

```
 1   memory.  I thought -- I think, you know, again,
 2   there are enumerated banned weapons.  There are
 3   weapons that they share or have certain features and
 4   elements, they are considered banned, and then I
 5   believe a weapon is a copy, it's internal -- fires
 6   the same way as basically the same weapon, then it
 7   would also be banned or not banned based upon its
 8   shared features.
 9        Q.   I'm going to hopefully provide more
10   structure to this.
11             MR. NARDONE:  Can you mark this as an
12   exhibit?
13             (Exhibit No. 8 marked for
14   identification.)
15   BY MR. NARDONE:
16        Q.   If you can take a moment to refresh your
17   recollection as to the actual statute in
18   Massachusetts, which I believe is on Pages 1 and 2
19   and maybe even some on 3 of this document.  Let me
20   know when you've finished looking at it.
21        A.   (Complies.)
22        Q.   Drawing your attention to Page 1, the
23   bolded language in the first indented paragraph
24   there.  It says "or copies or duplicates of the
```

```
 1                MR. PORTER:  Exhibit 8?
 2                MR. NARDONE:  Yes.
 3       Q.   And we're going to go through these tests
 4   kind of seriatim.  At the bottom underneath
 5   "guidance" it states that -- it provides a couple of
 6   tests for determining whether a firearm is a banned
 7   copy or duplicate, the first being the similarity
 8   test.
 9                If you can take a second to read that
10   and refresh your recollection, make sure you
11   understand rather than reading it all for the court
12   reporter.
13       A.   (Complies.)  Okay.
14       Q.   What does "substantially similar" mean in
15   that test?
16                MR. PORTER:  Objection to the form of
17   the question.
18       A.   I don't know what it meant from the
19   author.  What it means to me is we're looking for --
20   you know, in trying to determine a copy or a
21   duplicate substantial similarities, and I think
22   "substantial" would mean something that is not
23   inconsequential or meaningless but relates to how
24   the weapon is used, what its capabilities are, and
```

1  also, like I said, the internal structure and
2  mechanism of the weapon.  That's how I would
3  interpret it.
4       Q.   What would a law enforcement officer look
5  at to make that kind of a determination?
6            MR. PORTER:  Objection to the form of
7  the question.
8       A.   Again, I would say officers -- you know,
9  they do receive a lot of training in the weapons.
10 Some are more familiar than others, obviously, with
11 certain weapons so they might have their own
12 understanding.  They might possess certain
13 knowledge, but, again, they have to -- you know, if
14 they're going to seize a weapon, they would have to
15 have probable cause to believe.  I'm not sure making
16 an ultimate determination is the same as forming
17 probable cause.  So when an officer believes, based
18 upon whatever information is available, they have a
19 copy, they might appropriately seize the weapon and
20 make an arrest, and that could later be determined
21 by a ballistition or something that, you know,
22 You're wrong.  This is entirely different.  This is
23 only capable of shooting, you know, one bullet at a
24 time and it's not a banned weapon.

```
 1              So there could be a follow-up to that
 2   or there could be enough information available to
 3   the officer either through observation evidence or
 4   personal knowledge of the weapon to make that
 5   decision.
 6        Q.   Is there any written policy that officers
 7   would employ to make these kinds of
 8   determinations?
 9        A.   Well, we do have written policies
10   involving probable cause.  They're mostly guided by
11   Massachusetts case law and federal case law on that,
12   but it's pretty much the same for everybody.  In
13   order to make an arrest for a receiver you need to
14   have that probable cause to effectuate the arrest.
15        Q.   In reference specifically to probable
16   cause for an arrest of a possession of a copy or
17   duplicate, is there any policy for determining
18   substantial similarity that is employed by the
19   department?
20        A.   Not that I am aware of.
21        Q.   You stated a little a bit earlier --
22        A.   I should stop you, or I should qualify my
23   own statement.  Are we talking about -- I mean, we
24   now have additional guidance here, so the department
```

1  would obviously follow the statute and utilize the
2  guidelines from the Attorney General in order to do
3  that, so now the test would be -- the department
4  hasn't, I don't think, promulgated this as an
5  official policy, but it would certainly, as an agent
6  of the Commonwealth, use the guideline for the
7  Attorney General to determine if they have a
8  violation of the law.
9      Q.  Maybe I wasn't particularly clear there.
10 I was more focused than that.  I get you would apply
11 this generally, but in applying the actual specific
12 test that's under similarity test, is there any
13 written guidance to the officers on how to apply
14 that particular test?
15     A.  No, not that I'm aware of.
16     Q.  I don't want to put any words in your
17 mouth, but I believe you said earlier one of the
18 factors an officer would use in making these
19 determinations is their training.
20         Are all officers trained on patrol
21 rifles?
22     A.  No.
23     Q.  Are all officers trained on the internal
24 components of the enumerated banned firearms?

```
 1        A.   Not to my knowledge.
 2        Q.   You would agree with me that the
 3   individual officer's knowledge of the internal
 4   workings of an enumerated firearm will vary from
 5   officer to officer depending on their personal
 6   experiences?
 7             MR. PORTER:  Objection.
 8        A.   I think that's possible, yes.
 9        Q.   So individual officers may use different
10   factors to come to a determination if there is
11   probable cause for an arrest then?
12             MR. PORTER:  Objection.
13        A.   Yes, I think I stated earlier, I think,
14   every officer has to make their probable cause
15   determination based upon what is presently
16   observable in front of them and what they know.  So
17   the tests for that varies based upon the
18   circumstances they find themselves in.
19        Q.   If you turn over to the next page of the
20   same document, Exhibit 8.
21        A.   I'm sorry, where?
22        Q.   The next page.
23             MR. PORTER:  What page?
24        Q.   Page 4, Exhibit 8.
```

```
 1   in making that determination if you're dealing with
 2   a copy or a duplicate.
 3        Q.   Do your officers receive training on the
 4   marketing of firearms?
 5        A.   Again, as you phrase it, I would say
 6   possibly some do and some don't.  I would say most
 7   don't.
 8        Q.   The ones who do, what kind of training
 9   would that be?
10        A.   Again, prior to -- we have now a crime gun
11   unit.  Prior to that we had a firearms licensing
12   unit.  Individuals assigned to there are expected to
13   be aware of and have knowledge specific to firearms
14   laws and that may include some training in exposure
15   to the marketing end or capabilities of certain
16   weapons, that kind of thing.
17        Q.   Do your patrol officers have that kind of
18   training?
19        A.   Not to my knowledge.  Some may.  It's a
20   bit of an aside, but a lot of our officers have
21   particular interests in certain things, such as
22   firearms, and some of them do a lot of their own
23   independent training and teach on the side.  Some of
24   them teach, you know, courses that -- either through
```