**Gary Klein**
**August 29, 2017**

```
 1                                      Volume I
                                     Pages 1-188
 2           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 3
                             No. 1:17-cv-10107-WGY
 4

 5   DAVID SETH WORMAN, et al.,
           Plaintiffs,
 6   vs.

 7   CHARLES D. BAKER, et al.,
           Defendants.
 8

 9

10

11

12            DEPOSITION OF GARY KLEIN
          Tuesday, August 29, 2017 at 9:10 a.m.
13         Campbell, Campbell, Edwards & Conroy
                One Constitution Center
14             Boston, Massachusetts 02129

15

16

17
       ----------Jennifer A. Doherty, CSR--------------
18            Certified Shorthand Reporter

19

20
                    C.J. Reporting
21                  P.O. Box 1373
              Andover, Massachusetts 01810
22               617-763-1725
               cjr@cjrreporting.com
23

24
```

EXHIBIT
17

1      A.    No, I don't.  I'm not aware of a compiled

2   source that would allow me to get such information.

3   I'm aware of some incidents but not a compiled set

4   of data.

5      Q.    How many incidents are you aware of?

6      A.    I think most prominently I'm aware of the

7   Edgewater Technologies shooting.  It happened in

8   Wakefield, Massachusetts in 1999.

9      Q.    And what firearms were involved in that?

10     A.    To the best of my knowledge, it was an AK

11  47 of some type.

12     Q.    Do you know if that was subject to any ban

13  at the time?

14     A.    No, and that's one of the problems with

15  the question your asking.  It's hard to know without

16  examining a weapon and getting its manufactured date

17  whether the weapon used particularly was banned.

18  It's easier to know what the category of weapons was

19  banned, and certainly at the time AK 47s were banned

20  in Massachusetts.

21     Q.    At the time they were also banned

22  federally, correct?

23     A.    That's right.

24     Q.    So they were banned nationwide as a

1  deposition only, and obviously the responses to this

2  document we want to make sure we agree to our

3  terminology.  Is that fair?

4                    MR. PORTER:  Yes.

5  BY MR. SWEENEY:

6       Q.   My question was:  Can we agree that when

7  we refer to "banned magazine," is refers to all

8  magazines included in the definition of large

9  capacity feeding device pursuant to Massachusetts

10 General Laws Chapter 140, Section 121?

11      A.   Yes.

12      Q.   And when we refer to "challenged laws" in

13 this deposition, can we agree we'll be referring to

14 Massachusetts General Laws Chapter 140, Sections 121

15 and 131M?

16      A.   It may depend on the context, but yes.

17      Q.   When we refer to "semi-automatic," can we

18 agree we will be referring to the operating

19 mechanism of a firearm which only a single round is

20 discharged each time the trigger is pulled?

21      A.   Yes.

22      Q.   When we refer to "enumerated banned

23 firearm," we will referring to firearms listed by

24 name, model, make, manufacturer in Massachusetts

1  previously in your testimony today?

2      A.   Yes.

3      Q.   And as you sit here today, do you know of

4  any other incidents not identified in this

5  interrogatory response that involves a banned

6  firearm or banned magazine used to commit a crime in

7  Massachusetts?

8      A.   It's a hard question to answer because the

9  records are not compiled.  I'm aware of some records

10 that were produced in connection with the EOPSS

11 response to the interrogatory request sent to

12 them.

13     Q.   Are you referring to the Attachment A that

14 they provided to their discovery response?

15     A.   Yes.

16     Q.   And other than that, as a result of your

17 review you did and you described previously, are

18 there any other specific incidents that you can

19 identify?

20     A.   There are many incidents from outside

21 Massachusetts which involved firearms that are

22 banned in Massachusetts.

23     Q.   I understand that from your previous

24 response, but my question is:  Are there any other

**Gary Klein**
**August 29, 2017**                                                                  **50**

1  incidents involving the use of those firearms in

2  Massachusetts to commit a crime other than

3  identified in the response to Interrogatory 1?

4      A.   I have no doubt that there are other

5  incidents, but there is no readily available way to

6  identify them with precision.

