1

Volume 1, Pages 1-92

Exhibits: 1-7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DAVID SETH WORMAN, et al.,

        Plaintiffs,

vs.

CHARLES D. BAKER, in his official

capacity as Governor of the

Commonwealth of Massachusetts, et al.,

        Defendants

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Rule 30(b)(6) DEPOSITION OF EXECUTIVE OFFICE OF

PUBLIC SAFETY AND SECURITY (by David Marc Solet)

Wednesday, August 30, 2017, 9:31 a.m.

Campbell Campbell Edwards & Conroy

One Constitution Plaza, Third Floor

Charlestown, Massachusetts 02129


------- Alan H. Brock, RDR, CRR-------

C.J. Reporting

P.O. Box 1373

Andover, Massachusetts 01810

617.763.1725

David Marc Solet
August 30, 2017

22

```
 1   listed as a Colt AR-15 and thus was an enumerated
 2   weapon and it showed up and it had a manufacture
 3   date after the grandfathering provision expired,
 4   then I think you'd be able to conclude that that was
 5   a banned weapon.
 6       Q.  And that's not an analysis that you've done
 7   in preparation for this deposition?
 8       A.  At this time, no -- and I think that
 9   analysis alone would be highly underinclusive.  That
10   would only be for Colt weapons and would only be for
11   ones that are listed as AR-15s.  If you were looking
12   for ones that were copies or duplicates of AR-15s,
13   you'd presumably have to look for a different model.
14   And so I expect, to actually get close to the number
15   you're looking for, you'd have to do that for each
16   type of assault weapon and then do an analysis of
17   whether each other weapon that was sold was or was
18   not a copy or duplicate.
19       Q.  So looking at the data alone would not be
20   sufficient?
21       A.  I wouldn't say looking at the data alone
22   wouldn't be sufficient.  It's that the data has
23   never been -- the data that FRB keeps has never
24   been -- it's never been -- there's never been an
```

1   entry made that says this is a copy or duplicate,
2   this is not a copy or duplicate.  There's no tab
3   that you could click that would say give me all the
4   copies or duplicates, the way there would be if you
5   were saying give me all the rifles or give me all
6   the handguns.  It would be a much more detailed,
7   time-consuming, and complex analysis.
8       Q.  Since you mentioned handguns, do you have
9   an idea of the number of handguns that were sold in
10  Massachusetts last year?
11      A.  I don't know the answer to that.
12      Q.  Do you have an idea of the number of
13  shotguns that were sold?
14      A.  It's in the thousands, but I don't know how
15  many.
16      Q.  Do you have a sense of whether the number
17  of handguns sold is more than the number of rifles
18  sold?
19      A.  I don't know the answer to that.
20      Q.  Have you looked at any data related to the
21  number of firearms of any kind sold in
22  Massachusetts?
23      A.  I have, yes.
24      Q.  And what data have you looked at?

1  through 2015.  If you could take a moment and look
2  at that.  I know it's a big packet of materials, so
3  take as much time as you need.
4      A.  Okay.
5      Q.  Have you ever looked at UCR data before?
6      A.  Yes.
7      Q.  Have you ever looked at Table 20 before?
8      A.  No, I don't believe so.
9      Q.  Table 20 states that it is murder by state
10 and type of weapon.  Does that accord with what you
11 believe this document to be?
12     A.  It certainly appears to be that.
13     Q.  If I could turn your attention to the
14 second page of what you have there?
15     A.  Yes.
16     Q.  At the very top of the second page it has
17 Massachusetts data.
18     A.  Yes.
19     Q.  Based on this data, can you tell me the
20 number of murders that were committed with a rifle
21 in Massachusetts in 2005?
22             MR. PORTER:  Objection to the form.
23     Q.  You can answer.
24     A.  Are you asking me what the document says?

