UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID SETH WORMAN, ANTHONY LINDEN, JASON WILLIAM SAWYER,  PAUL NELSON CHAMBERLAIN, GUN OWNERS' ACTION LEAGUE, INC., ON TARGET TRAINING, INC., AND OVERWATCH OUTPOST, <br><br> Plaintiffs, <br><br> v. <br><br> MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts; DANIEL BENNETT, in his official capacity as the Secretary of the Executive Office of Public Safety and Security; and COLONEL KERRY GILPIN, in her official capacity as Superintendent of the Massachusetts State Police, <br><br> Defendants. | CIVIL ACTION <br><br> NO. 17-10107-WGY |

**Affidavit of Robert Spitzer, Ph. D**.

I, Robert Spitzer, do depose and state:

1.      I am a Distinguished Service Professor and Department Chair of the Political Science Department at the State University of New York, College at Cortland in Cortland, New York. A copy of my curriculum vitae is attached to this Declaration as Exhibit A.  I have been asked by the Office of the Massachusetts Attorney General to provide this affidavit in the above-captioned case.  It is my understanding that the plaintiffs have challenged the Massachusetts law banning assault weapons and large capacity magazines, mainly contending that these laws violate the Second Amendment.

2.      I have been studying and writing on gun policy for over thirty years. My first publication on the subject appeared in 1985. Since then, I have published five books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun and ammunition laws, gun policy in American politics and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control*, has been in print since its year of initial publication, 1995. It encompasses all of the listed areas. The seventh edition of the book will be published in early 2018 by Routledge Publishers. My most recent book on gun policy is

1

*Guns across America: Reconciling Gun Rules and Rights*, published by Oxford University Press in 2015. I am frequently interviewed and quoted in the national and international media on gun-related matters.

## SUMMARY OF FINDINGS

3.      Assault weapons available on the civilian market today were derived from military weapons designed specifically for combat use. Aside from assault weapons, thousands of other types of firearms of every sort are available for lawful civilian purchase today, amounting to hundreds of millions of weapons.

4.      Studies demonstrate that modern assault weapons have had disproportionately adverse effects on gun violence, and are particularly lethal because of their designs, firing characteristics, and appeal to segments of the criminal population and criminal activities, to wit: mass shootings, police killings, and gang activity.

## SPECIFIC FINDINGS AND CONCLUSIONS

### I.      The History of Assault Weapons

5.      Modern guns available to civilians labeled assault weapons are derived from military weapons designed for use on the battlefield.

6.      The firearm known today as the assault weapon arose during World War II when the Germans developed the STG 44 or *Sturmgewehr.* That soldier-carried weapon was studied and modified by the Soviets, who produced the well-known Soviet AK-47 in 1947, which has been the most successful and prolific soldier-held battlefield weapon in modern times.[1]

7.      The AR-15 was first produced by the ArmaLite Company in the late 1950s (the basis for the "AR" name). According to one of its designers, Jim Sullivan, the weapon was "designed for full automatic military use. It wasn't really designed as a sporting rifle."[2] ArmaLite sold the rights to the gun to the Colt Company in 1959. A few years later, the weapon was adopted by the American military and produced as the M16, where it gradually came in to use during the Vietnam War in the 1960s.

8.      Colt received permission to market a semi-automatic version of the AR-15 to the civilian market, but these weapons did not catch on in the American market in a significant way until the late 1980s,[3] when Chinese companies flooded the market with cheap weapons,

---

[1] Larry Kahaner, *AK-47: The Weapon That Changed the Face of War* (New York: Wiley, 2007).

