# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

DAVID SETH WORMAN, ANTHONY LINDEN, JASON WILLIAM SAWYER, PAUL NELSON CHAMBERLAIN, GUN OWNERS' ACTION LEAGUE, INC., ON TARGET TRAINING, INC., AND OVERWATCH OUTPOST,

*Plaintiffs*,

v.

MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts; DANIEL BENNETT, in his official capacity as the Secretary of the Executive Office of Public Safety and Security; and COLONEL KERRY GILPIN, in her official capacity as Superintendent of the Massachusetts State Police,

*Defendants*.

CIVIL ACTION
NO. 17-cv-10107-WGY

---

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MAURA HEALEY
ATTORNEY GENERAL

William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108

Date: December 15, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

BACKGROUND ........................................................................... 1

    I.      The Federal Assault Weapons and Large Capacity
          Magazine Ban .............................................................. 1

    II.     The Massachusetts Assault Weapons and Large Capacity
          Magazine Ban .............................................................. 3

    III.    The Attorney General's Enforcement Notice on
          Assault Weapons ........................................................... 3

STANDARD OF REVIEW ............................................................. 4

ARGUMENT .............................................................................. 5

    I.      MASSACHUSETTS' BAN ON ASSAULT WEAPONS AND
          LARGE CAPACITY MAGAZINES COMPORTS WITH
          THE SECOND AMENDMENT ...................................... 5

          A.    Assault Weapons and LCMs Are Not Protected
               by the Second Amendment ................................... 5

               1.    Assault Weapons and LCMs Are "Like" M16
                    Rifles and Other "Weapons That Are Most
                    Useful in Military Service." .................................... 6

               2.    Assault Weapons and LCMs Are Not Lineal
                    Descendants of Weapons in Common Use at the
                    Time the Second Amendment was Ratified, and
                    They Are Not in Common Use Today for
                    Self-Defense. .......................................................... 8

          B.    Even if Assault Weapons and LCMs Were Protected by
                the Second Amendment, the Commonwealth's Ban on
                Those Weapons Survives Intermediate Scrutiny. .............. 10

               1.    This Court Should Apply, At Most,
                    Intermediate Scrutiny to the AWB. ...................... 10

                2.    The Ban on Assault Weapons and LCMs Is
                    Substantially Related to the Important Interest in
                    Promoting the Safety of the Public and of Law

Enforcement Officials...........................................11

II.     THE ENFORCEMENT NOTICE COMPORTS WITH
        DUE PROCESS.............................................................13

        A.      *Bouie* Does Not Apply to the Enforcement Notice............13

        B.      The Attorney General's Interpretation of the AWB Was
                Not "Unexpected and Indefensible" Because Her
                Construction of "Copies or Duplicates" Is Consistent with
                the Plain Meaning of the Statute and Other Extant Law. ..15

III.    THE FACIAL VAGUENESS CLAIM CHALLENGING THE
        PHRASE "COPIES OR DUPLICATES" IS NOT COGNIZABLE
        AND FAILS ON THE MERITS...................................................17

        A.      As a Facial Challenge to the Statute, the Vagueness Claim
                Is Not Cognizable. ...........................................................17

        B.      The Facial Vagueness Claim Fails Because the Phrase
                "Copies or Duplicates" Provides Fair Notice of What
                Weapons Are Prohibited. ...................................................18

CONCLUSION....................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Bouie v. Columbia*,
  378 U.S. 347 (1964)........................................................................13, 14, 15

*Chapman v. United States*,
  500 U.S. 453 (1991)......................................................................17

*Clark v. Jeter*,
  486 U.S. 456 (1988)......................................................................11

*Commonwealth v. Twitchell*,
  617 N.E.2d 609 (Mass. 1993)......................................................14

*Country Vintner of N.C., LLC v. E.&J. Gallo Winery, Inc.*,
  718 F.3d 249 (4th Cir. 2013)......................................................15

*Daggett v. Comm'n on Gov'tl Ethics & Election Practices*,
  172 F.3d 104 (1st Cir. 1999)......................................................4

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)...........................................................5, 6, 7, 10-11

*D.C. v. John R. Thompson Co.*,
  346 U.S. 100 (1953)......................................................................15

*Doris v. Police Comm'r of Boston*,
  373 N.E.2d 944 (Mass. 1978)......................................................15

*Draper v. Healey*,
  827 F.3d 1 (1st Cir. 2016)..........................................................18

*Florida Bar v. Went for It, Inc.*,
  515 U.S. 618 (1995)......................................................................11

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015)......................................................5, 8

*Fyock v. City of Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015)......................................................5, 11

*Gun Owners' Action League v. Swift*,
  284 F.3d 198 (1st Cir. 2002)......................................................19

*Halebian v. Berv*,
    931 N.E.2d 936 (Mass. 2010) ...................................................................15

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ...................................................5, 8, 10, 11

*Hightower v. City of Boston*,
    693 F.3d 61, 66 (1st Cir. 2012) .................................................................10

*In re Sonus Networks, Inc.*,
    499 F.3d 47 (1st Cir. 2007) .......................................................................19

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ........................................................... *passim*

*Love v. Butler*,
    952 F.2d 10 (1st Cir. 1991) .......................................................................18

*Massachusetts v. Dep't of Health & Human Servs.*,
    682 F.3d 1 (1st Cir. 2012) ...........................................................................4

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ....................................................................................5

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004) .......................................................................19

*Metrish v. Lancaster*,
    569 U.S. 351 (2013) ..................................................................................13

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015).......................................................5, 8, 11, 19

*Rogers v. Tennessee*,
    532 U.S. 451 (2001)............................................................................13, 14

*Turner Broadcasting Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ..................................................................................11

*United States v. Booker*,
    644 F.3d 12 (1st Cir. 2011) .......................................................................10

*United States v. Mazurie*,
    419 U.S. 544 (1975)..................................................................................17

*United States v. Prosperi*,
    573 F. Supp. 2d 436 (D. Mass. 2008) .......................................................15

*United States v. Williams*,
    553 U.S. 285 (2008)......................................................................................18

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996)......................................................................14, 15

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ..........................................................................17, 18, 19

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)......................................................................................18

*Wilson v. Cnty. of Cook*,
    968 N.E.2d 641 (Ill. 2012) ...........................................................................16, 19

