# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DAVID SETH WORMAN, ANTHONY LINDEN, JASON WILLIAM SAWYER, PAUL NELSON CHAMBERLAIN, GUN OWNERS' ACTION LEAGUE, INC., ON TARGET TRAINING, INC., AND OVERWATCH OUTPOST,

*Plaintiffs*,

v.

MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts; DANIEL BENNETT, in his official capacity as the Secretary of the Executive Office of Public Safety and Security; and COLONEL KERRY GILPIN, in her official capacity as Superintendent of the Massachusetts State Police,

*Defendants*.

CIVIL ACTION
NO. 17-cv-10107-WGY

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

MAURA HEALEY
ATTORNEY GENERAL

William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108

Date: December 15, 2017

1

## I.    BACKGROUND.

1.     Since 1998, Massachusetts has banned Assault Weapons and Large Capacity Feeding Devices ("LCFDs").[1]  G.L. c. 140, §§ 121, 131M.

### A.  <u>The 1994 Federal Assault Weapons Ban.</u>

2.     In 1994, Congress enacted the Public Safety and Recreational Firearms Use Protection Act of 1994, also known as the Federal Assault Weapons Ban). Pub. L. No. 103–322, § 110102; 108 Stat. 1796, 1996–2010; codified at 18 U.S.C. §§ 921(a)(30), 922(v) (1994) (Kaplan Decl. Ex. 30). The law "combine[d] two approaches which ha[d] been followed in the past in legislation proposed to control semiautomatic assault weapons—the so-called 'list' approach and the 'characteristics' approach."  H.R. Rep. No. 103–489, at 20 (Kaplan Decl. Ex. 29).

3.     The first approach was a list of Enumerated Weapons.  The federal law banned the manufacture, transfer, and possession of 19 specific models or variations of semiautomatic weapons, "or copies or duplicates of th[os]e firearms in any caliber." 108 Stat. at 1996–98 (Kaplan Decl. Ex. 30).  The Enumerated Weapons are:

(i) Avtomat Kalashnikov (AK) (all models);

(ii) Action Arms Israeli Military Industries UZI and Galil;

(iii) Beretta Ar70 (SC-70);

(iv) Colt AR-15;

(v) Fabrique National FN/FAL, FN/LAR and FNC;

(vi) SWD M-10, M-11, M-11/9 and M-12;

---

[1] In the record and brief, these feeding devices are sometimes referred to as Large Capacity Magazines or "LCMs."  The terms are used interchangeably and are governed in Massachusetts by the definition of "Large capacity feeding devices" in G.L. 140, § 121.

(vii) Steyr AUG;

(viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and

(ix) revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12.

108 Stat. at 1997–98 (Kaplan Decl. Ex. 30).

4.      Under the second approach, the federal law also banned any semiautomatic rifle, pistol, or shotgun that had two or more combat-style features, and for rifles and pistols, that had the ability to accept a detachable magazine. 108 Stat. at 1996, 1998 (Kaplan Decl. Ex. 30). Examples of the combat-style features included folding or telescoping stocks, flash suppressors, grenade launchers, bayonet mounts, and pistol grips that protrude beneath the action on the weapon. *Id.*

5.      The federal ban did not apply to assault weapons that were possessed lawfully before September 13, 1994, the enactment date of the statute. 108 Stat. at 1997  (Kaplan Decl. Ex. 30). The law also exempted 661 rifles and shotguns, listed on Appendix A to the statute, that were commonly used in hunting and target practice. 108 Stat. at 1997, 2000–10. And the law exempted several other categories of weapons, including "any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition" and "any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine." 108 Stat. at 1997.

6.      Separately, the law banned "large capacity ammunition feeding devices," also called "large capacity magazines" or "LCMs," defined as feeding devices manufactured after September 13, 1994 that have "a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition," but not "attached tubular device[s] designed to accept, and capable of operating only with, .22 caliber rimfire ammunition." 108 Stat. at 1998–99; codified at

18 U.S.C. §§ 921(a)(31), 922(w)(1) (1994) (Kaplan Decl. Ex. 30).

**B. Federal Gun Control Act.**

7.      The federal Gun Control Act of 1968 generally bars the importation of firearms into the United States.  18 U.S.C. § 922(l).  The Act provides limited exceptions to the general prohibition, including firearms that are "…particularly suitable for or readily adaptable to sporting purposes …."  18 U.S.C. § 925(d)(3).

8.      In 1989, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") used its authority under the Gun Control Act of 1968 to block the importation of various foreign-made semiautomatic rifles with military features based on its determination that such weapons are not suitable for sporting purposes, and are instead "designed and intended to be particularly suitable for combat" and "military applications," and "for killing or disabling the enemy." United States Department of Treasury, Bureau of Alcohol Tobacco and Firearms, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles*, at 19 (July 6, 1989) (Kaplan Decl. Ex. 65).

9.      In 1998, ATF published a Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles (the "1998 Study"). The 1998 Study found that "the ability to accept a detachable large capacity military magazine ("LCMM")—a magazine with a capacity of more than ten rounds—originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.  The findings in this regard were based on the observation that LCMMs primarily serve "combat–functional ends" and that firearms equipped with LCMMs do not serve a traditional sporting purpose. United States Department of Treasury, Bureau of Alcohol Tobacco and Firearms, *Study on the Sporting Suitability of Modified Semiautomatic Rifles*, at 37 (April 1998) (Kaplan Aff. Ex. 66).

4

C. **The 1998 Massachusetts Assault Weapons Ban.**

10.     In 1998, the Massachusetts Legislature enacted a state version of an assault weapons ban as part of a broader Act Relative to Gun Control in the Commonwealth. Mass. St. 1998, c. 180, §§ 8, 9, 23, 47 (July 23, 1998).  The state Assault Weapons Ban provides that "[n]o person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994." St. 1998, c. 180, § 47; codified at G.L. c. 140, § 131M.

11.     The Act also prohibits licensed gun dealers from selling or offering to sell "to any person any assault weapon or large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994." St. 1998, c. 180, §§ 19, 23; codified at G.L. c. 140, §§ 123 (clause sixteenth) and 128.  Both provisions set forth criminal penalties for their violation.  *See* G.L. c. 140, §§ 128, 131M.

12.     In 1998, the Legislature adopted nearly the same definition of "assault weapon" that Congress employed in the 1994 federal law. The state law provides that "'[a]ssault weapon[']' shall have the same meaning as a semiautomatic assault weapon as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(30)." St. 1998, c. 180, § 8; codified at G.L. c. 140, § 121 (1998).

13.     Like the federal statute, the Massachusetts law defines assault weapons with two independent tests. First, the Massachusetts statute defines "[a]ssault weapon[s]" to "include, but not be limited to" 19 models or variations of semiautomatic weapons, like the Colt AR-15; all AK models, including the AK-47; and others.  St. 1998, c. 180, § 8; G.L. c. 140, § 121. The Enumerated Weapons listed in the state law are the same as those listed in federal law.  *See id.*; *supra*, ¶ 3.  The Massachusetts definition includes "copies or duplicates of th[os]e [enumerated] weapons, of any

5

caliber." *Id.*

14.     Second, by referencing the federal statute, the state statute separately adopted the Features Test, which generally banned any semiautomatic rifle, pistol, or shotgun that had the ability to accept a detachable magazine and had two or more specified combat-style features.  St. 1998, c. 180, § 8; G.L. c. 140, § 121; *supra* ¶ 4.

15.     The Massachusetts law also contains exceptions that track the federal statute. St. 1998, c. 180, § 8; G.L. c. 140, § 121. For example, all 661 rifles and shotguns listed on Appendix A to the federal statute were exempted from the state law, as were "any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition" and "any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine," among other exceptions. *Id.*

16.     Large capacity feeding devices are defined as "(i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with .22 caliber ammunition." St. 1998, c. 180, § 8, codified at G. L. c. 140, § 121.