7      Q.   Now, directing your attention to the

8  second interrogatory referring to any incident which

9  more than ten shots were fired by a single criminal

10  perpetrator in a single incident in Massachusetts,

11  again, you identify the Wakefield, Massachusetts

12  event, and that indicates 37 rounds were used by the

13  perpetrator.  How many firearms were used?

14      A.   It's unclear.

15      Q.   How many magazines were used?

16      A.   It's unclear.

17      Q.   Do you know what the capacity of the

18  magazines was?

19      A.   No.

20      Q.   There is a second incident here involving

21  East Boston which says, "An October 12, 2016,

22  incident in East Boston resulted in injuries to two

23  police officers.  The perpetrator appeared to fire

24  more than ten rounds."

**Gary Klein**
**August 29, 2017**                                                          52

 1  stated.   The East Boston incident was not

 2  investigated or prosecuted by the Attorney General,

 3  so we would largely be -- to start answering that --

 4               MR. SWEENEY:   It is bad enough -- off

 5  the record.

 6               (Discussion off the record.)

 7       Q.   Are you aware of any other incidents,

 8  other than the two identified here, in which more

 9  than ten shots were fired by a single criminal

10  perpetrator in a single incident in Massachusetts?

11       A.   I am confident that there are other

12  incidents, but again, it would be difficult to

13  identify them based on records available to the

14  Attorney General.

15       Q.   Now, Interrogatory No. 3 on Page 10 asked

16  to identify any incident in which an individual used

17  a banned firearm or banned magazine in self-defense

18  in Massachusetts.

19               After objections, "The AG states she

20  has no non-privileged information that is responsive

21  to this interrogatory at this time."

22               I take it that you're not aware of

23  any such incident?

24       A.   I am not.

**Gary Klein**
**August 29, 2017**                                                      53

1     Q.    And that would include use by law

2  enforcement officers?

3     A.    Correct.

4     Q.    To your knowledge, law enforcement

5  officers use banned firearms, correct?

6                MR. PORTER:  Objection.

7     A.    From time to time, yes.

8     Q.    They also use banned magazines, correct?

9     A.    I'm less certain that that's true.

10  Probably.

11     Q.    Probably they use them?

12                MR. PORTER:  Well --

13     A.    Yes.  It is very hard for me to know --

14  just to amplify this answer and make it clear, it's

15  very hard for me to know which among magazines any

16  particular law enforcement officer would use.

17     Q.    In your review of firearms that began on

18  October 2015, was your focus ever the capacity of

19  the magazines used in firearms?

20     A.    At some level I guess the answer is yes.

21     Q.    Did you learn or review what the standard

22  issue capacity magazine for the Massachusetts State

23  Police or other law enforcement agencies in

24  Massachusetts is?

1   that were deemed state complaint?

2                   MR. PORTER:  By the manufacturers,

3   yes.

4        A.   In what time period?

5        Q.   Ever.

6        A.   No.

7        Q.   How many in 2015?

8        A.   We have an estimate of the number of

9   weapons which we believe are copies or duplicates of

10  enumerated weapons.  Some of them were deemed state

11  compliant by the manufacturer; others weren't.

12       Q.   And what is your estimate of how many of

13  those firearms were sold in Massachusetts in 2015?

14       A.   7,000 to 12,000 would be the estimate, and

15  I would note there is some complications with

16  estimating in this issue.

17       Q.   There is a statement a couple lines above

18  the one we were just focused on.  It said, "But

19  despite the laws on our books that ban these

20  weapons, more than 10,000 of them were sold here in

21  Massachusetts last year alone."  Do you see that?

22       A.   I do.

23       Q.   What is the basis, to your knowledge, of

24  that 10,000 number?

1   terms, I would say clones of AR 15 or AK 47 or near

2   clones would probably be more accurate.

3        Q.   When you began your review in October of

4   2015, you did not have to guide you in that review

5   the tests for copies and/or duplicates that appear

6   in the July 20, 2016 Notice of Enforcement.  Am I

7   correct?