David Marc Solet
August 30, 2017

52

```
 1        Q.   Yes.
 2        A.   The entry is one.
 3        Q.   If you could turn to the next table, which
 4   should be, I think, two pages after.  It's Table 20,
 5   for 2006.
 6        A.   Yes.
 7        Q.   And again, if you could turn to the second
 8   page of that.
 9        A.   Yes.
10        Q.   What does the document say about the number
11   of murders committed with a rifle in that year in
12   Massachusetts?
13        A.   It says two with rifle and 40 with type
14   unknown.
15        Q.   And type unknown means what?
16        A.   I assume it means someone was murdered with
17   a firearm of some type but the authorities were
18   never able to determine what type of weapon.
19        Q.   So we don't know whether that includes
20   rifles?
21        A.   I would say I know if that includes rifles.
22        Q.   You do?
23        A.   Well, it would be a shock to me if unknown
24   weapon only meant handgun, because then they would
```

```
 1   have listed it as handgun.  I think unknown means
 2   unknown.
 3       Q.  So we can't know.
 4       A.  Well, I think that you know that the term
 5   "unknown" includes all unknown firearms, and one of
 6   those is rifles.
 7       Q.  But you don't know how many of those 40, if
 8   any, actually would have been rifles.
 9       A.  No, of course not.
10       Q.  And if you could look at the last column
11   there, hands and feet:  How many people were
12   murdered by hands and feet in that year?
13              MR. PORTER:  Which page?
14              MR. NARDONE:  The same page.
15       A.  This is the second page for the 2006 data?
16       Q.  Yes.
17       A.  It says four.
18       Q.  If you could turn to the next table, which
19   is the 2007 data.
20       A.  Yes.
21       Q.  How many murders were committed with a
22   rifle in Massachusetts that year?
23              MR. PORTER:  Marc, I'm sorry, I can't
24   keep up with you.
```

```
 1         A.    It says one.
 2               MR. PORTER:   This is 2007?
 3               MR. NARDONE:   2007, Massachusetts.
 4               MR. PORTER:   Gotcha.
 5         Q.    And the number of individuals murdered in
 6   Massachusetts with hands and feet that year?
 7         A.    It says 14.
 8         Q.    If you could go to the table for 2008.  In
 9   Massachusetts in 2008 what does this indicate for
10   the number of individuals murdered with rifles?
11         A.    It says two.
12         Q.    If we could move on to 2009.  The number of
13   individuals murdered with rifles?
14               MR. PORTER:   Is there a question there?
15         Q.    What does the document state about the
16   number of individuals murdered with rifles in 2009?
17         A.    It says two.
18         Q.    Move to the next one, which is the 2010
19   data.  I believe it's on the second page of that
20   one.  What does that document indicate about the
21   number of individuals murdered with rifles in
22   Massachusetts in 2009?  Excuse me, 2010.
23         A.    It says zero.
24         Q.    If we can move to 2011, the second page
```

David Marc Solet
August 30, 2017

55

```
 1   again.  What does that document state about the
 2   number of individuals murdered with rifles in 2011?
 3        A.   It says zero.
 4        Q.   And if we could move to 2012, second page.
 5   What does that document state about the number of
 6   individuals murdered with rifles in Massachusetts in
 7   2012?
 8        A.   It says zero.
 9        Q.   Moving to 2013, second page:  What does
10   that document indicate about the number of
11   individuals murdered with rifles in that year?
12        A.   It says two.
13        Q.   In 2014, the second page, what does the
14   document state about the number of individuals
15   murdered with rifles in that year?
16        A.   It appears to say zero.
17        Q.   And the last one of these, I promise, the
18   second page:  What does that document state about
19   the number of individuals murdered with rifles in
20   Massachusetts that year?
21             MR. PORTER:  What year is this, now?
22             MR. NARDONE:  This is the year 2015.
23        A.   It says one.
24        Q.   I'd be happy to provide you with this.  If
```

David Marc Solet
August 30, 2017

56

```
 1   you could check my math, but I understand that based
 2   on the document that we just looked at, the number
 3   of murders committed with a rifle from 2005 through
 4   2015 is 11.
 5           MR. PORTER:  Objection to the form of
 6   the question.
 7       Q.  Can you please take a look at those
 8   documents and tell me the number of murders that
 9   were committed between 2005 and 2015 in
10   Massachusetts with rifles, based on the documents in
11   front of you.
12       A.  Do you really want me to do the math?  I'm
13   glad to accept your math.  It's simple math.
14       Q.  You're willing to accept that it's 11.
15       A.  That's fine.
16       Q.  If I were to represent to you that over
17   that time period there were 1776 total murders in
18   Massachusetts, is that something you'd like to check
19   or are you okay with that representation?
20           MR. PORTER:  Objection to the form.  Are
21   you asking him if he'd like to check?  Or what's the
22   question?
23           MR. NARDONE:  I represented to him that
24   there were 1776 murders in Massachusetts over the
```