[2] "America's Gun – the Rise of the AR-15," *CNBC,* April 25, 2013, at
http://www.youtube.com/watch?v=OCvjoFPD5Kg

[3] The first assault weapon marketed to civilians was the Colt AR-15, introduced in 1964. Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, WI: Gun Digest Books, 2008), 4. Peterson says that the poor sales of these weapons, along with imported versions, was attributable at least in part to the fact that they were "too expensive to appeal to the average shooter."

including their own semi-automatic version of the AK-47.[4] Today, the AR-15-type weapon is manufactured and sold by over thirty companies, including Smith and Wesson, Bushmaster, and Sig Sauer.[5]

9.      The terms "assault weapon" and "assault rifle" are neither a "public relations stunt"[6] nor ginned up labels invented by gun control organizations. In fact, these were the very terms used by the companies that first produced, marketed, and sold such weapons to the public. Industry use of the terms "assault weapons" and "assault rifles" appeared in the early 1980s, before political efforts to regulate them emerged in the late 1980s.[7]

10.     Tom Diaz, a specialist on, and critic of the gun industry, has chronicled the marketing strategies employed by gun manufacturers and gun publications from the time that such weapons were first introduced to the American civilian market in a significant way in the 1980s. He reports on, and quotes directly from gun company advertisements and gun magazines from that decade, like Heckler and Koch selling its "HK 91 Semi-Automatic Assault Rifle," the "Bushmaster assault rifle," the AKM "imported assault rifle," the Beretta M-70 that "resembles many other assault rifles," the AR 10 (made by Paragon S&S Inc.) advertised as a "famous assault rifle [that] is now available in a semi-auto form!", the "AMT 25/.22 Lightning Carbine" that was advertised as an "assault-type semi-auto," among many other examples. The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public.[8]

11.     As a standard buyer's guide on assault weapons noted, the "popularly-held idea that the term 'assault weapon' originated with anti-gun activists, media or politicians is wrong. The term was first adopted by the manufacturers, wholesalers, importers and dealers in the American firearms industry. . . ."[9] The more expansive phrase "assault weapon" is generally used over "assault rifle" because "weapon" also includes not only rifles but some shotguns and handguns that were also subject to regulation in the 1994 and subsequent laws.

12.     By the early 1990s, both the gun industry and the National Rifle Association abruptly changed course in their labeling of such weapons as pressure built on Congress and in

---

[4] Jay Mathews, "AK47 Rifles Flood Into U.S. from Chinese Sales War," *Washington Post,* February 2, 1989, A1.

[5] Tom Diaz, *Making a Killing* (New York: The New Press, 1999), 125.

[6] Peter Ferrara, "'Assault Weapon' is Just a PR Stunt Meant to Fool the Gullible," *Forbes,* December 28, 2012, at http://www.forbes.com/sites/peterferrara/2012/12/28/assault-weapon-is-just-a-pr-stunt-meant-to-fool-the-gullible/

[7] Violence Policy Center, *The Militarization of the U.S. Civilian Arms Market,* June 2011, at http://www.vpc.org/studies/militarization.pdf#page=33; see also Violence Policy Center, *Assault Weapons and Accessories in America,* 1988, at http://www.vpc.org/studies/awacont.htm and http://www.vpc.org/studies/thatintr.htm

[8] Diaz, *Making a Killing*, 124-28, 230-31; Tom Diaz, *The Last Gun* (New York: The New Press, 2013), 142-43.

[9] Peterson, *Buyer's Guide to Assault Weapons*, 11.

some states to enact curbs (California enacted the first assault weapons ban in 1989 in the aftermath of a school shooting in Stockton, California committed with an AK-47), and that led to the remarketing and rebranding of such weapons as no different from typical, traditional hunting weapons that also fired in semi-automatic fashion. That effort has persisted to the present, with terms like "tactical rifles" and "modern sporting rifles" typically offered by gun organizations including the National Rifle Association (NRA) and the National Shooting Sports Foundation (NSSF) as preferred terms for such weapons.[10]

13.    Persistent efforts at rebranding – and parallel denials of assault weapons' past – accelerated through the 2012 and 2013 national concern about assault weapons, as seen, for example, in the NSSF web site and literature. A widely circulated "Modern Sporting Rifle Pocket Fact Card"[11] says that such weapons are "widely misunderstood" because of their cosmetic resemblance to military weapons (an intentional design feature). It urges gun owners to use the information on the card and web site "to correct misconceptions about these rifles." Among the "corrections" it offers: "AR-15-style rifles are NOT 'assault weapons' or 'assault rifles.' An assault rifle is fully automatic—a machine gun." It adds "Please correct them" if they use the term "assault weapon," claiming further that it "is a political term" created in the 1980s. (As noted above, this assertion is incorrect.)