## Federal Statutes

18 U.S.C. § 921(a)(30)(A) (1994) ...............................................................................2

18 U.S.C. § 921(a)(30) (1994) .....................................................................................2

18 U.S.C. § 921(a)(31) (1994) .....................................................................................2

18 U.S.C. § 922(v) (1994) ...........................................................................................2

18 U.S.C. § 922(w)(1) (1994) ......................................................................................2

## Massachusetts Statutes

G.L. c. 30A, § 2, 5–6A................................................................................................14

G.L. c. 140, § 121 .......................................................................................................3

G.L. c. 140, § 128 .......................................................................................................3

G.L. c. 140, § 131M.....................................................................................................3

St. 1998, c. 180, § 23 ..................................................................................................3

St. 1998, c. 180, § 47 ..................................................................................................3

St. 2004, c. 150, § 1 ....................................................................................................3

**Federal Rules and Regulations**

Fed. R. Civ. P. 56(a) ................................................................4

**Massachusetts Rules and Regulations**

803 Code Mass. Reg. 10.07 ....................................................16

**Miscellaneous**

150 Cong. Rec. S1901 (Mar. 1, 2004) ...................................3

1989–90 Mass. Op. Att'y Gen. No. 4, 1990 WL 508739 (Jan. 19, 1990).............14

1981–82 Mass. Op. Att'y Gen. No. 9, 1982 WL 188378 (Feb. 11, 1982) ............14

H.R. Rep. No. 103–489.................................................................1, 2

*Oxford English Dictionary* (12th ed. 2011) .........................................15

*Webster's II New College Dictionary* (1995) .......................................15

This case concerns the constitutionality of two interrelated public safety measures—the Commonwealth's statute banning assault weapons and large capacity magazines, and an Enforcement Notice issued by Attorney General Maura Healey notifying the public of her interpretation of that statute. The defendants are entitled to summary judgment on all of the plaintiffs' claims because the statute comports with the Second Amendment and is not void for vagueness, and because publication of the Enforcement Notice did not offend due process.

## BACKGROUND

### I.     The Federal Assault Weapons and Large Capacity Magazine Ban.

In the early 1990s, Congress determined that it was necessary to restrict the spread of a species of especially dangerous guns that were nearly identical to Russian Avtomat Kalashnikov ("AK") 47s, American M16s, and other military weapons. These assault weapons, which were being marketed and sold to civilians,[1] had enhanced "capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." H.R. Rep. No. 103–489, at 19–20 (Ex. 29). Police officers and the public were facing a "rising level of lethality" from assault weapons that was disproportionate to their numbers: Although 1% of the guns in circulation were assault weapons, they accounted for 8.1% of the guns traced to crime. *Id.* at 13. Congress found that "[p]ublic concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered." *Id.* at 14. Banning these weapons, said former Presidents Reagan, Ford, and Carter, was "a matter of vital importance to public safety." Ex. 31.

The bill Congress enacted—hereinafter the "Federal Assault Weapons Ban" or "Federal

---

[1] *See* Yurgealitis Decl. ¶¶ 24–25; Spitzer Aff. ¶¶ 9–15; Kaplan Decl. Ex. 44, at 21–25. All exhibits to the Kaplan Declaration are hereinafter cited as "Ex. __."

AWB"—"combine[d] two approaches . . . to control semiautomatic assault weapons." *Id.* at 20.

The first approach, known as the Enumerated Weapons Test, banned the manufacture, transfer, and possession of 19 specific models or variations of semiautomatic weapons, "or copies or duplicates of th[os]e firearms." 108 Stat. 1796, 1996–98; codified at 18 U.S.C. §§ 921(a)(30), 922(v) (1994) (Ex. 30).[2] The second approach, known as the Features Test, banned any semiautomatic rifle, pistol, or shotgun that had two or more combat-style features, and for rifles and pistols, that had the ability to accept a detachable magazine. 108 Stat. at 1996, 1998 (Ex. 30). Examples of the combat-style features included folding or telescoping stocks, flash suppressors, grenade launchers, bayonet mounts, and pistol grips that protrude beneath the action on the weapon. *Id.* The ban did not apply to assault weapons that were possessed lawfully before September 13, 1994. *Id.* at 1997. It also exempted many categories of weapons, including hundreds of rifles and shotguns commonly used in hunting and target practice. *Id.* at 1997, 2000–10.

Separately, the law banned "large capacity ammunition feeding devices," also called "large capacity magazines" or "LCMs," defined as feeding devices manufactured after September 13, 1994 that have "a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." *Id.* at 1998–99; codified at 18 U.S.C. §§ 921(a)(31), 922(w)(1) (1994) (Ex. 30). Congress found that LCMs "make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent," so that "a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes." Ex. 29, at 19.

In the years after the passage of the Federal Assault Weapons Ban, gun manufacturers

---

[2] Those Enumerated Weapons are: "(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR, and FNC; (vi) SWD M-10, M-11, M-11/9, and M-12; (vii) Steyr AUG; (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12." 108 Stat. 1796, 1997–98; codified at 18 U.S.C. § 921(a)(30)(A) (1994) (Ex. 30).

"sought to evade the ban by producing weapons with minor changes or new model names." 150 Cong. Rec. S1901, S1909 (Mar. 1, 2004) (Sen. Feinstein). Even though the "Act was designed to prevent this occurrence by defining assault weapons to include 'copies or duplicates' o[f] the firearms listed in the ban," *id.*, manufacturers nevertheless produced and advertised thousands of these copycat weapons. *See* Ex. 28, at 1–3; Ex. 36, at 142, 149; Ex. 48, at 4–5.

## II.     The Massachusetts Assault Weapons and Large Capacity Magazine Ban.

Four years after the Federal AWB went into effect, the Massachusetts Legislature enacted a state law that similarly forbade the sale and possession of assault weapons and LCMs, except those lawfully owned before September 13, 1994 ("AWB"). St. 1998, c. 180, §§ 23, 47; codified at G.L. c. 140, §§ 128, 131M. The Legislature adopted virtually the same definition of "assault weapon" that Congress employed. Thus, the state law defined assault weapons to include the Enumerated Weapons and "copies or duplicates of th[os]e weapons." G.L. c. 140, § 121. By referencing the federal ban, the state law separately adopted the Features Test. *Id.* The law's definition of "large capacity feeding device" and exemptions also tracked the federal ban. *Id.*

In 2004, the Legislature made the ban on assault weapons and LCMs permanent. St. 2004, c. 150, § 1. In signing that bill, Governor Romney emphasized that "[d]eadly assault weapons have no place in Massachusetts" and "are not made for recreation or self-defense." Ex. 21. "They are," he explained, "instruments of destruction with the sole purpose of hunting down and killing people." *Id.* The law made the state "safer," he added, but it also preserved the rights of the Commonwealth's "great sportsmen." Ex. 26; *see also* Ex. 27, at 5.