D.    **2004 Reauthorization of Massachusetts Assault Weapons Ban.**

17.     The 1998 Massachusetts Assault Weapons Ban was originally tied to the 1994 federal ban, which by its terms expired on September 13, 2004, and was not reauthorized.  *See* St. 1998, c. 180, §§ 8, 47; Pub. L. No. 103–322, § 110105(2); 108 Stat. at 2000. To ensure that the

6

Massachusetts law continued in force, the Legislature in 2004 made the state ban permanent. *See* St. 2004, c. 150, § 1; codified at G.L. c. 140, § 121.

18.     The Massachusetts Major City Police Chiefs Association ("MMCPCA") supports the Assault Weapon Ban.  Kyes Decl. ¶ 20.  According to the head of the association, Chief Kyes of Chelsea, Massachusetts, "[t]he Commonwealth's assault weapons ban and large-capacity magazine ban make Massachusetts safer by reducing the availability of particularly dangerous firearms and magazines being utilized by criminals with ill motives. These bans also help protect law enforcement officers from the dangers posed by individuals who utilize these types of weapons." *Id.* ¶ 18.

19.     According to retired chief Mark Leahy, the Executive Director of the Massachusetts Chiefs of Police Association ("MCOPA") (an officer of more than 35 years standing), the ban on assault weapons and LCFD's "is important to public safety."  Leahy Decl. ¶ 12.  He further states "[t]he weapons at issue in this case, banned Assault Weapons, are unreasonably dangerous because of their lethality." *Id.* ¶ 13.

20.     One of the plaintiffs in this matter, the Gun Owners' Action League ("GOAL"), previously challenged the state Assault Weapons Ban in court and lost, both in this Court and in the Court of Appeals. *Gun Owners' Action League v. Swift*, C.A. 98-cv-12125-GAO (D. Mass) (Unpublished Order Dated Sept. 28, 2000)), *aff'd*, 284 F.3d 198, 205 (1st Cir. 2002). A copy of the District Court Order is at Kaplan Decl. Ex. 19.

**E.   The Attorney General's Enforcement Notice.**

21.     In the latter part of 2015, the Massachusetts Attorney General's Office ("AGO") began to investigate compliance with the state Assault Weapons Ban. Klein Dep. 11:20 – 16:21; Bolcome Aff. ¶ 14.

22.     Among other things, the AGO sought to assess the risk that assault weapons posed to Massachusetts residents. *Id.*

23.     The AGO determined that, in 2015 alone, thousands of weapons had been sold by gun dealers in Massachusetts that appeared to be "copies or duplicates" of enumerated banned assault weapons, in violation of the Assault Weapons Ban. *See* Bolcome Aff. ¶ 17. These weapons were virtually identical in function and design to some of the 19 banned Enumerated Weapons— in particular, the Colt AR-15 and the AK-47. *See id.*

24.     The Attorney General thereafter issued a public advisory, titled "Enforcement Notice: Prohibited Assault Weapons," on July 20, 2016. Kaplan Decl. Ex. 35.  The purpose of the Notice was "to provide a framework to gun sellers and others for understanding the definition of 'Assault weapon' contained in G.L. c. 140, § 121." *Id.* at 1.  More specifically, the Notice aimed to "provid[e] guidance on the identification of weapons that are 'copies' or 'duplicates' of the enumerated Assault weapons that are banned under Massachusetts law." *Id.*

25.     The Notice explains how the Attorney General interprets the phrase "copies or duplicates" in the statute.  Kaplan Decl. Ex. 35, at 3.  Under that interpretation, a weapon is a copy or duplicate of an Enumerated Weapon if it "1) is a semiautomatic rifle or handgun that was manufactured or subsequently configured with an ability to accept a detachable magazine, or 2) a semiautomatic shotgun," and if it meets one or both of the following two tests.  *Id.* at 3–4.

A.  Under the Similarity Test, "[a] weapon is a Copy or Duplicate if its internal functional components are substantially similar in construction and configuration to those of an Enumerated Weapon." *Id.* at 3. The test then provided an example of its application: "[A] weapon is a Copy or Duplicate, for example, if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to

one of the Enumerated Weapons." *Id.*

B.   Under the Interchangeability Test, "[a] weapon is a Copy or Duplicate if it has a

receiver[2] that is the same as or interchangeable with the receiver of an Enumerated

Weapon. A receiver will be [so] treated . . . if it includes or accepts two or more

operating components that are the same as or interchangeable with those of an

Enumerated Weapon." *Id.* at 4.  "Such operating components may include, but are not

limited to: 1) the trigger assembly; 2) the bolt carrier or bolt carrier group; 3) the

charging handle; 4) the extractor or extractor assembly; or 5) the magazine port." *Id.*

26.   The Notice stated that, in the Attorney General's view, "[p]urely cosmetic

similarities to an Enumerated Weapon, such as finish, appearance, or shape of the stock, or

appearance or shape of the rail, will not be treated as relevant to a determination of whether a

weapon is a copy or duplicate." *Id.*

27.   The Notice also explained that, in the exercise of the Attorney General's

prosecutorial discretion, the Attorney General's understanding of "copies or duplicates" described

in the Notice would be applied prospectively only. *Id.*; *see* Klein Dep. 162:5-10; 163:17-23.  But

nothing in the Notice absolved any entity or person with respect to statutory violations that had

occurred under the law prior to the date the Notice was issued. *Id.*

28.   "Since approximately one month after the issuance of the Enforcement Notice, the

unlawful sale of assault weapons has virtually stopped in Massachusetts."  Bolcome Aff. ¶ 22.

29.   The AGO has published a variety of materials that are intended to aid law abiding

---

[2] The receiver, or frame of the weapon, is generally understood as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11 (defining "[f]irearm frame or receiver").

gun manufacturers, gun sellers, and gun buyers with compliance including a set of answers to frequently asked questions and a list of guns that are not assault weapons.  That information is collected here:  http://www.mass.gov/ago/public-safety/awbe.html.

30.     The AGO has also provided a hotline and a dedicated email address for gun sellers with questions about the ban.  Bolcome Aff. ¶ 23.

### F.  The Role of the Firearms Records Bureau in Maintaining Records of Gun Transactions.

31.     The Firearms Record Bureau ("FRB") is the state agency charged with keeping records of all transactions involving guns in Massachusetts, but, according to the testimony of the head of that bureau, it does not review or approve those transactions. Dunne Decl. ¶¶ 2, 7–8.

32.     When gun dealers and private sellers complete a gun transaction, they must enter information about the transaction—including the make, model, and serial number of the gun; the date of the transaction; whether the gun is large-capacity; and identifying information about the seller and buyer—into an electronic database. Dunne Decl. ¶¶ 3, 4. *See* 803 CMR 10.07(2).

33.     When this electronic transaction data arrives at the FRB, it is not examined or reviewed by any FRB employee, but instead is simply stored in the database for later retrieval. Dunne Decl. ¶ 5.

34.     If a law enforcement official requests the data from the FRB, the FRB retrieves that data from the database. Dunne Decl. ¶ 6.

35.     The FRB's passive storage and retrieval of transaction data does not imply "approval" of the thousands of gun transactions that take place in Massachusetts.  Dunne Decl. ¶¶ 7–8.

36.     Nor could it, as the data does not contain all of the information necessary to evaluate

whether any particular transferred weapon meets the requirements of Massachusetts law.  Dunne Decl. ¶ 8; Bolcome Aff. ¶ 19.

37.    Among other things, the information collected about gun transfers does not include information about the features of a gun to determine if the gun meets the features test under the Assault Weapons Ban.  Bolcome Aff. ¶ 19.  Nor does it include manufacture date, which is necessary to determine if the grandfathering exception to the ban applies.  Bolcome Aff. ¶ 19.  *See supra* ¶ 10.

38.    Nor does the system have updated information about the occupation of the purchaser which is necessary to evaluate the law enforcement exception in G.L. c. 131M. Bolcome Aff. ¶ 19.