8        A.   We did not have that definition, that's

9   correct.

10       Q.   And am I to understand that the definition

11  you used of copies and/or duplicates in conducting

12  your compliance review was clones of enumerated

13  firearms?

14                 MR. PORTER:  Objection to the form.

15       A.   You know, what we were looking for are the

16  guns that everybody in the gun community understands

17  to be AR-15s or AK-47s even if they're not labeled

18  Colt 15 or Avtomat Kalashnikov AK-47s.

19       Q.   Did that complete your response?

20       A.   Yes.

21       Q.   It says: "The AG did not submit a written

22  report of these findings to any other agency"; is

23  that correct?

24                 MR. PORTER:  Objection to the form.

1          A.    At some level, yes.

2          Q.    So to what extent did your review involve

3    assaults on law enforcement officers with banned

4    firearms or magazines?

5          A.    Publicly available information.

6          Q.    That would be the same publicly available

7    information you described earlier; media reports and

8    some publicly available journal articles?

9          A.    Those kinds of things, yes.

10         Q.    And am I correct that those are -- those

11   publicly available documents are document that it's

12   your understanding would be produced to us if they

13   have not been produced to us already?

14         A.    I don't think we turned up any reports in

15   Massachusetts, so I'm not sure there would be

16   documents.

17         Q.    Other than perhaps the East Boston

18   incident that we talked about in -- I believe it was

19   in Interrogatory 2 or 3, are you aware of any

20   incidents in which banned firearms or magazines have

21   been used to assault law enforcement officers in

22   Massachusetts?

23         A.    Not in Massachusetts, but there are many

24   reports nationally.

1  2016 can be sold in Massachusetts by an individual

2  gun owner?

3      A.   Yes.

4      Q.   What have you responded?

5      A.   The typical answer is:  We address this

6  question on the website.  Here's the web address.

7  That should answer your question.

8      Q.   Have there been inquiries about whether or

9  not an individual can sell an assault weapon

10 obtained prior to July 20, 2016 to a dealer in

11 Massachusetts?

12     A.   To a dealer?

13     Q.   Yes.

14     A.   I can't say for sure.

15     Q.   We talked earlier about the interrogatory

16 answer that listed the individuals who were involved

17 in preparing the Notice of Enforcement, and you

18 confirmed that those were the individuals.  I

19 noticed that the Attorney General Maura Healey's

20 name did not appear on that list.

21          Did she have any involvement in

22 preparing the Notice of Enforcement?

23     A.   Did she have any involvement?  Yes.

24     Q.   What was her involvement?

 1   if we can get where we need to get.

 2                You would agree with me there are two

 3   tests that are set out under guidance that

 4   alternatively may determine whether an assault

 5   weapon is banned as a copy or duplicate of the

 6   enumerated weapons.  Am I correct?

 7        A.   Yes.

 8        Q.   Now, those tests do not appear in the

 9   underlying statute that bans assault weapons in

10   Massachusetts, correct?

11        A.   Correct.

12        Q.   So what I'm asking you is where did the

13   language in these two tests come from?  Where did

14   you get them?

15        A.   As written by a group of people that I

16   have identified for you in the interrogatory

17   answers.

18        Q.   So it was written by that, essentially,

19   committee, that group, all those individuals that

20   are listed as having input in the Notice of

21   Enforcement?  Is that your testimony?

22        A.   Everyone had some input, people at

23   different levels, but yes.

24        Q.   Were there any sources or authorities,

 1     A.   I agree those tests are not in the

 2   statute.

 3     Q.   Is there anything in this guidance that

 4   gives my client assurance that those tests won't be

 5   applied to any transactions that occurred prior to

 6   the Notice of Enforcement?

 7     A.   I think that my answer is the same as the

 8   last one I gave.  It's the two paragraphs at the end

 9   of Paragraph 4, limiting the application of the

10   enforcement notice.