David Marc Solet
August 30, 2017

57

```
 1    time period contained in those documents.
 2              MR. PORTER:  Represented based on the
 3    exhibit?
 4              MR. NARDONE:  Yes.
 5              MR. PORTER:  Okay.
 6       Q.  Do you accept that number?
 7       A.  Sure.
 8              MR. PORTER:  As appearing in the
 9    exhibit.
10              MR. NARDONE:  As appearing in the
11    exhibit.
12       Q.  Do you have any reason to believe that
13    those numbers are inaccurate?
14       A.  So I haven't ever attempted to reconcile
15    the FBI Uniform Crime Reporting data with State data
16    on homicides.  I expect that it tracks very closely.
17    It might not track exactly.  My experience with
18    aggregating data from criminal justice agencies is
19    that there is not always uniform reporting.  I've
20    seen this done with hate crimes data, with other
21    kinds of data.  There are sometimes jurisdictions
22    that don't do a good job of reporting.  But I'd
23    expect with homicides you'd probably see less
24    underinclusion than some other crimes.
```

```
 1   cause any undue delay.
 2            MR. NARDONE:  It's about 11:00 o'clock,
 3   so I imagine a lunch break will probably be right
 4   around where we're talking about.
 5            MR. KLEIN:  Are you confident enough
 6   that I can call her and let her know --
 7            MR. NARDONE:  I'm not prepared to give
 8   an exact time right now.
 9            (Discussion off the record.)
10       Q.  Is anyone in EOPSS responsible for
11   determining whether a firearm is a copy or
12   duplicate?
13       A.  There's nobody who has primary
14   responsibility.  There's no single person who that's
15   their primary responsibility.  State Troopers who
16   are charged with enforcing the laws of
17   Massachusetts, parole officers who have a similar
18   role, if they were to encounter a weapon, that would
19   be part of their responsibility in terms of
20   determining whether it was evidence of a crime or
21   not evidence of a crime.
22       Q.  So the law enforcement officers and
23   probation officers under the umbrella of EOPSS would
24   have that --
```

73

```
 1      A.   Not probation officers.  Parole officers
 2   are EOPSS personnel.
 3      Q.   So the law enforcement officers and parole
 4   officers under EOPSS would have that responsibility
 5   in the field.
 6      A.   That's right.
 7      Q.   If you know, does EOPSS have any written
 8   protocols as to how to determine whether a weapon is
 9   a copy or duplicate?
10      A.   No.  I think that the personnel would be
11   relying on the Attorney General's guidance, which is
12   the document that you've shown.
13      Q.   So if you could turn to Page 4 of that
14   document, which is Exhibit 6.  It states that, in
15   the second paragraph below the number 2, it states,
16   "The fact that a weapon is or has been marketed by
17   the manufacturer on the basis that it is the same as
18   or substantially similar to one or more enumerated
19   weapons will be relevant to identifying whether the
20   weapon is a copy or duplicate."  Do you see that
21   statement?
22      A.   I do.
23      Q.   What is EOPSS's position on what the word
24   "relevant" means there?
```

```
 1              MR. PORTER:  Objection to the form.
 2       Q.  You can answer.
 3       A.  I would take the term "relevant" to mean
 4   should be a factor in the analysis.
 5       Q.  Is that factor contained in either of the
 6   tests set forth under guidance?
 7       A.  No.
 8       Q.  So it's your understanding that the two
 9   tests that are set forth are not exhaustive factors?
10       A.  I mean, I would say that the similarity
11   test contains the phrase "substantially similar," so
12   that if somebody was advertising their weapon as
13   being identical or, say, quote, "substantially
14   similar," that that would be a factor that would be
15   legitimate to use in assessing whether it was
16   substantially similar.  You could take the
17   manufacturer to some degree at their word.
18       Q.  So that's a reliance on the manufacturer's
19   determination, then.
20       A.  If a manufacturer were to advertise a
21   weapon saying "This has many duplicate parts of a
22   banned weapon," yes, if I were a State Trooper, I
23   would consider that important to know.
24       Q.  If you go down two paragraphs below the
```

1  configuration is, that makes sense.  How is a law
2  enforcement officer in the field to determine the
3  original manufacture to determine whether there's
4  probable cause for an arrest?
5      A.  That's actually what I meant my response to
6  answer.  If a person is highly expert in firearms, I
7  expect that they would be in a superior position to
8  recognize a weapon and know what its original status
9  was, as was originally sold.
10     Q.  Okay.  If I could turn your attention to
11 that same document, on Page 2.  At the top you'll
12 see little ii.
13         MR. PORTER:  Maybe we could set some
14 context here, if that would be okay.
15         MR. NARDONE:  Absolutely.  That's
16 exactly what I was about to do.
17     Q.  You'll find that under the heading "The
18 term 'assault weapon' shall not include."  Little ii
19 states, "Any weapon that is operated by manual bolt,
20 lever, or slide action."
21     A.  Yes.
22     Q.  How would a law enforcement officer in
23 EOPSS's umbrella determine that -- when they found a
24 bolt action rifle in the field, its original