14.    An article in *Outdoor Life* on this subject belies the claim that assault weapons are limited only to those that fire fully automatically. That article, too, urges its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons." In its account, it notes correctly that "the term 'assault weapon'. . . generally referred to a type of light infantry firearm initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47 and the M16/M4. These are selective-fire weapons that can shoot semi-auto, full-auto, or in three-round bursts. . . ."[12]

15.    The effort to rebrand "assault weapons" as something more benign and severed from its military origins was seen in the publication struggles of Phillip Peterson, whose book, titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons,*[13] is a well-known reference work on the subject. As Peterson explained, the gun industry "moved to shame or ridicule" those who used the phrase "assault weapons," insisting that the term should now only apply to fully automatic weapons. Peterson noted that the origin of the term "assault weapon" was the industry itself.[14] He found that the NRA refused to sell his book until he changed the title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles.*[15]

---

[10] Tom Diaz, *The Last Gun* (New York: The New Press, 2013), 144.

[11] http://www.nssf.org/ msr/

[12] John Haughey, "Five Things You Need to Know About 'Assault Weapons'" *Outdoor Life,* March 19, 2013, at http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-know-about-assault-weapons

[13] Iola, WI: Gun Digest Books, 2008.

[14] Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times,* January 17, 2013, A1.

[15] Iola, WI: Gun Digest Books, 2010.

16.     Contemporary assault weapons available to civilians are a sub-category of the military-style weapons, with the modification that civilian weapons do not have fully automatic or "selective fire" options, but can only fire in semi-automatic mode.

## II.     The Criminological Consequences of Assault Weapons

### A.     The Assault Weapons Ban of 1994

17.     In 1994, Congress enacted a measure to make it "unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon."[16] It did this in Title XI of a larger bill, the Violent Crime Control and Law Enforcement Act. The law barred these weapons in two different ways.

18.     First, it listed nineteen named, specified assault weapons firearms, as well as "copies or duplicates of the [listed] firearms in any caliber. . . ." It specifically exempted 661 sporting rifles. Pre-1994 assault weapons were exempted from the ban (around 1.5 million were then in circulation). It also limited bullet feeding devices (i.e. magazines) to those holding ten bullets or less. Pre-1994 magazines that could hold more than ten rounds were also exempted from the 1994 restriction (roughly 24 million pre-1994 magazines were in circulation).[17]

19.     Second, assault weapons were also defined as those that have "an ability to accept a detachable magazine and has at least 2" stipulated characteristics of military weapons, including "a folding or telescoping stock; a pistol grip that protrudes conspicuously beneath the action of the weapon; a bayonet mount; a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and a grenade launcher. . ."[18] This has been referred to as the "features test." The two-features test was also applied to certain semi-automatic pistols and semi-automatic shotguns.[19] These weapons are also generally more compact in design, having barrels less than twenty inches in length, take intermediate-sized cartridges, include extensive use of lightweight stampings and plastics, and are therefore lighter in weight (six to ten pounds).

20.     The Massachusetts assault weapons ban, enacted in 1998 and made permanent in 2004, was modeled on the federal ban.

21.     The National Institute of Justice funded a series of studies of the effects of the federal law. Before the 1994 federal ban, between 2 and 8 percent of gun crimes were committed with assault weapons – a larger-than-proportionate percent of such weapons found nationwide,

---

[16] 108 Stat. 1796, 1996-98.
[17] Christopher S. Koper, "America's Experience with the Federal Assault Weapons Ban, 1994-2004," *Reducing Gun Violence in America* Daniel W. Webster and Jon S. Vernick, eds. (Baltimore: The Johns Hopkins University Press, 2013), 161.
[18] 108 Stat. 1796.
[19] Robert J. Spitzer, *The Politics of Gun Control*, 6th ed. (Boulder, CO: Paradigm Publishers, 2015), 149-50.

but still a fairly small number. Large capacity bullet magazines, however, were often used in gun crimes – about 20 percent.[20]