## III.    The Attorney General's Enforcement Notice on Assault Weapons.

Since the expiration of the Federal AWB, our country has experienced a surge in mass

shootings committed with semiautomatic assault weapons.[3] Because of these massacres, Attorney General Healey sought to assess the risk that assault weapons posed to Massachusetts residents. Her office learned that, in 2015 alone, between 8,000 and 10,000 assault weapons had been sold in Massachusetts, despite the AWB. *See* Bolcome Aff. ¶ 17. These weapons were nearly identical to two of the banned Enumerated Weapons—the Colt AR-15 and the AK47—but they were being erroneously marketed as "Massachusetts compliant" and manufactured without, for example, flash suppressors and folding stocks in order to bypass the Features Test. *See id.* ¶¶ 17, 18, 20; Yurgealitis Decl. ¶¶ 71–72. But that did not make them any safer or, for that matter, legal, because "copies or duplicates" of the Enumerated Weapons remained unlawful in Massachusetts.

To address this problem, the Attorney General issued a public advisory, titled "Enforcement Notice: Prohibited Assault Weapons," on July 20, 2016. *See* Ex. 35. The Notice explained how the Attorney General, as chief law enforcement officer for the Commonwealth, interprets the phrase "copies or duplicates" in the statute. *Id.* at 3–4. It also explained that, in the exercise of the Attorney General's prosecutorial discretion, the interpretation of "copies or duplicates" contained in the Notice would be applied prospectively only. *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case, such as this, challenging the constitutionality of a statute, many facts cited in support of the law are legislative facts that may be asserted at summary judgment and need not be proven at trial. *See Massachusetts v. Dep't of Health & Human Servs.*, 682 F.3d 1, 7 (1st Cir. 2012); *Daggett v. Comm'n on Gov'tl Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999).

---

[3] *See* Defts' Statement of Material Facts (hereinafter Defts' Stmt.) ¶¶ 132–138.

**ARGUMENT**

**I.     MASSACHUSETTS' BAN ON ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES COMPORTS WITH THE SECOND AMENDMENT.**

In *District of Columbia v. Heller* and *McDonald v. City of Chicago*, the Supreme Court held that the Second Amendment secures an individual right to possess a handgun in the home for self-defense. *McDonald*, 561 U.S. 742, 791 (2010); *Heller*, 554 U.S. 570, 635 (2008). But *Heller* also explained that the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. Rather, "the Second Amendment right . . . extends only to certain types of weapons." *Id.* at 623.

Since *Heller* was decided, Courts of Appeals have uniformly rejected claims that state and local bans on assault weapons and LCMs violate the Second Amendment. *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), *cert. denied*, 2017 WL 3173130; *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2486 (2016) ("*NYSRPA*"); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447; *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"). The plaintiffs have no basis to argue that this case is different. Summary judgment should be granted to the defendants because assault weapons and LCMs are not among the "arms" protected by the Second Amendment, or in the alternative, because the Commonwealth's ban on those weapons fully satisfies intermediate scrutiny.

**A.    Assault Weapons and LCMs Are Not Protected by the Second Amendment.**

*Heller* identified several "limitation[s]" on weapons eligible for Second Amendment protection. 554 U.S. at 627. First, "weapons that are most useful in military service—M-16 rifles and the like—may be banned." *Id.* Second, "the sorts of weapons protected [a]re those 'in common use at the time'" for "lawful purposes like self-defense." *Id.* at 624, 627. Under either of these

limitations—either of which constitutes and independent and dispositive basis for judgment for the defendants—assault weapons and LCMs are not protected by the Second Amendment.

1.   <u>Assault Weapons and LCMs Are "Like" M16 Rifles and Other "Weapons That Are Most Useful in Military Service."</u>

*Heller* established "that there is no constitutional protection for weapons that are 'like' 'M-16 rifles' and [other weapons] 'most useful in military service.'" *Kolbe*, 849 F.3d at 136 n. 10 (quoting *Heller*, 554 U.S. at 627). As the Fourth Circuit concluded, and as the evidence in this case demonstrates, assault weapons and LCMs fall into that category. *Id.* at 136–37.

Today's semiautomatic assault weapons—including, in particular, AR-15 and AK platform rifles[4]—derive from weapons used by military forces around the world.[5] The AR-15 was originally developed to meet U.S. Army specifications and, after military testing proved its "phenomenal lethality," was adopted for use by U.S. troops in Vietnam and renamed the M16.[6] It had several design innovations attractive to the military: It was lightweight; its magazine could easily be released and reloaded; it chambered the .223 Remington bullet, a smaller caliber, high velocity cartridge; its muzzle velocity exceeded 3,000 feet per second; and its bullets tumbled after striking a human target, leading to catastrophic injuries.[7] AK style rifles likewise derive from the AK47, the most ubiquitous weapon in militaries worldwide, and other Enumerated Weapons similarly derive from weapons designed for military use.[8]

Functionally, AR-15s are virtually identical to M16s. The weapons have the same muzzle velocity, range, construction, configuration, and lethality.[9] They chamber the same caliber bullets,

---

[4] This brief focuses on AR-15 and AK47 style assault weapons because those weapons are the focus of the Complaint and are the most common assault weapons at this time. *See* Compl. ¶ 2.

[5] *See* Defts' Stmt. ¶¶ 43, 61–90; Yurgealitis Decl. ¶ 70.

[6] *See* Defts' Stmt. ¶¶ 61–68; Exs. 36, at 26, 43; 38, at 9–11; 58, at C-14; Yurgealitis Decl. ¶ 35.

[7] *See* Defts' Stmt. ¶¶ 44–45, 58–59, 61, 64–65; Exs. 37, at 2; 38, at 6.

[8] *See* Defts' Stmt. ¶¶ 74–90; Yurgealitis Decl. ¶¶ 28–32.