39.    Registration of a transfer does not and could not constitute a determination that the transaction is legal or otherwise reviewed and approved by the Commonwealth.  Bolcome Aff. ¶ 15; Dunne Decl. ¶¶ 5, 7-8; Klein Dep. 65:23-66:11.

## II.    DEVELOPMENT OF ASSAULT WEAPONS.

### A. The Assault Weapons Banned in Massachusetts Were Designed for Combat Use.

#### 1.  Banned Rifles.

40.    All of the guns banned as assault weapons in Massachusetts fire semi-automatically.  Automatic weapons (machine guns) are separately regulated and highly restricted at both the federal and state level.  *See generally* 26 U.S.C. 5845(b) (federal definition of machine gun); 18 U.S.C. § 922(o) (federal prohibition); G.L. c. 140, § 121 (state definition of machine gun); G.L. c. 140, § 131(o) (state limits on licenses); G.L. c. 269, § 10(c) (state criminal penalties for unlicensed possession).

41.    Automatic fire allows the gun to be fired as long as the trigger is held down until

the gun's ammunition feeding device is empty.  Yurgealitis Decl. ¶ 19.   Semiautomatic fire requires a trigger pull for each round fired. After each shot, the gun automatically loads the next round into the chamber and arms the firing mechanism for the next shot, thereby permitting a faster rate of fire compared to manually operated guns.  *Id.*  Rifles that can switch back and forth between automatic and semi-automatic fire are typically called "select fire."  *Id.*  Some rifles can also fire in burst mode, meaning that the gun will fire a certain number of shots for each trigger pull.  *Id.*

42.   Most of the weapons enumerated in the Massachusetts definition of Assault Weapons (including the Colt AR-15 and the AK) and their copies or duplicates are semi-automatic rifles.  Kaplan Decl. Ex. 67 (ATF 1994), at 3–17.  The exceptions are two types of semi-automatic pistols and a type of rotating cylinder shotgun, *id.*, which will be discussed separately in section II.A.2, *infra*.

43.   The rifles enumerated as Assault Weapons in the Commonwealth's AWB are derived from weapons that were designed by or for national military organizations, during or after World War II.  Yurgealitis Decl. ¶¶ 23, 46–59, 70.

44.   The banned rifles are based on military weapons designed to be effective in combat. Supica Dep. 160:17 – 162:15. As discussed more fully below, various militaries created these weapons to be easily portable by combatants, and to have features designed to put many rounds on target, quickly and at distances of a quarter mile or more.  *See* Supica Rep. 14–15 (describing military development of the weapons at issue); Yurgealitis Decl. ¶¶ 27, 45.

45.   The banned rifles can be fired semi-automatically at rates exceeding five rounds a second.  Kleck Dep. 175:20 – 176:23.  A shooter can easily empty a thirty-round magazine firing these weapons semi-automatically in five to six seconds. *Id*.

46.   As the recent mass shooting in Las Vegas demonstrates, the semiautomatic rate of

fire can further be increased (to rates approximating automatic fire) by use of a mechanical device, such as a bump stock, that is readily available in the United States. Bolcome Aff. ¶ 25; Supica Dep. 147:15 – 150:8; Rossi Dep. 38:19 – 41:19; Boone Dep. 67:8-15.

47.     Other devices to increase the rate of fire exist and are advertised for purchase on the internet. Bolcome Aff. ¶¶ 26–27; Supica Dep. 154:4 – 157:8; Boone Dep. 69:20 – 71:9.

48.     The rifles at issue are effective and accurate, fired semi-automatically, at distances of 500 yards or more. Yurgealitis Decl. ¶ 79; Supica Dep. 87:16-88:16; Kyes Decl. ¶ 13.

49.     In the recent mass shooting in Las Vegas, the shooter, Stephen Paddock, fired on a crowd at a distance of between 400 and 500 yards (about a quarter of a mile) using weapons that were identified as a Smith & Wesson AR-15 and a Daniel Defense DD5VI. Kaplan Decl. Exs. 68, 69. Based on the available information, it appears that these assault rifles are banned in Massachusetts as "copies" of a Colt AR-15. Kaplan Decl. Ex. 70. Fifty-nine people were killed and 527 others were injured in that incident. Kaplan Decl. Ex. 70, 72.

50.     Assault rifles trace their origins to the German *Sturmgewehr* (*StG44*), designed in the late stages of World War II to combine the power, long-range accuracy, and penetrating ability of a rifle with the ability to fire multiple rounds quickly. Yurgealitis Decl. ¶¶ 27–29; Supica Dep. 203:12 – 205:4.

51.     The United States Army directs that semiautomatic rather than automatic fire be used for virtually all purposes, because it is more effective and lethal. Kaplan Decl. Ex. 39 (Dept. of the Army, *Rifle Marksmanship M16-/M4 Series Weapons*, at 7-13 (August 2008)) (The M16 should "normally be employed in the semiautomatic fire mode."). The Army has concluded: "At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit." *Id.* at 7-10.

13

52.     United States Marines are trained to use automatic fire only for suppression of the enemy ("to provide cover for other soldiers or to keep an enemy from firing back.") Bolcome Aff. ¶ 9; Rossi Dep. 127:1 – 128:16.  Typically, effective use of automatic fire requires that individual targets are close together or that the shooter is firing at an "area" rather than at an individual target. Kaplan Decl. Ex. 39, at 7-10.

53.     It is difficult to keep automatic fire on target, particularly without training, because there is no time to aim between shots.  In automatic mode, there is an insufficient interval in which to correct for the muzzle rise and recoil that each shot generates. Bolcome Aff. ¶ 8; Supica Dep. 79:11 – 81:8; Rossi Dep. 35:5 – 36:16.

54.     When a select fire gun is fired semi-automatically, the ammunition fired attains the same muzzle velocity and muzzle energy and muzzle velocity and thus has the same penetrating power as it would if the gun were fired automatically. Bolcome Aff. ¶ 11; Supica Dep. 217:17 – 219:11 (referring to Kaplan Decl. Ex. 16, at 18 (chart)). *See also* Kaplan Decl. Ex. 39, at 2-1, Table 2-1 (muzzle velocity for various high powered army rifles, including M16).

55.     The banned assault rifles are semiautomatic only.  However, they retain all of the other capacities of the military weapons from which they were derived.  *See* Supica Dep. 127:6-10, 217:14 – 219:11; Bolcome Aff. ¶¶ 11–12; Kaplan Decl. Ex. 66, at 1. As the ATF reported in 1998, "[w]hen ATF examined these semiautomatic assault rifles, it found that the rifles, while no longer machineguns, still had a military configuration that was designed for killing and disabling the enemy and that distinguished the rifles from traditional sporting rifles."  Kaplan Decl. Ex. 66, at 1.  As one commentator noted: "Where the military design has wandered, the civilian market has followed."  Kaplan Decl. Ex. 75, at 16.

56.     Civilian versions of the banned rifles can fire ammunition that is manufactured for

the military.  Yurgealitis Decl. ¶¶ 20, 79; Bolcome Aff. ¶ 11.

57.     Semiautomatic rifles with military features, now banned in Massachusetts, were
marketed to the civilian public as "Assault rifles" or "Assault weapons" before the term was so
defined in the federal ban.  *See* Yurgealitis Decl. ¶¶ 24–25; Spitzer Aff. ¶¶ 9–15; Kaplan Decl. Ex.
44, at 21–25; Supica Dep. 205:20 – 206:16, 208:6 – 209:9.

58.     Assault weapons cause greater injuries and more extensive, complex wounds,
which result in higher complications, than those caused by non-assault weapons.  Colwell Dep.
109:2-13, 119:7-23, 147:16-22; Colwell Decl. at 2–4.

59.     The velocity and power of assault weapons causes greater damage to the muscles,
bones, joints and tissue, and result in more amputations and infection, than non-assault weapons.
Colwell Dep. 110:18 – 111:16, 146:2-15, 147:16 –148:3; Colwell Decl., at 2.