11           MR. PORTER:  End Page 4?

12           THE WITNESS:  End of Page 4.

13           MR. PORTER:  You said Paragraph 4.

14     A.   Page 4, sorry.

15     Q.   When I tried to ask what they meant, you

16   were instructed not to answer on grounds of

17   privilege.  So I'm trying to understand what those

18   two application paragraphs mean and all I'm hearing

19   is, I'm instructed not to answer on the grounds of

20   privilege.  So --

21     A.   May I ask a question?

22           MR. PORTER:  Again, impose the

23   objection because it's asking for a commitment in

24   advance or at least an answer in advance to a

1   weapon ban, and they go over to the top of Page 2,

2   and the third little i says "otherwise rendered

3   permanently unable to be designated as

4   semi-automatic assault weapon."  That would be an

5   exception from the assault weapon ban, correct?

6        A.   Yes.

7        Q.   And so if a semi-automatic firearm was

8   rendered unable to be designated as a semi-automatic

9   assault weapon, it would no longer be subject to the

10  ban, correct?

11       A.   I'm confused.  The exception you're

12  reading requires that the weapon be rendered

13  permanently inoperable or otherwise permanently

14  unable to be designated as a semi-automatic assault

15  weapon.

16       Q.   Right.  Then it would no longer be subject

17  to the ban, correct?

18       A.   Yes.

19       Q.   So it would no longer be a banned

20  firearm?

21       A.   As I sit here, I don't know that I know

22  the answer to that question as a matter of law.

23       Q.   So if an enumerated firearm was rendered

24  incapable of semi-automatic fire, it would no longer

1  be subject to the ban because it would no longer be

2  designated as a semi-automatic assault weapon?

3      A.   I guess I'm not sure that I know, as a

4  legal matter -- I'm really not trying to split

5  hairs, I want to be sure I don't say something that

6  certainly wouldn't be the policy of the office --

7  that if someone bought a semi-automatic assault

8  weapon and 15 minutes before prosecution rendered it

9  inoperable, then therefore they no longer have

10  violated the law, so I want to be clear enough about

11  that.  I'm not able to answer that question.  Does

12  that make sense?

13      Q.   No, not at all.

14           MR. PORTER:  Well, wait a minute.

15      A.   It's for personal --

16      Q.   I mean, you just hypothecated a bizarre

17  instance.  I'm talking generally speaking --

18      A.   That's not at all bizarre.

19      Q.   -- if a firearm -- if a firearm is

20  rendered unable to fire semi-automatically, would

21  that make it no longer a banned assault weapon?

22           MR. PORTER:  I'll object to the

23  question, the form of the question, and I also

24  believe it's been asked and answered.

1  weapon as the manufacturer publishes them.

2      Q.   And what is it about the specs that the

3  Office of the Attorney General relies upon to

4  determine whether or not the internal functional

5  components are substantially similar in construction

6  and configuration?

7      A.   Whether the specs suggest that the weapon

8  is substantially similar in construction and

9  configuration.  You know -- let me stop there.

10     Q.   How does the citizen wishing to purchase a

11 semi-automatic rifle determine whether or not the

12 internal functional components are substantially

13 similar in construction and configuration to those

14 of an enumerated weapon?

15     A.   We expect in the first instance that the

16 gun seller is going to help them make that

17 determination and that the gun seller knows whether

18 the gun, for example, is effectively an AR-15 for

19 all intents and purposes, but if there was any

20 doubt, the manufacturer would know.

21     Q.   So have you provided, you, the Office of

22 the Attorney General, provided any guidance to

23 dealers in Massachusetts on how to determine whether

24 or not internal functional components are

 1        A.    Yes.

 2        Q.    On the top of Page 3, the third paragraph:

 3  "These deadly assault weapons were originally

 4  designed for military combat."  Do you see that?

 5        A.    Yes.

 6        Q.    Do you agree with that statement?

 7        A.    Yes.

 8        Q.    What military service do you know uses

 9  semi-automatic rifles?

10        A.    The United States.

11        Q.    Really?  Which military service?

12        A.    The M4 weapon which is used certainly by

13  the Marines, probably by the infantry, is a

14  semi-automatic weapon that also has a burst mode

15  which allows it to fire three shots with one trigger

16  pull, but it's not an automatic weapon.