22.     The final study report noted that such weapons "account for a higher share of guns used in murders of police and mass public shootings." It noted the express purpose of the assault weapons ban: to "reduce gunshot victimizations" by limiting the availability of weapons and features that "enable shooters to discharge many shots rapidly" and other features "conducive to criminal use."[21] It also found that, in a study of crime in selected cities, the proportion of gun crimes using assault weapons declined an average of 45 percent during the period of the ban.[22] The researchers concluded that the effects of the law lagged its enactment (partly because of the law's limitations), meaning that its effects took several years to yield results, and that while the ban apparently did have some effect, the "most important part of the semiautomatic assault weapons ban. . .is probably the restriction on large ammunition magazines. . . ."[23]

23.     The National Institute of Justice study included Boston as one of the cities studied; it was the city that reported the highest assault weapon crime drop:  72 percent. The study's authors noted that Boston's sharp drop could have been attributable to the fact that Massachusetts also had a pre-existing state ban in place during the period under study, and that ban was even stricter in that it imposed additional requirements for large capacity magazine possession and transfer, and for guns able to receive those magazines. Another city in the study, Baltimore, saw the second largest drop, a notable fact given that Maryland also had its own state ban in place during the period under study.[24]

24.     A study by the Virginia State Police regarding the impact of the 1994 law on high capacity magazines used in crime in that state found that the use of magazines holding more than ten rounds fell from 17 percent in 1997 to 10 percent in 2004, the year the law lapsed, but then rose progressively to 22 percent by 2010.[25]

---

[20] Christopher S. Koper, et al., "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003," Report to the National Institute of Justice, U.S. Department of Justice, Jerry Lee Center of Criminology, University of Pennsylvania, June, 2004, 2.

[21] Koper, et al., "An Updated Assessment of the Federal Assault Weapons Ban," 1. An earlier version of this study from 1997 found similar, if tentative, trends. Jeffrey A. Roth, et al., "Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994," *Urban Institute,* March 13, 1997.

[22] Koper, et al., "An Updated Assessment of the Federal Assault Weapons Ban," 2-3.

[23] Christopher S. Koper, "Disassembling the Assault-Gun Ban," *Baltimore Sun,* September 13, 2004, at http://articles.baltimoresun.com/2004-09-13/news/0409130079_1_ban-guns-gun-crimes-magazines

[24] Koper et al., "An Updated Assessment of the Federal Assault Weapons Ban," 48, fn. 55.

[25] David S. Fallis and James V. Grimaldi, "Va. Data Show Drop in Criminal Firepower During Assault Gun Ban," *Washington Post,* January 23, 2011, at http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html

25.     Based on these studies and information, the federal ban had a positive effect on reducing the use of assault weapons in crime, and a combination of the federal and state bans was even more effective in reducing assault weapons' use in crime.

### B.     Contemporary Assault Weapons Concerns

26.     No precise count of the number of assault weapons owned in America is maintained. Out of roughly 300 million guns in America, several estimates in 2012 pegged the number at about four million.[26] A 2016 estimate put the number at about five million.[27] When five million is divided by 300 million, it equals 1.7 percent of all guns in America as falling into the category of assault weapons.

27.     Assault weapons play a disproportionately large role (in relation to their numbers in the general population) in three types of criminal activity: mass shootings, police killings, and gang activity.

#### 1.     Mass Shootings

28.     Mass shootings are generally defined as those where four or more people are killed, excluding the perpetrator. Among mass shootings that have garnered significant national attention, such as the Stockton, California elementary school shooting in 1989, the Columbine High School shooting in 1999, the Aurora, Colorado movie theater shooting in 2012, the Sandy Hook elementary school shooting also in 2012, the Orlando night club shooting in 2016, the Las Vegas shooting in 2017, and the Sutherland Spring, Texas, church shooting in 2017, all involved the use of assault weapons.

29.     An intensive study of mass public shootings (defined as those where four or more persons were killed) from 1982-2012 identified 62 such events. Of the 143 firearms used in these events, 34 percent of them were assault weapons that would have been banned under the 2013 assault weapons ban proposed by Sen. Dianne Feinstein (D-Cal.; the Senate voted the measure down); 50 percent were semiautomatic handguns (another 14 percent were revolvers). In terms of the number of shooting incidents rather than number of guns, over a third of the 62 mass public shootings had assault weapons; 75 percent of the mass shootings involved semi-automatic handguns; and, 87 percent had handguns of some type.[28]

---

[26] Spitzer, *Guns Across America,* 93.