[9] *See* Defts' Stmt. ¶¶ 54, 70–71, 79, 95; Bolcome Aff. ¶ 11; Yurgealitis Decl. ¶¶ 47–50.

are made of the same materials, and their operational components, including their upper and lower receivers, are interchangeable.[10] The difference between AR-15s and M16s is that AR-15s are semiautomatic, firing one bullet with each pull of the trigger, while M16s are select-fire, meaning they can fire in semiautomatic, "three-round burst," or "fully automatic" mode.[11]

In the plaintiffs' view, this distinction should mark the line between weapons eligible and ineligible for Second Amendment protection. But the fact that AR-15s and other assault rifles are semiautomatic does not render them "unlike" the M16 and other weapons most useful in military service. First, "[t]he difference [in rates of fire] between the fully automatic and semiautomatic versions of those firearms is slight." *Kolbe*, 849 F.3d at 125 (comparing rates and citing Ex. 29, at 18). Second, the Army specifically instructs that, because the recoil is easier to control and firing is therefore more accurate, the M16 should "normally be employed in the semiautomatic fire mode" instead of burst mode or automatic mode.[12] Soldiers use semiautomatic mode offensively— to kill the enemy—and only use three-round burst or automatic mode for defensive suppression in the face of enemy fire.[13] Third, semiautomatic assault weapons can easily be converted into weapons that simulate an automatic rate of fire. A range of devices—for example, bump stocks and trigger cranks—can be attached to AR-15s and other assault rifles to increase their firing speed.[14] Other assault rifles are manufactured with a "binary trigger," which fires once on the pull of the trigger and once on release, thereby doubling the rate of fire of a semiautomatic weapon.[15]

LCMs are similarly "like" weapons that are "most useful in military service." *Heller*, 554 U.S. at 627. As the ATF recognized, "virtually all modern military firearms are designed to accept

---

[10] *See* Defts' Stmt. ¶¶ 72, 79; Bolcome Aff. ¶ 11; Ex. 43; Yurgealitis Decl. ¶¶ 47–51.
[11] *See* Defts' Stmt. ¶¶ 63, 70, 79; Bolcome Aff. ¶¶ 7, 12; Ex. 39, at 2-1; Ex. 41.
[12] *See* Defts' Stmt. ¶ 51; Ex. 39, at 7-12, 7-13; Bolcome Aff. ¶ 8.
[13] *See* Defts' Stmt. ¶ 52; Bolcome Aff. ¶ 9.
[14] *See* Defts' Stmt. ¶¶ 46–47; Ex. 11, at 148:3-9, 149:13 – 150:8, 151:1-21, 156:8-20; Ex. 13, at 67:8-15, 69:20 – 71:9; Bolcome Aff. ¶¶ 24–25; Exs. 69, 70.
[15] Ex. 11, at 154:4-19; Bolcome Aff. ¶ 26.

large, detachable magazines" so that soldiers have a "large ammunition supply and the ability to reload rapidly."[16] Thus, LCMs are "particularly designed and most suitable for military and law enforcement applications," and the U.S. military issues soldiers LCMs.[17] "[T]hose engaged in sports shooting events," in contrast, "are not engaging in potentially hostile or confrontational situations, and therefore do not require the large amount of immediately available ammunition, as do military service members."[18] Most modern semiautomatic hunting rifles, therefore, have an internal magazine capacity of less than ten rounds.[19]

> 2. Assault Weapons and LCMs Are Not Lineal Descendants of Weapons in Common Use at the Time the Second Amendment was Ratified, and They Are Not in Common Use Today for Self-Defense.

In applying *Heller*'s second limitation—whether a weapon "'in common use at the time'" is used "for lawful purposes like self-defense," 554 U.S. at 624—courts have employed two approaches. Because *Heller* did not specify which "time" matters, some courts have focused on whether a weapon is a lineal descendant of a weapon that was in common use when the Second Amendment was ratified. *See, e.g.*, *Friedman*, 784 F.3d at 410. Other courts have focused on whether a weapon is commonly used for self-defense today. *See NYSRPA*, 804 F.3d at 255–56; *Heller II*, 670 F.3d at 331. Under either approach, assault weapons and LCMs are not protected.

**Not Lineal Descendants.** Assault weapons and LCMs are not lineal descendants of any weapon in common use when the Second Amendment was ratified. *See Friedman*, 784 F.3d at 410. Most weapons commonly used in that era were muskets—single-shot, muzzle-loading flintlocks.[20] Powder and bullets were loaded separately into the muzzle of the gun.[21] Muskets could

---

[16] Ex. 40, at 10; Ex. 69.
[17] Bolcome Aff. ¶ 4; Ex. 39, at 2-1.
[18] Ex. 40, at 10; *see also* Yurgealitis Decl. ¶¶ 44–45.
[19] Yurgealitis Decl. ¶ 43.
[20] Defts' Stmt. ¶ 93; Ex. 11, at 175:3-9; 176:5-14; 178:1-14; Ex. 13, at 108:15-20.
[21] Defts' Stmt. ¶ 93; Ex. 11, at 176:5 – 177: 21.

be reloaded and fired by most shooters three or, at best, four times a minute.[22] Because they were smoothbore and not rifled, their effective range was approximately 100 yards.[23]

Today's assault weapons, in contrast, are breech loading, rifled, and highly accurate at ranges up to 500 yards.[24] They use sophisticated and powerful cartridges rather than round shot and powder.[25] They can fire as fast as the shooter can pull the trigger—as fast as 30 rounds in five seconds.[26] They are percussion system and employ detachable magazines—two technological innovations that originated well after the time of ratification.[27] And they can be manufactured with a range of military features—grenade launchers, barrel shrouds, flash suppressors, pistol grips, muzzle breaks, and folding stocks—utterly unknown to the Founders.

**Not In Common Use for Self-Defense Today.** Nor are assault weapons or LCMs commonly used,[28] or suitable, for self-defense today. Because of their high muzzle velocity—more than double that of a 9mm handgun—assault weapons over-penetrate typical building materials, posing a serious risk to bystanders.[29] Compared to handguns, they are difficult to maneuver in close quarters and require more movements by the user to become operable.[30] Of the two guides to self-defense published by the National Rifle Association ("NRA"), neither mentions any weapons covered by the AWB as an appropriate choice for self-defense; instead, both focus on handguns.[31] LCMs, too, are not commonly used or necessary for self-defense. An analysis of an

---

[22] Defts' Stmt. ¶ 94; Ex. 11, at 191:6-14.