60.     Because they can be fired rapidly, and are often used with large capacity magazines,
assault weapons cause a higher number of wounds in a higher number of victims than non-assault
weapons.  Colwell Dep. 110:18-24.

### a.  Development of the AR-15

61.     The AR-15, the most popular of the banned assault rifles, was originally adopted
by the United States military because of its effectiveness as a military assault rifle.  Kaplan Decl.
Ex. 58, at C-14; Yurgealitis Decl. ¶ 35, 48–51; Supica Rep. at 15.

62.     Starting in approximately 1963, the AR-15 replaced the M14 as the standard issue
U.S. Army firearm.  *See* Kaplan Decl. Ex. 36, at 19, 25–28, 43; Yurgealitis Decl. ¶ 35.

63.     Armalite Corporation developed the AR-15 and marketed that firearm to the U.S.
military and other militaries around the world.  Kaplan Decl. Ex. 36, at 17–19, 23–25; Yurgealitis
Decl. ¶ 35.  As originally developed, the AR-15, like the M14, was a select fire automatic rifle that

could toggle between semi-automatic and automatic fire.    Yurgealitis Decl. ¶ 47; Supica Dep. 73:3-4.

64.     The AR-15 was designed to meet new U.S. Army specifications, including firing a round that would penetrate body armor and a steel helmet, holding a detachable 20-round magazine, having a weight of less than 6 pounds fully loaded, and allowing troops to rapidly fire multiple rounds in a controlled, yet simultaneously spread pattern.  Kaplan Decl. Ex. 36, at 17; Ex. 58, at C-1; Ex. 75, at 10.

65.     After military testing, Armalite implemented a number of changes suggested by the Army, including strengthening the AR-15's barrel and adding a flash suppressor. Kaplan Decl. Ex. 36, at 18.  Armalite's design performed so well that the military concluded that a five-man squad armed with AR-15s was as good or better "in hit-and-kill potential in combat-style tests" than an 11-man squad armed with M14 rifles.  *Id.* at 19.  In field testing in Vietnam, troops were impressed, reporting that "[a]mputations of limbs, massive body wounds, and decapitations had all been caused by the very high velocity AR-15 projectiles."  Kaplan Decl. Ex. 76, at 131.

66.     The military ultimately adopted the AR-15 as its standard-issue service rifle, and renamed it the M16 in 1963.  *See* Kaplan Decl. Ex. 36, at 26.

67.     After Air Force testing and in the midst of the Viet Nam war, the Air Force "reported the AR15 rifle to be an outstanding weapon with phenomenal lethality."  Kaplan Decl. Ex. 58, at C-14.

68.      Before the Army adopted the AR-15, Armalite sold its licensing rights to Colt.  *See* Kaplan Decl. Ex. 36, at 23.  In addition to fulfilling its military contracts, Colt also manufactured AR-15s for the civilian market. To comply with the National Firearms Act, which regulates the sale of fully-automatic firearms in the civilian market, Colt sold a "slightly modified" version of

the AR-15 that was adjusted so that it could not fire in full automatic mode, but that otherwise retained all military features and capabilities.  *See* Supica Dep. 92:2-93:14; Kaplan Decl. Ex. 77, at 235.

69.      M16 is the name used to refer to versions of the firearm sold to the United States military, and AR-15 is the name used to refer to semiautomatic versions sold in the civilian market or to law enforcement. Yurgealitis Decl. ¶¶ 35, 47–48.

70.      The M16 and the AR-15 are the same gun except that the AR-15 is not a select fire weapon.  Yurgealitis Decl. ¶ 48.  A person cannot tell the difference between an M16 and an AR-15 without "looking closely [for] the selector switch."  Supica Dep. 92:18 – 93:8.

71.      The M16 and the AR15 accommodate the same magazines, including magazines of the same capacities.  Yurgealitis Decl. ¶ 48; Supica Dep. 116:3 – 117:21.

72.      Because Colt's patent on the original AR-15 expired many years ago, copies of the AR-15 have been manufactured by dozens of different firearms manufacturers. Yurgealitis Decl. ¶¶ 47, 50–53; Supica Dep. 92:2-17; Bolcome Aff. ¶¶ 17–18, 20–21; Kaplan Decl. Ex. 28, at 1–3; Ex. 36, at 142, 149; Ex. 48, at 4–5. These weapons are marketed and sold based on representations that they are AR-15s.  Bolcome Aff. ¶ 21.  They are designed to have interchangeable parts. *See id.*; Yurgealitis Decl. ¶¶ 51–54; Boone Dep. 105:7-13.

73.      Many of the manufacturers of AR-15s stress the military origins and combat features in marketing their firearms to civilians.  *See* Supica Dep. 208:6 – 209:9; Kaplan Decl. Ex. 44.

### b.  Development of the AK47.

74.      Shortly after World War II, the Soviet Union produced the AK-47, which became the "most produced military firearm in history."  *See* Supica Dep. 128:5-17, 135:1-6; Yurgealitis

Decl. ¶¶ 28–29; Kaplan Decl. Ex. 16 (Supica Rep.), at 14; Ex. 78, at 19–29.  It was chosen in a contest sponsored by the Russian military as the gun that best suited military needs.  Supica Dep. 128:9-17.

75.     Like the AR-15, the AK-47 was developed for military use, and select fire versions of that firearm have been adopted by many militaries around the world.  *Id.*

76.     The AK-47 was ultimately exported to many other countries for military use and was used, for example, by the North Vietnamese in the Viet Nam war.  Supica Dep. 129:9-21.

77.     The rate of fire for a semiautomatic AK is approximately the same as that for an AR-15.  Supica Dep. 134:3-21.

78.     Civilian semiautomatic versions of the AK-47, also known as AK-platform guns, and subsequent variations like the AK-74, are the second-most popular type of centerfire semiautomatic rifle in the United States, behind the AR-15. Kaplan Decl. Ex. 16 (Supica Rep.), at 15; Yurgealitis Decl. ¶ 55.

79.     The difference between civilian AK-platform guns and the Russian military's AK47 is that the civilian versions do not provide for automatic fire.  Supica Dep. 127:3-10.  A person would have to look for a selector switch to distinguish between the civilian version and the military version.  Supica Dep. 131:8 – 132:5. They shoot the same ammunition and accept the same magazines.  Supica Dep. 132:6 – 133:10, 135:9-14. The muzzle velocity and rate of semiautomatic fire is also the same.  Supica Dep. 133:11 – 134:9.

80.     Other manufacturers have since copied the AK47 and now make AK platform guns including for the civilian market.   Yurgealitis Decl. ¶¶ 55–59.  These include the Chinese manufacturers Norinco and Polytech as well as manufacturers in Romania and Finland.  Supica Dep. 127:13-20; Yurgealitis Decl. ¶ 58; Kaplan Decl. Ex. 67, at 1.

18

### c.  Other banned rifles.

81.     Other banned rifles were also developed by or at the behest of militaries in the second half of the 20th century.

82.     The Uzi and the Galil were developed and manufactured by the Israeli army for military use.  *See* Kaplan Decl. Ex. 67, at 5; Supica Dep. 135:15 – 136:4.

83.     The Beretta Ar70 (SC-70) was developed and manufactured for the Italian military by Beretta, an Italian gun manufacturer. *See* Kaplan Decl. Ex. 67, at 7.

84.      Fabrique National FN/FAL, FN/LAR and FNC were developed and originally manufactured by a Belgian company and marketed to various militaries around the world, including those of Great Britain, France, and the United States.  *See* Kaplan Decl. Ex. 67, at 11; Supica Dep. 136:10-19; Yurgealitis Decl. ¶ 35.

85.     The Steyr AUG is a bullpup rifle that was designed and manufactured by an Austrian gun manufacturer in conjunction with and for the Austrian army.  *See* Kaplan Decl. Ex. 67, at 13.