17        Q.    A burst mode is three shots with the pull

18  of one trigger, correct?

19        A.    That's my understanding, yes.

20        Q.    It is three shots that fire automatically

21  with the pull of one trigger although it is not

22  fully automatic in the sense that it continues to

23  fire bullets until the magazine is empty so long as

24  the trigger is depressed?

 1        A.    Correct.

 2        Q.    These firearms that are banned in

 3   Massachusetts for civilian use are used by your law

 4   enforcement officers, correct?

 5        A.    I don't know if I would agree with the

 6   term "used."  They're available to law enforcement

 7   officers.

 8        Q.    Well, aren't they standard issue for some

 9   of your law enforcement agencies?

10        A.    Yes, but there are weeks of training

11   before they are issued and there are very specific

12   instructions, most of which prohibit their use

13   rather than encourage their use.

14        Q.    So your law enforcement officers are armed

15   with military weapons for their policing of

16   Massachusetts citizens, in your opinion then?

17        A.    They are armed with AR-15s in most

18   cases.

19        Q.    Which are or are not military weapons?

20        A.    They're weapons that are based on designs

21   of weapons that were first manufactured for military

22   purposes, yes.

23        Q.    But the AR-15 is the civilian version of

24   the firearm that was manufactured for military

 1  purpose, correct?

 2      A.   Yes, although it still has most of the

 3  features other than automatic follow of the military

 4  weapon.

 5      Q.   And what are those features other than

 6  fully automatic firearm?

 7      A.   Are you asking from a technical

 8  perspective?

 9      Q.   Yes, you just said.  What are those

10  features you're referring to?

11      A.   Well, you can fire a lot of shots very

12  quickly.  It really is -- just the difference is

13  that you have to pull the trigger as quickly as you

14  can and the shots will fire.  There is typically a

15  semi-automatic mechanism that operates very

16  efficiently.

17              The ammunition is the same or

18  similar.  The magazine construction and designed is

19  the same or similar.  The way in which it is fired

20  and the availability of sighting mechanisms is the

21  same or similar.  The penetrating capacity is the

22  same or similar.  The velocity of the ammunition as

23  it leaves the weapon is the same or similar.  I'm

24  sure that's not an exhaustive list.

1        A.    "To guns," yes.

2        Q.    Is that a correct statement of the

3  qualification on the guidance that's in the Notice

4  of Enforcement?

5        A.    I think so, yes.

6        Q.    By this directive it's meant the Notice of

7  Enforcement and particularly the guidance on the

8  definition of copies and duplicates, correct?

9        A.    I'm sorry.  I don't understand the

10  question.

11        Q.    So when this sentence says, "So this

12  directive will not apply," "this directive" means

13  the Notice of Enforcement and specifically the test

14  for copies or duplicates of assault weapons?

15        A.    As we discussed, yes.

16        Q.    So am I safe in concluding from the

17  Attorney General's statement here that the test for

18  what is a copy or duplicate will not be applied to

19  any guns bought or sold before July 20, 2016?

20        A.    The enforcement notice won't be applied,

21  correct.

22        Q.    When you say "enforcement notice," you're

23  including the guidance on the two tests for

24  determining whether or not a firearm is a copy or

 1  duplicate of an assault weapon?

 2      A.   Yes, and further to clarify, we are

 3  referring here to the two paragraphs at the end of

 4  Page 4 of the enforcement notice.

 5      Q.   So if one of my client dealers has

 6  purchased a firearm in the past and sold it and no

 7  longer is in possession of it, this directive will

 8  not be applied to those guns?

 9      A.   A directive would not be applied but the

10  assault weapon ban may be, the statute may be.

11      Q.   Because it might otherwise apply?

12      A.   Yes.

13      Q.   What was the definition of copies and

14  duplicates that was used prior to the Notice of

15  Enforcement test for copies or duplicates?

16              MR. PORTER:  Objection as to form.

17      A.   I'm sorry, can I get the question read

18  back?

19              MR. SWEENEY:  Read the question

20  back.

21              (The question was read back.)