[27] John W. Schoen, "Owned by Five Million Americans, AR-15 Under Renewed Fire After Orlando Massacre," *CNBC.com,* June 13, 2016, at https://www.cnbc.com/2016/06/13/owned-by-5-million-americans-ar-15-under-renewed-fire-after-orlando-massacre.html

[28] Mark Follman, "Why Mass Shootings Deserve Deeper Investigation," *Mother Jones,* January 30, 2013, at http://www.motherjones.com/politics/2013/01/mass-shootings-james-alan-fox; Mark Follman, "More Guns, More Mass Shootings—Coincidence?" *Mother Jones,* December 15, 2012, at http://www.motherjones.com/politics/2012/09/mass-shootings-investigation.

30.    A 2015 Congressional Research Service study of mass shootings from 1999 to 2013 concluded that assault rifles were used in 27 percent of mass public shootings; taking the data back to 1982, they were used in 24 percent of mass shootings.[29] Assault weapons thus play a disproportionately large role in these crimes, as compared with all gun crimes or as compared with all guns in society.

### 2.    Police Killings

31.    Using FBI data, the Violence Policy Center reported that from 1998-2001, 41 of 211 police officers (20 percent) killed in the line of duty with firearms were shot with assault weapons (in all, 224 police officers during this period were killed in the line of duty from all causes).[30] Data from 2009 found that of 45 officers killed by firearms nationwide, 8 (18 percent) were shot with assault weapons.[31] While this represents a minority of all police gun deaths, it is a far higher proportion than that of assault weapons in society.[32]

### 3.    Gang/Criminal Activity

32.    A report by the International Association of Chiefs of Police recommended "Enacting an effective ban on military-style assault weapons . . . and other weapons that enable criminals to outgun law enforcement."[33] A report by the Police Executive Research Forum (PERF) noted "significant support for the proposition that the expiration of the law [the 1994 assault weapons ban] has caused problems for local police. Thirty-seven percent of the police agencies responding to PERF's survey reported that they had seen noticeable increases in criminals' use of assault weapons."[34] When New York State's tough new gun law, the New York SAFE Act of 2013, was challenged in court, the counsel for the New York State Police filed a brief on behalf of the law, defending in particular the strengthened assault weapons ban and

---

[29] William J. Krouse and Daniel J. Richardson, "Mass Murder with Firearms," *CRS Report,* July 30, 2015, at https://fas.org/sgp/crs/misc/R44126.pdf; Michael S. Rosenwald, "Why Banning AR-15s and Other Assault Weapons Won't Stop Mass Shootings," *Washington Post,* June 16, 2016, at https://www.washingtonpost.com/news/local/wp/2016/06/16/why-banning-ar-15s-and-other-assault-weapons-wont-stop-mass-shootings/?utm_term=.7dffcadbb47b.

[30] "Officer Down," *Violence Policy Center,* May 2003.

[31] Lori Robertson, "Biden Wrong on Police Deaths," *FactCheck.org,* January 30, 2013, at http://www.factcheck.org/2013/01/biden-wrong-on-police-deaths/. The FBI data categorizes gun shootings by types of guns (handguns, rifles, shotguns) but does not have a separate category for assault weapons, meaning that the data must be reanalyzed or obtained in some other way.

[32] Koper, et al., "An Updated Assessment of the Federal Assault Weapons Ban."

[33] International Association of Chiefs of Police, "Taking a Stand," 2007, at http://www.theiacp.org/Portals/0/pdfs/GVR_A-page-iii_IACP-Taking-A-Stand.pdf

[34] Police Executive Research Forum, "Guns and Crime," May 2010, 2, at http://www.policeforum.org/assets/docs/Critical_Issues_Series/guns%20and%20crime%20-%20breaking%20new%20ground%20by%20focusing%20on%20the%20local%20impact%202010.pdf

magazine limit provisions. The 2013 law now included a provision that pre-ban magazines capable of holding more than ten rounds be destroyed, turned in to police, or sold out of state.[35]