[23] Defts' Stmt. ¶ 95; Ex. 64, at 4; Ex. 91, at 24.

[24] Defts' Stmt. ¶¶ 95, 148; Ex 11, at 87:16 – 88:16.

[25] Defts' Stmt. ¶¶ 56, 93.

[26] Defts' Stmt. ¶ 92; Ex. 12, at 175:20 – 176:23; Ex. 11, at 101:8-14.

[27] Defts' Stmt. ¶¶ 96, 101; Ex. 16, at 4.

[28] Although there may be as many as 13 million assault weapons in circulation nationwide, they represent only a small fraction of the approximately 357 million guns in the United States. *See* Defts' Stmt. ¶ 115; Ex. 45, at 1; Ex. 15, at 8 (chart). Assault weapons are, moreover, concentrated in the hands of a much smaller number of individuals. On average, owners of assault weapons own at least three such weapons, meaning that, at most, approximately 1% of Americans owns assault weapons. Defts' Stmt. ¶ 116; Ex. 15, MSR Report, at p. 13.

[29] Defts' Stmt. ¶ 148; Yurgealitis Decl. ¶ 79.

[30] Defts' Stmt. ¶ 147; Yurgealitis Decl. ¶ 80; Leahy Decl. ¶ 21.

[31] *See* Defts' Stmt. ¶¶ 144, 150; Exs. 62, 63.

NRA database of gun-related self-defense stories found that defenders fired an average of 2.2 shots per incident, and from 2011 to 2013, there were no incidents in which ten or more shots were fired.[32] When asked, none of the plaintiffs or their experts could identify a single example of the use of an AR-15, AK47, or other assault weapon in self-defense.[33] Nor could they identify an example in which ten or more shots were fired in self-defense.[34] Consistent with this evidence, the First Circuit recently concluded that "large capacity weapons," a category that includes assault weapons and LCMs, are not "of the type characteristically used to protect the home." *Hightower v. City of Boston*, 693 F.3d 61, 66, 71 & n. 7 (1st Cir. 2012).

### B. Even if Assault Weapons and LCMs Were Protected by the Second Amendment, the Commonwealth's Ban on Those Weapons Survives Intermediate Scrutiny.

Even if this Court were to assume that the Second Amendment protects assault weapons and LCMs, the Commonwealth's ban on those weapons readily survives constitutional scrutiny.

#### 1. This Court Should Apply, At Most, Intermediate Scrutiny to the AWB.

In determining the appropriate level of constitutional scrutiny for laws that implicate the Second Amendment, courts look to the severity of the burden on Second Amendment rights. *See Kolbe*, 849 F.3d at 138; *NYSRPA*, 804 F.3d at 258; *Heller II*, 670 F.3d at 1261–62. "[P]ossession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment." *Hightower*, 693 F.3d at 72. Laws that do not severely burden the ability to defend oneself in one's home are "distinct from this core interest emphasized in *Heller*," *id.*, and are analyzed under intermediate scrutiny. *See United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011).

Unlike the laws invalidated in *Heller*, the AWB does not severely burden the right of self-defense in the home. The AWB does not prohibit possession of the handgun, "the quintessential

---

[32] *See* Defts' Stmt. ¶ 154; Spitzer Aff. ¶ 42; Yurgealitis Decl. ¶ 84; Ex. 46.
[33] *See* Defts' Stmt. ¶ 133.
[34] *See* Defts' Stmt. ¶ 152.

self-defense weapon." 554 U.S. at 629. The Legislature could reasonably conclude that assault weapons and LCMs are not suitable or frequently used for self-defense, inside or outside the home. *See supra*, at 9–10. Notwithstanding the AWB, many other weapons remain available in Massachusetts for defense of the home[35]; indeed, all of the plaintiffs own alternative firearms for self-defense.[36] For these reasons, every appellate court to test a ban on assault weapons and LCMs under constitutional scrutiny has applied intermediate, not strict, scrutiny. *See Kolbe*, 849 F.3d at 138; *NYSRPA*, 804 F.3d at 259–61; *Fyock*, 779 F.3d at 999; *Heller II*, 670 F.3d at 1261–62. Any constitutional review of the AWB by this Court should also apply, at most, intermediate scrutiny.

      2.  <u>The Ban on Assault Weapons and LCMs Is Substantially Related to the Important Interest in Promoting the Safety of the Public and of Law Enforcement Officials.</u>

In applying intermediate scrutiny, a court must ask whether the challenged enactment is "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The government can justify the fit between the statute and government interest "by reference to studies and anecdotes . . . or even . . . based solely on history, consensus, and simple common sense." *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks and citations omitted). In this analysis, courts owe "substantial deference to the predictive judgments" of the Legislature. *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994).

The Legislature's interests in banning assault weapons and LCMs—protecting the safety of the public and of police officers[37]—are important, and indeed, compelling. *See Kolbe*, 849 F.3d at 139; *NYSRPA*, 804 F.3d at 261; *Fyock*, 779 F.3d at 1000; *Heller II*, 670 F.3d at 1262–63. And the AWB is substantially related to those interests. First, assault weapons and LCMs are the weapon of choice in public mass shootings and are disproportionately used in those shootings.

---

[35] *See, e.g.*, Defts' Stmt. ¶ 143; Exs. 61, 93; 108 Stat. at 1997, 2000–10 (Ex. 30)
[36] *See* Ex. 4 at 18:10 – 19:21; Ex. 5 at 16:4 – 17:1, 19:18 – 19:23; Ex. 6 at 26:3-4, 29:3-8; Ex. 7 at 21:1 – 22:3.
[37] *See, e.g.*, Exs. 21, 26, 27, 33, 34.