86.     Each of these weapons is or has been made available in the United States for the civilian market and prior to their ban, each was connected to criminal activity here.  *See* Kaplan Decl. Ex. 47, at 15; *see generally* Ex. 67.

### 2.  Banned Pistols and Shotguns.

87.     The SWD M-10, M-11, M-11/9 and M-12 are machine pistols that were originally developed by a company called the Military Armaments Corporation and were marketed for military use.  *See* Kaplan Decl. Ex. 67, at 3; Supica Dep. 136:20 – 137:2.

88.     The INTRATEC TEC-9, TEC-DC9 and TEC-22 were originally designed as machine pistols modeled on a Swedish military submachine gun developed by the Swedish gun

manufacturer InterDynamic AB.   Yurgealitis Decl. ¶ 41.   The design was adopted for a civilian semi-automatic gun by Intratec, a Florida company.  *See* Kaplan Decl. Ex. 67, at 15.   Prior to the federal ban, these guns were popular with criminals.   Between 1990 and 1993 they were traced in 638 narcotics investigations and in connection with 319 murder cases.  *Id.*

89.     Revolving cylinder shotguns such as, or similar to, the Street Sweeper and Striker 12, were designed in Rhodesia and used by the South African police for crowd control.   They were banned as destructive devices by ATF.  *See* Kaplan Decl. Ex. 67, at 17; Ex. 79.

90.     Each of these weapons is or has been made available in the United States for the civilian market and has been connected to criminal activity.  *See* Kaplan Decl. Ex. 67, at 1–19.

**B. The Differences Between Ratification Era Muskets and Modern Day Assault Weapons and LCFDs.**

91.     Assault weapons are vastly different from the muskets that were in common use at the time that the Second Amendment to the Constitution was written and ratified.   It would take about two hours for a musket to fire the maximum number of rounds that can be fired by an assault weapons at issue in just one minute.

92.     The banned assault weapons can fire as fast as a shooter can manipulate a finger to pull the trigger.   Supica Dep. 101:8-14.   This is as fast as 30 rounds in five seconds or 360 rounds in a minute.   Kleck Dep. 175:20 – 176:23.   With training, they can be fired accurately as fast as 45-60 rounds per minute.  *See* Kaplan Decl. Ex. 39, at 2-1, Table 2-1 (listing maximum effective rate of semi-automatic fire for trained soldiers using M16 and related weapons); Supica Dep. 106:20 – 108:4.

93.     By contrast, the weapons used during the Revolutionary War were single shot, smoothbore, flintlock muskets.  *See* Supica Dep. 196:7 – 196:21; Boone Dep. 107:23 – 108:20.

They were not mass-produced, but rather individually hand-fitted according to a pattern by skilled craftsmen.  Supica Dep. 197:1-12.  They were muzzle-loading: Powder and ammunition were poured down the muzzle.  *Id.* at 176:5 – 177: 21; 197:13 – 197:19.  The flintlock system relied on flint to generate a spark that, when fired, would ignite the powder poured into the gun.  *Id.* at 175:3-13.  Flintlocks could be unreliable, because sometimes the spark would not ignite the powder.  *Id*.

94.     Muzzle loading flintlocks could be reloaded and fired by most shooters, in general, at a rate of three shots per minute.  Supica Dep. 191:6-14.  With training and practice, they could be fired by soldiers about four times a minute.  *Id.*

95.     Assault weapons can hit a target as far as two miles off and they have an effective range of 500 meters (about a third of a mile).  *See* Kaplan Decl. Ex. 29, at 2-1, Table 2-1 (listing maximum range and maximum effective range of M16 and other related weapons); Yurgealitis Decl. ¶ 79; Kyes Decl. ¶ 13; Supica Dep. 87:16 – 88:16 (skilled shooters could shoot an AR-15 close to 500 yards).  By contrast, a musket ball could typically travel between 150 and 200 yards, and muskets were generally effective at 100 yards or less.  *See* Kaplan Decl. Ex. 96, at 24.

96.     The flintlock system was the best operating system available through the end of the 18th century.  Supica Dep. 174:13 – 178:14.  Percussion caps and weapons to make use of them, were not developed until the 1820s.  *See* Kaplan Decl. Ex. 64; Supica Dep. 191:15 – 193-9.

97.     Although some primitive semiautomatic guns were in development during the 18th century, they were not widely produced and were not in general use for militias or by regular soldiers.  Kaplan Decl. Ex. 16 (Supica Rep.) at 5–6; Boone Dep. 108:12-20 (none of the guns at the time the Constitution was written were semiautomatic).  They were not used on the battlefield during the Revolutionary War.  Supica Dep. 197:20 – 198:2.  Although the Revolutionary Army ordered 100 primitive repeating flintlocks during the Revolutionary War, that order was canceled

and never filled.  Kaplan Decl. Ex. 16 (Supica Rep.) at 6; Supica Dep. 187:11-17.

98.     A modern semiautomatic rifle, including an AR-15, would be much more effective at hitting multiple targets, and to cause seriously bodily injury or death in a shorter period of time, than a Revolutionary War era musket.  Supica Dep. 159:17 – 160:16.

III.     **LARGE CAPACITY FEEDING DEVICES.**

99.     LCFDs facilitate the rapid firing of large numbers of rounds without having to reload.  Yurgealitis Decl. ¶ 45.  They were originally designed for military use rather than for hunting.  Yurgealitis Decl. ¶¶ 43–45; Kaplan Decl. Ex. 66, at 37.

100.     In the United States, LCFDs are widely available with common capacities including 15, 20, 30, 50 and 100 rounds.  Bolcome Aff. ¶ 28.

101.     Removable ammunition magazines in any capacity were unknown at the time the Second Amendment was enacted, because there were no guns that could accommodate them. Kaplan Decl. Ex. 16 (Supica Rep.) at 4–6, 11–12; Yurgealitis Decl. ¶ 45.  There were no LCFDs with a capacity of 15 rounds or more. *Id.*

102.     LCFDs allow a shooter to inflict more casualties in a shorter period of time, and allow a shooter to lay down suppressing fire and more effectively hold-off an initial response by law enforcement or bystanders.  Kyes Decl. ¶ 17.

103.     The Violence Policy Center ("VPC") has searched news reports and has identified 59 mass shootings involving LCFDs in which 597 people were killed with 1,020 reported wounded. Kaplan Decl. Ex. 80; Rand Decl. ¶¶ 3–5. Because many news reports do not include information about the size of the magazine used by the shooter in the incident, VPC considers its conclusions a "significant undercount."  Rand Decl. ¶¶ 15, 17.

104.      Even a trained shooter requires two to five seconds to change a magazine. Kleck

Dep. 67:19 – 68:3 (easily in four seconds); Supica Dep. 145:18 – 146:13 (five seconds); Boone Dep. 59:18 – 60:10 (three seconds or less). Shooters under stress and those who have not planned to have additional magazines ready at hand can take substantially longer. Kleck Dep. 68:4 – 69:12; 126:1-15; Supica Dep. 146:14 – 147:14; Boone Dep. 60:11-23.

105. Depriving a criminal of an LCM and thereby forcing him or her to stop firing to change out magazines can be critical to intervention efforts by law enforcement and bystanders seeking to end a criminal incident. Kyes Decl. ¶¶ 16–17 ("Large capacity magazines allow an assailant the ability to engage in a more continuous stream of gunfire without having to continually swap out magazines.").

106. The "downtime" associated with reloads can allow victims an opportunity to flee from the immediate area during an incident and/or to take cover. *See* Kleck Dep. 126:8-17, 165:15 – 166:11, 172:20 – 173:23; Boone Dep. 101:21 – 102:17; Kyes Decl. ¶ 16.

107. When an assailant is using an LCFD, intervention by law enforcement is difficult and risky because of the number of rounds continuously being fired in the direction of the police. By contrast, when an assailant is force to reload multiple times with non-large capacity magazines, officers have more opportunity to return fire in the direction of the assailant without being fired upon. Kyes Decl. ¶ 17.