22      A.   Could you rephrase the question?

23      Q.   You said the tests that are in the Notice

24  of Enforcement won't be used for anything prior to

 1        Q.    Magazines that are banned, do you have any

 2    information about how many of them are estimated to

 3    be in circulation in the United States?

 4        A.    No.

 5        Q.    Would the number of greater than, you

 6    know, a hundred million of those magazines surprise

 7    you?

 8        A.    I don't have any basis to know.

 9        Q.    Do you have any information to disagree

10    that there are more than 50 percent of all magazines

11    sold in the United States, the banned magazines in

12    Massachusetts?

13        A.    I don't have any basis to know.

14        Q.    Would you agree with me that in

15    firearm-related crime in Massachusetts handguns are

16    overwhelmingly used over rifles?

17        A.    Could you define "overwhelmingly"?

18        Q.    I don't know, fifty or hundred to one?

19        A.    I think there are a lot more -- I think

20    that the data suggests that more handguns are used

21    in a crime than rifles.

22        Q.    Many more?

23        A.    I think that's fair.

24        Q.    And handguns are the most common firearm

1  used to assault police officers, correct?

2      A.   Yes, but there are many reports of police

3  officers being assaulted with assault weapons as

4  well.  Probably a disproportion number of assaults

5  on police officers occur with assault weapons.

6      Q.   "Probably," you said.  What is your

7  support for that data?

8      A.   The Kolbe record, I guess, is one source

9  of support.

10     Q.   Is there anything else outside the Kolbe

11  record that you can identify today as supporting

12  that statement?

13     A.   You know, there are reports about mass

14  shootings, including mass shootings involving police

15  officers.  And I believe you can glean those reports

16  for more information on the question.

17     Q.   You don't have any information that a law

18  enforcement officer has ever been assaulted with a

19  banned firearm in Massachusetts, correct?

20     A.   Putting aside the question about the East

21  Boston incident, no, I don't.

22     Q.   Do you know why law enforcement officers

23  in Massachusetts choose to use banned firearms?

24                 MR. PORTER:  Objection.  I think the

**Gary Klein**
**August 29, 2017**                                                          173

1      A.   They don't really use them for duty, so I

2  can't answer the question.

3      Q.   They don't use them off-duty, do they?

4      A.   They use them in certain circumstances for

5  duty.  Mostly they carry handguns for duty

6  purposes.

7      Q.   You don't know whether those handguns have

8  a banned magazine or not in Massachusetts?

9      A.   Well, I know that the banned magazines are

10  accessible to some police departments.  I don't know

11  how many make them accessible and I don't believe

12  that many officers walk a beat with a banned

13  magazine.

14      Q.   But your office doesn't have any

15  information on that, no data?

16             MR. PORTER:  Objection.

17      A.   Some information and based on oral

18  reports.

19      Q.   Do you have information on the extent to

20  which banned firearms are used for hunting in

21  Massachusetts?

22      A.   No.

23      Q.   Do you have any information about the

24  extent to which they are used for target shooting in

**Gary Klein**
**August 29, 2017**                                                          178

1  get a witness to ask counsel to instruct him not to

2  answer.

3       A.   I did not instruct him.  I was applying

4  his instruction to me.

5       Q.   Does your office have a process for

6  determining questions from the public about whether

7  a particular firearm is a copy or a duplicate?

8       A.   Yes.

9       Q.   What is that process?

10      A.   We get very few requests of that type, but

11 when we do, if we have an opinion, we tell them

12 that -- we tell the inquirer that it's our belief

13 that the weapon is a copy or duplicate but recommend

14 that if they have any doubt that they speak with

15 their gun seller or manufacturer.  In some cases we

16 don't know, I mean, we do further review.

17                 (Exhibit Nos. 7 and 8 marked for

18 identification.)

19 BY MR. SWEENEY:

20      Q.   Could you look at Exhibit 7, please, and

21 see if you can recognize that document.  I will

22 represent to you that's a printout from a website

23 Mass.gov/ago/public-safety/awde.html that was

24 printed out on August 28.