33.     Widely noted prolific gun trafficking between the U.S. and Mexico has been motivated in large part by the appeal of assault weapons to Mexican drug gangs.[36]

34.     A study of gang members in the American Midwest by a team of researchers from the National Gang Crime Research Center of 1206 respondents, including 505 gang members, found that over 43 percent reported owning an assault rifle, as compared with 15 percent of non-gang member criminals. Gang members were also much more likely to report having used an assault rifle in a crime (28 percent) than non-gang members (4 percent).[37] Other analyses note the appeal of assault weapons to American crime gangs and extremist paramilitary militias.[38]

## 4.     High Capacity Magazines

35.     A study of 62 mass public shootings found that high-capacity magazines (those holding more than ten rounds) were used in at least 31 of these instances. The preference for magazines holding more rather than fewer rounds underscores the utility of less reloading for those seeking to kill multiple people.[39]

[35] Spitzer, *Guns across America,* 164. The law was upheld in *New York State Rifle and Pistol Association v. Cuomo,* 804 F.3d 242 (2nd Cir. 2015). The only substantive provision of the original law that did not survive challenge was the law's seven bullet magazine limit; the state's pre-existing ten bullet limit remains in place. The Supreme Court declined to hear an appeal of the ruling.

[36] Statement by John F. Walsh, U.S. Attorney for the District of Colorado, testimony before the U.S. Senate Committee on the Judiciary, Washington, DC, February 27, 2013, 3. See also Police Executive Research Forum, *Guns and Crime: Breaking New Ground By Focusing on the Local Impact,* May 2010; "Target: Law Enforcement," *Violence Policy Center,* February 2010; Statement of Kristen Rand, Legislative Director, Violence Policy Center Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Hearing on Firearms Trafficking on the U.S.—Mexico Border, June 30, 2011, at https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/migrated/images/user_images/gt/stories/MINORITY/630%20gun%20forum/VPC--Kristen%20Rand%20Testimony%206-30-11.pdf ; Arindrajit Dube, Oeindrila Dube, and Omar Garcia-Ponce, "Cross-Border Spillover: U.S. Gun Laws and Violence in Mexico," *American Political Science Review* 107(August 2013): 397-417.

[37] George W. Knox, et al., "Gangs and Guns," National Gang Crime Research Center, 2001, 35, 36, at https://cops.usdoj.gov/html/cd_rom/solution_gang_crime/pubs/gangsandgunsataskforcereport2001.pdf  According to the Report: "Four social contexts were used for the survey: eight county jails from the farmland to the urban central area (891 inmates), matched pair design samples from a Chicago public high school and an inner city program, and a sample of gang members in a private suburban probation program." (2)

[38] Diaz, *Making a Killing,* 131; Philip J. Cook and Kristin A. Goss, *The Gun Debate* (New York: Oxford University Press, 2014), 13.

[39] Mark Follman and Gavin Aronsen, "'A Killing Machine': Half of All Mass Shooters Used High-Capacity Magazines," *Mother Jones,* January 30, 2013, at http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings/; Ashley Cannon, "Mayhem Multiplied: Mass Shooters and Large-Capacity Magazines," Citizens Crime Commission of New York City, May 2014.

36.     A study of 133 mass shootings from 2009 to 2015 found that shooting incidents involving high-capacity magazines resulted in 155 percent more people shot, and 47 percent more deaths, than in those instances where the perpetrators did not use such magazines.[40]

37.     In 2011, then-Arizona Congresswoman Gabrielle Giffords was shot in the head by a deranged man at a public event. Giffords survived the attack. In 2013, Giffords' husband, Mark Kelly (a former Navy captain and astronaut) offered this account of his wife's shooting in congressional testimony, indicating how the shooter's larger capacity magazines resulted in more deaths and injuries:

> The shooter in Tucson showed up with two 33-round magazines, one of which was in his 9 millimeter. He unloaded the contents of that magazine in 15 seconds. Very quickly. It all happened very, very fast. The first bullet went into Gabby's head. Bullet number 13 went into a nine-year old girl named Christina Taylor Green, who was very interested in democracy and our government, and really deserved a full life committed to advancing those ideas. If he had a 10-round magazine -- well, let me back up. When he tried to reload one 33-round magazine with another 33-round magazine, he dropped it. And a woman named Patricia Maisch grabbed it, and it gave bystanders a time to tackle him. I contend if that same thing happened when he was trying to reload one 10-round magazine with another 10-round magazine, meaning he did not have access to a high-capacity magazine, and the same thing happened, Christina Taylor Green would be alive today.[41]

38.     In a live shooting situation, shooters often succumb to the tension and confusion of the moment and take extra time, fumble or drop a magazine (as did the man who shot Giffords), or commit other errors that open the door to intervention.