Although assault weapons represent at most 3% of the U.S. gun stock, *see supra*, note 28, they are used in between 22% and 27% of all public mass shootings involving the deaths of four or more people.[38] Half of public mass shootings involve LCMs.[39]

Second, assault weapons and LCMs are disproportionately used to kill, and pose a unique threat to, police officers. Between 1998 and 2011, one in five law enforcement officers killed in the line of duty was slain by an assault weapon.[40] The body armor typically used by police officers can be penetrated by assault weapons, and because of the speed, range, and accuracy of the weapons, officers face increased risk when responding to mass shootings, particularly when the shooter is located at a secluded or distant location.[41]

Third, because of their high muzzle velocity and rapid fire capabilities, and the tumbling and cavitation of their bullets upon impact, assault weapons inflict more severe wounds in victims than do most handguns and other lower-velocity weapons.[42] According to the surgeon who treated victims of both the Columbine and Aurora massacres, injuries from assault weapons "cause far greater damage to the muscles, bones, soft tissue, and vital organs," which "are too often shredded beyond repair."[43] Assault weapons victims are at "far higher risk for both immediate and long term complications," including higher amputation and infection rates.[44] Because LCMs enable a shooter to spray more bullets more quickly, they give rise to a greater number of wounds per victim.[45]

Finally, banning assault weapons and LCMs has a significant impact on crime and public safety. The most comprehensive study of the impact of the Federal AWB concluded that crimes

---

[38] Defs' Stmt. ¶¶ 125–126; Ex. 54, at 29; Exs. 55, 56.
[39] Defs' Stmt. ¶ 127; Exs. 55, 56.
[40] Defs' Stmt. ¶ 120; Ex. 57, at 5.
[41] Defs' Stmt. ¶¶ 159, 161; Kyes Decl. ¶¶ 15, 23–24.
[42] Defs' Stmt. ¶¶ 58–59; Colwell Decl. at 2–4; Ex. 51, 52, 53, 71, 73.
[43] Colwell Decl. at 2.
[44] Colwell Decl. at 3.
[45] Defs' Stmt. ¶ 60; Colwell Decl. at 3–4; Ex. 29, at 19.

committed with assault weapons declined between 17% and 72% across major cities in the years the Federal AWB was in effect, with Boston showing the greatest decline, possibly because of the combined effect of the state and Federal AWB.[46] Another study concluded that in Virginia, the share of gun crimes committed with LCMs ranged between 13% and 16% in the early years of the Federal AWB, decreased to 9% by the last year the Federal AWB was in effect, then rose to 20% in 2010, after the federal ban expired.[47] A third study concluded that the number of fatalities in mass shootings was lower during the years that the Federal AWB was in effect.[48]

## II.   THE ENFORCEMENT NOTICE COMPORTS WITH DUE PROCESS.

The plaintiffs next claim that the Enforcement Notice violates due process. Relying on *Bouie v. Columbia*, 378 U.S. 347 (1964), they contend that it "is a regulation promulgated by an administrative agency that retroactively enlarged the scope of a criminal statute," and is therefore "unconstitutional, like an Ex Post Facto law passed by a legislature or a retroactive decision issued by a state supreme court." Compl. ¶¶ 82–84, 96. The argument is meritless.

### A.   *Bouie* Does Not Apply to the Enforcement Notice.

*Bouie* held that due process prevents state courts from retroactively applying to a criminal defendant an interpretation of a criminal law that was unexpected and indefensible by reference to existing law. 378 U.S. at 352–55; *see Metrish v. Lancaster*, 569 U.S. 351, 360 (2013); *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001). For at least two reasons, *Bouie* has no application to the Enforcement Notice. First, *Bouie* only recognizes due process rights for criminal defendants who are actually charged under a statute that has been unexpectedly and indefensibly reinterpreted. *See Rogers*, 532 U.S. at 458–62; *Bouie*, 378 U.S. at 354–55. But the plaintiffs are not defendants in

---

[46] Defts' Stmt. ¶ 140; Ex. 47, at 46–62 & n. 55; Spitzer Aff. ¶¶ 22–23; *see also* Ex. 48, at 7–9; Ex. 49, at 19–20.
[47] Defts' Stmt. ¶ 141; Ex. 50.
[48] Defts' Stmt. ¶ 130; Ex. 41.

any criminal proceeding, Compl. ¶¶ 8, 95, and the Attorney General has made clear that she will not apply the Notice to dealers' transactions that occurred before the Notice was issued. *See* Ex. 1, at 162:5-10; 163:17-23. Second, *Bouie* only provides due process protection against *state courts'* unexpected and indefensible interpretations of state law, and the Notice is not an interpretation by a state court. 378 U.S. at 354–55; *see also Rogers*, 532 U.S. at 461.

The plaintiffs ask this Court to expand *Bouie*'s holding to similarly constrain administrative agencies from making "'a substantial change in [an] enforcement policy that was not reasonably communicated to the public.'" Compl. ¶ 92 (quoting *Upton v. SEC*, 75 F.3d 92, 97 (2d Cir. 1996)). But even if *Bouie*'s fair warning doctrine did constrain agencies' interpretations of regulations, the Enforcement Notice is not a regulation. It is a prosecutor's advisory to the public of her interpretation of a criminal law committed to her enforcement. The Attorney General is "charged by law with the responsibility for the interpretation or enforcement of the law defining the offense[s]" made criminal by the Legislature, including the AWB. *Commonwealth v. Twitchell*, 617 N.E.2d 609, 619 (Mass. 1993). As part of that responsibility, she can, and does, issue advisories alerting the public to her interpretation of criminal laws.[49] To be sure, the Attorney General has separate authority to issue regulations under the Consumer Protection Act, G.L. c. 93A, § 2(c), but she did not exercise that authority here.[50]

It would be unprecedented to apply *Bouie*'s fair warning principle to constrain a prosecutor's discretion in interpreting and enforcing a criminal law. Suppose, for example, that rather than issuing the Enforcement Notice, the Attorney General simply began prosecuting dealers for selling "copies" of the Colt AR-15 or the AK47, as would have been unquestionably within

---

[49] *See, e.g.*, Exs. 59, 60; 1989–90 Mass. Op. Att'y Gen. No. 4, 1990 WL 508739 (Jan. 19, 1990); 1981–82 Mass. Op. Att'y Gen. No. 9, 1982 WL 188378 (Feb. 11, 1982).