## IV.   THE MEANING OF THE PHRASE "COPIES OR DUPLICATES."

108. The owner of plaintiff Overwatch Outpost testified that it is "obvious" that "we can't sell AR-15s, and we know that we can't sell AK-47s." Ricko Dep. 47:23 – 48:1. The plaintiffs' expert acknowledged that "a large number of guns that are all the same general pattern as the original Colt AR-15 in terms of function and usually in terms of cosmetic appearance" exist. Supica Dep. 92:2-17.

23

109.    The owner of plaintiff On Target similarly testified that after the Enforcement Notice, he stopped selling AR-15s and AK-47s to civilians.  O'Leary Dep. 64:10-13, 64:23-24, 67:13-16.  He identified specific copies of the Colt AR-15 that are banned, including "Smith & Wesson M&P 15s, Windham Weapons WW-15s," and AR-15s manufactured by Bushmaster, Daniel Defense, Stag Arms, Spike Tactical, and ATI. O'Leary Dep. 90:4-9, 94:1-10. "All of the modern sporting rifles, semiautomatic, gas operated that are similar in nature to the [Colt] AR-15," he explained, are banned.  O'Leary Dep. 90:11-13. In an email, he advised that an AK-47 "variant" "can't be transferred except to an FFL who can sell it out of state," but that an M1 carbine and semiautomatic Thompson rifle "aren't banned" because they have a "[c]ompletely different operation system" than any Enumerated Weapon.  Kaplan Decl. Ex. 24.

110.    FRB data demonstrates that after the Enforcement Notice was issued, sales of copies of statutorily enumerated weapons virtually ended in Massachusetts.  Bolcome Aff. ¶ 22; Klein Dep. 148:12-16.

111.    Two individual plaintiffs identified a model AR-15 that is not manufactured by Colt—namely, the Smith & Wesson M&P 15—as a "very common entry level AR-15." Linden Dep. 23:19 – 24:1; *see also* Sawyer Dep. 27:8-11.

112.    The Executive Director of GOAL testified that the Smith & Wesson M&P 15 is an AR-15 platform rifle, and that "there are a host of other manufacturers," including Sig Sauer and Bushmaster, that have produced AR-15s.  Wallace Dep. 49:9 – 50:17.

113.    The research director for the National Rifle Association ("NRA"), GOAL's national affiliate, Wallace Dep. 27:14-18, has explained that "'AR-15' is commonly used as a generic term to describe the same or similar rifles made by other manufacturers" besides Colt, and that the NRA tracked the number of AR-15s manufactured by Smith & Wesson, Bushmaster, Stag

Arms, and other manufacturers between 1986 and 2011.  *See* Kaplan Decl. Ex. 23 ¶¶ 1, 3, 7.

114.    According to the plaintiffs' expert, "[t]he AR-15 has become the most popular civilian rifle design in America, and is made in many variations by many companies."  Supica Rep. at 15.  In addition, "[b]eginning in the late 1970s semi-auto copies of the AK type rifles became widely popular in the U.S. and remain popular today.  They are likely the 2nd most popular type of centerfire semi-auto rifle, behind AR-15 types."  *Id.*

## V.    A SMALL PERCENTAGE OF THE GUN OWNING POPULATION OWN A HIGH PERCENTAGE OF ASSAULT WEAPONS.

115.    As of 2015, there were an estimated 357 million civilian-owned guns in the United States.  *See* Kaplan Decl. Ex. 45, at 8.  By comparison, plaintiffs' expert estimated that from 1990 to 2015, U.S. manufacturers produced approximately 9.3 million AR platform rifles and imported approximately 4.4 million AK platform rifles for the U.S. civilian market, for a total of 13.7 million. Kaplan Decl. Ex. 15, at 8 (chart).  More than half of these (7.4 million) were produced or imported between 2011 and 2015.  *Id.*

116.    One survey commissioned in 2013 by the National Shooting Sports Foundation and relied upon by plaintiffs' expert found that 65% of respondents who owned an AR or AK platform rifle owned more than one such rifle, and 27% of respondents owned four or more.  Kaplan Decl. Ex. 15, ¶ 2, and MSR Report, p. 13.  On average, owners of these rifles owned at least 3.1 such guns.  *Id.* at MSR Report, p. 13; Curcuruto Dep. 135:5 – 137:5.

## VI.    ASSAULT WEAPONS AND LCFDs HAVE BEEN A COMMON CHOICE FOR CRIME, INCLUDING MASS SHOOTINGS.

### A.  Assault Weapons Are Disproportionately Used in Certain Kinds of Crime.

117.    A study found that although assault weapons represented less than 1% of the civilian gun stock in 1994, they were used in between 2% and 8% of all gun crimes at that time.

*See* Kaplan Decl. Ex. 47, at 10, 15.  Congress made the same finding.  *See* Kaplan Decl. Ex. 29, at 13.

118.    That was at least twice as frequently—and perhaps more than eight times as frequently—as one would expect based on the presence of assault weapons in the civilian gun market.  *See* Kaplan Decl. Ex. 47, at 10, 15.

119.    The disproportionate numbers were higher for some of the most serious types of crime: murders of police officers and mass shootings.  *See* Kaplan Decl. Ex. 47, at 14–19, 87; Ex. 29, at 14–15; Ex. 49, at 3–9.  One study showed that, as of 1994, assault weapons accounted for up to 6% of murders, up to 9% of killings of law enforcement officers, and up to 13% of mass shootings in which four or more people died.  *See* Kaplan Decl. Ex. 47, at 15.  The study also found that assault weapons and other semiautomatics with LCFDs have been involved in 40% of mass shooting incidents that occurred between 1984 and 1993 and that resulted in six or more fatalities or 12 or more people wounded.  *Id.* at 14.

120.    A more recent study placed the percentage of assault weapons used in killings of law enforcement at as high as 20%.  *See* Kaplan Decl. Ex. 57, at 5.

121.    A study concluded that although only about 21% of civilian-owned guns were equipped with LCFDs in 1994, they were used in between 31% and 41% of gun murders of police.  *See* Kaplan Decl. Ex. 47, at 18.  They were also involved in 40% of mass shooting incidents between 1984 and 1993 in in which six or more persons were killed or a total of 12 or more were wounded.  *Id.* at 14.

122.    One study of handgun buyers in California found that those with minor criminal histories were more than twice as likely to purchase assault pistols than were buyers with no criminal history; those with more serious criminal histories, such as having been charged with two

or more serious violent offenses, were even more likely to purchase assault pistols.  *See* Kaplan Decl. Ex. 47, at 17–18; Ex. 49, at 10.

### B.  Mass shootings

123.    The FBI and the Congressional Research Service ("CRS") have defined mass shootings as those in which four or more people are killed, excluding the perpetrator, in one or more geographical locations in relatively close proximity to one another.  *See* Kaplan Decl. Ex. 54, at 2, 4–7, 10; Spitzer Aff. ¶ 28.

124.    The FBI and CRS have distinguished public mass shootings—those committed in public against a group of people unrelated to the shooter—from events in which a shooter kills four or more members of his own family.  *See* Kaplan Decl. Ex. 54, at 5.

125.    Multiple studies have concluded that assault weapons are disproportionately represented in mass shootings and, in particular, in public mass shootings.  *See* Kaplan Decl. Ex. 47, at 15.  For example, CRS concluded that out of 317 mass shootings between 1999 and 2013, "offenders used firearms that could be characterized as 'assault weapons' in 31 incidents (9.78%), or roughly 1 out of 10 incidents"; among 66 "mass public shootings" that CRS identified during that time frame, shooters used assault weapons 27.3% of the time.  *See* Kaplan Decl. Ex. 54, at 29.

126.    Similarly, *Mother Jones* magazine identified 62 mass public shootings from 1982 to 2012 and determined that in 14 of those incidents, the shooter used an assault weapon.  *See* Kaplan Decl. Ex. 55, 56.