39.     Assault weapons and large capacity magazines play a disproportionately large and therefore adverse role in mass shootings, police killings, and among gangs and gang activity.

### C.     Assault Weapons and Self-Defense

40.     In theory, any firearm can be used for self-defense, including assault weapons. Yet even if all assault weapons disappeared, Americans would still have thousands of models and hundreds of millions of guns to choose from for self-defense purposes. Handguns are, however, the clear choice for those citizens seeking a gun for self-protection, and they were identified specifically by the Supreme Court as the self-defense firearm of choice for use in the home.[42]

---

[40] Everytown for Gun Safety, "Analysis of Recent Mass Shootings," August 2015, 4, at https://everytownresearch.org/documents/2015/09/analysis-mass-shootings.pdf

[41] "Senate Judiciary Committee Hearing on Gun Violence," January 30, 2013, at http://articles.washingtonpost.com/2013-01-30/politics/36628109_1_gun-violence-gabby-giffords-senator-grassley

[42] *D.C. v. Heller* (554 U.S. 570; 2008).

10

41.     Americans consistently report self-defense as the primary reason for obtaining a handgun.  A handgun is preferable in such situations because only one hand is necessary to train the weapon on a target, whereas an assault weapon or other long gun requires two hands, a fact noted by Justice Scalia in the majority opinion in the *Heller* case.[43]

42.     Further, actual civilian gun self-defense situations do not involve anything resembling a protracted firefight necessitating the ability to fire many rounds without reloading. A study of self-defense shootings based on data cumulated by the National Rifle Association's Institute for Legislative Action conducted by Lucy P. Allen of National Economic Research Associates (NERA) examined data from the NRA's "armed citizen" stories—accounts compiled in a database of private citizens who use guns for self-defense. Data compiled from 1997-2001, and from 2011-2013, found that during the first time period defenders fired an average of 2.2 shots, and in 28 percent of these instances, defenders fired no shots (i.e. mere display of a weapon stopped or thwarted the incident). For the second time period, the average number of shots was 2.1, and no shots were fired in 16 percent of the instances. For this later time period, there were no instances in which the defender fired as many as ten shots or more.[44] Given the NRA's well known positions favoring gun ownership and use for self-defense and the non-random, self-selecting nature of the data, one may assume that it likely represents the most positive face of gun self-defense uses.

---

[43] *See Heller* at 629:  ". . .the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason . . .handguns are the most popular weapon chosen by Americans for self-defense in the home . . . ."

[44] Lucy P. Allen, Declaration submitted in the case of *Kolbe et al. v. O'Malley et al.,* Case No. 1:13-cv-02841-CCB, U.S. District Court for the District of Maryland, filed 2/14/14. The data reported in this Declaration did not include the maximum number of rounds fired in incidents reported and compiled from 1997-2001. It also did not report the number of incidents on which the 1997-2001 study was based, but did report that the 2011-2013 study was based on 279 incidents.

43.     In sum, therefore, it is my considered opinion, based on my thirty years of studying the many elements of gun policy and the national gun issue, and based specifically on my research related to assault weapons, and the aforementioned information, that the Massachusetts law restricting assault weapons and large capacity magazines has the potential to limit and reduce shooting injuries and deaths in the state over the long run. In doing so, the law is likely to advance the state's abiding interest in reducing the harms caused by gun violence.

I am being compensated by the Massachusetts Attorney General's office at the rate of $200 per hour. I have not testified at trial or provided any deposition or declaration as an expert witness (other than in this case) in the last four years.

Signed under the pains and penalties of perjury this $\underline{8}^{th}$ day of December 2017.

Robert J. Spitzer, Ph.D.

12