[50] If the Enforcement Notice were a regulation, it would have been promulgated under the procedures set forth in the Administrative Procedure Act, G.L. c. 30A, §§ 2, 5–6A.

her authority. No one would suggest that other dealers could assert a due process right not to be charged in the future for the same conduct because the first prosecution marked a "a substantial change in [an] enforcement policy that was not reasonably communicated to the public." *Upton*, 75 F.3d at 97. For good reason: Courts have long rejected the argument that due process or estoppel prevents a prosecutor from enforcing a criminal law, like the AWB, that has historically been under-enforced. *See, e.g.*, *D.C. v. John R. Thompson Co.*, 346 U.S. 100, 117 (1953); *United States v. Prosperi*, 573 F. Supp. 2d 436, 445 (D. Mass. 2008); *Doris v. Police Comm'r of Boston*, 373 N.E.2d 944, 949 (Mass. 1978). The analysis does not change because the Attorney General issued the Enforcement Notice instead of bringing charges; indeed, a public advisory provided dealers with *more* notice of how she interprets the AWB than simply commencing prosecution.

### B. The Attorney General's Interpretation of the AWB Was Not "Unexpected and Indefensible" Because Her Construction of "Copies or Duplicates" Is Consistent with the Plain Meaning of the Statute and Other Extant Law.

Even if *Bouie* could constrain a prosecutor's discretion in interpreting a criminal law, the Attorney General's interpretation of the phrase "copies or duplicates" is not "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." 378 U.S. at 354. Courts and dictionaries define a "copy" as "a thing made to be similar or identical to another," *Oxford English Dictionary*, at 316 (12th ed. 2011), or "a reproduction or imitation of an original." *Webster's II New College Dictionary*, at 249 (1995); *Country Vintner of N.C., LLC v. E.&J. Gallo Winery, Inc.*, 718 F.3d 249, 258 (4th Cir. 2013). A "duplicate," in contrast, is "one of two or more identical things." *Oxford English Dictionary*, at 444 (12th ed. 2011).

Under Massachusetts law, "[w]here the Legislature employs two similar terms or phrases in the same statutory series, [courts] are required to construe them differently if each is to have meaning." *Halebian v. Berv*, 931 N.E.2d 936, 993 n. 12 (Mass. 2010). In order to construe "copies"

and "duplicates" differently so that each has meaning, "copies" must encompass weapons that are similar to or imitations of the Enumerated Weapons, while "duplicates" must encompass weapons that are exact replicas of the Enumerated Weapons.

The Attorney General's interpretation of the phrase "copies or duplicates" aligns with this construction. It regards a weapon as a "copy or duplicate" of an Enumerated Weapon if the weapon's "internal functional components are substantially similar in construction and configuration to those of an Enumerated Weapon," or if that weapon "has a receiver that is the same as or interchangeable with the receiver of an Enumerated Weapon." Ex. 35. These functional inquiries are consistent with the definition of "copy"—that is, whether a weapon is similar to or an imitation of an Enumerated Weapon. The interpretation also aligns with other authorities' constructions. Although no Massachusetts court has interpreted "copies or duplicates," the Illinois Supreme Court concluded that the phrase "includes the specific weapons listed and any imitations or reproductions of those weapons made by that manufacturer or another." *Wilson v. Cnty. of Cook*, 968 N.E.2d 641, 652 (Ill. 2012). An enforcement notice issued by the Maryland Attorney General in 2010 likewise specified that "'a copy of a designated assault weapon must be similar in its internal components and function to the designated weapon.'" *Kolbe*, 849 F.3d at 148.

The plaintiffs strain to show that the Attorney General's interpretation was "unexpected and indefensible" by claiming that the Firearms Records Bureau ("FRB") "reviewed and approved" transfers of copies of Enumerated Weapons. Compl. ¶ 86. The undisputed evidence refutes that claim. The FRB keeps records of all transactions involving guns in Massachusetts, but it does not review or approve of those transactions. Dunne Decl. ¶¶ 2, 7–8. When gun dealers and private sellers sell weapons, they must enter information about the transaction into an electronic database. *Id.* ¶¶ 3, 4; 803 Code Mass. Reg. 10.07. When this transaction data arrives at the FRB,

it is not examined or reviewed by any FRB employee, but instead is simply stored in the database. Dunne Decl. ¶ 5. If a law enforcement official requests the data, the FRB retrieves that data from the database. *Id.* ¶ 6. The FRB's passive storage and retrieval of transaction data does not imply "approval" of the thousands of gun transactions that take place in Massachusetts. *Id.* ¶¶ 7–8. Nor could it, as the data does not contain all of the information necessary—like the date of manufacture of the weapon and the current occupation of the purchaser—to evaluate whether any particular transferred weapon meets the requirements of Massachusetts law. *Id.* ¶ 8; Bolcome Aff. ¶ 19.

Moreover, FRB has not issued an official statement interpreting the phrase "copies or duplicates" since at least 2001, Dunne Decl. ¶ 9, and there is no evidence that any official ever suggested that imitations of Enumerated Weapons are lawful. Indeed, official statements suggested the opposite: After the 2012 massacre at Sandy Hook Elementary School with a Bushmaster XM-15 rifle, Patrick Administration officials stated that the rifle "cannot be legally purchased in Massachusetts because it is prohibited under the state's assault weapons ban." Exs. 18, 42.

## III.    THE FACIAL VAGUENESS CLAIM CHALLENGING THE PHRASE "COPIES OR DUPLICATES" IS NOT COGNIZABLE AND FAILS ON THE MERITS.

Finally, the plaintiffs' claim that the phrase "copies or duplicates" in the AWB is void for vagueness, in violation of due process, is not cognizable and, in any event, fails on the merits.

### A.    As a Facial Challenge to the Statute, the Vagueness Claim Is Not Cognizable.

The plaintiffs challenge the statutory phrase "copies or duplicates" as unconstitutionally vague on its face, not as applied in a particular enforcement action. But vagueness claims that "'do not involve First Amendment freedoms must be examined in the light of the facts of [a] case at hand'"; such claims may not be brought to challenge a statute on its face. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 7 (1982) (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)); *see also Chapman v. United States*, 500 U.S. 453, 467 (1991);

17

*Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991). Under this rule, the plaintiffs' facial vagueness challenge to the AWB fails. The claim does not implicate the First Amendment; the plaintiffs do not contend that the statute threatens to chill protected speech or expression. The claim is therefore "eligible only for as-applied, not facial, review." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016). Because the plaintiffs have not asserted an as-applied vagueness claim—nor could they, as the "copies or duplicates" provision of the AWB has not been applied to them in an enforcement action—their vagueness claim is not cognizable.