127.    Large-capacity magazines are also commonly used in mass shootings.  In half of the mass public shootings that *Mother Jones* analyzed, the shooter(s) used weapons equipped with LCMs.  *See* Kaplan Decl. Ex. 55, 56.

128.    The VPC defines mass shootings as those involving three or more fatalities.  Rand

Decl. ¶ 4.  Using this definition, the VPC has identified 59 mass shootings since 1980 in which the shooter used LCMs; these shootings collectively resulted in 597 fatalities and 1,020 reported wounded.  Rand Decl. ¶ 5; Kaplan Decl. Ex. 80.

129.    *Mother Jones* magazine found that more than half of the mass public shootings it identified involved assault weapons, LCMs, or both.  *See* Kaplan Decl. Ex. 55, 56.

130.    Research has shown that "both state and federal assault weapons bans had statistically significant and negative effects [i.e., reductions] on mass shooting fatalities."  *See* Kaplan Decl. Ex. 41, at 282.

131.    Some studies have concluded that when assault weapons or LCMs have been used in mass shootings, the average number of people wounded or killed per incident has been higher than in incidents in which neither an assault weapon nor a large capacity magazine was used.  *See* Kaplan Decl. Ex. 82, at 3; Ex. 54, at 29 (in some mass shooting incidents involving assault weapons, "the capabilities of these firearms arguably led to higher victim counts in terms of both killed and wounded").

132.    Many of the deadliest mass shootings in recent years have involved assault weapons and large capacity magazines banned in Massachusetts.  For example, a gunman in Sutherland Springs, Texas, killed 26 people and wounded at least 20 when he opened fire inside a church during a Sunday service.  *See* Kaplan Decl. Exs. 83[3], 84.  The gunman used a "Ruger AR 15 variant" to commit the attack.  *See id.*

133.    In Las Vegas, Nevada, a gunman killed 59 people and injured hundreds more when

---

[3] The Gun Violence Archive maintains a Shooting Tracker website that compiles data on gun violence.  Kleck Dep. 33:10 – 35:7. One of plaintiffs' experts relies on data compiled in this site for his research.  Kleck Dep. 34:19 – 35:4.

he fired on an outdoor concert from a distance of 400 to 500 yards.  *See* Kaplan Decl. Exs. 69, 72,

85.  Law enforcement found 23 firearms in the hotel suite from which the gunman fired the shots,

including at least two AR-15s and one AK-47 type rifle.  *See* Kaplan Decl. Exs. 68, 69, 85; *supra*

¶ 49. The gunman had outfitted twelve of the rifles found in the suite with bump stocks.  *See*

Kaplan Decl. Ex. 69; *supra* ¶ 46.

134.    In Orlando, Florida, in 2016, a gunman killed 49 people and wounded 53 more in

a shooting at a crowded nightclub.  *See* Kaplan Decl. Ex. 42, 86.  The gunman used at least two

guns, one of which was a Sig Sauer AR 15 platform rifle, and multiple 30-round magazines.  *See*

Kaplan Decl. Exs. 42, 80, 86.

135.    In San Bernardino, California, in 2015, two shooters killed 14 people and wounded

19 more at an office holiday party.  *See* Kaplan Decl. Exs. 42, 87.  Their weapons included two

AR 15 platform rifles, a Smith & Wesson model and a DPMS model, and four 30-round

magazines. *See* Kaplan Decl. Exs. 42, 80, 87.

136.     In Newtown, Connecticut, in 2012, a gunman killed 26 people, 20 of whom were

children attending Sandy Hook Elementary School.  *See* Kaplan Decl. Ex. 42.  The gunman's

weapons included a Bushmaster XM15 assault rifle and 30-round magazines.  *See* Kaplan Decl.

Exs. 42, 80.  The gunman fired more than 150 rounds in less than five minutes.  *See* Kaplan Decl.

Ex. 88.

137.    In Aurora, Colorado, in 2012, a gunman killed 12 people and wounded scores more

inside a movie theatre.  *See* Kaplan Decl. Ex. 42.  His weapons included a Smith & Wesson

M&P15 and a 100-round magazine.  *See* Kaplan Decl. Exs. 42, 80, 89.

138.    On at least two occasions, shooters have used AK-47 style rifles to commit multiple

homicides in Massachusetts.  On December 26, 2000, a gunman used an AK-47 with a 60-round

magazine to kill seven people at Edgewater Technology, Inc., in Wakefield, Massachusetts. *See* Kaplan Decl. Exs. 80, 90. On December 15, 1992, a student brought an AK-47 to Simon's Rock College in Great Barrington, Massachusetts, where he killed two people and injured four more. *See* Kaplan Decl. Ex. 22.

139.    Mass shootings have negative consequences not only for the victims and their families, but also for the communities in which they take place. One review of studies following fifteen mass shootings found that 10% to 36% of those who had directly experienced or witnessed the events experienced post-disaster mental health diagnoses, while "[m]uch higher percentages reported subthreshold PTSD." *See* Kaplan Decl. Ex. 92, at 3. The studies also observed negative impacts on the affected communities generally, such as feelings of helplessness, anger, and stress, increased absenteeism at an affected school, and, in one location, collapse of the local tourism economy. *Id.* at 2–3; *see also* Kaplan Decl. Ex. 95 (discussing the collective grief of residents of Newtown, Connecticut five years after the massacre at Sandy Hook Elementary School).

###   C. The Effect of the Federal Assault Weapons Ban on Use of Assault Weapons and LCFDs in Crime.

140.    One study on the impact of the Federal Assault Weapons Ban concluded that crimes committed with assault weapons declined between 17% and 72% across major cities in the years the Federal AWB was in effect, with Boston showing the greatest decline, possibly because of the combined effect of the state and Federal AWB. *See* Kaplan Decl. Ex. 47, at 46–62 & n. 55; Ex. 48, at 7–9; Ex. 49, at 19–20; Spitzer Aff. ¶¶ 22–23.

141.    Another study concluded that in Virginia, the share of gun crimes committed with LCMs ranged between 13% and 16% in the early years of the Federal AWB, decreased to 9% by the last year the Federal AWB was in effect, then rose to 20% in 2010, after the federal ban expired.

*See* Kaplan Decl. Ex. 50.

## VII.   THE WEAPONS AND LARGE CAPACITY MAGAZINES AT ISSUE ARE NOT APPROPRIATE OR NECESSARY FOR SELF-DEFENSE

### A.  In general

142.    None of the plaintiffs, nor their experts, identified in their deposition testimony a self-defense situation in Massachusetts or anywhere in the country in which a civilian used in self-defense a weapon that is banned under the Commonwealth's Assault Weapons Ban.   Worman Dep. 27:14-16; Sawyer Dep. 30:19-23; Chamberlain Dep. 27:7-9; Linden Dep. 26:21-22; Ricko Dep. 25:8 – 26:4; O'Leary Dep. 84:18-22; Supica Dep. 77:4 – 78:14; Kleck Dep. 177:3-21; Boone Dep. 80:9-19; Curcuruto Dep. 164:2-20; Roberts Dep. 65:8-12, 68:16 – 69:13; *see* Rossi Dep. 97:9 – 98:3 (he is not aware of any studies or reports on how commonly these weapons are used in self-defense).

143.    Notwithstanding the Commonwealth's Assault Weapons Ban, hundreds of other models of guns remain available in Massachusetts for citizens to use in self-defense.  *See* Kaplan Decl. Ex. 30 (108 Stat. at 1997, 2000–10); Ex. 61; Ex. 93.  One survey commissioned in 2013 by the National Shooting Sports Foundation and relied upon by plaintiffs' expert found that most respondents who owned AR or AK platform rifles owned other guns prior to owning these rifles. *See* Kaplan Decl. Ex. 15 (Curc. Rep.) p. 2 and MSR Report 2013, at 15.