**B.  The Facial Vagueness Claim Fails Because the Phrase "Copies or Duplicates" Provides Fair Notice of What Weapons Are Prohibited.**

Even if the plaintiffs could challenge the phrase "copies or duplicates" as unconstitutionally vague on its face, which they cannot, their claim would still fail on the merits.

To succeed on a facial claim contesting the alleged vagueness of a statute, "the complainant must demonstrate that the law is impermissibly vague in all of its applications," *Hoffman Estates*, 455 U.S. at 498, or that the law lacks a "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Under either standard, the phrase "copies or duplicates" easily passes constitutional muster because it "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008).

As an initial matter, this Court has already rejected a vagueness challenge to the phrase "copies or duplicates" in the AWB. In 1998, one of the same plaintiffs—GOAL—filed a complaint alleging that "the ter[m] 'copies or duplicates' is vague."[51] This Court dismissed the claim on the merits, concluding that "it [wa]s patently apparent that the definitions, even if they might be

---

[51] Ex. 20, ¶ 121.

unclear at the margins, are not impermissibly vague in all applications."[52] Other courts, construing

the same statutory language in other assault weapons bans, have reached the same conclusion. *See*

*Kolbe*, 849 F.3d at 148–49; *NYSRPA*, 804 F.3d at 267; *Wilson*, 968 N.E.2d at 652–53.

These courts recognize that the phrase "copies or duplicates" gives ordinary people fair

notice of which weapons are prohibited. Dictionaries define a "copy" as "a thing made to be similar

or identical to another" or "a reproduction or imitation of an original," and a "duplicate" as "exactly

like something else, especially through having been copied." *See supra*, at 15. "A person of

ordinary intelligence would understand" that a statute banning "copies or duplicates" of

Enumerated Weapons "includes the specific weapons listed and any imitations or reproductions of

those weapons made by that manufacturer or another." *Wilson*, 968 N.E.2d at 652.

The Enforcement Notice adds further clarity by providing guidance on how the Attorney

General interprets the phrase "copies or duplicates," and by providing specific examples of the

application of its tests. *See* Ex. 35, at 3–4. In this respect, it is similar to guidance published by the

Maryland Attorney General. *See supra*, at 16. The Fourth Circuit held that that guidance enhanced

the clarity of the Maryland Assault Weapons Ban and undermined a vagueness challenge to the

statute. *Kolbe*, 849 F.3d at 149. Contrary to plaintiffs' argument, *see* Compl. ¶¶ 102–07, the Notice

does not muddy the meaning of the phrase "copies or duplicates"; indeed, guidance provided by

the Attorney General on the meaning of a criminal statute cannot make that statute more vulnerable

to constitutional attack. *See McGuire v. Reilly*, 386 F.3d 45, 58–59 (1st Cir. 2004).

The plaintiffs understand the phrase "copies or duplicates." The owner of Overwatch

Outpost testified that it is "obvious" that "we can't sell AR-15s, and we know that we can't sell

---

[52] Ex. 19, at 2 (citing *Hoffman Estates*, 455 U.S. at 494–95). GOAL chose not to appeal this ruling. *See Gun Owners' Action League v. Swift*, 284 F.3d 198, 203 (1st Cir. 2002). As asserted by GOAL, the vagueness claim is plainly barred by claim and issue preclusion. *See In re Sonus Networks, Inc.*, 499 F.3d 47, 56–57 (1st Cir. 2007).

AK-47s."[53] The owner of On Target Training identified specific copies of the Colt AR-15 that are banned, including "Smith & Wesson M&P 15s, Windham Weapons WW-15s," and AR-15s manufactured by Bushmaster, Daniel Defense, Stag Arms, Spike Tactical, and ATI.[54] He explained that "[a]ll of the modern sporting rifles, semiautomatic, gas operated that are similar in nature to the [Colt] AR-15" are banned.[55] Similarly, two of the individual plaintiffs identified the Smith & Wesson M&P 15 as a "very common entry level AR-15," and GOAL testified that "there are a host of other manufacturers," including Sig Sauer and Bushmaster, that have produced AR-15s.[56] FRB data further demonstrates that people know which rifles are copies of the Colt AR-15 and the AK47: After the Notice was issued, sales of those weapons virtually ended in Massachusetts.[57]

All of this evidence shows that the phrase "copies or duplicates" provides the plaintiffs, and persons of ordinary intelligence, with fair notice of the legal standard for determining whether weapons are copies or duplicates of Enumerated Weapons like the Colt AR-15 and AK47. The plaintiffs complain that they are confused as to the application of the statute to other weapons, but "[t]hat contention misapprehends the vagueness inquiry, which focuses on the intractability of identifying the applicable legal standard, not on the difficulty of ascertaining the relevant facts in close cases." *Kolbe*, 849 F.3d at 149. Judgment should enter for the defendants because the phrase "copies or duplicates" has a plainly legitimate sweep and is not vague in all of its applications.

## CONCLUSION

For the foregoing reasons, this Court should grant the Defendants' Motion for Summary Judgment and enter judgment in favor of the Defendants.

---

[53] Ex. 10, at 47:23 – 48:1.
[54] Ex. 9, at 90:4-9; 94:1-10; *see also id.* at 64:10-13, 64:23-24, 67:13-16.
[55] Ex. 9, at 90:11-13; *see also* Ex. 24 (email from Edward O'Leary).
[56] Ex. 5, at 23:19 – 24:1; Ex. 6, at 27:8-11; Ex. 8, at 49:9 – 50:17.
[57] Defts' Stmt. ¶ 110; Bolcome Aff. ¶ 22; Ex. 1, at 148:12-16.

Respectfully submitted,

MAURA HEALEY, in her official capacity as
Attorney General of the Commonwealth of
Massachusetts; DANIEL BENNETT, in his official
capacity as Secretary of the Executive Office of
Public Safety and Security; COLONEL KERRY
GILPIN, in her official capacity as Superintendent
of the Massachusetts State Police,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Julia E. Kobick
William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
(617) 963-2559
Date: December 15, 2017                julia.kobick@state.ma.us

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF, system will be sent
electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and
that paper copies will be sent to those indicated as non-registered participants by first-class mail
on December 15, 2017.

/s/ Julia E. Kobick
Julia E. Kobick
Assistant Attorney General