### B.  In the Home

144.    The "NRA Guide to the Basics of Personal Protection in the Home,"[4] a publication of the NRA, includes a chapter that describes how to select a firearm for use in personal protection

---

[4] The Defendants' citation of this source does not constitute an endorsement of the recommendations in the source, but is merely demonstrative of the advice that the NRA gives with respect to self-defense.

inside the home.  *See* Kaplan Decl. Ex. 62, at 183–87.  The chapter focuses exclusively on handgun options.  *Id.*

145.    Defendants' expert James Yurgealitis has been asked on numerous occasions what gun he would recommend for home defense and has never recommended an assault weapon for this purpose.  Yurgealitis Decl. ¶ 78.  Similarly, when asked to recommend a weapon for home defense, retired Northborough Police Chief Mark Leahy has always suggested a handgun.  Leahy Decl. ¶ 22.

146.    Assault rifles require more steps in order to make them operable than other guns do, making them difficult to use in stressful situations unless the user has had intensive training. Yurgealitis Decl. ¶¶ 80, 81; Leahy Decl. ¶ 21.

147.    Semiautomatic rifles generally are more difficult to maneuver in small spaces, including inside the home, than are handguns.  Leahy Decl. ¶ 21; Supica Dep. 272:10 – 273:18 (a shorter overall firearm is easier to maneuver in tight indoor spaces).

148.    Additionally, assault weapons were designed to be effective at battlefield ranges of 500 yards or more.  *See* Yurgealitis Decl. ¶ 79; Kyes Decl. ¶ 13; Supica Dep. 87:16-88:16 (skilled shooters could shoot an AR-15 close to 500 yards); *cf.* Kaplan Decl. Ex. 39, at 2-1, Table 2-1 (listing maximum effective range of M16 and other related weapons).  Therefore, they have a particularly high muzzle velocity and carry a risk of penetrating home construction materials, endangering persons elsewhere in the home.  *See* Yurgealitis Decl. ¶ 79; Kaplan Decl. Ex. 95; Kyes Decl. ¶ 24 (heavier body armor is recommended for police officers facing rounds from assault weapons).

**C.  Outside the Home**

149.    Long guns are not easy to conceal, making them difficult to have available for self

defense outside the home.  Rossi Dep. 152:1-7.

150.    The "NRA Guide to the Basics of Personal Protection Outside the Home,"[5] a publication of the NRA, focuses on "the effective use of a concealed handgun for self-defense outside the home."  Kaplan Decl. Ex. 63, Introduction, *vii*.  "For those who do not wish to incorporate a handgun into their personal protection plans, or who may not always be able to carry a handgun outside the home, the book also presents techniques and strategies to help [them] avoid, deter, repel, or escape an attack without the use of a firearm."  *Id.* at *viii*.  Nowhere does the book recommend the use of assault weapons for self-defense outside the home.  *See id.*

151.    Outside the home, assault weapons are difficult to make ready for use for self-defense under stressful situations and they present a risk of danger to bystanders.  Yurgealitis Decl. ¶¶ 79, 80, 81; Leahy Decl. ¶ 21.

**D.  Large Capacity Feeding Devices.**

152.    None of the plaintiffs, nor their experts, identified in their deposition testimony a self-defense situation in Massachusetts or anywhere in the country in which a civilian fired more than ten rounds or used a LCFD in self-defense.  Worman Dep. 27:14-16; Sawyer Dep. 30:19-23; Chamberlain Dep. 27:7-9; Linden Dep. 26:21-22; Ricko Dep. 25:13-17 (he drew a weapon in self-defense only as a police officer); O'Leary Dep. 84:18-22; Supica Dep. 275:2 – 276:2; Kleck Dep. 177:3-21; Rossi Dep. 111:8 – 113:22; Curcuruto Dep. 165:15-166:1; *see* Rossi 84:17-21 (he is not aware of any studies or reports on the average number of rounds that civilians have fired when acting in self-defense).

---

[5] The Defendants' citation of this source does not constitute an endorsement of the recommendations in the source, but is merely demonstrative of the advice that the NRA gives with respect to self-defense.

153.    The defendants are also unable to identify any such incidents.  Klein Dep. 52:15-24.

154.    A study conducted by Lucy P. Allen of National Economic Research Associates examined data from a publicly accessible database compiled by the NRA of stories of private citizens who had used guns for self-defense.  Allen found that from 1997 to 2001, defenders fired an average of 2.2 shots per incident, and in 28 percent of incidents, defenders merely a displayed a weapon and fired no shots.  *See* Kaplan Decl. Ex. 46 ¶ 10.  Allen also found that from 2011 to 2013, the average number of shots per incident was 2.1, and no shots were fired in 16 percent of the incidents.  *Id.* ¶¶ 11, 12.  For this later time period, Allen found no examples in which the defender fired as many as ten shots or more.  *Id.*

155.    Defendants' expert James Yurgealitis also reviewed three years (2010 – 2013) of news clips posted on the NRA's database of armed citizens and found that none of them described a self-defense incident in which more than ten shots were fired or in which a LCFD was likely to have been necessary.  Yurgealitis Decl. ¶ 84.

## VIII.   THE WEAPONS AND MAGAZINES AT ISSUE PRESENT SPECIAL RISKS TO LAW ENFORCEMENT AND TO LAW ENFORCEMENT OFFICERS.

### A.  Law Enforcement Use of Assault Weapons in Massachusetts is Limited to Highly Trained Officers Facing Dangerous Situations.

156.    Police in Massachusetts use handguns as their duty weapons and rarely fire them at individuals.  Leahy Decl.  ¶¶ 19, 20.

157.    Police departments in Massachusetts restrict the use of assault weapons to encounters where a significant threat of violence is possible, such as hostage situations, apprehension of potentially well-armed criminals, and response to active shooting situations.

34

Leahy Decl. ¶¶ 15, 16; Kyes Decl. ¶ 19. See Rossi Dep. 48:1 – 49:21. Some departments require specific authorization from a superior before such weapons are authorized for a particular situation. Leahy Decl. ¶ 18.

158.    Law enforcement training protocols on assault weapons include safety training, training on permitted circumstances use of assault weapons (as well as on the applicable department policy), and qualification with the weapon at a range.  Most departments require periodic requalification as well.  Leahy Decl. ¶ 17.

### B.  Risks to Law Enforcement Officers from Assault Weapons and LCFDs.

159.    Law enforcement officers need an advantage over the criminals they seek to apprehend. It is dangerous for law enforcement officers when they face criminals with superior firepower.  Leahy Decl. at ¶ 24; Kyes Decl. ¶ 12–17.

160.    Many of the weapons and magazines involved in violent crimes have been stolen in residential break-ins from legal license holders.  Kyes Decl. ¶ 21.  Absent the Commonwealth's ban, an assault weapon or LCFD that is legally acquired can, if stolen, be used by a violent dangerous criminal.  Kyes Decl. ¶ 22.

161.    The body armor that police must use when combatting criminals with assault weapons is heavier than soft body armor because it includes metal or ceramic plates.  Boone Dep. 123:6-23, 130:15 – 133:7; Kyes Decl. ¶ 23.  This is because of the penetrating power of bullets fired from these weapons.  Body armor with metal or ceramic plates is beyond the normal, less restrictive, soft body armor that patrol officers typically use, because the heavier armor is too restrictive.  Kyes Decl. ¶ 24.

Respectfully submitted,

MAURA HEALEY, in her official capacity as
Attorney General of the Commonwealth of
Massachusetts; DANIEL BENNETT, in his official
capacity as Secretary of the Executive Office of
Public Safety and Security; COLONEL KERRY
GILPIN, in her official capacity as Superintendent
of the Massachusetts State Police,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Julia E. Kobick
William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2559
Date: December 15, 2017                    julia.kobick@state.ma.us


## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF, system will be sent
electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and
that paper copies will be sent to those indicated as non-registered participants by first-class mail
on December 15, 2017.

/s/ Julia Kobick
Julia Kobick
Assistant Attorney General