# **EXHIBIT 1**

## **TO KAPLAN DECLARATION**

**Gary Klein**
**August 29, 2017**

```
 1                                      Volume I
                                      Pages 1-188
 2          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 3
                              No. 1:17-cv-10107-WGY
 4

 5  DAVID SETH WORMAN, et al.,
         Plaintiffs,
 6  vs.

 7  CHARLES D. BAKER, et al.,
         Defendants.
 8

 9

10

11

12               DEPOSITION OF GARY KLEIN
           Tuesday, August 29, 2017 at 9:10 a.m.
13          Campbell, Campbell, Edwards & Conroy
                  One Constitution Center
14              Boston, Massachusetts 02129

15

16

17
      ----------Jennifer A. Doherty, CSR--------------
18            Certified Shorthand Reporter

19

20
                     C.J. Reporting
21                   P.O. Box 1373
             Andover, Massachusetts 01810
22                   617-763-1725
              cjr@cjrreporting.com
23

24
```

```
 1   APPEARANCES:

 2

 3           BRADLEY ARANT BOULT CUMMINGS, LLP
             BY: John Parker Sweeney, Esq.
             1615 L Street, N.W., Suite 1350
 4           Washington, D.C. 20036
             202-719-8216
 5           jsweeney@bradley.com
             For the Plaintiffs.

 6

 7           BRADLEY ARANT BOULT CUMMINGS, LLP
             BY: Marc A. Nardone, Esq.
 8           1615 L. Street, N.W., Suite 1350
             Washington, D.C. 20036
 9           202-719-8256
             mnardone@bradley.com
10           Co-counsel for the Plaintiffs.

11

12           OFFICE OF THE ATTORNEY GENERAL
             ASSISTANT ATTORNEYS GENERAL
13           BY:  William W. Porter, Esq.
             One Ashburton Place
14           Boston, Massachusetts 02108
             bill.porter@state.ma.us
             For the Defendants.
15

16

17

18   ALSO PRESENT:

19

20           CAMPBELL CAMPBELL EDWARDS & CONROY
             Christopher R. Howe, Esq.
21           One Constitution Center
             Boston, Massachusetts 02129
22           617-241-3029
             chowe@campbell-traial-lawyers.com
23

24
```

```
 1                    I N D E X
         Testimony of:           Direct
 2
         GARY KLEIN
 3            by Mr. Sweeney          5

 4

 5

 6                    E X H I B I T S
         No.            Description            For I.D.
 7
         1  Subpoena                              4
 8
         2  Responses of Defendant Maura Healey
 9            in her capacity as Attorney General to
              Plaintiffs' First Set of Interrogatories
10            to all Defendants                   4

11       3  Defendant Maura Healey's Responses to
              Plaintiffs' First Set of Requests for
12            Production of Documents             4

13       4  Defendants' Required Disclosures Pursuant
              to Federal Rules of Civil Procedure 26    4
14
         5  Remarks of Attorney General Maura Healey
15            Assault Weapons Ban Press Conference    60

16       6  Enforcement Notice/Prohibited Assault
              Weapons, July 20, 2016             107
17
         7  Web page of Assault Weapons Ban
18            Enforcement                        178

19       8  Web page:  Guns That Are Not Assault
              Weapons                            178
20

21

22

23              **EXHIBITS SENT TO ATTORNEY SWEENEY**

24
```

1  year from the time I first started to discuss it.

2       Q.    So precisely when did you join the Office

3  of the Attorney General?

4       A.    September 2015.

5       Q.    And what were your responsibilities when

6  you joined the office?

7       A.    My responsibilities then and now are a

8  variety of special projects that are -- where the

9  Public Protection Advocacy Bureau has some

10  responsibilities.

11       Q.    Do any of those projects involve

12  firearms?

13       A.    Yes.  A significant portion of my time is

14  taken up with projects involving firearms.

15       Q.    Has that always been the case since you

16  joined the Bureau?

17       A.    I wouldn't say from day one, but fairly

18  early on I was asked if I would take the Bureau's

19  lead on firearms issues.

20       Q.    And approximately when was that?

21       A.    I would say it was approximately October

22  2015, more or less.

23       Q.    And in October 2015 what did you

24  understand you would be doing for the Bureau in

1   connection with firearms issues?

2        A.   When I was first asked to do it, my

3   understanding was that there was an ongoing review

4   of compliance by gun sellers with State law for the

5   most part and that I would have some role in being

6   what amounted to a team leader for that project.

7        Q.   Who communicated to you that concern?

8        A.   What concern do you mean?

9        Q.   The concern you just mentioned.

10       A.   Probably John Miller, but I think it was

11  something that became clear as I started to

12  understand what the Bureau was working on.

13       Q.   And what was the scope of your project?

14  What were you tasked with doing?

15       A.   At the very earliest stages it was what I

16  just said.  It was to evaluate whether gun sellers

17  across Massachusetts in general were complying with

18  Massachusetts law.

19       Q.   And did you have anyone assigned to work

20  with you in connection with that project?

21       A.   At the very beginning?

22       Q.   Yes.

23       A.   It was a team in the office.  The

24  reporting relationships in the context of this

1  project have shifted over time.

2       Q.   But who were you working with?

3       A.   I was working with members of the Criminal

4  Bureau members of the Government Bureau, another

5  lawyer or two in the Public Protection and Advocacy

6  Bureau; one of whom's responsibility was to sort of

7  pass the baton for these projects.  Probably a few

8  others; the state solicitor at the time who was

9  involved in some of these projects, and the Deputy

10 Attorney General.

11      Q.   What were you told about why the Office of

12 the Attorney General was concerned about compliance

13 with firearms laws?

14           MR. PORTER:  Objection.  I think I

15 would need to instruct the witness not to answer.

16 Really any questions about specific communications

17 concerning potential law enforcement activity within

18 the Attorney General's Office, which this has been

19 identified as, those communications would be

20 protected as attorney work product.  They would be

21 protected under the deliberative process privilege

22 and they would be protected under the privilege

23 investigative information.

24           We've indicated those objections

1  prior to the deposition in writing, and I believe

2  this particular communication or any communications

3  asking for this kind of specific information would

4  be privileged and not appropriate for testimony, so

5  I'm going to instruct the witness not to answer.

6  BY MR. SWEENEY:

7      Q.   I take it you'll follow your counsel's

8  instruction?

9      A.   Yes.

10      Q.   What did you understand the basis of the

11  concerns were at that time, October 2015?

12      A.   Some combination of finding a way forward

13  for the Office on gun policy issues and trying to do

14  what the Office can do to address problems of gun

15  violence.

16      Q.   Did you conduct any review or direct

17  review into the extent to which semi-automatic

18  rifles had been used in gun violence in the State of

19  Massachusetts?

20      A.   I would say yes.

21      Q.   And how did you go about that review?

22      A.   Some combination of talking to other

23  people in the Office, research of various kinds; on

24  some occasions talking to people outside the Office

1  in law enforcement or otherwise.

2      Q.   Can you be more specific?  That's pretty

3  vague.

4              MR. PORTER:  I just need to note the

5  same concern, which is, again, it's what we

6  indicated in our objections, written objections,

7  which is at a general level, it may not be

8  appropriate to describe the nature of this work.

9  The more specific it becomes, the more it is likely

10  and will fall within either attorney work product or

11  deliberative process or investigative privilege and

12  really we would see matters related to potential

13  criminal or civil investigations as not the proper

14  subject of testimony.

15              So I want to allow this to go as far

16  as we can help and so it will help to go from the

17  general to the specific and will help me draw my

18  lines.

19              MR. SWEENEY:  Sure.

20  BY MR. SWEENEY:

21      Q.   What individuals did you talk to in the

22  Office in connection with your view of the use of

23  semi-automatic rifles in crime?

24      A.   There was a discussion among the group of

1  people I mentioned in the prior answer; people from

2  the Criminal Bureau, people in the Government

3  Bureau, Deputy Attorney General, State Solicitor, as

4  well as a few others who would participate from time

5  to time.

6       Q.   You mentioned research.  What sources of

7  information did you consult on that issue?

8       A.   A variety of things; newspaper articles

9  and other material that's available on the Web in

10  various forms, as well as reports about gun crime

11  that are also publicly available, some scholarly

12  articles as well.

13       Q.   Did you consult any sources of data for

14  the use of semi-automatic rifles in crime in

15  Massachusetts?

16       A.   I would say that we were evaluating the

17  use of semi-automatic rifles in crime across the

18  country, so there was a good deal of material that

19  would have touched on whether there were incidents

20  in Massachusetts, and for the most part what we were

21  looking at were machines.

22       Q.   Do you have any information about how

23  often semi-automatic rifles had been used in murders

24  in Massachusetts, say, in the past 20 years?

 1  stated.  The East Boston incident was not

 2  investigated or prosecuted by the Attorney General,

 3  so we would largely be -- to start answering that --

 4          MR. SWEENEY:  It is bad enough -- off

 5  the record.

 6          (Discussion off the record.)

 7     Q.  Are you aware of any other incidents,

 8  other than the two identified here, in which more

 9  than ten shots were fired by a single criminal

10  perpetrator in a single incident in Massachusetts?

11     A.  I am confident that there are other

12  incidents, but again, it would be difficult to

13  identify them based on records available to the

14  Attorney General.

15     Q.  Now, Interrogatory No. 3 on Page 10 asked

16  to identify any incident in which an individual used

17  a banned firearm or banned magazine in self-defense

18  in Massachusetts.

19          After objections, "The AG states she

20  has no non-privileged information that is responsive

21  to this interrogatory at this time."

22          I take it that you're not aware of

23  any such incident?

24     A.  I am not.

1      A.    And individuals are responsible for

2  registering individual sales.

3      Q.    And in either event, no firearms was

4  transferred to Massachusetts without registration,

5  correct?

6                  MR. PORTER:   Objection to the form.

7      Q.    According to law?

8      A.    According to law, yes.

9      Q.    And what agency processes those

10  registrations?

11      A.    It's CJIS, the Criminal Justice

12  Information Service which is a division -- and

13  you'll have a witness on this, and I apologize, I

14  may not get this right, but my understanding is that

15  it is a division that is operated by EOPSS,

16  E-O-P-S-S, the Executive Office of Public Safety and

17  Security.

18      Q.    You'll defer to that witness who will be

19  talking tomorrow on the details of that, but that's

20  your understanding?

21      A.    Including on whether I have the exact name

22  of the organization.

23      Q.    That's fine.  Does the Office of the

24  Attorney General take a position with respect to

1  whether the registration of a fireman is an approval

2  of that firearm as being compliant with

3  Massachusetts law?

4      A.   Yes.

5      Q.   And what is that position?

6      A.   That it is not approval.

7      Q.   And what is the basis for that position?

8      A.   A number of things.  The information

9  registered wouldn't be sufficient to make a

10  determination of whether the firearm has lawfully

11  transferred.

12      Q.   To your knowledge, is there any process

13  within the Massachusetts government that is designed

14  to ascertain transaction by transaction whether or

15  not the firearm is compliant with Massachusetts

16  law?

17      A.   I would say the compliance review we

18  undertook was consistent with making that

19  evaluation.

20      Q.   And what conclusions did your compliance

21  review reach with respect to that evaluation?

22              MR. PORTER:  Objection to the form of

23  that question.

24      A.   May I consult with Mr. Porter again on

1  substantially similar in construction and

2  configuration to those of an enumerated weapon?

3     A.   It provided this in the enforcement

4  notice.

5     Q.   This enforcement says "substantially

6  similar," and you haven't provided any elaboration

7  on what substantially similar means.  So have you

8  provided any guidance to dealers that tells them how

9  to determine whether it is substantially similar?

10              MR. PORTER:  I think the question has

11  been asked and answered.  Objection.

12     A.   We provided the enforcement notice.  The

13  language is understandable and appears to be

14  understood by gun sellers who are not selling

15  AR-15s, AK-47s or other copies and duplicates at

16  this time.

17     Q.   In the next sentence of the similarity

18  test it says:  "If the operating system and firing

19  mechanism are based on or otherwise substantially

20  similar to one of the enumerated weapons," what does

21  it mean to be "based on"?

22     A.   You know, I think the language is clear

23  enough.  Based on the same plan.

24     Q.   How is that different from "substantially

 1 | duplicate of an assault weapon?

 2 |     A.   Yes, and further to clarify, we are

 3 | referring here to the two paragraphs at the end of

 4 | Page 4 of the enforcement notice.

 5 |     Q.   So if one of my client dealers has

 6 | purchased a firearm in the past and sold it and no

 7 | longer is in possession of it, this directive will

 8 | not be applied to those guns?

 9 |     A.   A directive would not be applied but the

10 | assault weapon ban may be, the statute may be.

11 |     Q.   Because it might otherwise apply?

12 |     A.   Yes.

13 |     Q.   What was the definition of copies and

14 | duplicates that was used prior to the Notice of

15 | Enforcement test for copies or duplicates?

16 |              MR. PORTER:  Objection as to form.

17 |     A.   I'm sorry, can I get the question read

18 | back?

19 |              MR. SWEENEY:  Read the question

20 | back.

21 |              (The question was read back.)

22 |     A.   Could you rephrase the question?

23 |     Q.   You said the tests that are in the Notice

24 | of Enforcement won't be used for anything prior to

1  July 20, 2016.  So what is the definition of copies

2  and duplicates that will be applied to any of those

3  transactions?

4      A.   Whatever the authority involved believes

5  to be the accurate appropriate test under the

6  statute itself.

7      Q.   And what test does the Office of the

8  Attorney General use?

9           MR. PORTER:  Objection.  I have to

10  instruct the witness not to answer that question.

11  The only information that the witness can testify to

12  about prosecutorial positions is information that is

13  public, not information that might suggest how a

14  certain prosecution will be framed in the future.

15  That will be work product and subject to

16  privilege.

17      Q.   Just so I understand, there's a Notice of

18  Enforcement that gives guidance on compliance to

19  dealers and citizens about how this office, the

20  Office of the Attorney General will interpret copies

21  or duplicates from July going forward, July 2016

22  going forward, correct?

23      A.   That's correct to state it.  I mean, there

24  may be individuals in the law enforcement community

1  including in our office that thought these tests

2  were the appropriate tests under the statute all the

3  way through.

4       Q.   But you won't tell me what tests are used

5  for transactions that occurred prior to July 20 --

6            MR. PORTER:  Let me object and make

7  my objection clear.  We won't tell you and I'll

8  instruct the witness not to answer in a way that

9  reveals internal communications, non-public

10 communications, about possible prosecutorial

11 positions or approaches of the Attorney General's

12 Office that are non-public, that are discussions and

13 positions being assessed within the office.  That's

14 both work product and subject to deliberative

15 process and privilege.

16      Q.   The tests that are in the Notice of

17 Enforcement, if I understand your last response, may

18 or may not be used by various enforcement

19 authorities in the State of Massachusetts?

20      A.   They may be considered relevant, I guess.

21 Let me amplify my answer because I think it will

22 probably speed up the rest of the afternoon.

23           The statute itself bans copies or

24 duplicates of guns including Colt AR-15s.  An AR-15

```
 1                   C E R T I F I C A T E

 2   COMMONWEALTH OF MASSACHUSETTS
     Worcester, ss.
 3
             I, Jennifer A. Doherty, Certified
 4   Shorthand Reporter and Notary Public duly
     commissioned and qualified in and for the
 5   Commonwealth of Massachusetts, do hereby certify
     that there came before me on the 29th day of August,
 6   2017, the person hereinbefore named, who was by me
     duly sworn to testify to the truth and nothing but
 7   the truth of their knowledge touching and concerning
     the matters in controversy in this cause; that they
 8   were thereupon examined upon their oath, and their
     examination reduced to typewriting under my
 9   direction and that the deposition is a true record
     of the testimony given by the deponent.
10           I further certify that I am neither
     attorney nor counsel for, nor related to or employed
11   by, any of the parties to the action in which this
     deposition is taken, and further that I am not a
12   relative or employee or financially interested in
     this action.
13
             IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY
14   HAND AND SEAL THIS 3RD DAY OF SEPTEMBER, 2017.

15

16

17
                     Notary Public
18                   My Commission Expires:
                     October 19, 2023
19                   CSR No. 1398F95

20

21

22

23

24
```

**Gary Klein**
**August 29, 2017**                                                            187

```
 1          I, Gary Klein, do hereby certify that I
 2     have read the foregoing transcript of my testimony,
 3     (with the exception of corrections listed on the
                         attached )
 4     errata sheet, if any) and further certify that said
 5     transcript is a true and accurate record of said
 6     testimony.
 7          DATED AT  Boston, MA             ,
 8     this 28th  day of  September       , 2017.
 9
10
11
12
13
14
15
16     SIGNED UNDER THE PAINS AND
17          PENALTIES OF PERJURY.
18
19
20
21
22
23
24
```

*Worman, et al. v. Baker*, et al.
17-cv-10107

Deposition Transcript of Gary Klein
August 29, 2017
ERRATA

The following corrections to the transcript apply:

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 6 | 18-19 | "class members" should be "litigation" | Clarify or correct answer |
| 7 | 11 | "Loss" should be "Law" | Correct reporter's error |
| 12 | 10 | "John" should be "Jon" | Correct spelling |
| 16 | 21 | "Machines" should be "summaries" | Correct reporter's error |
| 29 | 14 | Delete "not" | Correct reporter's error |
| 30 | 2 | "her amendment" should be "or amend" | Correct reporter's error |
| 58 | 2 | "schedule" should be "scheduled" | Correct reporter's error |
| 62 | 15 | "is" should be "are" | Correct reporter's error |
| 72 | 18 | "Colt 15" should be Colt AR-15 | Clarify or correct answer |
| 94 | 9 | "pending" should be "including" | Correct reporter's error |
| 94 | 13 | "I have" should be "At" | Correct reporter's error |
| 126 | 18 | "following" should be "follow on" | Correct reporter's error |
| 133 | 21 | "test and" should be "tests in" | Correct reporter's error |
| 150 | 18 | Tech" should be "Tec" | Correct spelling |
| 154 | 18 | "designed" should be "design" | Correct reporter's error |
| 158 | 2 | "wind up" should be "wind up in" | Correct reporter's error |
| 162 | 9 | "A" should be "The" | Correct reporter's error |
| 163 | 23 | "to state it" should be "as stated" | Correct reporter's error |
| 169 | 3 | "precedence" should be "precedents" | Correct spelling |
| 177 | 4 | "and" should be "but they" | Correct reporter's error |
| 183 | 5 | "we" should be "we would" | Correct reporter's error |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

# **<u>EXHIBIT 2</u>**

## **<u>TO KAPLAN DECLARATION</u>**

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS


DAVID SETH WORMAN, et al., ) Case No. 1:17-cv-10107-WGY
                                 )
                                 )
         Plaintiffs,     )
                                 )
vs.                        )
                                 )
                                 )
MAURA HEALEY, et al.,    )
                                 )
                                 )
         Defendants.     )
_____ )


DEPOSITION OF CHRISTOPHER B. COLWELL, M.D.

Wednesday, November 8, 2017


REPORTED BY:

CELIA A. ZARATE, RPR, CSR NO. 10769

Job No. 352097


MAGNA LEGAL SERVICES

(866)624-6221

www.MagnaLS.com



```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3         BRADLEY, ARANT, BOULT & CUMMINGS, LLP
           BY:  JOHN PARKER SWEENEY, Attorney at Law
 4         1615 L. Street, N.W., Suite 1350
           Washington, D.C.  20036
 5         (202) 719-8216
           jsweeney@bradley.com
 6
 7
 8   FOR THE DEFENDANTS:
 9         THE COMMONWEALTH OF MASSACHUSETTES
           OFFICE OF THE ATTORNEY GENERAL
10         GOVERNMENT BUREAU
           TRIAL DIVISION
11         BY:  JEFFREY T. COLLINS, Assistant Attorney at Law
           One Ashburton Place, 18th Floor
12         Boston, Massachusetts 02108
           (617) 963-2312
13         jeffrey.collins@state.ma.us
14
15
16   TAKEN AT:
17   Gordon & Rees, LLP
18   275 Battery Street, Suite 2000
19   San Francisco, California  94111
20
21
22
23
24
25
```



1                          I N D E X
2     DEPOSITION OF CHRISTOPHER B. COLWELL, M.D.
3     EXAMINATION BY:                              PAGE
4     MR. SWEENEY                                     6
5     MR. COLLINS                                   145
6     FURTHER EXAMINATION BY:
7     MR. SWEENEY                                   148
8                     PLAINTIFFS' EXHIBITS
9     EXHIBIT NO.         DESCRIPTION               PAGE
10    Exhibit 1           Subpoena to Testify at a
                          Deposition in a Civil Action;
11                        Proof of Service; Notice of
                          Deposition of Christopher
12                        Colwell; Certificate of
                          Service.                     6
13
      Exhibit 2           Curriculum vitae of
14                        Christopher Beall Colwell, M.D.   6
15    Exhibit 3           Report by
                          Christopher B. Colwell, M.D.     6
16
      Exhibit 4           209 American College of Surgeons
17                        article titled Bomb Explosions
                          in Acts of Terrorism:  Evil
18                        Creativity Challenges Our
                          Trauma Systems.                 32
19
      Exhibit 5           Emergency Medicine Reports
20                        Article, Volume 32,
                          Number 19/August 29, 2011.      36
21
      Exhibit 6           Emergency Medical Services
22                        The Journal of Emergency Care,
                          Rescue and Transportation,
23                        Detecting Mechanism of Injury,
                          May 2003, Volume 32, Number 5.   39
24
      Exhibit 7           emsworld.com article titled
25                        Shootings:  What EMS Providers



```
 1              PLAINTIFFS' EXHIBITS (CONTINUED)
 2    EXHIBIT NO.          DESCRIPTION              PAGE
 3    Exhibit 8           WTS Article Delivery; BCM article
                          titled Bobby R. Alford Department
 4                        of Otolaryngology-Head and Neck
                          Surgery.                   44
 5
      Exhibit 9           Firearms Tutorial on Patterns of
 6                        Tissue Injury.             56
 7    Exhibit 10          The Internet Journal of Rescue
                          and Disaster Medicine, Volume 5,
 8                        Number 2, titled Rebuttal to
                          "EMS Response to Columbine:
 9                        Lessons."                  59
10    Exhibit 11          The Internet Journal of Rescue
                          and Disaster Medicine, Volume 5,
11                        Number 1, EMS Response to
                          Columbine:  Lessons Learned.   59
12
      Exhibit 12          PowerPoint titled Mass Casualty
13                        and Disaster Management:
                          Colorado Shootings.        89
14
      Exhibit 13          PowerPoint titled EMS in the
15                        Crosshairs:  The Colorado
                          Shootings.                 90
16
      Exhibit 14          Confidential Aurora Century 16
17                        Theater Shooting After Action
                          Report for the City of Aurora
18                        April 2014.                91
19    Exhibit 15          Jefferson County, Colorado,
                          Sheriff Triage_Text Medical
20                        Triage Areas.              122
21    Exhibit 16          Jefferson County, Colorado,
                          Sheriff Equipment_Text How
22                        They Were Equipped That Day.  132
23    Exhibit 17          Jefferson County, Colorado,
                          Sheriff Narrative Time Line
24                        of Events.                 138
25
```



Page 5

1           BE IT REMEMBERED that, pursuant to Notice and

2    Subpoena, on Wednesday, November 8, 2017, commencing at

3    the hour of 8:54 a.m., before me, CELIA A. ZARATE, CSR

4    No. 10769, a Certified Shorthand Reporter in the State of

5    California, there personally appeared

6               CHRISTOPHER B. COLWELL, M.D.,

7    called as a witness by the Plaintiffs, who, having been

8    first duly sworn was examined and testified as

9    hereinafter set forth:

10                   ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1      A.   I disagreed with one of the statements they

2   made.  It's a fairly long explanation.  I don't know how

3   much you want to know about this.  In short, there

4   were -- as short as I can be, there were people

5   that rendered opinions after this, which is typical for a

6   major event, some of which were accurate and some of

7   which were not, and one of those opinions was published

8   in the U.S. Fire Administration major incidents

9   investigative team report, that included a statement made

10  by one firefighter that had not been at the scene that

11  day, that expressed the opinion that my decision to go

12  into the library to pronounce them dead was against law

13  enforcement orders, which was not the case.

14      Q.   Well, in your report, which we marked as Exhibit

15  3, and which you have in front of you, on the second

16  page, first sentence, you say:  I have experienced

17  firsthand the extensive damage caused by assault weapons

18  and have witnessed both victims and on occasion even the

19  shooters experienced the horror of what these weapons do.

20          Did I read that correctly?

21      A.   Yes.

22      Q.   All right.  And at the bottom of that page you

23  say:  My firsthand experience treating victims of gunshot

24  wounds includes being the physician at the scene of the

25  Columbine High School shootings on April 20th, 1999, in



Page 61

1    which a TEC-DC9 weapon was used, and treating victims of

2    the Aurora Theater shootings in the emergency department

3    on July 20th, 2012, in which an AR-15 was used.

4         Do I have that correct as well?

5    A.   Yes.

6    Q.   All right.  And with the exception of your

7    involvement as -- in the Columbine and Aurora shootings,

8    which we'll get into in more detail in a moment, what

9    other experience have you had firsthand treating damaged

10   caused by assault weapons?

11   A.   Well, my role as an emergency physician in an

12   urban level one trauma center requires that we treat

13   victims of all types of violence, and throughout the

14   course of my time there, have been called upon to treat

15   many victims of gunshot wounds, some of whom have been

16   victims of assault rifles or weapons.

17   Q.   All right.  How many times -- setting aside

18   Columbine and Aurora -- have you treated anyone who has

19   been shot by an assault weapon?

20   A.   I would be guessing.  An estimate would be 30,

21   40 times.

22   Q.   All right.  We talked earlier about your

23   testimony as an expert witness.  Have you ever testified

24   as an expert witness on the type of gun that was used

25   in creating a gunshot wound that you had treated?



 1          MR. COLLINS:  Objection.

 2          THE WITNESS:  Not specifically asked about the

 3    type of wound, but asked to give my experience in

 4    treating a wound where it was clear what type of weapon

 5    was used.

 6      Q.  BY MR. SWEENEY:  All right.  Have you ever given

 7    an opinion as an expert or as a treating physician on

 8    what type of firearm was used based upon your

 9    observations from treating the wound?

10          MR. COLLINS:  Objection.

11          THE WITNESS:  No.  Not specifically on the type

12    based on wound.  No.

13      Q.  BY MR. SWEENEY:  All right.  And in every case

14    where you were able to identify what kind of firearm was

15    used, it's because someone told you what kind of firearm

16    was used, correct?

17      A.  I would say certainly for the large majority, as

18    with the case of Columbine I did see the weapon.

19    Although, in all honesty, when I saw the weapon I was not

20    able to say that was a TEC-DC9.

21      Q.  All right.  Other than your experience

22    in emergency medicine, do you have any special education

23    or training in treating gunshot wounds?

24          MR. COLLINS:  Objection.

25          THE WITNESS:  Outside of my role as an emergency



1   physician in the academic environment trauma center, and

2   all those types of things, I can't think of something

3   specific outside of those roles.

4        I'm responsible for teaching residents and in

5   some cases faculty of other specialties with -- in areas

6   of advanced trauma life support, or ATLS, and other areas

7   where we would talk about gunshot wounds, and so there

8   are a lot of different courses that I both take and teach

9   in response to that, but they're all related in some way

10  to my role as both an emergency physician and then

11  sometimes as the chief of the emergency department.

12       Q.  BY MR. SWEENEY:  When you have treated patients

13  who you understood to have experienced gunshot wounds

14  caused by assault rifles, what did your treatment involve

15  in those cases?

16       MR. COLLINS:  Objection.

17       THE WITNESS:  I mean, it can involve virtually

18  any aspect of caring for patients.

19       Q.  BY MR. SWEENEY:  All right.  Do you recall that

20  you ever applied emergency bandages?

21       A.  Yes.

22       Q.  Tourniquets?

23       A.  Yes.

24       Q.  Nasopharyngeal tubes?

25       A.  Yes.  More likely endotracheal tubes, but



Page 64

1    certainly in some cases nasopharyngeal tubes,

2    particularly prior to putting in an endotracheal tube.

3         Q.  Did you ever remove bullets or a bullet from

4    fragments from gunshot wounds?

5         A.  Very rarely, but it has happened.

6         Q.  All right.  And very rarely, what were those

7    circumstances?

8         A.  When it was right there and obvious and with law

9    enforcement, we were exploring a wound, saw the bullet

10   and said there it is.

11        Q.  All right.  But typically in the -- I think you

12   said over a thousand patients with gunshot wounds, you

13   personally don't remove bullets or bullet fragments?

14        A.  I don't go in with a specific purpose of

15   removing them.  If as part of managing them it becomes

16   part of that, which is rare, we will remove them, but

17   that is not the intent or purpose of what we're doing.

18        Q.  All right.  In the thousands of patients with

19   gunshot wounds, how many times were you actually shown

20   the firearm that was used to shoot the projectile that

21   caused the wound?

22        A.  The actual firearm itself, very rarely.

23        Q.  And whatever information you would receive, what

24   would the source of the information about the type of

25   firearm used to the extent you ever knew?



1      A.   Law enforcement.

2      Q.   And by law enforcement, would that be a law

3  enforcement officer who might accompany the victim for

4  the hospital?

5      A.   So often there's a variety of law enforcement

6  officers involved in these episodes, and some company --

7  the victim and/or perpetrator, others come in later as

8  part of the investigative process, but often still

9  while the patient is in the emergency department, or

10  directly thereafter, and it's not always clear to me what

11  role they are in, but there are often multiple different

12  law enforcement folks that are involved in these

13  situations.

14      Q.   In connection with the -- over a thousand

15  patients with gunshot wounds that you've treated, have

16  you ever conducted forensic analysis of the trajectory of

17  the bullet that caused any of those wounds?

18           MR. COLLINS:   Objection.

19           THE WITNESS:   I don't know that I would call it

20  a forensic analysis.   There have been times when law

21  enforcement asked me to describe what I thought was a

22  trajectory of the wound based on what we were seeing, but

23  I wouldn't call that a forensic analysis.

24      Q.   BY MR. SWEENEY:   Would the trajectory of the

25  bullet causing gunshot wounds be an area that you would



1  consider yourself an expert in?

2      A.  I'm not sure that that particular area has

3  expertise or non-expertise, other than in my world,

4  treating those, I would classify myself as an expert in

5  evaluating those wounds.  I'm not sure I would classify

6  myself as an expert in determining a trajectory.

7      Q.  All right.  Have you ever given an opinion in a

8  court proceeding, at deposition, or at trial with respect

9  to the trajectory of a bullet in any of the gunshot

10  wounds that you've treated?

11          MR. COLLINS:  Objection.

12          THE WITNESS:  I don't recall a specific event.

13  I will sometimes get a question of, did this wound

14  represent potentially serious bodily injury

15  and/or life-threatening issues, and so I will then be

16  asked to say if my answer is yes, why, and oftentimes

17  part of that explanation is this was in the vicinity or

18  directly impacting a significant organ vessel, something

19  that would represent a life threat.

20      Q.  BY MR. SWEENEY:  When you were able to

21  personally observe the bullet used to cause the gunshot

22  wound that you were treating, were you able to

23  identify it -- the type of bullet it was as full metal

24  jacketed, soft-point, hollow point, et cetera?

25      A.  I was not myself, no.



1      Q.   All right.  Is that something you're capable of

2  doing based on your expertise?

3      A.   No.

4      Q.   And have you treated -- in the thousands of

5  patients with gunshot wounds that you treated, how many

6  of them had multiple wounds from multiple bullets?

7      A.   I don't have an absolute number for you.  There

8  were more with single wounds than with multiple wounds,

9  but there were a number with multiple wounds.

10      Q.   And when they're multiple wounds, some of them

11  may be exit wounds as opposed to entrance wounds where

12  the bullet actually left the body as opposed to the wound

13  where the bullet entered the body, correct?

14      A.   That is true.  We have to be careful about that

15  from a medical perspective, because when we -- first of

16  all, we don't seem to be particularly good, according to

17  literature at determining what was an entering and exit

18  wound as a global profession; and, number 2, often my

19  message when teaching about these issues, if you assume

20  it's only one bullet you have the risk of missing

21  something, if you assume it was two, and treated it as

22  such, you're less likely to miss something.

23           So there are times when in retrospect it turns

24  out to be, as you've described, but we often need to when

25  we see two wounds assume that it's multiple areas.  Other



1    times it's very obvious that it's multiple.

2         Q.  Have you ever been asked to give an opinion as

3    an expert or as treating physician on whether multiple

4    wounds were caused by multiple bullets in any of the

5    patients that you treated?

6         A.  Yes.

7         Q.  All right.  And how many occasions was that?

8         A.  I don't recall a specific number.  It would be a

9    number of them.

10        Q.  All right.  And do you recall anyone in which

11   you gave that testimony and what the basis for your

12   opinion was?

13        A.  So I don't remember the exact case or date.  I

14   do remember specifically three wounds to the abdomen and

15   was asked, is it likely that these represent three

16   different wounds, or a potential entry and exit wound,

17   and I said it was very unlikely that this represents a

18   entry and exit wound.  This from my perspective

19   represents three different wounds.

20        Q.  And that's sometimes a question at issue, and

21   not one that is necessarily obvious from observation,

22   correct?

23        A.  Correct.

24        Q.  And what have you done with any bullets that you

25   have personally removed from any of the gunshot wounds



1   that you have treated?

2        A.   Handed them immediately to law enforcement.

3        Q.   Right.  And you've never retained any of those

4   bullets, correct?

5        A.   No.

6        Q.   Have you made any study of the ballistics

7   analysis of any of the bullets that were removed from the

8   patients for which you've treated gunshot wounds?

9             MR. COLLINS:  Objection.

10            THE WITNESS:  I'm sorry.  I missed the first

11   part.

12        Q.   BY MR. SWEENEY:  Have you ever done a study of

13   the ballastic analysis of any bullets that were removed

14   from the patients who you treated with gunshot wounds?

15            MR. COLLINS:  Objection.

16            THE WITNESS:  So I haven't done a study of that.

17   I've read some of the analysis but, no, I have not done a

18   study of those.

19        Q.   BY MR. SWEENEY:  All right.  Do you have any

20   listing of the number of patients that you've treated

21   with gunshot wounds?

22        A.   No.

23        Q.   And have you made any notes and recorded the

24   different characteristics of the wounds for each of those

25   over a thousand patients that you've treated with gunshot



1    wounds?

2         A.   No.

3         Q.   When you removed a bullet from a wound, and you

4    have on more than one occasion, were you able to identify

5    the caliber based upon your observation of it?

6         A.   No.

7         Q.   Recalling your time spent at St. Joseph's --

8         A.   (Nods head.)

9         Q.   -- can you estimate how many gunshot wounds you

10   treated there -- how many patients with gunshot wounds

11   you treated while you were at St. Joseph's?

12        A.   I was there for two years and probably saw

13   anywhere between 10 and 15 patients total.  We weren't

14   the designated level one trauma center there, so we were

15   less likely to get gunshot wounds but we did get them.

16        Q.   All right.  And do you recall any breakdown of

17   the types of firearms that you understood to have been

18   used in those 10 to 15 gunshot wounds that you treated at

19   St. Joseph's?

20        A.   Most of them were shotgun injuries and/or

21   hunting rifles with one exception.

22        Q.   And that's in New Hampshire, correct?

23        A.   No.  That was in Ann Arbor or actually

24   Ypsilanti, spelled with a Y.

25        Q.   All right.



1       A.   Right on the border of Ann Arbor and Ypsilanti.

2       Q.   At Denver Health, how many gunshot wounds have

3   you treated there?

4       A.   Most of the victims I've seen.

5       Q.   All right.  And how many gunshot wounds have you

6   treated since you've been in San Francisco at Zuckerberg?

7       A.   In about a year and a half, a similar rate as

8   Denver Health, but far less time there.  Somewhere in the

9   neighborhood of 30 to 40.

10      Q.   All right.  And of those 30 to 40 patients

11  you've seen in San Francisco with gunshot wounds, did you

12  provide hands-on treatment of their wounds?

13      A.   Yes.

14      Q.   Do you have any breakdown of the 30 to 40

15  gunshot wound patients that you saw based on the type of

16  firearm that was used?

17      A.   No.

18           MR. COLLINS:  Objection.

19      Q.   BY MR. SWEENEY:  Do you know if any of them

20  involved assault rifles?

21      A.   Yes.

22      Q.   More than one?

23      A.   Yes.

24      Q.   Can you estimate how many more than one?

25      A.   In the neighborhood of ten.



1      Q.  All right.  Is it your understanding that

2   assault rifles are banned in the State of California?

3          MR. COLLINS:  Objection.

4          THE WITNESS:  I actually don't know the wording

5   of the law in California.

6      Q.  BY MR. SWEENEY:  Okay.  You haven't been invited

7   to the range by the police in California to shoot AR-15s

8   or AK-47s since you've been here, have you, Doctor?

9      A.  No, I have not.

10     Q.  At Denver Health did you treat gunshot wounds

11  from shotguns?

12     A.  Yes.

13     Q.  Can you estimate how many times?

14     A.  Multiple.  It would be a real guess, fifty.

15     Q.  All right.  And what about hunting rifles?

16     A.  Less frequent than in Michigan, but

17  still certainly a number of them.  Many of them were

18  transfers, and often that information came from the

19  victim and/or family as opposed to law enforcement,

20  necessarily, but we would get transfers from rural areas

21  that would be more likely to be victims of hunting

22  rifles.

23     Q.  All right.  And you talk about your experience

24  with the Columbine and the Aurora mass shootings.  In

25  terms of the gunshot wounds that you observed in



1    those two shootings, were there any significant

2    difference in the nature of those wounds, the severity of

3    them?

4         A.  Not a significant difference.

5         Q.  All right.  Any differences at all that you can

6    recall between the gunshot wounds that you

7    observed following the Aurora shootings and the wounds

8    following the Columbine shootings?

9         A.  Well, I have vivid memories of wounds from both

10   of those scenes, and they certainly weren't exactly the

11   same.  I don't recall a specific pattern or difference in

12   patterns.  Remembering that I was at the scene at

13   Columbine so I saw a different view and in some

14   cases fatal wounds that had not moved from that fatal

15   position, which is unusual for an emergency physician to

16   see.

17        Even when we see fatal wounds they're often --

18   have been obviously moved and brought into the emergency

19   department, and so the position they're in looks

20   different.  So I have vivid memories of the wounds both

21   at the scene in Columbine and patients that have been

22   brought out, and I saw, and then wounds that I saw in the

23   emergency department at Aurora, but I don't -- I can't

24   think of a particular pattern that I notice that was

25   different between them.



1        Q.   You never served in the military, am I correct?

2        A.   I have not.

3        Q.   And you've never been under the employment of A

4    law enforcement agency, am I correct?

5        A.   No.  We had discussed and entered into some

6    agreements with the police in terms of providing medical

7    oversight, but in terms of being a law enforcement

8    officer, no.

9        Q.   Have you ever observed anyone being shot?

10       A.   No.

11       Q.   Your report references on the second page:   In

12   one instance a man who shot his girlfriend said he had no

13   idea how destructive assault weapons can be.

14            Do you see that sentence?

15       A.   I do.

16       Q.   All right.  What do you recall about

17   that incident?  When did it occur?

18       A.   This was a number of years ago.  A weekday

19   evening -- I don't know how much detail in terms of when,

20   but I do recall specifically it was a weekday evening,

21   because it involved a argument after both parties had

22   gotten home from work.

23       Q.   All right.  And do you recall the circumstances

24   of the shooting as it was communicated to you how far

25   away was the shooter from the patient?



1      A.   He described being across the room, but I don't

2   have in terms of feet or meters.

3      Q.   Did he fire more than one shot?

4      A.   Yes.   Although he claimed to have intended to

5   only fire one.

6      Q.   Were there more than one wound on your patient?

7      A.   Yes.

8      Q.   How many wounds?

9      A.   Four.

10     Q.   And were you able to determine if they

11  were all entrance wounds or some of them might be exit

12  wounds?

13     A.   The wounds we were looking at were all -- when I

14  say four, it was four on the front.   There were also four

15  on the back.   So I guess the correct answer to your

16  question earlier was eight, but we assessed it as

17  four entry wounds in the setting of how it was described.

18     Q.   So in your opinion at least the patient you

19  treated was struck from relatively close range with four

20  bullets in the chest, correct?

21          MR. COLLINS:   Objection.

22          THE WITNESS:   It depends on how you define close

23  range.   He described it as, I was across the room

24  and implied that he thought, therefore, he was safe.

25     Q.   BY MR. SWEENEY:   What is your understanding of



1    how far he would have been away from this patient?  Based

2    on his description to you, what was your takeaway from

3    that?

4         A.  He described a far distance.  So my takeaway

5    was a -- he described the living room, a large room that

6    had at least 20, 30, 40 feet, but that was -- he did not

7    say that specific distance.

8         Q.  Are there any firearms that you're aware of

9    that when shot from 40 feet away, four bullets entering

10   the chest of a patient would not cause serious if

11   not fatal injuries?

12        A.  I'm not aware of a firearm that wouldn't at

13   least potentially if not really cause damage.

14        Q.  And what became of your patient in that

15   instance?

16        A.  She died.

17        Q.  In the sentence before that you mentioned the

18   shooters experienced the horror of what these weapons do.

19   Who are you refering to as the shooters experiencing the

20   horror of what these weapons do?  Is that a reference to

21   the young man who shot his girlfriend?

22        A.  That was one, and there were several others, if

23   not a large number, and I didn't -- certainly talk to

24   most of the shooters involved here, but do have very

25   specific memories of several shooters that would describe



1    that.

2         Q.   Did you have any involvement in any criminal or

3    civil proceedings that came out of the incident of the

4    young man shooting his girlfriend?

5         A.   I don't recall specific involvement there, but

6    remember that involvement can involve several things.

7    Initially I fill out a serious bodily injury form, which

8    I'm quite certain I did there, then it's a subpoena.  A

9    subpoena involves multiple discussions, may or may

10   not involve my being called to testify, and then whether

11   or not the case went to trial.  I did not testify in this

12   particular trial.  If I recall correctly, they came to an

13   agreement prior to going to trial, and I had been asked

14   several questions about this.  I didn't testify.

15        Q.   All right.  Do you know if the young man went to

16   jail for shooting his girlfriend?

17        A.   Yes.

18        Q.   What was your understanding of the make and

19   model of the firearm that he used?

20        A.   He described it as a TEC-DC9.

21        Q.   Do you know what the caliber of the bullets

22   were?

23        A.   I don't.

24        Q.   Do you know if it was a automatic or a

25   semiautomatic version of that firearm?



1      A.   I don't know.  He said:  I meant to pull the

2  trigger once, and there were at least four shots.  That's

3  the only information that he gave me.

4      Q.   And that easily could have happened if it were

5  an automatic firearm without him pulling the trigger more

6  than once, correct?

7           MR. COLLINS:  Objection.

8           THE WITNESS:  I would imagine.

9      Q.  BY MR. SWEENEY:  Any other experiences

10  involving shooters of assault weapons that you can recall

11  other than this specific one?

12      A.   Yes.  There were at least three or four other

13  times when we would also treat the shooter that they

14  specifically expressed concern that they had not intended

15  to cause anywhere near the damage that they had.

16      Q.   Have you ever had the discussion with any

17  shooters of firearms other than what you understand to be

18  assault weapons about their experience of the shooting?

19      A.   Had discussions about their experience with the

20  shootings, yes.

21      Q.   All right.  Is there any of them that didn't

22  express shock and horror at what they've done with the

23  shooting?

24      A.   One did.  That was not an assault weapon.  It

25  was a shotgun.



1        Q.   And do you recall what happened with

2   the individual who was shot by the shotgun in that case?

3        A.   Yes.  He unfortunately died also.

4        Q.   Is it typical that after you treat a patient

5   with gunshot wounds that you have follow-up with them

6   and/or their families over the course of their recovery?

7        A.   I wouldn't describe it as typical, no.

8        Q.   Okay.  Can you estimate how many times that's

9   happened?

10        A.   Certainly many times.  More than 20 or 30

11   depending on the context.  So there will be times when

12   they come back for wound checks and/or complications

13   related to their -- excuse me.  Their injuries.  There

14   will be other times when we will interact during either

15   criminal or civil cases, and occasionally times when they

16   will come back and say thank you, or express appreciation

17   or have other questions about what we saw in the

18   emergency department.

19        Q.   Is it typical that when you do have follow-up

20   with the patients and/or with their families, it's cases

21   that involve more severe gunshot wounds?

22        A.   Yes.  Although there's certainly exceptions to

23   that.

24        Q.   On page 3, you reference a vivid example was a

25   recent victim of a shooting from a non-assault weapon



1   presented to our emergency department with an elbow

2   wound.  You were able to treat this wound and release the

3   patient from the ED.  When did that occur?

4        A.  About eight months ago.

5        Q.  Okay.  And what was your understanding of the

6   firearm that was used?

7        A.  My understanding was that it was a .9 millimeter

8   pistol.

9        Q.  All right.  And do you have any information

10   about the circumstances of the shooting, including how

11   far away the shooter was from the victim?

12        A.  The victim was running and was shot from behind

13   in the range of 20 to 30 feet, and the only reason that I

14   remember that is because -- and the reason that it is

15   vivid is because a patient that was very similar in terms

16   of gender, age, build, came in not long after that also

17   running from the shooter, also in the 20 to 30 feet range

18   with a AK-47.  Shot at almost the same spot.

19        Q.  And what size bullets are used in a AK-47?

20        A.  I don't know.

21        Q.  And the wound that you treated for the first

22   elbow injury, what exactly did you observe the bullet had

23   done when it struck the elbow?

24        A.  There was a puncture wound to what we described

25   as the posterior aspect of the elbow that was a single


MAGNA ▸
LEGAL SERVICES

Page 81

1    wound and that was really all we saw, similar to the

2    other victim as well, other than the other victim

3    had clear damage that went further down the arm, but the

4    wound itself was in essentially the same spot.

5         Q.   In the first case had the bullet struck a

6    bone?

7         A.   We don't know if it struck the bone, but it did

8    not break the bone.

9         Q.   All right.  So it might not have even struck the

10   bone?

11        A.   Correct.

12        Q.   In the second case it was pretty clear from your

13   observation that the bullet had struck the bone, correct?

14        A.   Clearly.

15        Q.   Are there any other differences between the two

16   wounds that you recall?

17        A.   Well, on X-ray we saw the bullet for the first

18   wound and did not for the second.

19        Q.   Okay.  What happened to the bullet for the

20   second?

21        A.   It left the arm.

22        Q.   Exit?

23        A.   Yeah.

24        Q.   And is that consistent with -- scratch that.

25             (Break taken from 11:02 a.m. to 11:10 a.m.)



1    particular document.  No.

2         Q.   Okay.  And am I correct from your report that

3    your involvement with the shootings at the Century 16

4    Theater in Aurora was limited to your receiving and

5    treating patients at the ER at Denver Health, correct?

6         A.   Yes.

7         Q.   You weren't at the scene?

8         A.   I was not at the scene.

9         Q.   All right.

10        A.   We received patients both immediately from the

11   scene and then later in transfer as well.

12        Q.   All right.  And on page 75 there is a Table 7

13   that lists hospitals receiving patients and it lists

14   Denver Health -- Denver General as having received five

15   patients.  Is that consistent with your recollection?

16        A.   Five initially from the scene, and then there

17   were at least four more that were transferred later to

18   us.

19        Q.   So you recall a total of nine patients that came

20   out of the Century 16 Theater shooting that came to

21   Denver Health to be treated?

22        A.   I believe so.  It may have been one up or one

23   down from that, because again transfers happen both

24   within hours and then one even a day later, but, yes, I

25   believe it was around that number.



1      Q.   And of those eight or nine patients, how many of

2   them had gunshot wounds?

3      A.   All of those did.

4      Q.   All right.  So some patients arrived a day or

5   two later with gunshot wounds.  Is that --

6      A.   At least one did -- transferred from another

7   facility.  So they were seen initially at another

8   facility and then transferred -- we were the level one

9   trauma center -- to us as the regional level one trauma

10   center.

11      Q.   Did any of the eight or nine patients that you

12   saw at Denver Health from the Aurora shootings have

13   multiple gunshot wounds?

14      A.   Yes.

15      Q.   How many?

16      A.   At least one.

17      Q.   Okay.

18      A.   I don't recall exactly how many.

19      Q.   Were you able to tell from your treatment of

20   those individuals what type of firearm had caused their

21   gunshot wounds?

22          MR. COLLINS:  Objection.

23          THE WITNESS:  From that treatment, no.

24      Q.   BY MR. SWEENEY:  All right.  Did you remove any

25   bullet or bullet fragments from those eight or nine



1    patients?

2         A.   No.

3         Q.   And did you see any bullets or bullet fragments

4    removed from those patients?

5         A.   No.

6         Q.   And did you receive any information about the

7    type of firearms that were used in those shootings?

8         A.   From law enforcement, yes.

9         Q.   And what were you told?

10        A.   I was told that at least one of the weapons was

11   an AR victim.

12        Q.   Was it your understanding that there was more

13   than one weapon used?

14        A.   Yes.

15        Q.   And do you know what the other weapons were?

16        A.   No.  I was told at the same time, but I don't

17   recall.

18        Q.   All right.  And you don't know which of those

19   different weapons were used to make the gunshot wounds in

20   the patients you treated from the Aurora shootings,

21   correct?

22        A.   No.

23        Q.   If I could turn your attention to page 12 of

24   that report.

25        A.   Not Roman numeral 12, regular page?



1      Q.   On page 12, Arabic 12, yeah.  This is a

2   reference to the --

3           MR. COLLINS:  I don't think we're on the same

4   page.

5      Q.  BY MR. SWEENEY:  -- facts surrounding the

6   attack.

7      A.   Attack starts?

8      Q.   Right.

9           MR. COLLINS:  Oh.

10     Q.  BY MR. SWEENEY:  At the bottom of the page it

11   says:  The shooter carried into the theater a shotgun,

12   AR-15 style semiautomatic rifle, and a .40 caliber

13   semiautomatic handgun, correct?

14     A.   Yes.

15     Q.   It then skipping a sentence, it says:  He first

16   opened fire with a shotgun firing six shells until he

17   exhausted its ammunition.  Do you see that?

18     A.   Yes.

19     Q.   How many shotgun pellets would have been shot

20   into the crowd by him firing six shotgun shells?

21     A.   I don't know.

22     Q.   Dozens, if not hundreds, of pellets?

23     A.   I would imagine.

24     Q.   All right.  And depending upon the size of shot,

25   they can be almost the same diameter as a .223 round



 1   typically used in an AR-15, correct?

 2        A.  So my experience has been that the shotgun

 3   pellets are far smaller, and that the AR-15 wounds have

 4   been bigger and far more substantial.

 5        Q.  But you don't know if you were treating shotgun

 6   wounds or AR-15 wounds from the patients you saw from the

 7   Aurora shootings?

 8        A.  No.  I don't recall any of the wounds that

 9   looked like shotgun wounds or pellets, but I can't tell

10   you specifically what weapon was used.

11        Q.  All right.  It also says he fired five rounds

12   from the handgun on the next page, correct?

13        A.  Yes.

14        Q.  So you don't know whether or not any of the

15   wounds you treated were caused by a .40 caliber handgun,

16   correct?

17        A.  I don't.

18        Q.  And he did fire it says .65 -- at

19   least .65 high-velocity rounds from a magazine that was

20   AR-15.  Do you see that?

21        A.  Yes.

22        Q.  So that may or may not have been more bullets

23   from the AR-15 than he fired in terms of total number of

24   shotgun pellets and handgun rounds, correct?

25        A.  It may or may not have been.



1        Q.  All right.  Now, further down on that same page

2   at the bottom of the page it says:  A few people were

3   wounded in the adjacent theater.  They were struck by

4   bullets or shotgun pellets that had gone through the

5   common wall of the two theaters.

6            Do you see that?

7        A.  I do.

8        Q.  And do you know if you treated anyone from the

9   adjacent theater who had been struck by bullets or

10  shotgun pellets that had penetrated the common wall?

11       A.  One of the patients I saw at Denver Health that

12  had a -- very bad extremity wound said he was in the next

13  theater.  So I assume that was correct.  This was not a

14  shotgun wound.

15       Q.  How can you tell that?

16       A.  I'm sorry?

17       Q.  How can you tell that?

18       A.  It was far bigger than a pellet from anything

19  I've seen from a shotgun wound.  I have not seen a

20  shotgun wound that has gone through a wall.  So my

21  experience has been that when they've gone through the

22  wall they've been different velocity or weapons, but this

23  was consistent with wounds I had seen from assault

24  weapons.

25       Q.  Do you know what size buckshot the shooter was



1    using at Aurora?

2         A.   I don't.

3         Q.   And did you assume that if he had lethal intent

4    of killing people in that theater he would have chosen a

5    shot large enough to do that and not bird shot?

6              MR. COLLINS:   Objection.

7              THE WITNESS:   I would have to be in his mind to

8    do that, but I certainly would -- I would not be

9    surprised if his intent was to use whatever weapon would

10   be the most deadly.  I did actually treat him as a

11   patient separately, but he didn't mention anything

12   about his intent.

13        Q.   BY MR. SWEENEY:  When you're saying "he," you're

14   referring to the shooter?

15        A.   Yes.

16        Q.   Can you tell me about your treatment of the

17   shooter prior to the event?

18        A.   Oh, I didn't treat him before the event.  It was

19   after the event.

20        Q.   Oh, he was brought to your ER following the

21   event?

22        A.   Three months following the event.

23        Q.   What were those circumstances?

24        A.   He was ill and needed to be seen in the

25   emergency department and was in custody and we are the



1       A.   No.

2       Q.   What is it about firearms that you call assault

3   weapons that causes them to fire bullets in such a way as

4   to create more extensive damage, if that is your

5   opinion?

6       A.   So I would say it's not so much about the

7   weapon, but about the wounds that I have seen.  So when I

8   look back and think about the number of wounds that I

9   have seen, the ones that have come from -- what we are

10  describing as assault weapons, have been more extensive,

11  have been more associated with more complications, and

12  greater injuries in general, than the ones that have come

13  from non-assault weapons.

14      Q.   Have you done any research of the medical

15  literature to see if any studies have been done to

16  support that opinion?

17          MR. COLLINS:  Objection.

18          THE WITNESS:  So I have read a lot of the

19  medical literature.  I have not done research

20  specifically to support or refute that opinion.

21      Q.   BY MR. SWEENEY:  And you didn't cite any such

22  authority in your report.  Are you aware of any

23  authorities in the medical literature to support your

24  opinion in that regard?

25      A.   No.



1          MR. COLLINS:  Objection.

2     Q.  BY MR. SWEENEY:  And the cartridges used to

3  launch projectiles in assault weapons are also used in

4  other types of firearms that would not be considered

5  assault weapons, correct?

6          MR. COLLINS:  Objection.

7          THE WITNESS:  Are you asking if the bullets used

8  in assault weapons can be used in non-assault weapons?

9     Q.  BY MR. SWEENEY:  Yeah.

10     A.  My understanding is yes.

11     Q.  Would there be any difference in the severity or

12  extent of damage in the wounds caused by those same

13  bullets if they were launched from firearms that were not

14  assault weapons?

15     A.  So I have to go back to my experience on that

16  and say that although I haven't put two wounds together,

17  one from the same bullet in an assault weapon and one

18  from the same bullet on a non-assault weapon, the damage

19  I've seen from assault weapons has been more extensive.

20     Q.  And what explanation do you have for why that

21  is?

22     A.  First, in terms of number of wounds.  So they

23  have been associated with higher number of wounds.  A

24  higher number of victims, but that's not a testimony to

25  the extent of the damage, but the next part is what would



1    seem to me would be the velocity and power of the

2    wound -- the bullet.

3        Q.  Is there any difference between the velocity and

4    power of the same bullet being shot from an assault

5    weapon and from a non-assault weapon?

6        A.  From my experience there has been, and as an

7    example when that gentleman who was running away from the

8    shooter and was shot in essentially the same spot from a

9    non-assault weapon and one that was shot from an AK-47,

10   and the non-assault weapon we discharged from the

11   emergency department after getting an X-ray and showing

12   that it wasn't a fracture and the bullet was still in the

13   wound, whereas the one shot with the AK-47 had the joint

14   destroyed, much of the bone destroyed, and ultimately had

15   to undergo an amputation.  So my answer to that question

16   would be yes.

17       Q.  All right.  And just to confirm, I think we

18   touched on this before, but just to wrap it up, you

19   haven't made any practice of systematically recording for

20   every one of your gunshot wound patients the severity of

21   the wound and the specific firearm used, or even the

22   number of wounds in each patient, correct?

23       A.  That's correct.

24       Q.  Aren't you more likely to remember the more

25   devastating wounds that challenged your professional



1    homicides by blunt trauma have you treated?

2         A.   Killed?

3         Q.   Uh-huh.

4         A.   Hundreds.   I would say certainly far less than

5    the gunshot wounds, but of course the gunshot wounds were

6    not all fatalities.

7         Q.   Now, of the -- of the thousand or so gunshot

8    wounds that you treated, how many of them were

9    fatalities?

10        A.   We -- and this is an estimate also, 15 to 20

11   percent.

12        Q.   And of the 30 to 40 assault weapon gunshot

13   wounds that you -- that you handled, how many of those

14   were fatalities?

15        A.   About 50 percent.

16        Q.   The hunting rifle accidents or homicides that

17   you've treated, how many of those were fatalities?

18        A.   About 25 percent.

19        Q.   And the shotgun wounds that you've treated, how

20   many of those were homicides?

21        A.   Fatalities or homicides?

22        Q.   I'm sorry.   Fatalities.   Thank you.

23        A.   10 to 15 percent.

24        Q.   I think you're better at this than I am, by the

25   way.   Are more people killed each year by shotguns than



1          THE WITNESS:  Yes.

2      Q.  BY MR. COLLINS:  In your experience, and of

3  course we've talked at some length here today about what

4  that is, which includes treating patients at a level one

5  trauma center for 25-plus years, have you ever seen a

6  bullet or a projectile from an assault weapon?  For

7  example, an AR-15 or an AK-47 or a TEC-9 remain lodged in

8  the body?

9      A.  No.

10      Q.  Ever?

11      A.  Never.

12      Q.  Okay.  Can you say the same thing for a bullet

13  or a projectile from a non-assault weapon, for example, a

14  handgun?

15      A.  No.

16      Q.  Doctor, there's no question that you have both

17  seen and treated wounds that have been caused by assault

18  weapons, as we've defined that term here today, correct?

19          MR. SWEENEY:  Objection.  Leading.

20          THE WITNESS:  Correct.

21      Q.  BY MR. COLLINS:  You can answer.

22      A.  (Nods head.)

23      Q.  And there's no question that you have seen and

24  treated wounds caused by non-assault weapons, correct?

25          MR. SWEENEY:  Objection.  Leading.



1                        CERTIFICATE

2

3

4          I HEREBY CERTIFY that the witness was duly sworn

5     by me and that the deposition is a true record of the

6     testimony given by the witness.

7               It was requested before completion of the

8     deposition that the witness, CHRISTOPHER B. COLWELL,

9     M.D., have the opportunity to read and sign the

10    deposition transcript.

11

      _____

12    Celia A. Zarate

13    Certified Shorthand Reporter in the

14    State of California

15               CSR No. 10769

16    Dated:  November 14, 2017

17

18

19

20

21

22

23

24

25



# EXHIBIT 3
## TO KAPLAN DECLARATION

**In The Matter Of:**

*David Seth Worman, et al.  vs.*
*Charles D. Baker, et al.*

---

*James Cucuruto*

*Vol. 1*

*November 7, 2017*

---

*Gore Brothers Reporting & Videoconferencing*

*36 South Charles Street, Suite 2002*

*Baltimore, MD 21201*

*410-837-3027*

*www.gorebrothers.com*



Since 1961 -  Serving MD, DC & VA - Worldwide

Min-U-Script® with Word Index

1

          IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS


DAVID SETH WORMAN, et al.

               Plaintiffs          Case No.

vs.                                1:17-cv-10107-WYG

CHARLES D. BAKER, et al.

               Defendants

_____/




          The deposition of JAMES CURCURUTO was held

on Tuesday, November 7, 2017, commencing at 8:59 a.m.,

at Bradley, Arant, Boult, Cummings, LLP, 1615 L Street,

N.W., Suite 1350, Washington, D.C. 20036, before

Melinda Johnson, CSR, Notary Public.





REPORTED BY:  Melinda Johnson, CSR

2

1   APPEARANCES:

2

3                  ON BEHALF OF THE PLAINTIFFS:

4                  JAMES W. PORTER, III, ESQUIRE

5                       Bradley Arant Boult Cummings, LLP

6                       One Federal Place

7                       1819 Fifth Avenue North

8                       Birmingham, Alabama 35203

9                       Telephone:  202.521.8285

10                      Email:  jporter@bradley.com

11

12                 ON BEHALF OF THE DEFENDANTS:

13                 JAMES SWEENEY, ESQUIRE

14                 ELIZABETH KAPLAN, ESQUIRE

15                      Office of the Attorney General

16                      The Commonwealth of Massachusetts

17                      One Ashburton Place

18                      Boston, Massachusetts 02108

19                      Telephone:  617.963.2567

20                      Email:  jim.sweeney@state.ma.us

21   ALSO PRESENT:  Benjamin F. Erwin, Esquire

3

1                               INDEX

2                   Deposition of JAMES CURCURUTO

3                       November 7, 2017

4

5    Examination By:                              Page

6    Ms. Kaplan                                      4

7

8

9    Exhibit No:                               Marked

10   Exhibit 1      Subpoena                        7

11   Exhibit 2      Report                          8

12   Exhibit 3      Web Page                       35

13   Exhibit 4      Complaint                       36

14   Exhibit 5      Transcript                      46

15   Exhibit 6      Expert Report                   47

16   Exhibit 7      Web Page                        52

17   Exhibit 8      Report                          80

18   Exhibit 9      Report                          88

19   Exhibit 10     Report                         153

20   Exhibit 11     Report                         155

21   Exhibit 12     Report                         155

1  expertise?

2      A      Being the Director of Research and Market

3  Development at National Shooting Sports Foundation,

4  it's a normal course of business to provide our members

5  with reliable and accurate data, market data, that they

6  can use to make business decisions.  And, under my

7  direction -- the majority of that research, over the

8  past eight years has been under my direction.

9      Q      And when you say "provide our members," who

10  are your members?

11      A      The National Shooting Sports Foundation is

12  a member-based trade association for the firearms and

13  ammunition industry.  We have approximately 10,000

14  members made up primarily of firearm retailers,

15  shooting ranges, and manufacturers of firearms and

16  ammunition.

17      Q      So would you say your expertise is related

18  to providing market data to those members?

19      A      My expertise is indeed providing market

20  data to those individuals to help them make

21  better-informed business decisions.

18

 1       Q     And when you say "better-informed business
 2    decisions," what is a better-informed business
 3    decision?
 4             MR. PORTER:  Object to the form of the
 5    question.
 6             But you can answer if you can.
 7             THE WITNESS:  As with any business, the
 8    more accurate and reliable data that you have available
 9    prior to making a decision should benefit the positive
10    outcome toward making that decision if including
11    accurate and reliable data in your decision-making
12    process.
13    BY MS. KAPLAN:
14       Q     Are positive outcomes for a business
15    growing the market for that business?  And I'll put
16    that another way.
17             When you talk about positive outcomes in a
18    business setting, are you talking about, for example,
19    selling more firearms?
20             MR. PORTER:  Object to the form of the
21    question.

1                 But you can answer.

2                 THE WITNESS:  A positive business outcome

3    would be to have increased profit.

4    BY MS. KAPLAN:

5         Q    But how do you increase your profit if

6    you're one of these businesses?

7                 MR. PORTER:  Object to the form of the

8    question.

9                 But you can answer if you know the answer

10   to that.

11                THE WITNESS:  Can you restate that

12   question, please.

13   BY MS. KAPLAN:

14        Q    How does a business increase its profit --

15                MR. PORTER:  Object to the form.

16   BY MS. KAPLAN:

17        Q    -- to the extent that you know?

18                MR. PORTER:  I object to the form of the

19   question.

20                But you can answer if you can.

21                THE WITNESS:  Through increased sales.

28

1    BY MS. KAPLAN:

2         Q    Do you have any other paid employment

3    currently?

4         A    Other than the National Shooting Sports

5    Foundation, no.

6         Q    Where did you work prior to the National

7    Shooting Sports Foundation?

8         A    Immediately prior to the NSSF, I was

9    self-employed.

10        Q    What were you doing when you were

11   self-employed?

12        A    I formed an LLC called Marketing Memories

13   and had a website called framethatmoment.com where I

14   sold personalized engraved products.

15        Q    Did you design and conduct surveys as part

16   of that position?

17        A    Not surveys, no.

18        Q    Where did you work before you were

19   self-employed at Marketing Memories?

20        A    Scholastic, Inc.

21        Q    What is Scholastic, Inc.?

44

1          A      I do not know.

2          Q      Do you know if NSSF provides any financial

3    resources to the National Rifle Association?

4          A      I do not know.

5          Q      Turning back to Exhibit 2, which is your

6    report.  It says on Page 2, I believe, that you are not

7    receiving a fee in exchange for your opinions in this

8    case; is that correct?

9          A      Correct.  Other than my normal salary, no

10   additional fee.

11         Q      So is today a normal work day for you?

12         A      Yes.

13         Q      Are you using vacation time to be here?

14         A      No.

15         Q      Who do you report to at NSSF?

16         A      The Managing Director of Member Services,

17   Michael Vrooman, V-r-o-o-m-a-n.

18         Q      And you said -- I'm sorry, he is the

19   managing director of what?

20         A      Member services.

21         Q      So is what you do considered to be part of

45

1  the services that NSSF provides to its members?

2      A     I believe so, yes.

3      Q     And does Mr. Vrooman know that you're here

4  today?

5      A     He does.

6      Q     Who asked you to participate in this matter

7  as an expert?

8      A     I believe that was Ben -- a coworker, Ben

9  Erwin.

10     Q     He's the general counsel?

11     A     Assistant general counsel.

12     Q     Assistant.  I'm sorry.

13           How many times have you worked with the

14  lawyers at Bradley Arant?

15     A     I believe this is the second time, with the

16  Kolbe case being the first.

17     Q     Do you know if they asked you or asked your

18  boss for you to participate in this case as an expert?

19     A     I would assume they had gone through our

20  government relations department prior.

21     Q     Have you ever worked on a case on behalf of

1        Q      And is it fair to say that you started with

2    the Maryland report as a draft and then updated with

3    more recent numbers?

4        A      Correct.

5        Q      Was that report in Kolbe accurate to the

6    best of your ability?

7        A      I believe it was, yes.

8        Q      Let's go back to Exhibit 2, which is the

9    report in this case.

10        A      Okay.

11        Q      On the second to last page, you state that

12    it is your opinion that:

13            "Both modern sporting rifles and magazines

14    that are capable of holding more than ten rounds of

15    ammunition are commonly used by millions of law abiding

16    Americans for a variety of lawful purposes."

17            Is that your opinion?

18        A      Yes.

19        Q      What do you mean when you use the term

20    "modern sporting rifle"?

21        A      Modern sporting rifle is a category of

50

1   semi-automatic rifles built, primarily built, on an AR

2   or AK platform capable of accepting a detachable

3   magazine.

4        Q     Is an M16 included in a modern sporting

5   rifle, if you know?

6        A     M16?  Is an M16 included in a modern

7   sporting rifle?

8        Q     Would it be a modern sporting rifle?

9        A     Would it be a modern sporting rifle?

10  I believe M16 is fully automatic.  So, therefore, it

11  would not be a modern sporting rifle.

12       Q     What if an M16 was being operated in

13  semi-automatic mode?  Would it be a modern sporting

14  rifle then?

15       A     If it has the capability to shoot fully

16  automatic, it would not be considered a modern sporting

17  rifle.

18       Q     So is it your testimony that any rifle that

19  can be shot in fully-automatic mode is not a modern

20  sporting rifle?

21       A     Just to clarify, you said "any rifle that

128

1  to other guns for these particular purposes, does it?

2      A    I don't believe it does.

3      Q    And, in fact, we talked earlier about the

4  use of other guns for target shooting purposes;

5  correct?

6      A    Correct.

7      Q    And for hunting purposes; correct?

8      A    Yes.

9      Q    And other guns are, in fact, more commonly

10 used for those purposes based upon the Sport Shooting

11 Participation Survey; correct?

12     A    I believe you're referring to Exhibit D,

13 the Sport Shooting Participation Study where 14 million

14 people participated in target shooting with the modern

15 sporting rifle?

16     Q    Yes.

17     A    And then 33 million participated with a

18 handgun and 28 million with a traditional rifle?

19     Q    Yes.

20     A    Yes.  That would be correct.

21     Q    And, again, going back to the Modern

1   Sporting Rifle Consumer Report 2013, another conclusion

2   that you drew from this report, in your expert

3   report -- and I apologize for the jumping back and

4   forth, but we do what we have to do.

5              So toward the very end of that paragraph

6   number two --

7        A     Okay.

8        Q     -- you say that:

9              "Combining data from this report..."

10             -- meaning the Comprehensive Consumer

11  Report -- "...with production and import data from the

12  ATF AFMER and ITC, we can apply a weighted average

13  formula showing more than 4.8 million people currently

14  own one or more modern sport rifles."

15             Did I read that correctly?

16       A     Yes.

17       Q     Can you walk me through how you arrived at

18  that number -- 4.8 million people currently own one or

19  more of the modern sporting rifles.

20       A     Sure.  And I believe this was a topic in

21  the last deposition as well -- or, the Kolbe

1    deposition.

2         Q    That's true.  That's correct.

3              Would you like to refer to the deposition

4    testimony in Kolbe on this topic?

5         A    Sure.

6         Q    It's at Pages 177 to 180.

7         A    So nothing has changed.  That number didn't

8    get changed because we hadn't updated the modern

9    sporting rifle study, so we kept it at the same

10   4.8 million.

11        Q    So, just to clarify, when you say "nothing

12   has changed," do you mean nothing has changed from what

13   I believe is Exhibit 6, which is your expert report in

14   the Kolbe deposition; is that right?

15        A    Right.  And further defining, nothing has

16   changed with regard to the 4.8 million people currently

17   owning one or more modern sporting rifle.  We have not

18   updated that number for this case.

19        Q    Understood.  So, in that case -- if you

20   just give me a moment, we may be able to just refer to

21   the testimony in Kolbe on this topic.  Well, I think

1   the easiest thing to do is to basically summarize what
2   you've done here.
3          And that is:  Did you go back to your --
4   the first paragraph, numbered paragraph 1, in your
5   expert report?  Actually, don't even -- let me withdraw
6   that.
7          If you go to the chart that you've attached
8   at Tab A, you have approximately 13.7 million modern
9   sporting rifles derived from the US production less
10  exports and the US imports less exports; is that
11  correct?
12      A    That is correct from 1990 to 2015.  I
13  believe, during the Kolbe case -- referring back to the
14  deposition on Page 1 -- Page 181, Line 9, the number
15  was 8.2.  That was used as part of the calculation
16  8.2 million modern sporting rifles were available and
17  the calculation to get how many individual owners, the
18  4.8 millions, as referenced in this Section 2 of the
19  expert report Exhibit 2.
20      Q    So when you determined your weighted
21  average for the expert report in this case, did you use

1    the 8.2 million figure that you had come up with for

2    the Kolbe case and then divided that by the weighted

3    average, or did you use the 13.7 million figure that

4    you appear to have come up with for purposes of this

5    case?

6         A     Correct.

7               MR. PORTER:  Object to the form of the

8    question.

9               But you can answer.

10              THE WITNESS:  Okay.  And that 4.8 million

11   number didn't change from the Kolbe case because we

12   didn't update the Modern Sporting Rifle Consumer '13

13   study even though Exhibit A -- the other chart updated.

14              So that 4.8 million people that currently

15   own one, if you were to use the same figures from the

16   modern sporting rifle study '13 and then use the

17   updated final total of 13.7 million modern sporting

18   rifles, you would have a much higher number than

19   4.8 million.  But since we didn't have both pieces of

20   data, we kept them the same keeping the timelines the

21   same.

1    BY MS. KAPLAN:

2         Q    So you used the total number of modern

3    sporting rifles that you've estimated from -- I believe

4    at that time you were looking at 2012 numbers and

5    divided it by the weighted average that you obtained

6    from the Modern Consumer Report -- or, the consumer

7    survey in 2013?

8         A    That's how it was done.  You had mentioned

9    "me" or you said "you," referring to me; but, actually,

10   I had that calculation done by a Ph.D. statistician to

11   confirm the best way of doing that.

12        Q    And who was that person?

13        A    That was Laura Kippin of Info Maniacs.

14   (Phonetic.)

15        Q    When you say you had that done, did you pay

16   her to do that work?

17        A    Not for that.  She has done other studies

18   for us, but this was not something that I had paid to

19   do.  I just asked her for assistance.

20        Q    And sorry.  Just to clarify, you hired her

21   to do other studies for you; is that right?

1      A      Correct.  None of which are exhibits here,

2  I believe.

3      Q      And, in the Kolbe case, you had testified

4  that you used a weighted average approach where you

5  applied a certain percentage for people who had said

6  they owned one modern sporting rifle, a certain

7  percentage for people who said they owned two, and a

8  certain percentage for people who owned three or four

9  or more; is that correct?

10              MR. PORTER:  Object to the form of the

11  question.

12              But you can answer.  Go ahead.

13              THE WITNESS:  That is the way it was

14  described to me that the calculation was done by Laura

15  Kippin.

16  BY MS. KAPLAN:

17      Q      When she did that calculation -- well, let

18  me back up just one question.

19              The responses in the consumer survey that

20  led to that weighted average are in this report, and

21  pardon me for a second while I find them.

1            Yes, page 13.  Thank you.

2            So in doing that calculation, she relied on

3   the data on Page 13; is that correct?

4        A    Correct.

5        Q    And when respondents answered the questions

6   that produced the data on Page 13, do you know if they

7   were given the option to answer the exact number of

8   guns they owned if they owned more than four guns?

9        A    I do not recall.

10       Q    You don't know the difference whether

11   someone who owned four guns -- well, so, for example,

12   if I was answering the survey and I owned ten guns, you

13   don't know whether there was an option to enter ten?

14       A    Correct.

15       Q    So do you agree that the average number of

16   guns owned would be different if the average took into

17   consideration the exact number of guns owned by people

18   who owned more than four guns?

19       A    It would be very similar because the vast

20   majority, you know, have one, two, or three guns.  The

21   number would still be in the millions.  I mean...

1          Q      Well, you said the vast majority own one,

2     two, or three guns; but it looks to me like in 2013,

3     27 percent of respondents owned four or more guns; is

4     that right?

5          A      Correct.  Which means that 73 percent,

6     which would be a majority, own either one, two, or

7     three.

8          Q      So do you have any sense -- if 27 percent

9     of respondents owned ten or more guns, do you have any

10    sense of whether that would have any impact on your

11    average of number owned of 3.1?

12         A      No.  It's not something we really looked

13    into deeply because it doesn't affect our members.

14    They can use the information about the millions of gun

15    owners out there using them for multiple purposes.

16         Q      And when Laura Kippin used the information

17    on Page 13 to calculate the number of modern sporting

18    rifle owners, do you know if she took into

19    consideration what might be going on with this

20    27 percent of respondents who own any number of guns

21    the minimum of which is four?

1        A     No.  To the best of my recollection, we

2   were just trying to get a good estimate of how many

3   were out there.  So if the data didn't exist or if we

4   didn't look into how many owned four, five, six, seven

5   on upwards to however many, we didn't look into that.

6        Q     Just a couple of other questions about this

7   report.  If you turn to Page 9.

8              Is it fair to say that 99 percent of the

9   respondents to this survey about ownership of modern

10  sporting rifles were male?

11       A     Correct.

12       Q     Or I shouldn't say 99 percent of

13  respondents.

14             I should say 99 percent of owners of modern

15  sporting rifles were male based upon this survey; is

16  that correct?

17       A     The first response may be more -- or, your

18  first terminology may be more correct.  99 percent of

19  the respondents that took this survey were male.

20       Q     And if you turn to Page 15, this question

21  appears to have asked:

1          Which of the following did you purchase or
2    own previous to owning a modern sporting rifle?
3          Is that correct?
4      A    Yes.
5      Q    It appears that 99 percent of respondents
6    owned some other type of gun before they owned a modern
7    sporting rifle; is that correct?
8      A    I'm not seeing where you're getting the
9    99 percent -- 90 percent of handguns and 82 percent of
10   rifle...
11     Q    If you look at the very bottom where it
12   says:
13          Which of the following did you purchase or
14   own previous to owning a modern sporting rifle?
15          And at the bottom it says "none."  For
16   every category, the response is one percent.
17     A    Okay.
18     Q    Does that suggest that only one percent of
19   responses had owned no other gun before they owned a
20   modern sporting rifle?
21     A    Correct.

1           MR. PORTER:  I object to the form of the

2    question.  One of the categories is paintball gun,

3    which is not a firearm.

4           MS. KAPLAN:  Fair enough.

5    BY MS. KAPLAN:

6       Q    Why would a question like this include

7    paintball guns or BB air guns as possible guns that

8    were owned prior to owning a modern sporting rifle, if

9    you know?

10      A    Sure.  Some of our members, retailers

11   members, carry BB guns and air guns and paintball guns,

12   and that may be some relative information for them.

13      Q    In any event, approximately 90 percent of

14   modern sporting rifle owners owned a handgun prior to

15   owning a modern sporting rifle; correct?

16      A    Correct.

17      Q    And 82 percent owned a traditional rifle

18   prior to owning a modern sporting rifle; is that

19   correct?

20      A    Correct.

21      Q    Turning to the Firearms Retailer Survey

1   membership?

2        A    I believe we have.  Not on a monthly basis

3   like we do the adjusted NICS data.  That is just the

4   overall figures.

5        Q    And the long guns aren't broken down as to

6   modern sporting rifles as compared to other long guns,

7   are they?

8        A    I don't believe so.

9        Q    So back when we were talking about the

10  Consumer Report Survey, we talked about the fact that

11  people were asked if they owned one, two, three, or

12  four or more modern sporting rifles; right?

13       A    Correct.

14       Q    But it appears, though I think you said you

15  weren't sure, that the survey did not ask exactly how

16  many modern sporting rifles were owned if it was a

17  number more than four; correct?

18       A    Correct.  Yeah, I would have to double

19  check with the questionnaire to see exactly how that

20  was asked.

21       Q    But, in any event, that data wasn't

162

1    reported in the final report that was available to the
2    membership, was it?  And it's on Page -- I want to look
3    at the page.
4         A     I believe it's Page 13.
5         Q     Yeah, I think that's right.
6         A     That would be correct.
7         Q     And the reason that the chart doesn't
8    breakdown the exact number of modern sporting rifles
9    owned if it's more than four is because that particular
10   information isn't necessary for the purposes of this
11   survey, is it?
12        A     Correct.  Our members can get a general
13   feel for the market by knowing what's posted here on
14   Page 13.
15        Q     So the purpose of the survey is to give the
16   membership a general feel of the market; is that what
17   you're saying?
18        A     The survey is to provide our members with
19   as much data that we can about a specific topic.
20        Q     But it's to be used for marketing and sales
21   purposes; is that fair to say?

1        A       It can be used for whatever purposes the

2    member deems necessary.

3        Q       But it's for the members to use, in any

4    event?

5        A       Correct.

6        Q       And that's also true of the Firearms

7    Retailers Survey; correct?  That the purpose of the

8    survey is to be of benefit to the members; right?

9        A       That's one of the purposes, yes.

10       Q       Is that why you don't require them to

11   answer the survey based upon exact sales data?

12       A       They can answer the survey using exact

13   sales data if they wanted to.

14       Q       But what you're asking them to provide is

15   just a general picture of their overall sales; is that

16   correct?

17       A       We ask them, you know, their opinion on

18   topics relating to sales as well as relating to

19   customers.

20       Q       For the purpose of giving them an idea

21   about market trends; right?

164

```
 1        A      Correct.
 2        Q      Are you aware of any specific instances in
 3   which a modern sporting rifle was used in home or
 4   self-defense?
 5        A      Specific examples, no.
 6        Q      Are you aware of any specific examples in
 7   which a fully-automatic rifle such as the M16 was used
 8   in home or self-defense?
 9              MR. PORTER:  Object to the form of the
10   question.
11              But you can answer.
12              THE WITNESS:  No, I'm not aware.
13   BY MS. KAPLAN:
14        Q      Are you aware of any examples in which an
15   AK platform rifle with a fully-automatic mode was used
16   in home or self-defense?
17              MR. PORTER:  Object to the form of the
18   question.
19              But you can answer.
20              THE WITNESS:  No.
21   BY MS. KAPLAN:
```

1          Q      I apologize if I asked you this already.

2                 But, to your knowledge, has the NSSF ever

3     commissioned a study to determine whether modern

4     sporting rifles have been used in home or self-defense?

5          A      Well, the Modern Sporting Rifles Consumer

6     Study, as an exhibit here, does ask if they used it for

7     home defense, however, not specific examples.  That's

8     not data that we need to ask.

9          Q      It asks about whether home defense might be

10    a purpose for which someone might own a modern sporting

11    rifle; correct?

12         A      I believe it was reasons for owning.

13         Q      But not about specific instances; correct?

14         A      Correct.

15         Q      Are you aware of any specific instances in

16    which a magazine containing more than ten rounds was

17    used in home or self-defense?

18         A      No.

19         Q      Has NSSF ever commissioned a study

20    regarding the use of magazines with more than ten

21    rounds for self-defense purposes?

1          A      No.

2          Q      Are you familiar with devices that allow an

3   otherwise semi-automatic firearm to fire more rapidly

4   than a human being can pull the trigger?

5                 MR. PORTER:  Object to the form of the

6   question.

7                 But you can answer.

8   BY MS. KAPLAN:

9          Q      I'll back that up one step.

10                Are you aware that such devices exist?

11         A      I'm aware but not familiar with.

12         Q      Have you ever heard of something called a

13   bump stock?

14         A      I have heard of a bump stock.

15         Q      What's your understanding of a bump stock?

16         A      I've actually not ever seen one or used

17   one, but my understanding is they will allow a firearm

18   to fire a little quicker than if it wasn't on that

19   firearm.  But, again, I don't know if that's true not

20   having used one.

21         Q      Are you aware that there are other devices

1    with other names that perform a similar function?

2              MR. PORTER:  Object to the form of the

3    question.

4              But you can answer.

5              THE WITNESS:  I am not familiar with...

6    BY MS. KAPLAN:

7        Q    To your knowledge, has NSSF ever

8    commissioned a study that asked whether owners of

9    modern sporting rifles owned a bump stock?

10       A    Not to my knowledge.  We have not.

11       Q    Are you aware that owners of rifles such as

12   AR platform rifles can be modified to fire in

13   full-automatic mode?

14             MR. PORTER:  Objection to the form of the

15   question.

16             But you can answer if you know the answer

17   to that.

18             THE WITNESS:  I'm not aware of any specific

19   examples of that.

20   BY MS. KAPLAN:

21       Q    Has NSSF ever commissioned a study that

1   asked whether owners of AR platform rifles had ever

2   tried to modify their rifles for fully-automatic fire?

3        A     I'm not aware of any such study.

4        Q     Has NSSF ever commissioned a study that

5   asked respondents about the use of modern shooting

6   rifles for nonlegal purposes?

7        A     For nonlegal purposes, did you ask?

8        Q     Yes.

9        A     No, we have not.

10       Q     Like mass shootings?

11             MR. PORTER:  Object to the form of the

12  question.  He already said they haven't commissioned

13  any studies associated with nonlegal purposes.

14  BY MS. KAPLAN:

15       Q     Are you planning to offer any expert

16  testimony in this case other than what is set forth in

17  your report?

18       A     I have no plans to.

19       Q     If you could turn to Page 119 of the

20  transcript in the Kolbe deposition.  If you could read

21  from Page 119, Line 19 to 121, Line 10, please.

173

1    District of Columbia, to wit:

2              I, Melinda Johnson, CSR, a Notary Public of

3    the District of Columbia, do hereby certify that the

4    within-named witness personally appeared before me at

5    the time and place herein set out, and after having

6    been duly sworn by me, according to law, was examined

7    by counsel.

8              I further certify that the examination was

9    recorded stenographically by me and this transcript is

10   a true record of the proceedings.

11             I further certify that I am not of counsel

12   to any of the parties, nor in any way interested in the

13   outcome of this action.

14             As witness my hand 21st day of

15   November, 2017.

16

17   _Melinde Johnson_ ____

18                    Melinda Johnson, CSR

19                    Notary Public

20   My Commission Expires:

21   February 14, 2022

# EXHIBIT 4

## TO KAPLAN DECLARATION

# In The Matter Of:

*David Seth Worman, et al. vs.*
*Maura Healey, et al.*

---

*David Seth Worman*
*Vol. I*
*September 15, 2017*

---



### DORIS O. WONG ASSOCIATES, INC.

COURT REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File WORMAN_David.txt*
*Min-U-Script® with Word Index*

**David Seth Worman - Vol. I - September 15, 2017**

1

```
                         Volume I
                         Pages 1 to 33
                         Exhibits 1 to 3

            UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
 DAVID SETH WORMAN, ANTHONY     :
 LINDEN, JASON WILLIAM SAWYER,  :
 NICHOLAS ANDREW FELD, PAUL     :
 NELSON CHAMBERLAIN, GUN        :
 OWNERS' ACTION LEAGUE, INC.,   :
 ON TARGET TRAINING, INC., AND  :
 OVERWATCH OUTPOST,             :
             Plaintiffs,        :
                                :
         vs.                    :   Civil Action
                                :   No. 17-10107-WGY
 MAURA HEALEY, in her official  :
 capacity as Attorney General   :
 of the Commonwealth of         :
 Massachusetts; DANIEL          :
 BENNETT, in his official       :
 capacity as the Secretary of   :
 the Executive Office of        :
 Public Safety and Security;    :
 and COLONEL RICHARD D.         :
 McKEON, in his official        :
 capacity as Superintendent of  :
 the Massachusetts State        :
 Police,                        :
             Defendants.        :
                                :
- - - - - - - - - - - - - - - -x

       DEPOSITION OF DAVID SETH WORMAN, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Ken A. DiFraia, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Office of the Attorney
General, 100 Cambridge Street, Boston,
Massachusetts, on Friday, September 15, 2017,
commencing at 9:45 a.m.
```

**Doris O. Wong Associates, Inc.**

2

PRESENT:

    Bradley Arant Boult Cummings LLP
        (by James W. Porter, III, Esq., and Connor
        Blair, Esq.)
        One Federal Place, 1819 Fifth Avenue North,
        Birmingham, AL 35203-2119,
        jporter@bradley.com;
        cblair@bradley.com
        205.521.8285
        for the Plaintiffs.

    Office of the Attorney General
        (by Julia Kobick, Assistant Attorney
        General)
        One Ashburton Place, 18th Floor,
        Boston, MA 02108,
        Julia.Kobick@state.ma.us
        617.963.2567
        for the Defendants.

                * * * * *

**David Seth Worman - Vol. I - September 15, 2017**

3

1                         I N D E X

2

WITNESS                DIRECT  CROSS   REDIRECT  RECROSS

3

4    DAVID SETH WORMAN

5     BY MS. KOBICK          4

6

7

                       *  *  *  *

8

                   E X H I B I T S

9

    NO.                 DESCRIPTION              PAGE

10

    Exhibit 1   Copy of response to social       15
11              media posting, prepared by
                David Seth Worman,
12              Bates No. WORMAN-000034

13   Exhibit 2   Copy of response to social       16
                media posting, prepared by
14              David Seth Worman,
                Bates No. WORMAN-000036

15
     Exhibit 3   Copy of response to social       17
16              media posting, prepared by
                David Seth Worman,
17              Bates No. WORMAN-000049

18

19                     *  *  *  *

20

21

22

23

24

**Doris O. Wong Associates, Inc.**

**David Seth Worman - Vol. I - September 15, 2017**

4

```
 1                    P R O C E E D I N G S
 2                      DAVID SETH WORMAN
 3     a witness called for examination by counsel for the
 4     Defendants, having been satisfactorily identified by
 5     the production of his passport and being first duly
 6     sworn by the Notary Public, was examined and
 7     testified as follows:
 8                      DIRECT EXAMINATION
 9        BY MS. KOBICK:
10        Q.   Good morning.  I'm Julia Kobick.  I'm an
11     Assistant Attorney General, and I represent the
12     Defendants in this case, Worman versus Baker, at al.
13             Could you state your name and home ███ress
14     for the record.
15        A.   David Seth Worman, ██████████████
16     ██ ███████████████████████
17        Q.   Could you state your place of work and the
18     address there.
19        A.   Orthopedic Care Physician Network, and it's
20     15 Roche Brothers Way, North Easton, Massachusetts
21     02356.
22             MS. KOBICK:  Before we begin, I would like
23     to confirm that the deposition is being conducted
24     pursuant to the Federal Rule of Civil Procedure 30.
```

**David Seth Worman - Vol. I - September 15, 2017**

5

```
 1           MR. PORTER:  Yes.
 2      Q.   Dr. Worman, have you ever been deposed
 3  before?
 4      A.   Yes.
 5      Q.   Could you tell me when and the names of the
 6  cases, please.
 7      A.   I don't know the names of the cases.  One
 8  happened sometime between 1998 and 2003, when I was
 9  a resident in Miami.  One was last year, in which I
10  was just deposed as a witness in a medical
11  malpractice case.
12      Q.   Were you an expert witness or a fact
13  witness?
14      A.   A fact witness.
15      Q.   And the one between 1998 and 2003, was that
16  also a medical malpractice case?
17      A.   I think it was.
18      Q.   Were you an expert witness or a fact
19  witness?
20      A.   Fact witness.
21      Q.   You may be familiar with some of these
22  ground rules, but I'm going to run through them so
23  that you are familiar with how depositions go.
24           If I ask you a question that is unclear to
```

**David Seth Worman - Vol. I - September 15, 2017**

1     you, please ask me to clarify, and I will clarify

2     for you.

3          A.   Sure.

4          Q.   If you don't seek clarification, I will

5     assume you understood the question.  Does that make

6     sense?

7          A.   Yes.

8          Q.   Please wait for me to finish my question

9     before you answer.

10          Please answer the questions orally.  If you

11    nod your head or gesture, the court reporter can't

12    take down your answer appropriately.

13          A.   Sure.

14          Q.   If your attorney objects, please wait for

15    him to finish his objection, and then he will tell

16    you whether to answer or not.  Does that make sense?

17          A.   Yes.

18          Q.   If you need a break at any time, feel free

19    to ask for one.

20          You understand that you are under oath?

21          A.   Yes.

22          Q.   Did you tell me where you work now?

23          A.   Yes.  I gave you the address.  My practice

24    is based out of North Easton, Massachusetts.

**Doris O. Wong Associates, Inc.**

**David Seth Worman - Vol. I - September 15, 2017**

1     Q.    You are a physician?

2     A.    Yes, I am.

3     Q.    What kind of doctor are you?

4     A.    Orthopedic surgeon.

5     Q.    How long have you been employed as an

6  orthopedic surgeon?

7     A.    I started at my current practice in 2003.

8     Q.    Where did you work before then?

9     A.    I was a resident at University of Miami.

10    Q.    How long was your residency?

11    A.    Five years.

12    Q.    So 1998 to --

13    A.    Yes, to 2003.

14    Q.    What did you do before you were a resident?

15    A.    I was a medical student.

16    Q.    Where were you in medical school?

17    A.    At University of Florida, from '94 to '98.

18    Q.    Do you have any other employment besides

19  being a resident and a physician?

20    A.    No.

21    Q.    You mentioned you were in medical school.

22  Could you walk me through your educational

23  background, where you went to college.

24    A.    Sure.  I went to college at Emory

8

1    University in Atlanta from 1991 to 1994.  I then

2    went to medical school.

3         Q.   You've never been employed as a law

4    enforcement officer?

5         A.   No.

6         Q.   Do you have any military service?

7         A.   No.

8         Q.   Have you ever been tried or convicted of a

9    crime?

10        A.   No.

11        Q.   Have you ever been involved on either side

12   of a domestic violence incident?

13        A.   No.

14        Q.   How long have you lived in Massachusetts?

15        A.   Since 2003.

16        Q.   Do you have a gun license, Dr. Worman?

17        A.   Yes.

18        Q.   What kind?

19        A.   I thought there was only one available now

20   in Massachusetts, the unrestricted LTC.

21        Q.   Who issued you your license to carry?

22        A.   ███████████████████████████.

23        Q.   When was it issued?

24        A.   I don't know the date, somewhere in the

**David Seth Worman - Vol. I - September 15, 2017**

1    last two to three years.

2        Q.    Was that a renewal of a previous LTC or was

3    that the first time?

4        A.    That was my first time.

5        Q.    Your license has never been suspended or

6    revoked?

7        A.    No.

8        Q.    Do you have any other gun license, as a

9    dealer or anything like that?

10       A.    No.

11       Q.    Have you taken any gun safety training

12   classes?

13       A.    Yes.

14       Q.    Could you list them for me.

15       A.    Gosh...  So the first class I took was the

16   required class in order to get the license.  I have

17   trained in martial arts, Krav Maga, in which we do

18   gun safety training in that, and I've been doing

19   that for nine years.  I have taken multiple courses

20   at the SIG Sauer Academy in New Hampshire.

21       Q.    Let's go back to the first class.  You said

22   it was the required class for the LTC?

23       A.    Yes.

24       Q.    Do you remember the name of that class?

**David Seth Worman - Vol. I - September 15, 2017**

1     A.    No.

2     Q.    Do you remember about when you took it?

3     A.    No.  It was the year I got my license.

4     Q.    Do you remember who offered it?

5     A.    It was through Mass. Firearms School.

6     Q.    What topics did they cover?

7     A.    I remember they covered gun safety and some

8  of the laws of self-defense, I believe.  Then we did

9  a live firing section.  I don't remember all the

10  details of everything that was covered in that

11  class, though.

12     Q.    Do you remember what guns you shot in the

13  live firing session?

14     A.    No.

15     Q.    Do you remember if they were handguns or

16  rifles or shotguns?

17     A.    Handguns.

18     Q.    And then you said you've been doing the

19  martial arts academy for nine years?

20     A.    Yes.

21     Q.    What types of gun safety education does

22  those classes provide?

23     A.    We do both gun defense, defense against

24  people with guns against us.  Then we do dry

**David Seth Worman - Vol. I - September 15, 2017**

1  firearms training that involves safe handling and

2  manipulation of firearms, how to clear, how to

3  store, how to handle a gun in a safe manner.

4       Q.   Is it focused on handguns or rifles and

5  shotguns as well?

6       A.   It's everything.

7       Q.   Then the SIG Sauer Academy, tell me what

8  that course is focused on.

9       A.   So I have done several pistol courses from

10  basic to intermediate to advanced, pistol craft.   I

11  have done two semiautomatic rifle courses there.   I

12  have done a civilian active shooter response course.

13  I have done a civilian -- what's called a

14  "simunition course."

15       Q.   Could you elaborate on that.

16       A.   Yes.   Simunition is basically dummy rounds.

17  It's basically paint guns where you will simulate

18  real life scenarios to practice reactions.

19       Q.   Do the pistol and semiautomatic rifle

20  courses discuss safe handling and storage?

21       A.   Absolutely.

22       Q.   Have you ever participated as a trainer in

23  a firearms course?

24       A.   No.

**David Seth Worman - Vol. I - September 15, 2017**

1     Q.   And there are no other gun courses that you

2  have taken that you are aware of?

3     A.   No.  I don't know all the details of all

4  the ones I have taken at SIG Sauer.  There haven't

5  been that many, maybe a half dozen to ten.

6     Q.   You said that's in New Hampshire?

7     A.   Yes.

8     Q.   Are you familiar with the Gun Owners'

9  Action League?

10     A.   Yes.

11     Q.   If I use the acronym "GOAL" to refer to

12  them, will you understand that?

13     A.   Yes.

14     Q.   Are you a member of GOAL?

15     A.   Yes.

16     Q.   What does membership entail?

17     A.   I pay dues and that's about it.  I get a

18  newsletter.

19     Q.   Are you familiar with Commonwealth Second

20  Amendment?

21     A.   Not particularly.  I have heard of them.

22     Q.   You are not a member of Commonwealth Second

23  Amendment?

24     A.   No.

**David Seth Worman - Vol. I - September 15, 2017**

13

1      Q.   Are you familiar with the National Rifle

2   Association?

3      A.   Yes.

4      Q.   Are you a member of that organization?

5      A.   I believe I am.  I've been before.  I don't

6   know if my membership is currently active.  I think

7   it is.

8      Q.   Are you a member of any gun clubs?

9      A.   Yes.

10      Q.   Which ones?

11      A.   ████████████████████████████████████████

████   ████████████████████████  ████████████  ████████

████   ███████████████████████.

14      Q.   Are those the only two?

15      A.   Yes.

16      Q.   Just returning back to GOAL, have you ever

17   participated in any GOAL-sponsored-activities?

18      A.   No.

19      Q.   And the National Rifle Association, if I

20   use the acronym "NRA," will you understand that?

21      A.   Yes.

22      Q.   Do you participate in any NRA-sponsored

23   activities?

24      A.   No.

**David Seth Worman - Vol. I - September 15, 2017**

14

1      Q.   Just to confirm, you have not been employed

2   by either GOAL or the NRA?

3      A.   No.

4      Q.   Do you have a Facebook account?

5      A.   Yes.

6      Q.   Do you have a Twitter account?

7      A.   No.

8      Q.   Have you ever posted about guns on your

9   Facebook account?

10     A.   Yes.

11     Q.   Have you expressed opinions about this case

12  on your Facebook account?

13     A.   I don't know.

14     Q.   As part of your membership in GOAL, can you

15  post on GOAL's website?

16     A.   No, not that I know of.

17     Q.   Have you ever posted in response to any

18  GOAL articles or blog posts on line?

19     A.   On Facebook probably.

20     Q.   Do you know if you posted anything related

21  to a GOAL article about this case?

22     A.   I believe I have, but I can't recall

23  specifically.

24     Q.   Are you familiar with the Enforcement

**David Seth Worman - Vol. I - September 15, 2017**

 1    Notice issued by the Attorney General's Office on

 2    July 20, 2016?

 3         A.   Yes.

 4         Q.   Have you posted about that Enforcement

 5    Notice on your Facebook account?

 6         A.   I don't know.

 7         Q.   I'm going to give you a document.  It's

 8    labeled Worman-000034.

 9                    (Document marked as Worman

10                    Exhibit 1 for identification)

11         A.   (Examines document)  Yes.

12         Q.   Are you familiar with this document?

13         A.   No.

14         Q.   Do you recognize those words as your words?

15         A.   I don't recall writing them, but they

16    definitely could be.

17         Q.   Did you work with your attorneys to produce

18    documents that were responsive to the Defendants'

19    requests for documents?

20         A.   Yes.

21         Q.   Do you recognize this as one of the

22    documents that was produced to the Defendants?

23         A.   I don't.

24         Q.   Can you look at the upper left-hand corner

David Seth Worman - Vol. I - September 15, 2017

 1    of this page and read me what it says in the upper

 2    left.

 3        A.    "David Worman commented on David Webb's

 4    post."

 5        Q.    Could you read the date, please.

 6        A.    March 24, 2017.

 7        Q.    Having read that, you still do not

 8    recognize these as your words?

 9        A.    I don't remember writing these comments,

10    but I believe that they are mine.  I don't dispute

11    that.

12        Q.    I'm going to give you another document to

13    review.

14                  (Document marked as Worman

15                   Exhibit 2 for identification)

16              MS. KOBICK:  For the record, that's labeled

17    at the bottom Worman-000036.

18        Q.    Please take your time to review Exhibit 2.

19        A.    (Examines document)  Okay.

20        Q.    Are you familiar with this document?

21        A.    No, I'm not familiar with it.

22        Q.    Do you recognize this as your words?

23        A.    Yes.

24        Q.    I'll give you one additional document.

17

1    It's labeled Worman-000049.

2              (Document marked as Worman

3              Exhibit 3 for identification)

4    Q.   Please take your time to review it.

5    A.   (Examines document)  Okay.

6    Q.   Do you recognize those as your words?

7    A.   I don't remember writing them, but I don't

8    dispute that they are mine.

9    Q.   Thank you.  How did you hear about this

10   case?

11   A.   Through the GOAL Facebook page.

12   Q.   Did you see a posting about the case?

13   A.   I believe so.

14   Q.   What did you do after you saw that posting?

15   A.   I emailed the person that they said to

16   email.

17   Q.   Do you remember the name of the person that

18   you emailed?

19   A.   No.

20   Q.   Did they invite you to participate and

21   there was an ongoing discussion about that?

22   A.   That's not how it happened.

23   Q.   How did it happen?

24   A.   I e-mailed the -- I don't know who I

**David Seth Worman - Vol. I - September 15, 2017**

1  e-mailed.  It said to email this person.  I emailed

2  them saying I was interested in being a plaintiff in

3  the case.  Then someone later contacted me and

4  interviewed me.

5       Q.   Are you compensating your lawyers in this

6  case?

7       A.   Am I directly?

8       Q.   Yes.

9       A.   No.

10      Q.   Dr. Worman, do you own any guns?

11      A.   Yes.



David Seth Worman - Vol. I - September 15, 2017



**David Seth Worman - Vol. I - September 15, 2017**



David Seth Worman - Vol. I - September 15, 2017



**David Seth Worman - Vol. I - September 15, 2017**



David Seth Worman - Vol. I - September 15, 2017



David Seth Worman - Vol. I - September 15, 2017



David Seth Worman - Vol. I - September 15, 2017



David Seth Worman - Vol. I - September 15, 2017



David Seth Worman - Vol. I - September 15, 2017



28

1 █████████████████████████

█ ██ ████████████

█ ██ ███████████

█ ██ ████████████ ████████████████

█ ██████████████████████████

█ ███████

7    Q.    Can you tell me why you are participating

8  as a plaintiff in this lawsuit.

9    A.    Yes.  So I think the first reason is that

10 I'm a law-abiding citizen, and I've been living here

11 and, I thought, doing everything right and following

12 all the laws.  Suddenly on July 20th, Maura Healey,

13 without any notice, put something in the paper that

14 told me that I was a criminal.  She leaves me in a

15 situation where -- even in her own words in that

16 Enforcement Notice, she says that she's not going to

17 prosecute us now but that she can change her mind at

18 some time.  I don't know where my standing is in

19 terms of what my legal status is.  I know I have

20 done what I consider everything right.  She put me

21 in a position where I feel I'm criminalized.  I know

22 I represent a large class of people that I trained

23 with and that I shoot with and spent time with, and

24 they all feel the same way.  We don't know what's

**David Seth Worman - Vol. I - September 15, 2017**

```
 1    going to happen in the future.  We feel criminalized
 2    right now.  That's one thing.
 3           Then I think that the assault weapons ban
 4    in general, the way it's now interpreted, is a
 5    violation of my civil rights.  I feel like I'm
 6    standing up for my own civil rights.
 7        Q.   What do you hope to achieve in the lawsuit?
 8        A.   Restoration of my civil rights.
 9             MS. KOBICK:  I think that's all I have.
10             MR. PORTER:  No questions.
11                  (Whereupon the deposition
12                   was concluded at 10:25 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
```

**David Seth Worman - Vol. I - September 15, 2017**

30

```
1              C E R T I F I C A T E

2       I, DAVID SETH WORMAN, do hereby certify that I

3  have read the foregoing transcript of my testimony,

4  and further certify under the pains and penalties of

5  perjury that said transcript (with/without)

6  suggested corrections is a true and accurate record

7  of said testimony.

8       Dated at _____, this _____ day of _____,

9  2017.

10

11                        _____

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Doris O. Wong Associates, Inc.**

**David Seth Worman - Vol. I - September 15, 2017**

1                    SUGGESTED CORRECTIONS

2   RE:  David Seth Worman, et al., vs. Maura Healey,
        et al.
3
    WITNESS:  David Seth Worman, Vol. I
4
    The above-named witness wishes to make the following
5   changes to the testimony as originally given:

6   PAGE   LINE      SHOULD READ              REASON

7   _____  _____  _____  _____

8   _____  _____  _____  _____

9   _____  _____  _____  _____

10  _____  _____  _____  _____

11  _____  _____  _____  _____

12  _____  _____  _____  _____

13  _____  _____  _____  _____

14  _____  _____  _____  _____

15  _____  _____  _____  _____

16  _____  _____  _____  _____

17  _____  _____  _____  _____

18  _____  _____  _____  _____

19  _____  _____  _____  _____

20  _____  _____  _____  _____

21  _____  _____  _____  _____

22  _____  _____  _____  _____

23  _____  _____  _____  _____

24  _____  _____  _____  _____

**Doris O. Wong Associates, Inc.**

**David Seth Worman - Vol. I - September 15, 2017**

32

```
 1   COMMONWEALTH OF MASSACHUSETTS)

 2   SUFFOLK, SS.                 )

 3        I, Ken A. DiFraia, RPR and Notary Public in and

 4   for the Commonwealth of Massachusetts, do hereby

 5   certify that there came before me on the 15th day of

 6   September, 2017, at 9:45 a.m., the person

 7   hereinbefore named, who was by me duly sworn to

 8   testify to the truth and nothing but the truth of

 9   his knowledge touching and concerning the matters in

10   controversy in this cause; that he was thereupon

11   examined upon his oath, and his examination reduced

12   to typewriting under my direction; and that the

13   deposition is a true record of the testimony given

14   by the witness.

15        I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19        In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 29th day of

21   September, 2017.

22

23

24
```

**Doris O. Wong Associates, Inc.**

**David Seth Worman - Vol. I - September 15, 2017**

33

1        Under Federal Rule 30:

2                 X   Reading and Signing was requested

3                     Reading and Signing was waived

4                     Reading and Signing was not requested

5

6   *Ken A. DiFrava*

7

8   Notary Public

9   Commission expires 2/24/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

D I S C L A I M E R

This transcript in any format is a confidential

communication between Doris O. Wong Associates,

Inc., a professional court reporting firm, and the

parties to this matter and their counsel.  Any

reproduction or distribution of this transcript

without the express permission of the parties is a

violation of this confidentiality.  To fulfill any

request to the court reporter for an additional copy

or copies from persons or entities without standing

in this matter will require the consent of the

parties and/or counsel and/or a court order for such

delivery.

Case 1:17-cv-10107-WGY    Document 65-1    Filed 12/15/17    Page 132 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

David Seth Worman - Vol. I
September 15, 2017

## A

**Absolutely (1)**
11:21
**Academy (3)**
9:20;10:19;11:7
**accept (1)**
21:6
**accepts (1)**
24:8
**account (5)**
14:4,6,9,12;15:5
**achieve (1)**
29:7
**acquired (1)**
27:18
**acronym (2)**
12:11;13:20
**Action (1)**
12:9
**active (2)**
11:12;13:6
**activities (1)**
13:23
**additional (1)**
16:24
**address (3)**
4:13,18;6:23
**addressed (1)**
27:17
**advanced (1)**
11:10
**against (2)**
10:23,24
**al (1)**
4:12
**alert (1)**
21:2
**Amendment (2)**
12:20,23
**Ames (3)**
13:11,12,13
**anymore (1)**
24:16
**appropriately (1)**
6:12
**AR (1)**
26:15
**AR-15 (2)**
25:7,9
**Arms (4)**
20:7;22:3;24:5;
25:1
**article (1)**
14:21
**articles (1)**
14:18
**arts (2)**
9:17;10:19
**assault (1)**
29:3
**Assistant (1)**
4:11
**Association (2)**
13:2,19
**assume (1)**
6:5
**Atlanta (1)**
8:1
**Attorney (3)**
4:11;6:14;15:1
**attorneys (1)**
15:17
**available (1)**
8:19
**aware (1)**
12:2

## B

**back (2)**
9:21;13:16
**background (1)**
7:23
**Baker (1)**
4:12
**ban (1)**
29:3
**barrel (4)**
19:20,21;26:17;
28:4
**based (1)**
6:24
**basic (1)**
11:10
**basically (2)**
11:16,17
**BCM (2)**
19:13;26:2
**bear (1)**
19:23
**bedroom (1)**
22:12
**begin (1)**
4:22
**besides (1)**
7:18
**big (1)**
25:12
**blog (1)**
14:18
**both (3)**
10:23;26:18;28:4
**bottom (1)**
16:17
**brand (1)**
18:24
**break (1)**
6:18
**Brothers (1)**
4:20
**business (1)**
24:16

## C

**caliber (10)**
18:23;20:11,12;
22:16,18;23:23;
24:23;25:19;26:7,20
**called (2)**
4:3;11:13
**camera (1)**
20:24
**can (8)**
14:14;15:24;18:15,
16;19:13;20:19;28:7,
17
**Care (1)**
4:19
**carry (5)**
8:21;27:4,7,9,11
**case (9)**
4:12;5:11,16;14:11,
21;17:10,12;18:3,6
**cases (2)**
5:6,7
**cell (1)**
21:2
**change (1)**
28:17
**citizen (1)**
28:10
**Civil (4)**
4:24;29:5,6,8
**civilian (2)**
11:12,13
**clarification (1)**
6:4
**clarify (2)**
6:1,1
**class (7)**
9:15,16,21,22,24;
10:11;28:22
**classes (2)**
9:12;10:22
**clear (1)**
11:2
**closet (4)**
20:22;22:9,11,12
**Club (1)**
13:11
**clubs (1)**
13:8
**Collection (1)**
23:16
**collector's (1)**
23:16
**college (2)**
7:23,24
**combination (1)**
22:10
**commented (1)**
16:3
**comments (1)**
16:9

## C

**Commonwealth (2)**
12:19,22
**companies (1)**
24:15
**compensating (1)**
18:5
**concealed (2)**
27:7,12
**concluded (1)**
29:12
**conducted (1)**
4:23
**confirm (2)**
4:23;14:1
**consider (1)**
28:20
**contacted (1)**
18:3
**convicted (1)**
8:8
**corner (1)**
15:24
**counsel (1)**
4:3
**couple (1)**
21:15
**course (4)**
11:8,12,14,23
**courses (5)**
9:19;11:9,11,20;
12:1
**court (1)**
6:11
**cover (1)**
10:6
**covered (2)**
10:7,10
**craft (1)**
11:10
**crime (1)**
8:9
**criminal (1)**
28:14
**criminalized (2)**
28:21;29:1
**current (1)**
7:7
**currently (1)**
13:6

## D

**date (2)**
8:24;16:5
**dates (1)**
24:17
**DAVID (4)**
4:2,15;16:3,3
**dealer (1)**
9:9
**dealers (1)**
20:4
**Defendants (3)**
**Defendants' (1)**
15:18
**defense (2)**
10:23,23
**definitely (1)**
15:16
**deposed (2)**
5:2,10
**deposition (2)**
4:23;29:11
**depositions (1)**
5:23
**detachable (2)**
21:6;24:8
**details (1)**
10:10;12:3
**different (1)**
21:19;25:8
**DIRECT (1)**
4:8
**directly (1)**
18:7
**discuss (1)**
11:20
**discussed (1)**
22:11
**discussion (1)**
17:21
**dispute (2)**
16:10;17:8
**doctor (1)**
7:3
**document (11)**
15:7,9,11,12;16:12,
14,19,20,24;17:2,5
**documents (3)**
15:18,19,22
**domestic (1)**
8:12
**done (5)**
11:9,11,12,13;
28:20
**door (1)**
21:1
**down (1)**
6:12
**dozen (1)**
12:5
**Dr (3)**
5:2;8:16;18:10
**dry (1)**
10:24
**dues (1)**
12:17
**duly (1)**
4:5
**dummy (1)**
11:16

## E

**earlier (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 133 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

David Seth Worman - Vol. I
September 15, 2017

22:14
**Easton (5)**
4:20;6:24;8:22;
13:13;22:3
**education (1)**
10:21
**educational (1)**
7:22
**either (3)**
8:11;14:2;27:10
**elaborate (1)**
11:15
**email (2)**
17:16;18:1
**emailed (3)**
17:15,18;18:1
**e-mailed (2)**
17:24;18:1
**Emory (1)**
7:24
**employed (3)**
7:5;8:3;14:1
**employment (1)**
7:18
**enforcement (5)**
8:4;14:24;15:4;
28:5,16
**entail (1)**
12:16
**even (1)**
28:15
**exact (1)**
18:13
**exactly (1)**
21:15
**examination (2)**
4:3,8
**examined (1)**
4:6
**Examines (3)**
15:11;16:19;17:5
**Exhibit (4)**
15:10;16:15,18;
17:3
**expert (2)**
5:12,18
**expressed (1)**
14:11

**F**

**Facebook (6)**
14:4,9,12,19;15:5;
17:11
**fact (4)**
5:12,14,18,20
**familiar (9)**
5:21,23;12:8,19;
13:1;14:24;15:12;
16:20,21
**Federal (1)**
4:24
**feel (5)**

6:18;28:21,24;29:1,
5
**FFL (1)**
20:10
**finish (2)**
6:8,15
**fire (1)**
23:10
**Firearms (5)**
10:5;11:1,2,23;
26:10
**fired (1)**
25:22
**firing (2)**
10:9,13
**first (7)**
4:5;9:3,4,15,21;
22:13;28:9
**Five (1)**
7:11
**floor (10)**
20:18,20;22:7,23;
23:6;24:19;25:15;
26:1,14,23
**Florida (1)**
7:17
**FNH (2)**
19:8;25:16
**focused (2)**
11:4,8
**following (1)**
28:11
**follows (1)**
4:7
**four (1)**
18:20
**free (1)**
6:18
**friend (1)**
20:8
**future (1)**
29:1

**G**

**gave (1)**
6:23
**General (2)**
4:11;29:4
**General's (1)**
15:1
**gesture (1)**
6:11
**Glock (3)**
18:18;19:23;27:10
**Glocks (1)**
21:12
**GOAL (8)**
12:11,14;13:16;
14:2,14,18,21;17:11
**GOAL's (1)**
14:15
**GOAL-sponsored-activities (1)**

13:17
**goes (1)**
21:1
**Good (1)**
4:10
**Gosh (2)**
9:15;18:18
**ground (1)**
5:22
**gun (17)**
8:16;9:8,11,18;
10:7,21,23;11:3;12:1,
8;13:8,12;20:7;21:21;
24:18;27:4,14
**guns (13)**
10:12,24;11:17;
14:8;18:10,14;19:18;
21:6,9;27:9,11,18,20

**H**

**half (1)**
12:5
**Hampshire (2)**
9:20;12:6
**handguns (5)**
10:15,17;11:4;
21:19,20
**handle (1)**
11:3
**handling (2)**
11:1,20
**happen (2)**
17:23;29:1
**happened (2)**
5:8;17:22
**head (1)**
6:11
**Healey (1)**
28:12
**hear (1)**
17:9
**heard (1)**
12:21
**home (3)**
4:13;20:23;25:6
**hope (1)**
29:7
**Hour (4)**
20:7;22:3;24:5;
25:1
**house (1)**
20:18

**I**

**identification (3)**
15:10;16:15;17:3
**identified (1)**
4:4
**immediate (1)**
21:2
**incident (1)**

8:12
**interested (1)**
18:2
**intermediate (1)**
11:10
**interpreted (1)**
29:4
**interviewed (1)**
18:4
**invite (1)**
17:20
**involved (1)**
8:11
**involves (1)**
11:1
**issued (4)**
8:21,22,23;15:1
**item (1)**
23:16
**IWI (2)**
19:7;23:20

**J**

**Julia (1)**
4:10
**July (4)**
15:2;27:19,20;
28:12

**K**

**keep (7)**
21:4;22:6,22;23:5;
25:14,24;26:22
**kept (2)**
22:8,13
**keypad (2)**
20:22,23
**kind (2)**
7:3;8:18
**knows (2)**
20:23,24
**KOBICK (5)**
4:9,10,22;16:16;
29:9
**Krav (1)**
9:17

**L**

**labeled (3)**
15:8;16:16;17:1
**large (1)**
28:22
**last (5)**
5:9;9:1;20:3;24:2;
25:3;27:22
**later (1)**
18:3
**law (1)**
8:3
**law-abiding (1)**

28:10
**laws (2)**
10:8;28:12
**lawsuit (2)**
28:8;29:7
**lawyers (1)**
18:5
**League (1)**
12:9
**leaves (1)**
28:14
**left (1)**
16:2
**left-hand (1)**
15:24
**legal (1)**
28:19
**license (6)**
8:16,21;9:5,8,16;
10:3
**life (1)**
11:18
**line (2)**
14:18;20:9
**list (3)**
9:14;18:14;19:11
**listed (1)**
23:18
**little (1)**
19:18
**live (2)**
10:9,13
**lived (1)**
8:14
**living (1)**
28:10
**loaded (1)**
21:4
**locked (3)**
20:21,22;22:9
**long (3)**
7:5,10;8:14
**look (2)**
15:24;19:4
**looking (1)**
21:1
**LTC (3)**
8:20;9:2,22
**LWRC (8)**
19:8,9,19;24:20;
26:17,21,23;27:2

**M**

**M-6 (1)**
24:20
**M-682 (1)**
19:10
**Maga (1)**
9:17
**magazine (4)**
21:22;24:8,10,12
**magazines (5)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 134 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

David Seth Worman - Vol. I
September 15, 2017

21:6,8,14,18;25:10

**majority (1)**
19:5
**malpractice (2)**
5:11,16
**manipulation (1)**
11:2
**manner (1)**
11:3
**manufactured (3)**
21:16;24:12,13
**many (6)**
12:5;18:12,19;
21:14,15;24:16
**March (1)**
16:6
**marked (3)**
15:9;16:14;17:2
**Marlborough (1)**
20:8
**martial (2)**
9:17;10:19
**Mass (2)**
10:5;26:10
**Massachusetts (5)**
4:16,20;6:24;8:14,
20
**Maura (1)**
28:12
**may (2)**
5:21;19:18
**maybe (1)**
12:5
**mean (1)**
25:11
**medical (6)**
5:10,16;7:15,16,21;
8:2
**member (4)**
12:14,22;13:4,8
**membership (3)**
12:16;13:6;14:14
**mentioned (2)**
7:21;22:14
**Miami (2)**
5:9;7:9
**might (1)**
27:17
**military (1)**
8:6
**millimeter (4)**
20:12;22:17;26:21;
28:1
**mind (1)**
28:17
**mine (2)**
16:10;17:8
**model (1)**
19:9
**more (1)**
20:19
**morning (1)**
4:10

**Mostly (1)**
23:1
**MPX (5)**
19:21;26:18,21;
27:1;28:1
**multiple (1)**
9:19
**myself (1)**
20:10

## N

**name (3)**
4:13;9:24;17:17
**names (2)**
5:5,7
**National (2)**
13:1,19
**need (1)**
6:18
**Network (1)**
4:19
**New (2)**
9:20;12:6
**newsletter (1)**
12:18
**Newton (1)**
4:16
**nine (2)**
9:19;10:19
**nod (1)**
6:11
**North (2)**
4:20;6:24
**Notary (1)**
4:6
**Notice (5)**
15:1,5;28:6,13,16
**NRA (2)**
13:20;14:2
**NRA-sponsored (1)**
13:22
**number (2)**
18:13;20:23

## O

**oath (1)**
6:20
**objection (1)**
6:15
**objects (1)**
6:14
**offered (1)**
10:4
**offhand (1)**
18:24
**Office (1)**
15:1
**officer (1)**
8:4
**once (1)**
25:22

**One (17)**
5:7,9,15,6:19;8:19;
15:21;16:24;20:6,7,8,
9,12,23;22:8,9,22;
29:2
**ones (2)**
12:4;13:10;21:19
**ongoing (1)**
17:21
**only (6)**
8:19;13:14;20:23;
22:9;25:22;27:11
**operating (1)**
25:8
**opinions (1)**
14:11
**orally (1)**
6:10
**order (1)**
9:16
**organization (1)**
13:4
**Orthopedic (3)**
4:19;7:4,6
**out (4)**
6:24;8:22;23:9;
27:5
**over (1)**
20:3
**own (8)**
18:10,14,18,20;
19:20;21:21;28:15;
29:6
**Owners' (1)**
12:8

## P

**P-938 (2)**
19:1;23:2
**page (2)**
16:1;17:11
**paint (1)**
11:17
**paper (1)**
28:13
**part (1)**
14:14
**participate (2)**
13:22;17:20
**participated (2)**
11:22;13:17
**participating (1)**
28:7
**particularly (1)**
12:21
**passport (1)**
4:5
**pay (1)**
12:17
**people (2)**
10:24;28:22
**person (3)**

**phone (1)**
21:3
**Physician (3)**
4:19;7:1,19
**pistol (5)**
11:9,10,19;18:23;
23:2
**pistols (11)**
18:18,22;19:3,4,6,
23;20:11;21:23;22:2,
6,16
**place (1)**
4:17
**plaintiff (2)**
18:2;28:8
**platform (2)**
25:7;26:15
**please (8)**
5:6;6:1,8,10,14;
16:5,18;17:4
**PORTER (2)**
5:1;29:10
**position (1)**
28:21
**possession (1)**
27:1
**post (2)**
14:15;16:4
**posted (4)**
14:8,17,20;15:4
**posting (2)**
17:12,14
**posts (1)**
14:18
**PPS (2)**
21:23;27:10
**PPSs (1)**
18:21
**practice (5)**
6:23;7:7;11:18;
22:5;24:7
**previous (1)**
9:2
**Prior (4)**
21:17;24:13;28:2,5
**probably (1)**
14:19
**Procedure (1)**
4:24
**produce (1)**
15:17
**produced (1)**
15:22
**production (1)**
4:5
**prosecute (1)**
28:17
**provide (1)**
10:22
**Public (2)**
4:6;27:5
**purchased (7)**

19:21;20:8;24:4;
26:24;27:20,24;28:5
**pursuant (1)**
4:24
**put (3)**
20:10;28:13,20

## R

**range (1)**
25:22
**reactions (1)**
11:18
**read (3)**
16:1,5,7
**real (1)**
11:18
**reason (1)**
28:9
**recall (3)**
14:22;15:15;27:23
**recently (1)**
28:1
**recognize (5)**
15:14,21;16:8,22;
17:6
**record (2)**
4:14;16:16
**Recreation (5)**
20:14;22:5;25:6;
26:12;27:3
**Reece (2)**
19:13;26:2
**refer (1)**
12:11
**related (1)**
14:20
**remember (20)**
9:24;10:2,4,7,9,12,
15;16:9;17:7,17;
18:15,16,24;19:14;
20:2,4;22:2;24:1,4;
26:9
**renewal (1)**
9:2
**reporter (1)**
6:11
**represent (2)**
4:11;28:22
**requests (1)**
15:19
**required (1)**
9:16,22
**requires (1)**
21:21
**residency (1)**
7:10
**resident (4)**
5:9;7:9,14,19
**response (2)**
11:12;14:17
**responsive (1)**
15:18

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 135 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

David Seth Worman - Vol. I
September 15, 2017

**Restoration (1)**
29:8
**return (1)**
27:18
**returning (1)**
13:16
**review (3)**
16:13,18;17:4
**revoked (1)**
9:6
**rifle (11)**
11:11,19;13:1,12,
19;19:20,21;23:21;
25:7;26:5,15
**rifles (7)**
10:16;11:4;19:7;
21:11;23:18;26:17;
28:5
**right (3)**
28:11,20;29:2
**rights (3)**
29:5,6,8
**Road (1)**
4:15
**Roche (1)**
4:20
**room (5)**
20:16,21,21;21:2;
23:6
**round (2)**
21:14;24:12
**rounds (3)**
11:16;21:10,13
**Ruger (2)**
19:1;22:18
**Rule (1)**
4:24
**rules (1)**
5:22
**run (1)**
5:22

**S**

**safe (18)**
11:1,3,20;20:16,16,
17;21:4;22:6,8,9,13,
23;23:6,8;24:19;
25:15;26:1,23
**safety (4)**
9:11,18;10:7,21
**same (2)**
22:11;28:24
**satisfactorily (1)**
4:4
**Sauer (7)**
9:20;11:7;12:4;
19:1,2;23:2,11
**saw (1)**
17:14
**saying (1)**
18:2
**Scar (3)**

19:8,8;25:16
**scenarios (1)**
11:18
**school (5)**
7:16,21;8:2;10:5;
26:10
**Second (2)**
12:19,22
**section (1)**
10:9
**seek (1)**
6:4
**self-defense (7)**
10:8;20:14;22:5;
25:6;26:12;27:3,15
**semiautomatic (12)**
11:11,19;19:24;
21:24;22:20;23:3,13,
20;24:20;25:16;26:5,
18
**sense (2)**
6:6,16
**service (1)**
8:6
**session (1)**
10:13
**SETH (2)**
4:2,15
**several (2)**
11:9;18:18
**shoot (1)**
28:23
**shooter (1)**
11:12
**Shooters (1)**
13:11
**shooting (4)**
20:14;25:23;26:12;
27:3
**short (4)**
19:19,21;26:17;
28:4
**shot (1)**
10:12
**shotguns (3)**
10:16;11:5;19:15
**show (1)**
20:7
**side (1)**
8:11
**SIG (11)**
9:20;11:7;12:4;
19:1,2,21;23:2,11;
26:18,21;28:1
**simulate (1)**
11:17
**simunition (2)**
11:14,16
**sits (1)**
23:8
**situation (1)**
28:15
**size (3)**

21:8,10;24:10
**someone (1)**
18:3
**sometime (1)**
5:8
**somewhere (1)**
8:24
**Sorry (3)**
19:10,19,20
**specific (2)**
20:19;21:21
**specifically (1)**
14:23
**spent (1)**
28:23
**stamped (1)**
24:16
**standing (2)**
28:18;29:6
**started (1)**
7:7
**state (2)**
4:13,17
**status (1)**
28:19
**still (1)**
16:7
**storage (1)**
11:20
**store (4)**
11:3;20:15;24:18;
26:10
**stored (1)**
26:13
**student (1)**
7:15
**Suddenly (1)**
28:12
**Sure (5)**
6:3,13;7:24;13:12;
19:12
**surgeon (2)**
7:4,6
**surveillance (1)**
21:1
**suspended (1)**
9:5
**sworn (1)**
4:6
**system (1)**
25:8

**T**

**talking (1)**
21:11
**target (8)**
20:14;22:5;23:1;
24:7;25:6,23;26:12;
27:3
**Tavor (2)**
19:7;23:20
**ten (1)**

12:5
**terms (1)**
28:19
**testified (1)**
4:7
**third (10)**
20:18,20;22:7,23;
23:6;24:19;25:15;
26:1,14,23
**though (2)**
10:11;13:13
**thought (2)**
8:19;28:11
**three (4)**
9:1;20:3;24:2;25:3
**times (1)**
20:3
**together (1)**
20:10
**told (1)**
28:14
**took (2)**
9:15;10:2
**topics (1)**
10:6
**traditional (1)**
25:9
**trained (2)**
9:17;28:22
**trainer (1)**
11:22
**training (3)**
9:11,18;11:1
**transferred (1)**
20:9
**tried (1)**
8:8
**Twitter (1)**
14:6
**two (4)**
9:1;11:11;13:14;
18:20;26:17
**types (2)**
10:21;25:10

**U**

**unclear (1)**
5:24
**under (1)**
6:20
**understood (1)**
6:5
**University (3)**
7:9,17;8:1
**unrestricted (1)**
8:20
**up (3)**
21:10,13;29:6
**upper (2)**
15:24;16:1
**use (17)**
12:11;13:20;20:13;

21:18,19;22:4,24;
23:7,15;24:6,10;25:5,
10,21;26:11;27:2,14

**V**

**Various (2)**
20:3;21:10
**versus (1)**
4:12
**video (1)**
20:24
**violation (1)**
29:5
**violence (1)**
8:12

**W**

**wait (2)**
6:8,14
**walk (1)**
7:22
**Walther (3)**
18:20;21:23;27:10
**Way (3)**
4:20;28:24;29:4
**weapons (1)**
29:3
**Webb's (1)**
16:3
**website (1)**
14:15
**Westgate (1)**
4:15
**Weston (1)**
13:11
**what's (2)**
11:13;28:24
**Whereupon (1)**
29:11
**without (1)**
28:13
**witness (8)**
4:3;5:10,12,13,14,
18,19,20
**words (6)**
15:14,14;16:8,22;
17:6;28:15
**work (4)**
4:17;6:22;7:8;
15:17
**WORMAN (10)**
4:2,12,15;5:2;8:16;
15:9;16:3,14;17:2;
18:10
**Worman-000034 (1)**
15:8
**Worman-000036 (1)**
16:17
**Worman-000049 (1)**
17:1
**writing (3)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 136 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

David Seth Worman - Vol. I
September 15, 2017

15:15;16:9;17:7

## Y

**year (3)**
  5:9;10:3;27:22
**years (7)**
  7:11;9:1,19;10:19;
  20:3;24:3;25:3

## Z

**Zero (4)**
  20:7;22:3;24:5;
  25:1

## 0

**02356 (1)**
  4:21
**02459 (1)**
  4:16

## 1

**1 (1)**
  15:10
**10 (2)**
  24:11;25:13
**10:25 (1)**
  29:12
**11 (1)**
  4:15
**15 (1)**
  4:20
**17 (5)**
  19:8,8;21:13,14;
  25:16
**19 (1)**
  27:10
**1911 (2)**
  19:2;23:11
**1991 (1)**
  8:1
**1994 (3)**
  8:1;21:17;24:13
**1998 (3)**
  5:8,15;7:12

## 2

**2 (2)**
  16:15,18
**20 (3)**
  15:2;27:19,20
**2003 (5)**
  5:8,15;7:7,13;8:15
**2016 (3)**
  15:2;27:19,21
**2017 (1)**
  16:6
**20th (1)**
  28:12

**22 (2)**
  18:23;22:18
**24 (1)**
  16:6

## 3

**3 (1)**
  17:3
**30 (4)**
  4:24;24:11,12;
  25:13
**308 (1)**
  25:20

## 4

**45 (1)**
  20:12

## 5

**556 (4)**
  23:24;24:24;26:8,
  21

## 6

**6 (1)**
  21:10

## 9

**9 (4)**
  20:12;22:17;26:21;
  28:1
**94 (1)**
  7:17
**98 (1)**
  7:17

# **EXHIBIT 5**

## **TO KAPLAN DECLARATION**

# In The Matter Of:

*David Seth Worman, et al. vs.*
*Maura Healey, et al.*

---

*Anthony L. Linden*
*Vol. I*
*September 12, 2017*

---



**DORIS O. WONG**
**ASSOCIATES, INC.**

COURT   REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File LINDEN_Anthony.txt*
*Min-U-Script® with Word Index*

**Anthony L. Linden - Vol. I - September 12, 2017**

1

Volume I
Pages 1 to 39
Exhibits 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
DAVID SETH WORMAN, ANTHONY          :
LINDEN, JASON WILLIAM SAWYER,       :
NICHOLAS ANDREW FELD, PAUL          :
NELSON CHAMBERLAIN, GUN             :
OWNERS' ACTION LEAGUE, INC.,        :
ON TARGET TRAINING, INC., AND       :
OVERWATCH OUTPOST,                  :
            Plaintiffs,             :
                                    :
        vs.                         :   Civil Action
                                    :   No. 17-10107-WGY
MAURA HEALEY, in her official       :
capacity as Attorney General        :
of the Commonwealth of              :
Massachusetts; DANIEL               :
BENNETT, in his official            :
capacity as the Secretary of        :
the Executive Office of             :
Public Safety and Security;         :
and COLONEL RICHARD D.              :
McKEON, in his official             :
capacity as Superintendent of       :
the Massachusetts State             :
Police,                             :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF ANTHONY L. LINDEN, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Ken A. DiFraia, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Office of the Attorney
General, 100 Cambridge Street, Boston,
Massachusetts, on Tuesday, September 12, 2017,
commencing at 2:12 p.m.

Anthony L. Linden - Vol. I - September 12, 2017

2

```
PRESENT:

    Bradley Arant Boult Cummings LLP
        (by James W. Porter, III, Esq., and Connor
        Blair, Esq.)
        One Federal Place, 1819 Fifth Avenue North,
        Birmingham, AL 35203-2119,
        jporter@bradley.com;
        cblair@bradley.com
        205.521.8285
        for the Plaintiffs.

    Campbell Campbell Edwards & Conroy, P.C.
        (by Christopher Howe, Esq.)
        One Constitution Plaza, Boston, MA 02129,
        chowe@campbell-trial-lawyers.com
        617.241.3029
        for the Plaintiff Gun Owners' Action
        League, Inc.

    Office of the Attorney General
        (by Gary Klein, Assistant Attorney General;
        Elizabeth Kaplan, Assistant Attorney
        General)
        One Ashburton Place, 18th Floor,
        Boston, MA 02108,
        Gary.Klein@state.ma.us;
        Elizabeth.Kaplan@state.ma.us;
        617.963.2567
        for the Defendants.

                    *  *  *  *  *
```

**Anthony L. Linden - Vol. I - September 12, 2017**

3

```
1                      I N D E X

2
     WITNESS             DIRECT  CROSS   REDIRECT  RECROSS
3

4    ANTHONY L. LINDEN

5     BY MR. KLEIN            4

6

7
                       *  *  *  *
8
                     E X H I B I T S
9
     NO.                 DESCRIPTION              PAGE
10
     Exhibit 1    Copy of email to Anthony Linden     30
11                from Gun Owners' Action League
                  dated October 21, 2016
12

13
                       *  *  *  *
14
```

4

```
 1              P R O C E E D I N G S
 2                 ANTHONY L. LINDEN
 3      a witness called for examination by counsel for the
 4      Defendants, having been satisfactorily identified by
 5      the production of his driver's license and being
 6      first duly sworn by the Notary Public, was examined
 7      and testified as follows:
 8                 DIRECT EXAMINATION
 9         BY MR. KLEIN:
10         Q.    Good afternoon, Mr. Linden.  Could you
11      please state your full name, spelling your last
12      name, your home address and any business address for
13      the record, please.
14         A.    Sure.  Anthony Lee Linden, L-i-n-d-e-n,
15      residing at ███████████████████████████████
        ████████████████████
17         Q.    Do you have a business address?
18         A.    I'm unemployed.
19         Q.    Thank you.  My name is Gary Klein.  I'm one
20      of the attorneys for the defendants in this matter.
21      This is a matter that you are a plaintiff in called
22      "Worman versus Baker."  Are you familiar with that
23      case?
24         A.    Yes.
```

Anthony L. Linden - Vol. I - September 12, 2017

1      Q.   Have you ever had your deposition taken

2    before?

3      A.   No.

4      Q.   I'm going to spend a few minutes going

5    through some of the ground rules just so you

6    understand how the process will work.  Then we will

7    ask you questions, and you will be obligated to

8    respond truthfully to those questions, okay?

9      A.   Uh-huh.

10      Q.   First of all, it's important that you

11    answer the questions verbally.  The court reporter

12    can't take down nods of the head, shakes of the head

13    or "uh-huh."

14      A.   Understood.

15      Q.   Sometimes it's even hard for him to hear

16    when you say "uh-huh" so it's just better to answer

17    verbally.

18      A.   Thank you.

19      Q.   If I ask you a question that is unclear, I

20    want you to ask me to clarify it.  If you don't ask

21    me to clarify and you answer, I'll assume that you

22    understood it.

23      A.   Okay.

24      Q.   I want you to wait for all questions to be

Anthony L. Linden - Vol. I - September 12, 2017

1    completed.  I don't want to be talking over each

2    other.  That's to give the court reporter the

3    opportunity to take down all the questions and the

4    answers accurately.

5         A.    Okay.

6         Q.    Now, there may be some questions that your

7    attorney objects to.  At the end of his objection,

8    he will either instruct you to go forward and answer

9    or instruct you not to answer.  You should listen to

10   his instructions if he's making an objection before

11   you answer.

12        A.    Okay.

13        Q.    If you need a break at any time, we can

14   take a break, providing there's no question that's

15   already been asked that you need to answer, okay?

16        A.    Okay.

17        Q.    You understand that you are under oath

18   today, right?

19        A.    Yes.

20        Q.    And that means that you are obligated to

21   answer all my questions truthfully, right?

22        A.    Correct.

23        Q.    You also understand this deposition is

24   being taken under the penalty of perjury, correct?

Anthony L. Linden - Vol. I - September 12, 2017

1     A.    Yes.

2     Q.    Thank you.

3           MR. KLEIN:  I want to confirm on the

4     record, as we did earlier, that this deposition is

5     being taken pursuant to the Federal Rules, in

6     particular the portions of Rule 30 that apply to use

7     and objections in the context of the deposition.

8           MR. PORTER:  Subject to all counsel's

9     approval, that's fine.

10          MR. HOWE:  Yes.

11          MR. KLEIN:  I assume you would like

12    Mr. Linden to read and sign and correct the

13    transcript as appropriate?

14          MR. HOWE:  Yes.

15          MR. PORTER:  Yes, we would.

16    Q.    Mr. Linden, you just said you are not

17    currently employed.  How long have you been

18    unemployed?

19    A.    Since the beginning of April, I believe

20    April 10th.

21    Q.    Where were you employed before that?

22    A.    Prysmian Group, P-r-y-s-m-i-a-n.  It's an

23    international manufacturer of power cables.

24    Q.    How long were you employed there?

Anthony L. Linden - Vol. I - September 12, 2017

8

```
 1        A.    Six and a half years.
 2        Q.    What were your duties there?
 3        A.    Quality control inspector.
 4        Q.    You were inspecting cable?
 5        A.    Verifying conformity before being shipped
 6   to customers.
 7        Q.    Thank you.  What would you say your field
 8   is generally?
 9        A.    Clarify.
10        Q.    What field of work do you consider where
11   you are most likely to obtain employment?
12        A.    I'm in the process of transition.  I can't
13   guarantee or really control where I end up at this
14   point.
15        Q.    That's fine.  Have you ever had any jobs in
16   the gun industry of any kind?  Let's start with paid
17   work if that helps clarify the question.
18        A.    No.
19        Q.    Have you done any volunteer work that you
20   would consider relevant to the gun industry?
21        A.    Yes.
22        Q.    What kind of work?
23        A.    For friends and family, I have done some
24   private firearms instruction.  This was not paid.
```

Anthony L. Linden - Vol. I - September 12, 2017

1      Q.    Was that a formal process that you would do

2    the instruction or just upon request and because you

3    know the answers?

4      A.    A combination of both.   Friends and family

5    of mine are aware of where I stand on the Second

6    Amendment, as well as my enjoyment of hunting and

7    recreational shooting.   I'm sometimes approached by

8    friends or friends of friends who know that and are

9    looking for assistance in learning about the safe

10   handling of firearms.   I'm a certified instructor so

11   I am qualified to provide that instruction.   I have

12   never yet charged anyone for those services.

13     Q.    Do you have a formal course of instruction

14   that you provide people that ask for it?

15     A.    It's a scaled down version of two different

16   NRA training programs.

17     Q.    Which are which programs?

18     A.    The Home Firearms Safety Course and Basic

19   Pistol.

20     Q.    Have you ever provided any training with

21   regard to long guns?   I should ask you a

22   foundational question.   I'll take that question

23   back.   Are you familiar with what a long gun is?

24     A.    Yes.

**Anthony L. Linden - Vol. I - September 12, 2017**

1      Q.   What is your understanding?

2      A.   A long gun is a firearm with a barrel, is

3  of a certain length to classify it something other

4  than a pistol or any other weapon.

5      Q.   Would a rifle be a long gun?

6      A.   Good question.

7      Q.   Most of the time?

8      A.   Generally speaking, yes.

9      Q.   Would a shotgun be a long gun most of the

10  time?

11      A.   (Witness shrugs)

12          MR. PORTER:  You have to answer verbally,

13  if you know, if you can answer.

14      A.   There are a very wide variety of rifles and

15  shotguns available that fall under various

16  classifications.  Traditionally it's understood for

17  a shotgun to be a long gun, but that doesn't fit

18  every instance.  I can't give you a definite

19  answering one way or another.

20      Q.   Thank you.  Have you ever done any training

21  programs related to long guns?

22      A.   Only among my immediate family.  These were

23  casual settings, not formal instructor sessions.  It

24  was me taking my son and one of his friends to the

11

1    shooting range and shooting, offering very basic

2    instructions on safe handling and marksmanship.

3    That was the extent of any instructions that I have

4    given on long guns.

5        Q.   When you do that, it's in the context of

6    live fire at the range?

7        A.   Yes.  It's at the firearm range, and it's

8    live fire after going through an initial safety

9    briefing.

10       Q.   Is that true of most of the training

11   sessions that you have done?

12       A.   Always.  It's always at an approved range

13   and following a safety briefing by me.

14       Q.   Do you have any training materials that you

15   use when you do the trainings?

16       A.   I do.

17       Q.   What kind of materials?

18       A.   Materials provided by the NRA.

19       Q.   You mentioned in the course of your answer

20   earlier that people know your views on the Second

21   Amendment.  Could you describe briefly what those

22   views are.

23       A.   Briefly...

24       Q.   Take as much time as you need.

Anthony L. Linden - Vol. I - September 12, 2017

1          MR. PORTER:  Briefly will be fine.

2      A.   I can be a longwinded person.  I'm just

3  trying to be concise.

4          I am thankful that the Constitution

5  provides certain freedoms to its citizens.  I

6  believe that the Second Amendment is an important

7  part of some of those liberties that we are afforded

8  by the Constitution.  I am glad to exercise that

9  right in a safe and responsible manner.  I'm also

10  very glad and eager upon request to discuss that

11  further with anyone that wishes to talk about it.

12      Q.   What is your view of what the Second

13  Amendment protects?

14      A.   It protects the right of individual

15  citizens to keep and use for lawful purposes firearms.

16      Q.   Does that include any firearm, as far as

17  you are concerned?

18      A.   Are you asking for my personal opinion on

19  interpretation of the law?

20      Q.   I'm asking for your views about the Second

21  Amendment.  You stated that it protects the right to

22  own firearms for lawful purposes.  I just want your

23  opinion on what firearms are protected under the

24  Second Amendment.

13

1      A.   I can give you two parts to that answer.

2   One, which firearms can be owned varies greatly

3   depending on where you are located, what state you

4   live in.  Even if I were to be of a certain

5   persuasion that certain classification of firearms

6   are protected, that doesn't necessarily mean I can

7   actually purchase, own or use those.  Understood?

8           I personally believe, me as an individual,

9   that any firearm in common use by a law-abiding

10  citizen should not be restricted.

11     Q.   What is your definition of "common use" for

12  the purposes of that opinion?

13     A.   Anything that could be used for

14  recreational shooting, target practice, hunting or

15  personal and home defense.

16     Q.   You mentioned that in other states there

17  are restrictions on that use.  Are those

18  restrictions consistent with your understanding of

19  what the Constitution provides?

20     A.    That varies by state.  Some states I would

21  agree with some of the regulations that are in

22  place, that as being reasonable and noninfringement.

23  Other states I do not agree.  I do believe that

24  other states, although their intentions may be

14

```
 1    noble, have restricted unreasonably a constitutionally
 2    protected right.
 3         Q.    Thank you.   Have you ever employed as a law
 4    enforcement officer?
 5         A.    No.
 6         Q.    Have you ever been in military service?
 7         A.    No.
 8         Q.    Have you been tried for or convicted of a
 9    crime?
10         A.    No.
11         Q.    Have you ever been involved on either side
12    of a domestic violence incident?
13         A.    No.
14         Q.    How long have you lived in Massachusetts?
15         A.    I moved back to Massachusetts from Upstate
16    New York in 2010.   There was a one-year period,
17    approximately 15 months, where I lived in Upstate
18    New York.   Other than that, I've lived in
19    Massachusetts my whole life.
20         Q.    Do you have a gun license?
21         A.    Yes.
22         Q.    What type?
23         A.    LTC unrestricted.
24         Q.    When did you get that?
```

**Anthony L. Linden - Vol. I - September 12, 2017**

15

1        A.    (Examining document)

2        Q.    More or less.  I don't need the exact date.

3        A.    I can give you the exact date.  I can also

4    show you as well so you can get answers from that.



6        Q.    Your gun license permits you to carry a gun

7    concealed, correct?

8        A.    Yes.

23

Anthony L. Linden - Vol. I - September 12, 2017



17



```
 7       Q.    Approximately when was the training?

 8       A.    I couldn't say.  My initial firearms safety

 9   course in a formal setting was two years prior at a

10   local FFL.  I have gone to the range numerous times

11   with friends and relatives before that initial

12   safety class and many times after that.

13       Q.
```

Anthony L. Linden - Vol. I - September 12, 2017



Anthony L. Linden - Vol. I - September 12, 2017



Anthony L. Linden - Vol. I - September 12, 2017



Anthony L. Linden - Vol. I - September 12, 2017



**Anthony L. Linden - Vol. I - September 12, 2017**

22



    13          Q.    Could you give me a list of a handful of

    14    AR-15s that you are aware of.

    15                MR. PORTER:  Objection to form.  You can

    16    answer if you know.

    17          A.    Clarify.

    18          Q.    Can you give me some names of AR-15s that

    19    you are aware of.

    20                MR. PORTER:  Same objection.  Go ahead.

    21          A.    I'm not certain exactly what you are

    22    looking for in the answer.  This particular rifle

    23    platform, the reason why it is, like, without a

    24    doubt the number one most popular long gun platform

Anthony L. Linden - Vol. I - September 12, 2017

 1    or rifle platform is because of its versatility,

 2    that they can be used and built for a very wide

 3    range of hunting and sporting and home defense

 4    purposes.

 5           It's like a fingerprint.  I mean, each

 6    individual firearm owner or AR-15 owner, there's a

 7    very high likelihood to have customized it at some

 8    point.  You know, it may have a longer barrel or a

 9    shorter barrel or longer stock or a shorter stock.

10    It may have a scope or it may not have a scope.

11    Many of the AR-15s out there have been made by

12    individual owners.  Aside from listing whatever

13    manufacturer comes to my mind, I couldn't answer

14    that as far as how many different types of AR-15s

15    there are out there.

16        Q.    Let's take, for example, the Bushmaster

17    XM-15, is that a gun you are familiar with?

18        A.    Not that particular model.

19        Q.    Smith & Wesson M&P 500, are you familiar

20    with that gun?

21        A.    M&P 500?

22        Q.    M&P 15.  I'm sorry.

23        A.    Correct.

24        Q.    You are familiar with it?

Anthony L. Linden - Vol. I - September 12, 2017

24

1      A.    It's a very common entry level AR-15.

2      Q.    Ruger 556, are you familiar with that gun?

3      A.    Correct.

4      Q.    Is that an AR-15?

5      A.    There's some debate in the firearms

6   community whether it is because the gas piston is

7   slightly different than other AR-15s.  It would be

8   generally classified as that, though.

9      Q.    Are you familiar what a gun called "AK-47"?

10     A.    That's correct.

11     Q.    Are there other guns beside an Avtomat

12  Kalashnikov manufactured gun that would also be

13  classified as AK-47s?

14     A.    There are a couple of companies that make

15  reproductions of the AK-47.  As far as whether they

16  can be classified as that, I mean, I would think so.

17     Q.    Can you give me some examples?

18     A.    The first one that comes to mind is Century

19  Arms.  They are well known for making reproductions.

20     Q.    When you say "reproductions," you mean an

21  operating gun.  You don't mean something that's just

22  a copy or a model of them, right?

23     A.    It's a copy of an original model.

24     Q.    But it functions as a gun?

Anthony L. Linden - Vol. I - September 12, 2017

 1      A.    It functions as such, yes, but it's not the

 2   original company, and so it's not anything more than

 3   a functioning reproduction.

 4      Q.    Have you ever had self-defense training,

 5   Mr. Linden?

 6      A.    Clarify.

 7      Q.    Have you ever had training that was

 8   designed to give you clarity about what you can and

 9   can't do to use a gun in self-defense in

10   Massachusetts?

11           MR. PORTER:  Object to the form of the

12   question.  You can answer.

13      A.    As a component of hopefully all firearm

14   safety classes in Massachusetts, the instructors

15   make it a point to be clear of the responsibility of

16   handling firearms.  Many of those instructors offer

17   additional training to that effect.

18           Aside from the standard Massachusetts State

19   Police approved training courses, I have not had

20   additional training in the defense use of firearms.

21      Q.    Do you have an understanding of what the

22   rules are for self-defense in Massachusetts?

23           MR. PORTER:  Object to the form of the

24   question.  You can answer.

Anthony L. Linden - Vol. I - September 12, 2017

 1      A.   There are a lot of people in the state who

 2   don't have a clear understanding of what that is.

 3   Whether I am or am not one of them, I couldn't say.

 4      Q.   What is your understanding of the rules for

 5   use of a gun in self-defense in Massachusetts?

 6           MR. PORTER:  I object to the form of the

 7   question, but you can answer.

 8      A.   If someone is acting in such a way that

 9   puts me in legitimate fear of imminent harm or

10   danger, I may use lethal force to protect myself.

11      Q.   Any other rules that apply?

12           MR. PORTER:  I object to the form.  You can

13   answer.

14           THE WITNESS:  I can or should answer?

15           MR. PORTER:  Answer the question if you

16   know the answer.

17      A.   Aside from the defense of myself or people

18   in my home or my immediate family members, barring

19   some extreme situation, I would not exercise lethal

20   force.  I wouldn't.

21      Q.   Have you ever fired a gun in self-defense?

22      A.   Thankfully, no, and I hope to never do so.

23      Q.   Ever fire a gun at another person?

24      A.   No.

Anthony L. Linden - Vol. I - September 12, 2017

1    Q.   Are you a member of the Gun Owners' Action

2   League?

3    A.   My membership has lapsed.  I have been a

4   member for several years.

5    Q.   What period of time were you a member?

6    A.   I couldn't give you an exact date, but

7   through 2015, 2016, and up until perhaps April of

8   2017 I was a member.

9    Q.   Are you familiar with an organization

10  called "Comm2A"?

11   A.   Yes.

12   Q.   Do you have any connection to that

13  organization?

14   A.   No.

15   Q.   Are you familiar with the National Rifle

16  Association?

17   A.   Yes.

18   Q.   Is it okay if I refer to it as "NRA"?

19   A.   Yes.

20   Q.   You'll understand what I mean?

21   A.   Yes.

22   Q.   Are you a member of the NRA?

23   A.   Yes.

24   Q.   How long have you been a member?

**Anthony L. Linden - Vol. I - September 12, 2017**

28



1      A.   Again, I could not give you exact dates.

2  It's been for at least five or six years now.

3      Q.   Are you a member of any gun club?

4      A.   Yes.

5      Q.   Which one?

6      A.   ████████████████████████████.

7      Q.   Any others?

8      A.   No.

9      Q.   Do you have shooting privileges as a member

10  of any firing range?

11      A.   ████████████████████

████    ██   ████████████████████████

████    ██   ██.

14      ██   ████████████████████████████

████  ████████████████████████████████████

██    ██   ███

██    ██   ████████████████████████████████

██  ██████   ████████████████████████

██    ██   ████████████████████.

20      Q.   How did you first learn about the

21  possibility of being a plaintiff in a lawsuit like

22  the one you are now a plaintiff in?

23      A.   Gun Owners' Action League had made a public

24  notice that they were looking for people to

Anthony L. Linden - Vol. I - September 12, 2017

 1    participate in something similar to this.  I can't

 2    recall the exact wording, but there was a notice put

 3    out by Gun Owners' Action League.

 4         Q.   Do you remember where you saw that notice?

 5         A.   It could have been one of three places.  I

 6    do get regular email updates from them.  It could

 7    have been that.  I also regularly check their

 8    website.  It could have been that as well.  It could

 9    also have been off their Facebook page.  I don't

10    recall which one it was.

11         Q.   Did you respond to the notice as something

12    you were interested in?

13         A.   Yes.

14         Q.   That you were interested in being a

15    plaintiff in a lawsuit like this lawsuit?

16         A.   Yes.

17         Q.   Approximately when did you respond?

18         A.   Last summer.  I couldn't tell you exactly

19    when.  I'm guessing sometime probably in September,

20    August perhaps.

21         Q.   About how long a period was there between

22    the time you saw the public notice by GOAL

23    requesting volunteers to serve in this lawsuit and

24    when you responded?

Anthony L. Linden - Vol. I - September 12, 2017

30

1      A.    Seconds.

2      Q.    You applied right away?

3      A.    Immediately.

4      Q.    Did someone from GOAL contact you?

5      A.    I received an email confirmation that they

6   had received the inquiry.  I don't recall offhand

7   which organization it was that had contacted me

8   next, but shortly after I was contacted and informed

9   that a private investigator would be speaking with

10  me to evaluate my eligibility.  Who gave me that

11  information, I'm not certain whether that was GOAL

12  or Comm2A.

13     Q.    I think you produced a document that might

14  help us out.

15                  (Document marked as Linden

16                  Exhibit 1 for identification)

17     Q.    You have a document in front of you labeled

18  as Exhibit 1.  Do you recognize this document?

19     A.    (Examines document)  Yes.

20     Q.    What is it?

21     A.    It's an email that I received from Gun

22  Owners' Action League.

23     Q.    Does it refresh your recollection about

24  what you were responding to when you contacted GOAL?

Anthony L. Linden - Vol. I - September 12, 2017

31

1      A.    Yes.

2      Q.    What did you respond to?

3      A.    A plea or a notice put out by Gun Owners'

4  Action League looking for plaintiffs.

5      Q.    Was that a notice you received by email?

6      A.    I'm not sure if I had received it by email

7  or some other way.

8      Q.    I see.  Thank you.  This is the email you

9  received in response at the top of the page?

10     A.    Correct.

11     Q.    Do you remember receiving this email?

12     A.    Yes, but as I stated earlier, I was not

13 sure whether it was GOAL or COMM2A that had

14 responded to that.  As evidenced by the email, both

15 organizations were working together so...

16     Q.    Then you mentioned earlier that you were

17 told you would be contacted by a private

18 investigator.  Do you remember that contact?

19     A.    I don't recall her name, but I remember

20 having a lengthy conversation with her.

21     Q.    Do you know if it was a private

22 investigator working for the attorneys in this case?

23     A.    That was my understanding.

24     Q.    Are you familiar with the name "Suzanne

Anthony L. Linden - Vol. I - September 12, 2017

1    McComas"?

2        A.    I believe that's the name.

3        Q.    M-c-C-o-m-a-s?

4        A.    I'm not sure of the spelling, but it sounds

5    like the woman I spoke to.

6        Q.    What was your understanding of who

7    Ms. McComas worked for?

8        A.    That she had been hired to essentially vet

9    potential plaintiffs in the case.

10       Q.    Did she represent to you that she was an

11   attorney?

12       A.    I don't believe she identified herself as

13   such.

14       Q.    Did she identify herself as working for an

15   attorney?

16       A.    As a third party working on behalf of.

17       Q.    Do you remember what you talked to her about?

18       A.    We talked about a lot.  She was a very

19   pleasant and sociable person.  We actually talked

20   about much beyond the scope of her initial questions.

21       Q.    Are you familiar with someone named "Thomas

22   Bolioli"?

23       A.    Spell the last name.

24       Q.    B-o-l-i-o-l-i.

Anthony L. Linden - Vol. I - September 12, 2017

33



1      A.    I don't know.

2      Q.    Is it your understanding that you have an

3 obligation to compensate your lawyers for this case?

4      A.    I am under no obligation to compensate.

5      Q.    Do you know who is paying for the lawsuit?

6      A.    The National Rifle Association.

7      Q.

**Anthony L. Linden - Vol. I - September 12, 2017**



Anthony L. Linden - Vol. I - September 12, 2017

35



1       Q.

12              MR. KLEIN:  Let's take a short break.

13              (Recess at 2:55 p.m.)

14              MR. KLEIN:  (3:00 p.m.)  I don't have any

15      further questions.  Thanks.

16              MR. PORTER:  We have no questions.

17              (Whereupon the deposition

18               was concluded at 2:56 p.m.)

19

20

21

22

23

24

**Anthony L. Linden - Vol. I - September 12, 2017**

36

1                    C E R T I F I C A T E

2        I, ANTHONY L. LINDEN, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify under the pains and penalties of

5    perjury that said transcript (with/without)

6    suggested corrections is a true and accurate record

7    of said testimony.

8        Dated at _____, this ____ day of _____,

9    2017.

10

11                        _____

12

13

14

15

16

17

18

19

20

21

22

23

24

**Anthony L. Linden - Vol. I - September 12, 2017**

37

1                    SUGGESTED CORRECTIONS

2  RE:  David Seth Worman, et al., vs. Maura Healey,
        et al.
3
   WITNESS:  Anthony L. Linden, Vol. I
4
   The above-named witness wishes to make the following
5  changes to the testimony as originally given:

6  PAGE   LINE      SHOULD READ              REASON

7  _____  _____  _____  _____

8  _____  _____  _____  _____

9  _____  _____  _____  _____

10 _____  _____  _____  _____

11 _____  _____  _____  _____

12 _____  _____  _____  _____

13 _____  _____  _____  _____

14 _____  _____  _____  _____

15 _____  _____  _____  _____

16 _____  _____  _____  _____

17 _____  _____  _____  _____

18 _____  _____  _____  _____

19 _____  _____  _____  _____

20 _____  _____  _____  _____

21 _____  _____  _____  _____

22 _____  _____  _____  _____

23 _____  _____  _____  _____

24 _____  _____  _____  _____

**Doris O. Wong Associates, Inc.**

Anthony L. Linden - Vol. I - September 12, 2017

38

1    COMMONWEALTH OF MASSACHUSETTS)

2    SUFFOLK, SS.                    )

3         I, Ken A. DiFraia, RPR and Notary Public in and

4    for the Commonwealth of Massachusetts, do hereby

5    certify that there came before me on the 12th day of

6    September, 2017, at 2:12 p.m., the person

7    hereinbefore named, who was by me duly sworn to

8    testify to the truth and nothing but the truth of

9    his knowledge touching and concerning the matters in

10   controversy in this cause; that he was thereupon

11   examined upon his oath, and his examination reduced

12   to typewriting under my direction; and that the

13   deposition is a true record of the testimony given

14   by the witness.

15        I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19        In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 26th day of

21   September, 2017.

22

23

24

Anthony L. Linden - Vol. I - September 12, 2017

39

1        Under Federal Rule 30:

2              X   Reading and Signing was requested

3                  Reading and Signing was waived

4                  Reading and Signing was not requested

5

6   *Ken A. DiFrava*

7

8   Notary Public

9   Commission expires 2/24/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

D I S C L A I M E R

This transcript in any format is a confidential communication between Doris O. Wong Associates, Inc., a professional court reporting firm, and the parties to this matter and their counsel.  Any reproduction or distribution of this transcript without the express permission of the parties is a violation of this confidentiality.  To fulfill any request to the court reporter for an additional copy or copies from persons or entities without standing in this matter will require the consent of the parties and/or counsel and/or a court order for such delivery.

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 179 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Anthony L. Linden -  Vol. I
September 12, 2017

## A

**able (1)**
21:24
**accepting (1)**
33:12
**access (1)**
18:9
**accurately (1)**
6:4
**acquired (2)**
33:18;34:1
**acting (1)**
26:8
**action (7)**
19:14,23;27:1;
28:23;29:3;30:22;
31:4
**actually (2)**
13:7;32:19
**additional (3)**
20:18;25:17,20
**address (3)**
4:12,12,17
**afforded (1)**
12:7
**afternoon (1)**
4:10
**again (2)**
22:4;28:1
**agree (2)**
13:21,23
**ahead (1)**
22:20
**AK-47 (3)**
24:9,15;35:10
**AK-47s (1)**
24:13
**although (1)**
13:24
**always (2)**
11:12,12
**Amendment (6)**
9:6;11:21;12:6,13,
21,24
**ammunition (2)**
18:22;33:13
**among (1)**
10:22
**Anderson (3)**
20:15;21:6,21
**ANTHONY (2)**
4:2,14
**applied (1)**
30:2
**apply (2)**
7:6;26:11
**approached (1)**
9:7
**appropriate (1)**
7:13
**approval (1)**

7:9
**approved (2)**
11:12;25:19
**approximately (3)**
14:17;17:7;29:17
**April (3)**
7:19,20;27:7
**AR-15 (16)**
20:2,3,21,22;21:1,4,
8,11,14,23;22:8;23:6;
24:1,4;35:2,7
**AR-15s (6)**
22:14,18;23:11,14;
24:7;35:8
**area (1)**
17:16
**Arms (2)**
20:14;24:19
**Aside (3)**
23:12;25:18;26:17
**assistance (1)**
9:9
**Association (2)**
27:16;33:6
**assume (2)**
5:21;7:11
**attorney (3)**
6:7;32:11,15
**attorneys (2)**
4:20;31:22
**August (1)**
29:20
**available (1)**
10:15
**Avtomat (1)**
24:11
**aware (4)**
9:5;22:1,14,19
**away (1)**
30:2

## B

**back (3)**
9:23;14:15;21:21
**Baker (1)**
4:22
**barrel (7)**
10:2;20:17,19;
21:13,13;23:8,9
**barring (1)**
26:18
**Basic (2)**
9:18;11:1
**basis (1)**
15:10
**beforehand (1)**
34:23
**beginning (1)**
7:19
**behalf (1)**
32:16
**beside (1)**

24:11
**best (1)**
15:15
**better (2)**
5:16;21:24
**beyond (1)**
32:20
**Blaze (1)**
19:21
**Bolioli (1)**
32:22
**B-o-l-i-o-l-i (1)**
32:24
**both (2)**
9:4;31:14
**bought (1)**
20:8
**break (3)**
6:13,14;35:12
**briefing (2)**
11:9,13
**briefly (3)**
11:21,23;12:1
**brought (1)**
34:16
**build (4)**
20:5;22:10;28:17,
19
**building (2)**
28:15;35:8
**built (3)**
20:4,7;23:2
**Bushmaster (4)**
20:17;21:10;22:3;
23:16
**business (2)**
4:12,17

## C

**cable (1)**
8:4
**cables (1)**
7:23
**caliber (1)**
19:21
**called (4)**
4:3,21;24:9;27:10
**can (20)**
6:13;10:13;12:2;
13:1,2,6;15:3,3,4;
22:15,18;23:2;24:16,
17;25:8,12,24;26:7,
12,14
**Capable (1)**
33:12
**capacity (7)**
16:20;33:7,11,14;
34:9,15;35:1
**carried (4)**
15:23;16:18,24;
17:2
**carry (9)**

15:6,14,16,17,19;
16:6,14,14;17:5
**case (5)**
4:23;18:7;31:22;
32:9;33:3
**casual (1)**
10:23
**Century (1)**
24:18
**certain (7)**
10:3;12:5;13:4,5;
22:21;30:11;33:16
**certified (1)**
9:10
**charged (1)**
9:12
**Chase (1)**
4:15
**check (1)**
29:7
**chose (1)**
22:10
**citizen (1)**
13:10
**citizens (2)**
12:5,15
**claims (1)**
18:7
**clarify (7)**
5:20,21;8:9,17;
18:20;22:17;25:6
**clarity (1)**
25:8
**class (2)**
16:19;17:12
**classes (1)**
25:14
**classification (1)**
13:5
**classifications (1)**
10:16
**classified (3)**
24:8,13,16
**classify (1)**
10:3
**clear (4)**
18:8;25:15;26:2;
34:5
**closet (7)**
18:12,16,17,20,21;
19:1,19
**closets (1)**
19:9
**clothes (1)**
16:15
**club (3)**
28:3,6,11
**CMMG (2)**
20:19;21:13
**combination (1)**
9:4
**Comm2A (3)**
27:10;30:12;31:13

**common (2)**
13:9,11;24:1
**community (1)**
24:6
**companies (1)**
24:14
**company (1)**
25:2
**compensate (2)**
33:3,4
**completed (1)**
6:1
**compliance (1)**
18:2
**component (1)**
25:13
**concealed (8)**
15:7,16,23;16:5,18,
24;17:2,5
**concerned (1)**
12:17
**concise (1)**
12:3
**concluded (1)**
35:18
**confirm (1)**
7:3
**confirmation (1)**
30:5
**conformity (1)**
8:5
**connection (1)**
27:12
**consider (2)**
8:10,20
**consistent (1)**
13:18
**Constitution (3)**
12:4,8;13:19
**constitutionally (1)**
14:1
**contact (2)**
30:4;31:18
**contacted (4)**
30:7,8,24;31:17
**context (2)**
7:7;11:5
**control (2)**
8:3,13
**conversation (1)**
31:20
**convicted (1)**
14:8
**copy (2)**
24:22,23
**counsel (1)**
4:3
**counsel's (1)**
7:8
**couple (1)**
24:14
**course (4)**
9:13,18;11:19;17:9

David Seth Worman, et al. vs.
Maura Healey, et al.

**courses (1)**
25:19
**court (2)**
5:11;6:2
**crime (1)**
14:9
**currently (5)**
7:17;16:2,5;17:1;
33:8
**custom (2)**
20:4,7
**customers (1)**
8:6
**customized (1)**
23:7

## D

**danger (1)**
26:10
**date (10)**
15:2,3,5,5;27:6;
34:17,18,19,21,22
**dates (1)**
28:1
**dealer (1)**
34:17
**debate (1)**
24:5
**Defendants (2)**
4:4,20
**defense (4)**
13:15;23:3;25:20;
26:17
**definite (1)**
10:18
**definition (1)**
13:11
**depending (1)**
13:3
**deposition (5)**
5:1;6:23;7:4,7;
35:17
**describe (1)**
11:21
**described (1)**
20:21
**designed (1)**
25:8
**different (6)**
9:15;15:22;23:14;
24:7;34:19,20
**Dighton (1)**
4:15
**DIRECT (1)**
4:8
**discuss (1)**
12:10
**document (6)**
15:1;30:13,15,17,
18,19
**domestic (1)**
14:12

**done (5)**
8:19,23;10:20;
11:11;28:14
**doubt (1)**
22:24
**down (3)**
5:12;6:3;9:15
**driver's (1)**
4:5
**duly (1)**
4:6
**duties (1)**
8:2

## E

**eager (1)**
12:10
**earlier (6)**
7:4;11:20;19:24;
28:15;31:12,16
**effect (1)**
25:17
**either (2)**
6:8;14:11
**eligibility (1)**
30:10
**else (1)**
16:23
**email (8)**
29:6;30:5,21;31:5,
6,8,11,14
**employed (4)**
7:17,21,24;14:3
**employment (1)**
8:11
**end (2)**
6:7;8:13
**enforcement (1)**
14:4
**enjoyment (1)**
9:6
**entry (1)**
24:1
**essentially (1)**
32:8
**evaluate (1)**
30:10
**even (3)**
5:15;13:4;34:21
**evidenced (1)**
31:14
**exact (7)**
15:2,3;27:6;28:1;
29:2;33:17;35:6
**exactly (2)**
22:21;29:18
**examination (2)**
4:3,8
**examined (1)**
4:6
**Examines (1)**
30:19

**Examining (1)**
15:1
**example (1)**
23:16
**examples (1)**
24:17
**exercise (2)**
12:8;26:19
**Exhibit (2)**
30:16,18
**experienced (1)**
22:5
**expert (1)**
22:1
**Expiration (1)**
15:5
**extent (1)**
11:3
**extreme (1)**
26:19

## F

**Facebook (1)**
29:9
**fair (1)**
22:7
**fall (1)**
10:15
**familiar (11)**
4:22;9:23;23:17,19,
24;24:2,9;27:9,15;
31:24;32:21
**family (4)**
8:23;9:4;10:22;
26:18
**far (3)**
12:16;23:14;24:15
**fear (1)**
26:9
**Federal (1)**
7:5
**few (1)**
5:4
**FFL (1)**
17:10
**field (2)**
8:7,10
**fine (3)**
7:9;8:15;12:1
**fingerprint (1)**
23:5
**finish (1)**
19:7
**fire (3)**
11:6,8;26:23
**firearm (8)**
10:2;11:7;12:16;
13:9;16:19;21:18;
23:6;25:13
**firearms (15)**
8:24;9:10,18;12:15,
22,23;13:2,5;17:8,18;

18:23;24:5;25:16,20;
34:17
**fired (2)**
17:21;26:21
**firing (1)**
28:10
**first (5)**
4:6;5:10;24:18;
28:20;34:16
**fit (3)**
10:17;21:7,21
**fits (1)**
35:2
**five (1)**
28:2
**follow (2)**
15:12,15
**following (1)**
11:13
**follows (1)**
4:7
**force (2)**
26:10,20
**form (7)**
22:15;25:11,23;
26:6,12
**formal (4)**
9:1,13;10:23;17:9
**forward (1)**
6:8
**foundational (1)**
9:22
**freedoms (1)**
12:5
**friends (9)**
8:23;9:4,8,8,8;
10:24;17:11,16;34:13
**front (1)**
30:17
**full (1)**
4:11
**functioning (1)**
25:3
**functions (2)**
24:24;25:1
**further (2)**
12:11;35:15

## G

**Gary (1)**
4:19
**gas (1)**
24:6
**gave (1)**
30:10
**generally (3)**
8:8;10:8;24:8
**gifts (2)**
34:11,13
**given (1)**
11:4
**glad (2)**

12:8,10
**GOAL (5)**
29:22;30:4,11,24;
31:13
**Good (2)**
4:10;10:6
**greatly (1)**
13:2
**ground (1)**
5:5
**Group (1)**
7:22
**guarantee (1)**
8:13
**guessing (1)**
29:19
**gun (41)**
8:16,20;9:23;10:2,
5,9,17;14:20;15:6,6,
17,19;16:5,8;17:2,16;
18:3,5,10,23;19:1,13,
24;22:24;23:17,20;
24:2,9,12,21,24;25:9;
26:5,21,23;27:1;28:3,
23;29:3;30:21;31:3
**guns (20)**
9:21;10:21;11:4;
16:2,17;17:4,13,14,
19,23;18:9,13,16,21;
19:4,8,15,18,19;24:11
**gunsmith (2)**
21:24;22:6
**gunsmithing (1)**
28:14

## H

**half (2)**
8:1;28:19
**handful (1)**
22:13
**handgun (1)**
16:9
**handling (3)**
9:10;11:2;25:16
**hard (1)**
5:15
**harm (1)**
26:9
**head (2)**
5:12,12
**hear (1)**
5:15
**help (1)**
30:14
**helps (1)**
8:17
**herself (2)**
32:12,14
**high (1)**
23:7
**hired (1)**
32:8

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 181 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Anthony L. Linden -  Vol. I
September 12, 2017

**Hold (1)**
19:6
**holster (1)**
16:15
**home (6)**
4:12;9:18;13:15;
17:23;23:3;26:18
**hope (1)**
26:22
**hopefully (1)**
25:13
**hour (1)**
28:19
**HOWE (2)**
7:10,14
**hunting (3)**
9:6;13:14;23:3

**I**

**identification (1)**
30:16
**identified (2)**
4:4;32:12
**identify (1)**
32:14
**immediate (2)**
10:22;26:18
**Immediately (1)**
30:3
**imminent (1)**
26:9
**important (2)**
5:10;12:6
**incident (1)**
14:12
**include (1)**
12:16
**Including (2)**
17:19;20:11
**indicate (1)**
34:20
**individual (4)**
12:14;13:8;23:6,12
**industry (2)**
8:16,20
**information (2)**
20:18;30:11
**informed (1)**
30:8
**initial (4)**
11:8;17:8,11;32:20
**inquiry (1)**
30:6
**inside (3)**
18:17;19:4,19
**inspecting (1)**
8:4
**inspector (1)**
8:3
**instance (1)**
10:18
**instruct (2)**

6:8,9
**instructed (1)**
17:17
**instruction (4)**
8:24;9:2,11,13
**instructions (3)**
6:10;11:2,3
**instructor (2)**
9:10;10:23
**instructors (2)**
25:14,16
**intentions (1)**
13:24
**interested (2)**
29:12,14
**internal (1)**
34:18
**international (1)**
7:23
**interpretation (1)**
12:19
**investigator (3)**
30:9;31:18,22
**involved (1)**
14:11
**issue (1)**
15:5

**J**

**jobs (1)**
8:15

**K**

**Kalashnikov (1)**
24:12
**keep (4)**
12:15;18:5;19:1,8
**kept (1)**
19:16
**kind (4)**
8:16,22;11:17;
19:19
**KLEIN (6)**
4:9,19;7:3,11;
35:12,14
**knowledge (1)**
22:4
**known (1)**
24:19

**L**

**labeled (1)**
30:17
**lapsed (1)**
27:3
**large (6)**
33:7,10,14;34:9,15;
35:1
**last (4)**
4:11;29:18;32:23;

34:8
**law (3)**
12:19;14:3;18:2
**law-abiding (1)**
13:9
**lawful (2)**
12:15,22
**laws (2)**
15:13,14
**lawsuit (5)**
28:21;29:15,15,23;
33:5
**lawyers (1)**
33:3
**LC9S (1)**
16:19
**League (5)**
27:2;28:23;29:3;
30:22;31:4
**learn (1)**
28:20
**learning (1)**
9:9
**least (1)**
28:2
**Lee (1)**
4:14
**legal (1)**
34:14
**legitimate (1)**
26:9
**length (1)**
10:3
**lengthy (1)**
31:20
**less (1)**
15:2
**lethal (2)**
26:10,19
**level (1)**
24:1
**liberties (1)**
12:7
**license (5)**
4:5;14:20;15:6,21,
24
**life (1)**
14:19
**likelihood (1)**
23:7
**likely (1)**
8:11
**LINDEN (7)**
4:2,10,14;7:12,16;
25:5;30:15
**L-i-n-d-e-n (1)**
4:14
**list (1)**
22:13
**listen (1)**
6:9
**listing (1)**
23:12

**live (3)**
11:6,8;13:4
**lived (3)**
14:14,17,18
**loaded (4)**
19:4,9,10,16
**local (2)**
17:10;34:16
**located (2)**
13:3;18:10
**location (2)**
15:10,11
**locked (5)**
18:12,16,20;19:2,3
**locks (1)**
18:19
**long (18)**
7:17,24;9:21,23;
10:2,5,9,17,21;11:4;
14:14;17:2,19;18:21;
22:24;27:24;28:17;
29:21
**longer (2)**
23:8,9
**longwinded (1)**
12:2
**looking (4)**
9:9;22:22;28:24;
31:4
**lot (2)**
26:1;32:18
**lower (10)**
20:11,13,14,15,23,
24;21:1,3,7,22
**LTC (1)**
14:23

**M**

**M&P (3)**
23:19,21,22
**magazine (6)**
16:20;33:11;34:9,
19,21;35:1
**magazines (8)**
16:12,13,21;33:7,
14,18,22;34:15
**making (2)**
6:10;24:19
**manner (1)**
12:9
**manufacture (2)**
34:19,21
**manufactured (5)**
20:15;21:21;24:12;
33:20,22
**manufacturer (2)**
7:23;23:13
**manufacturers (1)**
34:20
**Manufacturing (1)**
20:16
**many (8)**

15:23;17:12;22:7;
23:11,14;25:16;
33:14;35:4
**marked (1)**
30:15
**market (1)**
22:8
**marketed (3)**
21:3,8,11
**marksmanship (1)**
11:2
**Massachusetts (11)**
4:16;14:14,15,19;
15:13;25:10,14,18,22;
26:5;34:15
**materials (3)**
11:14,17,18
**matter (2)**
4:20,21
**may (8)**
6:6;13:24;18:6;
21:24;23:8,10,10;
26:10
**McComas (2)**
32:1,7
**M-c-C-o-m-a-s (1)**
32:3
**mean (7)**
13:6;15:11;23:5;
24:16,20,21;27:20
**Meaning (1)**
16:21
**means (2)**
6:20;20:8
**member (8)**
27:1,4,5,8,22,24;
28:3,9
**members (1)**
26:18
**membership (1)**
27:3
**mentioned (10)**
11:19;13:16;17:13,
14;19:24;21:7,10,20;
28:15;31:16
**might (1)**
30:13
**military (1)**
14:6
**millimeter (1)**
16:7
**mind (2)**
23:13;24:18
**mine (2)**
9:5;34:13
**minutes (1)**
5:4
**Model (5)**
19:20;20:3;23:18;
24:22,23
**months (1)**
14:17
**More (5)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 182 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Anthony L. Linden -  Vol. I
September 12, 2017

15:2,19;25:2;33:12;
34:1
**Mossberg (4)**
19:12,20,21,22
**most (7)**
8:11;10:7,9;11:10;
16:5;22:24;34:18
**moved (1)**
14:15
**much (2)**
11:24;32:20
**myself (3)**
26:10,17;34:24

**N**

**name (7)**
4:11,12,19;31:19,
24;32:2,23
**named (1)**
32:21
**names (1)**
22:18
**National (2)**
27:15;33:6
**necessarily (2)**
13:6;15:18
**need (4)**
6:13,15;11:24;15:2
**New (2)**
14:16,18
**next (1)**
30:8
**nightstand (3)**
18:11,14;19:16
**Nikon (2)**
20:20;21:16
**nine (2)**
33:16;35:5
**noble (1)**
14:1
**nods (1)**
5:12
**noninfringement (1)**
13:22
**North (1)**
4:15
**Notary (1)**
4:6
**notice (7)**
28:24;29:2,4,11,22;
31:3,5
**NRA (4)**
9:16;11:18;27:18,
22
**number (3)**
22:24;33:17;35:6
**numerous (1)**
17:10

**O**

**oath (1)**

6:17
**Object (4)**
25:11,23;26:6,12
**objection (4)**
6:7,10;22:15,20
**objections (1)**
7:7
**objects (1)**
6:7
**obligated (2)**
5:7;6:20
**obligation (2)**
33:3,4
**obtain (1)**
8:11
**obviously (1)**
28:18
**off (1)**
29:9
**offer (1)**
25:16
**offering (1)**
11:1
**offhand (1)**
30:6
**officer (1)**
14:4
**Once (1)**
28:18
**one (19)**
4:19;10:19,24;13:2;
15:19;18:7,10,21;
19:10,11;20:2;22:10,
24;24:18;26:3;28:5,
22;29:5,10
**ones (2)**
15:22;16:4
**one-year (1)**
14:16
**Only (2)**
10:22;18:22
**operating (1)**
24:21
**opinion (4)**
12:18,23;13:12;
22:2
**opportunity (1)**
6:3
**organization (3)**
27:9,13;30:7
**organizations (1)**
31:15
**original (3)**
24:23;25:2;34:19
**others (1)**
28:7
**out (11)**
21:7,22;22:10;
23:11,15;28:15,17;
29:3;30:14;31:3;35:8
**over (2)**
6:1;15:24
**own (7)**

12:22;13:7;16:2,4,
17,23;33:22
**owned (3)**
13:2;35:8,10
**owner (2)**
23:6,6
**owners (1)**
23:12
**Owners' (5)**
27:1;28:23;29:3;
30:22;31:3

**P**

**page (2)**
29:9;31:9
**paid (2)**
8:16,24
**part (1)**
12:7
**participate (1)**
29:1
**particular (4)**
7:6;15:17;22:22;
23:18
**parts (8)**
13:1;20:8,15;21:6,
8,20,21;28:18
**party (1)**
32:16
**paying (1)**
33:5
**penalty (1)**
6:24
**people (5)**
9:14;11:20;26:1,17;
28:24
**perhaps (3)**
22:5;27:7;29:20
**period (3)**
14:16;27:5;29:21
**perjury (1)**
6:24
**permits (1)**
15:6
**permitted (1)**
15:13
**permitting (2)**
15:10,11
**person (3)**
12:2;26:23;32:19
**personal (2)**
12:18;13:15
**personally (1)**
13:8
**persuasion (1)**
13:5
**Pistol (6)**
9:19;10:4;16:10,21;
28:6,11
**pistols (1)**
18:15
**piston (1)**

24:6
**place (1)**
13:22
**places (1)**
29:5
**plaintiff (4)**
4:21;28:21,22;
29:15
**plaintiffs (2)**
31:4;32:9
**platform (4)**
20:22;22:23,24;
23:1
**plea (1)**
31:3
**pleasant (1)**
32:19
**please (2)**
4:11,13
**pm (3)**
35:13,14,18
**point (3)**
8:14;23:8;25:15
**Police (1)**
25:19
**popular (1)**
22:24
**PORTER (13)**
7:8,15;10:12;12:1;
19:6;22:15,20;25:11,
23;26:6,12,15;35:16
**portions (1)**
7:6
**possibility (1)**
28:21
**potential (1)**
32:9
**power (1)**
7:23
**practice (1)**
13:14
**prior (4)**
17:9,15;33:20,23
**private (4)**
8:24;30:9;31:17,21
**privileges (1)**
28:9
**probably (1)**
29:19
**process (3)**
5:6;8:12;9:1
**produced (1)**
30:13
**production (1)**
4:5
**programs (3)**
9:16,17;10:21
**proper (2)**
21:17,19
**protect (1)**
26:10
**protected (3)**
12:23;13:6;14:2

**protects (1)**
12:13,14,21
**provide (2)**
9:11,14
**provided (2)**
9:20;11:18
**provides (2)**
12:5;13:19
**providing (1)**
6:14
**Prysmian (1)**
7:22
**P-r-y-s-m-i-a-n (1)**
7:22
**Public (3)**
4:6;28:23;29:22
**pump (2)**
19:14,22
**purchase (1)**
13:7
**purchased (4)**
17:15;34:6,8,10
**purchasing (1)**
34:4
**purposes (4)**
12:15,22;13:12;
23:4
**pursuant (1)**
7:5
**put (4)**
20:8;29:2;31:3;
34:22
**puts (1)**
26:9

**Q**

**qualified (1)**
9:11
**Quality (1)**
8:3

**R**

**rail (2)**
21:17,19
**range (9)**
11:1,6,7,12;17:10,
18;23:3;28:10,12
**ranges (2)**
17:16,21
**read (1)**
7:12
**really (1)**
8:13
**reason (1)**
22:23
**reasonable (1)**
13:22
**recall (4)**
29:2,10;30:6;31:19
**received (6)**
30:5,6,21;31:5,6,9

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 183 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Anthony L. Linden - Vol. I
September 12, 2017

**receiver (10)**
20:11,13,14,16,23,
24;21:1,3,7,22
**receiving (1)**
31:11
**recent (1)**
16:5
**recently (2)**
16:18;34:1
**Recess (1)**
35:13
**recognize (1)**
30:18
**recollection (1)**
30:23
**record (3)**
4:13;7:4;34:5
**recreational (2)**
9:7;13:14
**refer (1)**
27:18
**refresh (1)**
30:23
**regard (1)**
9:21
**regular (2)**
15:10;29:6
**regularly (1)**
29:7
**regulations (1)**
13:21
**related (1)**
10:21
**relatives (2)**
17:11,17
**relevance (1)**
18:6
**relevant (1)**
8:20
**remember (5)**
29:4;31:11,18,19;
32:17
**reporter (2)**
5:11;6:2
**represent (1)**
32:10
**reproduction (1)**
25:3
**reproductions (3)**
24:15,19,20
**request (2)**
9:2;12:10
**requesting (1)**
29:23
**residing (1)**
4:15
**respect (1)**
15:14
**respond (4)**
5:8;29:11,17;31:2
**responded (2)**
29:24;31:14
**responding (1)**

30:24
**response (1)**
31:9
**responsibility (1)**
25:15
**responsible (1)**
12:9
**restricted (2)**
13:10;14:1
**restrictions (2)**
13:17,18
**rifle (9)**
10:5;19:22;21:17;
22:22;23:1;27:15;
28:6,11;33:6
**rifles (1)**
10:14
**right (9)**
6:18,21;12:9,14,21;
14:2;21:23;24:22;
30:2
**round (2)**
16:13,21
**rounds (1)**
33:12
**Ruger (2)**
16:19;24:2
**Rule (1)**
7:6
**rules (5)**
5:5;7:5;25:22;26:4,
11

**S**

**SA-20 (1)**
19:20
**safe (8)**
9:9;11:2;12:9;18:3,
5,17;19:8,15
**safes (4)**
18:10,21,23;19:1
**Safety (6)**
9:18;11:8,13;17:8,
12;25:14
**same (4)**
16:19,20;22:3,20
**satisfactorily (1)**
4:4
**saw (2)**
29:4,22
**scaled (1)**
9:15
**scope (5)**
20:19;21:16;23:10,
10;32:20
**Second (6)**
9:5;11:20;12:6,12,
20,24
**Seconds (1)**
30:1
**self-defense (6)**
18:8;25:4,9,22;

26:5,21
**semiautomatic (1)**
19:22
**semi-automatic (2)**
16:9;19:21
**September (1)**
29:19
**serve (1)**
29:23
**service (1)**
14:6
**services (1)**
9:12
**sessions (2)**
10:23;11:11
**setting (1)**
17:9
**settings (1)**
10:23
**Seven (1)**
16:1
**several (2)**
15:22;27:4
**shakes (1)**
5:12
**Shield (1)**
16:7
**shipped (1)**
8:5
**shooting (6)**
9:7;11:1,1;13:14;
28:9,12
**short (1)**
35:12
**shorter (2)**
23:9,9
**shortly (1)**
30:8
**shotgun (5)**
10:9,17;19:14,21,
23
**shotguns (1)**
10:15
**show (1)**
15:4
**shrugs (1)**
10:11
**side (1)**
14:11
**sign (1)**
7:12
**similar (1)**
29:1
**situation (1)**
26:19
**Six (4)**
8:1;28:2;33:16;
35:5
**size (1)**
16:12
**slightly (1)**
24:7
**Smith (2)**

16:7;23:19
**sociable (1)**
32:19
**sold (1)**
20:24
**someone (3)**
26:8;30:4;32:21
**sometime (1)**
29:19
**Sometimes (2)**
5:15;9:7
**son (1)**
10:24
**sorry (1)**
23:22
**sounds (1)**
32:4
**speaking (2)**
10:8;30:9
**specific (1)**
34:21
**Spell (1)**
32:23
**spelling (2)**
4:11;32:4
**spend (1)**
5:4
**spoke (1)**
32:5
**sporting (1)**
23:3
**stamping (1)**
34:18
**stand (1)**
9:5
**standard (1)**
25:18
**start (2)**
8:16;16:4
**state (5)**
4:11;13:3,20;25:18;
26:1
**stated (2)**
12:21;31:12
**states (4)**
13:16,20,23,24
**still (2)**
16:17,23
**stock (2)**
23:9,9
**store (1)**
17:23
**stored (2)**
18:13;19:18
**Street (1)**
4:15
**Subject (1)**
7:8
**summer (1)**
29:18
**Sure (7)**
4:14;19:6;31:6,13;
32:4;34:5,23

**Suzanne (1)**
31:24
**sworn (1)**
4:6

**T**

**talk (2)**
12:11;19:18
**talked (4)**
32:17,18,19;35:7
**talking (1)**
6:1
**target (1)**
13:14
**Taunton (1)**
28:6,11,12
**Technically (1)**
34:10
**Tegra (1)**
20:14
**ten (1)**
34:3
**testified (1)**
4:7
**thankful (1)**
12:4
**Thankfully (1)**
26:22
**Thanks (1)**
35:15
**third (1)**
32:16
**Thomas (1)**
32:21
**though (1)**
24:8
**three (3)**
18:10,23;29:5
**Thug (1)**
19:20
**times (2)**
17:10,12
**today (1)**
6:18
**together (2)**
20:8;31:15
**told (1)**
31:17
**took (1)**
34:22
**top (2)**
21:19;31:9
**total (2)**
18:24;28:19
**Traditionally (1)**
10:16
**training (12)**
9:16,20;10:20;
11:10,14;17:4,7;25:4,
7,17,19,20
**trainings (1)**
11:15

David Seth Worman, et al. vs.
Maura Healey, et al.

Anthony L. Linden -  Vol. I
September 12, 2017

**transcript (1)**
7:13
**transition (1)**
8:12
**tried (1)**
14:8
**trouble (1)**
34:24
**true (1)**
11:10
**truthfully (2)**
5:8;6:21
**trying (2)**
12:3;18:8
**Turkey (1)**
19:20
**two (12)**
9:15;13:1;16:13;
17:4,9;18:11,15,19,
21,23;19:1;34:13
**type (3)**
14:22;16:8;19:13
**types (1)**
23:14

## U

**unclear (1)**
5:19
**under (7)**
6:17,24;10:15;
12:23;16:15;18:13;
33:4
**underneath (2)**
18:11;19:15
**Understood (4)**
5:14,22;10:16;13:7
**unemployed (2)**
4:18;7:18
**unreasonably (1)**
14:1
**unrestricted (1)**
14:23
**up (2)**
8:13;27:7
**updates (1)**
29:6
**upon (2)**
9:2;12:10
**upper (4)**
20:16;21:10,11;
22:3
**Upstate (2)**
14:15,17
**use (12)**
7:6;11:15;12:15;
13:7,9,11,17;17:17;
25:9,20;26:5,10
**used (5)**
13:13;21:16,18,22;
23:2

## V

**varies (2)**
13:2,20
**variety (1)**
10:14
**various (2)**
10:15;18:9
**verbally (3)**
5:11,17;10:12
**verified (1)**
34:23
**verify (2)**
34:14,17
**Verifying (1)**
8:5
**versatility (1)**
23:1
**versed (1)**
22:5
**version (1)**
9:15
**versions (1)**
22:8
**versus (1)**
4:22
**vet (1)**
32:8
**view (1)**
12:12
**views (3)**
11:20,22;12:20
**violence (1)**
14:12
**visiting (1)**
17:16
**volunteer (1)**
8:19
**volunteers (1)**
29:23

## W

**wait (1)**
5:24
**way (3)**
10:19;26:8;31:7
**ways (1)**
34:20
**weapon (6)**
10:4;20:21,22;
21:23;28:15,18
**website (1)**
29:8
**Wesson (2)**
16:7;23:19
**what's (1)**
19:7
**Whereupon (1)**
35:17
**wherever (1)**
15:14

**whole (1)**
14:19
**wide (3)**
10:14;17:18;23:2
**wishes (1)**
12:11
**without (1)**
22:23
**witness (3)**
4:3;10:11;26:14
**woman (1)**
32:5
**wording (1)**
29:2
**work (5)**
5:6;8:10,17,19,22
**worked (1)**
32:7
**working (4)**
31:15,22;32:14,16
**Worman (1)**
4:22

## X

**XM-15 (1)**
23:17

## Y

**years (4)**
8:1;17:9;27:4;28:2
**York (2)**
14:16,18

## 1

**1 (2)**
30:16,18
**10 (1)**
33:12
**10th (1)**
7:20
**12-gauge (2)**
19:14,22
**15 (2)**
14:17;23:22
**195 (1)**
4:15
**1954 (1)**
19:12
**1994 (5)**
33:19,23;34:2,3,6

## 2

**2:55 (1)**
35:13
**2:56 (1)**
35:18
**2010 (1)**
14:16
**2015 (1)**

**27:7**
**2016 (1)**
27:7
**2017 (1)**
27:8
**20-gauge (1)**
19:20
**22 (1)**
19:21

## 3

**3:00 (1)**
35:14
**30 (1)**
7:6

## 5

**500 (4)**
19:12,22;23:19,21
**556 (1)**
24:2

## 6

**6/18/21 (1)**
15:5

## 7

**7 (2)**
16:13,21
**7/15/15 (1)**
15:5

## 9

**9 (1)**
16:7

# EXHIBIT 6

## TO KAPLAN DECLARATION

# In The Matter Of:

*David Seth Worman, et al. vs.*
*Maura Healey, et al.*

---

*Jason William Sawyer*
*Vol. I*
*September 13, 2017*

---



**DORIS O. WONG**
**ASSOCIATES, INC.**

COURT   REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File SAWYER_Jason.txt*
*Min-U-Script® with Word Index*

**Jason William Sawyer - Vol. I - September 13, 2017**

1

```
                          Volume I
                          Pages 1 to 36
                          Exhibits 1

              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
 DAVID SETH WORMAN, ANTHONY       :
 LINDEN, JASON WILLIAM SAWYER,    :
 NICHOLAS ANDREW FELD, PAUL       :
 NELSON CHAMBERLAIN, GUN          :
 OWNERS' ACTION LEAGUE, INC.,     :
 ON TARGET TRAINING, INC., AND    :
 OVERWATCH OUTPOST,               :
              Plaintiffs,         :
                                  :
         vs.                      :   Civil Action
                                  :   No. 17-10107-WGY
 MAURA HEALEY, in her official    :
 capacity as Attorney General     :
 of the Commonwealth of           :
 Massachusetts; DANIEL            :
 BENNETT, in his official         :
 capacity as the Secretary of     :
 the Executive Office of          :
 Public Safety and Security;      :
 and COLONEL RICHARD D.           :
 McKEON, in his official          :
 capacity as Superintendent of    :
 the Massachusetts State          :
 Police,                          :
              Defendants.         :
                                  :
- - - - - - - - - - - - - - - - -x

         DEPOSITION OF JASON WILLIAM SAWYER, a
witness called on behalf of the Defendants, taken
pursuant to the Federal Rules of Civil Procedure,
before Ken A. DiFraia, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Office of the
Attorney General, 100 Cambridge Street, Boston,
Massachusetts, on Wednesday, September 13, 2017,
commencing at 2:36 p.m.
```

**Doris O. Wong Associates, Inc.**

2

PRESENT:

    Bradley Arant Boult Cummings LLP
        (by James W. Porter, III, Esq., and Connor
        Blair, Esq.)
        One Federal Place, 1819 Fifth Avenue North,
        Birmingham, AL 35203-2119,
        jporter@bradley.com;
        cblair@bradley.com
        205.521.8285
        for the Plaintiffs.

    Campbell Campbell Edwards & Conroy, P.C.
        (by Christopher Howe, Esq.)
        One Constitution Plaza, Boston, MA 02129,
        chowe@campbell-trial-lawyers.com
        617.241.3029
        for the Plaintiff Gun Owners' Action
        League, Inc.

    Office of the Attorney General
        (by Elizabeth Kaplan, Assistant Attorney
        General; Gary Klein, Assistant Attorney
        General)
        One Ashburton Place, 18th Floor,
        Boston, MA 02108,
        Elizabeth.Kaplan@state.ma.us;
        Gary.Klein@state.ma.us
        617.963.2567
        for the Defendants.

                    * * * * *

**Jason William Sawyer - Vol. I - September 13, 2017**

3

1                    I N D E X

2

   WITNESS              DIRECT  CROSS   REDIRECT  RECROSS
3

4  JASON WILLIAM SAWYER

5   BY MS. KAPLAN            4

6

7
                      *  *  *  *
8
                   E X H I B I T S
9

   NO.                 DESCRIPTION              PAGE
10

   Exhibit 1    Copy of emails, including        23
11                emails between Jason Sawyer and
                  Suzanne McComas
12

13
                      *  *  *  *
14

15

16

17

18

19

20

21

22

23

24

Jason William Sawyer - Vol. I - September 13, 2017

4

```
 1                P R O C E E D I N G S
 2                JASON WILLIAM SAWYER
 3    a witness called for examination by counsel for the
 4    Defendants, having been satisfactorily identified by
 5    the production of his driver's license and being
 6    first duly sworn by the Notary Public, was examined
 7    and testified as follows:
 8                DIRECT EXAMINATION
 9        BY MS. KAPLAN:
10        Q.   Good afternoon, Mr. Sawyer.  I'm Elizabeth
11    Kaplan.  I'm one of the attorneys that represents
12    the Defendants in this case.
13             If you could please state your name for the
14    record.
15        A.   Jason Sawyer.
16        Q.   What is your home address?
17        A.   ███████████████████████.
18        Q.   Are you currently employed?
19        A.   Yes.
20        Q.   What is your business address?
21        A.   I work out of a home office.  We have an
22    office in Burlington, and an office in Cambridge
23    that are local that I use sometimes.
24        Q.   Let me back up for a second.  What is the
```

Jason William Sawyer - Vol. I - September 13, 2017

5

```
1   name of the business or employer you work for?

2       A.    VMware.

3       Q.    VMR?

4       A.    VMware.

5       Q.    Is there a specific address for VMware?

6       A.    The headquarters is in Palo Alto,

7   California.  We have offices all over the world.

8   The office I typically use is in Burlington.  It's

9   on Wall Street in Burlington.  I believe it's 1 Wall

10  Street in Burlington.

11      Q.    What is the rest of the address for the

12  Burlington address?

13      A.    1 Wall Street, Burlington, Massachusetts.

14  I'm not sure of the Zip code.

15      Q.    Have you ever been deposed before?

16      A.    No, I have not.

17      Q.    I'll just set forth some ground rules for

18  the deposition.

19          If a question is unclear, you can ask me to

20  clarify.  If you don't seek clarification and you

21  answer the question, I will assume that you

22  understood what I was asking, do you understand?

23      A.    Yes.

24      Q.    If you could please wait for me to finish
```

Jason William Sawyer - Vol. I - September 13, 2017

```
 1    asking the question before you try to answer, do you

 2    understand?

 3         A.   Yes.

 4         Q.   I need you to answer questions orally.  So

 5    if you nod your head or shake your head, the court

 6    reporter can't really take down that kind of gesture.

 7         A.   Okay.

 8         Q.   If your attorney objects, you can wait for

 9    him to finish the objection.  He may tell you at the

10    end of the objection whether or not you can proceed

11    to answer.  If he tells you to proceed to answer,

12    you can just answer the question, do you understand?

13         A.   Yes.

14         Q.   If you need to take a break at any time,

15    you can just ask.  However, I would ask that you

16    respond to the question if there's a question

17    pending before we take the break, do yo understand

18    that?

19         A.   Yes.

20         Q.   Do you understand that you are under oath

21    today and that you are obligated to answer each

22    question truthfully?

23         A.   Yes.

24         Q.   And that your testimony is under the
```

Doris O. Wong Associates, Inc.

Jason William Sawyer - Vol. I - September 13, 2017

```
 1   penalty of perjury?
 2       A.   Yes.
 3            MS. KAPLAN:   I would just like to confirm
 4   on the record that the deposition will be conducted
 5   pursuant to the Federal Rules of Civil Procedure,
 6   Rule 30.
 7            MR. PORTER:   Yes.
 8       Q.   You mentioned that you currently work for
 9   VMware.   What kind of business is that?
10       A.   Software.
11       Q.   Is it a company that creates software?
12       A.   Yes.
13       Q.   What is your role within the company?
14       A.   I'm a presales systems engineer.
15       Q.   Could you describe very briefly what that
16   is.
17       A.   Essentially I help customers that are
18   looking to buy our software understand how it works
19   technically and how it could potentially fit in
20   their business.
21       Q.   How long have you been employed at VMware?
22       A.   Originally I started at VMware in 2006.   I
23   left for a short period, about less than a year, in
24   about 2008.   So I've been back at VMware probably in
```

Jason William Sawyer - Vol. I - September 13, 2017

 1   late 2008 until now.

 2        Q.   Were you a systems engineer throughout that

 3   time?

 4        A.   No.   About three months ago, I was a

 5   technical account manager.   It's a very similar

 6   role, only on the post sales side.

 7        Q.   What did you do when you took that brief

 8   break from working at VMware?

 9        A.   I worked for a start-up called "Sonian."

10        Q.   What was your role at that start-up?

11        A.   I was director of support and renewals.

12        Q.   What does that mean?

13        A.   I was essentially in charge of helping

14   customers that had support issues.   I managed a

15   small team that responded to support questions.

16        Q.   Were you employed before 2006?

17        A.   Yes.

18        Q.   What did you do before 2006?

19        A.   I was also in the software business.   At

20   that point I was a solutions architect, which is

21   another consulting type role.

22        Q.   Can you briefly describe your educational

23   background.

24        A.   I went to Northeastern on the GI Bill.   I

Jason William Sawyer - Vol. I - September 13, 2017

9

1    have an associate's in Management Information

2    Systems from Northeastern.  I had some course work

3    towards my bachelor's, but I have not completed that

4    yet.

5        Q.   When did you attend Northeastern?

6        A.   After I got out of the Marine Corps.  It

7    would have been the early 2000s, like, 2001 to

8    probably 2004 or 2005.

9        Q.   So it sounds like you have military

10   service; is that right?

11       A.   Yes, ma'am.

12       Q.   Could you describe your military service.

13       A.   I did five years active duty in the Marine

14   Corps.  My job description was I believe technically

15   fire control systems technician.  Basically I fixed

16   radars.

17       Q.   Did you have additional military service or

18   was that it?  You said five years I think in the

19   Marine Corps, right?

20       A.   Five years active duty in the Marines.

21   When you sign a contract with the service, you

22   actually sign for eight years.  So the remainder of

23   that is a reserve component.

24       Q.   Are you still a reserve?

Jason William Sawyer - Vol. I - September 13, 2017

1      A.    No.

2      Q.    As part of your military service, did you

3  receive weapons training?

4      A.    Yes.

5      Q.    Could you describe the weapons training

6  that you received.

7      A.    Basic marksmanship training with rifles,

8  familiarity firing with all sorts of different crew

9  served weapons and things like that.

10         Then my primary role as a radar technician

11  was for the Hawk Missile System.  I worked on the

12  radars that were part of the Hawk Missile System.  I

13  was pretty familiar with the missile system.

14      Q.    Were you issued a weapon as part of your

15  military service?

16      A.    Yes.

17      Q.    What weapon were you issued?

18      A.    An M-16A2 was the primary.  At times I was

19  also issued a Beretta-M9.

20      Q.    Did you receive specific training on either

21  of those weapons?

22      A.    Yes.

23      Q.    Could you describe that briefly.  Or is

24  that the marksmanship training you already talked

Jason William Sawyer - Vol. I - September 13, 2017

1    about?

2        A.   Yes.  I mean, standard boot camp

3    marksmanship training, a two-week training evolution

4    in boot camp where you went through the whole rifle

5    training process from kind of start to finish.  In

6    addition to that, yearly qualifications, you know,

7    after boot camp.

8        Q.   Have you ever been tried for or convicted

9    of a crime?

10       A.   No.

11       Q.   Have you ever been involved on either side

12   of a domestic violence incident?

13       A.   No.

14       Q.   How long have you lived in Massachusetts?

15   Or do you live in Massachusetts?

16       A.   Yes.

17       Q.   How long have you lived in Massachusetts?

18       A.   Since approximately 2001 or 2002.

19       Q.   Where did you live prior to that?

20       A.   Salem, Massachusetts.

21       Q.   Sorry?

22       A.   Salem, Massachusetts.

23       Q.   Where did you live prior to 2001 or 2002?

24       A.   Briefly after I got out of the Marine

Jason William Sawyer - Vol. I - September 13, 2017

```
 1    Corps, I lived in New Hampshire with relatives until
 2    we could find a place.  Prior to that I was in the
 3    Marine Corps, mostly in Arizona, spent some time in
 4    Alabama.
 5         Q.   Do you currently have a gun license in
 6    Massachusetts?
 7         A.   I do.
 8         Q.   What type of license do you have?
 9         A.   Unrestricted license to carry, Category A,
10    if that's still a thing.
11         Q.   Who is the or what is the issuing authority
12    for your license?
13         A.   (No response)
14         Q.   What agency issued your license to you?
15         A.   ███████████.
16         Q.   Do you remember when you got your license?
17         A.   I renewed it once.  I know they are valid
18    for five years.  So seven to eight years ago.
19    That's an estimate.
20         Q.   Has that ever lapsed?
21         A.   No.
22         Q.   Have you ever been suspended or terminated
23    for any reason?
24         A.   No.
```

Doris O. Wong Associates, Inc.

Jason William Sawyer - Vol. I - September 13, 2017

 1       Q.   Have you had any problem with your license

 2    at all?

 3       A.   No, I have not.

 4       Q.   Have you ever held any other type of

 5    license related to guns?

 6       A.   I had at one point a New Hampshire

 7    nonresident license to carry.  That's expired.  I

 8    didn't renew it.  I don't know if it's considered a

 9    license technically, but for a while I had an

10    03 FFL, Federal firearms license.  I believe that's

11    currently expired as well.

12       Q.   Have you ever been licensed as a

13    manufacturer or seller of guns?

14       A.   No.

15       Q.   I know you talked a little bit about your

16    training in the military.  Have you received any

17    other training around the use of guns?

18       A.   Yes.

19       Q.   Can you describe that.

20       A.   I had various, you know, private training

21    courses, Sig Academy up in New Hampshire, various

22    others.  I went through the training to become an

23    NRA certified and Mass. State Police certified

24    instructor.  I've been to small arms firing school

Jason William Sawyer - Vol. I - September 13, 2017

14

```
 1    out of Camp Perry, which was a rifle kind of
 2    introductory training program.
 3           I can't think of any others off the top of
 4    my head.  I've been to quite a few training classing
 5    and things through the years.
 6      Q.   Were the trainings focused on shooting or
 7    marksmanship skills or on safety, or both?
 8           MR. PORTER:  Objection to form.
 9           MS. KAPLAN:  Sorry.
10           MR. PORTER:  That's okay.
11      Q.   I know you mentioned a group of trainings
12    just now.  Talking about, for example, the Sig
13    Academy, what kinds of topics were covered under
14    that?
15           MR. PORTER:  Go ahead.  You can answer the
16    question.
17      A.   Various.  So I did, like, an initial
18    training that was kind of focused more towards
19    safety that is a requirement to get a license in
20    Massachusetts.  In addition to that, later on I have
21    taken marksmanship courses of various types, you
22    know, in different disciplines and different types
23    of things.  To answer the question, it's both.
24      Q.   What about the training to become an NRA
```

**Jason William Sawyer - Vol. I - September 13, 2017**

```
 1   certified instructor, do you remember any of what
 2   that entailed?
 3        A.   Yes.  I mean, it covers essentially basic
 4   firearms handling, safety, things of that nature,
 5   things that essentially people need to be able to
 6   handle a firearm safely.
 7        Q.   The small arms firing course, what did that
 8   cover?
 9        A.   That is a program that essentially covers
10   basic marksmanship with a rifle.  They do a pistol
11   version too.  I did the rifle version.  It primarily
12   focused towards folks that are competitive shooters
13   or who want to be competitive shooters.
14        Q.   Are you yourself a competitive shooter?
15        A.   Yes.
16        Q.   Can you describe your competitive shooting
17   activities.
18        A.   I participate in various competitive
19   shooting activities.  Primarily I'm focused on what
20   we call "Across the Course High Power," which is
21   essentially rifle, traditional rifle position type
22   shooting.
23        Q.   Are these competitions?
24        A.   Yes.
```

**Jason William Sawyer - Vol. I - September 13, 2017**

1      Q.    Who organizes them?

2      A.    A few different organizations do.

3   Primarily the Civilian Marksmanship Program of the

4   NRA, National Rifle Association.  Local clubs also

5   organize competitive shooting events.

6      Q.    You said you are an NRA certified

7   instructor.  Have you actually given courses as a

8   firearms instructor?

9      A.    Not as a primary.  I have assisted other

10  instructors.

11     Q.    In what types of courses have you assisted

12  other instructors?

13     A.    Basic firearms safety.  I have also done --

14  one of my gun clubs did an introduction to action

15  style shooting.  I was involved with that as a

16  safety person.

17     Q.    Going back to the basic firearms safety,

18  what are some of the topics covered in that course?

19     A.    Proper care and handling of various types

20  of firearms, familiarity with how firearms work,

21  different types of actions, that sort of thing, you

22  know, safe storage recommendations.  I mean, there's

23  a whole gambit of different things that are involved.

24     Q.    Who offered those courses?

Jason William Sawyer - Vol. I - September 13, 2017

1      A.    So the individual instructors who are

2    certified by the NRA to be certification counselors,

3    I believe they are called, provide those.  They are

4    private people, but they are certified by the NRA.

5      Q.    Was self-defense a topic under any of those

6    courses that you assisted as a trainer?

7      A.    Not that I can recall specifically.  It was

8    really more about firearms safety.

9      Q.    Do you have any specific training in the

10   use of firearms for self-defense?

11     A.    Yes.

12     Q.    Could you describe that.

13     A.    The training I got in the Marine Corps was,

14   you know, certainly related to defense,

15   self-defense, defense of units, things like that.

16     Q.    Was that training offered in a combat type

17   scenario?

18     A.    I'm not sure I understand the question.

19     Q.    Were you offered that training as someone

20   who might be required to defend himself in the

21   context of combat?

22     A.    Yes.  Specifically the Marine Corps

23   training, yes.

24     Q.    Have you had any other training about

Jason William Sawyer - Vol. I - September 13, 2017

1    self-defense?

2         A.    I don't recall any specific training

3    focusing on self-defense specifically.  Most of the

4    training I've been involved with has been around

5    competitive shooting of some sort.  I don't remember

6    doing anything that was specifically designed

7    towards self-defense, no.

8         Q.    Are you familiar with an organization

9    called "Gun Owners' Action League"?

10        A.    Yes.

11        Q.    If I refer to that organization as "GOAL,"

12   will you under what I mean?

13        A.    Yes.

14        Q.    Are you a member of GOAL?

15        A.    Yes.

16        Q.    Are you familiar with an organization known

17   as Comm2A?

18        A.    Yes.

19        Q.    Are you a member of Comm2A?

20        A.    I have been a member.  I'm not sure if I'm

21   currently a member.

22        Q.    Are you familiar with the National Rifle

23   Association?

24        A.    Yes.

Jason William Sawyer - Vol. I - September 13, 2017

1      Q.    The acronym "NRA," do you understand that

2   to mean the National Rifle Association?

3      A.    Yes.

4      Q.    Are you a member of the NRA?

5      A.    Yes.

6      Q.    Are you a member of any other gun clubs?

7      A.    Yes.

8      Q.    Can you describe the other clubs that you

9   are a member of.

10      A.    Currently I'm a member of ████████████

███████████████████████████████████████████████

██  ███████.

13      Q.    Have you ever worked for a gun dealer?

14      A.    No.

15      Q.    Or sold guns in any capacity?

16      A.    I participated in some private sales, but

17   not as in the business of selling guns, no.

18      Q.    Have you ever worked for a gun manufacturer?

19      A.    No.

20      Q.    Have you ever been employed by GOAL?

21      A.    No.

22      Q.    Have you ever been employed by Comm2A?

23      A.    No.

24      Q.    Have you been employed by the NRA?

Jason William Sawyer - Vol. I - September 13, 2017

1     A.    No.

2     Q.    Have you ever volunteered for any of those

3  three organizations?

4     A.    Yes.

5     Q.    In what capacity?

6     A.    I volunteered to help Comm2A with some

7  technical stuff, website maintenance type stuff.

8     Q.    Is that all, or have you volunteered in

9  other capacities?

10     A.    I'm just trying to think.  I don't think

11  I've -- well, I volunteered to help GOAL count

12  ballots one year for their annual elections.  I

13  can't think of any other volunteer activities I have

14  done with any of those organizations.

15     Q.    Do you post on line in any on-line forums

16  about gun ownership?

17     A.    Sometimes.

18     Q.    In what forums?

19     A.    There's a few.  Northeast Shooters is a

20  sort of local forum that I post on.  There's a forum

21  called "National Match" that is kind of focused more

22  on rifle competitive shooting that I post on

23  occasionally.  I'm a member of different forums,

24  Cast Boolits, that kind of is focused around, you

Jason William Sawyer - Vol. I - September 13, 2017

1    know, reloading.  There's various other forums I'm

2    sure I've been involved in over the years.  The

3    primary ones would be Northeast Shooters and

4    National Match.

5         Q.   Have you ever posted specifically on GOAL's

6    social media accounts to your knowledge?

7         A.   I have replied to things that they posted

8    on, things like Facebook and things like that, if

9    that's what you mean.

10        Q.   Have you ever expressed any opinions about

11   this case in those forums?

12        A.   Yes.

13        Q.   Could you describe the opinions you

14   expressed.

15        A.   You know, confusion, just confusion as to

16   how the law or how the enforcement action applies,

17   you know, just questions, things likes that, trying

18   to figure out what it means.

19        Q.   Did you ever try to contact the Attorney

20   General's Office regarding your confusion?

21        A.   I don't think so.

22        Q.   Have you expressed any opinions on line

23   about any of the defendants in this case?

24        A.   Probably interpreted it, yes, I suppose.

Jason William Sawyer - Vol. I - September 13, 2017

1       Q.   Could you describe those opinions.

2       A.   I'm sure I expressed an opinion that the

3   enforcement action is overbroad.  That's really

4   pretty much it.

5       Q.   How did you first hear about this case?

6       A.   I believe it was Comm2A that reached out to

7   me.  You know, I had done some volunteer work for

8   them at some point.  They either were asking for

9   people or they had reached out to me.  I can't

10  remember specifically.  It was through Comm2A

11  originally, though.

12      Q.   Were you personally invited to participate

13  as a plaintiff?

14      A.   My recollection is that they asked for

15  volunteers, and I responded to that request to

16  volunteer.  Then they followed some sort of process

17  to figure out, you know, who was going to be

18  involved and invited me to be involved at that

19  point.

20      Q.   Am I correct in understanding that when you

21  say "they asked me," you are talking about Comm2A;

22  is that right?

23      A.   Yes, Comm2A.

24      Q.   Have you ever participated in any other

Jason William Sawyer - Vol. I - September 13, 2017

1    case as a party?

2        A.    No.

3        Q.    Are you compensating your lawyers in this

4    lawsuit?

5        A.    No.

6        Q.    Do you know who is compensating your lawyers?

7        A.    I mean, I know that there are multiple

8    organizations involved, including the NRA and GOAL

9    and Comm2A.  I'm not sure how they divvy that all up

10   in the back end.  I assume one of them is footing

11   the bill.  I believe the NRA is, but I don't know

12   for sure.

13       Q.    Are you familiar with someone named "Susan

14   McComas".

15       A.    I don't think so.

16       Q.    Or Suzanne McComas?

17       A.    Could you expand on that or provide some

18   context of some sort.

19                   (Document marked as Sawyer

20                   Exhibit 1 for identification)

21       Q.    You've been handed what was marked as

22   Exhibit 1.  Take a moment to review that.  Take as

23   long as you need to become familiar with it.

24       A.    (Examines document)  Yes.  I remember now.

Jason William Sawyer - Vol. I - September 13, 2017

1    I never met her personally but --

2              MR. PORTER:  Well, she did not ask you a

3    question.

4         Q.   Is this an email?

5         A.   Yes.

6         Q.   Is this an email exchange or a series of

7    emails?

8         A.   Yes.

9         Q.   Who are the emails between?

10        A.   Myself and Suzanne McComas.

11        Q.   Do you recall receiving these emails?

12        A.   Yes.

13        Q.   Did you know when you received these emails

14   who Suzanne McComas was working with?

15        A.   Am I allowed to...

16        Q.   Yes.  Feel free to review the document.

17             MR. PORTER:  You can peruse through.

18        A.   Yes.  So as I mentioned before, I had a

19   dialogue with Comm2A about potentially being

20   involved.  Suzanne McComas was the person who

21   initially contacted me about potentially being in

22   the action or suit, whatever you want to call it.

23        Q.   Did she identify herself as being involved

24   with any particular organization?

Jason William Sawyer - Vol. I - September 13, 2017

1     A.   I don't know.  I don't think so.  I don't

2  remember.

3     Q.   Are you familiar with someone named "Thomas

4  Bolioli"?

5     A.   Yes.

6     Q.   Do you know him personally?

7     A.   We've met.  I know him personally but not

8  well.  I mean, I have met him.

9     Q.   Do you know if he works with a particular

10  organization?

11     A.   He works -- well, he's involved in Comm2A.

12  I don't know what the relationship is between them.

13     Q.   Is that the context through which you know

14  him, as someone that's involved with Comm2A?

15     A.   I think I met him originally on Northeast

16  Shooters.  Yes, primarily the context would be

17  through Comm2A.

18     Q.   On I believe Page 3 of this Exhibit 1, is

19  this also an email exchange?

20     A.   Yes.

21     Q.   Who is this email exchange between?

22     A.   Between me and Thomas Bolioli.

23     Q.   Do you remember this email exchange?

24     A.   Yes.

26



Jason William Sawyer - Vol. I - September 13, 2017



Jason William Sawyer - Vol. I - September 13, 2017



Jason William Sawyer - Vol. I - September 13, 2017



**Jason William Sawyer - Vol. I - September 13, 2017**



30

19      Q.   Have you ever had to use a gun in

20   self-defense?

21      A.   No.

22      Q.   Have you ever fired a gun at another person?

23      A.   No.

24      Q.   In your own words, could you tell me why

Jason William Sawyer - Vol. I - September 13, 2017

 1    you are participating in this lawsuit.

 2        A.    As a competitive shooter, the platform fire

 3    that we use most often ████████████.  I am

 4    participating in the lawsuit to protect my ability

 5    ████████████████████  in the context of competitive

 6    shooting.

 7        Q.    What is your understanding of what the

 8    Second Amendment protects?

 9        A.    The right to keep and bear arms.

10        Q.    For everyone?

11        A.    I'm not sure I understand the question.

12        Q.    Does everyone have the right to keep and

13    bear arms, or every citizen?

14        A.    Excluding citizens who are, you know,

15    guilty of felonies and things like that, yes.

16        Q.    Do all citizens that meet that criteria

17    have the right to purchase any gun of any kind?

18        A.    Could you clarify if you are asking do they

19    or should they.  Are you asking for an opinion?

20        Q.    Do you believe they have that right under

21    the Constitution?

22        A.    I believe they should have that right under

23    the Constitution.

24        Q.    What about military type guns?

Jason William Sawyer - Vol. I - September 13, 2017

1          MR. PORTER:  Object to the form of the

2     question.  You can answer if you know the answer.

3          A.    Can you specify.

4          Q.    Do you believe citizens should be allowed

5     to have military type guns?

6          MR. PORTER:  Same objection.

7          A.    Can you specify what you mean by military

8     style guns.  I dont' understand what you mean.

9          Q.    From your military service, you are

10    familiar with at least some of the weapons used in

11    the military?

12         A.    Yes.

13         Q.    Do you believe citizens under the

14    Constitution should have the right to have those

15    kinds of weapons for nonmilitary use?

16         MR. PORTER:  Objection to form.  You can

17    answer if you understand what she's asking.

18         A.    I don't understand.  I'm sorry.  Could you

19    repeat or clarify.

20         MS. KAPLAN:  That's all the questions we

21    have.

22         MR. PORTER:  No questions.

23              (Whereupon the deposition

24              was concluded at 3:17 p.m.)

**Doris O. Wong Associates, Inc.**

33

1                    C E R T I F I C A T E

2        I, JASON WILLIAM SAWYER, do hereby certify that

3    I have read the foregoing transcript of my

4    testimony, and further certify under the pains and

5    penalties of perjury that said transcript

6    (with/without) suggested corrections is a true and

7    accurate record of said testimony.

8            Dated at _____, this _____ day of _____,

9    2017.

10

11                        _____

12

13

14

15

16

17

18

19

20

21

22

23

24

Jason William Sawyer - Vol. I - September 13, 2017

34

1                    SUGGESTED CORRECTIONS

2  RE:  David Seth Worman, et al., vs. Maura Healey,
        et al.
3
   WITNESS:  Jason William Sawyer, Vol. I
4
   The above-named witness wishes to make the following
5  changes to the testimony as originally given:

6  PAGE   LINE      SHOULD READ              REASON

7  _____  _____  _____  _____

8  _____  _____  _____  _____

9  _____  _____  _____  _____

10 _____  _____  _____  _____

11 _____  _____  _____  _____

12 _____  _____  _____  _____

13 _____  _____  _____  _____

14 _____  _____  _____  _____

15 _____  _____  _____  _____

16 _____  _____  _____  _____

17 _____  _____  _____  _____

18 _____  _____  _____  _____

19 _____  _____  _____  _____

20 _____  _____  _____  _____

21 _____  _____  _____  _____

22 _____  _____  _____  _____

23 _____  _____  _____  _____

24 _____  _____  _____  _____

```
 1   COMMONWEALTH OF MASSACHUSETTS)

 2   SUFFOLK, SS.                 )

 3       I, Ken A. DiFraia, RPR and Notary Public in and

 4   for the Commonwealth of Massachusetts, do hereby

 5   certify that there came before me on the 13th day of

 6   September, 2017, at 2:36 p.m., the person

 7   hereinbefore named, who was by me duly sworn to

 8   testify to the truth and nothing but the truth of

 9   his knowledge touching and concerning the matters in

10   controversy in this cause; that he was thereupon

11   examined upon his oath, and his examination reduced

12   to typewriting under my direction; and that the

13   deposition is a true record of the testimony given

14   by the witness.

15       I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 27th day of

21   September, 2017.

22

23

24
```

Jason William Sawyer - Vol. I - September 13, 2017

36

1        Under Federal Rule 30:

2              X   Reading and Signing was requested

3                  Reading and Signing was waived

4                  Reading and Signing was not requested

5

6        *Ken A. DiFrara*

7

8   Notary Public

9   Commission expires 2/24/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

D I S C L A I M E R

This transcript in any format is a confidential communication between Doris O. Wong Associates, Inc., a professional court reporting firm, and the parties to this matter and their counsel.  Any reproduction or distribution of this transcript without the express permission of the parties is a violation of this confidentiality.  To fulfill any request to the court reporter for an additional copy or copies from persons or entities without standing in this matter will require the consent of the parties and/or counsel and/or a court order for such delivery.

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 224 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Jason William Sawyer -  Vol. I
September 13, 2017

# A

**ability (1)**
31:4
**able (1)**
15:5
**Academy (2)**
13:21;14:13
**access (1)**
30:4
**accessible (1)**
30:2
**account (1)**
8:5
**accounts (1)**
21:6
**acronym (1)**
19:1
**Across (1)**
15:20
**action (5)**
16:14;18:9;21:16;
22:3;24:22
**actions (1)**
16:21
**active (2)**
9:13,20
**activities (3)**
15:17,19;20:13
**actually (3)**
9:22;16:7;28:24
**addition (2)**
11:6;14:20
**additional (1)**
9:17
**address (5)**
4:16,20;5:5,11,12
**afternoon (1)**
4:10
**agency (1)**
12:14
**ago (2)**
8:4;12:18
**ahead (1)**
14:15
**AK-47s (1)**
28:12
**Alabama (1)**
12:4
**allowed (2)**
24:15;32:4
**Alto (1)**
5:6
**Amendment (1)**
31:8
**annual (1)**
20:12
**anymore (1)**
27:15
**applies (1)**
21:16
**approximately (2)**

11:18;26:19
**AR-15 (3)**
27:21;28:14;31:3
**AR-15s (10)**
26:15,15,17;27:9;
28:9,22;29:3,7,20;
31:5
**architect (1)**
8:20
**Arizona (1)**
12:3
**arms (4)**
13:24;15:7;31:9,13
**around (3)**
13:17;18:4;20:24
**ARs (1)**
27:12
**assisted (3)**
16:9,11;17:6
**associate's (1)**
9:1
**Association (3)**
16:4;18:23;19:2
**assume (2)**
5:21;23:10
**attend (1)**
9:5
**attorney (2)**
6:8;21:19
**attorneys (1)**
4:11
**authority (1)**
12:11

# B

**bachelor's (1)**
9:3
**back (5)**
4:24;7:24;16:17;
23:10;28:24
**background (1)**
8:23
**ballots (1)**
20:12
**Basic (5)**
10:7;15:3,10;16:13,
17
**Basically (3)**
9:15;27:13,20
**bear (2)**
31:9,13
**become (3)**
13:22;14:24;23:23
**bedroom (2)**
28:21;30:1
**Beretta-M9 (1)**
10:19
**Bill (2)**
8:24;23:11
**bit (1)**
13:15
**Bolioli (2)**

25:4,22
**Boolits (1)**
20:24
**boot (3)**
11:2,4,7
**both (2)**
14:7,23
**brand (1)**
28:8
**break (4)**
6:14,17;8:8;27:5
**brief (1)**
8:7
**briefly (4)**
7:15;8:22;10:23;
11:24
**broadly (2)**
26:14;28:11
**build (1)**
27:16
**built (1)**
27:12
**Burlington (6)**
4:22;5:8,9,10,12,13
**business (7)**
4:20;5:1;7:9,20;
8:19;19:17;27:15
**buy (2)**
7:18;27:18

# C

**California (1)**
5:7
**call (2)**
15:20;24:22
**called (6)**
4:3;8:9;17:3;18:9;
20:21;27:14
**Cambridge (1)**
4:22
**camp (4)**
11:2,4,7;14:1
**can (20)**
5:19;6:8,10,12,15;
8:22;13:19;14:15;
15:16;17:7;19:8;
24:17;26:5,11;27:5;
29:12;32:2,3,7,16
**capacities (1)**
20:9
**capacity (2)**
19:15;20:5
**care (1)**
16:19
**carry (2)**
12:9;13:7
**case (5)**
4:12;21:11,23;22:5;
23:1
**Cast (1)**
20:24
**Category (1)**

12:9
**certainly (1)**
17:14
**certification (1)**
17:2
**certified (6)**
13:23,23;15:1;16:6;
17:2,4
**charge (1)**
8:13
**citizen (1)**
31:13
**citizens (3)**
31:14,16;32:4,13
**Civil (1)**
7:5
**Civilian (1)**
16:3
**clarification (1)**
5:20
**clarify (4)**
5:20;30:14;31:18;
32:19
**classing (1)**
14:4
**Club (2)**
19:11,12
**clubs (3)**
16:4,14;19:6,8
**code (1)**
5:14
**collection (1)**
29:8
**combat (2)**
17:16,21
**Comm2A (13)**
18:17,19;19:22;
20:6;22:6,10,21,23;
23:9;24:19;25:11,14,
17
**companies (1)**
28:5
**company (4)**
7:11,13;27:14;28:3
**compensating (2)**
23:3,6
**competitions (1)**
15:23
**competitive (13)**
15:12,13,14,16,18;
16:5;18:5;20:22;26:7,
8;28:15;31:2,5
**completed (1)**
9:3
**component (1)**
9:23
**concluded (1)**
32:24
**conducted (1)**
7:4
**confirm (1)**
7:3
**confusion (3)**

21:15,15,20
**considered (1)**
13:8
**Constitution (3)**
31:21,23;32:14
**consulting (1)**
8:21
**contact (2)**
21:19
**contacted (1)**
24:21
**context (5)**
17:21;23:18;25:13,
16;31:5
**contract (1)**
9:21
**control (1)**
9:15
**convicted (1)**
11:8
**Corps (7)**
9:6,14,19;12:1,3;
17:13,22
**counsel (1)**
4:3
**counselors (1)**
17:2
**count (1)**
20:11
**couple (1)**
27:13
**course (4)**
9:2;15:7,20;16:18
**courses (6)**
13:21;14:21;16:7,
11,24;17:6
**court (1)**
6:5
**cover (1)**
15:8
**covered (2)**
14:13;16:18
**covers (2)**
15:3,9
**creates (1)**
7:11
**crew (1)**
10:8
**crime (1)**
11:9
**criteria (1)**
31:16
**currently (8)**
4:18;7:8;12:5;
13:11;18:21;19:10;
26:1;30:5
**customers (2)**
7:17;8:14

# D

**dealer (1)**
19:13

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 225 of 1262

David Seth Worman, et al. vs.                                    Jason William Sawyer -  Vol. I
Maura Healey, et al.                                                          September 13, 2017

**dealers (1)**
30:15

**defend (1)**
17:20

**Defendants (3)**
4:4,12;21:23

**defense (2)**
17:14,15

**Delaware (2)**
27:14;28:7

**depends (1)**
27:24

**deposed (1)**
5:15

**deposition (3)**
5:18;7:4;32:23

**describe (11)**
7:15;8:22;9:12;
10:5,23;13:19;15:16;
17:12;19:8;21:13;
22:1

**description (1)**
9:14

**designed (3)**
18:6;30:2,4

**dialogue (1)**
24:19

**different (7)**
10:8;14:22,22;16:2,
21,23;20:23

**DIRECT (1)**
4:8

**director (1)**
8:11

**disciplines (1)**
14:22

**divvy (1)**
23:9

**Document (3)**
23:19,24;24:16

**domestic (1)**
11:12

**done (3)**
16:13;20:14;22:7

**dont' (1)**
32:8

**down (1)**
6:6

**driver's (1)**
4:5

**duly (1)**
4:6

**duty (2)**
9:13,20

**E**

**earlier (1)**
29:20

**early (1)**
9:7

**educational (1)**
8:22

**eight (4)**
9:22;12:18;26:18;
28:10

**either (3)**
10:20;11:11;22:8

**elections (1)**
20:12

**Elizabeth (1)**
4:10

**email (5)**
24:4,6;25:19,21,23

**emails (4)**
24:7,9,11,13

**employed (6)**
4:18;7:21;8:16;
19:20,22,24

**employer (1)**
5:1

**end (2)**
6:10;23:10

**enforcement (1)**
21:16;22:3

**engineer (2)**
7:14;8:2

**entailed (1)**
15:2

**Essentially (6)**
7:17;8:13;15:3,5,9,
21

**estimate (1)**
12:19

**events (1)**
16:5

**everyone (2)**
31:10,12

**evolution (1)**
11:3

**examination (2)**
4:3,8

**examined (1)**
4:6

**Examines (1)**
23:24

**example (1)**
14:12

**exchange (4)**
24:6;25:19,21,23

**Excluding (1)**
31:14

**Exhibit (3)**
23:20,22;25:18

**expand (1)**
23:17

**expired (2)**
13:7,11

**expressed (4)**
21:10,14,22;22:2

**F**

**Facebook (1)**
21:8

**familiar (8)**

10:13;18:8,16,22;
23:13,23;25:3;32:10

**familiarity (2)**
10:8;16:20

**Federal (2)**
7:5;13:10

**Feel (1)**
24:16

**felonies (1)**
31:15

**few (3)**
14:4;16:2;20:19

**FFL (1)**
13:10

**figure (2)**
21:18;22:17

**find (1)**
12:2

**finish (3)**
5:24;6:9;11:5

**fire (2)**
9:15;31:2

**firearm (1)**
15:6

**firearms (10)**
13:10;15:4;16:8,13,
17,20,20;17:8,10;29:8

**fired (1)**
30:22

**firing (3)**
10:8;13:24;15:7

**first (3)**
4:6;22:5;26:9

**fit (1)**
7:19

**five (6)**
9:13,18,20;12:18;
29:10;30:12

**fixed (1)**
9:15

**focused (6)**
14:6,18;15:12,19;
20:21,24

**focusing (1)**
18:3

**folks (1)**
15:12

**followed (1)**
22:16

**follows (1)**
4:7

**footing (1)**
23:10

**form (3)**
14:8;32:1,16

**forth (1)**
5:17

**forum (2)**
20:20,20

**forums (5)**
20:15,18,23;21:1,
11

**four (1)**

30:12

**free (1)**
24:16

**G**

**gambit (1)**
16:23

**general (1)**
28:1

**generally (1)**
28:14

**General's (1)**
21:20

**generic (1)**
27:13

**gesture (1)**
6:6

**GI (1)**
8:24

**given (1)**
16:7

**GOAL (5)**
18:11,14;19:20;
20:11;23:8

**GOAL's (1)**
21:5

**Good (2)**
4:10;26:15

**Gould (1)**
4:17

**Granby (1)**
19:11

**ground (1)**
5:17

**group (1)**
14:11

**guilty (1)**
31:15

**gun (11)**
12:5;16:14;18:9;
19:6,11,13,18;20:16;
30:19,22;31:17

**guns (17)**
13:5,13,17;19:15,
17;26:1,3;28:22;29:3,
5,15;30:3,6,9;31:24;
32:5,8

**H**

**Hampshire (3)**
12:1;13:6,21

**handed (1)**
23:21

**handle (1)**
15:6

**handling (2)**
15:4;16:19

**Hawk (2)**
10:11,12

**head (3)**
6:5,5;14:4

**headquarters (1)**
5:6

**hear (1)**
22:5

**held (1)**
13:4

**help (3)**
7:17;20:6,11

**helping (1)**
8:13

**herself (1)**
24:23

**High (1)**
15:20

**himself (1)**
17:20

**home (2)**
4:16,21

**house (2)**
28:19,20

**I**

**identification (1)**
23:20

**identified (1)**
4:4

**identify (1)**
24:23

**incident (1)**
11:12

**including (1)**
23:8

**individual (1)**
17:1

**Information (1)**
9:1

**initial (1)**
14:17

**initially (1)**
24:21

**instructor (4)**
13:24;15:1;16:7,8

**instructors (3)**
16:10,12;17:1

**interchangeable (2)**
27:20,21

**interpreted (1)**
21:24

**introduction (1)**
16:14

**introductory (1)**
14:2

**invited (2)**
22:12,18

**involved (12)**
11:11;16:15,23;
18:4;21:2;22:18,18;
23:8;24:20,23;25:11,
14

**issued (4)**
10:14,17,19;12:14

**issues (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 226 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Jason William Sawyer -   Vol. I
September 13, 2017

8:14
**issuing (1)**
  12:11

## J

**JASON (2)**
  4:2,15
**job (1)**
  9:14
**July (1)**
  27:3

## K

**KAPLAN (7)**
  4:9,11;7:3;14:9;
  27:5,7;32:20
**keep (4)**
  28:16;30:3;31:9,12
**kept (7)**
  29:1,15,17,18,19,
  22;30:6
**kind (9)**
  6:6;7:9;11:5;14:1,
  18;20:21,24;29:5;
  31:17
**kinds (2)**
  14:13;32:15
**knowledge (1)**
  21:6
**known (1)**
  18:16

## L

**lapsed (1)**
  12:20
**last (1)**
  30:9
**late (1)**
  8:1
**later (1)**
  14:20
**law (1)**
  21:16
**lawsuit (3)**
  23:4;31:1,4
**lawyers (2)**
  23:3,6
**League (1)**
  18:9
**least (1)**
  32:10
**left (1)**
  7:23
**less (1)**
  7:23
**license (13)**
  4:5;12:5,8,9,12,14,
  16;13:1,5,7,9,10;
  14:19
**licensed (3)**

13:12;26:22;30:15
**likes (1)**
  21:17
**line (2)**
  20:15;21:22
**little (1)**
  13:15
**live (3)**
  11:15,19,23
**lived (3)**
  11:14,17;12:1
**loaded (1)**
  30:6
**local (3)**
  4:23;16:4;20:20
**located (2)**
  28:18;29:24
**locked (1)**
  29:1
**long (4)**
  7:21;11:14,17;
  23:23
**looking (1)**
  7:18

## M

**M-16A2 (1)**
  10:18
**ma'am (1)**
  9:11
**Machinery (2)**
  27:14;28:7
**maintenance (1)**
  20:7
**makes (2)**
  26:13;27:8
**managed (1)**
  8:14
**Management (1)**
  9:1
**manager (1)**
  8:5
**manufactured (1)**
  28:2
**manufacturer (2)**
  13:13;19:18
**many (5)**
  26:17;29:9,11,13;
  30:11
**Marine (5)**
  9:6,13,19;11:24;
  12:3;17:13,22
**Marines (1)**
  9:20
**marked (2)**
  23:19,21
**marksmanship (8)**
  10:7,24;11:3;14:7,
  21;15:10;16:3;28:15
**Mass (2)**
  4:17;13:23
**Massachusetts (9)**

5:13;11:14,15,17,
  20,22;12:6;14:20;
  30:17
**Match (2)**
  20:21;21:4
**may (1)**
  6:9
**McComas (5)**
  23:14,16;24:10,14,
  20
**mean (12)**
  8:12;11:2;15:3;
  16:22;18:12;19:2;
  21:9;23:7;25:8;26:21;
  32:7,8
**means (1)**
  21:18
**media (1)**
  21:6
**meet (1)**
  31:16
**Melrose (2)**
  4:17;12:15
**member (9)**
  18:14,19,20,21;
  19:4,6,9,10;20:23
**mentioned (6)**
  7:8;14:11;24:18;
  28:10;29:16,20
**met (4)**
  24:1;25:7,8,15
**might (1)**
  17:20
**military (11)**
  9:9,12,17;10:2,15;
  13:16;31:24;32:5,7,9,
  11
**Missile (3)**
  10:11,12,13
**model (2)**
  26:12;27:11
**models (2)**
  26:14;27:8
**moment (1)**
  23:22
**months (1)**
  8:4
**more (3)**
  14:18;17:8;20:21
**Most (3)**
  18:3;27:12;31:3
**mostly (1)**
  12:3
**much (1)**
  22:4
**multiple (1)**
  23:7
**Myself (1)**
  24:10
**Mystic (1)**
  19:11

## N

**name (2)**
  4:13;5:1
**named (2)**
  23:13;25:3
**names (1)**
  28:8
**National (5)**
  16:4;18:22;19:2;
  20:21;21:4
**nature (1)**
  15:4
**need (4)**
  6:4,14;15:5;23:23
**New (3)**
  12:1;13:6,21
**nod (1)**
  6:5
**nonmilitary (1)**
  32:15
**nonresident (1)**
  13:7
**Northeast (3)**
  20:19;21:3;25:15
**Northeastern (3)**
  8:24;9:2,5
**Notary (1)**
  4:6
**NRA (11)**
  13:23;14:24;16:4,6;
  17:2,4;19:1,4,24;23:8,
  11

## O

**oath (1)**
  6:20
**Object (1)**
  32:1
**objection (5)**
  6:9,10;14:8;32:6,16
**objects (1)**
  6:8
**obligated (1)**
  6:21
**occasionally (1)**
  20:23
**off (1)**
  14:3
**offered (3)**
  16:24;17:16,19
**office (5)**
  4:21,22,22;5:8;
  21:20
**offices (1)**
  5:7
**often (1)**
  31:3
**once (1)**
  12:17
**one (10)**

4:11;13:6;16:14;
  20:12;23:10;26:5,5,
  23;27:10,22
**ones (1)**
  21:3
**on-line (1)**
  20:15
**only (1)**
  8:6
**opinion (2)**
  22:2;31:19
**opinions (4)**
  21:10,13,22;22:1
**orally (1)**
  6:4
**organization (5)**
  18:8,11,16;24:24;
  25:10
**organizations (4)**
  16:2;20:3,14;23:8
**organize (1)**
  16:5
**organizes (1)**
  16:1
**Originally (3)**
  7:22;22:11;25:15
**others (3)**
  13:22;14:3;29:22
**out (9)**
  4:21;9:6;11:24;
  14:1;21:18;22:6,9,17;
  27:23
**over (4)**
  5:7;21:2;26:21,23
**overbroad (1)**
  22:3
**own (10)**
  26:1,3,12,17;27:9;
  28:2,12;29:9,11;
  30:24
**Owners' (1)**
  18:9
**ownership (1)**
  20:16

## P

**Page (1)**
  25:18
**Palo (1)**
  5:6
**part (5)**
  10:2,14,14;27:24;
  28:20
**participate (2)**
  15:18;22:12
**participated (2)**
  19:16;22:24
**participating (2)**
  31:1,4
**particular (2)**
  24:24;25:9
**parts (4)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 227 of 1262

David Seth Worman, et al. vs.                                    Jason William Sawyer -  Vol. I
Maura Healey, et al.                                                        September 13, 2017

27:18,20,22,23
**party (1)**
    23:1
**penalty (1)**
    7:1
**pending (1)**
    6:17
**people (3)**
    15:5;17:4;22:9
**period (1)**
    7:23
**perjury (1)**
    7:1
**Perry (1)**
    14:1
**person (5)**
    16:16;24:20;30:13,
    13,22
**personally (4)**
    22:12;24:1;25:6,7
**peruse (1)**
    24:17
**pistol (1)**
    15:10
**pistols (5)**
    26:4,8;29:6,9;30:5
**place (1)**
    12:2
**plaintiff (1)**
    22:13
**platform (2)**
    27:21;31:2
**please (2)**
    4:13;5:24
**pm (3)**
    27:6,7;32:24
**point (4)**
    8:20;13:6;22:8,19
**Police (2)**
    12:15;13:23
**PORTER (10)**
    7:7;14:8,10,15;
    24:2,17;32:1,6,16,22
**portion (1)**
    26:16
**position (1)**
    15:21
**post (4)**
    8:6;20:15,20,22
**posted (2)**
    21:5,7
**potentially (3)**
    7:19;24:19,21
**Power (1)**
    15:20
**presales (1)**
    7:14
**pretty (2)**
    10:13;22:4
**previously (1)**
    28:6
**primarily (5)**
    15:11,19;16:3;

25:16;26:6
**primary (4)**
    10:10,18;16:9;21:3
**prior (3)**
    11:19,23;12:2
**private (4)**
    13:20;17:4;19:16;
    30:15
**probably (6)**
    7:24;9:8;21:24;
    26:18;29:10;30:12
**problem (1)**
    13:1
**Procedure (1)**
    7:5
**proceed (2)**
    6:10,11
**process (2)**
    11:5;22:16
**production (1)**
    4:5
**program (3)**
    14:2;15:9;16:3
**Proper (1)**
    16:19
**protect (1)**
    31:4
**protects (1)**
    31:8
**provide (2)**
    17:3;23:17
**Public (1)**
    4:6
**purchase (1)**
    31:17
**purchased (3)**
    26:20,24;27:2
**pursuant (1)**
    7:5

**Q**

**qualifications (1)**
    11:6
**quick (1)**
    27:5;30:4
**quickly (1)**
    30:2
**quite (1)**
    14:4

**R**

**radar (1)**
    10:10
**radars (2)**
    9:16;10:12
**reached (2)**
    22:6,9
**Reading (1)**
    19:10
**really (3)**
    6:6;17:8;22:3

**reason (1)**
    12:23
**recall (7)**
    17:7;18:2;24:11;
    26:11,19;27:8;28:5
**receive (2)**
    10:3,20
**received (3)**
    10:6;13:16;24:13
**receivers (1)**
    27:13
**receiving (1)**
    24:11
**Recess (1)**
    27:6
**recognize (1)**
    28:9
**recollection (1)**
    22:14
**recommendations (1)**
    16:22
**record (2)**
    4:14;7:4
**refer (2)**
    18:11;26:14
**regarding (1)**
    21:20
**related (2)**
    13:5;17:14
**relationship (1)**
    25:12
**relatives (1)**
    12:1
**reloading (1)**
    21:1
**remainder (1)**
    9:22
**remember (12)**
    12:16;15:1;18:5;
    22:10;23:24;25:2,23;
    26:6,13;27:11;28:7;
    29:12
**renew (1)**
    13:8
**renewals (1)**
    8:11
**renewed (1)**
    12:17
**repeat (1)**
    32:19
**replied (1)**
    21:7
**reporter (1)**
    6:6
**represents (1)**
    4:11
**request (1)**
    22:15
**required (1)**
    17:20
**requirement (1)**
    14:19
**reserve (2)**

9:23,24
**respond (1)**
    6:16
**responded (2)**
    8:15;22:15
**response (1)**
    12:13
**rest (1)**
    5:11
**review (2)**
    23:22;24:16
**Revolver (2)**
    19:11;30:5
**revolvers (2)**
    29:6,11
**rifle (12)**
    11:4;14:1;15:10,11,
    21,21;16:4;18:22;
    19:2,10,11;20:22
**rifles (7)**
    10:7;26:4,7,9,12,
    15;29:7
**right (9)**
    9:10,19;22:22;31:9,
    12,17,20,22;32:14
**role (2)**
    7:13;8:6,10,21;
    10:10
**Rule (1)**
    7:6
**rules (2)**
    5:17;7:5

**S**

**safe (10)**
    16:22;28:17,18;
    29:1,15,17,18,19;
    30:1,3
**safely (1)**
    15:6
**safes (2)**
    29:22,24
**safety (7)**
    14:7,19;15:4;16:13,
    16,17;17:8
**Salem (2)**
    11:20,22
**sales (5)**
    8:6;19:16;30:13,16,
    17
**same (2)**
    29:17;32:6
**satisfactorily (1)**
    4:4
**SAWYER (4)**
    4:2,10,15;23:19
**scenario (1)**
    17:17
**school (1)**
    13:24
**second (3)**
    4:24;28:24;31:8

**seek (1)**
    5:20
**self-defense (7)**
    17:5,10,15;18:1,3,
    7;30:20
**seller (1)**
    13:13
**selling (1)**
    19:17
**series (1)**
    24:6
**served (1)**
    10:9
**service (7)**
    9:10,12,17,21;10:2,
    15;32:9
**set (1)**
    5:17
**seven (1)**
    12:18
**shake (1)**
    6:5
**shooter (2)**
    15:14;31:2
**shooters (5)**
    15:12,13;20:19;
    21:3;25:16
**shooting (11)**
    14:6;15:16,19,22;
    16:5,15;18:5;20:22;
    26:7,8;31:6
**short (1)**
    7:23
**shotguns (4)**
    26:4,8;29:7,13
**side (2)**
    8:6;11:11
**Sig (2)**
    13:21;14:12
**sign (2)**
    9:21,22
**similar (1)**
    8:5
**six (3)**
    26:18;28:10;29:10
**skills (1)**
    14:7
**small (3)**
    8:15;13:24;15:7
**Smith (2)**
    27:10;28:3
**social (1)**
    21:6
**Software (4)**
    7:10,11,18;8:19
**sold (3)**
    19:15;30:8,14
**solutions (1)**
    8:20
**someone (4)**
    17:19;23:13;25:3,
    14
**sometimes (2)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 228 of 1262

David Seth Worman, et al. vs.                                    Jason William Sawyer -   Vol. I
Maura Healey, et al.                                             September 13, 2017

4:23;20:17
**Sonian (1)**
 8:9
**Sorry (3)**
 11:21;14:9;32:18
**sort (5)**
 16:21;18:5;20:20;
 22:16;23:18
**sorts (1)**
 10:8
**sounds (1)**
 9:9
**speaking (1)**
 28:11
**specific (6)**
 5:5;10:20;17:9;
 18:2;26:13;28:7
**specifically (9)**
 17:7,22;18:3,6;
 21:5;22:10;26:6,22;
 27:24
**specify (2)**
 32:3,7
**spent (1)**
 12:3
**standard (1)**
 11:2
**start (1)**
 11:5
**started (1)**
 7:22
**start-up (2)**
 8:9,10
**state (3)**
 4:13;13:23;26:11
**still (2)**
 9:24;12:10
**storage (1)**
 16:22
**Street (4)**
 4:17;5:9,10,13
**stuff (2)**
 20:7,7
**style (2)**
 16:15;32:8
**suit (1)**
 24:22
**support (3)**
 8:11,14,15
**suppose (1)**
 21:24
**sure (10)**
 5:14;17:18;18:20;
 21:2;22:2;23:9,12;
 26:10;28:1;31:11
**Susan (1)**
 23:13
**suspended (1)**
 12:22
**Suzanne (4)**
 23:16;24:10,14,20
**switch (1)**
 27:22

**sworn (1)**
 4:6
**System (3)**
 10:11,12,13
**systems (4)**
 7:14;8:2;9:2,15

**T**

**talk (1)**
 26:9
**talked (2)**
 10:24;13:15
**Talking (3)**
 14:12;22:21;28:1
**team (1)**
 8:15
**technical (2)**
 8:5;20:7
**technically (3)**
 7:19;9:14;13:9
**technician (2)**
 9:15;10:10
**tells (1)**
 6:11
**ten (1)**
 30:9
**terminated (1)**
 12:22
**testified (1)**
 4:7
**testimony (1)**
 6:24
**Thomas (2)**
 25:3,22
**though (1)**
 22:11
**three (4)**
 8:4;20:3;29:12,14
**throughout (1)**
 8:2
**times (3)**
 10:18;30:11,12
**today (1)**
 6:21
**took (1)**
 8:7
**top (1)**
 14:3
**topic (1)**
 17:5
**topics (2)**
 14:13;16:18
**towards (4)**
 9:3;14:18;15:12;
 18:7
**traditional (1)**
 15:21
**trainer (1)**
 17:6
**training (24)**
 10:3,5,7,20,24;11:3,
 3,5;13:16,17,20,22;

14:2,4,18,24;17:9,13,
 16,19,23,24;18:2,4
**trainings (2)**
 14:6,11
**transferred (1)**
 30:8
**tried (1)**
 11:8
**truthfully (1)**
 6:22
**try (2)**
 6:1;21:19
**trying (2)**
 20:10;21:17
**two (2)**
 26:23;30:5
**two-week (1)**
 11:3
**type (8)**
 8:21;12:8;13:4;
 15:21;17:16;20:7;
 31:24;32:5
**types (5)**
 14:21,22;16:11,19,
 21
**typically (1)**
 5:8

**U**

**unclear (1)**
 5:19
**under (8)**
 6:20,24;14:13;17:5;
 18:12;31:20,22;32:13
**understood (1)**
 5:22
**units (1)**
 17:15
**Unrestricted (1)**
 12:9
**up (3)**
 4:24;13:21;23:9
**use (11)**
 4:23;5:8;13:17;
 17:10;26:7;27:11;
 28:14;30:19;31:3,5;
 32:15
**used (1)**
 32:10

**V**

**valid (1)**
 12:17
**Valley (1)**
 19:11
**various (8)**
 13:20,21;14:17,21;
 15:18;16:19;21:1;
 26:4
**version (2)**
 15:11,11

**violence (1)**
 11:12
**VMR (1)**
 5:3
**VMware (8)**
 5:2,4,5;7:9,21,22,
 24;8:8
**volunteer (3)**
 20:13;22:7,16
**volunteered (4)**
 20:2,6,8,11
**volunteers (1)**
 22:15

**W**

**wait (2)**
 5:24;6:8
**Wall (3)**
 5:9,9,13
**weapon (2)**
 10:14,17
**weapons (7)**
 10:3,5,9,21;26:20;
 32:10,15
**website (1)**
 20:7
**Wesson (2)**
 27:10;28:3
**Whereupon (1)**
 32:23
**whole (2)**
 11:4;16:23
**WILLIAM (1)**
 4:2
**within (3)**
 7:13;27:21;30:17
**witness (1)**
 4:3
**words (1)**
 30:24
**work (6)**
 4:21;5:1;7:8;9:2;
 16:20;22:7
**worked (4)**
 8:9;10:11;19:13,18
**working (2)**
 8:8;24:14
**works (3)**
 7:18;25:9,11
**world (1)**
 5:7

**Y**

**year (2)**
 7:23;20:12
**yearly (1)**
 11:6
**years (11)**
 9:13,18,20,22;
 12:18,18;14:5;21:2;
 26:21,23;30:9

**yo (1)**
 6:17

**Z**

**Zip (1)**
 5:14

**0**

**03 (1)**
 13:10

**1**

**1 (5)**
 5:9,13;23:20,22;
 25:18
**1998 (1)**
 26:24

**2**

**20 (1)**
 27:3
**2000s (1)**
 9:7
**2001 (3)**
 9:7;11:18,23
**2002 (2)**
 11:18,23
**2004 (1)**
 9:8
**2005 (1)**
 9:8
**2006 (3)**
 7:22;8:16,18
**2008 (2)**
 7:24;8:1
**2016 (1)**
 27:3

**3**

**3 (1)**
 25:18
**3:05 (1)**
 27:6
**3:10 (1)**
 27:7
**3:17 (1)**
 32:24
**30 (1)**
 7:6

**5**

**51 (1)**
 4:17

# EXHIBIT 7

## TO KAPLAN DECLARATION

# In The Matter Of:

*David Seth Worman, et al. vs.*
*Maura Healey, et al.*

---

*Paul Nelson Chamberlain*
*Vol. I*
*September 14, 2017*

---



**DORIS O. WONG**
**ASSOCIATES, INC.**

COURT   REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File CHAMBERLAIN_Paul.txt*
*Min-U-Script® with Word Index*

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

1

```
                          Volume I
                          Pages 1 to 33
                          Exhibits 1 to 2

              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
 DAVID SETH WORMAN, ANTHONY       :
 LINDEN, JASON WILLIAM SAWYER,    :
 NICHOLAS ANDREW FELD, PAUL       :
 NELSON CHAMBERLAIN, GUN          :
 OWNERS' ACTION LEAGUE, INC.,     :
 ON TARGET TRAINING, INC., AND    :
 OVERWATCH OUTPOST,               :
               Plaintiffs,        :
                                  :
          vs.                     :   Civil Action
                                  :   No. 17-10107-WGY
 MAURA HEALEY, in her official    :
 capacity as Attorney General     :
 of the Commonwealth of           :
 Massachusetts; DANIEL            :
 BENNETT, in his official         :
 capacity as the Secretary of     :
 the Executive Office of          :
 Public Safety and Security;      :
 and COLONEL RICHARD D.           :
 McKEON, in his official          :
 capacity as Superintendent of    :
 the Massachusetts State          :
 Police,                          :
               Defendants.        :
                                  :
- - - - - - - - - - - - - - - - -x
```

         DEPOSITION OF PAUL NELSON CHAMBERLAIN, a
witness called on behalf of the Defendants, taken
pursuant to the Federal Rules of Civil Procedure,
before Ken A. DiFraia, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Office of the
Attorney General, 100 Cambridge Street, Boston,
Massachusetts, on Thursday, September 14, 2017,
commencing at 2:45 p.m.

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

PRESENT:

    Bradley Arant Boult Cummings LLP
        (by James W. Porter, III, Esq., and Connor
        Blair, Esq.)
        One Federal Place, 1819 Fifth Avenue North,
        Birmingham, AL 35203-2119,
        jporter@bradley.com;
        cblair@bradley.com
        205.521.8285
        for the Plaintiffs.

    Campbell Campbell Edwards & Conroy, P.C.
        (by Christopher Howe, Esq.)
        One Constitution Plaza, Boston, MA 02129,
        chowe@campbell-trial-lawyers.com
        617.241.3029
        for the Plaintiff Gun Owners' Action
        League, Inc.

    Office of the Attorney General
        (by Elizabeth Kaplan, Assistant Attorney
        General; Julia Kobick, Assistant
        Attorney General)
        One Ashburton Place, 18th Floor,
        Boston, MA 02108,
        Elizabeth.Kaplan@state.ma.us;
        Julia.Kobick@state.ma.us
        617.963.2567
        for the Defendants.

                  * * * * *

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

3

1                          I N D E X

2

   WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

3

4  PAUL NELSON CHAMBERLAIN

5   BY MS. KAPLAN            4

6

7

8                        *  *  *  *

                        E X H I B I T S

9

   NO.                    DESCRIPTION              PAGE

10

   Exhibit 1    Copy of document entitled         13
11              "Basic Firearms Instructor
               Course, Patrol Rifle"
12

   Exhibit 2    Copy of email exchange between     20
13              Paul Chamberlain and Thomas
               Bolioli
14

15

                        *  *  *  *
16

17

18

19

20

21

22

23

24

**Doris O. Wong Associates, Inc.**

4

```
 1                 P R O C E E D I N G S
 2                 PAUL NELSON CHAMBERLAIN
 3      a witness called for examination by counsel for the
 4      Defendants, having been satisfactorily identified by
 5      the production of his driver's license and being
 6      first duly sworn by the Notary Public, was examined
 7      and testified as follows:
 8                      DIRECT EXAMINATION
 9        BY MS. KAPLAN:
10        Q.   Hi, Mr. Chamberlain.  I'm Elizabeth Kaplan.
11      I'm an Assistant Attorney General, and I'm one of
12      the lawyers representing the Defendants in this
13      case.
14                 Could you please state your name and your
15      home address for the record.
16        A.   Paul Nelson Chamberlain, ████████████████
        ████████████████████████████.
18        Q.   Are you currently employed?
19        A.   I am.
20        Q.   Could you state your business address for
21      the record.
22        A.   25 Forbes Boulevard, Unit 1, Foxborough,
23      Massachusetts 02035.
24        Q.   Where are you employed?  What is the name
```

Paul Nelson Chamberlain - Vol. I - September 14, 2017

5

1    of the business?

2        A.    American Electrical Testing Company.

3        Q.    Have you ever been deposed before?

4        A.    I have.

5        Q.    Can you describe the circumstances in which

6    you were deposed.

7        A.    It was for an employee that was terminated

8    due to extenuating circumstances.

9        Q.    Was it a civil lawsuit to your knowledge?

10       A.    I don't recall.

11       Q.    But were you deposed as a fact witness in a

12   dispute?

13       A.    Again, I don't recall.  It was for my

14   company.  I was just doing what I had to do.  It was

15   many years ago.

16       Q.    Approximately when was it, if you recall?

17       A.    Seven years ago.

18       Q.    Is that the only time you were deposed

19   before?

20       A.    That's the only time.

21       Q.    For purposes of this deposition, I'll go

22   over some ground rules.

23            MS. KAPLAN:  First I would like to get on

24   the record that the entire deposition will be

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

6

1    conducted pursuant to the Federal Rule of Civil

2    Procedure 30?

3              MR. PORTER:  Plaintiffs agree.

4        Q.    If I ask you a question, Mr. Chamberlain,

5    that is unclear, you should ask me to clarify.  Do

6    you understand that?

7        A.    I understand.

8        Q.    If you don't seek clarification and you

9    answer the question, I will assume that you

10   understood.  Does that make sense?

11       A.    Yes, it does.

12       Q.    Please wait for a question to be completed.

13   Do you understand?

14       A.    I do.

15       Q.    You must answer orally.  The reporter

16   cannot take down, for example, nods of the head or

17   other gestures.  I would ask that you either speak,

18   yes or no, or otherwise answer the question.  Do you

19   understand?

20       A.    I understand.

21       Q.    If your attorney objects, you can wait for

22   him to tell you whether or not to answer the

23   question.  If he tells you to go ahead and answer

24   the question, please do so.  Do you understand?

Paul Nelson Chamberlain - Vol. I - September 14, 2017

7

```
 1        A.    I understand.

 2        Q.    Do you understand that you are under oath

 3   and that you are obligated to answer each question

 4   truthfully?

 5        A.    I do.

 6        Q.    And that your testimony is under the

 7   penalty of perjury, do you understand that?

 8        A.    I understand.

 9        Q.    Remind me of the place where you are

10   employed.

11        A.    American Electrical Testing Company.

12        Q.    What is your position there?

13        A.    I'm the safety manager.

14        Q.    And just briefly speaking, what does that

15   entail?

16        A.    Understanding OSHA and EPA rules and

17   regulations and interpreting them for the company.

18        Q.    How long have you been employed there?

19        A.    Let's see, spring of 2009.  That would be

20   eight years.  It's a lot longer than I thought it

21   was.

22        Q.    Were you employed previously somewhere

23   else?

24        A.    I was.
```

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

8

```
 1        Q.    Where were you employed before that?

 2        A.    I was employed at Allied Waste Industries.

 3        Q.    What was the first word?

 4        A.    Allied.

 5        Q.    Okay, Allied Waste Industries.  What was

 6   your position there?

 7        A.    Safety manager.

 8        Q.    How long were you at that position?

 9        A.    Approximately five years.

10        Q.    Were you employed prior to that?

11        A.    I was.

12        Q.    What was your employment previous to that?

13        A.    Boston Sand and Gravel Company.

14        Q.    Was that also as a safety manager?

15        A.    Yes, it was.

16        Q.    For how long were you employed there?

17        A.    A little over four years.

18        Q.    Did you have employment previous to the

19   Boston Sand and Gravel Company?

20        A.    Yes, I did.

21        Q.    Was all of your previous employment in the

22   nature of safety management?

23        A.    For the most part, yes.

24        Q.    Was there anything else that you did?
```

Paul Nelson Chamberlain - Vol. I - September 14, 2017

9

1      A.   I was a sample technician for Roy F. Weston

2  for a short period of time.  I ran the yard at

3  Boston Sand and Gravel for a short period of time.

4  There were other roles sometimes mixed in.  My

5  official role was almost always safety manager.

6      Q.   And what briefly is your educational

7  background?

8      A.   Starting from?

9      Q.   From high school.

10      A.   I went to high school at Old Rochester

11  Regional High School, located in Mattapoisett.  From

12  there I went to Massachusetts Maritime Academy,

13  graduated from there with a bachelor's of science in

14  Marine Safety Environmental Protection.

15      Q.   Did you have further education after your

16  bachelor's degree?

17      A.   Various certificates related to my

18  professional career, but that's about it.

19      Q.   Have you ever been employed as a law

20  enforcement officer?

21      A.   I have not.

22      Q.   Do you have any military service?

23      A.   No, I don't.

24      Q.   Have you ever been tried for or convicted

Paul Nelson Chamberlain - Vol. I - September 14, 2017

1   of a crime?

2        A.    No.

3        Q.    Have you ever been involved on either side

4   of a domestic violence incident?

5        A.    No.

6        Q.    Have you lived in Massachusetts your whole

7   life?

8        A.    No.

9        Q.    How long have you lived in Massachusetts?

10       A.    For all but two years.  That's the best way

11  to answer that.  From '98 until 2002, I lived in New

12  Hampshire.  No, not '98 to 2002.  It was '98 to 2000

13  I lived in New Hampshire, two years.

14       Q.    Otherwise, you lived in Massachusetts?

15       A.    Correct.

16       Q.    Do you currently hold a gun license?

17       A.    I do.

18       Q.    What specific license do you hold?

19       A.    License to carry, Class A.

20       Q.    What entity issued you your license to

21  carry?

22       A.    ███████████████████████.

23       Q.    Is your license current?

24       A.    It is.

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

```
 1        Q.    Do you know when it was issued to you?

 2        A.    June of last year.

 3        Q.    Was that a recertification or a reissue or

 4   was this the first time that you had a license to

 5   carry?

 6        A.    I've had other licenses to carry in the

 7   past.

 8        Q.    From other towns?

 9        A.    That's correct.

10        Q.    What towns have you had a license to carry

11   from?

12        A.    I had a license to carry from ███████████

     ██████████████, my hometown where I grew up.  I also

14   had a license to carry -- well, it's not called that

15   technically -- in ████████████████████.  It is

16   a pistol and revolver permit in New Hampshire.

17        Q.    Could you estimate how long in total you

18   have had a license to carry of some sort.

19        A.    All told, six years.

20        Q.    Have you ever had a license suspended or

21   terminated for some reason?

22        A.    No.

23        Q.    Have you ever had any other type of license

24   related to guns other than the one you mentioned in
```

Paul Nelson Chamberlain - Vol. I - September 14, 2017

1    New Hampshire?

2         A.    No.

3         Q.    Have you ever held a seller's license, for

4    instance?

5         A.    No, I have not.

6         Q.    Have you had any safety training related to

7    the use of firearms?

8         A.    I have.

9         Q.    Could you describe the training that you

10   have had.

11        A.    I took the Massachusetts state-approved

12   Basic Pistol Course -- don't quote me on the exact

13   name -- in order to get my license to carry this

14   past year in 2016, and prior to that I had the

15   Hunter's Safety Education Course.

16        Q.    Who offered the Massachusetts state-

17   approved course that you took?

18        A.    I don't remember his name.  I'm sorry.

19        Q.    Do you happen to know the company or

20   organization that was offering the course?

21        A.    I don't recall offhand.  I've got it all in

22   my files.  I've got a horrible memory at times.

23        Q.    Do you know who offered the Hunter's Safety

24   Course?

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

 1      A.   That was back when I was 18 years old.  I
 2   don't recall.
 3      Q.   Have you had any other training related to
 4   the use of guns besides these two courses?
 5      A.   With the Boy Scouts.  I guess that would
 6   count.
 7      Q.   What kind of training did you get with the
 8   Boy Scouts?
 9      A.   It was basic rifle marksmanship at the Boy
10   Scouts camp.  That was a very long time ago.
11      Q.   Did any of the training that you did
12   include information about the use of guns in
13   self-defense?
14      A.   In self-defense, not specifically, no.
15      Q.   Have you ever been a trainer for other
16   people regarding the use of guns?
17      A.   I have not.
18                  (Document marked as Chamberlain
19                  Exhibit 1 for identification)
20      Q.   You can take a moment to look at that
21   document.  See if you recognize it.  Look up when
22   you are ready for a question.
23              MR. HOWE:  Did we identify the document for
24   the record?

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

14

1          MR. PORTER:  Not yet.  Just to clarify, how

2     in-depth did you want him to review it?

3          Q.   It's too long.  Clearly you don't have to

4     read the whole thing.  I can represent to you that

5     this was provided to the defendants as part of the

6     documents that the plaintiffs provided and that it

7     was indicated as having come from you.  If you could

8     just take a look at it and tell me if you recognize

9     it.

10         A.   I do.

11         Q.   What is this document?

12         A.   Basic Firearms Instructor Course Patrol

13    Rifle.  It's available on the web.

14         Q.   You obtained it from a website?

15         A.   I did.

16         Q.   Have you ever taken this course?

17         A.   I have not taken this course.

18         Q.   But it's just a document you had in your

19    possession; is that right?

20         A.   If you call Google my possession.  I guess

21    it's in everyone's.

22         Q.   Did you save a copy?

23         A.   I have a copy of it, yes.

24         Q.   Why did you access this document on the web?

Paul Nelson Chamberlain - Vol. I - September 14, 2017

15

 1      A.    It was in discussion with my lawyers about

 2   a certain topic.

 3      Q.    Without telling me the substance of the

 4   conversation between you and your lawyers, is there

 5   anything more that you can tell me about why you

 6   decided to access the document and save a copy of

 7   it?

 8      A.    It's just something I was aware of and had

 9   pointed it out.  That was it.

10      Q.    Are you familiar with an organization

11   called "Gun Owners' Action League"?

12      A.    I am.

13      Q.    If I refer to that organization as "GOAL,"

14   will you know what I'm talking about?

15      A.    I will.

16      Q.    Are you a member of GOAL?

17      A.    I am.

18      Q.    Are you familiar with an organization known

19   as "Comm2A"?

20      A.    I am.

21      Q.    Are you a member of Comm2A?

22      A.    I don't think you are a per say member of

23   Comm2A.

24      Q.    Are you familiar with the National Rifle

Paul Nelson Chamberlain - Vol. I - September 14, 2017

16

1    Association?

2         A.    I am.

3         Q.    If I refer to it as "NRA," will you know

4    what I'm referring to?

5         A.    I will.

6         Q.    Are you a member of the NRA?

7         A.    I am.

8         Q.    Are you a member of a gun club?

9         A.    Yes, I am.

10        Q.    What gun club are you a member of?

11        A.    ███████████████████████.

12        Q.    Are you a member of any other organization

13   that has anything to do with guns?

14        A.    No.

15        Q.    Have you ever worked for a gun dealer?

16        A.    I have not.

17        Q.    Have you ever worked for a gun

18   manufacturer?

19        A.    I have not.

20        Q.    Have you ever been employed by -- I think I

21   know the answer to this.  Have ever been employed by

22   GOAL, Comm2A or the NRA?

23        A.    No.

24        Q.    Do you participate in any activities

```
 1    organized by GOAL?

 2         A.    I have, yes.

 3         Q.    What kinds of activities?

 4         A.    They held a raffle at -- I mean, it's not

 5    organized by GOAL per se I guess.  They will --

 6    like, a gun salesperson from some gun shop will have

 7    a sale or something.  GOAL will be present there

 8    raffling things off.  As far as organized events by

 9    GOAL, not really an organized event, but they are

10    there.

11         Q.    Did you participate in the raffle?

12         A.    I did.

13         Q.    Have you ever participated in any

14    activities organized by Comm2A?

15         A.    Not that I am aware of.

16         Q.    What about activities organized by the NRA?

17         A.    Again, not that I'm aware of.

18         Q.    Do you receive information from any of

19    these organizations?

20         A.    I do.

21         Q.    In what form?

22         A.    Email typically.

23         Q.    Are you on email lists, for example?

24         A.    Yes, I am.
```

Paul Nelson Chamberlain - Vol. I - September 14, 2017

1      Q.    Do you donate money to these organizations?

2      A.    I do.

3      Q.    Are you active on social media?

4      A.    Yes, I am.

5      Q.    What sites are you active on?

6      A.    Northeast Shooters, Twitter, Facebook.

7      Q.    Do you have accounts with each of those

8   sites?

9      A.    Yes, I do.

10      Q.    Have you posted opinions about gun

11   ownership on those sites?

12      A.    Yes, I have.

13      Q.    On all three of those sites?

14      A.    Probably.  I believe so.

15      Q.    At Northeast Shooters, have you posted

16   anything -- well, are you familiar with the Attorney

17   General's Notice of Enforcement that issued on

18   July 20, 2016?

19      A.    I am.

20      Q.    Did you post anything on the Northeast

21   Shooters website about that notice?

22      A.    Not that I recall.

23      Q.    How about on Twitter?

24      A.    Not that I recall.

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

1      Q.    Did you post anything on Facebook?

2      A.    No.  I don't post that much on Facebook.

3      Q.    Have you expressed any opinions about this

4   particular lawsuit in any of those forums?

5      A.    No.

6      Q.    How did you hear about this case?

7      A.    In an email that was sent out by I believe

8   GOAL looking for potential plaintiffs.

9      Q.    Did you receive that email through a GOAL

10  list serve?

11     A.    It was a blanket email to members.

12     Q.    Did you respond to that email?

13     A.    I did.

14     Q.    Do you recall having any email exchanges

15  with specific individuals about participating as a

16  plaintiff in this case?

17     A.    I don't recall who at GOAL it was.

18     Q.    Are you familiar with a person named

19  "Thomas Bolioli"?

20     A.    Yes, I am.  Actually, I believe that's who

21  I spoke with, now that you say that name.

22     Q.    Do you know what organization he's

23  connected with?

24     A.    I don't recall whether it's GOAL or Comm2A.

Paul Nelson Chamberlain - Vol. I - September 14, 2017

1    I'm sorry.

2                    (Document marked as Chamberlain

3                    Exhibit 2 for identification)

4        A.   (Examines document)  Comm2A, there you go.

5             MR. PORTER:  Wait for a question.

6        Q.   If you could take a moment and review this

7    document.  Do you recognize this document?

8        A.   I do.

9        Q.   What is it?

10       A.   It's the original request for plaintiffs.

11       Q.   Is it an email exchange?

12       A.   It is.

13       Q.   Who is it between?

14       A.   Myself and Thomas Bolioli.

15       Q.   Does this refresh your recollection at all

16   as to Thomas Bolioli's affiliation?

17       A.   It does.

18       Q.   What organization is he affiliated with?

19       A.   Commonwealth2A.

20       Q.   Are you compensating your lawyers?

21       A.   No, I am not.

22       Q.   Do you know who is paying your lawyers for

23   this lawsuit?

24       A.   I really don't know which organization it is.

Paul Nelson Chamberlain - Vol. I - September 14, 2017



21

Paul Nelson Chamberlain - Vol. I - September 14, 2017



**Paul Nelson Chamberlain - Vol. I - September 14, 2017**



**Paul Nelson Chamberlain - Vol. I - September 14, 2017**



**Paul Nelson Chamberlain - Vol. I - September 14, 2017**



25

1

22          MS. KAPLAN:  Give us one moment.

23          (Defendants' counsel exit to confer)

24

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

26

1      BY MS. KAPLAN:

2      Q.





**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

28



```
10        Q.    In your own words, why are you

11    participating in this lawsuit?

12        A.    I was asked, and I thought I would be a

13    good plaintiff.

14        Q.    Why did you feel you would be a good

15    plaintiff?

16        A.    I'm pretty much as honest and law abiding

17    as you can get.  Again, I never had any brushes with

18    the law.  I grew up with guns in the household.

19        Q.    What do you hope to achieve as a result of

20    this lawsuit?

21        A.    I would like our state to have less arcane

22    gun laws.

23             MS. KAPLAN:  Let's take another quick

24    break.  We can probably wrap up pretty quickly after
```

29

 1   that.

 2            (Recess at 3:19 p.m.)

 3       BY MS. KAPLAN:  (3:22 p.m.)

 4       Q.   Do you have any plans to purchase guns in

 5   the future?

 6       A.   Yes.

 7       Q.   Are there specific guns that you plan to

 8   purchase?

 9       A.   Define that.  There are lots of guns I

10   would like to purchase.  Whether I can afford them

11   or not is another story.  It's like a sports car.

12       Q.   Putting finances aside for a moment, if you

13   could afford to buy whatever guns you wanted, are

14   there guns you would like to purchase in the future?

15       A.   ████████████████████████████████████

16   ████████████.

17            MS. KAPLAN:  I think that's all we have.

18   Thank you.

19            MR. PORTER:  We have no questions.

20            (Whereupon the deposition

21            was concluded at 3:23 p.m.)

22

23

24

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

30

1              C E R T I F I C A T E

2      I, PAUL NELSON CHAMBERLAIN, do hereby certify

3   that I have read the foregoing transcript of my

4   testimony, and further certify under the pains and

5   penalties of perjury that said transcript

6   (with/without) suggested corrections is a true and

7   accurate record of said testimony.

8        Dated at _____, this ____ day of _____,

9   2017.

10

11                        _____

12

13

14

15

16

17

18

19

20

21

22

23

24

**Doris O. Wong Associates, Inc.**

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

31

1                    SUGGESTED CORRECTIONS

2   RE:   David Seth Worman, et al., vs. Maura Healey,
          et al.
3
    WITNESS:   Paul Nelson Chamberlain, Vol. I
4
    The above-named witness wishes to make the following
5   changes to the testimony as originally given:

6   PAGE   LINE        SHOULD READ              REASON

7   _____  _____  _____  _____

8   _____  _____  _____  _____

9   _____  _____  _____  _____

10  _____  _____  _____  _____

11  _____  _____  _____  _____

12  _____  _____  _____  _____

13  _____  _____  _____  _____

14  _____  _____  _____  _____

15  _____  _____  _____  _____

16  _____  _____  _____  _____

17  _____  _____  _____  _____

18  _____  _____  _____  _____

19  _____  _____  _____  _____

20  _____  _____  _____  _____

21  _____  _____  _____  _____

22  _____  _____  _____  _____

23  _____  _____  _____  _____

24  _____  _____  _____  _____

**Doris O. Wong Associates, Inc.**

```
 1   COMMONWEALTH OF MASSACHUSETTS)

 2   SUFFOLK, SS.                 )

 3        I, Ken A. DiFraia, RPR and Notary Public in and

 4   for the Commonwealth of Massachusetts, do hereby

 5   certify that there came before me on the 14th day of

 6   September, 2017, at 2:45 p.m., the person

 7   hereinbefore named, who was by me duly sworn to

 8   testify to the truth and nothing but the truth of

 9   his knowledge touching and concerning the matters in

10   controversy in this cause; that he was thereupon

11   examined upon his oath, and his examination reduced

12   to typewriting under my direction; and that the

13   deposition is a true record of the testimony given

14   by the witness.

15        I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19        In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 29th day of

21   September, 2017.

22

23

24
```

**Paul Nelson Chamberlain - Vol. I - September 14, 2017**

33

1       Under Federal Rule 30:

2              X   Reading and Signing was requested

3                  Reading and Signing was waived

4                  Reading and Signing was not requested

5

6       *Ken A. DiFrara*

7

8   Notary Public

9   Commission expires 2/24/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

D I S C L A I M E R

This transcript in any format is a confidential communication between Doris O. Wong Associates, Inc., a professional court reporting firm, and the parties to this matter and their counsel.  Any reproduction or distribution of this transcript without the express permission of the parties is a violation of this confidentiality.  To fulfill any request to the court reporter for an additional copy or copies from persons or entities without standing in this matter will require the consent of the parties and/or counsel and/or a court order for such delivery.

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 265 of 1262

David Seth Worman, et al. vs.                                    Paul Nelson Chamberlain -  Vol. I
Maura Healey, et al.                                             September 14, 2017

## A

**abiding (1)**
28:16
**Academy (1)**
9:12
**accept (3)**
22:18;23:16,23
**accepting (2)**
22:5,8
**access (2)**
14:24;15:6
**accounts (1)**
18:7
**achieve (1)**
28:19
**acquire (1)**
27:23
**acquired (2)**
27:20;28:2
**Action (1)**
15:11
**active (2)**
18:3,5
**activities (4)**
16:24;17:3,14,16
**Actually (7)**
19:20;23:11;25:13;
26:14;28:1,6,7
**address (2)**
4:15,20
**affiliated (1)**
20:18
**affiliation (1)**
20:16
**afford (2)**
29:10,13
**Again (6)**
5:13;17:17;21:14;
24:5;26:19;28:17
**ago (5)**
5:15,17;13:10;27:3,
15
**agree (1)**
6:3
**ahead (1)**
6:23
**Allied (3)**
8:2,4,5
**almost (1)**
9:5
**Alton (1)**
4:16
**always (1)**
9:5
**American (2)**
5:2;7:11
**apologize (1)**
28:8
**approved (1)**
12:17
**Approximately (3)**

5:16;8:9;27:15
**arcane (1)**
28:21
**aside (1)**
29:12
**Assistant (1)**
4:11
**Association (1)**
16:1
**assume (1)**
6:9
**Attorney (3)**
4:11;6:21;18:16
**available (1)**
14:13
**aware (4)**
15:8;17:15,17;
24:22

## B

**bachelor's (2)**
9:13,16
**back (2)**
13:1;26:7
**background (1)**
9:7
**Basic (3)**
12:12;13:9;14:12
**bedroom (1)**
25:13
**besides (1)**
13:4
**best (1)**
10:10
**bit (1)**
21:10
**blanket (1)**
19:11
**Bolioli (2)**
19:19;20:14
**Bolioli's (1)**
20:16
**Boston (3)**
8:13,19;9:3
**Both (1)**
25:2
**Boulevard (1)**
4:22
**Boy (3)**
13:5,8,9
**Braintree (1)**
16:11
**break (1)**
28:24
**briefly (2)**
7:14;9:6
**brushes (1)**
28:17
**build (1)**
27:14
**built (2)**
27:12,13

**business (3)**
4:20;5:1;26:23
**buy (1)**
29:13

## C

**call (1)**
14:20
**called (3)**
4:3;11:14;15:11
**camp (1)**
13:10
**Can (11)**
5:5;6:21;13:20;
14:4;15:5;21:5,11;
26:15;28:17,24;29:10
**capable (2)**
22:5,8
**car (1)**
29:11
**care (2)**
25:2,5
**career (1)**
9:18
**carry (9)**
10:19,21;11:5,6,10,
12,14,18;12:13
**case (3)**
4:13;19:6,16
**certain (1)**
15:2
**certificates (1)**
9:17
**CHAMBERLAIN (6)**
4:2,10,16;6:4;
13:18;20:2
**changed (1)**
26:17
**circumstances (2)**
5:5,8
**civil (2)**
5:9;6:1
**clarification (1)**
6:8
**clarify (4)**
6:5;14:1;21:21;
23:11
**Class (1)**
10:19
**Clearly (1)**
14:3
**closet (2)**
25:13,14
**club (2)**
16:8,10
**Comm2A (7)**
15:19,21,23;16:22;
17:14;19:24;20:4
**Commonwealth2A (1)**
20:19
**Company (9)**
5:2,14;7:11,17;

8:13,19;12:19;26:22,
24
**compensating (1)**
20:20
**completed (1)**
6:12
**concluded (1)**
29:21
**conducted (1)**
6:1
**confer (1)**
25:23
**confidentiality (1)**
24:24
**connected (1)**
19:23
**conversation (1)**
15:4
**convicted (1)**
9:24
**copy (1)**
14:22,23;15:6
**counsel (2)**
4:3;25:23
**count (1)**
13:6
**Course (8)**
12:12,15,17,20,24;
14:12,16,17
**courses (1)**
13:4
**crime (1)**
10:1
**current (1)**
10:23
**currently (3)**
4:18;10:16;21:1

## D

**date (1)**
27:11
**dates (1)**
28:8
**dealer (1)**
16:15
**decided (1)**
15:6
**Defendants (3)**
4:4,12;14:5
**Defendants' (1)**
25:23
**Define (4)**
25:21;26:2;27:12;
29:9
**degree (1)**
9:16
**Department (1)**
10:22
**deposed (4)**
5:3,6,11,18
**deposition (3)**
5:21,24;29:20

**describe (2)**
5:5;12:9
**different (1)**
21:6
**DIRECT (2)**
4:8;24:19
**discussed (2)**
24:23;27:16
**discussion (1)**
15:1
**dispute (1)**
5:12
**Document (11)**
13:18,21,23;14:11,
18,24;15:6;20:2,4,7,7
**documents (1)**
14:6
**domestic (1)**
10:4
**donate (1)**
18:1
**down (2)**
6:16;21:10
**driver's (1)**
4:5
**due (1)**
5:8
**duly (1)**
4:6

## E

**East (1)**
4:17
**education (2)**
9:15;12:15
**educational (1)**
9:6
**eight (1)**
7:20
**either (3)**
6:17;10:3;22:5
**Electrical (2)**
5:2;7:11
**Elizabeth (1)**
4:10
**else (3)**
7:23;8:24;27:5
**Email (8)**
17:22,23;19:7,9,11,
12,14;20:11
**employed (12)**
4:18,24;7:10,18,22;
8:1,2,10,16;9:19;
16:20,21
**employee (1)**
5:7
**employment (3)**
8:12,18,21
**end (1)**
29:15
**enforcement (2)**
9:20;18:17

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 266 of 1262

David Seth Worman, et al. vs.                                    Paul Nelson Chamberlain -  Vol. I
Maura Healey, et al.                                             September 14, 2017

**ensure (1)**
  25:2
**entail (1)**
  7:15
**entire (1)**
  5:24
**entity (1)**
  10:20
**Environmental (1)**
  9:14
**EPA (1)**
  7:16
**estimate (1)**
  11:17
**event (1)**
  17:9
**events (1)**
  17:8
**everyone (1)**
  25:3
**everyone's (1)**
  14:21
**exact (1)**
  12:12
**examination (2)**
  4:3,8
**examined (1)**
  4:6
**Examines (1)**
  20:4
**example (2)**
  6:16;17:23
**exchange (1)**
  20:11
**exchanges (1)**
  19:14
**Exhibit (2)**
  13:19;20:3
**exit (1)**
  25:23
**expressed (1)**
  19:3
**extenuating (1)**
  5:8

**F**

**Facebook (3)**
  18:6;19:1,2
**fact (1)**
  5:11
**familiar (5)**
  15:10,18,24;18:16;
  19:18
**far (2)**
  17:8;21:12
**Federal (1)**
  6:1
**feel (1)**
  28:14
**fifth (1)**
  22:2
**files (1)**

12:22
**finances (1)**
  29:12
**firearms (2)**
  12:7;14:12
**first (4)**
  4:6;5:23;8:3;11:4
**fit (3)**
  22:15,23;23:2
**five (4)**
  8:9;21:22,23;27:16
**follows (1)**
  4:7
**Forbes (1)**
  4:22
**form (1)**
  17:21
**forums (1)**
  19:4
**four (3)**
  8:17;21:21,22
**Foxborough (1)**
  4:22
**fully (1)**
  27:2
**further (1)**
  9:15
**future (2)**
  29:5,14

**G**

**General (1)**
  4:11
**General's (1)**
  18:17
**gestures (1)**
  6:17
**Glock (6)**
  21:12;22:1;23:6,7;
  26:17;27:19
**GOAL (11)**
  15:13,16;16:22;
  17:1,5,7,9;19:8,9,17,
  24
**good (2)**
  28:13,14
**Google (1)**
  14:20
**graduated (1)**
  9:13
**Gravel (3)**
  8:13,19;9:3
**great (1)**
  25:2
**grew (2)**
  11:13;28:18
**ground (1)**
  5:22
**guess (3)**
  13:5;14:20;17:5
**gun (18)**
  10:16;15:11;16:8,

10,15,17;17:6,6;
18:10;23:12;24:9;
27:4,7,12,13,24;28:5,
22
**guns (22)**
  11:24;13:4,12,16;
  16:13;21:1,3,6;24:9,
  11;25:18;26:3;27:10,
  20;28:2,7,18;29:4,7,9,
  13,14

**H**

**Hampshire (5)**
  10:12,13;11:15,16;
  12:1
**happen (1)**
  12:19
**head (1)**
  6:16
**hear (1)**
  19:6
**held (2)**
  12:3;17:4
**Hi (1)**
  4:10
**high (3)**
  9:9,10,11
**hold (2)**
  10:16,18
**home (1)**
  4:15
**hometown (1)**
  11:13
**honest (1)**
  28:16
**hope (1)**
  28:19
**horrible (1)**
  12:22
**house (3)**
  24:14,15;25:8
**household (1)**
  28:18
**HOWE (1)**
  13:23
**Hunter's (2)**
  12:15,23

**I**

**identification (2)**
  13:19;20:3
**identified (1)**
  4:4
**identify (1)**
  13:23
**incident (1)**
  10:4
**include (1)**
  13:12
**in-depth (1)**
  14:2

**indicated (1)**
  14:7
**individuals (1)**
  19:15
**Industries (2)**
  8:2,5
**information (3)**
  13:12;17:18;25:3
**instance (1)**
  12:4
**Instructor (1)**
  14:12
**interpreting (1)**
  7:17
**invasive (1)**
  25:10
**involved (2)**
  10:3;25:3
**issued (3)**
  10:20;11:1;18:17

**J**

**job (1)**
  25:11
**July (6)**
  18:18;27:10,21,23;
  28:2,5
**June (1)**
  11:2

**K**

**KAPLAN (8)**
  4:9,10;5:23;25:22;
  26:1;28:23;29:3,17
**keep (3)**
  25:20;26:3,5
**kept (1)**
  25:16
**kind (1)**
  13:7
**kinds (1)**
  17:3
**knowledge (1)**
  5:9
**known (1)**
  15:18

**L**

**last (3)**
  11:2;21:14;28:4
**law (1)**
  9:19;28:16,18
**laws (1)**
  28:22
**lawsuit (5)**
  5:9;19:4;20:23;
  28:11,20
**lawyers (6)**
  4:12;15:1,4;20:20,
  22;25:4

**League (1)**
  15:11
**less (1)**
  28:21
**license (16)**
  4:5;10:16,18,19,20,
  23;11:4,10,12,14,18,
  20,23;12:3,13;28:4
**licenses (1)**
  11:6
**life (1)**
  10:7
**list (3)**
  19:10;21:4,21,22
**lists (1)**
  17:23
**little (2)**
  8:17;21:10
**lived (5)**
  10:6,9,11,13,14
**loaded (3)**
  25:20,21;26:2
**located (2)**
  9:11;24:13
**locked (2)**
  25:14,16
**long (8)**
  7:18;8:8,16;10:9;
  11:17;13:10;14:3;
  27:3
**longer (1)**
  7:20
**look (2)**
  13:20,21;14:8
**looking (1)**
  19:8
**lot (1)**
  7:20
**lots (1)**
  29:9

**M**

**M&P (4)**
  21:8,24;22:8;28:6
**magazine (13)**
  22:6,9,15,19,23;
  23:12;26:9,14,16,17,
  18,19,22
**magazines (19)**
  22:11,13,17,17,21;
  23:1,7,16,18,19,23;
  24:2,3,3,4,5;26:3,5,8
**management (1)**
  8:22
**manager (4)**
  7:13;8:7,14;9:5
**Manchester (1)**
  11:15
**manufactured (7)**
  23:14;24:6;26:10,
  12,20,21,22
**manufacturer (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 267 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Paul Nelson Chamberlain -  Vol. I
September 14, 2017

16:18

**many (7)**
5:15;21:5,7;22:15,
23;23:8;24:1

**Marine (1)**
9:14

**Maritime (1)**
9:12

**marked (2)**
13:18;20:2

**marksmanship (1)**
13:9

**Mass (1)**
4:17

**Massachusetts (8)**
4:23;9:12;10:6,9,
14;11:13;12:11,16

**Mattapoisett (1)**
9:11

**May (1)**
24:17

**mean (3)**
17:4;22:14;26:16

**media (1)**
18:3

**member (7)**
15:16,21,22;16:6,8,
10,12

**members (1)**
19:11

**memory (1)**
12:22

**mentioned (1)**
11:24

**military (1)**
9:22

**millimeter (4)**
21:8,9,24;22:2

**Mini (4)**
21:13,15;22:1;
23:22

**mixed (2)**
9:4;28:9

**moment (4)**
13:20;20:6;25:22;
29:12

**money (1)**
18:1

**months (1)**
27:15

**more (2)**
15:5;26:15

**most (2)**
8:23;28:2

**much (2)**
19:2;28:16

**multiple (2)**
23:1,3

**must (1)**
6:15

**Myself (1)**
20:14

## N

**name (7)**
4:14,24;12:13,18;
19:21;21:16;27:2

**named (1)**
19:18

**National (1)**
15:24

**nature (1)**
8:22

**need (1)**
21:4

**NELSON (2)**
4:2,16

**New (5)**
10:11,13;11:15,16;
12:1

**next (1)**
29:15

**nods (1)**
6:16

**Northeast (3)**
18:6,15,20

**Notary (1)**
4:6

**Notice (2)**
18:17,21

**NRA (4)**
16:3,6,22;17:16

## O

**oath (1)**
7:2

**objects (1)**
6:21

**obligated (1)**
7:3

**obtained (1)**
14:14

**off (3)**
17:8;21:4,22

**offered (2)**
12:16,23

**offering (1)**
12:20

**offhand (1)**
12:21

**officer (1)**
9:20

**official (1)**
9:5

**Old (2)**
9:10;13:1

**one (11)**
4:11;11:24;21:14;
22:2,18;23:1;25:18,
22;27:16,18;28:5

**only (5)**
5:18,20;23:20,21;
28:4

**opinions (2)**
18:10;19:3

**orally (1)**
6:15

**order (2)**
12:13;24:24

**organization (8)**
12:20;15:10,13,18;
16:12;19:22;20:18,24

**organizations (2)**
17:19;18:1

**organized (6)**
17:1,5,8,9,14,16

**original (1)**
20:10

**OSHA (1)**
7:16

**otherwise (2)**
6:18;10:14

**out (3)**
15:9;19:7;26:23

**over (2)**
5:22;8:17

**own (6)**
21:1,3,7,8,12;28:10

**owned (1)**
28:5

**Owners' (1)**
15:11

**ownership (1)**
18:11

## P

**part (2)**
8:23;14:5

**participate (2)**
16:24;17:11

**participated (1)**
17:13

**participating (2)**
19:15;28:11

**particular (1)**
19:4

**past (2)**
11:7;12:14

**Patrol (1)**
14:12

**PAUL (2)**
4:2,16

**paying (1)**
20:22

**penalty (1)**
7:7

**people (2)**
13:16;25:8

**per (2)**
15:22;17:5

**period (2)**
9:2,3

**perjury (1)**
7:7

**permit (1)**

11:16

**person (1)**
19:18

**personal (1)**
25:3

**pistol (7)**
11:16;12:12;16:11;
21:8,9;22:1,2

**pistols (3)**
22:4,5,7

**place (1)**
7:9

**plaintiff (3)**
19:16;28:13,15

**Plaintiffs (4)**
6:3;14:6;19:8;
20:10

**plan (1)**
29:7

**plans (1)**
29:4

**please (4)**
4:14;6:12,24;25:12

**pm (3)**
29:2,3,21

**pointed (1)**
15:9

**Police (1)**
10:22

**PORTER (10)**
6:3;14:1;20:5;
21:10;24:17,19,22;
25:6,9;29:19

**position (3)**
7:12;8:6,8

**possession (2)**
14:19,20

**post (3)**
18:20;19:1,2

**posted (2)**
18:10,15

**potential (1)**
19:8

**prefer (1)**
25:10

**present (1)**
17:7

**pretty (2)**
28:16,24

**previous (3)**
8:12,18,21

**previously (1)**
7:22

**prior (7)**
8:10;12:14;24:7;
26:20,21;28:4,5

**Probably (4)**
18:14;25:10;28:24;
29:15

**problem (1)**
25:1

**Procedure (1)**
6:2

**production (1)**
4:5

**professional (1)**
9:18

**Protection (1)**
9:14

**protective (1)**
24:23

**provided (2)**
14:5,6

**Public (1)**
4:6

**purchase (5)**
29:4,8,10,14,15

**purchased (2)**
27:10,12

**purposes (1)**
5:21

**pursuant (1)**
6:1

**Putting (1)**
29:12

## Q

**quick (1)**
28:23

**quickly (1)**
28:24

**quote (1)**
12:12

## R

**raffle (2)**
17:4,11

**raffling (1)**
17:8

**ran (1)**
9:2

**read (1)**
14:4

**ready (1)**
13:22

**really (2)**
17:9;20:24

**reason (1)**
11:21

**recall (12)**
5:10,13,16;12:21;
13:2;18:22,24;19:14,
17,24;27:1,2

**receive (2)**
17:18;19:9

**received (2)**
24:8;28:3

**recertification (1)**
11:3

**Recess (1)**
29:2

**recognize (3)**
13:21;14:8;20:7

**recollection (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 268 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Paul Nelson Chamberlain -  Vol. I
September 14, 2017

20:15
**record (4)**
4:15,21;5:24;13:24
**refer (2)**
15:13;16:3
**referring (2)**
16:4;27:13
**refresh (1)**
20:15
**regarding (1)**
13:16
**Regional (1)**
9:11
**regulations (1)**
7:17
**reissue (1)**
11:3
**related (4)**
9:17;11:24;12:6;
13:3
**remember (1)**
12:18
**Remind (1)**
7:9
**reporter (1)**
6:15
**represent (1)**
14:4
**representing (1)**
4:12
**request (1)**
20:10
**respond (1)**
19:12
**result (1)**
28:19
**review (2)**
14:2;20:6
**revolver (1)**
11:16
**rifle (8)**
13:9;14:13;15:24;
16:11;21:13,17;22:1;
23:16
**rifles (1)**
21:12
**right (2)**
14:19;21:24
**Rochester (2)**
9:10;11:12
**role (1)**
9:5
**roles (1)**
9:4
**round (14)**
22:16,17;23:4,12,
19;24:2,2,3,3,5;26:8,
8,9,19
**rounds (5)**
22:15,23;23:8;24:1;
26:5
**Roy (1)**
9:1

**Ruger (2)**
21:15,18
**Rule (1)**
6:1
**rules (2)**
5:22;7:16

**S**

**safe (4)**
24:12,13;25:16,18
**safety (9)**
7:13;8:7,14,22;9:5,
14;12:6,15,23
**sale (1)**
17:7
**salesperson (1)**
17:6
**same (1)**
23:22
**sample (1)**
9:1
**Sand (3)**
8:13,19;9:3
**satisfactorily (1)**
4:4
**save (2)**
14:22;15:6
**school (3)**
9:9,10,11
**science (1)**
9:13
**Scouts (3)**
13:5,8,10
**se (1)**
17:5
**second (1)**
24:17
**seek (1)**
6:8
**self-defense (3)**
13:13,14;27:8
**seller's (1)**
12:3
**semiautomatic (1)**
21:19
**sense (1)**
6:10
**sent (1)**
19:7
**serve (1)**
19:10
**service (1)**
9:22
**Seven (1)**
5:17
**Shield (3)**
21:8,24;28:6
**Shooters (3)**
18:6,15,21
**shop (1)**
17:6
**short (2)**

9:2,3
**side (1)**
10:3
**sides (1)**
25:2
**sites (4)**
18:5,8,11,13
**six (1)**
11:19
**size (5)**
22:13,14;23:18,20,
21
**Slow (1)**
21:10
**Smith (1)**
22:16
**social (1)**
18:3
**sold (1)**
27:4
**someone (1)**
27:5
**sometimes (1)**
9:4
**somewhere (1)**
7:22
**sorry (4)**
12:18;20:1;28:1,7
**sort (1)**
11:18
**speak (1)**
6:17
**speaking (1)**
7:14
**specific (5)**
10:18;19:15;24:8,9;
29:7
**specifically (2)**
13:14;24:10
**spoke (1)**
19:21
**sports (1)**
29:11
**spring (1)**
7:19
**start (2)**
21:6;22:4
**Starting (1)**
9:8
**state (3)**
4:14,20;28:21
**state- (1)**
12:16
**state-approved (1)**
12:11
**store (1)**
24:11
**story (1)**
29:11
**style (3)**
26:14,16,18
**Subject (1)**
25:6

**substance (1)**
15:3
**suspended (1)**
11:20
**sworn (1)**
4:6

**T**

**talking (1)**
15:14
**Tavor (1)**
29:16
**technically (1)**
11:15
**technician (1)**
9:1
**telling (1)**
15:3
**tells (1)**
6:23
**Ten (1)**
22:24
**terminated (2)**
5:7;11:21
**Terrace (1)**
4:16
**testified (1)**
4:7
**testimony (1)**
7:6
**Testing (2)**
5:2;7:11
**thinking (1)**
28:3
**Thomas (3)**
19:19;20:14,16
**thought (2)**
7:20;28:12
**three (2)**
18:13;22:7
**times (1)**
12:22
**told (1)**
11:19
**took (2)**
12:11,17
**topic (1)**
15:2
**total (1)**
11:17
**towns (2)**
11:8,10
**trainer (1)**
13:15
**training (7)**
12:6,9;13:3,7,11;
24:8,9
**transcript (1)**
24:24
**transferred (1)**
27:4
**transmitted (1)**

25:4
**tried (1)**
9:24
**truthfully (1)**
7:4
**Twitter (2)**
18:6,23
**two (6)**
10:10,13;13:4;22:4;
23:13;27:15
**type (2)**
11:23;21:7
**types (1)**
21:6
**typically (2)**
17:22;25:7

**U**

**unclear (1)**
6:5
**under (3)**
7:2,6;24:23
**understood (1)**
6:10
**Unit (1)**
4:22
**unloaded (2)**
25:20;26:3
**U-notch (1)**
26:17
**up (6)**
11:13;13:21;28:9,
18,24;29:15
**upstairs (1)**
25:13
**USA (1)**
27:3
**use (5)**
12:7;13:4,12,16;
27:7
**used (1)**
25:1

**V**

**Various (1)**
9:17
**violence (1)**
10:4
**VP (4)**
21:9;22:2,18;28:7

**W**

**wait (3)**
6:12,21;20:5
**Waste (2)**
8:2,5
**way (1)**
10:10
**web (2)**
14:13,24

David Seth Worman, et al. vs.
Maura Healey, et al.

Paul Nelson Chamberlain -  Vol. I
September 14, 2017

**website (2)**
14:14;18:21
**Wesson (1)**
22:16
**Weston (1)**
9:1
**Weymouth (2)**
4:17;10:22
**Whereupon (1)**
29:20
**whole (2)**
10:6;14:4
**Without (1)**
15:3
**witness (6)**
4:3;5:11;24:18,21;
25:5,7
**word (1)**
8:3
**words (1)**
28:10
**worked (2)**
16:15,17
**wrap (1)**
28:24

## X

**X95 (1)**
29:16

## Y

**yard (1)**
9:2
**year (3)**
11:2;12:14;28:4
**years (9)**
5:15,17;7:20;8:9,
17;10:10,13;11:19;
13:1

## 0

**02035 (1)**
4:23
**02189 (1)**
4:17

## 1

**1 (2)**
4:22;13:19
**10 (4)**
23:4,9,19;24:3
**10/22 (4)**
21:13,16;22:1;
23:16
**12 (1)**
4:16
**14 (4)**
21:13,15;22:1;
23:22

**15 (4)**
23:10,12;26:8,9
**18 (1)**
13:1
**19 (5)**
21:12;22:1;23:6,7;
27:19
**1990 (3)**
24:7;26:20,21
**1993 (4)**
23:15;26:10,13,18

## 2

**2 (1)**
20:3
**20 (6)**
18:18;27:10,21,23;
28:2,5
**2000 (1)**
10:12
**2002 (2)**
10:11,12
**2009 (1)**
7:19
**2016 (8)**
12:14;18:18;27:11,
21,23;28:2,5,8
**22 (1)**
21:13
**25 (1)**
4:22

## 3

**3 (1)**
24:2
**3:19 (1)**
29:2
**3:22 (1)**
29:3
**3:23 (1)**
29:21
**30 (5)**
6:2;24:3,5;26:8,19

## 5

**5 (1)**
24:2

## 7

**7 (1)**
22:16

## 8

**8 (1)**
22:17

## 9

**9 (5)**
21:8,9,24;22:2;28:7
**98 (3)**
10:11,12,12

# EXHIBIT 8

## TO KAPLAN DECLARATION

# In The Matter Of:

*David Seth Worman, et al. vs.*
*Maura Healey, et al.*

---

*James L. Wallace*
*Vol. I*
*September 12, 2017*

---



**DORIS O. WONG**
**ASSOCIATES, INC.**

COURT   REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File WALLACE_James.txt*
*Min-U-Script® with Word Index*

**James L. Wallace - Vol. I - September 12, 2017**

1

```
                         Volume I
                         Pages 1 to 67
                         Exhibits 1 to 4

            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
DAVID SETH WORMAN, ANTHONY          :
LINDEN, JASON WILLIAM SAWYER,       :
NICHOLAS ANDREW FELD, PAUL          :
NELSON CHAMBERLAIN, GUN             :
OWNERS' ACTION LEAGUE, INC.,        :
ON TARGET TRAINING, INC., AND       :
OVERWATCH OUTPOST,                  :
            Plaintiffs,             :
                                    :
        vs.                         :   Civil Action
                                    :   No. 17-10107-WGY
MAURA HEALEY, in her official       :
capacity as Attorney General        :
of the Commonwealth of              :
Massachusetts; DANIEL               :
BENNETT, in his official            :
capacity as the Secretary of        :
the Executive Office of             :
Public Safety and Security;         :
and COLONEL RICHARD D.              :
McKEON, in his official             :
capacity as Superintendent of       :
the Massachusetts State             :
Police,                             :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF GUN OWNERS' ACTION LEAGUE,
INC., THROUGH ITS DESIGNEE JAMES L. WALLACE, a
witness called on behalf of the Defendants, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Office of
the Attorney General, 100 Cambridge Street, Boston,
Massachusetts, on Tuesday, September 12, 2017,
commencing at 9:59 a.m.
```

**Doris O. Wong Associates, Inc.**

**James L. Wallace - Vol. I - September 12, 2017**

2

PRESENT:

    Bradley Arant Boult Cummings LLP
        (by James W. Porter, III, Esq., and Connor
        Blair, Esq.)
        One Federal Place, 1819 Fifth Avenue North,
        Birmingham, AL 35203-2119,
        jporter@bradley.com;
        cblair@bradley.com
        205.521.8285
        for the Plaintiffs.

    Campbell Campbell Edwards & Conroy, P.C.
        (by Christopher Howe, Esq.)
        One Constitution Plaza, Boston, MA 02129,
        chowe@campbell-trial-lawyers.com
        617.241.3029
        for the Plaintiff Gun Owners' Action
        League, Inc.

    Office of the Attorney General
        (by Gary Klein, Assistant Attorney General;
        Elizabeth Kaplan, Assistant Attorney
        General; and Julia Kobick, Assistant
        Attorney General)
        One Ashburton Place, 18th Floor,
        Boston, MA 02108,
        Gary.Klein@state.ma.us;
        Elizabeth.Kaplan@state.ma.us;
        Julia.Kobick@state.ma.us
        617.963.2567
        for the Defendants.

    Edward George & Associates
        (by Edward F. George, Jr., Esq.)
        444 Washington Street, Suite 510,
        Woburn, MA 01801,
        ed@egalawoffices.com
        781.281.7288
        for the Witness.

                * * * * *

James L. Wallace - Vol. I - September 12, 2017

3

1                         I N D E X

2
   WITNESS                DIRECT  CROSS   REDIRECT  RECROSS
3

4   JAMES L. WALLACE

5     BY MR. KLEIN              4

6

7
                          *  *  *  *
8
                        E X H I B I T S
9
   NO.                DESCRIPTION               PAGE
10
   Exhibit 1    Copy of Notice of Taking          8
11             Deposition, with attached
               Schedule A
12
   Exhibit 2    Copy of training materials,      39
13             Bates Nos. GOAL-000094 through
               GOAL-000111
14
   Exhibit 3    Copy of page from GOAL's         54
15             website, Bates Nos. GOAL-000162
               through GOAL-000164
16
   Exhibit 4    Copy of information from GOAL's  54
17             website, Bates Nos. GOAL-000171
               through GOAL-000173
18

19
                          *  *  *  *
20

21

22

23

24

**Doris O. Wong Associates, Inc.**

James L. Wallace - Vol. I - September 12, 2017

4

```
 1              P R O C E E D I N G S
 2                 JAMES L. WALLACE
 3   a witness called for examination by counsel for the
 4   Defendants, having been satisfactorily identified by
 5   the production of his driver's license and being
 6   first duly sworn by the Notary Public, was examined
 7   and testified as follows:
 8                 DIRECT EXAMINATION
 9      BY MR. KLEIN:
10      Q.   Mr. Wallace, can you state your full name,
11   your home and your business address for the record,
12   please.
13      A.   James Lee Wallace.  ███████████████████
     ██████████████████████████████████████████  My
15   business address is 361 West Main Street,
16   Northborough, Massachusetts.
17      Q.   And what is the name of the business?
18      A.   Gun Owners' Action League, Incorporated.
19      Q.   Thank you.  My name is Gary Klein.  I'm one
20   of the attorneys for the defendants in this matter.
21   The matter we are taking the deposition in is called
22   "Worman versus Baker."  My understanding is that
23   GOAL is one of the plaintiffs in that action.  Is
24   that consistent with your understanding?
```

5

1        A.    Yes.

2        Q.    Have you ever been deposed before?

3        A.    No.

4        Q.    I want to give you some ground rules before

5    we start.  If you could keep those in mind over the

6    course of the deposition, it would be helpful.

7              If any question I ask is unclear, I want

8    you to ask me to clarify it.  If you don't ask me to

9    clarify, I'm going to assume you understood it.  Is

10   that okay?

11       A.    Yes.

12       Q.    It is important that you answer all the

13   questions verbally and not nod your head or shake

14   your head because the court reporter can't take down

15   nods and shakes, okay?

16       A.    Yes.

17       Q.    I want you to wait until all my questions

18   are completed.  There's a possibility that when a

19   question is asked your counsel will object to it.

20   Your counsel will either instruct you to go ahead

21   and answer it if you know the answer or he will

22   instruct you not to answer.  And, in general, it's

23   important that you wait for the questions to be

24   completed so that the reporter can take everything

James L. Wallace - Vol. I - September 12, 2017

1   down.  The reporter wouldn't be able to do that if

2   we talk over each other.  Is that okay?

3       A.   Yes.

4       Q.   If you need a break at any time, please let

5   me know.  We can always take a break, unless a

6   question is pending, okay?

7       A.   Yes.

8       Q.   You understand that you are under oath and

9   that you have to answer all my questions truthfully,

10  right?

11      A.   Yes.

12      Q.   Your testimony is under the penalties of

13  perjury, do you understand that?

14      A.   Yes.

15      Q.   It's my understanding that the

16  organizational name --

17          MR. HOWE:  Before you begin, can we put the

18  stipulations on the record?

19          MR. KLEIN:  Sure.

20          MR. HOWE:  Let the record reflect that all

21  objections, except as to form, are reserved until

22  the time of trial.  All motions to strike are

23  reserved until the time of trial.

24          Mr. Wallace, you have the right to read and

James L. Wallace - Vol. I - September 12, 2017

1  sign your deposition transcript in this case.  Do

2  you wish to exercise that right?

3          MR. PORTER:  Yes, he will.

4          MR. GEORGE:  Yes.

5          THE WITNESS:  Yes.

6          MR. HOWE:  We will waive notary, and he

7  will read and sign within 30 days.

8          MR. KLEIN:  For the record, it's our

9  position that the entire deposition is being

10  conducted according to the Federal Rules.

11      Q.    Now, it's my understanding that the name of

12  your organization, Gun Owners' Action League, is

13  often shortened and described as "GOAL," which is an

14  acronym; is that correct?

15      A.    Correct.

16      Q.    So if I use the term "GOAL," you will

17  understand that to mean Gun Owners' Action League in

18  the context I'm asking the question?

19      A.    Yes.

20      Q.    And you understand that this deposition is

21  being taken of GOAL and that you are a

22  representative of GOAL in the context of this

23  deposition?

24      A.    Yes.

James L. Wallace - Vol. I - September 12, 2017

8

```
 1      Q.   Do yo understand that your answers in this
 2  deposition will bind GOAL as an organization?
 3      A.   Yes.
 4                    (Document marked as Wallace
 5                    Exhibit 1 for identification)
 6      Q.   You have in front of you a document labeled
 7  Exhibit 1.  Is this a document that is familiar to
 8  you?
 9      A.   (Examines document)  Yes.
10      Q.   Have you seen it before?
11      A.   Yes.
12      Q.   If you look at Schedule A, which starts on
13  Page 3 and continues to Page 4, have you reviewed
14  the topics listed there?
15      A.   Yes.
16      Q.   Are you prepared to respond on behalf of
17  GOAL with respect to each of those topics?
18      A.   To the best of my ability, yes.
19      Q.   Thank you.  Can you tell me your job title,
20  please.
21      A.   Executive director.
22      Q.   How long have you been in that position?
23      A.   Since 2005.
24      Q.   Did you work for GOAL before 2005?
```

James L. Wallace - Vol. I - September 12, 2017

9

1      A.    Yes.

2      Q.    What position did you have then?

3      A.    I was their lobbyist and public speaker.

4      Q.    Was that your job title?

5      A.    No.

6      Q.    What was your job title at that time?

7      A.    I don't remember.

8      Q.    What period of time did you work as a

9   lobbyist and public speaker for GOAL?

10     A.    From December of 2000 until 2005.

11     Q.    Where did you work before you worked at

12   GOAL?

13     A.    U.S. Post Office.

14     Q.    What period of time did you work there?

15     A.    Approximately 1992 to 2000.

16     Q.    In what capacity?

17     A.    I was a letter carrier.

18     Q.    Were you in the working world before 1992?

19     A.    Yes.

20     Q.    I don't want to assume your age.  I was

21   letting you tell me whether you were working before

22   then.  Where did you work before 1992?

23     A.    For a very brief time, I actually owned a

24   bait and tackle shop.

**James L. Wallace - Vol. I - September 12, 2017**

1      Q.    What was the name of that business?

2      A.    Big Jim's Bait and Tackle.

3      Q.    Did that business sell guns?

4      A.    No.

5      Q.    By what period of time were you owner of

6  Big Jim's Bait and Tackle?

7      A.    It was only about six months.

8      Q.    Any other employment after you finished

9  your educational experience but before you started

10  at the U.S. Post Office?

11      A.    Yes.  It would probably be easier to start

12  from right after high school, which was the United

13  States Army.

14      Q.    How long were you in the Army?

15      A.    Two years and ten months.

16      Q.    What period of time was that?

17      A.    1983 to 1986.

18      Q.    Where did you serve?

19      A.    Basic training was in Fort Leonard Wood,

20  Missouri.  Radio school was in Fort Sill, Oklahoma.

21  Then approximately 18 months in Germany, then

22  finished the remainder of my term in Fort Dix, New

23  Jersey.

24      Q.    Did you have training in the use of weapons

James L. Wallace - Vol. I - September 12, 2017

11

1   while you were in the Army?

2        A.    Yes.

3        Q.    Which weapons were you trained on?

4        A.    M-16, M-203, M-60, grenades.   That's about

5   it.

6        Q.    Did you have a side arm as well?

7        A.    No.

8        Q.    Approximately how long would you say your

9   training on the M-16 lasted?   How much training did

10  you have?

11       A.    The bulk of it was in basic training.

12       Q.    How long was your basic training period?

13       A.    Eight weeks.

14       Q.    So it was one of the issues covered during

15  the basic training?

16       A.    Excuse me?

17       Q.    Use of the M-16, was that one of the issues

18  covered in your basic training?

19       A.    Yes.

20       Q.    Did you get any further training on the use

21  of that weapon after basic training?

22       A.    It was very limited after basic, maybe once

23  a year.

24       Q.    Did you have an opportunity to shoot an

James L. Wallace - Vol. I - September 12, 2017

1    M-16 during basic training?

2        A.    Yes.

3        Q.    About how often?

4        A.    It would be hard to recollect.

5        Q.    During the once-a-year initial training

6    that you had, did you also get the opportunity to

7    shoot the M-16?

8        A.    Yes.  We had to qualify once a year.

9        Q.    "Qualify" meaning qualify at a range?

10       A.    Yes.

11       Q.    What else was involved in qualifying with

12   the M-16?

13       A.    During the requalification every year, it

14   was just simply what we called "zeroing in your

15   rifle" and then shooting -- there were static drop

16   targets.  We had to hit a minimum of those targets

17   to qualify every year.

18       Q.    I think we pretty much covered everything

19   except for 1986 to 1992.  Are there other jobs that

20   lasted any substantial period at that time?

21       A.    Substantial time?  For most of that time, I

22   was a carpenter.

23       Q.    Anything else?

24       A.    Machinist.

James L. Wallace - Vol. I - September 12, 2017

13

1        Q.    What kind of machining did you do?

2        A.    Fairly soon after the military, I attended

3    the Boston Tooling and Machining Institute.   Once I

4    graduated there, I found a job at DG O'Brien in

5    Seabrook.   I manufactured on a lathe underwater

6    cable connectors.

7        Q.    Did any of your duties as a machinist

8    involve guns?

9        A.    No.

10       Q.    Other than your time in the military and

11   your time at GOAL, did you have any other jobs that

12   involved use or advocacy about guns?

13       A.    Not jobs.

14       Q.    Thank you.   What is the highest degree of

15   education that you obtained?

16       A.    Twelfth grade, high school.

17       Q.    Where did you get your high school degree?

18       A.    Whittier Regional Vocational Technical High

19   School.

20       Q.    Located where?

21       A.    Haverhill, Massachusetts.

22       Q.    Have you ever been employed as a law

23   enforcement officer?

24       A.    No.

James L. Wallace - Vol. I - September 12, 2017

14

1      Q.    Have you ever been tried or convicted of a

2    crime?

3      A.    No.

4      Q.    Have you ever been involved on either side

5    of a domestic violence incident?

6      A.    No.

7      Q.    Have you lived in Massachusetts your whole

8    life?

9      A.    Other than the military.

10     Q.    I assume you have a gun license; is that

11   correct?

12     A.    Yes.

13     Q.    What type?

14     A.    License to carry.

15     Q.    Has that ever been suspended?

16     A.    No.

17     Q.    Has it ever been revoked?

18     A.    No.

19     Q.    Has it ever lapsed?

20     A.    No.

21     Q.    Approximately when did you obtain it?

22     A.    License to carry would have been when I

23   turned 21.

24     Q.    Now you can tell us your age I guess.

James L. Wallace - Vol. I - September 12, 2017

15

1        MR. PORTER:  Was that, like, ten years ago?

2    A.   Because we usually have our FID first when

3 we are young.  Then we move into license to carry.

4 I'm 52, so...

5    Q.   Do you have any licenses related to guns

6 from any other state besides Massachusetts?

7    A.   No.

21    Q.   Let's go back to your duties at GOAL.  What

22 are your current duties and responsibilities as

23 executive director?

24    A.   Pretty much everything that has to do with

James L. Wallace - Vol. I - September 12, 2017

16

 1    running the organization.

 2        Q.    Could you be a little more specific.

 3        A.    Day-to-day operations, overseeing of the

 4    accounting processes, preparing whatever the board

 5    needs, making sure education and training is up to

 6    par, scheduling, lobbying.

 7        Q.    Did you say blogging with a "B"?

 8        A.    Lobbying.

 9        Q.    Lobbying?

10        A.    Yes, writing, public speaking.

11        Q.    When you say "writing," what type of

12    writing do you do?

13        A.    Anything from drafting legislation to

14    writing for blogs, writing for our newspaper.

15        Q.    Do you post material on GOAL's website?

16        A.    I don't normally do the posting.

17        Q.    Do you write material that gets posted on

18    GOAL's website?

19        A.    Yes.

20            MR. PORTER:  Remember to let him finish the

21    whole question.

22        A.    I'm sorry.

23        Q.    That's fine.  How many other employees does

24    GOAL have?

James L. Wallace - Vol. I - September 12, 2017

17

1      A.    Currently four.

2      Q.    Are they all full-time?

3      A.    No.

4      Q.    How many full-time employees does GOAL have?

5      A.    Including myself, four.

6      Q.    Can you give me their names and job titles,

7   please.

8      A.    Jon Green.

9      Q.    J-o-h-n?

10     A.    J-o-n.

11     Q.    What is his title?

12     A.    Director of education and training; Angela

13   Fisher.

14     Q.    What is her job title?

15     A.    Chief of staff; Michael Sweeney, director

16   of communications.

17     Q.    Is he related to Attorney Sweeney, who is a

18   lawyer in this case?

19     A.    I don't believe so.

20     Q.    That would leave one other employee that's

21   part-time; is that right?

22     A.    That's correct.

23     Q.    Who is that?

24     A.    Michael Chuldenski.

James L. Wallace - Vol. I - September 12, 2017

1      Q.    What is his position?

2      A.    Outreach coordinator.

3      Q.    Does that mean outreach to the members?

4      A.    To members mostly.

5      Q.    I should have asked this earlier.  Is GOAL

6   a membership organization?

7      A.    Yes.

8      Q.    Is it incorporated as a nonprofit?

9      A.    Yes.

10     Q.    501(c)(3)?

11     A.    (4).

12     Q.    Have there been any changes to GOAL's

13  corporate form in the last ten years?

14     A.    No.

15     Q.    In the last 20 years?

16     A.    Not that I'm aware of.

17     Q.    Going back to 2000, do you know of any

18  change in GOAL's corporate form?

19     A.    No.

20     Q.    It's always been incorporated as far as you

21  know and always as a 501(c)(4)?

22     A.    Yes.

23     Q.    Is it fair to say GOAL's primary sources of

24  income are membership dues and contributions?

James L. Wallace - Vol. I - September 12, 2017

19

1        A.    Yes.

2        Q.    Anything else?

3        A.    We do make some limited income on classes,

4    firearms safety classes.

5        Q.    Training courses?

6        A.    Yes, training courses.

7        Q.    And you sell some merchandise on the

8    website, I see?

9        A.    Sure, hats, T-shirts.

10       Q.    Anything else come to mind as a source of

11   income?

12       A.    Just donations, raffles, membership.

24       Q.    Approximately how many members does GOAL

James L. Wallace - Vol. I - September 12, 2017

20

 1   have?

 2        A.   Currently just over 15,000.

 3        Q.   Do you remember how many members Goal had

 4   in 2016?

 5        A.   It would be approximately the same.

 6        Q.   And 2015?

 7        A.   In 2015, if my memory recalls, somewhere

 8   around 14,000.

 9        Q.   Is your membership primarily limited to

10   citizens of the Commonwealth of Massachusetts?

11        A.   Primarily.

12        Q.   Is GOAL organized as a Massachusetts-based

13   organization?

14        A.   Yes.

15        Q.   Most of its work is in Massachusetts, right?

16        A.   Yes.

17        Q.   Does GOAL own any real estate?

18        A.   No.

19        Q.   Does GOAL have a gun seller's license?

20        A.   A retailer's license, yes.

21        Q.   It's a gun retailer's license, right?

22        A.   Correct.

23        Q.   Issued by what town?

24        A.   It would be Northborough.

James L. Wallace - Vol. I - September 12, 2017

21

1      Q.   Has that license been suspended or

2  terminated for any reason?

3      A.   No.

4      Q.   Does GOAL have any other licenses related

5  to guns?

6      A.   Yes.

7      Q.   What types?

8      A.   We have a state ammunition license.

9      Q.   Has that ever been revoked or suspended for

10  any reason?

11      A.   No.  And we have the firearms, the Federal

12  license as well.

13      Q.   Has that ever been terminated or suspended

14  for any reason?

15      A.   No.

16      Q.   Have any of GOAL's licenses ever lapsed?

17      A.   Not that I'm aware of.

18      Q.   Does GOAL maintain a place of business?

19      A.   Yes.

20      Q.   What type of building is it in?

21      A.   A steel structural commercial building.

22      Q.   In Northborough?

23      A.   Yes.



James L. Wallace - Vol. I - September 12, 2017



24

█

█

█   █

█   █

5      Q.    You mentioned GOAL offers training.  Could

6   you give me a list of the types of training GOAL

7   offers.

8      A.    I can certainly try to give you a partial

9   list.

10     Q.    Sure.

11     A.    Basics of Pistol training, which is an NRA

12   course.

13     Q.    "NRA" meaning National Rifle Association?

14     A.    Yes.

15     Q.    Just so we're clear, we'll call it "NRA"

16   from now on, okay?

17     A.    Of course.  Home Fire Safety Course, which

18   is another NRA course.

19     Q.    When you say these courses are NRA courses,

20   what do you mean?

21     A.    The curriculum was developed by the NRA.

22     Q.    Do you have to get permission from the NRA

23   at all for the course?

24     A.    You have to register the course, and you

James L. Wallace - Vol. I - September 12, 2017

1    have to be a certified trainer, and the materials

2    come from the NRA.

3        Q.   Does NRA offer training to the trainers who

4    offer this course in Massachusetts?

5        A.   Yes.

6        Q.   Would the trainers mostly be you and

7    Mr. Green?

8        A.   Mr. Green.

9        Q.   Always Mr. Green?

10       A.   Not always.  We have a cadre of trainers

11   across the state.

12       Q.   How do you develop those trainers?

13       A.   Very carefully.  They are vetted usually

14   through Mr. Green.  Then they have to go through an

15   approved trainer's course which typically takes at

16   least a weekend to accomplish.

17       Q.   Is that approved trainer's course offered

18   by GOAL?

19       A.   Yes.

20       Q.   It's usually conducted by GOAL as well?

21       A.   Excuse me?

22       Q.   Is it usually conducted by GOAL as well?

23       A.   Yes.

24       Q.   Is that typically Mr. Green?

James L. Wallace - Vol. I - September 12, 2017

1      A.    Correct.

2      Q.    Are there other trainings besides these two

3  that you mentioned?

4      A.    Yes.  As a matter of fact, we have this

5  week what's called a "Combat Focus Course."

6      Q.    Tell me more about that training.

7      A.    It's conducted by a Mr. Rob Pincus, who

8  travels nationally.  That's a pistol course.

9      Q.    What about the training connects the

10  training to combat?

11      A.    It's a good question.  I'm not sure it

12  actually does.  I think it's just a selling point

13  for some reason.

14          We have other courses.  There's a series of

15  what we call "introduction courses," intro for

16  short.  There's Intro to Trap Shooting, Intro to

17  Basic Pistol, Intro to Sporting Rifle.  There are

18  certain sports such as IDPA, which is International

19  Defensive Pistol.  We have an intro course for that.

20      Q.    Anything else you can think of?

21      A.    Occasionally we will run other instructor

22  courses with the help of the NRA, such as Short Gun

23  Instructor.  Then there are various teachers that

24  come in.  They are some reloading courses, metallic

27

```
 1   cartridge reloading, pistol reloading, occasionally

 2   a defensive knife course.

 3       Q.   The metallic cartridge reloading, is that

 4   reloading ammunition?

 5       A.   Yes.  Occasionally we will have a martial

 6   arts instructor that comes in and does a defensive

 7   course for women that is non-gun related.

 8       Q.   Does GOAL offer the basic safety training

 9   that is required to get a Massachusetts gun license?

10       A.   Yes.

11       Q.   You mentioned the NRA, National Rifle

12   Association.  Does GOAL have any ongoing

13   relationship with the NRA?

14       A.   GOAL is the state affiliate for the NRA.

15       Q.   What does that mean exactly?

16       A.   Basically we are the named state

17   association that works closely with the NRA on a lot

18   of issues from training to politics.

19       Q.   Does GOAL pay something to the National

20   Rifle Association to attain that status?

21       A.   No.

22       Q.   Does GOAL contribute to the National Rifle

23   Association?

24       A.   No.
```

James L. Wallace - Vol. I - September 12, 2017

28

1    Q.   Does the National Rifle Association provide

2 any financing to GOAL?

3    A.   Occasionally.

4    Q.   What for?

5    A.   Grants.

6    Q.   Can you give me one example of a grant.

7    A.   A recent grant that was awarded was to do a

8 mailing to potential members across the State of

9 Massachusetts, a membership mailing.

10   Q.   Typically does GOAL have to apply to

11 receive those grants from the NRA?

12   A.   Yes.

13   Q.   Are you familiar with an organization

14 called "Commonwealth2A"?

15   A.   Yes.

16   Q.   Which is also known as "Commonwealth Second

17 Amendment"?

18   A.   Yes.

19   Q.   Is it okay if I use the term "Comm2A" to

20 apply to it?  Is that a term that's familiar to you?

21   A.   Yes.

22   Q.   What relationship does GOAL have to Comm2A?

23   A.   Nothing official.

24   Q.   Does GOAL sometimes work with Comm2A?

James L. Wallace - Vol. I - September 12, 2017

29

1      A.   I would say we converse.  I don't know that
2  "work with" them is the right way to say it, since
3  they are a litigation group and we are not.
4      Q.   When you say "litigation group," what do
5  you mean by "litigation group"?
6      A.    Their primary mission is litigation.
7      Q.   Are you personally involved as an officer,
8  employee, or otherwise, with Comm2A?
9      A.   No.
10     *Q.   Are there other GOAL employees who are
11  employed by or otherwise affiliated with Comm2A?
12     *A.   No, other than maybe somebody that may have
13  donated.  I don't know.
14          MR. GEORGE:  Would you repeat the last
15  question and answer.
16          *(Question and answer read)
17          MR. GEORGE:  And what do you mean by
18  "affiliated"?
19     Q.   Are there other employees that have a
20  connection to Comm2A either because they work for
21  Comm2A or because they have a board position or if
22  they are an officer?
23     A.   Not that I'm aware of.
24          MR. GEORGE:  Thank you.

**James L. Wallace - Vol. I - September 12, 2017**

 1      Q.   Does GOAL own a gun range?

 2      A.   No.

 3      Q.   Does GOAL have any affiliation with or

 4   ownership interest in any gun range?

 5      A.   It's two different questions.  Certainly

 6   affiliated with.  We have approximately

 7   140 affiliated organizations across the state.

 8   Quite a few of them, many of them, have ranges.

 9      Q.   You say an organization is affiliated with

10   GOAL.  How does that affiliation become formalized?

11      A.   Through a membership process.  They pick a

12   level of affiliation for GOAL.

13      Q.   They would join GOAL as an organizational

14   member, in effect?

15      A.   Correct.

16      Q.   And they would pay dues to GOAL?

17      A.   Correct.

18      Q.   Is there any other connection between GOAL

19   and gun ranges across the state?

20      A.   We use many of them to facilitate for our

21   live fire for our training.  We run courses

22   typically throughout many of our affiliated clubs

23   across the state.

24      Q.   Are there other forms of -- are there other

31

1   types of companies that are GOAL affiliates besides

2   gun ranges?

3        A.   Some of them are typical gun ranges.  Some

4   are fish and game clubs and may or may not have

5   shooting facilities, have general interest in fish

6   and wildlife issues.

7        Q.   Those are also affiliated in the same way

8   as corporate members of GOAL?

9        A.   I wouldn't refer to them as corporate

10  members, but yes.

11       Q.   Organizational members of GOAL, is that a

12  better term?

13       A.   Yes.

14       Q.   Can you tell me whether GOAL had any role

15  in finding the other plaintiffs besides GOAL that

16  are participating in this litigation?

17       A.   Yes.

18       Q.   What was that role?

19       A.   We were simply seeking out individuals that

20  may have an interest in becoming a plaintiff, as

21  well as other, I'm sure, entities did as well.

22       Q.   What did GOAL do to seek out individuals

23  who had an interest in participating in the case?

24       A.   On an individual case-by-case basis, we got

1  the word out that we were looking for people that

2  may be interested.  To some extent we talked to

3  people who were and were not interested.

4        Q.    How did you get the word out?

5        A.    Mostly word of mouth from our staff.

6        Q.    Did you publish an inquiry in any form?

7        A.    I don't recall, to be honest.

8        Q.    Does GOAL have a Facebook page?

9        A.    Yes.

10       Q.    Did GOAL ever state on its Facebook page

11  that it was looking for plaintiffs to participate in

12  an action like this one?

13       A.    I don't recall.

14       Q.    Does GOAL have a Twitter account?

15       A.    Yes.

16       Q.    Did GOAL ever tweet that it was looking for

17  plaintiffs to participate in an action like this one?

18       A.    I don't recall.

19       Q.    Do you have access to the prior post on

20  Facebook that GOAL has made?

21       A.    We should.

22       Q.    Would there be a way to check if GOAL made

23  a post seeking plaintiffs for this action?

24       A.    We should be able to.

James L. Wallace - Vol. I - September 12, 2017

1      Q.    Same thing for Twitter?

2      A.    Yes.

3      Q.    Did GOAL send any form of email to its

4   members asking if they were interested in

5   participating if an action like this one?

6      A.    What's the correct term...  Not et al., or

7   not in mass.

8      Q.    Did GOAL email any portion of its

9   membership?

10     A.    I believe whatever we had was given as part

11  of the process, as part of the documents.  So

12  anything that would have been was given.

13     Q.    How did people alert GOAL that they may be

14  interested in participating in a case like this one?

15     A.    They might contact the staff, myself, Jon

16  Green, Angie, Mike.

17     Q.    By telephone typically?

18     A.    Telephone, email, text message.

19     Q.    Did everyone that expressed an interest

20  ultimately participate as a plaintiff in this case?

21     A.    No.

22     Q.    How many people contacted GOAL to express

23  interest in participating?

24     A.    I don't have that number.

James L. Wallace - Vol. I - September 12, 2017

34

1      Q.    More than ten?

2      A.    I honestly don't know.

3      Q.    Is there someone at GOAL that would know

4    that?

5      A.    No.

6      Q.    Did GOAL have any role in evaluating

7    whether a particular person who expressed an

8    interest was appropriately a plaintiff in this case?

9      A.    Yes.

10      Q.    What was that role?

11      A.    It depended upon who was talking to us, and

12    we would try to explain to them the process.

13      Q.    Did you ask them questions about their gun

14    ownership?

15      A.    No.

16      Q.    Were there certain things you were looking

17    for to indicate to you that somebody was

18    appropriately a plaintiff in this case?

19      A.    Yes.

20      Q.    What were you looking for?

21      A.    Somebody who could withstand the process

22    and somebody who lawfully owned firearms.

23      Q.    Were you contacted by anyone who you

24    concluded was not a lawful firearm owner?

James L. Wallace - Vol. I - September 12, 2017

```
 1        A.    Not to my knowledge.

 2        Q.    So if I could just ask you about the

 3   different individuals who are individuals plaintiffs

 4   in this case.  Could you tell me whether or not they

 5   became plaintiffs because -- after contacting GOAL.

 6        A.    Sure.

 7        Q.    Anthony Linden?

 8        A.    Is that the first one?

 9        Q.    It's at the top of the page if you want to

10   follow along.

11        A.    Oh, okay.

12        Q.    I'm just going in order.

13        A.    I got it.

14        Q.    Was Anthony Linden someone that contacted

15   GOAL about participating in the case?

16        A.    Not that I'm aware of.

17        Q.    Are you familiar with Mr. Linden?

18        A.    No.

19        Q.    Do you know how he came to the litigation?

20        A.    No.

21        Q.    Jason William Sawyer?

22        A.    No.

23        Q.    You don't know him?

24        A.    I don't know him.
```

James L. Wallace - Vol. I - September 12, 2017

 1      Q.   You don't know how he came to be involved

 2  in the litigation?

 3      A.   No.

 4      Q.   Have you ever met him?

 5      A.   I don't know.

 6      Q.   Anthony Linden, did you ever meet him?

 7      A.   I don't know.

 8      Q.   Andrew Feld, is that someone that contacted

 9  GOAL about participating in this litigation?

10           MR. PORTER:  It's Nicholas Andrew Feld.

11  He's withdrawn from the suit.

12           You can answer the question if you know the

13  answer.

14      A.   Not that I'm aware.

15      Q.   Paul Nelson Chamberlain?

16      A.   I don't think I know him.

17      Q.   Do you know whether any of these

18  individuals had contacted GOAL about participating

19  in a lawsuit like this one?

20      A.   They may have.

21      Q.   You don't know that any of them didn't

22  contact GOAL, then, either, right?

23      A.   That's correct.

24      Q.   Did GOAL also solicit gun sellers to

37

1    participate in the litigation?

2        A.   I don't know if "solicit" is the right

3    term.  We certainly spoke to a few.

4        Q.   When you spoke to them, what were you

5    trying to find out?

6        A.   Basically the same thing, could they

7    withstand the process or are they willing to go

8    through the process.

9        Q.   Was On Target Training, Incorporated one of

10   the gun sellers that you spoke with or someone that

11   GOAL spoke with?

12       A.   Not that I'm aware of.

13       Q.   How about Overwatch Outpost?

14       A.   Not that I'm aware.

15       Q.   Do you know if any of the plaintiffs are

16   being asked to pay any part of the cost of the

17   litigation?

18       A.   I know we are expected to pay some.

19       Q.   When you say "we," you mean?

20       A.   GOAL.

21       Q.   How about the other plaintiffs?

22       A.   I don't know.

23       Q.   Are you familiar with someone by the name

24   of "Suzanne McComas"?

James L. Wallace - Vol. I - September 12, 2017

 1      A.    The name does not ring a bill.

 2      Q.    Are you familiar with someone named "Thomas

 3  Bolioli"?

 4      A.    Yes.

 5      Q.    Who is Mr. Bolioli?

 6      A.    I know Tom from Comm2A.

 7      Q.    Do you know if he had a role in identifying

 8  plaintiffs to participate in the litigation?

 9      A.    I don't know if he had a role in these

10  people.

11      Q.    But you know if he had some role in putting

12  the litigation together?

13      A.    Yes.

14      Q.    When somebody was appropriate for

15  participation in the litigation in the eyes of GOAL,

16  was that person referred to counsel?

17      A.    I don't believe we actually came up with

18  individuals through GOAL.

19      Q.    You don't believe that GOAL came up with

20  any individuals?

21      A.    That made it to that process.

22      Q.    Did GOAL refer any people to Comm2A for

23  further evaluation?

24      A.    I don't think so.

 1      Q.   Do you know if the National Rifle

 2  Association had any role in putting this litigation

 3  together?

 4           MR. PORTER:  Object to the form of the

 5  question.  You can answer if you know the answer.

 6      A.   Yes.

 7      Q.   What was their role?

 8      A.   Basically organizational, and at some point

 9  attorneys had to talk to attorneys, putting the

10  complaint together.

11      Q.   What about Comm2A, do you know for certain

12  that they had a role in putting the case together?

13      A.   In some manner.

14      Q.   Do you know what that role was?

15      A.   Not specifically.

16           MR. KLEIN:  This is a good time for a short

17  break.

18           (Recess at 10:45 a.m.)

19                (Document marked as Wallace

20                 Exhibit 2 for identification)

21      BY MR. KLEIN:  (10:55 a.m.)

22      Q.   Mr. Wallace, you have in front of you a

23  document labeled as Exhibit No. 2.  Is that a

24  document that is familiar to you?

James L. Wallace - Vol. I - September 12, 2017

40

1         MR. GEORGE:  How many pages are in this
2    document, please?
3         MR. KLEIN:  It's Bates labeled starting
4    with GOAL 00094 and continues consecutively through
5    Page GOAL 000111.
6         MR. GEORGE:  So we can assume there are
7    111 minus 93 pages?
8         MR. KLEIN:  Yes.
9         MR. GEORGE:  So if we did the math, we
10   would know number of pages?
11        MR. KLEIN:  Yes.
12        MR. GEORGE:  Thank you.
13        MR. PORTER:  But we are all lawyers so that
14   will never happen.
15     A.   (Examines document)  I don't recognize the
16   document as it sits here.
17     Q.   Based on your general knowledge, is it a
18   set of PowerPoint slides?
19        MR. GEORGE:  That's if you know.
20     A.   It could be.
21     Q.   Do you know if these are training materials
22   that GOAL has used?
23     A.   They could be.
24     Q.   Do you understand the fact that there's

 1   Bates numbers at the bottom of each page means that

 2   these were documents that were produced by counsel

 3   as documents of GOAL?

 4        MR. GEORGE:  He understands that if you

 5   tell him that.

 6        Q.   I'm asking you if you understand, please.

 7        A.   No.  I don't have that presupposition.

 8        Q.   Does GOAL typically use training materials

 9   in any of its trainings?

10        A.   Yes.

11        Q.   Does it typically use PowerPoints in any of

12   its trainings?

13        A.   Yes.

14        Q.   Does the fact that -- the first page, the

15   first rectangle in the upper left corner says, "Gun

16   Owners' Action League" and has a logo on it that

17   says, "GOAL," do you see that?

18        A.   Yes.

19        Q.   Does that suggest that this is a document

20   that somehow GOAL --

21        MR. GEORGE:  It doesn't suggest that every

22   page is the same as the thing in the upper left

23   corner of Page 1.

24        MR. KLEIN:  Please don't instruct the

James L. Wallace - Vol. I - September 12, 2017

 1    witness.

 2            MR. GEORGE:  I'm not.  I'm objecting that

 3    something in the upper left corner of an umpteen

 4    page document that says, "GOAL" on it suggests --

 5    your word -- that all of these things are GOAL

 6    things.  I think that's an improper question.

 7            MR. KLEIN:  Thank you.

 8            MR. GEORGE:  You can go ahead and answer if

 9    you want to.

10        A.   Sorry, what was the question?

11        Q.   Does the fact that the first rectangle in

12    the upper left-hand corner says, "Gun Owners' Action

13    League" and that there's a name on it that says,

14    "GOAL" in the logo, does that suggest that these

15    were documents that were created by GOAL?

16            MR. PORTER:  Objection to form.  You can

17    answer the question if you can.

18        A.   It could be.

19        Q.   Do you know if someone else is using the

20    logo that appears in that box besides GOAL?

21        A.   Not that I'm aware.

22        Q.   Is that GOAL's logo?

23        A.   One of them.

24        Q.   If you look at the fourth page which says,

**Doris O. Wong Associates, Inc.**

43

 1    "GOAL 00097," do you see that page?

 2         A.    Hang on.  Yes, I see it.

 3         Q.    The slide -- well, I don't want to call it

 4    a slide because we have not established what this

 5    is, but the rectangle in the upper left corner says,

 6    "Gun Owners' Action League presents," and then

 7    there's a logo that says, "GOAL" in it, do you see

 8    that?

 9         A.    Yes.

10         Q.    Is that a logo that GOAL uses?

11         A.    Yes.

12         Q.    At the bottom of the same page it says,

13    "Gun Law for Citizens," do you see that?

14         A.    Yes.

15         Q.    Is that a training course that GOAL offers?

16         A.    Yes.

17         Q.    Does that suggest to you that this is a set

18    of training materials or PowerPoints related to

19    GOAL's Gun Law for Citizens training?

20              MR. PORTER:  I object to the form of the

21    question.  You can answer the question if you can.

22         A.    It could be.

23         Q.    But you don't know?

24         A.    For a fact, no.

James L. Wallace - Vol. I - September 12, 2017

44

```
 1        Q.   If you could turn to the page labeled
 2   GOAL 000108.  It says in that top rectangle, "Gun
 3   Owners' Action League."  Again, there's that same
 4   logo that we saw on the first page.  Do you see
 5   that?
 6        A.   Yes.
 7        Q.   Under that it says, "An Overview of
 8   Massachusetts Gun Laws, Revised 2017," do you see
 9   that?
10        A.   Yes.
11        Q.   Is this Overview of Massachusetts Gun Laws
12   a training that GOAL offers?
13        A.   It could be.
14        Q.   But you don't know?
15        A.   Not having reviewed it all.
16        Q.   Well, take some time and review it, and
17   answer the question if you can.
18        A.   (Examines document)  It appears to be the
19   slide show that Jon Green would use for the course,
20   yes.
21        Q.   So your belief is that the material
22   starting on Page 000108 is material that Mr. Green
23   uses to present a training called "An Overview of
24   Massachusetts Gun Laws"?
```

James L. Wallace - Vol. I - September 12, 2017

45

```
 1      A.    Yes.

 2      Q.    Is that a training that you ever offered

 3  yourself?

 4      A.    Once.

 5      Q.    Did you use these training materials?

 6      A.    I don't think I used these.

 7      Q.    Did you use similar training materials?

 8      A.    It would be similar because they would

 9  cover the same set of laws.

10      Q.    Was it a PowerPoint presentation?

11      A.    Yes.

12      Q.    Let's go back to the first page.  The top

13  rectangle, again, it says at the bottom, "Gun

14  Owners' Action League, Introduction to the Modern

15  Sporting Rifle."  Is Introduction to the Modern

16  Sporting Rifle a training that GOAL has offered?

17      A.    Yes.

18      Q.    Do these appear to be training materials

19  associated with that training?

20      A.    I have not actually ever reviewed the

21  training materials for that course.

22      Q.    Have you ever been the trainer in a

23  training called "Introduction to the Modern Sporting

24  Rifle"?
```

James L. Wallace - Vol. I - September 12, 2017

46

1     A.    No.

2     Q.    That would always be Mr. Green?

3     A.    Yes.

4     Q.    Let's go back to 00097.  Again, that top

5   rectangle says, "Gun Law for the Massachusetts

6   Resident 2017"?

7     A.    Right.

8     Q.    Below that it says, "Jon Green, Director of

9   Education and Training," do you see that?

10    A.    Yes.

11    Q.    Does that suggest to you that these are

12  training materials used by Mr. Green in connection

13  with the training on behalf of GOAL called "Gun Law

14  for the Massachusetts Resident"?

15          MR. PORTER:  Objection to form.  You can

16  answer.

17    A.    They certainly could be.

18    Q.    But you don't know?

19    A.    These change quite often.

20    Q.    Meaning they would have been used at one

21  time but may not be the materials currently in use?

22    A.    They could have, either way.

23    Q.    If we could go back to Exhibit 1 for a

24  second.

James L. Wallace - Vol. I - September 12, 2017

47

1      A.    This one (indicating)?

2      Q.    Yes.  Would you turn to Page 4, please.

3      A.    I'm there, Page 4.

4      Q.    Could you read the material after No. 9 on

5  that page.

6      A.    (Examines document)

7      Q.    Have you read it now?

8      A.    Yes.

9      Q.    Does No. 9 say, "The firearms training

10  provided by the Plaintiff"?

11      A.    Yes.

12      Q.    Is that a topic that you are here to

13  testify about today?

14      A.    Yes, I assume.

15      Q.    Have you familiarized yourself with the

16  training materials that were produced to us by GOAL

17  and are now in front of you as Exhibit 2?

18      A.    I would have to say I did not in this case,

19  in Exhibit 2.

20      Q.    Meaning you did not review it as part of

21  your planning for this deposition?

22      A.    Correct.

23      Q.    You said earlier that GOAL has offered a

24  training called "Introduction to the Modern Sporting

James L. Wallace - Vol. I - September 12, 2017

48

```
 1    Rifle"; is that right?
 2         A.    That's correct.
 3         Q.    Is that a training that GOAL frequently
 4    offers?
 5         A.    Maybe two or three times a year.
 6         Q.    Is Mr. Green always the trainer for that
 7    training?
 8         A.    To the best of my knowledge.
 9         Q.    Have you ever been the trainer for that
10    training?
11         A.    No.
12         Q.    As you look through this material, the
13    pages in front of you marked as Exhibit 2, did you
14    see anything that you believe is not part of
15    Mr. Green's training materials?
16              MR. PORTER:  Objection to the form of the
17    question.  You can answer if you know the answer to
18    that, though, Jim.
19         A.    Having not reviewed the material, I cannot
20    answer the question factually.
21         Q.    Let's start with the first page,
22    Page 00094.  Would you review that, please.
23              MR. GEORGE:  I take it you are asking him
24    to look at all six things on that page?
```

James L. Wallace - Vol. I - September 12, 2017

49

```
 1            MR. KLEIN:   Yes.

 2       A.   (Examines document)   Okay.

 3       Q.   There is a picture of a gun in the

 4   rectangle in the top left-hand corner, do you see

 5   that?

 6       A.   Yes.

 7       Q.   What type of gun is that?

 8       A.   It appears to be an AR-15 platform.

 9       Q.   When you use the term "AR-15 platform," do

10   you mean a gun that is built on the AR-15 platform?

11       A.   Yes.

12       Q.   Is there more than one gun built on the

13   AR-15 platform?

14       A.   I would say there are many.

15       Q.   Could you give us a list.

16       A.   I believe Sig makes one that is close.

17       Q.   Do you know the model name of the Sig gun

18   that you are referring to?

19       A.   No.

20       Q.   Could it be the Sig Sauer M-400?

21            MR. PORTER:   I object to the form of the

22   question.   He said he didn't know.

23            You can answer.

24       A.   It could be.
```

James L. Wallace - Vol. I - September 12, 2017

50

1      Q.    Give me the names of other guns that are
2  built on the AR-15 platform.
3      A.    Smith & Wesson has their M&P line.   There
4  are a host of other manufacturers.   Bushmaster used
5  to.
6      Q.    Do you know the Bushmaster model name?
7      A.    No.   There are some smaller manufacturers
8  in Massachusetts, Saxonville Arms.   Obviously they
9  don't still manufacture it, but they used to.



51

▇ ▇▇▇▇▇▇▇▇▇▇▇▇

▇ ▇▇ ▇▇▇▇▇▇▇

▇ ▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇

4      Q.   Is it fair to say guns that are built on

5 the AR-15 platform are often referred to in the gun

6 community as "AR-15s"?

7           MR. PORTER:  I object to the form of the

8 question.  You can answer if you know.

9      A.   Yes.

10     Q.   Are you familiar with a gun called the

11 "AK-47"?

12     A.   Yes.

13     Q.   Is that typically the shorthand name for a

14 gun called the "Avtomat Kalashnikov 47"?

15     A.   I suppose.

16          MR. PORTER:  Hold on.  Yes or no.  Answer

17 the question.  If you know it, answer it.  If you

18 don't, say "I don't know."

19     A.   Yes.

20     Q.   The answer is yes?

21     A.   Yes.

22     Q.   Do you know if there are other guns built

23 in the same platform as the AK-47?

24     A.   There are probably several that could be

52

1    determined as being built off that platform.

2         Q.    Can you give me any examples?

3         A.    SKS.

4         Q.    That's a gun that would be an AK-47

5    platform gun?

6         A.    It's very similar in design.

7         Q.    Any other guns that you can think of?

8         A.    Not off the top of my head.

9         Q.    Does Romanian Arms build a gun that's built

10   on the AK-47 platform?

11        A.    I don't know.

12        Q.    Is it fair to say that the guns built on

13   the AK-47 platform are typically referred to in the

14   gun-owning community as "AK-47s"?

15             MR. PORTER:  I object to the form of the

16   question.  You can answer if you know.

17        A.    Not typically.

18        Q.    What would they be called?

19        A.    AKs.

**James L. Wallace - Vol. I - September 12, 2017**



James L. Wallace - Vol. I - September 12, 2017

54

 9              (Documents marked as Wallace

10              Exhibits 3-4 for identification)

11      Q.   You have in front of you a document labeled

12 as Exhibit 3.  The Bates number on it is GOAL

13 000162.  It runs through GOAL 000164.

14      A.   (Examines document)

15      Q.   Have you had the chance to review that

16 document?

17      A.   Yes.

18      Q.   Do you know what it is?

19      A.   It looks like a copy of a page of our

20 website.

21      Q.   Is that currently a page that is on your

22 website?

23      A.   I do not know if it's been changed since

24 this was copied.

James L. Wallace - Vol. I - September 12, 2017

55

1     Q.   Were you involved at all in identifying it

2  on your website as something that would be

3  responsive to the request for production of

4  documents in this matter?

5     A.   Yes.   Under instruction, my staff was

6  instructed to get anything they could that would

7  meet the requirements.

8     Q.   Were they actually looking at pages on the

9  website?

10    A.   Yes.

11    Q.   So at the time this was produced, it was

12  present on your website?

13    A.   More than likely.

14    Q.   It says at the top, if I read it correctly,

15  "Understanding 'assault weapons' and 'large capacity

16  weapons'"; is that right?

17    A.   Yes.

18    Q.   Is this something that you would have

19  prepared for inclusion on GOAL's website personally?

20    A.   Most of the things, it's a joint effort

21  with the staff.

22    Q.   So some combination of GOAL's staff

23  prepared this?

24    A.   Yes.

James L. Wallace - Vol. I - September 12, 2017

56

1       Q.    Were you involved in preparing it?

2       A.    More than likely.

3       Q.    Did you review it before it was placed on

4    the website to the best of your recollection?

5       A.    This particular page I could not say yes or

6    no.  I don't know.

7       Q.    Is there anything on here, based on your

8    review this morning, that you consider incorrect?

9       A.    After a quick review, no.

10      Q.    Go ahead and take as much time as you need.

11            MR. GEORGE:  You are asking him to just

12    read the first page?

13            MR. KLEIN:  He can read the whole document

14    if he needs to.

15            MR. GEORGE:  Well, you said, Would you read

16    it.  Are you asking him to read all the pages in the

17    exhibit?

18            MR. KLEIN:  Whatever review he needs to do

19    he should do.

20      A.    (Examines document)  It seems accurate.

21      Q.    You don't see anything in here that you

22    believe to be inaccurate?

23      A.    I don't.

24      Q.    Would you turn to Exhibit 4 now.  The Bates

57

```
 1    label on that document is GOAL 000171 and 000172 and
 2    000173.
 3         A.   (Examines document)
 4         Q.   Have you had the chance to review this
 5    document?
 6         A.   Okay.
 7         Q.   Have you had the chance to review it?
 8         A.   Yes.
 9         Q.   Is this to the best of your knowledge
10    material that appeared on GOAL's website at the time
11    it was produced to us?
12         A.   Yes.
13         Q.   Did you have any role in preparing this
14    document?
15         A.   I don't believe so.
16         Q.   Do you know if you reviewed it before it
17    appeared on the website?
18         A.   I don't recall.
19         Q.   Is there anything in this document that you
20    believe to be inaccurate?
21              MR. GEORGE:  Which exhibit number are you
22    referring to now, please?
23              MR. KLEIN:  Exhibit No. 4.
24              MR. GEORGE:  Thank you.
```

James L. Wallace - Vol. I - September 12, 2017

1      A.   It says it's a column of some sort.  I'm

2   not sure accuracy would apply to it as, say, with a

3   training course.

4      Q.   Is there any factual information in here

5   that you believe to be inaccurate?

6      A.   There does not appear to be.

7      Q.   Are you familiar with the term "large

8   capacity magazine"?

9      A.   Yes.

10      Q.   What does that term refer to?

11      A.   Under Massachusetts law, it would refer to

12   magazines for a rifle or pistol that hold more than

13   10 and for a shotgun hold more than 5.

14      Q.   When you say "hold more than 10," you mean

15   hold more than 10 rounds?

16      A.   Yes.

17      Q.   And by "more than 5," you mean more than

18   5 rounds?

19      A.   Yes.

20      Q.   Do you happen to own any large capacity

21   magazines?

22      A.   Yes.

23      Q.   When did you acquire it?

24      A.   2001.

59

1     Q.   Was it your understanding when you acquired

2   it that the magazine you acquired was manufactured

3   before 1998?

4     A.   Yes.

5          MR. KLEIN:   We can take a very short break.

6   I want to confer with my colleagues.   I may be able

7   to wrap this up very soon.

8          (Recess at 11:27 a.m.)

9     BY MR. KLEIN:   (11:35 a.m.)

10     Q.   Mr. Wallace, when did GOAL first become

11   aware of the Enforcement Notice?

12     A.   Sometime in the morning of the 20th is when

13   I got a phone call.

14     Q.   Who did you get the phone call from?

15     A.   I found a message on my machine from

16   Michael Firestone, I believe was the name.

17     Q.   Do you know if he's an employee of the

18   Attorney General's Office?

19     A.   Yes.

20     Q.   Do you know what his position is?

21     A.   I thought he was chief of staff, but I

22   really don't know the answer to that.

23     Q.   What did he tell you in that message?

24     A.   Just that they were having a press release

1  about an enforcement notice on assault weapons.

2      Q.   Did you get a copy of it?

3      A.   Not actually.  At that point, I actually

4  had to go to the office, which took me an hour or so

5  to get there.

6      Q.   At GOAL?

7      A.   Yes.

8      Q.   Was there a copy of the press release there

9  for you?

10     A.   We finally got ahold of one, yes.

11     Q.   Did you get a copy of the Enforcement

12 Notice as well?

13     A.   Yes.

14     Q.   When you got a copy of the Enforcement

15 Notice, did you read it?

16     A.   We read through it several times.

17     Q.   Did you read the press release as well?

18     A.   I assume we did.

19     Q.   At some point GOAL began posting

20 information about the Enforcement Notice on its

21 website; is that right?

22     A.   Yes.

23     Q.   At what point was that, if you remember?

24     A.   I don't remember.

James L. Wallace - Vol. I - September 12, 2017

61

```
 1        Q.   Do you know if anything was posted the same
 2   day, on July 20, 2016?
 3        A.   I don't remember because our director of
 4   communications was on vacation that week.
 5        Q.   And how does that affect your memory?
 6        A.   Only because I don't remember exactly when
 7   we got ahold of him to try to get some type of alert
 8   up on the page.
 9        Q.   So he would have had to actually put the
10   alert on the page?
11        A.   I believe he is the only one that has
12   access to do so.
13        Q.   You don't remember if that was the same day
14   or a day later or two days later?
15        A.   I don't recall.
16        Q.   Would you be able to track on the website
17   the date on which the first material GOAL posted
18   about the Enforcement Notice appeared?
19        A.   I don't know.  I'm not familiar with that
20   technology.
21        Q.   Who would know that?
22        A.   Our director of communications may be able
23   to help with that.
24             MR. KLEIN:  I don't have any further
```

**James L. Wallace - Vol. I - September 12, 2017**

62

 1   questions.

 2            MR. PORTER:  We have no questions.

 3            MR. KLEIN:  I just want to state briefly on

 4   the record there are some concerns about this

 5   witness not being prepared to respond to matters

 6   that were within the scope of the 30(b)(6) notice in

 7   this matter.  Most particularly, we had a series of

 8   questions about firearms trainings provided by GOAL.

 9   The witness acknowledged he is not familiar with the

10   PowerPoints that were used in some of the trainings

11   GOAL provides.  For that reason we reserve the right

12   to reopen this deposition in order to get responses

13   to those questions.

14            MR. PORTER:  Okay.  Obviously you can

15   reserve the right to do that if you would like.  Our

16   position is that you didn't ask any substantive

17   questions about firearms training that he had the

18   opportunity to answer.  You asked him about the

19   slides or the images on the paper.  If you want a

20   stipulation from us that these are -- you know, to

21   authenticate these and use them that way, we can do

22   that.  I mean, GOAL produced these documents.

23            His familiarity with GOAL's training I

24   don't think was really plum during your deposition.

James L. Wallace - Vol. I - September 12, 2017

1        MR. KLEIN:  So would that stipulation

2    include that the material on that document, Exhibit

3    No. 2, are used by GOAL in training?

4        MR. PORTER:  Well, sitting here right now I

5    can't give you the full scope of the stipulation.  I

6    would be willing to take a look at these and talk to

7    my client.  In very short order we can answer the

8    question.

9        MR. KLEIN:  Would it include the

10   stipulation that GOAL believes the information

11   presented in the slides is accurate?

12       MR. PORTER:  That would be a

13   question-by-question basis.  I mean, some of the

14   stuff would be technical.  That would be easy to

15   stipulate to.  Some may be opinion based or

16   political, and that would be less susceptible to

17   stipulation.

18       MR. KLEIN:  Again, we reserve our rights.

19   It's possible we could resolve this by stipulation.

20       MR. PORTER:  I understand.

21           (Whereupon the deposition

22            was suspended at 11:39 a.m.)

23

24

James L. Wallace - Vol. I - September 12, 2017

64

1                 C E R T I F I C A T E

2       I, JAMES L. WALLACE, do hereby certify that I

3  have read the foregoing transcript of my testimony,

4  and further certify under the pains and penalties of

5  perjury that said transcript (with/without)

6  suggested corrections is a true and accurate record

7  of said testimony.

8       Dated at _____, this _____ day of _____,

9  2017.

10

11                          _____

12

13

14

15

16

17

18

19

20

21

22

23

24

**James L. Wallace - Vol. I - September 12, 2017**

65

1                        SUGGESTED CORRECTIONS

2    RE:  David Seth Worman, et al., vs. Maura Healey,
          et al.
3
     WITNESS:  James L. Wallace, Vol. I
4
     The above-named witness wishes to make the following
5    changes to the testimony as originally given:

6    PAGE    LINE        SHOULD READ              REASON

7    _____   _____   _____   _____

8    _____   _____   _____   _____

9    _____   _____   _____   _____

10   _____   _____   _____   _____

11   _____   _____   _____   _____

12   _____   _____   _____   _____

13   _____   _____   _____   _____

14   _____   _____   _____   _____

15   _____   _____   _____   _____

16   _____   _____   _____   _____

17   _____   _____   _____   _____

18   _____   _____   _____   _____

19   _____   _____   _____   _____

20   _____   _____   _____   _____

21   _____   _____   _____   _____

22   _____   _____   _____   _____

23   _____   _____   _____   _____

24   _____   _____   _____   _____

**Doris O. Wong Associates, Inc.**

66

```
 1   COMMONWEALTH OF MASSACHUSETTS)

 2   SUFFOLK, SS.                 )

 3       I, Ken A. DiFraia, RPR and Notary Public in and

 4   for the Commonwealth of Massachusetts, do hereby

 5   certify that there came before me on the 12th day of

 6   September, 2017, at 9:59 a.m., the person

 7   hereinbefore named, who was by me duly sworn to

 8   testify to the truth and nothing but the truth of

 9   his knowledge touching and concerning the matters in

10   controversy in this cause; that he was thereupon

11   examined upon his oath, and his examination reduced

12   to typewriting under my direction; and that the

13   deposition is a true record of the testimony given

14   by the witness.

15       I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 26th day of

21   September, 2017.

22

23

24
```

James L. Wallace - Vol. I - September 12, 2017

67

1      Under Federal Rule 30:

2              X   Reading and Signing was requested

3                  Reading and Signing was waived

4                  Reading and Signing was not requested

5

6      *Ken A. DiFrala*

7

8   Notary Public

9   Commission expires 2/24/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**James L. Wallace - Vol. I - September 12, 2017**

D I S C L A I M E R

This transcript in any format is a confidential communication between Doris O. Wong Associates, Inc., a professional court reporting firm, and the parties to this matter and their counsel.  Any reproduction or distribution of this transcript without the express permission of the parties is a violation of this confidentiality.  To fulfill any request to the court reporter for an additional copy or copies from persons or entities without standing in this matter will require the consent of the parties and/or counsel and/or a court order for such delivery.

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 340 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

James L. Wallace - Vol. I
September 12, 2017

## $

**$400,000 (1)**
19:18
**$500,000 (1)**
19:18
**$600,000 (1)**
19:23
**$700,000 (1)**
19:21

## *

**\*A (1)**
29:12
**\*Q (1)**
29:10
**\*Question (1)**
29:16

## A

**ability (1)**
8:18
**able (5)**
6:1;32:24;59:6;
61:16,22
**access (2)**
32:19;61:12
**accomplish (1)**
25:16
**according (1)**
7:10
**account (1)**
32:14
**accounting (1)**
16:4
**accuracy (1)**
58:2
**accurate (2)**
56:20;63:11
**acknowledged (1)**
62:9
**acquire (5)**
23:16;52:21;53:4,
17;58:23
**acquired (5)**
24:1;53:9,14;59:1,2
**acronym (1)**
7:14
**across (5)**
25:11;28:8;30:7,19,
23
**Action (13)**
4:18,23;7:12,17;
32:12,17,23;33:5;
41:16;42:12;43:6;
44:3;45:14
**actually (10)**
9:23;23:14;24:1;
26:12;38:17;45:20;
55:8;60:3,3;61:9

**address (3)**
4:11,13,15
**advocacy (1)**
13:12
**affect (1)**
61:5
**affiliate (1)**
27:14
**affiliated (7)**
29:11,18;30:6,7,9,
22;31:7
**affiliates (1)**
31:1
**affiliation (3)**
30:3,10,12
**Again (3)**
44:3;45:13;46:4;
63:18
**age (2)**
9:20;14:24
**ago (1)**
15:1
**ahead (3)**
5:20;42:8;56:10
**ahold (2)**
60:10;61:7
**Air (1)**
15:15
**AK-47 (5)**
51:11,23;52:4,10,
13
**AK-47s (1)**
52:14
**AKs (1)**
52:19
**al (1)**
33:6
**alarm (7)**
22:5,10,12,15,16,
16,21
**alert (3)**
33:13;61:7,10
**allowed (1)**
23:6
**along (1)**
35:10
**always (7)**
6:5;18:20,21;25:9,
10;46:2;48:6
**Amendment (1)**
28:17
**ammunition (4)**
21:8;22:6,8;27:4
**Andrew (2)**
36:8,10
**Angela (1)**
17:12
**Angie (1)**
33:16
**annual (1)**
19:13
**Anthony (3)**
35:7,14;36:6

**appear (2)**
45:18;58:6
**appeared (2)**
57:10,17;61:18
**appears (3)**
42:20;44:18;49:8
**apply (3)**
28:10,20;58:2
**appropriate (1)**
38:14
**appropriately (2)**
34:8,18
**approved (2)**
25:15,17
**Approximately (8)**
9:15;10:21;11:8;
14:21;19:13,24;20:5;
30:6
**AR-15 (11)**
49:8,9,10,13;50:2,
11,14,19,22;51:5;
52:21
**AR-15s (1)**
51:6
**arm (1)**
11:6
**Arms (2)**
50:8;52:9
**Army (3)**
10:13,14;11:1
**around (1)**
20:8
**arts (1)**
27:6
**assault (2)**
55:15;60:1
**associated (1)**
45:19
**Association (7)**
24:13;27:12,17,20,
23;28:1;39:2
**assume (6)**
5:9;9:20;14:10;
40:6;47:14;60:18
**attain (1)**
27:20
**attended (1)**
13:2
**Attorney (3)**
17:17;53:2;59:18
**attorneys (3)**
4:20;39:9,9
**authenticate (1)**
62:21
**Avtomat (1)**
51:14
**awarded (1)**
28:7
**aware (9)**
18:16;21:17;29:23;
35:16;36:14;37:12,
14;42:21;59:11

## B

**back (6)**
15:21;18:17;23:4;
45:12;46:4,23
**bait (3)**
9:24;10:2,6
**Baker (1)**
4:22
**ballpark (3)**
19:17,21
**Based (3)**
40:17;56:7;63:15
**Basic (10)**
10:19;11:11,12,15,
18,21,22;12:1;26:17;
27:8
**Basically (3)**
27:16;37:6;39:8
**Basics (1)**
24:11
**basis (3)**
23:2;31:24;63:13
**Bates (4)**
40:3;41:1;54:12;
56:24
**became (1)**
35:5
**become (2)**
30:10;59:10
**becoming (1)**
31:20
**began (1)**
60:19
**begin (1)**
6:17
**behalf (2)**
8:16;46:13
**belief (1)**
44:21
**believes (1)**
63:10
**Below (1)**
46:8
**besides (5)**
15:6;26:2;31:1,15;
42:20
**best (4)**
8:18;48:8;56:4;
57:9
**better (1)**
31:12
**Big (2)**
10:2,6
**bill (1)**
38:1
**bind (1)**
8:2
**blogging (1)**
16:7
**blogs (1)**
16:14

**board (2)**
16:4;29:21
**Bolioli (2)**
38:3,5
**Boston (1)**
13:3
**bottom (3)**
41:1;43:12;45:13
**box (1)**
42:20
**break (4)**
6:4,5;39:17;59:5
**brief (1)**
9:23
**briefly (1)**
62:3
**budget (1)**
19:14
**build (1)**
52:9
**building (2)**
21:20,21
**built (12)**
49:10,12;50:2,10,
14,18,22;51:4,22;
52:1,9,12
**bulk (1)**
11:11
**Bushmaster (2)**
50:4,6
**business (7)**
4:11,15,17;10:1,3;
21:18;23:23

## C

**cable (1)**
13:6
**cadre (1)**
25:10
**call (3)**
24:15;26:15;43:3;
59:13,14
**called (12)**
4:3,21;12:14;26:5;
28:14;44:23;45:23;
46:13;47:24;51:10,
14;52:18
**came (4)**
35:19;36:1;38:17,
19
**can (37)**
4:10;5:24;6:5,17;
8:19;14:24;15:10;
17:6;22:4;23:12,18;
24:8;26:20;28:6;
31:14;36:12;39:5;
40:6;42:8,16,17;
43:21,21;44:17;
46:15;48:17;49:23;
51:8;52:2,7,16,23;
56:13;59:5;62:14,21;
63:7

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 341 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

James L. Wallace -  Vol. I
September 12, 2017

**capacity (4)**
9:16;55:15;58:8,20
**carefully (1)**
25:13
**carpenter (1)**
12:22
**carrier (1)**
9:17
**carry (8)**
14:14,22;15:3,8,11,
13,14,18
**cartridge (2)**
27:1,3
**case (11)**
7:1;17:18;31:23;
33:14,20;34:8,18;
35:4,15;39:12;47:18
**case-by-case (1)**
31:24
**certain (3)**
26:18;34:16;39:11
**certainly (4)**
24:8;30:5;37:3;
46:17
**certified (1)**
25:1
**Chamberlain (1)**
36:15
**chance (3)**
54:15;57:4,7
**change (2)**
18:18;46:19
**changed (1)**
54:23
**changes (1)**
18:12
**charge (2)**
23:9,14
**check (2)**
32:22;51:3
**Chief (2)**
17:15;59:21
**Chuldenski (1)**
17:24
**circumstances (1)**
15:11
**citizens (3)**
20:10;43:13,19
**clarify (2)**
5:8,9
**classes (2)**
19:3,4
**clear (1)**
24:15
**client (1)**
63:7
**close (1)**
49:16
**closely (1)**
27:17
**clubs (2)**
30:22;31:4
**colleagues (1)**

59:6
**collection (2)**
53:22,22
**column (1)**
58:1
**Combat (2)**
26:5,10
**combination (1)**
55:22
**Comm2A (10)**
28:19,22,24;29:8,
11,20,21;38:6,22;
39:11
**commercial (1)**
21:21
**Commonwealth (2)**
20:10;28:16
**Commonwealth2A (1)**
28:14
**communications (3)**
17:16;61:4,22
**community (2)**
51:6;52:14
**companies (1)**
31:1
**company (1)**
22:11
**complaint (1)**
39:10
**completed (2)**
5:18,24
**concealed (1)**
15:19
**concerns (1)**
62:4
**concluded (1)**
34:24
**conducted (2)**
7:10;25:20,22;26:7
**confer (1)**
59:6
**connection (3)**
29:20;30:18;46:12
**connectors (1)**
13:6
**connects (1)**
26:9
**consecutively (1)**
40:4
**consider (3)**
52:20;53:21;56:8
**consistent (1)**
4:24
**contact (2)**
33:15;36:22
**contacted (5)**
33:22;34:23;35:14;
36:8,18
**contacting (1)**
35:5
**context (2)**
7:18,22
**continues (2)**

8:13;40:4
**contribute (1)**
27:22
**contributions (1)**
18:24
**converse (1)**
29:1
**convicted (1)**
14:1
**coordinator (1)**
18:2
**copied (1)**
54:24
**copy (5)**
54:19;60:2,8,11,14
**corner (6)**
41:15,23;42:3,12;
43:5;49:4
**corporate (4)**
18:13,18;31:8,9
**correctly (1)**
55:14
**cost (1)**
37:16
**counsel (5)**
4:3;5:19,20;38:16;
41:2
**course (19)**
5:6;24:12,17,17,18,
23,24;25:4,15,17;
26:5,8,19;27:2,7;
43:15;44:19;45:21;
58:3
**courses (9)**
19:5,6;24:19,19;
26:14,15,22,24;30:21
**court (1)**
5:14
**cover (1)**
45:9
**covered (3)**
11:14,18;12:18
**created (1)**
42:15
**crime (1)**
14:2
**current (1)**
15:22
**Currently (4)**
17:1;20:2;46:21;
54:21
**curriculum (1)**
24:21

## D

**date (3)**
19:17;53:1;61:17
**day (3)**
61:2,13,14
**days (2)**
7:7;61:14
**Day-to-day (1)**

16:3
**December (1)**
9:10
**Defendants (2)**
4:4,20
**Defensive (3)**
26:19;27:2,6
**degree (2)**
13:14,17
**depended (1)**
34:11
**deposed (1)**
5:2
**deposition (11)**
4:21;5:6;7:1,9,20,
23;8:2;47:21;62:12,
24;63:21
**describe (1)**
22:4
**described (1)**
7:13
**design (1)**
52:6
**determined (1)**
52:1
**develop (1)**
25:12
**developed (1)**
24:21
**DG (1)**
13:4
**different (3)**
15:12;30:5;35:3
**DIRECT (1)**
4:8
**director (7)**
8:21;15:23;17:12,
15;46:8;61:3,22
**Dix (1)**
10:22
**Document (26)**
8:4,6,7,9;39:19,23,
24;40:2,15,16;41:19;
42:4;44:18;47:6;49:2;
54:11,14,16;56:13,20;
57:1,3,5,14,19;63:2
**documents (7)**
33:11;41:2,3;42:15;
54:9;55:4;62:22
**domestic (1)**
14:5
**donated (2)**
23:19;29:13
**donations (1)**
19:12
**door (1)**
22:5
**down (2)**
5:14;6:1
**drafting (1)**
16:13
**driver's (1)**
4:5

**drop (1)**
12:15
**dues (2)**
18:24;30:16
**duly (1)**
4:6
**during (5)**
11:14;12:1,5,13;
62:24
**duties (3)**
13:7;15:21,22

## E

**earlier (2)**
18:5;47:23
**easier (1)**
10:11
**easy (1)**
63:14
**education (4)**
13:15;16:5;17:12;
46:9
**educational (1)**
10:9
**effect (1)**
30:14
**effort (1)**
55:20
**Eight (1)**
11:13
**either (6)**
5:20;14:4;23:10;
29:20;36:22;46:22
**else (7)**
12:11,23;19:2,10;
26:20;42:19;51:2
**email (3)**
33:3,8,18
**employed (2)**
13:22;29:11
**employee (3)**
17:20;29:8;59:17
**employees (5)**
16:23;17:4;23:6;
29:10,19
**employment (1)**
10:8
**enforcement (11)**
13:23;53:1,5,6,12;
59:11;60:1,11,14,20;
61:18
**entire (2)**
7:9;19:20
**entirety (1)**
53:16
**entities (1)**
31:21
**established (1)**
43:4
**estate (1)**
20:17
**et (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 342 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

James L. Wallace -  Vol. I
September 12, 2017

33:6
**evaluating (1)**
34:6
**evaluation (1)**
38:23
**everyone (1)**
33:19
**exactly (3)**
27:15;53:7;61:6
**examination (2)**
4:3,8
**examined (1)**
4:6
**Examines (8)**
8:9;40:15;44:18;
47:6;49:2;54:14;
56:20;57:3
**example (1)**
28:6
**examples (2)**
23:18;52:2
**except (2)**
6:21;12:19
**Excuse (2)**
11:16;25:21
**Executive (2)**
8:21;15:23
**exercise (1)**
7:2
**Exhibit (14)**
8:5,7;39:20,23;
46:23;47:17,19;
48:13;54:12;56:17,
24;57:21,23;63:2
**Exhibits (1)**
54:10
**expected (1)**
37:18
**experience (1)**
10:9
**explain (1)**
34:12
**express (1)**
33:22
**expressed (2)**
33:19;34:7
**extent (1)**
32:2
**eyes (1)**
38:15

## F

**Facebook (3)**
32:8,10,20
**facilitate (1)**
30:20
**facilities (1)**
31:5
**fact (5)**
26:4;40:24;41:14;
42:11;43:24
**factual (1)**

58:4
**factually (1)**
48:20
**fair (3)**
18:23;51:4;52:12
**Fairly (1)**
13:2
**familiar (11)**
8:7;28:13,20;35:17;
37:23;38:2;39:24;
51:10;58:7;61:19;
62:9
**familiarity (1)**
62:23
**familiarized (1)**
47:15
**far (2)**
18:20;19:16
**Federal (2)**
7:10;21:11
**Feld (2)**
36:8,10
**few (2)**
30:8;37:3
**FID (1)**
15:2
**finally (1)**
60:10
**financing (1)**
28:2
**find (1)**
37:5
**finding (1)**
31:15
**fine (1)**
16:23
**finish (1)**
16:20
**finished (2)**
10:8,22
**Fire (2)**
24:17;30:21
**firearm (1)**
34:24
**firearms (6)**
19:4;21:11;34:22;
47:9;62:8,17
**Firestone (1)**
59:16
**first (12)**
4:6;15:2;35:8;
41:14,15;42:11;44:4;
45:12;48:21;56:12;
59:10;61:17
**fish (2)**
31:4,5
**Fisher (1)**
17:13
**Focus (1)**
26:5
**follow (1)**
35:10
**follows (1)**

4:7
**form (15)**
6:21;18:13,18;32:6;
33:3;39:4;42:16;
43:20;46:15;48:16;
49:21;51:7;52:15,22;
53:10
**formalized (1)**
30:10
**forms (1)**
30:24
**Fort (3)**
10:19,20,22
**forth (1)**
23:5
**found (2)**
13:4;59:15
**four (2)**
17:1,5
**fourth (1)**
42:24
**frequently (1)**
48:3
**front (5)**
8:6;39:22;47:17;
48:13;54:11
**full (2)**
4:10;63:5
**full-time (2)**
17:2,4
**further (3)**
11:20;38:23;61:24

## G

**game (1)**
31:4
**Gary (1)**
4:19
**general (4)**
5:22;23:11;31:5;
40:17
**generally (1)**
15:10
**General's (2)**
53:2;59:18
**GEORGE (18)**
7:4;29:14,17,24;
40:1,6,9,12,19;41:4,
21;42:2,8;48:23;
56:11,15;57:21,24
**Germany (1)**
10:21
**gets (2)**
16:17;22:13
**given (2)**
33:10,12
**GOAL (119)**
4:23;7:13,16,21,22;
8:2,17,24;9:9,12;
13:11;15:21;16:24;
17:4;18:5;19:24;20:3,
12,17,19;21:4,18,24;

22:6,24;23:6,16,21;
24:5,6;25:18,20,22;
27:8,12,14,19,22;
28:2,10,22,24;29:10;
30:1,3,10,12,13,16,
18;31:1,8,11,14,15,
22;32:8,10,14,16,20,
22;33:3,8,13,22;34:3,
6;35:5,15;36:9,18,22,
24;37:11,20;38:15,18,
19,22;40:4,5,22;41:3,
8,17,20;42:4,5,14,15,
20;43:1,7,10,15;44:2,
12;45:16;46:13;
47:16,23;48:3;50:18,
22;53:18,19;54:12,
13;57:1;59:10;60:6,
19;61:17;62:8,11,22;
63:3,10
**GOAL's (15)**
16:15,18;18:12,18,
23;19:13;21:16;
42:22;43:19;53:22,
24;55:19,22;57:10;
62:23
**goes (2)**
22:10,14
**good (2)**
26:11;39:16
**grade (1)**
13:16
**graduated (1)**
13:4
**grant (2)**
28:6,7
**granting (1)**
23:9
**Grants (2)**
28:5,11
**Green (16)**
17:8;22:23;23:10;
24:4;25:7,8,9,14,24;
33:16;44:19,22;46:2,
8,12;48:6
**Green's (1)**
48:15
**grenades (1)**
11:4
**ground (1)**
5:4
**group (3)**
29:3,4,5
**guess (1)**
14:24
**Gun (49)**
4:18;7:12,17;14:10;
15:16;20:19,21;
23:24;26:22;27:9;
30:1,4,19;31:2,3;
34:13;36:24;37:10;
41:15;42:12;43:6,13,
19;44:2,8,11,24;
45:13;46:5,13;49:3,7,

10,12,17;50:13,16;
51:5,10,14;52:4,5,9,
20;53:9,15,17;54:5,7
**gun-owning (1)**
52:14
**guns (19)**
10:3;13:8,12;15:5;
21:5,24;22:24;23:7,
12,16,19;50:1,10,18,
22;51:4,22;52:7,12

## H

**Hang (1)**
43:2
**happen (2)**
40:14;58:20
**hard (1)**
12:4
**hats (1)**
19:9
**Haverhill (1)**
13:21
**head (3)**
5:13,14;52:8
**help (2)**
26:22;61:23
**helpful (1)**
5:6
**high (4)**
10:12;13:16,17,18
**highest (1)**
13:14
**hit (1)**
12:16
**Hold (5)**
51:16;58:12,13,14,
15
**holster (1)**
15:19
**home (4)**
4:11,13;24:17;54:3
**honest (1)**
32:7
**honestly (1)**
34:2
**host (1)**
50:4
**hour (1)**
60:4
**HOWE (3)**
6:17,20;7:6

## I

**identification (3)**
8:5;39:20;54:10
**identified (1)**
4:4
**identifying (2)**
38:7;55:1
**IDPA (1)**
26:18

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 343 of 1262

David Seth Worman, et al. vs.                                                    James L. Wallace -  Vol. I
Maura Healey, et al.                                                             September 12, 2017

**images (1)**
62:19
**important (2)**
5:12,23
**improper (1)**
42:6
**inaccurate (3)**
56:22;57:20;58:5
**incident (1)**
14:5
**include (2)**
63:2,9
**Including (1)**
17:5
**inclusion (1)**
55:19
**income (3)**
18:24;19:3,11
**Incorporated (4)**
4:18;18:8,20;37:9
**incorrect (1)**
56:8
**indicate (1)**
34:17
**indicating (1)**
47:1
**individual (1)**
31:24
**individuals (7)**
31:19,22;35:3,3;
36:18;38:18,20
**information (3)**
58:4;60:20;63:10
**initial (1)**
12:5
**inquiry (1)**
32:6
**Institute (1)**
13:3
**instruct (3)**
5:20,22;41:24
**instructed (1)**
55:6
**instruction (1)**
55:5
**instructor (3)**
26:21,23;27:6
**interest (7)**
30:4;31:5,20,23;
33:19,23;34:8
**interested (4)**
32:2,3;33:4,14
**International (1)**
26:18
**into (2)**
15:3;24:1
**intro (5)**
26:15,16,16,17,19
**introduction (5)**
26:15;45:14,15,23;
47:24
**inventory (2)**
51:3;54:1

**involve (1)**
13:8
**involved (7)**
12:11;13:12;14:4;
29:7;36:1;55:1;56:1
**Issued (3)**
20:23;53:2,13
**issues (4)**
11:14,17;27:18;
31:6

**J**

**JAMES (2)**
4:2,13
**Jason (1)**
35:21
**Jersey (1)**
10:23
**Jim (1)**
48:18
**Jim's (2)**
10:2,6
**job (6)**
8:19;9:4,6;13:4;
17:6,14
**jobs (3)**
12:19;13:11,13
**J-o-h-n (1)**
17:9
**join (1)**
30:13
**joint (1)**
55:20
**Jon (7)**
17:8;22:23;23:10;
24:4;33:15;44:19;
46:8
**J-o-n (1)**
17:10
**July (2)**
52:24;61:2

**K**

**Kalashnikov (1)**
51:14
**keep (2)**
5:5;15:18
**kind (2)**
13:1;50:13
**KLEIN (22)**
4:9,19;6:19;7:8;
39:16,21;40:3,8,11;
41:24;42:7;49:1;
56:13,18;57:23;59:5,
9;61:24;62:3;63:1,9,
18
**knew (4)**
53:4,6,8,12
**knife (1)**
27:2
**knowledge (4)**

35:1;40:17;48:8;
57:9
**known (1)**
28:16

**L**

**label (1)**
57:1
**labeled (5)**
8:6;39:23;40:3;
44:1;54:11
**lapsed (2)**
14:19;21:16
**large (4)**
19:13;55:15;58:7,
20
**last (3)**
18:13,15;29:14
**lasted (2)**
11:9;12:20
**later (2)**
61:14,14
**lathe (1)**
13:5
**law (6)**
13:22;43:13,19;
46:5,13;58:11
**lawful (1)**
34:24
**lawfully (1)**
34:22
**Laws (4)**
44:8,11,24;45:9
**lawsuit (1)**
36:19
**lawyer (1)**
17:18
**lawyers (1)**
40:13
**League (8)**
4:18;7:12,17;41:16;
42:13;43:6;44:3;
45:14
**least (1)**
25:16
**leave (1)**
17:20
**Lee (1)**
4:13
**left (4)**
41:15,22;42:3;43:5
**left-hand (2)**
42:12;49:4
**legislation (1)**
16:13
**Leonard (1)**
10:19
**less (1)**
63:16
**letter (1)**
9:17
**letting (1)**

9:21
**level (1)**
30:12
**license (12)**
4:5;14:10,14,22;
15:3;20:19,20,21;
21:1,8,12;27:9
**licenses (3)**
15:5;21:4,16
**life (1)**
14:8
**likely (2)**
55:13;56:2
**limited (3)**
11:22;19:3;20:9
**Linden (4)**
35:7,14,17;36:6
**line (1)**
50:3
**list (3)**
24:6,9;49:15
**listed (1)**
8:14
**litigation (14)**
29:3,4,5,6;31:16;
35:19;36:2,9;37:1,17;
38:8,12,15;39:2
**little (1)**
16:2
**live (1)**
30:21
**lived (1)**
14:7
**lobby (1)**
22:16
**lobbying (3)**
16:6,8,9
**lobbyist (2)**
9:3,9
**Located (1)**
13:20
**logo (7)**
41:16;42:14,20,22;
43:7,10;44:4
**long (5)**
8:22;10:14;11:8,12;
51:1
**look (5)**
8:12;42:24;48:12,
24;63:6
**looking (6)**
32:1,11,16;34:16,
20;55:8
**looks (1)**
54:19
**lot (1)**
27:17

**M**

**M&P (2)**
50:3,24
**M-16 (6)**

11:4,9,17;12:1,7,12
**M-203 (1)**
11:4
**M-400 (1)**
49:20
**M-60 (1)**
11:4
**machine (1)**
59:15
**machining (2)**
13:1,3
**Machinist (2)**
12:24;13:7
**magazine (2)**
58:8;59:2
**magazines (2)**
58:12,21
**mailing (2)**
28:8,9
**Main (2)**
4:15;22:16
**maintain (3)**
21:18,24;22:24
**makes (1)**
49:16
**making (1)**
16:5
**manner (1)**
39:13
**manufacture (1)**
50:9
**manufactured (2)**
13:5;59:2
**manufacturers (2)**
50:4,7
**many (11)**
15:12;16:23;17:4;
19:24;20:3;30:8,20,
22;33:22;40:1;49:14
**marked (4)**
8:4;39:19;48:13;
54:9
**martial (1)**
27:5
**mass (1)**
33:7
**Massachusetts (18)**
4:14,16;13:21;14:7;
15:6;20:10,15;23:23;
25:4;27:9;28:9;44:8,
11,24;46:5,14;50:8;
58:11
**Massachusetts-based (1)**
20:12
**material (10)**
16:15,17;44:21,22;
47:4;48:12,19;57:10;
61:17;63:2
**materials (12)**
25:1;40:21;41:8;
43:18;45:5,7,18,21;
46:12,21;47:16;48:15
**math (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 344 of 1262

David Seth Worman, et al. vs.                                    James L. Wallace -  Vol. I
Maura Healey, et al.                                                    September 12, 2017

40:9
**matter (5)**
  4:20,21;26:4;55:4;
  62:7
**matters (1)**
  62:5
**may (11)**
  29:12;31:4,4,20;
  32:2;33:13;36:20;
  46:21;59:6;61:22;
  63:15
**maybe (3)**
  11:22;29:12;48:5
**McComas (1)**
  37:24
**mean (13)**
  7:17;18:3;24:20;
  27:15;29:5,17;37:19;
  49:10;54:2;58:14,17;
  62:22;63:13
**meaning (5)**
  12:9;24:13;46:20;
  47:20;53:8
**means (1)**
  41:1
**meet (2)**
  36:6;55:7
**member (2)**
  23:11;30:14
**members (9)**
  18:3,4;19:24;20:3;
  28:8;31:8,10,11;33:4
**membership (7)**
  18:6,24;19:12;20:9;
  28:9;30:11;33:9
**memory (2)**
  20:7;61:5
**mentioned (3)**
  24:5;26:3;27:11
**merchandise (1)**
  19:7
**message (3)**
  33:18;59:15,23
**met (1)**
  36:4
**metallic (2)**
  26:24;27:3
**Michael (3)**
  17:15,24;59:16
**might (1)**
  33:15
**Mike (1)**
  33:16
**military (3)**
  13:2,10;14:9
**mind (2)**
  5:5;19:10
**minimum (1)**
  12:16
**minus (1)**
  40:7
**mission (1)**
  29:6

**Missouri (1)**
  10:20
**model (2)**
  49:17;50:6
**Modern (4)**
  45:14,15,23;47:24
**months (3)**
  10:7,15,21
**more (12)**
  16:2;26:6;34:1;
  49:12;55:13;56:2;
  58:12,13,14,15,17,17
**morning (2)**
  56:8;59:12
**most (5)**
  12:21;20:15;23:19;
  55:20;62:7
**mostly (3)**
  18:4;25:6;32:5
**motions (1)**
  6:22
**mouth (1)**
  32:5
**move (1)**
  15:3
**much (4)**
  11:9;12:18;15:24;
  56:10
**myself (4)**
  17:5;23:10;24:4;
  33:15

### N

**name (18)**
  4:10,17,19;6:16;
  7:11;10:1;23:21;24:2,
  3;37:23;38:1;42:13;
  49:17;50:6,21;51:13;
  54:7;59:16
**named (2)**
  27:16;38:2
**names (2)**
  17:6;50:1
**National (6)**
  24:13;27:11,19,22;
  28:1;39:1
**nationally (1)**
  26:8
**need (2)**
  6:4;56:10
**needs (3)**
  16:5;56:14,18
**Nelson (1)**
  36:15
**New (1)**
  10:22
**Newburyport (1)**
  4:14
**newspaper (1)**
  16:14
**Nicholas (1)**
  36:10

**nod (1)**
  5:13
**nods (1)**
  5:15
**non-gun (1)**
  27:7
**nonprofit (1)**
  18:8
**normally (1)**
  16:16
**Northborough (3)**
  4:16;20:24;21:22
**Notary (2)**
  4:6;7:6
**notice (12)**
  22:21;53:2,5,6,12;
  59:11;60:1,12,15,20;
  61:18;62:6
**notified (2)**
  22:12,14
**NRA (15)**
  24:11,13,15,18,19,
  21,22;25:2,3;26:22;
  27:11,13,14,17;28:11
**number (4)**
  33:24;40:10;54:12;
  57:21
**numbers (1)**
  41:1

### O

**oath (1)**
  6:8
**object (8)**
  5:19;39:4;43:20;
  49:21;51:7;52:15,22;
  53:10
**objecting (1)**
  42:2
**Objection (3)**
  42:16;46:15;48:16
**objections (1)**
  6:21
**O'Brien (1)**
  13:4
**obtain (1)**
  14:21
**obtained (1)**
  13:15
**Obviously (1)**
  50:8;62:14
**Occasionally (5)**
  23:3;26:21;27:1,5;
  28:3
**off (9)**
  22:10,10,13,14,17,
  18,22;52:1,8
**offer (3)**
  25:3,4;27:8
**offered (4)**
  25:17;45:2,16;
  47:23

**offers (5)**
  24:5,7;43:15;44:12;
  48:4
**Office (6)**
  9:13;10:10;53:2,18;
  59:18;60:4
**officer (3)**
  13:23;29:7,22
**official (1)**
  28:23
**often (4)**
  7:13;12:3;46:19;
  51:5
**Oklahoma (1)**
  10:20
**once (5)**
  11:22;12:8;13:3;
  23:24;45:4
**once-a-year (1)**
  12:5
**one (23)**
  4:19,23;11:14,17;
  17:20;22:17;23:3;
  28:6;32:12,17;33:5,
  14;35:8;36:19;37:9;
  42:23;46:20;47:1;
  49:12,16;50:24;
  60:10;61:11
**ongoing (1)**
  27:12
**only (4)**
  10:7;50:24;61:6,11
**operations (1)**
  16:3
**opinion (1)**
  63:15
**opportunity (3)**
  11:24;12:6;62:18
**order (3)**
  35:12;62:12;63:7
**organization (7)**
  7:12;8:2;16:1;18:6;
  20:13;28:13;30:9
**organizational (4)**
  6:16;30:13;31:11;
  39:8
**organizations (1)**
  30:7
**organized (1)**
  20:12
**otherwise (2)**
  29:8,11
**out (5)**
  31:19,22;32:1,4;
  37:5
**Outpost (1)**
  37:13
**Outreach (2)**
  18:2,3
**outside (1)**
  22:24
**over (3)**
  5:5;6:2;20:2

**overseeing (1)**
  16:3
**Overview (2)**
  44:7,11,23
**Overwatch (1)**
  37:13
**own (8)**
  20:17;23:24;30:1;
  50:10,13,18;52:20;
  58:20
**owned (2)**
  9:23;34:22
**owner (3)**
  10:5;23:22;34:24
**Owners' (7)**
  4:18;7:12,17;41:16;
  42:12;43:6;44:3;
  45:14
**ownership (2)**
  30:4;34:14
**owns (1)**
  50:22

### P

**Page (30)**
  8:13,13;32:8,10;
  35:9;40:5;41:1,14,22,
  23;42:4,24;43:1,12;
  44:1,4,22;45:12;47:2,
  3,5;48:21,22,24;
  54:19,21;56:5,12;
  61:8,10
**pages (6)**
  40:1,7,10;48:13;
  55:8;56:16
**paper (1)**
  62:19
**par (1)**
  16:6
**part (6)**
  33:10,11;37:16;
  47:20;48:14;53:24
**partial (1)**
  24:8
**participate (5)**
  32:11,17;33:20;
  37:1;38:8
**participating (8)**
  31:16,23;33:5,14,
  23;35:15;36:9,18
**participation (1)**
  38:15
**particular (2)**
  34:7;56:5
**particularly (1)**
  62:7
**part-time (1)**
  17:21
**Paul (1)**
  36:15
**pay (4)**
  27:19;30:16;37:16,

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 345 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

James L. Wallace - Vol. I
September 12, 2017

18
**penalties (1)**
6:12
**pending (1)**
6:6
**people (6)**
32:1,3;33:13,22;
38:10,22
**Perhaps (1)**
19:23
**period (6)**
9:8,14;10:5,16;
11:12;12:20
**perjury (1)**
6:13
**permanent (1)**
23:2
**permission (4)**
23:8,9,12;24:22
**person (4)**
22:13,18;34:7;
38:16
**personal (2)**
23:7;53:22
**personally (3)**
29:7;53:19;55:19
**Phoenix (1)**
22:11
**phone (2)**
59:13,14
**pick (1)**
30:11
**picture (1)**
49:3
**Pincus (1)**
26:7
**Pistol (6)**
24:11;26:8,17,19;
27:1;58:12
**place (1)**
21:18
**placed (1)**
56:3
**plaintiff (5)**
31:20;33:20;34:8,
18;47:10
**plaintiffs (10)**
4:23;31:15;32:11,
17,23;35:3,5;37:15,
21;38:8
**planning (1)**
47:21
**platform (15)**
49:8,9,10,13;50:2,
11,14,19,23;51:5,23;
52:1,5,10,13
**please (10)**
4:12;6:4;8:20;17:7;
40:2;41:6,24;47:2;
48:22;57:22
**plum (1)**
62:24
**point (5)**

26:12;39:8;60:3,19,
23
**political (1)**
63:16
**politics (1)**
27:18
**PORTER (21)**
7:3;15:1;16:20;
36:10;39:4;40:13;
42:16;43:20;46:15;
48:16;49:21;51:7,16;
52:15,22;53:10;62:2,
14;63:4,12,20
**portion (1)**
33:8
**position (7)**
7:9;8:22;9:2;18:1;
29:21;59:20;62:16
**possibility (1)**
5:18
**possible (1)**
63:19
**Post (5)**
9:13;10:10;16:15;
32:19,23
**posted (3)**
16:17;61:1,17
**posting (2)**
16:16;60:19
**potential (1)**
28:8
**PowerPoint (2)**
40:18;45:10
**PowerPoints (3)**
41:11;43:18;62:10
**prepared (4)**
8:16;55:19,23;62:5
**preparing (3)**
16:4;56:1;57:13
**present (2)**
44:23;55:12
**presentation (1)**
45:10
**presented (1)**
63:11
**presents (1)**
43:6
**press (3)**
59:24;60:8,17
**presupposition (1)**
41:7
**pretty (2)**
12:18;15:24
**primarily (2)**
20:9,11
**primary (2)**
18:23;29:6
**prior (1)**
32:19
**probably (3)**
10:11;19:20;51:24
**process (7)**
30:11;33:11;34:12,

21;37:7,8;38:21
**processes (1)**
16:4
**produced (5)**
41:2;47:16;55:11;
57:11;62:22
**production (2)**
4:5;55:3
**property (1)**
21:24
**provide (1)**
28:1
**provided (2)**
47:10;62:8
**provides (1)**
62:11
**Public (5)**
4:6;9:3,9;16:10;
23:11
**publish (1)**
32:6
**purchase (1)**
23:20
**purchased (1)**
23:21
**put (3)**
6:17;23:4;61:9
**putting (4)**
38:11;39:2,9,12

**Q**

**qualify (4)**
12:8,9,9,17
**qualifying (1)**
12:11
**question-by-question (1)**
63:13
**quick (1)**
56:9
**Quite (2)**
30:8;46:19

**R**

**Radio (1)**
10:20
**raffles (1)**
19:12
**range (3)**
12:9;30:1,4
**ranges (4)**
30:8,19;31:2,3
**read (13)**
6:24;7:7;29:16;
47:4,7;55:14;56:12,
13,15,16;60:15,16,17
**real (1)**
20:17
**really (2)**
59:22;62:24
**reason (6)**
21:2,10,14;23:3;

26:13;62:11
**reasons (1)**
15:12
**recall (5)**
32:7,13,18;57:18;
61:15
**recalls (1)**
20:7
**receive (1)**
28:11
**recent (1)**
28:7
**Recess (2)**
39:18;59:8
**recognize (1)**
40:15
**recollect (1)**
12:4
**recollection (1)**
56:4
**record (5)**
4:11;6:18,20;7:8;
62:4
**rectangle (7)**
41:15;42:11;43:5;
44:2;45:13;46:5;49:4
**refer (4)**
31:9;38:22;58:10,
11
**referred (3)**
38:16;51:5;52:13
**referring (2)**
49:18;57:22
**reflect (1)**
6:20
**Regional (1)**
13:18
**register (1)**
24:24
**registered (1)**
54:7
**related (5)**
15:5;17:17;21:4;
27:7;43:18
**relationship (2)**
27:13;28:22
**release (3)**
59:24;60:8,17
**reloading (5)**
26:24;27:1,1,3,4
**remainder (1)**
10:22
**remember (8)**
9:7;16:20;20:3;
60:23,24;61:3,6,13
**remove (2)**
23:6,12
**removing (1)**
23:15
**reopen (1)**
62:12
**repeat (1)**
29:14

**reporter (3)**
5:14,24;6:1
**representative (1)**
7:22
**requalification (1)**
12:13
**request (1)**
55:3
**required (1)**
27:9
**requirements (1)**
55:7
**reserve (3)**
62:11,15;63:18
**reserved (2)**
6:21,23
**Resident (2)**
46:6,14
**resolve (1)**
63:19
**respect (1)**
8:17
**respond (2)**
8:16;62:5
**responses (1)**
62:12
**responsibilities (1)**
15:22
**responsive (1)**
55:3
**retailer's (2)**
20:20,21
**review (10)**
44:16;47:20;48:22;
54:15;56:3,8,9,18;
57:4,7
**reviewed (6)**
8:13;44:15;45:20;
48:19;53:14;57:16
**Revised (1)**
44:8
**revoked (2)**
14:17;21:9
**Revolver (1)**
15:17
**rifle (14)**
12:15;24:13;26:17;
27:11,20,22;28:1;
39:1;45:15,16,24;
48:1;51:1;58:12
**right (17)**
6:10,24;7:2;10:12;
17:21;20:15,21;29:2;
36:22;37:2;46:7;48:1;
55:16;60:21;62:11,
15;63:4
**rights (1)**
63:18
**ring (1)**
38:1
**Rob (1)**
26:7
**role (12)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 346 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

James L. Wallace -   Vol. I
September 12, 2017

31:14,18;34:6,10;
38:7,9,11;39:2,7,12,
14;57:13
**Romanian (1)**
52:9
**room (6)**
22:3,4,8;23:1,7,13
**rounds (2)**
58:15,18
**rules (2)**
5:4;7:10
**run (2)**
26:21;30:21
**running (1)**
16:1
**runs (1)**
54:13
**Russell (1)**
4:14

**S**

**safe (7)**
23:1,7,12;53:24;
54:2,3,5
**safety (3)**
19:4;24:17;27:8
**same (11)**
20:5;31:7;33:1;
37:6;41:22;43:12;
44:3;45:9;51:23;61:1,
13
**satisfactorily (1)**
4:4
**Sauer (1)**
49:20
**saw (1)**
44:4
**Sawyer (1)**
35:21
**Saxonville (1)**
50:8
**Schedule (1)**
8:12
**scheduling (1)**
16:6
**school (5)**
10:12,20;13:16,17,
19
**scope (2)**
62:6;63:5
**Seabrook (1)**
13:5
**Second (2)**
28:16;46:24
**secured (2)**
22:3,4
**Security (1)**
22:11
**seek (1)**
31:22
**seeking (2)**
31:19;32:23

**seems (1)**
56:20
**sell (2)**
10:3;19:7
**sellers (2)**
36:24;37:10
**seller's (1)**
20:19
**selling (1)**
26:12
**send (1)**
33:3
**separated (1)**
22:15
**series (2)**
26:14;62:7
**serve (1)**
10:18
**set (4)**
22:17;40:18;43:17;
45:9
**several (2)**
51:24;60:16
**shake (1)**
5:13
**shakes (1)**
5:15
**shoot (2)**
11:24;12:7
**shooting (3)**
12:15;26:16;31:5
**shop (1)**
9:24
**short (5)**
26:16,22;39:16;
59:5;63:7
**shortened (1)**
7:13
**shorthand (1)**
51:13
**shotgun (1)**
58:13
**show (1)**
44:19
**side (2)**
11:6;14:4
**Sig (3)**
49:16,17,20
**sign (2)**
7:1,7
**Sill (1)**
10:20
**similar (3)**
45:7,8;52:6
**simply (2)**
12:14;31:19
**sits (1)**
40:16
**sitting (1)**
63:4
**six (2)**
10:7;48:24
**SKS (1)**

52:3
**slide (3)**
43:3,4;44:19
**slides (3)**
40:18;62:19;63:11
**smaller (1)**
50:7
**Smith (2)**
15:15;50:3
**solicit (2)**
36:24;37:2
**somebody (5)**
29:12;34:17,21,22;
38:14
**somebody's (1)**
24:2
**somehow (1)**
41:20
**someone (7)**
34:3;35:14;36:8;
37:10,23;38:2;42:19
**Sometime (1)**
59:12
**sometimes (1)**
28:24
**somewhere (3)**
19:17,20;20:7
**soon (2)**
13:2;59:7
**sorry (2)**
16:22;42:10
**sort (1)**
58:1
**source (1)**
19:10
**sources (2)**
18:23;23:17
**speaker (2)**
9:3,9
**speaking (1)**
16:10
**specific (1)**
16:2
**specifically (1)**
39:15
**spoke (9)**
23:1;37:3,4,10,11
**Sporting (5)**
26:17;45:15,16,23;
47:24
**sports (1)**
26:18
**staff (7)**
17:15;32:5;33:15;
55:5,21,22;59:21
**start (3)**
5:5;10:11;48:21
**started (1)**
10:9
**starting (2)**
40:3;44:22
**starts (1)**
8:12

**state (12)**
4:10;15:6;21:8;
25:11;27:14,16;28:8;
30:7,19,23;32:10;
62:3
**States (1)**
10:13
**static (1)**
12:15
**status (1)**
27:20
**steel (2)**
21:21;22:5
**still (1)**
50:9
**stipulate (1)**
63:15
**stipulation (6)**
62:20;63:1,5,10,17,
19
**stipulations (1)**
6:18
**stored (2)**
22:2,8
**Street (1)**
4:15
**strike (1)**
6:22
**structural (1)**
21:21
**stuff (1)**
63:14
**substantial (2)**
12:20,21
**substantive (1)**
62:16
**suggest (5)**
41:19,21;42:14;
43:17;46:11
**suggests (1)**
42:4
**suit (1)**
36:11
**suppose (1)**
51:15
**Sure (9)**
6:19;16:5;19:9;
24:10;26:11;31:21;
35:6;50:24;58:2
**susceptible (1)**
63:16
**suspended (5)**
14:15;21:1,9,13;
63:22
**Suzanne (1)**
37:24
**Sweeney (2)**
17:15,17
**sworn (1)**
4:6

**T**

**tackle (3)**
9:24;10:2,6
**talk (4)**
6:2;19:16;39:9;
63:6
**talked (1)**
32:2
**talking (1)**
34:11
**Target (1)**
37:9
**targets (2)**
12:16,16
**teachers (1)**
26:23
**Technical (2)**
13:18;63:14
**technically (1)**
23:24
**technology (1)**
61:20
**telephone (2)**
33:17,18
**ten (4)**
10:15;15:1;18:13;
34:1
**term (10)**
7:16;10:22;28:19,
20;31:12;33:6;37:3;
49:9;58:7,10
**terminated (2)**
21:2,13
**Terrace (1)**
4:14
**testified (1)**
4:7
**testify (1)**
47:13
**testimony (1)**
6:12
**text (1)**
33:18
**Thomas (1)**
38:2
**though (1)**
48:18
**thought (1)**
59:21
**three (1)**
48:5
**throughout (1)**
30:22
**times (2)**
48:5;60:16
**title (5)**
8:19;9:4,6;17:11,14
**titles (1)**
17:6
**today (1)**
47:13
**together (4)**
38:12;39:3,10,12
**Tom (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 347 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

James L. Wallace - Vol. I
September 12, 2017

38:6
**took (1)**
60:4
**Tooling (1)**
13:3
**top (7)**
35:9;44:2;45:12;
46:4;49:4;52:8;55:14
**topic (1)**
47:12
**topics (2)**
8:14,17
**town (1)**
20:23
**track (1)**
61:16
**trained (1)**
11:3
**trainer (4)**
25:1;45:22;48:6,9
**trainers (4)**
25:3,6,10,12
**trainer's (2)**
25:15,17
**training (57)**
10:19,24;11:9,9,11,
12,15,18,20,21;12:1,
5;16:5;17:12;19:5,6;
23:5;24:5,6,11;25:3;
26:6,9,10;27:8,18;
30:21;37:9;40:21;
41:8;43:15,18,19;
44:12,23;45:2,5,7,16,
18,19,21,23;46:9,12,
13;47:9,16,24;48:3,7,
10,15;58:3;62:17,23;
63:3
**trainings (5)**
26:2;41:9,12;62:8,
10
**transcript (1)**
7:1
**transferred (2)**
24:1;53:19
**Trap (1)**
26:16
**travels (1)**
26:8
**trial (2)**
6:22,23
**tried (1)**
14:1
**truthfully (1)**
6:9
**try (3)**
24:8;34:12;61:7
**trying (1)**
37:5
**T-shirts (1)**
19:9
**turn (3)**
44:1;47:2;56:24
**turned (1)**

14:23
**tweet (1)**
32:16
**Twelfth (1)**
13:16
**Twitter (2)**
32:14;33:1
**Two (5)**
10:15;26:2;30:5;
48:5;61:14
**type (6)**
14:13;15:16;16:11;
21:20;49:7;61:7
**types (3)**
21:7;24:6;31:1
**typical (1)**
31:3
**typically (13)**
15:19;24:3,4;25:15,
24;28:10;30:22;
33:17;41:8,11;51:13;
52:13,17

**U**

**ultimately (1)**
33:20
**umpteen (1)**
42:3
**unclear (1)**
5:7
**under (5)**
6:8,12;44:7;55:5;
58:11
**understands (1)**
41:4
**understood (1)**
5:9
**underwater (1)**
13:5
**Unfortunately (1)**
23:23
**United (1)**
10:12
**unless (1)**
6:5
**up (5)**
16:5;38:17,19;59:7;
61:8
**upon (1)**
34:11
**upper (5)**
41:15,22;42:3,12;
43:5
**use (16)**
7:16;10:24;11:17,
20;13:12;23:7;28:19;
30:20;41:8,11;44:19;
45:5,7;46:21;49:9;
62:21
**used (9)**
23:3;40:22;45:6;
46:12,20;50:4,9;

62:10;63:3
**uses (2)**
43:10;44:23
**using (1)**
42:19
**usually (5)**
15:2,14;25:13,20,
22

**V**

**vacation (1)**
61:4
**varies (2)**
15:12;19:15
**Various (2)**
23:17;26:23
**verbally (1)**
5:13
**version (1)**
51:1
**versus (1)**
4:22
**vetted (1)**
25:13
**violence (1)**
14:5
**Vocational (1)**
13:18

**W**

**wait (2)**
5:17,23
**waive (1)**
7:6
**WALLACE (9)**
4:2,10,13;6:24;8:4;
39:19,22;54:9;59:10
**way (5)**
29:2;31:7;32:22;
46:22;62:21
**weapon (4)**
11:21;15:8,11,13
**weapons (3)**
10:24;11:3;60:1
**weapons' (2)**
55:15,16
**website (14)**
16:15,18;19:8;
54:20,22;55:2,9,12,
19;56:4;57:10,17;
60:21;61:16
**week (2)**
26:5;61:4
**weekend (1)**
25:16
**weeks (1)**
11:13
**Weight (1)**
15:15
**Wesson (2)**
15:15;50:3

**West (1)**
4:15
**what's (2)**
26:5;33:6
**Whereupon (1)**
63:21
**Whittier (1)**
13:18
**whole (3)**
14:7;16:21;56:13
**Whose (1)**
24:3
**wildlife (1)**
31:6
**William (1)**
35:21
**willing (2)**
37:7;63:6
**wish (1)**
7:2
**withdrawn (1)**
36:11
**within (2)**
7:7;62:6
**without (1)**
23:8
**withstand (2)**
34:21;37:7
**witness (5)**
4:3;7:5;42:1;62:5,9
**women (1)**
27:7
**Wood (1)**
10:19
**word (4)**
32:1,4,5;42:5
**work (9)**
8:24;9:8,11,14,22;
20:15;28:24;29:2,20
**worked (1)**
9:11
**working (2)**
9:18,21
**works (1)**
27:17
**world (1)**
9:18
**Worman (1)**
4:22
**wrap (1)**
59:7
**write (1)**
16:17
**writing (5)**
16:10,11,12,14,14

**Y**

**year (9)**
11:23;12:8,13,17;
19:15,15,17,20;48:5
**years (4)**
10:15;15:1;18:13,

15
**yo (1)**
8:1
**young (1)**
15:3

**Z**

**zeroing (1)**
12:14

**0**

**000108 (2)**
44:2,22
**000111 (2)**
40:5
**000162 (1)**
54:13
**000164 (1)**
54:13
**000171 (2)**
57:1
**000172 (1)**
57:1
**000173 (1)**
57:2
**00094 (2)**
40:4;48:22
**00097 (2)**
43:1;46:4

**1**

**1 (4)**
8:5,7;41:23;46:23
**10 (3)**
58:13,14,15
**10:45 (1)**
39:18
**10:55 (1)**
39:21
**11:27 (1)**
59:8
**11:35 (1)**
59:9
**11:39 (1)**
63:22
**111 (1)**
40:7
**13 (1)**
4:14
**14,000 (1)**
20:8
**140 (1)**
30:7
**15,000 (1)**
20:2
**18 (1)**
10:21
**1983 (1)**
10:17
**1986 (2)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 348 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

James L. Wallace - Vol. I
September 12, 2017

10:17;12:19
**1992 (4)**
9:15,18,22;12:19
**1998 (1)**
59:3

### 2

**2 (6)**
39:20,23;47:17,19;
48:13;63:3
**20 (3)**
18:15;52:24;61:2
**2000 (3)**
9:10,15;18:17
**2001 (1)**
58:24
**2005 (3)**
8:23,24;9:10
**2015 (3)**
19:22;20:6,7
**2016 (4)**
19:19;20:4;52:24;
61:2
**2017 (3)**
19:16;44:8;46:6
**20th (1)**
59:12
**21 (1)**
14:23
**22 (1)**
51:1
**22-15 (1)**
51:1

### 3

**3 (2)**
8:13;54:12
**30 (1)**
7:7
**30b6 (1)**
62:6
**3-4 (1)**
54:10
**361 (1)**
4:15

### 4

**4 (6)**
8:13;18:11;47:2,3;
56:24;57:23
**47 (1)**
51:14

### 5

**5 (3)**
58:13,17,18
**501c3 (1)**
18:10
**501c4 (1)**

18:21
**52 (1)**
15:4

### 9

**9 (2)**
47:4,9
**93 (1)**
40:7

# EXHIBIT 9

## TO KAPLAN DECLARATION

# In The Matter Of:

*David Seth Worman, et al. vs.*
*Maura Healey, et al.*

---

*Edward O'Leary*
*Vol. I*
*September 14, 2017*

---



**DORIS O. WONG**
**ASSOCIATES, INC.**

COURT   REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File O'LEARY_Edward.txt*
*Min-U-Script® with Word Index*

1

```
                              Volume I
                              Pages 1 to 101
                              Exhibits 1 to 2

                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
 DAVID SETH WORMAN, ANTHONY       :
 LINDEN, JASON WILLIAM SAWYER,    :
 NICHOLAS ANDREW FELD, PAUL       :
 NELSON CHAMBERLAIN, GUN          :
 OWNERS' ACTION LEAGUE, INC.,     :
 ON TARGET TRAINING, INC., AND    :
 OVERWATCH OUTPOST,               :
              Plaintiffs,         :
                                  :
         vs.                      :   Civil Action
                                  :   No. 17-10107-WGY
 MAURA HEALEY, in her official    :
 capacity as Attorney General     :
 of the Commonwealth of           :
 Massachusetts; DANIEL            :
 BENNETT, in his official         :
 capacity as the Secretary of     :
 the Executive Office of          :
 Public Safety and Security;      :
 and COLONEL RICHARD D.           :
 McKEON, in his official          :
 capacity as Superintendent of    :
 the Massachusetts State          :
 Police,                          :
              Defendants.         :
                                  :
- - - - - - - - - - - - - - - - -x
```

        DEPOSITION OF ON TARGET TRAINING, INC.,
THROUGH ITS DESIGNEE EDWARD O'LEARY, a witness
called on behalf of the Defendants, taken pursuant
to Rule 30(b)(6) of the Federal Rules of Civil
Procedure, before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Office of
the Attorney General, 100 Cambridge Street, Boston,
Massachusetts, on Thursday, September 14, 2017,
commencing at 9:39 a.m.

**Edward O'Leary - Vol. I - September 14, 2017**

PRESENT:

    Bradley Arant Boult Cummings LLP
        (by James W. Porter, III, Esq., and Connor
        Blair, Esq.)
        One Federal Place, 1819 Fifth Avenue North,
        Birmingham, AL 35203-2119,
        jporter@bradley.com;
        cblair@bradley.com
        205.521.8285
        for the Plaintiffs.

    Campbell Campbell Edwards & Conroy, P.C.
        (by Christopher Howe, Esq.)
        One Constitution Plaza, Boston, MA 02129,
        chowe@campbell-trial-lawyers.com
        617.241.3029
        for the Plaintiff Gun Owners' Action
        League, Inc.

    Office of the Attorney General
        (by Dan Krockmalnic, Assistant Attorney
        General; Elizabeth Kaplan, Assistant
        Attorney General)
        One Ashburton Place, 18th Floor,
        Boston, MA 02108,
        Dan.Krockmalnic@state.ma.us;
        Elizabeth.Kaplan@state.ma.us
        617.963.2567
        for the Defendants.

                * * * * *

**Edward O'Leary - Vol. I - September 14, 2017**

3

1                        I N D E X

2

   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3

4   EDWARD O'LEARY

5     BY MR. KROCKMALNIC       4

6

7
                          *  *  *  *
8
                      E X H I B I T S
9

   NO.                 DESCRIPTION              PAGE

10

   Exhibit 1    Copy of Notice of Taking        10
11                Deposition of Plaintiff
                  On Target Training, Incorporated
12
   Exhibit 2    Copy of Requests for Production  95
13                of Documents

14

15                       *  *  *  *

16

17

18

19

20

21

22

23

24

**Doris O. Wong Associates, Inc.**

4

```
 1                  P R O C E E D I N G S
 2                      EDWARD O'LEARY
 3    a witness called for examination by counsel for the
 4    Defendants, having been satisfactorily identified by
 5    the production of his driver's license and being
 6    first duly sworn by the Notary Public, was examined
 7    and testified as follows:
 8                    DIRECT EXAMINATION
 9       BY MR. KROCKMALNIC:
10       Q.   Morning.  My name is Dan Krockmalnic.  I'm
11    an Assistant Attorney General.  I'm joined today by
12    Elizabeth Kaplan, also an Assistant Attorney
13    General.  We represent the Defendants in this case,
14    Worman versus Baker.
15            Could you please state your name, spell it,
16    and state your home and business addresses for the
17    record.
18            MR. PORTER:  Sorry to interrupt.  The usual
19    stipulations?  The Federal Rules of Civil Procedure?
20            MR. KROCKMALNIC:  I was going to get there.
21            MR. PORTER:  Sorry.
22            MR. KROCKMALNIC:  No worries at all.  How
23    do you define the usual stipulations?
24            MR. PORTER:  What we've been doing is
```

Edward O'Leary - Vol. I - September 14, 2017

5

```
 1   proceeding under the Federal Rules.  That's
 2   satisfactory to the Plaintiffs.  If that's how you
 3   would like to proceed, we are happy to proceed
 4   accordingly.
 5            MR. KROCKMALNIC:  That's acceptable.
 6            MR. PORTER:  Primarily, for the purposes of
 7   the deposition, all objections, except as to the
 8   form of the question, are reserved.
 9            MR. KROCKMALNIC:  Until the time of trial?
10            MR. PORTER:  Right.
11            MR. KROCKMALNIC:  Agreed.
12       Q.   Would you like me to restate the question?
13       A.   Please.
14       Q.   Please state your name, spelling your name,
15   and please state your home and business addresses
16   for the record.
17       A.   My name is Edward O'Leary.  ████████████
     ███████████████████████████████████████████
     ██████████████  My business address is 516 North
20   Bedford Street in East Bridgewater, Massachusetts.
21       Q.   Mr. O'Leary, have you ever been deposed
22   before?
23       A.   I have.
24       Q.   How many times have you been deposed before?
```

**Edward O'Leary - Vol. I - September 14, 2017**

6

```
 1       A.    More than once.

 2       Q.    Do you know how many times?

 3       A.    I don't.

 4       Q.    Approximately?

 5       A.    I don't have an answer.  I don't know.

 6       Q.    Can you tell me the situations, the matters

 7   in which you were deposed before.

 8       A.     I was deposed relative to my job as a

 9   police officer in Randolph.  I was deposed on one

10   case where a young boy had accidentally hung himself

11   and died.  I was deposed in another case where a

12   person was suing me.  Those are the three that come

13   to mind.

14       Q.    Am I right to understand that the situation

15   when you were deposed with respect to the boy who

16   hung himself was also in the capacity of your duties

17   as a police officer?

18       A.    Yes.

19       Q.    Were you deposed as a fact witness in that

20   case?

21       A.    (No response)

22       Q.    I can restate that question.  Were you a

23   party to that case?

24       A.    I was not a party to the case.
```

Edward O'Leary - Vol. I - September 14, 2017

```
 1        Q.    The second time you recall being deposed is
 2   when someone had sued you; is that correct?
 3        A.    That's correct.
 4        Q.    What was the nature of that lawsuit?
 5        A.    I'm not sure of the order, but false
 6   arrest, tortious assault and battery, excessive
 7   force, the litany that would go along with that.
 8        Q.    And I take it that was also arising out of
 9   the course of your employment as a police officer?
10        A.    It was.
11        Q.    Do you recall approximately what year that
12   case was brought against you?
13        A.    Maybe '87, '88.
14        Q.    So approximately 30 years ago?
15        A.    Yes.
16        Q.    Do you recall how that case was resolved?
17        A.    We won in a jury trial.
18        Q.    Who is "we"?
19        A.    There was another officer.  The town was
20   sued.  I think that was it.
21        Q.    Which town was this?
22        A.    Randolph.
23        Q.    Is that the town in which you served as a
24   police officer at the time?
```

Edward O'Leary - Vol. I - September 14, 2017

8

```
 1      A.   Yes.
 2      Q.   Do you still serve as a police officer for
 3  the Town of Randolph?
 4      A.   No.
 5      Q.   When did you stop serving as a police
 6  officer for the Town of Randolph?
 7      A.   Five years ago.
 8      Q.   Apart from those two situations that you
 9  recall being deposed, as you sit here today, do you
10  recall any other times you were deposed?
11      A.   I can't separate it in my mind between
12  depositions, Grand Jury.  I mean, I was in court all
13  the time.
14      Q.   Were there any instances when you testified
15  before the Grand Jury that were not in the course of
16  duties in your performance as a police officer for
17  the Town of Randolph?
18      A.   No.
19      Q.   Have you ever testified at trial?
20      A.   Yes.
21      Q.   Ever testify at trial apart from in the
22  course of your duties as a police officer for the
23  Town of Randolph?
24      A.   No.
```

**Edward O'Leary - Vol. I - September 14, 2017**

1    Q.   So since it sounds as though it might have

2   been some time ago, I want to go over some ground

3   rules for today's deposition to make sure we're on

4   the same page.  Is that alright?

5    A.   Sure.

6    Q.   If a question is unclear, please ask me to

7   rephrase.  It's my job to ask clear questions.  Do

8   you understand that?

9    A.   Yes.

10    Q.   Is it fair to say that if you don't ask me

11   to rephrase, that you will have understood the

12   question?

13    A.   Yes.

14    Q.   I would also ask you to wait until I finish

15   asking the full question so that Ken can give us a

16   clear record.  Do you understand that?

17    A.   Yes.

18    Q.   And you understand that Ken can't take down

19   nods of the head or shakes of the head or any

20   gestures?  Yes, exactly like the one you just --

21    A.   I do.

22    Q.   You just violated the

23   wait-until-the-end-of-the-question rule.

24    A.   Sorry.

**Edward O'Leary - Vol. I - September 14, 2017**

 1        Q.    No worries.  Of course, you understand you

 2   are represented today by Mr. Porter?

 3        A.    I do.

 4        Q.    You understand that if Mr. Porter objects,

 5   as is his right, please allow him to finish his

 6   objection, and he will tell you at the end of that

 7   objection as to whether you are allowed to answer or

 8   whether he is instructing you not to answer the

 9   question; do you understand that?

10        A.    Yes.

11        Q.    If you need a break at any time, don't

12   hesitate to ask for one.  The only thing I would ask

13   is that you don't take a break while a question is

14   pending.  Do you understand that?

15        A.    Yes.

16        Q.    You understand that you've been sworn in by

17   Ken and that you are obligated to answer each

18   question truthfully and that your testimony is under

19   the pains and penalties of perjury?

20        A.    Yes.

21                    (Document marked as O'Leary

22                    Exhibit 1 for identification)

23        Q.    Mr. O'Leary, I'm handing you what was

24   marked as Exhibit 1 for identification.  Take your

**Edward O'Leary - Vol. I - September 14, 2017**

```
 1   time to review it.  If you would then let me know

 2   when you have done so.

 3       A.   (Examines document)  Okay.

 4       Q.   You have reviewed the document?

 5       A.   I have.

 6       Q.   Do you recognize this document?

 7       A.   I do.

 8       Q.   What do you recognize the document to be?

 9       A.   This is the Notice of Taking Deposition of

10   Plaintiff On Target Training, Incorporated.

11       Q.   Have you seen this document prior to today?

12       A.   I have.

13       Q.   Were you shown it by your counsel?

14       A.   I was.

15       Q.   Please turn to the third page of the

16   document.  The header Schedule A, tell me when you

17   are there, please.

18       A.   I'm there.

19       Q.   Great.  Do you see the writing says, "The

20   Plaintiff's designee(s) shall be prepared to respond

21   to questions relating to the following topics," and

22   then that page and the page following there are

23   15 enumerated topics; do you see those?

24       A.   I do.
```

Edward O'Leary - Vol. I - September 14, 2017

12

1      Q.   Do you understand that your testimony today

2   is on behalf of Plaintiff On Target Training and

3   that your testimony with respect to those 15 topics

4   is on behalf of On Target and binds that company?

5      A.   Yes.

6      Q.   Thank you.  Mr. O'Leary, where are you

7   currently employed?

8      A.   On Target Training, Incorporated.

9      Q.   What is the nature of the business of On

10  Target Training, Incorporated?

11     A.   Retail gun store, training facility,

12  firearms accessories, ammunition, sales.

13     Q.   Would you agree with me that if we refer to

14  On Target Training, Incorporated throughout today's

15  deposition as simply "On Target," we will understand

16  what we are talking about as specifically On Target

17  Training, Incorporated?

18     A.   Yes.

19     Q.   What do you do at On Target?

20     A.   Everything.  I own the place.

21     Q.   Are you the sole owner of On Target?

22     A.   I am.

23     Q.   Do you have any employees at On Target?

24     A.   I actually do.  My wife and my daughter are

Edward O'Leary - Vol. I - September 14, 2017

13

 1   employees.

 2        Q.   They are both on the payroll in some form?

 3        A.   Yes.

 4        Q.   Salaried or hourly?

 5        A.   Salaried.

 6        Q.   Both of them?

 7        A.   Both.

 8        Q.   What is your wife's name?

 9        A.   Susan.

10        Q.   Susan O'Leary?

11        A.   Yes.

12        Q.   And your daughter?

13        A.   Shannon.

14        Q.   Shannon O'Leary?

15        A.   Yes.

16        Q.   Do you have any other employees at On

17   Target apart from your wife and your daughter?

18        A.   No.

19        Q.   How long have you been operating the

20   business of On Target?

21        A.   In its current situation as a corporation,

22   for about five years.  Prior to that I was just a

23   sole proprietor and it was a part-time thing,

24   probably since about 1998.

Edward O'Leary - Vol. I - September 14, 2017

14

```
 1      Q.    Did you open up On Target in 1998?

 2      A.    Yes.

 3      Q.    Is there anything you want to elaborate on

 4   with respect to that answer?

 5      A.    Yes.

 6      Q.    What is the reason for which you changed

 7   the legal structure of On Target approximately five

 8   years ago?

 9      A.    When I retired from the police department

10   and I obtained my Federal firearms dealer's license

11   and my state firearms dealer's license, I wanted to

12   be incorporated to provide a layer of protection.

13      Q.    To whom?

14      A.    To me.

15      Q.    What type of protection were you seeking?

16      A.    Liability.

17      Q.    What forms of liability were you worried

18   about?

19      A.    Civil liability.

20      Q.    What were the reasons you were worried

21   about civil liability?

22      A.    Just because everybody sues everybody these

23   days.

24      Q.    Prior to changing the legal form of On
```

Edward O'Leary - Vol. I - September 14, 2017

1   Target to a corporation status, you stated it was a

2   sole proprietorship?

3       A.   Yes.

4       Q.   And you were the sole owner?

5       A.   Yes.

6       Q.   For how long was On Target a sole

7   proprietorship?  From 1998 until approximately 2012?

8       A.   Yes.

9       Q.   Prior to 1998, did On Target exist?

10      A.   No.

11      Q.   So you opened up the shop in 1998?

12      A.   Well, not the shop, no, just the business.

13   I didn't have a shop until 2012.

14      Q.   So from 1998 through 2012, what was On

15   Target?

16      A.   Training facility, firearms training.  I

17   used to sell other products, not firearms, at gun

18   shows.  I didn't start selling firearms until I had

19   a business address and a lease and the proper zoning

20   and all that.

21      Q.   You currently have a storefront?

22      A.   I do.

23      Q.   Prior to 2012, there was no storefront for

24   On Target?

**Edward O'Leary - Vol. I - September 14, 2017**

1      A.    Correct.

2      Q.    What was the nature of the products that

3  you sold through On Target at gun shows and

4  elsewhere prior to 2012?

5      A.    Firearms accessories, cleaning kits,

6  holsters, ammunition, pepper spray, just general

7  firearms accessories.

8      Q.    You mentioned a training facility.  Could

9  you please explain, what was the nature of the

10  training facility?

11      A.    Well, maybe "facility" is not the right

12  word.  I was a training organization.  I would go to

13  people's homes, teach them at gun clubs.  We would

14  do halls.  Oh, the community college.

15      Q.    What about the community college?

16      A.    We taught at the community college.  We

17  taught basic firearms safety.

18      Q.    Which college?

19      A.    Massasoit.

20      Q.    What does it mean to do halls?

21      A.    Rent a hall or use a hall like the Elks

22  Hall.  We once rented a hotel hall at the Holiday

23  Inn.  A lot of homes, mostly gun clubs.

24      Q.    For which purpose or purposes did you rent

Edward O'Leary - Vol. I - September 14, 2017

17

1    or do halls?

2        A.    To teach basic firearms safety.

3        Q.    Are you currently employed anywhere else

4    apart from On Target at the moment?

5        A.    No.

6        Q.    You stated that you stopped working for the

7    Town of Randolph as a police officer approximately

8    five years ago; is that correct?

9        A.    Correct.

10       Q.    Did you retire from the Town of Randolph?

11       A.    I did.

12       Q.    For approximately how many years did you

13   serve as a police officer?

14       A.    32 years and 2 days.

15       Q.    I appreciate the specificity.  Was there

16   any specific reason that you chose to retire from

17   the Town of Randolph as a police officer after

18   32 years and 2 days?

19       A.    I had hit the magic numbers, 32 years and

20   55 years of age.  I was at the maximum pension.  It

21   was time to go.

22       Q.    Were all 32 years and 2 days of your

23   service as a police officer for the Town of

24   Randolph?

Edward O'Leary - Vol. I - September 14, 2017

 1      A.    No.

 2      Q.    What other town or cities did you serve as

 3   a police officer for?

 4      A.    I worked for about a year in Marshfield.

 5      Q.    Was that prior to working as a police

 6   officer for Randolph?

 7      A.    No.

 8      Q.    Was that during the term of your 32 years

 9   at Randolph?

10      A.    That was during the time of

11   Proposition 2 1/2.  In 1981 I was laid off from the

12   police department in Randolph because they reduced

13   the number of officers on the force, along with

14   several other people.  I had the good fortune of

15   being able to get appointed in Marshfield.  I worked

16   there for a year, close to a year, until Randolph

17   re-called.  Then I went back to Randolph.

18      Q.    So it was approximately 1982 or so?

19      A.    Yes.

20      Q.    When did you start working as a police

21   officer for the Town of Randolph?

22      A.    1980.

23      Q.    And you retired in 2012?

24      A.    Yes.

**Edward O'Leary - Vol. I - September 14, 2017**

1      Q.    Do you remember what date you retired?

2      A.    September 30th.

3      Q.    I figured you just might remember that.

4      A.    I was appointed on September 28th, and so

5    that's the two days.

6      Q.    What rank did you attain as a police

7    officer for Randolph?

8      A.    My highest civil service rank was

9    lieutenant.  I was on some occasions assigned as

10   acting chief when the chief was out of town.

11     Q.    Within the Town of Randolph's police

12   department, are there any ranks in between that of

13   lieutenant and that of chief?

14     A.    Yes.  There's the rank of commander.

15     Q.    Could you please explain how it came to

16   pass that from time to time you were the acting

17   chief.

18     A.    That was before the commanders existed.

19     Q.    Is it fair to say that when you were

20   serving in those moments as acting chief, you were

21   otherwise the number two at the Randolph Police

22   Department?

23     A.    No.  There was the chief, and there was all

24   the braves, the rest of us.  It depended on which

20

1    chief it was.  I was a lieutenant.  He asked me to

2    do it so I did it.

3        Q.   Does the Town of Randolph have the rank of

4    captain?

5        A.   No.

6        Q.   During the course of your employment as a

7    police officer either for the Town of Randolph or

8    the Town of Marshfield from 1980 through 2012, did

9    you hold any other jobs?

10       A.   On the police department?

11       Q.   No, apart from serving as a police officer

12   for those two towns.

13       A.   I did.

14       Q.   What jobs were those?

15       A.   I was on the adjunct faculty at Anna Maria

16   College, and I was on the adjunct faculty at

17   Massasoit Community College.

18       Q.   Where is Anna Maria College located?

19       A.   The main campus is in Paxton,

20   Massachusetts.  It's 1 Sunset Lane, if that helps.

21       Q.   It does.  Massasoit Community College,

22   where is that located?

23       A.   Brockton, Massachusetts.

24       Q.   What did you teach as an adjunct faculty

Edward O'Leary - Vol. I - September 14, 2017

21

1  member at those two colleges?

2      A.   The criminal justice curriculum, almost

3  everything they had at one time or another.

4      Q.   Can you please help me understand what the

5  criminal justice curriculum comprises.

6      A.   Criminal Law I, Constitutional Law I,

7  Evidence and Court Procedure, Police Community

8  Relations, Corrections, Probation and Parole.

9  There's probably more.

10     Q.   Were you teaching Massachusetts law,

11 Federal law, both, something else?

12     A.   Kind of a generic.  It was not statute

13 specific, state specific.  It was basic.

14     Q.   Could you please help me understand what

15 you mean by "basic."

16     A.   It would be freshman level criminal law, an

17 introduction to criminal law.  The difference

18 between felonies and misdemeanors, the difference

19 between criminal law and other law that is not

20 criminal, the definition of custody, some on use of

21 force.  I don't have a copy of the syllabus, so...

22     Q.   For what years did you serve as an adjunct

23 faculty member at Anna Maria and Massasoit Colleges?

24     A.   At Massasoit it was from 1989 until 2012.

**Doris O. Wong Associates, Inc.**

**Edward O'Leary - Vol. I - September 14, 2017**

```
 1   For Anna Maria it was in the '90s.  They had an off
 2   campus program much closer to home.  I taught there.
 3            I also taught in the police academy.
 4        Q.   Where was that?
 5        A.   The one I taught in was in Foxborough.  I
 6   don't think I taught in any other ones.
 7        Q.   Do you recall the name of the police
 8   academy?
 9        A.   I do.  It was the South Suburban Police
10   Institute, and it was the Municipal Police Training
11   Committee.  Yes, I was in Foxborough.
12        Q.   What did you teach there?
13        A.   I think I taught -- I'm trying to remember
14   now.  I think it was Evidence.  I think it was --
15   that's a long time ago.  I know Evidence was in
16   there.  I don't remember what else.
17        Q.   You said it was a long time ago.  When did
18   you teach at the South Suburban Police Institute?
19        A.   Again, starting around '89, probably for
20   five or six years.  It was off and on.  It was not a
21   full-time thing.
22        Q.   What were your titles at Massasoit
23   Community College and at Anna Maria College?
24        A.   Adjunct faculty.  Most people just called
```

**Edward O'Leary - Vol. I - September 14, 2017**

1   me "Ed."

2       Q.    Apart from what we discussed regarding your

3   time as a police officer for Randolph and for

4   Marshfield and your time teaching at Massasoit and

5   Anna Maria and at South Suburban Police Institute,

6   can you please walk me through what other employment

7   you have had.

8       A.    Oh, god, you mean like in high school?

9       Q.    No.   Well, let's start with 1980 onward.

10      A.    1980 onward?

11      Q.    Yes, anything else that you have not

12  mentioned thus far.

13      A.    In the interim period from the time I was

14  laid off from Randolph until the time I began

15  working in Marshfield, I sold parts for foreign cars

16  for a company called "Foreign Auto Part."

17      Q.    Where were they located?

18      A.    In Sharon, Mass.

19      Q.    Is there anything else that you can recall

20  as you sit here?   I understand it was a long time

21  ago.

22      A.    From '80 on, no.

23      Q.    Would you please briefly walk me through

24  your education.

**Edward O'Leary - Vol. I - September 14, 2017**

24

```
 1        A.   I have an associate's degree in law
 2   enforcement from Massasoit Community College.  I
 3   have a bachelor of arts degree in criminal justice
 4   from Western New England College.  I have a master
 5   of arts in criminal justice from Anna Maria College.
 6        Q.   Can you help me understand how the degree
 7   programs differ from on the one hand the associate's
 8   degree in law enforcement at Massasoit and on the
 9   other the criminal justice programs at Western New
10   England and the master's program at Anna Maria
11   College.
12        A.   It's just what they called it.
13        Q.   Roughly the same curriculum?
14        A.   Yes.
15        Q.   How would you describe that curriculum?
16        A.   Massasoit is a two-year community college.
17   You cannot get a bachelor's degree there.  You take
18   your first two years of undergrad there basically,
19   and you can either be in a degree program or you can
20   be in a transfer program.  I took the degree
21   program.  When you graduate with that, that
22   transfers to most schools as 60 undergraduate
23   credits, which is halfway to a bachelor's degree.
24   Then you take your third and fourth year at the
```

**Edward O'Leary - Vol. I - September 14, 2017**

```
 1    other school, and then you get your bachelor's
 2    degree.
 3         Q.    So you started at Massasoit first?
 4         A.    Well, I had credits at Northeastern.  I had
 5    credits at UMass, here and there different things.
 6    I got three college credits for English just for
 7    taking a test at UMass.  They called them
 8    "competencies," but it worked out to three credits.
 9         Q.    UMass Boston, Amherst, Dartmouth?
10         A.    Boston, in Dorchester.
11         Q.    Have you ever served in the military?
12         A.    No.
13         Q.    Have you ever been tried for or convicted
14    of a crime?
15         A.    I've never been convicted of a crime.
16         Q.    Were you tried for a crime?
17         A.    Actually, no.
18         Q.    Are you thinking back to the time you were
19    deposed in the lawsuit that you mentioned earlier
20    today?
21         A.    No, that's not what I'm thinking of at all.
22         Q.    Going back to that lawsuit when you were
23    deposed, was that a civil lawsuit against you?
24         A.    It was.
```

Edward O'Leary - Vol. I - September 14, 2017

 1     Q.   Were you ever tried criminally yourself?

 2     A.   For that?

 3     Q.   No, no, at any point.

 4     A.   I never was in a trial.

 5     Q.   Were you ever arrested or arraigned as a

 6 defendant in a criminal proceeding?

 7          MR. PORTER:   I object to the form of the

 8 question.  You can answer.

 9          MR. KROCKMALNIC:   I'm happy to rephrase.

10     Q.   Were you ever arraigned as a defendant in a

11 criminal proceeding?

12     A.   I was.

13     Q.   Can you tell me, what were the

14 circumstances for which you were arraigned as a

15 defendant in a court proceeding?

16     A.   I was arraigned for some disturbance.  I

17 don't know what the exact charge was.  It was in the

18 '70s.  The case was dismissed.

19     Q.   Where was this?

20     A.   In Boston.

21     Q.   City of Boston?

22     A.   Yes.

23     Q.   Where were you arraigned, do you recall?

24     A.   No.

**Doris O. Wong Associates, Inc.**

Edward O'Leary - Vol. I - September 14, 2017

1    Q.   Do you recall anything as you sit here

2  today about the nature of the disturbance?

3    A.   I was never really clear on what the

4  disturbance was.  I was present, but I was not

5  disturbing.

6    Q.   What were you present at?

7    A.   It was at a Red Sox game.

8    Q.   Was there a complainant in that case?

9    A.   I have no idea.

10    Q.   By whom were you arrested?

11    A.   Well, at some point I guess it was the

12  Boston Police.

13    Q.   As you sit here today, what do you recall

14  about the circumstances that led to your arrest at a

15  Red Sox game?

16    A.   Nothing, nothing.

17    Q.   Apart from the case being dismissed, what,

18  if anything, do you recall about the nature of the

19  proceedings against you relating to that arrest?

20    A.   It was dismissed in the morning.

21    Q.   Do you recall the reason or reasons for

22  which it was dismissed?

23    A.   Because we were out of there.  Everybody

24  was gone.  They took away people, guys.  They just

**Edward O'Leary - Vol. I - September 14, 2017**

28

1     took a bunch of guys away.

2         Q.    "They" meaning Boston PD?

3         A.    I think it was really the security.  I'm

4     not sure.  I mean, the police obviously came at some

5     point and got involved, but I don't know.  I don't

6     remember.  It was a long time ago.

7         Q.    Apart from this incident to which you've

8     just been testifying, have you ever been arrested at

9     any point?

10        A.    Yes.  I had an OUI too in the '70s.  It was

11    dismissed.

12        Q.    Apart from that incident, were there any

13    other circumstances in which you've been arrested?

14        A.    No.

15        Q.    Have you ever been involved in any domestic

16    violence incident?

17        A.    Outside of the police?

18        Q.    Exactly.  As an individual, not in the

19    course of your duties as a police officer.

20        A.    No.

21        Q.    How long have you lived in Massachusetts?

22        A.    My whole life.

23        Q.    How old are you?

24        A.    I am 61.

**Edward O'Leary - Vol. I - September 14, 2017**

1      Q.   Mr. O'Leary, do you hold any gun license or

2   licenses?

3      A.   I do.

4      Q.   Could you please walk me through what

5   licenses you own.

6      A.   I have a license to carry firearms, a

7   Class A.

8      Q.   Any restrictions on it?

9      A.   No.  I have a license to possess a machine

10  gun, Class E.  I have a license to sell, lease, rent

11  firearms, rifles, shotguns and machine guns.  I have

12  a license to perform gunsmithing.  I have a license

13  to sell ammunition.  I also have a Federal firearms

14  dealer's license.  Did you ask about that?

15     Q.   I asked about any and all licenses.

16     A.   Okay.  I just want to be responsive.

17     Q.   I appreciate that.  Any other licenses that

18  you recall -- withdrawn.  Do you have any other

19  license to which you did not testify?

20     A.   Gun licenses?

21     Q.   Yes.

22     A.   No.

23     Q.   The FFL is of course federally issued.

24  What about the remainder of the licenses you just

Edward O'Leary - Vol. I - September 14, 2017

30

1    stated?  Who are the issuing authorities?

2        A.    East Bridgewater Police Department,

3    specifically the chief.

4        Q.    For each of the other --

5        A.    For each of the others, yes.

6        Q.    Do you know who the chief of the East

7    Bridgewater Police Department is?

8        A.    I do.

9        Q.    What is her or her name?

10       A.    Scott Allen.

11       Q.    Are you acquainted with Chief Allen?

12       A.    No.

13       Q.    You just know of him as being the chief of

14   police?

15       A.    I know who he is, but I don't know him.

16       Q.    Do you know as you sit here today the

17   approximate dates of issue of each of the licenses

18   you just recited?

19       A.    I don't.

20       Q.    Are they all currently valid?

21       A.    Yes.

22       Q.    None are expired at the moment?

23       A.    No.

24       Q.    Have any of these licenses ever been

**Edward O'Leary - Vol. I - September 14, 2017**

31

```
 1   suspended or terminated for any reason?
 2       A.   No.
 3       Q.   Have any of the licenses that you testified
 4   to lapsed for any reason at any point in time?
 5       A.   Well, I don't know.  I don't know if
 6   there's a grace period on an ammunition dealer's
 7   license.  I don't think there is.  That might have
 8   been -- no, I don't think it was.  I think there's a
 9   grace period on an ammunition dealer's license.
10       Q.   I don't want to assume, but I take it you
11   are bringing that up because it's --
12       A.   It's possible it lapsed.  I can't say for
13   sure.
14       Q.   Just so your testimony is clear, it's
15   possible that your ammunition dealer's license
16   lapsed at some previous point in time or that it is
17   currently lapsed?
18       A.   Oh, no.  It's current.
19       Q.   But it's possible that at some previous
20   point in time, it might have lapsed prior to the
21   time that you renewed it?
22       A.   It may have.
23       Q.   But you are not certain as you sit here
24   today?
```

**Edward O'Leary - Vol. I - September 14, 2017**

32

```
 1        A.    I am not certain.
 2        Q.    What process or processes did you have to
 3   undergo to obtain your Class E machine gun license?
 4        A.    Well, I issued it to myself originally.
 5   The reason I did was because I had a machine gun on
 6   the police department.  I thought if I was ever
 7   going to take it home, it would be an appropriate
 8   thing to have the license to do that.
 9        Q.    When you say you issued it to yourself,
10   what do you mean?
11        A.    I was the firearms licensing officer.
12        Q.    I take it this was for the Town of Randolph?
13        A.    It was.
14        Q.    For how many years were you the firearms
15   licensing officer for the Town of Randolph?
16        A.    15 or so.
17        Q.    Which years were those?
18        A.    I would say 1995 to 2010.
19        Q.    What was the nature of your duties as a
20   firearms licensing officer for those years?
21        A.    I would accept applications, review
22   applications, make a determination of whether or not
23   to issue the license.  Then either issue it or, if
24   needed to be, denied.  There were occasions when it
```

**Edward O'Leary - Vol. I - September 14, 2017**

 1    was my job to suspend or revoke a license so I did

 2    that sort of thing.

 3        Q.   I had understood your testimony to be that

 4    apart from the FFL, the licensing authority for the

 5    other licenses that you testified you had, including

 6    the machine gun license, was the Town of East

 7    Bridgewater.  Is that the current licensing

 8    authority for your machine gun license or is it

 9    still through the Town of Randolph?

10        A.   No.  It's East Bridgewater now.

11        Q.   Could you please explain the process by

12    which the licensing authority for your Class E

13    machine gun license transferred from the Town of

14    Randolph to the Town of East Bridgewater.

15        A.   The machine gun license was expiring.  I

16    renewed it.  I don't live in Randolph.  I went to

17    where I lived.

18        Q.   What is your understanding as you sit here

19    today of what the requirements are to obtain a

20    machine gun license in Massachusetts?

21        A.   Well, the requirements are the same as to

22    obtain a Class A license, with a couple of added

23    things.  One of them is that the reasons for

24    issuance would be either a bona fide collector or an

34

1    MPTC firearms instructor.  Since I was both, I met

2    the criteria.

3        Q.    What does MPTC stand for?

4        A.    Municipal Police Training Committee.

5        Q.    This is the same training committee that

6    you testified earlier was part of the South Suburban

7    Police Institute?

8        A.    Yes.  They are not part of the institute.

9    The institute is part of them.  The MPTC is the

10   overarching organization that regulates, governs

11   police training in the Commonwealth.

12       Q.    Do you have a manufacturing license?

13       A.    I do.

14       Q.    That's also issued by the Town of East

15   Bridgewater?

16       A.    No.  That's my Federal dealer's license.

17       Q.    What is the scope of your FFL?

18       A.    I don't understand.

19       Q.    What is your understanding as you sit here

20   today of what your FFL permits you to do with

21   respect to firearms?

22       A.    Buy in interstate commerce, sell either

23   retail or in interstate commerce, also to

24   manufacture.

**Edward O'Leary - Vol. I - September 14, 2017**

1     Q.    Has On Target ever been inspected by either

2   East Bridgewater Police Department or any other

3   inspecting authority?

4     A.    Alcohol, Tobacco, Firearms and Explosives

5   was there in March.  They conduct an audit of the

6   guns, the books, et cetera.

7     Q.    Was this a standard ordinary course audit

8   or was there a specific reason that you understand

9   as to why they were auditing?

10    A.    No, no.  It was the standard.

11    Q.    What did that audit comprise of, as you

12  recall?

13    A.    There was an individual that came out.  He

14  checked my inventory of guns to make sure it matched

15  up with what my computer says.  They call it "the

16  book."  It's computerized.  He went through a year's

17  worth of transactions to make sure that the

18  paperwork was done correctly.

19    Q.    Do you recall what the result of that audit

20  was?

21    A.    Well, I remember him smiling when he told

22  me that all the guns were good.  We were not missing

23  any.  I was smiling too.  He found a couple of minor

24  mistakes.  That's what he's there for.  Sometimes

**Edward O'Leary - Vol. I - September 14, 2017**

1    people might write that they were born in Boston,

2    but not Boston, Mass., and I wouldn't catch it.  He

3    told me there was nothing in my records that would

4    make it difficult to trace a firearm.  He said

5    there's nothing I had to go back and correct, you

6    know, that it was pretty good.

7         Q.   Do you recall the name of the inspecting

8    officer?

9         A.   James Bender.

10        Q.   Had you met Mr. Bender prior to the date of

11   that inspection?

12        A.   No.

13        Q.   Apart from the ATF audit this past March,

14   have you been audited by the East Bridgewater Police

15   Department or inspected by the East Bridgewater

16   Police Department?

17        A.   No.

18        Q.   At no point from the time you opened up

19   your storefront in 2012 to the present?

20        A.   No.

21        Q.   Turning to the topic of training with

22   respect to firearms, could you please walk me

23   through your own training that you have received,

24   where you received it, and what the nature of the

Edward O'Leary - Vol. I - September 14, 2017

1  training was.

2      A.   When I was a young lad, my father and my

3  grandfather taught me to shoot.  They taught me to

4  keep the gun pointed in a safe direction and keep my

5  finger off the trigger.  I enjoyed it.  It wasn't

6  really too much into it.

7          I got appointed to the police academy --

8  sorry -- the police department.  They sent me to the

9  police academy.  We had firearms training there,

10  fairly extensive I would say.  Once again, stressing

11  safety.  We did qualifications.  You qualify to

12  carry a gun.

13          Once out of the academy, there was periodic

14  firearms training on the police department.

15          At some point around 1986, I was asked to

16  assist the range officer at the time.  He asked me

17  to assist him at the range.  That was a pretty big

18  deal to me.  I said, "Sure."  I said, "What do you

19  want me to do?"  He said, "Well, for this year I

20  want you to lug all the heavy stuff."  I did that.

21          Then they sent me to firearms instructor

22  school.  At that time it was handguns.  Then they

23  sent me to shotgun instructor school, which was

24  shotguns.  Then they sent me to patrol rifle

**Edward O'Leary - Vol. I - September 14, 2017**

1    instructor school, which was patrol rifles.  They

2    sent me to use of force instructor school, which

3    dealt with use of force.  They sent me to Glock

4    transitional instructor school, which dealt with

5    specifically Glock pistols.  They sent me to Glock

6    armorer school on a couple of occasions, then Glock

7    advanced armorer school.  They sent me to -- I

8    forget the name of the company, but it was the

9    company to -- the company taught how to build and

10   disassemble and repair AR-15s.

11        I also became for a period of time a

12   certified Rock River Arms warranty station, although

13   I never did anything with it.

14        I'm sure there's more.  That's what comes

15   to mind.

16   Q.   Is it fair to say you've been extensively

17   trained on firearms?

18   A.   That would be fair.

19   Q.   Could you please help me understand the

20   nature of the training you received at patrol rifle

21   school.

22   A.   We learned how to shoot them.  We learned

23   how to clean them.  We learned how to carry them.

24   We learned how to load them and unload them.  We

Edward O'Leary - Vol. I - September 14, 2017

 1   learned how to not shoot them because a lot of times

 2   that's what you have to do.  We learned to shoot

 3   standing, sitting, kneeling and prone.  We learned

 4   to shoot stationary and on the move.  We learned to

 5   shoot behind cover and not behind cover.

 6          You want me to get into the cleaning and

 7   disassembly, how to do that?

 8      Q.   Please do.

 9      A.   We learned how to take apart the rifle,

10   take the upper off the lower, take the buffer apart,

11   take the bolt carrier group out, disassemble the

12   bolt, clean it, put it all back together without

13   losing any little parts.

14          We learned about ballistics, how to zero a

15   rifle, how to take a rifle and go from battle zero

16   to individual operator zero.

17      Q.   What patrol rifles were you trained on at

18   patrol rifle school?

19      A.   Bushmaster XM-15s, I think they were.

20      Q.   Is that an AR-15?

21      A.   No.  An AR-15 is an Arma-Lite rifle.  The

22   AR-15 is a specific model of a specific rifle

23   manufactured by a specific company.

24      Q.   Is it fair to say the XM-15 is an AR-15

**Edward O'Leary - Vol. I - September 14, 2017**

 1  style rifle?

 2      A.   Yes.

 3      Q.   Were you trained on the XM-15 alone or on

 4  other AR-15 style rifles at patrol rifle school?

 5      A.   I think we also used some Colt Sporters,

 6  which is similar.

 7      Q.   Is the Colt Sporter an AR-15 style rifle?

 8      A.   It is.

 9     *Q.   And is it your understanding that the

10  upper -- the various parts to which you testified

11  to, the upper receiver, the lower receiver, the

12  bolt, the bolt carrier in the Colt Sporter, would

13  they also work in, for example, the Bushmaster

14  XM-15 AR-15 style rifle?

15          MR. PORTER:  Objection to the form of the

16  question.  You can answer if you know.

17      A.   I would say this.  I would never do that.

18  I would put the Colt with the Colt.  I would put the

19  Bushmaster with the Bushmaster.  I don't know how

20  safe it would be to start mixing and matching.

21      Q.   I understand.  Is it your understanding

22  that the rifle that could be put together by mixing

23  and matching, as you put it, would it operational

24  were you to mix it?

**Edward O'Leary - Vol. I - September 14, 2017**

1       A.    I believe it probably would.

2       Q.    Do you have any reason to believe it

3    wouldn't?

4       A.    No.   I just have never done it so I don't

5    know.

6       Q.    Understood.

7             MR. KROCKMALNIC:   Ken, could you please

8    read back the question to which Mr. Porter objected.

9             *(Question read)

10            MR. KROCKMALNIC:   If you tell me the nature

11   of the form objection, I would be happy to attempt

12   to rephrase it.

13            MR. PORTER:   Sure.   You can fix it quite

14   easily.   It was really the form.   The example left

15   it a little open-ended.   If you were talking about

16   the one rifle, the Bushmaster on the one hand and

17   the Colt on the other, I have no objection.   Those

18   are the two rifles he testified he had experience

19   with, and those are the examples you were using.

20   That's all.

21            MR. KROCKMALNIC:   I understand.   Thank you

22   for clarifying.   I'll let it stand, then.

23      Q.    Apart from the Colt Sporter AR-15 style

24   rifle and the Bushmaster XM-15 AR style rifle, do

**Doris O. Wong Associates, Inc.**

**Edward O'Leary - Vol. I - September 14, 2017**

1   you recall being trained on any other rifles at

2   patrol rifle school?

3        A.   No.

4        Q.   Have you received any training on AK-47

5   style rifles?

6        A.   No.

7        Q.   Can you please briefly walk me through the

8   nature of the training you received at the Glock

9   armorer school and the advanced Glock armorer

10  school.

11       A.   The basic Glock armorer school is a

12  complete disassembly/reassembly of the pistol, how

13  to diagnose problems and repair problems, how to

14  change parts, what would be the normal parts wear,

15  patterns, recommended maintenance, scheduling,

16  things like that.

17            The advanced armorer went into more.  The

18  instructors would actually do things to the guns to

19  make them not work and then just give them to us and

20  ask us to diagnose and repair the problem.  There

21  was an extra part that dealt with the Glock-18,

22  which is a machine pistol, and how to disassemble,

23  reassemble, diagnose, repair those issues as well.

24       Q.   I believe you testified that you also went

**Edward O'Leary - Vol. I - September 14, 2017**

43

```
 1   to school or received training for how to build,

 2   disassemble and repair AR-15s?

 3        A.   That's correct.

 4        Q.   Is that separate from the training you

 5   received at patrol rifle school?

 6        A.   No -- sorry.  Yes.  Yes.  I'm sorry.

 7        Q.   No need to apologize.  Could you please

 8   walk me through the training that you received with

 9   respect to building, disassembling and repairing

10   AR-15 style rifles.

11        A.   Well, we learned to take a bag of parts and

12   turn it into a rifle basically.  We learned about

13   the tools that are required.  We got experience

14   using the tools that were required to do it.  There

15   are some very specific tools.  We would take all of

16   the parts of the rifle, locate them, build it into a

17   rifle.  Then we would take it apart.  Then we would

18   do it again, take it apart again.  We did that at

19   least three times.  Then we were done.

20        Q.   Where was this training received?

21        A.   That was at the Municipal Police Training

22   Academy in Randolph, Massachusetts, the old Tower

23   Hill School.  I went there in first grade.

24        Q.   I should have asked this but I didn't.
```

Edward O'Leary - Vol. I - September 14, 2017

44

```
 1   Where was the patrol rifle school located?
 2        A.    The Holbrook Sportsmen's Club.  It's a gun
 3   range.
 4        Q.    Is that in Holbrook, Mass.?
 5        A.    It is.
 6        Q.    Who ran that training?
 7        A.    The Municipal Police Training Committee.
 8        Q.    Going back and forth here.  Going back to
 9   the training you received at the Municipal Police
10   Training Academy in Randolph, building,
11   disassembling, repairing AR-15 style rifles, do you
12   recall what brand AR-15 style rifles you were
13   trained on?
14        A.    I don't.
15        Q.    You just know they were AR-15 style rifles?
16        A.    I do know that.  I knew they were AR-15
17   rifles.  It's not an assault rifle.
18        Q.    I have not used that term.
19             MR. PORTER:  I think he misheard you.
20   That's all.  Sorry to interrupt.  I think he just
21   misheard what you said.
22             MR. KROCKMALNIC:  I appreciate that.
23        Q.    My question was if you recall the brand or
24   the models of AR-15 style rifles that you were
```

**Edward O'Leary - Vol. I - September 14, 2017**

45

1    trained on at the Municipal Police Training Academy

2    in Randolph.

3         A.    I don't.

4         Q.    You just knew them to be AR-15 style rifles?

5         A.    Yes.

6         Q.    Was it your understanding in the training

7    that you received that how to build, how to

8    disassemble, how to repair these rifles holds true

9    across the range of AR-15 style rifles or was it

10   specific to, as you noted before, the Arma-Lite

11   AR-15?

12        A.    Well, it all carries over.  Pistol armory

13   carries over to rifles, carries over to machine

14   guns, carries over to shotguns.  It's all very

15   similar, with obviously specific differences, like

16   in a pistol the barrel is much shorten than a rifle,

17   things like that.  You need to understand more about

18   what goes on in the gun.

19             I think that what we gathered out of that

20   school was that most of what we trained on would

21   work on most of what we encountered.  It's generic

22   because there's more than one police department

23   represented.  They really don't talk too much about

24   some parts of the gun because some guns, for

**Edward O'Leary - Vol. I - September 14, 2017**

46

1    example, don't have the carry handle mounted sights.

2    They have flat tops.  They don't get into too much

3    of that.

4              A lot of the stuff, yes, it carries across.

5    Not everything, but a lot of the stuff carries

6    across from brand to brand.

7        Q.   It's fair to say that different police

8    departments use different AR-15 brand and model

9    rifles?

10       A.   Yes.

11       Q.   So this training was designed for active

12   duty police officers to effectively and safely use

13   their AR-15 style rifles?

14       A.   This is to maintain them, to maintain those

15   rifles, not to use them.  It's not a range course.

16   It's how to maintain them, how to keep them in

17   operating condition, how to fix them if they break.

18       Q.   And you didn't recall what brand or

19   specific model of AR-15 you were trained on in that

20   course because you understood it was broadly

21   applicable for all AR-15s?

22       A.   For many AR-15s, not all.  I wouldn't say

23   all.  I would say many.

24       Q.   As you sit here now, which AR-15s was the

**Edward O'Leary - Vol. I - September 14, 2017**

47

1    training that you received at the Municipal Police

2    Training Academy not applicable?

3        A.    Well, there are similar guns, like the H&K

4    rifle, that are similar but not the same.  I would

5    never say that I know exactly how to take those

6    apart, fix them and maintain them.  I probably could

7    do it, but I wouldn't do that, like, on a police

8    department gun because I don't feel qualified.

9        Q.    What was the gun you just mentioned?

10       A.    H&K, Heckler & Koch.

11       Q.    This would be an AR-15 style platform?

12       A.    To my understanding, it's similar.

13       Q.    So I just want to make sure I understand

14   what your testimony is.  You are saying the training

15   you received at that training academy may have been

16   applicable to that weapon but you are not sure?

17       A.    Correct.

18       Q.    Apart from the H&K AR-15 style rifles to

19   which the training might not have been applicable,

20   can you think of any other AR-15 style rifle that

21   the training that you received at that training

22   academy in Randolph would not have been applicable?

23       A.    I can't think of any.

24       Q.    I don't want to assume, but were you sent

1    to this training academy because one of your duty

2    weapons in the course of your employment at Randolph

3    Police Department was an AR-15 style rifle?

4         A.    That's correct.



**Edward O'Leary - Vol. I - September 14, 2017**

███  ████████   ███████████████████████

███  ████████████████████

3     Q.    Is it your understanding the training you

4   received at the Municipal Police Training Academy in

5   Randolph on AR-15s was specifically applicable to

6   your duty Bushmaster XM-15?

7     A.    No.

8     Q.    For what reason or reasons was it not

9   applicable?

10     A.    It was not specifically applicable.  It was

11   a generic class.

12     Q.    Sorry.  I understand that.  I'm doing a

13   poor job of phrasing the question.  Let me try it

14   another way.  Is there anything you learned in that

15   class with respect to how to build, disassemble,

16   repair, et cetera, AR-15 style rifles that was not

17   applicable specifically to your duty Bushmaster

18   XM-15 rifle?

19     A.    Yes.

20     Q.    What?

21     A.    The use of the carry handle mounted rear

22   sights.  We took those carry handles off.

23     Q.    "We" meaning?

24     A.    The department.

**Edward O'Leary - Vol. I - September 14, 2017**

1      Q.    Randolph PD?

2      A.    Meaning me.

3            MR. PORTER:  You are doing fine, but don't

4   cross-talk.

5      Q.    Apart from the carry mounted rear handle

6   difference, anything else you received -- any other

7   training you received at that training course that

8   would not have been applicable to your duty

9   Bushmaster XM-15?

10     A.    No.

11     Q.    Did you receive any training at any point

12  either in your career as a police officer or as a

13  private citizen on the use of firearms for

14  self-defense?

15     A.    Well, as a police officer, sure.

16     Q.    What is the training you received there?

17     A.    That's exactly what you learn.  That's all

18  of it.  Self-defense or defense of others is when

19  you can shoot your gun.

20     Q.    That's a fair point.  I should have cabined

21  the question.  I'll start again.

22            In the course of your operating as a

23  private citizen, which is to say not as a police

24  officer in the course of your police officer duties,

Edward O'Leary - Vol. I - September 14, 2017

51

1   have you received any trainings about use of

2   firearms for self-defense purposes for private

3   citizens?

4       A.   I would say no.

5       Q.   I suspect the answer to the next question

6   will be lengthy so I will leave it kind of

7   open-ended.  Please describe the nature of the

8   training that you provided either as a police

9   officer or, again, as a private citizen on behalf of

10  On Target.

11      A.   Firearms training?

12      Q.   Yes.  Thank you.

13      A.   I taught basic firearms safety.  What I did

14  is I joined two approved classes because I liked the

15  curriculum in both.  I used the NRA Home Firearms

16  Safety course and the Mass. Chiefs of Police course.

17  I kind of merged them together.  What that course

18  does is it teaches the students basic firearms

19  safety rules, the most important basic firearms

20  safety rules.  For example, one of the most

21  important rules is if you don't know how to operate

22  a firearm, don't touch it.  Another important one is

23  you never assume a firearm is unloaded.  Always

24  treat every firearm is if it's loaded.  Rules like

Edward O'Leary - Vol. I - September 14, 2017

1    always keep your finger off the trigger, always keep

2    your gun pointed in a safe direction, always leave

3    your gun unloaded unless you are actually using it.

4    I taught them those kind of safety rules.

5         We also taught them nomenclature about the

6    gun, front sight, rear sight, barrel, cylinder

7    magazine, safeties, that kind of thing, the

8    mechanical operation of the gun.

9         We taught them the use of sights, what a

10   sight picture should be, what their perception of

11   the target should be.  We taught them about dominant

12   eye.  We taught them about how to grip a gun, how to

13   hold it in their hand, how to place their finger on

14   the trigger, how to press the trigger.

15        We taught them how to load and unload.  We

16   taught them how to shoot.  You point the gun down

17   that way and press the trigger and make it go bang

18   (indicating).  We did all that.  We did it for

19   handguns, rifles, shotguns.  We did it for the

20   police.  We did it for private citizens.

21        I also taught instructors how to be

22   instructors.  I was an instructor trainer.  I was

23   responsible for recertifying the other instructors,

24   my cadre of instructors on the police department.  I

Edward O'Leary - Vol. I - September 14, 2017

53

```
 1   was responsible for maintaining their certification
 2   as firearms instructors.
 3          That's what comes to mind right now.
 4      Q.   Switching gears a bit, are you --
 5          MR. HOWE:  Well, before you do that, why
 6   don't we take a short break.  We've been going a
 7   little over an hour now.
 8          MR. KROCKMALNIC:  Sure thing.  Let's go off
 9   the record.
10          (Discussion off the record)
11          (Recess at 10:45 a.m.)
12   BY MR. KROCKMALNIC:  (11:00 a.m.)
13      Q.   Mr. O'Leary, are you a member of GOAL, the
14   Gun Owners' Action League?
15      A.   I am.
16      Q.   How about Comm2A?
17      A.   I am not a member of that, no.
18      Q.   NRA?
19      A.   Yes, life member, proudly.
20      Q.   Any gun club?
21      A.   Yes.
22      Q.   Which?
23      A.   Braintree Rifle and Pistol Club.
24      Q.   How long have you been a member there?
```

**Edward O'Leary - Vol. I - September 14, 2017**

```
 1      A.    I don't know, a long time.

 2      Q.    When you say lifelong for the NRA, when did

 3   you join the NRA?

 4      A.    Maybe 30 years ago.

 5      Q.    When did you join GOAL?

 6      A.    Maybe seven or eight years ago.

 7      Q.    Are you a member of these organizations or

 8   are you also an officer of any of them?

 9      A.    Just a member.

10      Q.    Apart from these organizations that I asked

11   about and the gun club, any other firearms related

12   organizations in which you are or have ever been a

13   member?

14      A.    I was a member at the Standish Sportsmen's

15   Club for a while.

16      Q.    Located where?

17      A.    East Bridgewater.

18      Q.    What's the Standish Sportsmen's Club?

19      A.    A gun club.

20      Q.    With respect to On Target, is On Target a

21   member of any of the organizations that I asked you

22   about?

23      A.    I think we are.  I think On Target is an

24   affiliate business of the NRA.  I have some kind of
```

Edward O'Leary - Vol. I - September 14, 2017

55

1    a certificate.  I don't know.

2        Q.   What is your understanding of what it means

3    to be an affiliate business of the NRA?

4        A.   I got to send them some more money.  I

5    don't know what that means.  It means that we are on

6    their side and they are on our side.

7        Q.   Do you participate in any activities

8    organized by GOAL?

9        A.   The rallies and those things?

10       Q.   Yes.

11       A.   No.

12       Q.   Or any events or any talks or any sponsored

13   anything by GOAL?

14       A.   No.

15       Q.   So basically you are a member of GOAL, but

16   you don't participate in any active way?

17       A.   Correct.

18       Q.   Same questions for the NRA.  Apart from

19   being a member of the NRA, do you participate in any

20   way with respect to offerings that it provides?

21       A.   I am an NRA certified firearms instructor.

22   I maintain my certification as a firearms instructor

23   with them.  That's about it, though.  I don't go

24   to -- I'm not a meetings guy.

Edward O'Leary - Vol. I - September 14, 2017

56

```
 1        Q.    Do you use social media in the course of
 2    either your business or personally?
 3        A.    Yes.
 4        Q.    Both?
 5        A.    Both.
 6        Q.    What forms of social media do you use?
 7        A.    Well, we have Facebook.  We have Twitter.
 8    We might have Instagram.  I'm not really all that
 9    knowledgeable about some of that stuff.  I have
10    friends that help me with it.
11        Q.    The "we" you are referring to I take it is
12    On Target?
13        A.    Yes.
14        Q.    So you have some friends that help with On
15    Target's social media presence?
16        A.    Yes.
17        Q.    Who are these friends?
18        A.    Well, my daughter does a little bit.  My
19    wife does a little bit.  A friend of mine's daughter
20    does a little bit.  We just go from there.
21        Q.    Are you solely responsible for the content
22    of On Target's social media presence or are there
23    other folks that also contribute to it?
24        A.    I'm solely responsible.
```

**Edward O'Leary - Vol. I - September 14, 2017**

 1      Q.   I take it that across these various

 2  platforms, On Target has, generally speaking, posted

 3  about firearms and firearms related matters?

 4      A.   Yes.

 5      Q.   Across all of these media, Instagram,

 6  Twitter, Facebook?

 7      A.   I don't know if we ever put anything on

 8  Instagram, honestly.  I don't know.  We might have.

 9  I don't know.  I know Twitter.  I know Facebook.

10  I'm not sure about...

11      Q.   Are you acquainted with any of GOAL's

12  social media accounts?

13      A.   I know they have Facebook.  I know that.

14      Q.   Have you ever expressed any opinions about

15  this case, Worman versus Baker, on any social media

16  account, either personally or on behalf of On Target?

17      A.   Oh, definitely, yes, I have.

18      Q.   Where?

19      A.   Everywhere, probably Facebook, probably

20  Twitter.

21      Q.   Again, specifically about this litigation?

22      A.   Oh, about this particular suit or about

23  what the suit derives from?

24      Q.   My question was about this particular

Edward O'Leary - Vol. I - September 14, 2017

58

 1    litigation, Worman versus Baker.

 2        A.   Oh.  No.  The only thing I posted about

 3    Worman versus Baker was I going in for depositions

 4    today.  I think that's the only thing.

 5        Q.   Did you post this on Facebook, on Twitter,

 6    both?

 7        A.   Facebook.

 8        Q.   Anywhere else?

 9        A.   No.  I think it was just Facebook.

10        Q.   What is your recollection as you sit here

11    today of what you posted earlier today about going

12    in for depositions?

13        A.   I said, "I'm going in for depositions

14    today.  I will keep you all posted."

15        Q.   Why don't you answer the question you

16    thought I was asking you about whether you ever

17    posted on social media either personally or on

18    behalf of On Target with respect to, as you put it,

19    what this case derives from.

20        A.   From the Enforcement Notice?

21        Q.   Yes.

22        A.   Yes.  I posted it's clear she's running for

23    governor.  I mean, I posted all kinds of thing like

24    that.

**Edward O'Leary - Vol. I - September 14, 2017**

1      Q.   And the "she" here is the defendant Maura

2  Healey?

3      A.   Yes.  I don't know if Governor Baker was

4  really on her side with that.  I don't have a lot of

5  talks with them.

6      Q.   How did you hear about the possibility of

7  participating in this litigation?

8      A.   It's my recollection that I saw something

9  on GOAL's Friday news posting that they send me

10 every Friday.

11     Q.   What do you recall you saw on GOAL's Friday

12 news posting?

13     A.   I just recall that they were interested in

14 knowing whether anybody was offended by or damaged

15 by this enforcement action, and I was both.

16     Q.   What did you do in response to seeing that

17 post, if anything?

18     A.   I did something.  I replied to the email.

19 I contacted GOAL.  They had somebody contact me, and

20 somebody contacted me.

21     Q.   Do you recall who at GOAL contacted you?

22     A.   I don't.

23     Q.   What was the nature of their contact?  What

24 did this person say to you when they reached out to

Edward O'Leary - Vol. I - September 14, 2017

60

```
1    you?
2         A.   He told me that somebody would be in touch
3    with me.
4         Q.   Then what happened?
5         A.   Somebody was in touch with me, the
6    investigator for an attorney.
7         Q.   Do you recall this investigator's name?
8         A.   No.
9         Q.   Do you know on whose behalf the
10   investigator was working?
11        A.   I don't recall.  I probably did at the
12   time, but I don't now.
13        Q.   I understand.  What did the investigator
14   tell you?
15        A.   She took my name, address, phone number and
16   said that one of the attorneys would get in touch
17   with me.
18        Q.   What happened next?
19        A.   Some time went by.  I received a call from
20   Mr. Porter first I believe, maybe.
21        Q.   Are you familiar with the name "Suzanne
22   McComas"?
23        A.   No.
24        Q.   Are you familiar with the name "Thomas
```

Edward O'Leary - Vol. I - September 14, 2017

61

1   Bolioli"?

2       A.   No.

3       Q.   I want to be clear.  I don't want to hear

4   about any conversations that you had at any point in

5   time with your lawyers when it was just with your

6   lawyers after the time that they agreed to be your

7   lawyers.  Do you understand that?

8       A.   Yes.

9       Q.   Can you tell me about what conversations

10  you had with Mr. Porter or other lawyers relating to

11  this litigation prior to the time that they were

12  hired as your lawyer?

13          MR. PORTER:  I object.  Don't answer the

14  question.

15          MR. KROCKMALNIC:  Fair enough.  Could you

16  explain the basis.

17          MR. PORTER:  Because you are asking him for

18  communications between his attorney.

19          MR. KROCKMALNIC:  I said explicitly prior

20  to the witness actually being represented by counsel.

21          MR. PORTER:  Well, I would take the

22  position that he was represented by counsel the

23  moment that we spoke.  I mean, that was the purpose

24  for determining the basis for a possible

**Edward O'Leary - Vol. I - September 14, 2017**

```
 1    representation.  That's protected under the

 2    lawyer-client privilege.

 3            MR. KROCKMALNIC:  I will reserve my right

 4    to get back to this topic.  For now I am simply just

 5    noting our clear difference in position that the

 6    attorney-client relationship is not formed at the

 7    initial communication between an attorney and a

 8    person who ultimately becomes his or her client.

 9    Fair enough, though.

10        Q.   Are you paying for your counsel in this case?

11        A.   No.

12        Q.   Switching gears again, what do you sell at

13    the actual storefront at On Target?

14        A.   Well, we sell guns, handguns, rifles,

15    shotguns.  We sell ammunition, holsters, safety

16    glasses, ear protection, cleaning supplies.  We sell

17    nice purses that have built-in holsters for ladies.

18    We sell jewelry that my wife makes.  It's beautiful.

19    We sell all kinds of accessories.  We sell safes,

20    targets.  There's probably more.  Oh, we are going

21    to take on 511, 511 tactical gear, clothing.  I have

22    not placed the order yet.

23        Q.   You mean start carrying their --

24        A.   Product, yes.
```

**Edward O'Leary - Vol. I - September 14, 2017**

1    Q.   Do you have a sense of approximately what

2   percentage of the revenues of On Target derive from

3   the sales of actual firearms?

4    A.   I would say it's fair to say, yes, I do.

5    Q.   What is your best understanding of what

6   percentage of On Target's revenues comes from the

7   sales of firearms?

8    A.   Probably more than half.

9    Q.   Could you pinpoint it any more specifically?

10   A.   No.

11   Q.   What kind of firearms do you guys carry?

12   A.   Well, we carry Glocks.  The new ones are

13  for law enforcement only, but we also sell pre 1998

14  Glocks, which anybody can buy.  We sell Smith &

15  Wesson.  We sell Ruger.  We sell Charter Arms.  We

16  sell SIG Sauer.  We sell Beretta.  We sell HK.  We

17  sell Colt, but they are all pre-ban, pre '98.  We

18  sell High Standard.  We sell a variety of imported

19  firearms, many of which I can't pronounce the names

20  of.  We sell Walther.  We well Canik.  We sell

21  Remington.  We sell Winchester.  We sell Mossberg.

22  We sell Hi Point carbines, rifles.  We sell Auto

23  Ordinance.  We sell Henry.

24       I'm probably leaving a bunch out.  Those

**Edward O'Leary - Vol. I - September 14, 2017**

```
 1   are all brands that we sell.
 2       Q.   It's fair to say you sell many, many brands
 3   of firearms; is that right?
 4       A.   Yes.
 5       Q.   With respect to styles of firearms, do you
 6   sell pistols, rifles, shotguns, all of the above?
 7       A.   We do.
 8       Q.   You sell both new and used guns?
 9       A.   We do.
10       Q.   You sell AR-15s?
11       A.   We do, but only to law enforcement because
12   the enforcement action prevents us from doing it
13   otherwise.
14       Q.   You noted you also have pre-ban Colts as
15   well?
16       A.   Handguns.
17       Q.   Oh, I understand.  Okay.  So when you said
18   "pre-ban," what were you referring to?  I don't want
19   to assume anything.
20       A.   The 1998 consumer product safety
21   regulations in the CMRs that Attorney General
22   Harshbarger put in when he was running for governor.
23       Q.   Do you sell AK-47s?
24       A.   I would to law enforcement.
```

Edward O'Leary - Vol. I - September 14, 2017

65

```
 1        Q.    You said, "would."
 2        A.    I actually have one pending.  I have never
 3   before.  I never sold an AK-47 in the store before.
 4   I've sold similar to.
 5        Q.    What do you mean by that?
 6        A.    The IWI.  It's the same kind of gun, but
 7   it's not made by Kalashnikov.
 8        Q.    IWI is Israeli Weapons Industries?
 9        A.    Yes.
10        Q.    That's an AR-47 style rifle?
11              MR. PORTER:  Object to form.  Maybe you
12   should ask that again.
13        Q.    Sorry.  I meant AK-47.
14        A.    Similar to, yes.
15        Q.    Do you know approximately how many firearms
16   you have in your inventory at present?
17        A.    You want me to guess, a close guess?
18        Q.    Your best answer, yes.
19        A.    500.
20        Q.    Approximately how many firearms did you
21   sell in 2015, if you recall?
22        A.    This would be an approximation, but I think
23   it was in excess of 1,000, but not in excess of
24   2,000.
```

Edward O'Leary - Vol. I - September 14, 2017

1      Q.    Of those how many were ARs?

2      A.    No idea.

3      Q.    Do you have a sense of approximately how

4  many ARs you sold in 2015?

5      A.    No.  A fair amount, but no, I don't know.

6  I can't give you a number.

7      Q.    Approximately how many firearms did you

8  sell in 2016?

9      A.    Probably closer to 2,000.

10     Q.    Is it fair to say you sold more firearms in

11  2016 than in 2015?

12     A.    Yes.

13     Q.    And you know this because you are the owner

14  and you see the books of On Target?

15     A.    I was there every day.

16     Q.    How are sales this year so far as compared

17  to last year?

18     A.    Since the election, they are down.  Really,

19  they are down.  Sales of the firearms -- well, the

20  rifles addressed in the enforcement action there

21  almost are completely gone.

22     Q.    By "the election," you are referring to the

23  presidential election last November?

24     A.    Correct.

**Edward O'Leary - Vol. I - September 14, 2017**

 1      Q.   Do you see a correlation between your sales

 2   and the outcome of that presidential election?

 3      A.   Absolutely.

 4      Q.   Can you help me understand what that

 5   correlation is.

 6      A.   People are horrified.  Prior to the

 7   election, they were afraid that the ultra left wing

 8   liberal gun grabbers would be elected and take away

 9   their rights to have guns.  They were stocking up on

10   guns.

11      Q.   And you helped them stock up on guns?

12      A.   I just do what I can.

13      Q.   Do you manufacture firearms yourself?

14      A.   Well, we have not since the enforcement

15   action because we can't sell them, but we were

16   manufacturing AR-15s.  By manufacture, we don't melt

17   the metal and forge the aluminum.  We just put them

18   together.  Not since then, though, because we can't

19   sell them.

20      Q.   Describe what you mean by putting them

21   together.  Of course, prior to the time of the

22   Enforcement Notice.

23      A.   Well, somebody might come in and ask us to

24   build them a stripped lower or they might ask us to

Edward O'Leary - Vol. I - September 14, 2017

68

1    build a complete lower or they might ask us to build

2    them a complete upper, which we can still do, or

3    they might ask us to build them a complete rifle.

4    We would ask, What sort of specifications do you

5    want, what caliber, what barrel length, what kind of

6    a fore grip, what kind of stock.  Of course, it all

7    has to be -- prior to the enforcement action, there

8    was the two out of five rule.  We couldn't give them

9    a flash suppressor.  We could not give them a

10   bayonet lug.  We could not give them a collapsable

11   stock because those are three features.  They wanted

12   a pistol grip, and they wanted to detach the box

13   magazine.  Those were the two we could give them.

14   We would remain in compliance.  But they may have a

15   certain specific stock that they want, which would

16   be collapsable, so we would then permanently pin

17   that.  We would drill it and pin it.  We would put

18   on the barrel length they want, the barrel twist

19   rate they want, whatever kind of sights, fore ends,

20   all that stuff, whatever color they like.

21        Q.   This was all for AR-15s?

22        A.   Yes.

23        Q.   Did you manufacture any other firearms?

24        A.   No.

**Edward O'Leary - Vol. I - September 14, 2017**

```
 1        Q.    From which brands would you assemble the
 2   AR-15s that you manufactured?
 3        A.    Well, it might be Spikes Tactical.  It
 4   might be ATI.  It might be Anderson.  It might be
 5   Bushmaster.  It might be Palmetto State Armory,
 6   CMMG.  There's, like, a million companies.
 7        Q.    When you were assembling custom made ARs
 8   for your clients, would you use one manufacturer's
 9   parts throughout the entire firearm or would you
10   kind of mix and match different manufacturers for
11   different parts?
12        A.    You had to be careful.  Like, for example,
13   an Arma-Lite rifle, a lot of their stuff is not
14   interchangeable.  We wouldn't build Arma-Lite
15   rifles, though.  We didn't want to.  It was a
16   headache.  We tried to stick with, like, an ATI.  We
17   tried to use parts that we would get in from ATI.
18        Q.    What is ATI?
19        A.    It's just the name of a company.  I don't
20   know what that stands for.
21        Q.    When you say you get parts in from ATI,
22   what do you mean?
23        A.    We get them in from distributors actually.
24   We don't get anything from the factories directly.
```

**Edward O'Leary - Vol. I - September 14, 2017**

70

1    We go through distributors.

2        Q.    You would stick to the parts you receive

3    from ATI in the course of assembling the AR-15s

4    custom made for your clients?

5        A.    As much as possible, we stick with one

6    manufacturer.

19       Q.    These are all distributors that you

20   currently work with?

21       A.    Yes.

22       Q.    Do you find the distributor to be

23   knowledgeable about the guns they sell to you?

24       A.    Yes, I would say so.

71

```
 1        Q.   Do you have an opportunity to ask each of
 2   these distributors questions about the firearms that
 3   they sell to you?
 4        A.   To ask them questions?
 5        Q.   Yes.
 6        A.   I ask them if they've got them.  That's
 7   usually the big one.  On occasion somebody will call
 8   and say, "Hey, I have these guns."  I say, "Are they
 9   on the Attorney General's list?"  Well, there's not
10   a list, but I'll say, "Are they approved by the
11   Attorney General?"  Sometimes they say, "Yes," and
12   sometimes they say, "I don't know."
13        Q.   Who is "they"?
14        A.   The distributor, the sales reps.
15        Q.   So you will talk to the distributors from
16   time to time on topics that include things like
17   whether the specific firearm in question is approved
18   by the Attorney General?
19        A.   Yes.
20        Q.   Do you ever speak directly to manufacturers
21   of the firearms that you sell?
22        A.   Once in a while I speak to factory reps.  I
23   have spoke with the Smith & Wesson factory rep.  I
24   spoke with the Glock factory rep.  I spoke with the
```

Edward O'Leary - Vol. I - September 14, 2017

72

1   people from Charter Arms.  There's probably others.

2        Q.    Have you ever asked them questions about

3   the firearms that they are selling through

4   distributors to you?

5        A.    Sure.

6        Q.    What are the nature of the questions that

7   you have asked the manufacturers directly?

8        A.    I ask them if they can give me a list of

9   guns that we can sell in Massachusetts.  They say

10  yes sometimes, and sometimes they will say no.

11       Q.    You noted that you used to sell more ARs

12  prior to the date of the Enforcement Notice; is that

13  correct?

14       A.    Yes.

15       Q.    Approximately what percentage of the

16  revenues of On Target were comprised by sales of ARs

17  prior to the date of the Enforcement Notice?

18       A.    No idea.  My system doesn't break it down

19  like that.

20       Q.    I take it you are in the course now of

21  selling your first AK-47, is that what you testified

22  to earlier?

23       A.    Yes.

24       Q.    You never sold an AK-47 through On Target

Edward O'Leary - Vol. I - September 14, 2017

73

1    prior to today, correct?

2        A.    Right.   I never had an AK-47.

3        Q.    Are you familiar with the term "large

4    capacity magazines"?

5        A.    I am familiar with it, yes.

6        Q.    What do you understand that term to mean?

7        A.    I understand it to be something that

8    somebody made up one time.   Somebody made an

9    arbitrary definition of ten, except for five.   They

10   took what is the standard capacity magazines for

11   guns and decided that they would call them high

12   capacity.

13       Q.    What is your understanding of what the

14   definition is large capacity magazines is?

15       A.    A magazine for a rifle or shotgun that

16   holds more than 10 rounds is high capacity.   A

17   magazine for a shotgun that is semiautomatic that

18   holds more than 5 rounds is high capacity.

19       Q.    Have you sold any large capacity magazines

20   since the date of the Federal assault weapons ban in

21   1994?

22       A.    Yes, to law enforcement.

23       Q.    Have you ever sold any pre-ban large

24   capacity magazines subsequent to the Federal ban

Edward O'Leary - Vol. I - September 14, 2017

74

1  going into effect?

2       A.   Yes.

3       Q.   Do you continue to sell pre-ban magazines

4  at On Target today?

5       A.   Yes.

6       Q.   How do you know that the large capacity

7  magazines that you are selling at On Target today

8  are in fact pre-ban?

9       A.   Some of them actually have the date stamped

10  on the inside.  Others are manufactured by companies

11  that either merged or somehow they are not in

12  business anymore and have not been since then.  That

13  would be stamped in the magazine fore plate.

14       Q.   What would be stamped in the --

15       A.   The name of the company, name of the

16  manufacturer.

17       Q.   Just so I understand your testimony, to be

18  clear, you used the fact of the no longer, extent

19  company's name stamped in the fore plate of the

20  large capacity magazine to help you determine that

21  you are able to sell that large capacity magazine?

22       A.   Yes.

23       Q.   Approximately how frequently do you sell

24  large capacity magazines that are pre-ban currently

**Edward O'Leary - Vol. I - September 14, 2017**

 1    at On Target?

 2        A.    As often as possible.   They sell.

 3        Q.    Let me try and ask a better question.

 4    Approximately how many pre-ban large capacity

 5    magazines do you sell on an annual basis at On Target?

 6        A.    No idea.

 7        Q.    Can you ballpark it?

 8        A.    No.   I don't know.   I don't break it down

 9    that way.

10        Q.    Fair enough.   On an average day, how many

11    pre-ban large capacity magazines do you sell at On

12    Target?

13        A.    Some days none, and some days I'll sell

14    five.   One guy bought 125 of them once.   It varies.

15    I can't give you a fair estimate on that.

16        Q.    You are still selling large capacity

17    magazines to law enforcement officers, that's your

18    testimony?

19        A.    Yes.

20        Q.    Have sales of large capacity magazines been

21    affected in any way as a result of the Enforcement

22    Notice?

23        A.    Can you repeat that.

24        Q.    Have sales of large capacity magazines been

**Edward O'Leary - Vol. I - September 14, 2017**

1  impacted in any way by the Enforcement Notice?

2      A.   Yes.

3      Q.   How?

4      A.   For the pre-ban civilian market, it's much

5  slower than it was.  For law enforcement, it's about

6  the same.

7      Q.   What percentage of your large capacity

8  magazine sales come from sales to law enforcement

9  and what percentage come from sales to civilians?

10     A.   I don't have an answer.  I don't know.

11 Much less to the civilian market now than prior to

12 the Enforcement Notice.

13     Q.   What is your best guess of how many fewer

14 large capacity magazines you are selling on a daily

15 basis because of the Enforcement Notice?

16     A.   Probably half.

17     Q.   Do you have any understanding of kits for

18 AR-15s that can convert the firearms to fully auto

19 fire?

20     A.   To truly convert an AR-15 to fully

21 automatic fire -- you just can't do it because you

22 haven't got the space in the receiver to change the

23 sear in order to put the appropriate parts into the

24 gun, and that would be wicked illegal anyway.

Edward O'Leary - Vol. I - September 14, 2017

1      Q.    Do you sell any conversion kits?

2      A.    Are you talking about Bump Feed?

3      Q.    Among others.

4      A.    I don't sell them.

5      Q.    Any other kits with respect to converting

6  ARs that you have or currently sell?

7      A.    No.  I don't sell anything like that.

8      Q.    Have you ever used a Bump kit or any other

9  conversion kit on any AR?

10      A.    No.

11            MR. PORTER:  Wait for the whole question.

12            THE WITNESS:  I'm sorry.

13            MR. PORTER:  You are doing fine.

14      Q.    Are you familiar with the difference

15  between centerfire rifles and rimfire rifles?

16      A.    Yes.

17      Q.    What is your understanding of the

18  difference between centerfire rifles and rimfire

19  rifles?

20      A.    Well, a centerfire rifle has its primer in

21  the center of the case head.  A rimfire round of

22  ammunition has its primer on the rim of the case

23  head.

24      Q.    Are there any other differences with

**Edward O'Leary - Vol. I - September 14, 2017**

1    respect to the fire of ammunition from a rimfire as

2    compared to the centerfire?

3        A.   I don't think I understand the question.

4        Q.   Let me step back.  Do rimfire cartridges

5    have the same amount of charge as centerfire

6    cartridges?

7        A.   Again, I don't know what you mean by

8    "charge."

9        Q.   Specifically with respect to on the one

10   hand the 22 rimfire cartridge and on the other hand

11   a 223 centerfire cartridge.

12       A.   I'm familiar with both.  I'm trying to -- I

13   just don't understand what you are asking me about

14   it.

15       Q.   Sure.  The charge, does one of those have

16   more charge, more firing capacity than the other?

17       A.   Firing capacity...  I'm not understanding

18   the term.  Each one can only fire one.

19       Q.   Understood.  So not with respect to number

20   but with respect to force, is there a difference as

21   between those two?

22       A.   Oh, yes.

23       Q.   What is the difference?

24       A.   The 22 caliber rimfire round is a much less

1   powerful round than the centerfire 223 round.

2        Q.   What is your understanding of the reason

3   why the 22 caliber rimfire round is much less

4   powerful than the 223 centerfire round?

5        A.   It's much smaller.  It's much lighter.  It

6   has much less gunpowder.

7        Q.   Does it emerge from the barrel of the

8   firearm more slowly than the bullet from a

9   223 centerfire round, if you know?

10       A.   Oh, I know.  There are a variety of

11  different 223 rounds that have a variety of

12  different muzzle velocities.  The same holds true

13  with the 22 caliber rounds.  There may be in fact

14  some 22s that go faster than some 223s.  I don't

15  know that to be true, but there very well may be.  I

16  cannot tell you the absolute answer.  I would have

17  to look it up.

18       Q.   Fair enough.  As you sit here today, can

19  you think of any 22 rimfire round that is fired from

20  an AR-15 faster than a 223 centerfire round?

21       A.   Again, brand specific I cannot answer that.

22  I don't know the answer to that.



Edward O'Leary - Vol. I - September 14, 2017



**Doris O. Wong Associates, Inc.**

Edward O'Leary - Vol. I - September 14, 2017



82

**Doris O. Wong Associates, Inc.**

Edward O'Leary - Vol. I - September 14, 2017



Edward O'Leary - Vol. I - September 14, 2017

2       Q.    Did you ever carry machine guns in the

3   course of your employment as a police officer?

4       A.    I did.

5       Q.    Which machine gun did you carry?

6       A.    Glock 18.

7       Q.    This was a duty weapon?

8       A.    It was a specialty item that we had.

9       Q.    What do you mean by that?

10      A.    It's not something that you would carry on

11  patrol.  It would be for a special operator, that

12  kind of a situation where you need some intense fire

13  power really quickly delivered into a target area.

14  I was the instructor so I had to be very familiar

15  with it.

16      Q.    This was at Randolph PD?

17      A.    That's correct.

18      Q.    Have you ever fired a firearm in

19  self-defense as a civilian?

20      A.    No.

21      Q.    How about as a police officer?

22      A.    No.

23      Q.    Have you ever fired any firearm apart from

24  training situations in the course of your employment

**Edward O'Leary - Vol. I - September 14, 2017**

85

1   as a police officer?

2       A.    I don't think I know what you mean.

3       Q.    Putting aside on the shooting range or in a

4   firearms training school or something like that,

5   have you ever fired a firearm as a police officer on

6   the job?

7       A.    Yes.

8       Q.    How many times?

9       A.    Four, all at once.

10      Q.    In one occasion you fired your firearm four

11  times, four rounds?

12      A.    Yes.

13      Q.    What do you recall about that occasion?

14      A.    It was a goose that got mauled by some

15  dogs.  He needed to be euthanized.  Even after four

16  rounds it didn't work.

17          I can tell you what happened after that if

18  you want to know.

19      Q.    Sure.

20      A.    The dogcatcher ran it over.

21      Q.    Thank you.  Apart from that circumstance,

22  have you ever fired a firearm in the course of your

23  employment as a police officer in a non-training

24  situation?

**Edward O'Leary - Vol. I - September 14, 2017**

1      A.    No.

2      Q.    How about as a civilian, have you ever

3  fired a firearm in a non-training situation?

4      A.    No.

5      Q.    Have you ever drawn and aimed your firearm

6  in a non-training situation as a civilian?

7      A.    No.

8      Q.    Same question as a police officer.

9      A.    Of course I have.

10     Q.    Multiple occasions?

11     A.    Yes.  There have been times.

12     Q.    Approximately how many times?

13     A.    I don't know.  I have no idea.  No idea.

14     Q.    This was your duty weapon?

15     A.    Yes, it was.

16     Q.    At all times it was a handgun?

17     A.    Yes.

18     Q.    Have you ever aimed a non-handgun in a

19  non-training situation during the course of your

20  employment as a police officer?

21     A.    No.

Edward O'Leary - Vol. I - September 14, 2017

87



**Doris O. Wong Associates, Inc.**

**Edward O'Leary - Vol. I - September 14, 2017**

8      Q.    In the complaint in this lawsuit, it states

9   that On Target is no longer able to sell certain

10  guns; is that right?

11     A.    I don't know what the complaint says

12  specifically.

13     Q.    Did you review the complaint prior to it

14  being filed?

15     A.    I may have.

16     Q.    You are not sure?

17     A.    I'm not sure.  There's been a fair amount

18  of paperwork.

19     Q.    Again, without disclosing the contents of

20  any conversation you ever had solely with your

21  lawyer or lawyers with respect to this case, do you

22  recall reviewing the complaint prior to the time it

23  was filed?

24     A.    I don't recall.

**Edward O'Leary - Vol. I - September 14, 2017**

1      Q.   What is your understanding as you sit here

2   today of what the allegations made by you -- and,

3   again, "you" is you, On Target Training -- in the

4   complaint of this litigation?

5      A.   My understanding is that our complaint is

6   that the Attorney General in her Enforcement Notice

7   changed the rules by which firearms are -- well, not

8   firearms -- that rifles are sold; she reinterpreted

9   what the previous three Attorney Generals had

10  evidently interpreted in a much different manner,

11  and that was not a lawful thing to do; and anyway

12  that whole chapter and section of the General Laws

13  is basically violative of the Second Amendment.

14     Q.   What is the harm you are alleging?

15     A.   I'm losing money.  I'm losing money.  My

16  rights have been violated, and I'm offended by that.

17  But I'm losing money.  I'm losing sales.  Sales of

18  rifles are just about nonexistent.  Sales of

19  ammunition are much, much, much reduced.  Sales of

20  cleaning kits and other accessories are much, much,

21  much reduced.  I'm losing money.  I'm losing a lot

22  of money.

23     Q.   How much money are you losing?

24     A.   It's hard to say.  You can't predict

**Edward O'Leary - Vol. I - September 14, 2017**

 1    something that never happened, but however many guns

 2    I sold in 2015, I'm not going sell that many in

 3    2017, of those modern sporting rifles.

 4        Q.   What firearms are you no longer selling at

 5    On Target as a result of the Enforcement Notice,

 6    today?

 7        A.   Smith & Wesson M&P 15s, Windham Weapons,

 8    WW-15s, Bushmasters, Daniel Defense.   I mean,

 9    basically all of them.   I can't sell them anymore.

10        Q.   By "all of them," what are you referring to?

11        A.   All of the modern sporting rifles,

12    semiautomatic, gas operated that are similar in

13    nature to the Arma-Lite AR-15.   Also, at the same

14    time, the AK-47s, but it's not a big loss for that.

15    Also, the ones that are similar in nature, like the

16    IWI.   I can't sell Steyr AUGs anymore.   I can't sell

17    them anymore.

18        Q.   Is it your understanding that you were

19    lawfully able to sell Steyr AUGs to non-law

20    enforcement officers prior to the date of the

21    Enforcement Notice?

22        A.   You know, I would have to look at that.

23    I'm not sure.   I can't really say for sure.

24            It's primarily the two.

**Doris O. Wong Associates, Inc.**

Edward O'Leary - Vol. I - September 14, 2017

 1        Q.   By "the two," what do you mean?   AR-15s and

 2   AK-47s?

 3        A.   Sure.

 4        Q.   Is that a yes?

 5        A.   That's a yes.

 6        Q.   The Steyr AUG is one of the enumerated

 7   weapons that was on the federally banned list in

 8   1994; is that right?

 9        A.   It was.

10        Q.   So that's not a weapon that you can't sell

11   anymore by virtue of the Enforcement Notice,

12   correct?

13        A.   It's not what?

14        Q.   That's not a weapon that you can't sell

15   anymore by virtue of the Enforcement Notice,

16   correct?

17        A.   I would have to look.   I don't have those

18   things memorized.

19        Q.   But it's your understanding that it is on

20   the list of enumerated weapons on the Federal 1994

21   banned list, right?

22        A.   Yes, I think it is.

23        Q.   And you are actually now in the course of

24   selling an IWI AK-47 style rifle, correct?

**Edward O'Leary - Vol. I - September 14, 2017**

```
 1        A.    No.  It's not IWI.  It's an actual...

 2        Q.    Oh, it's a Kalashnikov?

 3        A.    Yes.  Well, it's a Century Arms import.  I

 4   don't know exactly who manufactures it.

 5        Q.    This is an AK-47 style rifle?

 6        A.    Yes.

 7        Q.    And it's to a law enforcement officer?

 8        A.    Yes.

 9        Q.    So when you say you are no longer selling

10   these firearms, specifically the AR-15 style

11   firearms and the AK-47 style firearms, it's to

12   non-law enforcement officers that you are no longer

13   selling them, correct?

14        A.    Yes.

15        Q.    You are still in fact selling AR-15 style

16   firearms to law enforcement officers?

17        A.    Yes.

18        Q.    Are you still selling WW-15s to law

19   enforcement officers?

20        A.    I would.  I don't know if I have, but I

21   would.

22        Q.    Which is to say that there's nothing

23   stopping you from doing so; is that correct?

24        A.    I don't believe so.
```

93

1        Q.    What about M&P 15 rifles, are you selling

2    those currently to law enforcement officers?

3        A.    I am.

4        Q.    They are actually one of the more popular

5    law enforcement duty rifles, aren't they?

6        A.    They're okay.  It's a pretty decent rifle.

7        Q.    They are commonly bought by law enforcement

8    officers; is that correct?

9        A.    It's not our biggest seller.  There is a

10   few.  There's a scattering of those rifles.

11       Q.    What is your biggest seller?

12       A.    Well, that might be the biggest seller, but

13   it's not a big seller.  There's not a lot of trade

14   in those guns.

15       Q.    Are you still selling Bushmaster XM-15s to

16   law enforcement officers?

17       A.    I would.

18       Q.    How about the Daniel Defense AR-15 style

19   rifles, are you still selling those to law

20   enforcement officers?

21       A.    I would.

22       Q.    Apart from the firearms you stated, the

23   Windham Weaponry, the Smith & Wesson, the

24   Bushmaster, the Daniel Defense, the Kalashnikov and

**Edward O'Leary - Vol. I - September 14, 2017**

1    the IWIs, are there other firearms you are no longer

2    selling to civilians as a result of the Enforcement

3    Notice?

4        A.   Yes.

5        Q.   Which?

6        A.   Stag Arms, Spike Tactical, ATI.  There's a

7    whole list of them.

8        Q.   What types of firearms are these?

9        A.   Similar to the AR-15, the modern sporting

10    rifle.

11        Q.   Is there anything else you are no longer

12    selling?

13        A.   It's hard to say if I'm not selling it.

14    There's so much that...

15     *Q.   I'll rephrase the question so it will be

16    easier to say hopefully.  Are there any other

17    weapons, apart from those that you have listed out,

18    that you are no longer willing to sell as a result

19    of the Enforcement Notice?

20        A.   Well, anything that appears to be something

21    that will get me in trouble.  If somebody brought to

22    me a gun broker ad or a sales catalog or something

23    like that, I would have to look at it.

24           There probably are other guns that I

Edward O'Leary - Vol. I - September 14, 2017

95

```
 1   wouldn't sell.  I'm probably forgetting a dozen, two
 2   dozen.  I don't know.  The point is I can't sell any
 3   of them, and I don't.
 4           MR. KROCKMALNIC:  Ken, can you read back
 5   the question, please.
 6           *(Question read)
 7       Q.   My next question is, apart from those
 8   specific weapons that you listed, the AR-15 style
 9   weapons and the IWI, are there any other weapons
10   that you have specifically decided, not
11   hypothetically, specifically decided that you are no
12   longer going to sell at On Target that you
13   previously had sold at one point?
14       A.   It does not come to my mind, but there
15   probably is.  I probably forgot or missed something.
16       Q.   As you sit here today, you can't think of
17   anything else?
18       A.   I cannot think of anything right now.
19               (Document marked as O'Leary
20               Exhibit 2 for identification)
21       Q.   You've been handed what was marked as
22   Exhibit 2 for identification.  Please take your time
23   and review it.  Let me know when you have done so.
24       A.   (Examines document)  Okay.
```

**Edward O'Leary - Vol. I - September 14, 2017**

1      Q.    Do you recognize that document?

2      A.    I do.

3      Q.    What do you recognize it to be?

4      A.    Requests for Production of Documents.

5      Q.    And have you seen that document prior to

6    today?

7      A.    I have.

8      Q.    Were you shown that by counsel?

9      A.    I was.

10      Q.    Have you provided your counsel with all

11    documents that are responsive to the topics requested?

12      A.    I have.

13      Q.    You in fact produced to this office records

14    of many firearm transactions; is that correct?

15      A.    I did.

16      Q.    Many of those firearm transactions in fact

17    occurred on July 20, 2016, the date of the

18    Enforcement Notice, correct?

19      A.    Correct.

20      Q.    When and how did you first receive the

21    Enforcement Notice itself?

22      A.    I got it the next day in the mail.

23      Q.    When did you first receive word of the fact

24    the Enforcement Notice was issued?

**Edward O'Leary - Vol. I - September 14, 2017**

1       A.    Customers were talking about it the day

2   that -- the 20th.

3       Q.    The day of the 20th?

4       A.    Yes, July 20th.

5             MR. KROCKMALNIC:  I think we are just about

6   done.  If you don't mind, I would like to take a

7   quick break and confer with Liz and make sure we are

8   not missing anything.

9             MR. PORTER:  Of course.

10            (Recess at 12:07 p.m.)

11            MR. KROCKMALNIC:  (12:10 p.m.)  We have

12  nothing further.  Thank you very much.

13            MR. PORTER:  No questions.

14                 (Whereupon the deposition

15                  was concluded at 12:10 p.m.)

16

17

18

19

20

21

22

23

24

Edward O'Leary - Vol. I - September 14, 2017

98

```
 1                C E R T I F I C A T E
 2        I, EDWARD O'LEARY, do hereby certify that I have
 3    read the foregoing transcript of my testimony, and
 4    further certify under the pains and penalties of
 5    perjury that said transcript (with/without)
 6    suggested corrections is a true and accurate record
 7    of said testimony.
 8        Dated at _____, this _____ day of _____,
 9    2017.
10
11                        _____
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Edward O'Leary - Vol. I - September 14, 2017**

99

SUGGESTED CORRECTIONS

1

2  RE:  David Seth Worman, et al., vs. Maura Healey,
        et al.

3

WITNESS:  Edward O'Leary, Vol. I

4

The above-named witness wishes to make the following
5  changes to the testimony as originally given:

6  PAGE   LINE       SHOULD READ              REASON

7   _____  _____  _____  _____

8   _____  _____  _____  _____

9   _____  _____  _____  _____

10  _____  _____  _____  _____

11  _____  _____  _____  _____

12  _____  _____  _____  _____

13  _____  _____  _____  _____

14  _____  _____  _____  _____

15  _____  _____  _____  _____

16  _____  _____  _____  _____

17  _____  _____  _____  _____

18  _____  _____  _____  _____

19  _____  _____  _____  _____

20  _____  _____  _____  _____

21  _____  _____  _____  _____

22  _____  _____  _____  _____

23  _____  _____  _____  _____

24  _____  _____  _____  _____

**Doris O. Wong Associates, Inc.**

**Edward O'Leary - Vol. I - September 14, 2017**

100

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                  )

3        I, Ken A. DiFraia, RPR and Notary Public in and

4   for the Commonwealth of Massachusetts, do hereby

5   certify that there came before me on the 14th day of

6   September, 2017, at 9:39 a.m., the person

7   hereinbefore named, who was by me duly sworn to

8   testify to the truth and nothing but the truth of

9   his knowledge touching and concerning the matters in

10   controversy in this cause; that he was thereupon

11   examined upon his oath, and his examination reduced

12   to typewriting under my direction; and that the

13   deposition is a true record of the testimony given

14   by the witness.

15        I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19        In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 29th day of

21   September, 2017.

22

23

24

**Edward O'Leary - Vol. I - September 14, 2017**

101

1       Under Federal Rule 30:

2            X   Reading and Signing was requested

3                Reading and Signing was waived

4                Reading and Signing was not requested

5

6   *Ken A. DiFraia*

7

8   Notary Public

9   Commission expires 2/24/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Doris O. Wong Associates, Inc.**

**Edward O'Leary - Vol. I - September 14, 2017**

D I S C L A I M E R

This transcript in any format is a confidential communication between Doris O. Wong Associates, Inc., a professional court reporting firm, and the parties to this matter and their counsel.  Any reproduction or distribution of this transcript without the express permission of the parties is a violation of this confidentiality.  To fulfill any request to the court reporter for an additional copy or copies from persons or entities without standing in this matter will require the consent of the parties and/or counsel and/or a court order for such delivery.

**Doris O. Wong Associates, Inc.**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 453 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary - Vol. I
September 14, 2017

*

**\*Q (3)**
40:9;80:18;94:15
**\*Question (3)**
41:9;81:11;95:6

**A**

**able (4)**
18:15;74:21;88:9;
90:19
**above (1)**
64:6
**absolute (1)**
79:16
**Absolutely (1)**
67:3
**academy (13)**
22:3,8;37:7,9,13;
43:22;44:10;45:1;
47:2,15,22;48:1;49:4
**accept (1)**
32:21
**acceptable (1)**
5:5
**accessories (5)**
12:12;16:5,7;62:19;
89:20
**accidentally (1)**
6:10
**accordingly (1)**
5:4
**account (1)**
57:16
**accounts (1)**
57:12
**AccuSport (1)**
70:15
**acquainted (2)**
30:11;57:11
**acquire (1)**
70:8
**across (5)**
45:9;46:4,6;57:1,5
**acting (3)**
19:10,16,20
**Action (7)**
53:14;59:15;64:12;
66:20;67:15;68:7;
83:13
**active (2)**
46:11;55:16
**activities (1)**
55:7
**actual (3)**
62:13;63:3;92:1
**actually (10)**
12:24;25:17;42:18;
52:3;61:20;65:2;
69:23;74:9;91:23;
93:4

**ad (1)**
94:22
**added (1)**
33:22
**address (4)**
5:17,19;15:19;
60:15
**addressed (1)**
66:20
**addresses (2)**
4:16;5:15
**adjunct (5)**
20:15,16,24;21:22;
22:24
**advanced (3)**
38:7;42:9,17
**affected (1)**
75:21
**affiliate (2)**
54:24;55:3
**afraid (1)**
67:7
**Again (15)**
22:19;37:10;43:18,
18;50:21;51:9;57:21;
62:12;65:12;78:7;
79:21,23;81:2;88:19;
89:3
**against (3)**
7:12;25:23;27:19
**age (1)**
17:20
**ago (11)**
7:14;8:7;9:2;14:8;
17:8;22:15,17;23:21;
28:6;54:4,6
**agree (1)**
12:13
**Agreed (2)**
5:11;61:6
**aimed (2)**
86:5,18
**AK-47 (10)**
42:4;65:3,13;72:21,
24;73:2;83:20;91:24;
92:5,11
**AK-47s (3)**
64:23;90:14;91:2
**Alcohol (1)**
35:4
**allegations (1)**
89:2
**alleging (1)**
89:14
**Allen (2)**
30:10,11
**allow (1)**
10:5
**allowed (1)**
10:7
**almost (2)**
21:2;66:21
**alone (1)**

**40:3**
**along (2)**
7:7;18:13
**alright (1)**
9:4
**although (1)**
38:12
**aluminum (1)**
67:17
**always (5)**
48:18;51:23;52:1,1,
2
**Amendment (1)**
89:13
**Amherst (1)**
25:9
**ammunition (10)**
12:12;16:6;29:13;
31:6,9,15;62:15;
77:22;78:1;89:19
**Among (1)**
77:3
**amount (3)**
66:5;78:5;88:17
**Anderson (1)**
69:4
**Anna (8)**
20:15,18;21:23;
22:1,23;23:5;24:5,10
**annual (1)**
75:5
**anymore (6)**
74:12;90:9,16,17;
91:11,15
**Apart (26)**
8:8,21;13:17;17:4;
20:11;23:2;27:17;
28:7,12;33:4;36:13;
39:9,10;41:23;43:17,
18;47:6,18;50:5;
54:10;55:18;84:23;
85:21;93:22;94:17;
95:7
**apologize (1)**
43:7
**appears (1)**
94:20
**applicable (10)**
46:21;47:2,16,19,
22;49:5,9,10,17;50:8
**applications (2)**
32:21,22
**appointed (3)**
18:15;19:4;37:7
**appreciate (3)**
17:15;29:17;44:22
**appreciating (1)**
81:16
**appropriate (2)**
32:7;76:23
**approved (3)**
51:14;71:10,17
**approximate (2)**

**30:17;48:14**
**Approximately (20)**
6:4;7:11,14;14:7;
15:7;17:7,12;18:18;
48:10,13;63:1;65:15,
20;66:3,7;72:15;
74:23;75:4;82:3;
86:12
**approximation (1)**
65:22
**AR (2)**
41:24;77:9
**AR-15 (34)**
39:20,21,22,24;
40:4,7,14;41:23;
43:10;44:11,12,15,16,
24;45:4,9,11;46:8,13,
19;47:11,18,20;48:3;
49:16;76:20;79:20;
83:18;90:13;92:10,
15;93:18;94:9;95:8
**AR-15s (13)**
38:10;43:2;46:21,
22,24;49:5;64:10;
67:16;68:21;69:2;
70:3;76:18;91:1
**AR-47 (1)**
65:10
**arbitrary (1)**
73:9
**area (1)**
84:13
**arising (1)**
7:8
**Arma-Lite (5)**
39:21;45:10;69:13,
14;90:13
**armorer (2)**
38:6,7;42:9,9,11,17
**armory (2)**
45:12;69:5
**Arms (6)**
38:12;63:15;70:13;
72:1;92:3;94:6
**around (3)**
22:19;37:15;82:12
**arraigned (5)**
26:5,10,14,16,23
**arrest (3)**
7:6;27:14,19
**arrested (4)**
26:5;27:10;28:8,13
**ARs (6)**
66:1,4;69:7;72:11,
16;77:6
**arts (2)**
24:3,5
**aside (1)**
85:3
**assault (3)**
7:6;44:17;73:20
**assemble (1)**
69:1

**assembling (2)**
69:7;70:3
**assigned (1)**
19:9
**assist (2)**
37:16,17
**Assistant (1)**
4:11,12
**associate's (2)**
24:1,7
**assume (4)**
31:10;47:24;51:23;
64:19
**ATF (1)**
36:13
**ATI (7)**
69:4,16,17,18,21;
70:3;94:6
**attain (1)**
19:6
**attempt (1)**
41:11
**Attorney (12)**
4:11,12;60:6;61:18;
62:7;64:21;71:9,11,
18;80:19;89:6,9
**attorney-client (1)**
62:6
**attorneys (1)**
60:16
**audit (5)**
35:5,7,11,19;36:13
**audited (1)**
36:14
**auditing (1)**
35:9
**AUG (1)**
91:6
**AUGs (2)**
90:16,19
**authorities (1)**
30:1
**authority (1)**
33:4,8,12;35:3
**Auto (3)**
23:16;63:22;76:18
**automatic (1)**
76:21
**average (1)**
75:10
**away (3)**
27:24;28:1;67:8

**B**

**bachelor (1)**
24:3
**bachelor's (3)**
24:17,23;25:1
**back (12)**
18:17;25:18,22;
36:5;39:12;41:8;44:8,
8;62:4;78:4;81:9;95:4

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 454 of 1262

David Seth Worman, et al. vs.                                    Edward O'Leary -   Vol. I
Maura Healey, et al.                                                    September 14, 2017

**bag (1)**
43:11
**Baker (5)**
4:14;57:15;58:1,3;
59:3
**ballistics (1)**
39:14
**ballpark (1)**
75:7
**ban (2)**
73:20,24
**bang (1)**
52:17
**banned (2)**
91:7,21
**barrel (6)**
45:16;52:6;68:5,18,
18;79:7
**basic (8)**
16:17;17:2;21:13,
15;42:11;51:13,18,19
**basically (5)**
24:18;43:12;55:15;
89:13;90:9
**basis (4)**
61:16,24;75:5;
76:15
**battery (1)**
7:6
**battle (1)**
39:15
**bayonet (1)**
68:10
**beautiful (2)**
62:18;80:7
**became (1)**
38:11
**becomes (1)**
62:8
**Bedford (1)**
5:20
**bedroom (1)**
87:12
**began (1)**
23:14
**behalf (6)**
12:2,4;51:9;57:16;
58:18;60:9
**behind (2)**
39:5,5
**Belmont (1)**
5:18
**Bender (2)**
36:9,10
**Beretta (1)**
63:16
**best (4)**
63:5;65:18;76:13;
83:8
**better (1)**
75:3
**big (5)**
37:17;70:15;71:7;

90:14;93:13
**biggest (3)**
93:9,11,12
**Bill (1)**
70:15
**binds (1)**
12:4
**bit (4)**
53:4;56:18,19,20
**Bolioli (1)**
61:1
**bolt (5)**
39:11,12;40:12,12;
83:13
**bona (1)**
33:24
**book (1)**
35:16
**books (2)**
35:6;66:14
**born (1)**
36:1
**Boston (8)**
25:9,10;26:20,21;
27:12;28:2;36:1,2
**both (13)**
13:2,6,7;21:11;
34:1;51:15;56:4,5;
58:6;59:15;64:8;
78:12;87:23
**bought (3)**
48:7;75:14;93:7
**box (1)**
68:12
**boy (3)**
6:10,15;70:12
**Braintree (1)**
53:23
**brand (7)**
44:12,23;46:6,6,8,
18;79:21
**brands (3)**
64:1,2;69:1
**braves (1)**
19:24
**break (7)**
10:11,13;46:17;
53:6;72:18;75:8;97:7
**Bridgewater (12)**
5:18,20;30:2,7;
33:7,10,14;34:15;
35:2;36:14,15;54:17
**briefly (2)**
23:23;42:7
**bringing (1)**
31:11
**broadly (1)**
46:20
**Brockton (1)**
20:23
**broker (1)**
94:22
**brought (2)**

7:12;94:21
**buffer (1)**
39:10
**build (10)**
38:9;43:1,16;45:7;
49:15;67:24;68:1,1,3;
69:14
**building (2)**
43:9;44:10
**built-in (1)**
62:17
**bullet (1)**
79:8
**Bump (2)**
77:2,8
**bunch (3)**
28:1;63:24;83:12
**Bushmaster (8)**
39:19;40:13,19,19;
41:16,24;48:9,10;
49:6,17;50:9;69:5;
93:15,24
**Bushmasters (1)**
90:8
**business (11)**
4:16;5:15,19;12:9;
13:20;15:12,19;
54:24;55:3;56:2;
74:12
**Buy (5)**
34:22;63:14;70:10,
11,17

---

## C

**cabined (1)**
50:20
**cadre (1)**
52:24
**caliber (6)**
68:5;78:24;79:3,13;
82:23,24
**call (4)**
35:15;60:19;71:7;
73:11
**called (5)**
4:3;22:24;23:16;
24:12;25:7
**Cam (1)**
70:12
**came (3)**
19:15;28:4;35:13
**campus (2)**
20:19;22:2
**Can (31)**
6:6,22;9:15;21:4;
23:6,19;24:6,19,19;
26:8,13;40:16;41:13;
42:7;47:20;50:19;
61:9;63:14;67:4,12;
68:2;72:8,9;75:7,23;
76:18;78:18;79:18;
81:8;85:17;95:4

**Canik (1)**
63:20
**capacity (23)**
6:16;73:4,10,12,14,
16,18,19,24;74:6,20,
21,24;75:4,11,16,20,
24;76:7,14;78:16,17;
80:23
**captain (1)**
20:4
**Carbine (2)**
83:3,6
**carbines (1)**
63:22
**Carcano (1)**
83:13
**career (1)**
50:12
**careful (1)**
69:12
**carrier (2)**
39:11;40:12
**carries (2)**
45:12,13,13,14;
46:4,5
**carry (2)**
29:6;37:12;38:23;
46:1;49:21,22;50:5;
63:11,12;84:2,5,10
**carrying (1)**
62:23
**cars (1)**
23:15
**cartridge (2)**
78:10,11
**cartridges (2)**
78:4,6
**case (17)**
4:13;6:10,11,20,23,
24;7:12,16;26:18;
27:8,17;57:15;58:19;
62:10;77:21,22;88:21
**catalog (1)**
94:22
**catch (1)**
36:2
**center (1)**
77:21
**centerfire (10)**
77:15,18,20;78:2,5,
11;79:1,4,9,20
**Century (1)**
92:3
**certain (4)**
31:23;32:1;68:15;
88:9
**certificate (1)**
55:1
**certification (2)**
53:1;55:22
**certified (2)**
38:12;55:21
**cetera (2)**

35:6;49:16
**change (2)**
42:14;76:22
**changed (2)**
14:6;89:7
**changing (1)**
14:24
**chapter (1)**
89:12
**charge (5)**
26:17;78:5,8,15,16
**Charter (2)**
63:15;72:1
**check (1)**
83:7
**checked (1)**
35:14
**chief (11)**
19:10,10,13,17,20,
23;20:1;30:3,6,11,13
**Chiefs (1)**
51:16
**chose (1)**
17:16
**circumstance (1)**
85:21
**circumstances (3)**
26:14;27:14;28:13
**cities (1)**
18:2
**citizen (3)**
50:13,23;51:9
**citizens (2)**
51:3;52:20
**City (2)**
26:21;80:9
**Civil (5)**
4:19;14:19,21;19:8;
25:23
**civilian (5)**
76:4,11;84:19;86:2,
6
**civilians (2)**
76:9;94:2
**clarifying (1)**
41:22
**Class (7)**
29:7,10;32:3;33:12,
22;49:11,15
**classes (1)**
51:14
**clean (2)**
38:23;39:12
**cleaning (4)**
16:5;39:6;62:16;
89:20
**clear (8)**
9:7,16;27:3;31:14;
58:22;61:3;62:5;
74:18
**client (1)**
62:8
**clients (3)**

Case 1:17-cv-10107-WGY Document 65-1 Filed 12/15/17 Page 455 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary - Vol. I
September 14, 2017

69:8;70:4,9
**close (2)**
18:16;65:17
**closer (2)**
22:2;66:9
**clothing (1)**
62:21
**Club (7)**
44:2;53:20,23;
54:11,15,18,19
**clubs (2)**
16:13,23
**CMMG (1)**
69:6
**CMRs (1)**
64:21
**collapsable (2)**
68:10,16
**collector (1)**
33:24
**college (16)**
16:14,15,16,18;
20:16,17,18,21;22:23,
23;24:2,4,5,11,16;
25:6
**colleges (2)**
21:1,23
**color (1)**
68:20
**Colt (13)**
40:5,7,12,18,18;
41:17,23;63:17;80:6;
82:21,22,24;87:20
**Colts (1)**
64:14
**Comm2A (1)**
53:16
**commander (1)**
19:14
**commanders (1)**
19:18
**commerce (2)**
34:22,23
**Committee (4)**
22:11;34:4,5;44:7
**commonly (1)**
93:7
**Commonwealth (1)**
34:11
**communication (1)**
62:7
**communications (1)**
61:18
**community (9)**
16:14,15,16;20:17,
21;21:7;22:23;24:2,
16
**companies (3)**
69:6;70:17;74:10
**company (8)**
12:4;23:16;38:8,9,
9;39:23;69:19;74:15
**company's (1)**

74:19
**compared (2)**
66:16;78:2
**competencies (1)**
25:8
**complainant (1)**
27:8
**complaint (6)**
88:8,11,13,22;89:4,
5
**complete (4)**
42:12;68:1,2,3
**completely (1)**
66:21
**compliance (1)**
68:14
**comprise (1)**
35:11
**comprised (1)**
72:16
**comprises (1)**
21:5
**computer (1)**
35:15
**computerized (1)**
35:16
**concluded (1)**
97:15
**condition (1)**
46:17
**conduct (1)**
35:5
**confer (1)**
97:7
**Constitutional (1)**
21:6
**consumer (1)**
64:20
**contact (2)**
59:19,23
**contacted (1)**
59:19,20,21
**contemporaneous (2)**
48:17,19
**content (1)**
56:21
**contents (1)**
88:19
**continue (1)**
74:3
**contribute (1)**
56:23
**conversation (1)**
88:20
**conversations (2)**
61:4,9
**conversion (2)**
77:1,9
**convert (2)**
76:18,20
**converting (1)**
77:5
**convicted (2)**

25:13,15
**copy (1)**
21:21
**corporation (2)**
13:21;15:1
**Corrections (1)**
21:8
**correctly (1)**
35:18
**correlation (2)**
67:1,5
**counsel (7)**
4:3;11:13;61:20,22;
62:10;96:8,10
**count (1)**
80:4
**couple (10)**
33:22;35:23;38:6;
80:12,12;81:24;
82:24;83:15,16;87:16
**course (29)**
7:9;8:15,22;10:1;
20:6;28:19;29:23;
35:7;46:15,20;48:2;
50:7,22,24;51:16,16,
17;56:1;67:21;68:6;
70:3;72:20;84:3,24;
85:22;86:9,19;91:23;
97:9
**court (3)**
8:12;21:7;26:15
**cover (2)**
39:5,5
**credits (5)**
24:23;25:4,5,6,8
**crime (3)**
25:14,15,16
**criminal (12)**
21:2,5,6,16,17,19,
20;24:3,5,9;26:6,11
**criminally (1)**
26:1
**criteria (1)**
34:2
**cross-talk (1)**
50:4
**Cup (1)**
80:6
**current (3)**
13:21;31:18;33:7
**currently (11)**
12:7;15:21;17:3;
30:20;31:17;70:20;
74:24;77:6;82:4,15;
93:2
**curriculum (5)**
21:2,5;24:13,15;
51:15
**custody (1)**
21:20
**custom (2)**
69:7;70:4
**Customers (1)**

97:1
**cylinder (1)**
52:6

**D**

**daily (1)**
76:14
**damaged (1)**
59:14
**Dan (1)**
4:10
**Daniel (3)**
90:8;93:18,24
**Dartmouth (1)**
25:9
**date (8)**
19:1;36:10;72:12,
17;73:20;74:9;90:20;
96:17
**dates (1)**
30:17
**daughter (5)**
12:24;13:12,17;
56:18,19
**day (5)**
66:15;75:10;96:22;
97:1,3
**days (7)**
14:23;17:14,18,22;
19:5;75:13,13
**deal (1)**
37:18
**dealer's (7)**
14:10,11;29:14;
31:6,9,15;34:16
**dealt (3)**
38:3,4;42:21
**decent (1)**
93:6
**decided (2)**
73:11;95:10,11
**defendant (4)**
26:6,10,15;59:1
**Defendants (2)**
4:4,13
**defense (4)**
50:18;90:8;93:18,
24
**define (1)**
4:23
**definitely (1)**
57:17
**definition (3)**
21:20;73:9,14
**degree (9)**
24:1,3,6,8,17,19,20,
23;25:2
**delivered (1)**
84:13
**denied (1)**
32:24
**department (19)**

14:9;18:12;19:12,
22;20:10;30:2,7;32:6;
35:2;36:15,16;37:8,
14;45:22;47:8;48:3,
24;49:24;52:24
**departments (1)**
46:8
**depended (1)**
19:24
**deposed (13)**
5:21,24;6:7,8,9,11,
15,19;7:1;8:9,10;
25:19,23
**deposition (6)**
5:7;9:3;11:9;12:15;
81:3;97:14
**depositions (4)**
8:12;58:3,12,13
**derive (1)**
63:2
**derives (2)**
57:23;58:19
**describe (3)**
24:15;51:7;67:20
**designed (1)**
46:11
**designees (1)**
11:20
**detach (1)**
68:12
**determination (1)**
32:22
**determine (1)**
74:20
**determining (1)**
61:24
**diagnose (3)**
42:13,20,23
**died (1)**
6:11
**differ (1)**
24:7
**difference (8)**
21:17,18;50:6;62:5;
77:14,18;78:20,23
**differences (2)**
45:15;77:24
**different (9)**
25:5;46:7,8;69:10,
11;70:17;79:11,12;
89:10
**difficult (1)**
36:4
**DIRECT (1)**
4:8
**direction (2)**
37:4;52:2
**directly (3)**
69:24;71:20;72:7
**disassemble (6)**
38:10;39:11;42:22;
43:2;45:8;49:15
**disassembling (2)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 456 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary -   Vol. I
September 14, 2017

43:9;44:11
**disassembly (1)**
   39:7
**disassembly/reassembly (1)**
   42:12
**disclosing (1)**
   88:19
**discussed (1)**
   23:2
**Discussion (1)**
   53:10
**dismissed (5)**
   26:18;27:17,20,22;
   28:11
**distributor (2)**
   70:22;71:14
**distributors (9)**
   69:23;70:1,10,11,
   13,19;71:2,15;72:4
**disturbance (3)**
   26:16;27:2,4
**disturbing (1)**
   27:5
**Document (11)**
   10:21;11:3,4,6,8,11,
   16;95:19,24;96:1,5
**Documents (2)**
   96:4,11
**dogcatcher (1)**
   85:20
**dogs (1)**
   85:15
**domestic (1)**
   28:15
**dominant (1)**
   52:11
**done (6)**
   11:2;35:18;41:4;
   43:19;95:23;97:6
**Dorchester (1)**
   25:10
**down (6)**
   9:18;52:16;66:18,
   19;72:18;75:8
**downloaded (2)**
   82:6,8
**downstairs (4)**
   87:10,15,24;88:5
**dozen (2)**
   95:1,2
**drawn (1)**
   86:5
**drill (1)**
   68:17
**driver's (1)**
   4:5
**duly (1)**
   4:6
**during (4)**
   18:8,10;20:6;86:19
**duties (2)**
   6:16;8:16,22;28:19;
   32:19;50:24

**duty (10)**
   46:12;48:1,10,22;
   49:6,17;50:8;84:7;
   86:14;93:5

---

## E

**ear (1)**
   62:16
**earlier (4)**
   25:19;34:6;58:11;
   72:22
**easier (1)**
   94:16
**easily (1)**
   41:14
**East (12)**
   5:18,20;30:2,6;
   33:6,10,14;34:14;
   35:2;36:14,15;54:17
**Ed (1)**
   23:1
**education (1)**
   23:24
**EDWARD (2)**
   4:2;5:17
**effect (1)**
   74:1
**effectively (1)**
   46:12
**eight (1)**
   54:6
**either (12)**
   20:7;24:19;32:23;
   33:24;34:22;35:1;
   50:12;51:8;56:2;
   57:16;58:17;74:11
**elaborate (1)**
   14:3
**elected (1)**
   67:8
**election (5)**
   66:18,22,23;67:2,7
**Elizabeth (1)**
   4:12
**Elks (1)**
   16:21
**else (9)**
   17:3;21:11;22:16;
   23:11,19;50:6;58:8;
   94:11;95:17
**elsewhere (1)**
   16:4
**email (1)**
   59:18
**emerge (1)**
   79:7
**employed (2)**
   12:7;17:3
**employees (3)**
   12:23;13:1,16
**employment (9)**
   7:9;20:6;23:6;48:2,

11;84:3,24;85:23;
86:20
**encountered (1)**
   45:21
**end (1)**
   10:6
**ends (1)**
   68:19
**enforcement (42)**
   24:2,8;58:20;59:15;
   63:13;64:11,12,24;
   66:20;67:14,22;68:7;
   72:12,17;73:22;
   75:17,21;76:1,5,8,12,
   15;89:6;90:5,20,21;
   91:11,15;92:7,12,16,
   19;93:2,5,7,16,20;
   94:2,19;96:18,21,24
**England (2)**
   24:4,10
**English (1)**
   25:6
**enjoyed (1)**
   37:5
**enough (4)**
   61:15;62:9;75:10;
   79:18
**entire (1)**
   69:9
**enumerated (3)**
   11:23;91:6,20
**equip (1)**
   49:2
**estimate (1)**
   75:15
**et (2)**
   35:6;49:16
**euthanized (1)**
   85:15
**Even (1)**
   85:15
**events (1)**
   55:12
**everybody (3)**
   14:22,22;27:23
**Everywhere (1)**
   57:19
**Evidence (1)**
   21:7;22:14,15
**evidently (1)**
   89:10
**exact (4)**
   26:17;48:14,15;
   80:4
**exactly (6)**
   9:20;28:18;47:5;
   50:17;80:4;92:4
**examination (2)**
   4:3,8
**examined (1)**
   4:6
**Examines (2)**
   11:3;95:24

**example (5)**
   40:13;41:14;46:1;
   51:20;69:12
**examples (1)**
   41:19
**except (2)**
   5:7;73:9
**excess (2)**
   65:23,23
**excessive (1)**
   7:6
**Exhibit (4)**
   10:22,24;95:20,22
**exist (1)**
   15:9
**existed (1)**
   19:18
**experience (2)**
   41:18;43:13
**expired (1)**
   30:22
**expiring (1)**
   33:15
**explain (4)**
   16:9;19:15;33:11;
   61:16
**explicitly (1)**
   61:19
**Explosives (1)**
   35:4
**expressed (1)**
   57:14
**extensive (1)**
   37:10
**extensively (1)**
   38:16
**extent (1)**
   74:18
**extra (1)**
   42:21
**eye (1)**
   52:12

---

## F

**Facebook (8)**
   56:7;57:6,9,13,19;
   58:5,7,9
**facility (5)**
   12:11;15:16;16:8,
   10,11
**fact (8)**
   6:19;74:8,18;79:13;
   92:15;96:13,16,23
**factories (1)**
   69:24
**factory (3)**
   71:22,23,24
**faculty (5)**
   20:15,16,24;21:23;
   22:24
**fair (17)**
   9:10;19:19;38:16,

18;39:24;46:7;50:20;
61:15;62:9;63:4;64:2;
66:5,10;75:10,15;
79:18;88:17
**fairly (1)**
   37:10
**false (1)**
   7:5
**familiar (7)**
   60:21,24;73:3,5;
   77:14;78:12;84:14
**far (2)**
   23:12;66:16
**faster (2)**
   79:14,20
**father (1)**
   37:2
**features (1)**
   68:11
**Federal (9)**
   4:19;5:1;14:10;
   21:11;29:13;34:16;
   73:20,24;91:20
**federally (1)**
   29:23;91:7
**Feed (1)**
   77:2
**feel (1)**
   47:8
**felonies (1)**
   21:18
**few (5)**
   80:3,12,13;81:19;
   93:10
**fewer (1)**
   76:13
**FFL (4)**
   29:23;33:4;34:17,
   20
**fide (1)**
   33:24
**figured (1)**
   19:3
**filed (2)**
   88:14,23
**find (1)**
   70:22
**fine (3)**
   50:3;77:13;81:7
**finger (3)**
   37:5;52:1,13
**finish (2)**
   9:14;10:5
**fire (5)**
   76:19,21;78:1,18;
   84:12
**firearm (17)**
   36:4;51:22,23,24;
   69:9;71:17;79:8;
   84:18,23;85:5,10,22;
   86:3,5;87:18;96:14,
   16
**firearms (78)**

Case 1:17-cv-10107-WGY    Document 65-1    Filed 12/15/17    Page 457 of 1262

David Seth Worman, et al. vs.                                    Edward O'Leary -   Vol. I
Maura Healey, et al.                                             September 14, 2017

12:12;14:10,11;
15:16,17,18;16:5,7,
17;17:2;29:6,11,13;
32:11,14,20;34:1,21;
35:4;36:22;37:9,14,
21;38:17;50:13;51:2,
11,13,15,18,19;53:2;
54:11;55:21,22;57:3,
3;63:3,7,11,19;64:3,5;
65:15,20;66:7,10,19;
67:13;68:23;70:8;
71:2,21;72:3;76:18;
79:24;80:5,22;81:17;
85:4;86:22;87:2,5,13,
14,22;88:1,4;89:7,8;
90:4;92:10,11,11,16;
93:22;94:1,8
**fired (7)**
79:19;84:18,23;
85:5,10,22;86:3
**firing (2)**
78:16,17
**first (10)**
4:6;24:18;25:3;
43:23;60:20;72:21;
87:9,13;96:20,23
**Five (9)**
8:7;13:22;14:7;
17:8;22:20;48:13;
68:8;73:9;75:14
**fix (3)**
41:13;46:17;47:6
**flash (1)**
68:9
**flat (1)**
46:2
**folks (1)**
56:23
**following (3)**
11:21,22;82:14
**follows (1)**
4:7
**force (6)**
7:7;18:13;21:21;
38:2,3;78:20
**fore (4)**
68:6,19;74:13,19
**foreign (2)**
23:15,16
**forge (1)**
67:17
**forget (1)**
38:8
**forgetting (1)**
95:1
**forgot (1)**
95:15
**form (8)**
5:8;13:2;14:24;
26:7;40:15;41:11,14;
65:11
**formed (1)**
62:6

**forms (2)**
14:17;56:6
**forth (1)**
44:8
**fortune (1)**
18:14
**found (1)**
35:23
**Four (5)**
70:12;85:9,10,11,
15
**fourth (1)**
24:24
**Foxborough (2)**
22:5,11
**frequently (1)**
74:23
**freshman (1)**
21:16
**Friday (3)**
59:9,10,11
**friend (1)**
56:19
**friends (3)**
56:10,14,17
**front (2)**
52:6;81:17
**fruitful (1)**
81:1
**full (1)**
9:15
**full-time (1)**
22:21
**fully (2)**
76:18,20
**further (1)**
97:12

**G**

**game (2)**
27:7,15
**Garand (1)**
83:16
**Garands (1)**
83:16
**gas (1)**
90:12
**gathered (1)**
45:19
**gauge (1)**
81:23
**gear (1)**
62:21
**gears (3)**
53:4;62:12;79:23
**General (8)**
4:4;11,13;16:6;64:21;
71:11,18;89:6,12
**generally (1)**
57:2
**Generals (1)**
89:9

**General's (1)**
71:9
**generic (3)**
21:12;45:21;49:11
**German (1)**
82:22
**gestures (1)**
9:20
**glasses (1)**
62:16
**Glock (9)**
38:3,5,5,6;42:8,9,
11;71:24;84:6
**Glock-18 (1)**
42:21
**Glocks (7)**
63:12,14;80:11;
81:18;82:3,15;87:17
**GOAL (7)**
53:13;54:5;55:8,13,
15;59:19,21
**GOAL's (3)**
57:11;59:9,11
**god (1)**
23:8
**goes (1)**
45:18
**Gold (1)**
80:6
**good (4)**
18:14;35:22;36:6;
70:7
**goose (1)**
85:14
**governor (3)**
58:23;59:3;64:22
**governs (1)**
34:10
**grabbers (1)**
67:8
**grace (2)**
31:6,9
**grade (1)**
43:23
**graduate (1)**
24:21
**Grand (2)**
8:12,15
**grandfather (1)**
37:3
**Great (1)**
11:19
**grip (3)**
52:12;68:6,12
**ground (1)**
9:2
**group (1)**
39:11
**guess (5)**
27:11;65:17,17;
76:13;82:11
**gun (38)**
12:11;15:17;16:3,

13,23;29:1,10,20;
32:3,5;33:6,8,13,15,
20;37:4,12;44:2;
45:18,24;47:8,9;
50:19;52:2,3,6,8,12,
16;53:14,20;54:11,
19;65:6,6;67:8;76:24;
84:5;94:22
**gunpowder (1)**
79:6
**guns (24)**
29:11;35:6,14,22;
42:18;45:14,24;47:3;
62:14;64:8;67:9,10,
11;70:23;71:8;72:9;
73:11;83:22,24;84:2;
88:10;90:1;93:14;
94:24
**gunsmithing (1)**
29:12
**guy (2)**
55:24;75:14
**guys (3)**
27:24;28:1;63:11

**H**

**H&K (3)**
47:3,10,18
**half (2)**
63:8;76:16
**halfway (1)**
24:23
**hall (4)**
16:21,21,22,22
**halls (3)**
16:14,20;17:1
**hand (5)**
24:7;41:16;52:13;
78:10,10
**handed (1)**
95:21
**handgun (1)**
86:16
**handguns (6)**
37:22;52:19;62:14;
64:16;82:18;87:16
**handing (1)**
10:23
**handle (3)**
46:1;49:21;50:5
**handles (1)**
49:22
**happened (4)**
60:4,18;85:17;90:1
**happy (3)**
5:3;26:9;41:11
**hard (2)**
89:24;94:13
**harm (1)**
89:14
**Harshbarger (1)**
64:22

**head (4)**
9:19,19;77:21,23
**headache (1)**
69:16
**header (1)**
11:16
**Healey (1)**
59:2
**hear (2)**
59:6;61:3
**heavy (1)**
37:20
**Heckler (1)**
47:10
**help (8)**
21:4,14;24:6;38:19;
56:10,14;67:4;74:20
**helped (1)**
67:11
**helps (1)**
20:20
**Henry (1)**
63:23
**hesitate (1)**
10:12
**Hey (1)**
71:8
**Hi (1)**
63:22
**Hicks (1)**
70:15
**high (5)**
23:8;63:18;73:11,
16,18
**highest (1)**
19:8
**Hill (1)**
43:23
**himself (2)**
6:10,16
**hired (1)**
61:12
**hit (1)**
17:19
**HK (1)**
63:16
**Holbrook (2)**
44:2,4
**hold (3)**
20:9;29:1;52:13
**holds (3)**
45:8;73:16,18;
79:12
**Holiday (1)**
16:22
**holsters (3)**
16:6;62:15,17
**home (7)**
4:16;5:15,17;22:2;
32:7;51:15;86:24
**homes (2)**
16:13,23
**honestly (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 458 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary -  Vol. I
September 14, 2017

57:8
**hopefully (1)**
94:16
**horrified (1)**
67:6
**Horton (1)**
70:13
**hotel (1)**
16:22
**hour (1)**
53:7
**hourly (1)**
13:4
**HOWE (1)**
53:5
**hung (3)**
6:10,16;80:9
**hypothetically (1)**
95:11

**I**

**idea (6)**
27:9;66:2;72:18;
75:6;86:13,13
**identification (4)**
10:22,24;95:20,22
**identified (1)**
4:4
**illegal (1)**
76:24
**impacted (1)**
76:1
**import (1)**
92:3
**important (3)**
51:19,21,22
**imported (1)**
63:18
**incident (3)**
28:7,12,16
**include (1)**
71:16
**including (1)**
33:5
**Incorporated (6)**
11:10;12:8,10,14,
17;14:12
**indicating (1)**
52:18
**individual (4)**
28:18;35:13;39:16;
82:11
**individually (1)**
82:6
**Industries (1)**
65:8
**infantry (1)**
83:14
**initial (1)**
62:7
**Inn (1)**
16:23

**inside (1)**
74:10
**inspected (1)**
35:1;36:15
**inspecting (2)**
35:3;36:7
**inspection (1)**
36:11
**Instagram (3)**
56:8;57:5,8
**instances (1)**
8:14
**Institute (6)**
22:10,18;23:5;34:7,
8,9
**instruct (2)**
80:24;81:3
**instructing (1)**
10:8
**instructor (10)**
34:1;37:21,23;38:1,
2,4;52:22;55:21,22;
84:14
**instructors (6)**
42:18;52:21,22,23,
24;53:2
**instructs (1)**
80:19
**intense (1)**
84:12
**interchangeable (1)**
69:14
**interested (1)**
59:13
**interim (1)**
23:13
**interpreted (1)**
89:10
**interrupt (2)**
4:18;44:20
**interstate (3)**
34:22,23;70:13
**into (9)**
37:6;39:6;42:17;
43:12,16;46:2;74:1;
76:23;84:13
**introduction (1)**
21:17
**inventory (2)**
35:14;65:16
**investigator (3)**
60:6,10,13
**investigator's (1)**
60:7
**involved (2)**
28:5,15
**Israeli (1)**
65:8
**issuance (1)**
33:24
**issue (3)**
30:17;32:23,23
**issued (5)**

29:23;32:4,9;34:14;
96:24
**issues (3)**
42:23;48:23,24
**issuing (1)**
30:1
**Italian (1)**
83:14
**item (1)**
84:8
**IWI (6)**
65:6,8;90:16;91:24;
92:1;95:9
**IWIs (1)**
94:1

**J**

**James (1)**
36:9
**jewelry (1)**
62:18
**job (5)**
6:8;9:7;33:1;49:13;
85:6
**jobs (2)**
20:9,14
**join (2)**
54:3,5
**joined (2)**
4:11;51:14
**July (2)**
96:17;97:4
**jury (3)**
7:17;8:12,15
**justice (1)**
21:2,5;24:3,5,9

**K**

**Kalashnikov (3)**
65:7;92:2;93:24
**Kaplan (1)**
4:12
**keen (1)**
80:14
**keep (6)**
37:4,4;46:16;52:1,
1;58:14
**Ken (6)**
9:15,18;10:17;41:7;
81:8;95:4
**Kind (13)**
21:12;51:6,17;52:4,
7;54:24;63:11;65:6;
68:5,6,19;69:10;
84:12
**kinds (2)**
58:23;62:19
**kit (2)**
77:8,9
**kits (5)**
16:5;76:17;77:1,5;

89:20
**kneeling (1)**
39:3
**knew (2)**
44:16;45:4
**knowing (1)**
59:14
**knowledge (1)**
83:8
**knowledgeable (2)**
56:9;70:23
**Koch (1)**
47:10
**KROCKMALNIC (21)**
4:9,10,20,22;5:5,9,
11;26:9;41:7,10,21;
44:22;53:8,12;61:15,
19;62:3;81:8;95:4;
97:5,11

**L**

**lad (1)**
37:2
**ladies (1)**
62:17
**laid (2)**
18:11;23:14
**Lane (1)**
20:20
**lapsed (5)**
31:4,12,16,17,20
**large (15)**
73:3,14,19,23;74:6,
20,21,24;75:4,11,16,
20,24;76:7,14
**last (2)**
66:17,23
**Law (25)**
21:6,6,10,11,16,17,
19,19;24:1,8;63:13;
64:11,24;73:22;
75:17;76:5,8;92:7,16,
18;93:2,5,7,16,19
**lawful (1)**
89:11
**lawfully (1)**
90:19
**Laws (1)**
89:12
**lawsuit (5)**
7:4;25:19,22,23;
88:8
**lawyer (2)**
61:12;88:21
**lawyer-client (1)**
62:2
**lawyers (5)**
61:5,6,7,10;88:21
**layer (1)**
14:12
**League (1)**
53:14

**learn (1)**
50:17
**learned (13)**
38:22,22,23,24;
39:1,2,3,4,9,14;43:11,
12;49:14
**lease (2)**
15:19;29:10
**least (1)**
43:19
**leave (2)**
51:6;52:2
**leaving (1)**
63:24
**led (1)**
27:14
**left (2)**
41:14;67:7
**legal (2)**
14:7,24
**length (2)**
68:5,18
**lengthy (1)**
51:6
**less (4)**
76:11;78:24;79:3,6
**level (1)**
21:16
**Lew (1)**
70:12
**Liability (4)**
14:16,17,19,21
**liberal (1)**
67:8
**license (26)**
4:5;14:10,11;29:1,
6,9,10,12,12,14,19;
31:7,9,15;32:3,8,23;
33:1,6,8,13,15,20,22;
34:12,16
**licenses (10)**
29:2,5,15,17,20,24;
30:17,24;31:3;33:5
**licensing (6)**
32:11,15,20;33:4,7,
12
**lieutenant (3)**
19:9,13;20:1
**life (2)**
28:22;53:19
**lifelong (1)**
54:2
**lighter (1)**
79:5
**liked (1)**
51:14
**line (1)**
81:2
**Lipsey's (1)**
70:14
**list (10)**
71:9,10;72:8;81:5,
6,16;91:7,20,21;94:7

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 459 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary -   Vol. I
September 14, 2017

listed (2)
94:17;95:8

litany (1)
7:7

litigation (5)
57:21;58:1;59:7;
61:11;89:4

little (6)
39:13;41:15;53:7;
56:18,19,20

live (1)
33:16

lived (2)
28:21;33:17

Liz (1)
97:7

load (2)
38:24;52:15

loaded (3)
51:24;87:22;88:2

locate (1)
43:16

located (5)
20:18,22;23:17;
44:1;54:16

long (9)
13:19;15:6;22:15,
17;23:20;28:6,21;
53:24;54:1

longer (9)
74:18;88:9;90:4;
92:9,12;94:1,11,18;
95:12

look (6)
79:17;81:24;82:2;
90:22;91:17;94:23

losing (8)
39:13;89:15,15,17,
17,21,21,23

loss (1)
90:14

lot (9)
16:23;39:1;46:4,5;
59:4;69:13;70:12;
89:21;93:13

lower (4)
39:10;40:11;67:24;
68:1

LTC (1)
80:9

lug (2)
37:20;68:10

Luger (1)
82:22

## M

M&P (2)
90:7;93:1

M-1 (4)
83:3,5,16,16

machine (15)
29:9,11;32:3,5;
33:6,8,13,15,20;
42:22;45:13;83:22,
24;84:2,5

magazine (8)
52:7;68:13;73:15,
17;74:13,20,21;76:8

magazines (14)
73:4,10,14,19,24;
74:3,7,24;75:5,11,17,
20,24;76:14

magic (1)
17:19

mail (1)
96:22

main (1)
20:19

maintain (5)
46:14,14,16;47:6;
55:22

maintaining (1)
53:1

maintenance (1)
42:15

makes (2)
48:6;62:18

manner (1)
89:10

manufacture (4)
34:24;67:13,16;
68:23

manufactured (4)
39:23;69:2;74:10;
80:7

manufacturer (2)
70:6;74:16

manufacturers (3)
69:10;71:20;72:7

manufacturer's (1)
69:8

manufactures (1)
92:4

manufacturing (2)
34:12;67:16

many (27)
5:24;6:2;17:12;
32:14;46:22,23;
48:10;63:19;64:2,2;
65:15,20;66:1,4,7;
75:4,10;76:13;80:2;
82:3,15;85:8;86:12;
90:1,2;96:14,16

March (2)
35:5;36:13

Maria (8)
20:15,18;21:23;
22:1,23;23:5;24:5,10

marked (4)
10:21,24;95:19,21

market (2)
76:4,11

Marshfield (5)
18:4,15;20:8;23:4,
15

Mass (4)
23:18;36:2;44:4;
51:16

Massachusetts (9)
5:19,20;20:20,23;
21:10;28:21;33:20;
43:22;72:9

Massasoit (11)
16:19;20:17,21;
21:23,24;22:22;23:4;
24:2,8,16;25:3

master (1)
24:4

master's (1)
24:10

match (1)
69:10

matched (1)
35:14

matching (2)
40:20,23

matters (2)
6:6;57:3

mauled (1)
85:14

Maura (1)
59:1

maximum (1)
17:20

may (6)
31:22;47:15;68:14;
79:13,15;88:15

Maybe (6)
7:13;16:11;54:4,6;
60:20;65:11

McComas (1)
60:22

mean (19)
8:12;16:20;21:15;
23:8;28:4;32:10;
58:23;61:23;62:23;
65:5;67:20;69:22;
73:6;78:7;82:8;84:9;
85:2;90:8;91:1

meaning (3)
28:2;49:23;50:2

means (3)
55:2,5,5

meant (1)
65:13

mechanical (1)
52:8

media (8)
56:1,6,15,22;57:5,
12,15;58:17

meetings (1)
55:24

melt (1)
67:16

member (13)
21:1,23;53:13,17,
19,24;54:7,9,13,14,
21;55:15,19

memorized (1)
91:18

mentioned (4)
16:8;23:12;25:19;
47:9

mentioning (1)
83:10

merged (2)
51:17;74:11

met (2)
34:1;36:10

metal (1)
67:17

might (21)
9:1;19:3;31:7,20;
36:1;47:19;48:8;56:8;
57:8;67:23,24;68:1,3;
69:3,4,4,4,5;82:14;
83:1;93:12

military (1)
25:11

millimeter (1)
83:14

million (1)
69:6

mind (8)
6:13;8:11;38:15;
53:3;82:5;83:17;
95:14;97:6

mine's (1)
56:19

Mini (1)
83:12

minor (1)
35:23

misdemeanors (1)
21:18

misheard (2)
44:19,21

missed (1)
95:15

missing (2)
35:22;97:8

mistakes (1)
35:24

mix (2)
40:24;69:10

mixing (2)
40:20,22

model (4)
39:22;46:8,19;48:5

models (2)
44:24;48:6

modern (3)
90:3,11;94:9

moment (3)
17:4;30:22;61:23

moments (1)
19:20

money (7)
55:4;89:15,15,17,
21,22,23

More (22)
6:1;21:9;38:14;
42:17;45:17,22;
48:21,24;55:4;62:20;
63:8,9;66:10;70:16;
72:11;73:16,18;
78:16,16;79:8;81:20;
93:4

Morning (2)
4:10;27:20

Mossberg (2)
63:21;81:23

Most (7)
22:24;24:22;45:20,
21;51:19,20;87:15

mostly (1)
16:23

mounted (3)
46:1;49:21;50:5

move (1)
39:4

MPTC (3)
34:1,3,9

much (22)
22:2;37:6;45:16,23;
46:2;70:5;76:4,11;
78:24;79:3,5,5,6;
89:10,19,19,19,20,20,
21,23;94:14;97:12

Multiple (1)
86:10

Municipal (8)
22:10;34:4;43:21;
44:7,9;45:1;47:1;49:4

muzzle (1)
79:12

myself (1)
32:4

## N

name (18)
4:10,15;5:14,14,17;
13:8;22:7;30:9;36:7;
38:8;60:7,15,21,24;
69:19;74:15,15,19

names (1)
63:19

nature (16)
7:4;12:9;16:2,9;
27:2,18;32:19;36:24;
38:20;41:10;42:8;
51:7;59:23;72:6;
90:13,15

need (5)
10:11;43:7;45:17;
80:18;84:12

needed (2)
32:24;85:15

New (4)
24:4,9;63:12;64:8

news (2)
59:9,12

Newton (1)

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 460 of 1262

David Seth Worman, et al. vs.                                           Edward O'Leary -   Vol. I
Maura Healey, et al.                                                      September 14, 2017

80:9
**next (5)**
51:5;60:18;70:7;
95:7;96:22
**Nicco (1)**
80:7
**nice (1)**
62:17
**nods (1)**
9:19
**nomenclature (1)**
52:5
**None (2)**
30:22;75:13
**nonexistent (1)**
89:18
**non-handgun (1)**
86:18
**non-law (2)**
90:19;92:12
**non-training (4)**
85:23;86:3,6,19
**normal (1)**
42:14
**North (1)**
5:19
**Northeastern (1)**
25:4
**Notary (1)**
4:6
**noted (3)**
45:10;64:14;72:11
**Notice (19)**
11:9;58:20;67:22;
72:12,17;75:22;76:1,
12,15;89:6;90:5,21;
91:11,15;94:3,19;
96:18,21,24
**noting (1)**
62:5
**November (1)**
66:23
**NRA (9)**
51:15;53:18;54:2,3,
24;55:3,18,19,21
**number (5)**
18:13;19:21;60:15;
66:6;78:19
**numbers (1)**
17:19

## O

**object (3)**
26:7;61:13;65:11
**objected (1)**
41:8
**objection (5)**
10:6,7;40:15;41:11,
17
**objections (1)**
5:7
**objects (1)**

10:4
**obligated (1)**
10:17
**obtain (3)**
32:3;33:19,22
**obtained (1)**
14:10
**obviously (2)**
28:4;45:15
**occasion (3)**
71:7;85:10,13
**occasions (4)**
19:9;32:24;38:6;
86:10
**occurred (1)**
96:17
**off (10)**
18:11;22:1,20;
23:14;37:5;39:10;
49:22;52:1;53:8,10
**offended (2)**
59:14;89:16
**offerings (1)**
55:20
**office (2)**
87:10;96:13
**officer (43)**
6:9,17;7:9,19,24;
8:2,6,16,22;17:7,13,
17,23;18:3,6,21;19:7;
20:7,11;23:3;28:19;
32:11,15,20;36:8;
37:16;48:12,24;49:2;
50:12,15,24,24;51:9;
54:8;84:3,21;85:1,5,
23;86:8,20;92:7
**officers (11)**
18:13;46:12;75:17;
90:20;92:12,16,19;
93:2,8,16,20
**often (1)**
75:2
**old (3)**
28:23;43:22;82:21
**O'LEARY (12)**
4:2;5:17,21;10:21,
23;12:6;13:10,14;
29:1;53:13;81:12;
95:19
**once (7)**
6:1;16:22;37:10,13;
71:22;75:14;85:9
**one (35)**
6:9;9:20;10:12;
21:3;22:5;24:7;33:23;
41:16,16;45:22;48:1,
18,21,24;51:20,22;
60:16;65:2;69:8;70:5;
71:7;73:8;75:14;78:9,
15,18,18;81:20;82:2;
85:10;87:16;88:1;
91:6;93:4;95:13
**ones (7)**

22:6;63:12;82:1,20,
21;83:4;90:15
**only (7)**
10:12;58:2,4;63:13;
64:11;78:18;83:5
**onward (2)**
23:9,10
**open (1)**
14:1
**opened (2)**
15:11;36:18
**open-ended (2)**
41:15;51:7
**operate (1)**
51:21
**operated (1)**
90:12
**operating (3)**
13:19;46:17;50:22
**operation (1)**
52:8
**operational (1)**
40:23
**operator (2)**
39:16;84:11
**opinions (1)**
57:14
**opportunity (1)**
71:1
**order (3)**
7:5;62:22;76:23
**Ordinance (1)**
63:23
**ordinary (1)**
35:7
**organization (2)**
16:12;34:10
**organizations (4)**
54:7,10,12,21
**organized (1)**
55:8
**originally (1)**
32:4
**Oswald (1)**
83:15
**others (3)**
30:5;50:18;72:1;
74:10;77:3
**otherwise (2)**
19:21;64:13
**OUI (1)**
28:10
**out (12)**
7:8;19:10;25:8;
27:23;35:13;37:13;
39:11;45:19;59:24;
63:24;68:8;94:17
**outcome (1)**
67:2
**Outside (1)**
28:17
**over (7)**
9:2;45:12,13,13,14;

53:7;85:20
**overarching (1)**
34:10
**own (14)**
12:20;29:5;36:23;
79:23;80:5;81:17,18;
82:18;83:18,20,22;
86:22;87:3;88:4
**owned (3)**
83:24
**owner (3)**
12:21;15:4;66:13
**Owners' (1)**
53:14
**ownership (1)**
80:23

## P

**P08 (1)**
82:22
**page (4)**
9:4;11:15,22,22
**pains (1)**
10:19
**Palmetto (1)**
69:5
**paperwork (2)**
35:18;88:18
**Parole (1)**
21:8
**Part (5)**
23:16;34:6,8,9;
42:21
**participate (3)**
55:7,16,19
**participating (1)**
59:7
**particular (2)**
57:22,24
**parts (14)**
23:15;39:13;40:10;
42:14,14;43:11,16;
45:24;69:9,11,17,21;
70:2;76:23
**part-time (1)**
13:23
**party (2)**
6:23,24
**pass (1)**
19:16
**past (1)**
36:13
**patrol (10)**
37:24;38:1,20;
39:17,18;40:4;42:2;
43:5;44:1;84:11
**patterns (1)**
42:15
**Paxton (1)**
20:19
**paying (1)**
62:10

**payroll (1)**
13:2
**PD (3)**
28:2;50:1;84:16
**penalties (1)**
10:19
**pending (4)**
10:14;65:2;81:9,12
**pension (1)**
17:20
**people (6)**
18:14;22:24;27:24;
36:1;67:6;72:1
**people's (1)**
16:13
**pepper (1)**
16:6
**percentage (5)**
63:2,6;72:15;76:7,9
**perception (1)**
52:10
**perform (1)**
29:12
**performance (1)**
8:16
**period (4)**
23:13;31:6,9;38:11
**periodic (1)**
37:13
**perjury (1)**
10:19
**permanently (1)**
68:16
**permits (1)**
34:20
**person (3)**
6:12;59:24;62:8
**personal (2)**
80:17,22
**personally (3)**
56:2;57:16;58:17
**phone (1)**
60:15
**phrasing (1)**
49:13
**picture (1)**
52:10
**pin (2)**
68:16,17
**pinpoint (1)**
63:9
**pistol (6)**
42:12,22;45:12,16;
53:23;68:12
**pistols (3)**
38:5;64:6;82:24
**place (3)**
12:20;52:13;87:5
**placed (1)**
62:22
**Plaintiff (2)**
11:10;12:2
**Plaintiffs (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 461 of 1262

David Seth Worman, et al. vs.                                    Edward O'Leary -   Vol. I
Maura Healey, et al.                                                     September 14, 2017

5:2

**Plaintiff's (1)**
11:20

**plan (1)**
49:1

**plate (2)**
74:13,19

**platform (1)**
47:11

**platforms (1)**
57:2

**please (26)**
4:15;5:13,14,15;
9:6;10:5;11:15,17;
16:9;19:15;21:4,14;
23:6,23;29:4;33:11;
36:22;38:19;39:8;
41:7;42:7;43:7;51:7;
81:8;95:5,22

**pm (3)**
97:10,11,15

**point (16)**
26:3;27:11;28:5,9;
31:4,16,20;36:18;
37:15;50:11,20;
52:16;61:4;63:22;
95:2,13

**pointed (2)**
37:4;52:2

**police (76)**
6:9,17;7:9,24;8:2,5,
16,22;14:9;17:7,13,
17,23;18:3,5,12,20;
19:6,11,21;20:7,10,
11;21:7;22:3,7,9,10,
18;23:3,5;27:12;28:4,
17,19;30:2,7,14;32:6;
34:4,7,11;35:2;36:14,
16;37:7,8,9,14;43:21;
44:7,9;45:1,22;46:7,
12;47:1,7;48:3,12;
49:4;50:12,15,23,24;
51:8,16;52:20,24;
84:3,21;85:1,5,23;
86:8,20

**poor (1)**
49:13

**popular (1)**
93:4

**PORTER (24)**
4:18,21,24;5:6,10;
10:2,4;26:7;40:15;
41:8,13;44:19;50:3;
60:20;61:10,13,17,21;
65:11;77:11,13;
80:21;97:9,13

**Porter's (1)**
81:10

**position (2)**
61:22;62:5

**possess (1)**
29:9;81:22;82:4,15;
83:5

**possessed (1)**
83:10

**possibility (1)**
59:6

**possible (6)**
31:12,15,19;61:24;
70:5;75:2

**post (2)**
58:5;59:17

**posted (7)**
57:2;58:2,11,14,17,
22,23

**posting (2)**
59:9,12

**power (1)**
84:13

**powerful (2)**
79:1,4

**pre (2)**
63:13,17

**pre-ban (10)**
63:17;64:14,18;
73:23;74:3,8,24;75:4,
11;76:4

**predict (1)**
89:24

**prepare (1)**
81:5

**prepared (1)**
11:20

**presence (2)**
56:15,22

**present (4)**
27:4,6;36:19;65:16

**presidential (2)**
66:23;67:2

**press (2)**
52:14,17

**pretty (3)**
36:6;37:17;93:6

**prevents (1)**
64:12

**previous (3)**
31:16,19;89:9

**previously (2)**
83:10;95:13

**Primarily (1)**
5:6;90:24

**primer (2)**
77:20,22

**prior (23)**
11:11;13:22;14:24;
15:9,23;16:4;18:5;
31:20;36:10;61:11,
19;67:6,21;68:7;
72:12,17;73:1;76:11;
81:9;88:13,22;90:20;
96:5

**private (5)**
50:13,23;51:2,9;
52:20

**privilege (1)**
62:2

**probably (19)**
13:24;21:9;22:19;
41:1;47:6;57:19,19;
60:11;62:20;63:8,24;
66:9;70:16;72:1;
76:16;94:24;95:1,15,
15

**Probation (1)**
21:8

**problem (1)**
42:20

**problems (2)**
42:13,13

**Procedure (2)**
4:19;21:7

**proceed (2)**
5:3,3

**proceeding (4)**
5:1;26:6,11,15

**proceedings (1)**
27:19

**process (2)**
32:2;33:11

**processes (1)**
32:2

**produced (1)**
96:13

**Product (2)**
62:24;64:20

**production (2)**
4:5;96:4

**products (2)**
15:17;16:2

**program (5)**
22:2;24:10,19,20,
21

**programs (2)**
24:7,9

**prone (1)**
39:3

**pronounce (1)**
63:19

**proper (1)**
15:19

**Proposition (1)**
18:11

**proprietor (1)**
13:23

**proprietorship (2)**
15:2,7

**protected (1)**
62:1

**protection (3)**
14:12,15;62:16

**proudly (1)**
53:19

**provide (1)**
14:12

**provided (2)**
51:8;96:10

**provides (1)**
55:20

**Public (1)**

4:6

**purchase (1)**
48:11

**purpose (2)**
16:24;61:23

**purposes (3)**
5:6;16:24;51:2

**purses (1)**
62:17

**put (11)**
39:12;40:18,18,22,
23;57:7;58:18;64:22;
67:17;68:17;76:23

**putting (2)**
67:20;85:3

**Q**

**qualifications (1)**
37:11

**qualified (1)**
47:8

**qualify (1)**
37:11

**quick (1)**
97:7

**quickly (1)**
84:13

**quite (1)**
41:13

**R**

**rallies (1)**
55:9

**ran (2)**
44:6;85:20

**Randolph (36)**
6:9;7:22;8:3,6,17,
23;17:7,10,17,24;
18:6,9,12,16,17,21;
19:7,21;20:3,7;23:3,
14;32:12,15;33:9,14,
16;43:22;44:10;45:2;
47:22;48:2,12;49:5;
50:1;84:16

**Randolph's (1)**
19:11

**range (6)**
37:16,17;44:3;45:9;
46:15;85:3

**rank (4)**
19:6,8,14;20:3

**ranks (1)**
19:12

**rate (1)**
68:19

**Raven (1)**
82:23

**reached (1)**
59:24

**read (6)**
41:8,9;81:8,11;

95:4,6

**really (11)**
27:3;28:3;37:6;
41:14;45:23;56:8;
59:4;66:18;80:13;
84:13;90:23

**rear (3)**
49:21;50:5;52:6

**reason (11)**
14:6;17:16;27:21;
31:1,4;32:5;35:8;
41:2;48:20;49:8;79:2

**reasons (5)**
14:20;27:21;33:23;
48:21;49:8

**reassemble (1)**
42:23

**recall (30)**
7:1,11,16;8:9,10;
22:7;23:19;26:23;
27:1,13,18,21;29:18;
35:12,19;36:7;42:1;
44:12,23;46:18;48:5;
59:11,13,21;60:7,11;
65:21;85:13;88:22,24

**re-called (1)**
18:17

**receive (4)**
50:11;70:2;96:20,
23

**received (20)**
36:23,24;38:20;
42:4,8;43:1,5,8,20;
44:9;45:7;47:1,15,21;
49:4;50:6,7,16;51:1;
60:19

**receiver (3)**
40:11,11;76:22

**recertifying (1)**
52:23

**Recess (2)**
53:11;97:10

**recited (1)**
30:18

**recognize (4)**
11:6,8;96:1,3

**recollection (2)**
58:10;59:8

**recommended (1)**
42:15

**record (6)**
4:17;5:16;9:16;
53:9,10;80:21

**records (2)**
36:3;96:13

**Red (2)**
27:7,15

**reduced (3)**
18:12;89:19,21

**refer (1)**
12:13

**referring (4)**
56:11;64:18;66:22;

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 462 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary -   Vol. I
September 14, 2017

90:10
**regarding (1)**
    23:2
**regulates (1)**
    34:10
**regulations (1)**
    64:21
**reinterpreted (1)**
    89:8
**related (2)**
    54:11;57:3
**relating (3)**
    11:21;27:19;61:10
**Relations (1)**
    21:8
**relationship (1)**
    62:6
**relative (1)**
    6:8
**remain (1)**
    68:14
**remainder (2)**
    29:24;88:4
**remember (6)**
    19:1,3;22:13,16;
    28:6;35:21
**Remington (1)**
    63:21
**renewed (2)**
    31:21;33:16
**Rent (3)**
    16:21,24;29:10
**rented (1)**
    16:22
**rep (2)**
    71:23,24
**repair (7)**
    38:10;42:13,20,23;
    43:2;45:8;49:16
**repairing (2)**
    43:9;44:11
**repeat (1)**
    75:23
**rephrase (5)**
    9:7,11;26:9;41:12;
    94:15
**replied (1)**
    59:18
**represent (1)**
    4:13
**representation (1)**
    62:1
**represented (4)**
    10:2;45:23;61:20,
    22
**reps (2)**
    71:14,22
**requested (1)**
    96:11
**Requests (1)**
    96:4
**required (2)**
    43:13,14

**requirements (2)**
    33:19,21
**reserve (1)**
    62:3
**reserved (1)**
    5:8
**resolved (1)**
    7:16
**respect (17)**
    6:15;12:3;14:4;
    34:21;36:22;43:9;
    49:15;54:20;55:20;
    58:18;64:5;77:5;78:1,
    9,19,20;88:21
**respond (1)**
    11:20
**response (2)**
    6:21;59:16
**responsible (4)**
    52:23;53:1;56:21,
    24
**responsive (2)**
    29:16;96:11
**rest (1)**
    19:24
**restate (2)**
    5:12;6:22
**restrictions (1)**
    29:8
**result (5)**
    35:19;75:21;90:5;
    94:2,18
**Retail (2)**
    12:11;34:23
**retire (2)**
    17:10,16
**retired (3)**
    14:9;18:23;19:1
**revenues (3)**
    63:2,6;72:16
**review (4)**
    11:1;32:21;88:13;
    95:23
**reviewed (1)**
    11:4
**reviewing (1)**
    88:22
**revoke (1)**
    33:1
**revolvers (1)**
    82:23
**rifle (43)**
    37:24;38:20;39:9,
    15,15,18,21,22;40:1,
    4,7,14,22;41:16,24,
    24;42:2;43:5,12,16,
    17;44:1,17;45:16;
    47:4,20;48:3,22;49:2,
    18;53:23;65:10;68:3;
    69:13;73:15;77:20;
    83:5,14,15;91:24;
    92:5;93:6;94:10
**rifles (46)**

29:11;38:1;39:17;
    40:4;41:18;42:1,5;
    43:10;44:11,12,15,17,
    24;45:4,8,9,13;46:9,
    13,15;47:18;49:16;
    52:19;62:14;63:22;
    64:6;66:20;69:15;
    77:15,15,18,19;80:12;
    83:2,9,13,18,20;89:8,
    18;90:3,11;93:1,5,10,
    19
**Right (14)**
    5:10;6:14;10:5;
    16:11;53:3;62:3;64:3;
    73:2;82:5,16;88:10;
    91:8,21;95:18
**rights (2)**
    67:9;89:16
**rim (1)**
    77:22
**rimfire (9)**
    77:15,18,21;78:1,4,
    10,24;79:3,19
**River (1)**
    38:12
**road (1)**
    49:1
**Rock (2)**
    38:12;70:15
**room (1)**
    87:10
**Roughly (1)**
    24:13
**round (9)**
    77:21;78:24;79:1,1,
    3,4,9,19,20
**rounds (6)**
    73:16,18;79:11,13;
    85:11,16
**Ruger (2)**
    63:15;83:12
**rule (2)**
    9:23;68:8
**Rules (9)**
    4:19;5:1;9:3;51:19,
    20,21,24;52:4;89:7
**running (2)**
    58:22;64:22

**S**

**safe (15)**
    37:4;40:20;52:2;
    86:23;87:3,6,7,9,11,
    13,14,17,19;88:2,5
**safely (1)**
    46:12
**safes (2)**
    62:19;87:8
**safeties (1)**
    52:7
**safety (10)**
    16:17;17:2;37:11;

51:13,16,19,20;52:4;
    62:15;64:20
**Salaried (2)**
    13:4,5
**sale (1)**
    80:8
**sales (18)**
    12:12;63:3,7;66:16,
    19;67:1;71:14;72:16;
    75:20,24;76:8,8,9;
    89:17,17,18,19;94:22
**same (14)**
    9:4;24:13;33:21;
    34:5;47:4;48:17,22;
    55:18;65:6;76:6;78:5;
    79:12;86:8;90:13
**satisfactorily (1)**
    4:4
**satisfactory (1)**
    5:2
**Sauer (1)**
    63:16
**saw (2)**
    59:8,11
**saying (1)**
    47:14
**scattering (1)**
    93:10
**Schedule (1)**
    11:16
**scheduling (1)**
    42:15
**school (22)**
    23:8;25:1;37:22,23;
    38:1,2,4,6,7,21;39:18;
    40:4;42:2,9,10,11;
    43:1,5,23;44:1;45:20;
    85:4
**schools (1)**
    24:22
**scope (1)**
    34:17
**Scott (1)**
    30:10
**sear (1)**
    76:23
**second (4)**
    7:1;87:11,14;89:13
**section (1)**
    89:12
**security (1)**
    28:3
**seeing (1)**
    59:16
**seeking (1)**
    14:15
**segue (1)**
    70:7
**self-defense (4)**
    50:14,18;51:2;
    84:19
**sell (66)**
    15:17;29:10,13;

34:22;62:12,14,15,16,
    18,19,19;63:13,14,15,
    15,16,16,16,17,18,18,
    20,20,21,21,22,22,23;
    64:1,2,6,8,10,23;
    65:21;66:8;67:15,19;
    70:23;71:3,21;72:9,
    11;74:3,21,23;75:2,5,
    11,13;77:1,4,6,7;88:9;
    90:2,9,16,16,19;
    91:10,14;94:18;95:1,
    2,12
**seller (4)**
    93:9,11,12,13
**selling (18)**
    15:18;72:3,21;74:7;
    75:16;76:14;90:4;
    91:24;92:9,13,15,18;
    93:1,15,19;94:2,12,13
**sells (2)**
    70:9;82:12
**semiautomatic (2)**
    73:17;90:12
**send (2)**
    55:4;59:9
**sense (2)**
    63:1;66:3
**sent (7)**
    37:8,21,23,24;38:2,
    3,5,7;47:24
**separate (2)**
    8:11;43:4
**September (2)**
    19:2,4
**sequence (1)**
    48:18
**serve (4)**
    8:2;17:13;18:2;
    21:22
**served (2)**
    7:23;25:11
**service (2)**
    17:23;19:8
**serving (3)**
    8:5;19:20;20:11
**seven (1)**
    54:6
**several (2)**
    18:14;81:18
**shakes (1)**
    9:19
**shall (1)**
    11:20
**Shannon (2)**
    13:13,14
**Sharon (1)**
    23:18
**shoot (8)**
    37:3;38:22;39:1,2,
    4,5;50:19;52:16
**shooting (1)**
    85:3
**shop (3)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 463 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary -   Vol. I
September 14, 2017

15:11,12,13
**short (1)**
   53:6
**shorten (1)**
   45:16
**shotgun (3)**
   37:23;73:15,17
**shotguns (9)**
   29:11;37:24;45:14;
   52:19;62:15;64:6;
   80:13;81:20,22
**shown (2)**
   11:13;96:8
**shows (2)**
   15:18;16:3
**side (3)**
   55:6,6;59:4
**SIG (1)**
   63:16
**sight (3)**
   52:6,6,10
**sights (4)**
   46:1;49:22;52:9;
   68:19
**similar (11)**
   40:6;45:15;47:3,4,
   12;65:4,14;83:14;
   90:12,15;94:9
**simply (2)**
   12:15;62:4
**sit (14)**
   8:9;23:20;27:1,13;
   30:16;31:23;33:18;
   34:19;46:24;58:10;
   79:18;81:15;89:1;
   95:16
**sitting (1)**
   39:3
**situation (7)**
   6:14;13:21;84:12;
   85:24;86:3,6,19
**situations (3)**
   6:6;8:8;84:24
**six (1)**
   22:20
**slower (1)**
   76:5
**slowly (1)**
   79:8
**smaller (1)**
   79:5
**smiling (2)**
   35:21,23
**Smith (4)**
   63:14;71:23;90:7;
   93:23
**social (7)**
   56:1,6,15,22;57:12,
   15;58:17
**sold (17)**
   16:3;23:15;65:3,4;
   66:4,10;72:24;73:19,
   23;81:24;82:9,11;

83:3,11;89:8;90:2;
95:13
**sole (5)**
   12:21;13:23;15:2,4,
   6
**solely (3)**
   56:21,24;88:20
**somebody (9)**
   59:19,20;60:2,5;
   67:23;71:7;73:8,8;
   94:21
**somehow (1)**
   74:11
**someone (1)**
   7:2
**Sometimes (5)**
   35:24;71:11,12;
   72:10,10
**Sorry (11)**
   4:18,21;9:24;37:8;
   43:6,6,44:20;49:12;
   65:13;77:12;80:11
**sort (2)**
   33:2;68:4
**sounds (1)**
   9:1
**South (5)**
   22:9,18;23:5;34:6;
   70:15
**Sox (2)**
   27:7,15
**space (1)**
   76:22
**speak (2)**
   71:20,22
**speaking (1)**
   57:2
**special (1)**
   84:11
**specialty (1)**
   84:8
**specific (15)**
   17:16;21:13,13;
   35:8;39:22,22,23;
   43:15;45:10,15;
   46:19;68:15;71:17;
   79:21;95:8
**specifically (13)**
   12:16;30:3;38:5;
   49:5,10,17;57:21;
   63:9;78:9;88:12;
   92:10;95:10,11
**specifications (1)**
   68:4
**specificity (1)**
   17:15
**spell (1)**
   4:15
**spelling (1)**
   5:14
**Spike (1)**
   94:6
**Spikes (1)**

69:3
**spoke (4)**
   61:23;71:23,24,24
**sponsored (1)**
   55:12
**Sporter (3)**
   40:7,12;41:23
**Sporters (1)**
   40:5
**sporting (3)**
   90:3,11;94:9
**Sports (2)**
   70:14,15
**Sportsmen's (3)**
   44:2;54:14,18
**spray (1)**
   16:6
**Stag (1)**
   94:6
**stamped (4)**
   74:9,13,14,19
**stand (2)**
   34:3;41:22
**standard (4)**
   35:7,10;63:18;
   73:10
**standing (1)**
   39:3
**Standish (2)**
   54:14,18
**stands (1)**
   69:20
**start (6)**
   15:18;18:20;23:9;
   40:20;50:21;62:23
**started (1)**
   25:3
**starting (1)**
   22:19
**state (8)**
   4:15,16;5:14,15;
   14:11;21:13;69:5;
   70:14
**stated (6)**
   15:1;17:6;30:1;
   81:17,20;93:22
**statement (1)**
   81:10
**states (1)**
   88:8
**station (1)**
   38:12
**stationary (1)**
   39:4
**status (1)**
   15:1
**statute (1)**
   21:12
**steel (1)**
   80:7
**step (1)**
   78:4
**Steyr (3)**

90:16,19;91:6
**stick (3)**
   69:16;70:2,5
**still (9)**
   8:2;33:9;68:2;
   75:16;81:12;92:15,
   18;93:15,19
**stipulations (2)**
   4:19,23
**stock (4)**
   67:11;68:6,11,15
**stocking (1)**
   67:9
**stop (1)**
   8:5
**stopped (1)**
   17:6
**stopping (1)**
   92:23
**store (7)**
   12:11;65:3;82:1,7,
   9,12,12
**stored (12)**
   86:22;87:3,5,13,14,
   15,19,22;88:2,2,5,5
**storefront (4)**
   15:21,23;36:19;
   62:13
**Street (2)**
   5:18,20
**stressing (1)**
   37:10
**stripped (1)**
   67:24
**structure (1)**
   14:7
**students (1)**
   51:18
**stuff (6)**
   37:20;46:4,5;56:9;
   68:20;69:13
**style (30)**
   40:1,4,7,14;41:23,
   24;42:5;43:10;44:11,
   12,15,24;45:4,9;
   46:13;47:11,18,20;
   48:3;49:16;65:10;
   83:18,20;91:24;92:5,
   10,11,15;93:18;95:8
**styles (1)**
   64:5
**subsequent (1)**
   73:24
**Suburban (4)**
   22:9,18;23:5;34:6
**sued (2)**
   7:2,20
**sues (1)**
   14:22
**suing (1)**
   6:12
**suit (2)**
   57:22,23

**Sunset (1)**
   20:20
**supplies (1)**
   62:16
**suppressor (1)**
   68:9
**sure (27)**
   7:5;9:3,5;28:4;
   31:13;35:14,17;
   37:18;38:14;41:13;
   47:13,16;50:15;53:8;
   57:10;72:5;78:15;
   80:22;81:1;82:7;
   85:19;88:16,17;
   90:23,23;91:3;97:7
**Susan (2)**
   13:9,10
**suspect (1)**
   51:5
**suspected (1)**
   48:16
**suspend (1)**
   33:1
**suspended (1)**
   31:1
**Suzanne (1)**
   60:21
**Switching (1)**
   53:4;62:12;79:23
**sworn (2)**
   4:6;10:16
**syllabus (1)**
   21:21
**system (1)**
   72:18

**T**

**tactical (3)**
   62:21;69:3;94:6
**talk (3)**
   45:23;71:15;80:17
**talking (4)**
   12:16;41:15;77:2;
   97:1
**talks (2)**
   55:12;59:5
**Target (48)**
   11:10;12:2,4,8,10,
   14,15,16,19,21,23;
   13:17,20;14:1,7;15:1,
   6,9,15,24;16:3;17:4;
   35:1;51:10;52:11;
   54:20,20,23;56:12;
   57:2,16;58:18;62:13;
   63:2;66:14;70:8;
   72:16,24;74:4,7;75:1,
   5,12;84:13;88:9;89:3;
   90:5;95:12
**targets (1)**
   62:20
**Target's (3)**
   56:15,22;63:6

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 464 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary -   Vol. I
September 14, 2017

**taught (19)**
16:16,17;22:2,3,5,6,
13;37:3,3;38:9;51:13;
52:4,5,9,11,12,15,16,
21

**teach (5)**
16:13;17:2;20:24;
22:12,18

**teaches (1)**
51:18

**teaching (2)**
21:10;23:4

**telling (1)**
80:14

**ten (1)**
73:9

**term (5)**
18:8;44:18;73:3,6;
78:18

**terminated (1)**
31:1

**test (1)**
25:7

**testified (11)**
4:7;8:14,19;31:3;
33:5;34:6;40:10;
41:18;42:24;72:21;
87:2

**testify (2)**
8:21;29:19

**testifying (1)**
28:8

**testimony (8)**
10:18;12:1,3;31:14;
33:3;47:14;74:17;
75:18

**thinking (2)**
25:18,21

**third (2)**
11:15;24:24

**Thomas (1)**
60:24

**though (5)**
9:1;55:23;62:9;
67:18;69:15

**thought (3)**
32:6;48:8;58:16

**three (9)**
6:12;25:6,8;43:19;
68:11;70:13;82:21,
22;89:9

**throughout (2)**
12:14;69:9

**thus (1)**
23:12

**times (10)**
5:24;6:2;8:10;39:1;
43:19;85:8,11;86:11,
12,16

**titles (1)**
22:22

**Tobacco (1)**
35:4

**today (25)**
4:11;8:9;10:2;
11:11;12:1;25:20;
27:2,13;30:16;31:24;
33:19;34:20;58:4,11,
11,14;73:1;74:4,7;
79:18;81:15;89:2;
90:6;95:16;96:6

**today's (2)**
9:3;12:14

**together (5)**
39:12;40:22;51:17;
67:18,21

**told (3)**
35:21;36:3;60:2

**took (6)**
24:20;27:24;28:1;
49:22;60:15;73:10

**tools (3)**
43:13,14,15

**topic (3)**
36:21;62:4;70:7

**topics (5)**
11:21,23;12:3;
71:16;96:11

**tops (1)**
46:2

**tortious (1)**
7:6

**touch (4)**
51:22;60:2,5,16

**Tower (1)**
43:22

**town (25)**
7:19,21,23;8:3,6,17,
23;17:7,10,17,23;
18:2,21;19:10,11;
20:3,7,8;32:12,15;
33:6,9,13,14;34:14

**towns (1)**
20:12

**trace (1)**
36:4

**trade (1)**
93:13

**train (1)**
49:1

**trained (8)**
38:17;39:17;40:3;
42:1;44:13;45:1,20;
46:19

**trainer (1)**
52:22

**Training (55)**
11:10;12:2,8,10,11,
14,17;15:16,16;16:8,
10,12;22:10;34:4,5,
11;36:21,23;37:1,9,
14;38:20;42:4,8;43:1,
4,8,20,21;44:6,7,9,10;
45:1,6;46:11;47:1,2,
14,15,19,21,21;48:1;
49:3,4;50:7,7,11,16;

51:8,11;84:24;85:4;
89:3

**trainings (1)**
51:1

**transactions (3)**
35:17;96:14,16

**transfer (1)**
24:20

**transferred (1)**
33:13

**transfers (1)**
24:22

**transitional (1)**
38:4

**treat (1)**
51:24

**trial (5)**
5:9;7:17;8:19,21;
26:4

**tried (5)**
25:13,16;26:1;
69:16,17

**trigger (5)**
37:5;52:1,14,14,17

**trouble (1)**
94:21

**true (3)**
45:8;79:12,15

**truly (1)**
76:20

**truthfully (1)**
10:18

**try (2)**
49:13;75:3

**trying (3)**
22:13;78:12;82:5

**turn (2)**
11:15;43:12

**Turning (1)**
36:21

**turns (1)**
82:12

**twist (1)**
68:18

**Twitter (5)**
56:7;57:6,9,20;58:5

**two (21)**
8:8;19:5,21;20:12;
21:1;24:18;41:18;
51:14;68:8,13;78:21;
82:5,16,17,21,22;
87:7;88:1;90:24;91:1;
95:1

**two-year (1)**
24:16

**type (1)**
14:15

**types (1)**
94:8

## U

**ultimately (2)**

62:8;70:8

**ultra (1)**
67:7

**UMass (3)**
25:5,7,9

**unclear (1)**
9:6

**under (3)**
5:1;10:18;62:1

**undergo (1)**
32:3

**undergrad (1)**
24:18

**undergraduate (1)**
24:22

**understood (5)**
9:11;33:3;41:6;
46:20;78:19

**unless (2)**
52:3;80:19

**unload (2)**
38:24;52:15

**unloaded (4)**
51:23;52:3;87:22;
88:6

**up (10)**
14:1;15:11;31:11;
35:15;36:18;67:9,11;
73:8;79:17;80:9

**upper (4)**
39:10;40:10,11;
68:2

**upstairs (5)**
87:16,17,19,24;
88:2

**use (15)**
16:21;21:20;38:2,3;
46:8,12,15;49:21;
50:13;51:1;52:9;56:1,
6;69:8,17

**used (8)**
15:17;40:5;44:18;
51:15;64:8;72:11;
74:18;77:8

**using (3)**
41:19;43:14;52:3

**usual (2)**
4:18,23

**usually (2)**
71:7;87:20

## V

**valid (1)**
30:20

**varies (1)**
75:14

**variety (4)**
63:18;79:10,11;
80:11

**various (2)**
40:10;57:1

**velocities (1)**

79:12

**versus (4)**
4:14;57:15;58:1,3

**violated (2)**
9:22;89:16

**violative (1)**
89:13

**violence (1)**
28:16

**virtue (2)**
91:11,15

## W

**wait (2)**
7:14;77:11

**wait-until-the-end-of-the-question (1)**
9:23

**walk (6)**
23:6,23;29:4;36:22;
42:7;43:8

**Walther (1)**
63:20

**warranty (1)**
38:12

**way (8)**
49:14;52:17;55:16,
20;75:9,21;76:1;80:8

**weapon (6)**
47:16;48:22;84:7;
86:14;91:10,14

**Weaponry (1)**
93:23

**weapons (10)**
48:2;65:8;73:20;
90:7;91:7,20;94:17;
95:8,9,9

**wear (1)**
42:14

**Wesson (4)**
63:15;71:23;90:7;
93:23

**Western (2)**
24:4,9

**What's (1)**
54:18

**Whereupon (1)**
97:14

**whole (4)**
28:22;77:11;89:12;
94:7

**whose (1)**
60:9

**wicked (1)**
76:24

**wife (4)**
12:24;13:17;56:19;
62:18

**wife's (1)**
13:8

**willing (1)**
94:18

**Winchester (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 465 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Edward O'Leary -   Vol. I
September 14, 2017

63:21
**Windham (2)**
90:7;93:23
**wing (1)**
67:7
**withdrawn (1)**
29:18
**Within (1)**
19:11
**without (2)**
39:12;88:19
**witness (4)**
4:3;6:19;61:20;
77:12
**won (1)**
7:17
**word (2)**
16:12;96:23
**work (5)**
40:13;42:19;45:21;
70:20;85:16
**worked (3)**
18:4,15;25:8
**working (5)**
17:6;18:5,20;23:15;
60:10
**Worman (4)**
4:14;57:15;58:1,3
**worried (2)**
14:17,20
**worries (2)**
4:22;10:1
**worth (1)**
35:17
**write (1)**
36:1
**writing (1)**
11:19
**WW-15s (2)**
90:8;92:18

**X**

**XM-15 (7)**
39:24;40:3,14;
41:24;49:6,18;50:9
**XM-15s (4)**
39:19;48:9,11;
93:15

**Y**

**year (8)**
7:11;18:4,16,16;
24:24;37:19;66:16,17
**years (20)**
7:14;8:7;13:22;
14:8;17:8,12,14,18,
19,20,22;18:8;21:22;
22:20;24:18;32:14,
17,20;54:4,6
**year's (1)**
35:16

**young (2)**
6:10;37:2

**Z**

**Zanders (1)**
70:14
**zero (3)**
39:14,15,16
**zoning (1)**
15:19

**0**

**03A3s (1)**
83:15

**1**

**1 (3)**
10:22,24;20:20
**1,000 (1)**
65:23
**1/2 (1)**
18:11
**10 (1)**
73:16
**10:45 (1)**
53:11
**11:00 (1)**
53:12
**12:07 (1)**
97:10
**12:10 (2)**
97:11,15
**125 (1)**
75:14
**14 (1)**
83:12
**15 (4)**
11:23;12:3;32:16;
93:1
**15s (1)**
90:7
**18 (1)**
84:6
**1911s (1)**
82:21
**1980 (4)**
18:22;20:8;23:9,10
**1981 (1)**
18:11
**1982 (1)**
18:18
**1986 (1)**
37:15
**1989 (1)**
21:24
**1994 (3)**
73:21;91:8,20
**1995 (1)**
32:18
**1998 (8)**

13:24;14:1;15:7,9,
11,14;63:13;64:20

**2**

**2 (6)**
17:14,18,22;18:11;
95:20,22
**2,000 (2)**
65:24;66:9
**20 (2)**
81:23;96:17
**2010 (1)**
32:18
**2012 (9)**
15:7,13,14,23;16:4;
18:23;20:8;21:24;
36:19
**2015 (4)**
65:21;66:4,11;90:2
**2016 (3)**
66:8,11;96:17
**2017 (1)**
90:3
**20th (3)**
97:2,3,4
**22 (6)**
78:10,24;79:3,13,
19;83:13
**223 (6)**
78:11;79:1,4,9,11,
20
**223s (1)**
79:14
**22s (1)**
79:14
**25 (4)**
70:16;82:23,24;
87:20
**28th (1)**
19:4

**3**

**30 (2)**
7:14;54:4
**30b6 (1)**
80:23
**30th (1)**
19:2
**32 (5)**
17:14,18,19,22;
18:8
**392 (1)**
5:18

**4**

**45 (1)**
80:6

**5**

**5 (1)**
73:18
**500 (2)**
65:19;81:23
**511 (2)**
62:21,21
**516 (1)**
5:19
**55 (1)**
17:20

**6**

**6.5 (1)**
83:14
**60 (1)**
24:22
**61 (1)**
28:24

**7**

**70s (3)**
26:18;28:10;80:7

**8**

**80 (1)**
23:22
**87 (1)**
7:13
**88 (1)**
7:13
**89 (1)**
22:19

**9**

**90s (1)**
22:1
**98 (1)**
63:17

# EXHIBIT 10

## TO KAPLAN DECLARATION

# In The Matter Of:

*David Seth Worman, et al. vs.*
*Maura Healey, et al.*

---

*Charles M. Ricko, II*
*Vol. I*
*September 13, 2017*

---



**DORIS O. WONG
ASSOCIATES, INC.**

COURT   REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File RICKO_Charles.txt*
*Min-U-Script® with Word Index*

**Charles M. Ricko, II - Vol. I - September 13, 2017**

```
                              Volume I
                              Pages 1 to 65
                              Exhibits 1 to 2

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
DAVID SETH WORMAN, ANTHONY      :
LINDEN, JASON WILLIAM SAWYER,   :
NICHOLAS ANDREW FELD, PAUL      :
NELSON CHAMBERLAIN, GUN         :
OWNERS' ACTION LEAGUE, INC.,    :
ON TARGET TRAINING, INC., AND   :
OVERWATCH OUTPOST,              :
              Plaintiffs,       :
                                :
         vs.                    :    Civil Action
                                :    No. 17-10107-WGY
MAURA HEALEY, in her official   :
capacity as Attorney General    :
of the Commonwealth of          :
Massachusetts; DANIEL           :
BENNETT, in his official        :
capacity as the Secretary of    :
the Executive Office of         :
Public Safety and Security;     :
and COLONEL RICHARD D.          :
McKEON, in his official         :
capacity as Superintendent of   :
the Massachusetts State         :
Police,                         :
              Defendants.       :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF OVERWATCH OUTPOST THROUGH ITS
DESIGNEE CHARLES M. RICKO, II, a witness called on
behalf of the Defendants, taken pursuant to
Rule 30(b)(6) of the Federal Rules of Civil
Procedure, before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Office of
the Attorney General, 100 Cambridge Street, Boston,
Massachusetts, on Wednesday, September 13, 2017,
commencing at 9:39 a.m.
```

**Charles M. Ricko, II - Vol. I - September 13, 2017**

2

PRESENT:

    Bradley Arant Boult Cummings LLP
        (by James W. Porter, III, Esq., and Connor
        Blair, Esq.)
        One Federal Place, 1819 Fifth Avenue North,
        Birmingham, AL 35203-2119,
        jporter@bradley.com;
        cblair@bradley.com
        205.521.8285
        for the Plaintiffs.

    Campbell Campbell Edwards & Conroy, P.C.
        (by Richard P. Campbell, Esq.)
        One Constitution Plaza, Boston, MA 02129,
        rpcampbell@campbell-trial-lawyers.com
        617.241.3029
        for the Plaintiff Gun Owners' Action
        League, Inc.

    Office of the Attorney General
        (by Gary Klein, Assistant Attorney General;
        Dan Krockmalnic, Assistant Attorney
        General)
        One Ashburton Place, 18th Floor,
        Boston, MA 02108,
        Gary.Klein@state.ma.us;
        Dan.Krockmalnic@state.ma.us
        617.963.2567
        for the Defendants.

                 * * * * *

3

1                          I N D E X

2
    WITNESS                 DIRECT  CROSS   REDIRECT  RECROSS
3

4   CHARLES M. RICKO, II

5    BY MR. KLEIN              4

6

7
                          *  *  *  *
8
                        E X H I B I T S
9
    NO.                  DESCRIPTION                PAGE
10
    Exhibit 1    Copy of Notice of Taking          55
11               Deposition

12  Exhibit 2    Copy of Requests for Production    57
                 of Documents
13

14
                        *  *  *  *
15

16

17

18

19

20

21

22

23

24

Charles M. Ricko, II - Vol. I - September 13, 2017

4

```
 1              P R O C E E D I N G S
 2                 CHARLES M. RICKO, II
 3   a witness called for examination by counsel for the
 4   Defendants, having been satisfactorily identified by
 5   the production of his driver's license and being
 6   first duly sworn by the Notary Public, was examined
 7   and testified as follows:
 8                 DIRECT EXAMINATION
 9     BY MR. KLEIN:
10     Q.    Morning, sir.  Would you please state your
11   full name, your home and your business address for
12   the record.
13     A.    Charles Myron Ricko, II.  ██████████████
   ██████████████████████████████████████████████████
15   My business address is 97 Main Street in Charlemont,
16   Massachusetts.
17     Q.    It would probably be helpful if you spelled
18   Ricko for the record because it's not the normal
19   spelling.
20     A.    R-i-c-k-o.
21     Q.    I'm Gary Klein, one of the attorneys for
22   the defendants in this matter, which is Worman
23   versus Baker, a case in which your business,
24   Overwatch Outpost, is a plaintiff, correct?
```

Charles M. Ricko, II - Vol. I - September 13, 2017

1     A.    Correct.

2     Q.    Have you had your deposition taken before?

3     A.    I have.

4     Q.    So you generally understand the rules of

5  the road in a deposition, correct?

6     A.    I believe so.

7     Q.    I just want to go over some ground rules in

8  case any question comes up later.

9        The first and most important ground rule is

10  if a question is unclear, I want you to ask me to

11  clarify it.  If you don't ask me to clarify, I will

12  assume that you understood the question, okay?

13     A.    Understood.

14     Q.    It's important that you answer all the

15  questions verbally.  The reporter can't take down

16  nods or shakes of the head, okay?

17     A.    Understood.

18     Q.    I want you to wait for all the questions to

19  be completed as best as possible.  It's important

20  that we not talk over each other during the course

21  of the deposition, okay?

22     A.    Okay.

23     Q.    You can take a break at any time.  Feel

24  free to ask for one.  We will always take a break,

**Charles M. Ricko, II - Vol. I - September 13, 2017**

```
 1   unless there's a question pending for you to answer,
 2   okay?
 3       A.   Okay.
 4       Q.   It's possible from time to time your
 5   attorney will object to a question.  If your
 6   attorney objects, you should wait for him to
 7   complete the objection, and then he will either
 8   instruct you to answer or not to answer.  If he does
 9   instruct you to answer, you can go ahead and answer,
10   okay?
11       A.   Okay.
12       Q.   You are aware that this is a deposition
13   taken under oath, correct?
14       A.   Correct.
15       Q.   And this means that you have the obligation
16   to answer all the questions truthfully, right?
17       A.   Yes.
18       Q.   And your testimony here is under the
19   penalty of perjury, right?
20       A.   Yes.
21       Q.   Thank you.
22            MR. KLEIN:  Can I confirm on the record the
23   deposition is being taken pursuant to the Federal
24   Rules, particularly Rule 30 of the Federal Rules of
```

**Charles M. Ricko, II - Vol. I - September 13, 2017**

 1    Civil Procedure?

 2             MR. PORTER:  The plaintiffs assent to that.

 3             MR. KLEIN:  I assume the witness will

 4    exercise his right to review and correct the

 5    transcript and make any corrections necessary?

 6             MR. PORTER:  That's correct.

 7             MR. KLEIN:  Thank you.

 8        Q.   Mr. Ricko, can you tell me how you are

 9    employed.

10        A.   I'm self-employed.

11        Q.   Is it correct to say that you have a

12    business?

13        A.   It is.  Well, I actually have two jobs.  I

14    own a business, and I'm also still employed as a

15    police officer.

16        Q.   You are self-employed as a police officer?

17        A.   No.  I have two jobs.

18        Q.   Let's take them one at a time.

19        A.   I own Overwatch Outpost.  That's my

20    business.  In addition to that, I am employed as a

21    police officer.

22        Q.   Where are you employed as a police officer?

23        A.   Town of Charlemont.

24        Q.   And that's the town where your business is

Charles M. Ricko, II - Vol. I - September 13, 2017

```
 1   located?

 2        A.    Correct.

 3        Q.    Are you full-time on the police force?

 4        A.    No.

 5        Q.    About how many hours do you work each week

 6   as a police officer?

 7        A.    As few as I can these days.

 8        Q.    How many is that?

 9        A.    Actually, I have not worked any shifts -- I

10   worked about an hour last night in the station.

11   Aside from that, I have not really worked any

12   regular shifts in a couple of months.

13        Q.    So explain to me how your work as a police

14   officer is controlled.  Are you on call as a police

15   officer?

16        A.    No.  We have a part-time police department,

17   and the chief sets the hours.  I just haven't -- I

18   mean, we can volunteer to, you know, put in for more

19   hours, but I have a lot of other things to do.  I

20   don't work as many hours as some of the others.

21        Q.    Was there ever a time that you did work

22   full-time as a police officer?

23        A.    Yes.

24        Q.    What period of time was that?
```

**Doris O. Wong Associates, Inc.**

**Charles M. Ricko, II - Vol. I - September 13, 2017**

1    A.    It would be prior to 1994.

2    Q.    Was that also in the Town of Charlemont?

3    A.    No.

4    Q.    Where was that?

5    A.    I worked full-time for the Town of

6    Ashfield, and I also worked for the police

7    department in the Town of Wendell.

8    Q.    Sorry, the second town was?

9    A.    Wendell.

10   Q.    How long have you worked as a police

11   officer in Charlemont?

12   A.    In Charlemont, I think about 10 years,

13   maybe 11 years.

14   Q.    Has it always been part-time?

15   A.    Yes.

16   Q.    Who is the police chief there?

17   A.    Jared Bellows.

18   Q.    Does he work full-time?

19   A.    No.

20   Q.    How many people live in Charlemont?

21   A.    I think our last census was somewhere

22   around 2,000 people.

23   Q.    Other than you and Mr. Bellows, are there

24   other part-time officers in Charlemont?

**Charles M. Ricko, II - Vol. I - September 13, 2017**

```
 1       A.   Yes.

 2       Q.   How many?

 3       A.   I'm not exactly sure.  Last count I think

 4  we had 16.

 5       Q.   And all of them work part-time?

 6       A.   Yes.

 7       Q.   And typically under a schedule that Chief

 8  Bellows sets?

 9       A.   Yes.

10       Q.   Do you know on average about how many hours

11  you worked in the last year?  By week, for example.

12       A.   Which job?

13       Q.   The police officer job.

14       A.   I have no idea.

15       Q.   Is it typical for you to work an hour or

16  less in a given week?

17       A.   No.  Last night I just happened by the

18  station.  Some stuff needed to be done in the office

19  so I stuck around and did it.

20       Q.   Is it typical for you to work less than ten

21  hours in a week?

22       A.   Yes.

23       Q.   Let's go back to your work at Overwatch

24  Outpost.  Why don't you describe what that business
```

**Doris O. Wong Associates, Inc.**

Charles M. Ricko, II - Vol. I - September 13, 2017

1    is.

2        A.    We are an outfitter.  I like to call it an

3    "outfitter."

4        Q.    What do you mean by that?

5        A.    We deal with all types of sportsmen.  We

6    are an Orvis fly shop.  We do guided fishing trips.

7    We sell guns and ammunition, gunsmithing, game

8    checking station, hunting and fishing licenses.

9        Q.    Do you have a place of business?

10       A.    Yes.

11       Q.    What's the address?

12       A.    97 Main Street.

13       Q.    Is that a storefront?

14       A.    Yes.

15       Q.    Is the business open 9:00 to 5:00?  Why

16   don't you just tell me the hours of the business.  I

17   apologize for asking the question the wrong way.

18       A.    Wednesday through Sunday, 8:30 to 5:00.  We

19   are closed Monday and Tuesday.

20       Q.    Are there other employees at the business

21   besides you?

22       A.    I have one employee.

23       Q.    What's that employee's name?

24       A.    John Kiablick.

**Charles M. Ricko, II - Vol. I - September 13, 2017**

```
 1      Q.   At some point you are going to be asked to
 2   spell Kiablick.  Do you want to do it now?
 3      A.   Sure.  It's K-i-a-b-l-i-c-k, I think.
 4      Q.   Is he full-time?
 5      A.   No.
 6      Q.   How many hours does he work a week?
 7      A.   He's worked about a total of three weeks
 8   this year.  So it's just when I need him, when I
 9   need someone to cover the shop.
10      Q.   Is he also a police officer?
11      A.   No.
12      Q.   So he's on call as a part-time employee; is
13   that fair?
14      A.   I guess you could say that.
15      Q.   He has another job?
16      A.   He's retired.
17      Q.   Other than working in connection with
18   Overwatch Outpost and as a police officer, have you
19   had other employment in the last ten years?
20      A.   Yes.
21      Q.   What other employment?
22      A.   I was an armed nuclear security officer.
23      Q.   What period of time?
24      A.   1994 until about two years ago, three years
```

13

```
 1   ago, when I opened Overwatch Outpost.

 2        Q.   Who did you work for?

 3        A.   Entergy.  Well, actually when I started we

 4   were contract employees.  I worked for the Wackenhut

 5   Corporation.  Then eventually we were taken on as

 6   Entergy employees.

 7        Q.   Was that a full-time job?

 8        A.   Yes.

 9        Q.   For the entire period you worked there?

10        A.   Yes.

11        Q.   Before 1994, did you work in any other

12   capacity?

13        A.   I was a police officer, which we just

14   discussed.

15        Q.   Could you briefly describe your educational

16   background.

17        A.   I have a GED.  I attended trade school in

18   Daytona Beach, Florida.

19        Q.   The GED is the highest educational degree

20   you received?

21        A.   Yes.

22        Q.   That's a high school degree; is that correct?

23        A.   Correct.

24        Q.   Have you ever been in the military?
```

Charles M. Ricko, II - Vol. I - September 13, 2017

14

```
 1      A.    No.

 2      Q.    Have you ever been tried for or convicted

 3   of a crime?

 4      A.    No.

 5      Q.    Have you ever been involved on either side

 6   of a domestic violence incident?

 7      A.    Involved?

 8      Q.    Yes.

 9      A.    Yes.

10      Q.    In what capacity were you involved in a

11   domestic violence incident?

12      A.    I was assaulted by a girlfriend.

13      Q.    Assaulted with fists or with a weapon?

14      A.    It was not with a weapon.

15      Q.    When did you move to Massachusetts?

16      A.    I've been here most of my life.

17      Q.    Were you born in Massachusetts?

18      A.    Yes.

19      Q.    Was there a period of time you lived in

20   another state?

21      A.    I lived in Florida for several years in the

22   late '80s/early '90s.

23      Q.    You currently have a license to carry?

24      A.    Yes.
```

Charles M. Ricko, II - Vol. I - September 13, 2017

1    Q.   It's unrestricted?

2    A.   Yes.

3    Q.   What jurisdiction is that issued by?

4    A.   Charlemont.

5    Q.   Do you know approximately when that was

6  issued?

7    A.   Five years ago maybe.

8    Q.   Did you have a license at any time prior to

9  that?

10   A.   A firearms license?

11   Q.   Firearms-related license, yes.

12   A.   I've had a firearms license since I was

13  21 years old.

14   Q.   Have any of your licenses ever been

15  suspended or terminated for any reason?

16   A.   No.

17   Q.   Have they ever lapsed for any reason?

18   A.   No.

19   Q.   Do you also have a license as a gun seller?

20   A.   Yes.

21   Q.   Who is the issuing authority on that?

22   A.   Can you clarify which license you are

23  talking about.

24   Q.   Why don't you tell me what kind of licenses

Charles M. Ricko, II - Vol. I - September 13, 2017

16

```
 1    you have relating to your gun sales business.
 2         A.    There are state licenses, Federal licenses,
 3    local licenses.
 4         Q.    Let's start with the state license.
 5         A.    I do have a state license as a gun seller.
 6         Q.    What is the issuing authority on that
 7    license?
 8         A.    That was issued through the Town of
 9    Charlemont.  I believe it's actually issued by the
10    state that it's done through, like the firearms
11    licenses are.
12         Q.    Approximately when was that issued?
13         A.    Approximately 2014.
14         Q.    The same time that you started Overwatch
15    Outpost?
16         A.    Yes.
17         Q.    The chief that you currently work for, was
18    he involved in that licensing process?
19         A.    Yes.
20         Q.    Is he the name on the license?
21         A.    Yes.
22         Q.    What other licenses do you have relating to
23    the sale of guns?
24         A.    I have a Federal firearms license.
```

Charles M. Ricko, II - Vol. I - September 13, 2017

```
 1       Q.    Approximately when was that issued?

 2       A.    The same time.

 3       Q.    Also in connection with your commencement

 4    of the Overwatch Outpost business?

 5       A.    Yes.

 6       Q.    Do you have any other licenses related to

 7    the sale of guns?

 8       A.    I have a gunsmithing license.

 9       Q.    Is that issued by the state?

10       A.    Yes.

11       Q.    Is that issued by the Town of Charlemont?

12       A.    Yes.

13       Q.    Was the chief that you work for currently

14    also involved in the issuance of that license?

15       A.    Yes.

16       Q.    Would it be his name on that license?

17       A.    Yes.

18       Q.    Is Chief Bellows also a customer of the

19    business?

20       A.    I guess you could say that.

21       Q.    He's bought things from the business?

22       A.    Yes.

23       Q.    Does he get a discount of any kind?

24       A.    No.
```

Charles M. Ricko, II - Vol. I - September 13, 2017

1      Q.    Has he ever bought a gun from the business?

2      A.    Yes.

3      Q.    Did he get a discount on that gun?

4      A.    No.

5      Q.    Has Chief Bellows ever been involved in an

6    inspection of the business?

7      A.    No, I don't think so.

8      Q.    Has anyone from the Town of Charlemont ever

9    inspected the business?

10      A.    Possibly when I officially was opening the

11   store, there may have been an inspection.  I don't

12   remember.

13      Q.    If there was an inspection, was it someone

14   from the police department?

15      A.    I don't remember.  I remember the ATF

16   inspected it.  The only one I honestly can remember

17   specifically is the ATF came in and did an inspection.

18      Q.    As far as you know, there have been no

19   inspections since the business was opened?

20      A.    Correct.

21      Q.    What was the date the business was opened,

22   if you know?

23      A.    I think it was October of 2014.

24      Q.    I assume in one capacity or another, you've

Charles M. Ricko, II - Vol. I - September 13, 2017

1    been trained on the use of various guns; is that

2    right?

3         A.    Yes.

4         Q.    Could you describe your training for me,

5    please.

6         A.    Well, I've had training in my capacity as a

7    police officer.  I have had a lot of training when I

8    did nuclear security.  I received training as an NRA

9    firearms instructor.  I received training as a

10   gunsmith.  That pretty much sums it up.

11        Q.    Did one or more of those trainings include

12   live fire?

13        A.    Yes.

14        Q.    Which ones?

15        A.    Most of them.  The NRA training required

16   live fire.  The police training requires live fire.

17   The nuclear security work requires live fire.

18        Q.    Are you required to requalify in connection

19   with the use of any particular gun for any

20   particular purpose?

21        A.    Yes.

22        Q.    Is that a live fire requalification

23   requirement?

24        A.    Yes.

**Charles M. Ricko, II - Vol. I - September 13, 2017**

```
 1      Q.   Is that associated with your work as a
 2   police officer?
 3      A.   As a police officer and nuclear security
 4   also.
 5      Q.   So which guns were you required to
 6   requalify on as a nuclear security officer?
 7      A.   We carried a -- actually, could I talk to
 8   my attorney for a second?
 9      Q.   Sure.  You can step out if you need to.  I
10   want to say that you are free to talk to your
11   attorney if it's a question about whether certain
12   information is privileged.
13      A.   It may be potentially what they call
14   "safeguards information" through the nuclear -- I'm
15   having a brain cramp here.
16           MR. PORTER:  You are saying it's
17   confidential governmental information?
18           THE WITNESS:  That's correct, that's what
19   I'm trying to say.
20           MR. KLEIN:  Does that carry a privilege,
21   Mr. Porter?
22           MR. PORTER:  This is the first I've heard
23   of it.  My concern would be, you know, did you sign
24   something saying you wouldn't disclose any of this
```

**Charles M. Ricko, II - Vol. I - September 13, 2017**

 1  information?  Are you bound by an agreement of some

 2  kind where you can't disclose what kind of firearm

 3  you carried?

 4          THE WITNESS:  The armament that is used to

 5  protect nuclear facilities is sort of guarded.  They

 6  prohibit the release of information, things like

 7  number of security officers, number of people on a

 8  shift, shift rotations, amount of ammunition

 9  carried, types and numbers of weapons that are

10  carried.  I mean, as long as we are not going to

11  violate any rules there, I don't mind testifying to

12  it.

13          MR. PORTER:  Would you be able to describe

14  in the most general terms what kind of firearms you

15  were issued without violating that law?

16          THE WITNESS:  I think so.

17          MR. PORTER:  Why don't you do that.  If

18  Gary has follow-up questions, we can see if we need

19  to take another step.

20      A.   We carried semi-automatic handguns and

21  semi-automatic rifles.

22          I would just like to say I believe that

23  information is covered under 10CFR of the NRC's

24  regulations.

Charles M. Ricko, II - Vol. I - September 13, 2017

22

 1     Q.   Were those issued to you in connection with
 2   your job, the guns that you are talking about?
 3     A.   Yes.
 4     Q.   When you talk about carrying those kinds of
 5   weapons, was it one of each type?
 6     A.   Yes.
 7     Q.   What kind of -- did you have large capacity
 8   magazines for those weapons?
 9     A.   Yes.
10     Q.   How large were those magazines?
11     A.   We carried standard high capacity handgun
12   magazines and standard high capacity rifle
13   magazines.
14     Q.   More than 10 rounds?
15     A.   Yes.
16     Q.   In each case, right?
17     A.   Yes.
18     Q.   Were you trained on the use of the weapons
19   that you were carrying at that time?
20     A.   Yes.
21     Q.   Were you required to qualify on a regular
22   basis with those weapons?
23     A.   Yes.
24     Q.   That requirement for requalification

Charles M. Ricko, II - Vol. I - September 13, 2017

23

1    included a requirement of live fire, right?

2        A.    Yes.

3        Q.    Did you ever have occasion to fire your

4    duty weapons in connection with your work as a

5    nuclear security officer?

6        A.    When I qualified.

7        Q.    Did you ever have occasion to fire them in

8    the performance of your duties, other than for

9    qualification purposes?

10       A.    No.

11       Q.    Were either of the weapons that you had as

12   a nuclear security officer given to you when you

13   completed your service there?

14       A.    No.

**Charles M. Ricko, II - Vol. I - September 13, 2017**



24

11        Q.    Have you been required as a member of the

12   Charlemont Police force to qualify on those guns?

13        A.    Yes.

14        Q.    Have you done so?

15        A.    I think I'm due now for a requalification.

16        Q.    When you requalify, that includes the

17   requirement of live fire?

18        A.    Yes.

19        Q.    Have you ever used either of those guns in

20   connection with your duties as a police officer?

21        A.    I use them every day as a police officer.

22        Q.    Have you ever fired either of those guns in

23   connection with your duties as a police officer?

24        A.    Yes.

Charles M. Ricko, II - Vol. I - September 13, 2017

1     Q.   In what context?

2     A.   I have had to use them to put down an

3  animal that was hit by a car, that sort of thing,

4  never at a person.

5     Q.   Have you ever fired a gun at a person in

6  any context?

7     A.   No.

8     Q.   Have you ever used any of your guns in a

9  self-defense context?

10     A.   As a police officer?

11     Q.   In any capacity.

12     A.   Yes.

13     Q.   In what capacity did you use a gun in

14  self-defense?

15     A.   I didn't actually fire it, but I had to use

16  it as a police officer.  I had to draw it on

17  multiple occasions as a police officer.

18     Q.   When you did so, did you draw a holster gun

19  or a gun that you were carrying in some other way?

20     A.   Usually it would be a holster gun.

21     Q.   Usually or all the time?

22     A.   I think all the time.

23     Q.   Have you ever drawn an AR-15 in the context

24  of self-defense?

Charles M. Ricko, II - Vol. I - September 13, 2017

26

```
 1        A.    I don't think so.

 2        Q.    Have you ever aimed the AR-15 at a person

 3    in any context?

 4        A.    I don't think so.
```



```
17        Q.    Are you familiar with an organization

18    called the "Gun Owners' Action League"?

19        A.    I have heard of it.

20        Q.    That's commonly referred to as "GOAL"; is

21    that right?

22        A.    I believe so.

23        Q.    If I use the term "GOAL," you'll understand

24    that to mean Gun Owners' Action League?
```

Charles M. Ricko, II - Vol. I - September 13, 2017

```
 1        A.    Yes.

 2        Q.    Are you a member of GOAL?

 3        A.    I'm not sure.  I have been.  I don't know

 4   if I've paid my dues or not.

 5        Q.    So there was a time that you were a member

 6   of GOAL?

 7        A.    Yes.

 8        Q.    It's possible your membership lapsed?

 9        A.    Yes, possibly.

10        Q.    Are you familiar with an organization

11   called the "National Rifle Association"?

12        A.    Yes.

13        Q.    Are you a member of the National Rifle

14   Association?

15        A.    Yes.

16        Q.    Has that membership lapsed?

17        A.    No.

18        Q.    Are you familiar with an organization

19   called "Commonwealth Second Amendment" or "Comm2A"?

20        A.    I have heard of it.

21        Q.    What is your understanding of what they do?

22        A.    I don't know much about them.

23        Q.    In what capacity have you heard of it?

24        A.    Seeing postings on social media, maybe some
```

Charles M. Ricko, II - Vol. I - September 13, 2017

28

1    printed ads.  I really don't know much about Comm2A.

2         Q.    Are you a member of any gun club?

3         A.    Yes.

4         Q.    Which club?

5         A.    The Leyden Rifle Club.

6         Q.    Do they have a shooting range there?

7         A.    Yes.

8         Q.    Do you use that shooting range?

9         A.    Yes.

10        Q.    Are you a member of any other organization

11   that primarily involves activities involving guns?

12        A.    I'm a member of the Melha Shriners

13   Sportsmen's Club.

14        Q.    What's the nature of that organization?

15        A.    The Melha Shriners run the children's

16   hospitals.

17        Q.    Anything else?

18        A.    Nothing that pops out at me.

19        Q.    Does Overwatch Outpost have an

20   organizational membership in any of the

21   organizations that we discussed?

22        A.    I don't know.

23        Q.    So you don't know, for example, if

24   Overwatch Outpost is an organizational member of

29

1     GOAL?

2         A.    I occasionally give money to groups such as

3     GOAL.  I may have given them money under the name of

4     the business.  I don't know.

5         Q.    Thank you.  Have you ever been employed by

6     any of those organizations?

7         A.    No.

8         Q.    Do you ever post on any information sites

9     that are sponsored by any of those organizations?

10        A.    I don't know.

11        Q.    Facebook page, for example?

12        A.    I don't know.

13        Q.    Have you ever posted on GOAL's website?

14        A.    I don't know.

15        Q.    Have you ever posted in any forum where you

16    expressed an opinion about this case?

17        A.    Yes.

18        Q.    What forum would that be?

19        A.    On my business page.

20        Q.    When you say your business page, is that a

21    page on your website?

22        A.    Our Facebook page.  We have a business

23    Facebook page.

24        Q.    Any other business pages?

Charles M. Ricko, II - Vol. I - September 13, 2017

```
 1        A.    I don't know.

 2        Q.    Have you ever posted on anyone else's page

 3   an opinion about this case?

 4        A.    I don't know.

 5        Q.    You don't know because you don't remember?

 6        A.    Yes.  I just don't remember.

 7        Q.    How did you first learn about the

 8   possibility of participating as a plaintiff in this

 9   case?

10        A.    I believe it was through an email or it may

11   have been a social media post.

12        Q.    Do you remember who the email or social

13   media post was from?

14        A.    It was from the NRA.  Who specifically, I

15   don't know.

16        Q.    How did you respond to that email or social

17   media post?

18        A.    I sent an email.

19        Q.    Saying that you were interested in

20   participating?

21        A.    Yes.

22        Q.    Do you have a copy of that email?

23        A.    No.

24        Q.    Why not?
```

Charles M. Ricko, II - Vol. I - September 13, 2017

31

```
 1      A.   I don't save emails.

 2      Q.   Do you have backup for your computer that

 3  you use to send emails?

 4      A.   No.  Most of it I do through my phone.

 5      Q.   Do you remember who that email was to?

 6      A.   No idea.

 7      Q.   What happened next?

 8      A.   Next I was contacted by someone who asked

 9  me questions about my interest in the case.

10      Q.   Do you remember who that person was?

11      A.   Suzanne McCormack.

12      Q.   Is that McComas?

13      A.   Yes.

14      Q.   M-c-C-o-m-a-s?

15      A.   I guess so.

16      Q.   Do you know who she works for?

17      A.   I believe she works for the NRA.

18      Q.   Did you provide information to her?

19      A.   Yes, I believe so.

20      Q.   Did you first hear from her by email?

21      A.   No.  I think she called me.

22      Q.   The email that you sent her included your

23  telephone number, then?

24      A.   Yes.
```

Charles M. Ricko, II - Vol. I - September 13, 2017

1      Q.   Is it fair to say that the email you sent

2   to express interest in the case was sent to her?

3      A.   I don't know.

4      Q.   It may have been sent to some other address

5   at the NRA?

6      A.   I'm a technical idiot.  I ask my

7   15-year-old son for computer advice.

8      Q.   What type of email accounts do you have?

9      A.   What do you mean by "what type"?

10      Q.   What is your email address?

11      A.   Overwatch@verizon.net.

12      Q.   Verizon.net?

13      A.   Yes.

14      Q.   Is it your testimony that you regularly

15   delete emails off that system and don't maintain any

16   backup?

17      A.   Correct.

18      Q.   Are you compensating the lawyers for their

19   work on this case in any way?

20      A.   I hope not.  No, I don't believe I am.

21      Q.   Is it your understanding you are not

22   legally obligated to do that?

23      A.   Yes.

24      Q.   What is your understanding of who is paying

**Charles M. Ricko, II - Vol. I - September 13, 2017**

1  the costs and fees in this lawsuit?

2      A.    I believe the NRA is paying the fees, but

3  I'm not entirely sure.

4      Q.    Let's talk about Overwatch Outpost as a

5  business.  I assume that you have a shop of some

6  kind?

7      A.    Yes.

8      Q.    About how many square feet is it?

9      A.    The entire store is about 800 square feet,

10  but a lot of that is office space and bathrooms.

11      Q.    What kind of merchandise do you display?

12      A.    Fishing, hunting, shooting.

13      Q.    Clothing?

14      A.    Some.

15      Q.    Anything else that you display?  Do you

16  display gun parts, for example?

17      A.    I don't display gun parts so much.  It's

18  mostly -- it's not what you would probably think of

19  when you think of a gun shop.  Specifically when I

20  opened my shop, I wanted more of a sportsmen's sort

21  of a place.  Half of my shop, 50 percent, is

22  entirely dedicated to fly fishing.  Half of it is

23  dedicated to hunting, shooting.  We do have some

24  outdoor gear, things of that nature.

**Charles M. Ricko, II - Vol. I - September 13, 2017**

34

1    Q.   What percentage of your business comes from

2    the fishing side?

3    A.   I can't give you an exact figure, but the

4    last time I was looking at my financial stuff, by

5    dollar value 70 percent of my sales are firearms

6    related, and about 30 percent is fishing related.

7    By volume of sales, it's exactly the opposite.

8    70 percent is fishing, and 30 percent is firearms

9    and hunting related.

10    Q.   So is that generally because the hunting

11    and firearms related gear is more expensive?

12    A.   I believe so.

13    Q.   I believe your website says that Overwatch

14    Outpost is an Orvis retailer?

15    A.   Correct.

16    Q.   What's that mean?

17    A.   It's an Orvis fly shop.  We sell Orvis gear

18    and equipment, fly fishing.

19    Q.   At present are there any particular makes

20    of guns that Overwatch Outpost maintains in its

21    inventory?

22         MR. PORTER:  Objection to form.  You can

23    answer if you know the answer to that question.

24    A.   I don't understand the question.

**Charles M. Ricko, II - Vol. I - September 13, 2017**

35

1    Q.   You understand the concept that there are

2  different makes and models of guns, right?

3        MR. PORTER:  Objection to form.

4    A.   Of course.

5    Q.   Are there any particular makes or models of

6  guns that Overwatch maintains in its inventory?

7        MR. PORTER:  If you can answer the

8  question, go ahead.

9    A.   We have rifles, shotguns, handguns,

10  pistols, revolvers.

**Charles M. Ricko, II - Vol. I - September 13, 2017**



36

24        Q.    How many guns do you display at a given

37

```
 1   time?
 2        A.    All of them.
 3        Q.    All the inventory is displayed in the shop?
 4        A.    Unless I don't have room for it.
 5        Q.    At present do you have room for everything
 6   that is in your inventory?
 7        A.    I think so.
 8        Q.    What would be the largest number of guns by
 9   type that you have in the shop?
10        A.    I don't think I really have any one
11   specific.
12        Q.    Are there more rifles than shotguns, more
13   handguns than rifles?
14        A.    I think it's pretty evenly disbursed.
15        Q.    Between the three categories I mentioned?
16        A.    Yes.
17        Q.    Pretty evenly disbursed between handguns,
18   rifles and shotguns?
19        A.    Yes.
20        Q.    If you have questions about a gun that you
21   have not sold before, is the distributor generally
22   able to answer those questions?
23        A.    Could you clarify that.
24        Q.    If you have a question about a gun if you
```

38

1    are considering selling a new gun, would your

2    distributor be able to answer questions about that

3    gun?

4        A.    I think so.

5        Q.    Technical questions?

6        A.    Yes.

7        Q.    If they don't know the answer, would you

8    expect them to get the answer from the manufacturer?

9        A.    Yes, I suppose they would.  Yes.  Or I

10   would just contact the manufacturer directly.

11       Q.    Do you do research on guns from time to

12   time?

13       A.    Yes.

14       Q.    How do you do that?

15       A.    Mostly through web searches.  Everything is

16   pretty much done through the internet nowadays.  I

17   do read magazines and things like that on occasion.

18       Q.    So you would be able to look at a

19   manufacturer's website if you needed to?

20       A.    Sure.

21       Q.    Just by what you described earlier as

22   technical incompetence.

23       A.    Well, yes.

24       Q.    You can perform web searches --

39

1      A.    Yes.

2      Q.    -- and get on a manufacturer's website to

3   look at the nature and type of gun that you might be

4   interested in?

5      A.    Yes.

6      Q.    You also have access to distributors to

7   answer questions, right?

8      A.    Yes.

9      Q.    Do you have any large capacity magazines in

10   your inventory?

11      A.    I believe so.

12      Q.    By "large capacity," that would be

13   magazines with a capacity over 10, right?

14      A.    Yes.

15      Q.    When you get a large capacity magazine in

16   your inventory, what do you do to make sure that

17   it's legal to sell in Massachusetts?

18      A.    Well, first of all, I don't know of a new

19   manufacturer of large capacity magazine that is

20   legal to sell in the State of Massachusetts.  I sell

21   also to law enforcement.  I occasionally have

22   magazines for law enforcement.  Aside from that, it

23   would have to be what we refer to as a pre-ban

24   magazine.

**Charles M. Ricko, II - Vol. I - September 13, 2017**

1      Q.   Do you have pre-ban magazines in your

2   inventory at this time?

3      A.   At the moment, I don't think I do.  I may,

4   but nothing that I have out for, like, sale or

5   anything.

6      Q.   Have you had them available for sale at any

7   time since Overwatch Outpost opened?

8      A.   I sold some pre-ban magazines, yes.

9      Q.   What do you do to make yourself comfortable

10  that a magazine is pre-ban?

11     A.   They have to have a date stamp on them.

12     Q.   Approximately how many magazines that are

13  pre-ban have you sold since Overwatch Outpost opened?

14     A.   Not many.  They usually will just come in

15  with a gun that's traded in or something.  I don't

16  actively go out seeking them.

17     Q.   If you wanted to have a pre-ban magazine,

18  do you know how to get one?

19     A.   Not offhand.  I guess I would have to look

20  around like anybody else.

21     Q.   Have you ever been to a gun show where

22  pre-ban magazines are offered for sale?

23     A.   I don't go to gun shows anymore.

24     Q.   When did you stop?

**Doris O. Wong Associates, Inc.**

Charles M. Ricko, II - Vol. I - September 13, 2017

41

 1      A.   I think the last one I went to was probably

 2   six or seven years ago.

 3      Q.   Would you describe yourself as someone who

 4   is pretty familiar with different types of guns?

 5      A.   Sure.

 6      Q.   How they work?

 7      A.   Yes.

 8      Q.   Would you recognize different types of guns

 9   on sight?

10      A.   Yes.

14      Q.   Are there other guns that are on the AR-15

15   platform?

16      A.   Yes.

17      Q.   Could you give me a list of a few of the

18   most common ones.

19      A.   I know Bushmaster makes one.  I know Ruger

20   makes one.  I know Smith & Wesson makes one.  I know

21   Colt makes one.  They all make several different

22   models of them.  Pretty much all of the

23   manufacturers that I know of have some form of an

24   AR-15 platform.

Charles M. Ricko, II - Vol. I - September 13, 2017

1     Q.   Is the Bushmaster AR-15 platform gun

2  typically referred to as a Bushmaster XM-15?

3     A.   That's one of them.

4     Q.   So the Ruger gun called the Ruger 556, is

5  that an AR-15 platform?

6     A.   That's one of them, yes.

7     Q.   The Smith & Wesson M&P 15, is that Smith &

8  Wesson an AR platform gun typically?

9     A.   Yes.

10     Q.   Is it fair to say that there are parts kits

11  for these kinds of guns?

12     A.   Yes.

13     Q.   And that you can get parts from other

14  manufacturers that fit into the AR-15 platform guns?

15     A.   They are pretty standard, yes.

16     Q.   Give me the names of some of the parts

17  manufacturers you are familiar with.

18     A.   All of the major manufacturers make parts.

19     Q.   Is it also fair to say that AR-15 platform

20  guns are often referred to in the gun community as

21  AR-15s?

22     A.   Yes.

23     Q.   Are you familiar with a gun called "AK-47"?

24     A.   Yes.

**Charles M. Ricko, II - Vol. I - September 13, 2017**

1    Q.    What can you tell me about it?

2    A.    What would you like to know about it?

3    Q.    What kind of gun is it?

4    A.    It's a semi-automatic rifle.

5    Q.    Was that originally made for the Russian

6  military?

7    A.    Are you talking about a military AK-47 or a

8  civilian type of AK-47?

9    Q.    Start with the military AK-47.  Is it true

10 that the AK-47 was originally developed for the

11 Russian military?

12         MR. PORTER:  I'm going to object to the

13 form of the question.  You can answer if you know.

14         He's here today in his capacity as a

15 30(b)(6) for his business.  You of course can ask

16 him anything you want.

17         MR. KLEIN:  Fair enough.  I'll back up a

18 little.

19    Q.    Have you sold any AK-47s in your shop?

20    A.    Civilian variants.  I have not sold any

21 machine guns out of my shop.  There's quite a

22 difference between the two.

23    Q.    Are the civilian variant AK-47s based on a

24 gun that was developed for the Russian military?

Charles M. Ricko, II - Vol. I - September 13, 2017

1       A.    I think that's fair to say.

2       Q.    Are there other companies that manufacturer

3   guns that are recognizable to you as AK-47s?

4       A.    Lots of them.

5       Q.    Can you tell me the names of some of those

6   companies.

7       A.    Century Arms make them.  There's a company

8   in Vermont.  I can't think of the name offhand,

9   maybe Windham.  I don't know.  I think a lot of them

10  are imported also.  I honestly couldn't rattle off a

11  handful of different manufacturers on them.

12      Q.    Is there a Romanian Arms variance of the

13  AK-47?

14      A.    Yes, there are Romanian variants.

15      Q.    Czech variants?

16      A.    Yes.

17      Q.    Again, Are these all guns based on the

18  AK-47 platform?

19      A.    Yes.

20      Q.    Again, are there kits available with parts

21  for these guns?

22      A.    Yes.

23      Q.    And they can be used in the different

24  variants of AK-47 platform guns?

45

1        A.    Some, yes.

2        Q.    Is it fair to say that AK-47 platform guns

3    are -- strike that.  Is it fair to say that the

4    AK-47 platform guns are often referred to in the gun

5    community as "AKs"?

6        A.    Yes.

7        Q.    Or "AK-47s"?

8        A.    Yes.

9             MR. KLEIN:  Let's take a break at this

10   point.  We'll see how much more we have.

11            (Recess at 10:27 a.m.)

12        BY MR. KLEIN:  (10:37 a.m.)



Charles M. Ricko, II - Vol. I - September 13, 2017

46

7      Q.    Does Overwatch Outpost offer any training

8  programs?

9      A.    Yes.

10      Q.    What types?

11      A.    We can do a lot of different training

12  programs.  The one we most often do is the Home

13  Firearms Safety class.

14      Q.    The one that is required as a condition of

15  getting a gun license in Massachusetts?

16      A.    Yes.

17      Q.    Is it you that conducts those trainings?

18      A.    Sometimes.

19      Q.    Who else might conduct them?

20      A.    I have an instructor named "Mike Walsh."

21      Q.    Does he work for you?

22      A.    He doesn't work for me, no.

23      Q.    But he's a qualified instructor as well?

24      A.    Yes.

Charles M. Ricko, II - Vol. I - September 13, 2017

1      Q.    And helps in trainings sponsored by

2    Overwatch Outpost; is that a fair way to put it?

3      A.    Yes.

4      Q.    What other types of trainings does

5    Overwatch Outpost offer?

6      A.    For firearms?

7      Q.    Yes.

8      A.    That's basically the only one we are

9    currently doing.

10      Q.    Does Overwatch Outpost offer any live fire

11    trainings?

12      A.    We can.  We have not done any yet.

13      Q.    In the complaint, one of the allegations is

14    that Overwatch Outpost wants to sell certain guns

15    that it no longer feels it can.  Do you have a list

16    that you can give me of the guns that you would like

17    to sell that you feel you can't sell anymore?

18      A.    There are a lot of them.  Specifically I --

19    honestly, that's part of the problem.  We don't know

20    what we can and can't sell.

21      Q.    Well, what guns are you not selling that

22    you would otherwise sell?

23      A.    Well, I mean, there are the obvious.  We

24    know that we can't sell AR-15s, and we know that we

**Charles M. Ricko, II - Vol. I - September 13, 2017**

48

```
 1    can't sell AK-47s.  After that, it's all who knows.
 2         Q.   What other guns are you concerned about
 3    that you are not selling because of the current
 4    status of the assault weapons ban in Massachusetts?
 5         A.   Pretty much I just steer clear of a whole
 6    bunch of guns that I would normally sell just
 7    because I'm not even sure.  I can't get clarification.
 8         Q.   Give me one gun that you are not clear on.
 9         A.   Tavor.
10         Q.   Semi-automatic Tavor?
11         A.   Yes.  N-PAP would be another, Century
12    N-PAP.  I have no idea.
13         Q.   Semi-automatic gun?
14         A.   Yes.
15         Q.   Who manufactures that?
16         A.   I believe they are Century Arms.  They are
17    made in Vermont.
18         Q.   Did you sell any Tavors before July 20, 2016?
19         A.   Yes.
20         Q.   How many?
21         A.   I don't know.
22         Q.   Did you sell any handguns before July 20,
23    2016?
24         A.   Yes.
```

**Charles M. Ricko, II - Vol. I - September 13, 2017**

49

1      Q.    How many?

2      A.    I don't know.  I can say that it was

3    between 30 and 40 percent of my business.  Not

4    N-PAPs, but guns overall that I can no longer sell.

5      Q.    What other guns can you no longer sell

6    besides the AR-15s, AK-47s, Tavor and N-PAP guns?

7      A.    Pretty much anything that's not

8    specifically spelled out that I can sell I won't

9    sell because I just don't know, and I don't want to

10   get in trouble for it.

11     Q.    Any other guns that you would be selling?

12     A.    Sure.

13     Q.    What other guns?

14     A.    There are lots of different semi-automatic

15   rifles that have -- part of the problem here is in

16   the -- what's the word I'm looking for here...  The

17   letter that was sent out by the Attorney General,

18   the July 20th letter, it says, "anything similar."

19   Well, define "similar."  I don't know what "similar"

20   means.

21     Q.    You told that us that you know a lot about

22   guns.  What other guns are you not selling that you

23   would be selling?

24     A.    Well, that's exactly my point.  I do know a

**Charles M. Ricko, II - Vol. I - September 13, 2017**

1   lot about guns.  I can tell you that I'm vague on

2   what I can and I cannot sell.  That's the problem.

3   That's why I'm here.

4       Q.   Let's talk about the Tavor.  That's one of

5   the guns you mentioned.

6       A.   Go ahead.

7       Q.   Have you made any inquiries about whether

8   or not it would meet the test in the Attorney

9   General's Enforcement Notice?

10      A.   I have tried calling.  The Attorney General

11  had a hotline.

12      Q.   I'm not asking if you called the Attorney

13  General's Office.  Did you call the distributor and

14  ask them?

15      A.   Most of those distributors are in other

16  states.

17      Q.   Did you call and ask them?

18      A.   I wouldn't trust them anyway.

19      Q.   Does your telephone reach other states?

20           MR. PORTER:  Objection to the form.  You

21  don't have to answer that.  Come on.

22      Q.   What about the N-PAP gun, have you called

23  anyone to ask whether that gun is going to meet the

24  test in the Attorney General's notice?

Charles M. Ricko, II - Vol. I - September 13, 2017

```
 1        A.    Who would I call?

 2        Q.    Did you call the distributor who offers it

 3   for sale?

 4        A.    Did I call the distributor?

 5        Q.    Yes.

 6        A.    I have had multiple conversations with the

 7   distributors about which guns we can and can't sell.

 8   They generally say, "We don't know.  You will have

 9   to check the laws in your own state."

10        Q.    Did you ask them to check with the

11   manufacturer about whether or not it meets any of

12   the test?

13        A.    I didn't specifically ask them.

14        Q.    Did you do any research on the question?

15        A.    Yes.

16        Q.    In what form?

17        A.    Web searches.  I checked with other shops.

18   I called the Attorney General's hotline.

19        Q.    Do you typically recognize an AR-15 when

20   you see one?

21        A.    Yes.

22        Q.    Do you typically recognize an AK-47 when

23   you see one?

24        A.    Yes.
```

Charles M. Ricko, II - Vol. I - September 13, 2017



**Charles M. Ricko, II - Vol. I - September 13, 2017**



**Doris O. Wong Associates, Inc.**

Charles M. Ricko, II - Vol. I - September 13, 2017



**Charles M. Ricko, II - Vol. I - September 13, 2017**



```
21              (Document marked as Ricko

22              Exhibit 1 for identification)

23      Q.   You have in front of you a document labeled

24  as Exhibit No. 1.  Do you see where it says about
```

56

1    halfway down, "Notice of Taking Deposition of

2    Plaintiff Overwatch Outpost"?

3        A.   Yes.

4        Q.   Is this a document you have seen before?

5        A.   Yes.

6        Q.   Have you reviewed it?

7        A.   Yes.

8        Q.   Do you see a list that says "Schedule A" on

9    Pages 3 and 4?

10       A.   (Examines document)  Yes.

11       Q.   You understand that any questions in any of

12   those areas that you've been asked today is a

13   question that you are providing testimony about on

14   behalf of Overwatch Outpost?

15       A.   Yes.

16            MR. PORTER:  Hold on.  I object to the form

17   of that question.  The obvious exception being all

18   of the personal information that you asked.

19            MR. KLEIN:  I think that was assumed in the

20   question itself.  I understand the objection.  As in

21   any 30(b)(6), we will potentially reserve on both

22   sides about whether or not a question is within the

23   scope of the 30(b)(6).

24            MR. PORTER:  Sure.

Charles M. Ricko, II - Vol. I - September 13, 2017

57

 1                    (Document marked as Ricko

 2                    Exhibit 2 for identification)

 3        Q.    You have in front of you a document labeled

 4   as Exhibit 2.  You see about halfway down it says,

 5   "Requests for Production of Documents Pursuant to

 6   Federal Rule of Civil Procedure 34," and then in

 7   parenthesis below that it says, "Requests to

 8   Plaintiff Overwatch Outpost"?

 9        A.    Yes.

10        Q.    Is this a document that you have seen before?

11        A.    Yes.

12        Q.    Have you reviewed it?

13        A.    Yes.

14        Q.    If you go to the page that is the fourth

15   from the back of the document, it says, Requests for

16   production of documents -- sorry -- "Requests for

17   production"; do you see that?

18        A.    Yes.

19        Q.    And then there's 19 listed items that

20   continue for two pages from there, do you see that?

21        A.    Yes.

22        Q.    To the best of your knowledge, have you

23   provided your lawyers with all of the documents that

24   would be responsive to any of these areas?

Charles M. Ricko, II - Vol. I - September 13, 2017

 1      A.    I think so.

 2           MR. KLEIN:   Let's take a short break.   I

 3   may be able to wrap up quickly after the break.

 4           (Recess at 11:55 a.m.)

 5      BY MR. KLEIN:   (11:02 a.m.)

 6      Q.    Mr. Ricko, are you familiar with the term

 7   "22 caliber rimfire round"?

 8      A.    Yes.

 9      Q.    Do you know what that is?

10      A.    Yes.

11      Q.    Are you familiar with 223 centerfire round?

12      A.    Yes.

13      Q.    Do you know what the difference is?

14      A.    Yes.

15      Q.    Can you describe it.

16      A.    The 22 rimfire round doesn't have a central

17   primer like the 223 cartridge would have.   The 223

18   cartridge is a rifle round.   It's much larger than

19   the 22 caliber round.   It has a primer in the center

20   of it that is struck by the firing pin to ignite the

21   detonation as it fires the round.   The 22 caliber

22   has a rimfire, which is basically a liquid that goes

23   around the outside rim of the case, and the striker

24   or firing pin strikes the rim of the case, igniting

Charles M. Ricko, II - Vol. I - September 13, 2017

1    the primer charge.

2         Q.   Is it fair to say that those two different

3    rounds are very different?

4         A.   Yes.

5         Q.   They need to be fired from different kinds

6    of guns with different firing mechanisms?

7         A.   Yes...

8         Q.   Is it also fair --

9              MR. PORTER:  Hold on a second.  He's not

10   done.  He was still answering the question.

11        Q.   Go ahead.

12        A.   There are kits that you can get so you can

13   actually take, let's say, a 223 caliber rifle and

14   put a 22 rimfire bolt in it, and you can shoot the

15   22 caliber bullets out of that gun.  The caliber of

16   the round is actually the same.  You can interchange

17   them, though.  Some places, like police departments,

18   actually do that to save money on ammunition.

19        Q.   But you would need a kit to make the

20   change, right?

21        A.   You would need to change some parts, yes.

22        Q.   Is it fair to say that a 22 caliber

23   rimfire round has less charge in it than a 223 round?

24        A.   Yes.

Charles M. Ricko, II - Vol. I - September 13, 2017

1      Q.   It has less firing power, in other words,

2   right?

3      A.   Yes.

4      Q.   Are you familiar with the possibility of

5   converting an AR-15 to automatic fire with a kit?

6      A.   Not unless you want to spend a long time in

7   prison.

8      Q.   It's not legal, but you could do it, right?

9      A.   That I'm not sure of.  I don't know.

10      Q.   Do you know if kits are available to make

11   that conversion?

12      A.   Not that I've ever seen.

13      Q.   Are you familiar with something called a

14   "Bump Stock"?

15      A.   Yes.

16      Q.   What is that?

17      A.   I don't have a lot of experience with them.

18   I understand it's a stock that fits on a rifle that

19   allows you to shoot a little more rapidly with it.

20      Q.   Does it simulate automatic fire?

21      A.   Well, automatic fire by definition is one

22   pull of the trigger, and no, it does not do that.

23      Q.   Does it simulate automatic fire in the

24   sense that if you have a Bump Stock, you don't need

61

1   to pull the trigger for each round fired?

2       A.   No.  You would still need to pull the

3   trigger for each round fired.

4       Q.   So how is it that it speeds up the rate of

5   fire?

6       A.   I cannot explain the whole mechanics of it,

7   but you can do it without a Bump Fire kit.  I think

8   the Bump Fire kit is just a gimmick, to be honest,

9   because you can simulate the same thing that that

10  does without anything at all.

11      Q.   And what is simulated there, the more rapid

12  rate of fire on a semi-automatic weapon?

13      A.   You can get it to fire faster, but you are

14  not changing it into a machine gun.  You are not

15  making it fire more than one round with one pull of

16  the trigger.

17      Q.   Thank you.

18          MR. KLEIN:  I have no further questions.

19          MR. PORTER:  No questions.

20              (Whereupon the deposition

21              was concluded at 11:08 a.m.)

22

23

24

**Charles M. Ricko, II - Vol. I - September 13, 2017**

62

```
 1               C E R T I F I C A T E

 2       I, CHARLES M. RICKO, II, do hereby certify that

 3   I have read the foregoing transcript of my

 4   testimony, and further certify under the pains and

 5   penalties of perjury that said transcript

 6   (with/without) suggested corrections is a true and

 7   accurate record of said testimony.

 8       Dated at _____, this _____ day of _____,

 9   2017.

10

11                       _____

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Charles M. Ricko, II - Vol. I - September 13, 2017**

63

1                    SUGGESTED CORRECTIONS

2  RE:  David Seth Worman, et al., vs. Maura Healey,
        et al.
3
   WITNESS:  Charles M. Ricko, II, Vol. I
4
   The above-named witness wishes to make the following
5  changes to the testimony as originally given:

6  PAGE   LINE      SHOULD READ              REASON

7  _____  _____  _____   _____

8  _____  _____  _____   _____

9  _____  _____  _____   _____

10  _____  _____  _____   _____

11  _____  _____  _____   _____

12  _____  _____  _____   _____

13  _____  _____  _____   _____

14  _____  _____  _____   _____

15  _____  _____  _____   _____

16  _____  _____  _____   _____

17  _____  _____  _____   _____

18  _____  _____  _____   _____

19  _____  _____  _____   _____

20  _____  _____  _____   _____

21  _____  _____  _____   _____

22  _____  _____  _____   _____

23  _____  _____  _____   _____

24  _____  _____  _____   _____

Charles M. Ricko, II - Vol. I - September 13, 2017

64

1   COMMONWEALTH OF MASSACHUSETTS )

2   SUFFOLK, SS.                    )

3       I, Ken A. DiFraia, RPR and Notary Public in and

4   for the Commonwealth of Massachusetts, do hereby

5   certify that there came before me on the 13th day of

6   September, 2017, at 9:39 a.m., the person

7   hereinbefore named, who was by me duly sworn to

8   testify to the truth and nothing but the truth of

9   his knowledge touching and concerning the matters in

10  controversy in this cause; that he was thereupon

11  examined upon his oath, and his examination reduced

12  to typewriting under my direction; and that the

13  deposition is a true record of the testimony given

14  by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this 27th day of

21  September, 2017.

22

23

24

**Charles M. Ricko, II - Vol. I - September 13, 2017**

65

1        Under Federal Rule 30:

2                X   Reading and Signing was requested

3                    Reading and Signing was waived

4                    Reading and Signing was not requested

5

6     *Ken A. DiFrara*

7

8    Notary Public

9    Commission expires 2/24/2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Charles M. Ricko, II - Vol. I - September 13, 2017**

D I S C L A I M E R

This transcript in any format is a confidential communication between Doris O. Wong Associates, Inc., a professional court reporting firm, and the parties to this matter and their counsel.  Any reproduction or distribution of this transcript without the express permission of the parties is a violation of this confidentiality.  To fulfill any request to the court reporter for an additional copy or copies from persons or entities without standing in this matter will require the consent of the parties and/or counsel and/or a court order for such delivery.

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 534 of 1262

David Seth Worman, et al. vs.                                      Charles M. Ricko, II - Vol. I
Maura Healey, et al.                                                    September 13, 2017

# A

**able (5)**
21:13;37:22;38:2,
18;58:3
**access (1)**
39:6
**accounts (1)**
32:8
**AccuSport (3)**
35:17;36:2,8
**acquire (3)**
36:6,14;54:24
**Action (2)**
26:18,24
**actively (1)**
40:16
**activities (1)**
28:11
**actually (9)**
7:13;8:9;13:3;16:9;
20:7;25:15;59:13,16,
18
**addition (1)**
7:20
**address (6)**
4:11,13,15;11:11;
32:4,10
**ads (1)**
28:1
**advice (1)**
32:7
**Again (2)**
44:17,20
**ago (2)**
12:24;13:1;15:7;
41:2
**agreement (1)**
21:1
**ahead (4)**
6:9;35:8;50:6;
59:11
**aimed (1)**
26:2
**AK-47 (14)**
42:23;43:7,8,9,10;
44:13,18,24;45:2,4;
51:22;55:10,16,19
**AK-47s (7)**
43:19,23;44:3;45:7;
48:1;49:6;54:13
**AKs (1)**
45:5
**allegations (1)**
47:13
**allows (1)**
60:19
**always (4)**
5:24;9:14;26:12,14
**Amendment (1)**
27:19
**ammunition (4)**

11:7;21:8;52:23;
59:18
**among (1)**
54:17
**amount (1)**
21:8
**animal (1)**
25:3
**anymore (2)**
40:23;47:17
**apologize (1)**
11:17
**approximately (6)**
15:5;16:12,13;17:1;
24:8;40:12
**AR (1)**
42:8
**AR-15 (16)**
24:2;25:23;26:2;
41:12,13,14,24;42:1,
5,14,19;51:19;54:11;
55:13,18;60:5
**AR-15s (5)**
42:21;47:24;49:6;
53:22;55:6
**areas (2)**
56:12;57:24
**armament (1)**
21:4
**armed (1)**
12:22
**Arms (3)**
44:7,12;48:16
**around (5)**
9:22;10:19;36:22;
40:20;58:23
**Ashfield (1)**
9:6
**Aside (2)**
8:11;39:22
**assault (1)**
48:4
**assaulted (2)**
14:12,13
**assent (1)**
7:2
**associated (1)**
20:1
**Association (2)**
27:11,14
**assume (4)**
5:12;7:3;18:24;
33:5
**assumed (1)**
56:19
**ATF (2)**
18:15,17
**attended (1)**
13:17
**attorney (10)**
6:5,6;20:8,11;
49:17;50:8,10,12,24;
51:18

**attorneys (1)**
4:21
**authority (2)**
15:21;16:6
**automatic (4)**
60:5,20,21,23
**available (3)**
40:6;44:20;60:10
**average (1)**
10:10
**aware (1)**
6:12

# B

**back (4)**
10:23;43:17;45:13;
57:15
**background (1)**
13:16
**backup (2)**
31:2;32:16
**Baker (1)**
4:23
**ban (1)**
48:4
**based (2)**
43:23;44:17
**basically (2)**
47:8;58:22
**basis (1)**
22:22
**bathrooms (1)**
33:10
**Beach (1)**
13:18
**bedroom (2)**
52:18;53:7
**behalf (1)**
56:14
**Bellows (5)**
9:17,23;10:8;17:18;
18:5
**below (1)**
57:7
**besides (2)**
11:21;49:6
**best (2)**
5:19;57:22
**biometric (1)**
52:20
**bolt (1)**
59:14
**born (1)**
14:17
**Both (2)**
55:8;56:21
**bought (3)**
17:21;18:1;23:23
**bound (1)**
21:1
**brain (1)**
20:15

**break (5)**
5:23,24;45:9;58:2,3
**briefly (1)**
13:15
**bullets (1)**
59:15
**Bump (4)**
60:14,24;61:7,8
**bunch (1)**
48:6
**Bushmaster (3)**
41:19;42:1,2
**business (33)**
4:11,15,23;7:12,14,
20,24;10:24;11:9,15,
16,20;16:1;17:4,19,
21;18:1,6,9,19,21;
29:4,19,20,22,24;
33:5;34:1;35:12;
43:15;45:15,20;49:3
**buy (5)**
23:19,21,24;24:8;
36:7

# C

**caliber (8)**
24:1;58:7,19,21;
59:13,15,15,22
**call (9)**
8:14;11:2;12:12;
20:13;50:13,17;51:1,
2,4
**called (11)**
4:3;26:18;27:11,19;
31:21;42:4,23;50:12,
22;51:18;60:13
**calling (1)**
50:10
**Cam (3)**
35:17;36:13,15
**came (1)**
18:17
**can (42)**
5:23;6:9,22;7:8;8:7,
18;15:22;18:16;20:9;
21:18;34:22;35:7;
36:7,14;38:24;42:13;
43:1,13,15;44:5,23;
46:11;47:12,15,16,20;
49:2,4,5,8;50:1,2;
51:7;52:1;58:15;
59:12,12,14,16;61:7,
9,13
**capacity (16)**
13:12;14:10;18:24;
19:6;22:7,11,12;
25:11,13;27:23;39:9,
12,13,15,19;43:14
**car (1)**
25:3
**carried (6)**
20:7;21:3,9,10,20;

22:11
**carry (4)**
14:23;20:20;26:6,8
**carrying (3)**
22:4,19;25:19
**cartridge (2)**
58:17,18
**case (17)**
4:23;5:8;22:16;
29:16;30:3,9;31:9;
32:2,19;45:17,20,21,
22,23,24;58:23,24
**categories (1)**
37:15
**census (1)**
9:21
**center (1)**
58:19
**centerfire (1)**
58:11
**central (1)**
58:16
**Century (3)**
44:7;48:11,16
**certain (2)**
20:11;47:14
**change (2)**
59:20,21
**changing (1)**
61:14
**charge (2)**
59:1,23
**Charlemont (14)**
4:14,15;7:23;9:2,
11,12,20,24;15:4;
16:9;17:11;18:8;
23:18;24:12
**CHARLES (2)**
4:2,13
**check (2)**
51:9;10
**checked (1)**
51:17
**checking (1)**
11:8
**chief (7)**
8:17;9:16;10:7;
16:17;17:13,18;18:5
**children's (1)**
28:15
**Civil (2)**
7:1;57:6
**civilian (3)**
43:8,20,23
**clarification (1)**
48:7
**clarify (4)**
5:11,11;15:22;
37:23
**class (1)**
46:13
**clear (2)**
48:5,8

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 535 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Charles M. Ricko, II - Vol. I
September 13, 2017

**closed (2)**
11:19;45:15
**closes (1)**
45:20
**clothes (1)**
26:15
**Clothing (1)**
33:13
**club (4)**
28:2,4,5,13
**collection (3)**
52:3,4;55:4
**collector (1)**
54:22
**Colt (1)**
41:21
**comfortable (1)**
40:9
**Comm2A (2)**
27:19;28:1
**commencement (1)**
17:3
**common (1)**
41:18
**commonly (1)**
26:20
**Commonwealth (1)**
27:19
**community (2)**
42:20;45:5
**companies (5)**
35:11,14,19;44:2,6
**company (1)**
44:7
**compensating (1)**
32:18
**complaint (1)**
47:13
**complete (1)**
6:7
**completed (2)**
5:19;23:13
**computer (2)**
31:2;32:7
**concealed (1)**
26:6
**concept (1)**
35:1
**concern (1)**
20:23
**concerned (1)**
48:2
**concluded (1)**
61:21
**condition (1)**
46:14
**conduct (1)**
46:19
**conducts (1)**
46:17
**confidential (1)**
20:17
**confirm (1)**

6:22
**connection (8)**
12:17;17:3;19:18;
22:1;23:4,22;24:20,
23
**consider (1)**
54:22
**considering (1)**
38:1
**contact (1)**
38:10
**contacted (1)**
31:8
**context (6)**
25:1,6,9,23;26:3,5
**continue (1)**
57:20
**contract (1)**
13:4
**controlled (1)**
8:14
**conversations (1)**
51:6
**conversion (1)**
60:11
**converting (1)**
60:5
**convicted (1)**
14:2
**copy (1)**
30:22
**Corporation (1)**
13:5
**corrections (1)**
7:5
**costs (1)**
33:1
**counsel (1)**
4:3
**count (1)**
10:3
**couple (1)**
8:12
**course (3)**
5:20;35:4;43:15
**cover (2)**
12:9;36:9
**covered (1)**
21:23
**cramp (1)**
20:15
**crime (1)**
14:3
**current (1)**
48:3
**currently (4)**
14:23;16:17;17:13;
47:9
**customer (1)**
17:18
**Czech (1)**
44:15

**D**

**date (2)**
18:21;40:11
**day (2)**
24:21;26:9
**days (1)**
8:7
**Daytona (1)**
13:18
**deal (2)**
11:5;35:17
**dedicated (2)**
33:22,23
**Defendants (2)**
4:4,22
**define (1)**
49:19
**definition (1)**
60:21
**degree (2)**
13:19,22
**delete (1)**
32:15
**department (3)**
8:16;9:7;18:14
**departments (1)**
59:17
**depends (3)**
26:9,10,10
**deposition (7)**
5:2,5,21;6:12,23;
56:1;61:20
**describe (6)**
10:24;13:15;19:4;
21:13;41:3;58:15
**described (1)**
38:21
**detonation (1)**
58:21
**developed (2)**
43:10,24
**difference (1)**
43:22;58:13
**different (15)**
26:11;35:2,23;
36:14;41:4,8,21;
44:11,23;46:11;
49:14;59:2,3,5,6
**DIRECT (1)**
4:8
**directly (1)**
38:10
**disbursed (2)**
37:14,17
**disclose (2)**
20:24;21:2
**discount (2)**
17:23;18:3
**discussed (2)**
13:14;28:21
**display (6)**

33:11,15,16,17;
36:24;45:19
**displayed (2)**
37:3;45:23
**distributor (6)**
36:11;37:21;38:2;
50:13;51:2,4
**Distributors (5)**
35:18,20;39:6;
50:15;51:7
**Document (8)**
55:21,23;56:4,10;
57:1,3,10,15
**Documents (3)**
57:5,16,23
**dollar (1)**
34:5
**domestic (2)**
14:6,11
**done (6)**
10:18;16:10;24:14;
38:16;47:12;59:10
**door (1)**
52:20
**down (4)**
5:15;25:2;56:1;
57:4
**dozen (1)**
52:5
**draw (2)**
25:16,18
**drawn (1)**
25:23
**driver's (1)**
4:5
**due (1)**
24:15
**dues (1)**
27:4
**duly (1)**
4:6
**during (1)**
5:20
**duties (3)**
23:8;24:20,23
**duty (1)**
23:4

**E**

**earlier (3)**
38:21;41:11;54:5
**educational (2)**
13:15,19
**either (5)**
6:7;14:5;23:11;
24:19,22
**else (6)**
28:17;33:15;40:20;
45:18;46:19;54:9
**else's (1)**
30:2
**email (11)**

30:10,12,16,18,22;
31:5,20,22;32:1,8,10
**emails (3)**
31:1,3;32:15
**employed (5)**
7:9,14,20,22;29:5
**employee (2)**
11:22;12:12
**employees (3)**
11:20;13:4,6
**employee's (1)**
11:23
**employment (2)**
12:19,21
**enforcement (3)**
39:21,22;50:9
**enough (1)**
43:17
**Entergy (2)**
13:3,6
**entire (2)**
13:9;33:9
**entirely (2)**
33:3,22
**equipment (1)**
34:18
**establishment (1)**
45:14
**even (1)**
48:7
**evenly (2)**
37:14,17
**eventually (1)**
13:5
**exact (2)**
34:3;36:21
**exactly (4)**
10:3;34:7;49:24;
52:3
**examination (2)**
4:3,8
**examined (1)**
4:6
**Examines (1)**
56:10
**example (4)**
10:11;28:23;29:11;
33:16
**exception (1)**
56:17
**exercise (1)**
7:4
**Exhibit (4)**
55:22,24;57:2,4
**expect (1)**
38:8
**expensive (1)**
34:11
**experience (1)**
60:17
**explain (2)**
8:13;61:6
**express (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 536 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Charles M. Ricko, II - Vol. I
September 13, 2017

32:2
**expressed (1)**
29:16

## F

**Facebook (3)**
29:11,22,23
**facilities (1)**
21:5
**fair (12)**
12:13;32:1;42:10,
19;43:17;44:1;45:2,3;
47:2;59:2,8,22
**familiar (10)**
26:17;27:10,18;
41:4;42:17,23;58:6,
11;60:4,13
**far (1)**
18:18
**faster (1)**
61:13
**Federal (5)**
6:23,24;16:2,24;
57:6
**Feel (3)**
5:23;47:17;55:18
**feels (1)**
47:15
**fees (2)**
33:1,2
**feet (2)**
33:8,9
**few (3)**
8:7;35:15;41:17
**figure (1)**
34:3
**financial (1)**
34:4
**fire (21)**
19:12,16,16,17,22;
23:1,3,7;24:17;25:15;
47:10;60:5,20,21,23;
61:5,7,8,12,13,15
**firearm (1)**
21:2
**firearms (11)**
15:10,12;16:10,24;
19:9;21:14;34:5,8,11;
46:13;47:6
**Firearms-related (1)**
15:11
**fired (7)**
24:22;25:5;55:3,6;
59:5;61:1,3
**fires (1)**
58:21
**firing (4)**
58:20,24;59:6;60:1
**first (6)**
4:6;5:9;20:22;30:7;
31:20;39:18
**fishing (8)**

11:6,8;33:12,22;
34:2,6,8,18
**fists (1)**
14:13
**fit (1)**
42:14
**fits (1)**
60:18
**Five (1)**
15:7
**Florida (2)**
13:18;14:21
**fly (4)**
11:6;33:22;34:17,
18
**follows (1)**
4:7
**follow-up (1)**
21:18
**force (3)**
8:3;23:18;24:12
**form (9)**
34:22;35:3;41:23;
43:13;50:20;51:16;
55:12,15;56:16
**forum (2)**
29:15,18
**Four (3)**
35:17;36:13,15
**fourth (1)**
57:14
**free (2)**
5:24;20:10
**front (2)**
55:23;57:3
**full (1)**
4:11
**full-time (6)**
8:3,22;9:5,18;12:4;
13:7
**further (1)**
61:18

## G

**game (1)**
11:7
**Gary (2)**
4:21;21:18
**gear (3)**
33:24;34:11,17
**GED (2)**
13:17,19
**general (3)**
21:14;49:17;50:10
**generally (5)**
5:4;34:10;36:13;
37:21;51:8
**General's (4)**
50:9,13,24;51:18
**gimmick (1)**
61:8
**girlfriend (1)**

14:12
**given (5)**
10:16;23:12;29:3;
36:20,24
**glass (1)**
45:24
**GOAL (6)**
26:20,23;27:2,6;
29:1,3
**GOAL's (1)**
29:13
**goes (1)**
58:22
**governmental (1)**
20:17
**ground (2)**
5:7,9
**groups (1)**
29:2
**guarded (1)**
21:5
**guess (5)**
12:14;17:20;31:15;
36:22;40:19
**guided (1)**
11:6
**gun (54)**
15:19;16:1,5;18:1,
3;19:19;24:3;25:5,13,
18,19,20;26:6,8,18,
24;28:2;33:16,17,19;
35:19,20;36:9;37:20,
24;38:1,3;39:3;40:15,
21,23;42:1,4,8,20,23;
43:3,24;45:4;46:15;
48:8,13;50:22,23;
52:14,15,21,23;53:2,
6,16;54:22;59:15;
**guns (66)**
11:7;16:23;17:7;
19:1;20:5;22:2;24:12,
19,22;25:8;28:11;
34:20;35:2,6,12,23;
36:3,6,14,14,19,22,
24;37:8;38:11;41:4,8,
14;42:11,14,20;
43:21;44:3,17,21,24;
45:2,4,15,16;46:3;
47:14,16,21;48:2,6;
49:4,5,6,11,13,22,22;
50:1,5;51:7;52:1,4,10,
21;53:2,5;54:17;55:1,
3;59:6
**gunsmith (1)**
19:10
**gunsmithing (2)**
11:7;17:8

## H

**Half (2)**
33:21,22

halfway (2)
56:1;57:4
**handful (1)**
44:11
**handgun (5)**
22:11;24:1;26:12;
53:7,15
**handguns (7)**
21:20;35:9;37:13,
17;45:17,19;48:22
**happened (2)**
10:17;31:7
**head (1)**
5:16
**hear (1)**
31:20
**heard (4)**
20:22;26:19;27:20,
23
**Heckler (1)**
24:1
**helpful (1)**
4:17
**helps (1)**
47:1
**high (3)**
13:22;22:11,12
**highest (1)**
13:19
**Hill (1)**
4:14
**hit (1)**
25:3
**Hold (2)**
56:16;59:9
**holster (2)**
25:18,20
**holstered (1)**
26:14
**home (6)**
4:11,13;46:12;52:8,
11;54:13
**honest (1)**
61:8
**honestly (4)**
18:16;24:9;44:10;
47:19
**hope (1)**
32:20
**Horton (2)**
35:17;36:17
**hospitals (1)**
28:16
**hotline (2)**
50:11;51:18
**hour (2)**
8:10;10:15
**hours (8)**
8:5,17,19,20;10:10,
21;11:16;12:6
**house (1)**
52:15
**hunting (5)**

11:8;33:12,23;34:9,
10

## I

**idea (5)**
10:14;31:6;36:4;
48:12;52:5
**identification (2)**
55:22;57:2
**identified (1)**
4:4
**idiot (1)**
32:6
**ignite (1)**
58:20
**igniting (1)**
58:24
**II (2)**
4:2,13
**important (3)**
5:9,14,19
**imported (1)**
44:10
**incident (2)**
14:6,11
**include (1)**
19:11
**included (2)**
23:1;31:22
**includes (1)**
24:16
**incompetence (1)**
38:22
**information (9)**
20:12,14,17;21:1,6,
23;29:8;31:18;56:18
**inquiries (1)**
50:7
**inside (1)**
45:22
**inspected (2)**
18:9,16
**inspection (4)**
18:6,11,13,17
**inspections (1)**
18:19
**instruct (2)**
6:8,9
**instructor (3)**
19:9;46:20,23
**interchange (1)**
59:16
**interest (2)**
31:9;32:2
**interested (2)**
30:19;39:4
**interesting (1)**
54:24
**internet (1)**
38:16
**into (2)**
42:14;61:14

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 537 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Charles M. Ricko, II - Vol. I
September 13, 2017

**inventory (9)**
34:21;35:6;36:20,
23;37:3,6;39:10,16;
40:2
**involved (6)**
14:5,7,10;16:18;
17:14;18:5
**involves (1)**
28:11
**involving (1)**
28:11
**issuance (1)**
17:14
**issued (12)**
15:3,6;16:8,9,12;
17:1,9,11;21:15;22:1;
23:17,19
**issuing (2)**
15:21;16:6
**items (1)**
57:19

**J**

**Jared (1)**
9:17
**job (5)**
10:12,13;12:15;
13:7;22:2
**jobs (2)**
7:13,17
**John (1)**
11:24
**July (3)**
48:18,22;49:18
**jurisdiction (1)**
15:3

**K**

**keep (9)**
52:7,13,21;53:2,5,7,
19,22;54:17
**Kiablick (2)**
11:24;12:2
**K-i-a-b-l-i-c-k (1)**
12:3
**kind (9)**
15:24;17:23;21:2,2,
14;22:7;33:6,11;43:3
**kinds (3)**
22:4;42:11;59:5
**kit (4)**
59:19;60:5;61:7,8
**kits (4)**
42:10;44:20;59:12;
60:10
**KLEIN (13)**
4:9,21;6:22;7:3,7;
20:20;43:17;45:9,12;
56:19;58:2,5;61:18
**knowledge (1)**
57:22

**knows (1)**
48:1
**Koch (1)**
24:1

**L**

**labeled (2)**
55:23;57:3
**lapsed (3)**
15:17;27:8,16
**large (7)**
22:7,10;39:9,12,15,
19;53:19
**larger (1)**
58:18
**largest (1)**
37:8
**last (8)**
8:10;9:21;10:3,11,
17;12:19;34:4;41:1
**late (1)**
14:22
**later (1)**
5:8
**law (3)**
21:15;39:21,22
**laws (1)**
51:9
**lawsuit (1)**
33:1
**lawyers (2)**
32:18;57:23
**League (2)**
26:18,24
**learn (1)**
30:7
**legal (3)**
39:17,20;60:8
**legally (1)**
32:22
**Legate (1)**
4:14
**less (5)**
10:16,20;52:6;
59:23;60:1
**letter (2)**
49:17,18
**Lew (2)**
35:17;36:17
**Leyden (1)**
28:5
**license (17)**
4:5;14:23;15:8,10,
11,12,19,22;16:4,5,7,
20,24;17:8,14,16;
46:15
**licenses (9)**
11:8;15:14,24;16:2,
2,3,11,22;17:6
**licensing (1)**
16:18
**life (1)**

14:16
**line (1)**
24:3
**liquid (1)**
58:22
**list (3)**
41:17;47:15;56:8
**listed (1)**
57:19
**little (2)**
43:18;60:19
**live (11)**
9:20;19:12,16,16,
17,22;23:1;24:17;
47:10;55:3,6
**lived (2)**
14:19,21
**loaded (4)**
52:21;53:8,9,12
**local (1)**
16:3
**located (1)**
8:1
**lock (1)**
52:20
**locked (6)**
45:20,21,22,23;
52:19;54:18
**locking (2)**
45:17;52:14
**locks (3)**
45:16;46:2,4
**long (6)**
9:10;21:10;24:10;
45:16;46:2;60:6
**longer (3)**
47:15;49:4,5
**look (3)**
38:18;39:3;40:19
**looking (2)**
34:4;49:16
**lot (10)**
8:19;19:7;26:10;
33:10;44:9;46:11;
47:18;49:21;50:1;
60:17
**Lots (2)**
44:4;49:14

**M**

**M&P (5)**
24:3,7;41:12;42:7;
54:7
**machine (2)**
43:21;61:14
**magazine (9)**
39:15,19,24;40:10,
17;53:11,12,19,21
**magazines (12)**
22:8,10,12,13;
38:17;39:9,13,22;
40:1,8,12,22

**Main (2)**
4:15;11:12
**maintain (2)**
32:15;36:19
**maintains (2)**
34:20;35:6
**major (2)**
36:9;42:18
**makes (7)**
34:19;35:2,5;41:19,
20,20,21
**making (1)**
61:15
**manner (1)**
26:6
**manufacturer (6)**
38:8,10;39:19;44:2;
51:11;54:3
**manufacturers (11)**
35:20,23;36:2,5,10,
15;41:23;42:14,17,
18;44:11
**manufacturer's (2)**
38:19;39:2
**manufactures (1)**
48:15
**many (17)**
8:5,8,20;9:20;10:2,
10;12:6;33:8;36:8,19,
24;40:12,14;48:20;
49:1;52:4,10
**marked (2)**
55:21;57:1
**Massachusetts (8)**
4:14,16;14:15,17;
39:17,20;46:15;48:4
**matter (1)**
4:22
**may (8)**
18:11;20:13;29:3;
30:10;32:4;35:16;
40:3;58:3
**maybe (4)**
9:13;15:7;27:24;
44:9
**McComas (1)**
31:12
**M-c-C-o-m-a-s (1)**
31:14
**McCormack (1)**
31:11
**mean (7)**
8:18;11:4;21:10;
26:24;32:9;34:16;
47:23
**means (2)**
6:15;49:20
**mechanics (1)**
61:6
**mechanisms (1)**
59:6
**media (4)**
27:24;30:11,13,17

**meet (2)**
50:8,23
**meets (2)**
51:11
**Melha (2)**
28:12,15
**member (9)**
23:17;24:11;27:2,5,
13;28:2,10,12,24
**membership (3)**
27:8,16;28:20
**mentioned (4)**
37:15;41:11;50:5;
54:5
**merchandise (1)**
33:11
**might (2)**
39:3;46:19
**Mike (1)**
46:20
**military (6)**
13:24;43:6,7,9,11,
24
**mind (1)**
21:11
**model (2)**
24:5;54:3
**models (3)**
35:2,5;41:22
**moment (1)**
40:3
**Monday (1)**
11:19
**money (3)**
29:2,3;59:18
**months (1)**
8:12
**more (8)**
8:18;19:11;22:14;
23:21;33:20;34:11;
37:12,12;45:10;52:5;
60:19;61:11,15
**Morning (1)**
4:10
**most (11)**
5:9;14:16;19:15;
21:14;31:4;35:21;
36:9,12;41:18;46:12;
50:15
**mostly (2)**
33:18;38:15
**move (1)**
14:15
**much (11)**
19:10;27:22;28:1;
33:17;36:7;38:16;
41:22;45:10;48:5;
49:7;58:18
**multiple (2)**
25:17;51:6
**Myron (1)**
4:13

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 538 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Charles M. Ricko, II - Vol. I
September 13, 2017

# N

**name (6)**
4:11;11:23;16:20;
17:16;29:3;44:8
**named (1)**
46:20
**names (2)**
42:16;44:5
**National (2)**
27:11,13
**nature (3)**
28:14;33:24;39:3
**necessary (1)**
7:5
**need (10)**
12:8,9;20:9;21:18;
36:7;59:5,19,21;
60:24;61:2
**needed (2)**
10:18;38:19
**new (2)**
38:1;39:18
**next (2)**
31:7,8
**night (2)**
8:10;10:17
**nods (1)**
5:16
**normal (1)**
4:18
**normally (1)**
48:6
**Notary (1)**
4:6
**Notice (3)**
50:9,24;56:1
**nowadays (1)**
38:16
**N-PAP (4)**
48:11,12;49:6;
50:22
**N-PAPs (1)**
49:4
**NRA (6)**
19:8,15;30:14;
31:17;32:5;33:2
**NRC's (1)**
21:23
**nuclear (9)**
12:22;19:8,17;20:3,
6,14;21:5;23:5,12
**number (6)**
21:7,7;24:5;31:23;
36:21;37:8
**numbers (1)**
21:9

# O

**oath (1)**
6:13

**object (3)**
6:5;43:12;56:16
**objection (5)**
6:7;34:22;35:3;
50:20;56:20
**objects (1)**
6:6
**obligated (1)**
32:22
**obligation (1)**
6:15
**obtain (1)**
35:12
**obvious (2)**
47:23;56:17
**occasion (3)**
23:3,7;38:17
**occasionally (3)**
29:2;35:16;39:21
**occasions (1)**
25:17
**October (1)**
18:23
**off (4)**
32:15;44:10;45:19;
52:18
**offer (3)**
46:7;47:5,10
**offered (1)**
40:22
**offers (1)**
51:2
**offhand (2)**
40:19;44:8
**office (3)**
10:18;33:10;50:13
**officer (27)**
7:15,16,21,22;8:6,
14,15,22;9:11;10:13;
12:10,18,22;13:13;
19:7;20:2,3,6;23:5,
12;24:20,21,23;25:10,
16,17;26:6
**officers (2)**
9:24;21:7
**officially (1)**
18:10
**often (3)**
42:20;45:4;46:12
**old (1)**
15:13
**one (31)**
4:21;5:24;7:18;
11:22;18:16,24;
19:11;22:5;23:21;
37:10;40:18;41:1,19,
20,20,21;42:3,6;
46:12,14;47:8,13;
48:8;50:4;51:20,23;
54:5,10;60:21;61:15,
15
**ones (2)**
19:14;41:18

**only (2)**
18:16;47:8
**open (1)**
11:15
**opened (6)**
13:1;18:19,21;
33:20;40:7,13
**opening (1)**
18:10
**opinion (2)**
29:16;30:3
**opposite (1)**
34:7
**organization (5)**
26:17;27:10,18;
28:10,14
**organizational (2)**
28:20,24
**organizations (3)**
28:21;29:6,9
**originally (2)**
43:5,10
**Orvis (4)**
11:6;34:14,17,17
**others (2)**
8:20;35:16
**otherwise (1)**
47:22
**out (9)**
20:9;28:18;40:4,16;
43:21;49:8,17;53:11;
59:15
**outdoor (1)**
33:24
**outfitter (2)**
11:2,3
**Outpost (24)**
4:24;7:19;10:24;
12:18;13:1;16:15;
17:4;28:19,24;33:4;
34:14,20;40:7,13;
45:13,15;46:7;47:2,5,
10,14;56:2,14;57:8
**Outside (4)**
26:5;53:2,5;58:23
**over (3)**
5:7,20;39:13
**overall (1)**
49:4
**Overwatch (25)**
4:24;7:19;10:23;
12:18;13:1;16:14;
17:4;28:19,24;33:4;
34:13,20;35:6;40:7,
13;45:13,14;46:7;
47:2,5,10,14;56:2,14;
57:8
**Overwatch@verizonnet (1)**
34:24
**own (5)**
7:14,19;23:20;51:9;
52:1
**Owners' (2)**

26:18,24

# P

**page (8)**
29:11,19,20,21,22,
23;30:2;57:14
**pages (3)**
29:24;56:9;57:20
**paid (1)**
27:4
**parenthesis (1)**
57:7
**part (4)**
35:21;47:19;49:15;
52:15
**participating (2)**
30:8,20
**particular (5)**
19:19,20;34:19;
35:5,11
**particularly (1)**
6:24
**parts (8)**
33:16,17;42:10,13,
16,18;44:20;59:21
**part-time (5)**
8:16;9:14,24;10:5;
12:12
**paying (2)**
32:24;33:2
**penalty (1)**
6:19
**pending (1)**
6:1
**people (3)**
9:20,22;21:7
**percent (6)**
33:21;34:5,6,8,8;
49:3
**percentage (1)**
34:1
**perform (1)**
38:24
**performance (1)**
23:8
**period (4)**
8:24;12:23;13:9;
14:19
**perjury (1)**
6:19
**person (4)**
25:4,5;26:2;31:10
**personal (1)**
56:18
**personally (1)**
52:2
**phone (1)**
31:4
**pin (2)**
58:20,24
**pistol (1)**
53:17

**pistols (1)**
35:10
**place (2)**
11:9;33:21
**places (1)**
59:17
**plaintiff (4)**
4:24;30:8;56:2;
57:8
**plaintiffs (1)**
7:2
**platform (12)**
41:13,15,24;42:1,5,
8,14,19;44:18,24;
45:2,4
**please (2)**
4:10;19:5
**point (3)**
12:1;45:10;49:24
**police (32)**
7:15,16,21,22;8:3,6,
13,14,16,22;9:6,10,
16;10:13;12:10,18;
13:13;18:14;19:7,16;
20:2,3;23:18;24:12,
20,21,23;25:10,16,17;
26:5;59:17
**pops (1)**
28:18
**PORTER (17)**
7:2,6;20:16,21,22;
21:13,17;34:22;35:3,
7;43:12;50:20;52:17;
56:16,24;59:9;61:19
**possibility (2)**
30:8;60:4
**possible (3)**
5:19;6:4;27:8
**Possibly (2)**
18:10;27:9
**post (2)**
29:8;30:11,13,17
**posted (3)**
29:13,15;30:2
**postings (1)**
27:24
**potentially (2)**
20:13;56:21
**power (1)**
60:1
**pre-ban (7)**
39:23;40:1,8,10,13,
17,22
**present (2)**
34:19;37:5
**pretty (10)**
19:10;36:7;37:14,
17;38:16;41:4,22;
42:15;48:5;49:7
**primarily (3)**
28:11;35:15,16
**primary (1)**
36:11

David Seth Worman, et al. vs.
Maura Healey, et al.

Charles M. Ricko, II - Vol. I
September 13, 2017

primer (3)
58:17,19;59:1
printed (1)
28:1
prior (2)
9:1;15:8
prison (1)
60:7
privilege (1)
20:20
privileged (1)
20:12
probably (5)
4:17;33:18;36:9,22;
41:1
problem (3)
47:19;49:15;50:2
Procedure (2)
7:1;57:6
process (1)
16:18
production (4)
4:5;57:5,16,17
programs (2)
46:8,12
prohibit (1)
21:6
protect (1)
21:5
provide (1)
31:18
provided (1)
57:23
providing (1)
56:13
Public (1)
4:6
pull (4)
60:22;61:1,2,15
purpose (1)
19:20
purposes (1)
23:9
pursuant (2)
6:23;57:5
put (5)
8:18;25:2;45:20;
47:2;59:14

## Q

qualification (1)
23:9
qualified (2)
23:6;46:23
qualify (2)
22:21;24:12
quickly (1)
58:3
quite (1)
43:21

## R

range (2)
28:6,8
rapid (1)
61:11
rapidly (1)
60:19
rate (2)
61:4,12
rather (1)
35:20
rattle (1)
44:10
reach (1)
50:19
read (1)
38:17
really (3)
8:11;28:1;37:10
reason (2)
15:15,17
received (3)
13:20;19:8,9
Recess (2)
45:11;58:4
recognizable (1)
44:3
recognize (3)
41:8;51:19,22
record (3)
4:12,18;6:22
refer (1)
39:23
referred (4)
26:20;42:2,20;45:4
regular (2)
8:12;22:21
regularly (1)
32:14
regulations (1)
21:24
related (5)
17:6;34:6,6,9,11
relating (2)
16:1,22
release (1)
21:6
relevant (1)
55:19
remember (10)
18:12,15,15,16;
24:9;30:5,6,12;31:5,
10
Remington (1)
46:4
reporter (1)
5:15
requalification (3)
19:22;22:24;24:15
requalify (3)
19:18;20:6;24:16

Requests (4)
57:5,7,15,16
required (6)
19:15,18;20:5;
22:21;24:11;46:14
requirement (1)
19:23;22:24;23:1;
24:17
requires (2)
19:16,17
research (2)
38:11;51:14
reserve (1)
56:21
respond (1)
30:16
responsive (1)
57:24
retail (1)
45:14
retailer (1)
34:14
retain (1)
23:15
retired (1)
12:16
review (1)
7:4
reviewed (2)
56:6;57:12
revolvers (1)
35:10
Ricco (1)
4:13
RICKO (6)
4:2,18;7:8;55:21;
57:1;58:6
R-i-c-k-o (1)
4:20
rifle (8)
22:12;27:11,13;
28:5;43:4;58:18;
59:13;60:18
rifles (6)
21:21;35:9;37:12,
13,18;49:15
right (14)
6:16,19;7:4;19:2;
22:16;23:1;26:21;
35:2;39:7,13;41:12;
59:20;60:2,8
rim (2)
58:23,24
rimfire (3)
58:7,16,22;59:14,
23
Road (2)
4:14;5:5
Romanian (2)
44:12,14
room (10)
37:4,5;52:14,15,21,
24;53:3,6,23;54:18

rotations (1)
21:8
round (13)
53:21;58:7,11,16,
18,19,21;59:16,23,23;
61:1,3,15
rounds (2)
22:14;59:3
Ruger (3)
41:19;42:4,4
rule (1)
5:9;6:24;57:6
rules (5)
5:4,7;6:24,24;21:11
run (1)
28:15
Russian (3)
43:5,11,24

## S

S&W (1)
24:3
safe (5)
45:18;53:7,8,9,12
safeguards (1)
20:14
Safety (1)
46:13
sale (6)
16:23;17:7;40:4,6,
22;51:3
sales (3)
16:1;34:5,7
same (7)
16:14;17:2;36:13,
17;46:6;59:16;61:9
satisfactorily (1)
4:4
save (2)
31:1;59:18
saying (3)
20:16,24;30:19
schedule (2)
10:7;56:8
school (2)
13:17,22
scope (1)
56:23
searches (3)
38:15,24;51:17
second (4)
9:8;20:8;27:19;
59:9
security (8)
12:22;19:8,17;20:3,
6;21:7;23:5,12
Seeing (1)
27:24
seeking (1)
40:16
self-defense (3)
25:9,14,24

self-employed (2)
7:10,16
sell (25)
11:7;34:17;35:12,
23;36:3,13;39:17,20,
20;47:14,17,17,20,22,
24;48:1,6,18,22;49:4,
5,8,9;50:2;51:7
seller (2)
15:19;16:5
selling (6)
38:1;47:21;48:3;
49:11,22,23
semi-automatic (7)
21:20,21;43:4;
48:10,13;49:14;61:12
send (1)
31:3
sense (1)
60:24
sent (6)
30:18;31:22;32:1,2,
4;49:17
service (2)
23:13,22
sets (2)
8:17;10:8
seven (1)
41:2
several (2)
14:21;41:21
shakes (1)
5:16
shift (2)
21:8,8
shifts (2)
8:9,12
shoot (2)
59:14;60:19
shooting (4)
28:6,8;33:12,23
shop (12)
11:6;12:9;33:5,19,
20,21;34:17;36:6;
37:3,9;43:19,21
shops (1)
51:17
short (1)
58:2
shotguns (4)
35:9;37:12,18;46:5
show (1)
40:21
shows (1)
40:23
Shriners (1)
28:12,15
side (2)
14:5;34:2
sides (1)
56:22
sight (1)
41:9

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 540 of 1262

David Seth Worman, et al. vs.                                    Charles M. Ricko, II -  Vol. I
Maura Healey, et al.                                             September 13, 2017

**Sigma (1)**
53:16
**sign (1)**
20:23
**similar (3)**
49:18,19,19
**simulate (3)**
60:20,23;61:9
**simulated (1)**
61:11
**sites (1)**
29:8
**six (1)**
41:2
**Smith (8)**
24:2,6;41:12,20;
42:7,7;53:16;54:4
**social (4)**
27:24;30:11,12,16
**sold (5)**
37:21;40:8,13;
43:19,20
**someone (4)**
12:9;18:13;31:8;
41:3
**Sometimes (1)**
46:18
**somewhere (1)**
9:21
**son (1)**
32:7
**Sorry (2)**
9:8;57:16
**sort (3)**
21:5;25:3;33:20
**space (1)**
33:10
**specific (1)**
37:11
**specifically (6)**
18:17;30:14;33:19;
47:18;49:8;51:13
**speeds (1)**
61:4
**spell (1)**
12:2
**spelled (2)**
4:17;49:8
**spelling (1)**
4:19
**spend (1)**
60:6
**sponsored (2)**
29:9;47:1
**sportsmen (1)**
11:5
**Sportsmen's (2)**
28:13;33:20
**square (2)**
33:8,9
**stamp (1)**
40:11
**standard (3)**

**start (2)**
16:4;43:9
**started (2)**
13:3;16:14
**Starting (1)**
36:2
**state (9)**
4:10;14:20;16:2,4,
5,10;17:9;39:20;51:9
**states (2)**
50:16,19
**station (3)**
8:10;10:18;11:8
**status (1)**
48:4
**steel (1)**
52:20
**steer (1)**
48:5
**step (2)**
20:9;21:19
**still (3)**
7:14;59:10;61:2
**Stock (3)**
60:14,18,24
**stop (1)**
40:24
**store (4)**
18:11;33:9;45:15,
22
**stored (9)**
45:17,18;52:7,11,
13,23;53:8,19;54:13
**storefront (1)**
11:13
**Street (2)**
4:15;11:12
**strike (1)**
45:3
**striker (1)**
58:23
**strikes (1)**
58:24
**struck (1)**
58:20
**stuck (1)**
10:19
**stuff (2)**
10:18;34:4
**sums (1)**
19:10
**Sunday (1)**
11:18
**suppose (1)**
38:9
**sure (13)**
10:3;12:3;20:9;
27:3;33:3;38:20;
39:16;41:5;48:7;
49:12;54:10;56:24;
60:9
**suspended (1)**

15:15
**Suzanne (1)**
31:11
**sworn (1)**
4:6
**system (1)**
32:15

### T

**talk (6)**
5:20;20:7,10;22:4;
33:4;50:4
**talking (3)**
15:23;22:2;43:7
**Tavor (4)**
48:9,10;49:6;50:4
**Tavors (1)**
48:18
**technical (3)**
32:6;38:5,22
**telephone (2)**
31:23;50:19
**ten (2)**
10:20;12:19
**term (2)**
26:23;58:6
**terminated (1)**
15:15
**terms (1)**
21:14
**test (3)**
50:8,24;51:12
**testified (1)**
4:7
**testifying (1)**
21:11
**testimony (3)**
6:18;32:14;56:13
**though (1)**
59:17
**three (4)**
12:7,24;35:19;
37:15
**today (2)**
43:14;56:12
**told (1)**
49:21
**total (1)**
12:7
**Town (9)**
7:23,24;9:2,5,7,8;
16:8;17:11;18:8
**trade (1)**
13:17
**traded (1)**
40:15
**trained (2)**
19:1;22:18
**training (12)**
19:4,6,7,8,9,15,16;
46:7,11;55:12,15,18
**trainings (5)**

19:11;46:17;47:1,4,
11
**transcript (1)**
7:5
**tried (2)**
14:2;50:10
**trigger (7)**
45:16;46:2,4;60:22;
61:1,3,16
**trips (1)**
11:6
**trouble (1)**
49:10
**true (1)**
43:9
**trust (1)**
50:18
**truthfully (1)**
6:16
**try (1)**
54:24
**trying (1)**
20:19
**Tuesday (1)**
11:19
**two (8)**
7:13,17;12:24;
23:23,24;43:22;
57:20;59:2
**type (12)**
22:5;32:8,9;37:9;
39:3;43:8;46:2;53:5,
15;54:1,2,15
**types (7)**
11:5;21:9;41:4,8;
46:10;47:4;54:24
**typical (2)**
10:15,20
**typically (5)**
10:7;42:2,8;51:19,
22

### U

**unclear (1)**
5:10
**under (5)**
6:13,18;10:7;21:23;
29:3
**underneath (1)**
26:14
**understood (3)**
5:12,13,17
**unless (3)**
6:1;37:4;60:6
**Unloaded (1)**
54:20
**unrestricted (1)**
15:1
**up (5)**
5:8;19:10;43:17;
58:3;61:4
**use (14)**

19:1,19;22:18;
24:21;25:2,13,15;
26:23;28:8;31:3;
35:15,16;36:5,12
**used (4)**
21:4;24:19;25:8;
44:23
**Usually (3)**
25:20,21;40:14

### V

**vague (1)**
50:1
**value (1)**
34:5
**variance (1)**
44:12
**variant (1)**
43:23
**variants (4)**
43:20;44:14,15,24
**various (1)**
19:1
**verbally (1)**
5:15
**Verizonnet (1)**
32:12
**Vermont (2)**
44:8;48:17
**versus (1)**
4:23
**violate (1)**
21:11
**violating (1)**
21:15
**violence (2)**
14:6,11
**volume (1)**
34:7
**volunteer (1)**
8:18

### W

**Wackenhut (1)**
13:4
**wait (2)**
5:18;6:6
**Walsh (1)**
46:20
**wants (1)**
47:14
**way (4)**
11:17;25:19;32:19;
47:2
**weapon (4)**
14:13,14;23:19;
61:12
**weapons (11)**
21:9;22:5,8,18,22;
23:4,11,15,17,21;48:4
**wearing (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 541 of 1262

David Seth Worman, et al. vs.
Maura Healey, et al.

Charles M. Ricko, II - Vol. I
September 13, 2017

26:10
**web (3)**
    38:15,24;51:17
**website (5)**
    29:13,21;34:13;
    38:19;39:2
**Wednesday (1)**
    11:18
**week (6)**
    8:5;10:11,16,21;
    12:6;26:9
**weeks (1)**
    12:7
**Wendell (2)**
    9:7,9
**Wesson (8)**
    24:2,6;41:12,20;
    42:7,8;53:16;54:4
**What's (5)**
    11:11,23;28:14;
    34:16;49:16
**Whereupon (1)**
    61:20
**whole (2)**
    48:5;61:6
**Windham (1)**
    44:9
**within (1)**
    56:22
**without (3)**
    21:15;61:7,10
**witness (6)**
    4:3;7:3;20:18;21:4,
    16;52:16
**word (1)**
    49:16
**words (1)**
    60:1
**work (21)**
    8:5,13,20,21;9:18;
    10:5,15,20,23;12:6;
    13:2,11;16:17;17:13;
    19:17;20:1;23:4;
    32:19;41:6;46:21,22
**worked (10)**
    8:9,10,11;9:5,6,10;
    10:11;12:7;13:4,9
**working (2)**
    12:17;26:5
**works (2)**
    31:16,17
**Worman (1)**
    4:22
**wrap (1)**
    58:3
**wrong (1)**
    11:17

## X

**XM-15 (1)**
    42:2

## Y

**year (2)**
    10:11;12:8
**years (9)**
    9:12,13;12:19,24,
    24;14:21;15:7,13;
    41:2

## 1

**1 (2)**
    55:22,24
**10 (4)**
    9:12;22:14;39:13;
    53:21
**10:27 (1)**
    45:11
**10:37 (1)**
    45:12
**100 (1)**
    36:22
**10CFR (1)**
    21:23
**11 (1)**
    9:13
**11:02 (1)**
    58:5
**11:08 (1)**
    61:21
**11:55 (1)**
    58:4
**15 (1)**
    42:7
**150 (1)**
    36:22
**15-year-old (1)**
    32:7
**16 (1)**
    10:4
**19 (1)**
    57:19
**1994 (3)**
    9:1;12:24;13:11

## 2

**2 (2)**
    57:2,4
**2,000 (1)**
    9:22
**20 (2)**
    48:18,22
**2014 (2)**
    16:13;18:23
**2016 (2)**
    48:18,23
**20th (1)**
    49:18
**21 (1)**
    15:13
**22 (7)**

58:7,16,19,21;
    59:14,15,22
**223 (5)**
    58:11,17,17;59:13,
    23
**283 (1)**
    4:14

## 3

**3 (1)**
    56:9
**30 (4)**
    6:24;34:6,8;49:3
**30b6 (3)**
    43:15;56:21,23
**34 (1)**
    57:6

## 4

**4 (1)**
    56:9
**40 (2)**
    24:1;49:3

## 5

**5:00 (2)**
    11:15,18
**50 (2)**
    33:21;52:6
**556 (1)**
    42:4

## 7

**70 (2)**
    34:5,8

## 8

**8:30 (1)**
    11:18
**800 (1)**
    33:9
**80s/early (1)**
    14:22

## 9

**9:00 (1)**
    11:15
**90s (1)**
    14:22
**97 (2)**
    4:15;11:12

# EXHIBIT 11

## TO KAPLAN DECLARATION

# In The Matter Of:

*David Seth Worman, et al. vs.*
*Charles D. Baker, et al.*

---

*James Supica*
*Vol. 1*
*October 30, 2017*

---

*Gore Brothers Reporting & Videoconferencing*
*36 South Charles Street, Suite 2002*
*Baltimore, MD 21201*
*410-837-3027*
*www.gorebrothers.com*



Reporting &
Videoconferencing

Since 1961 - Serving MD, DC & VA - Worldwide

**Min-U-Script® with Word Index**

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MASSACHUSETTS

3

4   DAVID SETH WORMAN, et al.

5             Plaintiffs          Case No.

6   vs.                          1:17-cv-10107-WYG

7   CHARLES D. BAKER, et al.

8             Defendants

9   _____/

10

11

12          The deposition of JIM SUPICA was held on

13   Monday, October 30, 2017, commencing at 9:01 a.m., at

14   the Law Offices of Bradley Arant Boult Cummings, LLP,

15   1615 L Street, N.W., Suite 1350, Washington, D.C. 20036,

16   before Melinda Johnson, CSR, Notary Public.

17

18

19

20

21   REPORTED BY:  Melinda Johnson, CSR

2

```
 1   APPEARANCES:

 2              ON BEHALF OF THE PLAINTIFFS:

 3              JOHN PARKER SWEENEY, ESQUIRE

 4              MARC A. NARDONE, ESQUIRE

 5                 Bradley Arant Boult Cummings, LLP

 6                 1615 L Street, N.W.

 7                 Suite 1350

 8                 Washington, D.C. 20036

 9                 Telephone:  202.393.7150

10                 Email:  Jsweeney@bradley.com

11                         Mnardone@bradley.com

12

13              ON BEHALF OF THE DEFENDANTS:

14              GARY KLEIN, ESQUIRE

15              ELIZABETH KAPLAN, ESQUIRE

16                 Office of the Attorney General

17                 The Commonwealth of Massachusetts

18                 One Ashburton Place

19                 Boston, Massachusetts 02108

20                 Telephone:  617.963.2567

21                 Email:  Gary.klein@state.ma.us
```

3

1                          INDEX

2               Deposition of JIM SUPICA

3                    October 30, 2017

4    Examination By:                          Page

5    Mr. Klein                                   4

6

7    Exhibit No.                             Marked

8    Exhibit 1      Subpoena                     7

9    Exhibit 2      Expert Report               9

10   Exhibit 3      Deposition Transcript       56

11   Exhibit 4      Deposition Exhibits         58

12   Exhibit 5      Documents                   70

13   Exhibit 6      Army Manual                102

14   Exhibit 7      Army Manual                119

15   Exhibit 8      Article                    236

16   Exhibit 9      Article                    236

17

18

19

20

21

4

1                        PROCEEDINGS

2   Whereupon,

3                        JIM SUPICA

4   called as a witness, having been first duly sworn to

5   tell the truth, the whole truth, and nothing but the

6   truth, was examined and testified as follows:

7              EXAMINATION BY MR. KLEIN:

8        Q     Good morning, Mr. Supica.  My name is Gary

9   Klein.  I'm one of the lawyers for the defendants in

10  the case of Worman versus Baker.

11             That's the case in which you've offered an

12  expert report for consideration by the Court, correct?

13       A     Yes, sir.

14       Q     Could you state your home and business

15  address for the record.

16       A     My business address is the NRA Museums

17  Division, 11250 Waples, W-a-p-l-e-s, Mill Road,

18  Fairfax, Virginia.  ████████████████████

    █  █████████████████████████████████

20       Q     And you've had your deposition taken

21  before, correct?

5

1        A     Yes, I have.

2        Q     I know about the deposition in the Kolbe

3   case, the case about the assault weapons ban in

4   Maryland.

5              Have you had your deposition taken on other

6   occasions?

7        A     I have.

8        Q     Can you tell me what occasions they were in

9   to the best of your recollection.

10       A     There was a case on a similar issue in

11  Chicago.

12       Q     Was that the Cook County case --

13       A     Yes, I think --

14       Q     -- or the Highland Park case?

15       A     One of those, yes.

16       Q     That's fine.

17       A     And I'm not sure I've been deposed as an

18  expert other times.  I've offered expert opinions in a

19  couple other cases.  Not many, but I don't know that

20  the others went to deposition.  I don't really recall.

21       Q     But you understand generally how a

6

1   deposition works, correct?

2        A    Yes, sir.

3        Q    And I just want to run through a couple of

4   ground rules so they're clear on the record.

5             If a question is unclear, I would ask you

6   to have me clarify it for you.  If you answer the

7   question, I'm going to assume that you understood it,

8   right?

9        A    Yes, sir.

10       Q    And it's important that we not talk over

11  each other.  That is, please wait for me to complete a

12  question before you answer, and I'll try to wait before

13  I ask another question, okay?

14       A    Okay.

15       Q    If you need a break at any time, just let

16  me know.  We can always take a break.

17            And you understand, generally, that you're

18  -- strike that.

19            You understand that you're under oath and

20  all of your answers have to be truthful to the best of

21  your ability, correct?

7

1        A      Yes, sir.

2        Q      So I'm going to show you a document that's

3   labeled Exhibit Number 1.

4              (Exhibit No. 1 was marked for

5   identification.)

6   BY MR. KLEIN:

7        Q      Do you recognize that document?

8        A      I believe that is the subpoena I received

9   to testify at this deposition.

10       Q      At the deposition today, right?

11       A      Yes, sir.

12       Q      Would you turn your attention briefly to

13   the third to the last page?

14       A      "Notice of Deposition of John Supica"?

15       Q      Yes.  It says in the bottom paragraph:

16              "The deponent is directed to bring with him

17   his file for this matter, including but not limited to

18   correspondence, hand written notes, memoranda,

19   photographs, video recordings, studies, reports,

20   literature, spreadsheets, electronic communications, he

21   has reviewed or authored in regard to this matter."

8

1          Do you see that?

2     A     Yes.

3     Q     Have you done so?

4     A     Yes.

5     Q     I notice that there is a big stack of books

6  on the table behind you.

7          Is that part of what you've brought to the

8  deposition today?

9     A     Those are the books that I referenced in

10  preparing my opinion.  Counsel accumulated those for me

11  so I wouldn't have to haul them all down here.

12     Q     Is there other responsive material that

13  you've brought with you?

14     A     I brought a folder of the material that I

15  have reviewed.  Some of this just very briefly, but,

16  yes that's --

17     Q     Thank you.

18     A     That's what we have.

19     Q     So what I'd like to do is take a look at

20  that material probably during the lunch break, and if

21  we need to examine you on any of it, I will get some

1   copies from counsel here, okay?

2        A    That sounds good.

3        Q    Thank you.

4             (Exhibit No. 2 was marked for

5   identification.)

6   BY MR. KLEIN:

7        Q    I'm going to show you a document that's

8   labeled Exhibit Number 2.

9             Is that your expert report in this case?

10       A    Yes, it is.

11       Q    Is that your signature on the first page of

12  the report?

13       A    Yes.

14       Q    And it's dated September 15, 2017.

15            Is there anything that you would need to

16  update in the month and a half that's passed since

17  September 15th of 2017?

18       A    In looking through this, I notice that

19  there are a few typos, but there is nothing substantive

20  that needs to be changed that I'm aware of.

21       Q    Are there typos you want to correct now?

1      A      Perhaps we'll see them when we come to

2  them.

3      Q      Okay.  That's fine.

4             And I noted that this expert report is

5  similar to a report you prepared in a case called Kolbe

6  versus Maryland; is that right?

7      A      Yes, sir.

8      Q      Do you know if you made changes from the

9  Kolbe report before serving this expert report on us?

10      A      Yes, I did.

11      Q      In particular, what did you do to change

12  the report?

13      A      I tried to orient it more towards the

14  applicable law in this case, so it's more Massachusetts

15  oriented than Maryland.

16      Q      So when you say the "applicable law," you

17  mean the assault weapons ban that's being reviewed in

18  the Worman versus Baker case?

19      A      Yes, sir.

20      Q      Is it fair to say, though, that you started

21  with the report that you filed in Kolbe and made

1  changes to it --

2        A     Yes.

3        Q     -- and prepared it that way for this case?

4        A     Yes.

5        Q     And in connection with this case, are you

6  working with the same lawyers that you worked with in

7  the Kolbe case?

8        A     Yes.  The same firm.

9        Q     Are there other cases where you're working

10  with that firm?

11        A     No.

12        Q     Just the Kolbe case --

13        A     Yes, sir.

14        Q     -- and this case?

15        A     I can't remember if we worked together on

16  the Highland Park, Illinois case or not.  That would be

17  the only other possibility.

18        Q     Okay.  And now you remember that the case

19  you worked on was Highland Park and not the Cook County

20  case?

21        A     It might have been either or both.

12

1        Q      Okay.  Can you explain your understanding
2   of what the case in which this report is offered is
3   about?
4        A      My understanding is that it is a challenge
5   to a Massachusetts law restricting so-called assault
6   weapons and magazine capacity -- magazines that have a
7   capacity of more than ten rounds.
8        Q      Anything else?
9        A      That's my understanding.
10       Q      Did you review the complaint in this
11  matter?
12       A      I believe I did.
13       Q      Did you review the answer --
14       A      Very -- I'm sorry, very briefly.
15       Q      Did you review the answer of the
16  Commonwealth?
17       A      I don't know that I did.  If I did, it
18  would be in this stack here.
19       Q      Did you review anything else that's
20  specifically relevant to the matter in court?
21              MR. SWEENEY:  Objection.

1                    You may answer.

2                    THE WITNESS:  Thank you.

3                    I reviewed a stack of documents that I

4    understand are related to the case.  Those are what

5    I've provided.

6    BY MR. KLEIN:

7        Q    Did you review any deposition testimony of

8    any party to the case?

9        A    I don't think that I did.  I don't recall

10   doing so.

11       Q    Did you review the assault weapons ban at

12   issue?

13       A    Yes, I believe I did.

14       Q    Did you review any documents relevant to

15   the Massachusetts law of self-defense?

16       A    I don't recall anything that was titled

17   that way.

18       Q    What is your understanding of the

19   Massachusetts law of self-defense?

20       A    I'm not sure what it is.

21       Q    Can you describe for me the area in which

14

1   you believe you have special expertise relative to this

2   matter?

3        A     I have special expertise in firearms

4   history.

5        Q     Anything else?

6        A     There would be a number of subfields that

7   are related to that.  My primary expertise is firearms

8   history.

9        Q     What subfields are you thinking about?

10        A     Firearms technology, use of defensive

11   firearms.  I think those might be primary.

12        Q     And when you say "use of defensive

13   firearms," what's your definition of a defensive

14   firearm?

15        A     That would be a justified and legal

16   civilian use of a firearm in personal defense.

17        Q     So is it fair to say what you're talking

18   about is defensive use of a firearm?

19        A     Yes, I think that's fair.

20        Q     And there is no particular firearm that's

21   only useful in self-defense, right?

15

1        A      That's correct.

2        Q      Firearms can be used also for offensive

3   purposes?

4        A      Firearms can be used for a number of

5   purposes.

6        Q      Including criminal purposes?

7        A      Yes, they are.

8        Q      And including mass shootings, right?

9        A      Yes, they are.

10       Q      ████████████████████████████████████





17



14        Q      What was the make and model of the AR-15
15   you did fire?
16        A      I don't know.  I've shot a few of them and
17   really don't know the model.
18        Q

18

1      ███████

2          Q      Have you ever fired a machine gun?

3          A      Yes.

4          Q      In what context?

5          A      In working for the museum, we periodically

6    have machine gun shoots.  And also for a television

7    show that I do.  We sometimes feature machine guns on

8    the show, and I shoot them for the show.

9          Q      And those are guns that are owned by the

10   NRA?

11         A      Usually by the NRA, yes.

12         Q      When you say "usually," who else might own

13   the machine guns you fire?

14         A      If we're visiting a collector for the

15   television show, it might be owned by that collector.

16   I can't recall the ownership of every machine gun that

17   I've shot.

18         Q      Is there video of you shooting machine

19   guns?

20         A      I think there are several.

21         Q      And do you personally have a machine gun

19

1   license?

2         A     No, I don't.

3         Q     Do you own any machine guns?

4         A     No, I don't.

5         Q     Do you own any select fire weapons?

6         A     No, I don't.  And I'd just like to clarify.

7    I'm assuming by "machine gun," you would include select

8    fire as a subset of machine gun.

9         Q     We're going to get to that, but let's do

10   that now.

11              What's your understanding of what "select

12   fire" means?

13        A     A select fire is a gun that can be fired

14   either semi-automatically, which means that one pull of

15   the trigger fires one shot, or it can be switched to

16   full-automatic mode.

17              Generally that means that if you hold the

18   trigger back, the gun keeps firing until it's empty.

19   In some cases, that can be a burst-fire function where

20   a limited number of rounds is fired while the trigger

21   is held back.  Usually that's three rounds.

20

1      Q      And then you'd have to pull the trigger

2  again for three more rounds to load?

3      A      Yes, sir.

4      Q      And when you say "fired until the gun is

5  empty," what you mean is until the magazine containing

6  ammunition is empty, right?

7      A      Yes.  The ammunition that the gun holds.

8  Yes, sir.

9      Q      And then you could put another magazine in

10  and fire that one in the same way until it's empty,

11  correct?

12      A      Yes.

13      Q      Now, a semi-automatic gun will fire with

14  each pull of the trigger also until the magazine is

15  empty, correct?

16      A      Yes, sir.

17      Q      And so when you use that term "select

18  fire," you're talking about a gun that can fire in any

19  of those modes, correct?

20      A      Not necessarily.  Usually it will be

21  limited to two modes -- either semi-automatic and burst

1   fire or semi-automatic and full-automatic.  I think

2   there are some that have all these modes.

3        Q     And typically there would be a switch on

4   the guns that you can put it into any of the modes?

5        A     I believe always, yes.

6        Q     Okay.  And that's --

7        A     There is one exception at least to that,

8   but usually that's the case.

9        Q     And what's the exception?

10       A     The one I'm thinking of is, I believe, an

11  Italian submachine gun from World World II.  It has two

12  triggers -- one for semi-automatic fire and one for

13  full-automatic fire.

14       Q     All the other guns have some sort of a

15  switch between modes, correct?

16       A     The vast majority do.

17       Q     So when we use the term "select fire," over

18  the course of the day, we'll try to both understand

19  that to mean a gun that can switch back and forth

20  between modes, okay?

21       A     Okay.

1      Q      And there are also pure machine guns,

2  right?

3      A      Yes, there are.

4      Q      And those are guns that always fire

5  automatically until -- with the single pull of the

6  trigger until the magazine is empty, right?

7      A      So long as the trigger is held back.

8      Q      Right.

9             And there is also guns that are just

10  semi-automatic, correct?

11      A      Yes.

12      Q      And those can only be fired by pulling the

13  trigger each time you want a shot to go?

14      A      One trigger pull, one shot.

15      Q      So we'll try to use those terms as well and

16  distinguish them from select fire over the course of

17  the day, okay?

18      A      Okay.

19      Q      I understand you're trained as a lawyer; is

20  that right?

21      A      I am.

1        Q       Where did you go to law school?

2        A       University of Kansas Law School.

3        Q       What year did you get your degree?

4        A       1980.

5        Q       Have you ever practiced as a lawyer?

6        A       Yes.  I practiced as corporate counsel for

7    United Construction Company for about 11 years.

8        Q       What kind of a business is United

9    Construction Company?

10       A       It's a highway construction company.

11       Q       Is that a family-owned business?

12       A       Yes.

13       Q       Is it still a business that your family

14   owns?

15       A       No.

16       Q       And what period of time were you corporate

17   counsel?

18       A       1980 to 1991, I believe.

19       Q       Did you practice in court at all?

20       A       No.  No, I didn't.

21       Q       Have you ever had a case load of any kind?

1      A      What's a case load?

2      Q      Where you have your own set of cases that

3 would have separate clients from your family-owned

4 business attached to them.

5      A      No.  The only client I worked for was

6 United Construction.

7      Q      What did your legal work consist of at

8 United Construction?

9      A      My legal work was part of what I did.  I

10 also did general administrative work for the company.

11 The legal work that I did do involved contract law,

12 government regulations, a little bit of workers' comp

13 type law, just a little bit of litigation, not a great

14 deal.

15      Q      Have you ever represented a party in any

16 case related to gun ownership?

17      A      Not as a lawyer, no.

18      Q      Have you ever represented any party in

19 relationship to guns in any way?

20      A      As an expert witness.  We've discussed

21 that.

1          Q     But not as a lawyer?

2          A     That's correct.

3          Q     And is it fair to say you're not here to

4    give legal opinions of any kind?

5          A     That's correct.

6          Q     Including legal opinions on the Second

7    Amendment, right?

8          A     That's right.

9          Q     You're not here to give legal opinions on

10   the scope of the right to use a gun in self-defense

11   under Massachusetts law, are you?

12         A     That's correct.

13         Q     Tell me about your current position.

14         A     I am Director of the NRA Museums Division.

15         Q     Does that mean you work for the NRA?

16         A     Yes, it does.

17         Q     You're an NRA employee?

18         A     Yes.

19         Q     About how long have you been an NRA

20   employee?

21         A     Nine years.

1     Q    Since about 2008?

2     A    Yes.

3     Q    Math on the fly is always --

4     A    That's pretty good.  Years are tough.

5     Q    And what do you do in connection with your
6 current position?

7     A    I'm responsible for the operation of the
8 two major NRA museums.  I manage the museum staff.  I
9 manage the museum's various media efforts.

10    Q    Can you describe those media efforts.

11    A    They would include television, Internet
12 platforms including social media, and publications.

13    Q    Were you ever called to give opinions on
14 gun issues in connection with the museum's media
15 efforts?

16    A    On political or legal gun issues?

17    Q    Well, let's start with political.

18    A    No.

19    Q    Are you ever called on to give opinions
20 about legal issues related to guns in connection with
21 your work for the NRA museums?

1          A      No.

2          Q      And you don't do that?

3          A      I don't.

4          Q      About how many people work for you?

5          A      About seven full time, two part time, and a

6    few volunteers.

7          Q      And do those folks work exclusively for NRA

8    museums?

9          A      Yes.  Except for the volunteers.  Our

10   part-timers, I think, are retired.  I think we're their

11   only paid employer, but I don't know that for sure.

12         Q      Who do you report to?

13         A      I report to Joe DeBergalis.

14         Q      What's his position?

15         A      He is Assistant -- I may get this wrong.

16   I'll try my best.  Assistant Director -- Assistant

17   Executive Director of General Operations.

18         Q      Does he work in the same physical location

19   as you do?

20         A      He works in the same building but not in

21   the museum offices.

1          Q      Do you see him every day?

2          A      No.

3          Q      How do you typically communicate with him?

4          A      E-mail or phone calls, and I'll see him

5     occasionally.

6          Q      And who does Mr. DeBergalis report to?

7          A      He reports to Josh Powell.

8          Q      What's is Mr. Powell's position?

9          A      Executive Director of General Operations,

10    I believe.  I think he has another title too, and I

11    don't recall that at the moment.

12         Q      Does he work in the same location?

13         A      I believe he does.

14         Q      Do you have any direct communication with

15    Mr. Powell?

16         A      Very rarely.

17         Q      Do you know who Mr. Powell reports to?

18         A      Who he works for?

19         Q      Who does he report to?

20         A      Wayne LaPierre.

21         Q      What's Mr. LaPierre's position?

1          A      He is the Executive Vice President of NRA.

2          Q      Does he work in the same physical location?

3          A      I believe he does.

4          Q      Do you see him fairly regularly?

5          A      No.

6          Q      Do you have any direct communication with

7     Mr. LaPierre?

8          A      No.  Generally, not.

9          Q      When you say "generally not," does that

10    mean you sometimes see him and talk to him?

11         A      We just say, "Hi" generally.  Very seldom

12    anything related to the museum.  Generally, I would go

13    through the chain of command for anything that has to

14    do with my responsibilities.

15         Q      Do you get memos from time to time from

16    Mr. LaPierre?

17         A      Mr. LaPierre sends out a weekly sort of

18    newsletter to all NRA employees.  I receive that.

19         Q      What kinds of things are discussed in the

20    newsletter?

21         A      Usually it will be links to media reports,

1   social media things, or other things that the NRA is

2   involved with.

3        Q     Do you have any contact with the Board of

4   Directors of the NRA?

5        A     I do.

6        Q     In what capacity?

7        A     I am the secretary of the Gun Collectors

8   Committee for the NRA, which is a committee of the

9   board.  And so I attend all the board of directors

10  meetings, both to help with the gun collectors

11  committee meetings and sit in on the board meetings.

12       Q     Is it fair to say that you could be fired

13  if your service displeases your superiors?

14            MR. SWEENEY:  Objection.

15            THE WITNESS:  Yes.

16  BY MR. KLEIN:

17       Q     Is it fair to say you could be fired if

18  your service displeases the board of directors?

19            MR. SWEENEY:  Objection.

20            THE WITNESS:  I would doubt that the board

21  of directors would get directly involved in personnel

1    decisions.

2    BY MR. KLEIN:

3        Q     But they could if they wanted to, couldn't

4    they?

5        A     I assume they could.

6        Q     And you understand that if you express

7    opinions that are inconsistent with the opinions of the

8    NRA that might be a reason that you might be fired?

9              MR. SWEENEY:  Objection.

10             THE WITNESS:  I'm not sure that it would

11   be.  I just don't really know on that.

12   BY MR. KLEIN:

13       Q     So if you were to use your media platform

14   to talk about the importance of regulating guns, would

15   you expect to keep your job at the NRA?

16             MR. SWEENEY:  Objection.

17             THE WITNESS:  Well, that's not part of my

18   job, so I would not use my social media platform for

19   that.

20   BY MR. KLEIN:

21       Q     But if you did, you wouldn't expect to keep

1  your job, would you?

2            MR. SWEENEY:  Objection.

3            THE WITNESS:  Wouldn't do it.

4  BY MR. KLEIN:

5       Q    But if you did do it, would you expect to

6  keep your job?

7            MR. SWEENEY:  Objection.  Asked answered.

8            THE WITNESS:  Ask again, please.

9  BY MR. KLEIN:

10       Q    If you did use your media platform to take

11  positions that were inconsistent with those of the NRA,

12  you understand that you might be fired for that, right?

13            MR. SWEENEY:  Objection.

14            THE WITNESS:  There are any number of

15  things that I could do that would get me fired, and I

16  assume that could be one of them.

17  BY MR. KLEIN:

18       Q    Besides your work at the NRA, do you have

19  other paid positions?

20       A    I receive royalties for writing, but other

21  than that, no.

1        Q      What percentage of your income is your

2    salary from the NRA?

3        A      The vast majority.

4        Q      More than 90 percent?

5        A      Probably, I'm sure.

6        Q      Are you also an NRA member?

7        A      Yes, I am.

8        Q      How long have you been an NRA member?

9        A      Probably around 20 years.  I'm not sure --

10   no, longer than that.  Probably closer to 30 years.

11       Q      And does the NRA have different tiers of

12   membership?

13       A      Yes, they do.

14       Q      What tier of membership are you in?

15       A      A benefactor.

16       Q      And where does that rank among the tiers of

17   membership at the NRA?

18       A      That's top in terms of standard

19   memberships.

20       Q      Do you pay additional dues to qualify as a

21   benefactor member?

```
 1        A     It's a one-time payment.

 2        Q     How much is the one-time payment?

 3        A     I don't recall.

 4        Q     Is it in the thousands of dollars?

 5        A     No.  I'm sure it's not.  I don't think it

 6   is.  I always tried to upgrade my membership when it

 7   was on sale, so I bought it cheaper than the list

 8   price, I'm sure.

 9              MR. SWEENEY:  We'll designate a portion of

10   this transcript as confidential if necessary.

11   BY MR. KLEIN:

12        Q     Do you remember when you became a

13   benefactor member?

14        A     I don't.

15        Q     Do you pay yearly dues?

16        A     No.  It's the higher levels of

17   membership -- life and above are a one-time payment for

18   the membership.

19        Q     And you've made that one-time payment?

20        A     Yes, I have.

21        Q     Does that mean you're a lifetime member of
```

1    the NRA?

2         A      I'm pretty sure benefactor members are part

3    of the group of members that are considered life

4    members.

5         Q      Is it fair to say that as a general matter

6    you support the NRA's position on legal issues?

7              MR. SWEENEY:  Objection.

8              THE WITNESS:  I generally do.

9    BY MR. KLEIN:

10        Q      Do you support the NRA's position on policy

11   issues?

12             MR. SWEENEY:  Objection.

13             THE WITNESS:  On what, please?

14   BY MR. KLEIN:

15        Q      Policy issues?

16        A      Can you explain what a policy issue is.

17        Q      When they take a position about a matter of

18   public policy, would you typically support the NRA's

19   position?

20        A      Not necessarily always, but usually I do.

21   And let me say that about political issues, which you

1   asked earlier.  Not always, but usually I do support

2   the NRA's position.

3        Q    Can you tell me any NRA positions that you

4   disagree with?

5        A    Not off the top of my head.

6        Q    But you've, for a period of time, served as

7   a member of the board of directors of the NRA, correct?

8        A    Yes, sir.

9        Q    What period of time was that?

10       A    About seven years.

11       Q    Do you remember the time period?

12       A    Pardon?

13       Q    Do you remember the time period?

14       A    About 2001 to 2008.

15       Q    How many terms were encompassed in that

16   period?

17       A    I was elected three times.

18       Q    So you served two full terms and parts of a

19   third?

20       A    Yes, sir.

21       Q    Each term is three years?

1        A       Yes, sir.

2        Q       Were you paid for board service?

3        A       No.

4        Q       Were you a board member in the time period

5   that you were general counsel of your family business?

6        A       No.

7        Q       What were you doing to earn money when you

8   were a board member of the NRA?

9        A       I had an antique and collectible firearms

10  business, and that's what I was doing.

11       Q       What were your responsibilities as a board

12  member?

13       A       The board of directors is the governing

14  body of the NRA, so they would generally set the

15  direction for the organization.  The board relies

16  heavily on a number of committees that report to the

17  board, and I served on some of those committees.

18       Q       Do you remember the committees that you

19  served on?

20       A       I served on the Gun Collectors Committee.

21  I served on the Publications Policies Committee.  I

38

1    think there was a third committee that I was involved

2    with for a briefer period of time, but I don't recall

3    what it was right off the top of my head.

4         Q    Were you ever involved in the NRA's legal

5    decision-making?

6         A    No.

7              MR. SWEENEY:  Objection.

8    BY MR. KLEIN:

9         Q    Have you ever had input into any legal

10   decision that the NRA made?

11             MR. SWEENEY:  Objection.

12             THE WITNESS:  No.

13   BY MR. KLEIN:

14        Q    Have you ever been asked for your input?

15        A    Other than offering expert opinion in the

16   cases that we've discussed, no.

17        Q    Were you ever consulted about an issue

18   before the NRA filed a case for your expert opinion?

19        A    Before the NRA filed a case, no.

20        Q    Were you involved at all in the Heller

21   case?

1        A      I'm pretty sure not.

2        Q      Have you provided any legal assistance of

3   any kind to the NRA?

4               MR. SWEENEY:  Objection.

5               THE WITNESS:  No.

6   BY MR. KLEIN:

7        Q      Have you provided any legal assistance of

8   any kind to any board member of the NRA?

9        A      No.  Let me go back to the previous

10  question too.  Other than the expert opinions that

11  we've discussed.

12       Q      I think we can exclude those.

13       A      Thank you.

14       Q      I understand your testimony to be that your

15  expert opinions are not legal opinions, correct?

16       A      Yes, sir.  Good.

17       Q      So I wouldn't include them when I ask a

18  question about whether you offered legal opinions --

19       A      Thank you.

20       Q      -- on any issues to the NRA, okay?

21       A      Thank you.

1      Q     Have you provided any legal opinions to any
2  officer of the NRA?

3      A     No.

4      Q     Any legal assistance of any kind?

5      A     No.

6      Q     Do you currently have legal malpractice
7  insurance?

8      A     No.

9      Q     Have you ever made recommendations to
10  anyone at the NRA about policies that the NRA might
11  pursue?

12      A     What kind of policies?

13      Q     Any policies of any kind at all.

14      A     I would make recommendations as to policies
15  for the NRA Museum Division.

16      Q     In preparing your report in this matter,
17  was it your intention that your legal opinions advance
18  the goals of the NRA?

19           MR. SWEENEY:  Objection.  He's already said
20  they're not legal opinions.

21           MR. KLEIN:  Fair enough.

1   BY MR. KLEIN:

2          Q      You can answer.

3          A      There aren't legal opinions in here.

4          Q      Is it fair to say it was your intention

5   that your expert opinions advance the goals of the NRA?

6          A      My intention was to give my expert opinion

7   in response to the questions raised in this case, and I

8   understand that the NRA is involved in and supporting

9   this case.

10          Q      So it's fair to say that your intention was

11   for your expert opinions to support the NRA's goals in

12   this case?

13          A      Yes, sir.

14          Q      And is it fair to say that your expert

15   opinion was intended to advance the NRA's positions

16   about the meaning of the Second Amendment?

17          A      My primary intention is to respond honestly

18   to this -- the facts in this case.

19                 Would you please ask that question again.

20          Q      Is if fair to say that your intention is

21   that your expert opinions advance the NRA's position

1  about the meaning of the Second Amendment?

2       A    It would please me if that happened.

3       Q    Let's -- if you don't mind turning to

4  Page 33 of your report in this matter, which is

5  Exhibit 2.

6       A    Yes, sir.

7       Q    Starting near the bottom of Page 33, there

8  is a list under the heading "Expert Witness and

9  Consulting."

10           Do you see that?

11      A    Yes, sir.

12      Q    First case there is Worman versus Baker.

13           That's this case, right?

14      A    Yes, sir.

15      Q    And, in this case, your opinions are on

16  behalf of Mr. Worman and his side of the case, right?

17      A    Yes, sir.

18      Q    And they are in support of his position

19  that the guns and large-capacity magazines at issue

20  should not be regulated, right?

21           MR. SWEENEY:  Objection.

1                    THE WITNESS:  Yes, sir.  Other than to the

2    extent that they already are.

3    BY MR. KLEIN:

4         Q     That they already are?

5         A     I'm sorry.

6               MR. SWEENEY:  Objection.

7               THE WITNESS:  Let me rephrase that.

8               MR. KLEIN:  I think that would be better,

9    yeah.

10               THE WITNESS:  Yeah, that they should not be

11   regulated differently than other firearms and

12   magazines.

13   BY MR. KLEIN:

14        Q     And that was true of the matter Kolbe

15   versus Hogan as well, right?

16        A     I think they were very similar issues.

17        Q     And, again, your testimony there was on

18   behalf of Mr. Kolbe and his side of the case, right?

19        A     Yes, sir.

20        Q     And intended to challenge the regulation of

21   firearms in large-capacity magazines?

44

 1              MR. SWEENEY:  Objection.

 2              THE WITNESS:  To challenge the regulation

 3    of so-called assault-style firearms and high-capacity

 4    magazines or large-capacity magazines.

 5    BY MR. KLEIN:

 6         Q    And in support of that challenge, right?

 7         A    Yes, sir.

 8         Q    And encoding firearms museum design review

 9    panel, what did you do?

10         A    That's consulting.  I haven't done a great

11    deal on that yet.

12         Q    What about JM Davis Foundation versus the

13    State of Oklahoma?

14         A    I offered expert opinion on the operation

15    of the JM Davis Museum in support of the continued

16    operation of the museum.

17         Q    And what was the challenge to the continued

18    operation of that museum?

19         A    The challenge was whether the museum was

20    giving appropriate curatorial care to the firearms in

21    the collection.

1     Q     When you say "curatorial care," what do you
2  mean?

3     A     Preserving the firearms appropriately and
4  displaying them appropriately.

5     Q     Was there a concern about the way they were
6  being secured?

7     A     Their primary concern was about the
8  custodial care, whether they were being properly
9  preserved.  I don't know that security was a major
10  concern in that.

11     Q     But it was some part of a concern?

12     A     It may have been.  I'm just not certain.
13  It was definitely was not the primary focus.

14     Q     Did you offer an expert opinion in the next
15  matter Wilson, et al., versus County of Cook, Illinois?

16     A     Yes, I did.

17     Q     On which side of the case?

18     A     I was opposed to the so-called assault
19  weapons ban.

20     Q     Did you offer expert opinion in connection
21  with Friedman and the Illinois State Rifle Association

46

1    versus the City of Highland Park?

2         A     Yes, sir.

3         Q     On what side of that case?

4         A     That is going to be the same general

5    principle as the previous assault-weapon-related cases.

6         Q     Meaning that your testimony was intended to

7    oppose the regulation of assault weapons?

8              MR. SWEENEY:  Objection.

9              THE WITNESS:  It was opposed to a different

10   regulation of assault weapons, so-called assault

11   weapons, and other similar firearms.

12   BY MR. KLEIN:

13        Q     And that means your testimony was on behalf

14   of Friedman and the Illinois State Rifle Association?

15        A     Yes, sir.

16        Q     Do you remember the counsel that you worked

17   with in that case?

18        A     No, I don't.

19        Q     And I notice in the Wilson case you

20   mentioned that you did have your deposition taken.

21             Does that refresh your recollection on the

1   issue we discussed earlier?

2        A     Yeah, and there should be a deposition for

3   that.

4        Q     Do you remember the counsel that you worked

5   for in that case?

6        A     No, I don't.

7        Q     And you don't know whether you had your

8   deposition taken in the Friedman case, do you?

9        A     I don't think I did.

10        Q     And then below that, there is a case called

11   Tardy versus O'Malley.

12              Do you see that?

13        A     Yes, sir.

14        Q     Do you remember what that case was about?

15        A     It was a similar issue to the others.

16        Q     Similar to the Kolbe case in Maryland?

17        A     Yes, sir.

18        Q     And which side did you testify on?

19        A     I testified for the party challenging the

20   so-called assault weapons ban.

21        Q     Have you ever offered expert testimony in

48

1   support of a regulation of assault weapons?

2        A     No, I haven't.

3        Q     Have you ever offered testimony in support

4   of a regulation on large-capacity magazines?

5        A     No, I have not.

6        Q     Have you ever offered testimony in support

7   of any type of regulations on guns or magazines?

8        A     I don't recall if my testimony in any of

9   these may have swerved into other types of firearms

10  regulations or not.

11       Q     Meaning that there could have been an issue

12  inside one of these cases where your testimony

13  supported the regulation of the firearms?

14       A     There could be.

15       Q     The firearms at issue or just in a general

16  sense?

17       A     Say again, please.

18       Q     Was your testimony in any of these cases in

19  support of regulation of the firearms at issue in the

20  case?

21       A     No, it was never in support of regulation

1  of the firearms at issue.

2       Q     I notice in the depositions I've looked at

3  that your testimony sometimes suggests that you are

4  comfortable with regulation of machine guns; is that

5  right?

6       A     Yes.

7       Q     And does that mean you would support

8  regulation of machine guns?

9       A     I would say that I find the regulations on

10  machine guns to be reasonable and acceptable.  It's

11  possible that they might be improved, but I haven't

12  given it a lot of thought and study.

13       Q     Would you also support regulation on

14  select-fire weapons?

15       A     Those would be a subset of machine guns.

16       Q     And what is the basis in which you are

17  comfortable with the regulation of machine guns but

18  uncomfortable with the regulation of semi-automatic

19  rifles?

20       A     The current regulations on machine guns

21  have been accepted law for quite a while.  They seem to

1    have worked and been acceptable.  I'm not sure it's

2    optimal.

3            I think at some point there is a

4    distinction between firearms that are appropriate as

5    individually-aimed weapons and firearms that tend to be

6    more military-oriented that might be more area weapons

7    than individual.

8        Q    So when you refer to something as an

9    "individually-aimed weapon," what are you referring to?

10       A    I'm referring to a gun that shoots one

11   aimed shot at a time.

12       Q    You can also aim a machine gun, correct?

13       A    Yes, you can.

14       Q    I presume you'd want to do that in order to

15   make sure you're hitting what you intend to hit, right?

16       A    Yes.

17       Q    And you can also fire a semi-automatic

18   rifle indiscriminantly, correct?

19            MR. SWEENEY:  Objection.

20            THE WITNESS:  You can fire any firearm

21   indiscriminantly including semi-automatic rifles.

51

BY MR. KLEIN:

    Q    Meaning you can fire it without aiming at any particular target, right?

    A    True of any firearm.

    Q    Now, you mentioned that the regulation of machine guns has been with us for some time, right?

    A    Yes, sir.

    Q    Approximately when were machine guns first regulated?

    A    I think it was 1934 that the primary restriction was passed.  I'm not sure of that year, and I don't know if there were other restrictions before that or not.

    Q    The first assault weapons ban was enacted in 1994, was it not?

    A    I don't know the year, but that sounds about right.

    Q    Federal assault weapons ban, do you not remember the year it was enacted?

    A    I don't remember the year, no.  But that sounds about right.  I could accept that.

1      Q      So it's about 24 years, right?

2      A      That sounds right, but you're the one with

3   the year math.

4      Q      Let me do the calculation more carefully.

5      A      Just so I'm sure we're talking about the

6   same regulation, I believe that's the one that

7   sunsetted out after a number of years.

8      Q      Correct.  But do you have any sense of when

9   the Massachusetts assault weapon ban went into effect?

10     A      From the language, it sounded as if it

11  might be in the same area.

12     Q      In the '90s?

13     A      Yeah, but I don't remember for sure when it

14  was.

15     Q      If I told you that the Massachusetts

16  assault weapon ban has been in effect for more than

17  20 years, would you agree with me?

18     A      I would believe you.

19     Q      And do you have any basis to believe that

20  it's not accepted in Massachusetts?

21             MR. SWEENEY:  Objection.

1           THE WITNESS:  Well, I'm sure there are a

2   number of people in Massachusetts who don't accept it.

3   BY MR. KLEIN:

4        Q     Do you believe there are a number of people

5   in Massachusetts who don't accept the regulation on

6   machine guns?

7        A     Probably fewer, but there may be.  There

8   are people who disagree with a number of different laws

9   and regulations.

10        Q     Are you aware of whether the NRA previously

11   challenged the Massachusetts assault weapon ban?

12        A     I'm not aware.

13           MR. SWEENEY:  Objection.

14   BY MR. KLEIN:

15        Q     Do you know whether there was a case that

16   the NRA supported challenging the assault weapons ban?

17        A     The federal assault weapons ban?

18        Q     The Massachusetts assault weapon ban.

19        A     No, I'm not aware.

20        Q     Are you aware of any court decision that

21   ruled against the challenge to the Massachusetts

54

1   assault weapon ban?

2        A      No.

3        Q      Would that be relevant to your evaluation

4   if you knew about it?

5        A      I'm not sure if it would or wouldn't.  I'd

6   have to see it.

7        Q      Can you tell me who asked you to

8   participate in this matter as an expert?

9        A      I believe it was either John or Jay Porter.

10  I forget exactly who with this firm contacted with me.

11       Q      When you say "John," you mean John Sweeney?

12       A      Yes, sir.

13       Q      The gentleman sitting next to you, correct?

14       A      Yes.  That's the guy.

15       Q      And Jay Porter is another lawyer for the

16  Bradley firm?

17       A      Yes, sir.

18       Q      Were you asked to participate in this

19  matter by anyone at the NRA?

20       A      No.  I asked for my boss's permission to

21  participate in it, and he gave his okay.

1        Q      And when you refer to your boss, who do you

2   mean?

3        A      Joe DeBergalis.

4        Q      And did you understand Mr. Sweeney and

5   Mr. Porter to be working for the NRA?

6        A      I understood that there was some

7   affiliation.  I'm not sure exactly who their client is.

8        Q      Are you aware that the NRA is paying the

9   fees and costs in this case?

10       A      That would not surprise me.  I didn't know

11  for sure.

12       Q      Now, I notice that you're not being paid

13  for your time working on this case; is that right?

14       A      No.  No special payment for my time on this

15  case.

16       Q      Who is paying you for your time today?

17       A      I'm salaried at the NRA, so I'm doing this

18  on NRA's time.

19       Q      They're not asking you to take a vacation

20  day to do this?

21       A      No, they're not.

1       Q      Personal day?

2       A      No.

3       Q      Sick day?

4       A      Not that either.

5       Q      So you'll get paid by the NRA for your time

6  here today?

7       A      Yes, sir.

8       Q      And you'll get paid for some of the time

9  you put into preparing the expert report in this

10  matter?

11       A      Just as part of my regular salary, yes,

12  sir.

13       Q      Is it fair to say that in this matter

14  you're working for the NRA?

15              MR. SWEENEY:  Objection.

16              THE WITNESS:  To the extent that I'm being

17  paid by the NRA for my time spent on this, yes, I think

18  so.

19              (Exhibit No. 3 was marked for

20  identification.)

21  ///

57

BY MR. KLEIN:

  Q     I've handed you a document that's labeled Exhibit Number 3.

        Is that a document that's familiar to you?

  A     That looks like it's a copy of my deposition in Tardy versus O'Malley.

  Q     And that's a document you reviewed as part of your preparation for your deposition today?

  A     Yes, sir.

  Q     So you remember having your deposition taken in that case on January 6, 2014?

  A     Generally, yes.

  Q     And you reviewed the testimony you gave in that case before you came here today?

  A     Yes, sir.

  Q     And you understood at the time of the deposition that you were answering questions under oath, correct?

  A     Yes, sir.

  Q     And at that time, all of your answers were truthful to the best of your ability, right?

58

1      A      Yes, sir.

2      Q      Is it fair to say that your opinions in

3  your area of expertise are the same now as they were

4  then?

5      A      I can't think of any matter in which

6  they've changed.

7            (Exhibit No. 4 was marked for

8  identification.)

9  BY MR. KLEIN:

10     Q      I've just handed you a document that's

11  labeled Exhibit Number 4.  I'm not sure why these were

12  separately copied, but if you would take a look at

13  them.

14     A      Okay.

15     Q      It's my understanding, and I'd ask you to

16  confirm my understanding, that these are the exhibits

17  to the deposition that you gave in Tardy versus

18  Maryland.

19     A      I don't know that I've seen this before, so

20  I can't confirm that.  I'd be willing to believe that

21  if you represent that.

1        Q     They would have been appended to the

2   deposition transcript at the time?  Do you know?

3        A     I'm not sure that I saw these.

4        Q     I'd ask you to turn then to Exhibit

5   Number 2, which says "Living With Brady" at the top.

6        A     Yes, sir.

7        Q     Is that something you wrote?

8        A     It is.

9        Q     And it appeared in the Blue Book of Gun

10  Values 15th Edition, right?

11       A     Yes, it did.

12       Q     And, at that time, you were working for a

13  company called Old Town Station; is that right?

14       A     Yes, sir.

15       Q     Do you remember approximately when this was

16  written?

17       A     Oh, wow.  You can look at Blue Book -- it

18  puts out one edition each year -- and figure out when

19  the 15th edition was published.  I guess this was

20  probably -- oh, third paragraph says, "At this writing,

21  March 1994, the Brady Bill has just become effective."

60

1          So it would be March 1994 when this was

2     written, and it was probably published a month or two

3     later.

4          Q     Do you remember writing this?

5          A     I do.

6          Q     At the time, did it accurately state your

7     opinions?

8          A     Yes, it did.

9          Q     If you could turn to Exhibit Number 3 -- to

10    the document you have, which is in this case, Exhibit

11    Number 4.  So it's something that says at the top,

12    "This is the Gun Zone."

13          Do you see that?

14          A     I do.

15          Q     And that was, based on the marking,

16    probably an exhibit to the deposition in Tardy versus

17    O'Malley, do you think?

18          A     It appears to be.

19          Q     And at the top it says, "Jim Supica, NRA

20    Board Candidate's Un-Redacted Responses."

21          Do you see that?

1     A     Yes, sir.

2     Q     Do you remember being interviewed for this

3  particular piece?

4     A     As I recall, this is a response to an

5  online group, a firearms related group, in response to

6  their request for information from board candidates for

7  the NRA Board.

8     Q     If you turn to the next page, close to the

9  bottom of the page, it says, "By Jim Supica, 2004

10  Candidate For Reelection."

11     A     Yes, sir.

12     Q     Does that mean that this was in connection

13  with your candidacy for reelection to the Board of the

14  NRA?

15     A     Yes, sir.

16     Q     And do you remember making these statements

17  at the time?

18     A     I haven't reviewed this, but I'm pretty

19  sure that is probably a correct copy.  And, yes, that

20  would be accurate.

21     Q     Go ahead and review it.

1     A    Okay, thanks.

2         That looks like what I wrote.

3     Q    And that means you actually wrote this down

4 rather than responded to a question orally and had

5 someone else write down what you said, right?

6     A    This would have been a question that was

7 probably e-mailed to me or posted on a website, and I

8 responded either by e-mail or by posting on a --

9 probably a forum on the website.

10     Q    And, as far as you know, this is an

11 accurate reproduction of what you responded at the

12 time, right?

13     A    I believe it probably is.

14     Q    At that time, it was your view that the

15 assault weapons ban and large-capacity magazine ban is

16 an egregious tumor on the Bill of Rights, correct?

17     A    Yes, sir.

18     Q    And you also believe that it's one of the

19 more hysteria-induced and silly-assed federal laws ever

20 passed, right?

21     A    In retrospect, there are probably a lot of

1   hysterical federal laws that have been passed, but I

2   think -- yeah, I think that statement can stand.

3        Q     It's one of the more hysteria-induced and

4   silly-assed federal laws?

5        A     Yes, sir.

6        Q     And you also believe that the assault

7   weapons ban is the poster child for demonizing the gun

8   culture, right?

9        A     Yes, sir.

10       Q     And how would you say that it demonized the

11  gun culture?

12       A     It takes a very commonly owned and commonly

13  used type of firearm that is owned and used by millions

14  of Americans for any number of legitimate purposes and

15  puts it in a banned, restricted, outlawed category.

16       Q     It's also banning guns that have been used

17  by criminals, correct?

18       A     Most types of guns have been used by

19  criminals.

20       Q     These guns have been used by criminals in

21  many mass shootings, right?

1     A     Again, any number of different types of

2  guns have been used by criminals in any number of

3  crimes including mass shootings.  There have been a

4  number of types of guns used in mass shootings, and

5  these guns are among those.

6     Q     So do you question the understanding of the

7  proponents of the Clinton Assault Weapons Ban that its

8  purpose was to help protect public safety?

9              MR. SWEENEY:  Objection.

10             THE WITNESS:  I question as to whether its

11  effect was to protect public safety.

12  BY MR. KLEIN:

13     Q     But you believe that the proponents were

14  not intending to protect public safety, but rather to

15  demonize the gun culture, right?

16     A     I think the proponents had a number of

17  reasons.  Certainly firearms are a very

18  politically-charged issue.  There are a number of

19  people on both sides of the issue who feel very

20  strongly, so I can believe that, as with most laws,

21  there were some good intent with this.  I can also

1  believe that there was a substantial amount of

2  political intent involved with this.

3      Q    What's the good intent in your view?

4      A    I can only guess that the proponents of

5  this had a misguided belief that restricting a type of

6  firearm would restrict crimes committed.

7      Q    These were elected officials, right?

8      A    Yes.  I believe they were.

9      Q    And if people disagreed with them, they

10 could have been voted out of office, right?

11     A    Yes.

12     Q    You also state an opinion that this assault

13 weapons ban is part of the divide and conquer

14 incrementalism tactics of the anti-Second Amendment

15 movement; is that right?

16     A    Yes.

17     Q    Do you still believe that?

18     A    Yes.  I think there's an aspect of that.

19     Q    So if I represent to you that the

20 Massachusetts assault weapons ban is the same as the

21 assault weapons ban at issue in this article, would you

66

1  say the same things about the Massachusetts assault

2  weapons ban?

3      A     Yes.  I think generally they would apply.

4      Q     I'm going to turn your attention to the

5  next to last paragraph of this statement.

6      A     Yes, sir.

7      Q     Is that still your opinion?

8            MR. SWEENEY:  I'm sorry.  What?  The entire

9  paragraph?

10           MR. KLEIN:  Yes.

11           MR. SWEENEY:  All right.

12           Do you understand which paragraph he's

13  referring to?

14           THE WITNESS:  Yeah.

15           At this point, we're talking about my

16  personal opinions, not my expert opinions.  But, yes, I

17  think that's -- I think I can still agree with that

18  paragraph.

19  BY MR. KLEIN:

20      Q     So when you say these are your personal

21  opinions, do they also inform your expert opinions?

1      A      I don't know that they do.

2      Q      So to the extent that your expert opinions

3  appear to reflect personal opinions, can we ignore

4  them?

5      A      My expert opinion is drawing on my

6  expertise in the field.  I have personal political,

7  religious, philosophical opinions that shape who I am,

8  but those are not necessarily what I'm reporting on in

9  my expert opinion.

10     Q      So it's not quite responsive to the

11  question I asked you, so I'm going to ask it again.

12     A      Okay.

13            MR. SWEENEY:  Objection.

14  BY MR. KLEIN:

15     Q      To the extent your expert report includes

16  what appear to be personal opinions, can we ignore

17  them?

18            MR. SWEENEY:  Objection.  Asked and

19  answered.

20            THE WITNESS:  I'm sorry.  One more time,

21  please.

68

1   BY MR. KLEIN:

2        Q    To the extent your expert report appears to

3   include personal opinions, can we ignore them?

4             MR. SWEENEY:  Objection.  Asked and

5   answered.

6             THE WITNESS:  My expert opinion is based on

7   my expertise in the field and not my personal opinions.

8   BY MR. KLEIN:

9        Q    So if it does include personal opinions, we

10  can ignore them, correct?

11            MR. SWEENEY:  Objection.

12            THE WITNESS:  No.  I don't think there are

13  personal opinions that are not substantiated by my

14  expertise in the report, so what I said in my expert

15  report is what I meant based on my expertise in the

16  field.

17            MR. SWEENEY:  Let's take a quick break.

18            MR. KLEIN:  Sure.

19            (A brief recess was taken.)

20  BY MR. KLEIN:

21       Q    Sir, do you have Exhibit 3 and 4 in front

69

1  of you?

2       A     Yes, sir.

3       Q     And, in both exhibits, there is a cover

4  sheet that says, "In the Matter of Shawn J. Tardy, et

5  al., Versus Martin J. O'Malley, et al."

6             Do you see that?

7       A     I do.

8       Q     Do you happen to know if that is the same

9  case as Kolbe versus O'Malley?

10      A     I have been told that it is.

11      Q     Is it fair to say that in that case, you

12  were also working for the NRA?

13            MR. SWEENEY:  Objection.

14            THE WITNESS:  I was employed by the NRA at

15  the time, and I was not paid separate expert witness

16  fees for my testimony.

17  BY MR. KLEIN:

18      Q     And the NRA paid the costs of that case as

19  far as you know?

20            MR. SWEENEY:  Objection.

21            THE WITNESS:  I don't know one way or the

1    other.

2    BY MR. KLEIN:

3         Q     Okay.  I'm going to show you a document

4    labeled Exhibit Number 5.

5              (Exhibit No. 5 was marked for

6    identification.)

7    BY MR. KLEIN:

8         Q     Would you look through that document,

9    please.

10        A     Okay.

11              Okay.  I've looked through it quickly.

12        Q     Do you recognize the document?

13        A     I recognize that it has material that I've

14   written.  I'm not sure what the document is.

15        Q     Let's turn to the third page of the

16   document.

17        A     Okay.

18        Q     Is that your signature at the bottom of the

19   page?

20        A     Yes, it is.

21        Q     And on the fifth page of the document, is

1  that also your signature?

2       A    Oh, we're counting front and back?  I'm

3  sorry.  Yes, those are both my signature.

4       Q    And is it possible that this is the

5  material that you filed with the court -- or, I

6  shouldn't say that you filed -- that the lawyers filed

7  with the court in connection with your expert opinion

8  in Kolbe versus O'Malley?

9            MR. SWEENEY:  Objection.

10           THE WITNESS:  It's not labeled, so I can't

11  be sure, but that's certainly possible.

12  BY MR. KLEIN:

13       Q    One way we can look at the question is:

14  Do you see at the top that there's a case caption?

15       A    Yes, there is.

16       Q    And it says, "1:13-CV-02841-CCV"?

17       A    Yes.

18       Q    And if you go back and look at Exhibit

19  Number 3 --

20       A    Yes, sir.

21       Q    -- that same number will appear, I think.

1      A      I see it on the second page of that

2   document.

3      Q      Does that suggest to you that these are

4   documents from the same case?

5      A      Yes.  I think it does.

6      Q      If you turn back to Exhibit Number 5 --

7      A      Yes, sir.

8      Q      -- the one you just started looking at.

9             Would you look at Paragraph 7 of your

10  declaration.

11     A      Yes, sir.

12     Q      It says there:

13            "One of the primary reasons for the

14  abandonment of the M14 as a field weapon was the

15  difficulty of controlling the firearm while engaged in

16  fully-automatic mode."

17            Do you see that?

18     A      Yes, sir.

19     Q      And is that your opinion?

20     A      Yes.

21     Q      And is it the case that when the Army

1  abandoned the M14 as a field weapon, they introduced a

2  weapon that did not have fully automatic mode?

3      A    I thought the M16 was the successor to the

4  M14, and that is a select fire weapon.

5      Q    With burst mode and semi-automatic mode,

6  right?

7      A    I don't know if it's burst or full-auto.

8  It maybe burst mode.

9      Q    And if you look at the first sentence of

10 Paragraph Number 8, that says:

11          "With respect to interchangeability of

12 parts between enumerated banned firearms and

13 unregulated firearms, this requirement remains

14 confusing.  Interchangeability of parts differs greatly

15 from firearm to firearm."

16          Do you see that?

17     A    Yes, sir.

18     Q    Did I read it correctly?

19     A    Yes.

20     Q    And then it says:

21          "And while some individual parts may not be

1  interchangeable, parts groupings such as bolt carriers

2  may, in fact, be interchangeable.  Again, this will

3  differ on a firearm-to-firearm basis."

4       A     Yes, sir.

5       Q     Is that still your opinion?

6       A     Yes, sir.

7       Q     And what you mean there, unless I

8  misunderstand, is that parts can be interchangeable

9  between guns of the same type?

10      A     Parts can be interchangeable between guns

11 of different types as well.  You've got to define

12 "types" if you want to make that statement.

13      Q     So I think specifically you're talking here

14 about bolt carrier as an example, right?

15      A     Bolt carrier is an example of a group of

16 parts, yes, sir.

17      Q     And the bolt carrier from an AR-15 can be

18 interchangeable with the bolt carrier of another AR-15,

19 correct?

20      A     I believe it can in most cases.

21      Q     The trigger mechanism for an AR-15 can be

1  interchanged with the trigger mechanism on another

2  AR-15, right?

3       A    In most cases.

4       Q    And, in general, the extractor mechanism

5  works the same on any AR-15; isn't that right?

6       A    Gosh, I think the extractor mechanism

7  serves the same general function in most firearms.

8       Q    But it works in the same way on different

9  makes and models of AR-15s, right?

10       A    Again, the general function of an extractor

11  is the same for all firearms, I think.

12       Q    And you can move a charging handle from an

13  AR-15 onto another AR-15 and still have it work, right?

14       A    There are a number of variations of AR-15s.

15  It's a very prolific and popular firearm.  My

16  understanding is that not all guns on the AR-15 have

17  fully interchangeable parts, but a significant number

18  of the different models do.

19       Q    One of the parts that can be interchanged

20  among that significant number of AR-15 models is the

21  charging handle, right?

76

1       A       I think probably so.  Again, maybe not on

2   all models.  I really can't answer that with

3   specificity.

4       Q       And if you have a magazine that's built for

5   an AR-15 platform gun, it can be used with any AR-15

6   platform gun, right?

7       A       I think if you're talking the same caliber,

8   that is generally true.

9       Q       Are you familiar with the facts of any

10  incident in which a civilian used an AR-15 platform

11  weapon in self-defense in Massachusetts?

12      A       In Massachusetts, I don't know that I'm

13  familiar with any self-defense situations in

14  Massachusetts.

15      Q       Are you familiar with the use of an AR-15

16  platform weapon in self-defense anywhere in the

17  country?

18      A       I cannot give specific examples, but I have

19  the impression that, yes, they have been used in

20  self-defense.

21      Q       When you say you have the impression, but

1  you don't have specific examples, does that mean you

2  can't point me to a specific incident?

3       A     I cannot point you to a specific incident.

4       Q     Are you aware of any circumstances in which

5  an AK-47 has been used in self-defense in

6  Massachusetts?

7       A     An AK-47 is a machine gun.  It would very

8  much surprise me if a full-auto AK-47 has been used in

9  personal defense anywhere in the country.

10      Q     Are you familiar with a semi-automatic

11 version of the AK?

12      A     Yes, sir.

13      Q     What would you call that?

14      A     I would call that an AK-type firearm.

15      Q     Are you familiar with any circumstances in

16 which an AK-type firearm has been used in self-defense

17 in Massachusetts?

18      A     Again, I'm not familiar with specific uses

19 of any firearms in Massachusetts for self-defense that

20 I can recall.

21      Q     Are you aware of any specific incidents

1    where an AK-platform gun has been used in self-defense
2    anywhere?
3         A    I'm not sure if they have or not.  It would
4    surprise me if they hadn't.
5         Q    But you can't give me any specific
6    incidents?
7         A    No, sir, I can't.
8         Q    Are you familiar with any circumstances in
9    which a weapon that would be treated as banned under
10   the Massachusetts assault weapons ban has been used in
11   self-defense in Massachusetts?
12        A    Once again, I'm not familiar with specific
13   self-defense incidents in Massachusetts, much less what
14   type of firearms were used.
15        Q    You mentioned that it's your opinion that
16   restrictions on access to fully-automatic weapons are
17   acceptable.
18             Is that a fair statement of what you said?
19        A    That is a personal opinion, yes.
20        Q    And I think you mentioned that one of the
21   reasons for that opinion is that they can be fired

1    indiscriminantly; am I right about that?

2            MR. SWEENEY:  Objection.

3            THE WITNESS:  I believe we discussed that,

4    and the gist of it was that any firearm can be fired

5    indiscriminantly.

6    BY MR. KLEIN:

7        Q    So is it fair to say that you believe that

8    fully-automatic weapons are more dangerous than

9    semi-automatic weapons?

10       A    No.  Not necessarily and intrinsically.

11       Q    Is it a true statement that the faster you

12   fire a gun, the harder it is to properly aim?

13       A    Many types of guns can be fired very

14   rapidly with proper aim with practice.  For most types

15   of firearms, there is some limitation as to how rapidly

16   they can be accurately fired.

17       Q    Would you say that that's true for an AR-15

18   type gun?

19       A    That would be true for a lot of types of

20   guns.  The AR would be one of those types of guns for

21   which it's true.

1      Q      And one of the reasons for that is that the

2  recoil of the gun moves it off target and has to be

3  re-aimed, correct?

4      A      The recoil of an AR is very minimal

5  compared to many other types of rifles, but that is one

6  of the reasons that it is difficult to rapidly fire a

7  gun accurately.  That is one of the limiting factors of

8  how rapidly a firearm can be fired.

9      Q      Even mild recall pulls it off target to

10  some extent, right?

11      A      There are types of guns and types of gun

12  setups that really minimize that effect.  But, yes, in

13  most cases, recoil for most commonly used center-fire

14  cartridges will pull a gun off target.  Now, there are

15  design characteristics that can mitigate that factor to

16  a certain extent.

17      Q      But not completely?

18      A      That's an absolute, and I can't say not

19  completely.  I think there are some types of very

20  specialized target firearms that go to a great deal of

21  extent to allow the shooter to be able to keep the

1  muzzle very steadily on target.

2        Q      No matter how fast the trigger is pulled?

3        A      I think, in those situations with that type

4  of gun, you're getting more into the skill and ability

5  of the shooter than the limitations of the firearms.

6        Q      You would agree that indiscriminate fire is

7  dangerous, correct?

8        A      Yes.

9              MR. SWEENEY:  Objection.

10             THE WITNESS:  Yes, sir, I would.

11  BY MR. KLEIN:

12        Q      Non-aimed fire is dangerous?

13        A      It certainly can be, yes, sir.

14        Q      Among other things, bystanders can be hit,

15  correct?

16        A      If we're talking about shooting in a

17  situation where there are bystanders, yes.

18        Q      In some cases, a semi-automatic weapon can

19  be fired indiscriminantly by someone pulling the

20  trigger as fast as possible, correct?

21        A      Along with other types of weapons.  It is a

1  function of the ability and training of the shooter,

2  the firearm, and the circumstances.

3       Q    But somebody who is poorly trained or not

4  very interested in hitting an aimed target could fire

5  indiscriminantly with an AR-15, right?

6            MR. SWEENEY:  Objection.

7            THE WITNESS:  As they could with many other

8  types of firearms.

9  BY MR. KLEIN:

10      Q    How fast can the trigger be pulled on an

11 AR-15?

12      A    As fast as you can work your finger.

13      Q    And how fast is that?

14      A    I can't give you a rate.

15      Q    Could you empty a 30-round magazine on an

16 AR-15 in five seconds or less?

17      A    I don't I think could.

18      Q    Could someone who could move their finger

19 quickly do that?

20      A    I don't really know.  That would surprise

21 me a little bit.

1        Q      Is it your view that civilians should have

2   access to any weapon that is available to law

3   enforcement officers in the United States?

4        A      My opinion is that federal law has

5   restrictions on some types of firearms and that

6   specifically full-automatic firearms -- but civilians

7   can have access to those in most states under certain

8   circumstances when they comply with that law.

9             So, yes, I think most firearms that are

10  appropriate for police are also appropriate for

11  civilian usage.

12       Q      Other than automatic weapons?

13       A      Again, I think it's appropriate for

14  civilians to own full-automatic firearms when they have

15  gone through the proper registration and legal

16  requirements.

17       Q      Are you familiar that there is also state

18  restrictions on guns?

19       A      I don't know that -- yeah, I am familiar

20  that state restrictions exist.  I don't know the status

21  of all 50 states' restrictions.

84

1      Q      You're familiar with at least the

2  Massachusetts restrictions that are at issue in this

3  case, right?

4      A      On full-automatic firearms?

5      Q      No.  On semi-automatic firearms.

6      A      Yes, sir.

7      Q      And is it your view that one of the reasons

8  civilians should have those guns is because they're

9  available to law enforcement?

10     A      No, sir.

11     Q      What's your understanding of the average

12 range of a handgun, more or less?

13     A      The average what, please?

14     Q      Range.

15     A      Range.  The vast majority of handguns can

16 be fired by the majority of somewhat-trained shooters

17 effectively out to 25 yards or 50 yards, and the round

18 is certainly dangerous further than that.

19            We're generally talking the most popular

20 and widely produced type of firearms.  There are other

21 handguns that can have a much greater range and a

1   number of fairly popular handguns that are very

2   difficult to shoot accurately at 25 yards.

3        Q    So you're using 25 yards as an approximate

4   average range for handguns?

5        A    What do you mean by "range"?

6        Q    How far they can be effective.

7        A    They can be effective much further than

8   that.

9        Q    Well, what's your understanding of what the

10  effective range of a gun is?

11       A    Well, I'm assuming that we're saying it's a

12  range at which the bullet could do damage if it hits

13  someone or a target.

14       Q    Is it fair to say that others would view it

15  as the range at which someone is likely to be able to

16  shoot what they're aiming at?

17       A    Well, that would be a specific definition.

18  But, yeah, that's a -- if you put it in those terms,

19  that's a fair way to define "range."

20       Q    Is there a different term you'd like to use

21  for that particular evaluation?

1         A     Just pick the term, and we'll go with that.

2         Q     So let's understand "effective range" to

3    mean the range at which someone is likely to be able to

4    hit the target.

5         A     What size target are we talking about?

6         Q     Let's talk about a target the size of a

7    human being.

8         A     Okay.  A human torso?

9         Q     Yes.

10        A     Okay.

11        Q     So what is the effective range of a handgun

12   on average?

13        A     For the average shooter --

14        Q     Yes.

15        A     -- or for a highly-trained shooter?

16        Q     For an average shooter?

17        A     Average shooter, reasonably ten yards; with

18   practice, 25 yards.

19        Q     What about for a shotgun?

20        A     Shotgun will go a little further in terms

21   of effective range.  Your average shooter -- let me

1  backtrack just a little bit.

2           In general, all other things being equal, a

3  shoulder-fired weapon will be easier to shoot

4  effectively and hit a target with than a handheld

5  weapon like a pistol or revolver.

6           So, generally, a shotgun will be effective

7  for an average shooter with moderate training to a

8  further range.  I think most shooters could hit with a

9  shotgun fairly easily at 25 yards with a little bit of

10  training and further than that with a little more

11  practice -- 50 yards or so and even further with

12  significant practice.

13           But a shotgun is going to start running out

14  of energy and start having a drop if you get too far

15  out.

16      Q     How about with a rifle?

17      A     A rifle will have generally a much more

18  extended effective range than either a handgun or a

19  shotgun.

20      Q     Can you give me a sense of what that range

21  is?

1      A      It will depend very much on the rifle and

2  the cartridge, especially the cartridge.

3      Q      Let's talk about an AR-15 then.

4      A      The most common chambering for an AR-15 is

5  going to be a .223 or 5.56 NATO, and most shooters can

6  learn to shoot a center-fire rifle in .223 effectively

7  out to a hundred yards with adequate practice.

8            Skilled shooters would be able to go

9  significantly further than that out to 300 yards.  And

10  highly motivated and highly trained shooters may be

11  able to hit further than that.

12      Q      Close to 500 yards?

13      A      Yes, sir.

14      Q      More than a third of a mile?

15      A      I don't know the math on that, but I'll

16  believe you.

17      Q      Is it fair to say that the more distant the

18  target, the more you would prefer to use a rifle?

19      A      Yes, sir.

20      Q      Is it fair to say that the more distant the

21  target, the more important it is to use some type of

1  sight with the gun?

2       A    It's nearly always important to use some

3  type of sight.

4       Q    Is it fair to say that, in the context of

5  guns used in self-defense, most targets are within the

6  range of a handgun?

7       A    I think the majority would be, yes, sir.

8       Q    Can you tell me what your understanding is

9  of what the Second Amendment protects?

10      A    The right to keep and bear arms, I believe

11  literally.

12      Q    Anywhere and for any purpose?

13      A    You're asking a personal opinion?

14      Q    Yes.

15      A    My personal opinion is that our society has

16  evolved an understanding of what arms are acceptable

17  for ownership and use and which ones need to have some

18  type of restriction.

19      Q    And you are willing to live with that

20  evolution?

21      A    I'm generally okay with the -- let's say,

1   the state or federal law on the matter.  I think that

2   there are improvements that could be made.

3        Q    What about the state of Massachusetts law?

4        A    What I know about the state of

5   Massachusetts law is what's been shown to me in this

6   case.  I think it's inappropriate to restrict the

7   firearms that are restricted under the Massachusetts

8   law.

9        Q    Are you familiar with the gun called the

10  M16?

11       A    Yes, sir.

12       Q    What is it?

13       A    It is a military select-fire firearm, so

14  technically it's a machine gun.  It uses the

15  improvements that were developed in the 1960s, and

16  similar improvements are used in the semi-automatic

17  sporting version, the AR-15 platform.

18       Q    And that latter gun is the civilian version

19  of an M16, right?

20       A    Yeah, I think it can go either way on that.

21  That's the civilian version, or the M16 is the military

1   version of the AR-15.  The difference is that one is
2   select fire and the other is semi-automatic.  That
3   would be the primary difference.
4        Q    And can you tell me the names of some of
5   the manufacturers of the M16?
6        A    Gosh, I'm not sure that I can tell you a
7   great number of the ones that have military contracts.
8   I believe probably Colt being the first one who sold to
9   the military still does have a military contract.
10            The very first ones may have been ArmaLite,
11  but Colt was certainly the major manufacturer for the
12  military for quite a while.  I'm just sure that other
13  companies have sold to the government too, but I can't
14  enumerate them.
15       Q    Is the original name for the M16 the AR-15?
16       A    Yeah.  While ArmaLite was developing the
17  firearm, it was named the AR-15.
18       Q    And then the military changed it to the
19  M16?
20       A    That's my understanding that when it was
21  adopted in its select-fire form, it was changed to the

1    M16.

2         Q     So when it was then made a semi-automatic

3    weapon for civilian use, either Colt or ArmaLite

4    changed the name back to AR-15?

5              MR. SWEENEY:  Objection.

6              THE WITNESS:  I believe it was first

7    offered by Colt at about the same time as the military

8    contract for the M16.  When it was first offered by

9    Colt, I know they were advertising it as the Sporter.

10   I think they might have picked that AR-15 back up at

11   that time, but at some point, the semi-automatic rifle

12   was known as the AR-15.

13             And when we're talking about AR-15s, I'm

14   talking about a large number of guns that are all the

15   same general pattern as the original Colt AR-15 in

16   terms of function and usually in terms of cosmetic

17   appearance.

18        Q     Do you recognize a M16 when you see it?

19        A     I'd have to look closely at the selector

20   switch to see if it was an M16 or an AR-15.

21        Q     So what you mean is you'd have to look to

1  see if it had a selector switch that allowed it to

2  engage in select fire?

3      A    Yes, sir.

4      Q    Including automatic fire?

5      A    Yes, sir.

6      Q    Otherwise, the appearance would be the same

7  to you as an AR-15 for civilian use?

8      A    Yes, sir.

9      Q    And I believe you mentioned that the most

10  popular forms of ammunition for an AR-15 are .223

11  Remington.

12          Is that one?

13      A    That's the most popular chambering for

14  AR-pattern rifles.

15      Q    And another chambering would be 5.56 NATO,

16  right?

17      A    That's essentially the same round.  They're

18  generally interchangeable.  I believe there are very

19  minor differences, and I think you can find some

20  authorities that suggest that they not be used

21  interchangeably.  But for most practical purposes,

1   they're generally considered interchangeable.

2        Q     And people do use them interchangeably?

3        A     I believe they do, yes, sir.

4        Q     And those two rounds are both available to

5   civilians, correct?

6        A     Yes, sir.

7        Q     And they're both available to military as

8   well?

9        A     Yeah, I think the military designation is

10  the 5.56.  I don't think the military designates the

11  .223 Remington.  I couldn't swear to that.

12       Q     And both the M16 and the AR-15 can also be

13  chambered for 7.62 NATO as well, right?

14       A     No, they cannot.

15       Q     7.62 NATO is different sized rounds,

16  correct?

17       A     Yes, sir.  It's a different cartridge.

18       Q     And it's -- a form of 7.62 is used in an

19  AK-type gun, right?

20       A     No, sir.  When you say, "7.62 NATO," that's

21  a very different high-powered rifle cartridge.  That's

1   what the M14 was chambered for.  It's about twice as

2   powerful as the .223 or 5.56.

3              I think the confusion is that there are two

4   types of very common 7.62 rounds.  The 7.62 NATO is the

5   same as .308 Winchester.  The 7.62 by 39 is the

6   original cartridge that was used in the AK.

7       Q    It's a similar power level to the 7.62

8   NATO?

9       A    No.  Much less powerful.  Much closer to

10  the .223.

11      Q    The 7.62 NATO round, is that available both

12  to civilians and to the military?

13      A    I believe it's probably called the 3.08

14  Winchester for civilians; but, again, they're

15  essentially identical rounds.  Again, there may be some

16  very minor differences in them.

17      Q    And are you familiar with what is typically

18  called a .22 round?

19      A    That would usually be .22 Long Rifle

20  Rimfire.  Yes, sir.

21      Q    And is that a less powerful round?

96

1      A     Yes.  That's significantly less powerful

2   than any of the three that we've discussed.

3      Q     The M16 that we've been discussing was

4   designed for the Army, correct?

5      A     The M16 came out of ArmaLite's program to

6   develop a modern rifle.  I suspect their primary market

7   was the military.  I suspect they targeted the best

8   sales there.

9           As far as I can tell, the M16 and the

10  semi-automatic version were developed pretty much

11  contemporaneously, but I would think that ArmaLite

12  would be looking primarily for the military contracts

13  of the select-fire machine gun version, the M16.

14     Q     And when you say the "semi-automatic

15  version," you mean what's now called the AR-15, right?

16     A     That's what we've been calling the AR-15,

17  yes, sir.

18     Q     And they were built on the same design but

19  for the addition of a select-fire option for the

20  military, right?

21     A     Yes.

1        Q       They both have two receivers -- an upper

2   and lower?

3        A       Yes, sir.

4        Q       If you examine those receivers, the

5   openings in the receiver would be configured the same

6   for the military and the civilian version, right?

7        A       We're talking about like the injection port

8   and the magazine well?

9        Q       Places where different parts fit in to

10  build it out into a gun?

11       A       I can't say that for certain.  I know there

12  are significant differences in the internal design of

13  an AR-15 and an M16, so there is not full parts

14  interchangeability between the two.

15       Q       But the interchangeability that we're

16  talking about is limited to the issue of whether it can

17  fire automatically or not, correct?

18       A       Yes, sir.  That would be the primary

19  difference between the two.

20       Q       And you don't know whether the receivers

21  would look the same for both guns as designed?

1      A      The receivers for both guns are going to

2  look very similar.  Again, the primary difference is

3  the select-fire switch for the full-auto M16.

4      Q      And the trigger is going to be the same for

5  both weapons, right?

6      A      Trigger will generally be very similar.

7  The AR-15 gets modified and customized extensively, so

8  there are a number of different triggers that can be

9  used on the AR-15.  Generally, the general

10  configuration between the M16 and most AR-15s in terms

11  of the trigger itself will be essentially identical.

12          Once you get into the operating parts

13  inside the receiver, they're going to be different

14  between the AR-15 and the M16 for several of the parts.

15      Q      Which parts?

16      A      I can't tell you specifically.  I'm not

17  much of a gunsmith.

18      Q      So what's the basis of your knowledge for

19  the statement you just made?

20      A      I have gone through the disassembly of an

21  AR-15 with other curators who are familiar with the

1  parts, and they pointed out the different parts that

2  would be different in an M16.  I understand there are

3  several different parts; but, as to their names, I

4  can't tell you what the names are.

5          Q     Typically those would be the parts that

6  would be necessary for the gun to fire automatically,

7  right?

8          A     Yes, sir.

9          Q     Do you know anything about the Army's

10 training program for the M16?

11         A     I don't know a great deal about that, no,

12 sir.

13         Q     Have you ever reviewed any of the Army's

14 training manuals?

15         A     Pardon?

16         Q     Have you ever reviewed any of the Army's

17 training manuals for the M16?

18         A     Not in any detail, no.

19         Q     Have you reviewed them at all?

20         A     I've seen them and flipped through them,

21 but certainly haven't read them in detail and don't

100

1   recall them.

2        Q    Do you have any reason to quarrel with the

3   way the Army trains its soldiers to use the M16?

4        A    I don't know how they train their soldiers.

5   I assume the Army generally knows what it's doing.

6        Q    Do you know the muzzle velocity of a

7   projectile fired from the M16?

8        A    It's pushing 3,000 feet per second, isn't

9   it?

10       Q    Do you know the range, the effective range,

11  of an M16?

12       A    And, again, let's define what we mean by

13  "effective range."

14       Q    The same as we've been talking about.

15       A    We've been talking about the ability to hit

16  an intended target the size of a human torso?

17       Q    Yes.

18       A    I think that's generally considered to be

19  around 300 yards for aimed fire.  I think that is

20  generally the military goal, although, the round will

21  be effective beyond that range.  And, again, a very

1    skilled shooter can hit beyond that range.

2         Q     Do you know what the rate of fire of an M16

3    is in automatic mode?

4         A     No, I don't.

5         Q     Do you know how fast an M16 can be fired in

6    burst mode?

7         A     No, I don't.

8         Q     Do you know how fast it can be fired in

9    semi-automatic mode?

10        A     Once again, about as fast as the shooter

11   can pull the trigger.  There's some mechanical

12   limitations on that, but I think for all practical

13   purposes, it's a limitation on how fast the shooter can

14   pull the trigger.

15        Q     And that's true equally of the M16 and the

16   AR-15, right?

17        A     Would you please ask that again.

18        Q     The ability to fire the gun

19   semi-automatically is just as fast for the AR-15 as it

20   is for the M16, right?

21        A      In the semi-automatic mode, yes.

1        Q     And that's as fast as you can pull the

2   trigger with your finger, correct?

3        A     Yes, sir.

4        Q     And then the muzzle velocity of an

5   individual projectile fired from an M16 and an AR-15

6   would be the same, right?

7        A     Yes.  They are essentially the same round.

8        Q     Is it fair to say that the M16 was designed

9   to be efficient in battle?

10        A     Yes, it was.

11              (Exhibit No. 6 was marked for

12   identification.)

13   BY MR. KLEIN:

14        Q     So I've shown you a document that's

15   labeled Exhibit Number 6.

16              Do you know what this is?

17        A     No.  I haven't seen this before that I

18   recall.

19        Q     If you would just turn to the third page of

20   the document.

21        A     Yes, sir.

Case 1:17-cv-10107-WGY  Document 65-1  Filed 12/15/17  Page 646 of 1262

```
 1        Q     It says, "Characteristics of M16/M4 Series
 2   of Weapons."
 3              Do you see that?
 4        A     I may not be on the same Page 3.  The table
 5   there?
 6        Q     The table.
 7              Is that not Page 3?
 8        A     It's in there.  I've got it.
 9              It's Chapter 2, "Weapons Characteristics,
10   Accessories, and Ammunition"?
11        Q     Yes.  And then below that, there's a chart,
12   right?
13        A     Yes, sir.
14        Q     And up above the chart it says,
15   "Characteristics of M16/M4 Series of Weapons."
16              Do you see that?
17        A     Yes, I do.
18        Q     Do you have any reason to think that the
19   Army would get any of the characteristics of these
20   weapons wrong?
21        A     I would bet the Army knows these pretty
```

1    well.

2        Q    So there are four weapons listed across the

3    top row of the chart.

4             Do you see that?

5        A    I do.

6        Q    Those are four different weapons, right?

7        A    I believe they are four different

8    configurations of the firearm that is very similar in

9    terms of function and construction.

10       Q    And those four weapons are an M4 or the M4

11   series in the first column; is that right?

12       A    Yes, sir.

13       Q    And then the M16A2 and A3, that's the

14   second column?

15       A    Yes, sir.

16       Q    And then the M16A4 in the third column?

17       A    Yes.

18       Q    And then the M16A1 in the last column?

19       A    Yes.

20       Q    And is it fair to say that the numbers on

21   the M16, A1, A2, A3, and A4 were introduced

1  sequentially?

2          The A1 preceded the A2 and A3, and then the

3  A4 followed that?

4      A    I believe that's true.  I can't say with

5  certainty.

6      Q    So if you look at that third column for

7  M16A4 and you go down to the row for automatic maximum

8  effective rate of fire --

9      A    Okay.

10     Q    -- do you see where it says, "N/A"?

11     A    N/A, yes, sir.

12     Q    Does that refresh your recollection that

13  the M16A4 does not have an automatic capability?

14          MR. SWEENEY:  Objection.

15          THE WITNESS:  I'm not familiar with what

16  the M16A4 is.

17  BY MR. KLEIN:

18     Q    Do you understand it to be a version of the

19  M16?

20     A    It would appear to be from this chart, yes,

21  sir.

1      Q    So I'd like to look in more detail at the

2   rows under "Maximum Effective Rate of Fire Rounds Per

3   Minute."

4           Do you see that?

5      A    Yes, sir.

6      Q    And there's four rows underneath that

7   heading?

8      A    Yes.

9      Q    One is for semi-automatic, one for

10  three-round burst, one for automatic, and one for

11  sustained.

12          Do you see that?

13     A    I see that.

14     Q    What's your understanding of what the term

15  "sustained" means in that context?

16          MR. SWEENEY:  Objection.

17          THE WITNESS:  I don't know what they mean

18  by "sustained."

19  BY MR. KLEIN:

20     Q    Do you have any reason to quarrel with the

21  rounds per minute figures in the chart for the

1  different types of fire?

2           MR. SWEENEY:  Objection.

3           THE WITNESS:  Once again, I would trust the

4  Army to know this information.

5  BY MR. KLEIN:

6       Q     So what it says there is that an effective

7  rate of fire for semi-automatic fire is about 45 rounds

8  per minute; is that right?

9       A     Yes, sir, for most variations.

10      Q     That's the way you understand it, right?

11      A     Right.

12      Q     And that sounds about right to you?

13      A     Yeah.  I'm sure, in coming up with that

14  number, they looked at what the average trained soldier

15  can do with a rifle.  That would be my guess of what

16  that figure means, but I'm not sure what that means.

17      Q     But you agree that the effective rate of

18  fire and the maximum rate of fire are two different

19  things, right?

20      A     I'm not sure how the Army defines

21  "effective rate of fire."  I would assume those are two

1  different things.

2      Q      And you could pull the trigger faster than

3  45 times in a minute, correct?

4      A      I would think most people could, yes, sir.

5      Q      And then under "automatic," it says, "150

6  to 200" in the columns there it appears; is that right?

7      A      Yes, sir.

8      Q      And would you assume that that means that

9  the maximum effective rate of automatic fire is 150 to

10  200 shots per minute?

11      A      I would assume it is.  I'm not sure how the

12  Army factors in things like magazine changes.  I don't

13  know if that is for one magazine and then they

14  extrapolate to a full minute, or I don't know if they

15  figure magazine changes in there.

16          I would expect that is for one magazine and

17  extrapolated, but I don't know what their definition of

18  their terminology is from this document.

19      Q      But you would agree that if they did have

20  to change magazines, it would slow the effective rate

21  of fire, correct?

1      A      Again, I don't know what these figures are.

2      Q      Would you say it's -- your general

3  assumption behind the last answer you gave is that if

4  there was a magazine change, it would slow the

5  effective rate of fire is because it takes time to

6  change a magazine, right?

7      A      We're no longer discussing this chart?

8      Q      Yes, sir.

9      A      That is a general question?

10     Q      Yes.

11     A      Yes, sir, that would.

12     Q      Let's go to the rows below the range

13  heading.

14     A      Okay.

15     Q      Under "Maximum Range," in the first three

16  columns, it's 3600.

17            Do you understand that to mean meters?

18     A      I don't know what they're meaning.  Meters

19  would not surprise me.

20     Q      Well, if you look at the range row, it says

21  "M" in parentheses, doesn't it?

110

1        A      Oh, yes.

2        Q      Doesn't that suggest that the figures are

3   in meters?

4        A      Yeah, I would think that probably does.

5        Q      And that means that the maximum range from

6   the Army's perspective of these M16 weapons is about

7   3600 feet, right?

8        A      Meters.

9        Q      I'm sorry, meters.

10        A      Yes, sir.  Now, again, we're talking

11   definition of range, which we've discussed before.  I

12   would expect that this is the maximum distance that a

13   bullet will travel fired by one of these rifles held at

14   an optimum angle to take advantage of the arc of the

15   bullet's trajectory.  That would be my guess on what

16   that figure means.

17        Q      3600 meters is almost 4,000 feet, right?

18        A      It would be more than that, wouldn't it?

19        Q      4,000 yards, I'm sorry.

20        A      Yes, sir.  Again, you're welcome to do the

21   math, but that sounds reasonable.

1      Q      And that's over two miles; is that right?

2      A      We can sit and do the math if you like, but

3  that seems reasonable.

4      Q      And below that it says, "Maximum Effective

5  Range."

6             Is that what you expect the Army to be

7  doing to calculate how far a shooter can be effective

8  with a gun?

9      A      I would bet that's what they mean.

10      Q      And so "point target" and "area target," do

11  you understand what that means?

12      A      My guess is that by "point target," they

13  are probably meaning aiming at an individual target.

14  And "area target" is probably more -- and I'm not sure

15  what that military term is, but more suppressive fire

16  or firing at a general area rather than selecting an

17  individual target.

18      Q      And the point target range given there is

19  somewhere between 460 and 550 meters; is that right?

20      A      Yes.

21      Q      And it looks like the Army is improved the

1  effective range from the M16A1 to the M16A4?

2        A     Yes, sir.

3        Q     By about 90 meters, right?

4        A     Yes.

5        Q     And the effective range for an area target

6  is either 600 or 800, depending on the gun?

7        A     Yes.

8        Q     And you wouldn't quarrel with me if I said

9  that that's a range that exceeds a third of a mile in

10  both cases?

11        A     I'll believe your math.

12        Q     Thank you.

13              Do you happen to know how far the shooter

14  in Las Vegas was from the target --

15        A     I don't know.

16        Q     -- the people he was aiming at?

17        A     I don't know.

18        Q     Do you know whether he would be in that --

19  strike that.

20              In that context, was his target an area

21  target or a point target?

113

1          A     I don't know that for sure.  I think there

2     are a lot of facts that still aren't known about it,

3     and I haven't studied the incident in depth.

4          Q     He was shooting at a crowd, right?

5          A     That's my understanding, yes.

6          Q     And he was shooting at a crowd from pretty

7     far away, right?

8          A     Again, that's my understanding, but I

9     really don't know for sure.

10          Q     He was on something like the 30th floor of

11     a hotel, right?

12          A     Yeah, he was.

13          Q     And he was at some distance from the

14     target, right?

15          A     Yes, he was.

16          Q     And do you know how many people he killed

17     in that context of that incident?

18          A     A lot.  I don't remember the number.

19          Q     59 sound right?

20          A     That sounds right.

21          Q     About 500 people were injured; is that

114

1  right?

2       A     That also sounds right.

3       Q     He was using an AR-15, is that right, for

4  much of the shooting?

5       A     I don't know what specific firearms he was

6  using.  I have heard AR-15 type guns mentioned.  I

7  don't know that with certainty.

8       Q     Do you have any reason or any basis to

9  disbelieve the news reports that say that he was using

10  at least several AR-15 type guns?

11      A     No, I don't.

12      Q     Do you have any opinions on whether he

13  would have been able to shoot as many people using

14  handguns from that distance?

15      A     My opinion is he would not have hit as many

16  people using handguns from that distance.

17      Q     If a particular manufacturer were making

18  both AR-15s for civilian use and M16 guns for the Army,

19  would you expect them to use the same materials for

20  both guns?

21      A     To the extent that they're interchangeable,

1  yes, I would.

2      Q    And, well, you've explained that they are

3  interchangeable but for the difference --

4      A    Except for the fully-automatic fire

5  components, I would expect them to use interchangeable

6  parts.

7      Q    And interchangeable materials, right?

8      A    Yes, sir.

9      Q    And you would expect them to be set up to

10  chamber the same size ammo as manufactured, correct?

11          MR. SWEENEY:  Objection.

12          THE WITNESS:  They generally are.  Again,

13  the most popular chambering for the AR-15 is the .223

14  Remington, which is just about identical to the

15  military's 5.56-millimeter round.

16  BY MR. KLEIN:

17      Q    And 5.56-millimeter rounds are available to

18  the public, right?

19      A    I don't -- yeah.  Yes, they are.  I'm not

20  sure if most ammunition manufacturers package them with

21  that name on them.  Probably the more common packaging

1    is .223.  But the rounds, again, are essentially

2    interchangeable and I believe available to the public.

3         Q     And you would expect that if a manufacturer

4    was making both an AR-15 gun for civilian use and an

5    M16 for Army use that they would be set up to take

6    advantage of the same sized magazines?

7         A     I would think that most manufacturers who

8    are making firearms for the civilian and the military

9    market would use the same materials and parts where

10   they could for both.  So, yes, I would expect they

11   would use the same magazines in most cases.

12        Q     They became more accepting of the same

13   magazines?

14        A     Yes, for the vast majority of ARs.  Again,

15   we have to specify that there are some indifferent

16   chambering that require special magazines.

17        Q     Is it safe to say that those would include

18   large-capacity magazines?

19        A     What do you mean by "large-capacity

20   magazines"?

21        Q     I was going to use the Massachusetts

1  definition, more than ten rounds.

2      A    Okay.  The standard magazine for an M16 or

3  an AR-15, I believe, is 20 or 30 rounds.  But I would

4  think that in most cases the manufacturer would

5  manufacture the magazines or purchase the magazines

6  from a supplier that could be fairly interchangeable in

7  both the military full-auto version and the civilian

8  semi-auto version.

9      Q    So they would be capable of accepting the

10  same sized magazine even if they were larger than the

11  standard?

12      A    My -- once again, I think the standard

13  magazine is 20 to 30 rounds.  And in most cases, except

14  where manufacturers are making a special version to try

15  to be compliant with restrictions in certain states,

16  the magazine should be interchangeable.

17      Q    If a gun is configured to accept the

18  standard magazine, would it also accept a magazine of

19  ten rounds and less?

20      A    Assuming that the magazine was the same

21  basic design, I think it would.

1        Q       And certainly, the manufacturer could

2    design magazines of ten rounds or less for an AR-15,

3    right?

4        A       I am pretty sure they have.

5        Q       And they do, right?  They do design

6    magazines of less than ten rounds to fit AR-15s?

7        A       Again, I'm pretty sure they have.

8        Q       And is it safe to say that if a

9    manufacturer manufactures both an AR-15 for civilian

10   use and an M16 for Army use, that those guns would

11   achieve approximately the same muzzle velocity?

12       A       In general, yes.  Muzzle velocity is very

13   dependent on the specific cartridge that is used and

14   the barrel length.  So if they're making a relatively

15   short barrelled in forth for the military, it's going

16   to have a lower muzzle velocity than a long barrelled

17   target rifle for the civilian market.  And you can see

18   that to a certain extent on the figures that are on

19   this table that we're looking at.

20       Q       Let's assume that the barrel length of the

21   two guns we're talking about is the same, the muzzle

1  velocity -- strike that.

2              Let's assume that the barrel length and the

3  round being used is the same, both guns would achieve

4  the same muzzle velocity, right?

5        A     They should, yes.

6        Q     And that's true whether or not the M16 is

7  fired in automatic or semi-automatic mode?

8        A     I believe that's true.

9              (A brief recess was taken.)

10  BY MR. KLEIN:

11       Q     Back on the record.  I'm going to show you

12  an exhibit labeled Exhibit Number 7.

13             (Exhibit No. 7 was marked for

14  identification.)

15  BY MR. KLEIN:

16       Q     I'd ask you to compare the cover page on

17  this one to the cover page on Exhibit Number 6.

18       A     Those appear to be the same.

19       Q     I'll represent to you that it's just a

20  different section of the same Army manual.

21       A     Thank you.

1        Q    And I'd ask you to turn to -- and it's true

2   that you're no more familiar with this Exhibit Number 7

3   than you were with Exhibit Number 6, right?

4        A    That's correct.  I don't believe I've seen

5   this before.

6        Q    It's not my intention to trick you, but I

7   do want to look at some sections of this manual.  If

8   you would, turn to page 7-9.

9        A    Yes, sir.

10       Q    Strike that.

11            Can we go to 7-8, the prior page?

12       A    Okay.

13       Q    Do you see where it says, "Rapid

14   semi-automatic fire"?

15       A    Yes, sir.

16       Q    It says:

17            "The most important firing technique during

18   fast moving modern combat is rapid semi-automatic fire.

19   It is the most accurate technique of placing a large

20   volume of fire on poorly defined targets or target

21   areas such as short exposure, multiple or moving

```
 1    targets.  To apply rapid semi-automatic fire, the

 2    soldier intentionally fires a quick series of shots

 3    into the target area to ensure a high probability of a

 4    hit."

 5              Do you see that?

 6        A     Yes, sir.

 7        Q     Do you have any reason to disagree that

 8    this is the Army's opinion?

 9              MR. SWEENEY:  Objection.

10              THE WITNESS:  No.

11    BY MR. KLEIN:

12        Q     Would you believe that the reason that they

13    recommend rapid semi-automatic fire rather than

14    automatic fire is that the shooter is more likely to be

15    accurate with their fire?

16              MR. SWEENEY:  Objection.

17              THE WITNESS:  I am purely speculating.  I

18    would also speculate that there is a conservation of

19    ammunition factor here, which is important to the

20    military because a soldier can only carry so much

21    ammunition.  I think both of those would be factors.
```

1  BY MR. KLEIN:

2       Q     In here where it says, "The most accurate

3  technique of placing a large volume of fire," that

4  means that the Army considers it more accurate to use

5  rapid semi-automatic fire than automatic fire, right?

6              MR. SWEENEY:  Objection.

7              THE WITNESS:  That's what they've written

8  here.  That must be their opinion.

9  BY MR. KLEIN:

10      Q     Let's turn to the next page.  If you would

11 look at the statement following the note near the top

12 of the page.

13      A     So paragraph 7-14?

14      Q     Yes, that's the paragraph number.

15      A     Okay.

16      Q     I'm going to read it, and you can tell me

17 whether I've read it accurately.  It says:

18              "While soldiers sacrifice some degree of

19 accuracy to deliver a greater volume of fire, it is

20 surprising how devastatingly accurate rapid

21 semi-automatic fire can be.  It ranges beyond

1   25 meters.  Rapid semi-automatic fire is superior to

2   automatic fire in all measures.  Shots per target,

3   trigger pulls per hit, and time to hit.  Proper

4   training and repeated practice increases the degree of

5   accuracy."

6           Do you have any reason to believe that's

7   not the Army's opinion?

8           MR. SWEENEY:  Objection.

9           THE WITNESS:  It's printed here.  I'm sure

10  it is.

11  BY MR. KLEIN:

12      Q    And that's, again, a statement suggesting

13  that they believe soldiers can be more effective with

14  semi-automatic -- rapid semi-automatic fire than with

15  automatic fire, right?

16          MR. SWEENEY:  Objection.

17          THE WITNESS:  I think it's situational,

18  isn't it?

19  BY MR. KLEIN:

20      Q    It's situational because it says, "Ranges

21  beyond 25 meters"?

**124**

1        A       Yes, sir.

2        Q       And isn't it the case that you can achieve

3   rapid semi-automatic fire with a civilian AR-15?

4                MR. SWEENEY:  Objection.

5                THE WITNESS:  You can receive -- you can

6   create rapid fire with any number of semi-auto and

7   other types of firearms.

8   BY MR. KLEIN:

9        Q       But my question really has to do with the

10  distinction between an AR-15 and the M16.

11               They both fire the same in semi-automatic

12  mode, right?

13       A       Yes, they do.

14       Q       And there is no difference between the

15  ability to generate rapid semi-automatic fire with an

16  AR-15 than there would be with an M16?

17       A       That is true.  And again, that is also true

18  of a number of other semi-automatic firearms and other

19  types of firearms that are not semi-automatic.

20       Q       Many of the other types of firearms that

21  you're mentioning don't have the features that make the

125

1   AR-15 and the M16 so effective, right?  The features

2   you talk about in your expert report.

3             MR. SWEENEY:  Objection.

4             THE WITNESS:  We'd have to go into the

5   features and talk about them.

6   BY MR. KLEIN:

7       Q     We'll do that and come back to it.

8             Would you turn to page 7-13.

9       A     Okay.

10      Q     Would you look at paragraph 7-38?

11      A     Yes, sir.

12      Q     There is a sentence there, "Automatic

13  reversed fire is inherently less accurate than

14  semi-automatic fire."

15            Do see that?

16      A     I do.

17      Q     Do you agree with that?

18      A     That makes sense to me.

19      Q     Is it the case that the maximum effective

20  rate of an M16 used in semi-automatic mode would be the

21  same as the maximum effective rate of an AR-15 designed

126

1    for civilian use?

2              MR. SWEENEY:  Objection.

3              THE WITNESS:  As rate of semi-automatic

4    fire would be the same with an M16, an AR-15, and

5    nearly all other semi-automatic firearms.

6    BY MR. KLEIN:

7        Q    The maximum effective rate of fire is the

8    same for all semi-automatic firearms?

9        A    I believe it would be pretty close, yes,

10   sir.

11       Q    That would be true regardless of any other

12   features of the gun?

13       A    We would have to go into specifics.

14       Q    So I notice that you didn't answer the

15   question.  I was only asking about the AR-15 and the

16   M16.

17       A    I'm sorry.  Let's do it again.

18       Q    Isn't it the case that the maximum

19   effective rate of an M16 used in semi-automatic mode

20   would be the same as an AR-15?

21             MR. SWEENEY:  Objection.

127

1              THE WITNESS:  Yes, sir.

2   BY MR. KLEIN:

3       Q    So we've talked at some points throughout

4   the day about differences between AK-47s and an

5   AK-platform gun.

6              Can you describe the difference to me.

7       A    An AK-47 is a military issued select fire

8   firearm.  An AK-47 platform, when you're talking about

9   the civilian sporting arms market, is a semi-automatic

10  only firearm.

11      Q    Do you know the manufacturers of any AK-47

12  platform guns?

13             Do you know the names of the manufacturers

14  of any of the AK-47 platform guns?

15      A    I prefer to call them AK-platform.  AK-47

16  is a specific model.  I believe there are a number of

17  manufacturers of AK-type semi-automatic rifles.  Right

18  to mind come a couple of Chinese manufacturers, Norinco

19  and Poly Tech.  I think they've been fairly prolific in

20  producing semi-auto AK-patterns.

21      Q    Is it fair to say that the difference

1    between the AK-47 guns and the AK-platform guns are

2    basically the distinction between select fire and

3    semi-automatic fire?

4         A    In most cases, yes.

5         Q    And can you tell me when the AK-47 was

6    first designed?

7         A    I think it was around 1947.  It was early

8    post-World War II designed for the Russian military.

9         Q    And there was a contest that the military

10   sponsored, right?

11        A    Yes, sir.  Usually in the adoption of

12   military firearms, there is a competition between

13   various design, and I believe there was in the case as

14   well.

15        Q    And the AK-47 was chosen in that contest as

16   best suiting military needs?

17        A    Yes, sir.

18        Q    And do you know if the company that made

19   AK-47s itself produced AK-platform guns without the

20   select fire option?

21        A    I think there were two or three Russian

1    arsenals.  This would have been during the Soviet era.

2    So these weren't companies that were making them, they

3    were divisions of the state.  And I'm not aware that

4    they made any semi-automatic versions.

5         Q    Other manufacturers started to make

6    semi-automatic versions?

7         A    I think that's probably the sequence of

8    events.

9         Q    And they started also making military

10   versions to sell to various militaries around the

11   world?

12             MR. SWEENEY:  Objection.

13             THE WITNESS:  I don't know that that's

14   true.  I'm guessing the Chinese manufacturers may have

15   manufactured for the Chinese military.  In fact, those

16   companies may have grown out of state firearms

17   manufacturing concerns, but I don't know for certain.

18   BY MR. KLEIN:

19        Q    And the AK-47 was used by the North

20   Vietnamese in the Vietnam War?

21        A    Among many other countries, yes, sir.

1        Q     And the M16 was used by the United States
2   Army in the Vietnam War?

3        A     It was a primary issue long arm.

4        Q     And it's still true that many militaries
5   across the world use AK-47s?

6        A     Yes, sir.

7        Q     Or guns designed to be the same as an
8   AK-47?

9        A     Thank you.  Yeah, the AK-47 itself was
10  actually discontinued.  But subsequent military models
11  capable of full-automatic fire are used widely around
12  the world.

13       Q     Would you recognize an AK-47 if you saw
14  one?

15       A     Usually, I will.  There are some sporting
16  models that have been redesigned to such an extent that
17  it's hard to recognize at first glance by the profile.
18  The AK-pattern arm generally has a very distinctive
19  profile, but they've been made with traditional
20  sporting stocks and in other configurations where you'd
21  have to look a little bit closer at the gun to see that

1  it was an AK-pattern.

2        Q     Would an AK-pattern look the same as an

3  AK-47?

4        A     In most cases, but not always.  Again,

5  there is some that have been designed with different

6  stocks and different features and have a very different

7  appearance.

8        Q     What would you do to tell whether it was an

9  AK or an AK-47?

10       A     I would take a close look at the receiver

11 and barrel configuration.

12       Q     Would you look at whether there was a

13 switch on it for select fire?

14       A     I'm sorry.  I may have mis-answered that

15 question.  Would you repeat the first question before

16 that?

17       Q     What would you do to tell if a particular

18 gun was an AK-platform gun or an AK-47?

19       A     Yeah, I did mis-hear that.  Yes, that's

20 exactly what you would look for, if there is a

21 full-automatic function.  And you'd look at the

132

1    operator controls to see if it had the full-automatic
2    position.
3         Q    And the operator controls would essentially
4    be a switch somewhere on the gun --
5         A    A selector switch, yes, sir.
6         Q    Do you know if both the AK-47 and
7    AK-platform guns are designed to take the same
8    ammunition?
9         A    In most cases, they are.  And to a greater
10   extent than the AR-15 and M16 are.  Vast majority of
11   AK-platform guns do take the 7.62 by 39 Russian
12   ammunition.
13        Q    So your distinction there from the AR-15,
14   is that based on the possibility that the AR could be
15   chambered either for 5.56 or .223 Remington?
16        A    No, sir.  The AR-platform rifles are made
17   for, I want to say, maybe 50 different calibers.
18   They're very easy to change from one caliber to the
19   other by swapping upper receivers.  And different
20   calibers will fit different shooters' needs.
21              The AK is a more difficult rifle to -- let

133

1  me rephrase that.  The AK is usually manufactured for a

2  single caliber, and that's what the gun stays as.  I

3  believe there are other guns that look like AKs that

4  are generally of the AK type that are chambered for

5  other rounds.  But that's not as common as it is with

6  the AR.

7       Q    What is the caliber of a rifle that an AK

8  gun typically takes?

9       A    Again, it's 7.62 by 39, originally

10  developed as the Russian military round.

11       Q    Is it fair to say that the muzzle velocity

12  of an individual projectile fired from an AK-platform

13  gun would be the same as it would be for an AK-47?

14       A    Caliber and barrel length being the same,

15  it should be the same.

16       Q    Okay.  And do you know how fast it would be

17  possible to fire an AK-platform gun?

18       A    Semi-automatic mode?

19       Q    Isn't that the only AK -- isn't that the

20  definition of an AK-platform gun as you've been using

21  it?

134

1        A      Well, the AK-47 is also built on an

2   AK-platform.

3        Q      Let's talk about semi-automatic fire for

4   either AK-47s or AK-platform guns that are limited to

5   semi-automatic --

6        A      Yeah.  I would think the rate of fire for

7   an AK-platform semi-automatic would be the same as an

8   AR-15, or for about any other type of semi-automatic

9   firearm.

10       Q      And you would agree that the number that

11  the Army uses is probably accurate, at least for

12  soldiers, right?

13       A      In the context that we've previously

14  discussed, yes.

15       Q      And how fast can an AK-47 select fire

16  weapon be fired in automatic mode?

17       A      We went over that on the Army's numbers.

18  Do you want to look back at them and see what the Army

19  says?

20       Q      Again, that would be the same --

21       A      I think it would be pretty similar.

1     Q    And the AK-47 was designed for the Army as

2  a gun for use by soldiers, right?

3     A    Yes, it was.

4     Q    And it was designed to be efficient in

5  battle, right?

6     A    Yeah.  Many, many firearms have their

7  origins to military development, as well as civilian

8  development.

9     Q    Is there any difference in the size of

10  magazines that an AK-47 select fire weapon can

11  accommodate from that -- that an AK-platform gun

12  designed for civilian use?

13     A    I think those magazines -- again, all other

14  things being equal, are pretty much interchangeable.

15     Q    Are you familiar with a gun called an Uzi?

16     A    Yes, sir.

17     Q    That was designed for the Israeli army; is

18  that right?

19     A    Yes, sir.

20     Q    Are you familiar with the gun called a

21  Galil?

```
1        A     Yes, sir.

2        Q     Also first designed for the Israeli

3   military?

4        A     Yes, sir.

5        Q     Are you familiar with a Beretta AR70?

6        A     Generally, yes.

7        Q     So it was first designed for the Italian

8   army?

9        A     I believe so.  I'm not sure.

10        Q     Fabrique Nationale FN FAL, is that another

11   gun that you're familiar with?

12        A     Yes, sir.

13        Q     Is that a gun that was first designed for

14   the French military?

15        A     That's possible.  It's based on a gun that

16   was widely used in the early Cold War era.

17        Q     For military purposes?

18        A     Yes.  I believe it was designed primarily

19   originally as a military gun.

20        Q     SWD M10, M11, and M12, those were designed

21   by a company called the Military Armament Corporation;
```

137

1    is that right?

2         A      Yeah.  My impression is that those are

3    mostly versions of what's called a MAC-10 type of gun.

4         Q      And those were first designed for the

5    American military, correct?

6         A      I'm not sure if they were or not.

7         Q      But they were designed for some military

8    use?

9         A      I'm not sure what the original design

10   intent of them -- I believe they were originally

11   designed -- the original platform was designed as

12   select fire, if that helps.

13        Q      And the Steyr AUG, do you know --

14        A      I'm familiar with that, yes, sir.

15        Q      That was designed in Austria for the

16   Austrian military?

17        A      I don't know the design history of that.

18        Q      The Intratec TEC-9, are you familiar with

19   that?

20        A      I am generally familiar with that.

21        Q      Is that a design based on a Swedish

1  submachine pistol?

2         A     It might be.

3         Q     Designed by a company called Interdynamic,

4  does that round right?

5         A     I can't say with certainty.  I'd be willing

6  to believe that.

7         Q     Do you understand whether it was designed

8  first for the Swedish military?

9         A     The gun that you suggested, it was based on

10 -- sounds like it was designed for the Swedish

11 military.  I'm not sure how this -- what market this

12 specific gun was designed for.

13        Q     Are you familiar with a gun called the

14 Street Sweeper?

15        A     Generally, yes.

16        Q     What kind of gun is that?

17        A     I believe that's a shotgun with a revolving

18 cylinder.

19        Q     Do you know why it was designed, or how it

20 was designed?

21        A     I think it was -- I would have to speculate

139

1   on that.  My guess would be probably for the police and
2   civilian market.

3          Q     Not for the military?

4          A     It's not my impression that that was a
5   military design originally.

6          Q     What about the Striker 12?

7          A     Very similar situation.  It's a revolving
8   cylinder shotgun, I believe.  And again, if I'd have to
9   guess -- I don't know for certain, I'd guess that it
10  was designed for the police and civilian market.

11         Q     So let's go back to the Street Sweeper.  Do
12  you have any sense of why it was named the Street
13  Sweeper?

14         A     Yes.  It would be used as a defense or
15  police firearm.  It would be effective as close range,
16  engaging multiple assailants in a fairly wide area.

17         Q     But not for military uses in combat within
18  a city?

19         A     You know, I don't know that the military
20  ever experimented with those revolving shotguns.  They
21  certainly may have, I'm just not familiar with whether

1   they have or not.

2          Q     Are you comfortable with the idea then that

3   a Street Sweeper should not be available to civilians?

4          A     No.  It's just a shotgun.

5          Q     With a revolving cylinder?

6          A     Like revolvers have revolving cylinders.

7          Q     But it shoots the same number of

8   projectiles as a revolver?

9          A     It's a revolver, yes, sir.  Oh,

10  projectiles.  No, I'm sorry.  Same number of rounds,

11  yes.

12         Q     It shoots shots, correct?

13         A     Yes, sir, it does, like all shotguns.

14         Q     You can fill a street pretty quickly with a

15  revolving cylinder shotgun, right?

16         A     Or with a standard semi-automatic or pump

17  shotgun, yes, sir.

18         Q     But you can do it quicker with a revolving

19  cylinder shotgun because you can get more rounds off?

20         A     No, not necessarily.

21         Q     Okay.  I think your resume mentions that

1   you do some training for the NRA?

2        A     I'm certified as a trainer for the NRA.  I

3   haven't done a great deal of formal training with that

4   certification.

5        Q     Have you trained anyone else on use of an

6   AR-15 or AK-47?

7        A     Only informally, never through a formal

8   training session.

9        Q     And in what context did you do that

10  training?

11       A     Usually, that will be for a range session

12  where we're having an individual or a group experience

13  shooting various firearms.  It could be from

14  muzzleloaders up through modern firearms.  In that

15  case, I would be overseeing and supervising individuals

16  shooting a number of different types of firearms,

17  including AR-15 and AK-platform guns, possibly.  It

18  would depend on the group and the program.

19       Q     Would you generally instruct people on how

20  to use those guns?  In what context would you instruct

21  people on how to use those guns?

1      A      Only very general instruction.  The primary

2  focus would be on firearm safety and handling the gun,

3  and firing the gun safely in a range situation.

4      Q      Would you consider people who didn't have

5  that kind of training safe to use the gun?

6      A      Which kind of training?

7      Q      The training you just mentioned.

8      A      I think for any firearm, training is

9  advisable.

10      Q      Including experience firing the gun?

11      A      I think -- I'm sorry.  Ask that last one

12  again.

13      Q      Including experience firing the gun?

14      A      What including experience firing the gun?

15      Q      You said, "For any firearm, training is

16  advisable."

17              And I'm asking:  Does that include training

18  firing that particular gun?

19      A      I'd say, yes, sir.  I would think effective

20  training would include firing the gun.

21      Q      Have you ever personally fired an M16?

1        A       I don't think I have.

2        Q       Have you ever personally fired any gun

3    designed for military use in the United States?

4        A       Yes, sir.

5        Q       Which one?

6        A       Gosh, I've shot the M3 Grease gun, the

7    Thompson submachine gun, a couple of crew-served

8    machine guns.  Although, I can't remember the specific

9    models.

10       Q       You said "crew-served machine gun"?

11       A       That would be a machine gun that is not

12   fired from the shoulder.  It would usually be mounted

13   on a tripod or a vehicle like a tank or Jeep.  And it

14   generally will have at least a shooter and a loader.

15   It's more than a one-person operation in most cases.

16       Q       Have you ever fired any of the guns we were

17   looking at in the Army Marksmanship Manuals, M4 series?

18       A       Those variations of the M16?

19       Q       Yes.

20       A       I'm not sure.  I may have, but I don't

21   specifically remember it.  If I had, it would probably

1   be a fairly early M16, but I just don't remember if I

2   have or haven't.

3          Q     And your answer reminded me that I

4   neglected to ask a question, which is whether the M4 is

5   a variation of the M16?

6          A     I would consider it to be such.

7          Q     Carbine?

8          A     A shorter, more compact version is my

9   understanding.

10         Q     Is the term "carbine" not appropriate in

11  that context?

12         A     I'm okay with it.  I don't know that that's

13  the term the military uses.  They may.

14         Q     How fast can a trained shooter change a

15  magazine on a gun?

16         A     Depends to a certain extent on how much

17  training and what type of gun.  There are guys who are

18  dedicated to different types of sport shooting that

19  will get very, very fast in magazine changes.  Just ask

20  guys who are shooting revolvers in certain types of

21  sport competition.  They get very, very fast with

1  street loaders.

2          A shooter with an average amount of

3  training, it will depend on how much range time they

4  spend practicing.  Most range setups are not always

5  conducive to practicing fast magazine changes.

6          Q     Why not?

7          A     I think it's a safety issue.  Because when

8  you are doing administrative handling on a firearm that

9  would be doing something other than aiming or shooting

10  it, the shooter will tend to get less conscious of what

11  direction the muzzle is pointing.  So an inexperienced

12  or under-trained shooter may let the muzzle cover other

13  people on the range, or go in a direction it shouldn't

14  while they're attempting to make the magazine change.

15          Q     That's one of the reasons my wife doesn't

16  want me to go to the shooting range.

17          A     Get a single-action revolver.

18          Q     So do you have a sense of how fast you

19  could change a magazine?

20          A     I'm not very fast.

21          Q     How fast would you say?

1        A       I shoot a lot of different guns.  So I

2   would look at the gun.  I would figure out where the

3   magazine release was.  I would release the magazine.

4   If you're doing serious combat training, you're going

5   to let it drop off on the ground.  If you're not,

6   you're going to take it out and put it on the bench.

7                You're going to find your loaded magazine.

8   You're going to insert it.  You're going to push it.

9   You're going to either rack the slide and release it to

10  load a new round, or you're going to push the slide

11  release to let the slide come forward and chamber

12  around.  So that's, what, maybe five seconds, if I'm

13  doing that efficiently.

14        Q       And if you're not doing it efficiently, it

15  would take longer?

16        A       Oh, I can fumble around for a long time.

17        Q       As many shooters can?

18        A       Yeah, exactly.

19        Q       Is it fair to say that if you don't have

20  the magazine at hand, it would take you longer?

21        A       If I have to go back to my office to get it

1   and load it, yeah, that's going to take me 20 minutes.

2        Q     If it's not present in a belt or a pocket

3   in whatever you're wearing when you're shooting, it

4   would probably take longer than five seconds, right?

5        A     If it's not present, it's not present.

6        Q     And it's true that if you're nervous, it

7   might take even longer to take a change a magazine?

8        A     Yes.  I think shooting in a high stress

9   situation makes it more difficult.

10        Q     And that's true both of criminals and of

11   people who might be using the gun defensively?

12        A     It would probably be true of about anybody

13   other than somebody who is very, very intensively and

14   regularly trained.

15        Q     Are you familiar with the device called a

16   bump stock?

17        A     I am now.

18        Q     When you say you are now, when did you

19   become aware?

20        A     I was generally familiar with them for a

21   while.  I hadn't paid much attention to them until the

1    Las Vegas shooting incident where they were reportedly

2    used.

3         Q     What is the purpose of a bump stock?

4         A     My understanding is that a bump stock

5    simulates full-auto fire on some semi-auto long guns.

6    I also understand that there is supposedly some

7    application of that type of device for certain disabled

8    shooters, but I don't fully understand what that

9    function is.

10        Q     Do you understand how a bump stock works?

11        A     Generally, I think I do now.

12        Q     Can you explain it.

13        A     My understanding is that it is a device

14   that slips over the butt stock of a semi-automatic

15   rifle.  I think it has to be designed for the specific

16   model, semi-automatic rifle.  And that it extends -- a

17   portion of it extends partway into the trigger guard.

18              My understanding is that the idea is that

19   the trigger finger rests on the extension so that when

20   the gun is first fired, the recoil takes the shooter's

21   fingers off of the trigger.  And then as the gun is

1    pushed forward, the shooter's finger is in position to

2    fire a subsequent round.

3              And I assume that continues as long as

4    there are rounds of the magazine, or as long as the

5    shooter's finger stays in position, and as long as the

6    firearm is properly positioned on the shooter's

7    shoulder to allow that type of function.

8              Again, I'm not sure if you're -- if a

9    shooter would use this holding the gun freestyle

10   without being braced on it against his shoulder, or if

11   it's used with the gun in a traditional manner pressed

12   against his shoulder.

13        Q    And is the purpose of the device to speed

14   the rate of fire beyond what a semi-automatic firing

15   rate would normally be?

16        A    My understanding is that the device is to

17   come close to simulating the rate of fully-automatic

18   fire.  Again, supposedly, they're handicapped

19   applications.  I'm just not sure what those are and how

20   those work.

21        Q    Are you aware that bump stocks are designed

150

1  for AR-15 weapons?

2       A     I have the impression that that is the

3  primary gun that they're designed for.  There may be

4  others, I don't know.

5       Q     So have bump stocks been available to

6  civilians in the United States?

7       A     They've been available for a number of

8  years, yes, sir.

9       Q     And you don't have any information about

10  how many might have been purchased?

11       A     No, I don't.

12       Q     And you don't know how often they're used

13  when people shoot, do you?

14            MR. SWEENEY:  Objection.

15            THE WITNESS:  My impression is that they're

16  not used very often.  They have been kind of a novelty

17  device for most people who use them.

18  BY MR. KLEIN:

19       Q     What's your impression there based on?

20       A     Just anecdotal discussion with other

21  shooters and other firearms enthusiasts.

1      Q     Based on your knowledge of guns, is it your
2  impression that the Las Vegas shooter, Stephen Paddock,
3  used a bump stock?
4      A     That's what I hear from the media.  I
5  really don't know from the little bit that I've seen
6  and heard of the news reports on that.  But my
7  understanding is that that's what's been reported.
8      Q     Did you listen to the rate of fire in any
9  of the videos that were available of the shooting?
10      A     I did.
11      Q     Did it sound to you like a rate of fire
12  consistent with automatic weapons?
13      A     Given that I don't have a great deal of
14  experience with automatic firearms, that was my initial
15  impression is that it would have probably been an
16  automatic firearm.
17      Q     Based on what you heard?
18      A     Yes, sir.
19      Q     Based on how quickly the shots were,
20  audible on the tape, right?
21      A     Yes, sir.

1        Q     Is it your view that civilians should be
2   allowed to modify their guns to use bump stocks?
3        A     Ask that again, please.
4        Q     Is it your view that civilians should be
5   allowed to modify their guns to use bump stocks?
6        A     My personal opinion on it is that it's
7   reasonable for the ATF to take a second look at their
8   initial ruling on permitting bump stocks without
9   restriction.  I think it's something that -- it's
10   legitimate to review.
11        Q     What did the ATF initial ruling consist of?
12        A     My understanding is that the ATF decided
13   there should be no restrictions on bump stocks.
14        Q     Does the ATF have authority to ban bump
15   stocks?
16        A     I don't know if they do or not.  That would
17   be a legal question.
18        Q     Is it your view that somebody, whether it's
19   the ATF or another regulatory authority, should
20   restrict civilian access to bump stocks?
21        A     My opinion is that that should be subject

1    to an ATF review, revisiting their previous ruling.

2    That's where I would go first.  I think they'd probably

3    have the expertise to address that question.

4         Q    And that's consistent with the NRA's view

5    of that question?

6         A    I believe it is.  I'm not their spokesman

7    on that matter.

8         Q    If I wanted to buy a bump stock today,

9    could I buy one on the Internet?

10        A    I assume you could.  I don't know that

11   there is any restriction in place.  Usually, whenever

12   there is a perspective legislative restriction or

13   regulatory restriction on anything firearms related,

14   there is a rush to buy them before the restriction

15   comes into place.  So speculating entirely, they may be

16   in short supply now.

17        Q    Is it your assumption that bump stocks have

18   been more popular based on people's belief that they

19   may be restricted?

20        A    That usually happens in the firearms

21   market.  Whenever there is a prospect of something

154

1   being restricted, folks who are interested generally in

2   that type of thing, will want to go ahead and buy one

3   while they still can.

4        Q    Are you familiar with device called a

5   binary trigger?

6        A    I have heard the term, but I don't know

7   exactly how that functions.  I have a general --

8   function that it allows a shooter -- it -- I have a

9   general impression that it allows a shooter to fire a

10  round both on the pull of the trigger and the release

11  of the trigger.  But I may be way off on that.

12       Q    If your general impression is right, and I

13  think it is, does that double the rate of fire that one

14  can achieve with a semi-automatic weapon?

15       A    I don't know that it doubles it, but it

16  should increase it.

17       Q    And that's because two rounds go off with

18  every pull of the trigger?

19       A    That would be correct.

20       Q    Do you know if they're illegal in the

21  United States?

1       A     I have the impression that they are.  That

2  surprises me a little bit.  It would seem -- I don't

3  know the specific law.  I have the impression that a

4  definition of a machine gun is firing more than one

5  round with a single pull of the trigger.  And it would

6  seem to me that that would be firing two rounds with a

7  single pull of the trigger.  So I'm a little bit

8  surprised, but I'm sure that there are reasons that

9  somebody has for the sale being permitted.

10      Q     Are you familiar with a device called a

11  trigger crank?

12      A     Yes, sir.

13      Q     How does a trigger crank work?

14      A     Well, the practical function is similar to

15  Gatling guns.  They were introduced around the time of

16  the Civil War.  It is a crank that is attached to the

17  trigger guard, and it's rotated and has multiple

18  strikers that will strike the trigger in passing.  And

19  presumably, a higher rate of fire could be attained

20  with that than with pulling the trigger individually

21  very rapidly.

1            I haven't seen them used -- I don't know if

2    that's factual or not that that rate of fire can be

3    significantly higher.

4        Q    Is the purpose of the design to have the

5    projections on the crank strike the trigger more often

6    than your finger would be able to strike the trigger?

7        A    That's my impression, yes.

8        Q    If so, that would speed the rate of fire

9    beyond what a semi-automatic weapon could achieve?

10        A    I believe that's the intention.  Again, I

11    haven't really seen them demonstrated to know that for

12    sure.

13        Q    Do you know if there are trigger cranks

14    available for use of AR-15 type guns?

15        A    I assume there would be, but I don't know

16    that for certain.

17        Q    Do you know if there are trigger cranks

18    available for use with AK-pattern guns?

19        A    Again, I don't know for certain, but it

20    wouldn't surprise me.

21        Q    There is no reason why that couldn't be

157

1  designed, right?

2       A    It seems like it would be a fairly

3  adaptable design.  It just has to fit the trigger guard

4  in the firearm.  So it could fit AK-patterns, ARs, any

5  semi-automatic firearm.

6       Q    Do you know if I can buy a trigger crank

7  today for an AR-15 on the Internet?

8       A    Again, I sort of assume you could.  I don't

9  know that for a fact.

10      Q    Is it your opinion that civilians should be

11 allowed to modify their guns to use a trigger crank?

12      A    Again, I think it's legitimate fodder for

13 ATF review.

14      Q    Are you familiar with a device called an

15 AutoGlove?

16      A    No, I'm not.

17      Q    If I told you that it vibrates your

18 fingers --

19      A    Sounds relaxing, therapeutic.

20      Q    It if I told you that it's designed to

21 vibrate your finger on a trigger faster than you could

1  pull it yourself, would that make sense to you?

2      A    Well, it would seem a little silly to me,

3  but maybe they do exist, and maybe they do work.  I've

4  never heard of them.

5      Q    I think this is a good place for a lunch

6  break.

7          (Recess.)

8  BY MR. KLEIN:

9      Q    We're back on the record after a lunch

10  break.  I just want to remind you that your testimony

11  is under oath.

12          Is it your opinion, Mr. Supica, that all

13  firearms are dangerous?

14      A    All firearms can be dangerous, yes, sir.

15      Q    Isn't it true, though, that some are more

16  dangerous than others?

17          MR. SWEENEY:  Objection.

18          THE WITNESS:  Boy, that's going to depend

19  on what you are talking about when you say "dangerous."

20  BY MR. KLEIN:

21      Q    Well, that more people can be killed or

1   injured in a short time than other firearms?

2        A    I think it's true that more people could be

3   killed or injured with certain firearms than with

4   others.

5        Q    And that's because the gun that has more

6   power, the rounds are more likely to cause serious

7   injuries; isn't that also a basis on which some

8   firearms are more dangerous than others?

9             MR. SWEENEY:  Objection.

10            THE WITNESS:  Firearms are designed to hit

11  things with power, and the level of power needs to be

12  appropriate to the use.  And there is a balance there.

13  So "dangerous" in terms of being effective for an

14  intended use, that's going to vary from firearm to

15  firearm, and the intention with which it's being used.

16  BY MR. KLEIN:

17       Q    In the hands of a criminal, would you

18  concede that an AR-15 style weapon is more likely to

19  cause death or serious bodily injury than a

20  revolutionary iron musket?

21            MR. SWEENEY:  Objection.

1            THE WITNESS:  For a single round, not

2   necessarily.

3   BY MR. KLEIN:

4        Q     But for multiple rounds being fired?

5        A     Most Revolutionary War muskets would be

6   very, very slow to fire out a multiple round -- so, an

7   AR would be more effective at hitting multiple targets

8   in a shorter period of time than a Revolutionary War

9   musket.

10       Q     Let me ask the same question in a different

11  way.  We talked a little bit about the Las Vegas

12  shooting.

13            Would you concede that he was able to kill

14  or injure more people with the AR-15 that he apparently

15  used than if he had had a Revolutionary era musket?

16       A     Yes.

17       Q     In fact, the reason that some guns are more

18  dangerous is that over time, they've been developed by

19  military to be effective in combat, right?

20            MR. SWEENEY:  Objection.

21            THE WITNESS:  The evolution of firearms

1   between civilian uses or nonmilitary uses and military

2   uses has been parallel.  And advances in one have been

3   adopted in the other throughout history since they were

4   first introduced.

5   BY MR. KLEIN:

6        Q    And the military's goal in firearms design

7   is to make them more lethal to combat the enemy,

8   correct?

9             MR. SWEENEY:  Objection.

10            THE WITNESS:  That would be one of a number

11   of goals, I'm sure.

12   BY MR. KLEIN:

13       Q    But it would be one of the goals, right?

14       A    Yeah.  A gun is made to be effective for a

15   specific purpose.  And the military killing the enemy

16   or injuring the enemy is a primary purpose of their

17   firearms.

18       Q    And as the military seeks out more

19   potentially lethal weapons, those weapons become more

20   dangerous in the hands of criminals, correct?

21       A    No.

MR. SWEENEY: Objection.

THE WITNESS: The military hasn't always sought out more lethal weapons. Depending, again, on your definitions of lethal and dangerous, the AR-15, the M16, was a step down in the military in terms of the power of an individual round. From the .308 Winchester class of cartridge used in the M14 and the .30-06 cartridge used in World War I and World War II, it was a less powerful and less lethal round than had previously been used.

BY MR. KLEIN:

Q And the military chose it to make it more effective in combat, correct?

MR. SWEENEY: Objection.

THE WITNESS: I believe they did.

BY MR. KLEIN:

Q And isn't it true that to the extent a weapon is more effective in combat, that weapon is also more effective for criminal uses against civilian targets?

MR. SWEENEY: Objection.

THE WITNESS: Not necessarily.

BY MR. KLEIN:

Q So the ability to get off more rounds isn't equally important to a criminal as it is to the military?

MR. SWEENEY: Objection.

THE WITNESS: The ability to get off a number of rounds is not at all specific to military firearms. That's been a continuous goal throughout firearms evolution.

BY MR. KLEIN:

Q To get off more rounds and to have them more likely to hit their targets, correct?

A Yes, sir.

Q When the military is able to successfully achieve that to make the weapon more effective in combat, isn't that same weapon then equally more effective in the hands of a criminal?

A Or in the hands of a civilian using it for legitimate purposes that are related to the firearm. Generally, yes, if given the same purposes.

1        Q     So the civilian purpose that we're talking

2   about would involve perhaps killing lots of people very

3   quickly.  Is that the civilian purpose you're talking

4   of?

5                MR. SWEENEY:  Objection.

6   BY MR. KLEIN:

7        Q     That can now get to a criminal purpose?

8                MR. SWEENEY:  Objection.

9                THE WITNESS:  The AR-15 platform rifles are

10   used by civilians very widely for a number of purposes.

11   They're used for target competition.  They're used for

12   hunting.  They're used for recreational shooting.

13   They're used for personal defense.  Like any other

14   firearm, they're subject to use by criminals.

15   BY MR. KLEIN:

16        Q     I want to restrict ourselves in this

17   discussion to the purposes that make the guns dangerous

18   to other human beings, okay?

19                MR. SWEENEY:  Objection.

20                THE WITNESS:  Define "dangerous to other

21   human beings."

165

1    BY MR. KLEIN:

2         Q    Making it more likely that they will be

3    killed or injured.

4              MR. SWEENEY:  Objection.

5              THE WITNESS:  By a person shooting at them

6    with intention to hurt or kill them?

7    BY MR. KLEIN:

8         Q    Yes.

9         A    Okay.

10        Q    So the same things that make the gun more

11   effective for the Army to achieve those purposes make

12   them more effective for criminals to achieve those

13   purposes?

14             MR. SWEENEY:  Objection.

15             THE WITNESS:  I don't think that's what we

16   just said, the question before.

17   BY MR. KLEIN:

18        Q    Okay.  We can have the questions read back

19   if you think it will be helpful.

20        A    Let's try that.

21             (Record read.)

 1   BY MR. KLEIN:

 2        Q    We can try again.  For the purposes of this

 3   discussion, I want to limit the questions to the

 4   aspects of the gun that make it useful for killing more

 5   people or injuring more people more quickly.

 6             You agree that over time, guns can -- have

 7   become more dangerous on those terms, right?

 8             MR. SWEENEY:  Objection.

 9             THE WITNESS:  Let's ask the question in

10   terms of the way you originally phrased it, and then we

11   can address "more dangerous."  Have guns become more

12   effective at killing and injuring larger number of

13   people over the evolution of firearms?  And for guns

14   that are intended to be used by an anti- -- in an

15   anti-personnel role, whether by the military or the

16   police or legitimate defenders or criminals, that's

17   true.

18   BY MR. KLEIN:

19        Q    So the answer is yes?

20        A    Yes.

21        Q    And I assume that means you'll also concede

1   that guns of this century are more effective at killing

2   and injuring people more quickly than guns of the 18th

3   century, for example?

4              MR. SWEENEY:  Objection.

5              THE WITNESS:  18th or 19th, or do you care?

6   BY MR. KLEIN:

7        Q    Let's start with the 18th --

8        A    Okay.  Yes, they would be.

9        Q    And for the 19th century?

10             MR. SWEENEY:  Objection.

11             THE WITNESS:  We're talking throughout

12   specific types of firearms?

13   BY MR. KLEIN:

14        Q    Right.  The types available now as compared

15   to the types available to Army, civilians, criminals,

16   in the 18th century.

17        A    I think throughout history, that's been one

18   of the goals for which firearms have been used.  And

19   there has been continuous successful efforts to improve

20   that aspect of firearms use.

21        Q    To the extent that those attributes make

1   those guns more desirable in the military context,

2   those same attributes might make them more desirable

3   for criminals, right?

4              MR. SWEENEY:  Objection.

5              THE WITNESS:  Well, given that a vast

6   majority of the guns that are more effective in the

7   military are highly restricted for civilian ownership,

8   and that usually criminal use of them would have been

9   obtaining them through a criminal means, yeah.

10  BY MR. KLEIN:

11      Q    Did the shooter in Las Vegas obtain his gun

12  through criminal means?

13      A    You know, I don't know the full details,

14  but I understood that he bought them legitimately.  I

15  don't know that that's entirely been disclosed yet.

16      Q    And he used those guns, which didn't have

17  select fire, to kill 59 people and injure more than

18  500, correct?

19              MR. SWEENEY:  Objection.

20              THE WITNESS:  That's my understanding.

21  ///

1    BY MR. KLEIN:

2        Q      Let's go to your report, which I believe is

3    Exhibit Number 2.  This is where I might start to get a

4    little fuzzy with my numbers.

5        A      Okay.  I got it.

6        Q      Would you turn to page 3 of your report.

7        A      Which page, please.

8        Q      Three, please.

9        A      Yes, sir.

10       Q      In your -- is the material there labeled

11   Number 1, your first expert opinion in this matter?

12       A      Yes, sir.

13       Q      And it says there:

14              "A central goal has been the ability to

15   deliver multiple repeat shots on target as quickly as

16   possible with minimal effort and disruption to the

17   shooter."

18       A      Yes.

19       Q      Those are desirable characteristics for

20   someone interested in a mass shooting of human beings,

21   aren't they?

170

1       A       Those are desirable characteristics for

2   firearms for a number of purposes.  In certain criminal

3   uses, that would be a desirable aspect to the criminal.

4       Q       And if the target is other humans, that

5   sentence still applies, right?

6       A       That's -- yes.

7       Q       So you make a point here about one of the

8   purposes of gun advances is safety of the shooter and

9   for unintended targets.

10              Do you see that?

11      A       Yes, sir.

12      Q       I'm interested in that point.  Are you

13  familiar with smart gun technologies?

14      A       I think I generally am familiar with the

15  concept.

16      Q       What is that?

17      A       I think it is trying to develop a firearm

18  that can only be used by a specific individual.

19      Q       Does that limitation make those guns more

20  safe for the shooter?

21      A       To my understanding, not necessarily at

1    this state of the art.  I don't think that's been

2    perfected or effective yet.  And a firearm that doesn't

3    function reliably is not safe to a shooter if he's

4    trying to use it in a self-defense situation.

5         Q    If the technology were effective, would it

6    be safer for the shooter to be the only one who could

7    fire the gun?

8              MR. SWEENEY:  Objection.

9              THE WITNESS:  If that shooter is -- I'm not

10   sure how that is safer to the shooter.  I'm not sure

11   what risk to the shooter of the gun that is preventing.

12   It would prevent another person from using that gun to

13   shoot the shooter with it, or shoot the owner.  Is that

14   what you're getting at?

15   BY MR. KLEIN:

16        Q    Wouldn't that make the gun safer for the

17   shooter?

18             MR. SWEENEY:  Objection.

19             THE WITNESS:  Or the gun not to be able to

20   be used by somebody other than the shooter -- against

21   the shooter?  It's not the shooter if he's not

1   shooting.

2   BY MR. KLEIN:

3        Q     Right.  The owner.

4        A     Okay.  Yeah.  I think that would probably

5   be the intention of that line of development.  One of

6   the intentions.

7        Q     Wouldn't it also be safer for unintended

8   targets?

9              MR. SWEENEY:  Objection.

10             THE WITNESS:  I don't think so.  The

11  shooter is intending to shoot a target.

12  BY MR. KLEIN:

13       Q     If the gun is stolen from the shooter, but

14  can't be used by the person --

15       A     It was an operative, yeah.  It doesn't

16  pertain to the shooter, but to the person who does not

17  -- the person who is not encoded to be able to use that

18  gun -- would not be able to use it against other

19  people.

20       Q     Does the speed at which a gun can be fired

21  indiscriminately make it unsafe?

1           MR. SWEENEY:  Objection.

2           THE WITNESS:  Firing any gun

3    indiscriminately is an unsafe practice.  Ability to

4    fire a gun rapidly and indiscriminately does not make

5    the gun itself unsafe.

6    BY MR. KLEIN:

7        Q    Isn't it more unsafe than a gun that can't

8    fire as quickly --

9           MR. SWEENEY:  Objection.

10           THE WITNESS:  That's an unsafe practice

11    regardless of how quickly the gun is firing.

12    BY MR. KLEIN:

13        Q    It's an unsafe practice that's based on the

14    capacity of the gun, correct?

15           MR. SWEENEY:  Objection.

16           THE WITNESS:  Would you restate that for

17    me.

18    BY MR. KLEIN:

19        Q    It's an unsafe practice that's based on the

20    capacity of the gun --

21        A    What is an unsafe practice, please?

1      Q    The ability to fire indiscriminately is

2  more unsafe when the gun can be fired indiscriminately

3  more quickly, correct?

4            MR. SWEENEY:  Objection.

5            THE WITNESS:  You'll have to parse that a

6  little more for me.

7  BY MR. KLEIN:

8      Q    I'll move on.  So in the paragraph closer

9  to the bottom of the page, I want to ask you a little

10  bit about matchlock, wheel lock, and various flintlock

11  types of actions.

12      A    Okay.

13      Q    In the context of your opinion there, are

14  you using ignition systems and type of actions

15  synonymously?

16      A    Yeah, I think those are pretty similar

17  terms.

18      Q    So what you're saying here is:

19            "In the 14th through the 17th centuries,

20  the most significant development in firearms design

21  were in the form of ignition systems evolving through

1   hand cannon, matchlock, wheel lock, and various

2   flintlock types of actions."

3          Can you describe to me what a flintlock

4   type of action is.

5      A    Generally, a flintlock uses the propensity

6   of steel when struck with flint to create a spark to

7   ignite gun powder in a pan that commutes that ignition

8   to the gun powder in the barrel of the gun to fire the

9   projectile or projectiles.

10     Q    Wasn't it the case with flintlock actions

11  that some guns were unreliable because the spark didn't

12  ignite the powder?

13     A    Yeah.  And part of the point of that

14  sentence is that these actions were continually

15  evolving from less reliable to more reliable.

16     Q    And as reliable as it got through the 17th

17  century, flintlock is at the top of the list, right?

18     A    Through the 17th century?

19     Q    That's what your sentence says, right?

20     A    Yes.

21     Q    At the end of the 17th century, which is

1    the 1600s, you acknowledge that in the hierarchy of

2    actions, flintlock was number one?

3        A    It was number one in terms of reliability

4    and cost of production combined.

5        Q    So in a flintlock type of action, was the

6    charge separate from the projectile?

7             The charge is the gun powder, right?

8        A    Right.  In most types of powder ignition,

9    the projectile is packed right against the powder.  So

10   that would be true, I think, in all of those types of

11   actions.  And it's still true today that in a

12   self-contained cartridge, the projectile is packed

13   right against the gun powder in the cartridge in most

14   cases.

15       Q    But there is a big difference between the

16   types of cartridges available today and the way a

17   flintlock gun was fired in that the cartridge today is

18   loaded into the gun, and at the end of the 17th

19   century, as you stated here, you had to load a

20   projectile and the charge separately, correct?

21            MR. SWEENEY:  Objection.

1          THE WITNESS:  Generally, the process for

2    most of these action types that we're talking about is

3    to pour gun powder down the barrel, and then put the

4    projectile on top of the gun powder.  Now, that can

5    generally be two separate actions.  At some point in

6    firearms evolution -- and I don't know if we saw that

7    by the end of the 17th century or not.

8          The practice of preloading powder and

9    bullet or projectile in a paper or linen cartridge came

10   into being to where it was a simpler and more efficient

11   process.  But, generally, that's a process that is used

12   for all of these early muzzleloader type of firearms.

13   BY MR. KLEIN:

14        Q    Can you explain what the term

15   "muzzleloader" means.

16        A    Muzzleloader means that the firearm is

17   loaded from the front end of the barrel.  That would be

18   in most of these cases.  The powder is poured down, and

19   then either the bullet or the shot charge is pushed

20   down the barrel from the front end of the barrel to the

21   rear end where the ignition occurs.

1        Q     And I'm interested in why you stopped here

2   at the end of the 17th century --

3        A     I think --

4        Q     -- when flintlock type of action was really

5   the only type of action through the end of the 18th

6   century, wasn't it?

7        A     End of the 18th century.  I think -- yeah.

8   The flintlock was the predominant action probably for a

9   longer period of time than any other action type, and

10  that went well into the 18th century.

11       Q     Went through the end of the 18th century,

12  didn't it?

13       A     Yeah, I believe it did.  I think percussion

14  was early 19th century.

15       Q     Let's turn to page 4.  Thank you for the

16  nice pictures of guns.  I think they make the report

17  more interesting.

18       A     Good.  I'm glad.

19       Q     So let's start with the Cookson Volitional

20  Repeating Flintlock, seven-shot capacity.

21             At the bottom of that paragraph, you say,

1    "Limited production."

2              What do you mean by that?

3         A    Not a great many were made.

4         Q    About how many, would you say?

5         A    I don't know a number off the top of my

6    head.  I use phrases like that throughout this history

7    of firearms to indicate kind of how widely used and

8    widely produced they were.  Some of them were very

9    limited.  They were in an advance in technology, but

10   not widely successful and widely adopted.

11        Q    Do you know why production was of the

12   Cookson Volition Repeating Flintlock was limited?

13        A    That one specifically, no.  But I can

14   comment in general why some of these improvements in

15   firearms were not widely produced.  That would usually

16   be a combination of effectiveness and cost.  A lot of

17   times, these would not be completely perfected at the

18   time they were developed.  And often, they would be

19   much more expensive than other types of firearms.

20        Q    And do you think that applies to the

21   Cookson that you described here?

1      A     I suspect that it does.

2      Q     Cookson was muzzle loaded, was it not?

3      A     No, it was not.  It was loaded from two

4 internal magazines on the gun.  One for powder, and one

5 for the ball.  And those were worked, I believe, by a

6 crank to load successive rounds into the breach of the

7 barrel, the rear end of the barrel.

8      Q     How would you get the powder into the gun?

9      A     It's loaded into a magazine that's part of

10 the gun.  So you've got a magazine of gun powder, and

11 you have a magazine of lead bullets that are an

12 integral part of that gun.

13      Q     How did you get the gun powder into the

14 magazine?

15      A     The Cookson is illustrated there.  And if

16 you look at the left side of the gun, the full length

17 picture of the gun, you see a crank there.  And you

18 would operate that crank by hand, and that would move

19 -- I think it took two strokes, and I haven't

20 manipulated this action, so I can't say for certain.

21           My understanding is that one stroke, the

181

1    loading mechanism would pick up the lead ball to load

2    into the barrel.  And then the next stroke, it would

3    pick up the powder to load behind the ball.  But these

4    are not occurring from the muzzle end of the gun,

5    they're occurring from the rear or the breach end of

6    the gun.

7         Q    But you still had to load to projectiles,

8    the balls, into the magazine through the muzzle, didn't

9    you?

10        A    No.  No.  No.  Those are magazines that are

11   mounted on the gun, just like loading a magazine today

12   on a semi-automatic --

13        Q    Show me where on the weapon the magazine is

14   positioned since we have a picture.

15        A    Yeah.  I believe they're mounted behind the

16   action, behind the lock.  Again, I'd have to handle the

17   specific specimen to be sure.  They're not separate.

18   The powder and the balls are carried in the mechanism

19   of the weapon itself.

20        Q    So even under your vision of how this gets

21   loaded, they still have to be loaded separately,

1  correct?

2      A    Two strokes.  One for the ball, one for the

3  powder.

4      Q    Well, would you take the magazine off, load

5  it, and then reattach it, is that what --

6      A    It may have been that you opened a

7  compartment and loaded it that way.  I don't think

8  these had easily detachable magazines.  I think that

9  there were compartments in the firearm itself where you

10  would load the lead balls, and then a separate

11  compartment for the gun powder.

12      Q    Where were these produced, if you know?

13      A    Gosh, I don't know.

14      Q    Somewhere in Europe?

15      A    Cookson introduced -- I think that Cookson

16  was an American version, if I recall, of the Lorenzoni

17  guns that were being produced in Europe.  They were an

18  American adaptation of the system originally developed

19  in Europe.

20      Q    Do you have an example of a gun at the NRA

21  museum?

1     A    The Cookson, yes, we do.  I think that's

2 the picture of the Cookson that's included in the

3 report.

4     Q    Let's talk about the Belton Repeating

5 Flintlock next.

6     A    Okay.

7     Q    It says they are very limited production.

8          Do you see that?

9     A    Yes.

10     Q    What do you know about the production of

11 the Belton Repeating Flintlock?

12     A    In terms of numbers?

13     Q    Uh-huh.

14     A    Again, very limited production.  I don't

15 know that there was ever a large number produced.  They

16 were demonstrated, as it says, in the opinion, there

17 was -- one was demonstrated to British ordinance in

18 1784, but they declined to purchase a significant

19 number of them.  They had been demonstrated in America,

20 but I don't know how many of them total were made.

21     Q    You don't know, as you sit here, about any

184

1    problems with the gun that prevented them from being

2    adopted by any armies, right?

3        A    The reason the Continental Congress gave

4    for canceling their order for Cookson Repeaters was the

5    prices that was being quoted.  The inventor was very

6    cagey and nonspecific in how he was trying to price the

7    guns to the government.

8        Q    And you have a quote here that the gun was

9    reported as firing 16 or 20 rounds in 16, 10 or five

10   seconds of time.

11            What does that mean?

12       A    That's a quote.  That's what they said.

13       Q    You don't know whether it was 16, 10 or

14   five seconds?

15       A    I think those were -- I would have to

16   speculate.  I would speculate that that applied to

17   different models and different loadings of the firearm.

18       Q    And the gun was loaded through the muzzle,

19   correct?

20       A    This was a muzzleloader, yes, sir.

21       Q    And you had to individually load each

1  charge through the muzzle?

2        A      Yes.

3        Q      They would stack up against each other?

4        A      Yes, sir.

5        Q      Now, below that, you have a sentence, "The

6  founders were very familiar with multiple shot

7  repeating firearms at the time the Second Amendment was

8  drafted."

9               What do you base that on?

10       A      The Continental Congress attempting to

11  order 100 of these in 1777.

12       Q      But they never saw the guns used, correct,

13  because the order was canceled?

14       A      I don't know if they saw it demonstrated or

15  not.  I have an impression that they may have seen it

16  demonstrated, but I don't know that for sure.

17       Q      You have an impression based on what?

18       A      Just reviewing the reports on these.  Like

19  I say, I can't give you a specific instance.

20       Q      Where do you find the reports on these?

21       A      You can find quite a bit of information

1  about it online, and then they're in various books,

2  too.  I think one of the books that I referenced for

3  this chapter has the information on the Belton.

4      Q    But you don't know that the founders were

5  very familiar with multiple shot repeating firearms --

6      A    Surely.

7          MR. SWEENEY:  Objection.

8  BY MR. KLEIN:

9      Q    For sure?

10      A    I'm sure they were.  A lot of them would

11  have owned double-barrel or multiple-barrel firearms.

12  And for the Continental Congress to order these

13  eight-shot flintlocks, they would have had to be

14  familiar with them.

15      Q    Your statement here is "very familiar," but

16  you don't know they were familiar at all, do you?

17      A    How familiar would you like them to be?

18      Q    I'd like for you to tell me that you have a

19  basis to know that any founder even had a multiple-shot

20  repeating firearm?

21      A    I reference some correspondence there

1  between Franklin and Washington talking about the

2  Belton design.  And for Congress to order them, they

3  would have to be familiar with them.

4      Q    Meaning, they knew they existed, but they

5  didn't know if they would work on the battlefield, for

6  example?

7              MR. SWEENEY:  Objection.

8              THE WITNESS:  I don't know what they knew

9  and didn't know.

10 BY MR. KLEIN:

11     Q    Well, they never ordered them, so how could

12 they have known how they performed?

13     A    They did order them, and they canceled the

14 order.

15     Q    Correct.  They never -- obviously, if they

16 canceled the order, they never acquired the gun --

17     A    That's correct.

18     Q    So they really wouldn't have known whether

19 the guns worked even, for example?

20              MR. SWEENEY:  Objection.

21              THE WITNESS:  I don't know.  They may have

188

```
 1   had them demonstrated to them.  I just don't know.
 2   BY MR. KLEIN:
 3        Q    They wouldn't have known if the production
 4   of 100 guns was possible, would they?  Because the
 5   order was canceled.
 6        A    They placed the order.
 7        Q    But the order was canceled before they
 8   received the production, correct?
 9             MR. SWEENEY:  Objection.
10             THE WITNESS:  Over pricing.
11   BY MR. KLEIN:
12        Q    But they wouldn't have known, if the order
13   was canceled, whether this company could even make 100
14   guns within a reasonable timeframe, would they?
15             MR. SWEENEY:  Objection.
16             THE WITNESS:  I would think a logical
17   assumption would be that for them to place the order,
18   they believed that the order could be filled.
19   BY MR. KLEIN:
20        Q    But they --
21        A    I can't say that with certainty.
```

1      Q    You can't say whether they believed it or

2  whether they knew it, correct?

3          MR. SWEENEY:  Objection.

4          THE WITNESS:  I think it's more likely that

5  they believed it with reasonable certainty.

6  BY MR. KLEIN:

7      Q    What would be the basis for that certainty?

8      A    Placing an order to buy 100 of these.

9      Q    Are you suggesting that some portion of our

10  Founding Fathers went to the place where these guns

11  were to be produced to see if it would be possible for

12  them to actually be produced?

13      A    I don't know if they did or not.

14      Q    They never acquired the guns, though,

15  right?

16      A    That's correct.

17      Q    It's very hard to be very familiar with a

18  gun you never acquire, right?

19          MR. SWEENEY:  Objection.

20          THE WITNESS:  It's very easy to be very

21  familiar with multiple-shot firearms.  It was a pretty

1  common technology at this time.

2  BY MR. KLEIN:

3      Q    So far, we haven't looked at anything that

4  you haven't described as limited production or very

5  limited production.

6      A    Double barrel and multiple-barrel firearms

7  offering two or more shots were very common during this

8  era.

9      Q    What was the most popular form of a double

10 barrelled gun?

11     A    Probably a double barrelled shotgun.

12     Q    How were those loaded?

13     A    They were muzzle loaded.

14     Q    How many shots could get out in a minute?

15     A    If they had two barrels, they could get two

16 off almost simultaneously.  So if you apply the math of

17 not counting the loading time, that would be a very

18 high rate of fire.  If you apply that two shots in one

19 second, that's a remarkably high rate of fire.

20          But if you factor in the loading time, it's

21 going to take a pretty skilled marksman 30 seconds to

1    reload two barrels.  That's for a pretty skilled guy.

2         Q     So I would count the loading time.  And so

3    what you're saying, really, is at best, maybe four

4    shots in a minute?

5         A     Assuming only two barrels.

6         Q     In general, the rate of fire of the guns

7    that were used in the Revolutionary War were, at best,

8    three or sometimes four shots a minute, right?

9         A     Probably, yes.  I think that's a good

10   generalization.

11        Q     And there were many armies striving to get

12   the rate of fire up to four shots a minute in that time

13   frame, right?

14        A     I would think so.

15        Q     So you mentioned earlier that percussion

16   cartridges weren't available until sometimes in the

17   19th century, right?

18        A     Well, the percussion system is different

19   than the cartridge system.

20        Q     Why don't you describe the percussion

21   system.

192

1           A      The percussion system, in most cases, were

2      still applied to muzzleloading arms.  Although,

3      repeating arms, especially revolvers, became very

4      popular during the percussion era.  The percussion arm

5      worked very similarly to a flintlock arm in terms of

6      the powder and projectile being loaded in a barrel or

7      in a chamber.  And then a percussion cap was used for

8      ignition instead of flint and steel.

9                  So instead of flint striking steel to

10     create a spark, to ignite a small quantity of gun

11     powder, a percussion sensitive chemical was loaded into

12     a metallic cap that was put on a hollow nipple on the

13     end of a firing chamber.  And then when it's struck by

14     a hammer blow from the hammer of the gun, it creates a

15     spark that translates to the powder in the chamber and

16     fires the round.

17                 They're in a different form, but a

18     percussion cap works on the same general principal as a

19     kids' cap gun that shoots a roll of paper caps.  You

20     strike the cap, you make a spark.  In the case of a

21     percussion firearm, that ignites the powder.

1      Q      When was that system developed?

2      A      I want to say the early 19th century.  It

3   may be in my report, but I'm not sure.  I couldn't give

4   you a closer date off the top of my head.

5      Q      Can you find that in your report.

6      A      Let me try to.  No, I don't find it here.

7   Best of my recollection, it's going to be initially

8   developed in the 1820s sometime, and then fairly widely

9   used in the 1830s, 1840s, 1850s, 1860s.

10      Q      Why didn't you include that in your report?

11      A      There are lots and lots and lots of

12   firearms, evolutionary fact, that I did not include in

13   my report.

14      Q      Well, you were careful to explain the

15   actions that were available in the 14th through the

16   17th century, right?

17      A      I gave you a very brief general summary of

18   early firearms evolution, emphasizing that for most of

19   that time, developments in firearms technology were the

20   actions that were being developed.

21      Q      And you neglected in describing that

1    summary to mention that those types of actions were the

2    only actions commonly in use through the end of the

3    18th century, right?

4              MR. SWEENEY:  Objection.

5              THE WITNESS:  The sentence that you're

6    referring to, let's reference that, may we?

7    BY MR. KLEIN:

8        Q    Sure.  Page 2.  Page 3, I'm sorry.

9        A    "In the 14th through 17th centuries, the

10   most significant developments in firearms designs were

11   in the form of ignition systems, evolving through hand

12   cannon, matchlock, wheel lock, and various flintlock

13   types of actions."

14             What I'm talking about there is the overall

15   evolution of firearms, and what the most significant

16   development during those centuries was.  During those

17   centuries, there were a number of attempts at repeating

18   firearms, but the developments that were most effective

19   and turned out to be successful and continued, were in

20   the type of action.  That's what this sentence says.

21             It doesn't represent that it's a

1    comprehensive story of the action designs of firearms.

2    It's to explain the very earliest centuries of firearms

3    development as opposed to the 17th, 18th, and 19th

4    centuries where the actions were more perfected, which

5    allowed the attempt of development of repeating

6    firearms.

7          Q    So what you've neglected there is that

8    there were no further developments in the action until

9    the percussion system was designed in about 1820,

10   right?

11              MR. SWEENEY:  Objection.

12              THE WITNESS:  It's not neglected.  That

13   wouldn't be part of that sentence or story.

14   BY MR. KLEIN:

15         Q    It's not part of the story about how

16   firearms developed?

17         A    It's not part of that sentence.  That

18   discusses only the very early evolution of firearms

19   before there were a number of successful attempts to

20   create effective repeating firearms.  The percussion

21   system is introduced at a period of time where you're

1   beginning to see effective repeaters.  And the

2   percussion system does contribute to the effective

3   development of repeating firearms.

4        Q     And that occurred after the Founding

5   Fathers wrote the Second Amendment, correct?

6        A     Yes, it did.

7        Q     What was the primary gun used in the

8   Revolutionary War?

9             MR. SWEENEY:  Objection.

10            THE WITNESS:  It would have been a

11  Smoothbore Flintlock Musket.  There were a couple of

12  different types.  The most prevalent ones would have

13  been the British Brown Bess and the French Charleville

14  pattern.

15  BY MR. KLEIN:

16       Q     And those weapons were available on both

17  sides of that war, correct?

18       A     Yes.  Primarily, the British used the Brown

19  Bess pattern, and the Americans primarily used the

20  French Charleville patterns.  Those weren't exclusive,

21  but those were the two most widely used arms.

197

1      Q    When you call them "patterns," they were

2  available and used to manufacture guns?

3      A    "Pattern" describes the type of gun.  It's

4  sort of like saying "a model."  But back then, guns

5  were pretty much made by individual craftsmen or by

6  groups of craftsmen.  They would be working from a

7  pattern.  The firearms did not have interchangeable

8  parts.

9          Each gun was individually crafted and hand

10  fitted.  So you couldn't take parts out of one gun and

11  put them to the other, but they all tried to have a

12  uniform pattern.

13      Q    And those were muzzleloading flintlocks,

14  correct?

15      A    Yes, they were.

16      Q    And that means that someone had to shove a

17  powder and a ball down the muzzle of the gun in order

18  for them to fire?

19      A    Yes, that's true.

20      Q    Were there any semi-automatic weapons on

21  the battlefield in the Revolutionary War that you could

1  tell me about?

2       A     I don't think so.

3       Q     Did the French or Indians have a better

4  design than a muzzleloading flintlock in the French and

5  Indian War?

6       A     That was still the -- pretty much the state

7  of the art.  At that point, there tended to be more

8  military use of rifle firearms than there had been in

9  the past.  So muzzleloading rifles were seeing some

10 use, as opposed to Smoothbore, a certain amount of use

11 of rifles in the Revolutionary War and were probably a

12 little more prevalent during the French and Indian War.

13      Q     In the advancement you're pointing to,

14 rifling is intended to keep a shot on target, correct?

15      A     That's right.  Rifling are grooves cut in

16 the barrel that, in part, extend to a projectile like

17 when a quarterback is throwing the football and puts a

18 spin on it so that it will go farther, more accurately

19 than if you just fling it.

20      Q     That advancement didn't do anything to

21 speed the rate of fire of guns at the time, right?

1       A       It slowed the rate of fire.  They were
2   slower to load than a Smoothbore.

3       Q       It was harder to get the gauge -- the ball
4   down the barrel, right?

5       A       Exactly.  Yes, sir.

6       Q       Give me one second, please.

7               If you'd go to page 11 of your report.

8       A       Yes, sir.

9       Q       You have a sentence here, "The distinction
10  between semi-auto and full-auto is vitally important to
11  understand."

12              Do you see that?

13      A       I'm not finding it.  Yes, I do see that.

14      Q       So I'm interested in your choice of the
15  adverb "vitally" there.

16              What do you mean there?

17      A       To understand the issue we're addressing,
18  and especially the term "assault weapons."  It's very,
19  very important to understand the difference between how
20  a semi-auto and a fully-automatic gun functions.

21      Q       That's your definition of the term "assault

200

1    weapon," correct?

2         A     No, that's borrowing the law's definition

3    of assault weapon.

4         Q     So for the purpose of the Massachusetts

5    law, there is no distinction between automatic and

6    semi-automatic firearms, right?

7         A     Despite some unfortunate terminology, I

8    have the impression that the Massachusetts law is

9    targeted specifically at the semi-automatic firearms.

10   They use the AK-47 terminology, which is a full-auto

11   gun.  It's a machine gun.  It's one that is already

12   very, very heavily restricted by the federal

13   government.

14            And it seems to me they probably intended

15   to say "semi-automatic versions of the AK," but it's

16   not what they said.

17        Q     Doesn't it say "AK, all models"?

18        A     I think it says "AK-47, all models."  If

19   you want to, we can look at that and see what it says.

20        Q     It says what it says.  So the distinction

21   you're talking about here is only important if you

1   consider the defining feature of an assault weapon to

2   be the ability to fire automatically?

3               MR. SWEENEY:  Objection.

4               THE WITNESS:  It's vitally important if you

5   consider what type of firearms the government might

6   legitimately prohibit an individual from possessing.

7   BY MR. KLEIN:

8        Q    Is that a personal opinion, a legal opinion

9   or an expert opinion?

10              MR. SWEENEY:  Objection.

11              THE WITNESS:  I think it's sort of experty

12  [sic].

13              MR. KLEIN:  Off the record for a moment.

14              (Discussion off the record.)

15  BY MR. KLEIN:

16       Q    Just because I don't think you answered my

17  question, I'm going to see if I can ask it in a

18  different way.

19              Your view is that a key feature that

20  converts a weapon into an assault weapon is its ability

21  to fire automatically, correct?

1        A     Historically, the term "assault rifle" or

2   "assault weapon" was used to describe for specific

3   characteristics, and that's one of them.  Now, I do

4   understand that different laws have redefined the term

5   "assault weapon."

6        Q     So it's the version that you would prefer

7   from your perspective, which includes the ability to

8   shoot automatically as one of the defining features of

9   assault weapons, correct?

10              MR. SWEENEY:  Objection.

11              THE WITNESS:  I prefer to see terminology

12  used correctly in addressing this law.  We have to

13  understand that the law redefines an assault weapon or

14  an assault rifle in a different manner.

15              Does that make sense?

16  BY MR. KLEIN:

17       Q     Well, only if your definition is correct

18  and every one else's is wrong.

19              MR. SWEENEY:  Object to the form.

20  BY MR. KLEIN:

21       Q     So you are making an assumption that

1    pervades your entire report that the definition of

2    "assault weapon" includes the ability to shoot

3    automatically, right?

4         A    I am explaining the historic evolution of

5    assault rifles.  And in that history, there is a

6    specific definition -- specific characteristics that

7    distinguish an assault rifle.  I don't know how

8    important that is to the rest of the report, other than

9    to understand that a term has been taken, modified, and

10   changed.  That has a specific historic and technical

11   meaning.

12        Q    Well, point me to where in your report you

13   are able to cite to something that defines "assault

14   weapons" in the way that you prefer.

15        A    Okay.  Historically, when you look at the

16   assault rifle, the primary milestone that you look at

17   is the development of the German StG 44 in World War

18   II.  And that has those four specific characteristics

19   for an assault rifle.  And that's where the origin of

20   the term "assault rifle" began.  You want the four

21   characteristics.

1      Q      No.  I understand what you're saying of the

2  four characteristics, but where does the definition of

3  "assault rifle" get cited to a specific authoritative

4  source?

5      A      It's attributed to Adolf Hitler.  There was

6  a long series of development in the German military for

7  an intermediate power cartridge in a full-auto capable

8  long gun.  At one point, Hitler discouraged this.  They

9  renamed it as a pistol so it wouldn't get discontinued.

10          You're probably familiar with that general

11  history of the development of the StG 44.  But

12  eventually, when it was finalized, when it was

13  developed, when it was ready for production, it was

14  reviewed.  And it's attributed that Hitler developed

15  the stormy affair, or storm rifle.  "Storm" in the

16  sense of the assault, as in "storm the castle."

17          So that's the origin -- the historic origin

18  of the term and the concept.  And the concept is

19  important to apply in the evolution of military

20  firearms because there was a dramatic change in

21  thinking about what the primary military long arm

1    should be after World War II.  And that moved towards

2    the development and adoption of long guns that fit the

3    true assault rifle definition by most, if not all of

4    the worlds militaries.

5         Q    So you keep referring to something you

6    called the "true assault rifle definition."

7              What historical point do you point to that

8    makes that a true historical definition?

9         A    Oh, gosh.  Anywhere you look in firearms

10   history.  There are a number of books over there we

11   could dig out.  Let me reiterate that we're talking

12   about the historical context and that we do understand

13   that this term has been picked up and used in ways that

14   are different than the historical use.  And people have

15   redefined, especially assault weapons, but also assault

16   rifles, at different times.

17             And the only point of this is that this

18   term has been borrowed and changed to be something that

19   it didn't originally represent.

20        Q    So in your view, there has never been a

21   manufacturer who referred to a semi-automatic weapon as

1   an assault rifle?

2              MR. SWEENEY:  Objection.

3              THE WITNESS:  I think there probably have.

4   I don't think the vast majority of them have been

5   advertised that way by manufacturers, but I am certain

6   they have.  I think that term started to be used more

7   broadly in the 1980s.

8   BY MR. KLEIN:

9        Q     But it was used by some manufacturers

10  before 1980s to refer to certain semi-automatic

11  weapons, right?

12       A     I would suspect it was used by

13  manufacturers.  I think it was picked up more by people

14  who were writing about guns, but it wouldn't surprise

15  me that some manufacturers had used that term.

16             MR. KLEIN:  Let's take a break.

17             (A brief recess was taken.)

18  BY MR. KLEIN:

19       Q     If you could turn to page 16 of your

20  report.

21       A     Okay.

1      Q     There is a sentence there just below your

2   opinion number three, "Improvements in firearms

3   technology tend to be adopted for both military and

4   civilian use."

5           Is that right?

6      A     Yes, sir.

7      Q     And that also would include use by

8   criminals if they choose to use the guns at issue,

9   right?

10          MR. SWEENEY:  Objection.

11          THE WITNESS:  "Improvements in firearms

12  technology" refers primarily to them being adopted by

13  manufacturers and incorporated into requested designs.

14  It doesn't so much address the use of firearms.

15  BY MR. KLEIN:

16     Q     The end users get the benefit of those

17  improvements, correct?

18     A     Yes, sir.

19     Q     That would be military, for one, right?

20     A     Yes, sir.

21     Q     And civilians for another?

208

1        A     Yes, sir.

2        Q     And criminals as well, right?

3              MR. SWEENEY:  Objection.

4              THE WITNESS:  Yes.

5   BY MR. KLEIN:

6        Q     Then you say, "Firearms designers and

7   manufacturers have historically marketed new

8   developments for both military and civilian uses."

9        A     Yes.

10       Q     And that includes the various improvements

11  that make the guns more likely to be effective for

12  combat, right?

13       A     In a military sense, yes.  For military

14  uses.

15       Q     But when they're marketed to civilians,

16  they're often marketed on the basis of the features

17  that make the guns more desirable for military uses?

18             MR. SWEENEY:  Objection.

19             THE WITNESS:  I would state that -- the way

20  I would state that is that in many, if not most, cases

21  the development improves the use for both military and

209

1   civilian use.

2   BY MR. KLEIN:

3       Q     But when they're marketed to civilians, the

4   marketing often includes touting the additional

5   features that made them desirable to the military,

6   correct?

7       A     The specific features?

8       Q     Yes.

9       A     Yes, sir.

10      Q     Turn to page 17.  There is a series of

11  bullet points there.  All those bullets apply to the

12  development of weapons, both for civilian and military

13  use, right?

14      A     Yes.

15      Q     And all those additional improvements are

16  equally applicable if the gun is select fire or

17  semi-automatic, right?

18          MR. SWEENEY:  Objection.

19          THE WITNESS:  I think that's generally

20  correct.  We might look at some specific instances, but

21  I think generally that's true.

210

1   BY MR. KLEIN:

2        Q     Your statement below those bullets that,

3   "The semi-auto only rifles that are built on assault

4   rifle patterns tend to incorporate these improvements

5   that are functionally identical to other more

6   old-fashioned looking commercial semi-auto rifles."

7              Do you see that?

8        A     Yes.

9        Q     I read it correctly?

10       A     Yes.

11       Q     So even though they're improved, you're

12   saying they're functionally identical to other more

13   old-fashioned commercial semi-auto rifles?

14       A     Functionally in terms of capacity and how

15   rapidly they can be fired, yes.  They are substantially

16   identical.

17       Q     So you don't -- you don't give any credit

18   to any of these other improvements as important to the

19   development of weapons?

20             MR. SWEENEY:  Objection.

21             THE WITNESS:  No, I'm pointing out

1  specifically that they are very important, and they've

2  been important for the development of both military and

3  sporting firearms.

4  BY MR. KLEIN:

5      Q    They have improved the function of those

6  weapons over older -- what do you call them,

7  old-fashioned looking commercial semi-automatic rifles?

8      A    Each of them have offered an improvement.

9  But did you ask about function?

10     Q    Well, you described them as functionally

11 identical.  I'm asking whether the improvements that

12 you speak about mean that they're not functionally

13 identical to the older weapons would that be

14 improvement?

15     A    I'm lost there.  Would you give that to me

16 again, please?

17     Q    I'm asking you whether the improvements

18 that you describe in the bulleted points on this page

19 mean that the weapon after the improvements is better

20 than more old-fashioned looking commercial

21 semi-automatic rifles?

1              MR. SWEENEY:  Objection.

2              THE WITNESS:  Each of those listed

3    improvements can improve a specific aspect of the

4    rifle.  Now --

5    BY MR. KLEIN:

6         Q    Go ahead.  Sorry.

7         A    In general, those won't change how the

8    rifle functions in terms of how a round is fired, how

9    an empty cartridge case is ejected, how a new cartridge

10   is fed into the chamber.  Functionally, in that sense,

11   in terms of the mechanical function of the rifle, these

12   improvements don't really change that.  They improve

13   other aspects, such as ergonomics, safety, improving

14   manufacturing techniques.

15        Q    I'm not following the distinction you're

16   trying to make.

17             Aren't those functional improvements to the

18   rifle?

19        A    Depends on how you define "function."

20        Q    Let's take one example and see if we can't

21   work this through.  So third bullet point down,

213

1    "Improved ergonomics such as pistol grips, separate

2    from stocks, stock design that directs recoil straight

3    into the shoulder instead of creating muzzle flip and

4    raise sights to allow effective aiming the more

5    straight stock design."

6              Aren't those things that make the weapon

7    functionally improved over older weapons?

8         A    When I'm using the term "functionally

9    identical" in the sentence below that, I'm talking

10   about how the arm functions in terms of the mechanical

11   function of the rifle including it's capacity, how

12   quickly it can be fired.  The ergonomics that are

13   discussed here generally improve the shooter's

14   experience and their ability to fire the rifle

15   accurately as they're intending to fire it.  But they

16   don't affect how the mechanism of the firearm

17   functions.

18        Q    Isn't the ability to shoot the weapon more

19   accurately a functional improvement?

20        A    Depending how you want to define

21   "function."  We can go through and discuss each of

1   these if you want a different definition of function

2   than what I just gave you.

3        Q    Even under your definition of function that

4   you just gave me, doesn't the ability to fire the

5   weapon more accurately consist of a functional

6   improvement?

7        A    It does not change the way the firearm

8   functions in terms of feeding and firing and capacity.

9        Q    So reducing the amount of muzzle flip

10  doesn't improve the way the firearm functions for the

11  shooter?

12       A    The mechanical process of the function is

13  the same.  The muzzle flip improves the shootability

14  and the safety for the shooter.  Again, if you want to

15  re-define "function," we can look at these of those.

16       Q    So when you refer there to "old-fashioned

17  looking commercial semi-auto rifles," are you referring

18  to rifles that are chambered for an intermediate

19  cartridge?

20       A    In some cases, but not always.

21       Q    Are you referring there to rifles that are

1  capable of accuracy in ranges of more than a quarter

2  mile?

3       A     In some cases, yes.

4       Q     But not all?

5       A     Usually that range or further.

6       Q     The old-fashioned commercial semi-auto

7  rifles?

8       A     Yes, sir.

9       Q     All of them were capable of firing more

10 than a quarter mile?

11      A     No, I think I said "usually."

12      Q     Some of them were, and some of them

13 weren't; isn't that right?

14      A     The question you're asking about is the

15 effective range?

16      Q     Yes.

17      A     It's going to be more a product of the

18 cartridge than the rifle.  The rounds that are used in

19 AR and AK rifles are fairly low in terms of power and

20 range compared to the entire spectrum of center-fire

21 cartridges that are used in center-fire rifles.

216

1       Q      Those types of rounds weren't available to

2    the more old-fashioned semi-automatic rifles, were

3    they?

4       A      Does it say "old-fashioned looking"?

5       Q      It does say "old-fashioned looking," yeah.

6       A      Yeah, that would be a traditional wood

7    stock as opposed to a plastic stock.

8              Does that make sense?

9       Q      Is that the comparison you're interested

10   in, whether the wood stock is old-fashioned?

11      A      The comparison I'm making is between rifles

12   that incorporate those bullet points, and those that

13   don't.

14      Q      So --

15      A      Or don't include all of them.

16      Q      I'm afraid we've lost each other.  I'm just

17   trying to get this back on track.  The stock has no --

18   the finish on the stock is no functional quality,

19   right?

20      A      In terms of allowing the firearm to

21   mechanically function, in most cases, the design of the

1    stock will not affect that.  We're not talking finish

2    of the stock, we're talking the design of the stock.

3         Q     So what you're saying here is that weapons

4    that have these improvements are functionally identical

5    to other old-fashioned looking commercial rifles that

6    have wood stocks?

7              MR. SWEENEY:  Objection.

8    BY MR. KLEIN:

9         Q     That's your definition of "old-fashioned

10   looking rifle"?

11        A     "Old-fashioned looking rifle" is a term I'm

12   using to refer to semi-automatic rifles that don't

13   include all of these bullet points that are listed.

14        Q     Let's turn to page 18.  In the chart on

15   page 18, you list an AR type and an AK type.

16        A     Yes, sir.

17        Q     And you have "Muzzle energy range" as one

18   of the pieces of information about those two types of

19   weapons.

20        A     Yes, sir.

21        Q     Those muzzle energy ranges apply whether

1   the gun is fired automatically or semi-automatically,

2   right?

3        A     Yes, sir.  A number of those cartridges are

4   not produced in either semi-automatic or full-automatic

5   as a general rule.  Several of those will be primarily

6   in other types of firearms.

7        Q     Which types of cartridges is that you're

8   referring to?

9        A     The .38 Special, the .357 Magnum, the .44

10  Magnum.  Those would all be primarily revolver

11  cartridges.  The .30-06 and 8-millimeter Mauser, those

12  are offered in a semi-automatic configuration, but

13  they're probably slightly more prevalent in bold action

14  configuration.

15       Q     So I appreciate that, but just so the

16  record is clear, I was asking only about the rows

17  concerning the AR type and AK type.

18       A     I'm sorry.

19       Q     In those cases, the ammunition is available

20  to be fired both automatically and semi-automatically,

21  correct?

1      A      It is a function of the gun and not the

2   ammunition.  So in a full-auto gun, those will fire

3   full-auto.

4      Q      And then a semi-automatic gun will fire

5   semi-automatically, correct?

6      A      One shot with one pull of a trigger, yes,

7   sir.

8      Q      The muzzle energy ranges described there

9   would apply whether the gun and the projectile are

10  fired automatically or semi-automatically?

11     A      Yes, sir.

12     Q      I want to just turn your attention to the

13  same chart, the rimfire handgun and rifle example is

14  .22 LR.

15            What does that mean?

16     A      Stands for .22 long rifle.

17     Q      And that's a rimfire round; is that right?

18     A      Yes, sir.

19     Q      And it says there that, "The common uses of

20  that round are for plinking, small game, and practice."

21            Correct?

1               MR. SWEENEY:  Objection.

2               THE WITNESS:  And target.

3    BY MR. KLEIN:

4         Q     Did I miss -- sorry.  I missed that.  And

5    that round is a relatively low power, correct?

6         A     Yes, sir.

7         Q     Be harder to use that to stop an enemy than

8    the .223 cartridge, for example, right?

9         A     That gun would very seldom be first choice

10   for a defense, police, or military application.

11        Q     Turn to page 20.

12        A     Okay.

13        Q     You have a statement there after the letter

14   C, "The guns restricted by this law have features that

15   may make them easier and safer to use by small statured

16   individuals, including some women of ethnic groups, the

17   elderly, and disabled individuals?"

18               What size women are you talking about

19   there?

20        A     Any individual that is smaller stature than

21   average.

1      Q     Are there men as small as the woman you're
2  referring to?

3      A     Yes, there are.

4      Q     Which ethnic groups are you talking about
5  there?

6      A     I think many Asian ethnic groups tend to be
7  smaller statured than other ethnic groups.  Again,
8  there are certainly folks that are smaller stature than
9  some Asians.

10     Q     And aren't there white men that are also
11 that same stature?

12     A     I think that's what I just said.

13     Q     Are you saying here that white men
14 typically don't need those features?

15     A     Nope.  That's not what it says.

16     Q     Isn't it true that small statured
17 individuals might also choose a handgun, including a
18 semi-automatic handgun, correct?

19            MR. SWEENEY:  Objection.

20            THE WITNESS:  I don't know that stature has
21 a great deal of impact on handgun choice, other than

222

1    with very, very powerful hunting firearms.  And

2    generally, folks of any stature can learn to shoot most

3    firearms effectively.  It's just that certain

4    configurations are easier for people to shoot a gun

5    that the stock matches the individual's body type can

6    make a significant difference on their ability to use

7    it effectively and safely.

8    BY MR. KLEIN:

9        Q     After letter E, there is a sentence, "When

10   consumers are restricted to a magazine capacity of ten

11   rounds are less, they are more likely to choose a

12   compact firearm, which is more difficult to effectively

13   fire accurately than a full size pistol."

14            What's your basis for that statement?

15       A     Experience and observation and discussion

16   with a wide, wide range of firearms experts.  That's

17   pretty a universally known fact.

18       Q     This is a scientific study that you've run

19   on this question?

20       A     No, it's common observation.  It's hard to

21   debate.  And you can find references to it throughout

1   the literature, throughout the Internet, that a very

2   small compact pistol will be more difficult to shoot

3   effectively than a full size pistol.

4        Q     That's not what your statement here says.

5   What you're saying here is that when consumers are

6   restricted to a magazine capacity of ten rounds or

7   less, they are more likely to choose a compact firearm.

8             What's your basis for that statement?

9        A     Again, observation and experience.  I see a

10  lot of guys buy guns.

11       Q     And so if they can't get a large magazine,

12  they choose a smaller firearm?

13       A     Yes.  In some cases, they will.  It's an

14  incentive to purchase a more compact concealable

15  firearm for personal defense.  You've given up one of

16  the positive features of a firearm, a magazine capacity

17  in excess of ten rounds.  So a lot of times, a

18  purchaser will compensate by going with a smaller, less

19  controllable handgun.

20       Q     Why wouldn't they compensate with going

21  with a bigger, more dangerous looking handgun?

1            MR. SWEENEY:  Objection.

2            THE WITNESS:  Usually -- this is primarily

3    talking about people looking at firearms for personal

4    defense, which is a very large part of the handgun

5    market.  It's a weighing of factors there when someone

6    makes that decision.  If somebody can have a handgun

7    that has a standard capacity of 14 rounds, let's say,

8    in the magazine, they may like having those extra

9    rounds available.  If they're limited to ten rounds,

10   and there is a smaller version of the gun, they may

11   make the choice that I prefer something that is more

12   concealable over something that is full size.

13   BY MR. KLEIN:

14       Q    And that concealability might also be an

15   advantage in some circumstances for self-protection,

16   right?

17       A    It's definitely an advantage in some

18   circumstances.  It's a disadvantage in terms of

19   accuracy in fire.

20       Q    It's possible to get a ten-round magazine

21   or smaller for a full size pistol, right?

225

1       A       Yes, it is.

2       Q       Turn to page 22, please.  You reference the

3   NSSF Firearms Retailer Survey Report, 2013 and 2017

4   Editions.

5       A       Yes, sir.

6       Q       Can you tell me what "NSSF" stands for?

7       A       I hope I can remember.  I think it's the --

8   I'm not sure if I know the acronym.  It's an

9   organization for firearms dealers.  I think it's like

10  the National Sport and Shooting Foundation, something

11  along those lines.

12      Q       National Shooting Sports Foundation sound

13  right?

14      A       I like that even better.  Yes, sir.

15      Q       Do you know what kind of organization NSSF

16  is?

17      A       I believe it's a professional organization

18  for firearms dealers or possibly firearms

19  manufacturers, I'm not sure.

20      Q       Dealers and manufacturers, is that

21  possible?

1          A     I think that would be very possible, yes,
2     sir.

3          Q     And did you look into the methodology
4     behind the survey report before you quoted it?

5          A     If I recall properly, I think it was a
6     survey of firearms dealers.

7          Q     Is it fair to say that NSSF is a trade
8     group for those dealers?

9          A     I think that's probably a fair
10    representation.

11         Q     Is it fair to say that the dealers have an
12    interest in selling more guns?

13         A     I assume that's why they're dealers.

14         Q     Is it fair to say that if they have a trade
15    group that the trade group is likely to be interested
16    in helping them to sell more guns?

17         A     Yes, sir.

18         Q     Have you ever studied mass shootings?

19         A     No, I really haven't.  I've just seen what
20    everybody sees in the press and seen accounts.

21         Q     Are you familiar with the types of guns

1    that have been used in mass shootings over the last ten

2    years?

3         A     I've seen references to them in different

4    places.

5         Q     But you don't study that particular

6    question?

7         A     I've reviewed it, but I don't have

8    immediate finger tip in-depth knowledge, no, sir.

9         Q     So you have a sentence on page 23 of your

10   report, about halfway down, "Clearly the types of guns

11   and magazines banned are exactly the type commonly used

12   by responsible individuals for lawful purposes such as

13   self-defense."

14        A     Yes, sir.

15        Q     If you haven't studied mass shootings,

16   would you have any reason to disagree if someone said,

17   "Clearly the types of guns and magazines banned are

18   exactly the type most commonly used by criminals for

19   mass shootings"?

20              MR. SWEENEY:  Objection.

21              THE WITNESS:  I'd have to know what was

228

1  meant by "mass shootings."

2  BY MR. KLEIN:

3      Q     Typically, the definition is the shooting

4  of a criminal nature in which four or more people are

5  killed or injured.

6             Is that a fair definition?

7             MR. SWEENEY:  Objection.

8             THE WITNESS:  I've seen that definition

9  used.

10  BY MR. KLEIN:

11     Q     So in that context, would it be accurate

12  for someone to say, "Clearly the types of guns and

13  magazines banned are exactly the types commonly used by

14  criminals in mass shootings"?

15            MR. SWEENEY:  Objection.

16            THE WITNESS:  I'd really to have to see the

17  statistics on it.

18  BY MR. KLEIN:

19     Q     If the statistics supported that, would you

20  say that maybe these guns are used both by responsible

21  individuals and by criminals?

 1              MR. SWEENEY:  Objection.

 2              THE WITNESS:  I have no doubt that there

 3    are any number of firearms that are used both by

 4    responsible individuals and criminals, including the

 5    type we're discussing.

 6    BY MR. KLEIN:

 7         Q     Are you familiar with the mass shooting in

 8    a movie theater in Aurora, Colorado?

 9         A     Generally.  Not in specificity.

10         Q     You don't know what type of gun was used?

11         A     I think there was -- I'm trying to

12    remember.  I may be wrong.  I think initially a shotgun

13    was used.  And then I believe it might have been an AR

14    type of rifle with an unusual after-market magazine.

15         Q     Underground magazine?

16         A     After-market magazine.

17         Q     Do you remember it be a 100-round magazine?

18         A     100-round?

19         Q     Yes.

20         A     That wouldn't surprise me.

21         Q     Do you know if the gun was fired

1   automatically or semi-automatically?

2              MR. SWEENEY:  Objection.

3              THE WITNESS:  I don't know.  My assumption

4   is that it was semi-automatically.

5   BY MR. KLEIN:

6        Q     Are you familiar with a mass shooting in

7   Edgewater Technology in Wakefield, Massachusetts?

8        A     No.

9        Q     Do you know what type of gun was used?

10       A     I'm not familiar with that shooting.

11       Q     Are you familiar with a shooting at

12   Columbine High School?

13       A     Yes.

14       Q     Do you know what type of gun was used?

15       A     Again, I'm very, very fuzzy on the details.

16   Again, I think the shooter started with shotguns, and

17   then they may have gone to either handguns or AR-type

18   rifles, but I'm not at all sure on that.

19       Q     Does TEC-9 ring a bell?

20       A     TEC-9, yeah.  That -- I would find that

21   credible.

1        Q     Do you know if the gun was fired
2   semi-automatically?

3        A     I'm pretty sure we would have heard if it
4   was a full-auto firearm.

5        Q     Do you know about a shooting in San
6   Bernardino, California?

7        A     It rings a bell, but I don't remember
8   specifics.

9        Q     Do you happen to remember that two AR-15
10  type guns were used?

11       A     I don't.  I'm sorry.

12       Q     Are you familiar with the shooting in
13  Newtown, Connecticut.

14       A     Yes.

15       Q     That's the one where 20 children and six
16  adults were killed?

17       A     Yes.

18       Q     Do you know what type of gun was used
19  there?

20       A     Not off the top of my head.

21       Q     Is it possible that it was a Bushmaster

232

1    XM-15?

2         A     Which would be an AR-type rifle, that's

3    certainly possible.

4         Q     Do you know whether it was shot

5    semi-automatically?

6         A     I would assume it was shot

7    semi-automatically.  Because, again, I think any time a

8    full-auto gun was used, it would be fairly prominent in

9    the press.

10         Q     Are you familiar with the shooting at the

11    Pulse Nightclub in Orlando, Florida?

12         A     Yes.

13         Q     Do you know how many people were killed

14    there?

15         A     I don't.

16         Q     Do you know what kind of weapon was used

17    there?

18         A     I don't.

19         Q     If I told you it was a Sig Saur AR-15 type

20    weapon, would that ring a bell?

21              MR. SWEENEY:  Objection.

1          THE WITNESS:  I'm not sure that it does.

2    BY MR. KLEIN:

3          Q     You don't know whether a weapon that would

4    be banned in Massachusetts was used there?

5          A     I don't know.  I don't know what gun was

6    used, so I wouldn't know if it was banned in

7    Massachusetts.

8          Q     We talked about Las Vegas.  Those were not

9    select fire automatic guns used in Las Vegas, were

10   they?

11         MR. SWEENEY:  Objection.

12         THE WITNESS:  The reports that have been

13   made public so far don't indicate that they were.  They

14   indicate that they were semi-automatics.

15   BY MR. KLEIN:

16         Q     On page 24 of your report, you've quoted,

17   "The Similarity tests in part..." below heading number

18   eight.  Is it fair to say you left some words out

19   there?

20         A     That's why the ellipses are there, yes.

21         Q     Do you know what words you left out?

1        A      No, but I'm sure we could find them.

2        Q      On page 25, you say:

3               "The Interchangeability Test attempts to

4   provide a complicated formula to define whether a gun's

5   receiver is 'the same as or interchangeable with the

6   receiver as an Enumerated weapon.'"

7        A      Yes.

8        Q      The term "complicated" is your term, right?

9               MR. SWEENEY:  Objection.

10               THE WITNESS:  That's my opinion.

11  BY MR. KLEIN:

12        Q      Would it be complicated to see if parts are

13  interchangeable between two guns?

14        A      Yes, it would.

15        Q      You wouldn't be able to just move from one

16  gun to another and test it?

17        A      As I understand the law, you would have to

18  test the part on all of the enumerated guns to see if

19  it was interchangeable.  And that presumes a fairly --

20  fist of all, it presumes having specimens to compare

21  them to, and then it presumes a fairly sophisticated

235

1   set of gunsmithing skills that are certainly beyond my

2   capability.

3         Q     Would a magazine for an AR-15 fit an AK-47?

4         A     No, it would not.

5         Q     Different size, right?

6         A     Yes, sir.

7         Q     You know that confidently?

8               You wouldn't have to test that, would you?

9         A     No, I wouldn't have to test that.

10        Q     Would a trigger from an AR-15 fit an AK-47?

11        A     The trigger itself?

12        Q     The trigger mechanism --

13        A     The whole group?

14        Q     Yes, the trigger group.

15        A     It would not fit.  There are parts of it

16   that might be interchangeable.

17        Q     But you wouldn't have to change the trigger

18   mechanism because you know it wouldn't fit, right?  The

19   group of parts that we're talking about here.

20        A     As I read this definition, I didn't see

21   anywhere that it referred to a group of parts.  I think

1    the word is "components."  I could be wrong.

2         Q    Okay.  Thank you.  Show you an Exhibit

3    labeled 8.

4              (Exhibit No. 8 was marked for

5    identification.)

6    BY MR. KLEIN:

7         Q    Says at the top, "The Nazis' assault rifle

8    now made in America."

9         A    Yes.

10        Q    Then there is a quote from you at the

11   bottom of the page.  Does that seem like an accurate

12   quote to you?

13        A    Yes, it does.

14        Q    And is it true that the rifle made in

15   America that they're describing here is a

16   semi-automatic weapon?

17        A    I'm just sure that it is.

18        Q    Thank you.

19             (Exhibit No. 9 was marked for

20   identification.)

21   ///

237

1   BY MR. KLEIN:

2        Q      Giving you something labeled Exhibit

3   Number 9.  Is that something you're familiar with?

4        A      Yes.  That appears to be an article, a

5   chapter that I originally produced for a book.  And

6   other versions of it have been are reproduced in other

7   books.  I'm going to assume that this was the original

8   from the book named "Guns."

9        Q      And you wrote this?

10       A      I wrote this part of it, yes, sir.

11       Q      This article?

12       A      If that's what this book came from, yes,

13  sir.

14       Q      Do you know approximately when you wrote

15  it?

16       A      I don't remember.  It's probably on my

17  curriculum vitae.

18       Q      Why don't we take a look at that.

19       A      Okay.

20       Q      Looks like page 29.

21       A      Thank you.

1    Q    Can you point it out to me, if you see it.

2    A    Oh, okay.

3    Q    Could be on page 23 as well.

4    A    Probably.  It's probably on books on

5  page 28, and it would be the one at the bottom.  Guns

6  Introduction by Jim Supica, 2005.

7    Q    And this was intended as your summary of

8  the history of gun development at that time?

9    A    Yes, for that book.

10    Q    As far as you know, is this all accurate?

11    A    You know, I haven't looked through this

12  copy of it.  Do you know if this was the one taken from

13  the museum's website, the article that's reproduced

14  there?

15    Q    Yes.  I will represent to you that I took

16  this directly from the museum's website.

17    A    Yeah.  The article posted on the website

18  may not be completely identical to the one in Guns, but

19  it's substantially the same.  And I did review and

20  write that article on the website.

21    Q    So you're comfortable with everything in

1   here?

2         A     I think so.

3         Q     And we can take this as accurate in

4   connection with this case?

5         A     A keyword in the title of this article is

6   "a brief history of firearms."  So this is by no means

7   comprehensive.  But you can take this as my summary of

8   some of the high points in the history of firearms.

9         Q     Would you describe your history of firearms

10  in your expert report as also a brief summary?

11        A     Yes.  It tends to focus more specifically

12  on issues that are related to firearms capacity, rate

13  of fire, and use of detachable magazines.  It's also a

14  summary.

15        Q     So if there is something in this article

16  that is not in your expert report, we can sort of

17  supplement the expert report by treating this

18  information as equally accurate?

19              MR. SWEENEY:  Objection.

20              THE WITNESS:  Those are not identical

21  reports.

240

BY MR. KLEIN:

1

2       Q       I understand that.

3       A       Yeah.  I'd have to see what you're wanting

4  to substitute to see if that fits.

5       Q       Okay.  So let's look at the description of

6  flintlocks on page 2 and 3.

7       A       Okay.

8       Q       Is it accurate?

9       A       We're starting at the top of page 3?

10      Q       Starting at bottom of page 2, where it

11 says, "flintlocks."  You can read it to yourself.  You

12 don't need to read it out loud.

13      A       Thanks.

14              MR. SWEENEY:  You're asking him to look at

15 the whole section --

16              MR. KLEIN:  Uh-huh.

17              THE WITNESS:  And the question is:  Is this

18 accurate?

19              MR. KLEIN:  Uh-huh.

20              THE WITNESS:  Thanks.  Yes, I believe

21 that's accurate.

1   BY MR. KLEIN:

2          Q     Is there any reason why we can't rely on

3   the accuracy of your statements in here in connection

4   with this case?

5          A     I'm not aware of anything in this article

6   that I would differ with at this time.  I would want to

7   review it thoroughly, but I think it's still pretty

8   accurate.

9          Q     Why don't we take a break.  I'll let you

10  read through it.  And then you can tell me after the

11  break whether there is anything in here that we

12  shouldn't rely on.

13         A     Okay.

14               (A brief recess was taken.)

15  BY MR. KLEIN:

16         Q     I want the record to reflect that you just

17  spent 10 to 15 minutes reading through the article that

18  we've marked Exhibit Number 9.

19               Is it, to the best of your knowledge,

20  accurate to the history of guns?

21         A     Yes.  I think it holds up well.  I read

1   through it very quickly, but if there is specific parts

2   that you'd like me to look at harder, I'd be glad to do

3   that.

4         Q     But as far as you know, everything is still

5   true, right?

6         A     I think it holds up well, yes.

7         Q     The history hasn't changed?

8         A     No.

9         Q     Where you used a date, for example, that

10  would be your best effort to come up with an accurate

11  date?

12        A     I could have made an error in this.  So if

13  there is a specific date you're concerned about, I'd

14  like to look at it and see if I'm aware of anything

15  that's been different.

16        Q     As far as you know, you applied your best

17  efforts to identifying correct dates, right?

18        A     I did.

19        Q     Turn back to Exhibit Number 3, which is the

20  deposition transcript of the Kolbe versus O'Malley

21  case.

1        A     Okay.

2        Q     If you could turn to page 30.

3        A     Okay.

4        Q     Starting on line 17, you say:

5              "I know that generally whenever there is a

6   prospect of some type of gun being restricted, it tends

7   to promote a glut and drive prices up for guns that are

8   expected to be restricted as to being able to buy them

9   in the future.  So it probably would have been

10  something along those lines."

11             I think we already talked about this a

12  little bit.  The glut is something that's likely to be

13  restricted.  It's still a phenomenon in the United

14  States, right?

15       A     Yes, sir.

16       Q     So, in your view, does that mean that for

17  restrictions to be effective, and meaningfully restrict

18  the sale of an item, that it can't be announced too far

19  in advance?

20             MR. SWEENEY:  Objection.

21             THE WITNESS:  I don't want to imply that

1    restriction of the type of guns we're talking about

2    would be effective or desirable.  As to whether or not

3    a restriction on anything works, if you don't want the

4    people buying them in advance, probably the shortest

5    lead time would be the most effective in restricting

6    ownership of that item.

7    BY MR. KLEIN:

8         Q    And could you turn to page 32, please.

9         A    Okay.

10        Q    You are describing there a book or a set of

11   books called Rifles, Shotguns and Guns?

12        A    And handguns.

13        Q    And handguns, right.

14        A    Yes, sir.

15        Q    Starting on line 9, you say:

16             "The editor and publisher of this compiled

17   information on various firearms from manufacturers

18   along with pictures.  So basically most of the interior

19   of this book is from firearms manufacturers."

20        A    That's correct.

21        Q    These are books that your name is on as

1  author, right?

2      A    Or co-author, yes.

3      Q    Is it fair to say that you consider the

4  manufacturer to be a good source of information about

5  guns?

6      A    I didn't have a say on the content of

7  these.  The publisher asked us to create the

8  introduction to them.  And then they provided the

9  publisher with the information that he requested, which

10  was the pictures, descriptions, and technical

11  specification of guns that were available on the

12  market.  I think in most cases in those books, the

13  manufacturers probably represented their products

14  accurately, and in the terms that they wanted to market

15  them as.

16      Q    So, in general, the material that was taken

17  from manufacturers, you think is likely to be accurate?

18           MR. SWEENEY:  Objection.

19           THE WITNESS:  I think it's likely -- I

20  think the technical specifications are likely to be

21  accurate.  And I think the text is likely to be

1    designed in part to promote that particular product.

2    BY MR. KLEIN:

3          Q      Would it be fair to rely on a

4    manufacturer's representation of the type of gun that

5    they're selling?

6                   MR. SWEENEY:   Objection.

7                   THE WITNESS:   It would depend on how

8    they're representing it.

9    BY MR. KLEIN:

10         Q      Would it be fair to rely on their

11   descriptions of guns?

12                  MR. SWEENEY:   Objection.

13                  THE WITNESS:   On their technical

14   description of guns, I think they will get the caliber

15   and the type of action and other technical aspects of

16   the gun correct.

17   BY MR. KLEIN:

18         Q      Including the platform on which it's made?

19         A      I don't know that manufacturers always list

20   that.

21         Q      But if they do, you would expect them to be

1  listing it accurately?

2       A     In terms of if it's based on another model?

3       Q     Yes.

4       A     Yes, I would expect them -- I would.  If

5  they represented in those terms, I would expect it to

6  be an accurate representation.

7       Q     Would they correctly identify the operating

8  system for the gun?

9       A     Operating system, meaning?

10       Q     Whether it's direct impingement, gas

11  piston, for example, in an AR-type weapon?

12       A     I think they would, yes, sir.

13       Q     Would they correctly represent which parts

14  can be swapped out for other parts made by other

15  manufacturers if they made that representation?

16       A     I don't often see that in a manufacturer's

17  product descriptions.  But if they did make that

18  representation, I would expect it to be accurate.

19       Q     Is it fair to say as a general manner --

20  strike that.

21             Is it fair to say generally that

1    manufacturers probably know as much or more about their

2    own guns than anyone else?

3         A    In terms of current production of the

4    firearms, they're going to be very knowledgeable on it.

5    A lot of times, firearms manufacturers don't have a

6    good grasp of firearms history.

7         Q    If you asked a question of a manufacturer

8    about their gun, the gun that they produced, would you

9    expect to get accurate information?

10              MR. SWEENEY:  Objection.

11              THE WITNESS:  It would depend on what the

12   question was and who you asked with the manufacturer.

13   BY MR. KLEIN:

14        Q    If you asked for information about

15   technical specifications for the gun, would you expect

16   to get an accurate answer?

17        A    If you reached the right person in the

18   organization, I would.

19        Q    If they published something about their

20   gun, you would expect them to publish accurate

21   information?

249

1             MR. SWEENEY:  Objection.

2             THE WITNESS:  In terms of the technical

3     specifications of the gun, I would think it's to their

4     great advantage to publish accurate information.

5     BY MR. KLEIN:

6          Q     Turn to page 37.

7          A     Okay.

8          Q     You're describing here your work at the NRA

9     National Firearms Museum.

10         A     Okay.

11         Q     Is that right?

12         A     Yes, it looks like it.

13         Q     And then it says at the bottom, "We also

14    are involved in a number of educational efforts through

15    various media."

16         A     Yes, sir.

17         Q     "Through Facebook, the Internet, we have a

18    website, YouTube."

19             And then the next page, it says, "We have a

20    YouTube channel trying to present educational

21    information on firearms."

1              Is that all accurately read?

2        A     Yes, it is.

3        Q     When you use the term "we" at the beginning

4   of the paragraph, do you mean the NRA?

5        A     I mean the museum staff, the NRA museum

6   staff.  Let me go back and double check that, but I

7   think that's the context.  Yeah, no.  That's

8   specifically the NRA Museums Division.

9        Q     You have all these different media outlets

10  for the museum?

11       A     Yes, sir.

12       Q     The information that you put forward on

13  those outlets, is that consistent with the views of the

14  NRA?

15       A     They're -- it's the historical information

16  from the museum.  It's -- the views of the NRA in terms

17  of legislative and political opinion are not involved

18  with any of our work.

19       Q     Are any of the materials that you published

20  reviewed first by someone outside the museum staff?

21       A     Generally not.  In some cases, some social

1  media postings might be.  But in the vast majority of

2  cases, not.

3       Q     Who would review the social media postings?

4       A     The NRA media staff might review it.

5  Again, that's very rare.  Generally, it's more a case

6  of the museum staff developing historical content on

7  firearms that the NRA General Operations Division might

8  use on some of their social media as a presentation of

9  firearms history.

10      Q     Turn to page 51.

11      A     Okay.

12      Q     Starting on line 10, your answer includes,

13 "I mean, there are a lot of straight up AR-15 clones

14 that are pretty much interchangeable."

15            Should I read that again because I messed

16 up?

17      A     No, I understood it.

18      Q     That's still your view, right?

19            MR. SWEENEY:  Objection.

20            THE WITNESS:  Yes, I think so.

21 ///

252

BY MR. KLEIN:

    Q    You identified in the Kolbe case about a
gun called the SKS; is that right?

    A    You'd have to refer to me where that is.

    Q    72 to 73.

    A    Yes.

    Q    So is it the case that the SKS was a
semi-automatic gun?

    A    Yes, it is.

    Q    And you state here:

        "The SKS was borrowing some of the assault
rifle concepts, in that it was a semi-automatic and
that it did use an intermediate power cartridge."

        That's accurate, right?

    A    It's not accurate that being semi-automatic
is an assault rifle concept.  I misspoke there.

    Q    Select fire guns also have some automatic
capacity, right?

    A    Many of them do.  Select fire -- yes.
Select fire would generally have a semi-automatic
capacity.  The SKS had no full-automatic capacity.  It

1   was semi-automatic only.

2        Q     The SKS was a predecessor to the AK?

3        A     By a very short period of time.  They were

4   produced contemporaneously for a while for the Soviet

5   Union and then for some of their allies, including

6   companies that set up production on their own.  I

7   believe it was preferred by China as a military rifle

8   for a significant period of time after true assault

9   rifles were available.

10       Q     And again, when you use the term "true

11  assault rifle," that's your definition of assault

12  rifle, right?

13       A     That's the historic definition of an

14  assault rifle, yes, sir.

15       Q     Which has also been applied to some

16  semi-automatic guns that we discussed, right?

17             MR. SWEENEY:  Objection.

18  BY MR. KLEIN:

19       Q     Including by manufacturers?

20       A     Yes.  And accurately applied, yes, sir.

21       Q     On page 86, starting on line 12.

1          A      Line 12.  Yes, sir.

2          Q      "We discussed earlier that the designation

3     of the rifle was changed by the military from AR-15,

4     which had been assigned to it by ArmaLite to M16."

5                 Is that accurate?

6          A      I believe that's accurate, yes, sir.

7          Q      "And then at a later point in time, Colt

8     picked up the AR-15 designation for their

9     semi-automatic sporting version of the rifle."

10                Is that also accurate?

11         A      I believe it is.

12         Q      And the term "sporting version," that's a

13    marketing term that was adopted in the context of

14    identifying this AR-15, right?

15         A      It's a descriptive term for the use of the

16    rifle.  I believe model name was Sporter,

17    S-p-o-r-t-e-r.

18         Q      But it had uses other than sporting,

19    correct?

20         A      It was marketed as a sporting rifle.

21         Q      But it could have been also used for a

1  variety of other purposes, correct?

2         A     It could have been used as a doorstop, yes,

3  sir.

4         Q     It could have been used even, for example,

5  in the context of an assault, correct?

6         A     What sort of an assault, please?

7         Q     An assault with combat troops who were

8  directed to fire semi-automatically, right?

9               MR. SWEENEY:  Objection.

10              THE WITNESS:  Generally, in modern

11  militaries, a semi-automatic sporting rifle would not

12  be issued to combat troops.

13  BY MR. KLEIN:

14        Q     But if they had been, they could use it

15  semi-automatically the same way the Army now directs

16  its troops semi-automatically as a preference over

17  automatic fire?

18              MR. SWEENEY:  Objection.

19              THE WITNESS:  I don't think there is any

20  accurate historical precedent for that.  I don't think

21  they have been issued, other than in possibly

1 | specialized roles.

2 | BY MR. KLEIN:

3 |      Q      And you're aware that some law enforcement

4 | agencies use semi-automatic versions of the AR-15?

5 |      A      Yes, sir.

6 |      Q      And they use them, for example, in the

7 | connection with SWAT team activities?

8 |      A      Yes, sir.

9 |      Q      Some of those SWAT team activities might be

10 | assaults, right?

11 |                MR. SWEENEY:  Objection.

12 |                THE WITNESS:  I'm not sure how you're using

13 | that term.  It's more of police terminology than

14 | historical terminology.  It sounds accurate, but I'm

15 | not sure what it means in that context.

16 | BY MR. KLEIN:

17 |      Q      Sounds accurate, meaning that SWAT teams

18 | might use semi-automatic AR-15s to, for example, storm

19 | a compound where hostages are held?

20 |                MR. SWEENEY:  Objection.

21 |                THE WITNESS:  I don't know what all the

1   police uses of the AR-15s are.

2   BY MR. KLEIN:

3       Q      It's possible they're used by police to

4   storm a compound where hostages are held, isn't it?

5                   MR. SWEENEY:  Objection.

6                   THE WITNESS:  I don't know how often that

7   happens.  If that does happen, it would make sense that

8   that might be one of the firearms they would use or

9   variations of it.  It's fairly popular as a police long

10  gun.

11  BY MR. KLEIN:

12      Q      If you turn to page 118, please.

13      A      Okay.

14      Q      Starting on line 20, it says:

15                  "The fact that a gun can fire a bullet with

16  any degree of accuracy is equal to either a bad guy or

17  a good guy."

18                  Do you see that?

19      A      Yes, sir.

20      Q      And that's an accurate quote from the

21  deposition?

258

1          A      Yes, that would be true of any

2   characteristics of a gun's function.

3          Q      Then it says:

4                 "The fact that guns function reliably, uses

5   effective ammunition, can be aimed and hit what it's

6   aimed at, it's morally neutral."

7                 Right?

8          A      Yes, sir.

9          Q      And that's an accurate quote?

10         A      Yes, sir.

11         Q      And then it says:

12                "The gun doesn't know if it's a good guy or

13  a bad guy?."

14                Right?

15         A      Yes.

16         Q      That's also an accurate quote?

17         A      It is.

18         Q      And then it says:

19                "That's the truth for any improvement in

20  firearms design.  It's not a moral improvement, it's an

21  improvement in the intended function of the firearms."

1        A     Yes, sir.

2        Q     Is that quote accurate?

3        A     Yes, sir.

4        Q     It's also true that a bad guy might train

5    for a given criminal situation more than a civilian

6    anticipating the need for a gun in self-defense?

7              MR. SWEENEY:  Objection.

8              THE WITNESS:  I have no knowledge as to

9    that.  It has probably happened on occasion, but I'm

10   guessing it's fairly rare.  That's just a guess.

11   That's not an informed opinion.

12   BY MR. KLEIN:

13       Q     If someone intends to commit a crime, they

14   would typically plan for that crime, right?

15             MR. SWEENEY:  Objection.

16             THE WITNESS:  I don't know.  I think there

17   are a lot spontaneous crimes, and I don't know if

18   planning would include the discipline to practice

19   that's necessary to become really proficient with a

20   firearm.  I suppose that it's happened in some cases.

21   It's a guess.

1   BY MR. KLEIN:

2        Q      Let's go back to page 108, please.

3        A      Okay.

4        Q      Starting on line 1, you say:

5               "A criminal who enters a situation with an

6   intent to do maximum damages, cause maximum fatalities,

7   and who is trained and is going into this with the

8   mindset that that is what they're going to do with

9   their ammunition prepared, I think they would be faster

10  than someone who is taken unaware."

11              Are you talking there about magazine

12  changes, right?

13       A      I don't know.  Let me look on the previous

14  page.

15       Q      Please.

16       A      Okay.  What was the question, please?

17       Q      You're talking there about magazine

18  changes, right?

19       A      The part I reviewed, it looks like we are

20  talking about firearms training and practice in

21  general.  Is there a section that specifies magazine

1    changes?

2         Q     I think if you go to page 106, it's clear

3    that you're discussing how long it takes to change a

4    magazine.  I don't want to trick you.  It's just, I'm

5    happy to go back and --

6         A     Yeah.  Let's see what we're talking about.

7    Where would we start there?

8         Q     Line 9.

9         A     That string of questions appears to begin

10   with a question about training for magazine change

11   practice.  I think by here, it seems to spread towards

12   training and practice in general.  But we can say that

13   practicing magazine change could be part of that

14   training and practice.

15        Q     And practicing with a gun generally is also

16   something that some criminals might engage in, right?

17              MR. SWEENEY:  Objection.

18              THE WITNESS:  I think it's possible.

19   BY MR. KLEIN:

20        Q     And you are aware, based on this testimony,

21   that there are criminals who enter situations with an

262

1    intent to do maximum damages and cause maximum

2    fatalities?

3                    MR. SWEENEY:  Objection.

4                    THE WITNESS:  Say it again, please.

5    BY MR. KLEIN:

6         Q     Your are aware that there are some

7    criminals who enter a situation with an intent to do

8    maximum damages and cause maximum fatalities, right?

9                    MR. SWEENEY:  Objection.

10                   THE WITNESS:  It appears that's the case in

11   some pretty specific criminal activities.

12   BY MR. KLEIN:

13        Q     Like the mass shootings we talked about

14   earlier?

15                   MR. SWEENEY:  Objection.

16                   THE WITNESS:  I would say that is probably

17   part of the intention that at least some of those

18   shooters had.

19   BY MR. KLEIN:

20        Q     And so it's fair to say that in some of

21   those situations, the mass shooter had done some

1   planning and thought about how to maximize the damage

2   they were causing?

3              MR. SWEENEY:  Objection.

4              THE WITNESS:  I don't know what they were

5   thinking.

6   BY MR. KLEIN:

7       Q    That's the goal of the mass shooter in

8   those contexts, to shoot as many people as possible,

9   right?

10             MR. SWEENEY:  Objection.

11             THE WITNESS:  I don't know what the goal

12  is.

13  BY MR. KLEIN:

14      Q    You don't know what the goal was when

15  Stephen Paddock opened fire in Las Vegas?

16             MR. SWEENEY:  Objection.

17             THE WITNESS:  I don't think anybody does at

18  this point.

19  BY MR. KLEIN:

20      Q    So you wouldn't, based on what you know

21  about that act, assume that he was trying to cause

264

1  maximum fatalities and did everything possible to do

2  so?

3              MR. SWEENEY:  Objection.

4              THE WITNESS:  It certainly looks like that

5  was his intention.  Again, that case is very much in

6  the early stages of investigation.  I have no special

7  insight into that.

8  BY MR. KLEIN:

9      Q     Based on the media reports, it looks like

10 he did a substantial amount of planning, correct?

11             MR. SWEENEY:  Objection.

12             THE WITNESS:  A substantial amount of

13 planning?

14 BY MR. KLEIN:

15     Q     Yes.

16     A     Media reports indicate that.

17     Q     I'd like you to review the testimony

18 starting on page 120, line 16, through page 122, line

19 8.  If you can just read it to yourself, if you don't

20 mind.

21     A     Starting on page 129?

1        Q     No.  Page 120, starting on line 17.

2        A     And continuing through?

3        Q     122, line 8.

4        A     I see that.

5        Q     Is this testimony an accurate recording of

6   what happened during the deposition?

7        A     I think there is one term that is mistaken.

8   I think it says "selected" on page 8 -- page 120,

9   line 18, and that should probably be "select fire."

10  And certainly, there are grammatical stumbles.  But I

11  think generally, this is accurate.

12       Q     If I asked you these same questions today,

13  you'd answer in more or less the same way?

14       A     I think that I would with the exception

15  that the question of whether a firearm is dangerous and

16  unusual, was one of the specific points in this law

17  that was being reviewed.  So the term "dangerous" or

18  unusual -- I'm sorry, the terms "dangerous" or

19  "unusual" in this case have a different significance

20  and different importance than they do in the case that

21  we're currently looking at.

1          Q     But that's not really what your testimony
2    says.  You're suggesting here that full-automatic fire
3    is dangerous, but semi-automatic fire, not so much,
4    right?

5          A     That's very specifically what we're
6    addressing there.  The term "dangerous" is used in that
7    particular law.  That's why the term "dangerous" is
8    used in that answer.

9          Q     But you are suggesting here -- and I can
10   ask you the question again -- that full-automatic fire
11   is dangerous in a way that semi-automatic fire is not,
12   correct?

13               MR. SWEENEY:  Objection.

14               THE WITNESS:  The text that you've asked me
15   to review includes a discussion of the term
16   "dangerous."  We've discussed dangerous in this
17   deposition.  Dangerous is an important term in the
18   deposition and the case that we're looking at here with
19   this Exhibit 3.  And so the answers in this deposition
20   are going to be in the context of that case.

21               If you have a question in the context of

1  this case, I'd be glad to try and answer it.

2  BY MR. KLEIN:

3      Q    Let's ignore the definition of dangerous in

4  the Maryland law.  And let me ask you whether it's your

5  view that automatic fire is dangerous in a way that

6  semi-automatic fire is not?

7          MR. SWEENEY:  Objection.

8          THE WITNESS:  We have discussed "dangerous"

9  in some length during this deposition.  Dangerous with

10  a firearm could easily mean, is the gun safe to fire?

11  And so if you can give me a more specific definition of

12  dangerous for your question, I'll be glad to try and

13  answer that.

14  BY MR. KLEIN:

15      Q    Let's talk about mass shootings again.  Is

16  the -- is a gun with semi-automatic capacity less

17  likely to kill people in a mass shooting situation than

18  a gun with automatic capacity?

19          MR. SWEENEY:  Objection.

20          THE WITNESS:  We're talking in the context

21  of a mass shootings?

1  BY MR. KLEIN:

2         Q     Yes.

3         A     Your question is:  Is a semi-automatic less

4  likely to kill people than a full-automatic?

5         Q     Yes.

6               MR. SWEENEY:  Objection.

7               THE WITNESS:  That would depend to an

8  extent in how the gun is used.

9  BY MR. KLEIN:

10        Q     Is it fair to say there is certain

11  situations where you could kill more people if that's

12  your intent with a semi-automatic gun than an automatic

13  gun?

14              MR. SWEENEY:  Objection.

15              THE WITNESS:  I think you can come up with

16  situations where that would be true.

17  BY MR. KLEIN:

18        Q     Let's turn to page 131, line 14.

19        A     Okay.

20        Q     Question:  "And it was developed by

21  ArmaLite for military application."

269

1           And your answer is:  "Again, I assume they
2    wanted as much of both markets as they could get."
3           Isn't it the case that any manufacturer
4    would want as much of both military and civilian
5    markets as they could get?
6               MR. SWEENEY:  Objection.
7               THE WITNESS:  I think it would depend on
8    the product they were developing.
9    BY MR. KLEIN:
10       Q    Wouldn't they want to sell more guns?
11              MR. SWEENEY:  Objection.
12              THE WITNESS:  Specifically for firearms
13   manufacturers?
14   BY MR. KLEIN:
15       Q    Yes.
16       A    I would think that most firearms
17   manufacturers would want both the civilian and the
18   military markets.  I don't know that there is -- that
19   that's universally true.  There are firearms
20   manufacturers that have seemed to focus more on one
21   market or the other.

1        Q    But if a gun could be sold in both markets,

2   they would want to sell it in both markets, wouldn't

3   they?

4              MR. SWEENEY:   Objection.

5              THE WITNESS:   They might.

6   BY MR. KLEIN:

7        Q    They would want to make more money,

8   wouldn't they?

9              MR. SWEENEY:   Objection.

10              THE WITNESS:   I think there is situations

11   where a manufacturer could decide that they could make

12   more money by focusing on one market or the other.   I

13   think often times, developments in firearms are applied

14   to both the military and civilian markets.

15   BY MR. KLEIN:

16        Q    And in those situations, the manufacturer

17   also has an interest in keeping costs down, correct?

18              MR. SWEENEY:   Objection.

19              THE WITNESS:   I think the manufacturer is

20   going to balance a number of factors.   It would be cost

21   of production, it would be quality of the end product,

1    any number of things go into to making manufacturing

2    decisions.  I'm not a manufacturer.  I don't know

3    everything that goes into that.

4    BY MR. KLEIN:

5         Q    Wouldn't you assume, though, that the

6    process that a manufacturer would choose if it wanted

7    to sell a gun in both the military and civilian market

8    would be as close as possible to each other?

9              MR. SWEENEY:  Objection.

10             THE WITNESS:  I'm not sure I understand

11   that.

12   BY MR. KLEIN:

13        Q    Wouldn't the manufacturer choose to use a

14   process for manufacturing civilian and military guns

15   that is as close as possible to each other?

16             MR. SWEENEY:  Objection.

17             THE WITNESS:  I'd have to speculate as to

18   what manufacturers try to do.  My guess would be that a

19   manufacturer tries to develop a targeted product for a

20   targeted market.  And then if by modifying that

21   product, they can also tap another market, if they

1    think that's a lucrative market that fits with their

2    overall corporate plan, they might want to try to do

3    that.  Again, I don't know.

4    BY MR. KLEIN:

5         Q    They'd want to modify it as little as

6    possible in order to keep costs down, right?

7              MR. SWEENEY:  Objection.

8              THE WITNESS:  The same answer.

9    BY MR. KLEIN:

10        Q    Turn to page 146, please.

11        A    Okay.

12        Q    Line 18, the question is:  "Why would

13   someone prefer that bullpup configuration?"

14             Your answer is:  "It's more compact.  In a

15   military police, or self-defense situation, it would be

16   easier to maneuver in tight indoor spaces."

17             Is that still an accurate answer?

18             MR. SWEENEY:  Objection.

19             THE WITNESS:  There should be a comma

20   between military and police.  But that is a partial

21   explanation of advantages that a bullpup configuration

1   can offer.

2   BY MR. KLEIN:

3        Q    It's generally true that a shorter barrel

4   is easier to maneuver in a tight indoor spaces?

5                MR. SWEENEY:  Objection.

6                THE WITNESS:  On most bullpup designs, it's

7   not the overall length of the barrel, but it's how the

8   barrel is mounted in the firearm.  It produces a

9   shorter overall firearm, which would make it easier to

10  manipulate in indoor spaces.

11  BY MR. KLEIN:

12       Q    And generally, a shorter overall firearm is

13  easier to manipulate in indoor spaces, right?

14                MR. SWEENEY:  Objection.

15                THE WITNESS:  I think all other things

16  being equal, we're talking comparable designs, assuming

17  either a rifle or a shotgun, I think that would

18  probably be accurate.

19  BY MR. KLEIN:

20       Q    Page 157.

21       A    Okay.

1        Q     You testified:  "Springfield Armory has

2   typically made good copies of existing designs for

3   their rifles."

4              Do you see that?

5        A     Yes, sir.

6        Q     That includes AR-15s, right?

7              MR. SWEENEY:  Objection.

8              THE WITNESS:  Gosh, I don't know if

9   Springfield Armory has introduced copies of the AR-15

10  or not.  I think -- when I think of them, I think

11  primarily of semi-automatic copies of the M14 and

12  copies of the 1911 military pistol.

13  BY MR. KLEIN:

14       Q     So you don't know whether they've also

15  introduced an AR-15 platform rifle?

16       A     It wouldn't surprise me at all if they had

17  because it's so popular in the market.  But I can't say

18  with certainty that they had.

19       Q     Okay.  Let's take a short break.

20             (A brief recess was taken.)

21  ///

 1   BY MR. KLEIN:

 2        Q     We've been talking about Exhibit 3, the

 3   transcript from the Kolbe case.  If you could turn to

 4   page 111, please.

 5        A     Yes, sir.  Okay.

 6        Q     On line 13, you were asked the question:

 7              "Do you know of situations -- do you

 8   personally know of situations in which someone expended

 9   10 rounds in self-defense of the home?"

10              And your answer is:  "Other than police

11   officers?"

12              And Mr. Friedman responded:  "Self --

13   civilian self-defense of the home."

14              And your answer was:  "I do not."

15              Is that still true that you don't know of

16   situations in which someone expended 10 rounds of

17   ammunition in self-defense of the home?

18        A     That's still true.  I don't know a specific

19   instances.  I've heard allusions to that happening, but

20   I've never seen the actual report.

21        Q     You can't give me the facts of any of those

276

1   incidents?

2          A      No, sir.  I can't.

3                 MR. KLEIN:  I have nothing further.

4                 MR. SWEENEY:  He'll read and sign.

5                 (Deposition concluded at 4:16 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1                CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read and

4   examined the foregoing transcript, and the same is a

5   true and accurate record of the testimony given by me.

6   Any additions or corrections that I feel are necessary

7   will be made on the Errata Sheet.

8

9

10

11          _____

12                    JIM SUPICA

13

14          _____

15                      Date

16

17   (If needed, make additional copies of the Errata Sheet

18   on the next page or use a blank piece of paper.)

19

20

21

278

1                           ERRATA SHEET

2    Case:  David Worman, et al. vs. Charles Baker, et al.

3    Witness: JIM SUPICA                    Date: 10/30/2017

4    PAGE/LINE              SHOULD READ        REASON FOR CHANGE

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

279

1  District of Columbia, to wit:

2          I, Melinda Johnson, CSR, a Notary Public of

3  the District of Columbia, do hereby certify that the

4  within-named witness personally appeared before me at

5  the time and place herein set out, and after having

6  been duly sworn by me, according to law, was examined

7  by counsel.

8          I further certify that the examination was

9  recorded stenographically by me and this transcript is

10  a true record of the proceedings.

11          I further certify that I am not of counsel

12  to any of the parties, nor in any way interested in the

13  outcome of this action.

14          As witness my hand this 2nd day of November,

15  2017.

16

17                                               _____

18                          Melinda Johnson, CSR

19                          Notary Public

20  My Commission Expires:

21  February 14, 2022

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 823 of 1262

David Seth Worman, et al.  vs.                    James Supica -  Vol. 1
Charles D. Baker, et al.                          October 30, 2017

## /

**/// (5)**
56:21;168:21;236:21;
251:21;274:21

## [

**[sic] (1)**
201:12

## A

**A1 (2)**
104:21;105:2
**A2 (2)**
104:21;105:2
**A3 (3)**
104:13,21;105:2
**A4 (2)**
104:21;105:3
**abandoned (1)**
73:1
**abandonment (1)**
72:14
**ability (20)**
6:21;57:21;81:4;82:1;
100:15;101:18;124:15;
163:3,7;169:14;173:3;
174:1;201:2,20;202:7;
203:2;213:14,18;214:4;
222:6
**able (16)**
16:18;80:21;85:15;86:3;
88:8,11;114:13;156:6;
160:13;163:15;171:19;
172:17,18;203:13;234:15;
243:8
**above (2)**
34:17;103:14
**absolute (1)**
80:18
**accept (5)**
51:21;53:2,5;117:17,18
**acceptable (4)**
49:10;50:1;78:17;89:16
**accepted (2)**
49:21;52:20
**accepting (2)**
116:12;117:9
**access (4)**
78:16;83:2,7;152:20
**Accessories (1)**
103:10
**accommodate (1)**
135:11
**accounts (1)**
226:20
**accumulated (1)**
8:10
**accuracy (6)**
122:19;123:5;215:1;

224:19;241:3;257:16
**accurate (45)**
61:20;62:11;120:19;
121:15;122:2,4,20;125:13;
134:11;228:11;236:11;
238:10;239:3,18;240:8,18,
21;241:8,20;242:10;245:17,
21;247:14,18;248:9,16,20;
249:4;252:14,15;254:5,6,
10;255:20;256:14,17;
257:20;258:9,16;259:2;
265:5,11;272:17;273:18;
277:5
**accurately (14)**
60:6;79:16;80:7;85:2;
122:17;198:18;213:15,19;
214:5;222:13;245:14;
247:1;250:1;253:20
**achieve (8)**
118:11;119:3;124:2;
154:14;156:9;163:16;
165:11,12
**acknowledge (1)**
176:1
**acquire (1)**
189:18
**acquired (2)**
187:16;189:14
**acronym (1)**
225:8
**across (2)**
104:2;130:5
**act (1)**
263:21
**action (14)**
175:4;176:5;177:2;178:4,
5,8,9;180:20;181:16;
194:20;195:1,8;218:13;
246:15
**actions (14)**
174:11,14;175:2,10,14;
176:2,11;177:5;193:15,20;
194:1,2,13;195:4
**activities (3)**
256:7,9;262:11
**actual (1)**
275:20
**actually (3)**
62:3;130:10;189:12
**adaptable (1)**
157:3
**adaptation (1)**
182:18
**addition (1)**
96:19
**additional (4)**
33:20;209:4,15;277:17
**additions (1)**
277:6
**address (5)**
4:15,16;153:3;166:11;
207:14
**addressing (3)**

199:17;202:12;266:6
**adequate (1)**
88:7
**administrative (2)**
24:10;145:8
**Adolf (1)**
204:5
**adopted (7)**
91:21;161:3;179:10;
184:2;207:3,12;254:13
**adoption (2)**
128:11;205:2
**adults (1)**
231:16
**advance (7)**
40:17;41:5,15,21;179:9;
243:19;244:4
**advancement (2)**
198:13,20
**advances (2)**
161:2;170:8
**advantage (5)**
110:14;116:6;224:15,17;
249:4
**advantages (1)**
272:21
**adverb (1)**
199:15
**advertised (1)**
206:5
**advertising (1)**
92:9
**advisable (2)**
142:9,16
**affair (1)**
204:15
**affect (2)**
213:16;217:1
**affiliation (1)**
55:7
**afraid (1)**
216:16
**after-market (2)**
229:14,16
**again (67)**
17:8;20:2;32:8;41:19;
43:17;48:17;64:1;67:11;
74:2;75:10;76:1;77:18;
78:12;83:13;95:14,15;98:2;
100:12,21;101:10,17;107:3;
109:1;110:10,20;113:8;
115:12;116:1,14;117:12;
118:7;123:12;124:17;
126:17;131:4;133:9;
134:20;135:13;139:8;
142:12;149:8,18;152:3;
156:10,19;157:8,12;162:3;
166:2;181:16;183:14;
211:16;214:14;221:7;
223:9;230:15,16;232:7;
251:5,15;253:10;262:4;
264:5;266:10;267:15;
269:1;272:3

**against (9)**
53:21;149:10,12;162:19;
171:20;172:18;176:9,13;
185:3
**agencies (1)**
256:4
**agree (8)**
52:17;66:17;81:6;107:17;
108:19;125:17;134:10;
166:6
**ahead (3)**
61:21;154:2;212:6
**aim (3)**
50:12;79:12,14
**aimed (5)**
50:11;82:4;100:19;258:5,
6
**aiming (6)**
51:2;85:16;111:13;
112:16;145:9;213:4
**AK (14)**
77:11;95:6;131:9;132:21;
133:1,4,7,19;200:15,17;
215:19;217:15;218:17;
253:2
**AK-47 (31)**
16:21;17:18;77:5,7,8;
127:7,8,11,14,15;128:1,5,
15;129:19;130:8,9,13;
131:3,9,18;132:6;133:13;
134:1,15;135:1,10;141:6;
200:10,18;235:3,10
**AK-47s (4)**
127:4;128:19;130:5;
134:4
**AK-pattern (4)**
130:18;131:1,2;156:18
**AK-patterns (2)**
127:20;157:4
**AK-platform (16)**
78:1;127:5,15;128:1,19;
131:18;132:7,11;133:12,17,
20;134:2,4,7;135:11;141:17
**AKs (1)**
133:3
**AK-type (4)**
77:14,16;94:19;127:17
**al (3)**
45:15;69:5,5
**allies (1)**
253:5
**allow (3)**
80:21;149:7;213:4
**allowed (4)**
93:1;152:2,5;157:11;
195:5
**allowing (1)**
216:20
**allows (2)**
154:8,9
**allusions (1)**
275:19
**almost (2)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 824 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

110:17;190:16

**Along (4)**
81:21;225:11;243:10;
244:18

**although (3)**
100:20;143:8;192:2

**always (13)**
6:16;21:5;22:4;26:3;
34:6;35:20;36:1;89:2;
131:4;145:4;162:2;214:20;
246:19

**Amendment (7)**
25:7;41:16;42:1;65:14;
89:9;185:7;196:5

**America (3)**
183:19;236:8,15

**American (3)**
137:5;182:16,18

**Americans (2)**
63:14;196:19

**ammo (1)**
115:10

**ammunition (14)**
20:6,7;93:10;103:10;
115:20;121:19,21;132:8,12;
218:19;219:2;258:5;260:9;
275:17

**among (5)**
33:16;64:5;75:20;81:14;
129:21

**amount (6)**
65:1;145:2;198:10;214:9;
264:10,12

**anecdotal (1)**
150:20

**angle (1)**
110:14

**announced (1)**
243:18

**answered (4)**
32:7;67:19;68:5;201:16

**anti- (1)**
166:14

**anticipating (1)**
259:6

**anti-personnel (1)**
166:15

**antique (1)**
37:9

**anti-Second (1)**
65:14

**apparently (1)**
160:14

**appear (5)**
67:3,16;71:21;105:20;
119:18

**appearance (3)**
92:17;93:6;131:7

**appeared (1)**
59:9

**appears (6)**
60:18;68:2;108:6;237:4;
261:9;262:10

**appended (1)**
59:1

**applicable (3)**
10:14,16;209:16

**application (3)**
148:7;220:10;268:21

**applications (1)**
149:19

**applied (6)**
184:16;192:2;242:16;
253:15,20;270:13

**applies (2)**
170:5;179:20

**apply (8)**
66:3;121:1;190:16,18;
204:19;209:11;217:21;
219:9

**appreciate (1)**
218:15

**appropriate (7)**
44:20;50:4;83:10,10,13;
144:10;159:12

**appropriately (2)**
45:3,4

**approximate (1)**
85:3

**Approximately (4)**
51:8;59:15;118:11;
237:14

**AR (9)**
79:20;80:4;132:14;133:6;
160:7;215:19;217:15;
218:17;229:13

**AR-15 (84)**
15:17;16:15;17:12,14;
74:17,18,21;75:2,5,13,13,
16,20;76:5,5,10,15;79:17;
82:5,11,16;88:3,4;90:17;
91:1,15,17;92:4,10,12,15,
20;93:7,10;94:12;96:15,16;
97:13;98:7,9,14,21;101:16,
19;102:5;114:3,6,10;
115:13;116:4;117:3;118:2,
9;124:3,10,16;125:1,21;
126:4,15,20;132:10,13;
134:8;141:6,17;150:1;
156:14;157:7;159:18;
160:14;162:4;164:9;231:9;
232:19;235:3,10;251:13;
254:3,8,14;256:4;274:9,15

**AR-15s (10)**
17:10;75:9,14;92:13;
98:10;114:18;118:6;
256:18;257:1;274:6

**AR70 (1)**
136:5

**arc (1)**
110:14

**area (11)**
13:21;50:6;52:11;58:3;
111:10,14,16;112:5,20;
121:3;139:16

**areas (1)**

120:21

**ARM (7)**
17:7;130:3,18;192:4,5;
204:21;213:10

**ArmaLite (6)**
91:10,16;92:3;96:11;
254:4;268:21

**ArmaLite's (1)**
96:5

**Armament (1)**
136:21

**armies (2)**
184:2;191:11

**Armory (2)**
274:1,9

**arms (6)**
89:10,16;127:9;192:2,3;
196:21

**Army (26)**
72:21;96:4;100:3,5;
103:19,21;107:4,20;108:12;
111:6,21;114:18;116:5;
118:10;119:20;122:4;
130:2;134:11,18;135:1,17;
136:8;143:17;165:11;
167:15;255:15

**Army's (7)**
99:9,13,16;110:6;121:8;
123:7;134:17

**around (9)**
15:20;33:9;100:19;128:7;
129:10;130:11;146:12,16;
155:15

**AR-pattern (1)**
93:14

**AR-platform (1)**
132:16

**ARs (2)**
116:14;157:4

**arsenals (1)**
129:1

**art (2)**
171:1;198:7

**article (10)**
65:21;237:4,11;238:13,
17,20;239:5,15;241:5,17

**AR-type (3)**
230:17;232:2;247:11

**Asian (1)**
221:6

**Asians (1)**
221:9

**aspect (4)**
65:18;167:20;170:3;
212:3

**aspects (3)**
166:4;212:13;246:15

**assailants (1)**
139:16

**assault (63)**
5:3;10:17;12:5;13:11;
45:18;46:7,10,10;47:20;
48:1;51:14,18;52:9,16;

53:11,16,17,18;54:1;62:15;
63:6;64:7;65:12,20,21;
66:1;78:10;199:18,21;
200:3;201:1,20;202:1,2,5,9,
13,14;203:2,5,7,13,16,19,
20;204:3,16;205:3,6,15,15;
206:1;210:3;236:7;252:11,
16;253:8,11,11,14;255:5,6,
7

**assaults (1)**
256:10

**assault-style (1)**
44:3

**assault-weapon-related (1)**
46:5

**assigned (1)**
254:4

**assistance (3)**
39:2,7;40:4

**Assistant (3)**
27:15,16,16

**Association (2)**
45:21;46:14

**assume (20)**
6:7;31:5;32:16;100:5;
107:21;108:8,11;118:20;
119:2;149:3;153:10;
156:15;157:8;166:21;
226:13;232:6;237:7;
263:21;269:1;271:5

**assuming (5)**
19:7;85:11;117:20;191:5;
273:16

**assumption (5)**
109:3;153:17;188:17;
202:21;230:3

**ATF (7)**
152:7,11,12,14,19;153:1;
157:13

**attached (2)**
24:4;155:16

**attained (1)**
155:19

**attempt (1)**
195:5

**attempting (2)**
145:14;185:10

**attempts (3)**
194:17;195:19;234:3

**attend (1)**
30:9

**attention (4)**
7:12;66:4;147:21;219:12

**attributed (2)**
204:5,14

**attributes (2)**
167:21;168:2

**audible (1)**
151:20

**AUG (1)**
137:13

**Aurora (1)**
229:8

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 825 of 1262

David Seth Worman, et al. vs.
Charles D. Baker, et al.

James Supica - Vol. 1
October 30, 2017

**Austria (1)**
137:15

**Austrian (1)**
137:16

**author (1)**
245:1

**authored (1)**
7:21

**authoritative (1)**
204:3

**authorities (1)**
93:20

**authority (2)**
152:14,19

**AutoGlove (1)**
157:15

**automatic (26)**
73:2;83:12;93:4;101:3;
105:7,13;106:10;108:5,9;
119:7;121:14;122:5;123:2,
15;125:12;134:16;151:12,
14,16;200:5;233:9;252:17;
255:17;267:5,18;268:12

**automatically (11)**
22:5;97:17;99:6;201:2,
21;202:8;203:3;218:1,20;
219:10;230:1

**available (25)**
83:2;84:9;94:4,7;95:11;
115:17;116:2;140:3;150:5,
7;151:9;156:14,18;167:14,
15;176:16;191:16;193:15;
196:16;197:2;216:1;
218:19;224:9;245:11;253:9

**average (12)**
84:11,13;85:4;86:12,13,
16,17,21;87:7;107:14;
145:2;220:21

**aware (16)**
9:20;53:10,12,19,20;
55:8;77:4,21;129:3;147:19;
149:21;241:5;242:14;
256:3;261:20;262:6

**away (1)**
113:7

---

## B

**back (23)**
19:18,21;21:19;22:7;
39:9;71:2,18;72:6;92:4,10;
119:11;125:7;134:18;
139:11;146:21;158:9;
165:18;197:4;216:17;
242:19;250:6;260:2;261:5

**backtrack (1)**
87:1

**bad (3)**
257:16;258:13;259:4

**Baker (3)**
4:10;10:18;42:12

**balance (2)**
159:12;270:20

**ball (6)**
180:5;181:1,3;182:2;
197:17;199:3

**balls (3)**
181:8,18;182:10

**ban (24)**
5:3;10:17;13:11;45:19;
47:20;51:14,18;52:9,16;
53:11,16,17,18;54:1;62:15,
15;63:7;64:7;65:13,20,21;
66:2;78:10;152:14

**banned (8)**
63:15;73:12;78:9;227:11,
17;228:13;233:4,6

**banning (1)**
63:16

**barrel (20)**
118:14,20;119:2;131:11;
133:14;175:8;177:3,17,20,
20;180:7,7;181:2;190:6;
192:6;198:16;199:4;273:3,
7,8

**barrelled (4)**
118:15,16;190:10,11

**barrels (3)**
190:15;191:1,5

**base (1)**
185:9

**based (19)**
60:15;68:6,15;132:14;
136:15;137:21;138:9;
150:19;151:1,17,19;153:18;
173:13,19;185:17;247:2;
261:20;263:20;264:9

**basic (1)**
117:21

**basically (2)**
128:2;244:18

**basis (11)**
49:16;52:19;74:3;98:18;
114:8;159:7;186:19;189:7;
208:16;222:14;223:8

**battle (2)**
102:9;135:5

**battlefield (2)**
187:5;197:21

**bear (1)**
89:10

**became (3)**
34:12;116:12;192:3

**become (6)**
59:21;147:19;161:19;
166:7,11;259:19

**began (1)**
203:20

**begin (1)**
261:9

**beginning (2)**
196:1;250:3

**behalf (3)**
42:16;43:18;46:13

**behind (6)**
8:6;109:3;181:3,15,16;

226:4

**beings (3)**
164:18,21;169:20

**belief (2)**
65:5;153:18

**bell (3)**
230:19;231:7;232:20

**below (9)**
47:10;103:11;109:12;
111:4;185:5;207:1;210:2;
213:9;233:17

**belt (1)**
147:2

**Belton (4)**
183:4,11;186:3;187:2

**bench (1)**
146:6

**benefactor (4)**
33:15,21;34:13;35:2

**benefit (1)**
207:16

**Beretta (1)**
136:5

**Bernardino (1)**
231:6

**Besides (1)**
32:18

**Bess (2)**
196:13,19

**best (12)**
5:9;6:20;27:16;57:21;
96:7;128:16;191:3,7;193:7;
241:19;242:10,16

**bet (2)**
103:21;111:9

**better (4)**
43:8;198:3;211:19;
225:14

**beyond (7)**
100:21;101:1;122:21;
123:21;149:14;156:9;235:1

**big (2)**
8:5;176:15

**bigger (1)**
223:21

**Bill (2)**
59:21;62:16

**binary (1)**
154:5

**bit (13)**
24:12,13;82:21;87:1,9;
130:21;151:5;155:2,7;
160:11;174:10;185:21;
243:12

**blank (1)**
277:18

**blow (1)**
192:14

**Blue (2)**
59:9,17

**Board (19)**
30:3,9,9,11,18,20;36:7;
37:2,4,8,11,13,15,17;39:8;

60:20;61:6,7,13

**bodily (1)**
159:19

**body (2)**
37:14;222:5

**bold (1)**
218:13

**bolt (5)**
74:1,14,15,17,18

**Book (8)**
59:9,17;237:5,8,12;
238:9;244:10,19

**books (10)**
8:5,9;186:1,2;205:10;
237:7;238:4;244:11,21;
245:12

**borrowed (1)**
205:18

**borrowing (2)**
200:2;252:11

**boss (1)**
55:1

**boss's (1)**
54:20

**both (43)**
11:21;21:18;30:10;64:19;
69:3;71:3;94:4,7,12;95:11;
97:1,21;98:1,5;112:10;
114:18,20;116:4,10;117:7;
118:9;119:3;121:21;
124:11;132:6;147:10;
154:10;196:16;207:3;
208:8,21;209:12;211:2;
218:20;228:20;229:3;
269:2,4,17;270:1,2,14;
271:7

**bottom (10)**
7:15;42:7;61:9;70:18;
174:9;178:21;236:11;
238:5;240:10;249:13

**bought (2)**
34:7;168:14

**Boy (1)**
158:18

**braced (1)**
149:10

**Bradley (1)**
54:16

**Brady (2)**
59:5,21

**breach (2)**
180:6;181:5

**break (10)**
6:15,16;8:20;68:17;
158:6,10;206:16;241:9,11;
274:19

**brief (8)**
68:19;119:9;193:17;
206:17;239:6,10;241:14;
274:20

**briefer (1)**
38:2

**briefly (3)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 826 of 1262

David Seth Worman, et al. vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

7:12;8:15;12:14
**bring (1)**
　7:16
**British (3)**
　183:17;196:13,18
**broadly (1)**
　206:7
**brought (3)**
　8:7,13,14
**Brown (2)**
　196:13,18
**build (1)**
　97:10
**building (1)**
　27:20
**built (9)**
　15:16;16:9,10,14,20;
　76:4;96:18;134:1;210:3
**bullet (9)**
　85:12;110:13;177:9,19;
　209:11;212:21;216:12;
　217:13;257:15
**bulleted (1)**
　211:18
**bullets (3)**
　180:11;209:11;210:2
**bullet's (1)**
　110:15
**bullpup (3)**
　272:13,21;273:6
**bump (15)**
　147:16;148:3,4,10;
　149:21;150:5;151:3;152:2,
　5,8,13,14,20;153:8,17
**burst (6)**
　20:21;73:5,7,8;101:6;
　106:10
**burst-fire (1)**
　19:19
**Bushmaster (1)**
　231:21
**business (8)**
　4:14,16;23:8,11,13;24:4;
　37:5,10
**butt (1)**
　148:14
**buy (8)**
　153:8,9,14;154:2;157:6;
　189:8;223:10;243:8
**buying (1)**
　244:4
**bystanders (2)**
　81:14,17

**C**

**cagey (1)**
　184:6
**calculate (1)**
　111:7
**calculation (1)**
　52:4
**caliber (6)**

76:7;132:18;133:2,7,14;
　246:14
**calibers (2)**
　132:17,20
**California (1)**
　231:6
**call (5)**
　77:13,14;127:15;197:1;
　211:6
**called (24)**
　4:4;10:5;16:5;26:13,19;
　47:10;59:13;90:9;95:13,18;
　96:15;135:15,20;136:21;
　137:3;138:3,13;147:15;
　154:4;155:10;157:14;
　205:6;244:11;252:3
**calling (1)**
　96:16
**calls (1)**
　28:4
**came (1)**
　57:14;96:5;177:9;237:12
**Can (151)**
　5:8;6:16;12:1;13:21;15:2,
　4,21;16:2;19:13,15,19;
　20:18;21:4,19;22:12;26:10;
　35:16;36:3;39:12;41:2;
　50:12,13,17,20;51:2;54:7;
　59:17;63:2;64:20,21;65:4;
　66:17;67:3,16;68:3,10;
　71:13;74:8,10,17,20,21;
　75:12,19;76:5;77:20;78:21;
　79:4,13,16;80:8,15;81:13,
　14,18;82:10,12;83:7;84:15,
　21;85:6,7;87:20;88:5;89:8;
　90:20;91:4,6;93:19;94:12;
　96:9;97:16;98:8;101:1,5,8,
　11,13;102:1;107:15;111:2,
　7;118:17;120:11;121:20;
　122:16,21;123:13;124:2,5,
　5;127:6;128:5;134:15;
　135:10;140:14,18,19;
　144:14;146:16,17;148:12;
　154:3,14;156:2;157:6;
　158:14,21;164:7;165:18;
　166:2,6,11;170:18;172:20;
　174:2;175:3;177:4,14;
　179:13;185:21;193:5;
　200:19;201:17;210:15;
　212:3;213:12,21;214:15;
　222:2,5,21;224:6;225:6,7;
　238:1;239:3,7,16;240:11;
　241:10;247:14;257:15;
　258:5;261:12;264:19;
　266:9;267:11;268:15;
　271:21;273:1
**canceled (6)**
　185:13;187:13,16;188:5,
　7,13
**canceling (1)**
　184:4
**candidacy (1)**
　61:13

**Candidate (1)**
　61:10
**candidates (1)**
　61:6
**Candidate's (1)**
　60:20
**cannon (2)**
　175:1;194:12
**cap (5)**
　192:7,12,18,19,20
**capability (2)**
　105:13;235:2
**capable (5)**
　117:9;130:11;204:7;
　215:1,9
**capacity (19)**
　12:6,7;30:6;173:14,20;
　178:20;210:14;213:11;
　214:8;222:10;223:6,16;
　224:7;239:12;252:18,21,21;
　267:16,18
**caps (1)**
　192:19
**caption (1)**
　71:14
**Carbine (3)**
　16:11;144:7,10
**C-a-r-b-i-n-e (1)**
　16:12
**Carbon (3)**
　16:6,11,13
**C-a-r-b-o-n (1)**
　16:13
**care (4)**
　44:20;45:1,8;167:5
**careful (1)**
　193:14
**carefully (1)**
　52:4
**carried (1)**
　181:18
**carrier (4)**
　74:14,15,17,18
**carriers (1)**
　74:1
**carry (1)**
　121:20
**cartridge (20)**
　88:2,2;94:17,21;95:6;
　118:13;162:7,8;176:12,13,
　17;177:9;191:19;204:7;
　212:9,9;214:19;215:18;
　220:8;252:13
**cartridges (7)**
　80:14;176:16;191:16;
　215:21;218:3,7,11
**case (86)**
　4:10,11;5:3,3,10,12,14;
　9:9;10:5,14,18;11:3,5,7,12,
　14,16,18,20;12:2;13:4,8;
　21:8;23:21;24:1,16;38:18,
　19,21;41:7,9,12,18;42:12,
　13,15,16;43:18;45:17;46:3,

17,19;47:5,8,10,14,16;
　48:20;53:15;55:9,13,15;
　57:11,14;60:10;69:9,11,18;
　71:14;72:4,21;84:3;90:6;
　124:2;125:19;126:18;
　128:13;141:15;175:10;
　192:20;212:9;239:4;241:4;
　242:21;251:5;252:2,7;
　262:10;264:5;265:19,20;
　266:18,20;267:1;269:3;
　275:3
**cases (33)**
　5:19;11:9;19:19;24:2;
　38:16;46:5;48:12,18;74:20;
　75:3;80:13;81:18;112:10;
　116:11;117:4,13;128:4;
　131:4;132:9;143:15;
　176:14;177:18;192:1;
　208:20;214:20;215:3;
　216:21;218:19;223:13;
　245:12;250:21;251:2;
　259:20
**castle (1)**
　204:16
**category (1)**
　63:15
**cause (6)**
　159:6,19;260:6;262:1,8;
　263:21
**causing (1)**
　263:2
**center-fire (4)**
　80:13;88:6;215:20,21
**central (1)**
　169:14
**centuries (6)**
　174:19;194:9,16,17;
　195:2,4
**century (19)**
　167:1,3,9,16;175:17,18,
　21;176:19;177:7;178:2,6,7,
　10,11,14;191:17;193:2,16;
　194:3
**certain (23)**
　17:7,9;45:12;80:16;83:7;
　97:11;117:15;118:18;
　129:17;139:9;144:16,20;
　148:7;156:16,19;159:3;
　170:2;180:20;198:10;
　206:5,10;222:3;268:10
**Certainly (13)**
　64:17;71:11;81:13;84:18;
　91:11;99:21;118:1;139:21;
　221:8;232:3;235:1;264:4;
　265:10
**certainty (7)**
　105:5;114:7;138:5;
　188:21;189:5,7;274:18
**CERTIFICATE (1)**
　277:1
**certification (1)**
　141:4
**certified (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 827 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

141:2

**certify (1)**
277:3

**chain (1)**
29:13

**challenge (7)**
12:4;43:20;44:2,6,17,19;
53:21

**challenged (1)**
53:11

**challenging (2)**
47:19;53:16

**chamber (6)**
115:10;146:11;192:7,13,
15;212:10

**chambered (5)**
94:13;95:1;132:15;133:4;
214:18

**chambering (5)**
88:4;93:13,15;115:13;
116:16

**change (17)**
10:11;108:20;109:4,6;
132:18;144:14;145:14,19;
147:7;204:20;212:7,12;
214:7;235:17;261:3,10,13

**changed (9)**
9:20;58:6;91:18,21;92:4;
203:10;205:18;242:7;254:3

**changes (9)**
10:8;11:1;108:12,15;
144:19;145:5;260:12,18;
261:1

**channel (1)**
249:20

**Chapter (3)**
103:9;186:3;237:5

**characteristics (13)**
80:15;103:1,9,15,19;
169:19;170:1;202:3;203:6,
18,21;204:2;258:2

**charge (5)**
176:6,7,20;177:19;185:1

**charging (2)**
75:12,21

**Charleville (2)**
196:13,20

**chart (8)**
103:11,14;104:3;105:20;
106:21;109:7;217:14;
219:13

**cheaper (1)**
34:7

**check (1)**
250:6

**chemical (1)**
192:11

**Chicago (1)**
5:11

**child (1)**
63:7

**children (1)**
231:15

**China (1)**
253:7

**Chinese (3)**
127:18;129:14,15

**choice (4)**
199:14;220:9;221:21;
224:11

**choose (7)**
207:8;221:17;222:11;
223:7,12;271:6,13

**chose (1)**
162:12

**chosen (1)**
128:15

**circumstances (7)**
77:4,15;78:8;82:2;83:8;
224:15,18

**cite (1)**
203:13

**cited (1)**
204:3

**City (2)**
46:1;139:18

**Civil (1)**
155:16

**civilian (39)**
14:16;76:10;83:11;90:18,
21;92:3;93:7;97:6;114:18;
116:4,8;117:7;118:9,17;
124:3;126:1;127:9;135:7,
12;139:2,10;152:20;161:1;
162:19;163:19;164:1,3;
168:7;207:4;208:8;209:1,
12;259:5;269:4,17;270:14;
271:7,14;275:13

**civilians (17)**
83:1,6,14;84:8;94:5;
95:12,14;140:3;150:6;
152:1,4;157:10;164:10;
167:15;207:21;208:15;
209:3

**clarify (2)**
6:6;19:6

**class (1)**
162:7

**clear (3)**
6:4;218:16;261:2

**Clearly (3)**
227:10,17;228:12

**client (2)**
24:5;55:7

**clients (1)**
24:3

**Clinton (1)**
64:7

**clones (1)**
251:13

**close (8)**
61:8;88:12;126:9;131:10;
139:15;149:17;271:8,15

**closely (1)**
92:19

**closer (5)**

33:10;95:9;130:21;174:8;
193:4

**co-author (1)**
245:2

**Cold (1)**
136:16

**collectible (1)**
37:9

**collection (2)**
17:13;44:21

**collector (2)**
18:14,15

**Collectors (3)**
30:7,10;37:20

**Colorado (1)**
229:8

**Colt (7)**
91:8,11;92:3,7,9,15;254:7

**Columbine (1)**
230:12

**column (5)**
104:11,14,16,18;105:6

**columns (2)**
108:6;109:16

**combat (11)**
120:18;139:17;146:4;
160:19;161:7;162:13,18;
163:17;208:12;255:7,12

**combination (1)**
179:16

**combined (1)**
176:4

**comfortable (4)**
49:4,17;140:2;238:21

**coming (1)**
107:13

**comma (1)**
272:19

**command (1)**
29:13

**comment (1)**
179:14

**commercial (7)**
210:6,13;211:7,20;
214:17;215:6;217:5

**commit (1)**
259:13

**committed (1)**
65:6

**committee (6)**
30:8,8,11;37:20,21;38:1

**committees (3)**
37:16,17,18

**common (8)**
88:4;95:4;115:21;133:5;
190:1,7;219:19;222:20

**commonly (7)**
63:12,12;80:13;194:2;
227:11,18;228:13

**Commonwealth (1)**
12:16

**communicate (1)**
28:3

**communication (2)**
28:14;29:6

**communications (1)**
7:20

**commutes (1)**
175:7

**comp (1)**
24:12

**compact (6)**
144:8;222:12;223:2,7,14;
272:14

**companies (4)**
91:13;129:2,16;253:6

**Company (9)**
23:7,9,10;24:10;59:13;
128:18;136:21;138:3;
188:13

**comparable (1)**
273:16

**compare (2)**
119:16;234:20

**compared (3)**
80:5;167:14;215:20

**comparison (2)**
216:9,11

**compartment (2)**
182:7,11

**compartments (1)**
182:9

**compensate (2)**
223:18,20

**competition (4)**
16:6;128:12;144:21;
164:11

**compiled (1)**
244:16

**complaint (1)**
12:10

**complete (1)**
6:11

**completely (4)**
80:17,19;179:17;238:18

**compliant (1)**
117:15

**complicated (3)**
234:4,8,12

**comply (1)**
83:8

**components (2)**
115:5;236:1

**compound (2)**
256:19;257:4

**comprehensive (2)**
195:1;239:7

**concealability (1)**
224:14

**concealable (2)**
223:14;224:12

**concede (3)**
159:18;160:13;166:21

**concept (4)**
170:15;204:18,18;252:16

**concepts (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 828 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

252:12
**concern (4)**
45:5,7,10,11
**concerned (1)**
242:13
**concerning (1)**
218:17
**concerns (1)**
129:17
**concluded (1)**
276:5
**conducive (1)**
145:5
**confidential (1)**
34:10
**confidently (1)**
235:7
**configuration (6)**
98:10;131:11;218:12,14;
272:13,21
**configurations (3)**
104:8;130:20;222:4
**configured (2)**
97:5;117:17
**confirm (2)**
58:16,20
**confusing (1)**
73:14
**confusion (1)**
95:3
**Congress (4)**
184:3;185:10;186:12;
187:2
**Connecticut (1)**
231:13
**connection (10)**
11:5;26:5,14,20;45:20;
61:12;71:7;239:4;241:3;
256:7
**conquer (1)**
65:13
**conscious (1)**
145:10
**conservation (1)**
121:18
**consider (5)**
142:4;144:6;201:1,5;
245:3
**consideration (1)**
4:12
**considered (3)**
35:3;94:1;100:18
**considers (1)**
122:4
**consist (3)**
24:7;152:11;214:5
**consistent (3)**
151:12;153:4;250:13
**Construction (6)**
23:7,9,10;24:6,8;104:9
**consulted (1)**
38:17
**Consulting (2)**

42:9;44:10
**consumers (2)**
222:10;223:5
**contact (1)**
30:3
**contacted (1)**
54:10
**containing (1)**
20:5
**contemporaneously (2)**
96:11;253:4
**content (2)**
245:6;251:6
**contest (2)**
128:9,15
**context (20)**
18:4;89:4;106:15;112:20;
113:17;134:13;141:9,20;
144:11;168:1;174:13;
205:12;228:11;250:7;
254:13;255:5;256:15;
266:20,21;267:20
**contexts (1)**
263:8
**Continental (3)**
184:3;185:10;186:12
**continually (1)**
175:14
**continued (3)**
44:15,17;194:19
**continues (1)**
149:3
**continuing (1)**
265:2
**continuous (2)**
163:9;167:19
**contract (3)**
24:11;91:9;92:8
**contracts (2)**
91:7;96:12
**contribute (1)**
196:2
**controllable (1)**
223:19
**controlling (1)**
72:15
**controls (2)**
132:1,3
**converts (1)**
201:20
**Cook (3)**
5:12;11:19;45:15
**Cookson (10)**
178:19;179:12,21;180:2,
15;182:15,15;183:1,2;184:4
**copied (1)**
58:12
**copies (6)**
9:1;274:2,9,11,12;277:17
**copy (3)**
57:5;61:19;238:12
**corporate (3)**
23:6,16;272:2

**Corporation (1)**
136:21
**corrections (1)**
277:6
**correctly (5)**
73:18;202:12;210:9;
247:7,13
**correspondence (2)**
7:18;186:21
**cosmetic (1)**
92:16
**cost (3)**
176:4;179:16;270:20
**costs (2)**
55:9;69:18;270:17;272:6
**Counsel (7)**
8:10;9:1;23:6,17;37:5;
46:16;47:4
**count (1)**
191:2
**counting (2)**
71:2;190:17
**countries (1)**
129:21
**country (2)**
76:17;77:9
**County (3)**
5:12;11:19;45:15
**couple (7)**
5:19;6:3;17:12,21;
127:18;143:7;196:11
**course (2)**
21:18;22:16
**Court (6)**
4:12;12:20;23:19;53:20;
71:5,7
**cover (4)**
69:3;119:16,17;145:12
**crafted (1)**
197:9
**craftsmen (2)**
197:5,6
**crank (9)**
155:11,13,16;156:5;
157:6,11;180:6,17,18
**cranks (2)**
156:13,17
**create (5)**
124:6;175:6;192:10;
195:20;245:7
**creates (1)**
192:14
**creating (1)**
213:3
**credible (1)**
230:21
**credit (1)**
210:17
**crew-served (2)**
143:7,10
**crime (2)**
259:13,14
**crimes (3)**

64:3;65:6;259:17
**criminal (15)**
15:6;159:17;162:19;
163:4,18;164:7;168:8,9,12;
170:2,3;228:4;259:5;260:5;
262:11
**criminals (20)**
63:17,19,20;64:2;147:10;
161:20;164:14;165:12;
166:16;167:15;168:3;
207:8;208:2;227:18;
228:14,21;229:4;261:16,21;
262:7
**crowd (2)**
113:4,6
**culture (3)**
63:8,11;64:15
**curatorial (2)**
44:20;45:1
**curators (1)**
98:21
**current (4)**
25:13;26:6;49:20;248:3
**currently (2)**
40:6;265:21
**curriculum (1)**
237:17
**custodial (1)**
45:8
**customized (1)**
98:7
**cut (1)**
198:15
**cylinder (5)**
138:18;139:8;140:5,15,
19
**cylinders (1)**
140:6

## D

**damage (2)**
85:12;263:1
**damages (3)**
260:6;262:1,8
**dangerous (24)**
79:8;81:7,12;84:18;
158:13,14,16,19;159:8,13;
160:18;161:20;162:4;
164:17,20;166:7,11;223:21;
265:15,17,18;266:3,6,7,11,
16,16,17;267:3,5,8,9,12
**date (5)**
193:4;242:9,11,13;
277:15
**dated (1)**
9:14
**dates (1)**
242:17
**Davis (2)**
44:12,15
**day (7)**
21:18;22:17;28:1;55:20;

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 829 of 1262

David Seth Worman, et al. vs.
Charles D. Baker, et al.

James Supica - Vol. 1
October 30, 2017

56:1,3;127:4

**deal (7)**
24:14;44:11;80:20;99:11;
141:3;151:13;221:21

**dealers (7)**
225:9,18,20;226:6,8,11,
13

**death (1)**
159:19

**debate (1)**
222:21

**DeBergalis (3)**
27:13;28:6;55:3

**decide (1)**
270:11

**decided (1)**
152:12

**decision (3)**
38:10;53:20;224:6

**decision-making (1)**
38:5

**decisions (2)**
31:1;271:2

**declaration (1)**
72:10

**declined (1)**
183:18

**dedicated (1)**
144:18

**defendants (1)**
4:9

**defenders (1)**
166:16

**defense (7)**
14:16;77:9;139:14;
164:13;220:10;223:15;
224:4

**defensive (4)**
14:10,12,13,18

**defensively (1)**
147:11

**define (7)**
74:11;85:19;100:12;
164:20;212:19;213:20;
234:4

**defined (1)**
120:20

**defines (2)**
107:20;203:13

**defining (2)**
201:1;202:8

**definitely (2)**
45:13;224:17

**definition (27)**
14:13;85:17;108:17;
110:11;117:1;133:20;
155:4;199:21;200:2;
202:17;203:1,6;204:2;
205:3,6,8;214:1,3;217:9;
228:3,6,8;235:20;253:11,
13;267:3,11

**definitions (1)**
162:4

**degree (4)**
23:3;122:18;123:4;
257:16

**deliver (2)**
122:19;169:15

**demonize (1)**
64:15

**demonized (1)**
63:10

**demonizing (1)**
63:7

**demonstrated (7)**
156:11;183:16,17,19;
185:14,16;188:1

**depend (8)**
88:1;141:18;145:3;
158:18;246:7;248:11;
268:7;269:7

**dependent (1)**
118:13

**depending (3)**
112:6;162:3;213:20

**Depends (2)**
144:16;212:19

**deponent (2)**
7:16;277:1

**deposed (1)**
5:17

**deposition (28)**
4:20;5:2,5,20;6:1;7:9,10,
14;8:8;13:7;46:20;47:2,8;
57:6,8,10,17;58:17;59:2;
60:16;242:20;257:21;
265:6;266:17,18,19;267:9;
276:5

**depositions (1)**
49:2

**depth (1)**
113:3

**describe (8)**
13:21;26:10;127:6;175:3;
191:20;202:2;211:18;239:9

**described (4)**
179:21;190:4;211:10;
219:8

**describes (1)**
197:3

**describing (4)**
193:21;236:15;244:10;
249:8

**description (2)**
240:5;246:14

**descriptions (3)**
245:10;246:11;247:17

**descriptive (1)**
254:15

**design (23)**
44:8;80:15;96:18;97:12;
117:21;118:2,5;128:13;
137:9,17,21;139:5;156:4;
157:3;161:6;174:20;187:2;
198:4;213:2,5;216:21;
217:2;258:20

**designate (1)**
34:9

**designates (1)**
94:10

**designation (5)**
17:7,9;94:9;254:2,8

**designed (39)**
96:4;97:21;102:8;125:21;
128:6,8;130:7;131:5;132:7;
135:1,4,12,17;136:2,7,13,
18,20;137:4,7,11,11,15;
138:3,7,10,12,19,20;
139:10;143:3;148:15;
149:21;150:3;157:1,20;
159:10;195:9;246:1

**designers (1)**
208:6

**designs (6)**
194:10;195:1;207:13;
273:6,16;274:2

**desirable (8)**
168:1,2;169:19;170:1,3;
208:17;209:5;244:2

**Despite (1)**
200:7

**detachable (2)**
182:8;239:13

**detail (3)**
99:18,21;106:1

**details (3)**
168:13;230:15

**devastatingly (1)**
122:20

**develop (3)**
96:6;170:17;271:19

**developed (13)**
90:15;96:10;133:10;
160:18;179:18;182:18;
193:1,8,20;195:16;204:13,
14;268:20

**developing (3)**
91:16;251:6;269:8

**development (17)**
135:7,8;172:5;174:20;
194:16;195:3,5;196:3;
203:17;204:6,11;205:2;
208:21;209:12;210:19;
211:2;238:8

**developments (6)**
193:19;194:10,18;195:8;
208:8;270:13

**device (9)**
147:15;148:7,13;149:13,
16;150:17;154:4;155:10;
157:14

**differ (2)**
74:3;241:6

**difference (12)**
91:1,3;97:19;98:2;115:3;
124:14;127:6,21;135:9;
176:15;199:19;222:6

**differences (4)**
93:19;95:16;97:12;127:4

**different (50)**
33:11;46:9;53:8;64:1;
74:11;75:8,18;85:20;94:15,
17,21;97:9;98:8,13;99:1,2,
3;104:6,7;107:1,18;108:1;
119:20;131:5,6,6;132:17,
19,20;141:16;144:18;
146:1;160:10;184:17,17;
191:18;192:17;196:12;
201:18;202:4,14;205:14,16;
214:1;227:3;235:5;242:15;
250:9;265:19,20

**differently (1)**
43:11

**differs (1)**
73:14

**difficult (6)**
80:6;85:2;132:21;147:9;
222:12;223:2

**difficulty (1)**
72:15

**dig (1)**
205:11

**direct (3)**
28:14;29:6;247:10

**directed (2)**
7:16;255:8

**direction (3)**
37:15;145:11,13

**directly (2)**
30:21;238:16

**Director (4)**
25:14;27:16,17;28:9

**Directors (6)**
30:4,9,18,21;36:7;37:13

**directs (2)**
213:2;255:15

**disabled (2)**
148:7;220:17

**disadvantage (1)**
224:18

**disagree (4)**
36:4;53:8;121:7;227:16

**disagreed (1)**
65:9

**disassembly (1)**
98:20

**disbelieve (1)**
114:9

**discipline (1)**
259:18

**disclosed (1)**
168:15

**discontinued (2)**
130:10;204:9

**discouraged (1)**
204:8

**discuss (1)**
213:21

**discussed (14)**
24:20;29:19;38:16;39:11;
47:1;79:3;96:2;110:11;
134:14;213:13;253:16;

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 830 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

254:2;266:16;267:8

**discusses (1)**
195:18

**discussing (4)**
96:3;109:7;229:5;261:3

**discussion (6)**
150:20;164:17;166:3;
201:14;222:15;266:15

**displaying (1)**
45:4

**displeases (2)**
30:13,18

**disruption (1)**
169:16

**distance (4)**
110:12;113:13;114:14,16

**distant (2)**
88:17,20

**distinction (8)**
50:4;124:10;128:2;
132:13;199:9;200:5,20;
212:15

**distinctive (1)**
130:18

**distinguish (2)**
22:16;203:7

**divide (1)**
65:13

**Division (5)**
4:17;25:14;40:15;250:8;
251:7

**divisions (1)**
129:3

**document (18)**
7:2,7;9:7;57:2,4,7;58:10;
60:10;70:3,8,12,14,16,21;
72:2;102:14,20;108:18

**documents (3)**
13:3,14;72:4

**dollars (1)**
34:4

**done (4)**
8:3;44:10;141:3;262:21

**doorstop (1)**
255:2

**double (5)**
154:13;190:6,9,11;250:6

**double-barrel (1)**
186:11

**doubles (1)**
154:15

**doubt (2)**
30:20;229:2

**down (14)**
8:11;62:3,5;105:7;162:5;
177:3,18,20;197:17;199:4;
212:21;227:10;270:17;
272:6

**drafted (1)**
185:8

**dramatic (1)**
204:20

**drawing (1)**

67:5

**Drive (2)**
4:19;243:7

**drop (2)**
87:14;146:5

**dues (2)**
33:20;34:15

**duly (1)**
4:4

**during (10)**
8:20;120:17;129:1;190:7;
192:4;194:16,16;198:12;
265:6;267:9

# E

**earlier (5)**
36:1;47:1;191:15;254:2;
262:14

**earliest (1)**
195:2

**early (9)**
128:7;136:16;144:1;
177:12;178:14;193:2,18;
195:18;264:6

**earn (1)**
37:7

**easier (7)**
87:3;220:15;222:4;
272:16;273:4,9,13

**easily (3)**
87:9;182:8;267:10

**easy (2)**
132:18;189:20

**Edgewater (1)**
230:7

**Edition (3)**
59:10,18,19

**Editions (1)**
225:4

**editor (1)**
244:16

**educational (2)**
249:14,20

**effect (4)**
52:9,16;64:11;80:12

**effective (59)**
59:21;85:6,7,10;86:2,11,
21;87:6,18;100:10,13,21;
105:8;106:2;107:6,17,21;
108:9,20;109:5;111:4,7;
112:1,5;123:13;125:1,19,
21;126:7,19;139:15;
142:19;159:13;160:7,19;
161:14;162:13,18,19;
163:16,18;165:11,12;
166:12;167:1;168:6;171:2,
5;194:18;195:20;196:1,2;
208:11;213:4;215:15;
243:17;244:2,5;258:5

**effectively (7)**
84:17;87:4;88:6;222:3,7,
12;223:3

**effectiveness (1)**
179:16

**efficient (2)**
102:9;135:4;177:10

**efficiently (2)**
146:13,14

**effort (2)**
169:16;242:10

**efforts (6)**
26:9,10,15;167:19;
242:17;249:14

**egregious (1)**
62:16

**eight (1)**
233:18

**eight-shot (1)**
186:13

**either (18)**
11:21;19:14;20:21;54:9;
56:4;62:8;87:18;90:20;
92:3;112:6;132:15;134:4;
146:9;177:19;218:4;
230:17;257:16;273:17

**ejected (1)**
212:9

**elderly (1)**
220:17

**elected (2)**
36:17;65:7

**electronic (1)**
7:20

**ellipses (1)**
233:20

**else (7)**
12:8,19;14:5;18:12;62:5;
141:5;248:2

**else's (1)**
202:18

**E-mail (2)**
28:4;62:8

**e-mailed (1)**
62:7

**emphasizing (1)**
193:18

**employed (1)**
69:14

**employee (2)**
25:17,20

**employees (1)**
29:18

**employer (1)**
27:11

**empty (8)**
19:18;20:5,6,10,15;22:6;
82:15;212:9

**enacted (2)**
51:14,19

**encoded (1)**
172:17

**encoding (1)**
44:8

**encompassed (1)**
36:15

**effectiveness (1)**
179:16

**end (17)**
175:21;176:18;177:7,17,
20,21;178:2,5,7,11;180:7;
181:4,5;192:13;194:2;
207:16;270:21

**enemy (4)**
161:7,15,16;220:7

**energy (4)**
87:14;217:17,21;219:8

**enforcement (3)**
83:3;84:9;256:3

**engage (2)**
93:2;261:16

**engaged (1)**
72:15

**engaging (1)**
139:16

**enough (1)**
40:21

**ensure (1)**
121:3

**enter (2)**
261:21;262:7

**enters (1)**
260:5

**enthusiasts (1)**
150:21

**entire (3)**
66:8;203:1;215:20

**entirely (2)**
153:15;168:15

**enumerate (1)**
91:14

**enumerated (3)**
73:12;234:6,18

**equal (4)**
87:2;135:14;257:16;
273:16

**equally (5)**
101:15;163:4,17;209:16;
239:18

**era (5)**
129:1;136:16;160:15;
190:8;192:4

**ergonomics (3)**
212:13;213:1,12

**Errata (1)**
277:7,17

**error (1)**
242:12

**especially (4)**
88:2;192:3;199:18;
205:15

**essentially (6)**
93:17;95:15;98:11;102:7;
116:1;132:3

**et (3)**
45:15;69:4,5

**ethnic (4)**
220:16;221:4,6,7

**Europe (3)**
182:14,17,19

**evaluation (2)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 831 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

54:3;85:21

**Even (12)**
80:9;87:11;117:10;147:7;
181:20;186:19;187:19;
188:13;210:11;214:3;
225:14;255:4

**events (1)**
129:8

**eventually (1)**
204:12

**everybody (1)**
226:20

**evolution (10)**
89:20;160:21;163:10;
166:13;177:6;193:18;
194:15;195:18;203:4;
204:19

**evolutionary (1)**
193:12

**evolved (1)**
89:16

**evolving (3)**
174:21;175:15;194:11

**exactly (9)**
54:10;55:7;131:20;
146:18;154:7;199:5;
227:11,18;228:13

**EXAMINATION (1)**
4:7

**examine (2)**
8:21;97:4

**examined (2)**
4:6;277:4

**example (14)**
74:14,15;167:3;182:20;
187:6,19;212:20;219:13;
220:8;242:9;247:11;255:4;
256:6,18

**examples (2)**
76:18;77:1

**exceeds (1)**
112:9

**Except (3)**
27:9;115:4;117:13

**exception (3)**
21:7,9;265:14

**excess (1)**
223:17

**exclude (1)**
39:12

**exclusive (1)**
196:20

**exclusively (1)**
27:7

**Executive (3)**
27:17;28:9;29:1

**Exhibit (35)**
7:3,4;9:4,8;42:5;56:19;
57:3;58:7,11;59:4;60:9,10,
16;68:21;70:4,5;71:18;
72:6;102:11,15;119:12,12,
13,17;120:2,3;169:3;236:2,
4,19;237:2;241:18;242:19;

266:19;275:2

**exhibits (2)**
58:16;69:3

**exist (2)**
83:20;158:3

**existed (1)**
187:4

**existing (1)**
274:2

**expect (18)**
31:15,21;32:5;108:16;
110:12;111:6;114:19;
115:5,9;116:3,10;246:21;
247:4,5,18;248:9,15,20

**expected (1)**
243:8

**expended (2)**
275:8,16

**expensive (1)**
179:19

**experience (8)**
141:12;142:10,13,14;
151:14;213:14;222:15;
223:9

**experimented (1)**
139:20

**expert (40)**
4:12;5:18,18;9:9;10:4,9;
24:20;38:15,18;39:10,15;
41:5,6,11,14,21;42:8;44:14;
45:14,20;47:21;54:8;56:9;
66:16,21;67:2,5,9,15;68:2,
6,14;69:15;71:7;125:2;
169:11;201:9;239:10,16,17

**expertise (9)**
14:1,3,7;58:3;67:6;68:7,
14,15;153:3

**experts (1)**
222:16

**experty (1)**
201:11

**explain (6)**
12:1;35:16;148:12;
177:14;193:14;195:2

**explained (1)**
115:2

**explaining (1)**
203:4

**explanation (1)**
272:21

**exposure (1)**
120:21

**express (1)**
31:6

**extend (1)**
198:16

**extended (1)**
87:18

**extends (2)**
148:16,17

**extension (1)**
148:19

**extensively (1)**

98:7

**extent (16)**
43:2;56:16;67:2,15;68:2;
80:10,16,21;114:21;118:18;
130:16;132:10;144:16;
162:17;167:21;268:8

**extra (1)**
224:8

**extractor (3)**
75:4,6,10

**extrapolate (1)**
108:14

**extrapolated (1)**
108:17

## F

**Fabrique (1)**
136:10

**Facebook (1)**
249:17

**fact (8)**
74:2;129:15;157:9;
160:17;193:12;222:17;
257:15;258:4

**factor (3)**
80:15;121:19;190:20

**factors (5)**
80:7;108:12;121:21;
224:5;270:20

**facts (4)**
41:18;76:9;113:2;275:21

**factual (1)**
156:2

**fair (40)**
10:20;14:17,19;25:3;
30:12,17;35:5;40:21;41:4,
10,14,20;56:13;58:2;69:11;
78:18;79:7;85:14,19;88:17,
20;89:4;102:8;104:20;
127:21;133:11;146:19;
226:7,9,11,14;228:6;
233:18;245:3;246:3,10;
247:19,21;262:20;268:10

**Fairfax (2)**
4:18,19

**fairly (15)**
29:4;85:1;87:9;117:6;
127:19;139:16;144:1;
157:2;193:8;215:19;232:8;
234:19,21;257:9;259:10

**FAL (1)**
136:10

**familiar (51)**
57:4;76:9,13,15;77:10,15,
18;78:8,12;83:17,19;84:1;
90:9;95:17;98:21;105:15;
120:2;135:15,20;136:5,11;
137:14,18,20;138:13;
139:21;147:15,20;154:4;
155:10;157:14;170:13,14;
185:6;186:5,14,15,16,17;
187:3;189:17,21;204:10;

226:21;229:7;230:6,10,11;
231:12;232:10;237:3

**family (2)**
23:13;37:5

**family-owned (2)**
23:11;24:3

**far (14)**
62:10;69:19;85:6;87:14;
96:9;111:7;112:13;113:7;
190:3;233:13;238:10;
242:4,16;243:18

**farther (1)**
198:18

**fast (21)**
81:2,20;82:10,12,13;
101:5,8,10,13,19;102:1;
120:18;133:16;134:15;
144:14,19,21;145:5,18,20,
21

**faster (4)**
79:11;108:2;157:21;
260:9

**fatalities (4)**
260:6;262:2,8;264:1

**Fathers (2)**
189:10;196:5

**feature (1)**
18:7;201:1,19

**features (12)**
124:21;125:1,5;126:12;
131:6;202:8;208:16;209:5,
7;220:14;221:14;223:16

**fed (1)**
212:10

**Federal (8)**
51:18;53:17;62:19;63:1,
4;83:4;90:1;200:12

**feeding (1)**
214:8

**feel (2)**
64:19;277:6

**fees (2)**
55:9;69:16

**feet (3)**
100:8;110:7,17

**few (3)**
9:19;17:16;27:6

**fewer (1)**
53:7

**field (5)**
67:6;68:7,16;72:14;73:1

**fifth (1)**
70:21

**figure (5)**
59:18;107:16;108:15;
110:16;146:2

**figures (4)**
106:21;109:1;110:2;
118:18

**file (1)**
7:17

**filed (6)**
10:21;38:18,19;71:5,6,6

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -   Vol. 1
October 30, 2017

**fill (1)**
140:14
**filled (1)**
188:18
**finalized (1)**
204:12
**find (10)**
49:9;93:19;146:7;185:20,
21;193:5,6;222:21;230:20;
234:1
**finding (1)**
199:13
**fine (2)**
5:16;10:3
**finger (9)**
82:12,18;102:2;148:19;
149:1,5;156:6;157:21;
227:8
**fingers (2)**
148:21;157:18
**finish (2)**
216:18;217:1
**fire (134)**
17:15;18:13;19:5,8,12,
13;20:10,13,18,18;21:1,12,
13,17;22:4,16;50:17,20;
51:2;73:4;79:12;80:6;81:6,
12;82:4;91:2;93:2,4;97:17;
99:6;100:19;101:2,18;
105:8;106:2;107:1,7,7,18,
18,21;108:9,21;109:5;
111:15;115:4;120:14,18,20;
121:1,13,14,15;122:3,5,5,
19,21;123:1,2,14,15;124:3,
6,11,15;125:13,14;126:4,7;
127:7;128:2,3,20;130:11;
131:13;133:17;134:3,6,15;
135:10;137:12;148:5;
149:2,14,18;151:8,11;
154:9,13;155:19;156:2,8;
160:6;168:17;171:7;173:4,
8;174:1;175:8;190:18,19;
191:6,12;197:18;198:21;
199:1;201:2,21;209:16;
213:14,15;214:4;219:2,4;
222:13;224:19;233:9;
239:13;252:17,19,20;255:8,
17;257:15;263:15;265:9;
266:2,3,10,11;267:5,6,10
**firearm (59)**
14:14,16,18,20;50:20;
51:4;63:13;65:6;72:15;
73:15,15;75:15;77:14,16;
79:4;80:8;82:2;90:13;
91:17;104:8;127:8,10;
134:9;139:15;142:2,8,15;
145:8;149:6;151:16;157:4,
5;159:14,15;163:20;
164:14;170:17;171:2;
177:16;182:9;184:17;
186:20;192:21;213:16;
214:7,10;216:20;222:12;
223:7,12,15,16;231:4;

259:20;265:15;267:10;
273:8,9,12
**firearms (144)**
14:3,7,10,11,13;15:2,4;
37:9;43:11,21;44:3,8,20;
45:3;46:11;48:9,13,15,19;
49:1;50:4,5;61:5;64:17;
73:12,13;75:7,11;77:19;
78:14;79:15;80:20;81:5;
82:8;83:5,6,9,14;84:4,5,20;
90:7;114:5;116:8;124:7,18,
19,20;126:5,8;128:12;
129:16;135:6;141:13,14,16;
150:21;151:14;153:13,20;
158:13,14;159:1,3,8,10;
160:21;161:6,17;163:9,10;
166:13;167:12,18,20;170:2;
174:20;177:6,12;179:7,15,
19;185:7;186:5,11;189:21;
190:6;193:12,18,19;194:10,
15,18;195:1,2,6,16,18,20;
196:3;197:7;198:8;200:6,9;
201:5;204:20;205:9;207:2,
11,14;208:6;211:3;218:6;
222:1,3,16;224:3;225:3,9,
18,18;226:6;229:3;239:6,8,
9,12;244:17,19;248:4,5,6;
249:9,21;251:7,9;257:8;
258:20,21;260:20;269:12,
16,19;270:13
**firearm-to-firearm (1)**
74:3
**fired (46)**
17:10,11,12,18;18:2;
19:13,20;20:4;22:12;30:12,
17;31:8;32:12,15;78:21;
79:4,13,16;80:8;81:19;
84:16;100:7;101:5,8;102:5;
110:13;119:7;133:12;
134:16;142:21;143:2,12,16;
148:20;160:4;172:20;
174:2;176:17;210:15;
212:8;213:12;218:1,20;
219:10;229:21;231:1
**fires (3)**
19:15;121:2;192:16
**firing (18)**
19:18;111:16;120:17;
142:3,10,13,14,18,20;
149:14;155:4,6;173:2,11;
184:9;192:13;214:8;215:9
**firm (5)**
11:8,10;16:7;54:10,16
**first (26)**
4:4;9:11;42:12;51:8,14;
73:9;91:8,10;92:6,8;
104:11;109:15;128:6;
130:17;131:15;136:2,7,13;
137:4;138:8;148:20;153:2;
161:4;169:11;220:9;250:20
**fist (1)**
234:20
**fit (10)**

97:9;118:6;132:20;157:3,
4;205:2;235:3,10,15,18
**fits (2)**
240:4;272:1
**fitted (1)**
197:10
**five (6)**
15:20;82:16;146:12;
147:4;184:9,14
**fling (1)**
198:19
**flint (3)**
175:6;192:8,9
**flintlock (19)**
174:10;175:2,3,5,10,17;
176:2,5,17;178:4,8,20;
179:12;183:5,11;192:5;
194:12;196:11;198:4
**flintlocks (4)**
186:13;197:13;240:6,11
**flip (3)**
213:3;214:9,13
**flipped (1)**
99:20
**floor (1)**
113:10
**Florida (1)**
232:11
**fly (1)**
26:3
**FN (1)**
136:10
**focus (4)**
45:13;142:2;239:11;
269:20
**focusing (1)**
270:12
**fodder (1)**
157:12
**folder (1)**
8:14
**folks (4)**
27:7;154:1;221:8;222:2
**followed (1)**
105:3
**following (2)**
122:11;212:15
**follows (1)**
4:6
**football (1)**
198:17
**foregoing (1)**
277:4
**forget (1)**
54:10
**form (7)**
91:21;94:18;174:21;
190:9;192:17;194:11;
202:19
**formal (2)**
141:3,7
**forms (1)**
93:10

**formula (1)**
234:4
**forth (2)**
21:19;118:15
**forum (1)**
62:9
**forward (3)**
146:11;149:1;250:12
**Foundation (3)**
44:12;225:10,12
**founder (1)**
186:19
**founders (2)**
185:6;186:4
**Founding (2)**
189:10;196:4
**four (13)**
15:20;104:2,6,7,10;
106:6;191:3,8,12;203:18,
20;204:2;228:4
**frame (1)**
191:13
**Franklin (1)**
187:1
**freestyle (1)**
149:9
**French (6)**
136:14;196:13,20;198:3,
4,12
**Friedman (4)**
45:21;46:14;47:8;275:12
**front (4)**
68:21;71:2;177:17,20
**full (10)**
27:5;36:18;97:13;108:14;
168:13;180:16;222:13;
223:3;224:12,21
**full-auto (12)**
73:7;77:8;98:3;117:7;
148:5;199:10;200:10;
204:7;219:2,3;231:4;232:8
**full-automatic (14)**
19:16;21:1,13;83:6,14;
84:4;130:11;131:21;132:1;
218:4;252:21;266:2,10;
268:4
**fully (3)**
73:2;75:17;148:8
**fully-automatic (6)**
72:16;78:16;79:8;115:4;
149:17;199:20
**fumble (1)**
146:16
**function (27)**
19:19;75:7,10;82:1;
92:16;104:9;131:21;148:9;
149:7;154:8;155:14;171:3;
211:5,9;212:11,19;213:11,
21;214:1,3,12,15;216:21;
219:1;258:2,4,21
**functional (4)**
212:17;213:19;214:5;
216:18

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 833 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

**functionally (9)**
210:5,12,14;211:10,12;
212:10;213:7,8;217:4
**functions (7)**
154:7;199:20;212:8;
213:10,17;214:8,10
**further (11)**
84:18;85:7;86:20;87:8,
10,11;88:9,11;195:8;215:5;
276:3
**future (1)**
243:9
**fuzzy (2)**
169:4;230:15

## G

**Galil (1)**
135:21
**game (1)**
219:20
**Gary (1)**
4:8
**gas (1)**
247:10
**Gatling (1)**
155:15
**gauge (1)**
199:3
**gave (8)**
54:21;57:13;58:17;109:3;
184:3;193:17;214:2,4
**general (33)**
24:10;27:17;28:9;35:5;
37:5;46:4;48:15;75:4,7,10;
87:2;92:15;98:9;109:2,9;
111:16;118:12;142:1;
154:7,9,12;179:14;191:6;
192:18;193:17;204:10;
212:7;218:5;245:16;
247:19;251:7;260:21;
261:12
**generalization (1)**
191:10
**generally (55)**
5:21;6:17;19:17;29:8,9,
11,12;35:8;37:14;57:12;
66:3;76:8;84:19;87:6,17;
89:21;93:18;94:1;98:6,9;
100:5,18,20;115:12;130:18;
133:4;136:6;137:20;
138:15;141:19;143:14;
147:20;148:11;154:1;
163:21;170:14;175:5;
177:1,5,11;209:19,21;
213:13;222:2;229:9;243:5;
247:21;250:21;251:5;
252:20;255:10;261:15;
265:11;273:3,12
**generate (1)**
124:15
**gentleman (1)**
54:13

**German (2)**
203:17;204:6
**gets (2)**
98:7;181:20
**gist (1)**
79:4
**given (8)**
49:12;111:18;151:13;
163:21;168:5;223:15;
259:5;277:5
**giving (2)**
44:20;237:2
**glad (4)**
178:18;242:2;267:1,12
**glance (1)**
130:17
**glut (2)**
243:7,12
**goal (7)**
100:20;161:6;163:9;
169:14;263:7,11,14
**goals (6)**
40:18;41:5,11;161:11,13;
167:18
**goes (1)**
271:3
**Good (14)**
4:8;9:2;26:4;39:16;
64:21;65:3;158:5;178:18;
191:9;245:4;248:6;257:17;
258:12;274:2
**Gosh (6)**
75:6;91:6;143:6;182:13;
205:9;274:8
**governing (1)**
37:13
**government (5)**
24:12;91:13;184:7;
200:13;201:5
**grammatical (1)**
265:10
**grasp (1)**
248:6
**Grease (1)**
143:6
**great (10)**
24:13;44:10;80:20;91:7;
99:11;141:3;151:13;179:3;
221:21;249:4
**greater (3)**
84:21;122:19;132:9
**greatly (1)**
73:14
**grips (1)**
213:1
**grooves (1)**
198:15
**ground (2)**
6:4;146:5
**group (13)**
35:3;61:5,5;74:15;
141:12,18;226:8,15,15;
235:13,14,19,21

**groupings (1)**
74:1
**groups (5)**
197:6;220:16;221:4,6,7
**grown (1)**
129:16
**guard (3)**
148:17;155:17;157:3
**guess (11)**
59:19;65:4;107:15;
110:15;111:12;139:1,9,9;
259:10,21;271:18
**guessing (2)**
129:14;259:10
**gun (207)**
15:10;18:2,6,16,21;19:7,
8,13,18;20:4,7,13,18;21:11,
19;24:16;25:10;26:14,16;
30:7,10;37:20;50:10,12;
59:9;60:12;63:7,11;64:15;
76:5,6;77:7;78:1;79:12,18;
80:2,7,11,14;81:4;85:10;
89:1;90:9,14,18;94:19;
96:13;97:10;99:6;101:18;
111:8;112:6;116:4;117:17;
126:12;127:5;130:21;
131:18,18;132:4;133:2,8,
13,17,20;135:2,11,15,20;
136:11,13,15,19;137:3;
138:9,12,13,16;142:2,3,5,
10,13,14,18,20;143:2,6,7,
10,11;144:15,17;146:2;
147:11;148:20,21;149:9,11;
150:3;155:4;159:5;161:14;
165:10;166:4;168:11;
170:8,13;171:7,11,12,16,
19;172:13,18,20;173:2,4,5,
7,11,14,20;174:2;175:7,8,8;
176:7,13,17,18;177:3,4;
180:4,8,10,10,12,13,16,17;
181:4,6,11;182:11,20;
184:1,8,18;187:16;189:18;
190:10;192:10,14,19;196:7;
197:3,9,10,17;199:20;
200:11,11;204:8;209:16;
218:1;219:1,2,4,9;220:9;
222:4;224:10;229:10,21;
230:9,14;231:1,18;232:8;
233:5;234:16;238:8;243:6;
246:4,16;247:8;248:8,8,15,
20;249:3;252:3,8;257:10,
15;258:12;259:6;261:15;
267:10,16,18;268:8,12,13;
270:1;271:7
**guns (140)**
15:13,16;16:1,20;17:5,
18;18:7,9,13,19;19:3;21:4,
14;22:1,4,9;24:19;26:20;
31:14;42:19;48:7;49:4,8,10,
15,17,20;51:6,8;53:6;63:16,
18,20;64:2,4,5;74:9,10;
75:16;79:13,20;80:11,
83:18;84:8;89:5;92:14;

97:21;98:1;114:6,10,18,20;
118:10,21;119:3;127:12,14;
128:1,1,19;130:7;132:7,11;
133:3;134:4;141:17,20,21;
143:8,16;146:1;148:5;
151:1;152:2,5;155:15;
156:14,18;157:11;160:17;
164:17;166:6,11,13;167:1,
2;168:1,6,16;170:19;
175:11;178:16;182:17;
184:7;185:12;187:19;
188:4,14;189:10,14;191:6;
197:2,4;198:21;205:2;
206:14;207:8;208:11,17;
220:14;223:10;226:12,16,
21;227:10,17;228:12,20;
231:10;233:9;234:13,18;
237:8;238:5,18;241:20;
243:7;244:1,11;245:5,11;
246:11,14;248:2;252:17;
253:16;258:4;269:10;
271:14
**gun's (2)**
234:4;258:2
**gunsmith (1)**
98:17
**gunsmithing (1)**
235:1
**guy (7)**
54:14;191:1;257:16,17;
258:12,13;259:4
**guys (3)**
144:17,20;223:10

## H

**half (1)**
9:16
**halfway (1)**
227:10
**hammer (2)**
192:14,14
**hand (6)**
7:18;146:20;175:1;
180:18;194:11;197:9
**handed (2)**
57:2;58:10
**handgun (12)**
84:12;86:11;87:18;89:6;
219:13;221:17,18,21;
223:19,21;224:4,6
**handguns (9)**
84:15,21;85:1,4;114:14,
16;230:17;244:12,13
**handheld (1)**
87:4
**handicapped (1)**
149:18
**handle (3)**
75:12,21;181:16
**handling (2)**
142:2;145:8
**hands (4)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 834 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

159:17;161:20;163:18,19
**happen (4)**
69:8;112:13;231:9;257:7
**happened (4)**
42:2;259:9,20;265:6
**happening (1)**
275:19
**happens (2)**
153:20;257:7
**happy (1)**
261:5
**hard (3)**
130:17;189:17;222:20
**harder (4)**
79:12;199:3;220:7;242:2
**haul (1)**
8:11
**head (5)**
36:5;38:3;179:6;193:4;
231:20
**heading (4)**
42:8;106:7;109:13;
233:17
**hear (1)**
151:4
**heard (7)**
114:6;151:6,17;154:6;
158:4;231:3;275:19
**heavily (2)**
37:16;200:12
**held (5)**
19:21;22:7;110:13;
256:19;257:4
**Heller (1)**
38:20
**help (2)**
30:10;64:8
**helpful (1)**
165:19
**helping (1)**
226:16
**helps (1)**
137:12
**hereby (1)**
277:3
**Hi (1)**
29:11
**hierarchy (1)**
176:1
**high (6)**
121:3;147:8;190:18,19;
230:12;239:8
**high-capacity (1)**
44:3
**higher (3)**
34:16;155:19;156:3
**Highland (4)**
5:14;11:16,19;46:1
**highly (3)**
88:10,10;168:7
**highly-trained (1)**
86:15
**high-powered (1)**

94:21
**highway (1)**
23:10
**historic (4)**
203:4,10;204:17;253:13
**historical (9)**
15:13;205:7,8,12,14;
250:15;251:6;255:20;
256:14
**Historically (3)**
202:1;203:15;208:7
**history (17)**
14:4,8;137:17;161:3;
167:17;179:6;203:5;
204:11;205:10;238:8;
239:6,8,9;241:20;242:7;
248:6;251:9
**hit (15)**
50:15;81:14;86:4;87:4,8;
88:11;100:15;101:1;
114:15;121:4;123:3,3;
159:10;163:13;258:5
**Hitler (3)**
204:5,8,14
**hits (1)**
85:12
**hitting (3)**
50:15;82:4;160:7
**Hogan (1)**
43:15
**hold (1)**
19:17
**holding (1)**
149:9
**holds (3)**
20:7;241:21;242:6
**hollow (1)**
192:12
**home (5)**
4:14,18;275:9,13,17
**honestly (1)**
41:17
**hope (1)**
225:7
**hostages (2)**
256:19;257:4
**hotel (1)**
113:11
**human (6)**
86:7,8;100:16;164:18,21;
169:20
**humans (1)**
170:4
**hundred (1)**
88:7
**hunting (2)**
164:12;222:1
**hurt (1)**
165:6
**hysteria-induced (2)**
62:19;63:3
**hysterical (1)**
63:1

## I

**idea (2)**
140:2;148:18
**identical (12)**
95:15;98:11;115:14;
210:5,12,16;211:11,13;
213:9;217:4;238:18;239:20
**identification (9)**
7:5;9:5;56:20;58:8;70:6;
102:12;119:14;236:5,20
**identified (1)**
252:2
**identify (1)**
247:7
**identifying (2)**
242:17;254:14
**ignite (3)**
175:7,12;192:10
**ignites (1)**
192:21
**ignition (7)**
174:14,21;175:7;176:8;
177:21;192:8;194:11
**ignore (5)**
67:3,16;68:3,10;267:3
**II (5)**
21:11;128:8;162:8;
203:18;205:1
**illegal (1)**
154:20
**Illinois (4)**
11:16;45:15,21;46:14
**illustrated (1)**
180:15
**immediate (1)**
227:8
**impact (1)**
221:21
**impingement (1)**
247:10
**imply (1)**
243:21
**importance (2)**
31:14;265:20
**important (16)**
6:10;88:21;89:2;120:17;
121:19;163:4;199:10,19;
200:21;201:4;203:8;
204:19;210:18;211:1,2;
266:17
**impression (17)**
76:19,21;137:2;139:4;
150:2,15,19;151:2,15;
154:9,12;155:1,3;156:7;
185:15,17;200:8
**improve (5)**
167:19;212:3,12;213:13;
214:10
**improved (6)**
49:11;111:21;210:11;
211:5;213:1,7

**improvement (7)**
211:8,14;213:19;214:6;
258:19,20,21
**improvements (18)**
90:2,15,16;179:14;207:2,
11,17;208:10;209:15;210:4,
18;211:11,17,19;212:3,12,
17;217:4
**improves (2)**
208:21;214:13
**improving (1)**
212:13
**inappropriate (1)**
90:6
**incentive (1)**
223:14
**incident (6)**
76:10;77:2,3;113:3,17;
148:1
**incidents (4)**
77:21;78:6,13;276:1
**include (14)**
19:7;26:11;39:17;68:3,9;
116:17;142:17,20;193:10,
12;207:7;216:15;217:13;
259:18
**included (1)**
183:2
**includes (8)**
67:15;202:7;203:2;
208:10;209:4;251:12;
266:15;274:6
**including (19)**
7:17;15:6,8;25:6;26:12;
50:21;64:3;93:4;141:17;
142:10,13,14;213:11;
220:16;221:17;229:4;
246:18;253:5,19
**income (1)**
33:1
**inconsistent (2)**
31:7;32:11
**incorporate (2)**
210:4;216:12
**incorporated (1)**
207:13
**increase (1)**
154:16
**increases (1)**
123:4
**incrementalism (1)**
65:14
**in-depth (1)**
227:8
**Indian (2)**
198:5,12
**Indians (1)**
198:3
**indicate (4)**
179:7;233:13,14;264:16
**indifferent (1)**
116:15
**indiscriminantly (6)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 835 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

50:18,21;79:1,5;81:19;
82:5
**indiscriminate (1)**
81:6
**indiscriminately (5)**
172:21;173:3,4;174:1,2
**individual (12)**
50:7;73:21;102:5;111:13,
17;133:12;141:12;162:6;
170:18;197:5;201:6;220:20
**individually (3)**
155:20;184:21;197:9
**individually-aimed (2)**
50:5,9
**individuals (7)**
141:15;220:16,17;
221:17;227:12;228:21;
229:4
**individual's (1)**
222:5
**indoor (4)**
272:16;273:4,10,13
**inexperienced (1)**
145:11
**inform (1)**
66:21
**informally (1)**
141:7
**information (17)**
61:6;107:4;150:9;185:21;
186:3;217:18;239:18;
244:17;245:4,9;248:9,14,
21;249:4,21;250:12,15
**informed (1)**
259:11
**inherently (1)**
125:13
**initial (3)**
151:14;152:8,11
**initially (2)**
193:7;229:12
**injection (1)**
97:7
**injure (2)**
160:14;168:17
**injured (5)**
113:21;159:1,3;165:3;
228:5
**injuries (1)**
159:7
**injuring (4)**
161:16;166:5,12;167:2
**injury (1)**
159:19
**input (2)**
38:9,14
**insert (1)**
146:8
**inside (2)**
48:12;98:13
**insight (1)**
264:7
**instance (1)**

185:19
**instances (2)**
209:20;275:19
**instead (3)**
192:8,9;213:3
**instruct (2)**
141:19,20
**instruction (1)**
142:1
**insurance (1)**
40:7
**integral (1)**
180:12
**intend (1)**
50:15
**intended (10)**
41:15;43:20;46:6;100:16;
159:14;166:14;198:14;
200:14;238:7;258:21
**intending (3)**
64:14;172:11;213:15
**intends (1)**
259:13
**intensively (1)**
147:13
**intent (8)**
64:21;65:2,3;137:10;
260:6;262:1,7;268:12
**intention (13)**
40:17;41:4,6,10,17,20;
120:6;156:10;159:15;
165:6;172:5;262:17;264:5
**intentionally (1)**
121:2
**intentions (1)**
172:6
**interchangeability (5)**
73:11,14;97:14,15;234:3
**interchangeable (22)**
74:1,2,8,10,18;75:17;
93:18;94:1;114:21;115:3,5,
7;116:2;117:6,16;135:14;
197:7;234:5,13,19;235:16;
251:14
**interchangeably (2)**
93:21;94:2
**interchanged (2)**
75:1,19
**Interdynamic (1)**
138:3
**interest (2)**
226:12;270:17
**interested (8)**
82:4;154:1;169:20;
170:12;178:1;199:14;
216:9;226:15
**interesting (1)**
178:17
**interior (1)**
244:18
**intermediate (3)**
204:7;214:18;252:13
**internal (2)**

97:12;180:4
**Internet (5)**
26:11;153:9;157:7;223:1;
249:17
**interviewed (1)**
61:2
**into (33)**
16:15;21:4;38:9;48:9;
52:9;56:9;81:4;97:10;
98:12;121:3;125:4;126:13;
148:17;153:15;176:18;
177:10;178:10;180:6,8,9,
13;181:2,8;192:11;201:20;
207:13;212:10;213:3;
226:3;260:7;264:7;271:1,3
**Intratec (1)**
137:18
**intrinsically (1)**
79:10
**introduced (8)**
73:1;104:21;155:15;
161:4;182:15;195:21;
274:9,15
**Introduction (2)**
238:6;245:8
**inventor (1)**
184:5
**investigation (1)**
264:6
**involve (1)**
164:2
**involved (10)**
24:11;30:2,21;38:1,4,20;
41:8;65:2;249:14;250:17
**iron (1)**
159:20
**Israeli (2)**
135:17;136:2
**issue (20)**
5:10;13:12;35:16;38:17;
42:19;47:1,15;48:11,15,19;
49:1;64:18,19;65:21;84:2;
97:16;130:3;145:7;199:17;
207:8
**issued (3)**
127:7;255:12,21
**issues (10)**
26:14,16,20;35:6,11,15,
21;39:20;43:16;239:12
**Italian (2)**
21:11;136:7
**item (2)**
243:18;244:6

**J**

**January (1)**
57:11
**Jay (2)**
54:9,15
**Jeep (1)**
143:13
**JIM (5)**

4:3;60:19;61:9;238:6;
277:12
**JM (2)**
44:12,15
**job (4)**
31:15,18;32:1,6
**Joe (2)**
27:13;55:3
**John (4)**
7:14;54:9,11,11
**Josh (1)**
28:7
**justified (1)**
14:15

**K**

**Kansas (1)**
23:2
**keep (8)**
31:15,21;32:6;80:21;
89:10;198:14;205:5;272:6
**keeping (1)**
270:17
**keeps (1)**
19:18
**key (1)**
201:19
**keyword (1)**
239:5
**kids' (1)**
192:19
**kill (6)**
160:13;165:6;168:17;
267:17;268:4,11
**killed (7)**
113:16;158:21;159:3;
165:3;228:5;231:16;232:13
**killing (5)**
161:15;164:2;166:4,12;
167:1
**kind (15)**
23:8,21;25:4;39:3,8;40:4,
12,13;138:16;142:5,6;
150:16;179:7;225:15;
232:16
**kinds (1)**
29:19
**KLEIN (178)**
4:7,9;7:6;9:6;13:6;30:16;
31:2,12,20;32:4,9,17;34:11;
35:9,14;38:8,13;39:6;
40:21;41:1;43:3,8,13;44:5;
46:12;51:1;53:3,14;57:1;
58:9;64:12;66:10,19;67:14;
68:1,8,18,20;69:17;70:2,7;
71:12;79:6;81:11;82:9;
102:13;105:17;106:19;
107:5;115:16;119:10,15;
121:11;122:1,9;123:11,19;
124:8;125:6;126:6;127:2;
129:18;150:18;158:8,20;
159:16;160:3;161:5,12;

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 836 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

162:11,16;163:2,11;164:6,
15;165:1,7,17;166:1,18;
167:6,13;168:10;169:1;
171:15;172:2,12;173:6,12,
18;174:7;177:13;186:8;
187:10;188:2,11,19;189:6;
190:2;194:7;195:14;
196:15;201:7,13,15;202:16,
20;206:8,16,18;207:15;
208:5;209:2;210:1;211:4;
212:5;217:8;220:3;222:8;
224:13;228:2,10,18;229:6;
230:5;233:2,15;234:11;
236:6;237:1;240:1,16,19;
241:1,15;244:7;246:2,9,17;
248:13;249:5;252:1;
253:18;255:13;256:2,16;
257:2,11;259:12;260:1;
261:19;262:5,12,19;263:6,
13,19;264:8,14;267:2,14;
268:1,9,17;269:9,14;270:6,
15;271:4,12;272:4,9;273:2,
11,19;274:13;275:1;276:3

**knew (4)**
54:4;187:4,8;189:2

**knowledge (5)**
98:18;151:1;227:8;
241:19;259:8

**knowledgeable (1)**
248:4

**known (7)**
92:12;113:2;187:12,18;
188:3,12;222:17

**knows (2)**
100:5;103:21

**Kolbe (14)**
5:2;10:5,9,21;11:7,12;
43:14,18;47:16;69:9;71:8;
242:20;252:2;275:3

## L

**labeled (11)**
7:3;9:8;57:2;58:11;70:4;
71:10;102:15;119:12;
169:10;236:3;237:2

**language (1)**
52:10

**LaPierre (4)**
28:20;29:7,16,17

**LaPierre's (1)**
28:21

**large (6)**
92:14;120:19;122:3;
183:15;223:11;224:4

**large-capacity (7)**
42:19;43:21;44:4;48:4;
62:15;116:18,19

**larger (2)**
117:10;166:12

**Las (8)**
112:14;148:1;151:2;
160:11;168:11;233:8,9;

263:15

**last (6)**
7:13;66:5;104:18;109:3;
142:11;227:1

**later (2)**
60:3;254:7

**latter (1)**
90:18

**law (30)**
10:14,16;12:5;13:15,19;
23:1,2;24:11,13;25:11;
49:21;83:2,4,8;84:9;90:1,3,
5,8;155:3;200:5,8;202:12,
13;220:14;234:17;256:3;
265:16;266:7;267:4

**lawful (1)**
227:12

**laws (6)**
53:8;62:19;63:1,4;64:20;
202:4

**law's (1)**
200:2

**lawyer (5)**
22:19;23:5;24:17;25:1;
54:15

**lawyers (3)**
4:9;11:6;71:6

**lead (4)**
180:11;181:1;182:10;
244:5

**learn (3)**
16:19;88:6;222:2

**least (6)**
21:7;84:1;114:10;134:11;
143:14;262:17

**left (3)**
180:16;233:18,21

**legal (25)**
14:15;24:7,9,11;25:4,6,9;
26:16,20;35:6;38:4,9;39:2,
7,15,18;40:1,4,6,17,20;
41:3;83:15;152:17;201:8

**legislative (2)**
153:12;250:17

**legitimate (5)**
63:14;152:10;157:12;
163:20;166:16

**legitimately (2)**
168:14;201:6

**length (7)**
118:14,20;119:2;133:14;
180:16;267:9;273:7

**less (20)**
78:13;82:16;84:12;95:9,
21;96:1;117:19;118:2,6;
125:13;145:10;162:9,9;
175:15;222:11;223:7,18;
265:13;267:16;268:3

**lethal (5)**
161:7,19;162:3,4,9

**letter (2)**
220:13;222:9

**level (2)**

95:7;159:11

**levels (1)**
34:16

**license (1)**
19:1

**life (2)**
34:17;35:3

**lifetime (1)**
34:21

**light (1)**
16:5

**likely (19)**
85:15;86:3;121:14;159:6,
18;163:13;165:2;189:4;
208:11;222:11;223:7;
226:15;243:12;245:17,19,
20,21;267:17;268:4

**limit (1)**
166:3

**limitation (3)**
79:15;101:13;170:19

**limitations (2)**
81:5;101:12

**limited (13)**
7:17;19:20;20:21;97:16;
134:4;179:1,9,12;183:7,14;
190:4,5;224:9

**limiting (1)**
80:7

**line (17)**
172:5;243:4;244:15;
251:12;253:21;254:1;
257:14;260:4;261:8;
264:18,18;265:1,3,9;
268:18;272:12;275:6

**linen (1)**
177:9

**lines (2)**
225:11;243:10

**links (1)**
29:21

**list (5)**
34:7;42:8;175:17;217:15;
246:19

**listed (3)**
104:2;212:2;217:13

**listen (1)**
151:8

**listing (1)**
247:1

**literally (1)**
89:11

**literature (2)**
7:20;223:1

**litigation (1)**
24:13

**little (19)**
24:12,13;82:21;86:20;
87:1,9,10;130:21;151:5;
155:2,7;158:2;160:11;
169:4;174:6,9;198:12;
243:12;272:5

**live (1)**

89:19

**Living (1)**
59:5

**load (14)**
20:2;23:21;24:1;146:10;
147:1;176:19;180:6;181:1,
3,7;182:4,10;184:21;199:2

**loaded (14)**
146:7;176:18;177:17;
180:2,3,9;181:21,21;182:7;
184:18;190:12,13;192:6,11

**loader (1)**
143:14

**loaders (1)**
145:1

**loading (5)**
181:1,11;190:17,20;
191:2

**loadings (1)**
184:17

**location (3)**
27:18;28:12;29:2

**lock (4)**
174:10;175:1;181:16;
194:12

**logical (1)**
188:16

**long (18)**
22:7;25:19;33:8;95:19;
118:16;130:3;146:16;
148:5;149:3,4,5;204:6,8,21;
205:2;219:16;257:9;261:3

**longer (7)**
33:10;109:7;146:15,20;
147:4,7;178:9

**look (42)**
8:19;58:12;59:17;70:8;
71:13,18;72:9;73:9;92:19,
21;97:21;98:2;105:6;106:1;
109:20;120:7;122:11;
125:10;130:21;131:2,10,12,
20,21;133:3;134:18;146:2;
152:7;180:16;200:19;
203:15,16;205:9;209:20;
214:15;226:3;237:18;
240:5,14;242:2,14;260:13

**looked (5)**
49:2;70:11;107:14;190:3;
238:11

**looking (18)**
9:18;72:8;96:12;118:19;
143:17;210:6;211:7,20;
214:17;216:4,5;217:5,10,
11;223:21;224:3;265:21;
266:18

**looks (8)**
57:5;62:2;111:21;237:20;
249:12;260:19;264:4,9

**Lorenzoni (1)**
182:16

**lost (2)**
211:15;216:16

**lot (13)**

David Seth Worman, et al. vs.
Charles D. Baker, et al.

James Supica - Vol. 1
October 30, 2017

49:12;62:21;79:19;113:2,
18;146:1;179:16;186:10;
223:10,17;248:5;251:13;
259:17
**lots (4)**
164:2;193:11,11,11
**loud (1)**
240:12
**low (2)**
215:19;220:5
**lower (6)**
16:3,3,8,14;97:2;118:16
**LR (1)**
219:14
**lucrative (1)**
272:1
**lunch (3)**
8:20;158:5,9

# M

**M10 (1)**
136:20
**M11 (1)**
136:20
**M12 (1)**
136:20
**M14 (6)**
72:14;73:1,4;95:1;162:7;
274:11
**M16 (55)**
73:3;90:10,19,21;91:5,15,
19;92:1,8,18,20;94:12;96:3,
5,9,13;97:13;98:3,10,14;
99:2,10,17;100:3,7,11;
101:2,5,15,20;102:5,8;
104:21;105:19;110:6;
114:18;116:5;117:2;
118:10;119:6;124:10,16;
125:1,20;126:4,16,19;
130:1;132:10;142:21;
143:18;144:1,5;162:5;
254:4
**M16/M4 (2)**
103:1,15
**M16A1 (2)**
104:18;112:1
**M16A2 (1)**
104:13
**M16A4 (5)**
104:16;105:7,13,16;
112:1
**M3 (1)**
143:6
**M4 (4)**
104:10,10;143:17;144:4
**Maadi (1)**
17:6
**M-a-a-d-i (1)**
17:6
**MAC-10 (1)**
137:3
**machine (29)**

18:2,6,7,13,16,18,21;
19:3,7,8;22:1;49:4,8,10,15,
17,20;50:12;51:6,8;53:6;
77:7;90:14;96:13;143:8,10,
11;155:4;200:11
**magazine (58)**
12:6;20:5,9,14;22:6;
62:15;76:4;82:15;97:8;
108:12,13,15,16;109:4,6;
117:2,10,13,16,18,18,20;
144:15,19;145:5,14,19;
146:3,3,7,20;147:7;149:4;
180:9,10,11,14;181:8,11,
13;182:4;222:10;223:6,11,
16;224:8,20;229:14,15,16,
17;235:3;260:11,17,21;
261:4,10,13
**magazines (28)**
12:6;42:19;43:12,21;
44:4,4;48:4,7;108:20;116:6,
11,13,16,18,20;117:5,5;
118:2,6;135:10,13;180:4;
181:10;182:8;227:11,17;
228:13;239:13
**Magnum (2)**
218:9,10
**major (3)**
26:8;45:9;91:11
**majority (10)**
21:16;33:3;84:15,16;
89:7;116:14;132:10;168:6;
206:4;251:1
**makes (7)**
15:21;17:4;75:9;125:18;
147:9;205:8;224:6
**making (12)**
61:16;114:17;116:4,8;
117:14;118:14;129:2,9;
165:2;202:21;216:11;271:1
**malpractice (1)**
40:6
**manage (2)**
26:8,9
**maneuver (2)**
272:16;273:4
**manipulate (2)**
273:10,13
**manipulated (1)**
180:20
**manner (3)**
149:11;202:14;247:19
**manual (2)**
119:20;120:7
**manuals (3)**
99:14,17;143:17
**manufacture (2)**
117:5;197:2
**manufactured (3)**
115:10;129:15;133:1
**manufacturer (18)**
91:11;114:17;116:3;
117:4;118:1,9;205:21;
245:4;248:7,12;269:3;

270:11,16,19;271:2,6,13,19
**manufacturers (31)**
91:5;115:20;116:7;
117:14;127:11,13,17,18;
129:5,14;206:5,9,13,15;
207:13;208:7;225:19,20;
244:17,19;245:13,17;
246:19;247:15;248:1,5;
253:19;269:13,17,20;
271:18
**manufacturer's (2)**
246:4;247:16
**manufactures (1)**
118:9
**manufacturing (4)**
129:17;212:14;271:1,14
**many (31)**
5:19;15:13,19;17:2,20;
27:4;36:15;63:21;79:13;
80:5;82:7;113:16;114:13,
15;124:20;129:21;130:4;
135:6,6;146:17;150:10;
179:3,4;183:20;190:14;
191:11;208:20;221:6;
232:13;252:19;263:8
**March (2)**
59:21;60:1
**marked (10)**
7:4;9:4;56:19;58:7;70:5;
102:11;119:13;236:4,19;
241:18
**market (18)**
96:6;116:9;118:17;127:9;
138:11;139:2,10;153:21;
224:5;245:12,14;269:21;
270:12;271:7,20,21;272:1;
274:17
**marketed (5)**
208:7,15,16;209:3;
254:20
**marketing (2)**
209:4;254:13
**markets (6)**
269:2,5,18;270:1,2,14
**marking (1)**
60:15
**marksman (1)**
190:21
**Marksmanship (1)**
143:17
**Martin (1)**
69:5
**Maryland (6)**
5:4;10:6,15;47:16;58:18;
267:4
**mass (19)**
15:8;63:21;64:3,4;
169:20;226:18;227:1,15,19;
228:1,14;229:7;230:6;
262:13,21;263:7;267:15,17,
21
**Massachusetts (34)**
10:14;12:5;13:15,19;

25:11;52:9,15,20;53:2,5,11,
18,21;65:20;66:1;76:11,12,
14;77:6,17,19;78:10,11,13;
84:2;90:3,5,7;116:21;200:4,
8;230:7;233:4,7
**matches (1)**
222:5
**matchlock (3)**
174:10;175:1;194:12
**material (7)**
8:12,14,20;70:13;71:5;
169:10;245:16
**materials (4)**
114:19;115:7;116:9;
250:19
**Math (7)**
26:3;52:3;88:15;110:21;
111:2;112:11;190:16
**matter (21)**
7:17,21;12:11,20;14:2;
35:5,17;40:16;42:4;43:14;
45:15;54:8,19;56:10,13;
58:5;69:4;81:2;90:1;153:7;
169:11
**Mauser (1)**
218:11
**maximize (1)**
263:1
**maximum (19)**
105:7;106:2;107:18;
108:9;109:15;110:5,12;
111:4;125:19,21;126:7,18;
260:6,6;262:1,1,8,8;264:1
**may (34)**
13:1;17:7;27:15;45:12;
48:9;53:7;73:21;74:2;
88:10;91:10;95:15;103:4;
129:14,16;131:14;139:21;
143:20;144:13;145:12;
150:3;153:15,19;154:11;
182:6;185:15;187:21;
193:3;194:6;220:15;224:8,
10;229:12;230:17;238:18
**Maybe (10)**
15:20;18:1;73:8;76:1;
132:17;146:12;158:3,3;
191:3;228:20
**mean (33)**
10:17;20:5;21:19;25:15;
29:10;34:21;45:2;49:7;
54:11;55:2;61:12;74:7;
77:1;85:5;86:3;92:21;
96:15;100:12;106:17;
109:17;111:9;116:19;
179:2;184:11;199:16;
211:12,19;219:15;243:16;
250:4,5;251:13;267:10
**meaning (11)**
41:16;42:1;46:6;48:11;
51:2;109:18;111:13;187:4;
203:11;247:9;256:17
**meaningfully (1)**
243:17

**means (21)**
19:12,14,17;46:13;62:3;
106:15;107:16,16;108:8;
110:5,16;111:11;122:4;
166:21;168:9,12;177:15,16;
197:16;239:6;256:15
**meant (2)**
68:15;228:1
**measures (1)**
123:2
**mechanical (4)**
101:11;212:11;213:10;
214:12
**mechanically (1)**
216:21
**mechanism (9)**
74:21;75:1,4,6;181:1,18;
213:16;235:12,18
**media (18)**
26:9,10,12,14;29:21;
30:1;31:13,18;32:10;151:4;
249:15;250:9;251:1,3,4,8;
264:9,16
**meetings (3)**
30:10,11,11
**member (10)**
33:6,8,21;34:13,21;36:7;
37:4,8,12;39:8
**members (3)**
35:2,3,4
**membership (6)**
33:12,14,17;34:6,17,18
**memberships (1)**
33:19
**memoranda (1)**
7:18
**memos (1)**
29:15
**men (3)**
221:1,10,13
**mention (1)**
194:1
**mentioned (8)**
46:20;51:5;78:15,20;
93:9;114:6;142:7;191:15
**mentioning (1)**
124:21
**mentions (1)**
140:21
**messed (1)**
251:15
**metallic (1)**
192:12
**meters (10)**
109:17,18;110:3,8,9,17;
111:19;112:3;123:1,21
**methodology (1)**
226:3
**might (35)**
11:21;14:11;17:8;18:12,
15;31:8,8;32:12;40:10;
49:11;50:6;52:11;92:10;
138:2;147:7,11;150:10;

168:2;169:3;201:5;209:20;
221:17;224:14;229:13;
235:16;251:1,4,7;256:9,18;
257:8;259:4;261:16;270:5;
272:2
**mild (1)**
80:9
**mile (1)**
88:14;112:9;215:2,10
**miles (1)**
111:1
**milestone (1)**
203:16
**militaries (4)**
129:10;130:4;205:4;
255:11
**military (87)**
90:13,21;91:7,9,9,12,18;
92:7;94:7,9,10;95:12;96:7,
12,20;97:6;100:20;111:15;
116:8;117:7;118:15;
121:20;127:7;128:8,9,12,
16;129:9,15;130:10;
133:10;135:7;136:3,14,17,
19,21;137:5,7,16;138:8,11;
139:3,5,17,19;143:3;
144:13;160:19;161:1,15,18;
162:2,5,12;163:5,8,15;
166:15;168:1,7;198:8;
204:6,19,21;207:3,19;
208:8,13,13,17,21;209:5,
12;211:2;220:10;253:7;
254:3;268:21;269:4,18;
270:14;271:7,14;272:15,20;
274:12
**military-oriented (1)**
50:6
**military's (2)**
115:15;161:6
**Mill (1)**
4:17
**millions (1)**
63:13
**mind (3)**
42:3;127:18;264:20
**mindset (1)**
260:8
**minimal (2)**
80:4;169:16
**minimize (1)**
80:12
**minor (2)**
93:19;95:16
**Minute (10)**
106:3,21;107:8;108:3,10,
14;190:14;191:4,8,12
**minutes (2)**
147:1;241:17
**mis-answered (1)**
131:14
**misguided (1)**
65:5
**mis-hear (1)**

131:19
**miss (1)**
220:4
**missed (1)**
220:4
**misspoke (1)**
252:16
**mistaken (1)**
265:7
**misunderstand (1)**
74:8
**mitigate (1)**
80:15
**mode (16)**
19:16;72:16;73:2,5,5,8;
101:3,6,9,21;119:7;124:12;
125:20;126:19;133:18;
134:16
**model (11)**
16:5,6;17:6,9,14,17;
127:16;148:16;197:4;
247:2;254:16
**models (12)**
15:21;17:4;75:9,18,20;
76:2;130:10,16;143:9;
184:17;200:17,18
**moderate (1)**
87:7
**modern (4)**
96:6;120:18;141:14;
255:10
**modes (6)**
20:19,21;21:2,4,15,20
**modified (2)**
98:7;203:9
**modify (4)**
152:2,5;157:11;272:5
**modifying (1)**
271:20
**moment (2)**
28:11;201:13
**money (2)**
37:7;270:7,12
**month (2)**
9:16;60:2
**moral (2)**
258:20
**morally (1)**
258:6
**more (131)**
10:13,14;12:7;20:2;33:4;
50:6,6;52:4,16;62:19;63:3;
67:20;79:8;81:4;84:12;
87:10,17;88:14,17,18,20,
21;106:1;110:18;111:14,
15;115:21;116:12;117:1;
120:2;121:14;122:4;
123:13;132:21;140:19;
143:15;144:8;147:9;
153:18;155:4;156:5;
158:15,21;159:2,5,6,8,18;
160:7,14,17;161:7,18,19;
162:3,12,18,19;163:3,12,13,

16,17;165:2,10,12;166:4,5,
5,7,11,11;167:1,2;168:1,2,6,
17;170:19;173:7;174:2,3,6;
175:15;177:10;178:17;
179:19;189:4;190:7;195:4;
198:7,12,18;206:6,13;
208:11,17;210:5,12;211:20;
213:4,18;214:5;215:1,9,17;
216:2;218:13;222:11,12;
223:2,7,14,21;224:11;
226:12,16;228:4;239:11;
248:1;251:5;256:13;259:5;
265:13;267:11;268:11;
269:10,20;270:7,12;272:14
**morning (1)**
4:8
**Most (60)**
63:18;64:20;74:20;75:3,
7;79:14;80:13,13;83:7,9;
84:19;87:8;88:4,5;89:5;
93:9,13,21;98:10;107:9;
108:4;115:13,20;116:7,11;
117:4,13;120:17,19;122:2;
128:4;131:4;132:9;143:15;
145:4;150:17;160:5;
174:20;176:8,13;177:2,18;
190:9;192:1;193:18;
194:10,15,18;196:12,21;
205:3;208:20;216:21;
222:2;227:18;244:5,18;
245:12;269:16;273:6
**mostly (1)**
137:3
**motivated (1)**
88:10
**mounted (4)**
143:12;181:11,15;273:8
**move (5)**
75:12;82:18;174:8;
180:18;234:15
**moved (1)**
205:1
**movement (1)**
65:15
**moves (1)**
80:2
**movie (1)**
229:8
**moving (2)**
120:18,21
**much (28)**
17:21;34:2;77:8;78:13;
84:21;85:7;87:17;88:1;
95:9,9;96:10;98:17;114:4;
121:20;135:14;144:16;
145:3;147:21;179:19;
197:5;198:6;207:14;248:1;
251:14;264:5;266:3;269:2,
4
**multiple (9)**
120:21;139:16;155:17;
160:4,6,7;169:15;185:6;
186:5

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 839 of 1262

David Seth Worman, et al.  vs.                    James Supica -  Vol. 1
Charles D. Baker, et al.                          October 30, 2017

**multiple-barrel (2)**
186:11;190:6
**multiple-shot (2)**
186:19;189:21
**museum (18)**
18:5;26:8;27:21;29:12;
40:15;44:8,15,16,18,19;
182:21;249:9;250:5,5,10,
16,20;251:6
**Museums (6)**
4:16;25:14;26:8,21;27:8;
250:8
**museum's (4)**
26:9,14;238:13,16
**musket (4)**
159:20;160:9,15;196:11
**muskets (1)**
160:5
**must (1)**
122:8
**muzzle (24)**
81:1;100:6;102:4;118:11,
12,16,21;119:4;133:11;
145:11,12;180:2;181:4,8;
184:18;185:1;190:13;
197:17;213:3;214:9,13;
217:17,21;219:8
**muzzleloader (4)**
177:12,15,16;184:20
**muzzleloaders (1)**
141:14
**muzzleloading (4)**
192:2;197:13;198:4,9

**N**

**N/A (2)**
105:10,11
**name (7)**
4:8;16:7;91:15;92:4;
115:21;244:21;254:16
**named (3)**
91:17;139:12;237:8
**names (4)**
91:4;99:3,4;127:13
**National (3)**
225:10,12;249:9
**Nationale (1)**
136:10
**NATO (8)**
88:5;93:15;94:13,15,20;
95:4,8,11
**nature (1)**
228:4
**Nazis' (1)**
236:7
**near (2)**
42:7;122:11
**nearly (2)**
89:2;126:5
**necessarily (8)**
20:20;35:20;67:8;79:10;
140:20;160:2;163:1;170:21

**necessary (4)**
34:10;99:6;259:19;277:6
**need (7)**
6:15;8:21;9:15;89:17;
221:14;240:12;259:6
**needed (1)**
277:17
**needs (4)**
9:20;128:16;132:20;
159:11
**neglected (4)**
144:4;193:21;195:7,12
**nervous (1)**
147:6
**neutral (1)**
258:6
**new (3)**
146:10;208:7;212:9
**news (1)**
114:9;151:6
**newsletter (2)**
29:18,20
**Newtown (1)**
231:13
**next (9)**
45:14;54:13;61:8;66:5;
122:10;181:2;183:5;
249:19;277:18
**nice (1)**
178:16
**Nightclub (1)**
232:11
**Nine (1)**
25:21
**nipple (1)**
192:12
**Non-aimed (1)**
81:12
**nonmilitary (1)**
161:1
**nonspecific (1)**
184:6
**Nope (1)**
221:15
**Norinco (1)**
127:18
**normally (1)**
149:15
**North (1)**
129:19
**note (1)**
122:11
**noted (1)**
10:4
**notes (1)**
7:18
**Notice (7)**
7:14;8:5;9:18;46:19;
49:2;55:12;126:14
**novelty (1)**
150:16
**NRA (68)**
4:16;18:10,11;25:14,15,

17,19;26:8,21;27:7;29:1,18;
30:1,4,8;31:8,15;32:11,18;
33:2,6,8,11,17;35:1;36:3,7;
37:8,14;38:10,18,19;39:3,8,
20;40:2,10,10,15,18;41:5,8;
53:10,16;54:19;55:5,8,17;
56:5,14,17;60:19;61:7,14;
69:12,14,18;141:1,2;
182:20;249:8;250:4,5,8,14,
16;251:4,7
**NRA's (10)**
35:6,10,18;36:2;38:4;
41:11,15,21;55:18;153:4
**NSSF (4)**
225:3,6,15;226:7
**Number (75)**
7:3;9:8;14:6;15:4;19:20;
32:14;37:16;52:7;53:2,4,8;
57:3;58:11;59:5;60:9,11;
63:14;64:1,2,4,16,18;70:4;
71:19,21;72:6;73:10;75:14,
17,20;85:1;91:7;92:14;
98:8;102:15;107:14;
113:18;119:12,17;120:2,3;
122:14;124:6,18;127:16;
134:10;140:7,10;141:16;
150:7;161:10;163:8;
164:10;166:12;169:3,11;
170:2;176:2,3;179:5;
183:15,19;194:17;195:19;
205:10;207:2;218:3;229:3;
233:17;237:3;241:18;
242:19;249:14;270:20;
271:1
**numbers (4)**
104:20;134:17;169:4;
183:12

**O**

**oath (3)**
6:19;57:18;158:11
**Object (1)**
202:19
**Objection (150)**
12:21;30:14,19;31:9,16;
32:2,7,13;35:7,12;38:7,11;
39:4;40:19;42:21;43:6;
44:1;46:8;50:19;52:21;
53:13;56:15;64:9;67:13,18;
68:4,11;69:13,20;71:9;
79:2;81:9;82:6;92:5;
105:14;106:16;107:2;
115:11;121:9,16;122:6;
123:8,16;124:4;125:3;
126:2,21;129:12;150:14;
158:17;159:9,21;160:20;
161:9;162:1,14,21;163:6;
164:5,8,19;165:4,14;166:8;
167:4,10;168:4,19;171:8,
18;172:9;173:1,9,15;174:4;
176:21;186:7;187:7,20;
188:9,15;189:3,19;194:4;

195:11;196:9;201:3,10;
202:10;206:2;207:10;
208:3,18;209:18;210:20;
212:1;217:7;220:1;221:19;
224:1;227:20;228:7,15;
229:1;230:2;232:21;
233:11;234:9;239:19;
243:20;245:18;246:6,12;
248:10;249:1;251:19;
253:17;255:9,18;256:11,20;
257:5;259:7,15;261:17;
262:3,9,15;263:3,10,16;
264:3,11;266:13;267:7,19;
268:6,14;269:6,11;270:4,9,
18;271:9,16;272:7,18;
273:5,14;274:7
**observation (3)**
222:15,20;223:9
**obtain (1)**
168:11
**obtaining (1)**
168:9
**obviously (1)**
187:15
**occasion (1)**
259:9
**occasionally (1)**
28:5
**occasions (2)**
5:6,8
**occurred (1)**
196:4
**occurring (2)**
181:4,5
**occurs (1)**
177:21
**off (20)**
36:5;38:3;80:2,9,14;
140:19;146:5;148:21;
154:11,17;163:3,7,12;
179:5;182:4;190:16;193:4;
201:13,14;231:20
**offensive (1)**
15:2
**offer (3)**
45:14,20;273:1
**offered (12)**
4:11;5:18;12:2;39:18;
44:14;47:21;48:3,6;92:7,8;
211:8;218:12
**offering (2)**
38:15;190:7
**office (2)**
65:10;146:21
**officer (1)**
40:2
**officers (2)**
83:3;275:11
**offices (1)**
27:21
**officials (1)**
65:7
**often (9)**

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

**150:**12,16;156:5;179:18;
208:16;209:4;247:16;
257:6;270:13
**Oklahoma (1)**
44:13
**Old (1)**
59:13
**older (3)**
211:6,13;213:7
**old-fashioned (13)**
210:6,13;211:7,20;
214:16;215:6;216:2,4,5,10;
217:5,9,11
**O'Malley (7)**
47:11;57:6;60:17;69:5,9;
71:8;242:20
**Once (5)**
78:12;98:12;101:10;
107:3;117:12
**one (93)**
4:9;5:15;17:6;19:14,15;
20:10;21:7,10,12,12;22:14,
14;32:16;48:12;50:10;52:2,
6;59:18;62:18;63:3;67:20;
69:21;71:13;72:8,13;75:19;
78:20;79:20;80:1,5,7;84:7;
91:1,8;93:12;106:9,9,10,10;
108:13,16;110:13;119:17;
130:14;132:18;142:11;
143:5;145:15;153:9;154:2,
13;155:4;161:2,10,13;
167:17;170:7;171:6;172:5;
176:2,3;179:13;180:4,4,21;
182:2,2;183:17;186:2;
190:18;197:10;199:6;
200:11;202:3,8,18;204:8;
207:19;212:20;217:17;
219:6,6;223:15;231:15;
234:15;238:5,12,18;257:8;
265:7,16;269:20;270:12
**one-person (1)**
143:15
**ones (5)**
17:13;89:17;91:7,10;
196:12
**one-time (4)**
34:1,2,17,19
**online (2)**
61:5;186:1
**only (24)**
11:17;14:21;22:12;24:5;
27:11;65:4;121:20;126:15;
127:10;133:19;141:7;
142:1;170:18;171:6;178:5;
191:5;194:2;195:18;
200:21;202:17;205:17;
210:3;218:16;253:1
**onto (1)**
75:13
**opened (2)**
182:6;263:15
**openings (1)**
97:5

**operate (1)**
180:18
**operating (3)**
98:12;247:7,9
**operation (5)**
26:7;44:14,16,18;143:15
**Operations (3)**
27:17;28:9;251:7
**operative (1)**
172:15
**operator (2)**
132:1,3
**opinion (40)**
8:10;38:15,18;41:6,15;
44:14;45:14,20;65:12;66:7;
67:5,9;68:6;71:7;72:19;
74:5;78:15,19,21;83:4;
89:13,15;114:15;121:8;
122:8;123:7;152:6,21;
157:10;158:12;169:11;
174:13;183:16;201:8,8,9;
207:2;234:10;250:17;
259:11
**opinions (35)**
5:18;25:4,6,9;26:13,19;
31:7,7;39:10,15,15,18;40:1,
17,20;41:3,5,11,21;42:15;
58:2;60:7;66:16,16,21,21;
67:2,3,7,16;68:3,7,9,13;
114:12
**oppose (1)**
46:7
**opposed (5)**
45:18;46:9;195:3;198:10;
216:7
**optimal (1)**
50:2
**optimum (1)**
110:14
**option (2)**
96:19;128:20
**orally (1)**
62:4
**order (18)**
50:14;184:4;185:11,13;
186:12;187:2,13,14,16;
188:5,6,7,12,17,18;189:8;
197:17;272:6
**ordered (1)**
187:11
**ordinance (1)**
183:17
**organization (5)**
37:15;225:9,15,17;
248:18
**orient (1)**
10:13
**oriented (1)**
10:15
**origin (3)**
203:19;204:17,17
**original (6)**
91:15;92:15;95:6;137:9,

11;237:7
**originally (8)**
133:9;136:19;137:10;
139:5;166:10;182:18;
205:19;237:5
**origins (1)**
135:7
**Orlando (1)**
232:11
**others (7)**
5:20;47:15;85:14;150:4;
158:16;159:4,8
**Otherwise (1)**
93:6
**ourselves (1)**
164:16
**out (32)**
16:9,10,14;29:17;52:7;
59:18,18;65:10;84:17;
87:13,15;88:7,9;96:5;
97:10;99:1;129:16;146:2,6;
160:6;161:18;162:3;
190:14;194:19;197:10;
205:11;210:21;233:18,21;
238:1;240:12;247:14
**outlawed (1)**
63:15
**outlets (2)**
250:9,13
**outside (1)**
250:20
**over (16)**
6:10;21:17;22:16;111:1;
134:17;148:14;160:18;
166:6,13;188:10;205:10;
211:6;213:7;224:12;227:1;
255:16
**overall (5)**
194:14;272:2;273:7,9,12
**overseeing (1)**
141:15
**own (11)**
15:13,16,19;16:20;18:12;
19:3,5;24:2;83:14;248:2;
253:6
**owned (5)**
18:9,15;63:12,13;186:11
**owner (3)**
15:11;171:13;172:3
**ownership (5)**
18:16;24:16;89:17;168:7;
244:6
**owns (1)**
23:14

**P**

**package (1)**
115:20
**packaging (1)**
115:21
**packed (2)**
176:9,12

**Paddock (1)**
151:2;263:15
**page (65)**
7:13;9:11;42:4,7;61:8,9;
70:15,19,21;72:1;102:19;
103:4,7;119:16,17;120:8,
11;122:10,12;125:8;169:6,
7;174:9;178:15;194:8,8;
199:7;206:19;209:10;
211:18;217:14,15;220:11;
225:2;227:9;233:16;234:2;
236:11;237:20;238:3,5;
240:6,9,10;243:2;244:8;
249:6,19;251:10;253:21;
257:12;260:2,14;261:2;
264:18,18,21;265:1,8,8;
268:18;272:10;273:20;
275:4;277:18
**paid (10)**
27:11;32:19;37:2;55:12;
56:5,8,17;69:15,18;147:21
**pan (1)**
175:7
**panel (1)**
44:9
**paper (3)**
177:9;192:19;277:18
**Para (1)**
16:4
**P-a-r-a (1)**
16:4
**paragraph (14)**
7:15;59:20;66:5,9,12,18;
72:9;73:10;122:13,14;
125:10;174:8;178:21;250:4
**parallel (1)**
161:2
**Pardon (2)**
36:12;99:15
**parentheses (1)**
109:21
**Park (4)**
5:14;11:16,19;46:1
**parse (1)**
174:5
**part (24)**
8:7;24:9;27:5;31:17;
35:2;45:11;56:11;57:7;
65:13;175:13;180:9,12;
195:13,15,17;198:16;224:4;
233:17;234:18;237:10;
246:1;260:19;261:13;
262:17
**partial (1)**
272:20
**participate (3)**
54:8,18,21
**particular (11)**
10:11;14:20;51:3;61:3;
85:21;114:17;131:17;
142:18;227:5;246:1;266:7
**parts (30)**
36:18;73:12,14,21;74:1,8,

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 841 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

10,16;75:17,19;97:9,13;
98:12,14,15;99:1,1,3,5;
115:6;116:9;197:8,10;
234:12;235:15,19,21;242:1;
247:13,14

**part-timers (1)**
27:10

**partway (1)**
148:17

**party (4)**
13:8;24:15,18;47:19

**passed (4)**
9:16;51:11;62:20;63:1

**passing (1)**
155:18

**past (1)**
198:9

**pattern (6)**
92:15;196:14,19;197:3,7,
12

**patterns (3)**
196:20;197:1;210:4

**pay (2)**
33:20;34:15

**paying (2)**
55:8,16

**payment (5)**
34:1,2,17,19;55:14

**people (41)**
27:4;53:2,4,8;64:19;65:9;
94:2;108:4;112:16;113:16,
21;114:13,16;141:19,21;
142:4;145:13;147:11;
150:13,17;158:21;159:2;
160:14;164:2;166:5,5,13;
167:2;168:17;172:19;
205:14;206:13;222:4;
224:3;228:4;232:13;244:4;
263:8;267:17;268:4,11

**people's (1)**
153:18

**per (7)**
100:8;106:2,21;107:8;
108:10;123:2,3

**percent (1)**
33:4

**percentage (1)**
33:1

**percussion (14)**
178:13;191:15,18,20;
192:1,4,4,7,11,18,21;195:9,
20;196:2

**perfected (3)**
171:2;179:17;195:4

**performed (1)**
187:12

**Perhaps (2)**
10:1;164:2

**period (13)**
23:16;36:6,9,11,13,16;
37:4;38:2;160:8;178:9;
195:21;253:3,8

**periodically (1)**

18:5

**permission (1)**
54:20

**permitted (1)**
155:9

**permitting (1)**
152:8

**person (6)**
165:5;171:12;172:14,16,
17;248:17

**personal (20)**
14:16;56:1;66:16,20;
67:3,6,16;68:3,7,9,13;77:9;
78:19;89:13,15;152:6;
164:13;201:8;223:15;224:3

**personally (5)**
15:10;18:21;142:21;
143:2;275:8

**personnel (1)**
30:21

**perspective (3)**
110:6;153:12;202:7

**pertain (1)**
172:16

**pervades (1)**
203:1

**phenomenon (1)**
243:13

**philosophical (1)**
67:7

**phone (1)**
28:4

**photographs (1)**
7:19

**phrased (1)**
166:10

**phrases (1)**
179:6

**physical (2)**
27:18;29:2

**pick (3)**
86:1;181:1,3

**picked (4)**
92:10;205:13;206:13;
254:8

**picture (3)**
180:17;181:14;183:2

**pictures (3)**
178:16;244:18;245:10

**piece (2)**
61:3;277:18

**pieces (1)**
217:18

**pistol (9)**
87:5;138:1;204:9;213:1;
222:13;223:2,3;224:21;
274:12

**piston (1)**
247:11

**place (5)**
153:11,15;158:5;188:17;
189:10

**placed (1)**

188:6

**Places (2)**
97:9;227:4

**placing (2)**
120:19;122:3;189:8

**plan (2)**
259:14;272:2

**planning (4)**
259:18;263:1;264:10,13

**plastic (1)**
216:7

**platform (17)**
15:17;16:21;31:13,18;
32:10;76:5,6,10,16;90:17;
127:8,12,14;137:11;164:9;
246:18;274:15

**platforms (1)**
26:12

**please (26)**
6:11;32:8;35:13;41:19;
42:2;48:17;67:21;70:9;
84:13;101:17;152:3;169:7,
8;173:21;199:6;211:16;
225:2;244:8;255:6;257:12;
260:2,15,16;262:4;272:10;
275:4

**plinking (1)**
219:20

**pm (1)**
276:5

**pocket (1)**
147:2

**point (23)**
50:3;66:15;77:2,3;92:11;
111:10,12,18;112:21;170:7,
12;175:13;177:5;198:7;
203:12;204:8;205:7,7,17;
212:21;238:1;254:7;263:18

**pointed (1)**
99:1

**pointing (3)**
145:11;198:13;210:21

**points (7)**
127:3;209:11;211:18;
216:12;217:13;239:8;
265:16

**police (13)**
83:10;139:1,10,15;
166:16;220:10;256:13;
257:1,3,9;272:15,20;275:10

**Policies (5)**
37:21;40:10,12,13,14

**policy (4)**
35:10,15,16,18

**political (6)**
26:16,17;35:21;65:2;
67:6;250:17

**politically-charged (1)**
64:18

**Poly (2)**
17:8;127:19

**P-o-l-y (1)**
17:8

**poorly (2)**
82:3;120:20

**popular (11)**
75:15;84:19;85:1;93:10,
13;115:13;153:18;190:9;
192:4;257:9;274:17

**port (1)**
97:7

**Porter (3)**
54:9,15;55:5

**portion (3)**
34:9;148:17;189:9

**position (15)**
25:13;26:6;27:14;28:8,
21;35:6,10,17,19;36:2;
41:21;42:18;132:2;149:1,5

**positioned (2)**
149:6;181:14

**positions (4)**
32:11,19;36:3;41:15

**positive (1)**
223:16

**possessing (1)**
201:6

**possibility (2)**
11:17;132:14

**possible (21)**
49:11;71:4,11;81:20;
133:17;136:15;169:16;
188:4;189:11;224:20;
225:21;226:1;231:21;
232:3;257:3;261:18;263:8;
264:1;271:8,15;272:6

**possibly (3)**
141:17;225:18;255:21

**posted (2)**
62:7;238:17

**poster (1)**
63:7

**posting (1)**
62:8

**postings (2)**
251:1,3

**post-World (1)**
128:8

**potentially (1)**
161:19

**pour (1)**
177:3

**poured (1)**
177:18

**powder (24)**
175:7,8,12;176:7,8,9,13;
177:3,4,8,18;180:4,8,10,13;
181:3,18;182:3,11;192:6,
11,15,21;197:17

**Powell (3)**
28:7,15,17

**Powell's (1)**
28:8

**power (9)**
95:7;159:6,11,11;162:6;
204:7;215:19;220:5;252:13

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 842 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

**powerful (6)**
95:2,9,21;96:1;162:9;
222:1
**practical (3)**
93:21;101:12;155:14
**practice (19)**
23:19;79:14;86:18;87:11,
12;88:7;123:4;173:3,10,13,
19,21;177:8;219:20;
259:18;260:20;261:11,12,
14
**practiced (2)**
23:5,6
**practicing (4)**
145:4,5;261:13,15
**preceded (1)**
105:2
**precedent (1)**
255:20
**predecessor (1)**
253:2
**predominant (1)**
178:8
**prefer (7)**
88:18;127:15;202:6,11;
203:14;224:11;272:13
**preference (1)**
255:16
**preferred (1)**
253:7
**preloading (1)**
177:8
**preparation (1)**
57:8
**prepared (3)**
10:5;11:3;260:9
**preparing (3)**
8:10;40:16;56:9
**present (4)**
147:2,5,5;249:20
**presentation (1)**
251:8
**preserved (1)**
45:9
**Preserving (1)**
45:3
**President (1)**
29:1
**press (2)**
226:20;232:9
**pressed (1)**
149:11
**presumably (1)**
155:19
**presume (1)**
50:14
**presumes (3)**
234:19,20,21
**pretty (24)**
26:4;35:2;39:1;61:18;
96:10;103:21;113:6;118:4,
7;126:9;134:21;135:14;
140:14;174:16;189:21;

190:21;191:1;197:5;198:6;
222:17;231:3;241:7;
251:14;262:11
**prevalent (3)**
196:12;198:12;218:13
**prevent (1)**
171:12
**prevented (1)**
184:1
**preventing (1)**
171:11
**previous (4)**
39:9;46:5;153:1;260:13
**previously (1)**
53:10;134:13;162:10
**price (2)**
34:8;184:6
**prices (2)**
184:5;243:7
**pricing (1)**
188:10
**primarily (9)**
96:12;136:18;196:18,19;
207:12;218:5,10;224:2;
274:11
**primary (18)**
14:7,11;41:17;45:7,13;
51:10;72:13;91:3;96:6;
97:18;98:2;130:3;142:1;
150:3;161:16;196:7;
203:16;204:21
**principal (1)**
192:18
**principle (1)**
46:5
**printed (1)**
123:9
**prior (1)**
120:11
**probability (1)**
121:3
**probably (49)**
8:20;33:5,9,10;53:7;
59:20;60:2,16;61:19;62:7,9,
13,21;76:1;91:8;95:13;
110:4;111:13,14;115:21;
129:7;134:11;139:1;
143:21;147:4,12;151:15;
153:2;172:4;178:8;190:11;
191:9;198:11;200:14;
204:10;206:3;218:13;
226:9;237:16;238:4,4;
243:9;244:4;245:13;248:1;
259:9;262:16;265:9;273:18
**problems (1)**
184:1
**PROCEEDINGS (1)**
4:1
**process (6)**
177:1,11,11;214:12;
271:6,14
**produced (13)**
84:20;128:19;179:8,15;

182:12,17;183:15;189:11,
12;218:4;237:5;248:8;
253:4
**produces (1)**
273:8
**producing (1)**
127:20
**product (7)**
215:17;246:1;247:17;
269:8;270:21;271:19,21
**production (14)**
176:4;179:1,11;183:7,10,
14;188:3,8;190:4,5;204:13;
248:3;253:6;270:21
**products (1)**
245:13
**professional (1)**
225:17
**proficient (1)**
259:19
**profile (2)**
130:17,19
**program (3)**
96:5;99:10;141:18
**prohibit (1)**
201:6
**projectile (13)**
100:7;102:5;133:12;
175:9;176:6,9,12,20;177:4,
9;192:6;198:16;219:9
**projectiles (4)**
140:8,10;175:9;181:7
**projections (1)**
156:5
**prolific (2)**
75:15;127:19
**prominent (1)**
232:8
**promote (2)**
243:7;246:1
**propensity (1)**
175:5
**proper (3)**
79:14;83:15;123:3
**properly (4)**
45:8;79:12;149:6;226:5
**proponents (4)**
64:7,13,16;65:4
**prospect (2)**
153:21;243:6
**protect (3)**
64:8,11,14
**protects (1)**
89:9
**provide (1)**
234:4
**provided (5)**
13:5;39:2,7;40:1;245:8
**public (7)**
35:18;64:8,11,14;115:18;
116:2;233:13
**publications (2)**
26:12;37:21

**publish (2)**
248:20;249:4
**published (4)**
59:19;60:2;248:19;
250:19
**publisher (3)**
244:16;245:7,9
**pull (16)**
19:14;20:1,14;22:5,14;
80:14;101:11,14;102:1;
108:2;154:10,18;155:5,7;
158:1;219:6
**pulled (2)**
81:2;82:10
**pulling (3)**
22:12;81:19;155:20
**pulls (2)**
80:9;123:3
**Pulse (1)**
232:11
**pump (1)**
140:16
**purchase (3)**
117:5;183:18;223:14
**purchased (1)**
150:10
**purchaser (1)**
223:18
**pure (1)**
22:1
**purely (1)**
121:17
**purpose (11)**
64:8;89:12;148:3;149:13;
156:4;161:15,16;164:1,3,7;
200:4
**purposes (18)**
15:3,5,6;63:14;93:21;
101:13;136:17;163:20,21;
164:10,17;165:11,13;166:2;
170:2,8;227:12;255:1
**pursue (1)**
40:11
**push (2)**
146:8,10
**pushed (2)**
149:1;177:19
**pushing (1)**
100:8
**put (9)**
20:9;21:4;56:9;85:18;
146:6;177:3;192:12;
197:11;250:12
**puts (3)**
59:18;63:15;198:17

---

**Q**

**qualify (1)**
33:20
**quality (2)**
216:18;270:21
**quantity (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 843 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

192:10

**quarrel (3)**
100:2;106:20;112:8

**quarter (2)**
215:1,10

**quarterback (1)**
198:17

**quick (2)**
68:17;121:2

**quicker (1)**
140:18

**quickly (13)**
70:11;82:19;140:14;
151:19;164:3;166:5;167:2;
169:15;173:8,11;174:3;
213:12;242:1

**quite (4)**
49:21;67:10;91:12;
185:21

**quote (8)**
184:8,12;236:10,12;
257:20;258:9,16;259:2

**quoted (3)**
184:5;226:4;233:16

### R

**rack (1)**
146:9

**raise (1)**
213:4

**raised (1)**
41:7

**range (46)**
17:21;84:12,14,15,21;
85:4,5,10,12,15,19;86:2,3,
11,21;87:8,18,20;89:6;
100:10,10,13,21;101:1;
109:12,15,20;110:5,11;
111:5,18;112:1,5,9;139:15;
141:11;142:3;145:3,4,13,
16;215:5,15,20;217:17;
222:16

**ranges (5)**
122:21;123:20;215:1;
217:21;219:8

**rank (1)**
33:16

**Rapid (11)**
120:13,18;121:1,13;
122:5,20;123:1,14;124:3,6,
15

**rapidly (7)**
79:14,15;80:6,8;155:21;
173:4;210:15

**rare (2)**
251:5;259:10

**rarely (1)**
28:16

**rate (33)**
82:14;101:2;105:8;106:2;
107:7,17,18,21;108:9,20;
109:5;125:20,21;126:3,7,

19;134:6;149:14,15,17;
151:8,11;154:13;155:19;
156:2,8;190:18,19;191:6,
12;198:21;199:1;239:12

**rather (4)**
62:4;64:14;111:16;
121:13

**reached (1)**
248:17

**read (17)**
73:18;99:21;122:16,17;
165:18,21;210:9;235:20;
240:11,12;241:10,21;250:1;
251:15;264:19;276:4;277:3

**reading (1)**
241:17

**ready (1)**
204:13

**re-aimed (1)**
80:3

**really (18)**
5:20;17:17;31:11;76:2;
80:12;82:20;113:9;124:9;
151:5;156:11;178:4;
187:18;191:3;212:12;
226:19;228:16;259:19;
266:1

**rear (3)**
177:21;180:7;181:5

**reason (13)**
31:8;100:2;103:18;
106:20;114:8;121:7,12;
123:6;156:21;160:17;
184:3;227:16;241:2

**reasonable (6)**
49:10;110:21;111:3;
152:7;188:14;189:5

**reasonably (1)**
86:17

**reasons (8)**
64:17;72:13;78:21;80:1,
6;84:7;145:15;155:8

**reattach (1)**
182:5

**recall (16)**
5:20;13:9,16;16:7;18:16;
28:11;34:3;38:2;48:8;61:4;
77:20;80:9;100:1;102:18;
182:16;226:5

**receive (3)**
29:18;32:20;124:5

**received (2)**
7:8;188:8

**receiver (6)**
16:14;97:5;98:13;131:10;
234:5,6

**receivers (8)**
16:3,3,9;97:1,4,20;98:1;
132:19

**recess (6)**
68:19;119:9;158:7;
206:17;241:14;274:20

**recognize (6)**

7:7;70:12,13;92:18;
130:13,17

**recoil (5)**
80:2,4,13;148:20;213:2

**recollection (4)**
5:9;46:21;105:12;193:7

**recommend (1)**
121:13

**recommendations (2)**
40:9,14

**record (10)**
4:15;6:4;119:11;158:9;
165:21;201:13,14;218:16;
241:16;277:5

**recording (1)**
265:5

**recordings (1)**
7:19

**recreational (1)**
164:12

**re-define (1)**
214:15

**redefined (2)**
202:4;205:15

**redefines (1)**
202:13

**redesigned (1)**
130:16

**reducing (1)**
214:9

**Reelection (2)**
61:10,13

**refer (6)**
50:8;55:1;206:10;214:16;
217:12;252:4

**reference (3)**
186:21;194:6;225:2

**referenced (2)**
8:9;186:2

**references (2)**
222:21;227:3

**referred (2)**
205:21;235:21

**referring (9)**
50:9,10;66:13;194:6;
205:5;214:17,21;218:8;
221:2

**refers (1)**
207:12

**reflect (2)**
67:3;241:16

**refresh (2)**
46:21;105:12

**regard (1)**
7:21

**regardless (2)**
126:11;173:11

**registration (1)**
83:15

**regular (1)**
56:11

**regularly (2)**
29:4;147:14

**regulated (3)**
42:20;43:11;51:9

**regulating (1)**
31:14

**regulation (17)**
43:20;44:2;46:7,10;48:1,
4,13,19,21;49:4,8,13,17,18;
51:5;52:6;53:5

**regulations (6)**
24:12;48:7,10;49:9,20;
53:9

**regulatory (2)**
152:19;153:13

**reiterate (1)**
205:11

**related (9)**
13:4;14:7;24:16;26:20;
29:12;61:5;153:13;163:20;
239:12

**relationship (1)**
24:19

**relative (1)**
14:1

**relatively (2)**
118:14;220:5

**relaxing (1)**
157:19

**release (5)**
146:3,3,9,11;154:10

**relevant (3)**
12:20;13:14;54:3

**reliability (1)**
176:3

**reliable (3)**
175:15,15,16

**reliably (2)**
171:3;258:4

**relies (1)**
37:15

**religious (1)**
67:7

**reload (1)**
191:1

**rely (4)**
241:2,12;246:3,10

**remains (1)**
73:13

**remarkably (1)**
190:19

**remember (27)**
11:15,18;34:12;36:11,13;
37:18;46:16;47:4,14;51:19,
20;52:13;57:10;59:15;60:4;
61:2,16;113:18;143:8,21;
144:1;225:7;229:12,17;
231:7,9;237:16

**remind (1)**
158:10

**reminded (1)**
144:3

**Remington (4)**
93:11;94:11;115:14;
132:15

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 844 of 1262

David Seth Worman, et al.  vs.                                    James Supica -  Vol. 1
Charles D. Baker, et al.                                          October 30, 2017

**renamed (1)**
204:9
**repeat (2)**
131:15;169:15
**repeated (1)**
123:4
**Repeaters (2)**
184:4;196:1
**Repeating (12)**
178:20;179:12;183:4,11;
185:7;186:5,20;192:3;
194:17;195:5,20;196:3
**rephrase (2)**
43:7;133:1
**report (44)**
4:12;9:9,12;10:4,5,9,9,12,
21;12:2;27:12,13;28:6,19;
37:16;40:16;42:4;56:9;
67:15;68:2,14,15;125:2;
169:2,6;178:16;183:3;
193:3,5,10,13;199:7;203:1,
8,12;206:20;225:3;226:4;
227:10;233:16;239:10,16,
17;275:20
**reported (2)**
151:7;184:9
**reportedly (1)**
148:1
**reporting (1)**
67:8
**reports (12)**
7:19;28:7,17;29:21;
114:9;151:6;185:18,20;
233:12;239:21;264:9,16
**represent (7)**
58:21;65:19;119:19;
194:21;205:19;238:15;
247:13
**representation (5)**
226:10;246:4;247:6,15,
18
**represented (4)**
24:15,18;245:13;247:5
**representing (1)**
246:8
**reproduced (2)**
237:6;238:13
**reproduction (1)**
62:11
**request (1)**
61:6
**requested (2)**
207:13;245:9
**require (1)**
116:16
**requirement (1)**
73:13
**requirements (1)**
83:16
**respect (1)**
73:11
**respond (1)**
41:17

**responded (4)**
62:4,8,11;275:12
**response (3)**
41:7;61:4,5
**Responses (1)**
60:20
**responsibilities (2)**
29:14;37:11
**responsible (4)**
26:7;227:12;228:20;
229:4
**responsive (2)**
8:12;67:10
**rest (1)**
203:8
**restate (1)**
173:16
**restrict (3)**
65:6;90:6;152:20;164:16;
243:17
**restricted (12)**
63:15;90:7;153:19;154:1;
168:7;200:12;220:14;
222:10;223:6;243:6,8,13
**restricting (3)**
12:5;65:5;244:5
**restriction (9)**
51:11;89:18;152:9;
153:11,12,13,14;244:1,3
**restrictions (10)**
51:12;78:16;83:5,18,20,
21;84:2;117:15;152:13;
243:17
**rests (1)**
148:19
**resume (1)**
140:21
**Retailer (1)**
225:3
**retired (1)**
27:10
**retrospect (1)**
62:21
**reversed (1)**
125:13
**review (18)**
12:10,13,15,19;13:7,11,
14;44:8;61:21;152:10;
153:1;157:13;238:19;
241:7;251:3,4;264:17;
266:15
**reviewed (15)**
7:21;8:15;10:17;13:3;
57:7,13;61:18;99:13,16,19;
204:14;227:7;250:20;
260:19;265:17
**reviewing (1)**
185:18
**revisiting (1)**
153:1
**revolutionary (8)**
159:20;160:5,8,15;191:7;
196:8;197:21;198:11

**revolver (5)**
87:5;140:8,9;145:17;
218:10
**revolvers (3)**
140:6;144:20;192:3
**revolving (7)**
138:17;139:7,20;140:5,6,
15,18
**Rifle (59)**
45:21;46:14;50:18;87:16,
17;88:1,6,18;92:11;94:21;
95:19;96:6;107:15;118:17;
132:21;133:7;148:15,16;
198:8;202:1,14;203:7,16,
19,20;204:3,15;205:3,6;
206:1;210:4;212:4,8,11,18;
213:11,14;215:18;217:10,
11;219:13,16;229:14;
232:2;236:7,14;252:12,16;
253:7,11,12,14;254:3,9,16,
20;255:11;273:17;274:15
**rifles (31)**
49:19;50:21;80:5;93:14;
110:13;127:17;132:16;
164:9;198:9,11;203:5;
205:16;210:3,6,13;211:7,
21;214:17,18,21;215:7,19,
21;216:2,11;217:5,12;
230:18;244:11;253:9;274:3
**rifling (2)**
198:14,15
**right (190)**
6:8;7:10;10:6;14:21;15:8,
14;20:6;22:2,6,8,20;25:7,8,
10;32:12;38:3;42:13,16,20;
43:15,18;44:6;49:5;50:15;
51:3,6,17,21;52:1,2;55:13;
57:21;59:10,13;62:5,12,20;
63:8,21;64:15;65:7,10,15;
66:11;73:6;74:14;75:2,5,9,
13,21;76:6;79:1;80:10;
82:5;84:3;89:10;90:19;
93:16;94:13,19;96:15,20;
97:6;98:5;99:7;101:16,20;
102:6;103:12;104:6,11;
107:8,10,11,12,19;108:6;
109:6;110:7,17;111:1,19;
112:3;113:4,7,11,14,19,20;
114:1,2,3;115:7,18;118:3,5;
119:4;120:3;122:5;123:15;
124:12;125:1;127:17;
128:10;134:12;135:2,5,18;
137:1;138:4;140:15;147:4;
151:20;154:12;157:1;
160:19;161:13;166:7;
167:14;168:3;170:5;172:3;
175:17,19;176:7,8,9,13;
184:2;189:15,18;191:8,13,
17;193:16;194:3;195:10;
198:15,21;199:4;200:6;
203:3;206:11;207:5,9,19;
208:2,12;209:13,17;215:13;
216:19;218:2;219:17;

220:8;224:16,21;225:13;
234:8;235:5,18;242:5,17;
243:14;244:13;245:1;
248:17;249:11;251:18;
252:3,14,18;253:12,16;
254:14;255:8;256:10;
258:7,14;259:14;260:12,18;
261:16;262:8;263:9;266:4;
272:6;273:13;274:6
**Rights (1)**
62:16
**Rimfire (3)**
95:20;219:13,17
**ring (2)**
230:19;232:20
**rings (1)**
231:7
**risk (1)**
171:11
**Road (1)**
4:17
**role (1)**
166:15
**roles (1)**
256:1
**roll (1)**
192:19
**rotated (1)**
155:17
**Rothbury (1)**
4:18
**R-o-t-h-b-u-r-y (1)**
4:19
**round (24)**
84:17;93:17;95:11,18,21;
100:20;102:7;115:15;
119:3;133:10;138:4;
146:10;149:2;154:10;
155:5;160:1,6;162:6,9;
192:16;212:8;219:17,20;
220:5
**rounds (42)**
12:7;19:20,21;20:2;94:4,
15;95:4,15;106:2,21;107:7;
115:17;116:1;117:1,3,13,
19;118:2,6;133:5;140:10,
19;149:4;154:17;155:6;
159:6;160:4;163:3,8,12;
180:6;184:9;215:18;216:1;
222:11;223:6,17;224:7,9,9;
275:9,16
**row (3)**
104:3;105:7;109:20
**rows (4)**
106:2,6;109:12;218:16
**royalties (1)**
32:20
**rule (1)**
218:5
**ruled (1)**
53:21
**rules (1)**
6:4

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 845 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

**ruling (3)**
  152:8,11;153:1
**run (2)**
  6:3;222:18
**running (1)**
  87:13
**rush (1)**
  153:14
**Russian (4)**
  128:8,21;132:11;133:10

## S

**sacrifice (1)**
  122:18
**safe (6)**
  116:17;118:8;142:5;
  170:20;171:3;267:10
**safely (2)**
  142:3;222:7
**safer (5)**
  171:6,10,16;172:7;
  220:15
**safety (8)**
  64:8,11,14;142:2;145:7;
  170:8;212:13;214:14
**salaried (1)**
  55:17
**salary (2)**
  33:2;56:11
**sale (3)**
  34:7;155:9;243:18
**sales (1)**
  96:8
**same (80)**
  11:6,8;20:10;27:18,20;
  28:12;29:2;46:4;52:6,11;
  58:3;65:20;66:1;69:8;
  71:21;72:4;74:9;75:5,7,8,
  11;76:7;92:7,15;93:6,17;
  95:5;96:18;97:5,21;98:4;
  100:14;102:6,7;103:4;
  114:19;115:10;116:6,9,11,
  12;117:10,20;118:11,21;
  119:3,4,18,20;124:11;
  125:21;126:4,8,20;130:7;
  131:2;132:7;133:13,14,15;
  134:7,20;140:7,10;160:10;
  163:17,21;165:10;168:2;
  192:18;214:13;219:13;
  221:11;234:5;238:19;
  255:15;265:12,13;272:8;
  277:4
**San (1)**
  231:5
**Saur (1)**
  232:19
**saw (5)**
  59:3;130:13;177:6;
  185:12,14
**saying (9)**
  85:11;174:18;191:3;
  197:4;204:1;210:12;217:3;

**221:13;223:5**
**school (3)**
  23:1,2;230:12
**scientific (1)**
  222:18
**scope (1)**
  25:10
**Second (12)**
  25:6;41:16;42:1;72:1;
  89:9;100:8;104:14;152:7;
  185:7;190:19;196:5;199:6
**seconds (6)**
  82:16;146:12;147:4;
  184:10,14;190:21
**secretary (1)**
  30:7
**section (3)**
  119:20;240:15;260:21
**sections (1)**
  120:7
**secured (1)**
  45:6
**security (1)**
  45:9
**seeing (1)**
  198:9
**seeks (1)**
  161:18
**seem (5)**
  49:21;155:2,6;158:2;
  236:11
**seemed (1)**
  269:20
**seems (4)**
  111:3;157:2;200:14;
  261:11
**sees (1)**
  226:20
**seldom (2)**
  29:11;220:9
**select (24)**
  19:5,7,11,13;20:17;
  21:17;22:16;73:4;91:2;
  93:2;127:7;128:2,20;
  131:13;134:15;135:10;
  137:12;168:17;209:16;
  233:9;252:17,19,20;265:9
**selected (1)**
  265:8
**select-fire (6)**
  49:14;90:13;91:21;96:13,
  19;98:3
**selecting (1)**
  111:16
**selector (3)**
  92:19;93:1;132:5
**Self (1)**
  275:12
**self-contained (1)**
  176:12
**self-defense (22)**
  13:15,19;14:21;25:10;
  76:11,13,16,20;77:5,16,19;

**78:1,11,13;89:5;171:4;**
  227:13;259:6;272:15;
  275:9,13,17
**self-protection (1)**
  224:15
**sell (5)**
  129:10;226:16;269:10;
  270:2;271:7
**selling (2)**
  226:12;246:5
**semi-auto (11)**
  117:8;124:6;127:20;
  148:5;199:10,20;210:3,6,
  13;214:17;215:6
**semi-automatic (95)**
  20:13,21;21:1,12;22:10;
  49:18;50:17,21;73:5;77:10;
  79:9;81:18;84:5;90:16;
  91:2;92:2,11;96:10,14;
  101:9,21;106:9;107:7;
  119:7;120:14,18;121:1,13;
  122:5,21;123:1,14,14;
  124:3,11,15,18,19;125:14,
  20;126:3,5,8,19;127:9,17;
  128:3;129:4,6;133:18;
  134:3,5,7,8;140:16;148:14,
  16;149:14;154:14;156:9;
  157:5;181:12;197:20;
  200:6,9,15;205:21;206:10;
  209:17;211:7,21;216:2;
  217:12;218:4,12;219:4;
  221:18;236:16;252:8,12,15,
  20;253:1,16;254:9;255:11;
  256:4,18;266:3,11;267:6,
  16;268:3,12;274:11
**semi-automatically (14)**
  19:14;101:19;218:1,20;
  219:5,10;230:1,4;231:2;
  232:5,7;255:8,15,16
**semi-automatics (1)**
  233:14
**sends (1)**
  29:17
**sense (13)**
  48:16;52:8;87:20;125:18;
  139:12;145:18;158:1;
  202:15;204:16;208:13;
  212:10;216:8;257:7
**sensitive (1)**
  192:11
**sentence (15)**
  73:9;125:12;170:5;
  175:14,19;185:5;194:5,20;
  195:13,17;199:9;207:1;
  213:9;222:9;227:9
**separate (7)**
  24:3;69:15;176:6;177:5;
  181:17;182:10;213:1
**separately (3)**
  58:12;176:20;181:21
**September (3)**
  9:14,17
**sequence (1)**

**129:7**
**sequentially (1)**
  105:1
**Series (7)**
  103:1,15;104:11;121:2;
  143:17;204:6;209:10
**serious (3)**
  146:4;159:6,19
**served (6)**
  36:6,18;37:17,19,20,21
**serves (1)**
  75:7
**service (3)**
  30:13,18;37:2
**serving (1)**
  10:9
**session (2)**
  141:8,11
**set (7)**
  24:2;37:14;115:9;116:5;
  235:1;244:10;253:6
**setups (2)**
  80:12;145:4
**seven (2)**
  27:5;36:10
**seven-shot (1)**
  178:20
**several (5)**
  18:20;98:14;99:3;114:10;
  218:5
**shape (1)**
  67:7
**Shawn (1)**
  69:4
**sheet (3)**
  69:4;277:7,17
**shoot (18)**
  18:8;85:2,16;87:3;88:6;
  114:13;146:1;150:13;
  171:13,13;172:11;202:8;
  203:2;213:18;222:2,4;
  223:2;263:8
**shootability (1)**
  214:13
**shooter (46)**
  80:21;81:5;82:1;86:13,
  15,16,17,21;87:7;101:1,10,
  13;111:7;112:13;121:14;
  143:14;144:14;145:2,10,12;
  149:9;151:2;154:8,9;
  168:11;169:17;170:8,20;
  171:3,6,9,10,11,13,17,20,
  21,21;172:11,13,16;214:11,
  14;230:16;262:21;263:7
**shooters (9)**
  84:16;87:8;88:5,8,10;
  146:17;148:8;150:21;
  262:18
**shooters' (1)**
  132:20
**shooter's (5)**
  148:20;149:1,5,6;213:13
**shooting (31)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 846 of 1262

David Seth Worman, et al.  vs.                                    James Supica -   Vol. 1
Charles D. Baker, et al.                                          October 30, 2017

18:18;81:16;113:4,6;
114:4;141:13,16;144:18,20;
145:9,16;147:3,8;148:1;
151:9;160:12;164:12;
165:5;169:20;172:1;
225:10,12;228:3;229:7;
230:6,10,11;231:5,12;
232:10;267:17
**shootings (13)**
15:8;63:21;64:3,4;
226:18;227:1,15,19;228:1,
14;262:13;267:15,21
**shoots (5)**
18:6;50:10;140:7,12;
192:19
**short (6)**
118:15;120:21;153:16;
159:1;253:3;274:19
**shorter (5)**
144:8;160:8;273:3,9,12
**shortest (1)**
244:4
**shot (14)**
17:16;18:17;19:15;22:13,
14;50:11;143:6;177:19;
185:6;186:5;198:14;219:6;
232:4,6
**shotgun (15)**
86:19,20;87:6,9,13,19;
138:17;139:8;140:4,15,17,
19;190:11;229:12;273:17
**shotguns (4)**
139:20;140:13;230:16;
244:11
**shots (12)**
108:10;121:2;123:2;
140:12;151:19;169:15;
190:7,14,18;191:4,8,12
**shoulder (5)**
143:12;149:7,10,12;
213:3
**shoulder-fired (1)**
87:3
**shove (1)**
197:16
**show (10)**
7:2;9:7;18:7,8,8,15;70:3;
119:11;181:13;236:2
**shown (2)**
90:5;102:14
**Sick (1)**
56:3
**side (6)**
42:16;43:18;45:17;46:3;
47:18;180:16
**sides (2)**
64:19;196:17
**Sig (1)**
232:19
**sight (2)**
89:1,3
**sights (1)**
213:4

**sign (1)**
276:4
**signature (4)**
9:11;70:18;71:1,3
**significance (1)**
265:19
**significant (10)**
75:17,20;87:12;97:12;
174:20;183:18;194:10,15;
222:6;253:8
**significantly (3)**
88:9;96:1;156:3
**silly (1)**
158:2
**silly-assed (2)**
62:19;63:4
**similar (15)**
5:10;10:5;43:16;46:11;
47:15,16;90:16;95:7;98:2,
6;104:8;134:21;139:7;
155:14;174:16
**Similarity (1)**
233:17
**similarly (1)**
192:5
**simpler (1)**
177:10
**simulates (1)**
148:5
**simulating (1)**
149:17
**simultaneously (1)**
190:16
**single (5)**
22:5;133:2;155:5,7;160:1
**single-action (1)**
145:17
**sit (3)**
30:11;111:2;183:21
**sitting (1)**
54:13
**situation (10)**
81:17;139:7;142:3;147:9;
171:4;259:5;260:5;262:7;
267:17;272:15
**situational (2)**
123:17,20
**situations (11)**
76:13;81:3;261:21;
262:21;268:11,16;270:10,
16;275:7,8,16
**six (1)**
231:15
**size (11)**
86:5,6;100:16;115:10;
135:9;220:18;222:13;
223:3;224:12,21;235:5
**sized (3)**
94:15;116:6;117:10
**skill (1)**
81:4
**Skilled (4)**
88:8;101:1;190:21;191:1

**skills (1)**
235:1
**SKS (3)**
252:3,7,11,21;253:2
**slide (3)**
146:9,10,11
**slightly (1)**
218:13
**slips (1)**
148:14
**slow (3)**
108:20;109:4;160:6
**slowed (1)**
199:1
**slower (1)**
199:2
**small (6)**
192:10;219:20;220:15;
221:1,16;223:2
**smaller (7)**
220:20;221:7,8;223:12,
18;224:10,21
**smart (1)**
170:13
**Smoothbore (3)**
196:11;198:10;199:2
**so-called (5)**
12:5;44:3;45:18;46:10;
47:20
**social (6)**
26:12;30:1;31:18;250:21;
251:3,8
**society (1)**
89:15
**sold (3)**
91:8,13;270:1
**soldier (3)**
107:14;121:2,20
**soldiers (6)**
100:3,4;122:18;123:13;
134:12;135:2
**somebody (6)**
82:3;147:13;152:18;
155:9;171:20;224:6
**someone (17)**
62:5;81:19;82:18;85:13,
15;86:3;169:20;197:16;
224:5;227:16;228:12;
250:20;259:13;260:10;
272:13;275:8,16
**sometime (1)**
193:8
**sometimes (5)**
18:7;29:10;49:3;191:8,16
**somewhat-trained (1)**
84:16
**somewhere (3)**
111:19;132:4;182:14
**sophisticated (1)**
234:21
**sorry (17)**
12:14;43:5;66:8;67:20;
71:3;110:9,19;126:17;

131:14;140:10;142:11;
194:8;212:6;218:18;220:4;
231:11;265:18
**sort (7)**
21:14;29:17;157:8;197:4;
201:11;239:16;255:6
**sought (1)**
162:3
**sound (3)**
113:19;151:11;225:12
**sounded (1)**
52:10
**sounds (12)**
9:2;51:16,21;52:2;
107:12;110:21;113:20;
114:2;138:10;157:19;
256:14,17
**source (2)**
204:4;245:4
**Soviet (2)**
129:1;253:4
**spaces (4)**
272:16;273:4,10,13
**spark (5)**
175:6,11;192:10,15,20
**speak (1)**
211:12
**special (7)**
14:1,3;55:14;116:16;
117:14;218:9;264:6
**specialized (2)**
80:20;256:1
**specialty (1)**
16:7
**specific (37)**
76:18;77:1,2,3,18,21;
78:5,12;85:17;114:5;
118:13;127:16;138:12;
143:8;148:15;155:3;
161:15;163:8;167:12;
170:18;181:17;185:19;
202:2;203:6,6,10,18;204:3;
209:7,20;212:3;242:1,13;
262:11;265:16;267:11;
275:18
**specifically (12)**
12:20;74:13;83:6;98:16;
143:21;179:13;200:9;
211:1;239:11;250:8;266:5;
269:12
**specification (1)**
245:11
**specifications (3)**
245:20;248:15;249:3
**specificity (2)**
76:3;229:9
**specifics (2)**
126:13;231:8
**specifies (1)**
260:21
**specify (1)**
116:15
**specimen (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 847 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

181:17
**specimens (1)**
 234:20
**spectrum (1)**
 215:20
**speculate (5)**
 121:18;138:21;184:16,
 16;271:17
**speculating (2)**
 121:17;153:15
**speed (4)**
 149:13;156:8;172:20;
 198:21
**spend (1)**
 145:4
**spent (2)**
 56:17;241:17
**spin (1)**
 198:18
**spokesman (1)**
 153:6
**sponsored (1)**
 128:10
**spontaneous (1)**
 259:17
**sport (3)**
 144:18,21;225:10
**Sporter (2)**
 92:9;254:16
**S-p-o-r-t-e-r (1)**
 254:17
**sporting (10)**
 90:17;127:9;130:15,20;
 211:3;254:9,12,18,20;
 255:11
**Sports (1)**
 225:12
**spread (1)**
 261:11
**spreadsheets (1)**
 7:20
**Springfield (2)**
 274:1,9
**stack (4)**
 8:5;12:18;13:3;185:3
**staff (6)**
 26:8;250:5,6,20;251:4,6
**stages (1)**
 264:6
**stand (1)**
 63:2
**standard (7)**
 33:18;117:2,11,12,18;
 140:16;224:7
**Stands (2)**
 219:16;225:6
**start (7)**
 26:17;87:13,14;167:7;
 169:3;178:19;261:7
**started (6)**
 10:20;72:8;129:5,9;
 206:6;230:16
**Starting (12)**

42:7;240:9,10;243:4;
 244:15;251:12;253:21;
 257:14;260:4;264:18,21;
 265:1
**state (18)**
 4:14;44:13;45:21;46:14;
 60:6;65:12;83:17,20;90:1,3,
 4;129:3,16;171:1;198:6;
 208:19,20;252:10
**stated (1)**
 176:19
**statement (14)**
 63:2;66:5;74:12;78:18;
 79:11;98:19;122:11;
 123:12;186:15;210:2;
 220:13;222:14;223:4,8
**statements (2)**
 61:16;241:3
**States (8)**
 83:3,7;117:15;130:1;
 143:3;150:6;154:21;243:14
**states' (1)**
 83:21
**Station (1)**
 59:13
**statistics (2)**
 228:17,19
**stature (5)**
 220:20;221:8,11,20;
 222:2
**statured (3)**
 220:15;221:7,16
**status (1)**
 83:20
**stays (2)**
 133:2;149:5
**steadily (1)**
 81:1
**steel (3)**
 175:6;192:8,9
**step (1)**
 162:5
**Stephen (2)**
 151:2;263:15
**Steyr (1)**
 137:13
**StG (2)**
 203:17;204:11
**still (23)**
 23:13;65:17;66:7,17;
 74:5;75:13;91:9;113:2;
 130:4;154:3;170:5;176:11;
 181:7,21;192:2;198:6;
 241:7;242:4;243:13;
 251:18;272:17;275:15,18
**stock (18)**
 147:16;148:3,4,10,14;
 151:3;153:8;213:2,5;216:7,
 7,10,17,18;217:1,2,2;222:5
**stocks (13)**
 130:20;131:6;149:21;
 150:5;152:2,5,8,13,15,20;
 153:17;213:2;217:6

**stolen (1)**
 172:13
**stop (1)**
 220:7
**stopped (1)**
 178:1
**storm (5)**
 204:15,15,16;256:18;
 257:4
**stormy (1)**
 204:15
**story (3)**
 195:1,13,15
**straight (3)**
 213:2,5;251:13
**Street (6)**
 138:14;139:11,12;140:3,
 14;145:1
**stress (1)**
 147:8
**strike (9)**
 6:18;112:19;119:1;
 120:10;155:18;156:5,6;
 192:20;247:20
**Striker (1)**
 139:6
**strikers (1)**
 155:18
**striking (1)**
 192:9
**string (1)**
 261:9
**stripped (1)**
 16:3
**striving (1)**
 191:11
**stroke (2)**
 180:21;181:2
**strokes (2)**
 180:19;182:2
**strongly (1)**
 64:20
**struck (2)**
 175:6;192:13
**studied (3)**
 113:3;226:18;227:15
**studies (1)**
 7:19
**study (3)**
 49:12;222:18;227:5
**stumbles (1)**
 265:10
**style (1)**
 159:18
**subfields (2)**
 14:6,9
**subject (2)**
 152:21;164:14
**submachine (3)**
 21:11;138:1;143:7
**subpoena (1)**
 7:8
**subsequent (2)**

130:10;149:2
**subset (2)**
 19:8;49:15
**substantial (3)**
 65:1;264:10,12
**substantially (2)**
 210:15;238:19
**substantiated (1)**
 68:13
**substantive (1)**
 9:19
**substitute (1)**
 240:4
**successful (4)**
 167:19;179:10;194:19;
 195:19
**successfully (1)**
 163:15
**successive (1)**
 180:6
**successor (1)**
 73:3
**suggest (3)**
 72:3;93:20;110:2
**suggested (1)**
 138:9
**suggesting (4)**
 123:12;189:9;266:2,9
**suggests (1)**
 49:3
**suiting (1)**
 128:16
**summary (5)**
 193:17;194:1;238:7;
 239:7,10,14
**sunsetted (1)**
 52:7
**superior (1)**
 123:1
**superiors (1)**
 30:13
**supervising (1)**
 141:15
**SUPICA (8)**
 4:3,8;7:14;60:19;61:9;
 158:12;238:6;277:12
**supplement (1)**
 239:17
**supplier (1)**
 117:6
**supply (1)**
 153:16
**support (15)**
 35:6,10,18;36:1;41:11;
 42:18;44:6,15;48:1,3,6,19,
 21;49:7,13
**supported (3)**
 48:13;53:16;228:19
**supporting (1)**
 41:8
**suppose (1)**
 259:20
**supposedly (2)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 848 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

148:6;149:18
**suppressive (1)**
    111:15
**sure (67)**
    5:17;13:20;27:11;31:10;
    33:5,9;34:5,8;35:2;39:1;
    50:1,15;51:11;52:5,13;
    53:1;54:5;55:7,11;58:11;
    59:3;61:19;68:18;70:14;
    71:11;78:3;91:6,12;107:13,
    16,20;108:11;111:14;113:1,
    9;115:20;118:4,7;123:9;
    136:9;137:6,9;138:11;
    143:20;149:8,19;155:8;
    156:12;161:11;171:10,10;
    181:17;185:16;186:9,10;
    193:3;194:8;225:8,19;
    230:18;231:3;233:1;234:1;
    236:17;256:12,15;271:10
**Surely (1)**
    186:6
**surprise (9)**
    55:10;77:8;78:4;82:20;
    109:19;156:20;206:14;
    229:20;274:16
**surprised (1)**
    155:8
**surprises (1)**
    155:2
**surprising (1)**
    122:20
**Survey (3)**
    225:3;226:4,6
**suspect (4)**
    96:6,7;180:1;206:12
**sustained (3)**
    106:11,15,18
**swapped (1)**
    247:14
**swapping (1)**
    132:19
**SWAT (3)**
    256:7,9,17
**SWD (1)**
    136:20
**swear (1)**
    94:11
**Swedish (3)**
    137:21;138:8,10
**SWEENEY (159)**
    12:21;30:14,19;31:9,16;
    32:2,7,13;34:9;35:7,12;
    38:7,11;39:4;40:19;42:21;
    43:6;44:1;46:8;50:19;
    52:21;53:13;54:11;55:4;
    56:15;64:9;66:8,11;67:13,
    18;68:4,11,17;69:13,20;
    71:9;79:2;81:9;82:6;92:5;
    105:14;106:16;107:2;
    115:11;121:9,16;122:6;
    123:8,16;124:4;125:3;
    126:2,21;129:12;150:14;
    158:17;159:9,21;160:20;

161:9;162:1,14,21;163:6;
164:5,8,19;165:4,14;166:8;
167:4,10;168:4,19;171:8,
18;172:9;173:1,9,15;174:4;
176:21;186:7;187:7,20;
188:9,15;189:3,19;194:4;
195:11;196:9;201:3,10;
202:10,19;206:2;207:10;
208:3,18;209:18;210:20;
212:1;217:7;220:1;221:19;
224:1;227:20;228:7,15;
229:1;230:2;232:21;
233:11;234:9;239:19;
240:14;243:20;245:18;
246:6,12;248:10;249:1;
251:19;253:17;255:9,18;
256:11,20;257:5;259:7,15;
261:17;262:3,9,15;263:3,
10,16;264:3,11;266:13;
267:7,19;268:6,14;269:6,
11;270:4,9,18;271:9,16;
272:7,18;273:5,14;274:7;
276:4
**Sweeper (4)**
    138:14;139:11,13;140:3
**swerved (1)**
    48:9
**switch (9)**
    21:3,15,19;92:20;93:1;
    98:3;131:13;132:4,5
**switched (1)**
    19:15
**sworn (1)**
    4:4
**synonymously (1)**
    174:15
**system (11)**
    182:18;191:18,19,21;
    192:1;193:1;195:9,21;
    196:2;247:8,9
**systems (3)**
    174:14,21;194:11


## T

**table (4)**
    8:6;103:4,6;118:19
**tactics (1)**
    65:14
**talk (11)**
    6:10;16:8;29:10;31:14;
    86:6;88:3;125:2,5;134:3;
    183:4;267:15
**talked (5)**
    127:3;160:11;233:8;
    243:11;262:13
**talking (42)**
    14:17;20:18;52:5;66:15;
    74:13;76:7;81:16;84:19;
    86:5;92:13,14;97:7,16;
    100:14,15;110:10;118:21;
    127:8;158:19;164:1,3;
    167:11;177:2;187:1;

194:14;200:21;205:11;
213:9;217:1,2;220:18;
221:4;224:3;235:19;244:1;
260:11,17,20;261:6;267:20;
273:16;275:2
**tank (1)**
    143:13
**tap (1)**
    271:21
**tape (1)**
    151:20
**Tardy (5)**
    47:11;57:6;58:17;60:16;
    69:4
**target (38)**
    51:3;80:2,9,14,20;81:1;
    82:4;85:13;86:4,5,6;87:4;
    88:18,21;100:16;111:10,10,
    12,13,14,17,18;112:5,14,20,
    21,21;113:14;118:17;
    120:20;121:3;123:2;
    164:11;169:15;170:4;
    172:11;198:14;220:2
**targeted (4)**
    96:7;200:9;271:19,20
**targets (8)**
    89:5;120:20;121:1;160:7;
    162:20;163:13;170:9;172:8
**team (2)**
    256:7,9
**teams (1)**
    256:17
**TEC-9 (3)**
    137:18;230:19,20
**Tech (2)**
    17:8;127:19
**T-e-c-h (1)**
    17:8
**technical (7)**
    203:10;245:10,20;
    246:13,15;248:15;249:2
**technically (1)**
    90:14
**technique (3)**
    120:17,19;122:3
**techniques (1)**
    212:14
**technologies (1)**
    170:13
**technology (8)**
    14:10;171:5;179:9;190:1;
    193:19;207:3,12;230:7
**television (3)**
    18:6,15;26:11
**ten (11)**
    12:7;86:17;117:1,19;
    118:2,6;222:10;223:6,17;
    224:9;227:1
**tend (5)**
    50:5;145:10;207:3;210:4;
    221:6
**tended (1)**
    198:7

**tends (2)**
    239:11;243:6
**ten-round (1)**
    224:20
**term (38)**
    20:17;21:17;36:21;85:20;
    86:1;106:14;111:15;
    144:10,13;154:6;177:14;
    199:18,21;202:1,4;203:9,
    20;204:18;205:13,18;206:6,
    15;213:8;217:11;234:8,8;
    250:3;253:10;254:12,13,15;
    256:13;265:7,17;266:6,7,
    15,17
**terminology (6)**
    108:18;200:7,10;202:11;
    256:13,14
**terms (33)**
    22:15;33:18;36:15,18;
    85:18;86:20;92:16,16;
    98:10;104:9;159:13;162:5;
    166:7,10;174:17;176:3;
    183:12;192:5;210:14;
    212:8,11;213:10;214:8;
    215:19;216:20;224:18;
    245:14;247:2,5;248:3;
    249:2;250:16;265:18
**Test (5)**
    234:3,16,18;235:8,9
**testified (3)**
    4:6;47:19;274:1
**testify (2)**
    7:9;47:18
**testimony (20)**
    13:7;39:14;43:17;46:6,
    13;47:21;48:3,6,8,12,18;
    49:3;57:13;69:16;158:10;
    261:20;264:17;265:5;
    266:1;277:5
**tests (1)**
    233:17
**thanks (3)**
    62:1;240:13,20
**theater (1)**
    229:8
**therapeutic (1)**
    157:19
**thinking (4)**
    14:9;21:10;204:21;263:5
**third (11)**
    7:13;36:19;38:1;59:20;
    70:15;88:14;102:19;
    104:16;105:6;112:9;212:21
**Thompson (1)**
    143:7
**thoroughly (1)**
    241:7
**though (5)**
    10:20;158:15;189:14;
    210:11;271:5
**thought (3)**
    49:12;73:3;263:1
**thousands (1)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 849 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

34:4

**three (10)**
19:21;20:2;36:17,21;
96:2;109:15;128:21;169:8;
191:8;207:2

**three-round (1)**
106:10

**throughout (8)**
127:3;161:3;163:9;
167:11,17;179:6;222:21;
223:1

**throwing (1)**
198:17

**tier (1)**
33:14

**tiers (2)**
33:11,16

**tight (2)**
272:16;273:4

**timeframe (1)**
188:14

**times (10)**
5:18;17:12,20;36:17;
108:3;179:17;205:16;
223:17;248:5;270:13

**tip (1)**
227:8

**title (2)**
28:10;239:5

**titled (1)**
13:16

**today (13)**
7:10;8:8;55:16;56:6;57:8,
14;153:8;157:7;176:11,16,
17;181:11;265:12

**together (1)**
11:15

**told (5)**
52:15;69:10;157:17,20;
232:19

**took (2)**
180:19;238:15

**top (16)**
33:18;36:5;38:3;59:5;
60:11,19;71:14;104:3;
122:11;175:17;177:4;
179:5;193:4;231:20;236:7;
240:9

**torso (2)**
86:8;100:16

**total (1)**
183:20

**tough (1)**
26:4

**touting (1)**
209:4

**towards (3)**
10:13;205:1;261:11

**Town (1)**
59:13

**track (1)**
216:17

**trade (3)**

226:7,14,15

**traditional (3)**
130:19;149:11;216:6

**train (2)**
100:4;259:4

**trained (8)**
22:19;82:3;88:10;107:14;
141:5;144:14;147:14;260:7

**trainer (1)**
141:2

**training (25)**
82:1;87:7,10;99:10,14,
17;123:4;141:1,3,8,10;
142:5,6,7,8,15,17,20;
144:17;145:3;146:4;
260:20;261:10,12,14

**trains (1)**
100:3

**trajectory (1)**
110:15

**transcript (5)**
34:10;59:2;242:20;275:3;
277:4

**translates (1)**
192:15

**travel (1)**
110:13

**treated (1)**
78:9

**treating (1)**
239:17

**trick (2)**
120:6;261:4

**tried (3)**
10:13;34:6;197:11

**tries (1)**
271:19

**trigger (50)**
19:15,18,20;20:1,14;22:6,
7,13,14;74:21;75:1;81:2,20;
82:10;98:4,6,11;101:11,14;
102:2;108:2;123:3;148:17,
19,21;154:5,10,11,18;
155:5,7,11,13,17,18,20;
156:5,6,13,17;157:3,6,11,
21;219:6;235:10,11,12,14,
17

**triggers (2)**
21:12;98:8

**tripod (1)**
143:13

**trips (1)**
17:21

**troops (3)**
255:7,12,16

**true (44)**
43:14;51:4;76:8;79:11,
17,19,21;101:15;105:4;
119:6,8;120:1;124:17,17;
126:11;129:14;130:4;
147:6,10,12;158:15;159:2;
162:17;166:17;176:10,11;
197:19;205:3,6,8;209:21;

221:16;236:14;242:5;
253:8,10;258:1;259:4;
268:16;269:19;273:3;
275:15,18;277:5

**trust (1)**
107:3

**truth (4)**
4:5,5,6;258:19

**truthful (2)**
6:20;57:21

**try (13)**
6:12;16:2;21:18;22:15;
27:16;117:14;165:20;
166:2;193:6;267:1,12;
271:18;272:2

**trying (8)**
170:17;171:4;184:6;
212:16;216:17;229:11;
249:20;263:21

**tumor (1)**
62:16

**turn (29)**
7:12;59:4;60:9;61:8;
66:4;70:15;72:6;102:19;
120:1,8;122:10;125:8;
169:6;178:15;206:19;
209:10;217:14;219:12;
220:11;225:2;242:19;
243:2;244:8;249:6;251:10;
257:12;268:18;272:10;
275:3

**turned (1)**
194:19

**turning (1)**
42:3

**twice (1)**
95:1

**two (34)**
16:2;17:3;20:21;21:11;
26:8;27:5;36:18;60:2;94:4;
95:3;97:1,14,19;107:18,21;
111:1;118:21;128:21;
154:17;155:6;177:5;180:3,
19;182:2;190:7,15,15,18;
191:1,5;196:21;217:18;
231:9;234:13

**type (52)**
17:18;24:13;48:7;63:13;
65:5;74:9;78:14;79:18;
81:3;84:20;88:21;89:3,18;
114:6,10;133:4;134:8;
137:3;144:17;148:7;149:7;
154:2;156:14;174:14;
175:4;176:5;177:12;178:4,
5,9;194:20;197:3;201:5;
217:15,15;218:17,17;222:5;
227:11,18;229:5,10,14;
230:9,14;231:10,18;232:19;
243:6;244:1;246:4,15

**types (48)**
15:14;48:9;63:18;64:1,4;
74:11,12;79:13,14,19,20;
80:5,11,11,19;81:21;82:8;

83:5;95:4;107:1;124:7,19,
20;141:16;144:18,20;
167:12,14,15;174:11;175:2;
176:8,10,16;177:2;179:19;
194:1,13;196:12;216:1;
217:18;218:6,7;226:21;
227:10,17;228:12,13

**typically (10)**
21:3;28:3;35:18;95:17;
99:5;133:8;221:14;228:3;
259:14;274:2

**typos (2)**
9:19,21

---

**U**

**unaware (1)**
260:10

**unclear (1)**
6:5

**uncomfortable (1)**
49:18

**under (13)**
6:19;25:11;42:8;57:17;
78:9;83:7;90:7;106:2;
108:5;109:15;158:11;
181:20;214:3

**Underground (1)**
229:15

**underneath (1)**
106:6

**understood (5)**
6:7;55:6;57:16;168:14;
251:17

**under-trained (1)**
145:12

**unfortunate (1)**
200:7

**uniform (1)**
197:12

**unintended (2)**
170:9;172:7

**Union (1)**
253:5

**United (10)**
23:7,8;24:6,8;83:3;130:1;
143:3;150:6;154:21;243:13

**universally (2)**
222:17;269:19

**University (1)**
23:2

**unless (1)**
74:7

**Un-Redacted (1)**
60:20

**unregulated (1)**
73:13

**unreliable (1)**
175:11

**unsafe (9)**
172:21;173:3,5,7,10,13,
19,21;174:2

**unusual (4)**

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 850 of 1262
David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

229:14;265:16,18,19

**up (22)**
92:10;103:14;107:13;
115:9;116:5;141:14;181:1,
3;185:3;191:12;205:13;
206:13;223:15;241:21;
242:6,10;243:7;251:13,16;
253:6;254:8;268:15

**update (1)**
9:16

**upgrade (1)**
34:6

**upper (2)**
97:1;132:19

**usage (1)**
83:11

**use (87)**
14:10,12,16,18;20:17;
21:17;22:15;25:10;31:13,
18;32:10;76:15;85:20;
88:18,21;89:2,17;92:3;
93:7;94:2;100:3;114:18,19;
115:5;116:4,5,9,11,21;
118:10,10;122:4;126:1;
130:5;135:2,12;137:8;
141:5,20,21;142:5;143:3;
149:9;150:17;152:2,5;
156:14,18;157:11;159:12,
14;164:14;167:20;168:8;
171:4;172:17,18;179:6;
194:2;198:8,10,10;200:10;
205:14;207:4,7,8,14;
208:21;209:1,13;220:7,15;
222:6;239:13;250:3;251:8;
252:13;253:10;254:15;
255:14;256:4,6,18;257:8;
271:13;277:18

**used (102)**
15:2,4;63:13,13,16,18,20;
64:2,4;76:5,10,19;77:5,8,
16;78:1,10,14;80:13;89:5;
90:16;93:20;94:18;95:6;
98:9;118:13;119:3;125:20;
126:19;129:19;130:1,11;
136:16;139:14;148:2;
149:11;150:12,16;151:3;
156:1;159:15;160:15;
162:7,8,10;164:10,11,11,12,
13;166:14;167:18;168:16;
170:18;171:20;172:14;
177:11;179:7;185:12;
191:7;192:7;193:9;196:7,
18,19,21;197:2;202:2,12;
205:13;206:6,9,12,15;
215:18,21;227:1,11,18;
228:9,13,20;229:3,10,13;
230:9,14;231:10,18;232:8,
16;233:4,6,9;242:9;254:21;
255:2,4;257:3;266:6,8;
268:8

**useful (2)**
14:21;166:4

**users (1)**

207:16

**uses (18)**
77:18;90:14;134:11;
139:17;144:13;161:1,1,2;
162:19;170:3;175:5;208:8,
14,17;219:19;254:18;
257:1;258:4

**using (14)**
85:3;114:3,6,9,13,16;
133:20;147:11;163:19;
171:12;174:14;213:8;
217:12;256:12

**Usually (22)**
18:11,12;19:21;20:20;
21:8;29:21;35:20;36:1;
92:16;95:19;128:11;
130:15;133:1;141:11;
143:12;153:11,20;168:8;
179:15;215:5,11;224:2

**Uzi (1)**
135:15

## V

**vacation (1)**
55:19

**Values (1)**
59:10

**variation (1)**
144:5

**variations (4)**
75:14;107:9;143:18;
257:9

**variety (1)**
255:1

**various (12)**
15:13;26:9;128:13;
129:10;141:13;174:10;
175:1;186:1;194:12;
208:10;244:17;249:15

**vary (1)**
159:14

**vast (8)**
21:16;33:3;84:15;116:14;
132:10;168:5;206:4;251:1

**Vegas (8)**
112:14;148:1;151:2;
160:11;168:11;233:8,9;
263:15

**vehicle (1)**
143:13

**velocity (8)**
100:6;102:4;118:11,12,
16;119:1,4;133:11

**version (19)**
77:11;90:17,18,21;91:1;
96:10,13,15;97:6;105:18;
117:7,8,14;144:8;182:16;
202:6;224:10;254:9,12

**versions (7)**
129:4,6,10;137:3;200:15;
237:6;256:4

**versus (16)**

4:10;10:6,18;42:12;
43:15;44:12;45:15;46:1;
47:11;57:6;58:17;60:16;
69:5,9;71:8;242:20

**vibrate (1)**
157:21

**vibrates (1)**
157:17

**Vice (1)**
29:1

**video (2)**
7:19;18:18

**videos (1)**
151:9

**Vietnam (2)**
129:20;130:2

**Vietnamese (1)**
129:20

**view (14)**
62:14;65:3;83:1;84:7;
85:14;152:1,4,18;153:4;
201:19;205:20;243:16;
251:18;267:5

**views (2)**
250:13,16

**Virginia (2)**
4:18,19

**vision (1)**
181:20

**visiting (1)**
18:14

**vitae (1)**
237:17

**vitally (3)**
199:10,15;201:4

**Volition (1)**
179:12

**Volitional (1)**
178:19

**volume (3)**
120:20;122:3,19

**volunteers (2)**
27:6,9

**voted (1)**
65:10

## W

**wait (2)**
6:11,12

**Wakefield (1)**
230:7

**Waples (1)**
4:17

**W-a-p-l-e-s (1)**
4:17

**War (18)**
128:8;129:20;130:2;
136:16;155:16;160:5,8;
162:8,8;191:7;196:8,17;
197:21;198:5,11,12;203:17;
205:1

**Washington (1)**

187:1

**way (27)**
11:3;13:17;20:10;24:19;
45:5;69:21;71:13;75:8;
85:19;90:20;100:3;107:10;
154:11;160:11;166:10;
176:16;182:7;201:18;
203:14;206:5;208:19;
214:7,10;255:15;265:13;
266:11;267:5

**Wayne (1)**
28:20

**ways (1)**
205:13

**weapon (48)**
50:9;52:9,16;53:11,18;
54:1;72:14;73:1,2,4;76:11,
16;78:9;81:18;83:2;87:3,5;
92:3;134:16;135:10;
154:14;156:9;159:18;
162:18,18;163:16,17;
181:13,19;200:1,3;201:1,
20,20;202:2,5,13;203:2;
205:21;211:19;213:6,18;
214:5;232:16,20;233:3;
236:16;247:11

**weapon' (1)**
234:6

**weapons (59)**
5:3;10:17;12:6;13:11;
19:5;45:19;46:7,10,11;
47:20;48:1;49:14;50:5,6;
51:14,18;53:16,17;62:15;
63:7;64:7;65:13,20,21;
66:2;78:10,16;79:8,9;
81:21;83:12;98:5;103:2,9,
15,20;104:2,6,10;110:6;
150:1;151:12;161:19,19;
162:3;196:16;197:20;
199:18;202:9;203:14;
205:15;206:11;209:12;
210:19;211:6,13;213:7;
217:3,19

**wearing (1)**
147:3

**website (7)**
62:7,9;238:13,16,17,20;
249:18

**weekly (1)**
29:17

**weighing (1)**
224:5

**welcome (1)**
110:20

**weren't (5)**
129:2;191:16;196:20;
215:13;216:1

**what's (19)**
14:13;19:11;21:9;24:1;
27:14;28:8,21;65:3;84:11;
85:9;90:5;96:15;98:18;
106:14;137:3;150:19;
151:7;222:14;223:8

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 851 of 1262

David Seth Worman, et al.  vs.                                    James Supica -  Vol. 1
Charles D. Baker, et al.                                          October 30, 2017

**wheel (3)**
174:10;175:1;194:12

**whenever (3)**
153:11,21;243:5

**Whereupon (1)**
4:2

**white (2)**
221:10,13

**whole (3)**
4:5;235:13;240:15

**wide (3)**
139:16;222:16,16

**widely (11)**
84:20;130:11;136:16;
164:10;179:7,8,10,10,15;
193:8;196:21

**wife (1)**
145:15

**willing (3)**
58:20;89:19;138:5

**Wilson (2)**
45:15;46:19

**Winchester (3)**
95:5,14;162:7

**within (3)**
89:5;139:17;188:14

**without (4)**
51:2;128:19;149:10;
152:8

**witness (150)**
4:4;13:2;24:20;30:15,20;
31:10,17;32:3,8,14;35:8,13;
38:12;39:5;42:8;43:1,7,10;
44:2;46:9;50:20;53:1;
56:16;64:10;66:14;67:20;
68:6,12;69:14,15,21;71:10;
79:3;81:10;82:7;92:6;
105:15;106:17;107:3;
115:12;121:10,17;122:7;
123:9,17;124:5;125:4;
126:3;127:1;129:13;
150:15;158:18;159:10;
160:1,21;161:10;162:2,15;
163:1,7;164:9,20;165:5,15;
166:9;167:5,11;168:5,20;
171:9,19;172:10;173:2,10,
16;174:5;177:1;187:8,21;
188:10,16;189:4,20;194:5;
195:12;196:10;201:4,11;
202:11;206:3;207:11;
208:4,19;209:19;210:21;
212:2;220:2;221:20;224:2;
227:21;228:8,16;229:2;
230:3;233:1,12;234:10;
239:20;240:17,20;243:21;
245:19;246:7,13;248:11;
249:2;251:20;255:10,19;
256:12,21;257:6;259:8,16;
261:18;262:4,10,16;263:4,
11,17;264:4,12;266:14;
267:8,20;268:7,15;269:7,
12;270:5,10,19;271:10,17;
272:8,19;273:6,15;274:8

**woman (1)**
221:1

**women (2)**
220:16,18

**wood (3)**
216:6,10;217:6

**word (1)**
236:1

**words (2)**
233:18,21

**work (21)**
24:7,9,10,11;25:15;
26:21;27:4,7,18;28:12;
29:2;32:18;75:13;82:12;
149:20;155:13;158:3;
187:5;212:21;249:8;250:18

**worked (10)**
11:6,15,19;24:5;46:16;
47:4;50:1;180:5;187:19;
192:5

**workers' (1)**
24:12

**working (9)**
11:6,9;18:5;55:5,13;
56:14;59:12;69:12;197:6

**works (8)**
6:1;27:20;28:18;75:5,8;
148:10;192:18;244:3

**World (9)**
21:11,11;129:11;130:5,
12;162:8,8;203:17;205:1

**worlds (1)**
205:4

**Worman (4)**
4:10;10:18;42:12,16

**wow (1)**
59:17

**write (2)**
62:5;238:20

**writing (4)**
32:20;59:20;60:4;206:14

**written (5)**
7:18;59:16;60:2;70:14;
122:7

**wrong (5)**
27:15;103:20;202:18;
229:12;236:1

**wrote (7)**
59:7;62:2,3;196:5;237:9,
10,14

**X**

**XM-15 (1)**
232:1

**Y**

**yards (13)**
84:17,17;85:2,3;86:17,
18;87:9,11;88:7,9,12;
100:19;110:19

**year (7)**

23:3;51:11,16,19,20;
52:3;59:18

**yearly (1)**
34:15

**years (12)**
23:7;25:21;26:4;33:9,10;
36:10,21;52:1,7,17;150:8;
227:2

**YouTube (2)**
249:18,20

**Z**

**Zone (1)**
60:12

**1**

**1 (4)**
7:3,4;169:11;260:4

**1:13-CV-02841-CCV (1)**
71:16

**10 (6)**
184:9,13;241:17;251:12;
275:9,16

**100 (4)**
185:11;188:4,13;189:8

**100-round (2)**
229:17,18

**106 (1)**
261:2

**108 (1)**
260:2

**11 (2)**
23:7;199:7

**111 (1)**
275:4

**11250 (1)**
4:17

**11480 (1)**
4:18

**118 (1)**
257:12

**12 (3)**
139:6;253:21;254:1

**120 (3)**
264:18;265:1,8

**122 (2)**
264:18;265:3

**129 (1)**
264:21

**13 (1)**
275:6

**131 (1)**
268:18

**14 (2)**
224:7;268:18

**146 (1)**
272:10

**14th (3)**
174:19;193:15;194:9

**15 (5)**
9:14;16:6,11,13;241:17

**150 (2)**
108:5,9

**157 (1)**
273:20

**15th (3)**
9:17;59:10,19

**16 (5)**
184:9,9,13;206:19;
264:18

**1600s (1)**
176:1

**17 (3)**
209:10;243:4;265:1

**1777 (1)**
185:11

**1784 (1)**
183:18

**17th (10)**
174:19;175:16,18,21;
176:18;177:7;178:2;
193:16;194:9;195:3

**18 (4)**
217:14,15;265:9;272:12

**1820 (1)**
195:9

**1820s (1)**
193:8

**1830s (1)**
193:9

**1840s (1)**
193:9

**1850s (1)**
193:9

**1860s (1)**
193:9

**18th (10)**
167:2,5,7,16;178:5,7,10,
11;194:3;195:3

**1911 (1)**
274:12

**1934 (1)**
51:10

**1947 (1)**
128:7

**1960s (1)**
90:15

**1980 (2)**
23:4,18

**1980s (2)**
206:7,10

**1991 (1)**
23:18

**1994 (3)**
51:15;59:21;60:1

**19th (6)**
167:5,9;178:14;191:17;
193:2;195:3

**2**

**2 (9)**
9:4,8;42:5;59:5;103:9;
169:3;194:8;240:6,10

Case 1:17-cv-10107-WGY    Document 65-1    Filed 12/15/17    Page 852 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

James Supica -  Vol. 1
October 30, 2017

**20 (9)**
  33:9;52:17;117:3,13;
  147:1;184:9;220:11;
  231:15;257:14
**200 (2)**
  108:6,10
**2001 (1)**
  36:14
**2004 (1)**
  61:9
**2005 (1)**
  238:6
**2008 (2)**
  26:1;36:14
**2013 (1)**
  225:3
**2014 (1)**
  57:11
**2017 (3)**
  9:14,17;225:3
**22 (5)**
  95:18,19;219:14,16;
  225:2
**223 (10)**
  88:5,6;93:10;94:11;95:2,
  10;115:13;116:1;132:15;
  220:8
**23 (2)**
  227:9;238:3
**24 (2)**
  52:1;233:16
**25 (8)**
  84:17;85:2,3;86:18;87:9;
  123:1,21;234:2
**28 (1)**
  238:5
**29 (1)**
  237:20

## 3

**3 (14)**
  56:19;57:3;60:9;68:21;
  71:19;103:4,7;169:6;194:8;
  240:6,9;242:19;266:19;
  275:2
**3,000 (1)**
  100:8
**3.08 (1)**
  95:13
**30 (5)**
  33:10;117:3,13;190:21;
  243:2
**300 (2)**
  88:9;100:19
**30-06 (2)**
  162:8;218:11
**308 (2)**
  95:5;162:6
**30-round (1)**
  82:15
**30th (1)**
  113:10

**32 (1)**
  244:8
**33 (2)**
  42:4,7
**357 (1)**
  218:9
**3600 (3)**
  109:16;110:7,17
**37 (1)**
  249:6
**38 (1)**
  218:9
**39 (3)**
  95:5;132:11;133:9

## 4

**4 (5)**
  58:7,11;60:11;68:21;
  178:15
**4,000 (2)**
  110:17,19
**4:16 (1)**
  276:5
**44 (3)**
  203:17;204:11;218:9
**45 (2)**
  107:7;108:3
**460 (1)**
  111:19

## 5

**5 (3)**
  70:4,5;72:6
**5.56 (5)**
  88:5;93:15;94:10;95:2;
  132:15
**5.56-millimeter (2)**
  115:15,17
**50 (4)**
  83:21;84:17;87:11;
  132:17
**500 (3)**
  88:12;113:21;168:18
**51 (1)**
  251:10
**550 (1)**
  111:19
**59 (2)**
  113:19;168:17

## 6

**6 (5)**
  57:11;102:11,15;119:17;
  120:3
**600 (1)**
  112:6

## 7

**7 (4)**

**7.62 (11)**
  94:13,15,18,20;95:4,4,5,
  7,11;132:11;133:9
**7-13 (1)**
  125:8
**7-14 (1)**
  122:13
**72 (1)**
  252:5
**73 (1)**
  252:5
**7-38 (1)**
  125:10
**7-8 (1)**
  120:11
**7-9 (1)**
  120:8

72:9;119:12,13;120:2

## 8

**8 (6)**
  73:10;236:3,4;264:19;
  265:3,8
**800 (1)**
  112:6
**86 (1)**
  253:21
**8-millimeter (1)**
  218:11

## 9

**9 (5)**
  236:19;237:3;241:18;
  244:15;261:8
**90 (2)**
  33:4;112:3
**90s (1)**
  52:12

1                    CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6    Any additions or corrections that I feel are necessary

7    will be made on the Errata Sheet.

8    (Approx. 31 corrections)

9

10

11    _____

12                   JIM SUPICA

13

14    12 / 6 / 2017
     _____

15                   Date

16

17    (If needed, make additional copies of the Errata Sheet

18    on the next page or use a blank piece of paper.)

19

20

21

278

1                    ERRATA SHEET (page 1 of 2)

2    Case:  David Worman, et al. vs. Charles Baker, et al.

3    Witness: JIM SUPICA                    Date:  10/30/2017

4    PAGE/LINE   SHOULD READ                REASON FOR CHANGE

5      7/14     Subst. "Jim" for "John"                  Error

6      44/8     Subst. "Cody" for "encoding"             Error

7      75/16    Add "platform" after "AR-15"             Error

8      80/9     Subst. "recoil" for "recall"             Error

9      95/13    Subst. ".308" for "3.08"                 Error

10   116/15&16  Subst. "different chamberings"
                For "indifferent chambering"             Error

11     118/15   Subst. "version" for "in forth"          Error

12     125/13   Subst. "burst" for "reversed"

13     126/3    Subst. "The rate" for "As rate"          Error

14     127/8    Subst. "AK platform" for "AK-47 platform"   Error

15     131/5    Subst. "are some" for "is some"          Error

16     135/1    Subst. "army" for "Army"                 Error

17     144/19   Subst. "Just as" for "just ask"          Error

18     145/1    Subst. "speed" for "street"              Error

19     149/10   Delete "on it"                           Error

20     155/1    Add "legal" after "are"                  Error

21     172/15   Subst. "inoperative" for "an operative"   Error

278

1                    ERRATA SHEET (page 2 of 2)

2    Case:  David Worman, et al. vs. Charles Baker, et al.

3    Witness: JIM SUPICA                    Date: 10/30/2017

4    PAGE/LINE  SHOULD READ                 REASON FOR CHANGE

5    177/7&8    This is a continuous sentence

6    184/5      Subst. "price" for "prices"           Error

7    193/12     Subst. "facts" for "fact"             Error

8    198/16     Subst. "impart spin" for ", in part, extend" Error

9    199/18     Subst. "weapons" it's" for "weapons." It's"Error

10   204/15     Subst. Sturmgemehr" for "stormy affair"    Error

11   214/15     Subst. "each" for "these"            Error

12   218/13     Subst. "bolt" for "bold"             Error

13   220/16     Subst. "and" for "of"                Error

14   222/4      Subst. "shoot. A gun" for "shoot a gun"    Error

15   234/20     Subst. "first" for "fist"            Error

16   237/12     Subst. "book this" for "this book"        Error

17   253/20     Subst. "Inaccurately" for "And accurately" Error

18   270/10     Subst. "are" for "is"                Error

19   _____

20   _____

21   _____

278

1                    CONFIDENTIAL DESIGNATIONS SHEET

2     Case:  David Worman, et al. vs. Charles Baker, et al.

3     Witness: JIM SUPICA                    Date: 10/30/2017

4     PAGE/LINE   TO   PAGE/LINE        REASON  FOR  CONFIDENTIALITY

5      4/18            4/19             Personal firearms

6      5/10            17/13            Home address

7      17/18           18/1            Personal firearms

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

# EXHIBIT 12

## TO KAPLAN DECLARATION

DANIEL COURT REPORTING, INC.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

DAVID SETH WORMAN, et al.,

    Plaintiffs,               Case No.

vs.                      1:17-CV-10107-WGY

MAURA HEALEY, et al.,

    Defendants.

\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF GARY KLECK

\* \* \* \* \* \* \* \* \* \*

Taken before Kathy Hart Canaday, Registered Professional Reporter, Certified Court Reporter #586 and Notary Public for the State of Alabama, on the 25th of October, 2017, at 9:18 a.m. at the offices of Bradley, Arant, Boult, Cummings, One Federal Place, 1819 5th Avenue North, Birmingham, Alabama 35203.

DANIEL COURT REPORTING, INC.

Page 2

1              S T I P U L A T I O N

2

3        IT IS STIPULATED and agreed by and between

4     the parties through their respective counsel

5     that said deposition may be taken by me on this

6     date.

7        IT IS FURTHER STIPULATED and agreed that it

8     shall not be necessary for any objections to be

9     made by counsel to any questions, and that

10    counsel for the parties may make objections and

11    assign grounds at the time of the trial, or at

12    the time said deposition is offered in evidence,

13    or prior thereto.

14       IT IS FURTHER STIPULATED that notice of

15    filing of deposition is waived.

16

17

18

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 3

1                    A P P E A R A N C E S

2

3       FOR THE PLAINTIFF:

4            James W. Porter, III

5            Candice L. Rucker

6            Bradley, Arant, Boult, Cummings

7            One Federal Place

8            1819 5th Avenue North

9            Birmingham, Alabama 35203

10

11      FOR THE DEFENDANT:

12           Gary Klein

13           Senior Trial Counsel

14           The Commonwealth of Massachusetts

15           One Ashburton Place, 18th Floor

16           Boston, MA 02108

17

18

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 4

1                      TABLE OF CONTENTS

2

3        EXAMINATION BY:

4         MR. KLEIN                                        5

5

6                       EXHIBIT INDEX

7

8        NO.    DESCRIPTION                           PAGE

9         1     Subpoena and Notice of Deposition       8

10        2     Expert Report of Gary Kleck dated      21
               09/09/2017

11

         3     Declaration of Gary Kleck dated       140

12             03/16/2014

13        4     Deposition of Gary Kleck dated        169
               01/02/2014

14

15

16      REPORTER'S CERTIFICATE                        193

17      READING AND SIGNING LETTER                    194

18

19

20

21

22

23

Page 5

1                I, Kathy Hart Canaday, a Certified

2        Court Reporter for the State of Alabama acting

3        as Commissioner, certify that on this date, as

4        provided by the Alabama Rules of Civil Procedure

5        and the foregoing stipulations of counsel, there

6        came before me this witness in the above cause,

7        for oral examination, whereupon the following

8        proceedings were had:

9

10                       GARY KLECK,

11             being first duly sworn, was examined

12             and testified as follows:

13

14                      EXAMINATION

15       BY MR. KLEIN:

16             Q.    It's Dr. Kleck, correct?

17             A.    Sure.

18             Q.    I'm Gary Klein.  I'm one of the

19       lawyers for the Defendants in the matter of

20       Worman versus the Attorney General of the State

21       of Massachusetts.  We're here today for your

22       deposition.  Have you had your deposition taken

23       before?

Page 6

1          A.    Yes.

2          Q.    That means you have an understanding

3     of the way these depositions work?

4          A.    Yes.

5          Q.    You understand that you've taken an

6     oath to answer all questions truthfully to the

7     best of your ability, right?

8          A.    Yes.

9          Q.    Just a couple of quick ground rules.

10    First, it's important that we try not to talk

11    over each other.  If we do, it makes the

12    reporter's life difficult because she can't take

13    everything down.  Okay?

14         A.    Okay.

15         Q.    What that means is I want you to wait

16    until I finish a question before you try to

17    answer; and by the same token, I'll try to wait

18    for you to answer completely before I ask

19    another question.  Okay?

20         A.    Yes.

21         Q.    If you have any concern that you

22    don't understand a question, please let me know;

23    because if you answer the question, I'm going to

1    assume that you understood it.  Okay?

2         A.   Okay.

3         Q.   And if you need a break at any time,

4    just let me know.

5         A.   I will.

6         Q.   Can you state your home and business

7    address for the record?

8         A.   I'm retired, so I don't really have a

9    business address.  [Redacted]

10   [Redacted]

11        Q.   Can you tell me when you retired?

12        A.   May of last year, 2016.

13        Q.   And what position did you retire

14   from?

15        A.   Professor.

16        Q.   At what institution?

17        A.   Florida State University, College of

18   Criminology and Criminal Justice.

19        Q.   Do you still have any affiliation at

20   all with Florida State University?

21        A.   Yes, I'm an emeritus professor.

22        Q.   What are your duties as an emeritus

23   professor?

DANIEL COURT REPORTING, INC.

Page 8

1          A.    Not a thing.  It's all privilege and

2     no duties.

3          Q.    That sounds pretty awesome.  Do you

4     have any other businesses or work that you're

5     engaged in at this time?

6          A.    Other than in consulting like this,

7     no.

8          Q.    So you take on consulting projects --

9          A.    I do.

10          Q.    -- for various purposes?

11          A.    I do.

12          Q.    People who want to use you as a

13     consultant contact you at home?

14          A.    Yes.

15               (Whereupon, Defendant's Exhibit 1

16                was marked for identification and

17                same is attached hereto.)

18          Q.    I'm going to show you a document

19     that's labeled Exhibit 1.

20               MR. KLEIN:  Do you have a copy of

21     this?

22               MR. PORTER:  I didn't bring one, but

23     I don't need one.

Page 9

1         Q.    Is this a document you've seen
2    before?
3         A.    It is.
4         Q.    And you understand this to be a
5    subpoena for your testimony today?
6         A.    I do.
7         Q.    If you turn to the third to last
8    page, I want to direct your attention to the
9    bottom paragraph on that page.  Do you see it?
10        A.    Yes.
11        Q.    The Deponent -- it says this, right,
12   the Deponent is directed to bring with him his
13   file for this matter including, but not limited
14   to correspondence, handwritten notes, memoranda,
15   photographs, video recordings, studies, reports,
16   literature, spreadsheets, electronic
17   communications he has reviewed or authored in
18   regards to this matter.  Did I read that
19   correctly?
20        A.    You did.
21        Q.    Have you brought anything with you
22   today?
23        A.    I have my notebook computer and it

1    has this material in it.  Well, it doesn't have

2    handwritten notes.  But I don't really have any

3    handwritten notes.

4         Q.    Everything else here would be on your

5    computer?

6         A.    I believe so.

7         Q.    And is it your intention to reference

8    it?

9         A.    Of the things that are relevant of

10   the things that I have, they're on there.  I

11   don't think I make any use of photographs or

12   video recordings.

13        Q.    So you consider the file on your

14   computer for this matter to be your file for

15   this case?

16        A.    Yes.

17        Q.    So I think I need you to do me a

18   favor and open up your computer and just read me

19   the file names of the documents you have with

20   you.

21        A.    One is called 140 section 121 and

22   13M -- 131M.

23        Q.    Do you know what that -- let's take

1        them one at a time just so I can ask you what

2        they are.

3              A.    I'd have to open it up.

4              Q.    Go ahead.

5              A.    That appears to be the Massachusetts

6        statute defining assault weapon.

7              Q.    And that's something you reviewed in

8        connection with this matter?

9              A.    Yes.

10             Q.    What file is next?

11             A.    AGO interrogatory responses.  And

12       let's see, that is responses of Maura Healey in

13       her capacity as Attorney General for Plaintiffs'

14       First Set of Interrogatories to all Defendants.

15             Q.    And that's something you reviewed in

16       connection with this case?

17             A.    Yes.  Although, I probably couldn't

18       tell you a thing about it.  It really doesn't

19       have any bearing on any of my opinions.  But

20       it's in there.

21                   Colwell report.  So that's a report

22       by one of your witnesses.  EOPSS interrogatory

23       responses, final.  And that is responses of

1      Defendant Daniel Bennett in his capacity as

2      Secretary of Public Safety and Security to

3      Plaintiffs' First Set of Interrogatories to all

4      Defendants.

5          Q.   Is that something you reviewed in

6      this case?

7          A.   It is.  But again, I couldn't tell

8      you anything that's in it.  It didn't have

9      anything to do with my conclusions.

10              The next one is EOPSS spreadsheet A,

11     INTS, I-N-T-S, period, 2017, 88-COR.  And that

12     is a spreadsheet, an Excel spreadsheet, which I

13     didn't really make use of.  But it's some kind

14     of listing of crimes, I think.

15         Q.   So you're saying that's something you

16     didn't make use of?

17         A.   No.  Yeah -- I mean, this is stuff

18     that was sent to me, but it's not necessarily

19     anything that, you know, had any influence on my

20     opinions.

21              Then there is Gius, G-I-U-S, 14 AW

22     bans.  And that's an article by a guy named

23     Gius, G-I-U-S, on the effect of assault weapon

DANIEL COURT REPORTING, INC.

1    bans on murder rates in general.

2         Q.   Is that something you reviewed in

3    connection with your opinion?

4         A.   Yes.  I had read it before, but I

5    reviewed it again.

6         Q.   Could you read me the title one more

7    time?  I'm sorry.

8         A.   Okay.  It's G-I-U-S 14.  That's my

9    way of denoting it.  It's the year it was

10   published.  AW bans, B-A-N-S.

11        Q.   And is J-I-U-S (sic) the publication

12   name?

13        A.   G-I-U-S.

14        Q.   G-I-U-S.

15        A.   That's the author's name.

16        Q.   I see.  And do you remember the

17   author's conclusions in that matter?

18        A.   I think he concluded no effect of

19   assault weapon bans on general homicide rates.

20             Okay.  And the next one is -- I think

21   it's my declaration in the Maryland case.  It's

22   titled MD Declaration K5.  Oh, it's expert

23   report of Gary Kleck.  I may have duplicate

Page 14

1    copies of that in the file.

2         Q.   And that's your report in the

3    Maryland case that we were talking about

4    earlier?

5         A.   Yes, Kolbe et. al, versus O'Malley,

6    et. al.

7         Q.   Thank you.  What's next?

8         A.   I think this is the duplicated.  It's

9    MD Expert Report of Gary Kleck, Final.  And I

10   think it's really just the same thing.  Yeah.

11   It says the same thing, so there's duplicates of

12   that.

13        Q.   I'm just going to have to remind you

14   to keep your voice up so the reporter can take

15   down your answers.

16        A.   Oh, okay.

17        Q.   Thank you.

18        A.   Let's see, the next one is titled MSP

19   Response to Interrogatories.  And it is titled

20   Defendant Colonel Richard D. McKeon's Responses

21   to Plaintiff's First Set of Interrogatories.

22   And again, I read it, but I couldn't tell you

23   anything about it.  It didn't have any impact on

DANIEL COURT REPORTING, INC.

Page 15

1    my opinions.

2              Then Notice of Enforcement is the

3    next file.  And this is where the Attorney

4    General's office defines what they mean by

5    copies or duplicates of weapons.

6         Q.   Okay.

7         A.   And then there is -- oh, it's called

8    Sig Mass, S-I-G M-A-S-S, and it's just the

9    signature page in my expert report for the

10   Massachusetts case.

11        Q.   Okay.

12        A.   And the next one is Spitzer comments.

13   And that was comments on one of your experts,

14   Robert Spitzer, I think.

15        Q.   When you say comments on, that's

16   something you wrote or something you received

17   that he wrote?

18        A.   Something I wrote.  My comments on

19   his report.  And then the next file is Spitzer

20   report, the thing I was commenting on.

21              And then the next one is The Impact

22   of State and Federal Assault Weapons Bans on

23   Public Mass Shootings, which is another article,

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 873 of 1262
DANIEL COURT REPORTING, INC.

Page 16

1      a different one by G-I-U-S.  And I don't know

2      how that's pronounced.  And in this case the

3      focus is on the effect of assault weapon bans on

4      public mass shootings rather than murder in

5      general, which is what the first article was

6      about.

7              Q.    Do you remember what the conclusions

8      were?

9              A.    He said it did have an impact.

10             Q.    That it did have an impact?

11             A.    Yes.

12             Q.    Thank you.

13             A.    And the next one is labeled UCR

14     05-15.  And it's a table from the Uniform Crime

15     Reports.  Actually it's a series of tables.  And

16     it's murder by state, type of weapon for the

17     years 2005 through 2015, I think.  And that was

18     supplied to me, I think, by Mr. Porter.  It's

19     already labeled an exhibit, so somebody used it

20     as an exhibit.  And it basically confirms that

21     murdering with any kind of rifle, assault rifle

22     or otherwise are virtually nonexistent in

23     Massachusetts.  I mean, zero or one in a typical

1       year.

2                   And then the next one is Washington

3       hashtag, or whatever that symbol is,

4       62891-V1-Worman, underscore, report.  Let's see.

5       I think that's my expert report in this case.

6       Is this Worman?

7               Q.    Yes.

8               A.    Yeah, that's what it is.

9               Q.    That's the last time I let you ask me

10      a question and I answer it.

11              A.    I need help.  And then the last file

12      in the file is the report of James Yurgealitis.

13      And the file is titled Yurgealitis Report.

14      That's it.

15              Q.    I just have a couple of questions

16      about the documents you've just reviewed with

17      me.  You mentioned that you made notes on

18      Spitzer's report.  Is that something you shared

19      with counsel?

20              A.    Yes.

21              Q.    Did you make notes on Colwell's

22      report?

23              A.    Oh, yes -- yeah.  In fact, the

Page 18

1       Spitzer comments might encompass that as well.

2       They're mostly about Spitzer.  But there may be

3       a little bit about -- yeah, there's also some

4       stuff about Colwell in there.  So what I -- the

5       file labeled Spitzer Comments is actually about

6       Spitzer, Colwell and Yurgealitis.  But it's

7       mostly about Spitzer, so that's why I called it

8       Spitzer Comments.

9            Q.   And have you been asked to prepare an

10      additional declaration or report for this matter

11      based on your review of those reports?

12           A.   Beyond my expert report?

13           Q.   Yes.

14           A.   No.

15           Q.   And you mentioned an article by

16      Mr. Gius, the second one, Effect of State

17      Assault Weapons Bans on Public Shootings.  Is

18      that the correct title?

19           A.   The Impact of State and Federal

20      Assault Weapons Bans on Public Mass Shootings.

21           Q.   And you mentioned that he concluded

22      that it did have an impact, right?

23           A.   That's what he concluded.

DANIEL COURT REPORTING, INC.

Page 19

1          Q.    Is that something you considered in

2     connection with your report in this matter?

3          A.    Considered and rejected, because it's

4     too flawed to draw any conclusions.

5          Q.    So you believe that study is flawed?

6          A.    Yes.  Well, all studies are flawed,

7     but this one is fatally flawed.

8          Q.    And when you say all studies are

9     flawed, I assume you include your own?

10         A.    Yeah, absolutely.  Everybody's are.

11         Q.    And that's because the data and

12    information available to do these studies is

13    typically flawed, right?

14         A.    It's either flawed or it's

15    incomplete.  It might be perfectly fine as far

16    as it goes, but we're missing crucial or

17    relevant information.

18         Q.    Is it fair to say that when you're

19    missing crucial or relevant information, that's

20    a flaw in the data that affects the study?

21         A.    I would make a distinction between

22    information you have and you know there's

23    problems with it versus information you don't

Page 20

1    have.

2         Q.    But both are effectively limitations

3    on what you can conclude based on the data?

4         A.    Yes.

5              MR. KLEIN:   All right.   Let me just

6    ask counsel if he would object to production of

7    the notes that Dr. Kleck made on the expert

8    reports he reviewed?

9              MR. PORTER:   Yes, we would object.

10        Q.    All right.   So what I would like to

11   do, and figure out how to do this over the

12   course of the next couple of hours, is ask you

13   to give me copies of the two Gius articles.

14   J-I-U-S or G-I-U-S?

15        A.    G.

16        Q.    G-I-U-S.   And of the UCR data table

17   that you have in your file.

18              MR. KLEIN:   Off the record for just a

19   minute.

20              (Off-the-Record discussion)

21        Q.    So you reviewed all of the documents

22   and described them all that are in your computer

23   file for this case, right?

DANIEL COURT REPORTING, INC.

Page 21

1        A.    Yes.

2        Q.    Is there anything else that you

3    reviewed, other documents in connection with

4    preparing your report in this case?

5        A.    Only the things that are cited in the

6    expert report that are in that list of

7    references.

8        Q.    So if you listed something as a

9    reference, it meant that you reviewed it?

10       A.    It is.

11             (Whereupon, Defendant's Exhibit 2

12              was marked for identification and

13              same is attached hereto.)

14       Q.    So let me give you this document,

15    Exhibit Number 2.

16             MR. KLEIN:  You don't need this one,

17    right?

18             MR. PORTER:  Right.  This is for

19    Worman and not the copy from Kolbe, correct?

20             MR. KLEIN:  That's right.

21             MR. PORTER:  Okay.  That's fine.

22       A.    This looks likes there's two of them.

23       Q.    Oh, that's possible.  Was there a

DANIEL COURT REPORTING, INC.

Page 22

1    copying error made?

2              A.    (Indicating).

3              Q.    You can pull them apart.

4              A.    (Witness complies).

5              Q.    I'll take that back.

6              A.    I knew it was a little thick.

7              Q.    Do you feel like that's a complete

8    report at this time?

9              A.    Well, it was more than complete, it

10   was twice as long.

11             Q.    What I have, just so we're sure we

12   have the full copy of your report, is a report

13   that begins on the first page.  It says at the

14   top, Expert Report of Gary Kleck.  Do you see

15   that?

16             A.    Yes.

17             Q.    And that's you, right?

18             A.    Yes.

19             Q.    And then on the last page -- page 41;

20   is that right?

21             A.    Yes.

22             Q.    And the last thing on that page is

23   Flanagan versus Becerra, a U.S. District Court

DANIEL COURT REPORTING, INC.

1          case from the Central District of California?

2               A.   Yes.

3               Q.   Do you understand this to be the

4          expert report you produced and that was served

5          on us in connection with this matter?

6               A.   I believe so.

7               Q.   And if you go to page 14 of this

8          report, is that your signature?

9               A.   Yes, it is.

10               Q.   And at the top of that page it says

11          References.  Are those the references you

12          described earlier as other things that you

13          reviewed in connection with the preparation of

14          this report?

15               A.   Yes.

16               Q.   So these references, together with

17          the material in your computer file, are the

18          things you reviewed in connection with the

19          preparation of the report?

20               A.   Yes.

21               Q.   And just to be clear, you mentioned

22          that you had a copy of Dr. Colwell's report,

23          Mr. Yurgealitis's report and Professor Spitzer's

DANIEL COURT REPORTING, INC.

1    report.  Those are things that were provided to

2    you after you completed your work on your

3    declaration, right?

4         A.   I'm not sure I had a declaration, I

5    had an expert report.  Is there a distinction?

6         Q.   I wasn't making any distinction.

7         A.   Oh.  I don't really know when I got

8    those.  My vague recollection is I got those

9    after I had done the report, after September

10   9th.  But really, I honestly can't remember.  If

11   what you're getting at is did it have any affect

12   on the content of the expert report, the answer

13   is no.

14        Q.   Thank you.  The report you prepared

15   for this case is similar to a report you

16   prepared in the case, Kolbe versus O'Malley that

17   we've been discussing?

18        A.   Yes.

19        Q.   And in that case you also worked on

20   behalf of the Plaintiffs and their claim that

21   the assault weapons ban in Maryland is

22   unconstitutional, right?

23        A.   I didn't really opine on the

DANIEL COURT REPORTING, INC.

Page 25

1    constitutionality or any other legal issues.  I

2    was asked for a criminological assessment.

3        Q.   But you worked on behalf of the

4    Plaintiffs, right?

5        A.   Yes, I did.

6        Q.   And the same, you worked on behalf of

7    the Plaintiffs in terms of their claim

8    concerning large capacity magazines, right?

9        A.   Yes.

10       Q.   So do you remember making changes to

11   the report that you made for Maryland when you

12   produced the report for this case?

13       A.   Yes.  I don't think they were of any

14   great substance or significance.  But the only

15   one of possible significance would be in between

16   those two cases, I had completed work on my own

17   study of large capacity magazine use in mass

18   shootings.  And so, the current report in this

19   case alludes to that one.  It's listed in the

20   references.

21       Q.   So, your study is listed rather than

22   the data that you provided in connection with

23   the earlier report?

DANIEL COURT REPORTING, INC.

Page 26

1       A.    Right.  And there are changes in that

2    study.

3       Q.    Okay.  So, I am -- I was going to get

4    to this issue later, but let me just ask some

5    preliminary questions about it now.  If you will

6    turn to page 13 of your report.

7       A.    (Witness complies).

8       Q.    At the bottom of that page it says,

9    Source: Kleck (2016).  Do you see that?

10       A.    Yes.

11       Q.    And that's a reference to the report

12    that's listed on page 14 called Large Capacity

13    Magazines and the Casualty Counts in Mass

14    Shootings, the Plausibility of Linkages, which

15    was published in the Journal of Justice Research

16    and Policy.  Is that right?

17       A.    That's right.

18       Q.    And so, in the Maryland report, if

19    I'm not mistaken, you had an appendix that

20    listed data.  Is that data the data that was

21    primarily the source for the 2016 article?

22       A.    No.  That's what I'm alluding to when

23    I say there was a change.

DANIEL COURT REPORTING, INC.

1          Q.    So how was the data changed from what

2    you --

3          A.    Um --

4          Q.    -- provided to --

5          A.    You'll laugh at me for not realizing

6    this immediately.  But it occurred to me,

7    belatedly, the only kinds of mass shootings in

8    which a large capacity magazine could possibly

9    have affected the number of casualties; that is,

10   the number of people killed or injured, is if

11   the incident involved a shooter who used a large

12   capacity magazine.  And so there was no need to

13   review the thousands, literally thousands of

14   mass shootings where there's no affirmative

15   evidence that the person used a large capacity

16   magazine.  And so, the second study is

17   confined -- the second version of the study is

18   confined to cases where it was publicly known

19   that the shooter had used a large capacity

20   magazine.

21         Q.    So, when you say confined to, you

22   mean that you selected only studies where there

23   was some sort of public report or a news report

1          that suggested that a large capacity magazine

2          was used?

3                  A.    That's correct.

4                  Q.    And it's possible that large capacity

5          magazines were used in some of the other mass

6          shootings, but you didn't have any news report

7          or public report to reach that collusion, right?

8                  A.    Yeah.   There was no publicly

9          available evidence affirmatively establishing

10         the involvement of a large capacity magazine.

11         It wouldn't have to be a media report.   In some

12         cases there were publicly available reports from

13         governmental entities; law enforcement agencies,

14         commissions and so forth.

15                 Q.    But the absence of such a report that

16         mentions a large capacity magazine doesn't mean

17         that no large capacity magazine was used in

18         those incidents, right?

19                 A.    Not definitively, no.   It's possible,

20         though unlikely, that large capacity magazines

21         were used in other incidents where it wasn't

22         explicitly mentioned.

23                 Q.    And why do you say it's unlikely?

1          A.    Because there are people powerfully

2     motivated to identify every single case of a

3     mass shooting in which a large capacity magazine

4     is used, including essentially every major gun

5     control advocacy organization.  They have staff

6     literally combing through media reports, looking

7     for any indication of large capacity magazine

8     use.

9          Q.    So when you did that study, did you

10    go through all the gun control advocacy groups'

11    materials about mass shootings?

12         A.    Yes.

13         Q.    And you looked for evidence that they

14    might have turned up that a large capacity

15    magazine was used?

16         A.    Yes.

17         Q.    Isn't it possible that in some

18    shootings there is no access, either by the

19    public or to a advocacy group looking for the

20    issue that bears on the question of what type of

21    magazine was used?

22         A.    I kind of lost the thread of your

23    question.

DANIEL COURT REPORTING, INC.

Page 30

1          Q.    That's fair enough.  It wasn't a

2     particularly well-asked question.

3               It's possible that there are mass

4     shootings in which there is no public

5     information about the type of magazine that was

6     used?

7          A.    Yes.

8          Q.    In connection with the case Kolbe

9     versus Maryland, you worked with the same

10    lawyers that you're working with in this matter,

11    correct?

12         A.    Honestly, I don't remember.

13         Q.    You don't remember that it was the

14    same law firm?

15         A.    No, I really don't retain that kind

16    of information.  Sorry.

17         Q.    Have you worked with the Bradley firm

18    in other cases?

19         A.    I think I have, yeah.

20         Q.    But you don't know which cases?

21         A.    No.

22         Q.    Do you know if it's more than one

23    other case?

Page 31

1          A.    Don't know, no.

2          Q.    What is your definition of a mass

3     shooting?

4          A.    In the research I did, I defined it

5     as a single incident in which more than six

6     people were killed or injured.

7          Q.    Have you ever used a different

8     definition in connection with research you've

9     done?

10         A.    I don't recall any offhand.  It's

11    possible it was slightly different in a book I

12    wrote called Point Blank.  But it's -- yeah, in

13    that case it might have been incidents which

14    have a minimum number of people killed and it

15    didn't take account of people non-fatally

16    wounded.  But you're asking me about something

17    published a quarter of a century ago, so I don't

18    really recall exactly what definition I used.

19         Q.    Have you ever used a definition which

20    involved four or more deaths or injuries in

21    connection with a shooting?

22         A.    I don't think so.

23         Q.    Are you aware that there are

Page 32

1      institutions and other individuals who have done

2      research where they've used that definition?

3            A.   Yes.

4            Q.   And is there a basis on which you

5      choose six as a threshold for mass shooting?

6            A.   My thinking initially was that the

7      most common capacity of revolvers is six rounds.

8      And so the distinction was between incidents

9      where somebody would need something beyond the

10     capacity of a traditional six-shot revolver to

11     shoot that many victims.  So that's why it was

12     up through six versus over six.

13           Q.   And so the concept that you're using

14     in creating the definition that you use for your

15     research is that if someone had a six-shot

16     revolver, they could kill or injure six

17     individuals, right?

18           A.   Yes.

19           Q.   But, of course, if you have a

20     six-shot revolver, you could also miss somebody

21     with at least one of your shots, right?

22           A.   Yes.  And any numerical cutoff is

23     somewhat arbitrary.  That one just struck me as

DANIEL COURT REPORTING, INC.

1      a little less arbitrary.

2            Q.   Do you have any sense of how many

3      mass shootings under your definition there have

4      been in the last twelve months in the United

5      States?

6            A.   Total or involving large capacity

7      magazines?

8            Q.   Total.

9            A.   No.

10           Q.   And do you have any sense of how many

11     shootings --

12           A.   Well, actually, as I sit here, no.

13     But I may have noted that from the Shooting

14     Tracker website.  I may have tabulated that kind

15     of count.  I couldn't tell you what it is here

16     and now, but I might well have done that.

17           Q.   What is the Shooting Tracker website?

18           A.   Shootingtracker.com is an internet

19     website that's devoted to compiling data on gun

20     violence.  And the portion that's relevant to my

21     research on large capacity magazines was a

22     compilation of every shooting in which -- I

23     think their cutoff is four or more people are

Page 34

1    shot, either fatally or non-fatally, and

2    they've -- as far as I can tell, they fairly

3    comprehensively covered incidents for roughly

4    the last three years or so when they started

5    around 2014 or so.

6         Q.   So they use a definition of four or

7    more deaths or injuries?

8         A.   I think they do, yes.

9         Q.   And do you then cull them for mass

10   shootings that meet your definition of six or

11   more?

12        A.   Well, those would be a subset, yes.

13        Q.   Right.  Do you yourself sort the data

14   and information they publish in order to

15   identify those that involve six or more injuries

16   or deaths?

17        A.   I believe at one time I did compile a

18   count like that.

19        Q.   And you rely on the Shooting Tracker

20   website for your research?

21        A.   Other than that simple -- I really

22   rely on it for one point, which is that there's

23   this enormous number of mass shootings and

DANIEL COURT REPORTING, INC.

Page 35

1      hardly any of them involve, as far as we know, a

2      large capacity magazine being used.  It's under

3      one percent of the mass shootings listed on the

4      Shooting Tracker.

5           Q.   It's less than one percent where they

6      have identified the shooting to involve a large

7      capacity magazine?

8           A.   No.  The Shooting Tracker website

9      establishes, as best we can, the full universe

10     of mass shootings.  But the information on how

11     many mass shootings involve use of a large

12     capacity magazine, I relied primarily on the

13     Violence Policy Center's compilation of such

14     incidents.  And again, they are an entity

15     well-motivated to identify as many of the cases

16     publicly known to involve large capacity

17     magazines as they could.  And if you take their

18     number in a typical year, divide it by the

19     number of mass shootings defined on Shooting

20     Tracker, it's well under one percent.

21          Q.   And do you happen to know the

22     methodologies employed by the Violence Policy

23     Center to identify shootings that involve large

Page 36

1    capacity magazines?

2         A.   I believe it searches news media

3    outlets, and I believe primarily using the

4    internet.

5         Q.   And so in general, you believe that

6    the best information we have about mass

7    shootings is what's published in media reports

8    or which is otherwise publicly available in a

9    public report by a governmental agency?

10        A.   It's best in some respects.  It's

11   best in the extent of its coverage.  It wouldn't

12   be best in terms of the details about each

13   incident.  No one law enforcement source would

14   cover large numbers of mass shootings as I've

15   defined them.  But a law enforcement agency that

16   was involved in investigating a particular mass

17   shooting would have considerable detail that

18   doesn't show up in a news media outlet.

19        Q.   So it's possible that large capacity

20   magazines were used in a particular incident,

21   but that it was never -- that information was

22   never released in any form to a news media

23   outlet, correct?

DANIEL COURT REPORTING, INC.

Page 37

1       A.    It's possible.

2       Q.    And when you do your research, you

3   don't attempt to find nonpublic police reports

4   about mass shooting incidents, right, you rely

5   on what's publicly available?

6       A.    Well, I wouldn't be able to get law

7   enforcement reports that were not publicly

8   available.  For example, recent cases where, you

9   know, the case is still under investigation.

10  Normally outsiders couldn't get access to those

11  files.  But for some of the more prominent cases

12  that had been resolved, for example, the shooter

13  was dead, there was often a publicly available

14  report on the internet and I made use of that.

15      Q.    So really your research is

16  internet-based research, correct?

17      A.    Yes.  Including the fact that

18  material that originally appeared in print then

19  may appear on the internet.

20      Q.    Right.  So you don't know if the

21  Violence Policy Center is using

22  shootingtracker.com to identify the mass

23  shooting incidents it investigates, do you?

1          A.    I don't know one way or the other for

2     sure.  But they would be foolish not to make use

3     of that resource.

4          Q.    And when you cull through the

5     information that's available from the Violence

6     Policy Center about large capacity magazines,

7     you don't include incidents where five or fewer

8     individuals were killed or injured, right?

9          A.    I don't include -- no, actually it's

10    six or fewer.

11         Q.    So your definition is --

12         A.    Over six.

13         Q.    More than six?

14         A.    Right.  Over six.

15         Q.    So it has to be at least seven killed

16    or injured in the incident?

17         A.    Correct.  Correct.  But could you ask

18    the question again?  I'm not sure I answered it.

19         Q.    Right.  When you review the material

20    published by the Violence Policy Center, you

21    aren't looking at the incidents which involve

22    six or fewer individuals killed or injured?

23         A.    Yeah, I don't count the ones as mass

DANIEL COURT REPORTING, INC.

Page 39

1      shootings that have six or fewer victims.  For

2      example, sometimes their counts include the

3      offender if he's killed during the incident.

4      And so the numerical criterion refers to number

5      of victims, not counting offender or offenders,

6      plural.

7           Q.   Thank you for that clarification.  So

8      it's possible that there are some incidents with

9      six or fewer victims that involve large capacity

10     magazines and you wouldn't count those as large

11     capacity magazines used in mass shootings?

12          A.   That's correct.

13          Q.   Since you wrote the report in this

14     matter, there was a mass shooting in Las Vegas.

15     Are you aware of that?

16          A.   Yes.

17          Q.   Are you familiar with that incident?

18          A.   Only what I've seen in the news.

19          Q.   And you have reviewed the news

20     reports that are publicly available to get some

21     understanding of that incident?

22          A.   A little bit, yeah.

23          Q.   And do you understand how many people

DANIEL COURT REPORTING, INC.

Page 40

1      were killed in that incident?

2            A.   I don't really recall the number,

3      just that it was very large.

4            Q.   Very large meaning approximately how

5      many?

6            A.   Certainly at least dozens, maybe over

7      a hundred, I'm not sure.

8            Q.   And how many people were injured?

9            A.   Hundreds.

10           Q.   But you don't know the number?

11           A.   No.

12           Q.   Does the fact of the mass shooting in

13     Las Vegas change any of the opinions in your

14     report?

15           A.   No.

16           Q.   Do you know if the shooter in that

17     incident used any AR-15 rifles?

18           A.   I've seen news reports to the fact he

19     used an AR style -- one or more AR style rifles.

20           Q.   Do you have any reason to disagree

21     with the news reports you've seen?

22           A.   No.

23           Q.   Do you know if the shooter in

Page 41

1      those -- strike that.

2                  Do you know if the shooter in Las

3      Vegas used any AK-47 rifles?

4            A.   I don't know.

5            Q.   Do you know if any of the AR-15

6      rifles that has been reported that he's used

7      could have been acquired legally in

8      Massachusetts at this time?

9            A.   I don't know.

10           Q.   Do you have any sense of how many

11     rounds were fired in Las Vegas?

12           A.   My impression was hundreds.

13           Q.   Do you have any sense of the rate of

14     fire in the Las Vegas incident?

15           A.   I heard the audio from the news

16     reports.  And it sounded on the order of

17     full-auto fire, although it turned out he didn't

18     have a fully-automatic weapon.

19           Q.   So based on news reports, your

20     understanding is he had semi-automatic AR-15

21     style rifles?

22           A.   Yes, with the device known as a bump

23     stock.

DANIEL COURT REPORTING, INC.

Page 42

1      Q.    Do you know if he used any large

2   capacity magazines in the shooting in Las Vegas?

3      A.    I don't know.

4      Q.    You haven't seen any reports

5   suggesting that he had large capacity magazines?

6      A.    I don't recall any reports on the

7   capacity of the magazines.

8      Q.    So even though this is an issue that

9   you've studied for your academic research, you

10   didn't take the time to figure out whether he

11   had large capacity magazines in Las Vegas?

12          MR. PORTER:  Object to the form of

13   the question.  You can answer.

14      A.    No, it would have been totally

15   irrelevant to my research.

16      Q.    Why would that have been irrelevant?

17      A.    It's a utterly unique case in almost

18   every significant respect and it doesn't allow

19   one to make any generalizations about mass

20   shootings in general, never mind violence or gun

21   violence in general.

22      Q.    So you would have not included it in

23   your report because you considered it unique?

 1          A.   Well, I probably would have included

 2     it had my study period included 2017, but it

 3     didn't.  I mean, you have to stop your research

 4     at some point.  And I think I covered up through

 5     2014 or so, so -- and at that point stopped.

 6     So, no, it wouldn't encompass any very recent

 7     incidents.

 8          Q.   When you say it's utterly unique, how

 9     is it different from other mass shooting

10     incidents that you've studied?

11          A.   The number of victims, the number of

12     rounds fired, the fact that the shooter was

13     firing from 400 yards away from an elevated

14     position.  The fact that even now it seems

15     unmotivated by a person who had no prior

16     indication of mental illness and who is wealthy

17     and successful in life, whereas the typical mass

18     shooter is a person who is something of a

19     failure in life.  I can't think, for example, of

20     any other mass shooting involving such a wealthy

21     person who was the shooter.  So it's bizarre and

22     unusual and unrepresentative in any conceivable

23     way.

DANIEL COURT REPORTING, INC.

Page 44

1          Q.   Have --

2          A.   But had I been doing an analysis of

3    all mass shootings that did encompass 2017, it

4    would have been included.  It would have been

5    one highly unusual case that I wouldn't expect

6    to be repeated or typical or part of a pattern

7    likely to be repeated in the future.  But yes,

8    it would have qualified because more than six

9    people were shot.

10          Q.   Have you studied the demographics of

11    other mass shooters?

12          A.   It's never been a focus.  The focus

13    was not on the shooters, the focus was on the

14    weaponry.

15          Q.   Are you familiar with the mass

16    shooting in Newtown, Connecticut?

17          A.   Yes.

18          Q.   Do you know anything about the

19    economic status of the shooter in Newtown,

20    Connecticut?

21          A.   As I recall, he was a kid and he was

22    from a moderately but not extremely wealthy

23    family.

DANIEL COURT REPORTING, INC.

1      Q.    And do you recall the incident in San

2   Bernardino, California?

3      A.    Not offhand, no.

4      Q.    So you have no sense of the

5   demographics of the shooter in San Bernardino?

6      A.    No.

7      Q.    Do you remember a shooting in Aurora,

8   Colorado at a movie theater?

9      A.    Yes.

10      Q.    Do you have any understanding of the

11   demographics of the individual who committed

12   that mass shooting?

13      A.    Young, white male.  Those are

14   demographics.

15      Q.    But not his economic status?

16      A.    No.

17      Q.    Do you have a recollection of the

18   shooting at the Pulse Nightclub in Florida?

19      A.    Yes.

20      Q.    Do you have any understanding of the

21   demographics of the shooter in Florida?

22      A.    Of his socioeconomic status, no.

23      Q.    Are you aware that the CDC publishes

DANIEL COURT REPORTING, INC.

Page 46

1      data about firearms fatalities by state?

2           A.   Yes.

3           Q.   Do you have any reason to doubt the

4      accuracy of the CDC's data?

5           A.   Could you repeat the first question

6      before the one about do I have any reason to

7      doubt?

8           Q.   Are you aware that the CDC, the

9      Center for Disease Control, publishes data about

10     firearm fatalities by state?

11          A.   No, not the counts as just fatality

12     counts, firearm fatality counts.  The doubts are

13     about the classification of them as homicide,

14     suicide or unintentional.

15          Q.   So I think we have perhaps unclarity

16     in the record at this point.  You do know that

17     the CDC publishes data about firearm fatalities,

18     right?

19          A.   Yes.

20          Q.   And you believe that the counts are

21     accurate, right?

22          A.   Yes, when they lump all firearms

23     deaths together, those are pretty accurate.

DANIEL COURT REPORTING, INC.

Page 47

1        Q.   What you don't necessarily agree with

2   is the way they're segmenting those firearm

3   fatalities into buckets for homicide, criminal

4   activity or other categories, right?

5        A.   It's not the way CDC is doing it.

6   They're just passively taking the information

7   provided by the attending physician or medical

8   examiner who filled out a death certificate.   So

9   I wouldn't blame CDC for any flaws in

10  misclassification.   It's just that the

11  information was erroneous on the death

12  certificate in the first place.

13       Q.   So you believe that in some cases

14  death certificate information is unreliable?

15       A.   Yes.   It's not unreliable regarding

16  whether the victim died of a gunshot wound, it's

17  unreliable as to whether or not it was other

18  inflicted versus self-inflicted or whether it

19  was intentional or unintentional.   It's also

20  often incomplete as to the type of gun that's

21  involved.

22       Q.   Do you happen to know where

23  Massachusetts ranked nationally in the rate of

DANIEL COURT REPORTING, INC.

Page 48

1    firearm deaths in the last five years?

2         A.    No.

3         Q.    Do you know where Florida ranks?

4         A.    No.

5         Q.    Do you know where Alabama ranks?

6         A.    No.

7         Q.    Do you have any sense that some

8    states have substantially fewer firearm deaths

9    than other states?

10        A.    Yes.

11        Q.    And you are unsure about the reason

12   some states have fewer firearm deaths than

13   others?

14        A.    Well, I'm sure about some of the

15   reasons.  And some of the reasons would include

16   that, A, they have more violent people

17   regardless of weaponry involved; and, B, they

18   have higher gun ownership.

19        Q.    So if I told you that Massachusetts

20   ranks somewhere between 1 and 5 in terms of the

21   number of firearm facilities and Alabama tends

22   to rank somewhere between 46 and 50 year in and

23   year out, would you agree with that?

1        A.    I would be astounded if that were

2    true.  That Massachusetts is high and Alabama is

3    low?

4        Q.    I probably stated it the wrong way in

5    the question, so I apologize.

6        A.    You were talking about rankings.

7        Q.    Yeah.

8        A.    So you meant would I be surprised if

9    Massachusetts doesn't have much and Alabama had

10   a lot?

11       Q.    That's right.

12       A.    No, I would not be surprised by that.

13       Q.    And you would attribute that to the

14   fact that there's more violent people in Alabama

15   and more firearms in Alabama than in

16   Massachusetts?

17       A.    Correct.

18       Q.    Is it possible that Massachusetts'

19   gun control laws have an impact on the number of

20   guns available in Massachusetts?

21       A.    It's possible, but I don't think

22   historically that's what the evidence indicates.

23   Because not just Massachusetts, but the entire

DANIEL COURT REPORTING, INC.

Page 50

1      northeastern part of the country, as far as we

2      know, always had low gun ownership, even before

3      significant gun controls that might have reduced

4      that number were implemented.  That's mostly a

5      phenomenon of the 20th Century.  And we have

6      evidence that it was always the south and west

7      that had high gun ownership and it was always

8      the northeast that had low gun ownership, even

9      from the late 19th Century and earlier.

10          Q.   Is it possible that gun control laws

11     that make it harder for people to acquire guns

12     contribute to fewer guns being available in

13     those states?

14          A.   It can contribute to fewer guns being

15     available to criminals and other high-risk

16     subsets of the population.  But since they're a

17     small subset of the population, it wouldn't be

18     enough to show up for the population as a whole,

19     which is the way I interpreted your original

20     question to refer to the full population of

21     those states.

22          Q.   And is this an issue that you've done

23     research on?

DANIEL COURT REPORTING, INC.

Page 51

1          A.    Yes.

2          Q.    And so, you don't draw any connection

3    in your research between states that have higher

4    levels of gun control and the level of gun

5    ownership in those states?

6          A.    That's correct.  I mean, in fact the

7    research I've done affirmatively indicates that

8    gun control laws don't effect gun ownership

9    rates, at least for the population as a whole,

10   which is about all we have data on.

11         Q.    But not state by state?

12         A.    Well, some of the research was of

13   states, but it wasn't focused on any one state.

14         Q.    Do you have data for Massachusetts?

15         A.    Probably buried in my computer files

16   that describe states, it would be one of the 50

17   states included.  But at no point has the focus

18   ever been narrowly on Massachusetts in

19   particular.

20              MR. KLEIN:  Let's take a break.

21              (Brief recess was taken from

22              10:13 a.m. to 10:23 a.m.)

23         Q.    Dr. Kleck, can you explain your

Page 52

1      understanding of what the case in which your

2      report has been offered is about?

3          A.   My understanding is that the legal

4      dispute is mainly over how the Attorney General

5      has recently defined duplicate or copy weapons

6      and thus, the scope of what is encompassed under

7      the definition of assault weapon.

8          Q.   And not about the statute itself?

9          A.   That wasn't my understanding.

10         Q.   Did you review the complaint in this

11     matter?

12         A.   I believe I did.  Probably, yeah.

13         Q.   Did you review the answer filed by

14     the Defendants in this case?

15         A.   I don't remember what that is.

16         Q.   Did you review any deposition

17     testimony of any individuals in connection with

18     your preparation of the report?

19         A.   I'm not sure if there were

20     depositions, but -- no, I don't think there were

21     -- I'm sorry, let me revise that.  Not

22     depositions.  I've read expert reports of other

23     people, but I don't think I've read any

Page 53

1   depositions.

2          Q.   Are you referring to the expert

3   reports you mentioned that you have in your

4   file?

5          A.   Yes.

6          Q.   And you think you reviewed those

7   after you produced your report?

8          A.   Maybe.  I'm really not sure.

9          Q.   Possibly --

10         A.   The only thing I can be confident

11  about is that it didn't have any effect on the

12  report, it was irrelevant to the report.  But

13  whether I read them before or after I prepared

14  the report, I don't know.

15         Q.   Dr. Kleck, have you ever lived in

16  Massachusetts?

17         A.   No.

18         Q.   Other than the law that you have in

19  your file, have you reviewed any other

20  Massachusetts state laws that touch on gun

21  ownership?

22         A.   Well, in the course of doing those

23  studies that I mentioned before that either

DANIEL COURT REPORTING, INC.

Page 54

1      encompass all 50 states or all the seventh large

2      cities, one of the states or, you know, some of

3      the cities for which I would have that

4      information would include the state of

5      Massachusetts or Boston as a city within it.

6      But it wouldn't be a focus on either

7      Massachusetts or any cities within

8      Massachusetts.  In other words, I would be

9      coding for the kind of gun control laws that all

10     states had or for the city ordinances that all

11     large cities might have.

12          Q.   And based on that research, do you

13     understand that many, many weapons are not

14     banned in Massachusetts, including many semi-

15     automatic weapons?

16          A.   Yes.

17          Q.   And that those are available -- ones

18     that are not banned are available for use in

19     self-defense?

20          A.   Yes.

21          Q.   Are you aware that the Attorney

22     General has explicitly said that the Ruger

23     Mini-14 semi-automatic rifle is not banned?

DANIEL COURT REPORTING, INC.

Page 55

1          A.    I was not aware of that.

2          Q.    But if I told you that were true, you

3     would conclude that that weapon could be used in

4     self-defense, correct?

5          A.    Yes.

6          Q.    Or if I told you that the M1A is not

7     banned in Massachusetts, that weapon could also

8     be used in self-defense, correct?

9          A.    Yes, I mean, if the circumstances

10    permitted it.  I mean, you know, if its long

11    size was not a problem, if the penetrating power

12    of rifles versus handguns was not a problem,

13    yes, in some circumstances it could be used for

14    self-defense.

15         Q.    So the long size and penetrating

16    power you think might limit the uses of the gun

17    for self-defense, correct?

18         A.    Correct.

19         Q.    And you understand, too, that all

20    magazines 10 rounds and under are available to

21    civilians in Massachusetts, correct?

22         A.    Yes, that is my understanding.

23         Q.    And that those are available for

DANIEL COURT REPORTING, INC.

Page 56

1      self-defense uses as well?

2              A.    Yes.

3              Q.    Do you have any understanding as you

4      sit here of the Massachusetts law of self-

5      defense?

6              A.    Not really, no.

7              Q.    Have you ever studied the

8      Massachusetts law of self-defense for any

9      purpose?

10             A.    If I have, I don't recall doing so.

11             Q.    Are you a lawyer?

12             A.    No.

13             Q.    Have you been trained in the law?

14             A.    No.

15             Q.    Are you offering any legal opinions

16     in connection with this case?

17             A.    No.

18             Q.    Is it fair to say that a summary of

19     your academic work at the broadest level is that

20     regulation of guns typically has little or no

21     effect on stopping crime?

22             A.    That's certainly a large portion of

23     my research.  Although, a lot of my research

1       doesn't have anything to do with guns and the

2       research that does have to do with guns often

3       does not address the issue of the effect of gun

4       control laws on violence.

5              But of that portion that does address

6       that topic, it indicates that most gun control

7       laws have no measurable net effect on violence

8       rates.  An exception would be background checks,

9       which I have endorsed and supported since as

10      early as 1991, including expanding background

11      checks to cover private transfers as well as

12      dealer transfers, what is today known as

13      universal background checks.  And you know,

14      there are a few other measures that may have

15      effects, like bans on acquisition by alcoholics

16      or mentally ill people.

17          Q.   Anything else?

18          A.   Those are the primary exceptions that

19      I can think of.  So, yes, a minority of gun

20      control laws seem to have measurable net effects

21      on violence rates, but the vast majority do not.

22          Q.   And is it fair to say that you

23      generally believe that gun regulation doesn't

Page 58

1        have effects on the number of individuals who

2        are shot in mass shootings?

3               A.    You mean the average number per mass

4        shooting or --

5               Q.    In mass shootings overall.  I think

6        you could think about it as an average number if

7        that's convenient for you.

8               A.    If that's the case, no, I do not

9        think that it has any such effect.

10              Q.    What about the overall number?

11              A.    Well, the gun control laws that

12       basically reduce access to guns among dangerous

13       people can have effects on any kind of gun

14       violence, including mass shootings.  It wouldn't

15       have effects especially for mass shootings, it

16       would just restrict -- it would make it less

17       likely somebody may have a gun to engage in any

18       kind of gun violence.

19              Q.    So you mentioned that you're aware

20       that the shooter in Las Vegas had a device

21       called a bump stock?

22              A.    Yes.

23              Q.    Are you familiar with what a bump

DANIEL COURT REPORTING, INC.

Page 59

1    stock is?

2            A.    No.

3            Q.    Not even to the point that you

4    understand that it increases the rate of fire

5    for a semi-automatic weapon to which it is

6    attached?

7            A.    That, I understand.

8            Q.    Had the shooter in Las Vegas not had

9    access to a bump stock, do you think fewer

10   people would have died?

11           A.    I have no idea.

12           Q.    Do you think the rate of fire in Las

13   Vegas made a difference to the number of people

14   who died?

15           A.    Probably.  Although I haven't given

16   it any detailed attention, but probably.

17           Q.    So if the bump stock has the effect

18   of increasing the rate of fire, would it have an

19   impact on the number of people who died?

20           A.    In that unique incident, probably,

21   yeah.

22           Q.    And you can't imagine other incidents

23   where the same effect could occur?

DANIEL COURT REPORTING, INC.

Page 60

1          A.   Well, I can imagine lots of things.

2    But I just don't know of any real world

3    incidents where it would have made much

4    difference.  All I know about real world

5    incidents is that regarding rate of fire,

6    they're not remotely like the incident in Las

7    Vegas.  Instead, the rate of fire tends to be

8    quite low, way below what the firearms capacity

9    would permit.

10         Q.   And you're basing that on --

11         A.   And certainly nothing like what we

12   observed in Las Vegas.

13         Q.   You're basing that on the Kleck

14   (2016) study that we mentioned earlier?

15         A.   Yes.

16         Q.   Is it fair to say that your work in

17   general has concluded that the existence of

18   large capacity magazines have little or no

19   effect on criminal activity?

20         A.   I didn't catch the last part of the

21   question.

22         Q.   Have little or no effect on criminal

23   activity?

1          A.   Yes, that would be a fair

2     description.

3          Q.   And they have little or no effect on

4     the number of individuals shot in mass

5     shootings?

6          A.   Correct.

7          Q.   Let's turn to page 41 of your report,

8     if we can.  I think that's the last page.

9          A.   (Witness complies).

10         Q.   There are a number of cases here in

11    which you've been deposed or testified in the

12    last ten years.  In each of those cases, did you

13    testify on behalf of the Plaintiffs, if you

14    remember?

15         A.   Not in the Barbra Schlifer

16    Commemorative Clinic versus HMQ Canada case.

17         Q.   What was that case about?

18         A.   That was a challenge to Canada's

19    decision to get rid of its registration system.

20    And the Plaintiffs in that case were challenging

21    the decision they wanted it retained.

22         Q.   So you worked in favor of the party

23    that wanted it thrown out?

1          A.    For it to continue to be thrown out;

2     that is, the government of Canada.

3          Q.    So in the Illinois Association of

4     Firearm Retailers case, the first one listed,

5     your testimony was on behalf of the Illinois

6     Association of Firearm Retailers?

7          A.    Yes.

8          Q.    And it was against a restriction on

9     gun ownership, correct?

10         A.    Yes.

11         Q.    In Heller versus the District of

12    Columbia, your testimony was on behalf of

13    Heller, correct?

14         A.    Yes.

15         Q.    And it was against the restrictions

16    imposed by the District of Columbia?

17         A.    Yes.

18         Q.    In Cook versus Hickenlooper, your

19    testimony was on behalf of Cook, right?

20         A.    Yes.

21         Q.    And it was against the restrictions

22    on large capacity magazines that were at issue

23    in that case?

DANIEL COURT REPORTING, INC.

Page 63

1          A.   Yes.

2          Q.   In Wilson versus Cook County, your

3     testimony was on behalf of Wilson, right?

4          A.   Yes.

5          Q.   Is --

6          A.   Well, I'm not sure.  You would have

7     to refresh my memory.  I've been involved in

8     more than one case in Cook County or Chicago.  I

9     was temporarily involved in a case where it was

10     the City of Chicago who wanted me to testify.

11     And then it went nowhere, it didn't result in a

12     deposition or testimony.  I think this was a --

13     I really just don't remember what that case was

14     about.

15          Q.   Do you ever remember testifying in

16     favor of restrictions on gun ownership or large

17     capacity magazines?

18          A.   No.

19          Q.   In Kolbe versus O'Malley, the case

20     that we've talked about before this morning,

21     your testimony was on behalf of Kolbe, right?

22          A.   Yes.

23          Q.   And it was against the restrictions

DANIEL COURT REPORTING, INC.

Page 64

1      in Maryland law on large capacity magazines in

2      certain types of firearms, right?

3              A.   Yes.

4              Q.    In Arie Friedman and the Illinois

5      State Rifle Association v. City of Highland

6      Park, your testimony was on behalf of

7      Dr. Friedman and Illinois State Rifle

8      Association?

9              A.   Yes.

10             Q.    And it was against the restrictions

11     on certain guns that were imposed in the City of

12     Highland Park, right?

13             A.    Correct.

14             Q.    In Tracy Rifle & Pistol versus Kamala

15     Harris, your testimony was on behalf of Tracy

16     Rifle & Pistol?

17             A.   Yes.

18             Q.    And it was against restrictions

19     imposed by the state of California?

20             A.   Yes.

21             Q.    And in Flanagan versus Becerra, same

22     thing, right?

23             A.   Yes.

DANIEL COURT REPORTING, INC.

Page 65

1      Q.  ██████ ████ ████████ █ ████ ████████

2  ██ ████ ████████ ████ ██████ ████████ ████████

3      Q.  Have you ever shot an AR-15 type

4  rifle?

5      A.  I don't believe so.

6      Q.  Have you ever shot an AK-47 type

7  rifle?

8      A.  I don't believe so.

9      Q.  Have you ever used a large capacity

10  magazine?

11      A.  Well, yeah, because anything over ten

12  rounds is large, so I've used guns that had a

13  15-round magazine.

14      Q.  And is that in the context of

15  shooting at a rifle range?

16      A.  It was at a range of some kind.  I

17  don't think it was a rifle range.

18      Q.  And then I assume it's fair to say

19  that you've shot semi-automatic weapons?

20      A.  Yes.

21      Q.  And you've changed magazines on semi-

22  automatic weapons?

23      A.  Yes.

DANIEL COURT REPORTING, INC.

1      Q.   Are you a member of the National

2   Rifle Association?

3      A.   No.

4      Q.   Have you ever been?

5      A.   No.

6      Q.   Do you remember who asked you to

7   participate in this matter as an expert?

8      A.   Might have -- I assume it was Jay

9   Porter.  Might have been.

10      Q.   And do you remember who asked you to

11   participate as an expert in the Kolbe case?

12      A.   I think it was someone else in the

13   same firm.  Kolbe is the Maryland case?

14      Q.   Yes.

15      A.   I think it was somebody else in the

16   same firm.

17      Q.   Do you know approximately how many

18   times you've worked with that firm?  Is it more

19   than twice?

20      A.   I don't recall whether there were any

21   other occasions besides those two.

22      Q.   When you bill for your time and work

23   on this litigation, who do you send the bill to?

DANIEL COURT REPORTING, INC.

1          A.    Bradley, Arant.

2          Q.    And how much have you billed so far

3    in connection with this case?

4          A.    I'd have to consult my records.  I

5    don't know that I've billed anything yet.

6          Q.    Do you have any sense of how many

7    hours you've put in on this case other than for

8    today's deposition?

9          A.    Really, again, I would have to

10   consult my records.

11         Q.    Are you aware that the National Rifle

12   Association is paying the costs in this case?

13         A.    I was not aware, but I'm not

14   surprised.

15         Q.    Why are you not surprised?

16         A.    Because the National Rifle

17   Association has an interest in the issue and

18   they most definitely oppose these kinds of laws.

19         Q.    What's your understanding of how fast

20   an average person can change a magazine on a

21   semi-automatic weapon?

22         A.    Probably on the order of four

23   seconds.

DANIEL COURT REPORTING, INC.

1          Q.   Is that about how fast you could

2     change one?

3          A.   Yes, easily.

4          Q.   Would it take longer in some cases if

5     the person changing the magazine was under

6     stress?

7          A.   It's possible.

8          Q.   Is it possible to take a new magazine

9     and fumble it in the process of putting it into

10    the gun?

11         A.   It's possible.

12         Q.   If that happened, it would take

13    longer than four seconds, right?

14         A.   Yes.

15         Q.   It could also take longer if the

16    person hadn't organized themselves to keep their

17    magazines in easy reach for the purpose of

18    changing them, right?

19         A.   Yes.

20         Q.   Meaning that if the magazine were not

21    in a belt or in a pocket that was easily

22    available, it would take longer to change the

23    magazine, right?

DANIEL COURT REPORTING, INC.

Page 69

1          A.    Under those circumstances, yes,

2     probably would.

3          Q.    Could take far longer than two to

4     four seconds, right?

5          A.    I don't know about far longer.  I

6     mean, I could imagine it taking 10 or 20

7     seconds.

8          Q.    And if the magazine were on a table

9     across the room, it could take even longer,

10    right?

11         A.    It would have to be a pretty big room

12    to take more than 20 seconds to get to it.

13         Q.    Are you familiar with a device called

14    a trigger crank?

15         A.    No.

16         Q.    Are you familiar with a device known

17    as a Binary AR trigger?

18         A.    No.

19         Q.    Are you familiar with a device called

20    an AutoGlove?

21         A.    No.

22         Q.    We talked about bump stocks earlier

23    and you mentioned that you had some very limited

Page 70

1          sense of what a bump stock does, right?

2               A.    That's very limited, yes.

3               Q.    You're aware that at least the bump

4          stock is available to people who own semi-

5          automatic weapons for the purpose of speeding up

6          their rate of fire, right?

7               A.    Yes.

8               Q.    And you don't know how quickly the

9          rate of fire can be increased on a semi-

10         automatic weapon using the device, right?

11              A.    Only that it can increase it to

12         approximately the rate of a full-auto weapon.

13              Q.    And you base that on, at least in

14         part, on hearing the audiotape of the Las Vegas

15         incident?

16              A.    Yes.  Watching news video that had

17         audio to it and listening to that audio portion

18         of it.

19              Q.    Have you looked at any other videos

20         that demonstrate the use of a device like a bump

21         stock?

22              A.    No.

23              Q.    In your work, have you ever studied

Page 71

1        law enforcement practices for issuance of guns?

2              A.    I don't understand the question.

3              Q.    Do you know if law enforcement

4        agencies typically issue guns to individuals who

5        have not been trained on them?

6              A.    You're talking civilians, then?

7              Q.    I'm talking about law enforcement

8        officers.

9              A.    Oh, police officers.  I guess my

10       answer would be I don't think I'm qualified to

11       answer that question.

12             Q.    In your opinion would it make sense

13       for law enforcement officers to be issued guns

14       that they haven't been trained on?

15             A.    No.

16             MR. PORTER:  Object to the form of

17       the question.  You can answer.

18             A.    No.

19             Q.    Does it make sense for civilians to

20       be allowed to use guns that they haven't been

21       trained on?

22             MR. PORTER:  Same objection, but you

23       can answer.

Page 72

1           A.    I'm not quite sure how to respond to

2     that.  You tell me if this is responsive.

3                 MR. PORTER:  Great.

4                 MR. KLEIN:  Your lawyer is going to

5     explode.

6                 MR. PORTER:  Please, go ahead.

7           A.    If you're getting at should people be

8     required to demonstrate prior training on the

9     particular firearm that they're intending to

10    acquire, I'd say that it's a procedure that's

11    subject to a lot of abuse, you know, because

12    basically, you can set the standards higher and

13    higher.  You can, for example, on the one hand

14    require that people demonstrate their competence

15    in handling the gun by requiring them to go to a

16    range, but then, you know, making it illegal to

17    have firearms ranges anywhere near the person's

18    home, in which case you've made it very

19    difficult, albeit not impossible, to meet the

20    training requirements.

21                But if you're asking do I think it's

22    better to have training than not having

23    training, well, I'm an educator and I think more

DANIEL COURT REPORTING, INC.

Page 73

1    education and training is good, so, you know.

2            MR. PORTER:  Was that responsive?

3            THE WITNESS:  You tell me.

4            MR. KLEIN:  Neither you nor the

5    witness gets to ask me questions that I have to

6    answer during the deposition.

7        Q.   So what term are you comfortable with

8    to describe the weapons that have been designed

9    as assault weapons in Massachusetts?

10       A.   I guess I'm not comfortable with any

11   term because I'm uncomfortable with the

12   definition itself.  It's obviously the statutory

13   term is assault weapons.  But, you know, that

14   term does not define anything mechanical about

15   how the gun functions and, thus, why it might be

16   more dangerous than other guns.  Instead it's a

17   label that applies to an arbitrary subset of

18   firearms that are not defined by either how

19   dangerous they are or how often they've been

20   used to commit violent crimes.

21       Q.   So are you comfortable just calling

22   them assault weapons and you'll understand that

23   to mean weapons that are banned as assault

DANIEL COURT REPORTING, INC.

1      weapons under the Massachusetts definition?

2             A.    Yeah, I would be comfortable as long

3      as you understand we're only talking about the

4      Massachusetts definition, and the Massachusetts

5      definition encompasses basically an arbitrary

6      subset of firearms.

7             Q.    When you use the term "arbitrary" in

8      that context, would you consider that a legal

9      opinion?

10            A.    No, it's a criminological opinion

11     because it's a matter of the guns don't have any

12     characteristics that are known to involve --

13     that advance a violent person's desire to do

14     violence with a gun.  And that distinguishes the

15     weapons defined as assault weapons from those

16     not defined as assault weapons.

17            Q.    So they have no effect on the use

18     that a criminal might make of them?

19            A.    Well, they don't necessarily have

20     that kind of property, and the ones that are not

21     assault weapons lack that property.  In other

22     words, it doesn't really distinguish the guns

23     with and without that dangerous property.

DANIEL COURT REPORTING, INC.

Page 75

1          Q.    So you just disagree with the

2     Massachusetts definition, right?

3          A.    Well, I don't think it's an effective

4     way of identifying guns that are especially

5     dangerous or likely to be used in crime.

6          Q.    That's your personal opinion or an

7     expert opinion?

8          A.    It's my expert opinion.

9          Q.    Are you aware that the Massachusetts

10     definition of assault weapons includes AR-15

11     pattern rifles?

12          A.    Yes.

13          Q.    Are you aware that it includes AK-47

14     pattern rifles?

15          A.    Yes.

16          Q.    What else are you aware that it

17     includes?

18          A.    It includes what are claimed to be

19     duplicates or copies of those weapons, as well

20     as a variety of other specifically named models,

21     as well as weapons that have two or more

22     purportedly military style features, things like

23     flash suppressors, bayonet lugs and the like.

DANIEL COURT REPORTING, INC.

Page 76

1      Q.   And one of the opinions you have is

2   that there are other guns that have similar uses

3   for criminals that aren't banned, right?

4      A.   Yes.

5      Q.   Are you aware of any incidents in

6   which an AR-15 pattern rifle was used by a

7   civilian in self-defense in Massachusetts?

8      A.   No.

9      Q.   Do you have any knowledge of an

10   incident in which an AK-47 type rifle was used

11   by a civilian in self-defense?

12      A.   No.

13      Q.   Are you aware of any circumstances in

14   which an assault weapon that is within the

15   Massachusetts definition has been used by an

16   individual in Massachusetts in self-defense?

17      A.   No.

18      Q.   Are you aware of any circumstances

19   where any semi-automatic rifle was used by a

20   civilian in self-defense in Massachusetts?

21      A.   No.

22      Q.   Are you aware of any incident in

23   which a large capacity magazine was used by a

Page 77

1        civilian in self-defense in Massachusetts?

2              A.    No.

3              Q.    Is it your opinion that anything that

4        is available to law enforcement should equally

5        be available to civilians?

6              A.    No.

7              Q.    And that applies to any guns

8        available to law enforcement?

9              A.    I don't understand that question.

10             Q.    Is it your opinion that if a gun is

11       available to law enforcement, it should also be

12       available to civilians?

13             A.    Not necessarily, no.

14             Q.    And is it your opinion that if a

15       large capacity magazine is available to law

16       enforcement, it should also be available to

17       civilians?

18             A.    Not necessarily.  Let me expand on

19       that.  It doesn't matter -- it's irrelevant

20       whether law enforcement had it or not.

21             Q.    But the fact that law enforcement has

22       it doesn't mean that civilians are also entitled

23       to the --

DANIEL COURT REPORTING, INC.

1          A.    It wouldn't be sufficient to make it

2     okay for civilians to have it all by itself.

3          Q.    Thank you.  So you have written about

4     the question of why people support gun control;

5     is that right?

6          A.    Yes.

7          Q.    What is your conclusion on that

8     question?

9          A.    Part of the -- the obvious part of

10    the explanation is that people believe,

11    correctly or not, that it will reduce gun

12    violence.  So that's the instrumental or

13    utilitarian justification for the laws.  But

14    that doesn't really explain much of the

15    variation across individuals and their opinions

16    about gun control.

17              In addition to that -- not instead of

18    but in addition, people's stereotypes about gun

19    owners have an effect; that is, the more of a

20    negative stereotype you have about gun owners,

21    the more likely you are to support stricter gun

22    laws.

23          Q.    What about mass shootings?  Does that

DANIEL COURT REPORTING, INC.

Page 79

1    have an impact on people's beliefs about gun

2    control?

3         A.    Temporarily.  It's a transitory

4    effect.  We know from public opinion polls that

5    support for gun control goes up in the weeks

6    after a highly-publicized mass shooting and then

7    after a few weeks, it declines to the

8    pre-shooting level.

9         Q.   And does that mean if people knew

10   more about mass shootings because there was more

11   publicity about them that the effect would go

12   longer?

13        A.    Well, it wouldn't be a matter of

14   knowing more about the shootings, it would be a

15   matter of being reminded of them more often and

16   more recent.

17        Q.    Well, if we knew the level of

18   frequency of mass shootings because they were

19   all equally publicized, would that effect be

20   extended?

21             MR. PORTER:  Object to form of the

22   question, but you can answer that.

23        A.    It wouldn't be, you know, their

Page 80

1      knowledge of how many there are.  That wouldn't

2      have any effect on people's views.  But hearing

3      about more of them via news media accounts more

4      often, I believe that would have a transitory

5      effect.  And if you had that kind of account

6      every day to remind people of the issue, then

7      it's more likely to have a sustained effect in

8      elevating gun control support.

9          Q.    Do you know -- you mentioned that you

10     rely on a website called shootingtracker.com?

11         A.    Yes.

12         Q.    And you mentioned that you use a

13     different definition of what a mass shooting is

14     than shootingtracker.com, right?

15         A.    Yes.

16         Q.    Do you have any sense of how many

17     mass shooting incidents shootingtracker.com has

18     catalogued for 2017?

19         A.    No.

20         Q.    Do you have any sense of how many

21     incidents of mass shootings shootingtracker.com

22     catalogued for 2016?

23         A.    I believe it was in the hundreds.

DANIEL COURT REPORTING, INC.

Page 81

1          Q.    And for 2015?

2          A.    Also in the hundreds, I believe.

3          Q.    Have you ever looked at a website

4     called the Gun Violence Archive?

5          A.    Yes.

6          Q.    Is that a website similar to

7     shootingtracker.com?

8          A.    I think that might be the same thing.

9     I think it might be the name of the organization

10    and the website URL is www.shootingtracker.com.

11    I think that's the same thing.

12         Q.    And so you consider that a reasonably

13    reliable source of information about --

14         A.    As far as I know.

15         Q.    And you understand them to be using

16    the kinds of publicly available information that

17    you have also looked for in your research

18    yourself?

19         A.    Yes.  It's basically the same pool of

20    information everyone draws on.

21         Q.    Including news reports?

22         A.    Yes.

23         Q.    Are you aware that in 2017 to date,

DANIEL COURT REPORTING, INC.

Page 82

1      shootingtracker.com has identified 290 mass

2      shooting incidents?

3            A.    It wouldn't surprise me.

4            Q.    That's about one a day, right?

5            A.    Yes.

6            Q.    And in 2016, shootingtracker.com

7      identified 383 mass shooting incidents?

8            A.    Yes.

9            Q.    That's also about one a day, right?

10           A.    Yes.

11           Q.    In 2015 shootingtracker.com

12     identified 333 incidents; is that right?

13           A.    That sounds plausible.  It's in the

14     ballpark.

15           Q.    Just short of one a day; is that

16     right?

17           A.    Yes.

18           Q.    And in 2014, they identified 273 mass

19     shooting incidents; is that about right?

20           A.    Sounds plausible.

21           Q.    So is it fair to say that, you know,

22     we're getting close to an average of one mass

23     shooting per day based on the incidents

DANIEL COURT REPORTING, INC.

Page 83

1      identified by shootingtracker.com?

2           A.   Yes, as defined by

3      shootingtracker.com.

4           Q.   Using their definition which is, as I

5      understand it, four or more deaths or injuries,

6      right?

7           A.   Yes.

8           Q.   Let's turn to page 2 of your report.

9           A.   (Witness complies).

10          Q.   I want to ask you some questions

11     about the National Self-Defense Survey that's

12     referenced in the first full paragraph.

13          A.   Yes.

14          Q.   That's research that you conducted in

15     1994, correct?

16          A.   Correct.

17          Q.   Or that was published in 1994.

18     Perhaps some of the research was done earlier.

19          A.   No.   The article was published in

20     '95.   The survey was conducted in spring of '94,

21     and the reference period, the period that

22     respondents were asked about was roughly '93,

23     mostly '93 was the past twelve months and the

DANIEL COURT REPORTING, INC.

Page 84

1    past five years.  So the past year estimates

2    were -- pertained to, for the most part, in

3    1993.

4         Q.   So that's research that's close to 25

5    years old at this point?

6         A.   Correct.

7         Q.   Have you ever attempted to update it?

8         A.   I have.

9         Q.   And have you published any

10   information based on the updated --

11        A.   No.

12        Q.   -- work that you did?  Why not?

13        A.   I haven't yet written it up and

14   submitted it to a professional journal.

15   Actually, no, I stand corrected.  I submitted

16   it, but then they asked for revisions and I

17   haven't provided the revisions.  So, yes, it was

18   submitted, but it's still in play, so to speak.

19        Q.   So you have a draft of that article?

20        A.   Yes.

21        Q.   Did you provide it to counsel in this

22   matter?

23        A.   No.

DANIEL COURT REPORTING, INC.

1        Q.   Is it also based on a nationwide

2   survey?

3        A.   Yes.

4        Q.   And when did you conduct that survey?

5        A.   It was probably about five years ago,

6   let's say.  Maybe somewhere around 2012.

7        Q.   So in the intervening six years,

8   you've been pulling it together for publication?

9        A.   I haven't been doing anything with it

10  because I've been busy with other things,

11  including completing a book on a totally

12  different subject, the Effect of Punishment on

13  Crime.

14       Q.   And remind me, in the work that you

15  published in 1994 in which there was a survey of

16  about 5,000 adults, how were those adults

17  identified?

18       A.   I published it in '95, just to

19  refresh your memory.

20       Q.   Thank you.

21       A.   Not '94.  They were -- they were

22  whoever answered the phone when we dialed --

23  when we randomly dialed telephone numbers that

Page 86

1        were randomly generated.  This is where you take

2        known area codes and prefixes; that is, the

3        first six digits of a telephone number --

4        actually the first seven digits, and then you

5        randomly generate the last digits.  And so this

6        generates a random sample of telephone numbers

7        so you can get at everybody in the U.S. that has

8        a telephone, which was well over 95 percent of

9        the population.  And in those days, cell phones

10       were uncommon, so these were basically land line

11       phones.  And whoever answers, we establish that

12       the person is an adult, age 18 and over.  And if

13       they agree to the interview, then that's who was

14       included in the survey.

15            Q.   Were there people who didn't agree to

16       the interview?

17            A.   Yes.

18            Q.   What were they told about the purpose

19       of the interview before they agreed or didn't

20       agree?

21            A.   Oh, they didn't know anything about

22       the subject matter.

23            Q.   So there was just a request for

DANIEL COURT REPORTING, INC.

Page 87

1    someone to participate in an interview without

2    any identification of the subject matter?

3         A.    That's correct.  I mean, the way we

4    did it was -- you know, one standard procedure

5    that survey researchers, at least telephone

6    surveyors did was you just breeze right into the

7    first question.  And so, you hopefully encourage

8    people to participate by the fact that they're

9    practically already in it anyway.  But people

10   who don't want to participate are still free to

11   say, you know, sorry, I don't want to do this or

12   I don't have time to do it.

13        Q.    If someone --

14        A.    And the first question didn't reveal

15   what the topic of the survey was.  It was a

16   throat clearing sort of a question just to kind

17   of get things going.

18        Q.    What was the first question, if you

19   remember?

20        A.    It was something about whether or not

21   they thought crime was a big problem in their

22   area or whether they thought it was getting

23   worse that's sort of an easy to answer opinion

DANIEL COURT REPORTING, INC.

Page 88

1       question.  But nothing about guns, gun

2       ownership, defensive gun use, self-protective

3       actions or anything like that, it was just

4       something about crime is all they knew at that

5       point.

6              Q.   And if someone started the survey but

7       didn't complete it, declined to continue at some

8       point during the survey, what happened to their

9       results?

10             A.   Well, normally they just would be

11      tossed out.  They didn't have any effect on the

12      results.  Because if they told us that in a

13      general way they thought that they had had a

14      defensive gun use, as they defined it, unless we

15      got through the rest of the questions we

16      wouldn't know if their understanding was correct

17      or whether it qualified as a defensive gun use,

18      so it just wouldn't be used.  We didn't know one

19      way or the other.  I mean, we knew they were

20      claiming to have had what they considered to be

21      a defensive gun use, but that's all we knew.

22      And so they would simply be tossed out.

23             Q.   And the same thing if someone didn't

Page 89

1      get to the end after declining to identify

2      defensive gun use, you would toss that out?

3          A.   I think we had some criterion as to

4      how far they had to go through.  But if they

5      denied having had a defensive gun use, well,

6      there's nothing further that we needed to know.

7      I mean, we didn't have to ask, well, what kind

8      of incident did you not have?  We had everything

9      we were going to need to know.  And so, that's a

10     person who would be classified as a

11     non-defensive gun user.

12         Q.   So only the people who

13     self-identified as defensive gun users went

14     through the entire set of survey questions,

15     right?

16         A.   No.  Well, yes, that's correct.

17     Because they're the only ones who had a

18     defensive gun use to describe.  And some of the

19     questions pertained to details of the defensive

20     gun use, so certainly those questions would not

21     be asked of anyone else.

22         Q.   So what was the trigger question that

23     you treated as yes or no for a defensive gun

DANIEL COURT REPORTING, INC.

Page 90

1     use?

2          A.    In the past five years, have you or

3     somebody in your household used a gun for

4     self-protection, even if it was not fired, to

5     protect against crime, something like that.

6          Q.    And so only if they answered yes to

7     that question did they get the final set of

8     questions, correct?

9          A.    Well, they weren't the final ones.

10    But yes, then they would be asked additional

11    questions asking for the details of the event

12    that they described as a defensive gun use.

13         Q.    So in order to have that set of

14    survey questions asked, they had to have

15    identified themselves as having used a gun for

16    defensive purposes, whether or not it was in

17    connection with a crime?

18         A.    No.  It would have had to be in

19    connection with a crime, otherwise a yes

20    response wouldn't have been correct.  Because we

21    asked about protection against crime.

22         Q.    So if someone identified as having a

23    defensive gun use at that time but then later

DANIEL COURT REPORTING, INC.

Page 91

1      acknowledged that they were mistaken about

2      whether a crime was being committed on them, how

3      was that treated?

4           A.   Well, they wouldn't acknowledge that

5      they had made a mistake or whatever; rather, we

6      would ask them a series of questions to

7      establish what kind of crime they thought was

8      being committed against them.  And if they

9      either described something that wasn't a crime

10     or they couldn't describe it at all, you know,

11     maybe they would respond to some vague threat

12     that was only in their mind, then those

13     subsequent questions would establish we're not

14     going to classify that as defensive gun use.

15          Q.   And did you allow them to

16     self-characterize the experience that they

17     believed was criminal in connection with their

18     defensive gun use?

19          A.   Self-characterize how?

20          Q.   By telling you what happened in their

21     own words?

22          A.   Yes.  But then interviewers would

23     have to prompt them to get -- if it didn't nail

Page 92

1      down the details that we needed, then they would

2      be asked other questions that would

3      unambiguously establish the details, including

4      whether or not they could articulate what kind

5      of crime they thought was being reported.  So,

6      yes, they would state in their own words the

7      crime that they thought was being committed.

8      But then our interviewers would have to record

9      that as falling into these categories, crime

10     categories or not being a crime at all as far as

11     we could tell.

12          Q.   So if someone woke up in the night,

13     for example, and they heard a noise and they

14     went and they reached for their gun and searched

15     the house and told you that they had scared the

16     intruder off, that would be accepted at face

17     value?

18          A.   No.

19          Q.   So what other questions would get at

20     whether an intruder was actually scared off?

21          A.   Because in that case, as you've

22     described it, there was no confrontation and so

23     they couldn't confirm that there was actually a

1      burglar or intruder or whatever, in which case

2      you don't know it's a crime, in which case we're

3      right back to the point where we don't have

4      affirmative reason to believe that it was a

5      crime.

6          Q.   So all of the 1.3 percent of

7      responses that you identified as involving a

8      defensive gun use involved a confrontation of

9      some kind?

10         A.   Yes.  And we partly established that

11     by asking them how many offenders there were.

12     Well, if there's no confrontation, obviously you

13     couldn't say that.  If you were just a guy who

14     investigated a noise at night but never saw

15     anyone, then you wouldn't have any idea how many

16     there were.  So if somebody said, well, we don't

17     know, I don't know, I never saw them, then we're

18     right back to, well, as far as we know, it's not

19     a crime they were defending against.

20         Q.   So they would not be included in the

21     1.3 percent of the survey?

22         A.   They were not.

23         Q.   So in the context of interview of

Page 94

1      5,000 people, the number of respondents that

2      you're reviewing here who reported a defensive

3      gun use is under 600 -- under 60, right?

4           A.   No.

5           Q.   Sorry, let's get the math right.  I

6      apologize if I did it wrong.

7           A.   I think there were 194 who said they

8      had had a defensive gun use where as far as we

9      could tell, it was a legitimate claim.  And that

10     was in reference to the five-year recall period.

11     We asked them, you know, in the past five years.

12     Among those who said it was in the past twelve

13     months, there were 66 of those.

14          Q.   Now, you didn't ask those 194 people

15     what type of gun they used in these incidents,

16     right?

17          A.   Yes, we did.  We established the

18     broad categories of firearms.

19          Q.   Whether it was a rifle or a pistol --

20          A.   Yes.

21          Q.   -- or is a shotgun?

22          A.   Yes.

23          Q.   Are those the broad categories you

Page 95

1    used?

2         A.    Yes.

3         Q.    But you wouldn't know whether or not

4    they were a gun that's been defined as an

5    assault weapon in Massachusetts, right?

6         A.    That's correct.

7         Q.    You wouldn't know whether the gun was

8    an AR-15 pattern rifle, for example?

9         A.    Yes, that's correct.

10        Q.    You wouldn't know whether the gun was

11   an AK-47?

12        A.    Right.

13        MR. PORTER:  What do you think about

14   a five-minute break?

15        MR. KLEIN:  I think that's fine.  Let

16   me just make sure I've gotten to the end of this

17   series of questions.

18        MR. PORTER:  Sure.

19        Q.    Do you happen to remember what

20   percentage of the individuals who reported a

21   defensive gun use reported that they had used a

22   rifle?

23        A.    No.

1          Q.    Is that in the study?

2          A.    Yes.

3          Q.    And the same question for a handgun?

4          A.    Yes.

5          Q.    So when you did the work to survey

6     people more recently, did you use the same

7     methodology you used in the early '90s?

8          A.    No.  It was really no longer feasible

9     to do a telephone survey.  Basically, the advent

10    of cell phones screwed things up.

11         Q.    Because you can't identify random

12    sample of telephone numbers?

13         A.    Yeah, you can.  But, you know, it's

14    getting people to answer a number they've never

15    seen before.  And people are not -- they're not

16    going to undergo the cost of paying for an

17    incoming call from some number that they don't

18    know.

19         Q.    So what survey methodology do you

20    use?

21         A.    It's an internet survey.  An internet

22    survey, one way it can be done scientifically so

23    that you get a probability sample is you make

Page 97

1      use of previously selected panels of respondents

2      who were selected to be representative of the

3      national population.  And then in effect, the

4      agency that have gathered those panels, have

5      selected those panels, will allow researchers to

6      select a subset of them to interview them about

7      whatever topics those researchers happen to be

8      in.

9              And the way they gather it

10     originally, their original panels of respondents

11     is they use the U.S. Postal Service's delivery

12     sequence files which basically have every

13     address to which mail can be addressed to be

14     delivered.  And the residential portion of that,

15     all the residential addresses, they basically

16     encompass the full population other than

17     homeless people.  And so they contact people, a

18     probability sample of addresses, they send mail,

19     they solicit people to participate in their

20     panels.  And the incentive for them is they get

21     a free computer, laptop or notebook type

22     computer and they get free internet access.  But

23     they're obliged to participate in a minimum

1         number of surveys each month.

2                    And so somebody like me comes along

3         and says, well, okay, I want to do a sample, I

4         want a portion of that pool, which is very

5         large.  I mean, they might have 20,000 people

6         total.  You take a random sub-sample of that

7         panel, so they're a representative of the

8         national population but you contact them through

9         the internet.  You provide a questionnaire

10        that's on the website that they go to.  They're

11        instructed via e-mail to go to this website,

12        there's a link that they can click on and then

13        they go to that website and answer the

14        questions.

15             Q.   Do you consider that methodology to

16        be reasonably scientific and to yield results

17        that you can rely on?

18             A.   Yes, it's state-of-the-art now.

19             Q.   And you prepared a questionnaire for

20        that group of people in connection with your

21        update to the 1994 survey?

22             A.   Yes.

23             Q.   And did you use the same questions

1     that you used in the early '90s?

2          A.   The initial question, the screener

3     question, as technoheads refer to it, is I think

4     the same, it's exactly the same.  You know, that

5     stuff about in the past five years, have you or

6     a member of your household blah-blah-blah.  But

7     I might have asked additional questions about

8     the details of the incidents for those who

9     reported a defensive gun use or claimed a

10    defensive gun use.

11         Q.   Do you have a copy of that survey

12    with you in your computer today?

13         A.   Yes.  Well, in my computer?  No, I do

14    not.

15         Q.   Why not?

16         A.   Because it has nothing to do with

17    this case.  I'm making no use of the information

18    generated by that survey.

19         Q.   Is it not on your computer or is it

20    something that you believe has nothing to do

21    with this case?

22         A.   It's not on this computer, and it's

23    not in any way providing a foundation for the

Page 100

1      opinions I've expressed in this case.

2           Q.   And the results that you achieved,

3      the basis for the article that you prepared that

4      hasn't yet been published, are those also no

5      part of the opinions in this case?

6           A.   Could you repeat that, please?

7           Q.   The results that you obtained from

8      the survey that you ran, are those also no part

9      of your opinions in this case?

10          A.   They form no part of the basis for my

11     opinions in this case.

12          Q.   Do you have a copy of the article

13     that you prepared that has not yet been

14     published on that computer in front of you

15     today?

16          A.   No.

17          Q.   And why is that?

18          A.   Because it's not a part of the

19     foundation for my opinions in this case.

20          Q.   It's not your general work computer?

21          A.   No, it's not.  This is basically

22     something I bring along when I'm traveling.

23               MR. KLEIN:  Can we take a break?

Page 101

1           (Brief recess was taken from

2           11:16 a.m. to 11:57 a.m.)

3      Q.   So before the break, we were talking

4  about an additional survey that you have done on

5  defensive gun use and an article that you have

6  prepared but haven't published based on that

7  survey result.  Do you remember that?

8      A.   Yes.

9      Q.   I am asking for a copy of both the

10  survey and the draft article because it bears on

11  the issues you've opined.  In fact, it bears on

12  a central issue in your opinion.  You've told me

13  that it's not available to you as you sit here.

14           MR. KLEIN:  And my understanding is

15  that the Plaintiffs are not going to produce

16  those two items?

17           MR. PORTER:  That's right.  Not only

18  do we not have a copy to produce either here or

19  else wise, Dr. Kleck doesn't base any of his

20  opinions in his expert report in this case on

21  that study or the analysis, and he does not rely

22  upon or disclose unpublished academic material.

23  He wants to show these as to be academically

Page 102

1    defensible.

2              MR. KLEIN:  And our view is that that

3    material is central to being able to examine

4    this witness about his opinions, including on

5    the question of whether they have changed based

6    on his additional work on this issue.

7              MR. PORTER:  And my response to that

8    is he's your witness, you can ask him whatever

9    you want.  But --

10             MR. KLEIN:  It's hard to ask him

11   questions about a survey and an article and

12   conclusions that he's apparently put to paper

13   that I haven't seen.

14             MR. PORTER:  I understand that.

15        Q.   All right.  Just a few more questions

16   with respect to that work.  Is there anybody

17   else who worked with you on that project?

18        A.   Well, the people of the survey firm.

19   Nobody else worked on the development of

20   questionnaire, but other people -- I mean,

21   you've obviously got to have people who put the

22   questionnaire on the website, you have people

23   who are in the business of selecting that

DANIEL COURT REPORTING, INC.

Page 103

1    representative panel of people and so on.

2         Q.   Do you have co-authors on the paper

3    that you prepared?

4         A.   No.

5         Q.   Did you have research assistants

6    working on it?

7         A.   No.

8         Q.   Have you talked about the results in

9    connection with that survey in any forum?

10        A.   I think I have.  I think I might have

11   discussed it at a conference possibly.

12        Q.   What conference was that?

13        A.   I couldn't tell you in a million

14   years.

15        Q.   Did you prepare a PowerPoint in

16   connection with the presentation that you made?

17        A.   No.

18        Q.   Did you have any other presentation

19   materials?

20        A.   Probably -- given my limited

21   technical skills, probably paper handouts.

22        Q.   Do you have copies of the paper

23   handouts that you would have made?

Page 104

1          A.    I would have a digital copy of those

2     paper things.

3          Q.    Do you remember if they included any

4     of the results or outcomes?

5          A.    Yes.

6          Q.    Did they?

7          A.    Yes.

8          Q.    Then you don't remember what

9     conference or forum the presentation you made

10    was in?

11         A.    No.

12         Q.    Do you remember any of the folks that

13    attended?

14         A.    No.

15         Q.    Do you remember, were there other

16    presenters on the panel?

17         A.    No.

18         Q.    Have you ever talked about these

19    survey results in one of your classes?

20         A.    I don't think so, no.

21         Q.    Have you ever published any work that

22    mentions or discusses the fact that you've done

23    this additional work?

DANIEL COURT REPORTING, INC.

Page 105

1          A.     Not that I recall.

2          Q.     Now, you've told me that you did not

3     consider the survey results in connection with

4     the report that you provided in this case.  Why

5     not?

6          A.     It just didn't occur to me.  I didn't

7     give it a moment's thought.  It's kind of hard

8     to explain why you did not do something or why

9     something didn't occur to you.  You know, the

10    information I needed to draw those conclusions

11    was already available to me without that survey.

12         Q.     So just to be clear, on page 2 of

13    your report, you discuss your 1995 publication

14    on defensive gun use.  And you didn't consider

15    it relevant that you had additional, more recent

16    survey data to the question of instances of

17    defensive gun use?

18         A.     I really didn't think about it one

19    way or another.

20                MR. KLEIN:  I just want to add to the

21    list of things that we're requesting to complete

22    this deposition the presentation material that

23    was used at the conference at which Dr. Kleck

Page 106

1     discussed these results.

2               MR. PORTER:  Okay.  That's not in

3     your deposition notice.  You asked him to bring

4     his file for the things that he relied upon

5     pursuant to making this opinion.  So you're

6     asking for an additional extrinsic item now.

7               MR. KLEIN:  I would say we have asked

8     for it, but I don't think we need to have that

9     fight on the record.

10              MR. PORTER:  That's fine.

11         Q.   Have you ever studied the types of

12    weapons used in mass shootings?

13         A.   I don't know as I'd call it study.

14    I've noted from media counts how many weapons,

15    you know, and maybe generally what types of

16    weapons without reference to specific models or

17    the individual characteristics that would

18    establish whether they fit a statutory

19    definition of assault weapons.  But yeah, I

20    mean, I've -- just for example, in the large

21    capacity magazine research, I noted how many

22    guns the offender was using without reference to

23    details about what those guns were.

DANIEL COURT REPORTING, INC.

Page 107

1      Q.   Do you happen to know what type of

2    gun was used in the Columbine High School

3    shooting?

4      A.   Multiple gun types.  But as I sit

5    here, I couldn't recall what they were.

6      Q.   Do you happen to know what type of

7    guns were used at the Aurora movie theater?

8      A.   Again, I noted that there were

9    multiple guns, but I don't recall what exactly

10   the types of guns used were.

11     Q.   How about at San Bernardino?

12     A.   No.

13     Q.   Newtown?

14     A.   No.

15     Q.   How about in the Pulse Nightclub

16   shooting?

17     A.   No.

18     Q.   And when you say no in response to

19   each of those questions, that means you don't

20   know?

21     A.   That's correct.

22     Q.   You've never published on the

23   question of whether the guns in any mass

1      shootings were among the guns that are included

2      in the Massachusetts assault weapons ban?

3            A.    I haven't done any original research

4      on that.  But in writing on the general topic, I

5      might well have cited other people's information

6      on that topic.

7            Q.    In what context would you say you've

8      done that?

9            A.    Well, for example, in targeting guns

10     there's a chapter that concerns so-called bad

11     guns.  Among other things there was a section on

12     assault weapons, and that addresses the issue of

13     how often assault weapons are used in violent

14     crime.  And so I would cite other people's

15     information on that topic, for example, a police

16     department's report or the Bureau of Alcohol,

17     Tobacco and Firearms report on trace data on

18     types of guns used in crimes.  So you can

19     describe it as my re-research.  It's just making

20     use of other people's information.

21           Q.    In your work on defensive gun use,

22     how did you treat situations where two people

23     were engaged in a dispute and both of them drew

1      a gun?

2           A.    If we thought -- if one person, the

3      person we were talking to believed that they

4      were attacked or threatened by the other person,

5      then -- and they used a gun, meaning they either

6      attacked or threatened their adversary with it,

7      the fact that it was a dispute that led to that

8      conflict is irrelevant.  I mean, it simply

9      wouldn't enter into the decision as to whether

10     or not it would qualify as a defensive gun use.

11          Q.    I'm not sure I followed your answer.

12     Would you include that as a situation in which

13     the gun use was defensive?

14          A.    If it otherwise qualified, yes.

15          Q.    And is it your understanding that

16     there are disputes where both parties believe

17     the other party drew first, right?

18          A.    I'd say very, very rarely.  In fact,

19     offhand, I don't know of any specific instances

20     of that.

21          Q.    And do you --

22          A.    What we found -- I mean, to complete

23     the answer.  What we found is that incidents in

1    which people claim to have used their gun

2    defensively almost never involve the other

3    party, whatever their character, having and

4    using a gun; that is, it not only wasn't a

5    shootout, it wasn't even two people, as you put

6    it, drawing their weapon, the other party just

7    didn't have a gun.

8              And it's kind of analogous to when

9    the offender has a gun, it's rare the victim has

10   a gun.  It's one party or the other.  It's a

11   very asymmetrical situation almost all the time.

12   So whether it's dispute related or not,

13   situations where both parties had a gun are

14   really, really rare, only a negligible fraction

15   of all the defensive gun uses that we counted.

16        Q.   So what you're saying is that in most

17   of the situations where someone reported

18   defensive gun use, a person that they were

19   defending against did not have a gun?

20        A.   Yes.

21        Q.   And did you -- in the context of your

22   evaluation of defensive gun use, did you

23   evaluate whether the circumstances of that

DANIEL COURT REPORTING, INC.

1      defensive gun use would constitute a legal

2      defense of self-defense?

3           A.   No.

4           Q.   So it's possible --

5           A.   Well, let me complete the answer.

6      Only to the extent that the things we did ask

7      about might be relevant to that judgment, but we

8      weren't making that judgment.  I mean, we

9      weren't qualified to make legal judgments.

10          Q.   So it's possible that at least some

11     of the defensive gun use was in situations where

12     the person who claimed to be using the gun

13     defensively didn't have a right to self-defense?

14          A.   It's possible, yes.

15          Q.   Go to page 3 of your report.

16          A.   (Witness complies).

17          Q.   I'm looking at the sentence in the

18     last paragraph, and I'll read it so I can ask

19     you questions about it.  It says, to the extent

20     that Massachusetts lawmakers intend for a ban on

21     commonly used magazines to reduce the number of

22     homicides and violent crimes committed in the

23     Commonwealth, my research has found no such link

DANIEL COURT REPORTING, INC.

Page 112

1    and none can be found in the literature.  So do

2    you have a basis for the belief that that's what

3    the Massachusetts Legislature has intended?

4        A.   I would say it's simply something I

5    assumed as a matter of common sense.  I mean, I

6    assumed that the lawmakers weren't doing it just

7    for the sake of irritating gun owners, but

8    rather had an intention of that they wanted to

9    in some way reduce violence.

10       Q.   And I notice in that sentence you

11   don't include injuries, just homicides and

12   violent crimes, right?

13       A.   I would say that's inadvertent.  I

14   mean, I would be perfectly happy if the word

15   "injuries" were added in there.

16       Q.   Isn't it possible that the

17   Massachusetts Legislature was also considering

18   the possibility that use of certain weapons

19   could lead to injuries to innocent bystanders in

20   shooting incidents?

21       A.   Possibly, yes.

22       Q.   Which wouldn't necessarily be

23   criminal in nature, right?

DANIEL COURT REPORTING, INC.

Page 113

1          A.    Possibly.

2          Q.    And you say that none can be found in

3     the literature.  Is there literature that shows

4     that a ban on large capacity magazines increases

5     violent crimes?

6          A.    I don't know of any research that's

7     even addressed the issue.  So the answer, I

8     guess -- the short answer would be no.

9          Q.    Is there any literature that shows

10    that a ban on large capacity magazines reduces

11    the success of defensive gun use?

12         A.    Well, only indirectly in the sense

13    that we know something about defensive gun use

14    and we know something about what a ban on large

15    capacity magazines would imply.  It would

16    necessarily imply and it intended to result in

17    the inability of whoever the user is, whether

18    offender or defender, to fire large numbers of

19    rounds without reloading.

20         Q.    So you're saying you infer that

21    connection.  But I asked you a different

22    question.  Is there literature that shows that a

23    ban on large capacity magazines reduces the

DANIEL COURT REPORTING, INC.

Page 114

1      success of defensive gun use?

2           A.   No.  My answer would be the same.  To

3      my knowledge there's no research on the point

4      one way or the other.

5           Q.   The last sentence of the paragraph

6      says, it is law abiding citizens who will

7      primarily be impacted by the restriction, being

8      deprived of sufficient ammunition capacity to

9      assure themselves of being able to fend off

10     attackers.  Is there support in the literature

11     for that sentence or that is based on the

12     inference that you shared with me just now?

13          A.   Well, the first premise underlying

14     that statement is that it's law abiding citizens

15     who will primarily be impacted, meaning who are

16     most likely to obey the law and do without the

17     forbidden large capacity magazines.  And I guess

18     you could say that's an assumption, but it's

19     probably an assumption that virtually nobody

20     would dispute.  It's virtually a tautology that

21     law abiding people obey the law more than

22     criminals do.  I mean, it's what makes criminals

23     criminals; they don't obey the law.

Page 115

1          Q.    You --

2          A.    And there's no earthly reason why

3    bans on large capacity magazines would be an

4    exception.

5          Q.    But you opined here that you need

6    that large capacity magazine to assure

7    themselves of being able to fend off attackers.

8    And you told me that there's no literature that

9    supports the position that there are incidents

10   or has ever been an incident where a large

11   capacity magazine would have successfully fended

12   off an attack that otherwise couldn't have been

13   fended off?

14         A.    Yes.  But there is research on

15   related questions such as, well, how often do

16   people manage to hit what they shoot at in

17   real-world combat circumstances.  That's

18   relevant because it's relevant to how many shots

19   you would have to fire in order to stop an

20   offender who could only be stopped by shooting

21   them, fatally or non-fatally.  And there's

22   research showing how many crime victimizations

23   involve multiple offenders.  And there's

Page 116

1    hundreds of thousands of incidents that occur

2    each year, violent crime incidents, where the

3    victims are facing multiple adversaries,

4    multiple offenders.

5              And so we know two things from prior

6    research.  It's not exactly directly a test of

7    the proposition that a ban on large capacity

8    magazines would impair people's ability to

9    defend themselves, but it's a logical inference

10   from two other points that have been established

11   in research; people don't hit what they aim at

12   more than one in three times, optimistically.

13   Some research indicates one in seven.  And

14   number two, the fact that they often face

15   multiple offenders.  So it wouldn't be

16   sufficient to just stop one offender to prevent

17   the victims from being harmed.

18        Q.   So can you point me to even one

19   incident where you're aware that the victim of a

20   crime involving multiple offenders used a large

21   capacity magazine to stop that crime?

22        A.   No, because I don't know of any

23   research that's made an effort to find that sort

Page 117

1    of thing out.

2           Q.   And can you point me to even one

3    incident where a large capacity magazine was

4    necessary for self-defense because some

5    percentage of shots missed their target?

6           A.   It sounds like a compound question.

7    Do I know of crime incidents where it took large

8    numbers of rounds to stop the offender?  Yes.

9    But do I know why that is and the role that not

10   having a large capacity magazine in it played?

11   No.  Because, again, as far as I know, there's

12   no research on that.

13           MR. KLEIN:  Could you read that

14   answer back, please?  Thank you.

15           COURT REPORTER:  The answer or the

16   question?

17           MR. KLEIN:  The answer is fine.

18           (The desired portion was read by the

19            court reporter)

20           Q.   You said that you're aware of a large

21   number of incidents where a large number of

22   rounds were necessary to stop the offenders?

23           MR. PORTER:  Object to the form of

DANIEL COURT REPORTING, INC.

Page 118

1      the question.

2          Q.    Maybe I have the specific language

3      wrong.  You said you're aware of incidents in

4      which it took a large number of rounds to stop

5      the offenders?

6          A.    (Witness nods head).

7          Q.    Can you tell me which incidents

8      you're referring to?

9          A.    The incidents that are referred to in

10     the source cited at the end.  Actually, I'm

11     sure -- actually, it's not cited at the end.

12     It's a compilation of research on the police use

13     of deadly force.  Of course, police are not even

14     supposed to draw their weapons, never mind

15     firing them unless it's necessary to prevent a

16     crime or other harm from occurring.

17         Q.    That's specifically a study of police

18     use of --

19         A.    Of deadly force, correct.  And it's

20     sort of a limiting situation if you make the

21     assumption that the marksmanship under stressful

22     circumstances of civilians would be even worse

23     and, thus, they would need even more rounds than

DANIEL COURT REPORTING, INC.

Page 119

1      the police officer did.

2              But the title of the book, I believe,

3      is Deadly Force and it has a subtitle, too.  And

4      it's based on a large number of reports usually

5      done by individual police departments on

6      shooting incidents.  And they would compile

7      information on, among other things, how many

8      times the officer fired, how many times their

9      rounds landed on the offender and so on.

10         Q.   Are you aware of incidents where

11     civilians have used a large number of rounds to

12     stop a criminal incident?

13         A.   No.

14         Q.   Is it true that police engage in

15     activities that civilians don't participate in

16     in terms of their role in stopping crime?

17         A.   Certainly.

18         Q.   And that would include, for example,

19     assaults on criminal hideouts, for example?

20              MR. PORTER:  Object to the form of

21     the question.  You can answer.

22         A.   Yes.  That would be something on rare

23     occasions police do that civilians do not.

DANIEL COURT REPORTING, INC.

Page 120

1      Q.   Rescue of hostages, for example?

2      A.   Yes.

3      Q.   And that would make police much more

4    likely to face multiple criminal offenders than

5    a civilian?

6           MR. PORTER:  Object to the form of

7    the question.  You can answer.

8      A.   Yes.  In those rare circumstances,

9    that would be true, that's likely to be true.

10     Q.   On page 4 of your report there's the

11   sentence, in 63 percent of the incidents, the

12   officers failed to hit even a single offender

13   with a single round.

14     A.   Oh, that's where it's cited.  It's in

15   footnote 3.  That's the one I was referring to

16   in my last response.

17     Q.   So that's your support for --

18     A.   Yeah.

19     Q.   -- that particular statement?

20     A.   Yeah.  It's titled Deadly Force, What

21   We Know.

22     Q.   And that's a report from 1993?

23     A.   Correct.

Page 121

1          Q.   And are you aware of whether law

2    enforcement organizations have responded to that

3    20-year-old study with additional training of

4    officers on the use of their guns?

5          A.   No, I'm not aware.

6          Q.   Do you know if that study has been

7    updated in the last 25 years?

8          A.   I don't believe so.

9          Q.   And are you aware of whether the

10   author studied what happened to the rounds that

11   missed their target?

12         A.   No.

13         Q.   They hit something, right?

14         A.   Possibly an inanimate object, but I

15   have no idea.  The report just didn't address

16   it.

17         Q.   And possibly to an animate object,

18   right?

19         A.   Possibly.

20         Q.   And that animate object might have

21   been an innocent bystander, right?

22         A.   Could be.

23         Q.   And in the case where civilian

Page 122

1       victims of crime use a gun to defend themselves,

2       they often miss their targets more often than

3       they hit them, right?

4              A.    Yes.

5              Q.    And we don't know anything about what

6       happens to the bullets that miss their target,

7       right?

8              A.    That's correct.  We don't know one

9       way or the other.

10             Q.    It's possible that in some cases

11      they're hitting innocent bystanders as well?

12             A.    Well, it's possible.  Although, we do

13      have a little bit of information on that.

14      Because people have studied, you know, how often

15      it happens that innocent bystanders are shot,

16      regardless of the nature of the original

17      shooting, and the research indicates it's

18      extraordinarily rare.  So this could be either

19      two criminals shooting it out or police and a

20      civilian criminal or a civilian and a criminal.

21      And so, we don't know specifically about the

22      subset of cases where civilians were engaging in

23      self-defense, we just know that the result

DANIEL COURT REPORTING, INC.

Page 123

1    you're discussing where a human is hit by a

2    stray round is extremely rare.

3         Q.   If you would go to page 6.

4         A.   (Witness complies).

5         Q.   The statement, it takes two to four

6    seconds for even a minimally experienced shooter

7    to eject an expended magazine from a semi-

8    automatic gun, insert a loaded magazine and make

9    the gun ready to fire.  What's your source for

10   that statement?

11        A.   I think that -- let's see.  Oh, okay.

12   I see what you're referring to.  One source

13   would be testing it out myself.  I'm not a

14   particularly experienced shooter, but I've had a

15   friend use a stopwatch to time me as to how long

16   magazine changes take place.  Also, I've

17   participated or witnessed action shooting events

18   where people who are experienced shooters will

19   -- you know, they'll have it timed how long a

20   magazine change is using an acoustic device

21   which can hear the last round fired from the

22   previous magazine and then it hears the

23   magazine -- the first round fired from the next

Page 124

1     magazine so the magazine change occurred within

2     that interval.  So you have extremely accurate

3     times right down to the tenth and even the

4     hundredth of an inch how long that span was.

5              And also there's internet video

6     footage, like on YouTube, where it will show you

7     magazine changes.  And they'll have a clock at

8     the bottom running, showing from the time the

9     guy ejects the previous magazine to the time he

10    inserts the next magazine and makes the gun

11    ready to fire.  And that also confirms that it's

12    in a two to four second range.

13         Q.   And in that context, the people who

14    are changing magazines are essentially

15    competitors and they have an interest in

16    changing them as quickly as possible, correct?

17         A.   Well, they're certainly experienced

18    shooters.  I mean, in some of those examples I

19    was citing, yes, they're competitors; in other

20    cases, it's just somebody demonstrating it.

21         Q.   But they're all people who have a

22    great deal of experience changing magazines?

23         A.   There are such people in the world.

DANIEL COURT REPORTING, INC.

1        Q.    And it's possible that there are

2    criminals who don't have the same level of

3    experience changing magazines?

4        A.    It's possible.

5        Q.    And it's possible that there are

6    criminals who don't plan well enough to maximize

7    the conditions under which their magazines can

8    be changed, right?

9        A.    Certainly a logical possibility.

10       Q.    Meaning that it might take them

11   longer, and perhaps even a good deal longer to

12   change a magazine, right?

13       A.    Well, I don't know about a good deal

14   longer, but one can certainly imagine them

15   taking longer than two to four seconds.

16       Q.    And even if it's just two to four

17   seconds, there's a possibility that people can

18   use the additional time between shots while the

19   magazine is being changed in order to escape,

20   right?

21       A.    It's a very farfetched possibility

22   because, of course, we have real-world

23   experience on whether people actually do that

DANIEL COURT REPORTING, INC.

Page 126

1    when they're in the midst of mass shooting

2    incidents whether bystanders do, in fact,

3    intervene or make some effort to stop the

4    shooter while they're making that kind of a

5    magazine change.  So all we know is that

6    regardless of whether there's some hypothetical

7    potential, people don't actually do it.

8         Q.   It's possible, for example, if the

9    criminal is fumbling the magazine, that people

10   can exit a room where the shooting is taking

11   place, right?

12        A.   Well, they could have done that

13   whether or not he's fumbling the magazine.  The

14   issue is whether or not they have any extra time

15   to do that.  And, yeah, they might have some --

16   you know, a second or two of additional time to

17   do that.

18        Q.   Well, assuming a two to four second

19   magazine change, why don't they have two to four

20   seconds?

21        A.   Well, partly because humans are not

22   robots.  They have to have a certain amount of

23   time to recognize that's what the person is

DANIEL COURT REPORTING, INC.

Page 127

1    doing and --

2         Q.   What if they're already running away,

3    Dr. Kleck?

4              MR. PORTER:  Object.  Hold on.  Let

5    him answer your question.

6              MR. KLEIN:  I thought he was done.  I

7    apologize.

8         A.   That's okay.  No, go ahead.

9         Q.   So what if they're already running

10   away?  I mean, wouldn't that two to four seconds

11   be an opportunity to get out of the room while

12   no one is firing at them?

13        A.   Well, it's only significant if it's

14   two to four seconds that they wouldn't have been

15   firing.  If they were going to be firing and

16   then they didn't because of this fumbling, as

17   you put it, then, yeah, that makes a difference.

18   But if they were going to be shooting that

19   slowly anyway, if there were already going to be

20   a two to four second delay in their shooting,

21   then no, it doesn't matter that they're

22   fumbling.  It only matters if there's some

23   additional delay in when the next shots come due

Page 128

1    to that fumbling.

2         Q.   Why isn't it always an additional

3    delay when the magazine is being changed?

4         A.   Because mass shooters shoot very

5    slowly and deliberately.  They take their time

6    between shots.

7         Q.   But they're adding to the time in

8    which they can take shots --

9              MR. PORTER:  Were you done with your

10   answer?

11             THE WITNESS:  No.

12             MR. PORTER:  Okay.  Answer his

13   question, then he can ask another one.

14        A.   You know, the information we have

15   from eyewitnesses, in surviving eyewitnesses in

16   mass shooting incidents is that the shooters

17   pick out individual targets and they approach

18   those targets to get closer so they are more

19   likely to be able to shoot that person, which

20   means they take their time.  Taking a lot of

21   time to fire each round is the norm.  And you

22   kind of lose sight of that if you focus on

23   extraordinary, exceptional situations like the

DANIEL COURT REPORTING, INC.

Page 129

1      Las Vegas incident.

2          Q.    Before we get to the Las Vegas

3      incident, and we will, if someone is acting

4      slowly and deliberately and they're already

5      taking some time between shots, wouldn't it

6      nevertheless add to the amount of time between

7      shots if they have to change a magazine between

8      shots?

9          A.    No.  Because it's time they would

10     have been taking anyway.  I mean, it's not

11     additional time.  That seems to be the

12     assumption you're making, that it's additional

13     delay time rather than the time between shots

14     that would have occurred anyway.

15         Q.    So --

16         A.    So sometimes it's due to the fact

17     that they're choosing another target; other

18     times it might be because they're fumbling with

19     a magazine.  But the time interval is the time

20     interval, whatever it is.  So the fact that they

21     fumble with the magazine doesn't necessarily

22     imply anything about additional time between

23     shots, as you seem to be assuming.

DANIEL COURT REPORTING, INC.

Page 130

1           Q.   I don't understand because it seems
2      to me -- and I want you to explain to me why if
3      somebody is taking ten seconds to choose
4      targets, why they don't also add time if they're
5      changing a magazine and then choosing a new
6      target?
7           A.   And I guess I don't understand why
8      you would think that would be the case.  I mean,
9      it just doesn't strike me as logical.  They may
10     simply allocate, if you want to put it that way,
11     or devote some of that ten-second interval to
12     fumbling with the magazine instead of, you know,
13     firing the gun or pursuing a victim or whatever.
14          Q.   Wouldn't they need the time both to
15     change the magazine and to choose a new target?
16          A.   Which time are we talking about now?
17          Q.   The time between shots.
18          A.   They might use that time for
19     anything.  I mean, yeah, among other things,
20     they might use it for choosing a victim or
21     pursuing a victim or changing magazines or
22     fumbling with the magazines.  Any of those
23     things might be what they're devoting that

Page 131

1    interval to.

2           Q.    Let me ask you to think about a

3    situation where as soon as shots are fired,

4    people commence running away or getting to a

5    place where they're protected.  Assuming that

6    there needs to be a magazine change, doesn't

7    that add to the opportunity for someone to get

8    away from the shooter?

9           MR. PORTER:  I object to the form of

10   the question.  You can answer that if you can.

11          A.    No.

12          Q.    And that's based on your belief that

13   the shooter will be mechanically acquiring

14   targets the entire time regardless of whether

15   they're changing a magazine?

16          A.    No, it's not.  It's just based on the

17   assumption that he will be taking his time for

18   whatever reason, whatever he might be doing.  It

19   may be just a matter of preference.  You know,

20   maybe whatever lust for violence he's had, it's

21   tapering off for a moment.  We don't really know

22   why.  The point is mass shooters routinely take

23   a long time to -- well, relatively speaking,

Page 132

1      time between shots for whatever reason for

2      whatever purposes.

3           Q.   And if you were running away from a

4      mass shooter, wouldn't you rather do it during a

5      magazine change when the shooter can't shoot at

6      you than during a time when he is simply

7      acquiring his target?

8                MR. PORTER:  I object to the form of

9      the question, but you can answer.

10          A.   I find it highly unlikely any victim

11     would be aware of the distinction or paying

12     attention.  I mean, they would be panicked.

13     They would be either paralyzed and not moving at

14     all or they would be panicked and without

15     respect to what the shooter is doing, they would

16     be trying to get away.

17          Q.   And if the choice had been made to

18     run away, wouldn't it be better to do so when

19     the shooter couldn't shoot at you than when the

20     shooter just isn't choosing to shoot at you?

21               MR. PORTER:  I object to the form of

22     the question, but you can answer.

23          A.   It wouldn't make a dime's worth of

Page 133

1    difference.  All that matters to the victim is

2    the guy is not shooting and, therefore, they

3    couldn't shoot the victim.

4         Q.   But in one scenario, the shooter

5    could choose to fire more quickly while you're

6    running away and the other, he could not because

7    he was in the midst of changing a magazine;

8    isn't that right?

9         A.   If you're just asking could he shoot

10   when he's not changing a magazine and can't

11   shoot with that weapon while he's changing a

12   magazine, then that much is true.  Although a

13   more expanded answer would be, well, most mass

14   shooters, the vast majority, also have multiple

15   guns and, in fact, they wouldn't have to delay

16   at all.  Then they would have the option to

17   continue shooting, even totally ignoring or

18   bypassing or foregoing the magazine change.

19        Q.   And that's only true if the gun is at

20   hand, right?

21        A.   Well, yes, of course.

22        Q.   So let's talk about Las Vegas,

23   because it is important here.  Is it your

DANIEL COURT REPORTING, INC.

Page 134

1      understanding that as soon as people recognized

2      that they were being fired on that they

3      commenced running away or trying to get behind a

4      barrier to avoid the shots?

5          A.   Yes.

6          Q.   And isn't it true that if the shooter

7      in Las Vegas had been forced to change

8      magazines, there would have been more time for

9      people to run away?

10              MR. PORTER:   I object to the form of

11      the question.

12          A.   I don't know.   I just don't know

13      enough about that particular incident.

14          Q.   Why wouldn't they have been able to

15      use the time during which the magazine was being

16      changed to add to their opportunity to get away

17      from where the shots were being aimed?

18          A.   Because we don't know why there is

19      that additional time.   We don't even know that

20      the additional time when he wasn't shooting was

21      due to magazine changes.

22          Q.   But if he had been required to change

23      magazines, wouldn't there have been more time

DANIEL COURT REPORTING, INC.

Page 135

1    between shots?

2         A.    Only if it's additional time when

3    he's not shooting.  That's the logical point I'm

4    making here.  It's pretty self-evident.  I mean,

5    it's only additional time if it's time he

6    otherwise would have been shooting.

7         Q.    Well, you're assuming that he would

8    have been -- he wouldn't have to do both; use

9    the additional time he is using between shots

10   plus the time to change magazines, right?

11        A.    You lost me.

12        Q.    Your assumption is that when people

13   are taking time between shots, they wouldn't

14   also have to take time to change magazines if a

15   magazine change is required?

16        A.    I still don't understand the

17   question.

18        Q.    So let's assume that the shooter in

19   Las Vegas brought two 100-round magazines to the

20   site of the shooting and could shoot

21   continuously until the magazines were expired

22   because he had a bump stock.

23             MR. PORTER:  We're assuming one

Page 136

1    firearm, two 100-round magazines for the

2    purposes of this question?

3            THE WITNESS:  This is not accurate to

4    the Las Vegas situation.

5            MR. PORTER:  I just want to make sure

6    I understand the question.

7        Q.    Let's assume that all the other facts

8    of what happened in Las Vegas were true, but

9    what the shooter had was one gun with two

10   100-round magazines.  How long would the time

11   have been for him to change magazines in that

12   scenario?

13       A.    Probably two to four seconds.

14       Q.    And if he had been forced to bring 20

15   10-round magazines to which he had the same

16   number of shots, how long would the time have

17   been when he was forced to change magazines

18   during the incident?

19       A.    In that totally hypothetical

20   situation, ten -- not ten, but nine times two to

21   four seconds.

22       Q.    So somewhere between 18 and 36

23   seconds?

1          A.    Yes, in that completely hypothetical

2     scenario.

3          Q.    And in that hypothetical scenario,

4     wouldn't there have been an opportunity for

5     people to get away from where the shots were

6     being aimed during that period?

7          A.    Well, there would be time for them to

8     escape regardless of why there isn't shooting

9     going on, whether it's due to magazine changes

10    or not.

11         Q.    Go to page 7 of your report.

12         A.    (Witness complies).

13         Q.    The second paragraph references 23

14    LCM involved mass shootings known to have

15    occurred from 1994 through July 2013, (with or

16    without LCM use).  I'm not sure I understand

17    what you mean.

18         A.    I don't either.  I think that

19    parenthetical remark is a typo.  Yeah, that's

20    not the set of events I was describing.  It's

21    that statement without the parenthetical remark;

22    that is, without the phrase with or without LCM

23    use, which doesn't make any sense at all, given

DANIEL COURT REPORTING, INC.

Page 138

1      that I say I'm talking about LCM involved mass

2      shootings.  And the research in question, in

3      fact, did only pertain to mass shootings where

4      an LCM was involved.

5           Q.   And you're referring there to the

6      incidents listed in Table 1 on page 13?

7           A.   No.  This paragraph is addressing a

8      different set of events and a different issue.

9      This paragraph and that sentence that you quoted

10     is concerning whether or not the offenders had

11     multiple guns and multiple magazines.  And Table

12     1 -- wait a minute.  Are you talking about Table

13     1 in the expert report?

14          Q.   Yes.

15          A.   Yeah, that table only refers to rates

16     of fire.  In that set of events, it excludes

17     some mass shootings where a large capacity

18     magazine was known to have been used because we

19     don't have the information to establish rate of

20     fire; and likewise, it includes some mass

21     shootings that did not involve large capacity

22     magazines but we did have information necessary

23     to establish rate of fire.

DANIEL COURT REPORTING, INC.

Page 139

1      Q.   And it excludes all of the mass

2   shootings, as other people would define them,

3   unless they had more than six casualties?

4      A.   That's correct.  Had to have more

5   than six to be included in that table.

6      Q.   And they have to have more than six

7   to be included in the paragraph that begins, my

8   research of these 23 LCM involved mass

9   shootings?

10     A.   Correct.

11     Q.   So you use that same definition?

12     A.   Correct.

13          MR. KLEIN:  Let's take a break there.

14  Good time for a lunch break?

15          MR. PORTER:  Yeah, sure.

16          (Lunch recess was taken from

17          12:44 p.m. to 1:56 p.m.)

18     Q.   I'd like you to turn to Table 1 of

19  your report, which is on page 13.

20     A.   Okay.

21     Q.   So this is work that was discussed in

22  the context of the Kolbe deposition and in your

23  Kolbe report, right?

Page 140

1        A.    Really, I don't know the names of

2   cases.  It's another assault weapon case?

3        Q.    The Maryland case.

4        A.    Yes.  In that case, yes.

5        Q.    And you presented in the context of

6   that case some additional information that's not

7   in your report for this case.  Do you remember

8   that?

9        A.    No.

10       Q.    I'll show it to you.  I'm showing you

11   an exhibit labeled Exhibit Number 3.  Is that

12   document familiar to you?

13       A.    It's not the same thing?  It looks an

14   awful lot like Exhibit 2.

15       Q.    I'm sorry.  I just handed you the

16   wrong document.

17            MR. KLEIN:  Let's go off the record

18   for a second.

19            (Off-the-Record discussion)

20            (Whereupon, Defendant's Exhibit 3

21             was marked for identification and

22             same is attached hereto.)

23       Q.    During the break I found the correct

Page 141

1      exhibit.  This is Exhibit Number 3.  I've

2      withdrawn what you were previously looking at,

3      which you were correct, is exactly the same as

4      Exhibit Number 2.  If you look at the second

5      page to that document, is that your signature?

6            A.   Yes, it is.

7            Q.   And the date on this is March 16th,

8      2014?

9            A.   Correct.

10           Q.   Do you remember this as the

11     declaration that you submitted in connection

12     with the Maryland case?

13           A.   Yes.

14           Q.   I'd like you to turn to page 11 of

15     the exhibit article.  I'd like you to turn to

16     page 11 of Exhibit 3.  Is that data the same as

17     the data that is appended to Exhibit Number 2?

18           A.   I'm pretty sure it's the same set of

19     mass shootings.

20           Q.   And are there any differences in the

21     way you report the data?

22           A.   No, I don't think so.  I took a quick

23     glance at it and it doesn't look any different.

DANIEL COURT REPORTING, INC.

Page 142

1      Q.   And in Exhibit Number 3, your source

2  is appendix synopsis of mass shootings.  Do you

3  see that at the bottom?

4      A.   Yes.

5      Q.   In Exhibit Number 2 you cited Kleck

6  (2016).

7      A.   Correct.

8      Q.   And I think you testified earlier

9  that's because you published an article based on

10  this data which you referred to in Exhibit 2 as

11  Kleck (2016)?

12      A.   Yeah, by this date, I mean it's a

13  subset of the data I referred to in Exhibit 3.

14  It was a subset of that.  But it's the same

15  subset in both Exhibit 2 and Exhibit 3.

16      Q.   It's the same subset of a larger data

17  set, you have more information in the

18  publication than you did present in this

19  synopses that are appended to Exhibit Number 3,

20  right?

21      A.   Yeah.  And most of the stuff in the

22  appendix to Exhibit 3, I didn't use in the study

23  that's cited in Exhibit 2.

1        Q.    But you based your expert report in

2    both cases on the same data set, right?

3        A.    Well, I wouldn't -- in my terms, no,

4    I wouldn't have said that because it's a subset

5    of the larger set of mass shootings that's used

6    in the later Kleck (2016) statement.

7        Q.    You presented the same data in

8    support of your expert report in both cases,

9    right?

10        A.    On the issue of rate of fire, yes.

11        Q.    So in connection with Exhibit 3, the

12    Maryland declaration, you have an appendix that

13    starts on page 12.  Can you turn to that?

14        A.    Okay.

15        Q.    And that appendix has more

16    information about each incident that you

17    included in the table in appendix 3, right?

18        A.    Appendix 3?  I don't know what

19    appendix 3 is.

20        Q.    I should have said Exhibit 3.  I'm

21    sorry.

22        A.    Okay.  Could you repeat the question?

23        Q.    Yeah.  The appendix to Exhibit 3 that

Page 144

1    starts on page 12 includes more information

2    about each incident that appears in Table 1 --

3         A.   Oh, yeah, definitely.  Yeah,

4    absolutely.

5         Q.   And the appendix that starts on page

6    12 is not included in the Massachusetts report,

7    right?

8         A.   That's correct, because I didn't use

9    most of that.  Most of those incidents have no

10   known involvement of large capacity magazines.

11   And so as I explained earlier, there's no point

12   in trying to judge the impact of large capacity

13   magazine use in incidents where it wasn't used,

14   so.

15        Q.   So, all I'm trying to get to is that

16   the information in the appendix in Exhibit 3 is

17   just as useful for the data in Table 1 of

18   Exhibit 2 as it is for the data in Table 1 of

19   Exhibit 3?  It's the same backup information

20   about the incidents we're looking at?

21        A.   For Table 1 for the rate of fire

22   stuff, absolutely it's the exact same thing.

23        Q.   So we can rely for the purposes of

1    understanding the data in Table 1 in the

2    Massachusetts report on the information you

3    provide in the appendix that was in your

4    Maryland report?

5        A.   Not necessarily.  Because if -- you

6    know, you can see there's like a three or four

7    year gap between Kleck (2016) and this thing,

8    which -- the appendix is earlier material.  So,

9    if I came across any new information where

10   previously I didn't know it in this appendix and

11   then I became aware of it, then I would add it

12   in and I would take account of it.

13       Q.   So you didn't change the data from

14   Exhibit 2 to Exhibit 3?  Table 1 in Exhibit 2 is

15   the same as Table 1 in Exhibit 3, right?

16       A.   Yes.

17       Q.   And the backup information you

18   provided at the time of your Maryland

19   declaration that appears in appendix 1 to the

20   Maryland declaration is explanatory with respect

21   to Table 1 in Exhibit 2, the Massachusetts

22   declaration, right?

23       A.   Yes, regarding the rate of fire.

1    That wasn't changed.  In fact, Table 1 isn't

2    even confined to cases where a large capacity

3    magazine was known to be used.  There's a few

4    cases where, you know, it wasn't known.

5         Q.   Right, we talked about that earlier.

6    So in connection with preparing Table 1, you've

7    omitted information about the number of

8    injuries, correct?

9         A.   Omitted?  Well, it wasn't there in

10   the first place, I mean.  I guess you could say,

11   yeah, I didn't put it in in the first place

12   certainly.

13        Q.   So Table 1 doesn't have any

14   information about the number of people who were

15   injured in each incident, correct?

16        A.   Only that you know that there were

17   over six killed or injured.

18        Q.   And --

19        A.   And not separately tabulated dead

20   versus not dead.

21        Q.   But it could be six or 60; there's no

22   way to know that from Table 1, right?

23        A.   It could be seven or 60, but it

Page 147

1      couldn't be six because they all have more than

2      six.

3            Q.    So it could be seven or 60, correct?

4            A.    Correct.

5            Q.    And the number of deaths in

6      connection with each incident in Table 1 isn't

7      included either, right?

8            A.    Yeah, it's not mentioned in Table 1,

9      no.

10           Q.    But you had that data, right?

11           A.    Sure.

12           Q.    Because you included it in your

13     Maryland report in appendix --

14           A.    Sure.   Table 1 is concerned with rate

15     of fire, it's not concerned with number of dead

16     or number of injured other than the fact that

17     there had to be more than a total of six killed

18     or injured in order to qualify.

19           Q.    So rate of fire, you studied rate of

20     fire without respect to the number of people who

21     might have been killed or injured as long as --

22     the incident was included because it was above

23     six, right?

Page 148

1        A.    Correct.

2        Q.    And in the second column of Table 1,

3    and I'm back on Exhibit 2, which is your

4    declaration in the Massachusetts case, you list

5    the number of shots fired?

6        A.    Wait a minute.  Exhibit 2 is in

7    connection with the current case.

8        Q.    The Massachusetts case, that's right.

9        A.    So you want Exhibit 3?

10        Q.    I want Exhibit 2.

11            MR. PORTER:  For this question, he

12    wants you to look at the table in Exhibit 2.

13        Q.    I do.

14        A.    Okay.

15        Q.    You have a column in that table

16    labeled Shots Fired.  Do you see that?

17        A.    Yes.

18        Q.    That's taken from news reports,

19    right?

20        A.    Correct.

21        Q.    And in a few of the columns, more

22    than a few, you don't have the exact number of

23    shots fired?

Page 149

1          A.    Correct.

2          Q.    And that's because that information

3     wasn't available in the accounts you used to

4     develop the data here?

5          A.    That's right.

6          Q.    And so in the column labeled Shots

7     Fired -- let's look at just the first incident

8     for the time being.  The number represented

9     there is greater than 50?

10         A.    Uh-huh (positive response), yes.

11         Q.    And you don't know exactly how many

12    shots were fired?

13         A.    That's right.

14         Q.    And what that means is you're not

15    sure that you've accurately calculated the rate

16    of fire, right?

17         A.    Well, best available information was

18    that it was 50 or somewhat over in that -- over

19    that.  That's about all we know.

20         Q.    Somewhat over, but you don't know how

21    much over?

22         A.    No.  We have no idea, no, not from

23    the news media accounts.

Page 150

1      Q.   It could be 50 or it could be 100,

2   right?

3      A.   Well, unlikely to be 100, otherwise

4   people wouldn't have described it as it's over

5   50 because they could have just as easily said

6   over ten if there were 100 rounds.  But I think

7   that usually means it's somewhat over 50.

8      Q.   So when you calculated rate of fire,

9   you used the 50 number, even though you knew the

10   number of shots was more than 50?

11      A.   Right.  It could have been 51 for all

12   I know.

13      Q.   It could also have been 60, right?

14      A.   Maybe, yeah.

15      Q.   Could have been 75, right?

16      A.   Less likely.

17      Q.   But it could have been?

18      A.   As a remote possibility, sure.

19      Q.   In the fourth incident down, the one

20   dated 9/15/99, the number of shots fired is

21   greater than 100.  Do you see that?

22      A.   Correct.

23      Q.   And you used 100 to calculate the

Page 151

1    rate of fire, right?

2         A.    Uh-huh (positive response), yeah.

3    Closest thing to specific information I had.

4         Q.    But it could have been a lot more

5    shots than 100, right?

6         A.    We can speculate, you know, about

7    anything we want.  And yeah, it's certainly

8    possible.

9         Q.    When people choose a round number

10   like that, they're often over or underestimating

11   by some significant degree, right?

12        A.    I don't know that to be the case at

13   all, no.  I mean, they just don't want to risk a

14   more exact estimate is about all it means.

15        Q.    And then if you go down to the last

16   incident, and I'm not -- I'm not going to

17   belabor this point too much longer, but you have

18   154 plus, right?

19        A.    Yes.

20        Q.    And that means that it was at least

21   154 and could have been more?

22        A.    That is correct.

23        Q.    And you used the 154 as the number of

1       shots fired in your calculation?

2               A.    Yes.

3               Q.    And unlike some of the other

4       columns -- I'm sorry, unlike some of the other

5       incidents, you don't have any qualification on

6       your seconds per shot calculation in the final

7       column?

8               A.    I don't understand what you mean by

9       qualifications.

10              Q.    Let's go back and look at the first

11      incident again.   The number of shots fired is

12      greater than 50?

13              A.    Yes.

14              Q.    And in the second column it says c.5.

15      That's means about five, right?

16              A.    Yes.

17              Q.    So you don't know the time of firing

18      either?

19              A.    Correct.

20              Q.    It could have been more; it could

21      have been less?

22              A.    Yeah.   But if I had to make a single

23      guess for a single time, best guess would have

Page 153

1    been five minutes, just as best estimate of

2    shots fired would be 50, as opposed to just

3    saying, well, it might be 60 or it might be 100.

4    The closest thing to specific information we had

5    was 50 shots fired and the closest thing to

6    specific information we had about time of firing

7    was five minutes.

8         Q.   That means --

9         A.   And by the way, circa means it could

10   have been under as well as over or either one.

11   So it just means around.

12        Q.   It means you don't really know the

13   time of fire, though?

14        A.   Well, we know approximately what it

15   is; we just don't know exactly what it was.

16        Q.   Correct.  So then in the third column

17   you've got a calculation, which is Shots Per

18   Minute and it's greater than ten?

19        A.   Yes.

20        Q.   And so you're using the greater than

21   symbol there to qualify the answer because

22   you're using the estimates --

23        A.   Oh, I see what you mean by a

Page 154

1    qualification.  In other words, establishing

2    sort of a range.

3         Q.   That's right.  So in the last column

4    it says less than six because you're again

5    running a calculation and you're making clear in

6    including the less than symbol that it isn't

7    precise.  It could be less because you don't

8    know the number of -- precise number of shots

9    fired and you don't know the precise time of

10   firing, right?

11        A.   Correct.

12        Q.   In that last column, and I'm going to

13   refer to that as the Newtown incident if that's

14   fair.  That's the incident that we're talking

15   about --

16        A.   You're asking the question do I think

17   it's fair?

18        Q.   Yes.

19        A.   Yeah, sure.

20        Q.   That's the incident in Newtown,

21   Connecticut where 20 children and six adults

22   were shot in a school, right?

23        A.   Yes.

1          Q.    And again, in the second column, the

2      Shots Fired column, you have included the number

3      154 plus, meaning at least 154 shots were fired,

4      right?

5          A.    Correct.

6          Q.    And in the Shots Per Minute column,

7      you've done a calculation and it says 38.5 plus,

8      meaning that it's at least 38.5 shots being

9      fired per minute?

10         A.    Correct.

11         Q.    And then in the last column it says

12     1.6.  You haven't qualified that in the same way

13     to make clear that it's more or less not 1.6,

14     right?

15         A.    No, I haven't.

16         Q.    And you haven't also included the

17     number of victims here.  So we could understand

18     the number of people who were murdered by the

19     154 shots that were fired, the 154 plus shots

20     that were fired?

21         A.    Not from this table, no.

22         Q.    And you don't include any information

23     about how many people were shot multiple times

Page 156

1     in the incident, right?

2          A.    In this table, no.

3          Q.    So you don't know anything about

4     whether the firing was deliberate or not

5     deliberate because you don't know how many times

6     the shooter missed his target and how many times

7     he fired wildly, right?

8               MR. PORTER:  Object to the form of

9     the question.  But you can answer.

10         A.    I know rate of fire.  That's all I'm

11    inferring from this table is rate of fire.

12         Q.    You inferred from that one of the --

13    and I'm going back to your prior testimony, and

14    you can feel free to correct me if I'm wrong.

15    You inferred from that that shooters in mass

16    shootings often don't fire as quickly as the gun

17    that they're using will allow?

18         A.    No, I didn't infer it solely from

19    this table.  This table merely confirms what

20    eyewitnesses, interviewed usually by journalists

21    after the fact, say about how the shooter went

22    about his business.  But it certainly confirms

23    that it's consistent with it because the rates

1      of fire are clearly not very high.

2              Q.    And it's fair to say that you can

3      conclude from your evaluation of the data that

4      the shooter was firing approximately 1.6 -- a

5      shot every 1.6 seconds during the incident,

6      right?

7              A.    Around that, yeah, uh-huh (positive

8      response).

9              Q.    And so he's firing pretty quickly

10     from any sort of perspective of getting away,

11     right?

12             A.    On average, yes.  These are averages

13     throughout the incident.  They don't describe

14     any particular one moment --

15             Q.    Right.  And he might have --

16             A.    -- so there might be many minutes

17     where he's taking his time, he's going up to

18     individual victims and shooting them at close

19     range and then using the gun to fire as fast as

20     it's mechanically capable of doing in other

21     circumstances, and then it averages out to 1.6

22     seconds per shot.

23             Q.    And we know about this incident that

Page 158

1    the shooter, whose name was Adam Lanza, was

2    walking from room to room, right?

3         A.   Yes.

4         Q.   We don't have any basis to believe he

5    was shooting randomly while moving from one room

6    to the next, right?

7         A.   Don't have any reason to believe

8    that, no.

9         Q.   So while he was in a room, he was

10   shooting pretty quickly.  It seems clear that it

11   was at least one shot every 1.6 seconds, right,

12   and probably faster?

13        A.   Yeah, there were sometimes -- it's

14   the nature of an average.  Sometimes he was

15   firing faster and sometimes he was firing much

16   slower.  And of course, obviously, sometimes he

17   was not firing at all.

18        Q.   So if you had smaller capacity

19   magazines and was required to change magazines

20   more frequently and to take the two to four

21   seconds you think it would have taken him to

22   change a magazine, it would have slowed his rate

23   of fire at some level, correct?

Page 159

1        A.    No, we don't know that at all.

2        Q.    So he's shooting at least as fast as

3    one round every 1.6 seconds, correct?

4        A.    Yes.

5        Q.    And if he had to change magazines,

6    that would have taken two to four seconds,

7    right?

8        A.    Yes.  If he was changing magazines.

9    He had multiple guns, too, as do nearly all the

10   vast majority of mass shooters.

11       Q.    And if he had to change guns, that

12   would take some period of time as well, correct?

13       A.    Well, he was often changing magazines

14   when he didn't even have to, meaning he either

15   had an already loaded gun ready to continue

16   firing without interruption or he was using

17   magazines that were ready to go and he hadn't

18   even emptied the previous magazine because cops

19   found a number of magazines that were only

20   partially discharged.  So he was doing what you

21   might call kind of discretionary magazine

22   changes.  He did them maybe sometimes when he

23   needed to in order to continue shooting and

Page 160

1      other times when he didn't need to.

2           Q.   If he had to change guns, as you

3      speculate, that would take some time as well,

4      right, similar to the amount of time it would

5      take to change a magazine?

6           A.   Probably less.  I mean, you could

7      literally be holding two guns in -- one in

8      either hand and fire simultaneously, never mind

9      with a two to four second interval, while you,

10     you know, stop shooting.

11          Q.   And the need to aim, if you're

12     hypothesizing a deliberate firing, as you have,

13     would take some time, right?

14          A.   Could you ask that --

15          Q.   He would need to aim the second gun

16     if he changed guns, even if it was in a

17     different hand?

18          A.   Yes, it certainly takes some small

19     amount of time to aim, you know, regardless.

20          Q.   And even more if he has to pick up a

21     gun from some place that he's got it holstered

22     or stored, right?

23          A.   Hypothetically, if that were the

DANIEL COURT REPORTING, INC.

Page 161

1    situation, sure, he would have to also bend over

2    to pick up a gun that's on the ground or

3    whatever.

4         Q.   And he would have to take a moment to

5    aim the gun as well?

6         A.   Yeah.

7         Q.   And you're aware that in the reports

8    about the Newtown incident, eyewitnesses had

9    stated that children were able to escape during

10   the magazine change, right?

11        A.   Yes.  Well, let me revise that.  I'm

12   aware that that was the claim made in

13   newspapers, in the news outlets.

14        Q.   But you're relying on newspaper

15   information for this whole study, right?

16        A.   Well, some of the information -- the

17   information that I rely on that comes from news

18   media outlets, it originates with law

19   enforcement.  I mean, the reporters are not

20   making this stuff up, they're getting almost all

21   of this from the cops.

22        Q.   You don't know that, right?  It could

23   also come from eyewitnesses, couldn't it?

Page 162

1           A.    No.   Most of this stuff, it couldn't.

2    For example, when they know exact numbers of

3    rounds, the bystanders and witnesses, they don't

4    know that.

5           Q.    So what --

6           A.    They can guess.   They can give these

7    really approximate assessments.   But when the

8    guy uses a semi-automatic weapon, which is

9    ejecting cartridge shells, the cops can know

10   exactly.   And if the journalists are reporting

11   exact numbers of rounds fired, then they have to

12   be getting that from the police.   So yes, I do

13   know that's coming from the police and not from

14   eyewitnesses.

15             And some other information, you know,

16   where on the rare occasions they know exactly

17   how long the shooting lasted, that's usually

18   also because of some piece of information the

19   cops had that victims and bystanders wouldn't

20   know.   The latter could just guess.   But if the

21   cops had found an audio recording, for example,

22   made during the shooting, then they can know

23   exactly how long the shooting persisted, like,

Page 163

1      you know, if somebody made a 911 call.

2            Q.    Do you have any idea in how many of

3      these incidents the police had a audio recording

4      of the duration of the shooting?

5            A.    I haven't the faintest idea other

6      than there were -- there was at least one.

7            Q.    But it's possible that all of the

8      information about the duration of shooting comes

9      from eyewitness information, right?

10           A.    No, that's not possible.  Because as

11     I just said, there's at least one incident where

12     they knew it from an audio recording.

13           Q.    So in 19 of the 20 cases you've got

14     listed here, it's possible that the duration of

15     shooting information came to the police from an

16     eyewitness?

17           A.    Is it possible, sure.  It's possible.

18     Lots of things are possible.

19           Q.    And let me ask you to count and make

20     sure that I've counted correctly that you've

21     reported here on 20 incidents?

22           A.    21 -- no.  Yeah, 21.  Yeah, 21.

23           Q.    Right.  21 incidents.  In how many of

1       those incidents did you have the exact number of

2       shots fired based on the reports you reviewed?

3              MR. PORTER:  I'm sorry.  Don't write

4       anything on the exhibit.

5              THE WITNESS:  Oh, sorry.

6              MR. PORTER:  That's okay.

7           Q.   You can use the other side of the pen

8       if it helps you to count.

9           A.   Force of habit.  Nine.

10          Q.   And the rest of the incidents, you're

11      relying on an estimate of the number of shots

12      fired which you think is reasonably likely to be

13      a decent estimate?

14          A.   Correct.

15          Q.   In how many of the incidents that you

16      report on do you have the exact number of

17      minutes for time of firing?

18          A.   Nine.

19          Q.   And isn't it the case that in many of

20      these incidents, the last shot fired was a shot

21      that the criminal fired to take his or her own

22      life?

23          A.   Yes.

Page 165

1          Q.   And isn't it possible that in many

2     cases where the criminal is firing the last shot

3     to take their own life that that last shot took

4     some period of deliberation before it was fired?

5          A.   I don't have any affirmative evidence

6     that that's the case.  But you know, as a

7     hypothetical possibility, sure, it might be.

8          Q.   Doesn't that mean that the rate of

9     fire during the incident might be estimated at

10    too long an interval?

11         A.   In those cases where it ended in the

12    suicide of a shooting, yes, it's a possibility.

13    In the other cases, you know, it's sort of

14    irrelevant.

15         Q.   Would you agree as a general

16    principle that a reasonably quick person can

17    exit a room in less than two to four seconds?

18         A.   It's way too abstract a question for

19    me.  It would depend on how crowded it is and

20    how many other people are in the way and how big

21    the room is.  And so I haven't a clue whether

22    that's true or not.

23         Q.   Let's make it less abstract.  We're

1      sitting in a conference room that I'm going to

2      estimate is about 30 feet by 15 feet.  Is that a

3      fair estimate of the size of this room?

4              A.    Sure, why not.

5              Q.    And you're sitting across the table

6      from me and I'm sitting, what, twelve feet from

7      the door?

8              A.    Twelve feet away, sure.

9              Q.    Could I get out of this room in two

10     to four seconds?

11             A.    Yes.

12             Q.    Thank you.  Did you do the same

13     analysis that you did in Table 1 for any mass

14     shootings after the Newtown incident?

15             A.    No.

16             Q.    So you don't know the rate of

17     shooting, for example, at Pulse Nightclub in

18     Orlando, Florida?

19             A.    No.  These were all cases confined to

20     the 20-year period that the Kleck (2016) study

21     concerned.

22             Q.    You don't know the rate of firing in

23     Las Vegas?

Page 167

1          A.    I don't know the rate of fire about

2     any incident that occurred outside the interval

3     1994 to 2013.

4          Q.    You don't know the rate of fire in

5     the incident in San Bernardino, do you?

6          A.    If it occurred outside that range,

7     no.

8          Q.    You're aware as well that

9     eyewitnesses reported that the shooter in an

10    incident in Tucson, Arizona, an attempted

11    assassination of Congresswoman Gabby Giffords,

12    that the shooter was tackled during a magazine

13    change, right?

14         A.    Some people said that, yes.

15         Q.    And that was in news reports as well?

16         A.    Yes.

17         Q.    But you don't think that to be true?

18         A.    I'd say it's unknown whether it's

19    true.  The New York Times, generally regarded as

20    a reliable news source, said that police found

21    the magazine he was using had -- was defective,

22    it had a broken spring, and so he couldn't fire

23    any further.  He wasn't changing a magazine, he

DANIEL COURT REPORTING, INC.

Page 168

1    was struggling with a defective magazine.  That

2    was the alternative version of what was going on

3    when he was tackled.

4         Q.   If the magazine was defective, he

5    could have changed it and used a different

6    magazine to continue firing, correct?

7         A.   If he had some additional ones that

8    weren't defective, he certainly could have done

9    that.  But the New York Times article was

10   indicating that he, in fact, did not -- that's

11   not what he was doing.

12        Q.   Do you think that the news reports

13   are on both sides of the question?

14        A.   Yes, they are --  they give two

15   different versions of what happened.

16        Q.   And that's true a lot of times with

17   news reports, right, they're not always exactly

18   in step, correct?

19        A.   On some issues.

20        Q.   Some reporters will report one thing

21   and others will report something different?

22        A.   Right.  And others, they're exactly

23   uniformly correct; every last one agrees with

Page 169

1      the others.

2                   MR. KLEIN:  I'll double check and

3      make sure I have the correct exhibit this time.

4                   (Whereupon, Defendant's Exhibit 4

5                    was marked for identification and

6                    same is attached hereto.)

7           Q.    Let me show you a document labeled

8      Exhibit Number 4.  Is that a document you're

9      familiar with?

10          A.    Familiar with, no.  But, yeah, I

11     recollect it.

12          Q.    Meaning you recollect that this is a

13     deposition that you were involved in on January

14     2nd, 2014?

15          A.    Yes.

16          Q.    And that deposition occurred in the

17     Maryland case we've been talking about?

18          A.    Yes.

19          Q.    And you are an expert witness in that

20     case as well, correct?

21          A.    Correct.

22          Q.    And at the time of this deposition,

23     was there counsel present on your side of the

DANIEL COURT REPORTING, INC.

Page 170

1     case?

2          A.    I think so, yeah.

3          Q.    And in fact, that counsel was John

4     Parker Sweeney of the Bradley firm, right?

5          A.    If you say so.

6          Q.    If you look at the top of the second

7     page.

8          A.    Yeah, I can see.  Yeah, that's the

9     only reason I can say yes because I'm reading

10    it.

11         Q.    You don't remember, but there was

12    counsel present, correct?

13         A.    No.  No offense to present company,

14    but they do tend to run together.

15         Q.    Is that a statement about all

16    lawyers?

17         A.    Well, I deal with a lot of them, so.

18         Q.    Do you remember at the time of this

19    deposition that you were sworn as a witness?

20         A.    Yes.

21         Q.    And that means that you were

22    obligated to tell the truth during the course of

23    the deposition?

DANIEL COURT REPORTING, INC.

Page 171

1          A.    Yes.

2          Q.    Do you remember at the time that you

3     did your best to answer all questions as

4     truthfully and accurately as possible?

5          A.    I always do.

6          Q.    I would like you to turn to page 138

7     of Exhibit 4.

8          A.    (Witness complies).

9          Q.    If you start on line 10, there are

10    some questions there about an incident in

11    Aurora, Colorado at a movie theater.  Could you

12    read to the end of the discussion of that

13    incident?

14         A.    Question:  Now, you don't list the

15    Aurora, Colorado shooting in here, am I right

16    about that?  Answer:  What was the date of that?

17    Let's see.  Question:  July 20th, 2012.  I found

18    myself in Aurora two weeks after that.  It is on

19    page 33 to 34 of your report.  Answer:  Okay.

20    No, I don't.

21         Q.    So let me ask you about that.  Isn't

22    that within the time frame of your study?

23         A.    It is.

Page 172

1          Q.    And do you remember why you didn't
2     include this incident in the study?
3          A.    In the Table 1 you mean?
4          Q.    Yes.
5          A.    The rate of fire stuff?  Probably
6     because at the time, I didn't have information
7     on both number of rounds and the time of the
8     shooting.
9          Q.    So you would have excluded it because
10    you didn't have sufficient information to
11    include it?
12         A.    Right.
13         Q.    And you don't know anything as you
14    sit here about whether large capacity magazines
15    were used in this incident?
16         A.    I think they were, so.
17         Q.    Do you remember how many people died
18    in that incident?
19         A.    No.
20         Q.    So at that point, your testimony
21    continues.  And you don't have to read this out
22    loud.  But could you read from page 138, line 22
23    until page 139, line 10?

1        A.   Question:  Now, that's a situation

2    where you were in a movie theater which

3    obviously has multiple exits, correct?  Answer:

4    Correct.  Question:  So people certainly could

5    flee in multiple different directions while a

6    shooter was shooting; is that correct -- right?

7    Answer:  Correct.  And if you assume there were

8    four exits, as there are in most theaters, two

9    into the theater complex and two out somewhere

10   else, you would have had four different places

11   where people could have been running; is that

12   right?  Answer:  Possibly.  Question:  And in

13   the time that it would take Mr. Holmes to change

14   magazines, is it possible that additional people

15   could have gotten out if he had had 10-round

16   magazines instead of a 100-round drum?  Answer:

17   It's possible, but I don't think there was any

18   affirmative evidence of it.  But sure, it is a

19   logical possibility.

20       Q.   So if I asked you those same

21   questions today, you would give more or less the

22   same answers, right?

23       A.   Pretty much, yeah.

DANIEL COURT REPORTING, INC.

Page 174

1        Q.    And if you would just read to

2    yourself -- and again, I'll let you know when

3    you need to read out loud -- the questions and

4    answers from line (sic) 139, 18 to line (sic)

5    140, 4.   And I'll just ask you a couple of quick

6    questions about that.

7              (Witness reviews the document)

8        A.    Yes.

9        Q.    And you would answer those same

10   questions the same way if I asked them today,

11   right?

12       A.    Yes.   But only because, you know, I'd

13   have to look up the relevant information to give

14   you a new, more accurate answer.

15       Q.    Well, this is just math, right?   I'm

16   really not understanding that answer because

17   he's asking --

18       A.    Oh, I see what you mean.

19       Q.    -- the amount of time it takes to

20   change magazines, right?

21       A.    So you're just asking about the point

22   being made by the questioner on lines 18 through

23   20?

1      Q.   Yes.  It may be simpler for me to

2   just ask you the same questions, if that would

3   be preferable from your perspective.

4      A.   Yes.  I mean -- and as I pointed out

5   in my answers in that deposition, yeah, you

6   would have fewer instances of reloading.

7      Q.   And that would give people time to

8   attempt to escape, right?

9      A.   Only if it's additional time as

10  distinct from time the shooter was going to take

11  anyway.  But if it's time he was going to take

12  anyway, then there's no additional time for

13  prospective victims to escape.

14     Q.   You have no idea how fast he was

15  firing, right, because you didn't have the data

16  for that?

17     A.   No, not at the time.

18     Q.   If you would turn to page 151.

19     A.   Okay.

20     Q.   You were asked the question, what

21  rate of fire are semi-automatic rifles capable

22  of?  And you answered, people can easily fire --

23  probably the untrained individual can easily, if

DANIEL COURT REPORTING, INC.

Page 176

1    they were just told to pull the trigger as fast

2    as you can, they can probably fire six rounds in

3    a second.  Do you see that?

4         A.   Yes.

5         Q.   Is that still your answer about how

6    fast a semi-automatic rifle can fire?

7         A.   Rifle?  Yeah.  Yeah, absolutely.

8         Q.   They can easily empty a 30-round

9    magazine in six seconds or less, right?

10        A.   That would be five seconds, I think.

11   Let's see, because it's six rounds per second.

12   So 30 rounds would take as little as five

13   seconds.

14        Q.   If you could turn to page 79.

15        A.   Okay.

16        Q.   The same basic set of questions.  The

17   question is, would you agree with me that you

18   can empty a 30-round magazine from an AR-15 in

19   five or six seconds?  Your answer was, easily.

20   And the question was, probably even faster than

21   that, right?  And your answer was, yes.  Is that

22   still your answer to those same questions?

23        A.   Yes.

DANIEL COURT REPORTING, INC.

Page 177

1          Q.    Turn to page 15, please.

2          A.    (Witness complies).

3          Q.    The bottom of the page on line 22,

4     there's a question, sir, am I correct that you

5     don't have any data on the use or not of assault

6     weapons in self-defense?  Your answer, that is

7     correct.  Is that still true?

8          A.    Yes.

9          Q.    Next question is, is that also true

10    with respect to any data on the use of -- the

11    use or not of large capacity magazines in self-

12    defense?  And your answer was, yes, that's

13    correct.  Is that still correct?

14         A.    Yes.

15         Q.    And the next question is, am I also

16    correct that you don't have any direct knowledge

17    about the use or not of assault weapons or large

18    capacity magazines in self-defense?  Your answer

19    was, yes, that's correct.  Is that still

20    correct?

21         A.    It is.

22         Q.    Turn to page 12, please.

23         A.    Okay.

DANIEL COURT REPORTING, INC.

1      Q.   So on line 4, there's a question that

2   begins, and maybe you were predicting that I was

3   going to ask you about large capacity magazines

4   next.  But just to step back, my question had

5   been whether you had done any studies focusing

6   specifically on use of assault weapons.  Have

7   you?  And the answer was, no, other than that it

8   is sort of a minor component of the

9   aforementioned study covering, I think, 1986 to

10   1995.  But it was a secondary concern.  So

11   certainly, besides that, there's nothing that

12   specifically addressed assault weapons other

13   than reviewing other people's research.  Is that

14   still correct?

15      A.   Yes.  Except that, of course, now

16   there's more of other people to research.

17      Q.   At the bottom of the page, there's a

18   question starting on line 25, you also reference

19   a study indicating the victims who use guns for

20   self-protection were less likely to suffer

21   property loss or injury.  Did that study focus

22   at all on teasing out assault weapons as opposed

23   to any other kind of gun in those incidents?

1    Your answer was, no.  That's still correct,

2    right?

3          A.    Yes.

4          Q.    And the next question is, did it look

5    at teasing out use of large capacity magazines

6    as opposed to any other magazines or types of

7    loading ammunition?  Your answer was, no.

8    That's still correct, right?

9          A.    It is.

10         Q.    And then the next question is, are

11   you aware of any studies with respect to use of

12   firearms for self-protection and how that

13   interplays with the likelihood of suffering

14   injury or property loss that do specifically

15   look at either assault weapons or large capacity

16   magazines to the exclusion of other types of

17   magazines or firearms?  And your answer was, no.

18   Is that still correct?

19         A.    It is.

20         Q.    Turn to page 18, please.

21         A.    Okay.

22         Q.    Starting on line 20, the question is,

23   do you have a belief as to whether a significant

1      portion of defensive gun users have a criminal

2      background?  And it says Mr. Sweeney, objection.

3      And then it says the witness, yes.  Is that

4      still true?

5             MR. PORTER:  I object to the form of

6      the question.  Same objection as Mr. Sweeney.

7      You can answer.

8          Q.   We're only asking about whether you

9      have a belief here.  I assume you still have a

10     belief?

11         A.   Yes.

12         Q.   Okay.  With two objections, you still

13     have that belief.  And then at the beginning of

14     the next page, it says, what is that?  And I

15     think what he means there and what you

16     understood him to mean is what is your belief,

17     right?  And you answered, I think that people

18     with a criminal background would be

19     disproportionate likely to engage in any type of

20     self-defensive action, including with firearms.

21     Is that still your answer?

22         A.   Yes.  Although, I wish I had made

23     it -- made the limitations of that conclusion

DANIEL COURT REPORTING, INC.

Page 181

1     clearer.  You know, what is the comparison?

2     Compared to what?  And you know, what I meant

3     was compared to the rest of the population, you

4     know, the people who use the gun for

5     self-protection which is likely to be in a very

6     serious incident are more likely than the rest

7     of the population to have a criminal record.

8     But whether those who are crime victims who use

9     guns for self-protection are anymore likely to

10    have a criminal record than those who are crime

11    victims but did not use a gun for self-

12    protection, that I don't know.

13         Q.   And the question is, why is that?

14    And he's asking again about the answer you did

15    give, not about the answer you just gave.  And

16    your answer to his question, this was

17    Mr. Fader's question in this deposition

18    transcript is, because they are victimized more

19    often than the noncriminal population.  What you

20    mean there are the criminals are victimized more

21    often than the noncriminal population, right?

22         A.   Again, it's hard to recollect, you

23    know, what I had in mind as the point of

Page 182

1      comparison there.  I can tell you what I would

2      say about it now; but what I was thinking at the

3      time, I'm not so sure.

4           Q.   So is it your view that criminals are

5      more often victimized more often than the

6      noncriminal population?

7           A.   Definitely, yes.

8           Q.   Is that the reason why criminals are

9      more likely to use a gun in self-defense than

10     noncriminals?

11          A.   Yes.  Not in comparison with other

12     noncriminal victims, but just in comparison with

13     all noncriminals as a group, victimized or not.

14          Q.   Let's turn to page 50, please.

15          A.   Okay.

16          Q.   On line 9, there's a statement that

17     you make that says, I can say definitively the

18     vast majority of people in the population will

19     not be a victim of violent crime in their lives

20     or at least any kind of serious violent crimes

21     beyond the school yard pushing and shoving as a

22     kid.  Is that still true?

23          A.   Yes.

DANIEL COURT REPORTING, INC.

Page 183

1          Q.    I'd like you to turn to page 55.

2          A.    (Witness complies).

3               MR. PORTER:  Can we go off the record

4      for a second?

5               (Off-the-Record discussion)

6          Q.    All right.  What I think I need you

7      to do is go back to Exhibit 2, please.

8          A.    Okay.

9          Q.    And if you would look at page 4 of

10     Exhibit 2.

11         A.    Okay.

12         Q.    And if you look at the numbered

13     heading 1, it says, having only ten rounds to

14     fire in a situation of lawful self-defense is

15     insufficient in a significant share of defensive

16     gun use situations.  Is that your expert

17     opinion?

18         A.    It is.

19         Q.    Turn back to Exhibit 4, page 55.

20         A.    Okay.

21         Q.    Starting on line 6 it says, as I

22     understand it, the first opinion that you

23     offered, beginning on page 3, having only ten

1      rounds to fire in a situation of lawful

2      self-defense will be insufficient in a

3      significant share of defensive gun use

4      situations.  Is that the same opinion being

5      offered in connection with the Maryland case?

6          A.    I believe it is.

7          Q.    And then Mr. Fader --

8                MR. PORTER:  I'm sorry to interrupt.

9      Can you repeat your question that you just asked

10     him?

11               MR. KLEIN:  Is that the same opinion

12     that's being offered?  I can have it read back

13     because I'm sure I'll get it wrong.

14               MR. PORTER:  I believe you said it's

15     the same opinion that you're offering in the

16     Maryland case.  I think you meant Massachusetts.

17               MR. KLEIN:  I did.  Thank you for

18     that clarification.  I think you are right about

19     that.

20               MR. PORTER:  Okay.

21         Q.    So again, I'm sorry, I'm going to

22     reask the question because Mr. Bradley (sic)

23     pointed out I made a speaking error.

DANIEL COURT REPORTING, INC.

Page 185

1              The opinion that you were asked about

2     in connection with your deposition in Maryland

3     is the same opinion as you're offering in the

4     Massachusetts case, right?

5          A.   Yes.

6          Q.   And Mr. Fader asked you, does that

7     accurately state your first opinion in this

8     case?  And you answered, yes.  And then he asked

9     you, do you have any empirical evidence

10    regarding the number of rounds fired by

11    individuals defending themselves with a gun?

12    And you answered, no.  Is that still true?

13         A.   Yes.

14         Q.   And then it says, do you have any

15    anecdotal evidence regarding any incidents in

16    which an individual fired more than ten rounds

17    in self-defense?  And your answer is, none that

18    I can recall right now.  Can you recall any as

19    you sit here today?

20         A.   No.

21         Q.   And then you were asked, have you

22    ever made an attempt to look for such incidents?

23    And your answer is, no.  Is that still true?

Page 186

1          A.    It is.

2          Q.    Then he asks you, you state in your

3     report some criminal attempts can only be

4     stopped by shooting the offenders.  Is that part

5     of your Massachusetts opinion as well?  Do you

6     see it on page 4 at subheading C?

7          A.    Yes.

8          Q.    So Mr. Fader asked you about that

9     opinion, do you have any empirical evidence in

10    how many criminal attempts can only be stopped

11    by shooting the offenders?  And your answer was,

12    no.  Is that still true?

13         A.    It is.

14         Q.    Are you aware of any data on that

15    subject, question.  And your answer is, no.

16    Question:  Is it true then that in the vast

17    majority of self-defense cases the criminal

18    attempt is stopped just by knowing that there is

19    a gun, I'm sorry, by knowing that there is a gun

20    in the hands of the potential victim?  And you

21    answered, it's certainly stopped without the gun

22    being fired, if that's what you're getting at.

23    Would that still be your answer to that same

Page 187

1      question?

2           A.    It would.

3           Q.    Then the question is, so at least in

4      the vast majority of self-defense cases there is

5      not even a need to fire a weapon, much less to

6      hit the offender; is that right?  And then your

7      answer is, well, independent of the issue of the

8      need to do so, certainly the vast majority of

9      gun uses do not involve the gun actually being

10     fired.  Because the gun is fired, even included

11     warning shots only about 24 percent of defensive

12     gun uses, and it is fired at the offender in a

13     little under 16 percent of the cases.  Is that

14     still your answer?

15          A.    It is.

16          Q.    Turn to page 75, please.

17          A.    Okay.

18          Q.    Question:  As a general proposition,

19     do you agree that mass shootings that involve

20     the use of a high capacity magazine by a mass

21     shooter result in more injuries and more gunshot

22     wounds among victims than mass shooting events

23     that do not involve high capacity magazines?

Page 188

1          Your answer is, probably.  But I am cautious

2     about making those sorts of generalizations

3     based on a really small number of cases.  Is

4     that still a correct answer?

5          A.   It is.

6          Q.   If you would turn to page 83.

7          A.   (Witness complies).

8          Q.   Starting on line 15, question:  What

9     data do we have on how quickly mass shooters

10     change magazines during incidents?  Your answer

11     is, none that I am aware of.  Are you aware of

12     any data on that question now?

13          A.   No.

14          Q.   Page 119.

15          A.   Okay.

16          Q.   Starting on line 19, the question is,

17     at what distance is it that you think it doesn't

18     matter whether you are using a handgun or a

19     rifle?  And your answer is, well, there is no

20     particular cutoff.  It is just that the longer

21     the range, the more of a help it is to have a

22     rifle.  Is that still correct?

23          A.   It is.

DANIEL COURT REPORTING, INC.

1          Q.    Let's look at page 157, please.

2          A.    (Witness complies).

3          Q.    Could you read to yourself the

4     testimony on page 157 and 158, up to line 14 on

5     158.

6          A.    Okay.

7                (Witness reviews the document)

8          A.    Okay.

9          Q.    Is it still your opinion that

10    self-selected samples have no basis for yielding

11    representative samples?

12         A.    Yes.

13         Q.    And is it your practice not to rely

14    on studies where the sample itself is selected?

15         A.    Well, I always rely on the best

16    available evidence.  If there is a true

17    probability sample, I'll rely on that.  But for

18    some purposes, the best available is not all

19    that great.  So in cases where I don't have a

20    probability sample of some larger population,

21    I'll rely on a non-probability sample, including

22    self-selected samples but make appropriate

23    adjustments in how confident I am in the

DANIEL COURT REPORTING, INC.

Page 190

1    findings.

2          Q.    So if you were running a survey

3    yourself, would you chose to use a self-selected

4    sample?

5          A.    No.

6          Q.    That's because you don't consider

7    them particularly accurate?

8          A.    No, they're certainly not as accurate

9    as getting a probability sample and not as

10   likely to yield results that can be generalized

11   to the larger population.

12         Q.    And that's partly because someone who

13   self-selects to participate in a survey is

14   usually doing so based on an interest in the

15   issue in which the survey is being made?

16         A.    Well, they're certainly likely to be

17   different in some way from the rest of the

18   population.

19         Q.    And if I represented to you that a

20   survey on gun ownership issues was based on an

21   opportunity to participate that was offered by a

22   website, for example, that focused on gun

23   ownership, that wouldn't be a particularly

1       useful self-selected sample?

2               MR. PORTER:  I object to the form of

3       the question.

4           A.   So it's limited to people who happen

5       upon that website then?

6           Q.   Yes, who happen upon that website and

7       discover the survey by participating in that

8       website.

9           A.   Yeah, I would have no -- I wouldn't

10      have much confidence in findings based on such a

11      sample.

12              MR. KLEIN:  Can we just take a five-

13      minute break, please.

14              MR. PORTER:  Sure.

15              (Brief recess was taken from

16              3:00 p.m. to 3:08 p.m.)

17              MR. KLEIN:  So I don't have any

18      further questions.  Before we close, I wanted to

19      say that there's an open question about three

20      additional documents relevant to Professor

21      Kleck's study of defensive gun use.  We probably

22      will want to continue to talk to you about that.

23      And if we get ahold of those documents, we may

DANIEL COURT REPORTING, INC.

Page 192

1      want to reopen the deposition.

2                  MR. PORTER:  Understood.

3                  MR. KLEIN:  So for formal purposes,

4      it's our position that the deposition is not

5      closed at this time.

6                  MR. PORTER:  I understand.  And I

7      reiterate our position, when you raised the

8      issue earlier, that we object to production of

9      the documents.  And I'm not going to belabor the

10     point on the record, but I think we understand

11     one other.

12                 MR. KLEIN:  Okay.

13                 MR. PORTER:  And I have no questions.

14                 (Deposition adjourned at 3:08 p.m.)

15

16

17

18

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 193

1                    CERTIFICATE

2

3     STATE OF ALABAMA    )

4     AT LARGE            )

5              I hereby certify that the above and

6     foregoing deposition was taken down by me in

7     stenotype and the questions and answers thereto

8     were transcribed by means of computer-aided

9     transcription and that the foregoing represents

10    a true and correct transcript of the testimony

11    given by said witness upon said deposition.

12              I further certify that I am neither

13    of counsel nor of kin to the parties to the

14    action, nor am I in anywise interested in the

15    result of said cause.

16

17                    /s/ KATHY HART CANADAY, CCR, RPR

18                        Certified 10/26/2017

19                        Commissioner at Large

20                        ACCR 586, Expires 9/30/2018

21                        MY COMMISSION EXPIRES:

22                        2/20/2018

23

DANIEL COURT REPORTING, INC.

Page 194

1

2

3

            Please read the enclosed transcript

4

    and return to my office within 30 days.  It is

5

    not necessary to correct punctuation.  NO

6

    CHANGES ARE ALLOWED TO BE MADE TO THE

7

    TRANSCRIPT, ONLY ON THE ERRATA SHEET PROVIDED.

8

    Also, changes can only be made to your answer if

9

    you feel it is not a correct word or name

10

    spelling.  No other changes are to be made.

11

    Please read and mail back to me as soon as

12

    possible.

13

14

                    Thank You,

15

                    Kathy Hart Canaday, CCR, RPR

16

                    North Alabama Reporting Service

17

                    Post Office Box 2116

18

                    Cullman, AL 35056

19

                    (256)737-9770

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 195

1

2                          SIGNATURE

3

4          I, GARY KLECK, hereby certify that I

5     have read the transcript of my deposition, and

6     except for the corrections listed below, certify

7     that it is a true and correct transcription.

8

9

10

11                         _____

12                         GARY KLECK

13

14

15

16

17

18

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 196

1

    As you read your deposition, if you have any
2
corrections to make, please itemize them below.
Upon completion, please sign on this errata
3
sheet so that I can return it to the proper
court.  However, if you do not have any
4
corrections to make, sign this form and return
it to me within 30 days.  Thank you.

5

6

7
        CHANGES MADE BY THE WITNESS:

8
PAGE   LINE     FROM              TO

9
_____

10
_____

11
_____

12
_____

13
_____

14
_____

15
_____

16
_____

17
_____

18
_____

19
_____

20
_____

21
_____

22
_____

23
DEPONENT_____   DATE_____

**A**

**a.m** 1:15 51:22,22 101:2,2
**abiding** 114:6,14 114:21
**ability** 6:7 116:8
**able** 37:6 102:3 114:9 115:7 128:19 134:14 161:9
**absence** 28:15
**absolutely** 19:10 144:4,22 176:7
**abstract** 165:18,23
**abuse** 72:11
**academic** 42:9 56:19 101:22
**academically** 101:23
**accepted** 92:16
**access** 29:18 37:10 58:12 59:9 97:22
**account** 31:15 80:5 145:12
**accounts** 80:3 149:3,23
**ACCR** 193:20
**accuracy** 46:4
**accurate** 46:21,23 124:2 136:3 174:14 190:7,8
**accurately** 149:15 171:4 185:7
**achieved** 100:2
**acknowledge** 91:4
**acknowledged** 91:1
**acoustic** 123:20
**acquire** 50:11 72:10
**acquired** 41:7
**acquiring** 131:13 132:7
**acquisition** 57:15
**acting** 5:2 129:3
**action** 123:17 180:20 193:14

**actions** 88:3
**activities** 119:15
**activity** 47:4 60:19 60:23
**Adam** 158:1
**add** 105:20 129:6 130:4 131:7 134:16 145:11
**added** 112:15
**adding** 128:7
**addition** 78:17,18
**additional** 18:10 90:10 99:7 101:4 102:6 104:23 105:15 106:6 121:3 125:18 126:16 127:23 128:2 129:11,12 129:22 134:19,20 135:2,5,9 140:6 168:7 173:14 175:9,12 191:20
**address** 7:7,9,9 57:3,5 97:13 121:15
**addressed** 97:13 113:7 178:12
**addresses** 97:15,18 108:12
**addressing** 138:7
**adjourned** 192:14
**adjustments** 189:23
**adult** 86:12
**adults** 85:16,16 154:21
**advance** 74:13
**advent** 96:9
**adversaries** 116:3
**adversary** 109:6
**advocacy** 29:5,10 29:19
**affect** 24:11
**affiliation** 7:19
**affirmative** 27:14 93:4 165:5 173:18

**affirmatively** 28:9 51:7
**aforementioned** 178:9
**age** 86:12
**agencies** 28:13 71:4
**agency** 36:9,15 97:4
**ago** 11:11 31:17 85:5
**agree** 47:1 48:23 86:13,15,20 165:15 176:17 187:19
**agreed** 2:3,7 86:19
**agrees** 168:23
**ahead** 11:4 72:6 127:8
**ahold** 191:23
**aim** 116:11 160:11 160:15,19 161:5
**aimed** 134:17 137:6
**AK-47** 41:3 65:6 75:13 76:10 95:11
**al** 1:4,7 14:5,6 194:18
**Alabama** 1:14,18 3:9 5:2,4 48:5,21 49:2,9,14,15 193:3 194:16
**albeit** 72:19
**Alcohol** 108:16
**alcoholics** 57:15
**allocate** 130:10
**allow** 42:18 91:15 97:5 156:17
**allowed** 71:20 194:6
**alludes** 25:19
**alluding** 26:22
**alternative** 168:2
**ammunition** 114:8 179:7
**amount** 126:22 129:6 160:4,19 174:19

**analogous** 110:8
**analysis** 44:2 101:21 166:13
**anecdotal** 185:15
**animate** 121:17,20
**answer** 6:6,17,18 6:23 17:10 24:12 42:13 52:13 65:2 71:10,11,17,23 73:6 79:22 87:23 96:14 98:13 109:11,23 111:5 113:7,8 114:2 117:14,15,17 119:21 120:7 127:5 128:10,12 131:10 132:9,22 133:13 153:21 156:9 171:3,16,19 173:3,7,12,16 174:9,14,16 176:5 176:19,21,22 177:6,12,18 178:7 179:1,7,17 180:7 180:21 181:14,15 181:16 185:17,23 186:11,15,23 187:7,14 188:1,4 188:10,19 194:8
**answered** 38:18 85:22 90:6 175:22 180:17 185:8,12 186:21
**answers** 14:15 86:11 173:22 174:4 175:5 193:7
**anybody** 102:16
**anymore** 181:9
**anyway** 87:9 127:19 129:10,14 175:11,12
**anywise** 193:14
**apart** 22:3
**apologize** 49:5 94:6 127:7
**apparently** 102:12

**appear** 37:19
**appeared** 37:18
**appears** 11:5 144:2 145:19
**appended** 141:17 142:19
**appendix** 26:19 142:2,22 143:12 143:15,17,18,19 143:23 144:5,16 145:3,8,10,19 147:13
**applies** 73:17 77:7
**approach** 128:17
**appropriate** 189:22
**approximate** 162:7
**approximately** 40:4 66:17 70:12 153:14 157:4
**AR** 40:19,19 69:17
**AR-15** 40:17 41:5 41:20 65:3 75:10 76:6 95:8 176:18
**Arant** 1:16 3:6 67:1
**arbitrary** 32:23 33:1 73:17 74:5,7
**Archive** 81:4
**area** 86:2 87:22
**Arie** 64:4
**Arizona** 167:10
**article** 12:22 15:23 16:5 18:15 26:21 83:19 84:19 100:3 100:12 101:5,10 102:11 141:15 142:9 168:9
**articles** 20:13
**articulate** 92:4
**Ashburton** 3:15
**asked** 18:9 25:2 66:6,10 83:22 84:16 89:21 90:10 90:14,21 92:2 94:11 99:7 106:3 106:7 113:21 173:20 174:10

175:20 184:9
185:1,6,8,21
186:8
**asking** 31:16 72:21
90:11 93:11 101:9
106:6 133:9
154:16 174:17,21
180:8 181:14
**asks** 186:2
**assassination**
167:11
**assault** 11:6 12:23
13:19 15:22 16:3
16:21 18:17,20
24:21 52:7 73:9
73:13,22,23 74:15
74:16,21 75:10
76:14 95:5 106:19
108:2,12,13 140:2
177:5,17 178:6,12
178:22 179:15
**assaults** 119:19
**assessment** 25:2
**assessments** 162:7
**assign** 2:11
**assistants** 103:5
**Association** 62:3,6
64:5,8 66:2 67:12
67:17
**assume** 7:1 19:9
65:18 66:8 135:18
136:7 173:7 180:9
**assumed** 112:5,6
**assuming** 126:18
129:23 131:5
135:7,23
**assumption** 114:18
114:19 118:21
129:12 131:17
135:12
**assure** 114:9 115:6
**astounded** 49:1
**asymmetrical**
110:11
**attached** 8:17
21:13 59:6 140:22

169:6
**attack** 115:12
**attacked** 109:4,6
**attackers** 114:10
115:7
**attempt** 37:3 175:8
185:22 186:18
**attempted** 84:7
167:10
**attempts** 186:3,10
**attended** 104:13
**attending** 47:7
**attention** 9:8 59:16
132:12
**Attorney** 5:20
11:13 15:3 52:4
54:21
**attribute** 49:13
**audio** 41:15 70:17
70:17 162:21
163:3,12
**audiotape** 70:14
**Aurora** 45:7 107:7
171:11,15,18
**author** 121:10
**author's** 13:15,17
**authored** 9:17
**AutoGlove** 69:20
**automatic** 54:15
65:22 70:5,10
123:8
**available** 19:12
28:9,12 36:8 37:5
37:8,13 38:5
39:20 49:20 50:12
50:15 54:17,18
55:20,23 68:22
70:4 77:4,5,8,11
77:12,15,16 81:16
101:13 105:11
149:3,17 189:16
189:18
**Avenue** 1:17 3:8
**average** 58:3,6
67:20 82:22
157:12 158:14

**averages** 157:12,21
**avoid** 134:4
**AW** 12:21 13:10
**aware** 31:23 39:15
45:23 46:8 54:21
55:1 58:19 67:11
67:13 70:3 75:9
75:13,16 76:5,13
76:18,22 81:23
116:19 117:20
118:3 119:10
121:1,5,9 132:11
145:11 161:7,12
167:8 179:11
186:14 188:11,11
**awesome** 8:3
**awful** 140:14

**B**

**B** 48:17
**B-A-N-S** 13:10
**back** 22:5 93:3,18
117:14 148:3
152:10 156:13
178:4 183:7,19
184:12 194:11
**background** 57:8
57:10,13 180:2,18
**backup** 144:19
145:17
**bad** 108:10
**ballpark** 82:14
**ban** 24:21 108:2
111:20 113:4,10
113:14,23 116:7
**banned** 54:14,18
54:23 55:7 73:23
76:3
**bans** 12:22 13:1,10
13:19 15:22 16:3
18:17,20 57:15
115:3
**Barbra** 61:15
**barrier** 134:4
**base** 70:13 101:19
**based** 18:11 20:3

41:19 54:12 82:23
84:10 85:1 101:6
102:5 114:11
119:4 131:12,16
142:9 143:1 164:2
188:3 190:14,20
191:10
**basic** 176:16
**basically** 16:20
58:12 72:12 74:5
81:19 86:10 96:9
97:12,15 100:21
**basing** 60:10,13
**basis** 32:4 100:3,10
112:2 158:4
189:10
**bayonet** 75:23
**bearing** 11:19
**bears** 29:20 101:10
101:11
**Becerra** 22:23
64:21
**beginning** 180:13
183:23
**begins** 22:13 139:7
178:2
**behalf** 24:20 25:3,6
61:13 62:5,12,19
63:3,21 64:6,15
**belabor** 151:17
192:9
**belatedly** 27:7
**belief** 112:2 131:12
179:23 180:9,10
180:13,16
**beliefs** 79:1
**believe** 10:6 19:5
23:6 34:17 36:2,3
36:5 46:20 47:13
52:12 57:23 65:5
65:8 78:10 80:4
80:23 81:2 93:4
99:20 109:16
119:2 121:8 158:4
158:7 184:6,14
**believed** 91:17

109:3
**belt** 68:21
**bend** 161:1
**Bennett** 12:1
**Bernardino** 45:2,5
107:11 167:5
**best** 6:7 35:9 36:6
36:10,11,12
149:17 152:23
153:1 171:3
189:15,18
**better** 72:22 132:18
**beyond** 18:12 32:9
182:21
**big** 69:11 87:21
165:20
**bill** 66:22,23
**billed** 67:2,5
**Binary** 69:17
**Birmingham** 1:18
3:9
**bit** 18:3 39:22
122:13
**bizarre** 43:21
**blah-blah-blah**
99:6
**blame** 47:9
**Blank** 31:12
**book** 31:11 85:11
119:2
**Boston** 3:16 54:5
**bottom** 9:9 26:8
124:8 142:3 177:3
178:17
**Boult** 1:16 3:6
**Box** 194:17
**Bradley** 1:16 3:6
30:17 67:1 170:4
184:22
**break** 7:3 51:20
95:14 100:23
101:3 139:13,14
140:23 191:13
**breeze** 87:6
**Brief** 51:21 101:1
191:15

**bring** 8:22 9:12
100:22 106:3
136:14
**broad** 94:18,23
**broadest** 56:19
**broken** 167:22
**brought** 9:21
135:19
**buckets** 47:3
**bullets** 122:6
**bump** 41:22 58:21
58:23 59:9,17
69:22 70:1,3,20
135:22
**Bureau** 108:16
**burglar** 93:1
**buried** 51:15
**business** 7:6,9
102:23 156:22
**businesses** 8:4
**busy** 85:10
**bypassing** 133:18
**bystander** 121:21
**bystanders** 112:19
122:11,15 126:2
162:3,19

**C**

**C** 3:1 186:6
**c.5** 152:14
**calculate** 150:23
**calculated** 149:15
150:8
**calculation** 152:1,6
153:17 154:5
155:7
**California** 23:1
45:2 64:19
**call** 96:17 106:13
159:21 163:1
**called** 10:21 15:7
18:7 26:12 31:12
58:21 69:13,19
80:10 81:4
**calling** 73:21
**Canada** 61:16 62:2

**Canada's** 61:18
**Canaday** 1:12 5:1
193:17 194:15
**Candice** 3:5
**capable** 157:20
175:21
**capacity** 11:13 12:1
25:8,17 26:12
27:8,12,15,19
28:1,4,10,16,17
28:20 29:3,7,14
32:7,10 33:6,21
35:2,7,12,16 36:1
36:19 38:6 39:9
39:11 42:2,5,7,11
60:8,18 62:22
63:17 64:1 65:9
76:23 77:15
106:21 113:4,10
113:15,23 114:8
114:17 115:3,6,11
116:7,21 117:3,10
138:17,21 144:10
144:12 146:2
158:18 172:14
177:11,18 178:3
179:5,15 187:20
187:23
**cartridge** 162:9
**case** 1:5 10:15
11:16 12:6 13:21
14:3 15:10 16:2
17:5 20:23 21:4
23:1 24:15,16,19
25:12,19 29:2
30:8,23 31:13
37:9 42:17 44:5
52:1,14 56:16
58:8 61:16,17,20
62:4,23 63:8,9,13
63:19 66:11,13
67:3,7,12 72:18
92:21 93:1,2
99:17,21 100:1,5
100:9,11,19
101:20 105:4

121:23 130:8
140:2,3,4,6,7
141:12 148:4,7,8
151:12 164:19
165:6 169:17,20
170:1 184:5,16
185:4,8
**cases** 25:16 27:18
28:12 30:18,20
35:15 37:8,11
47:13 61:10,12
68:4 122:10,22
124:20 140:2
143:2,8 146:2,4
163:13 165:2,11
165:13 166:19
186:17 187:4,13
188:3 189:19
**casualties** 27:9
139:3
**Casualty** 26:13
**catalogued** 80:18
80:22
**catch** 60:20
**categories** 47:4
92:9,10 94:18,23
**cause** 5:6 193:15
**cautious** 188:1
**CCR** 193:17
194:15
**CDC** 45:23 46:8,17
47:5,9
**CDC's** 46:4
**cell** 86:9 96:10
**Center** 35:23 37:21
38:6,20 46:9
**Center's** 35:13
**central** 23:1 101:12
102:3
**century** 31:17 50:5
50:9
**certain** 64:2,11
112:18 126:22
**certainly** 40:6
56:22 60:11 89:20
119:17 124:17

125:9,14 146:12
151:7 156:22
160:18 168:8
173:4 178:11
186:21 187:8
190:8,16
**certificate** 4:16
47:8,12,14 193:1
**Certified** 1:13 5:1
193:18
**certify** 5:3 193:5,12
195:4,6
**challenge** 61:18
**challenging** 61:20
**change** 26:23 40:13
67:20 68:2,22
123:20 124:1
125:12 126:5,19
129:7 130:15
131:6 132:5
133:18 134:7,22
135:10,14,15
136:11,17 145:13
158:19,22 159:5
159:11 160:2,5
161:10 167:13
173:13 174:20
188:10
**changed** 27:1 65:21
102:5 125:8,19
128:3 134:16
146:1 160:16
168:5
**changes** 25:10 26:1
123:16 124:7
134:21 137:9
159:22 194:6,8,10
196:7
**changing** 68:5,18
124:14,16,22
125:3 130:5,21
131:15 133:7,10
133:11 159:8,13
167:23
**chapter** 108:10
**character** 110:3

**characteristics**
74:12 106:17
**check** 169:2
**checks** 57:8,11,13
**Chicago** 63:8,10
**children** 154:21
161:9
**choice** 132:17
**choose** 32:5 130:3
130:15 133:5
151:9
**choosing** 129:17
130:5,20 132:20
**chose** 190:3
**circa** 153:9
**circumstances** 55:9
55:13 69:1 76:13
76:18 110:23
115:17 118:22
120:8 157:21
**cite** 108:14
**cited** 21:5 108:5
118:10,11 120:14
142:5,23
**cities** 54:2,3,7,11
**citing** 124:19
**citizens** 114:6,14
**city** 54:5,10 63:10
64:5,11
**Civil** 5:4
**civilian** 76:7,11,20
77:1 120:5 121:23
122:20,20
**civilians** 55:21 71:6
71:19 77:5,12,17
77:22 78:2 118:22
119:11,15,23
122:22
**claim** 24:20 25:7
94:9 110:1 161:12
**claimed** 75:18 99:9
111:12
**claiming** 88:20
**clarification** 39:7
184:18
**classes** 104:19

classification 46:13
classified 89:10
classify 91:14
clear 23:21 105:12
  154:5 155:13
  158:10
clearer 181:1
clearing 87:16
clearly 157:1
click 98:12
Clinic 61:16
clock 124:7
close 82:22 84:4
  157:18 191:18
closed 192:5
closer 128:18
closest 151:3 153:4
  153:5
clue 165:21
co-authors 103:2
codes 86:2
coding 54:9
College 7:17
collusion 28:7
Colonel 14:20
Colorado 45:8
  171:11,15
Columbia 62:12,16
Columbine 107:2
column 148:2,15
  149:6 152:7,14
  153:16 154:3,12
  155:1,2,6,11
columns 148:21
  152:4
Colwell 11:21 18:4
  18:6
Colwell's 17:21
  23:22
combat 115:17
combing 29:6
come 127:23
  161:23
comes 98:2 161:17
  163:8
comfortable 73:7

73:10,21 74:2
coming 162:13
Commemorative
  61:16
commence 131:4
commenced 134:3
commenting 15:20
comments 15:12,13
  15:15,18 18:1,5,8
COMMISSION
  193:21
Commissioner 5:3
  193:19
commissions 28:14
commit 73:20
committed 45:11
  91:2,8 92:7
  111:22
common 32:7
  112:5
commonly 111:21
Commonwealth
  3:14 111:23
communications
  9:17
company 170:13
compared 181:2,3
comparison 181:1
  182:1,11,12
competence 72:14
competitors 124:15
  124:19
compilation 33:22
  35:13 118:12
compile 34:17
  119:6
compiling 33:19
complaint 52:10
complete 22:7,9
  88:7 105:21
  109:22 111:5
completed 24:2
  25:16
completely 6:18
  137:1
completing 85:11

completion 196:2
complex 173:9
complies 22:4 26:7
  61:9 83:9 111:16
  123:4 137:12
  171:8 177:2 183:2
  188:7 189:2
component 178:8
compound 117:6
comprehensively
  34:3
computer 9:23 10:5
  10:14,18 20:22
  23:17 51:15 97:21
  97:22 99:12,13,19
  99:22 100:14,20
computer-aided
  193:8
conceivable 43:22
concept 32:13
concern 6:21
  178:10
concerned 147:14
  147:15 166:21
concerning 25:8
  138:10
concerns 108:10
conclude 20:3 55:3
  157:3
concluded 13:18
  18:21,23 60:17
conclusion 78:7
  180:23
conclusions 12:9
  13:17 16:7 19:4
  102:12 105:10
conditions 125:7
conduct 85:4
conducted 83:14,20
conference 103:11
  103:12 104:9
  105:23 166:1
confidence 191:10
confident 53:10
  189:23
confined 27:17,18

27:21 146:2
  166:19
confirm 92:23
confirms 16:20
  124:11 156:19,22
conflict 109:8
confrontation
  92:22 93:8,12
Congresswoman
  167:11
Connecticut 44:16
  44:20 154:21
connection 11:8,16
  13:3 19:2 21:3
  23:5,13,18 25:22
  30:8 31:8,21 51:2
  52:17 56:16 67:3
  90:17,19 91:17
  98:20 103:9,16
  105:3 113:21
  141:11 143:11
  146:6 147:6 148:7
  184:5 185:2
consider 10:13 74:8
  81:12 98:15 105:3
  105:14 190:6
considerable 36:17
considered 19:1,3
  42:23 88:20
considering 112:17
consistent 156:23
constitute 111:1
constitutionality
  25:1
consult 67:4,10
consultant 8:13
consulting 8:6,8
contact 8:13 97:17
  98:8
content 24:12
CONTENTS 4:1
context 65:14 74:8
  93:23 108:7
  110:21 124:13
  139:22 140:5
continue 62:1 88:7

133:17 159:15,23
  168:6 191:22
continues 172:21
continuously
  135:21
contribute 50:12
  50:14
control 29:5,10
  46:9 49:19 50:10
  51:4,8 54:9 57:4,6
  57:20 58:11 78:4
  78:16 79:2,5 80:8
controls 50:3
convenient 58:7
Cook 62:18,19 63:2
  63:8
copies 14:1 15:5
  20:13 75:19
  103:22
cops 159:18 161:21
  162:9,19,21
copy 8:20 21:19
  22:12 23:22 52:5
  99:11 100:12
  101:9,18 104:1
copying 22:1
correct 5:16 18:18
  21:19 28:3 30:11
  36:23 37:16 38:17
  38:17 39:12 49:17
  51:6 55:4,8,17,18
  55:21 61:6 62:9
  62:13 64:13 83:15
  83:16 84:6 87:3
  88:16 89:16 90:8
  90:20 95:6,9
  107:21 118:19
  120:23 122:8
  124:16 139:4,10
  139:12 140:23
  141:3,9 142:7
  144:8 146:8,15
  147:3,4 148:1,20
  149:1 150:22
  151:22 152:19
  153:16 154:11

155:5,10 156:14
158:23 159:3,12
164:14 168:6,18
168:23 169:3,20
169:21 170:12
173:3,4,6,7 177:4
177:7,13,13,16,19
177:20 178:14
179:1,8,18 188:4
188:22 193:10
194:5,9 195:7
**corrected** 84:15
**corrections** 195:6
196:2,4
**correctly** 9:19
78:11 163:20
**correspondence**
9:14
**cost** 96:16
**costs** 67:12
**counsel** 2:4,9,10
3:13 5:5 17:19
20:6 84:21 169:23
170:3,12 193:13
**count** 33:15 34:18
38:23 39:10
163:19 164:8
**counted** 110:15
163:20
**counting** 39:5
**country** 50:1
**counts** 26:13 39:2
46:11,12,12,20
106:14
**County** 63:2,8
**couple** 6:9 17:15
20:12 174:5
**course** 20:12 32:19
53:22 118:13
125:22 133:21
158:16 170:22
178:15
**court** 1:1,13 5:2
7:10 22:23 117:15
117:19 196:3
**cover** 36:14 57:11

**coverage** 36:11
**covered** 34:3 43:4
**covering** 178:9
**crank** 69:14
**creating** 32:14
**crime** 16:14 56:21
75:5 85:13 87:21
88:4 90:5,17,19
90:21 91:2,7,9
92:5,7,9,10 93:2,5
93:19 108:14
115:22 116:2,20
116:21 117:7
118:16 119:16
122:1 181:8,10
182:19
**crimes** 12:14 73:20
108:18 111:22
112:12 113:5
182:20
**criminal** 7:18 47:3
60:19,22 74:18
91:17 112:23
119:12,19 120:4
122:20,20 126:9
164:21 165:2
180:1,18 181:7,10
186:3,10,17
**criminals** 50:15
76:3 114:22,22,23
122:19 125:2,6
181:20 182:4,8
**criminological** 25:2
74:10
**Criminology** 7:18
**criterion** 39:4 89:3
**crowded** 165:19
**crucial** 19:16,19
**cull** 34:9 38:4
**Cullman** 194:18
**Cummings** 1:16
3:6
**current** 25:18
148:7
**cutoff** 32:22 33:23
188:20

**D**

**D** 14:20
**dangerous** 58:12
73:16,19 74:23
75:5
**Daniel** 12:1
**data** 19:11,20 20:3
20:16 25:22 26:20
26:20,20 27:1
33:19 34:13 46:1
46:4,9,17 51:10
51:14 105:16
108:17 141:16,17
141:21 142:10,13
142:16 143:2,7
144:17,18 145:1
145:13 147:10
149:4 157:3
175:15 177:5,10
186:14 188:9,12
**date** 2:6 5:3 81:23
141:7 142:12
171:16 196:23
**dated** 4:10,11,13
150:20
**DAVID** 1:4
**day** 80:6 82:4,9,15
82:23
**days** 86:9 194:4
196:4
**dead** 37:13 146:19
146:20 147:15
**deadly** 118:13,19
119:3 120:20
**deal** 124:22 125:11
125:13 170:17
**dealer** 57:12
**death** 47:8,11,14
**deaths** 31:20 34:7
34:16 46:23 48:1
48:8,12 83:5
147:5
**decent** 164:13
**decision** 61:19,21
109:9
**declaration** 4:11

13:21,22 18:10
24:3,4 141:11
143:12 145:19,20
145:22 148:4
**declined** 88:7
**declines** 79:7
**declining** 89:1
**defective** 167:21
168:1,4,8
**defend** 116:9 122:1
**Defendant** 3:11
12:1 14:20
**Defendant's** 8:15
21:11 140:20
169:4
**Defendants** 1:8
5:19 11:14 12:4
52:14
**defender** 113:18
**defending** 93:19
110:19 185:11
**defense** 56:5 111:2
177:12
**defensible** 102:1
**defensive** 88:2,14
88:17,21 89:2,5
89:13,18,19,23
90:12,16,23 91:14
91:18 93:8 94:2,8
95:21 99:9,10
101:5 105:14,17
108:21 109:10,13
110:15,18,22
111:1,11 113:11
113:13 114:1
180:1 183:15
184:3 187:11
191:21
**defensively** 110:2
111:13
**define** 73:14 139:2
**defined** 31:4 35:19
36:15 52:5 73:18
74:15,16 83:2
88:14 95:4
**defines** 15:4

**defining** 11:6
**definitely** 67:18
144:3 182:7
**definition** 31:2,8,18
31:19 32:2,14
33:3 34:6,10
38:11 52:7 73:12
74:1,4,5 75:2,10
76:15 80:13 83:4
106:19 139:11
**definitively** 28:19
182:17
**degree** 151:11
**delay** 127:20,23
128:3 129:13
133:15
**deliberate** 156:4,5
160:12
**deliberately** 128:5
129:4
**deliberation** 165:4
**delivered** 97:14
**delivery** 97:11
**demographics**
44:10 45:5,11,14
45:21
**demonstrate** 70:20
72:8,14
**demonstrating**
124:20
**denied** 89:5
**denoting** 13:9
**department's**
108:16
**departments** 119:5
**depend** 165:19
**Deponent** 9:11,12
196:23
**deposed** 61:11
**deposition** 1:10 2:5
2:12,15 4:9,13
5:22,22 52:16
63:12 67:8 73:6
105:22 106:3
139:22 169:13,16
169:22 170:19,23

175:5 181:17
185:2 192:1,4,14
193:6,11 195:5
196:1
**depositions** 6:3
52:20,22 53:1
**deprived** 114:8
**describe** 51:16 73:8
89:18 91:10
108:19 157:13
**described** 20:22
23:12 90:12 91:9
92:22 150:4
**describing** 137:20
**description** 4:8
61:2
**designed** 73:8
**desire** 74:13
**desired** 117:18
**detail** 36:17
**detailed** 59:16
**details** 36:12 89:19
90:11 92:1,3 99:8
106:23
**develop** 149:4
**development**
102:19
**device** 41:22 58:20
69:13,16,19 70:10
70:20 123:20
**devote** 130:11
**devoted** 33:19
**devoting** 130:23
**dialed** 85:22,23
**died** 47:16 59:10,14
59:19 172:17
**difference** 59:13
60:4 127:17 133:1
**differences** 141:20
**different** 16:1 31:7
31:11 43:9 80:13
85:12 113:21
138:8,8 141:23
160:17 168:5,15
168:21 173:5,10
190:17

**difficult** 6:12 72:19
**digital** 104:1
**digits** 86:3,4,5
**dime's** 132:23
**direct** 9:8 177:16
**directed** 9:12
**directions** 173:5
**directly** 116:6
**disagree** 40:20 75:1
**discharged** 159:20
**disclose** 101:22
**discover** 191:7
**discretionary**
159:21
**discuss** 105:13
**discussed** 103:11
106:1 139:21
**discusses** 104:22
**discussing** 24:17
123:1
**discussion** 20:20
140:19 171:12
183:5
**Disease** 46:9
**disproportionate**
180:19
**dispute** 52:4 108:23
109:7 110:12
114:20
**disputes** 109:16
**distance** 188:17
**distinct** 175:10
**distinction** 19:21
24:5,6 32:8
132:11
**distinguish** 74:22
**distinguishes** 74:14
**District** 1:1,2 22:23
23:1 62:11,16
**divide** 35:18
**document** 8:18 9:1
21:14 140:12,16
141:5 169:7,8
174:7 189:7
**documents** 10:19
17:16 20:21 21:3

191:20,23 192:9
**doing** 44:2 47:5
53:22 56:10 85:9
112:6 127:1
131:18 132:15
157:20 159:20
168:11 190:14
**door** 166:7
**double** 169:2
**doubt** 46:3,7
**doubts** 46:12
**dozens** 40:6
**Dr** 5:16 20:7 23:22
51:23 53:15 64:7
101:19 105:23
127:3
**draft** 84:19 101:10
**draw** 19:4 51:2
105:10 118:14
**drawing** 110:6
**draws** 81:20
**drew** 108:23
109:17
**drum** 173:16
**due** 127:23 129:16
134:21 137:9
**duly** 5:11
**duplicate** 13:23
52:5
**duplicated** 14:8
**duplicates** 14:11
15:5 75:19
**duration** 163:4,8
163:14
**duties** 7:22 8:2

_____
**E**
_____
**E** 3:1,1
**e-mail** 98:11
**earlier** 14:4 23:12
25:23 50:9 60:14
69:22 83:18 142:8
144:11 145:8
146:5 192:8
**early** 57:10 96:7
99:1

**earthly** 115:2
**easily** 68:3,21
150:5 175:22,23
176:8,19
**easy** 68:17 87:23
**economic** 44:19
45:15
**education** 73:1
**educator** 72:23
**effect** 12:23 13:18
16:3 18:16 51:8
53:11 56:21 57:3
57:7 58:9 59:17
59:23 60:19,22
61:3 74:17 78:19
79:4,11,19 80:2,5
80:7 85:12 88:11
97:3
**effective** 75:3
**effectively** 20:2
**effects** 57:15,20
58:1,13,15
**effort** 116:23 126:3
**either** 19:14 29:18
34:1 53:23 54:6
73:18 91:9 101:18
109:5 122:18
132:13 137:18
147:7 152:18
153:10 159:14
160:8 179:15
**eject** 123:7
**ejecting** 162:9
**ejects** 124:9
**electronic** 9:16
**elevated** 43:13
**elevating** 80:8
**emeritus** 7:21,22
**empirical** 185:9
186:9
**employed** 35:22
**emptied** 159:18
**empty** 176:8,18
**enclosed** 194:3
**encompass** 18:1
43:6 44:3 54:1

97:16
**encompassed** 52:6
**encompasses** 74:5
**encourage** 87:7
**ended** 165:11
**endorsed** 57:9
**enforcement** 15:2
28:13 36:13,15
37:7 71:1,3,7,13
77:4,8,11,16,20
77:21 121:2
161:19
**engage** 58:17
119:14 180:19
**engaged** 8:5 108:23
**engaging** 122:22
**enormous** 34:23
**enter** 109:9
**entire** 49:23 89:14
131:14
**entities** 28:13
**entitled** 77:22
**entity** 35:14
**EOPSS** 11:22
12:10
**equally** 77:4 79:19
**errata** 194:7 196:2
**erroneous** 47:11
**error** 22:1 184:23
**escape** 125:19
137:8 161:9 175:8
175:13
**especially** 58:15
75:4
**essentially** 29:4
124:14
**establish** 86:11
91:7,13 92:3
106:18 138:19,23
**established** 93:10
94:17 116:10
**establishes** 35:9
**establishing** 28:9
154:1
**estimate** 151:14
153:1 164:11,13

166:2,3
**estimated** 165:9
**estimates** 84:1
  153:22
**et** 1:4,7 14:5,6
**evaluate** 110:23
**evaluation** 110:22
  157:3
**event** 90:11
**events** 123:17
  137:20 138:8,16
  187:22
**everybody** 86:7
**Everybody's** 19:10
**evidence** 2:12
  27:15 28:9 29:13
  49:22 50:6 165:5
  173:18 185:9,15
  186:9 189:16
**exact** 144:22
  148:22 151:14
  162:2,11 164:1,16
**exactly** 31:18 99:4
  107:9 116:6 141:3
  149:11 153:15
  162:10,16,23
  168:17,22
**examination** 4:3
  5:7,14
**examine** 102:3
**examined** 5:11
**examiner** 47:8
**example** 37:8,12
  39:2 43:19 72:13
  92:13 95:8 106:20
  108:9,15 119:18
  119:19 120:1
  126:8 162:2,21
  166:17 190:22
**examples** 124:18
**Excel** 12:12
**exception** 57:8
  115:4
**exceptional** 128:23
**exceptions** 57:18
**excluded** 172:9

**excludes** 138:16
  139:1
**exclusion** 179:16
**exhibit** 4:6 8:15,19
  16:19,20 21:11,15
  140:11,11,14,20
  141:1,1,4,15,16
  141:17 142:1,5,10
  142:13,15,15,19
  142:22,23 143:11
  143:20,23 144:16
  144:18,19 145:14
  145:14,14,15,21
  148:3,6,9,10,12
  164:4 169:3,4,8
  171:7 183:7,10,19
**existence** 60:17
**exit** 126:10 165:17
**exits** 173:3,8
**expand** 77:18
**expanded** 133:13
**expanding** 57:10
**expect** 44:5
**expended** 123:7
**experience** 91:16
  124:22 125:3,23
**experienced** 123:6
  123:14,18 124:17
**expert** 4:10 13:22
  14:9 15:9 17:5
  18:12 20:7 21:6
  22:14 23:4 24:5
  24:12 52:22 53:2
  66:7,11 75:7,8
  101:20 138:13
  143:1,8 169:19
  183:16
**experts** 15:13
**expired** 135:21
**Expires** 193:20,21
**explain** 51:23 78:14
  105:8 130:2
**explained** 144:11
**explanation** 78:10
**explanatory** 145:20
**explicitly** 28:22

54:22
**explode** 72:5
**expressed** 100:1
**extended** 79:20
**extent** 36:11 111:6
  111:19
**extra** 126:14
**extraordinarily**
  122:18
**extraordinary**
  128:23
**extremely** 44:22
  123:2 124:2
**extrinsic** 106:6
**eyewitness** 163:9
  163:16
**eyewitnesses**
  128:15,15 156:20
  161:8,23 162:14
  167:9

---

**F**
**face** 92:16 116:14
  120:4
**facilities** 48:21
**facing** 116:3
**fact** 17:23 37:17
  40:12,18 43:12,14
  49:14 51:6 77:21
  87:8 101:11
  104:22 109:7,18
  116:14 126:2
  129:16,20 133:15
  138:3 146:1
  147:16 156:21
  168:10 170:3
**facts** 136:7
**Fader** 184:7 185:6
  186:8
**Fader's** 181:17
**failed** 120:12
**failure** 43:19
**faintest** 163:5
**fair** 19:18 30:1
  56:18 57:22 60:16
  61:1 65:18 82:21

154:14,17 157:2
  166:3
**fairly** 34:2
**falling** 92:9
**familiar** 39:17
  44:15 58:23 69:13
  69:16,19 140:12
  169:9,10
**family** 44:23
**far** 19:15 34:2 35:1
  50:1 67:2 69:3,5
  81:14 89:4 92:10
  93:18 94:8 117:11
**farfetched** 125:21
**fast** 67:19 68:1
  157:19 159:2
  175:14 176:1,6
**faster** 158:12,15
  176:20
**fatalities** 46:1,10
  46:17 47:3
**fatality** 46:11,12
**fatally** 19:7 34:1
  115:21
**favor** 10:18 61:22
  63:16
**feasible** 96:8
**features** 75:22
**Federal** 1:17 3:7
  15:22 18:19
**feel** 22:7 156:14
  194:9
**feet** 166:2,2,6,8
**fend** 114:9 115:7
**fended** 115:11,13
**fewer** 38:7,10,22
  39:1,9 48:8,12
  50:12,14 59:9
  175:6
**fight** 106:9
**figure** 20:11 42:10
**file** 9:13 10:13,14
  10:19 11:10 14:1
  15:3,19 17:11,12
  17:13 18:5 20:17
  20:23 23:17 53:4

53:19 106:4
**filed** 52:13
**files** 37:11 51:15
  97:12
**filing** 2:15
**filled** 47:8
**final** 11:23 14:9
  90:7,9 152:6
**find** 37:3 116:23
  132:10
**findings** 190:1
  191:10
**fine** 19:15 21:21
  95:15 106:10
  117:17
**finish** 6:16
**fire** 41:14,17 59:4
  59:12,18 60:5,7
  70:6,9 113:18
  115:19 123:9
  124:11 128:21
  133:5 138:16,20
  138:23 143:10
  144:21 145:23
  147:15,19,20
  149:16 150:8
  151:1 153:13
  156:10,11,16
  157:1,19 158:23
  160:8 165:9 167:1
  167:4,22 172:5
  175:21,22 176:2,6
  183:14 184:1
  187:5
**firearm** 46:10,12
  46:17 47:2 48:1,8
  48:12,21 62:4,6
  72:9 136:1
**firearms** 46:1,22
  49:15 60:8 64:2
  72:17 73:18 74:6
  94:18 108:17
  179:12,17 180:20
**fired** 41:11 43:12
  90:4 119:8 123:21
  123:23 131:3

134:2 148:5,16,23
149:7,12 150:20
152:1,11 153:2,5
154:9 155:2,3,9
155:19,20 156:7
162:11 164:2,12
164:20,21 165:4
185:10,16 186:22
187:10,10,12
**firing** 43:13 118:15
127:12,15,15
130:13 152:17
153:6 154:10
156:4 157:4,9
158:15,15,17
159:16 160:12
164:17 165:2
166:22 168:6
175:15
**firm** 30:14,17
66:13,16,18
102:18 170:4
**first** 5:11 6:10
11:14 12:3 14:21
16:5 22:13 46:5
47:12 62:4 83:12
86:3,4 87:7,14,18
109:17 114:13
123:23 146:10,11
149:7 152:10
183:22 185:7
**fit** 106:18
**five** 38:7 48:1 84:1
85:5 90:2 94:11
99:5 152:15 153:1
153:7 176:10,12
176:19
**five-** 191:12
**five-minute** 95:14
**five-year** 94:10
**Flanagan** 22:23
64:21
**flash** 75:23
**flaw** 19:20
**flawed** 19:4,5,6,7,9
19:13,14

**flaws** 47:9
**flee** 173:5
**Floor** 3:15
**Florida** 7:10,17,20
45:18,21 48:3
166:18
**focus** 16:3 44:12,12
44:13 51:17 54:6
128:22 178:21
**focused** 51:13
190:22
**focusing** 178:5
**folks** 104:12
**followed** 109:11
**following** 5:7
**follows** 5:12
**foolish** 38:2
**footage** 124:6
**footnote** 120:15
**forbidden** 114:17
**force** 118:13,19
119:3 120:20
164:9
**forced** 134:7
136:14,17
**foregoing** 5:5
133:18 193:6,9
**form** 36:22 42:12
71:16 79:21
100:10 117:23
119:20 120:6
131:9 132:8,21
134:10 156:8
180:5 191:2 196:4
**formal** 192:3
**forth** 28:14
**forum** 103:9 104:9
**found** 109:22,23
111:23 112:1
113:2 140:23
159:19 162:21
167:20 171:17
**foundation** 99:23
100:19
**four** 31:20 33:23
34:6 67:22 68:13

69:4 83:5 123:5
124:12 125:15,16
126:18,19 127:10
127:14,20 136:13
136:21 145:6
158:20 159:6
160:9 165:17
166:10 173:8,10
**fourth** 150:19
**fraction** 110:14
**frame** 171:22
**free** 87:10 97:21,22
156:14
**frequency** 79:18
**frequently** 158:20
**Friedman** 64:4,7
**friend** 123:15
**front** 100:14
**full** 22:12 35:9
50:20 83:12 97:16
**full-auto** 41:17
70:12
**fully-automatic**
41:18
**fumble** 68:9 129:21
**fumbling** 126:9,13
127:16,22 128:1
129:18 130:12,22
**functions** 73:15
**further** 2:7,14 89:6
167:23 191:18
193:12
**future** 44:7

---

**G**

**G** 20:15
**G-I-U-S** 12:21,23
13:8,13,14 16:1
20:14,16
**Gabby** 167:11
**gap** 145:7
**Gary** 1:10 3:12
4:10,11,13 5:10
5:18 13:23 14:9
22:14 195:4,12
**gather** 97:9

**gathered** 97:4
**general** 5:20 11:13
13:1,19 16:5 36:5
42:20,21 52:4
54:22 60:17 88:13
100:20 108:4
165:15 187:18
**General's** 15:4
**generalizations**
42:19 188:2
**generalized** 190:10
**generally** 57:23
106:15 167:19
**generate** 86:5
**generated** 86:1
99:18
**generates** 86:6
**getting** 24:11 72:7
82:22 87:22 96:14
131:4 157:10
161:20 162:12
186:22 190:9
**Giffords** 167:11
**Gius** 12:21,23
18:16 20:13
**give** 20:13 21:14
105:7 162:6
168:14 173:21
174:13 175:7
181:15
**given** 59:15 103:20
137:23 193:11
**glance** 141:23
**go** 11:4 23:7 29:10
72:6,15 79:11
89:4 98:10,11,13
111:15 123:3
127:8 137:11
140:17 151:15
152:10 159:17
183:3,7
**goes** 19:16 79:5
**going** 6:23 8:18
14:13 26:3 72:4
87:17 89:9 91:14
96:16 101:15

127:15,18,19
137:9 151:16
154:12 156:13
157:17 166:1
168:2 175:10,11
178:3 184:21
192:9
**good** 73:1 125:11
125:13 139:14
**gotten** 95:16
173:15
**government** 62:2
**governmental**
28:13 36:9
**great** 25:14 72:3
124:22 189:19
**greater** 149:9
150:21 152:12
153:18,20
**ground** 6:9 161:2
**grounds** 2:11
**group** 29:19 98:20
182:13
**groups'** 29:10
**guess** 71:9 73:10
113:8 114:17
130:7 146:10
152:23,23 162:6
162:20
**gun** 29:4,10 33:19
42:20 47:20 48:18
49:19 50:2,3,7,8
50:10 51:4,4,8,8
53:20 54:9 55:16
57:3,6,19,23
58:11,13,17,18
62:9 63:16 65:1
68:10 72:15 73:15
74:14 77:10 78:4
78:11,16,18,20,21
79:1,5 80:8 81:4
88:1,2,14,17,21
89:2,5,11,13,18
89:20,23 90:3,12
90:15,23 91:14,18
92:14 93:8 94:3,8

94:15 95:4,7,10
95:21 99:9,10
101:5 105:14,17
107:2,4 108:21
109:1,5,10,13
110:1,4,7,9,10,13
110:15,18,19,22
111:1,11,12 112:7
113:11,13 114:1
122:1 123:8,9
124:10 130:13
133:19 136:9
156:16 157:19
159:15 160:15,21
161:2,5 178:23
180:1 181:4,11
182:9 183:16
184:3 185:11
186:19,19,21
187:9,9,10,12
190:20,22 191:21
**guns** 49:20 50:11
50:12,14 56:20
57:1,2 58:12
64:11 65:12 71:1
71:4,13,20 73:16
74:11,22 75:4
76:2 77:7 88:1
106:22,23 107:7,9
107:10,23 108:1,9
108:11,18 121:4
133:15 138:11
159:9,11 160:2,7
160:16 178:19
181:9
**gunshot** 47:16
187:21
**guy** 12:22 93:13
124:9 133:2 162:8

——————
**H**
**habit** 164:9
**hand** 72:13 133:20
160:8,17
**handed** 140:15
**handgun** 96:3

188:18
**handguns** 55:12
**handling** 72:15
**handouts** 103:21
103:23
**hands** 186:20
**handwritten** 9:14
10:2,3
**happen** 35:21
47:22 95:19 97:7
107:1,6 191:4,6
**happened** 68:12
88:8 91:20 121:10
136:8 168:15
**happens** 122:6,15
**happy** 112:14
**hard** 102:10 105:7
181:22
**harder** 50:11
**harm** 118:16
**harmed** 116:17
**Harris** 64:15
**Hart** 1:12 5:1
193:17 194:15
**hashtag** 17:3
**head** 118:6
**heading** 183:13
**Healey** 1:7 11:12
**hear** 123:21
**heard** 41:15 92:13
**hearing** 70:14 80:2
**hears** 123:22
**Heller** 62:11,13
**help** 17:11 188:21
**helps** 164:8
**hereto** 8:17 21:13
140:22 169:6
**Hickenlooper**
62:18
**hideouts** 119:19
**high** 49:2 50:7
107:2 157:1
187:20,23
**high-risk** 50:15
**higher** 48:18 51:3
72:12,13

**Highland** 64:5,12
**highly** 44:5 132:10
**highly-publicized**
79:6
**historically** 49:22
**hit** 115:16 116:11
120:12 121:13
122:3 123:1 187:6
**hitting** 122:11
**HMQ** 61:16
**Hold** 127:4
**holding** 160:7
**Holmes** 173:13
**holstered** 160:21
**home** 7:6,9 8:13
72:18
**homeless** 97:17
**homicide** 13:19
46:13 47:3
**homicides** 111:22
112:11
**honestly** 24:10
30:12
**hopefully** 87:7
**hostages** 120:1
**hours** 20:12 67:7
**house** 92:15
**household** 90:3
99:6
**human** 123:1
**humans** 126:21
**hundred** 40:7
**hundreds** 40:9
41:12 80:23 81:2
116:1
**hundredth** 124:4
**hypothesizing**
160:12
**hypothetical** 126:6
136:19 137:1,3
165:7
**Hypothetically**
160:23

——————
**I**
**I-N-T-S** 12:11

**idea** 59:11 93:15
121:15 149:22
163:2,5 175:14
**identification** 8:16
21:12 87:2 140:21
169:5
**identified** 35:6 82:1
82:7,12,18 83:1
85:17 90:15,22
93:7
**identify** 29:2 34:15
35:15,23 37:22
89:1 96:11
**identifying** 75:4
**ignoring** 133:17
**III** 3:4
**ill** 57:16
**illegal** 72:16
**Illinois** 62:3,5 64:4
64:7
**illness** 43:16
**imagine** 59:22 60:1
69:6 125:14
**immediately** 27:6
**impact** 14:23 15:21
16:9,10 18:19,22
49:19 59:19 79:1
144:12
**impacted** 114:7,15
**impair** 116:8
**implemented** 50:4
**imply** 113:15,16
129:22
**important** 6:10
133:23
**imposed** 62:16
64:11,19
**impossible** 72:19
**impression** 41:12
**inability** 113:17
**inadvertent** 112:13
**inanimate** 121:14
**incentive** 97:20
**inch** 124:4
**incident** 27:11 31:5
36:13,20 38:16

39:3,17,21 40:1
40:17 41:14 45:1
59:20 60:6 70:15
76:10,22 89:8
115:10 116:19
117:3 119:12
129:1,3 134:13
136:18 143:16
144:2 146:15
147:6,22 149:7
150:19 151:16
152:11 154:13,14
154:20 156:1
157:5,13,23 161:8
163:11 165:9
166:14 167:2,5,10
171:10,13 172:2
172:15,18 181:6
**incidents** 28:18,21
31:13 32:8 34:3
35:14 37:4,23
38:7,21 39:8 43:7
43:10 59:22 60:3
60:5 76:5 80:17
80:21 82:2,7,12
82:19,23 94:15
99:8 109:23
112:20 115:9
116:1,2 117:7,21
118:3,7,9 119:6
119:10 120:11
126:2 128:16
138:6 144:9,13,20
152:5 163:3,21,23
164:1,10,15,20
178:23 185:15,22
188:10
**include** 19:9 38:7,9
39:2 48:15 54:4
109:12 112:11
119:18 155:22
172:2,11
**included** 42:22
43:1,2 44:4 51:17
86:14 93:20 104:3
108:1 139:5,7

143:17 144:6
147:7,12,22 155:2
155:16 187:10
**includes** 75:10,13
75:17,18 138:20
144:1
**including** 9:13 29:4
37:17 54:14 57:10
58:14 81:21 85:11
92:3 102:4 154:6
180:20 189:21
**incoming** 96:17
**incomplete** 19:15
47:20
**increase** 70:11
**increased** 70:9
**increases** 59:4
113:4
**increasing** 59:18
**independent** 187:7
**INDEX** 4:6
**indicates** 49:22
51:7 57:6 116:13
122:17
**indicating** 22:2
168:10 178:19
**indication** 29:7
43:16
**indirectly** 113:12
**individual** 45:11
76:16 106:17
119:5 128:17
157:18 175:23
185:16
**individuals** 32:1,17
38:8,22 52:17
58:1 61:4 71:4
78:15 95:20
185:11
**infer** 113:20 156:18
**inference** 114:12
116:9
**inferred** 156:12,15
**inferring** 156:11
**inflicted** 47:18
**influence** 12:19

**information** 19:12
19:17,19,22,23
30:5,16 34:14
35:10 36:6,21
38:5 47:6,11,14
54:4 81:13,16,20
84:10 99:17
105:10 108:5,15
108:20 119:7
122:13 128:14
138:19,22 140:6
142:17 143:16
144:1,16,19 145:2
145:9,17 146:7,14
149:2,17 151:3
153:4,6 155:22
161:15,16,17
162:15,18 163:8,9
163:15 172:6,10
174:13
**initial** 99:2
**initially** 32:6
**injure** 32:16
**injured** 27:10 31:6
38:8,16,22 40:8
146:15,17 147:16
147:18,21
**injuries** 31:20 34:7
34:15 83:5 112:11
112:15,19 146:8
187:21
**injury** 178:21
179:14
**innocent** 112:19
121:21 122:11,15
**insert** 123:8
**inserts** 124:10
**instances** 105:16
109:19 175:6
**institution** 7:16
**institutions** 32:1
**instructed** 98:11
**instrumental** 78:12
**insufficient** 183:15
184:2
**intend** 111:20

**intended** 112:3
113:16
**intending** 72:9
**intention** 10:7
112:8
**intentional** 47:19
**interest** 67:17
124:15 190:14
**interested** 193:14
**internet** 33:18 36:4
37:14,19 96:21,21
97:22 98:9 124:5
**internet-based**
37:16
**interplays** 179:13
**interpreted** 50:19
**Interrogatories**
11:14 12:3 14:19
14:21
**interrogatory**
11:11,22
**interrupt** 184:8
**interruption**
159:16
**interval** 124:2
129:19,20 130:11
131:1 160:9
165:10 167:2
**intervene** 126:3
**intervening** 85:7
**interview** 86:13,16
86:19 87:1 93:23
97:6
**interviewed** 156:20
**interviewers** 91:22
92:8
**intruder** 92:16,20
93:1
**INTS** 12:11
**investigated** 93:14
**investigates** 37:23
**investigating** 36:16
**investigation** 37:9
**involve** 34:15 35:1
35:6,11,16,23
38:21 39:9 74:12

110:2 115:23
138:21 187:9,19
187:23
**involved** 27:11
31:20 36:16 47:21
48:17 63:7,9 93:8
137:14 138:1,4
139:8 169:13
**involvement** 28:10
144:10
**involving** 33:6
43:20 93:7 116:20
**irrelevant** 42:15,16
53:12 77:19 109:8
165:14
**irritating** 112:7
**issuance** 71:1
**issue** 26:4 29:20
42:8 50:22 57:3
62:22 67:17 71:4
80:6 101:12 102:6
108:12 113:7
126:14 138:8
143:10 187:7
190:15 192:8
**issued** 71:13
**issues** 25:1 101:11
168:19 190:20
**item** 106:6
**itemize** 196:2
**items** 101:16

_____

**J**

**J-I-U-S** 13:11
20:14
**James** 3:4 17:12
**January** 169:13
**Jay** 66:8
**John** 170:3
**journal** 26:15
84:14
**journalists** 156:20
162:10
**judge** 144:12
**judgment** 111:7,8
**judgments** 111:9

**July** 137:15 171:17
**Justice** 7:18 26:15
**justification** 78:13

_____

**K**

**K5** 13:22
**Kamala** 64:14
**Kathy** 1:12 5:1
193:17 194:15
**keep** 14:14 68:16
**kid** 44:21 182:22
**kill** 32:16
**killed** 27:10 31:6
31:14 38:8,15,22
39:3 40:1 146:17
147:17,21
**kin** 193:13
**kind** 12:13 16:21
29:22 30:15 33:14
54:9 58:13,18
65:16 74:20 80:5
87:16 89:7 91:7
92:4 93:9 105:7
110:8 126:4
128:22 159:21
178:23 182:20
**kinds** 27:7 67:18
81:16
**Kleck** 1:10 4:10,11
4:13 5:10,16
13:23 14:9 20:7
22:14 26:9 51:23
53:15 60:13
101:19 105:23
127:3 142:5,11
143:6 145:7
166:20 195:4,12
**Kleck's** 191:21
**Klein** 3:12 4:4 5:15
5:18 8:20 20:5,18
21:16,20 51:20
72:4 73:4 95:15
100:23 101:14
102:2,10 105:20
106:7 117:13,17
127:6 139:13

140:17 169:2
184:11,17 191:12
191:17 192:3,12
**knew** 22:6 79:9,17
88:4,19,21 150:9
163:12
**know** 6:22 7:4
10:23 12:19 16:1
19:22 24:7 30:20
30:22 31:1 35:1
35:21 37:9,20
38:1 40:10,16,23
41:2,4,5,9 42:1,3
44:18 46:16 47:22
48:3,5 50:2 53:14
54:2 55:10 57:13
60:2,4 66:17 67:5
69:5 70:8 71:3
72:11,16 73:1,13
79:4,23 80:9
81:14 82:21 86:21
87:4,11 88:16,18
89:6,9 91:10 93:2
93:17,17,18 94:11
95:3,7,10 96:13
96:18 99:4 105:9
106:13,15 107:1,6
107:20 109:19
113:6,13,14 116:5
116:22 117:7,9,11
120:21 121:6
122:5,8,14,21,23
123:19 125:13
126:5,16 128:14
130:12 131:19,21
134:12,12,18,19
140:1 143:18
145:6,10 146:4,16
146:22 149:11,19
149:20 150:12
151:6,12 152:17
153:12,14,15
154:8,9 156:3,5
156:10 157:23
159:1 160:10,19
161:22 162:2,4,9

162:13,15,16,20
162:22 163:1
165:6,13 166:16
166:22 167:1,4
172:13 174:2,12
181:1,2,4,12,23
**knowing** 79:14
186:18,19
**knowledge** 76:9
80:1 114:3 177:16
**known** 27:18 35:16
41:22 57:12 69:16
74:12 86:2 137:14
138:18 144:10
146:3,4
**Kolbe** 14:5 21:19
24:16 30:8 63:19
63:21 66:11,13
139:22,23

**L**

**L** 2:1 3:5
**label** 73:17
**labeled** 8:19 16:13
16:19 18:5 140:11
148:16 149:6
169:7
**lack** 74:21
**land** 86:10
**landed** 119:9
**language** 118:2
**Lanza** 158:1
**laptop** 97:21
**large** 25:8,17 26:12
27:8,11,15,19
28:1,4,10,16,17
28:20 29:3,7,14
33:6,21 35:2,6,11
35:16,23 36:14,19
38:6 39:9,10 40:3
40:4 42:1,5,11
54:1,11 56:22
60:18 62:22 63:12
64:1 65:9,12
76:23 77:15 98:5
106:20 113:4,10

113:14,18,23
114:17 115:3,6,10
116:7,20 117:3,7
117:10,20,21
118:4 119:4,11
138:17,21 144:10
144:12 146:2
172:14 177:11,17
178:3 179:5,15
193:4,19
**larger** 142:16 143:5
189:20 190:11
**Las** 39:14 40:13
41:2,11,14 42:2
42:11 58:20 59:8
59:12 60:6,12
70:14 129:1,2
133:22 134:7
135:19 136:4,8
166:23
**lasted** 162:17
**late** 50:9
**laugh** 27:5
**law** 28:13 30:14
36:13,15 37:6
53:18 56:4,8,13
64:1 71:1,3,7,13
77:4,8,11,15,20
77:21 114:6,14,16
114:21,21,23
121:1 161:18
**lawful** 183:14
184:1
**lawmakers** 111:20
112:6
**laws** 49:19 50:10
51:8 53:20 54:9
57:4,7,20 58:11
67:18 78:13,22
**lawyer** 56:11 72:4
**lawyers** 5:19 30:10
170:16
**LCM** 137:14,16,22
138:1,4 139:8
**lead** 112:19
**led** 109:7

**legal** 25:1 52:3
56:15 74:8 111:1
111:9
**legally** 41:7
**Legislature** 112:3
112:17
**legitimate** 94:9
**let's** 10:23 11:12
14:18 17:4 51:20
61:7 83:8 85:6
94:5 123:11
133:22 135:18
136:7 139:13
140:17 149:7
152:10 165:23
171:17 176:11
182:14 189:1
**LETTER** 4:17
**level** 51:4 56:19
79:8,17 125:2
158:23
**levels** 51:4
**life** 6:12 43:17,19
164:22 165:3
**likelihood** 179:13
**likes** 21:22
**likewise** 138:20
**limit** 55:16
**limitations** 20:2
180:23
**limited** 9:13 69:23
70:2 103:20 191:4
**limiting** 118:20
**line** 86:10 171:9
172:22,23 174:4,4
177:3 178:1,18
179:22 182:16
183:21 188:8,16
189:4 196:8
**lines** 174:22
**link** 98:12 111:23
**Linkages** 26:14
**list** 21:6 105:21
148:4 171:14
**listed** 21:8 25:19,21
26:12,20 35:3

62:4 138:6 163:14
195:6
**listening** 70:17
**listing** 12:14
**literally** 27:13 29:6
160:7
**literature** 9:16
112:1 113:3,3,9
113:22 114:10
115:8
**litigation** 66:23
**little** 18:3 22:6 33:1
39:22 56:20 60:18
60:22 61:3 122:13
176:12 187:13
**lived** 53:15
**lives** 182:19
**loaded** 123:8
159:15
**loading** 179:7
**logical** 116:9 125:9
130:9 135:3
173:19
**long** 22:10 55:10,15
74:2 123:15,19
124:4 131:23
136:10,16 147:21
162:17,23 165:10
**longer** 68:4,13,15
68:22 69:3,5,9
79:12 96:8 125:11
125:11,14,15
151:17 188:20
**look** 141:4,23
148:12 149:7
152:10 170:6
174:13 179:4,15
183:9,12 185:22
189:1
**looked** 29:13 70:19
81:3,17
**looking** 29:6,19
38:21 111:17
141:2 144:20
**looks** 21:22 140:13
**lose** 128:22

**loss** 178:21 179:14
**lost** 29:22 135:11
**lot** 49:10 56:23
    72:11 128:20
    140:14 151:4
    168:16 170:17
**lots** 60:1 163:18
**loud** 172:22 174:3
**low** 49:3 50:2,8
    60:8
**lugs** 75:23
**lump** 46:22
**lunch** 139:14,16
**lust** 131:20

**M**

**M-A-S-S** 15:8
**M1A** 55:6
**MA** 3:16
**magazine** 25:17
    27:8,12,16,20
    28:1,10,16,17
    29:3,7,15,21 30:5
    35:2,7,12 65:10
    65:13 67:20 68:5
    68:8,20,23 69:8
    76:23 77:15
    106:21 115:6,11
    116:21 117:3,10
    123:7,8,16,20,22
    123:23 124:1,1,7
    124:9,10 125:12
    125:19 126:5,9,13
    126:19 128:3
    129:7,19,21 130:5
    130:12,15 131:6
    131:15 132:5
    133:7,10,12,18
    134:15,21 135:15
    137:9 138:18
    144:13 146:3
    158:22 159:18,21
    160:5 161:10
    167:12,21,23
    168:1,4,6 176:9
    176:18 187:20

**magazines** 25:8
    26:13 28:5,20
    33:7,21 35:17
    36:1,20 38:6
    39:10,11 42:2,5,7
    42:11 55:20 60:18
    62:22 63:17 64:1
    65:21 68:17
    111:21 113:4,10
    113:15,23 114:17
    115:3 116:8
    124:14,22 125:3,7
    130:21,22 134:8
    134:23 135:10,14
    135:19,21 136:1
    136:10,11,15,17
    138:11,22 144:10
    158:19,19 159:5,8
    159:13,17,19
    172:14 173:14,16
    174:20 177:11,18
    178:3 179:5,6,16
    179:17 187:23
    188:10
**mail** 97:13,18
    194:11
**major** 29:4
**majority** 57:21
    133:14 159:10
    182:18 186:17
    187:4,8
**making** 24:6 25:10
    72:16 99:17 106:5
    108:19 111:8
    126:4 129:12
    135:4 154:5
    161:20 188:2
**male** 45:13
**manage** 115:16
**March** 141:7
**marked** 8:16 21:12
    140:21 169:5
**marksmanship**
    118:21
**Maryland** 13:21
    14:3 24:21 25:11

26:18 30:9 64:1
    66:13 140:3
    141:12 143:12
    145:4,18,20
    147:13 169:17
    184:5,16 185:2
**mass** 15:8,23 16:4
    18:20 25:17 26:13
    27:7,14 28:5 29:3
    29:11 30:3 31:2
    32:5 33:3 34:9,23
    35:3,10,11,19
    36:6,14,16 37:4
    37:22 38:23 39:11
    39:14 40:12 42:19
    43:9,17,20 44:3
    44:11,15 45:12
    58:2,3,5,14,15
    61:4 78:23 79:6
    79:10,18 80:13,17
    80:21 82:1,7,18
    82:22 106:12
    107:23 126:1
    128:4,16 131:22
    132:4 133:13
    137:14 138:1,3,17
    138:20 139:1,8
    141:19 142:2
    143:5 156:15
    159:10 166:13
    187:19,20,22
    188:9
**Massachusetts** 1:2
    3:14 5:21 11:5
    15:10 16:23 41:8
    47:23 48:19 49:2
    49:9,16,20,23
    51:14,18 53:16,20
    54:5,7,8,14 55:7
    55:21 56:4,8 73:9
    74:1,4,4 75:2,9
    76:7,15,16,20
    77:1 95:5 108:2
    111:20 112:3,17
    144:6 145:2,21
    148:4,8 184:16

185:4 186:5
**Massachusetts'**
    49:18
**material** 10:1 23:17
    37:18 38:19
    101:22 102:3
    105:22 145:8
**materials** 29:11
    103:19
**math** 94:5 174:15
**matter** 5:19 9:13,18
    10:14 11:8 13:17
    18:10 19:2 23:5
    30:10 39:14 52:11
    66:7 74:11 77:19
    79:13,15 84:22
    86:22 87:2 112:5
    127:21 131:19
    188:18
**matters** 127:22
    133:1
**Maura** 1:7 11:12
**maximize** 125:6
**McKeon's** 14:20
**MD** 13:22 14:9
**mean** 12:17 15:4
    16:23 27:22 28:16
    43:3 51:6 55:9,10
    58:3 69:6 73:23
    77:22 79:9 87:3
    88:19 89:7 98:5
    102:20 106:20
    109:8,22 111:8
    112:5,14 114:22
    124:18 127:10
    129:10 130:8,19
    132:12 135:4
    137:17 142:12
    146:10 151:13
    152:8 153:23
    160:6 161:19
    165:8 172:3
    174:18 175:4
    180:16 181:20
**meaning** 40:4
    68:20 109:5

114:15 125:10
    155:3,8 159:14
    169:12
**means** 6:2,15
    107:19 128:20
    149:14 150:7
    151:14,20 152:15
    153:8,9,11,12
    170:21 180:15
    193:8
**meant** 21:9 49:8
    181:2 184:16
**measurable** 57:7
    57:20
**measures** 57:14
**mechanical** 73:14
**mechanically**
    131:13 157:20
**media** 28:11 29:6
    36:2,7,18,22 80:3
    106:14 149:23
    161:18
**medical** 47:7
**meet** 34:10 72:19
**member** 66:1 99:6
**memoranda** 9:14
**memory** 63:7 85:19
**mental** 43:16
**mentally** 57:16
**mentioned** 17:17
    18:15,21 23:21
    28:22 53:3,23
    58:19 60:14 69:23
    80:9,12 147:8
**mentions** 28:16
    104:22
**merely** 156:19
**methodologies**
    35:22
**methodology** 96:7
    96:19 98:15
**midst** 126:1 133:7
**military** 75:22
**million** 103:13
**mind** 42:20 91:12
    118:14 160:8

181:23
**Mini-14** 54:23
**minimally** 123:6
**minimum** 31:14
   97:23
**minor** 178:8
**minority** 57:19
**minute** 20:19
   138:12 148:6
   153:18 155:6,9
   191:13
**minutes** 153:1,7
   157:16 164:17
**misclassification**
   47:10
**missed** 117:5
   121:11 156:6
**missing** 19:16,19
**mistake** 91:5
**mistaken** 26:19
   91:1
**models** 75:20
   106:16
**moderately** 44:22
**moment** 131:21
   157:14 161:4
**moment's** 105:7
**month** 98:1
**months** 33:4 83:23
   94:13
**morning** 63:20
**motivated** 29:2
**movie** 45:8 107:7
   171:11 173:2
**moving** 132:13
   158:5
**MSP** 14:18
**multiple** 107:4,9
   115:23 116:3,4,15
   116:20 120:4
   133:14 138:11,11
   155:23 159:9
   173:3,5
**murder** 13:1 16:4
   16:16
**murdered** 155:18

**murdering** 16:21

— **N** —

**N** 2:1 3:1
**nail** 91:23
**name** 13:12,15 81:9
   158:1 194:9
**named** 12:22 75:20
**names** 10:19 140:1
**narrowly** 51:18
**national** 66:1 67:11
   67:16 83:11 97:3
   98:8
**nationally** 47:23
**nationwide** 85:1
**nature** 112:23
   122:16 158:14
**near** 72:17
**nearly** 159:9
**necessarily** 12:18
   47:1 74:19 77:13
   77:18 112:22
   113:16 129:21
   145:5
**necessary** 2:8 117:4
   117:22 118:15
   138:22 194:5
**need** 7:3 8:23 10:17
   17:11 21:16 27:12
   32:9 89:9 106:8
   115:5 118:23
   130:14 160:1,11
   160:15 174:3
   183:6 187:5,8
**needed** 89:6 92:1
   105:10 159:23
**needs** 131:6
**negative** 78:20
**negligible** 110:14
**neither** 73:4 193:12
**net** 57:7,20
**never** 36:21,22
   42:20 44:12 93:14
   93:17 96:14
   107:22 110:2
   118:14 160:8

**nevertheless** 129:6
**new** 68:8 130:5,15
   145:9 167:19
   168:9 174:14
**news** 27:23 28:6
   36:2,18,22 39:18
   39:19 40:18,21
   41:15,19 70:16
   80:3 81:21 148:18
   149:23 161:13,17
   167:15,20 168:12
   168:17
**newspaper** 161:14
**newspapers** 161:13
**Newtown** 44:16,19
   107:13 154:13,20
   161:8 166:14
**night** 92:12 93:14
**Nightclub** 45:18
   107:15 166:17
**nine** 136:20 164:9
   164:18
**nods** 118:6
**noise** 92:13 93:14
**non-defensive**
   89:11
**non-fatally** 31:15
   34:1 115:21
**non-probability**
   189:21
**noncriminal**
   181:19,21 182:6
   182:12
**noncriminals**
   182:10,13
**nonexistent** 16:22
**nonpublic** 37:3
**norm** 128:21
**normally** 37:10
   88:10
**North** 1:17 3:8
   194:16
**northeast** 50:8
**northeastern** 50:1
**Notary** 1:14
**notebook** 9:23

97:21
**noted** 33:13 106:14
   106:21 107:8
**notes** 9:14 10:2,3
   17:17,21 20:7
**notice** 2:14 4:9 15:2
   106:3 112:10
**number** 21:15 27:9
   27:10 31:14 34:23
   35:18,19 39:4
   40:2,10 43:11,11
   48:21 49:19 50:4
   58:1,3,6,10 59:13
   59:19 61:4,10
   86:3 94:1 96:14
   96:17 98:1 111:21
   116:14 117:21,21
   118:4 119:4,11
   136:16 140:11
   141:1,4,17 142:1
   142:5,19 146:7,14
   147:5,15,16,20
   148:5,22 149:8
   150:9,10,20 151:9
   151:23 152:11
   154:8,8 155:2,17
   155:18 159:19
   164:1,11,16 169:8
   172:7 185:10
   188:3
**numbered** 183:12
**numbers** 36:14
   85:23 86:6 96:12
   113:18 117:8
   162:2,11
**numerical** 32:22
   39:4

— **O** —

**O** 2:1
**O'Malley** 14:5
   24:16 63:19
**oath** 6:6
**obey** 114:16,21,23
**object** 20:6,9 42:12
   71:16 79:21

117:23 119:20
   120:6 121:14,17
   121:20 127:4
   131:9 132:8,21
   134:10 156:8
   180:5 191:2 192:8
**objection** 71:22
   180:2,6
**objections** 2:8,10
   180:12
**obligated** 170:22
**obliged** 97:23
**observed** 60:12
**obtained** 100:7
**obvious** 78:9
**obviously** 73:12
   93:12 102:21
   158:16 173:3
**occasions** 66:21
   119:23 162:16
**occur** 59:23 105:6
   105:9 116:1
**occurred** 27:6
   124:1 129:14
   137:15 167:2,6
   169:16
**occurring** 118:16
**October** 1:15
**Off-the-Record**
   20:20 140:19
   183:5
**offender** 39:3,5
   106:22 110:9
   113:18 115:20
   116:16 117:8
   119:9 120:12
   187:6,12
**offenders** 39:5
   93:11 115:23
   116:4,15,20
   117:22 118:5
   120:4 138:10
   186:4,11
**offense** 170:13
**offered** 2:12 52:2
   183:23 184:5,12

190:21
**offering** 56:15
184:15 185:3
**offhand** 31:10 45:3
109:19
**office** 15:4 194:4,17
**officer** 119:1,8
**officers** 71:8,9,13
120:12 121:4
**offices** 1:16
**oh** 13:22 14:16 15:7
17:23 21:23 24:7
71:9 86:21 120:14
123:11 144:3
153:23 164:5
174:18
**okay** 6:13,14,19 7:1
7:2 13:8,20 14:16
15:6,11 21:21
26:3 78:2 98:3
106:2 123:11
127:8 128:12
139:20 143:14,22
148:14 164:6
171:19 175:19
176:15 177:23
179:21 180:12
182:15 183:8,11
183:20 184:20
187:17 188:15
189:6,8 192:12
**old** 84:5
**omitted** 146:7,9
**ones** 38:23 54:17
74:20 89:17 90:9
168:7
**open** 10:18 11:3
191:19
**opine** 24:23
**opined** 101:11
115:5
**opinion** 13:3 71:12
74:9,10 75:6,7,8
77:3,10,14 79:4
87:23 101:12
106:5 183:17,22

184:4,11,15 185:1
185:3,7 186:5,9
189:9
**opinions** 11:19
12:20 15:1 40:13
56:15 76:1 78:15
100:1,5,9,11,19
101:20 102:4
**opportunity** 127:11
131:7 134:16
137:4 190:21
**oppose** 67:18
**opposed** 153:2
178:22 179:6
**optimistically**
116:12
**option** 133:16
**oral** 5:7
**order** 34:14 41:16
67:22 90:13
115:19 125:19
147:18 159:23
**ordinances** 54:10
**organization** 29:5
81:9
**organizations**
121:2
**organized** 68:16
**original** 50:19
97:10 108:3
122:16
**originally** 37:18
97:10
**originates** 161:18
**Orlando** 166:18
**outcomes** 104:4
**outlet** 36:18,23
**outlets** 36:3 161:13
161:18
**outside** 167:2,6
**outsiders** 37:10
**overall** 58:5,10
**owner** 65:1
**owners** 78:19,20
112:7
**ownership** 48:18

50:2,7,8 51:5,8
53:21 62:9 63:16
88:2 190:20,23

---

**P**

**P** 2:1 3:1,1
**p.m** 139:17,17
191:16,16 192:14
**page** 4:8 9:8,9 15:9
22:13,19,19,22
23:7,10 26:6,8,12
61:7,8 83:8
105:12 111:15
120:10 123:3
137:11 138:6
139:19 141:5,14
141:16 143:13
144:1,5 170:7
171:6,19 172:22
172:23 175:18
176:14 177:1,3,22
178:17 179:20
180:14 182:14
183:1,9,19,23
186:6 187:16
188:6,14 189:1,4
196:8
**panel** 98:7 103:1
104:16
**panels** 97:1,4,5,10
97:20
**panicked** 132:12,14
**paper** 102:12 103:2
103:21,22 104:2
**paragraph** 9:9
83:12 111:18
114:5 137:13
138:7,9 139:7
**paralyzed** 132:13
**parenthetical**
137:19,21
**Park** 64:6,12
**Parker** 170:4
**part** 44:6 50:1
60:20 70:14 78:9
78:9 84:2 100:5,8

100:10,18 186:4
**partially** 159:20
**participate** 66:7,11
87:1,8,10 97:19
97:23 119:15
190:13,21
**participated**
123:17
**participating** 191:7
**particular** 36:16,20
51:19 72:9 120:19
134:13 157:14
188:20
**particularly** 30:2
123:14 190:7,23
**parties** 2:4,10
109:16 110:13
193:13
**partly** 93:10 126:21
190:12
**party** 61:22 109:17
110:3,6,10
**passively** 47:6
**pattern** 44:6 75:11
75:14 76:6 95:8
**paying** 67:12 96:16
132:11
**pen** 164:7
**penetrating** 55:11
55:15
**people** 8:12 27:10
29:1 31:6,14,15
33:23 39:23 40:8
44:9 48:16 49:14
50:11 52:23 57:16
58:13 59:10,13,19
70:4 72:7,14 78:4
78:10 79:9 80:6
86:15 87:8,9
89:12 94:1,14
96:6,14,15 97:17
97:17,19 98:5,20
102:18,20,21,22
103:1 108:22
110:1,5 114:21
115:16 116:11

122:14 123:18
124:13,21,23
125:17,23 126:7,9
131:4 134:1,9
135:12 137:5
139:2 146:14
147:20 150:4
151:9 155:18,23
165:20 167:14
172:17 173:4,11
173:14 175:7,22
178:16 180:17
181:4 182:18
191:4
**people's** 78:18 79:1
80:2 108:5,14,20
116:8 178:13
**percent** 35:3,5,20
86:8 93:6,21
120:11 187:11,13
**percentage** 95:20
117:5
**perfectly** 19:15
112:14
**period** 12:11 43:2
83:21,21 94:10
137:6 159:12
165:4 166:20
**permit** 60:9
**permitted** 55:10
**persisted** 162:23
**person** 27:15 43:15
43:18,21 67:20
68:5,16 86:12
89:10 109:2,3,4
110:18 111:12
126:23 128:19
165:16
**person's** 72:17
74:13
**personal** 75:6
**personally** 65:1
**perspective** 157:10
175:3
**pertain** 138:3
**pertained** 84:2

89:19
phenomenon 50:5
phone 85:22
phones 86:9,11
96:10
photographs 9:15
10:11
phrase 137:22
physician 47:7
pick 128:17 160:20
161:2
piece 162:18
pistol 64:14,16
94:19
place 1:17 3:7,15
47:12 123:16
126:11 131:5
146:10,11 160:21
places 173:10
PLAINTIFF 3:3
Plaintiff's 14:21
Plaintiffs 1:5 24:20
25:4,7 61:13,20
101:15
Plaintiffs' 11:13
12:3
plan 125:6
Plausibility 26:14
plausible 82:13,20
play 84:18
played 117:10
please 6:22 72:6
100:6 117:14
177:1,22 179:20
182:14 183:7
187:16 189:1
191:13 194:3,11
196:2,2
plural 39:6
plus 135:10 151:18
155:3,7,19
pocket 68:21
point 31:12 34:22
43:4,5 46:16
51:17 59:3 84:5
88:5,8 93:3 114:3

116:18 117:2
131:22 135:3
144:11 151:17
172:20 174:21
181:23 192:10
pointed 175:4
184:23
points 116:10
police 37:3 71:9
108:15 118:12,13
118:17 119:1,5,14
119:23 120:3
122:19 162:12,13
163:3,15 167:20
Policy 26:16 35:13
35:22 37:21 38:6
38:20
polls 79:4
pool 81:19 98:4
population 50:16
50:17,18,20 51:9
86:9 97:3,16 98:8
181:3,7,19,21
182:6,18 189:20
190:11,18
Porter 3:4 8:22
16:18 20:9 21:18
21:21 42:12 66:9
71:16,22 72:3,6
73:2 79:21 95:13
95:18 101:17
102:7,14 106:2,10
117:23 119:20
120:6 127:4 128:9
128:12 131:9
132:8,21 134:10
135:23 136:5
139:15 148:11
156:8 164:3,6
180:5 183:3 184:8
184:14,20 191:2
191:14 192:2,6,13
portion 33:20
56:22 57:5 70:17
97:14 98:4 117:18
180:1

position 7:13 43:14
115:9 192:4,7
positive 149:10
151:2 157:7
possibility 112:18
125:9,17,21
150:18 165:7,12
173:19
possible 21:23
25:15 28:4,19
29:17 30:3 31:11
36:19 37:1 39:8
49:18,21 50:10
68:7,8,11 111:4
111:10,14 112:16
122:10,12 124:16
125:1,4,5 126:8
151:8 163:7,10,14
163:17,17,18
165:1 171:4
173:14,17 194:12
possibly 27:8 53:9
103:11 112:21
113:1 121:14,17
121:19 173:12
Post 194:17
Postal 97:11
potential 126:7
186:20
power 55:11,16
powerfully 29:1
PowerPoint 103:15
practically 87:9
practice 189:13
practices 71:1
pre-shooting 79:8
precise 154:7,8,9
predicting 178:2
prefer 65:2
preferable 175:3
preference 131:19
prefixes 86:2
preliminary 26:5
premise 114:13
preparation 23:13
23:19 52:18

prepare 18:9
103:15
prepared 24:14,16
53:13 98:19 100:3
100:13 101:6
103:3
preparing 21:4
146:6
present 142:18
169:23 170:12,13
presentation
103:16,18 104:9
105:22
presented 140:5
143:7
presenters 104:16
pretty 8:3 46:23
69:11 135:4
141:18 157:9
158:10 173:23
prevent 116:16
118:15
previous 123:22
124:9 159:18
previously 97:1
141:2 145:10
primarily 26:21
35:12 36:3 114:7
114:15
primary 57:18
principle 165:16
print 37:18
prior 2:13 43:15
72:8 116:5 156:13
private 57:11
privilege 8:1
probability 96:23
97:18 189:17,20
190:9
probably 11:17
43:1 49:4 51:15
52:12 59:15,16,20
67:22 69:2 85:5
103:20,21 114:19
136:13 158:12
160:6 172:5

175:23 176:2,20
188:1 191:21
problem 55:11,12
87:21
problems 19:23
procedure 5:4
72:10 87:4
proceedings 5:8
process 68:9
produce 101:15,18
produced 23:4
25:12 53:7
production 20:6
192:8
professional 1:13
84:14
professor 7:15,21
7:23 23:23 191:20
project 102:17
projects 8:8
prominent 37:11
prompt 91:23
pronounced 16:2
proper 196:3
property 74:20,21
74:23 178:21
179:14
proposition 116:7
187:18
prospective 175:13
protect 90:5
protected 131:5
protection 90:21
181:12
provide 84:21 98:9
145:3
provided 5:4 24:1
25:22 27:4 47:7
84:17 105:4
145:18 194:7
providing 99:23
public 1:14 12:2
15:23 16:4 18:17
18:20 27:23 28:7
29:19 30:4 36:9
79:4

**publication** 13:11
  85:8 105:13
  142:18
**publicity** 79:11
**publicized** 79:19
**publicly** 27:18 28:8
  28:12 35:16 36:8
  37:5,7,13 39:20
  81:16
**publish** 34:14
**published** 13:10
  26:15 31:17 36:7
  38:20 83:17,19
  84:9 85:15,18
  100:4,14 101:6
  104:21 107:22
  142:9
**publishes** 45:23
  46:9,17
**pull** 22:3 176:1
**pulling** 85:8
**Pulse** 45:18 107:15
  166:17
**punctuation** 194:5
**Punishment** 85:12
**purportedly** 75:22
**purpose** 56:9 68:17
  70:5 86:18
**purposes** 8:10
  90:16 132:2 136:2
  144:23 189:18
  192:3
**pursuant** 106:5
**pursuing** 130:13,21
**pushing** 182:21
**put** 67:7 102:12,21
  110:5 127:17
  130:10 146:11
**putting** 68:9

**Q**

**qualification** 152:5
  154:1
**qualifications**
  152:9
**qualified** 44:8

71:10 88:17
109:14 111:9
155:12
**qualify** 109:10
  147:18 153:21
**quarter** 31:17
**question** 6:16,19,22
  6:23 17:10 29:20
  29:23 30:2 38:18
  42:13 46:5 49:5
  50:20 60:21 65:2
  71:2,11,17 77:9
  78:4,8 79:22 87:7
  87:14,16,18 88:1
  89:22 90:7 96:3
  99:2,3 102:5
  105:16 107:23
  113:22 117:6,16
  118:1 119:21
  120:7 127:5
  128:13 131:10
  132:9,22 134:11
  135:17 136:2,6
  138:2 143:22
  148:11 154:16
  156:9 165:18
  168:13 171:14,17
  173:1,4,12 175:20
  176:17,20 177:4,9
  177:15 178:1,4,18
  179:4,10,22 180:6
  181:13,16,17
  184:9,22 186:15
  186:16 187:1,3,18
  188:8,12,16 191:3
  191:19
**questioner** 174:22
**questionnaire** 98:9
  98:19 102:20,22
**questions** 2:9 6:6
  17:15 26:5 73:5
  83:10 88:15 89:14
  89:19,20 90:8,11
  90:14 91:6,13
  92:2,19 95:17
  98:14,23 99:7

102:11,15 107:19
111:19 115:15
171:3,10 173:21
174:3,6,10 175:2
176:16,22 191:18
192:13 193:7
**quick** 6:9 141:22
  165:16 174:5
**quickly** 70:8
  124:16 133:5
  156:16 157:9
  158:10 188:9
**quite** 60:8 72:1
**quoted** 138:9

**R**

**R** 3:1
**raised** 192:7
**ran** 100:8
**random** 86:6 96:11
  98:6
**randomly** 85:23
  86:1,5 158:5
**range** 65:15,16,17
  72:16 124:12
  154:2 157:19
  167:6 188:21
**ranges** 72:17
**rank** 48:22
**ranked** 47:23
**rankings** 49:6
**ranks** 48:3,5,20
**rare** 110:9,14
  119:22 120:8
  122:18 123:2
  162:16
**rarely** 109:18
**rate** 41:13 47:23
  59:4,12,18 60:5,7
  70:6,9,12 138:19
  138:23 143:10
  144:21 145:23
  147:14,19,19
  149:15 150:8
  151:1 156:10,11
  158:22 165:8

166:16,22 167:1,4
172:5 175:21
**rates** 13:1,19 51:9
  57:8,21 138:15
  156:23
**re-research** 108:19
**reach** 28:7 68:17
**reached** 92:14
**read** 9:18 10:18
  13:4,6 14:22
  52:22,23 53:13
  111:18 117:13,18
  171:12 172:21,22
  174:1,3 184:12
  189:3 194:3,11
  195:5 196:1
**reading** 4:17 170:9
**ready** 123:9 124:11
  159:15,17
**real** 60:2,4
**real-world** 115:17
  125:22
**realizing** 27:5
**really** 7:8 10:2
  11:18 12:13 14:10
  24:7,10,23 30:15
  31:18 34:21 37:15
  40:2 53:8 56:6
  63:13 67:9 74:22
  78:14 96:8 105:18
  110:14,14 131:21
  140:1 153:12
  162:7 174:16
  188:3
**reask** 184:22
**reason** 40:20 46:3,6
  48:11 93:4 115:2
  131:18 132:1
  158:7 170:9 182:8
**reasonably** 81:12
  98:16 164:12
  165:16
**reasons** 48:15,15
**recall** 31:10,18
  40:2 42:6 44:21
  45:1 56:10 66:20

94:10 105:1 107:5
107:9 185:18,18
**received** 15:16
**recess** 51:21 101:1
  139:16 191:15
**recognize** 126:23
**recognized** 134:1
**recollect** 169:11,12
  181:22
**recollection** 24:8
  45:17
**record** 7:7 20:18
  46:16 92:8 106:9
  140:17 181:7,10
  183:3 192:10
**recording** 162:21
  163:3,12
**recordings** 9:15
  10:12
**records** 67:4,10
**reduce** 58:12 78:11
  111:21 112:9
**reduced** 50:3
**reduces** 113:10,23
**refer** 50:20 99:3
  154:13
**reference** 10:7 21:9
  26:11 83:21 94:10
  106:16,22 178:18
**referenced** 83:12
**references** 21:7
  23:11,11,16 25:20
  137:13
**referred** 118:9
  142:10,13
**referring** 53:2
  118:8 120:15
  123:12 138:5
**refers** 39:4 138:15
**refresh** 63:7 85:19
**regarded** 167:19
**regarding** 47:15
  60:5 145:23
  185:10,15
**regardless** 48:17
  122:16 126:6

131:14 137:8
160:19
**regards** 9:18
**Registered** 1:12
**registration** 61:19
**regulation** 56:20
57:23
**reiterate** 192:7
**rejected** 19:3
**related** 110:12
115:15
**relatively** 131:23
**released** 36:22
**relevant** 10:9 19:17
19:19 33:20
105:15 111:7
115:18,18 174:13
191:20
**reliable** 81:13
167:20
**relied** 35:12 106:4
**reloading** 113:19
175:6
**rely** 34:19,22 37:4
80:10 98:17
101:21 144:23
161:17 189:13,15
189:17,21
**relying** 161:14
164:11
**remark** 137:19,21
**remember** 13:16
16:7 24:10 25:10
30:12,13 45:7
52:15 61:14 63:13
63:15 66:6,10
87:19 95:19 101:7
104:3,8,12,15
140:7 141:10
170:11,18 171:2
172:1,17
**remind** 14:13 80:6
85:14
**reminded** 79:15
**remote** 150:18
**remotely** 60:6

**reopen** 192:1
**repeat** 46:5 100:6
143:22 184:9
**repeated** 44:6,7
**report** 4:10 11:21
11:21 13:23 14:2
14:9 15:9,19,20
17:4,5,12,13,18
17:22 18:10,12
19:2 21:4,6 22:8
22:12,12,14 23:4
23:8,14,19,22,23
24:1,5,9,12,14,15
25:11,12,18,23
26:6,11,18 27:23
27:23 28:6,7,11
28:15 36:9 37:14
39:13 40:14 42:23
52:2,18 53:7,12
53:12,14 61:7
83:8 101:20 105:4
105:13 108:16,17
111:15 120:10,22
121:15 137:11
138:13 139:19,23
140:7 141:21
143:1,8 144:6
145:2,4 147:13
164:16 168:20,21
171:19 186:3
**reported** 41:6 92:5
94:2 95:20,21
99:9 110:17
163:21 167:9
**reporter** 1:13,13
5:2 14:14 117:15
117:19
**reporter's** 4:16
6:12
**reporters** 161:19
168:20
**reporting** 162:10
194:16
**reports** 9:15 16:15
18:11 20:8 28:12
29:6 36:7 37:3,7

39:20 40:18,21
41:16,19 42:4,6
52:22 53:3 81:21
119:4 148:18
161:7 164:2
167:15 168:12,17
**representative** 97:2
98:7 103:1 189:11
**represented** 149:8
190:19
**represents** 193:9
**request** 86:23
**requesting** 105:21
**require** 72:14
**required** 72:8
134:22 135:15
158:19
**requirements**
72:20
**requiring** 72:15
**Rescue** 120:1
**research** 26:15
31:4,8 32:2,15
33:21 34:20 37:2
37:15,16 42:9,15
43:3 50:23 51:3,7
51:12 54:12 56:23
56:23 57:2 81:17
83:14,18 84:4
103:5 106:21
108:3 111:23
113:6 114:3
115:14,22 116:6
116:11,13,23
117:12 118:12
122:17 138:2
139:8 178:13,16
**researchers** 87:5
97:5,7
**residential** 97:14
97:15
**resolved** 37:12
**resource** 38:3
**respect** 42:18
102:16 132:15
145:20 147:20

177:10 179:11
**respective** 2:4
**respects** 36:10
**respond** 72:1 91:11
**responded** 121:2
**respondents** 83:22
94:1 97:1,10
**response** 14:19
90:20 102:7
107:18 120:16
149:10 151:2
157:8
**responses** 11:11,12
11:23,23 14:20
93:7
**responsive** 72:2
73:2
**rest** 88:15 164:10
181:3,6 190:17
**restrict** 58:16
**restriction** 62:8
114:7
**restrictions** 62:15
62:21 63:16,23
64:10,18
**result** 63:11 101:7
113:16 122:23
187:21 193:15
**results** 88:9,12
98:16 100:2,7
103:8 104:4,19
105:3 106:1
190:10
**Retailers** 62:4,6
**retain** 30:15
**retained** 61:21
**retire** 7:13
**retired** 7:8,11
**return** 194:4 196:3
196:4
**reveal** 87:14
**review** 18:11 27:13
38:19 52:10,13,16
**reviewed** 9:17 11:7
11:15 12:5 13:2,5
17:16 20:8,21

21:3,9 23:13,18
39:19 53:6,19
164:2
**reviewing** 94:2
178:13
**reviews** 174:7
189:7
**revise** 52:21 161:11
**revisions** 84:16,17
**revolver** 32:10,16
32:20
**revolvers** 32:7
**Richard** 14:20
**rid** 61:19
**rifle** 16:21,21 54:23
64:5,7,14,16 65:4
65:7,15,17 66:2
67:11,16 76:6,10
76:19 94:19 95:8
95:22 176:6,7
188:19,22
**rifles** 40:17,19 41:3
41:6,21 55:12
75:11,14 175:21
**right** 6:7 9:11
18:22 19:13 20:5
20:10,23 21:17,18
21:20 22:17,20
24:3,22 25:4,8
26:1,16,17 28:7
28:18 32:17,21
34:13 37:4,20
38:8,14,19 46:18
46:21 47:4 49:11
62:19 63:3,21
64:2,12,22 68:13
68:18,23 69:4,10
70:1,6,10 75:2
76:3 78:5 80:14
82:4,9,12,16,19
83:6 87:6 89:15
93:3,18 94:3,5,16
95:5,12 101:17
102:15 109:17
111:13 112:12,23
121:13,18,21

122:3,7 124:3
125:8,12,20
126:11 133:8,20
135:10 139:23
142:20 143:2,9,17
144:7 145:15,22
146:5,22 147:7,10
147:23 148:8,19
149:5,13,16 150:2
150:11,13,15
151:1,5,11,18
152:15 154:3,10
154:22 155:4,14
156:1,7 157:6,11
157:15 158:2,6,11
159:7 160:4,13,22
161:10,15,22
163:9,23 167:13
168:17,22 170:4
171:15 172:12
173:6,12,22
174:11,15,20
175:8,15 176:9,21
179:2,8 180:17
181:21 183:6
184:18 185:4,18
187:6
**risk** 151:13
**Robert** 15:14
**robots** 126:22
**role** 117:9 119:16
**room** 69:9,11
126:10 127:11
158:2,2,5,9
165:17,21 166:1,3
166:9
**roughly** 34:3 83:22
**round** 120:13 123:2
123:21,23 128:21
151:9 159:3
**rounds** 32:7 41:11
43:12 55:20 65:12
113:19 117:8,22
118:4,23 119:9,11
121:10 150:6
162:3,11 172:7

176:2,11,12
183:13 184:1
185:10,16
**routinely** 131:22
**RPR** 193:17 194:15
**Rucker** 3:5
**Ruger** 54:22
**rules** 5:4 6:9
**run** 132:18 134:9
170:14
**running** 124:8
127:2,9 131:4
132:3 133:6 134:3
154:5 173:11
190:2

---

**S**

**S** 2:1 3:1
**S-I-G** 15:8
**s/** 193:17
**Safety** 12:2
**sake** 112:7
**sample** 86:6 96:12
96:23 97:18 98:3
189:14,17,20,21
190:4,9 191:1,11
**samples** 189:10,11
189:22
**San** 45:1,5 107:11
167:5
**saw** 93:14,17
**saying** 12:15
110:16 113:20
153:3
**says** 9:11 14:11
22:13 23:10 26:8
98:3 111:19 114:6
152:14 154:4
155:7,11 180:2,3
180:14 182:17
183:13,21 185:14
**scared** 92:15,20
**scenario** 133:4
136:12 137:2,3
**Schlifer** 61:15
**school** 107:2

154:22 182:21
**scientific** 98:16
**scientifically** 96:22
**scope** 52:6
**screener** 99:2
**screwed** 96:10
**searched** 92:14
**searches** 36:2
**second** 18:16 27:16
27:17 124:12
126:16,18 127:20
137:13 140:18
141:4 148:2
152:14 155:1
160:9,15 170:6
176:3,11 183:4
**secondary** 178:10
**seconds** 67:23
68:13 69:4,7,12
123:6 125:15,17
126:20 127:10,14
130:3 136:13,21
136:23 152:6
157:5,22 158:11
158:21 159:3,6
165:17 166:10
176:9,10,13,19
**Secretary** 12:2
**section** 10:21
108:11
**Security** 12:2
**see** 9:9 11:12 13:16
14:18 17:4 22:14
26:9 123:11,12
142:3 145:6
148:16 150:21
153:23 170:8
171:17 174:18
176:3,11 186:6
**seen** 9:1 39:18
40:18,21 42:4
96:15 102:13
**segmenting** 47:2
**select** 97:6
**selected** 27:22 97:1
97:2,5 189:14

**selecting** 102:23
**self-** 56:4 177:11
181:11
**self-characterize**
91:16,19
**self-defense** 54:19
55:4,8,14,17 56:1
56:8 76:7,11,16
76:20 77:1 83:11
111:2,13 117:4
122:23 177:6,18
182:9 183:14
184:2 185:17
186:17 187:4
**self-defensive**
180:20
**self-evident** 135:4
**self-identified**
89:13
**self-inflicted** 47:18
**self-protection**
90:4 178:20
179:12 181:5,9
**self-protective** 88:2
**self-selected** 189:10
189:22 190:3
191:1
**self-selects** 190:13
**semi-** 54:14 65:21
70:4,9 123:7
**semi-automatic**
41:20 54:23 59:5
65:19 67:21 76:19
162:8 175:21
176:6
**send** 66:23 97:18
**Senior** 3:13
**sense** 33:2,10 41:10
41:13 45:4 48:7
67:6 70:1 71:12
71:19 80:16,20
112:5 113:12
137:23
**sent** 12:18
**sentence** 111:17
112:10 114:5,11

120:11 138:9
**separately** 146:19
**September** 24:9
**sequence** 97:12
**series** 16:15 91:6
95:17
**serious** 181:6
182:20
**served** 23:4
**Service** 194:16
**Service's** 97:11
**set** 11:14 12:3
14:21 72:12 89:14
90:7,13 137:20
138:8,16 141:18
142:17 143:2,5
176:16
**SETH** 1:4
**seven** 38:15 86:4
116:13 146:23
147:3
**seventh** 54:1
**share** 183:15 184:3
**shared** 17:18
114:12
**sheet** 194:7 196:3
**shells** 162:9
**shoot** 32:11 115:16
128:4,19 132:5,19
132:20 133:3,9,11
135:20
**shooter** 27:11,19
37:12 40:16,23
41:2 43:12,18,21
44:19 45:5,21
58:20 59:8 123:6
123:14 126:4
131:8,13 132:4,5
132:15,19,20
133:4 134:6
135:18 136:9
156:6,21 157:4
158:1 167:9,12
173:6 175:10
187:21
**shooters** 44:11,13

123:18 124:18
128:4,16 131:22
133:14 156:15
159:10 188:9
**shooting** 29:3 31:3
31:21 32:5 33:13
33:17,22 34:19
35:4,6,8,19 36:17
37:4,23 39:14
40:12 42:2 43:9
43:20 44:16 45:7
45:12,18 58:4
65:15 79:6 80:13
80:17 82:2,7,19
82:23 107:3,16
112:20 115:20
119:6 122:17,19
123:17 126:1,10
127:18,20 128:16
133:2,17 134:20
135:3,6,20 137:8
157:18 158:5,10
159:2,23 160:10
162:17,22,23
163:4,8,15 165:12
166:17 171:15
172:8 173:6 186:4
186:11 187:22
**shootings** 15:23
16:4 18:17,20
25:18 26:14 27:7
27:14 28:6 29:11
29:18 30:4 33:3
33:11 34:10,23
35:3,10,11,19,23
36:7,14 39:1,11
42:20 44:3 58:2,5
58:14,15 61:5
78:23 79:10,14,18
80:21 106:12
108:1 137:14
138:2,3,17,21
139:2,9 141:19
142:2 143:5
156:16 166:14
187:19

**shootingtracker....**
33:18 37:22 80:10
80:14,17,21 81:7
82:1,6,11 83:1,3
**shootout** 110:5
**short** 82:15 113:8
**shot** 34:1 44:9 58:2
61:4 65:3,6,19
122:15 152:6
154:22 155:23
157:5,22 158:11
164:20,20 165:2,3
**shotgun** 94:21
**shots** 32:21 115:18
117:5 125:18
127:23 128:6,8
129:5,7,8,13,23
130:17 131:3
132:1 134:4,17
135:1,9,13 136:16
137:5 148:5,16,23
149:6,12 150:10
150:20 151:5
152:1,11 153:2,5
153:17 154:8
155:2,3,6,8,19,19
164:2,11 187:11
**shoving** 182:21
**show** 8:18 36:18
50:18 101:23
124:6 140:10
169:7
**showing** 115:22
124:8 140:10
**shows** 113:3,9,22
**sic** 13:11 174:4,4
184:22
**side** 164:7 169:23
**sides** 168:13
**Sig** 15:8
**sight** 128:22
**sign** 196:2,4
**signature** 15:9 23:8
141:5 195:2
**significance** 25:14
25:15

**significant** 42:18
50:3 127:13
151:11 179:23
183:15 184:3
**SIGNING** 4:17
**similar** 24:15 76:2
81:6 160:4
**simple** 34:21
**simpler** 175:1
**simply** 88:22 109:8
112:4 130:10
132:6
**simultaneously**
160:8
**single** 29:2 31:5
120:12,13 152:22
152:23
**sir** 177:4
**sit** 33:12 56:4
101:13 107:4
172:14 185:19
**site** 135:20
**sitting** 166:1,5,6
**situation** 109:12
110:11 118:20
131:3 136:4,20
161:1 173:1
183:14 184:1
**situations** 108:22
110:13,17 111:11
128:23 183:16
184:4
**six** 31:5 32:5,7,12
32:12,16 34:10,15
38:10,12,13,14,22
39:1,9 44:8 85:7
86:3 139:3,5,6
146:17,21 147:1,2
147:17,23 154:4
154:21 176:2,9,11
176:19
**six-shot** 32:10,15
32:20
**size** 55:11,15 166:3
**skills** 103:21
**slightly** 31:11

**slowed** 158:22
**slower** 158:16
**slowly** 127:19
128:5 129:4
**small** 50:17 160:18
188:3
**smaller** 158:18
**so-called** 108:10
**socioeconomic**
45:22
**solely** 156:18
**solicit** 97:19
**somebody** 16:19
32:9,20 58:17
66:15 90:3 93:16
98:2 124:20 130:3
163:1
**somewhat** 32:23
149:18,20 150:7
**soon** 131:3 134:1
194:11
**sorry** 13:7 30:16
52:21 87:11 94:5
140:15 143:21
152:4 164:3,5
184:8,21 186:19
**sort** 27:23 34:13
87:16,23 116:23
118:20 154:2
157:10 165:13
178:8
**sorts** 188:2
**sounded** 41:16
**sounds** 8:3 82:13
82:20 117:6
**source** 26:9,21
36:13 81:13
118:10 123:9,12
142:1 167:20
**south** 50:6
**span** 124:4
**speak** 84:18
**speaking** 131:23
184:23
**specific** 106:16
109:19 118:2

151:3 153:4,6
**specifically** 75:20
118:17 122:21
178:6,12 179:14
**speculate** 151:6
160:3
**speeding** 70:5
**spelling** 194:10
**Spitzer** 15:12,14,19
18:1,2,5,6,7,8
**Spitzer's** 17:18
23:23
**spreadsheet** 12:10
12:12,12
**spreadsheets** 9:16
**spring** 83:20
167:22
**staff** 29:5
**stand** 84:15
**standard** 87:4
**standards** 72:12
**start** 171:9
**started** 34:4 88:6
**starting** 178:18
179:22 183:21
188:8,16
**starts** 143:13 144:1
144:5
**state** 1:14 5:2,20
7:6,17,20 15:22
16:16 18:16,19
46:1,10 51:11,11
51:13 53:20 54:4
64:5,7,19 92:6
185:7 186:2 193:3
**state-of-the-art**
98:18
**stated** 49:4 161:9
**statement** 114:14
120:19 123:5,10
137:21 143:6
170:15 182:16
**states** 1:1 33:5 48:8
48:9,12 50:13,21
51:3,5,13,16,17
54:1,2,10

**status** 44:19 45:15
  45:22
**statute** 11:6 52:8
**statutory** 73:12
  106:18
**stenotype** 193:7
**step** 168:18 178:4
**stereotype** 78:20
**stereotypes** 78:18
**STIPULATED** 2:3
  2:7,14
**stipulations** 5:5
**stock** 41:23 58:21
  59:1,9,17 70:1,4
  70:21 135:22
**stocks** 69:22
**stop** 43:3 115:19
  116:16,21 117:8
  117:22 118:4
  119:12 126:3
  160:10
**stopped** 43:5
  115:20 186:4,10
  186:18,21
**stopping** 56:21
  119:16
**stopwatch** 123:15
**stored** 160:22
**stray** 123:2
**stress** 68:6
**stressful** 118:21
**stricter** 78:21
**strike** 41:1 130:9
**struck** 32:23
**struggling** 168:1
**studied** 42:9 43:10
  44:10 56:7 70:23
  106:11 121:10
  122:14 147:19
**studies** 9:15 19:6,8
  19:12 27:22 53:23
  178:5 179:11
  189:14
**study** 19:5,20 25:17
  25:21 26:2 27:16
  27:17 29:9 43:2

60:14 96:1 101:21
  106:13 118:17
  121:3,6 142:22
  161:15 166:20
  171:22 172:2
  178:9,19,21
  191:21
**stuff** 12:17 18:4
  99:5 142:21
  144:22 161:20
  162:1 172:5
**style** 40:19,19
  41:21 75:22
**sub-sample** 98:6
**subheading** 186:6
**subject** 72:11 85:12
  86:22 87:2 186:15
**submitted** 84:14,15
  84:18 141:11
**subpoena** 4:9 9:5
**subsequent** 91:13
**subset** 34:12 50:17
  73:17 74:6 97:6
  122:22 142:13,14
  142:15,16 143:4
**subsets** 50:16
**substance** 25:14
**substantially** 48:8
**subtitle** 119:3
**success** 113:11
  114:1
**successful** 43:17
**successfully** 115:11
**suffer** 178:20
**suffering** 179:13
**sufficient** 78:1
  114:8 116:16
  172:10
**suggested** 28:1
**suggesting** 42:5
**suicide** 46:14
  165:12
**summary** 56:18
**supplied** 16:18
**support** 78:4,21
  79:5 80:8 114:10

120:17 143:8
**supported** 57:9
**supports** 115:9
**supposed** 118:14
**suppressors** 75:23
**sure** 5:17 22:11
  24:4 38:2,18 40:7
  48:14 52:19 53:8
  63:6 72:1 95:16
  95:18 109:11
  118:11 136:5
  137:16 139:15
  141:18 147:11,14
  149:15 150:18
  154:19 161:1
  163:17,20 165:7
  166:4,8 169:3
  173:18 182:3
  184:13 191:14
**surprise** 82:3
**surprised** 49:8,12
  67:14,15
**survey** 83:11,20
  85:2,4,15 86:14
  87:5,15 88:6,8
  89:14 90:14 93:21
  96:5,9,19,21,22
  98:21 99:11,18
  100:8 101:4,7,10
  102:11,18 103:9
  104:19 105:3,11
  105:16 190:2,13
  190:15,20 191:7
**surveyors** 87:6
**surveys** 98:1
**surviving** 128:15
**sustained** 80:7
**Sweeney** 170:4
  180:2,6
**sworn** 5:11 170:19
**symbol** 17:3 153:21
  154:6
**synopses** 142:19
**synopsis** 142:2
**system** 61:19

|  | T |
| --- | --- |

**T** 2:1,1
**table** 4:1 16:14
  20:16 69:8 138:6
  138:11,12,15
  139:5,18 143:17
  144:2,17,18,21
  145:1,14,15,21
  146:1,6,13,22
  147:6,8,14 148:2
  148:12,15 155:21
  156:2,11,19,19
  166:5,13 172:3
**tables** 16:15
**tabulated** 33:14
  146:19
**tackled** 167:12
  168:3
**take** 6:12 8:8 10:23
  14:14 22:5 31:15
  35:17 42:10 51:20
  68:4,8,12,15,22
  69:3,9,12 86:1
  98:6 100:23
  123:16 125:10
  128:5,8,20 131:22
  135:14 139:13
  145:12 158:20
  159:12 160:3,5,13
  161:4 164:21
  165:3 173:13
  175:10,11 176:12
  191:12
**taken** 1:12 2:5 5:22
  6:5 51:21 101:1
  139:16 148:18
  158:21 159:6
  191:15 193:6
**takes** 123:5 160:18
  174:19
**talk** 6:10 133:22
  191:22
**talked** 63:20 69:22
  103:8 104:18
  146:5
**talking** 14:3 49:6

71:6,7 74:3 101:3
  109:3 130:16
  138:1,12 154:14
  169:17
**Tallahassee** 7:10
**tapering** 131:21
**target** 117:5 121:11
  122:6 129:17
  130:6,15 132:7
  156:6
**targeting** 108:9
**targets** 122:2
  128:17,18 130:4
  131:14
**tautology** 114:20
**teasing** 178:22
  179:5
**technical** 103:21
**technoheads** 99:3
**Teenie** 7:9
**telephone** 85:23
  86:3,6,8 87:5 96:9
  96:12
**tell** 7:11 11:18 12:7
  14:22 33:15 34:2
  72:2 73:3 92:11
  94:9 103:13 118:7
  170:22 182:1
**telling** 91:20
**temporarily** 63:9
  79:3
**ten** 61:12 65:11
  130:3 136:20,20
  150:6 153:18
  183:13,23 185:16
**ten-second** 130:11
**tend** 170:14
**tends** 48:21 60:7
**tenth** 124:3
**term** 73:7,11,13,14
  74:7
**terms** 25:7 36:12
  48:20 119:16
  143:3
**test** 116:6
**testified** 5:12 61:11

142:8
**testify** 61:13 63:10
**testifying** 63:15
**testimony** 9:5
52:17 62:5,12,19
63:3,12,21 64:6
64:15 156:13
172:20 189:4
193:10
**testing** 123:13
**Thank** 14:7,17
16:12 24:14 39:7
78:3 85:20 117:14
166:12 184:17
194:14 196:4
**theater** 45:8 107:7
171:11 173:2,9
**theaters** 173:8
**thereto** 2:13 193:7
**thick** 22:6
**thing** 8:1 11:18
14:10,11 15:20
22:22 53:10 64:22
81:8,11 88:23
117:1 140:13
144:22 145:7
151:3 153:4,5
168:20
**things** 10:9,10 21:5
23:12,18 24:1
60:1 75:22 85:10
87:17 96:10 104:2
105:21 106:4
108:11 111:6
116:5 119:7
130:19,23 163:18
**think** 10:11,17
12:14 13:18,20
14:8,10 15:14
16:17,18 17:5
25:13 30:19 31:22
33:23 34:8 43:4
43:19 46:15 49:21
52:20,23 53:6
55:16 57:19 58:5
58:6,9 59:9,12

61:8 63:12 65:17
66:12,15 71:10
72:21,23 75:3
81:8,9,11 89:3
94:7 95:13,15
99:3 103:10,10
104:20 105:18
106:8 123:11
130:8 131:2
137:18 141:22
142:8 150:6
154:16 158:21
164:12 167:17
168:12 170:2
172:16 173:17
176:10 178:9
180:15,17 183:6
184:16,18 188:17
192:10
**thinking** 32:6
182:2
**third** 9:7 153:16
**thought** 87:21,22
88:13 91:7 92:5,7
105:7 109:2 127:6
168:9,16
**thousands** 27:13,13
116:1
**thread** 29:22
**threat** 91:11
**threatened** 109:4,6
**three** 34:4 116:12
145:6 191:19
**threshold** 32:5
**throat** 87:16
**thrown** 61:23 62:1
**time** 2:11,12 7:3
8:5 11:1 13:7
17:9 22:8 34:17
41:8 42:10 66:22
87:12 90:23
110:11 123:15
124:8,9 125:18
126:14,16,23
128:5,7,20,21
129:5,6,9,11,13
129:13,19,19,22

130:4,14,16,17,18
131:14,17,23
132:1,6 134:8,15
134:19,20,23
135:2,5,5,9,10,13
135:14 136:10,16
137:7 139:14
145:18 149:8
152:17,23 153:6
153:13 154:9
157:17 159:12
160:3,4,13,19
164:17 169:3,22
170:18 171:2,22
172:6,7 173:13
174:19 175:7,9,10
175:11,12,17
182:3 192:5
**timed** 123:19
**times** 66:18 116:12
119:8,8 124:3
129:18 136:20
155:23 156:5,6
160:1 167:19
168:9,16
**title** 13:6 18:18
119:2
**titled** 13:22 14:18
14:19 17:13
120:20
**Tobacco** 108:17
**today** 5:21 9:5,22
57:12 99:12
100:15 173:21
174:10 185:19
**today's** 67:8
**token** 6:17
**told** 48:19 55:2,6
86:18 88:12 92:15
101:12 105:2
115:8 176:1
**top** 22:14 23:10
170:6
**topic** 57:6 87:15
108:4,6,15
**topics** 97:7

**toss** 89:2
**tossed** 88:11,22
**total** 33:6,8 98:6
147:17
**totally** 42:14 85:11
133:17 136:19
**touch** 53:20
**trace** 108:17
**Tracker** 33:14,17
34:19 35:4,8,20
**Tracy** 64:14,15
**traditional** 32:10
**trained** 56:13 71:5
71:14,21
**training** 72:8,20,22
72:23 73:1 121:3
**transcribed** 193:8
**transcript** 181:18
193:10 194:3,7
195:5
**transcription** 193:9
195:7
**transfers** 57:11,12
**transitory** 79:3
80:4
**traveling** 100:22
**treat** 108:22
**treated** 89:23 91:3
**trial** 2:11 3:13
**trigger** 69:14,17
89:22 176:1
**true** 49:2 55:2
119:14 120:9,9
133:12,19 134:6
136:8 165:22
167:17,19 168:16
177:7,9 180:4
182:22 185:12,23
186:12,16 189:16
193:10 195:7
**truth** 170:22
**truthfully** 6:6
171:4
**try** 6:10,16,17
**trying** 132:16 134:3
144:12,15

**Tucson** 167:10
**turn** 9:7 26:6 61:7
83:8 139:18
141:14,15 143:13
171:6 175:18
176:14 177:1,22
179:20 182:14
183:1,19 187:16
188:6
**turned** 29:14 41:17
**twelve** 33:4 83:23
94:12 166:6,8
**twice** 22:10 66:19
**two** 20:13 21:22
25:16 66:21 69:3
75:21 101:16
108:22 110:5
116:5,10,14
122:19 123:5
124:12 125:15,16
126:16,18,19
127:10,14,20
135:19 136:1,9,13
136:20 158:20
159:6 160:7,9
165:17 166:9
168:14 171:18
173:8,9 180:12
**type** 16:16 29:20
30:5 47:20 65:3,6
76:10 94:15 97:21
107:1,6 180:19
**types** 64:2 106:11
106:15 107:4,10
108:18 179:6,16
**typical** 16:23 35:18
43:17 44:6
**typically** 19:13
56:20 71:4
**typo** 137:19

---
**U**

**U** 2:1
**U.S** 22:23 86:7
97:11
**UCR** 16:13 20:16

**uh-huh** 149:10 151:2 157:7
**Um** 27:3
**unambiguously** 92:3
**unclarity** 46:15
**uncomfortable** 73:11
**uncommon** 86:10
**unconstitutional** 24:22
**underestimating** 151:10
**undergo** 96:16
**underlying** 114:13
**underscore** 17:4
**understand** 6:5,22 9:4 23:3 39:23 54:13 55:19 59:4 59:7 71:2 73:22 74:3 77:9 81:15 83:5 102:14 130:1 130:7 135:16 136:6 137:16 152:8 155:17 183:22 192:6,10
**understanding** 6:2 39:21 41:20 45:10 45:20 52:1,3,9 55:22 56:3 67:19 88:16 101:14 109:15 134:1 145:1 174:16
**understood** 7:1 180:16 192:2
**Uniform** 16:14
**uniformly** 168:23
**unintentional** 46:14 47:19
**unique** 42:17,23 43:8 59:20
**United** 1:1 33:4
**universal** 57:13
**universe** 35:9
**University** 7:17,20
**unknown** 167:18

**unmotivated** 43:15
**unpublished** 101:22
**unreliable** 47:14,15 47:17
**unrepresentative** 43:22
**unsure** 48:11
**untrained** 175:23
**unusual** 43:22 44:5
**update** 84:7 98:21
**updated** 84:10 121:7
**URL** 81:10
**use** 8:12 10:11 12:13,16 25:17 29:8 32:14 34:6 35:11 37:14 38:2 54:18 70:20 71:20 74:7,17 80:12 88:2,14,17,21 89:2,5,18,20 90:1 90:12,23 91:14,18 93:8 94:3,8 95:21 96:6,20 97:1,11 98:23 99:9,10,17 101:5 105:14,17 108:20,21 109:10 109:13 110:18,22 111:1,11 112:18 113:11,13 114:1 118:12,18 121:4 122:1 123:15 125:18 130:18,20 134:15 135:8 137:16,23 139:11 142:22 144:8,13 164:7 177:5,10,11 177:17 178:6,19 179:5,11 181:4,8 181:11 182:9 183:16 184:3 187:20 190:3 191:21
**useful** 144:17 191:1
**user** 89:11 113:17

**users** 89:13 180:1
**uses** 55:16 56:1 76:2 110:15 162:8 187:9,12
**usually** 119:4 150:7 156:20 162:17 190:14
**utilitarian** 78:13
**utterly** 42:17 43:8

## V

**v** 64:5
**vague** 24:8 91:11
**value** 92:17
**variation** 78:15
**variety** 75:20
**various** 8:10
**vast** 57:21 133:14 159:10 182:18 186:16 187:4,8
**Vegas** 39:14 40:13 41:3,11,14 42:2 42:11 58:20 59:8 59:13 60:7,12 70:14 129:1,2 133:22 134:7 135:19 136:4,8 166:23
**version** 27:17 168:2
**versions** 168:15
**versus** 5:20 14:5 19:23 22:23 24:16 30:9 32:12 47:18 55:12 61:16 62:11 62:18 63:2,19 64:14,21 146:20
**victim** 47:16 110:9 116:19 130:13,20 130:21 132:10 133:1,3 182:19 186:20
**victimizations** 115:22
**victimized** 181:18 181:20 182:5,13
**victims** 32:11 39:1

39:5,9 43:11
116:3,17 122:1
155:17 157:18
162:19 175:13
178:19 181:8,11
182:12 187:22
**video** 9:15 10:12 70:16 124:5
**videos** 70:19
**view** 102:2 182:4
**views** 80:2
**violence** 33:20 35:13,22 37:21 38:5,20 42:20,21 57:4,7,21 58:14 58:18 74:14 78:12 81:4 112:9 131:20
**violent** 48:16 49:14 73:20 74:13 108:13 111:22 112:12 113:5 116:2 182:19,20
**virtually** 16:22 114:19,20
**voice** 14:14
**vs** 1:6

## W

**W** 3:4
**wait** 6:15,17 138:12 148:6
**waived** 2:15
**walking** 158:2
**want** 6:15 8:12 9:8 83:10 87:10,11 98:3,4 102:9 105:20 130:2,10 136:5 148:9,10 151:7,13 191:22 192:1
**wanted** 61:21,23 63:10 112:8 191:18
**wants** 101:23 148:12
**warning** 187:11

**Washington** 17:2
**wasn't** 24:6 28:21 30:1 51:13 52:9 91:9 110:4,5 134:20 144:13 146:1,4,9 149:3 167:23
**Watching** 70:16
**way** 6:3 13:9 38:1 43:23 47:2,5 49:4 50:19 60:8 75:4 87:3 88:13,19 96:22 97:9 99:23 105:19 112:9 114:4 122:9 130:10 141:21 146:22 153:9 155:12 165:18,20 174:10 190:17
**we're** 5:21 19:16 22:11 74:3 82:22 91:13 93:2,17 105:21 135:23 144:20 154:14 165:23 180:8
**we've** 24:17 63:20 169:17
**wealthy** 43:16,20 44:22
**weapon** 11:6 12:23 13:19 16:3,16 41:18 52:7 55:3,7 59:5 67:21 70:10 70:12 76:14 95:5 110:6 133:11 140:2 162:8 187:5
**weaponry** 44:14 48:17
**weapons** 15:5,22 18:17,20 24:21 52:5 54:13,15 65:19,22 70:5 73:8,9,13,22,23 74:1,15,15,16,21 75:10,19,21 106:12,14,16,19

108:2,12,13
112:18 118:14
177:6,17 178:6,12
178:22 179:15
**website** 33:14,17
33:19 34:20 35:8
80:10 81:3,6,10
98:10,11,13
102:22 190:22
191:5,6,8
**weeks** 79:5,7
171:18
**well-asked** 30:2
**well-motivated**
35:15
**went** 63:11 89:13
92:14 156:21
**weren't** 90:9 111:8
111:9 112:6 168:8
**west** 50:6
**white** 45:13
**wildly** 156:7
**Wilson** 63:2,3
**wise** 101:19
**wish** 180:22
**withdrawn** 141:2
**witness** 5:6 22:4
26:7 61:9 73:3,5
83:9 102:4,8
111:16 118:6
123:4 128:11
136:3 137:12
164:5 169:19
170:19 171:8
174:7 177:2 180:3
183:2 188:7 189:2
189:7 193:11
196:7
**witnessed** 123:17
**witnesses** 11:22
162:3
**woke** 92:12
**word** 112:14 194:9
**words** 54:8 74:22
91:21 92:6 154:1
**work** 6:3 8:4 24:2

25:16 56:19 60:16
66:22 70:23 84:12
85:14 96:5 100:20
102:6,16 104:21
104:23 108:21
139:21
**worked** 24:19 25:3
25:6 30:9,17
61:22 66:18
102:17,19
**working** 30:10
103:6
**world** 60:2,4
124:23
**Worman** 1:4 5:20
17:6 21:19
**worse** 87:23 118:22
**worth** 132:23
**wouldn't** 28:11
36:11 37:6 39:10
43:6 44:5 47:9
50:17 54:6 58:14
78:1 79:13,23
80:1 82:3 88:16
88:18 90:20 91:4
93:15 95:3,7,10
109:9 112:22
116:15 127:10,14
129:5 130:14
132:4,18,23
133:15 134:14,23
135:8,13 137:4
143:3,4 150:4
162:19 190:23
191:9
**wound** 47:16
**wounded** 31:16
**wounds** 187:22
**write** 164:3
**writing** 108:4
**written** 78:3 84:13
**wrong** 49:4 94:6
118:3 140:16
156:14 184:13
**wrote** 15:16,17,18
31:12 39:13

www.shootingtra...
81:10

---
**X**
---

---
**Y**
---

**yard** 182:21
**yards** 43:13
**yeah** 12:17 14:10
17:8,23 18:3
19:10 28:8 30:19
31:12 38:23 39:22
49:7 52:12 59:21
65:11 74:2 96:13
106:19 120:18,20
126:15 127:17
130:19 137:19
138:15 139:15
142:12,21 143:23
144:3,3 146:11
147:8 150:14
151:2,7 152:22
154:19 157:7
158:13 161:6
163:22,22 169:10
170:2,8,8 173:23
175:5 176:7,7
191:9
**year** 7:12 13:9 17:1
35:18 48:22,23
84:1 116:2 145:7
**years** 16:17 34:4
48:1 61:12 84:1,5
85:5,7 90:2 94:11
99:5 103:14 121:7
**yield** 98:16 190:10
**yielding** 189:10
**York** 167:19 168:9
**Young** 45:13
**YouTube** 124:6
**Yurgealitis** 17:12
17:13 18:6
**Yurgealitis's** 23:23

---
**Z**
---

**zero** 16:23

---
**0**
---

**01/02/2014** 4:13
**02108** 3:16
**03/16/2014** 4:12
**05-15** 16:14
**09/09/2017** 4:10

---
**1**
---

**1** 4:9 8:15,19 48:20
138:6,12,13
139:18 144:2,17
144:18,21 145:1
145:14,15,19,21
146:1,6,13,22
147:6,8,14 148:2
166:13 172:3
183:13
**1.3** 93:6,21
**1.6** 155:12,13 157:4
157:5,21 158:11
159:3
**1:17-CV-10107-...**
1:6
**1:56** 139:17
**10** 55:20 69:6 171:9
172:23
**10-round** 136:15
173:15
**10/26/2017** 193:18
**10:13** 51:22
**10:23** 51:22
**100** 150:1,3,6,21,23
151:5 153:3
**100-round** 135:19
136:1,10 173:16
**11** 141:14,16
**11:16** 101:2
**11:57** 101:2
**119** 188:14
**12** 143:13 144:1,6
177:22
**12:44** 139:17
**121** 10:21
**13** 26:6 138:6
139:19
**131M** 10:22

**138** 171:6 172:22
**139** 172:23 174:4
**13M** 10:22
**14** 12:21 13:8 23:7
26:12 189:4
**140** 4:11 10:21
174:5
**15** 166:2 177:1
188:8
**15-round** 65:13
**151** 175:18
**154** 151:18,21,23
155:3,3,19,19
**157** 189:1,4
**158** 189:4,5
**16** 187:13
**169** 4:13
**16th** 141:7
**18** 86:12 136:22
174:4,22 179:20
**1819** 1:17 3:8
**18th** 3:15
**19** 163:13 188:16
**193** 4:16
**194** 4:17 94:7,14
**1986** 178:9
**1991** 57:10
**1993** 84:3 120:22
**1994** 83:15,17
85:15 98:21
137:15 167:3
**1995** 105:13 178:10
**19th** 50:9

---
**2**
---

**2** 4:10 21:11,15
83:8 105:12
140:14 141:4,17
142:5,10,15,23
144:18 145:14,14
145:21 148:3,6,10
148:12 183:7,10
**2/20/2018** 193:22
**20** 69:6,12 136:14
154:21 163:13,21
174:23 179:22

**20-year** 166:20
**20-year-old** 121:3
**20,000** 98:5
**2005** 16:17
**2012** 85:6 171:17
**2013** 137:15 167:3
**2014** 34:5 43:5
  82:18 141:8
  169:14
**2015** 16:17 81:1
  82:11
**2016** 7:12 26:9,21
  60:14 80:22 82:6
  142:6,11 143:6
  145:7 166:20
**2017** 1:15 12:11
  43:2 44:3 80:18
  81:23
**20th** 50:5 171:17
**21** 4:10 163:22,22
  163:22,23
**2116** 194:17
**22** 172:22 177:3
**23** 137:13 139:8
**24** 187:11
**25** 84:4 121:7
  178:18
**256)737-9770**
  194:19
**25th** 1:15
**273** 82:18
**290** 82:1
**2nd** 169:14

_____

**3**

**3** 4:11 111:15
  120:15 140:11,20
  141:1,16 142:1,13
  142:15,19,22
  143:11,17,18,19
  143:20,23 144:16
  144:19 145:14,15
  148:9 183:23
**3:00** 191:16
**3:08** 191:16 192:14
**30** 166:2 176:12

**194:4** 196:4
**30-round** 176:8,18
**32312** 7:10
**33** 171:19
**333** 82:12
**34** 171:19
**35056** 194:18
**35203** 1:18 3:9
**36** 136:22
**38.5** 155:7,8
**383** 82:7

_____

**4**

**4** 4:13 120:10 169:4
  169:8 171:7 174:5
  178:1 183:9,19
  186:6
**400** 43:13
**41** 22:19 61:7
**46** 48:22
**489** 7:9

_____

**5**

**5** 4:4 48:20
**5,000** 85:16 94:1
**50** 48:22 51:16 54:1
  149:9,18 150:1,5
  150:7,9,10 152:12
  153:2,5 182:14
**51** 150:11
**55** 183:1,19
**586** 1:14 193:20
**5th** 1:17 3:8

_____

**6**

**6** 123:3 183:21
**60** 94:3 146:21,23
  147:3 150:13
  153:3
**600** 94:3
**62891-V1-Worm...**
  17:4
**63** 120:11
**66** 94:13

_____

**7**

**7** 137:11

**75** 150:15 187:16
**79** 176:14

_____

**8**

**8** 4:9
**83** 188:6
**88-COR** 12:11

_____

**9**

**9** 182:16
**9/15/99** 150:20
**9/30/2018** 193:20
**9:18** 1:15
**90s** 96:7 99:1
**911** 163:1
**93** 83:22,23
**94** 83:20 85:21
**95** 83:20 85:18 86:8
**9th** 24:10

DANIEL COURT REPORTING, INC.

---

Page 193

```
1              CERTIFICATE
2
3    STATE OF ALABAMA  )
4    AT LARGE          )
5         I hereby certify that the above and
6    foregoing deposition was taken down by me in
7    stenotype and the questions and answers thereto
8    were transcribed by means of computer-aided
9    transcription and that the foregoing represents
10   a true and correct transcript of the testimony
11   given by said witness upon said deposition.
12        I further certify that I am neither
13   of counsel nor of kin to the parties to the
14   action, nor am I in anywise interested in the
15   result of said cause.
16
17        /s/ KATHY HART CANADAY, CCR, RPR
18        Certified 10/26/2017
19        Commissioner at Large
20        ACCR 586, Expires 9/30/2018
21        MY COMMISSION EXPIRES:
22        2/20/2018
23
```

---

Page 194

```
1
2
3         Please read the enclosed transcript
4    and return to my office within 30 days.  It is
5    not necessary to correct punctuation.  NO
6    CHANGES ARE ALLOWED TO BE MADE TO THE
7    TRANSCRIPT, ONLY ON THE ERRATA SHEET PROVIDED.
8    Also, changes can only be made to your answer if
9    you feel it is not a correct word or name
10   spelling.  No other changes are to be made.
11   Please read and mail back to me as soon as
12   possible.
13
14        Thank You,
15        Kathy Hart Canaday, CCR, RPR
16        North Alabama Reporting Service
17        Post Office Box 2116
18        Cullman, AL 35056
19        (256)737-9770
20
21
22
23
```

---

Page 195

```
1              SIGNATURE
2
3         I, GARY KLECK, hereby certify that I
4    have read the transcript of my deposition, and
5    except for the corrections listed below, certify
6    that it is a true and correct transcription.
7
8
9
10
11        _____
12             GARY KLECK
13
14
15
16
17
18
19
20
21
22
23
```

---

Page 196

```
1
2    As you read your deposition, if you have any
     corrections to make, please itemize them below.
3    Upon completion, please sign on this errata
     sheet so that I can return it to the proper
4    court.  However, if you do not have any
     corrections to make, sign this form and return
5    it to me within 30 days.  Thank you.
6
7         CHANGES MADE BY THE WITNESS:
8    PAGE LINE FROM        TO
9    16   21  murdering    murders
10   48   21  facilities   fatalities
11   51   8   effect       affect
12   54   1   seventh      170
13   93   12  obviously    obvious
14   83   12  first        fourth
15   93   23
16   113  16  and it       that it was
17   165  12  shooting     shooter
18   173  7   Correct.     Correct. Question
19   178  16  people to research   people's research
20
21
22
23   DEPONENT _Gary Kleck_    DATE 11-20-17
```

---

# EXHIBIT 13

## TO KAPLAN DECLARATION

DANIEL COURT REPORTING, INC.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


DAVID SETH WORMAN, et al.,

    Plaintiffs,               Case No.

vs.                     1:17-CV-10107-WGY

MAURA HEALEY, et al.,

    Defendants.

\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF J. BUFORD BOONE, III

\* \* \* \* \* \* \* \* \* \*

Taken before Kathy Hart Canaday, Registered
Professional Reporter, Certified Court Reporter
#586 and Notary Public for the State of Alabama,
on the 24th day of October, 2017, at 9:09 a.m.,
at the offices of Bradley, Arant, Boult,
Cummings, One Federal Place, 1819 5th Avenue
North, Birmingham, Alabama 35203.

DANIEL COURT REPORTING, INC.

Page 2

S T I P U L A T I O N

1

2

3      IT IS STIPULATED and agreed by and between

4      the parties through their respective counsel

5      that said deposition may be taken by me on this

6      date.

7      IT IS FURTHER STIPULATED and agreed that it

8      shall not be necessary for any objections to be

9      made by counsel to any questions, and that

10     counsel for the parties may make objections and

11     assign grounds at the time of the trial, or at

12     the time said deposition is offered in evidence,

13     or prior thereto.

14     IT IS FURTHER STIPULATED that notice of

15     filing of deposition is waived.

16

17

18

19

20

21

22

23

Page 3

1              A P P E A R A N C E S

2

3     FOR THE PLAINTIFF:

4          James W. Porter, III

5          Candice L. Rucker

6          Bradley, Arant, Boult, Cummings

7          One Federal Place

8          1819 5th Avenue North

9          Birmingham, Alabama 35203

10

11     FOR THE DEFENDANT:

12          Gary Klein

13          Senior Trial Counsel

14          The Commonwealth of Massachusetts

15          One Ashburton Place, 18th Floor

16          Boston, MA 02108

17

18

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 4

1                           TABLE OF CONTENTS

2        EXAMINATION BY:

3        MR. KLEIN                                        5

4

5                              EXHIBITS

6        NO.    DESCRIPTION:                            PAGE

7         1       Subpoena and Notice of Deposition       9

8         2       Mr. Boone's CV and Report dated       11
                  09/14/2017
9
          3       Mr. Boone's Declaration dated        110
10                03/06/2014

11        4       Deposition of Mr. Boone dated        116
                  01/03/2014
12
          5       Document titled Rifle Marksmanship   128
13
          6       Document titled Selection and        130
14                Application Guide to Personal Body
                  Armor
15
          7       Internet Document, Wound Ballistics  135
16                Testing Panel

17        8       Document from wethearmed.com         139

18

19       REPORTER'S CERTIFICATE                        145

20       READING AND SIGNING LETTER                    146

21

22

23

DANIEL COURT REPORTING, INC.

Page 5

1              I, Kathy Hart Canaday, a Certified

2      Court Reporter for the State of Alabama acting

3      as Commissioner, certify that on this date, as

4      provided by the Alabama Rules of Civil Procedure

5      and the foregoing stipulations of counsel, there

6      came before me this witness in the above cause,

7      for oral examination, whereupon the following

8      proceedings were had:

9

10                  J. BUFORD BOONE, III,

11              being first duly sworn, was examined

12              and testified as follows:

13

14                      EXAMINATION

15     BY MR. KLEIN:

16          Q.   Good morning, Agent Boone.  Would you

17     mind stating your full name and your business

18     address for the record, please?

19          A.   Yes.  And it's retired Agent Boone.

20     But I don't mind if you call me Agent, I just

21     don't want to give the impression that I'm still

22     employed there.  My name is James Buford Boone,

23     III.  And my business address is Post Office Box

DANIEL COURT REPORTING, INC.

Page 6

1    2370, Tuscaloosa, Alabama.  And I believe the

2    zip code is 35403.

3         Q.   And since the address you gave is a

4    post office box, if you wouldn't mind giving

5    your home address, I would appreciate it.

6    Thanks.

7         A.   ████████ ████████ ████████ ████ ████ ████ ████████

8    ██  ████████████ ████████

9         Q.   Agent Boone, is it fair to say that

10   you've been deposed before?

11        A.   Yes.

12        Q.   How many times?

13        A.   Probably less than fifteen.  But I

14   don't know how many times exactly.

15        Q.   Ten to fifteen is a fair range?

16        A.   We'll assume ten.  It depends on what

17   you mean by deposed in what sort of -- in

18   matters like this, this will be the second

19   deposition as an expert witness.

20        Q.   And the other depositions you were

21   referring to were --

22        A.   Criminal type things.

23        Q.   -- criminal cases?

DANIEL COURT REPORTING, INC.

Page 7

1        A.    Yeah, as an agent.

2              MR. PORTER:  Let him finish his

3    question just so she can get it all down.

4              THE WITNESS:  Sorry.

5        Q.    But not in court?

6        A.    I'm not sure I understand.  I've

7    testified in court.

8        Q.    Right.  But the depositions -- what

9    I'm asking about are depositions which would

10   typically be an opportunity for a lawyer

11   representing a party, included in a criminal

12   case, to ask you questions.

13       A.    Probably less than five.

14             MR. KLEIN:  Can we go off the record

15   just a second?

16             (Off-the-Record discussion)

17       Q.    Agent Boone, is it fair to say you

18   understand the way this process works, the

19   process of taking a deposition?

20       A.    Yes.

21       Q.    You've done this before, right?

22       A.    Yes.

23       Q.    And you understand that I'm going to

DANIEL COURT REPORTING, INC.

1      ask you questions and you're under oath and

2      obligated to answer them truthfully, right?

3           A.   Yes.

4           Q.   A couple of other rules, just so that

5      we're clear as we go forward.  One is that we

6      have to be careful about talking over each

7      other, meaning that I want to wait until you

8      complete your answers before I ask a new

9      question.  And I would ask you to do the same,

10     wait for me to complete a question before you

11     give your answer, okay?

12          A.   Yes.

13          Q.   And I would also ask that if you

14     don't understand my question, you let me know.

15     Because if you don't let me know, I'm going to

16     assume that you understood the question.  Okay?

17          A.   Yes.

18          Q.   Thank you.  If you need a break at

19     any time, just let me know and we can take a

20     break.

21          A.   Okay.

22               (Whereupon, Defendant's Exhibit 1

23                was marked for identification and

1          same is attached hereto.)

2          Q.   I'm going to ask you to take a look

3     at a document that we've marked as Exhibit

4     Number 1.

5          A.   Okay.

6          Q.   Is that a document you've seen

7     before?

8          A.   I've seen it electronically, yes,

9     sir.

10          Q.   And I want to direct your attention

11     to the next to the last page at the bottom of

12     that page -- I think you're on the wrong page.

13     I'm sorry.  If you go back one, the third from

14     the last page.  You had it right and I had it

15     wrong.  It says, the deponent is directed to

16     bring with him his file for this matter,

17     including but not limited to correspondence,

18     handwritten notes, memoranda, photographs, video

19     recordings, studies, reports, literature,

20     spreadsheets, electronic communications he has

21     reviewed or authored in regard to this matter.

22     Do you see that?

23          A.   Yes, sir.

DANIEL COURT REPORTING, INC.

Page 10

1      Q.   Did you bring any documents with you

2  today?

3      A.   Yes, sir, I did.

4      Q.   Can you tell me what you brought in

5  here?

6      A.   Would you like me to hand you the

7  whole file or would you like me to go over them

8  one by one?

9      Q.   I'll just take a quick look through

10  it.  Thank you.

11           (Whereupon, Defendant's Exhibit 2

12            was marked for identification and

13            same is attached hereto.)

14      Q.   Let me give you a document that's

15  been labeled Exhibit 2.  Could you take a look

16  at that, please?

17      A.   Yes, sir.

18      Q.   Is that a complete copy of the report

19  that you prepared in connection with this case?

20      A.   It appears to be, yes, sir.

21      Q.   And is that your signature at the

22  back?  Or not all the way to the back.  Your CV

23  takes up quite a number of pages at the end of

Page 11

1       the document.

2               A.    Yes, sir.

3               Q.    You see your signature in among these

4       pages?

5               A.    Yes, sir.

6               Q.    So what I would like you to do, so

7       that we can talk about it a little more easily,

8       is put some page numbers on for me.  If we could

9       number together, that will make our lives

10      easier --

11              A.    Sure.

12              Q.    -- to talk about this over the course

13      of the morning.

14              A.    Yes, sir.

15              Q.    So you can number the first page as 1

16      and then each page thereafter.

17              A.    (Witness complies).

18              Q.    If I'm not mistaken, you can stop at

19      page 15 because that's the last page before your

20      CV.

21              A.    (Witness complies).

22              Q.    So I've asked to you number from

23      pages 1 through 15.  Is it fair to say that

DANIEL COURT REPORTING, INC.

Page 12

1     everything after page 15 is your CV?

2          A.   Yes, sir.

3          Q.   And that's all the way through the

4     end of the document, correct?

5          A.   Yes, sir.

6          Q.   And your CV, which does have pages

7     numbered, is 36 pages, right?

8          A.   Yes, sir.

9          Q.   And in addition, at the beginning of

10    the document there are four pages stating your

11    qualifications, right?

12         A.   Yes, sir.

13         Q.   So is it fair to say that your

14    opinions in this matter start on page 5 and go

15    through page 15 as we've just numbered them?

16         A.   Yes, sir.

17         Q.   Thank you.  Is this report -- and I'm

18    talking about pages 5 through 15, is it the same

19    as a report you prepared in a case called Kolbe

20    versus Maryland?

21         A.   Similar.

22         Q.   When you say similar, does that mean

23    you made some changes and updates?

DANIEL COURT REPORTING, INC.

Page 13

1          A.    I believe that I added some things.

2          Q.    Is it fair to say what you added is

3     the material that starts on page 12, which is

4     specifically about Mass. General Law and then

5     additional material on page 14 and 15, which is

6     about the Attorney General's Notice of

7     Enforcement?

8          A.    Yes.

9          Q.    That's the added material?

10         A.    Yes.

11         Q.    Is everything in your opinions before

12    the added material starting on page 12, is it

13    the same as what you opined in the Kolbe case?

14         A.    I believe so.  I can't be certain

15    without reviewing it line by line, but it's very

16    similar.

17         Q.    So basically what you did is you took

18    that opinion and you added some material about

19    Massachusetts law and provided it for use in

20    this case as well?

21         MR. PORTER:  Object to the form of

22    the question.  You can answer.

23         A.    Right.  Subject matter is similar.

DANIEL COURT REPORTING, INC.

Page 14

1          Q.    And your opinions are essentially the

2     same, correct?

3          A.    Yes.

4          Q.    Did you use the same material in

5     connections with an opinion that you provided in

6     any other case?

7          A.    I don't believe so.

8          Q.    Are there any other cases challenging

9     gun laws around the country in which you're

10    serving as an expert witness at present?

11         A.    I don't believe so.

12         Q.    Have you provided an opinion in

13    connection with any of the California cases

14    about large capacity magazines that are pending?

15         A.    I don't believe so, but I can't

16    recall.

17         Q.    Have you provided an opinion in

18    connection with a Colorado case which had to do

19    with large capacity magazines?

20         A.    I don't believe so.

21         Q.    Did you author an opinion or provide

22    an opinion in connection with a case that was

23    pending in Illinois concerning assault weapons?

DANIEL COURT REPORTING, INC.

Page 15

1          A.    I don't believe so.

2          Q.    So what other cases can you think of

3     in which you've authored an opinion about the --

4     about a state law regulating firearms or weapons

5     magazines?

6          A.    There was a case in San Francisco

7     regarding ammunition that I gave some opinion

8     on.

9          Q.    Do you happen to remember the name of

10    that case?

11         A.    I don't, no, sir.

12         Q.    Do you remember approximately when

13    you gave that opinion?

14         A.    A year and a half ago, maybe.

15         Q.    And you don't know whether that case

16    is still pending?

17         A.    I do not.

18         Q.    Have you been deposed in that case?

19         A.    I have not.

20         Q.    Thank you.  We talked a little bit

21    about the case Kolbe versus Maryland in which

22    you issued essentially these same opinions.  Did

23    you work with the same lawyers that you're

Page 16

1    working with in this case?

2              MR. PORTER:  I object to the form of

3    the question, but you can answer.

4         A.   Yes.

5         Q.   You worked with the same law firm?

6         A.   Yes.

7         Q.   That's the Bradley law firm?

8         A.   Yes.

9         Q.   Did you work specifically with

10   Mr. Porter?

11        A.   Yes.

12        Q.   Did you work with Mr. Sweeney as

13   well?

14        A.   Yes.

15        Q.   So can you explain your understanding

16   of what the case in which you issued this report

17   is about?  And when I say this report, obviously

18   I mean Exhibit Number 1 -- Exhibit Number 2.

19   Let me just start the question again so that

20   it's clearer in the record.  Apologies.

21              So can you give me your understanding

22   of what the case is about in which you issued

23   this expert report, Exhibit Number 2?

DANIEL COURT REPORTING, INC.

1          A.    The Massachusetts case?

2          Q.    Yes.

3          A.    It's restrictions on firearms and

4     magazines or firearm feeding devices.

5          Q.    Did you review the complaint in this

6     matter?

7          A.    Yes.

8          Q.    Did you review the answer of the

9     Commonwealth?

10         A.    What do you mean the answer of the

11    Commonwealth?

12         Q.    We refer to ourselves in

13    Massachusetts as a Commonwealth rather than a

14    state, so.

15         A.    Right.  But I recall documents, but I

16    don't recall reading something that said it was

17    the answer of the Commonwealth.

18         Q.    The answer of the Attorney General?

19         A.    The answer to the complaint?

20         Q.    Yes.

21         A.    I don't remember if I read her answer

22    or not.  I read what was provided to me.

23         Q.    And the complaint was provided to

Page 18

1      you, but the answer was not?

2            A.    I don't know whether it was or not.

3      I don't recall.

4            Q.    What else did you review that's

5      relevant to the Massachusetts case?

6            A.    My report, obviously, and the things

7      contained in the file that I brought to you.

8            Q.    Did you review any deposition

9      testimony in connection with the case?

10           A.    Yes.

11           Q.    Whose deposition testimony?

12           A.    Oh, I don't know his deposition.  I

13     reviewed a report, not a deposition.  A report

14     of -- Urgealitis, does that sound right?

15           Q.    Yes.  So you reviewed his report?

16           A.    Yes.

17           Q.    And did you offer any additional

18     opinions after reading his report?

19           A.    Opinions about the case --

20           Q.    Yes.

21           A.    -- or opinions about his report?

22           Q.    About his report?

23           A.    I offered opinions about his report.

1          Q.   Have they been provided to counsel in

2     this case?

3          A.   Yes.

4          Q.   Do you know if the expectation is

5     that you're going to provide an additional

6     document in connection with this case that will

7     be used in court?

8          A.   I don't know.  I don't have an

9     expectation.

10         Q.   What's your understanding of the

11    Massachusetts Law of Self-Defense?

12         A.   Can I add one back?  Because we

13    didn't finish.  You asked about all the reports

14    I reviewed.  I reviewed a report of a doctor, I

15    believe, as well.

16         Q.   Dr. Colwell?

17         A.   That sounds familiar, yes, sir.

18         Q.   And did you have opinions about his

19    report as well?

20         A.   Yes.

21         Q.   And did you share those?

22         A.   Yes, I did.

23         Q.   Can you tell me your understanding of

DANIEL COURT REPORTING, INC.

1      the Massachusetts Law of Self-Defense?

2              A.    I don't have a true understanding of

3      Massachusetts Law of Self-Defense.

4              Q.    Have you ever reviewed the

5      Massachusetts Law of Self-Defense?

6              A.    I don't believe I have.

7              Q.    Which Massachusetts laws have you

8      reviewed?

9              A.    This one.

10             Q.    When you say this one, what do you

11     mean?

12             A.    140, Section 121.

13             Q.    Any other laws?

14             A.    Not that I can think of, no, sir.

15             Q.    And I assume you also reviewed the

16     Notice of Enforcement that you provided opinions

17     on, correct?

18             A.    Yes.

19             Q.    That's the Attorney General's Notice

20     of Enforcement?

21             A.    Yes, sir.

22             Q.    Thank you.  So if we could go to the

23     first page of your CV very briefly.

DANIEL COURT REPORTING, INC.

Page 21

1          A.    (Witness complies).

2          Q.    You have a degree from the University

3     of Alabama?

4          A.    Yes, sir.

5          Q.    Is that a four-year degree?

6          A.    Yes, sir.

7          Q.    And what does a degree in General

8     Management at the University of Alabama entail?

9          A.    Business school.

10          Q.    Do you have any science degrees of

11    any kind?

12          A.    No, sir.

13          Q.    Have you ever been trained in

14    scientific methods?

15          A.    On-the-job training when I was

16    running Ballistic Research Facility.

17          Q.    Self-taught for the most part?

18          A.    Well, there was people that taught

19    me, but it was all done in-house.  Well, it

20    started in-house.  I have had other training as

21    well, as you can see in my CV.

22          Q.    Thank you.  It's my understanding

23    that members of your family owned a newspaper

DANIEL COURT REPORTING, INC.

Page 22

1      chain; is that right?

2            A.    Newspaper management group.

3            Q.    What's the name of that?

4            A.    Boone Newspapers, Incorporated.

5            Q.    Do you have any role in that

6      newspaper business?

7            A.    I'm a director of Boone Newspapers.

8            Q.    Is that a family-owned business?

9            A.    Yes.

10           Q.    How long have you been a director?

11           A.    Mid '80s, I suspect.  I don't recall

12     when we set that up.  But it was prior to my

13     employment with the FBI.

14           Q.    So can you describe the areas in

15     which you have special expertise that's relevant

16     to the Massachusetts case?

17           A.    General firearms and wound

18     ballistics, internal, external, and terminal

19     ballistics.

20           Q.    What do you mean by general firearms?

21           A.    I have an extremely thorough

22     knowledge of most matters dealing with firearms;

23     the way they function, with training individuals

Page 23

1      to use them, their appropriateness for certain

2      situations.  I have conducted training of many,

3      many people on the use of firearms and the

4      selection of firearms for various circumstances.

5           Q.   And can you describe what you mean by

6      wound ballistics?

7           A.   What a projectile does to human

8      tissue.

9           Q.   How do you -- what's the source of

10     your understanding of wound ballistics?

11          A.   The time that I spent as the

12     Supervisory Special Agent with oversight of the

13     Ballistic Research Facility at the FBI.

14          Q.   Did you actually examine patients in

15     this context?

16          A.   I have examined human tissue, not

17     live patients.

18          Q.   What context would you have examined

19     human tissue with outside of a live patient?

20          A.   Cadavers.  And I have examined animal

21     tissue.

22          Q.   Approximately how many times have you

23     examined human tissue?

DANIEL COURT REPORTING, INC.

Page 24

1      A.    Once.

2      Q.    And what was the circumstances in

3   which that examination took place?

4      A.    That was looking at the anatomy of

5   human beings.  And those were not gunshot

6   wounds.  But that was looking at human anatomy,

7   cross-sections of the head, for example, to

8   locate structures.

9      Q.    You've never actually examined human

10  tissue for gunshot wounds, right?

11     A.    No, I have not.

12     Q.    It's correct to say you're not a

13  lawyer, right?

14     A.    Correct.

15     Q.    And that you're not here to offer

16  legal opinions, right?

17     A.    Correct.

18     Q.    To the extent you offer any legal

19  opinions, the court is free to disregard them,

20  right?

21          MR. PORTER:  Object to the form of

22  the question.  You can answer the question.

23     A.    Correct.

Page 25

1        Q.   And you're not a doctor, right?

2        A.   Correct.

3        Q.   And to the extent you offer medical

4    opinions, the court would be free to disregard

5    them, right?

6             MR. PORTER:  Object to the form of

7    the question.  You can answer.

8        A.   Correct.

9        Q.   And you're not offering personal

10   opinions in connection with this matter, right?

11       A.   I'm not sure I understand.

12       Q.   You're not offering personal opinions

13   except that they are based on your experience as

14   an expert in wound ballistics or in general

15   background on guns?

16            MR. PORTER:  Object to the form of

17   the question.  You can answer.

18       A.   I'm not sure you can separate the

19   two.

20       Q.   So how would -- what kind of personal

21   opinions would you say that you've offered in

22   this matter?

23            MR. PORTER:  Object to the form of

DANIEL COURT REPORTING, INC.

Page 26

1    the question.  But you can answer.

2         A.   Based on my experience, personal

3    experience from conducting firearms training and

4    shooting of animals and examination of animals

5    for the wound ballistics to see what the

6    projectiles did to the tissue and from my own

7    use of firearms, it would be difficult to

8    separate personal opinion from professional

9    opinion.

10         Q.   In what context did you shoot at

11    animals?

12         A.   In hunting and in eradication for

13    research.

14         Q.   So that was out in the field in

15    uncontrolled conditions, right?

16         A.   Right.

17         Q.   Have you ever conducted any

18    scientific experiments on animals to study wound

19    tissue?

20         A.   No, not controlled.

21         Q.   So in the context of your time in the

22    field, I assume hunting is what we're talking

23    about for the most part, right?

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 1106 of 1262
DANIEL COURT REPORTING, INC.

Page 27

1        A.    And eradication.  Nuisance animals

2    that needed to be dealt with.

3        Q.    So if you shot something, you'd take

4    a look at the wounds, right?

5        A.    We would examine the wounds, yes,

6    sir.

7        Q.    And did you apply any scientific

8    evaluation of the wounds in that context?

9        A.    One of the individuals that worked

10   under my supervision was a veterinarian, and we

11   had him do postmortem examinations and describe

12   the wounding.

13       Q.    So I want to talk a little bit about

14   your time working in the FBI's Ballistics

15   Research Facility.  There was a period of time

16   there when you were the only full-time employee;

17   is that right?

18       A.    Correct.

19       Q.    What period of time?

20       A.    That would have been April of 1997

21   until sometime I believe the fall of '98 when

22   Mr. Marshall joined me.  Those are approximate.

23   The ending day is an approximate; the starting

Page 28

1     day is pretty exact.  Actually back up.  I

2     started in April and the man who was there left

3     two months later.  So it would have been June

4     when I was by myself.

5          Q.   So if you could look at what we've

6     labeled as page 2 and 3 of your report, there's

7     something that's confusing me a little bit.

8          A.   Yes, sir.

9          Q.   So if you look at the next to last

10    paragraph on page 2, it says, I was transferred

11    to the Ballistics Research Facility of the FTU

12    on April 15th, 1997.  Do you see that?

13         A.   Yes, sir.

14         Q.   And then on the next page, in the

15    second full paragraph, it says, I was the only

16    full-time person at the BRF until a support

17    person, non-agent, was assigned as an

18    Engineering Technician of Ballistics, ETB, in

19    the last quarter of 1988.  Should that be 1998?

20         A.   Yes, it should be.

21         Q.   Thank you.

22         A.   That's embarrassing.

23         Q.   And that person was someone named

DANIEL COURT REPORTING, INC.

Page 29

1     Mr. Marshall; is that right?

2          A.   Yes, sir.

3          Q.   And he was not an FBI agent; is that

4     right?

5          A.   Correct.

6          Q.   What was his -- he was a civilian?

7          A.   We was a support employee.

8          Q.   And what was his job function?

9          A.   Engineering technician of ballistics.

10         Q.   And how long was it just the two of

11    you?

12         A.   I don't recall.

13         Q.   Do you remember when any other

14    individuals were hired to work at the BRF?

15         A.   We had a contractor that worked with

16    us some, and then that contractor was replaced

17    by another contractor.

18         Q.   Anyone else?

19         A.   Then my replacement came in prior to

20    my retirement.

21         Q.   Approximately when was that?

22         A.   My replacement came in, I believe, in

23    the first quarter of 2011.

DANIEL COURT REPORTING, INC.

Page 30

1      Q.    When did you retire?

2      A.    August 31 of 2012.

3      Q.    So for the majority of the time

4  between 1997 and 2012 when you retired, it was

5  you and Mr. Marshall working together?

6      A.    Mr. Marshall did work with me from

7  the time he showed up until my retirement.

8      Q.    So in that unit, it was just the two

9  of you other than the contractor you mentioned?

10      A.    Two different contractors, yes, sir.

11      Q.    And you mentioned that there was a

12  veterinarian who worked on ballistic issues with

13  you?

14      A.    One of the contractors was a

15  veterinarian.

16      Q.    Was that just a coincidence or was he

17  hired specifically as a veterinarian on a

18  contract for the BRF?

19      A.    We worked to get him at BRF.  He was

20  a contractor with Firearms Training Unit.  But

21  based on his medical background, we pushed to

22  get him brought down to us.

23      Q.    Does the BRF still exist?

DANIEL COURT REPORTING, INC.

1        A.    Yes.

2        Q.    Who runs it now?

3        A.    Supervisory Special Agent Scott

4   Patterson.  I believe it's A. Scott Patterson,

5   the first initial A.

6        Q.    Is it still just him and one other

7   person for the most part?

8        A.    No, sir.  They've got a couple of

9   more people there now.

10       Q.    When you were Supervisory Special

11   Agent at the BRF, who did you report to?

12       A.    The last supervisor was Unit Chief

13   William Kochzek.

14       Q.    And what unit was he the chief of?

15       A.    The Defensive Systems Unit.

16       Q.    Do you know how to spell Kochzek?

17   Because there's someone who's going to ask.

18       A.    K-O-C-H-Z-E-K.

19             MR. PORTER:  Just like it sounds.

20             THE WITNESS:  Common spelling.

21       Q.    And tell me again what was the unit

22   he was chief of.

23       A.    Defensive Systems Unit.

Page 32

1       Q.    About how many people worked in the

2    Defensive Systems Unit at the FBI when you were

3    there?

4       A.    I don't recall.  It encompassed the

5    gun vault personnel, the BRF, and then some

6    other support people.

7       Q.    Was it more than a hundred?

8       A.    No.

9       Q.    More than 20?

10      A.    Potentially.  I --

11      Q.    In that range, around 20?

12      A.    It's something -- yes, sir.

13      Q.    Thank you.  And what was your reason

14   for leaving the FBI?

15      A.    I wanted to spend time with my

16   father, and I was eligible to retire.  And I had

17   hit the pay cap, which meant I would never get

18   another raise.  There was no financial incentive

19   to stay in the government.  And life is too

20   short not to spend it with the people you care

21   about.

22      Q.    When you worked at the FBI, where

23   were you located?

DANIEL COURT REPORTING, INC.

Page 33

1          A.    The BRF was in Quantico, Virginia.

2     Prior to that, I was in New Haven, Connecticut.

3          Q.    What was your job when you were in

4     New Haven?

5          A.    I was a field agent.  And I was the

6     principal firearms instructor in charge of all

7     firearms training from the New Haven division.

8          Q.    [Redacted Personal Information]



18         A.    [Redacted Personal Information]

DANIEL COURT REPORTING, INC.

Page 34

1          Q.   Redacted Personal Information ██████ ██████

█     ██████          ██████  ██████  ██████  ██████  ████████

█     ██████       ██████  ██ ██████  ██████  ██████

█      ██████

█     ██████  ██████  ██████  ██████  ██████  ██████

█  ██████  ██████  ██████████  ██████████  ██████

█  ██████  ██████  ██  ██████  ██████████

8          Q.   I believe some of this, including

9     your home address could fairly be marked

10    confidential.

11               MR. PORTER:  It will be under the

12    protective order.

13               MR. KLEIN:  Yeah, okay.

14               MR. PORTER:  And I can't imagine that

15    anybody would come to your home with malice

16    aforethought anyway, Buford, knowing what they

17    know about you.

18               THE WITNESS:  I would pray they

19    wouldn't.

20          Q.   Redacted Personal Information ██████ ██████████ ██████████ ██████████ ██

█     ██████

█     ██████       ██████████  ██████████

█     ██████  ██████  ██████  ██████████

DANIEL COURT REPORTING, INC.

Page 35



DANIEL COURT REPORTING, INC.

Page 36





DANIEL COURT REPORTING, INC.

Page 38



Page 39

1       Redacted Personal Information

2            Q.    You understand the Massachusetts law

3       has a definition of large capacity magazines?

4            A.    I do.

5            Q.    What is that?

6            A.    I believe it was, as you said, over

7       ten rounds.  Which makes me question where the

8       number ten came from.

9            Q.    So explain what you mean by that.

10           A.    Explain what I mean by where the

11      number ten came from?

12           Q.    No, explain what you mean by your

13      rejection of the concept of large capacity

14      magazine?

15           A.    A large capacity magazine to me would

16      be one that held more ammunition than the

17      firearm was originally designed to hold.  For

18      example, if you have a handgun that was designed

19      to hold 15 rounds of ammunition, a 10-round

20      magazine would be a reduced capacity, a 15-round

21      magazine would be a standard capacity, and a

22      20-round magazine would be a large capacity.

23           Q.    So if you had a gun designed to hold

Page 40

1      a 15-round magazine, it would also equally well

2      hold a magazine of ten rounds, correct?

3           A.   Assuming the external dimensions were

4      the same, yes.

5           Q.   And would equally well hold a

6      magazine of 20 rounds, correct?

7           A.   Assuming the dimensions were

8      appropriate, but the 20-round mag would likely

9      stick out further than the firearm was

10     originally designed.

11          Q.   And the reality is you could get a

12     magazine for almost any gun in any of those

13     sizes that fit that particular gun, right?

14               MR. PORTER:  Object to the form of

15     the question.  But you can answer.

16          A.   They could be designed.  I don't

17     suspect all guns have those type magazines

18     already designed for them.  But yes, you could

19     even design a handgun to hold only one cartridge

20     in the magazine.

21          Q.   The gun would function the same

22     regardless of whether it had a 10 or 15 or

23     20-round magazine inserted in it, correct?

DANIEL COURT REPORTING, INC.

Page 41

1          A.    What do you mean by function?

2          Q.    It would fire until the magazine was

3     empty, right?

4          A.    Correct, as long as it didn't

5     malfunction.  But you would have to pull the

6     trigger for each shot.

7          Q.    Have you ever fired a machine gun?

8          A.    Yes.  By machine gun, I should ask,

9     do you mean belt fed or a box magazine?

10         Q.    I mean a gun that fires automatically

11    for today's purposes.  Is that okay?

12         A.    Yes.

13         Q.    We can use that definition?

14         A.    Yes, sir, I have.

15         Q.    In what capacity did you fire a

16    machine gun?

17         A.    In my capacity as FBI Special Agent,

18    as a firearms instructor, and also prior to that

19    when -- I don't remember where I was, but I was

20    allowed to go shoot with a police department and

21    they had some fully-automatic weapons.

22         Q.    You don't remember what police

23    department that was?

Page 42

1           A.    I think it was Tuscaloosa Police

2     Department.

3           Q.    About when was that?

4           A.    When I was in high school.  Oh, and I

5     fired with an Alabama State Trooper a machine

6     gun.

7           Q.    In what capacity did you do that?

8           A.    As a friend and he was training me on

9     firearms.

10          Q.    So is it fair to say you've had some

11    training in the use of machine guns?

12          A.    Yes, sir.

13          Q.    Can you describe the training?

14          A.    Standard FBI training.  I had

15    training from Sergeant Jim Collins when I was in

16    high school on how to handle a manipulating

17    control full-automatic fire and then in the FBI

18    standard firearms training.

19          Q.    Was that training helpful to you to

20    understand how to use a firearm?

21          A.    Yes.

22          Q.    Did you also have training on when

23    the use of an automatic firearm makes sense?

Page 43

1          A.    We had some training.  I also from my

2     training determined when use of a firearm --

3     when an automatic setting would make sense.

4          Q.    Was that FBI related training?

5          A.    Yes, sir, when I started training for

6     confrontations with human adversaries, that's

7     when that came about.

8          Q.    Are you a member of the National

9     Rifle Association?

10          A.    Yes, I am.

11          Q.    How long have you been a member?

12          A.    I don't recall.  But I became a life

13     member probably in the mid '80s, and I've

14     upgraded my membership a few times since then.

15          Q.    What does it mean to upgrade a life

16     membership?

17          A.    There are different levels, like

18     patron and benefactor.

19          Q.    What level are you at now?

20          A.    I believe I'm benefactor, but I'm not

21     positive.

22          Q.    What's required to be a benefactor of

23     the NRA?

1          A.    I think it's just paying your dues.

2     I believe, I'm not sure.

3          Q.    Higher level of dues?

4          A.    Yes, sir.

5          Q.    Do you know how much the dues are to

6     be a benefactor?

7          A.    I don't recall, no.

8          Q.    Is it in the thousands of dollars?

9          A.    Total, probably, if you add them all

10    together.  What you pay for life membership and

11    go to patron and go to benefactor, I believe it

12    would be.

13         Q.    Is it your understanding that the NRA

14    is paying the costs associated with this case?

15         A.    No, sir.

16         Q.    Meaning they're not paying the cost

17    or you don't know?

18         A.    Bradley, Arant, Boult, Cummings is

19    who paid me --

20         Q.    Who's paying your bills?

21         A.    -- in the previous case and I assume

22    paying me in this one, yes, sir.

23              MR. PORTER:  We'll see how you do

1      today.

2           Q.    What's your hourly rate for this
3      case?

4           A.    $700.

5           Q.    Have all your bills been paid up till
6      now?

7           A.    I've only submitted one invoice in
8      this case.  And there may be a check waiting in
9      the mailbox.  I'm not sure.

10          Q.    How large was the invoice?

11          A.    I don't recall.  I think it was
12     10,000 something.

13          Q.    About how many hours have you worked
14     on this case?

15          A.    I would have to do the math for you
16     to figure that out.  $700 an hour.

17          Q.    And you have no sense of who might be
18     paying Bradley, Arant for their representation
19     of the Plaintiffs in this case?

20          A.    You've just given me some sense of
21     it, but that would be logical to assume.

22          Q.    It would be logical to assume that
23     the NRA is paying Bradley, Arant for this case?

1           MR. PORTER:  Object to the form of

2       the question.  You can answer.

3           A.   They're the one that -- well, they're

4       one of the institutions that fight for our

5       constitutional rights, yes, sir, it would be

6       reasonable to believe that.

7           Q.   And when you said fight for our

8       constitutional rights, you mean Second Amendment

9       rights?

10          A.   Yes, sir.

11          Q.   So is it fair to say you would

12      support the NRA's views about what the Second

13      Amendment means?

14          A.   I'd say most of them.  I would have

15      to look at all of their views one by one to tell

16      you whether I support them all, but probably.

17          Q.   Are you aware of any views that the

18      NRA has expressed that you don't support?

19          A.   No, sir.

20          Q.   So everything you know about, you do

21      support?

22          A.   Yes, sir.

23          Q.   When you say fight for our rights,

1      you're including yourself among the people who

2      are fighting for those type of amendment rights?

3              A.    All citizens of the United States.

4              Q.    Have those rights?

5              A.    All citizens of the United States

6      have those rights unless they have done

7      something to give up those rights; for example,

8      if they've been convicted of a felony.

9              Q.    And do you consider yourself among

10     the people that are fighting for those rights?

11             A.    Yes, sir.  I fight for all

12     constitutional rights, whether I agree with them

13     or not.  It's part of the oath I swore.

14             Q.    But in particular, you've focused

15     your career since you left the FBI in fighting

16     for constitutional rights under the Second

17     Amendment, right?

18             A.    Yes, sir.

19             Q.    Thank you.  You've trained on all the

20     weapons that you were authorized to use at the

21     FBI?

22             A.    Yes, sir.

23             Q.    And was that a requirement at the FBI

Page 48

1      that you train on the weapon before you can use

2      it?

3              A.    Yes, sir.

4              Q.    Were you authorized to use AR-15s at

5      the FBI?

6              A.    Yes, sir.

7              Q.    Can you describe the training you had

8      on the AR-15?

9              A.    Well, we had function training and

10     accuracy training, how to reload it when it's

11     appropriate to select it, the terminal

12     ballistics of the ammunition that we used.

13             Q.    So is that five different things?

14     Function, training --

15             A.    I didn't count them.  But that --

16             Q.    Let's go back and have that read back

17     because I want to be sure I have a list so we

18     can go through them one at a time, if that's

19     okay.

20             A.    And that may not be all-inclusive.

21     General training would include everything;

22     storage of the firearm within the FBI policies,

23     deadly force training, which is not specific to

DANIEL COURT REPORTING, INC.

Page 49

1     any individual firearm.  It applies to all of

2     them.

3              MR. KLEIN:  So before we go any

4     farther, can we go off the record for just a

5     minute?

6              (Off-the-Record discussion)

7                (The desired portion was read by the

8                 court reporter)

9              MR. KLEIN:  Thank you.  Go back on

10    the record.

11        Q.   Can you describe what you mean by

12    function training?

13        A.   Yes, sir.  How the firearm functions,

14    how it operates, what to do when it doesn't

15    function, how to clear the malfunction and get

16    it back into operation.

17        Q.   And accuracy training?

18        A.   Accuracy so far as being able to

19    shoot it accurately, yes, sir.  Not the accuracy

20    capability of the firearm.

21        Q.   And that accuracy you're talking

22    about is shooting training, right?

23        A.   Yes, sir.

1          Q.    Practice shooting?

2          A.    Yes, sir.

3          Q.    Mostly at a range, right?

4          A.    Yes, sir.

5          Q.    About how many times did your

6    training require that you go to the range and

7    shoot an AR-15?

8          A.    Wow.  We qualified four times a year,

9    all agents qualified four times a year.  I

10   believe you were required to qualify with long-

11   arms twice a year.  So if you had an issue with

12   the AR-15 or personally owned AR-15, I believe

13   you're required to shoot it twice a year.  You

14   were encouraged to shoot it all four times a

15   year.  And that's training received as opposed

16   to training given, correct?

17         Q.    Yes.

18         A.    Yes, sir, I believe that's correct.

19   It's been a while.

20         Q.    And the reason for the FBI's

21   qualification requirements is to make sure that

22   people knew how to use their weapons and were

23   using them accurately?

DANIEL COURT REPORTING, INC.

1          A.    Correct.   To make sure you could

2     safely function it, that you were accurate with

3     it.   And in all firearms training or most

4     firearms training, we also included deadly force

5     training, defensive tactics training.   In the

6     field anyway, in Quantico, not necessarily.

7          Q.    So let's talk about deadly force

8     training.   We may want to come back to some of

9     the others, but let's skip ahead since it's come

10    up again.   What does deadly force training

11    consist of?

12         A.    When the FBI policy authorizes you to

13    utilize deadly force.   And the FBI policy, by my

14    understanding, is more restrictive than the

15    constitutional requirements.

16         Q.    In your mind there's constitutional

17    requirements that apply to when you can use

18    deadly force?

19         A.    Right.

20         Q.    So what are the FBI's requirements

21    for use of deadly force?

22         A.    Simplistically, in defense of self

23    and others.

Page 52

1      Q.   So you're simplifying a more

2   complicated policy?

3      A.   It's a longer policy and I don't

4   recall exactly what it was.  But you're allowed

5   to use deadly force in defense of yourself or

6   others to stop a threat of death or grievous

7   bodily harm to yourself or others.

8      Q.   And so would that apply, for example,

9   if you were going to engage in an assault on a

10  criminal's hideout?

11     A.   We call them raids.  And we go to a

12  criminal's hideout to arrest the criminal.  And

13  we would take as many agents as we thought we

14  could and we would try to overcome them with

15  speed and surprise and violence of action, such

16  as opening the door, in an attempt to not have

17  to use deadly force.

18     Q.   But the context that you might use

19  deadly force is if you felt at risk --

20     A.   Only --

21     Q.   -- in that raid, correct?

22     A.   Only defensively, only if we were

23  threatened.  Not offensively.

1          MR. PORTER:  Make sure that he

2     finishes his question before you answer.

3          THE WITNESS:  I'm sorry.

4          MR. PORTER:  We just don't want to

5     crosstalk.

6          Q.   It's hard sometimes.  It's an

7     interesting conversation, so I understand why --

8          A.   We don't do this every day.

9          Q.   You just did it again, for whatever

10     it's worth.  I don't mind that much, but the

11     reporter minds --

12          MR. PORTER:  You should be less

13     charming.

14          MR. KLEIN:  Now Jay has done it, too.

15          MR. PORTER:  I don't want to be left

16     out.

17          MR. KLEIN:  All right.  Let's do our

18     best not to talk over each other.  Although if

19     it happens, it happens.

20          Q.   So in the context of the raid, if you

21     felt endangered, you believe the FBI's policy

22     would be to allow you to use deadly force in

23     response, correct?

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 1133 of 1262
DANIEL COURT REPORTING, INC.

Page 54

1        A.    Correct.  If myself or others were

2    endangered.  It was not just endangering me,

3    it's myself or other innocents.

4        Q.    And so that might apply in the

5    context, say, of storming a compound where

6    hostages are held?  It's another form of raid

7    you might have engaged in at the FBI, right?

8        A.    I don't believe I did a hostage

9    rescue.

10       Q.    But the FBI might participate in

11   hostage rescues, right?

12       A.    Correct.

13       Q.    If they did, the same rule would

14   apply because there might be other people, the

15   hostages, who would be at risk, right?

16       A.    Correct.

17       Q.    Are you aware of any circumstances in

18   which civilians participated in a raid like

19   that?

20       A.    Not on the entry, no, sir.

21       Q.    And are you aware of any

22   circumstances where civilians participated in

23   raids with the FBI in any way?

1          A.    I don't have personal knowledge.  I

2     can suspect some instances where there might

3     have been biohazards where they may have taken

4     civilians in with them after the initial

5     securing of the area.

6          Q.    Civilians who were trained in

7     biohazards?

8          A.    Right.  Which would be part of the

9     raid in my mind.

10          Q.    But are you aware of circumstances

11     where the FBI authorizes civilians to use deadly

12     force to participate in a raid conducted by the

13     FBI?

14          A.    By civilian, what do you mean?

15          Q.    Someone who is not a law enforcement

16     officer of any kind.

17          A.    No.

18          Q.    Meaning no, that wouldn't happen?

19          A.    No.  I'm not aware of that happening,

20     no, sir.

21          Q.    Thank you.  So your training on the

22     AR-15 also included training on situations in

23     which use of that gun was most appropriate?

DANIEL COURT REPORTING, INC.

Page 56

1          A.    Yes.

2          Q.    Which part of the training program

3    was that?

4          A.    The firearms training.

5          Q.    General firearms training?

6          A.    Specifically with the AR-15.

7          Q.    But I think you mentioned something

8    that you referred to as appropriateness

9    training.  That's part of the general firearms

10   training, correct?

11         A.    Yes, sir.  In general firearms

12   training we talk about using the most effective

13   firearm and the one you're the most accurate

14   with.

15         Q.    And sometimes that would be the

16   AR-15?

17         A.    I can't imagine a situation where the

18   AR-15 wouldn't be more accurate than a handgun

19   or more effective than a handgun.

20         Q.    Can't imagine any situation at all?

21         A.    No, sir.  Having shot both many

22   times, I'm far more accurate with an AR-15.  I

23   don't know of anyone that can shoot a handgun

DANIEL COURT REPORTING, INC.

Page 57

1    more accurately than they can shoot the AR-15.

2    And with proper projectile selection, the

3    terminal ballistics are superior.

4         Q.    

DANIEL COURT REPORTING, INC.

Page 58





17        Q.    How fast can a typical individual

18    change an ammunition magazine?

19        A.    What do you mean by typical?  A

20    typical FBI agent or --

21        Q.    Give me a range of rates it would

22    take to change a magazine.

23        A.    Someone who has never seen the

Page 60

1     firearm, it might take minutes; whereas, anyone

2     who has received training should take a few

3     seconds.

4          Q.   Few being?

5          A.   Three.

6          Q.   Three?

7          A.   Or less.

8          Q.   Can you change a magazine in three or

9     less?

10          A.   I'm quite confident I can.

11          Q.   And does that depend on having the

12     magazine that you're swapping into the gun near

13     at hand?

14          A.   Well, of course.  If it was across

15     the room, it would take me longer.

16          Q.   So it would depend on where you have

17     the magazine stored, right?

18          A.   Correct.

19          Q.   It would take longer if the magazine

20     weren't at hand?

21          A.   Correct.

22          Q.   Where would you keep the magazine if

23     you intended to change it in that three or less

DANIEL COURT REPORTING, INC.

Page 61

1    time frame?

2         A.   Either in a magazine pouch on my belt

3    or in a pocket.

4         Q.   You would have to wear the magazine

5    pouch in order to have magazines available to

6    you on your person or put one in your pocket

7    before you picked up the gun, right?

8         A.   You could tuck it in your belt.  You

9    could do that after you pick up the firearm.

10        Q.   And you can reach into a pocket, pull

11   a magazine, take the magazine out of a gun and

12   put the new one in in three seconds or less?

13        A.   It depends on where the pocket is.

14   But I would assume so, yes.

15        Q.   And you can do that consistently?

16        A.   I believe I can, yes.

17        Q.   Is that based on training?

18        A.   I believe it is, yes.

19        Q.   And practice?

20        A.   Yes.

21        Q.   Not everyone has that training and

22   practice, right?

23        A.   I would assume they don't.

1        Q.    And it's possible when you change a

2    magazine to fumble it, correct?

3        A.    Of course it is.

4        Q.    And in that context, it would take

5    longer than three seconds, correct?

6        A.    Well, it depends on how badly you

7    fumbled it now, wouldn't it?

8        Q.    If you attempt to put it in the gun

9    and you don't hit the magazine port correctly,

10   it would take a little longer to get it locked

11   in place, right?

12       A.    Longer than if you hit it correctly.

13   But I can't say it would take longer than three

14   seconds.

15       Q.    Are you familiar with the device

16   called a bump stock?

17       A.    I am now.

18       Q.    When you say now, what do you mean?

19       A.    After the recent media.  I was aware

20   of bump stocks but had never handled one or

21   investigated how they functioned.  I have a more

22   thorough understanding of how they function now.

23       Q.    So when you say the recent media, you

1      mean media about the incident in Las Vegas,

2      right?

3              A.    Correct.

4              Q.    So prior to that incident in Las

5      Vegas, you were aware of the existence of bump

6      stocks?

7              A.    I was.

8              Q.    Redacted Personal Information

12             Q.    How did you become aware of the

13     existence of bump stocks?

14             A.    A friend of mine told me he had one

15     and he wanted to show it to me.

16             Q.    Did he show it to you?

17             A.    No.

18             Q.    Did he tell you what it did?

19             A.    He said it allowed him to fire

20     rapidly.

21             Q.    Do you have an understanding -- and

22     at some point since the media about the incident

23     in Las Vegas, have you actually used a bump

Page 64

1    stock yourself?

2         A.    No.

3         Q.    Have you seen a bump stock?

4         A.    Not physically in person.  I've seen

5    them on the news media and on the internet,

6    watched a video on YouTube.

7         Q.    What's your understanding about a

8    bump stock's function?

9         A.    They give you a shelf to place your

10   trigger finger on and that the stock and the

11   shelf itself reciprocates with the functioning

12   of the firearm.  You're required to push forward

13   with your support hand, so as you start, the

14   firearm is pulled back into your shoulder, you

15   slam your support hand forward, bringing the

16   trigger in contact with your trigger finger.

17   Based on the recoil, the firearm reciprocates

18   back and forth, bringing the trigger in contact

19   to your finger for each subsequent shot.

20        Q.    And does that allow a shooter who has

21   been trained or has used a bump stock to fire

22   more rapidly than you could typically fire with

23   a semi-automatic weapon?

1          A.    That's what they appear to show on

2     the video.  I would not want to comment on that

3     unless I'd actually fired one.

4          Q.    Did you also watch video of the Las

5     Vegas incident?

6          A.    Yes.

7          Q.    Did you hear the sounds of the

8     gunshots in that video?

9          A.    I did.

10         Q.    Was it your understanding that the

11    sounds of the gunshots in the video were more

12    rapid than typically could be fired with a semi-

13    automatic weapon?

14         A.    They sounded more rapid and more --

15    they had more longevity than you might expect.

16    They did not sound like someone placing shots

17    precisely.

18         Q.    So you would have no reason to

19    quarrel with the media report saying that the

20    shooter in Las Vegas used a bump stock with his

21    weapon?

22         A.    I would have no reason to quarrel

23    with that.  But the media reports have shown not

DANIEL COURT REPORTING, INC.

Page 66

1      to be correct.  They've gone back and corrected

2      themselves on a couple of issues.  I just don't

3      know until we see the actual facts.

4             Q.    What are you referring to

5      specifically?

6             A.    The security guard and the timing of

7      when he was shot by the subject.

8             Q.    But not the reports of the shooting

9      on the folks who were at the concert that day?

10            A.    I haven't looked into it

11     significantly, no, sir.

12            Q.    But you're not aware of corrections

13     that have been made to the way in which the

14     shooter attacked the individuals who were

15     attending that concert that evening?

16            A.    No, I'm not.

17            Q.    You're not aware?

18            A.    I'm not aware, no, sir.  I haven't

19     looked into it.  It was a horrible tragedy.  I

20     formed my own opinions about it and it's...

21            Q.    Is it your understanding that the

22     shooter in Las Vegas used one or more AR-15s in

23     connection with --

1          A.    That's what the media --

2          Q.    -- this incident?

3          A.    AR-15 type.  That's what the media

4     has said, yes, sir.

5          Q.    Do you have any reason to disagree

6     with that based on what you know?

7          A.    I do not.

8          Q.    Is it your opinion that civilians

9     should be allowed to modify their guns to use

10    bump stocks if they so choose?

11         A.    If they so choose.  I don't -- I

12    believe it's legal.  I may not like it, but I

13    believe it's legal.

14         Q.    You believe it is legal?

15         A.    I believe it is legal, yes, sir.

16         Q.    So there's nothing that restricts

17    civilians from using bump stocks with their guns

18    if they so choose?

19         A.    Not currently.

20         Q.    When you say you may not like it,

21    would you favor regulation of bump stocks?

22         A.    I'm not in favor of firing more

23    rapidly than you can acquire a target, which is

1      probably the reason that I rarely, if ever,

2      operate with the switch on full automatic.

3          Q.   Doesn't Las Vegas demonstrate that

4      you can acquire a target very quickly if the

5      target is in a large group of people?

6          A.   If the target is large enough, you

7      can acquire it quickly, of course.  That was a

8      very large target.

9          Q.   So does that mean that you would

10     favor allowance of use of bump stocks in

11     connection with targets like the crowd in Las

12     Vegas?

13              MR. PORTER:  Object to the form of

14     the question.  I'm not sure I understand the

15     question.

16         Q.   You can acquire targets very quickly

17     in a large crowd, correct?

18         A.   If the crowd is your target, the

19     larger the crowd, the easier it is to acquire.

20         Q.   So firing --

21         A.   That's a terrible thing to think

22     about and it's upsetting that you would look at

23     it that way.  It makes me wonder what you're

DANIEL COURT REPORTING, INC.

Page 69

1      thinking of doing.

2           Q.    What do you mean by that?

3           A.    You sound like you've contemplated

4      how to hurt people.

5                 MR. KLEIN:   Let's take a break.

6                 (Brief recess was taken from

7                 10:11 a.m. to 10:22 a.m.)

8           Q.    So we were talking about a device

9      called the bump stock before the break.  You

10     understand that there are civilians who own bump

11     stocks?

12          A.    It's been reported, yes, sir.

13          Q.    And they've properly bought them and

14     believed that they were legal, correct?

15          A.    Yes, sir.

16          Q.    And if they own them, they can use

17     them to increase the speed with which the AR-15

18     fires, right?

19          A.    That's my belief.

20          Q.    Are you familiar with a device called

21     a trigger crank?

22          A.    I am familiar with some devices that

23     you crank that hook to the trigger, but I don't

1    remember them being called trigger crank.  I

2    don't -- the name is not familiar to me.  But

3    I'm familiar -- I think I'm familiar with what

4    you're talking about.

5         Q.   Do you have a different name that you

6    use for that kind of device?

7         A.   I do not.

8         Q.   And do you understand how that -- and

9    is it okay if we call them trigger cranks?

10        A.   Sure.

11        Q.   And I think you said that they hook

12   to the trigger, correct?

13        A.   Trigger guard, I believe it is, not

14   the trigger.

15        Q.   They hook to the trigger guard?

16        A.   I believe so.

17        Q.   And is it your understanding that

18   those devices, if you turn the crank, will fire

19   more rapidly than you can fire the gun with your

20   finger alone?

21        A.   From the advertisements, that's what

22   it appears to be.  I've never examined one.

23        Q.   Have you ever used one?

1          A.    I've never seen one, no, sir.

2          Q.    And is it your understanding that

3    those kinds of devices are legal in the United

4    States?

5          A.    I believe so.  I've not looked into

6    it.  I've had no desire to own one.

7          Q.    Is it your understanding that people

8    do own them in the United States?

9          A.    Yes.

10         Q.    And if someone owns one of those

11   devices, is it true that they can use it to fire

12   the gun more rapidly than you can with your

13   finger alone?

14         A.    I would have to see the rate of fire

15   that allows you to attain to answer that

16   question.

17         Q.    Well, isn't the whole point of the

18   crank to pull the trigger rapidly?

19              MR. PORTER:  Object to the form of

20   the question.  You can answer if you know.

21         A.    You can make that assumption.  But

22   you would need to ask the designer of the

23   device.

Page 72

1          Q.    Are you familiar with a device called

2     an AutoGlove?

3          A.    No, sir.

4          Q.    Does the FBI issue guns to its agents

5     that they have not been trained on?

6          A.    No, sir.

7          Q.    And are there any circumstances in

8     which the FBI doesn't require re-qualification

9     on the gun that agents are trained on?

10         A.    Not that I'm aware of, no, sir.

11         Q.    And I think you said re-qualification

12    is two or four times a year, right?

13         A.    It's supposed to be.

14         Q.    And if someone doesn't re-qualify on

15    some sort of regular basis, what would happen?

16         A.    Unfortunately, historically nothing.

17         Q.    Meaning the FBI doesn't monitor as

18    well as it should?

19         A.    Correct.

20         Q.    So the requirement is in place, but

21    the FBI doesn't fully monitor it?

22         A.    Correct.

23         Q.    Would you expect law enforcement

1      officers of any kind to get guns that they

2      aren't trained on?

3            A.    No.

4            Q.    What's your understanding -- strike

5      that.

6                  What's your belief about the minimal

7      level of training that a law enforcement officer

8      should have to use a particular gun?

9            A.    It varies from jurisdiction to

10     jurisdiction, state to state.

11           Q.    I'm asking about your belief at this

12     time.

13           A.    My belief?  To show proficiency with

14     the firearm and an ability to maintain a level

15     of accuracy that meets the standards of the

16     jurisdiction in which you're operating.

17           Q.    So when you say a level of accuracy,

18     what you mean is that they shoot the gun,

19     presumably at a range, correct?

20           A.    That they qualify with the firearm.

21           Q.    Qualify means take the gun to the

22     range and fire at a target and establish that

23     you're hitting the target a suitable number of

1    times?

2         A.    Correct.

3         Q.    And would you expect that law

4    enforcement agencies would also train on the

5    suitability of the gun for particular purposes?

6         A.    It would be ideal if they would, yes.

7         Q.    And would you expect that they would

8    also train on the use of the gun in connection

9    with deadly force?

10         A.    Yes.

11         Q.    If someone knows how to use a

12    handgun, would they also be able to equally well

13    use an AR-15?

14         A.    It would depend on which handgun they

15    used.

16         Q.    Are there some handguns that you

17    think are adequate for someone to have an

18    understanding of how to fire a semi-automatic

19    rifle?

20         A.    Yes.

21         Q.    Which one?

22         A.    Some of the handguns that resemble an

23    AR-15, for example.  I don't recall the model

Page 75

1  numbers, but there are a number of handguns that

2  are very similar to AR-15s but they don't have

3  shoulder stocks.

4       Q.   And would you say if someone knows

5  how to fire a Glock that they equally well would

6  be able to use an AR-15?

7       A.   You would have to define equally

8  well.

9       Q.   Would they need additional training

10  to be able to fire an AR-15 accurately?

11       A.   It would depend on what other

12  training they had.

13       Q.   Suppose they had only been trained on

14  the Glock in this context?

15       A.   Potentially.

16       Q.   You would want them to have some

17  training on the long gun as well, correct?

18       A.   Ideally, you want people to have

19  training on everything.  But you simply asked if

20  they could shoot it.

21       Q.   There are circumstances in which

22  civilians can use weapons in a manner that's not

23  defensive, right?

DANIEL COURT REPORTING, INC.

Page 76

1        A.    Can you tell me what you're speaking

2    of?

3        Q.    Civilians could use weapons in a

4    criminal context, for example, right?

5        A.    They can.

6        Q.    And that wouldn't necessarily be a

7    defensive use, right?

8        A.    Correct.

9        Q.    They could use weapons, mistakenly

10   believing that they was using them defensively

11   when that's not really the case, right?

12       A.    I would assume so.

13       Q.    If someone is mentally deranged, they

14   might think they're firing defensively when

15   they're not, right?

16       A.    I'm not a psychologist.

17       Q.    It could happen, though, right?

18       A.    Of course.

19       Q.    So, let's go to Exhibit Number 2.  I

20   think you have it there in front of you.  I'll

21   ask you to look at the paragraph above the

22   heading Self-Defense, the one that starts, for

23   purposes of this discussion.  Do you see that?

Page 77

1        A.    Yes, sir.

2        Q.    So what it says is, for purposes of

3   this discussion, rifles similar to the AR-15,

4   despite their manufacturer or model variation,

5   will be referred to as AR-15 rifles.  Do you see

6   that?

7        A.    Yes, sir.

8        Q.    And then it says, they may also be

9   correctly referred to as modern sporting rifles;

10  is that right?

11       A.    Yes, sir.

12       Q.    Is it true that you would also use

13  the term "modern sporting rifles" to include

14  AK-47s?

15       A.    Yes, sir.  Or a variant of AK-47.

16       Q.    Is it true that you would also use

17  modern sporting rifles to cover the long guns

18  that are listed in Massachusetts law 140,

19  Section 121?

20       A.    Yes, sir.  There's a correction on

21  the AK-47.  It's semi-automatic versions of it.

22  I would not consider a fully-automatic AK-47 to

23  be a modern sporting rifle.

1          Q.   And what's your understanding of

2     where the term "modern sporting rifle" comes

3     from?

4          A.   I don't know where it came from.

5     It's been used in common language for quite some

6     time.

7          Q.   Since when?

8          A.   I don't recall.

9          Q.   Since you first trained on an AR-15?

10         A.   I would say probably in the last 15

11    years, but I don't know exactly when.

12         Q.   So 15 years would take us back to

13    about 2000 to 2002, more or less, right?

14         A.   Correct.

15         Q.   If you look at the first sentence

16    under the heading Self-Defense, it says, the

17    appearance of increasing violence, especially

18    home-invasion type crimes, has many citizens

19    concerned for the safety of themselves and their

20    family.  Do you see that?

21         A.   Yes, sir.

22         Q.   Do you consider that an expert

23    opinion or a personal opinion?

Page 79

1          A.    Both.

2          Q.    So do you feel that you are expert on

3    concerns of citizens about their safety?

4          A.    No, not in that context.

5          Q.    Do you have any knowledge of how many

6    home invasions took place in the United States

7    in the last five years?

8          A.    I do not.

9          Q.    In the last year?

10         A.    I do not.

11         Q.    In that sentence you use the term

12   "many" citizens.  Do you have any quantification

13   of the term "many" in that context?

14         A.    I would suspect "most" might be more

15   accurate than "many".

16         Q.    Do you have any quantification of the

17   term "most"?

18         A.    No, sir.

19         Q.    Do you have a basis for your

20   conclusion that most citizens are concerned for

21   the safety of themselves and their family in the

22   context of home-invasion type crimes?

23         A.    It would be difficult for me to

Page 80

1       understand how anyone would not be concerned for

2       their safety, particularly with the reports of

3       home invasions.

4           Q.   Are you talking about media reports?

5           A.   Yes, sir.  And in my experience there

6       are not large numbers of people that have

7       security forces to protect them.  Those people

8       may not be concerned.

9           Q.   Are you aware of any incidents in

10      which a assault weapon that's been defined by

11      Massachusetts was used in self-defense by a

12      citizen in Massachusetts?

13          A.   I am not.

14          Q.   Are you aware of any incidents

15      outside Massachusetts?

16          A.   I have heard of some, but I don't

17      recall where they occurred.

18          Q.   So you can't give me any specifics?

19          A.   No, sir.

20          Q.   Go to this first paragraph under the

21      heading Wound Ballistics.  It says, Americans

22      are exposed to violence, real or imagined, every

23      day.  It is reasonable to say that most

1    Americans witness far more imagined than real

2    violence.  What's the basis you have for that

3    statement?

4         A.   My belief that people see violence on

5    television and in the movies regularly.  And the

6    video games which I have seen or seen depictions

7    of, and the numbers of times that I suspect

8    people actually see real violence, which

9    thankfully, is less than you see every night on

10   TV.

11        Q.   So isn't it true that people can

12   avoid video games and the kinds of movies and

13   media that you're talking about?

14        A.   I believe they could.

15        Q.   So do you have a basis to say that

16   most Americans witness that type of violence in

17   the media?

18        A.   I know of very few people that don't

19   have televisions or don't watch TV or watch

20   movies.

21        Q.   But you don't know what they watch on

22   TV, do you?

23        A.   No, sir.

1          Q.   Don't have any basis to know that

2     they watch movies or images, right?

3          A.   Other than my opinion that that's

4     prolific in the entertainment industry.

5          Q.   You don't have any basis to believe

6     that most people Americans play violent video

7     games, do you?

8          A.   No, sir.

9          Q.   And it goes on to say, entertainment,

10    particularly television, movies and video games,

11    is replete with fantasy examples of firearm

12    effectiveness.  The fantasy can and does create

13    false expectations.  When you're talking about

14    false expectations, do you mean false

15    expectations about the stopping power of

16    weapons?

17         A.   Yes, sir.

18         Q.   Anything else?

19         A.   The effectiveness of the stopping

20    power or the ability to hit what you're shooting

21    at.

22         Q.   So does all this imagined violence

23    that you're talking about in this paragraph also

1       mean that some people have false expectations of

2       how much they might need a gun to defend

3       themselves?

4               A.    It could.

5               Q.    Let's turn to page to page 6 of your

6       report.

7               A.    (Witness complies).

8               Q.    It says, as misguided as it may be,

9       many decisions regarding firearms are founded on

10      myths.  Do you see that?

11              A.    Yes, sir.

12              Q.    Does that include what type of

13      firearm is appropriate to respond to a

14      particular situation?

15              A.    I would say it's more as to caliber

16      or cartridge selection is the way I meant that.

17              Q.    Does it also apply to the type of gun

18      people might select?

19              A.    It could.

20              Q.    If you go to the bottom of that page,

21      there's a reference to ammunition.  See it, it's

22      115 grain+P+9 millimeter.  Do you see that?

23              A.    Yes, sir.

Page 84

1      Q.   Is that a particular type of bullet?

2      A.   That is a cartridge.

3      Q.   A cartridge.  Is it a hollow-nose

4   cartridge?

5      A.   That one was, yes, sir.

6      Q.   So in the test that you participated

7   in, was that the only type of cartridge being

8   tested or were there other cartridges tested at

9   that same time?

10      A.   I think in that particular test, it

11   was that specific cartridge that we tested.

12      Q.   Were there controlled cartridges

13   being tested?

14      A.   No, sir.

15      Q.   Were there any reports made of the

16   results that you're talking about in this

17   paragraph?

18      A.   Yes, there were.

19      Q.   Are they written reports?

20      A.   Yes, they are.

21      Q.   Do you have copies of those reports?

22      A.   I don't think so.  I would have to go

23   back and see.  I didn't reference them for this

1      report.  That report would have been contained

2      on the CD ROM the FBI published.  And I believe

3      Massachusetts has a copy of that.

4             Q.    So would it be safe to say that one

5      of the reasons for this particular -- sorry.  Is

6      it safe to say that one of the reasons for this

7      particular result might have been that the

8      cartridge tested was a hollow-nose cartridge?

9             A.    Yes.

10            Q.    Go to the next page, page 7.

11            A.    (Witness complies).

12            Q.    First sentence of that first

13     paragraph under Law Enforcement says, average

14     citizens require, and are entitled to, the same

15     firearms, magazines, and ammunition as law

16     enforcement inasmuch as legally discharging a

17     firearm at another human being requires the same

18     litmus test; fear of death or grievous bodily

19     harm to yourself or another.  Do you see that?

20            A.    Yes, sir.

21            Q.    Do you consider that an expert

22     opinion or a personal opinion?

23            A.    It's a personal opinion, as I'm not

1          an attorney.

2               Q.   So you would consider this a legal

3          opinion?

4               A.   If it's the law.  If it's based on

5          law, it would be a legal opinion, yes, sir.

6               Q.   And when you say it's based on law,

7          you mean that they're entitled to the same

8          firearms as law enforcement, right?

9               A.   No, sir.  I'm saying the deadly

10         force, the ability to apply deadly force.

11              Q.   Fair enough.  But isn't it also true

12         that the question of what average citizens are

13         entitled to is a legal question?

14              A.   I would think it's a human question.

15         They're entitled to protect themselves just as

16         much as law enforcement officers are entitled to

17         protect themselves.

18              Q.   But the point is the question of

19         entitlement is a question under the Second

20         Amendment, right?

21              A.   Yes, I believe so.

22              Q.   And so you're offering an opinion on

23         what the Second Amendment entitles an average

Page 87

1      citizen to, right?

2            A.   Yes, sir.

3            Q.   Isn't it also true that law

4      enforcement officers use guns in different ways

5      than civilians from time to time?

6            A.   How do you mean?

7            Q.   Well, I think the examples we talked

8      about earlier serve here as well.  In the

9      context, for example, of a raid on a criminal

10     hideout, wouldn't a law enforcement officer be

11     using the gun in a different way than you would

12     expect a civilian to use a gun?

13           A.   I'm not sure I follow you.

14           Q.   If an officer brings a gun to a raid,

15     isn't that a different use of a gun than a

16     civilian would engage in?

17           A.   The presence of the firearm might be

18     used offensively.  But if the firearm is

19     discharged, it's used defensively.

20           Q.   Isn't that a reason for officers to

21     have a weapon that civilians might not also be

22     entitled to?

23           A.   Not in my opinion, no, sir.

DANIEL COURT REPORTING, INC.

Page 88

1       Q.   Because the civilians could also go

2   on a raid from time to time?

3       A.   No, sir.  Because a civilian having a

4   firearm in their presence might deter an

5   individual from attacking them.

6       Q.   So is there any limiting principle to

7   your opinion here?  Is there anything you think

8   the law enforcement officer should have that

9   civilians shouldn't?

10      A.   In terms of firearms?

11      Q.   Yes.

12      A.   No, sir.

13      Q.   In terms of magazines?

14      A.   No, sir.

15      Q.   Would it be true that if the military

16  started to release military weapons to law

17  enforcement officers again, as they did for a

18  period of time about a decade ago, that

19  civilians should also have access to those

20  weapons?

21      A.   What weapons are you speaking of?

22      Q.   I'm talking about machine guns, for

23  example.

DANIEL COURT REPORTING, INC.

Page 89

1      A.   I don't recall the military releasing
2  machine guns to law enforcement.
3      Q.   Is it the case that law enforcement
4  officers can acquire machine guns?
5      A.   Yes.
6      Q.   Is it your belief that civilians
7  should therefore also have access to machine
8  guns?
9      A.   It's my belief it's covered in the
10  Second Amendment.
11      Q.   Because the Second Amendment means
12  that civilians should have the same weaponry as
13  law enforcement officers?
14      A.   I don't think the Second Amendment
15  addresses law enforcement.
16      Q.   So I'm not sure I understand your
17  answer.
18      A.   I don't believe the Second Amendment
19  addresses law enforcement.  If I look at the
20  words in the Second Amendment, I don't see a
21  restriction on machine guns, although I have
22  recently had discussions that are making me
23  rethink that position.

DANIEL COURT REPORTING, INC.

Page 90

1          Q.    Discussions that are making you

2     rethink whether civilians should have access to

3     machine guns?

4          A.    Not whether they should, whether or

5     not the law allows it.

6          Q.    Does the law allow it?

7          A.    I believe it does and I believe it

8     did, other than the Gun Control Act.  By the

9     law, I mean the Second Amendment.

10         Q.    So what you mean is that with certain

11    restrictions, there are circumstances where guns

12    can get licensed on a machine gun under Federal

13    law?

14         A.    They are allowed now, yes, sir.

15         Q.    In certain very limited

16    circumstances, right?

17         A.    Limited by the availability, mostly.

18         Q.    Isn't it also limited by access to a

19    Federal license to carry a machine gun?

20         A.    No, sir.

21         Q.    Is it the case that some police

22    departments have access to flamethrowers?

23         A.    Not that I am aware of.

Page 91

1      Q.   If they did have access to

2  flamethrowers, should civilians also have access

3  to flamethrowers?

4      A.   You'd have to give me a definition of

5  flamethrower because I'm not sure that civilians

6  are restricted from owning them.

7      Q.   What's your understanding of what a

8  flamethrower is?

9      A.   A device that projects a flame

10  forward of a nozzle.

11      Q.   And it's your view that there's no

12  restrictions on civilian ownership of

13  flamethrowers?

14      A.   I am aware of weed-burning devices

15  that have a nozzle that projects a flame

16  forward.  And I've never looked into

17  flamethrowers, so I really don't know.

18      Q.   Do some SWAT teams have access to

19  grenades?

20      A.   What type of grenade?

21      Q.   Tactical grenades.

22      A.   What do you mean by tactical grenade?

23      Q.   I mean a grenade that would be used

DANIEL COURT REPORTING, INC.

Page 92

1      in connection with a raid, for example?

2           A.   By grenade, do you mean a handheld

3      device that is thrown and makes a loud noise and

4      a flash?

5           Q.   I mean a handheld explosive device

6      that is thrown and creates an explosion?

7           A.   The only grenades I am aware of that

8      law enforcement uses either expel chemical

9      agents as an irritant or they make a loud flash

10     and a loud sound, but they're not designed to

11     damage anything.

12          Q.   Should civilians also have access to

13     grenades that expel a chemical agent?

14          A.   I don't know if they're restricted or

15     not.  I've never thought about that.

16          Q.   Is it your belief that if law

17     enforcement officers have them that civilians

18     should have them as well?

19          A.   Sure.

20          Q.   And if law enforcement officers did

21     have access to grenades that create an explosion

22     when thrown, would your opinion be that

23     civilians should also have access --

Page 93

1          MR. PORTER:  I object --

2      Q.   -- to those grenades?

3          MR. PORTER:  I object to form of the

4      question.  You can answer.

5      A.   By explosion, do you mean an

6      explosion like a firecracker explosion or do you

7      mean explosion to damage?

8      Q.   Explosion to damage.

9      A.   No.

10     Q.   What's the reason that your statement

11     that average citizens are entitled to the same

12     firearms magazines and ammunition as law

13     enforcement, why doesn't that apply to grenades?

14     A.   I don't consider a grenade to be a

15     firearm or ammunition or a magazine.

16     Q.   Is it also because an explosive

17     grenade of the type we're talking about is

18     unreasonably dangerous?

19     A.   The type of explosive grenade that

20     causes destruction is unreasonably dangerous,

21     yes.  If it's just a noisemaker, it doesn't

22     cause destruction.

23     Q.   Do you know, as you sit here, whether

DANIEL COURT REPORTING, INC.

Page 94

1     all law enforcement officers agree with the

2     statement we've just been reviewing about what

3     average citizens are required and are entitled

4     to?

5          A.   Do I know if they all agree?

6          Q.   Uh-huh (positive response).

7          A.   I would assume they don't all agree.

8          Q.   Are there law enforcement officers of

9     an opinion that law enforcement should have

10    access to certain kinds of firearms, magazines

11    and ammunition that aren't available to average

12    citizens, right?

13         A.   I believe there are some, yes.

14         Q.   And that's because they would believe

15    that they can be effective guardians of public

16    safety, right?

17              MR. PORTER:  I object to the form of

18    the question.  But you can answer.

19         A.   I would not know why it would be.

20         Q.   Let's look at this sentence at the

21    bottom of the page.  It says, therefore, the

22    appearance of the firearm may be considered

23    offensive, but intentional discharge of the

1       firearm is strictly defensive.

2               A.   Okay.

3               Q.   Do you see that?

4               A.   Yes, sir.

5               Q.   Isn't it the case that the appearance

6       of the firearm has uses to a police force that

7       are different from the appearance of a firearm

8       to civilians?

9               A.   Can you clarify that?

10              Q.   That they might be using the

11      existence and appearance of a firearm to

12      apprehend suspects, for example?

13              A.   Citizens don't typically apprehend

14      suspects, but I know of times when it has

15      happened.

16              Q.   But isn't it the case that one of the

17      uses of a firearm by a police force is to

18      apprehend suspects, and it would be very rare

19      for citizens to use a firearm for that purpose?

20              A.   I don't think so.

21              Q.   You don't think so, meaning that it

22      isn't rare for citizens to use firearms to

23      apprehend suspects?

1      A.   I would believe citizens use them to

2   apprehend suspects far more than they shoot at

3   suspects.  In other words, if you catch someone

4   breaking in your house and you have a firearm

5   and they surrender and you call the police and

6   you've not discharged a firearm but it's mere

7   appearance has caused the subject to surrender.

8      Q.   So you're assuming a defensive

9   encounter in that context?  Don't police go out

10   and look for suspects from time to time?

11      A.   Yes, they do.

12      Q.   And civilians don't do that

13   typically, right?

14      A.   Correct.

15      Q.   Civilians also don't typically

16   participate in raids, the type we talked about

17   earlier, right?

18      A.   Not in my experience.

19      Q.   Isn't it possible that -- strike

20   that.  Let's go to page 8.

21      A.   (Witness complies).

22      Q.   I want to look at the paragraph

23   that's just above the heading Magazine Capacity.

1    It says, it could easily be argued that

2    fully-automatic rifles are appropriate for

3    defensive purposes as most federal and many

4    state and local enforcement agencies issue

5    fully-automatic rifles.  And it says, the FBI

6    actually had available for general issue a

7    carbine with the ability to fire two shots with

8    one trigger press.  Though these carbines were

9    being phased out, it is likely that there are

10   still examples being used by field agents.  Do

11   you see that?

12        A.   Yes, sir.

13        Q.   When you say it could easily be

14   argued, would you say you're arguing that here?

15        A.   I'd say I was making a statement.

16        Q.   Is your statement an opinion that

17   fully-automatic rifles should be available to

18   civilians?

19        A.   I'm not saying should be.  I believe

20   the Second Amendment says they're allowable.

21   Although, as I've said, I had discussions

22   recently that -- I'm not an attorney.  So I have

23   discussed with attorneys things like that.

Page 98

1          Q.   Is it your opinion that citizens

2     should have access to fully-automatic weapons?

3          A.   It's my opinion that they do already.

4          Q.   Is your statement in this paragraph

5     connected back to your belief that citizens

6     should have access to the same firearms,

7     magazines, and ammunition as law enforcement?

8          A.   It's more along the lines that it is

9     just as appropriate for citizens for

10    self-defense as it is for law enforcement for

11    self-defense.

12         Q.   Are you aware of any circumstances in

13    which a fully-automatic rifle was used for

14    self-defense by a civilian?

15         A.   I am not.  I've not studied that,

16    though.  And can I add to that?

17         Q.   Sure.

18         A.   Many times law enforcement officers

19    have used fully-automatic rifles for self-

20    defense.  But in most instances, they're not set

21    to fully automatic.  So full-automatic is not a

22    necessity.

23         Q.   So what you mean then is that the

Page 99

1      weapon has a fully-automatic capacity, but it's

2      being used as a semi-automatic weapon?

3           A.   Correct.

4           Q.   And that's because the setting on the

5      weapon, the safe setting is set to semi-

6      automatic rather than to fully-automatic, right?

7           A.   The fire selector is set to

8      semi-automatic.  In my experience, most law

9      enforcement, even if they have the capability

10     for fully-automatic, they use the firearm set on

11     semi-automatic.

12          Q.   We were talking earlier about the

13     events in Las Vegas in recent weeks.  Is it your

14     understanding that the shooter in that incident

15     had large capacity magazines?

16          A.   That was reported in the media.

17          Q.   What size were the magazines that

18     were reported in the media?

19          A.   I heard 60 and 100.

20          Q.   If the shooter had not had access to

21     60 or 100-round magazines but was rather limited

22     to 10-round magazines, do you think more people

23     would have escaped?

1          A.    Not necessarily.

2          Q.    Why not?

3          A.    Because it's my understanding that he

4     did not fire nearly as long as he had the

5     ability to fire.  In other words, he stopped

6     firing at some point long before he was -- he

7     wasn't arrested, but long before they found him,

8     long before they were physically able to stop

9     him, he stopped for some other reason.

10         Q.    So is it the case that when people

11    started to recognize that they were being fired

12    at in Las Vegas, they commenced running away?

13         A.    I would assume so.

14         Q.    And so isn't it the case that if the

15    shooter had been required to take the -- for

16    purpose of argument, take the three-second

17    interval to replace the magazines each time ten

18    rounds had fired, people might have been able to

19    run away before he stopped shooting?

20         A.    It's not fair for me to try to answer

21    that because I wasn't there.  But my opinion,

22    based on experiences, that there would have been

23    more than adequate time to fire more cartridges

1      than he did.

2            Q.   But people would have had that

3      additional time during the magazine changes to

4      get away from where the firing was aimed, right?

5            A.   I don't think there would have been

6      additional time.

7            Q.   Why not?

8            A.   I think he stopped long before.

9            Q.   But wouldn't they have been further

10     away, I mean, in each three second interval?

11     Assuming they could make two steps or maybe

12     three steps, wouldn't they have been farther

13     away or better protected from the firing?

14           A.   I wouldn't make that assumption with

15     a crowd of that size.  And the distances you're

16     talking about are marginal increases, two to

17     three steps over a distance of 400 yards or

18     whatever it was, I don't know the exact

19     distance.  But percentage wise, that's not much

20     gain in distance.

21           Q.   But people presumably who were close

22     to the exits might have been able to get out in

23     those intervals, right?

Page 102

1      A.    In three seconds, maybe one or two

2   people.

3      Q.    That's all the people that can fit

4   through an exit in three seconds?

5      A.    I don't know.

6           MR. PORTER:  Object to the form of

7   the question.

8      Q.    I'm a little baffled by the

9   statement.  I mean, certainly more than one or

10  two people can get out an exit in a period of

11  seconds, right?

12     A.    It depends on the size of the exit.

13  But potentially.

14     Q.    Thank you.  Other people could have

15  gotten closer to the exits and perhaps exited

16  during the next magazine change, right?

17     A.    I would assume so.

18     Q.    So I would ask you to review for

19  yourself, to refresh your recollection, the

20  section that you wrote on magazine capacity.  I

21  have some questions about it.

22           (Witness reviews the document)

23     A.    Yes, sir.

DANIEL COURT REPORTING, INC.

1          Q.    Is it fair to say that your opinions

2     in this section are based on choices about

3     magazine capacity made by the FBI and other law

4     enforcement officers?

5          A.    Yes, sir.

6          Q.    And does that mean that your opinion

7     here is based on that same belief that you

8     stated on page 7 about average citizens

9     requiring and being entitled to the same

10    firearms, magazines and ammunition as law

11    enforcement?

12         A.    Yes, sir.

13         Q.    And in your view, it's not relevant

14    that large capacity magazines might be misused

15    by individuals who want to kill or injure a lot

16    of people in a very short time?

17         A.    What do you mean?

18         Q.    Isn't it possible that there are

19    individuals who want a large capacity magazine

20    to use in a mass shooting?

21         A.    It is possible.

22         Q.    And do you discount the possibility

23    that the larger the magazine, the more people

1    that that individual might be able to kill?

2         A.    Might be able to wound or kill.

3         Q.    If you will turn to page 11.

4         A.    (Witness complies).

5         Q.    About three paragraphs from the

6    bottom of page 11 says, the FBI began making

7    AR-15 rifles more readily available following a

8    procurement action conducted jointly with the

9    DEA.  The DEA there is the Drug Enforcement

10   Agency, right?

11        A.    Yes, sir.

12        Q.    And it says, the contract was awarded

13   to Rock River, Colt and Sig Sauer in

14   approximately December of 2003.  All three of

15   those companies were making AR-15s to the FBI's

16   specifications, right?

17        A.    I believe the Sig Sauer was

18   different.  Not an AR-15 pattern, but it was

19   semi-automatic.

20        Q.    So why do you include it there in a

21   discussion about AR-15 rifles being more readily

22   available?

23        A.    Because the contract was awarded to

1      Sig Sauer, but we didn't purchase many of them.

2           Q.   And they weren't the AR-15s in your

3      opinion?

4           A.   They were more similar to a -- I

5      believe from memory, more similar to an AK-47

6      type.

7           Q.   So when the FBI used both Rock River

8      and Colt to produce AR-15s, were those guns

9      essentially the same?

10          A.   Yes, sir.

11          Q.   And were the parts on them

12     interchangeable?

13          A.   Some parts were.

14          Q.   The parts we talked about earlier?

15          A.   Yes, sir.

16          Q.   The next paragraph begins, FBI agents

17     routinely use AR-15s -- strike that.  I'm not

18     reading it correctly.

19               FBI agents routinely use AR-15 rifles

20     in arrest situations occurring in and around

21     common housing structures.  When the FBI uses

22     AR-15s in and around common housing structures,

23     is it FBI policy to evacuate those structures

Page 106

1    first?

2         A.    No, sir.

3         Q.    As best as possible?

4         A.    (Witness shakes head).

5         Q.    The FBI wouldn't recommend that

6    people leave the scene where they're about to

7    conduct a raid, for example?

8         A.    I've rarely, if ever, known of the

9    FBI to try to evacuate an apartment or a

10   building of all the other places other than the

11   one where the raid occurred.

12        Q.    What about people in and around the

13   structure, wouldn't they -- I'm sorry, not in or

14   around.  People who are not inside the

15   structure, would the FBI recommend to those

16   individuals that they leave the scene before

17   using an AR-15 in that context?

18        A.    No more so than using their handguns.

19        Q.    They wouldn't warn people to move

20   away from the scene of a raid?

21        A.    No more so than when using a handgun.

22        Q.    Would they do it in the context of a

23   handgun?

DANIEL COURT REPORTING, INC.

1          A.    If possible, if you could get people

2     away from the raid, but it's not always

3     possible.

4          Q.    And would they also do it in the

5     context of a raid conducted with AR-15s?

6          A.    With any firearm, yes, sir.

7          Q.    Would they also try to evacuate

8     apartments next to or on the same floor as an

9     apartment before they conducted a raid using any

10    handgun or rifle?

11         A.    I don't recall ever doing that, no,

12    sir.

13         Q.    So people would stay in the

14    neighboring apartments even if the raid was

15    about to be conducted and they could be safely

16    evacuated?

17         A.    I can't imagine the FBI choosing not

18    to evacuate them if they could safely evacuate

19    them.  But I don't recall in my career ever

20    evacuating people from adjacent apartments prior

21    to conducting a spontaneous -- or a planned

22    raid.

23         Q.    What's your understanding of the time

DANIEL COURT REPORTING, INC.

Page 108

1      period in which AR-15 rifles were developed?

2              A.    I believe back in the '60s.

3              Q.    1960s, right?

4              A.    Yes, sir.

5              Q.    They weren't available in 1900?

6              A.    No, sir.

7              Q.    Or before then, right?

8              A.    No, sir.

9              Q.    And they certainly weren't available

10     at the time the Constitution was written, right?

11             A.    Correct.

12             Q.    The guns at the time the Constitution

13     was written were very different, right?

14             A.    Yes, sir.

15             Q.    They were primarily flintlock muskets

16     and similar weapons, right?

17             A.    Muzzle-loading weapons, yes, sir.

18             Q.    None of them were semi-automatic,

19     right?

20             A.    No, sir.

21                   MR. KLEIN:  Let's go off the record a

22     second.

23                   (Off-the-Record discussion)

Page 109

1                    (Whereupon, Defendant's Exhibit 3

2                    was marked for identification and

3                    same is attached hereto.)

4          Q.   I'm going to show you a document

5     labeled Exhibit Number 3.  Would you take a look

6     at it and let me know if it's something that's

7     familiar to you.

8          A.   Yes, sir, I believe I recognize this.

9          Q.   Can you tell me what it is?

10         A.   I believe it's a statement I made on

11    Kolbe, the Kolbe case.  But I don't recall for

12    sure.

13         Q.   So what you think is that it's a

14    statement that you made and was filed in the

15    record in the Kolbe case, Kolbe versus Maryland,

16    right?

17         A.   I believe so, yes, sir, but I'm not

18    positive.

19         Q.   Is that your signature at the bottom

20    of page 8?

21         A.   Yes, sir, it is.

22         Q.   And the date on there is 3/16/2014?

23         A.   Yes, sir.

1          Q.    Does that refresh your recollection

2    that this was, in fact, something that was

3    provided in the Kolbe case?

4          A.    I believe it is, yes, sir.

5          Q.    As you look through it, is there

6    anything in there that you don't believe is

7    correct or true?

8                (Witness reviews the document)

9          A.    I have no reason to disagree with

10   anything I've written there, no, sir.

11         Q.    You had a chance to read through the

12   whole thing?

13         A.    Yes, sir.

14         Q.    And so your opinions on any of the

15   issues that you cover in this declaration are

16   still the same as they were at that time, right?

17         A.    Yes, sir.

18         Q.    I'd like to go to page 5.  Strike

19   that.  Paragraph 5.  Let's go by paragraphs at

20   this point.  It's easier.  So it says at the top

21   of that paragraph, it is notable that the

22   Defendants make use of high-ranking police

23   officers for many of their arguments.  It has

DANIEL COURT REPORTING, INC.

1    been my experience that law enforcement

2    executives typically have very little

3    understanding of wound ballistics and

4    appropriate firearms for law enforcement

5    purposes.  Do you see that?

6         A.   Yes, sir.

7         Q.   Is that still your opinion?

8         A.   Yes, sir.

9         Q.   And what's the basis for that

10   opinion?

11        A.   I conducted numerous live fire

12   demonstrations for FBI National Academy classes.

13   The National Academy is composed of high-ranking

14   police officers, administrative personnel.  And

15   in all of those demonstrations, the majority of

16   them seem to be surprised by what we showed them

17   were facts regarding firearms and ammunition,

18   the capabilities and the realities of how they

19   interacted with intermediate barriers.

20        Q.   Would it be fair to infer that

21   civilians have the same lack of understanding of

22   wound ballistics and appropriate firearms for

23   the choices that they make?

DANIEL COURT REPORTING, INC.

Page 112

1        A.    Probably.

2        Q.    Turn to paragraph 7.

3        A.    (Witness complies).

4        Q.    The middle of that paragraph says,

5    while it is accurate to say that law enforcement

6    uses firearms with magazines capable of holding

7    more than ten rounds in most arrests, it is

8    misleading to indicate that the actual magazine

9    capacity had anything to do with the success of

10   most of those arrests; similarly, the number of

11   incidents wherein a single officer has been

12   required to fire more than ten rounds is small.

13   Do you see that?

14       A.    Yes, sir.

15       Q.    Would you expect the same to apply to

16   civilian defensive uses of large capacity

17   magazines?

18       A.    Yes, sir.

19       Q.    Go to paragraph 13.  You say in

20   paragraph 13, the vast majority of law

21   enforcement actions end with no shots fired.  If

22   a situation ends with no shots fired, it cannot

23   be argued that a magazine capacity of greater

1    than ten rounds is necessary.  Similarly, when

2    the shots are fired, the number fired by

3    individual officers is typically less than ten;

4    therefore, there is little or no necessity for

5    law enforcement officers to have firearms with

6    magazine capacity greater than ten rounds.  Is

7    that your opinion?

8         A.   Yes.

9         Q.   It's still your opinion?

10         A.   Yes, sir.

11         Q.   Let's go back a little bit to

12    paragraph 11.  It says at the beginning of that

13    paragraph, Defendants' statements claiming the

14    banned rifles to be dangerous and unusual are

15    crafted to elicit emotional responses.  All

16    firearms are dangerous.  Is that opinion still

17    your opinion?

18         A.   Yes.

19         Q.   And would it also apply to the

20    Massachusetts case?

21         A.   Apply to all cases.

22         Q.   So your statement, all firearms are

23    dangerous is very absolute.  Isn't it the case

Page 114

1      that some firearms are more dangerous than

2      others?

3             A.    In what manner?

4             Q.    Dangerous to other humans.

5             A.    It's the projectile that's propelled,

6      not the firearm that's dangerous.

7             Q.    Doesn't the number of shots that can

8      be fired in a short period of time increase the

9      danger of a firearm to other humans?

10            A.    The number of projectiles that can be

11     discharged in a short period of time increases

12     the danger.

13            Q.    And when you say projectiles, you

14     typically mean bullets, right?

15            A.    Yes, sir, the actual item that is

16     propelled through the air.

17            Q.    Which is typically a bullet in most

18     contexts?

19            A.    Or a round shot, like a buckshot.

20            Q.    Fair enough.  Thank you.

21                  MR. KLEIN:  Let's take a break.

22                  (Brief recess was taken from

23                  11:18 a.m. to 11:29 a.m.)

Page 115

1              (Whereupon, Defendant's Exhibit 4

2                   was marked for identification and

3                   same is attached hereto.)

4         Q.    I'm going to show you a document

5    that's labeled Exhibit Number 4.  And I'm going

6    to represent to you before you review it that

7    this is a copy of the transcript of a deposition

8    that was taken in the case Kolbe versus

9    O'Malley, which we've been discussing from time

10   to time over the course of the morning.  And my

11   understanding is this is a deposition taken of

12   you, and the date was January 3rd, 2014.  Do you

13   remember having that deposition taken?

14        A.    Yes, sir.

15        Q.    Did you have an opportunity to review

16   the transcript after the deposition?

17        A.    I did.

18        Q.    Do you have any reason to believe

19   that on that date, you were not giving truthful

20   and responsive answers to the questions being

21   asked of you to the best of your ability?

22        A.    No, sir.

23        Q.    Meaning that you were under oath and

1      you were doing your best to answer truthfully?

2            A.   Yes, sir.

3            Q.   At the time that this deposition was

4      taken, you were represented by one of the

5      lawyers from the Bradley firm, right?

6            A.   Yes, sir.

7            Q.   That was John Parker Sweeney,

8      correct?

9            A.   Yes, sir.

10           Q.   Do you remember that he was there and

11     present with you?

12           A.   Yes, sir, I do.

13           Q.   Do you remember that the Bradley firm

14     represented the Plaintiffs in the Kolbe case?

15           A.   Yes, sir.

16           Q.   And in connection with that

17     deposition, you issued a report that was

18     discussed over the course of the deposition,

19     right?

20           A.   Yes, sir.

21           Q.   And I think you've already testified

22     that that report, but for additional material,

23     was very similar to the one you provided for the

1        Massachusetts case, right?

2               A.    Yes, sir.

3               Q.    And you had an opportunity to work

4        with a lawyer at the Bradley firm to prepare

5        yourself for that deposition, correct?

6               A.    Yes, sir.

7               Q.    And that would have been Mr. Sweeney,

8        right?

9               A.    Yes, sir.

10              Q.    So I'd like you to turn to page 95 of

11       this deposition.  And if you could, starting on

12       line 8 of page 95, could you read the questions

13       and answers all the way through page 101, line

14       9?

15                    MR. PORTER:  Read or read out loud?

16                    MR. KLEIN:  No, I just want him to

17       read to himself.

18              A.    What was the number?

19              Q.    You're welcome to put a line on here

20       so you know where I want you to start and stop.

21       Starting on page 95 at line 8 and going through

22       page 101, line 9.  If you would read that

23       material, I would appreciate it.

DANIEL COURT REPORTING, INC.

Page 118

1        (Witness reviews the document)

2        Q.   So if I asked you these same

3   questions as we sit here today, would you give

4   me the same answers?

5        A.   If they were asked exactly the same

6   way, yes, sir.

7        Q.   Would you turn to page 132?

8        A.   (Witness complies).

9        Q.   If you start with the question on

10   line 11 of page 132 and read to the next page,

11   133, line 8.

12        (Witness reviews the document)

13        A.   Okay.

14        Q.   And if I asked you these same

15   questions in the same words, would you answer

16   the same way?

17        A.   No, sir.

18        Q.   What would you change in your

19   answers?

20        A.   The last question, have you ever

21   heard of them functioning differently, the

22   10-round magazines as opposed to the 15, my

23   answer was no.  Since then, I have been told by

Page 119

1       a friend that some reduced-capacity magazines

2       did not function appropriately in the Glock

3       pistols.

4                Q.    Meaning that they didn't work right?

5                A.    The pistols malfunctioned.

6                Q.    Because the magazine was defective,

7       as far as you know?

8                A.    I was just told the magazine was the

9       only change and the pistol malfunctioned, so I

10      assumed it was because of the magazine, yes,

11      sir.

12               Q.    So they could have been faulty

13      magazines in that context?

14               A.    It was assumed that since the

15      magazine was the only variable that changed,

16      that the magazine itself was the cause.  Whether

17      it was a faulty magazine -- whether it was by

18      design or an individual piece.

19               Q.    Is it fair to say you've also heard

20      of 10-round magazines functioning correctly in

21      the Glock pistol?

22               A.    Yes.

23               Q.    Go to page 162.

Page 120

1        A.    (Witness complies).

2        Q.    If you would start at the top of that

3   page with line 1 and read through page 163, line

4   10, I have some questions about that.

5             (Witness reviews the document)

6        A.    Okay.

7        Q.    If I ask you these same questions,

8   would you answer the same way?

9        A.    For the most part.  There is what I

10  believe to be a typo or I misspoke on line

11  number 8.  I said 9-millimeter and a .223 would

12  be, I believe, 200 rounds.  That should be 200

13  yards.

14       Q.    Correct.  I made a note of that as

15  well.  I agree, that should be 200 yards.

16  Otherwise, your answers are, to the best of your

17  knowledge, the same now as they were then?

18       A.    Yes, sir.

19       Q.    You state here that civilians are

20  probably more likely than law enforcement

21  officers to miss their shots.  Is that right?

22       A.    Yes, sir.

23       Q.    Would that be even more true if the

Page 121

1      civilian was untrained on the gun that they were

2      firing?

3           A.    That's the basis for the opinion is

4      that they are more likely not as well trained as

5      the law enforcement officer.

6           Q.    And is it also true that there are no

7      qualification requirements for civilians such

8      that they probably spend less time qualifying on

9      the rifle in most instances?

10          A.    It would depend on the jurisdiction.

11     I believe for pistol permits, some jurisdictions

12     require a qualification.  But I'm not sure.

13          Q.    Require a qualification, but not a

14     regular re-qualification like a law enforcement

15     agency as we've discussed?

16          A.    Probably not.  I would have to look

17     at the individual jurisdiction.  It would not be

18     unusual for them to be required to qualified

19     less than the law enforcement officer is.

20          Q.    And is it your opinion that civilians

21     are less likely to have experience with the

22     firearm that allows them to hit what they're

23     aiming at?

1      A.    If looked at a large group, yes, sir.

2      Some civilians would have more experience.  But

3      overall a large group, yes, sir.

4          Q.    When you say overall, you mean an

5      average; is that a fair way to say it?

6          A.    Taken as the sum of the whole

7      civilian population, yes, sir.

8          Q.    Let's go back to page 59.  If you

9      would start on line 6 and read through the next

10     page, 60, line 5, I have some questions.

11              (Witness reviews the document)

12         A.    May I read further back for context?

13         Q.    Sure, whatever you would like to read

14     is fine for you to read.

15              (Witness reviews the document)

16         A.    Okay.

17         Q.    So we talked earlier very briefly

18     about AR-15s being chambered for slightly

19     different ammunition, right?

20         A.    (Witness nods head).

21         Q.    And what we were talking about then

22     is covered in this testimony, right, that there

23     are different kinds of ammunition that can be

DANIEL COURT REPORTING, INC.

Page 123

1      used in AR-15s provided they're properly

2      chambered, right?

3           A.   Yes, sir.  But there are also

4      cartridges chambered for an AR-15 that would not

5      be expected to penetrate soft body armor.

6           Q.   Okay.  The cartridges we're talking

7      about here, the .223 Remington, the 5.56 NATO

8      and the 7.62 NATO, those are all cartridges that

9      can be fired from an AR-15 provided the gun is

10     properly chambered for it?

11          A.   No, sir.

12          Q.   Why not?

13          A.   7.62 NATO would be an AR-10.  It's a

14     larger rifle.

15          Q.   Right.  And 7.62x39 millimeter is

16     what most AK-47s are chambered for?

17          A.   Yes, sir.

18          Q.   And all of those rounds can penetrate

19     soft body armor, right?

20          A.   Should be expected to, yes, sir.

21          Q.   So if you wanted to use body armor

22     for these rounds, you would put a plate in it?

23          A.   Yes, sir.

1          Q.    And it would be some sort of a metal

2     plate designed for the purpose, right?

3          A.    A plate designed for the purpose, not

4     necessarily metal.

5          Q.    And there is -- what other substances

6     could be used besides metal?

7          A.    Ceramic.

8          Q.    And there is body armor that's

9     designed to accommodate the plate that would

10    stop penetration of these rounds, right?

11         A.    That should.

12         Q.    Meaning you could slide the plate in?

13         A.    That should, yes, sir.

14         Q.    Not every example of soft body armor

15    has the proper pocket for it, but most of them

16    do, right?

17         A.    Well, by these rounds, you're lacking

18    specificity by quoting a cartridge -- a

19    chambering as opposed to an actual cartridge

20    loading.  For example, there are certain

21    projectiles that can be loaded in these

22    cartridges which have a greater propensity to

23    penetrate than others.

1          Q.   And in order to stop penetration of

2     those rounds, you would put in a metal or a

3     ceramic plate and you would incorporate that

4     into your body armor, right?

5          A.   We would incorporate a plate that was

6     tested to stop them.  We did not really specify

7     the material it was made of.

8          Q.   Turn to page 118, please.  If you

9     could read from page 118, line 17 through 120,

10    line 4, I have some questions.  And feel free to

11    read anything else you think would amplify your

12    understanding of what you're reading.

13               MR. PORTER:  What was the terminal

14    page and line?

15               MR. KLEIN:  120, line 4.

16          A.   Okay.

17          Q.   If I ask you these same questions

18    today, would you answer the same way?

19          A.   Can I ask to go off the record?

20          Q.   I'd prefer you answer the question

21    first and then we can go off the record.  Unless

22    you have a question that --

23          A.   For the most part.

1          Q.   When you say for the most part, is
2     there an answer that you would change?
3          A.   There might be a classified cartridge
4     I'm aware of that might violate some of what
5     I've specified there.
6          Q.   Is that the cartridge that you
7     describe at the top of page 119?
8          A.   Yes, sir.
9          Q.   And when you say it's classified,
10    does that mean it's in development and there's
11    no public knowledge of its development?
12         A.   There should be no public knowledge
13    of it.
14         Q.   I won't ask you any additional
15    questions about it then.
16         A.   Thank you.
17         Q.   If you will turn to page 170.
18         A.   Okay.
19         Q.   Can you read from the beginning of --
20    well, I'm sorry.  From line 3 of page 170
21    through line 22 of 172.
22              (Witness reviews the document)
23         A.   Okay.

1          Q.    So is it fair to say that your answer

2     in page 172, line 18 should say steal rather

3     than style?

4          A.    Yes, sir.

5          Q.    That's just a typo, right?

6          A.    Yes, sir.

7          Q.    If I ask you these questions, would

8     you answer the same way but for correcting that

9     typo?

10         A.    I believe so.

11              (Whereupon, Defendant's Exhibit 5

12               was marked for identification and

13               same is attached hereto.)

14         Q.    I'm going to show you an exhibit

15    that's labeled Exhibit Number 5.  Have you seen

16    this document before?

17         A.    Probably, but I don't recall.

18         Q.    I'm not going to ask you a lot of

19    detailed questions about it.  I want to look at

20    a chart with you and see if it's consistent with

21    your understanding of the questions the Army

22    offers opinions on.

23              MR. PORTER:  Can we go off the record

Page 128

1    real quick for a second?

2              MR. KLEIN:  Sure.

3              (Off-the-Record discussion)

4         Q.   On page 7-8 of this document.  It's a

5    section that begins, Rapid Semi-Automatic Fire.

6    Can you read to the place on 7-9 that says,

7    Modifications for Rapid Semi-Automatic Fire?

8              ((Witness reviews the document)

9         A.   Okay.

10        Q.   Do you have any reason to believe

11   that this is not an accurate description of how

12   the Army trains soldiers about use of guns that

13   can fire either automatically or semi-

14   automatically?

15        A.   I do not.

16        Q.   Are you aware that this is the Army's

17   policy about use of weapons that can fire either

18   semi-automatically or automatically?

19        A.   I'm not aware prior to reading this.

20        Q.   Do you have any reason to disagree

21   with anything that the Army says here?

22        A.   I have no basis to agree or disagree.

23        Q.   Okay.  Are you aware that soldiers

DANIEL COURT REPORTING, INC.

Page 129

1    are discouraged from using automatic fire except

2    for suppression and are normally encouraged to

3    use semi-automatic fire because it's more

4    accurate?

5        A.   I was not in the military, nor did I

6    participate in that type of training.  But it's

7    what the manual appears to say that you've shown

8    me.

9             (Whereupon, Defendant's Exhibit 6

10             was marked for identification and

11             same is attached hereto.)

12       Q.   I've given you an exhibit that's been

13   labeled Exhibit Number 6.  Is this document

14   familiar to you?

15       A.   I don't recall the cover sheet.  But

16   I believe I have seen the document behind it.

17       Q.   Did you have any involvement in

18   preparing the document?

19       A.   I do not believe that I did.

20       Q.   Is it possible that any of your

21   testing results were incorporated in the

22   document by you?

23       A.   I would need to read the whole

Page 130

1    document to know.

2          Q.    Okay, fair enough.  In particular, I

3    would like you to turn to page 37.

4          A.    Yes, sir.

5          Q.    Is Exhibit 7 test results that you

6    generated?

7          A.    I do not believe so, no, sir.

8          Q.    So you have a good deal of background

9    in the question of ballistics associated with

10   testing body armor; is that fair to say?

11         A.    Yes, sir.

12         Q.    You did a fair amount of testing of

13   body armor from time to time for the FBI?

14         A.    Yes, sir.

15         Q.    Can you explain how the different

16   classifications of body armor work?

17         A.    The NIJ established threat levels

18   based on a belief of the ability of different

19   projectiles at different projective velocities

20   to penetrate soft body armor.

21         Q.    And so they establish standards for

22   what type of body armor is necessary to protect

23   against projectiles of different types, right?

1          A.    They establish standards with that

2     end goal.  That was their goal, yes, sir.

3          Q.    So if you go to page 34 and 35 of

4     this document, do those accurately reflect the

5     standards as far as you know?

6          A.    The NIJ standards, yes, sir.

7          Q.    And are those standards that you

8     agree with for the most part?

9          A.    As a starting point, yes, sir.

10          Q.    So if you look at the standard for

11     Type III-A body armor, can you read that?

12          A.    High velocity -- oh, out loud or --

13          Q.    You can read it to yourself.  It's

14     fairly technical.

15               (Witness reviews the document)

16          A.    I read it.

17          Q.    Is that your understanding of what

18     Type III-A body armor does?

19          A.    For the most part, yes, sir.

20          Q.    Can you read the next paragraph about

21     Type III body armor?

22          A.    Yes, sir.

23               (Witness reviews the document)

Page 132

1          Q.    Is that your understanding of the

2     standard for Type III body armor?

3          A.    It is.

4          Q.    Is it fair to say that Type III body

5     armor prevents penetration of some projectiles

6     that Type III-A does not?

7          A.    Yes.

8          Q.    And what type of projectiles are

9     those, the ones listed here?

10         A.    Yes, sir.

11         Q.    And that means it's essentially more

12    protective body armor than Type III-A, right?

13         A.    Yes, sir.

14         Q.    And more protective than I think

15    anything in the Type I or Type II class, right?

16         A.    Correct.

17         Q.    And Type III-A body armor -- I'm

18    sorry.  Strike that.

19              Type III body armor is the type of

20    body armor that would typically be recommended

21    for an agent that's facing the threat of an

22    AR-15 type weapon, right?

23         A.    No, sir, I don't believe we had Type

Page 133

1      III.

2           Q.    Type III would protect against the

3      range of threats typically offered by an AR-15

4      type weapon, correct?

5           A.    Typically, yes, sir.

6           Q.    And Type III-A would not?

7           A.    Correct.

8                 MR. KLEIN:  All right.  At this point

9      I'd like to take a lunch break.  We're almost

10     done, but I don't want to represent how quickly

11     I can finish when I get back, only because I

12     haven't gone through these documents.

13                MR. PORTER:  Sure.

14                MR. KLEIN:  It's noon.  Take an hour

15     and a quarter just because I want to be sure I

16     have a fair chance to read through this.

17                MR. PORTER:  Absolutely.

18                MR. KLEIN:  And I don't think we're

19     going to be that long in the afternoon.  I think

20     we'll be done in time for you to get out of

21     Birmingham without too much traffic.

22                (Lunch recess was taken from

23                12:04 p.m. to 1:17 p.m.)

Page 134

1                    (Whereupon, Defendant's Exhibit 7

2                    was marked for identification and

3                    same is attached hereto.)

4          Q.    Let me show you Exhibit Number 7,

5     which is a document that I downloaded from the

6     internet which seems to quote you.  Do you

7     recognize the quote at the bottom of the page?

8          A.    Absolutely.

9          Q.    Is that something you've said?

10         A.    Yes, it is.

11         Q.    Do you want to read it out loud just

12    so we can talk about it, please?

13         A.    This is not a discussion about shot

14    placement.  Its importance has been evident

15    since men started to fling rocks at other men.

16    This is a discussion about improving the rock.

17         Q.    So was this discussion a discussion

18    you were present at?

19         A.    Where I made the quote?

20         Q.    Well, I'm not asking about the quote

21    just yet.  I'm just asking about this appears to

22    be related to a wound ballistics testing panel.

23                 MR. PORTER:  There's another side.

1        Q.   Yeah, I'm sorry.  It's a two-sided

2   document.  If you look at the other side, this

3   might help you remember what this is from.

4        A.   I was present when they had this

5   panel.  I don't believe I was a participant in

6   the panel.

7        Q.   And do you know where they took this

8   quote from?

9        A.   I've made that statement many times

10   during the course of my career when I was -- my

11   counsel was sought on wound ballistics and

12   projectile selection.

13        Q.   So there's a number of people whose

14   faces who are whited out of the picture here.

15        A.   Yes.

16        Q.   Is there a reason why their pictures

17   are not available?

18        A.   I didn't white their faces out.  But

19   I suspect that whoever put the picture did not

20   want those individuals identified.

21        Q.   Uh-huh (positive response).  And what

22   kind of gun do you see in the picture there?

23        A.   That -- because I was there when the

1        picture was taken, I know that to be a 6.8 SPC

2        Carbine.  And I believe it was a PRI, if I

3        remember correctly.  But I'm not positive on it

4        being a PRI.

5               Q.    And did you take the picture?

6               A.    No, sir, I did not.

7               Q.    But you were present when they were

8        taking it?

9               A.    Yes, sir.

10              Q.    And so I want to ask you just briefly

11       about what you meant by the statement that's at

12       the bottom of the page.  What does it mean to

13       improve the rock?

14              A.    If not for the bullet, no one would

15       be afraid of the gun.  And therefore, I was

16       telling them that we need to improve the

17       projectile to get performance.

18              Q.    Improve in what way?

19              A.    Improve it for its terminal

20       effectiveness to meet the goals that you want it

21       to meet.  And it was also made in regards to

22       quite frequently when discussing appropriate

23       cartridges, persons wanting to bring up

1    training.  And people will say we improve our

2    effectiveness by improving our training,

3    therefore, our shot placement gets better.  And

4    that statement was made to remind people that

5    we're not here to talk about training, we're

6    here to talk about improving projectile terminal

7    performance.

8         Q.    And when you say terminal

9    performance, do you generally mean stopping

10   power?

11        A.    That's not a term that I use.

12        Q.    What do you mean by terminal

13   performance then?

14        A.    Effectively damaging tissue to

15   physiologically make an aggressive subject cease

16   the actions he was committing which caused you

17   to shoot him in the first place.

18        Q.    So the concept there is if you hit

19   somebody, you want to stop that person?

20        A.    If you shoot anybody, you're trying

21   to stop them from doing something.  But we stop

22   shooting when they stop doing what they're

23   doing, whether we've shot them or not.

Page 138

1          Q.   Assuming we can further improve the

2     rock, as you state here, that improvement would

3     typically be available not just to law

4     enforcement but also to civilians and to

5     criminals, right?

6          A.   Yes.

7          Q.   All right.   One more.

8               (Whereupon, Defendant's Exhibit 8

9                was marked for identification and

10               same is attached hereto.)

11         Q.   I wanted to show you a document

12    that's been labeled Exhibit Number 8.   I'll

13    represent to you that I took this off the

14    internet.   It's from a site called

15    wethearmed.com.   Do you see that at the top?

16         A.   Yes, sir.

17         Q.   And it's from a thread called What is

18    Wrong with the FBI.   It appears to be that We

19    The Armed is a message board; is that right?

20         A.   I don't recall wethearmed.com.

21         Q.   It's not a message board you

22    participate in?

23         A.   It's not one that I recall

1      participating in.  I may have participated at

2      one time, but I don't -- I don't recall doing

3      so.  I can't say I haven't, but I don't recall

4      doing it.

5             Q.    That's fine.  If you would turn --

6      the pages are labeled in the bottom right.  If

7      you would turn to the page that's labeled 4-14.

8             A.    Okay.

9             Q.    And there's something that appears to

10     be a quote from you in the post by someone

11     called coyotesfan97.  It says from SSA Buford

12     Boone, recently retired supervisor of the FBI

13     BRF.  Do you see that?

14            A.    Yes, sir.

15            Q.    Could you read the quoted material

16     and tell me if it's an accurate quote?

17                  (Witness reviews the document)

18            A.    I believe it to be.  It looks like

19     something that I remember writing.

20            Q.    Is it something you wrote and

21     probably posted somewhere else?

22            A.    Yes, sir.

23            Q.    And the fellow who posted it here

1        picked it up and put it in the thread?

2              A.   Yes, sir.

3              Q.   But he accurately picked up what you

4        wrote on another forum of some kind?

5              A.   It appears so.  Without having the

6        other one to quote, it appears that he did.

7              Q.   Do you remember where you posted

8        this?

9              A.   Probably on lightfighter.net.

10             Q.   What is lightfighter.net?

11             A.   An internet forum.

12             Q.   What kind of an internet forum is it?

13       What's the general subject matter that you

14       addressed in lightfighter.net?

15             A.   Military law enforcement.

16             Q.   Military and law enforcement?

17             A.   Yes, sir.

18             Q.   And is that some place you post

19       regularly?

20             A.   Not regularly.  But I'm easy to find

21       because I post in my real name.

22             Q.   So do you remember the general

23       context of the discussion in which you posted

DANIEL COURT REPORTING, INC.

Page 141

1      this statement?

2            A.    Yes, sir.

3            Q.    Can you tell me?

4            A.    The FBI was switching to

5      9-millimeter, and I knew that was going to be

6      viewed with a jaundiced eye by many in the

7      firearms community.  And I wanted to ensure that

8      people knew that my replacement had my full

9      support, that it was something I had tried to do

10     in the past but I was unable to do it.

11           Q.    And what you're talking about there

12     is switching from .40 caliber to 9-millimeter

13     caliber ammunition, right?

14           A.    Yes, sir.  The FBI was using .40

15     caliber ammunition during my tenure.  And

16     because of the recoil associated with it, we

17     were forced to lower the velocity which then

18     also changed the terminal performance.  And I

19     lobbied hard and lost, that if we're going to

20     modify the .40 to be less effective than the 9,

21     we should just issue the 9-millimeter because

22     it's disingenuous of us to give the impression

23     that we're giving a better firearm when, in

DANIEL COURT REPORTING, INC.

Page 142

1      fact, all we're doing is giving less cartridges

2      available for defense of yourself.

3           Q.   At the bottom of the page what you

4      wrote is, so far as the more powerful cartridges

5      go, my personal opinion is that nobody should

6      even be allowed to carry them unless they're

7      able to consistently max out on the

8      qualification course.  Do you see that?

9           A.   Yes, sir.

10          Q.   And then it says, I'd far rather go

11     to work with a 98 to 100 percent agent carrying

12     a 9 than an 80 percent agent caring a .40 to

13     .45.  In that sentence, does 98 to 100 percent

14     mean the qualification score?

15          A.   Yes, sir.

16          Q.   And the 80 percent means a lower

17     qualification score?

18          A.   Yes, sir.

19          Q.   So you would prefer to be with an

20     agent who had a higher score with a 9-millimeter

21     caliber bullet than someone with a lower score

22     with a .40 caliber or a higher powered full

23     round, right?

DANIEL COURT REPORTING, INC.

Page 143

1      A.   Yes, sir.  The premise is you can't

2  miss fast enough to stop someone.  Anything you

3  can do to increase your ability to place the

4  shot on target.

5      Q.   So in general, does this reflect of

6  you that people should be required to qualify

7  with guns or ammunition prior to being able to

8  carry it and use it?

9           MR. PORTER:  Object to the form of

10  the question.

11      A.   This was specifically with regards to

12  law enforcement officers.

13      Q.   So does a different principal apply

14  to civilians?

15      A.   In a perfect world, I would prefer

16  everybody could shoot.  But I was only applying

17  that to law enforcement officers.

18      Q.   In the statement?

19      A.   Yes, sir.

20      Q.   And it's not a perfect world, right?

21      A.   Far from it.

22           MR. KLEIN:  I have no further

23  questions.

Page 144

1              MR. PORTER:  We have no questions.

2              (Off-the-Record discussion)

3              MR. PORTER:  Counsel for the

4     Plaintiffs designates the following information

5     is confidential pursuant to the protective order

6     entered in this case:  Mr. Boone's personal

7     identifying information, which would include his

8     home address; any discussion of Mr. Boone's

9     personal ownership of firearms; any discussion

10    of Mr. Boone's personal carry of firearms; and

11    any discussion of his personal firearms, that

12    would include any storage or keeping of his

13    firearms whether stored or not stored.  Buford,

14    is that satisfactory to you?

15              THE WITNESS:  Yes.

16              MR. KLEIN:  Agreeable.  Thank you.

17              (Deposition concluded at 1:31 p.m.)

18

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 145

1                         CERTIFICATE

2

3      STATE OF ALABAMA     )

4      AT LARGE             )

5                I hereby certify that the above and

6      foregoing deposition was taken down by me in

7      stenotype and the questions and answers thereto

8      were transcribed by means of computer-aided

9      transcription and that the foregoing represents

10     a true and correct transcript of the testimony

11     given by said witness upon said deposition.

12                I further certify that I am neither

13     of counsel nor of kin to the parties to the

14     action, nor am I in anywise interested in the

15     result of said cause.

16

17                    /s/ KATHY HART CANADAY, CCR, RPR

18                         Certified 10/26/2017

19                         Commissioner at Large

20                         ACCR 586, Expires 9/30/2018

21                         MY COMMISSION EXPIRES:

22                         2/20/2018

23

DANIEL COURT REPORTING, INC.

Page 146

1

2          Please read the enclosed transcript

3     and return to my office within 30 days.  It is

4     not necessary to correct punctuation.  NO

5     CHANGES ARE ALLOWED TO BE MADE TO THE

6     TRANSCRIPT, ONLY ON THE ERRATA SHEET PROVIDED.

7     Also, changes can only be made to your answer if

8     you feel it is not a correct word or name

9     spelling.  No other changes are to be made.

10    Please read and mail back to me as soon as

11    possible.

12

13               Thank You,

14               Kathy Hart Canaday, CCR, RPR

15               North Alabama Reporting Service

16               Post Office Box 2116

17               Cullman, AL 35056

18               (256)737-9770

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 147

1

2                         SIGNATURE

3

4           I, J. BUFORD BOONE, III, hereby

5     certify that I have read the transcript of my

6     deposition, and except for the corrections

7     listed below, certify that it is a true and

8     correct transcription.

9

10

11

12                        _____

13                        J. BUFORD BOONE, III

14

15

16

17

18

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 148

1

         As you read your deposition, if you have any
2    corrections to make, please itemize them below.
     Upon completion, please sign on this errata
3    sheet so that I can return it to the proper
     court.  However, if you do not have any
4    corrections to make, sign this form and return
     it to me within 30 days.  Thank you.

5

6

7              CHANGES MADE BY THE WITNESS:

8    PAGE  LINE    FROM            TO

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   DEPONENT_____   DATE_____

## A

**a.m** 1:15 69:7,7
114:23,23
**ability** 73:14 82:20
86:10 97:7 100:5
115:21 130:18
143:3
**able** 49:18 74:12
75:6,10 100:8,18
101:22 104:1,2
142:7 143:7
**absolute** 113:23
**Absolutely** 133:17
134:8
**Academy** 111:12
111:13
**access** 88:19 89:7
90:2,18,22 91:1,2
91:18 92:12,21,23
94:10 98:2,6
99:20
**accommodate**
37:16 124:9
**ACCR** 145:20
**accuracy** 48:10
49:17,18,19,21
73:15,17
**accurate** 51:2
56:13,18,22 79:15
112:5 128:11
129:4 139:16
**accurately** 49:19
50:23 57:1 75:10
131:4 140:3
**acquire** 67:23 68:4
68:7,16,19 89:4
**Act** 90:8
**acting** 5:2
**action** 52:15 104:8
145:14
**actions** 112:21
137:16
**actual** 66:3 112:8
114:15 124:19
**add** 19:12 44:9
98:16

**added** 13:1,2,9,12
13:18
**addition** 12:9 33:18
**additional** 13:5
18:17 19:5 75:9
101:3,6 116:22
126:14
**address** 5:18,23 6:3
6:5,7 34:7,9 144:8
**addressed** 140:14
**addresses** 89:15,19
**adequate** 74:17
100:23
**adjacent** 107:20
**administrative**
111:14
**adversaries** 43:6
**advertisements**
70:21
**aforethought** 34:16
**afraid** 136:15
**afternoon** 133:19
**agencies** 74:4 97:4
**agency** 104:10
121:15
**agent** 5:16,19,20
6:9 7:1,17 23:12
29:3 31:3,11 33:5
41:17 59:20 92:13
132:21 142:11,12
142:20
**agents** 50:9 52:13
72:4,9 92:9 97:10
105:16,19
**aggressive** 137:15
**ago** 15:14 88:18
**agree** 38:18 47:12
94:1,5,7 120:15
128:22 131:8
**Agreeable** 144:16
**agreed** 2:3,7
**ahead** 51:9
**aimed** 101:4
**aiming** 121:23
**air** 114:16
**AK-47** 38:1,3 77:15

77:21,22 105:5
**AK-47s** 77:14
123:16
**al** 1:4,7 146:17
**Alabama** 1:14,18
3:9 5:2,4 6:1,8
21:3,8 42:5 145:3
146:15
**all-inclusive** 48:20
**allow** 53:22 64:20
90:6
**allowable** 97:20
**allowance** 68:10
**allowed** 41:20 52:4
63:19 67:9 90:14
142:6 146:5
**allows** 71:15 90:5
121:22
**amendment** 46:8
46:13 47:2,17
86:20,23 89:10,11
89:14,18,20 90:9
97:20
**Americans** 80:21
81:1,16 82:6
**ammunition** 15:7
35:8 37:17 39:16
39:19 48:12 59:18
83:21 85:15 93:12
93:15 94:11 98:7
103:10 111:17
122:19,23 141:13
141:15 143:7
**amount** 130:12
**amplify** 125:11
**anatomy** 24:4,6
**animal** 23:20
**animals** 26:4,4,11
26:18 27:1
**answer** 8:2,11
13:22 16:3 17:8
17:10,17,18,19,21
18:1 24:22 25:7
25:17 26:1 34:2
40:15 46:2 53:2
57:10 71:15,20

89:17 93:4 94:18
100:20 116:1
118:15,23 120:8
125:18,20 126:2
127:1,8 146:7
**answers** 8:8 115:20
117:13 118:4,19
120:16 145:7
**anybody** 34:15
137:20
**anyway** 34:16 51:6
**anywise** 145:14
**apartment** 106:9
107:9
**apartments** 107:8
107:14,20
**Apologies** 16:20
**appear** 57:18 65:1
**appearance** 78:17
94:22 95:5,7,11
96:7
**appears** 10:20
70:22 129:7
134:21 138:18
139:9 140:5,6
**Application** 4:14
**applies** 49:1
**apply** 27:7 51:17
52:8 54:4,14
83:17 86:10 93:13
112:15 113:19,21
143:13
**applying** 143:16
**appreciate** 6:5
117:23
**apprehend** 95:12
95:13,18,23 96:2
**appropriate** 40:8
48:11 55:23 83:13
97:2 98:9 111:4
111:22 136:22
**appropriately**
119:2
**appropriateness**
23:1 56:8
**approximate** 27:22

27:23
**approximately**
15:12 23:22 29:21
104:14
**April** 27:20 28:2,12
**AR-10** 123:13
**AR-15** 33:19 35:6
35:16 48:8 50:7
50:12,12 55:22
56:6,16,18,22
57:1 67:3 69:17
74:13,23 75:6,10
77:3,5 78:9 104:7
104:18,21 105:19
106:17 108:1
123:4,9 132:22
133:3
**AR-15s** 33:11 35:2
35:3,15 37:21
48:4 66:22 75:2
104:15 105:2,8,17
105:22 107:5
122:18 123:1
**Arant** 1:16 3:6
44:18 45:18,23
**area** 55:5 58:8
**areas** 22:14
**argued** 97:1,14
112:23
**arguing** 97:14
**argument** 100:16
**arguments** 110:23
**Armed** 138:19
**armor** 4:14 123:5
123:19,21 124:8
124:14 125:4
130:10,13,16,20
130:22 131:11,18
131:21 132:2,5,12
132:17,19,20
**arms** 50:11
**Army** 127:21
128:12,21
**Army's** 128:16
**arrest** 52:12 105:20
**arrested** 100:7

**arrests** 112:7,10
**Ashburton** 3:15
**asked** 11:22 19:13
 75:19 115:21
 118:2,5,14
**asking** 7:9 73:11
 134:20,21
**assault** 14:23 52:9
 80:10
**assembly** 37:10
**assign** 2:11
**assigned** 28:17
**associated** 44:14
 130:9 141:16
**Association** 43:9
**assume** 6:16 8:16
 20:15 26:22 34:3
 35:13 44:21 45:21
 45:22 61:14,23
 76:12 94:7 100:13
 102:17
**assumed** 119:10,14
**assuming** 40:3,7
 96:8 101:11 138:1
**assumption** 71:21
 101:14
**attached** 9:1 10:13
 109:3 115:3
 127:13 129:11
 134:3 138:10
**attacked** 66:14
**attacking** 88:5
**attain** 71:15
**attempt** 52:16 62:8
**attending** 66:15
**attention** 9:10
**attorney** 13:6 17:18
 20:19 86:1 97:22
**attorneys** 97:23
**August** 30:2
**author** 14:21
**authored** 9:21 15:3
**authorized** 47:20
 48:4
**authorizes** 51:12
 55:11

**AutoGlove** 72:2
**automatic** 42:23
 43:3 65:13 68:2
 98:21 99:6 129:1
**automatically**
 41:10 128:13,14
 128:18
**availability** 90:17
**available** 61:5
 94:11 97:6,17
 104:7,22 108:5,9
 135:17 138:3
 142:2
**Avenue** 1:17 3:8
**average** 85:13
 86:12,23 93:11
 94:3,11 103:8
 122:5
**avoid** 81:12
**awarded** 104:12,23
**aware** 46:17 54:17
 54:21 55:10,19
 62:19 63:5,12
 66:12,17,18 72:10
 80:9,14 90:23
 91:14 92:7 98:12
 126:4 128:16,19
 128:23

**B**
**back** 9:13 10:22,22
 19:12 28:1 36:11
 48:16,16 49:9,16
 51:8 64:14,18
 66:1 78:12 84:23
 98:5 108:2 113:11
 122:8,12 133:11
 146:10
**background** 25:15
 30:21 130:8
**badly** 62:6
**baffled** 102:8
**bag** 57:16,17,19
**ballistic** 21:16
 23:13 30:12
**ballistics** 4:15

22:18,19 23:6,10
 25:14 26:5 27:14
 28:11,18 29:9
 48:12 57:3 80:21
 111:3,22 130:9
 134:22 135:11
**banned** 113:14
**barriers** 111:19
**based** 25:13 26:2
 30:21 61:17 64:17
 67:6 86:4,6
 100:22 103:2,7
 130:18
**basically** 13:17
**basis** 72:15 79:19
 81:2,15 82:1,5
 111:9 121:3
 128:22
**bed** 58:1,3,10,13
**bedroom** 57:20
 58:5
**bedrooms** 58:6
**began** 104:6
**beginning** 12:9
 113:12 126:19
**begins** 105:16
 128:5
**beings** 24:5
**belief** 69:19 73:6,11
 73:13 81:4 89:6,9
 92:16 98:5 103:7
 130:18
**believe** 6:1 13:1,14
 14:7,11,15,20
 15:1 19:15 20:6
 27:21 29:22 31:4
 33:22 34:8 36:8
 36:10 39:6 43:20
 44:2,11 46:6
 50:10,12,18 53:21
 54:8 61:16,18
 67:12,13,14,15
 70:13,16 71:5
 81:14 82:5 85:2
 86:21 89:18 90:7
 90:7 94:13,14

96:1 97:19 104:17
 105:5 108:2 109:8
 109:10,17 110:4,6
 115:18 120:10,12
 121:11 127:10
 128:10 129:16,19
 130:7 132:23
 135:5 136:2
 139:18
**believed** 69:14
**believing** 76:10
**belt** 41:9 61:2,8
**benefactor** 43:18
 43:20,22 44:6,11
**best** 53:18 106:3
 115:21 116:1
 120:16
**better** 101:13 137:3
 141:23
**bills** 44:20 45:5
**biohazards** 55:3,7
**Birmingham** 1:18
 3:9 133:21
**bit** 15:20 27:13
 28:7 113:11
**Blackout** 58:15,19
 59:1
**board** 138:19,21
**bodily** 52:7 85:18
**body** 4:14 123:5,19
 123:21 124:8,14
 125:4 130:10,13
 130:16,20,22
 131:11,18,21
 132:2,4,12,17,19
 132:20
**bolt** 37:3
**Boone** 1:10 4:11
 5:10,16,19,22 6:9
 7:17 22:4,7
 139:12 147:4,13
**Boone's** 4:8,9 144:6
 144:8,10
**Boston** 3:16
**bottom** 9:11 83:20
 94:21 104:6

109:19 134:7
 136:12 139:6
 142:3
**bought** 69:13
**Boult** 1:16 3:6
 44:18
**box** 5:23 6:4 41:9
 146:16
**Bradley** 1:16 3:6
 16:7 44:18 45:18
 45:23 116:5,13
 117:4
**brand** 33:15
**break** 8:18,20 69:5
 69:9 114:21 133:9
**breaking** 96:4
**BRF** 28:16 29:14
 30:18,19,23 31:11
 32:5 33:1 139:13
**Brief** 69:6 114:22
 122:17 136:10
**briefly** 20:23
 122:17 136:10
**bring** 9:16 10:1
 136:23
**bringing** 64:15,18
**brings** 87:14
**brought** 10:4 18:7
 30:22
**buckshot** 114:19
**Buford** 1:10 5:10
 5:22 34:16 139:11
 144:13 147:4,13
**building** 106:10
**built** 33:22 38:1
**bullet** 84:1 114:17
 136:14 142:21
**bullets** 114:14
**bump** 62:16,20
 63:5,13,23 64:3,8
 64:21 65:20 67:10
 67:17,21 68:10
 69:9,10
**business** 5:17,23
 21:9 22:6,8
**buttstocks** 36:23

## C

**C** 3:1
**Cadavers** 23:20
**caliber** 35:9 58:21
  83:15 141:12,13
  141:15 142:21,22
**California** 14:13
**call** 5:20 33:21
  52:11 70:9 96:5
**called** 12:19 34:20
  62:16 69:9,20
  70:1 72:1 138:14
  138:17 139:11
**Canaday** 1:12 5:1
  145:17 146:14
**Candice** 3:5
**cap** 32:17
**capabilities** 111:18
**capability** 49:20
  99:9
**capable** 112:6
**capacity** 14:14,19
  38:11,16,16,21,22
  39:3,13,15,20,21
  39:22 41:15,17
  42:7 96:23 99:1
  99:15 102:20
  103:3,14,19 112:9
  112:16,23 113:6
**carbine** 97:7 136:2
**carbines** 97:8
**care** 32:20
**career** 47:15
  107:19 135:10
**careful** 8:6
**caring** 142:12
**carrier** 37:3
**carry** 57:4,7,11,13
  57:15 90:19 142:6
  143:8 144:10
**carrying** 57:9
  58:14 142:11
**cartridge** 40:19
  83:16 84:2,3,4,7
  84:11 85:8,8
  124:18,19 126:3,6

**cartridges** 84:8,12
  100:23 123:4,6,8
  124:22 136:23
  142:1,4
**case** 1:5 7:12 10:19
  12:19 13:13,20
  14:6,18,22 15:6
  15:10,15,18,21
  16:1,16,22 17:1
  18:5,9,19 19:2,6
  22:16 44:14,21
  45:3,8,14,19,23
  58:22 76:11 89:3
  90:21 95:5,16
  100:10,14 109:11
  109:15 110:3
  113:20,23 115:8
  116:14 117:1
  144:6
**cases** 6:23 14:8,13
  15:2 38:22 113:21
**catch** 96:3
**cause** 5:6 59:7
  93:22 119:16
  145:15
**caused** 96:7 137:16
**causes** 93:20
**CCR** 145:17
  146:14
**CD** 85:2
**cease** 137:15
**ceramic** 124:7
  125:3
**certain** 13:14 23:1
  90:10,15 94:10
  124:20
**certainly** 102:9
  108:9
**certainty** 38:10
**CERTIFICATE**
  4:19 145:1
**Certified** 1:13 5:1
  145:18
**certify** 5:3 145:5,12
  147:5,7
**chain** 22:1

**challenging** 14:8
**chambered** 37:16
  122:18 123:2,4,10
  123:16
**chambering** 59:1
  124:19
**chance** 110:11
  133:16
**change** 59:18,22
  60:8,23 62:1
  102:16 118:18
  119:9 126:2
**changed** 119:15
  141:18
**changes** 12:23
  101:3 146:5,7,9
  148:7
**characterize** 38:1
**charge** 33:6
**charging** 37:6,7
**charming** 53:13
**chart** 127:20
**Chase** 6:7
**check** 37:4 45:8
**chemical** 92:8,13
**chief** 31:12,14,22
**choices** 103:2
  111:23
**choose** 67:10,11,18
**choosing** 107:17
**circumstances** 23:4
  24:2 54:17,22
  55:10 72:7 75:21
  90:11,16 98:12
**citizen** 80:12 87:1
**citizens** 47:3,5
  78:18 79:3,12,20
  85:14 86:12 93:11
  94:3,12 95:13,19
  95:22 96:1 98:1,5
  98:9 103:8
**Civil** 5:4
**civilian** 29:6 55:14
  87:12,16 88:3
  91:12 98:14
  112:16 121:1

122:7
**civilians** 54:18,22
  55:4,6,11 67:8,17
  69:10 75:22 76:3
  87:5,21 88:1,9,19
  89:6,12 90:2 91:2
  91:5 92:12,17,23
  95:8 96:12,15
  97:18 111:21
  120:19 121:7,20
  122:2 138:4
  143:14
**claiming** 113:13
**clarification** 38:19
**clarify** 38:15 95:9
**class** 132:15
**classes** 111:12
**classifications**
  130:16
**classified** 33:11
  126:3,9
**clear** 8:5 49:15
**clearer** 16:20
**close** 101:21
**closer** 102:15
**code** 6:2
**coincidence** 30:16
**Collins** 42:15
**Colorado** 14:18
**Colt** 33:18 35:6,16
  104:13 105:8
**Colwell** 19:16
**come** 34:15 51:8,9
**comes** 78:2
**commenced** 100:12
**comment** 65:2
**COMMISSION**
  145:21
**Commissioner** 5:3
  145:19
**committing** 137:16
**common** 31:20
  78:5 105:21,22
**Commonwealth**
  3:14 17:9,11,13
  17:17

**communications**
  9:20
**community** 141:7
**companies** 104:15
**complaint** 17:5,19
  17:23
**complete** 8:8,10
  10:18
**completion** 148:2
**complicated** 52:2
**complies** 11:17,21
  21:1 83:7 85:11
  96:21 104:4 112:3
  118:8 120:1
**composed** 111:13
**compound** 54:5
**computer-aided**
  145:8
**conceal** 57:13,14
  57:16
**concealed** 57:4
**concept** 39:13
  137:18
**concerned** 78:19
  79:20 80:1,8
**concerning** 14:23
**concerns** 79:3
**concert** 66:9,15
**concluded** 144:17
**conclusion** 79:20
**conditions** 26:15
**conduct** 106:7
**conducted** 23:2
  26:17 55:12 104:8
  107:5,9,15 111:11
**conducting** 26:3
  107:21
**confident** 60:10
**confidential** 34:10
  144:5
**confrontations**
  43:6
**confusing** 28:7
**connected** 98:5
**Connecticut** 33:2
**connection** 10:19

14:13,18,22 18:9
19:6 25:10 66:23
68:11 74:8 92:1
116:16
**connections** 14:5
**consider** 35:17 47:9
77:22 78:22 85:21
86:2 93:14
**considered** 94:22
**consist** 51:11
**consistent** 127:20
**consistently** 61:15
142:7
**Constitution**
108:10,12
**constitutional** 46:5
46:8 47:12,16
51:15,16
**contact** 64:16,18
**contained** 18:7
85:1
**contemplated** 69:3
**CONTENTS** 4:1
**context** 23:15,18
26:10,21 27:8
52:18 53:20 54:5
59:15 62:4 75:14
76:4 79:4,13,22
87:9 96:9 106:17
106:22 107:5
119:13 122:12
140:23
**contexts** 114:18
**contract** 30:18
104:12,23
**contractor** 29:15
29:16,17 30:9,20
**contractors** 30:10
30:14
**control** 42:17 90:8
**controlled** 26:20
84:12
**convenient** 57:15
**conversation** 53:7
**convicted** 47:8
**copies** 84:21

**copy** 10:18 85:3
115:7
**correct** 12:4 14:2
20:17 24:12,14,17
24:23 25:2,8
27:18 29:5 34:22
37:11 38:23 39:1
40:2,6,23 41:4
50:16,18 51:1
52:21 53:23 54:1
54:12,16 56:10
60:18,21 62:2,5
63:3 66:1 68:17
69:14 70:12 72:19
72:22 73:19 74:2
75:17 76:8 78:14
96:14 99:3 108:11
110:7 116:8 117:5
120:14 132:16
133:4,7 145:10
146:4,8 147:8
**corrected** 66:1
**correcting** 127:8
**correction** 77:20
**corrections** 66:12
147:6 148:2,4
**correctly** 62:9,12
77:9 105:18
119:20 136:3
**correspondence**
9:17
**cost** 44:16
**costs** 44:14
**counsel** 2:4,9,10
3:13 5:5 19:1
135:11 144:3
145:13
**count** 48:15
**country** 14:9
**couple** 8:4 31:8
66:2
**course** 11:12 60:14
62:3 68:7 76:18
115:10 116:18
135:10 142:8
**court** 1:1,13 5:2 7:5

7:7 19:7 24:19
25:4 49:8 148:3
**cover** 77:17 110:15
129:15
**covered** 89:9
122:22
**Covey** 6:7
**coyotesfan97**
139:11
**crafted** 113:15
**crank** 69:21,23
70:1,18 71:18
**cranks** 70:9
**create** 82:12 92:21
**creates** 92:6
**crimes** 78:18 79:22
**criminal** 6:22,23
7:11 52:12 76:4
87:9
**criminal's** 52:10,12
**criminals** 138:5
**cross-sections** 24:7
**crosstalk** 53:5
**crowd** 68:11,17,18
68:19 101:15
**Cullman** 146:17
**Cummings** 1:17
3:6 44:18
**currently** 67:19
**CV** 4:8 10:22 11:20
12:1,6 20:23
21:21

---
**D**

**damage** 92:11 93:7
93:8
**damaging** 137:14
**danger** 114:9,12
**dangerous** 93:18
93:20 113:14,16
113:23 114:1,4,6
**date** 2:6 5:3 109:22
115:12,19 148:23
**dated** 4:8,9,11
**DAVID** 1:4
**day** 1:15 27:23 28:1

53:8 58:18 66:9
80:23
**days** 146:3 148:4
**DEA** 104:9,9
**deadly** 48:23 51:4,7
51:10,13,18,21
52:5,17,19 53:22
55:11 74:9 86:9
86:10
**deal** 130:8
**dealing** 22:22
**dealt** 27:2
**death** 52:6 85:18
**decade** 88:18
**December** 104:14
**decisions** 83:9
**declaration** 4:9
110:15
**defective** 119:6
**defend** 83:2
**DEFENDANT**
3:11
**Defendant's** 8:22
10:11 109:1 115:1
127:1 129:9
134:1 138:8
**Defendants** 1:8
110:22
**Defendants'** 113:13
**defense** 51:22 52:5
98:20 142:2
**defensive** 31:15,23
32:2 51:5 75:23
76:7 95:1 96:8
97:3 112:16
**defensively** 52:22
76:10,14 87:19
**define** 75:7
**defined** 80:10
**definition** 38:19
39:3 41:13 91:4
**degree** 21:2,5,7
**degrees** 21:10
**demonstrate** 68:3
**demonstrations**
111:12,15

**department** 41:20
41:23 42:2
**departments** 90:22
**depend** 60:11,16
74:14 75:11
121:10
**depending** 58:17
**depends** 6:16 58:4
61:13 62:6 102:12
**depictions** 81:6
**deponent** 9:15
148:23
**deposed** 6:10,17
15:18
**deposition** 1:10 2:5
2:12,15 4:7,11
6:19 7:19 18:8,11
18:12,13 38:15
115:7,11,13,16
116:3,17,18 117:5
117:11 144:17
145:6,11 147:6
148:1
**depositions** 6:20
7:8,9
**deranged** 76:13
**describe** 22:14 23:5
27:11 42:13 48:7
49:11 126:7
**description** 4:6
128:11
**design** 40:19
119:18
**designates** 144:4
**designed** 38:21
39:17,18,23 40:10
40:16,18 57:18
92:10 124:2,3,9
**designer** 71:22
**desire** 71:6
**desired** 49:7
**despite** 77:4
**destruction** 93:20
93:22
**detailed** 127:19
**deter** 88:4

determined 43:2
developed 108:1
development
  126:10,11
device 62:15 69:8
  69:20 70:6 71:23
  72:1 91:9 92:3,5
devices 17:4 69:22
  70:18 71:3,11
  91:14
differences 35:14
different 30:10
  35:9 37:14,15,16
  37:19,20,22 43:17
  48:13 70:5 87:4
  87:11,15 95:7
  104:18 108:13
  122:19,23 130:15
  130:18,19,23
  143:13
differently 118:21
difficult 26:7 79:23
dimensions 40:3,7
direct 9:10 36:3,6
directed 9:15
director 22:7,10
disagree 67:5 110:9
  128:20,22
discharge 94:23
discharged 87:19
  96:6 114:11
discharging 85:16
discount 103:22
discouraged 129:1
discussed 97:23
  116:18 121:15
discussing 115:9
  136:22
discussion 7:16
  49:6 76:23 77:3
  104:21 108:23
  128:3 134:13,16
  134:17,17 140:23
  144:2,8,9,11
discussions 89:22
  90:1 97:21

disingenuous
  141:22
disregard 24:19
  25:4
distance 101:17,19
  101:20
distances 101:15
DISTRICT 1:1,2
division 33:7
doctor 19:14 25:1
document 4:12,13
  4:15,17 9:3,6
  10:14 11:1 12:4
  12:10 19:6 102:22
  109:4 110:8 115:4
  118:1,12 120:5
  122:11,15 126:22
  127:16 128:4,8
  129:13,16,18,22
  130:1 131:4,15,23
  134:5 135:2
  138:11 139:17
documents 10:1
  17:15 133:12
doing 69:1 107:11
  116:1 137:21,22
  137:23 139:2,4
  142:1
dollars 44:8
door 52:16
downloaded 134:5
Dr 19:16
Drug 104:9
dues 44:1,3,5
duly 5:11

——————
E
E 3:1,1
earlier 87:8 96:17
  99:12 105:14
  122:17
easier 11:10 68:19
  110:20
easily 11:7 97:1,13
easy 140:20
effective 56:12,19

94:15 141:20
Effectively 137:14
effectiveness 82:12
  82:19 136:20
  137:2
either 59:6 61:2
  92:8 128:13,17
electronic 9:20
electronically 9:8
elicit 113:15
eligible 32:16
embarrassing
  28:22
emotional 113:15
employed 5:22
employee 27:16
  29:7
employment 22:13
empty 41:3
enclosed 146:2
encompassed 32:4
encounter 96:9
encouraged 50:14
  129:2
endangered 53:21
  54:2
endangering 54:2
ends 112:22
enforcement 13:7
  20:16,20 55:15
  72:23 73:7 74:4
  85:13,16 86:8,16
  87:4,10 88:8,17
  89:2,3,13,15,19
  92:8,17,20 93:13
  94:1,8,9 97:4 98:7
  98:10,18 99:9
  103:4,11 104:9
  111:1,4 112:5,21
  113:5 120:20
  121:5,14,19 138:4
  140:15,16 143:12
  143:17
engage 52:9 87:16
engaged 54:7
Engineering 28:18

29:9
ensure 141:7
entail 21:8
entered 144:6
entertainment 82:4
  82:9
entitled 85:14 86:7
  86:13,15,16 87:22
  93:11 94:3 103:9
entitlement 86:19
entitles 86:23
entry 54:20
equally 40:1,5
  74:12 75:5,7
eradication 26:12
  27:1
errata 146:6 148:2
escaped 99:23
especially 78:17
essentially 14:1
  15:22 105:9
  132:11
establish 73:22
  130:21 131:1
established 130:17
et 1:4,7
evacuate 105:23
  106:9 107:7,18,18
evacuated 107:16
evacuating 107:20
evaluation 27:8
evening 66:15
events 99:13
everybody 143:16
evidence 2:12
evident 134:14
exact 28:1 33:20
  101:18
exactly 6:14 52:4
  78:11 118:5
examination 4:2
  5:7,14 24:3 26:4
examinations
  27:11
examine 23:14 27:5

examined 5:11
  23:16,18,20,23
  24:9 70:22
example 24:7 39:18
  47:7 52:8 74:23
  76:4 87:9 88:23
  92:1 95:12 106:7
  124:14,20
examples 82:11
  87:7 97:10
executives 111:2
exhibit 8:22 9:3
  10:11,15 16:18,18
  16:23 76:19 109:1
  109:5 115:1,5
  127:11,14,15
  129:9,12,13 130:5
  134:1,4 138:8,12
EXHIBITS 4:5
exist 30:23
existence 63:5,13
  95:11
exit 102:4,10,12
exited 102:15
exits 101:22 102:15
expect 65:15 72:23
  74:3,7 87:12
  112:15
expectation 19:4,9
expectations 82:13
  82:14,15 83:1
expected 123:5,20
expel 92:8,13
experience 25:13
  26:2,3 80:5 96:18
  99:8 111:1 121:21
  122:2
experiences 100:22
experiments 26:18
expert 6:19 14:10
  16:23 25:14 78:22
  79:2 85:21
expertise 22:15
Expires 145:20,21
explain 16:15 39:9
  39:10,12 130:15

explosion 92:6,21
  93:5,6,6,7,8
explosive 92:5
  93:16,19
exposed 80:22
expressed 46:18
extent 24:18 25:3
external 22:18 40:3
extremely 22:21
eye 141:6

**F**

faces 135:14,18
Facility 21:16
  23:13 27:15 28:11
facing 132:21
fact 110:2 142:1
facts 66:3 111:17
fair 6:9,15 7:17
  11:23 12:13 13:2
  42:10 46:11 86:11
  100:20 103:1
  111:20 114:20
  119:19 122:5
  127:1 130:2,10,12
  132:4 133:16
fairly 34:9 131:14
fall 27:21
false 82:13,14,14
  83:1
familiar 19:17
  62:15 69:20,22
  70:2,3,3 72:1
  109:7 129:14
family 21:23 78:20
  79:21
family-owned 22:8
fan 36:11
fantasy 82:11,12
far 36:9 49:18
  56:22 81:1 96:2
  119:7 131:5 142:4
  142:10 143:21
farm 58:8,12,18
farther 49:4 101:12
fast 59:17 143:2

father 32:16
faulty 119:12,17
favor 67:21,22
  68:10
FBI 22:13 23:13
  29:3 32:2,14,22
  41:17 42:14,17
  43:4 47:15,21,23
  48:5,22 51:12,13
  54:7,10,23 55:11
  55:13 59:20 72:4
  72:8,17,21 85:2
  97:5 103:3 104:6
  105:7,16,19,21,23
  106:5,9,15 107:17
  111:12 130:13
  138:18 139:12
  141:4,14
FBI's 27:14 50:20
  51:20 53:21
  104:15
fear 85:18
fed 41:9
federal 1:17 3:7
  90:12,19 97:3
feeding 17:4
feel 79:2 125:10
  146:8
fellow 139:23
felony 47:8
felt 52:19 53:21
field 26:14,22 33:5
  51:6 97:10
fifteen 6:13,15
fight 46:4,7,23
  47:11
fighting 47:2,10,15
figure 45:16
file 9:16 10:7 18:7
filed 109:14
filing 2:15
financial 32:18
find 140:20
fine 34:3 122:14
  139:5
finger 64:10,16,19

70:20 71:13
finish 7:2 19:13
  133:11
finishes 53:2
fire 35:11 41:2,15
  42:17 63:19 64:21
  64:22 70:18,19
  71:11,14 73:22
  74:18 75:5,10
  97:7 99:7 100:4,5
  100:23 111:11
  112:12 128:5,7,13
  128:17 129:1,3
firearm 17:4 39:17
  40:9 42:20,23
  43:2 48:22 49:1
  49:13,20 56:13
  60:1 61:9 64:12
  64:14,17 73:14,20
  82:11 83:13 85:17
  87:17,18 88:4
  93:15 94:22 95:1
  95:6,7,11,17,19
  96:4,6 99:10
  107:6 114:6,9
  121:22 141:23
firearms 15:4 17:3
  22:17,20,22 23:3
  23:4 26:3,7 30:20
  33:6,7 34:6 35:1
  38:20 41:18 42:9
  42:18 51:3,4 56:4
  56:5,9,11 83:9
  85:15 86:8 88:10
  93:12 94:10 95:22
  98:6 103:10 111:4
  111:17,22 112:6
  113:5,16,22 114:1
  141:7 144:9,10,11
  144:13
Fireball 58:22
firecracker 93:6
fired 41:7 42:5 65:3
  65:12 100:11,18
  112:21,22 113:2,2
  114:8 123:9

fires 41:10 69:18
firing 67:22 68:20
  76:14 100:6 101:4
  101:13 121:2
firm 16:5,7 116:5
  116:13 117:4
first 5:11 11:15
  20:23 29:23 31:5
  78:9,15 80:20
  85:12,12 106:1
  125:21 137:17
fit 37:5 40:13 102:3
five 7:13 34:4 48:13
  79:7
flame 91:9,15
flamethrower 91:5
  91:8
flamethrowers
  90:22 91:2,3,13
  91:17
flash 37:1 92:4,9
fling 134:15
flintlock 108:15
floor 3:15 107:8
focused 47:14
folks 66:9
follow 87:13
following 5:7 104:7
  144:4
follows 5:12
force 48:23 51:4,7
  51:10,13,18,21
  52:5,17,19 53:22
  55:12 74:9 86:10
  86:10 95:6,17
forced 141:17
forces 80:7
foregoing 5:5 145:6
  145:9
foregrips 36:21
form 13:21 16:2
  24:21 25:6,16,23
  38:12 40:14 46:1
  54:6 68:13 71:19
  93:3 94:17 102:6
  143:9 148:4

formed 66:20
forth 64:18
forum 140:4,11,12
forward 8:5 64:12
  64:15 91:10,16
found 100:7
founded 83:9
four 12:10 50:8,9
  50:14 72:12
four-year 21:5
frame 61:1
Francisco 15:6
free 24:19 25:4
  125:10
frequently 136:22
friend 42:8 63:14
  119:1
front 76:20
FTU 28:11
full 5:17 28:15 68:2
  141:8 142:22
full-automatic
  42:17 98:21
full-time 27:16
  28:16
fully 72:21 98:21
fully-automatic
  41:21 77:22 97:2
  97:5,17 98:2,13
  98:19 99:1,6,10
fumble 62:2
fumbled 62:7
function 22:23 29:8
  35:5 40:21 41:1
  48:9,14 49:12,15
  51:2 62:22 64:8
  119:2
functioned 62:21
functioning 64:11
  118:21 119:20
functions 49:13
further 2:7,14 40:9
  101:9 122:12
  138:1 143:22
  145:12

## G

gain 101:20
games 81:6,12 82:7
  82:10
Gary 3:12
gas 36:3,6
general 13:4 17:18
  21:7 22:17,20
  25:14 48:21 56:5
  56:9,11 97:6
  140:13,22 143:5
General's 13:6
  20:19
generally 137:9
generated 130:6
give 5:21 8:11
  10:14 16:21 47:7
  59:21 64:9 80:18
  91:4 118:3 141:22
given 45:20 50:16
  129:12 145:11
giving 6:4 115:19
  141:23 142:1
Glock 57:8 58:11
  75:5,14 119:2,21
go 7:14 8:5 9:13
  10:7 12:14 20:22
  36:11 41:20 44:11
  44:11 48:16,18
  49:3,4,9 50:6
  52:11 76:19 80:20
  83:20 84:22 85:10
  88:1 96:9,20
  108:21 110:18,19
  112:19 113:11
  119:23 122:8
  125:19,21 127:23
  131:3 142:5,10
goal 131:2,2
goals 136:20
God 59:13,16
goes 82:9
going 7:23 8:15 9:2
  19:5 31:17 36:2
  52:9 109:4 115:4
  115:5 117:21

127:14,18 133:19
  141:5,19
good 5:16 130:8
gotten 102:15
government 32:19
grain+P+9 83:22
greater 112:23
  113:6 124:22
grenade 91:20,22
  91:23 92:2 93:14
  93:17,19
grenades 91:19,21
  92:7,13,21 93:2
  93:13
grievous 52:6 85:18
grips 36:22
groove 37:3
grounds 2:11
group 22:2 68:5
  122:1,3
guard 66:6 70:13
  70:15
guardians 94:15
Guide 4:14
gun 14:9 32:5 33:8
  35:18,19,22 36:4
  36:10 39:23 40:12
  40:13,21 41:7,8
  41:10,16 42:6
  55:23 57:4,11,13
  58:10,13 60:12
  61:7,11 62:8
  70:19 71:12 72:9
  73:8,18,21 74:5,8
  75:17 83:2,17
  87:11,12,14,15
  90:8,12,19 121:1
  123:9 135:22
  136:15
guns 25:15 33:10
  35:4 36:4,7,15
  37:23 40:17 42:11
  57:20 58:2 67:9
  67:17 72:4 73:1
  77:17 87:4 88:22
  89:2,4,8,21 90:3

90:11 105:8
  108:12 128:12
  143:7
gunshot 24:5,10
gunshots 65:8,11

## H

half 15:14
hand 10:6 60:13,20
  64:13,15
handgun 39:18
  40:19 56:18,19,23
  57:15 58:14 74:12
  74:14 106:21,23
  107:10
handguns 74:16,22
  75:1 106:18
handheld 92:2,5
handle 42:16
handled 62:20
handles 37:6,7
handwritten 9:18
happen 15:9 55:18
  72:15 76:17
happened 95:15
happening 55:19
happens 53:19,19
hard 53:6 141:19
harm 52:7 85:19
Hart 1:12 5:1
  145:17 146:14
Haven 33:2,4,7
head 24:7 106:4
  122:20
heading 76:22
  78:16 80:21 96:23
HEALEY 1:7
hear 65:7
heard 80:16 99:19
  118:21 119:19
held 39:16 54:6
help 135:3
helpful 42:19
hereto 9:1 10:13
  109:3 115:3
  127:13 129:11

134:3 138:10
hideout 52:10,12
  87:10
hiders 37:2
high 42:4,16
  131:12
high-ranking
  110:22 111:13
higher 44:3 142:20
  142:22
hired 29:14 30:17
historically 72:16
hit 32:17 62:9,12
  82:20 121:22
  137:18
hitting 73:23
hold 39:17,19,23
  40:2,5,19
holding 112:6
hollow-nose 84:3
  85:8
home 6:5,7 34:7,9
  34:15 58:8,9 79:6
  80:3 144:8
home-invasion
  78:18 79:22
homes 58:7
hook 69:23 70:11
  70:15
horrible 66:19
hostage 54:8,11
hostages 54:6,15
hour 45:16 133:14
hourly 45:2
hours 45:13
house 96:4
housing 105:21,22
human 23:7,16,19
  23:23 24:5,6,9
  43:6 59:13,14
  85:17 86:14
humans 114:4,9
hundred 32:7
hunting 26:12,22
hurt 69:4

## I

ideal 74:6
Ideally 75:18
identification 8:23
  10:12 109:2 115:2
  127:12 129:10
  134:2 138:9
identified 135:20
identifying 144:7
II 132:15
III 1:10 3:4 5:10,23
  131:21 132:2,4,19
  133:1,2 147:4,13
III-A 131:11,18
  132:6,12,17 133:6
Illinois 14:23
images 82:2
imagine 34:14
  56:17,20 107:17
imagined 80:22
  81:1 82:22
impingement 36:6
importance 134:14
impression 5:21
  141:22
improve 136:13,16
  136:18,19 137:1
  138:1
improvement
  138:2
improving 134:16
  137:2,6
in-house 21:19,20
inasmuch 85:16
incentive 32:18
incident 63:1,4,22
  65:5 67:2 99:14
incidents 80:9,14
  112:11
include 48:21 77:13
  83:12 104:20
  144:7,12
included 7:11 51:4
  55:22
including 9:17 34:8
  47:1

incorporate 125:3
  125:5
incorporated 22:4
  129:21
increase 69:17
  114:8 143:3
increases 101:16
  114:11
increasing 78:17
indicate 112:8
individual 49:1
  59:17 88:5 104:1
  113:3 119:18
  121:17
individuals 22:23
  27:9 29:14 66:14
  103:15,19 106:16
  135:20
industry 82:4
infer 111:20
information 144:4
  144:7
initial 31:5 55:4
injure 103:15
innocents 54:3
inserted 40:23
inside 106:14
instances 55:2
  98:20 121:9
institutions 46:4
instructor 33:6
  41:18
intended 60:23
intentional 94:23
interacted 111:19
interchangeable
  105:12
interested 145:14
interesting 53:7
intermediate
  111:19
internal 22:18
internet 4:15 64:5
  134:6 138:14
  140:11,12
interval 100:17

101:10
intervals 101:23
introduced 58:23
invasions 79:6 80:3
investigated 62:21
invoice 45:7,10
involved 34:5
involvement
  129:17
irritant 92:9
issue 50:11 72:4
  97:4,6 141:21
issued 15:22 16:16
  16:22 116:17
issues 30:12 66:2
  110:15
item 114:15
itemize 148:2

**J**

J 1:10 5:10 147:4
  147:13
James 3:4 5:22
January 115:12
jaundiced 141:6
Jay 53:14
Jim 42:15
job 29:8 33:3
John 116:7
joined 27:22
jointly 104:8
June 28:3
jurisdiction 73:9
  73:10,16 121:10
  121:17
jurisdictions
  121:11

**K**

K-O-C-H-Z-E-K
  31:18
Kathy 1:12 5:1
  145:17 146:14
keep 57:20,23 58:2
  58:10,13,14 59:4
  60:22

keeping 144:12
kill 103:15 104:1,2
kin 145:13
kind 21:11 25:20
  55:16 58:2,9,12
  70:6 73:1 135:22
  140:4,12
kinds 71:3 81:12
  94:10 122:23
Klein 3:12 4:3 5:15
  7:14 34:13 49:3,9
  53:14,17 69:5
  108:21 114:21
  117:16 125:15
  128:2 133:8,14,18
  143:22 144:16
knew 50:22 141:5,8
know 6:14 8:14,15
  8:19 15:15 18:2
  18:12 19:4,8
  31:16 33:20 34:17
  36:2,9 38:3 44:5
  44:17 46:20 56:23
  66:3 67:6 71:20
  78:4,11 81:18,21
  82:1 91:17 92:14
  93:23 94:5,19
  95:14 101:18
  102:5 109:6
  117:20 119:7
  130:1 131:5 135:7
  136:1
knowing 34:16
knowledge 22:22
  37:18 55:1 79:5
  120:17 126:11,12
known 106:8
knows 74:11 75:4
Kochzek 31:13,16
Kolbe 12:19 13:13
  15:21 109:11,11
  109:15,15 110:3
  115:8 116:14

**L**

L 2:1 3:5

labeled 10:15 28:6
  109:5 115:5
  127:15 129:13
  138:12 139:6,7
lack 111:21
lacking 124:17
language 78:5
large 14:14,19
  38:11,15 39:3,13
  39:15,22 45:10
  68:5,6,8,17 80:6
  99:15 103:14,19
  112:16 122:1,3
  145:4,19
larger 68:19 103:23
  123:14
Redact ed
Las 63:1,4,23 65:4
  65:20 66:22 68:3
  68:11 99:13
  100:12
law 13:4,19 15:4
  16:5,7 19:11 20:1
  20:3,5 39:2 55:15
  72:23 73:7 74:3
  77:18 85:13,15
  86:4,5,6,8,16 87:3
  87:10 88:8,16
  89:2,3,13,15,19
  90:5,6,9,13 92:8
  92:16,20 93:12
  94:1,8,9 98:7,10
  98:18 99:8 103:3
  103:10 111:1,4
  112:5,20 113:5
  120:20 121:5,14
  121:19 138:3
  140:15,16 143:12
  143:17
laws 14:9 20:7,13
lawyer 7:10 24:13
  117:4
lawyers 15:23
  116:5
leave 106:6,16

leaving 32:14
left 28:2 47:15
  53:15
legal 24:16,18
  67:12,13,14,15
  69:14 71:3 86:2,5
  86:13
legally 85:16
let's 38:15 48:16
  51:7,9 53:17 69:5
  76:19 83:5 94:20
  96:20 108:21
  110:19 113:11
  114:21 122:8
LETTER 4:20
level 43:19 44:3
  73:7,14,17
levels 43:17 130:17
license 90:19
licensed 90:12
life 32:19 43:12,15
  44:10
lightfighter.net
  140:9,10,14
limited 9:17 90:15
  90:17,18 99:21
limiting 88:6
line 13:15,15
  117:12,13,19,21
  117:22 118:10,11
  120:3,3,10 122:9
  122:10 125:9,10
  125:14,15 126:20
  126:21 127:2
  148:8
lines 98:8
list 48:17
listed 77:18 132:9
  147:7
literature 9:19
litmus 85:18
little 11:7 15:20
  27:13 28:7 62:10
  102:8 111:2 113:4
  113:11
live 23:17,19

111:11
**lives** 11:9
**loaded** 124:21
**loading** 124:20
**lobbied** 141:19
**local** 97:4
**locate** 24:8
**located** 32:23
**locked** 62:10
**logical** 45:21,22
**long** 22:10 29:10
  41:4 43:11 57:11
  57:13 75:17 77:17
  100:4,6,7,8 101:8
  133:19
**long-** 50:10
**long-gun** 57:19
**longer** 52:3 60:15
  60:19 62:5,10,12
  62:13
**longevity** 65:15
**look** 9:2 10:9,15
  27:4 28:5,9 36:11
  46:15 68:22 76:21
  78:15 89:19 94:20
  96:10,22 109:5
  110:5 121:16
  127:19 131:10
  135:2
**looked** 66:10,19
  71:5 91:16 122:1
**looking** 24:4,6
  33:15 36:3,3 38:8
**looks** 139:18
**lost** 141:19
**lot** 103:15 127:18
**loud** 92:3,9,10
  117:15 131:12
  134:11
**lower** 33:22 141:17
  142:16,21
**lunch** 133:9,22

**M**

**MA** 3:16
**machine** 41:7,8,16

42:5,11 88:22
  89:2,4,7,21 90:3
  90:12,19
**mag** 40:8
**magazine** 38:16
  39:14,15,20,21,22
  40:1,2,6,12,20,23
  41:2,9 59:4,18,22
  60:8,12,17,19,22
  61:2,4,11,11 62:2
  62:9 93:15 96:23
  101:3 102:16,20
  103:3,19,23 112:8
  112:23 113:6
  119:6,8,10,15,16
  119:17
**magazines** 14:14
  14:19 15:5 17:4
  36:12 38:11,20
  39:3 40:17 61:5
  85:15 88:13 93:12
  94:10 98:7 99:15
  99:17,21,22
  100:17 103:10,14
  112:6,17 118:22
  119:1,13,20
**mail** 146:10
**mailbox** 45:9
**maintain** 73:14
**majority** 30:3
  111:15 112:20
**making** 89:22 90:1
  97:15 104:6,15
**malfunction** 41:5
  49:15
**malfunctioned**
  119:5,9
**malice** 34:15
**man** 28:2
**management** 21:8
  22:2
**manipulating**
  42:16
**manner** 57:14
  75:22 114:3
**manual** 129:7

**manufacturer** 35:1
  38:7 77:4
**marginal** 101:16
**marked** 8:23 9:3
  10:12 34:9 109:2
  115:2 127:12
  129:10 134:2
  138:9
**Marksmanship**
  4:12
**Marshall** 27:22
  29:1 30:5,6
**Maryland** 12:20
  15:21 109:15
**mass** 13:4 103:20
**Massachusetts** 1:2
  3:14 13:19 17:1
  17:13 18:5 19:11
  20:1,3,5,7 22:16
  39:2 77:18 80:11
  80:12,15 85:3
  113:20 117:1
**material** 13:3,5,9
  13:12,18 14:4
  116:22 117:23
  125:7 139:15
**math** 45:15
**matter** 9:16,21
  12:14 13:23 17:6
  25:10,22 140:13
**matters** 6:18 22:22
**MAURA** 1:7
**max** 142:7
**mean** 6:17 12:22
  16:18 17:10 20:11
  22:20 23:5 33:15
  36:1 37:10 39:9
  39:10,12 41:1,9
  41:10 43:15 46:8
  49:11 55:14 59:9
  59:19 62:18 63:1
  68:9 69:2 73:18
  82:14 83:1 86:7
  87:6 90:9,10
  91:22,23 92:2,5
  93:5,7 98:23

101:10 102:9
  103:6,17 114:14
  122:4 126:10
  136:12 137:9,12
  142:14
**meaning** 8:7 44:16
  55:18 72:17 95:21
  115:23 119:4
  124:12
**means** 46:13 73:21
  89:11 132:11
  142:16 145:8
**meant** 32:17 83:16
  136:11
**media** 62:19,23
  63:1,22 64:5
  65:19,23 67:1,3
  80:4 81:13,17
  99:16,18
**medical** 25:3 30:21
**meet** 136:20,21
**meets** 73:15
**member** 43:8,11,13
**members** 21:23
**membership** 43:14
  43:16 44:10
**memoranda** 9:18
**memory** 105:5
**men** 134:15,15
**mentally** 76:13
**mentioned** 30:9,11
  34:20 56:7
**mere** 96:6
**message** 138:19,21
**metal** 124:1,4,6
  125:2
**methods** 21:14
**mid** 22:11 43:13
**middle** 112:4
**military** 88:15,16
  89:1 129:5 140:15
  140:16
**millimeter** 83:22
  123:15
**mind** 5:17,20 6:4
  51:16 53:10 55:9

**minds** 53:11
**mine** 63:14
**minimal** 73:6
**minute** 49:5
**minutes** 60:1
**misguided** 83:8
**misleading** 112:8
**misspoke** 120:10
**mistaken** 11:18
**mistakenly** 76:9
**misused** 103:14
**model** 33:16,17,21
  74:23 77:4
**modern** 77:9,13,17
  77:23 78:2
**Modifications**
  128:7
**modify** 67:9 141:20
**monitor** 72:17,21
**months** 28:3
**morning** 5:16
  11:13 115:10
**move** 36:14,17
  106:19
**moved** 36:19,22,22
  36:23 37:1,1,2,7
  37:12
**movies** 81:5,12,20
  82:2,10
**muskets** 108:15
**Muzzle-loading**
  108:17
**myths** 83:10

**N**

**N** 2:1 3:1
**name** 5:17,22 15:9
  22:3 70:2,5
  140:21 146:8
**named** 28:23
**National** 43:8
  111:12,13
**NATO** 123:7,8,13
**near** 58:10,13
  60:12
**nearly** 100:4

necessarily 51:6
76:6 100:1 124:4
necessary 2:8 113:1
130:22 146:4
necessity 98:22
113:4
need 8:18 71:22
75:9 83:2 129:23
136:16
needed 27:2
neighboring
107:14
neither 145:12
never 24:9 32:17
35:12 59:23 62:20
70:22 71:1 91:16
92:15
new 8:8 33:2,4,7
61:12
news 64:5
newspaper 21:23
22:2,6
Newspapers 22:4,7
night 81:9
NIJ 130:17 131:6
nods 122:20
noise 92:3
noisemaker 93:21
non-agent 28:17
noon 133:14
normally 129:2
North 1:18 3:8
146:15
notable 110:21
Notary 1:14
note 120:14
notes 9:18
notice 2:14 4:7 13:6
20:16,19
nozzle 91:10,15
NRA 43:23 44:13
45:23 46:18
NRA's 46:12
Nuisance 27:1
number 9:4 10:23
11:9,15,22 16:18

16:18,23 33:17,21
39:8,11 73:23
75:1 76:19 109:5
112:10 113:2
114:7,10 115:5
117:18 120:11
127:15 129:13
134:4 135:13
138:12
numbered 12:7,15
numbers 11:8
33:15,16 75:1
80:6 81:7
numerous 111:11

O

O 2:1
O'Malley 115:9
oath 8:1 47:13
115:23
object 13:21 16:2
24:21 25:6,16,23
38:12 40:14 46:1
68:13 71:19 93:1
93:3 94:17 102:6
143:9
objections 2:8,10
obligated 8:2
OBRs 33:18
obviously 16:17
18:6
occurred 80:17
106:11
occurring 105:20
October 1:15
Off-the-Record
7:16 49:6 108:23
128:3 144:2
offensive 94:23
offensively 52:23
87:18
offer 18:17 24:15
24:18 25:3
offered 2:12 18:23
25:21 133:3
offering 25:9,12

86:22
offers 127:22
office 5:23 6:4
146:3,16
officer 55:16 73:7
87:10,14 88:8
112:11 121:5,19
officers 73:1 86:16
87:4,20 88:17
89:4,13 92:17,20
94:1,8 98:18
103:4 110:23
111:14 113:3,5
120:21 143:12,17
offices 1:16
oh 18:12 42:4
131:12
okay 8:11,16,21 9:5
34:13 41:11 48:19
70:9 95:2 118:13
120:6 122:16
123:6 125:16
126:18,23 128:9
128:23 130:2
139:8
On-the-job 21:15
Once 24:1
ones 132:9
opening 52:16
operate 36:15 68:2
operates 35:18,19
49:14
operating 35:21,23
73:16
operation 35:21
49:16
opined 13:13
opinion 13:18 14:5
14:12,17,21,22
15:3,7,13 26:8,9
67:8 78:23,23
82:3 85:22,22,23
86:3,5,22 87:23
88:7 92:22 94:9
97:16 98:1,3
100:21 103:6

105:3 111:7,10
113:7,9,16,17
121:3,20 142:5
opinions 12:14
13:11 14:1 15:22
18:18,19,21,23
19:18 20:16 24:16
24:19 25:4,10,12
25:21 66:20 103:1
110:14 127:22
opportunity 7:10
115:15 117:3
opposed 50:15
118:22 124:19
oral 5:7
order 34:12 61:5
125:1 144:5
originally 39:17
40:10
outside 23:19 80:15
overall 122:3,4
overcome 52:14
oversight 23:12
owned 21:23 50:12
owner 33:8
ownership 91:12
144:9
owning 91:6
owns 71:10

P

P 2:1 3:1,1
p.m 133:23,23
144:17
page 4:6 9:11,12,12
9:14 11:8,15,16
11:19,19 12:1,14
12:15 13:3,5,12
20:23 28:6,10,14
83:5,5,20 85:10
85:10 94:21 96:20
103:8 104:3,6
109:20 110:18
117:10,12,13,21
117:22 118:7,10
118:10 119:23

120:3,3 122:8,10
125:8,9,14 126:7
126:17,20 127:2
128:4 130:3 131:3
134:7 136:12
139:7 142:3 148:8
pages 10:23 11:4
11:23 12:6,7,10
12:18 139:6
paid 44:19 45:5
panel 4:16 134:22
135:5,6
paragraph 28:10
28:15 76:21 80:20
82:23 84:17 85:13
96:22 98:4 105:16
110:19,21 112:2,4
112:19,21 113:12
113:13 131:20
paragraphs 104:5
110:19
Parker 116:7
part 21:17 26:23
31:7 47:13 55:8
56:2,9 120:9
125:23 126:1
131:8,19
participant 135:5
participate 54:10
55:12 96:16 129:6
138:22
participated 54:18
54:22 84:6 139:1
participating 139:1
particular 38:7
40:13 47:14 73:8
74:5 83:14 84:1
84:10 85:5,7
130:2
particularly 34:6
80:2 82:10
parties 2:4,10
145:13
parts 35:5,15 36:14
36:16,17 105:11
105:13,14

party 7:11
patient 23:19
patients 23:14,17
patron 43:18 44:11
pattern 104:18
Patterson 31:4,4
pay 32:17 44:10
paying 44:1,14,16
  44:20,22 45:18,23
pending 14:14,23
  15:16
penetrate 123:5,18
  124:23 130:20
penetration 124:10
  125:1 132:5
people 21:18 23:3
  31:9 32:1,6,20
  47:1,10 50:22
  54:14 68:5 69:4
  71:7 75:18 80:6,7
  81:4,8,11,18 82:6
  83:1,18 99:22
  100:10,18 101:2
  101:21 102:2,3,10
  102:14 103:16,23
  106:6,12,14,19
  107:1,13,20
  135:13 137:1,4
  141:8 143:6
percent 142:11,12
  142:13,16
percentage 101:19
perfect 143:15,20
performance
  136:17 137:7,9,13
  141:18
period 27:15,19
  88:18 102:10
  108:1 114:8,11
permits 121:11
person 28:16,17,23
  31:7 61:6 64:4
  137:19
personal 4:14 25:9
  25:12,20 26:2,8
  55:1 78:23 85:22

85:23 142:5 144:6
  144:9,10,11
personally 50:12
personnel 32:5
  111:14
persons 136:23
phased 97:9
photographs 9:18
physically 64:4
  100:8
physiologically
  137:15
pick 61:9
picked 61:7 140:1,3
picture 135:14,19
  135:22 136:1,5
pictures 135:16
piece 119:18
pins 37:12,20
pistol 36:22 119:9
  119:21 121:11
pistols 119:3,5
piston 36:4,4,10
place 1:17 3:7,15
  24:3 57:17 62:11
  64:9 72:20 79:6
  128:6 137:17
  140:18 143:3
placement 134:14
  137:3
places 106:10
placing 65:16
PLAINTIFF 3:3
Plaintiffs 1:5 45:19
  116:14 144:4
planned 107:21
plate 123:22 124:2
  124:3,9,12 125:3
  125:5
platform 38:1
play 82:6
please 5:18 10:16
  125:8 134:12
  146:2,10 148:2,2
pocket 61:3,6,10,13
  124:15

point 63:22 71:17
  86:18 100:6
  110:20 131:9
  133:8
police 41:20,22
  42:1 90:21 95:6
  95:17 96:5,9
  110:22 111:14
policies 48:22
policy 51:12,13
  52:2,3 53:21
  105:23 128:17
population 122:7
port 62:9
Porter 3:4 7:2
  13:21 16:2,10
  24:21 25:6,16,23
  31:19 34:11,14
  38:12 40:14 44:23
  46:1 53:1,4,12,15
  68:13 71:19 93:1
  93:3 94:17 102:6
  117:15 125:13
  127:23 133:13,17
  134:23 143:9
  144:1,3
portion 49:7
position 89:23
positive 43:21 94:6
  109:18 135:21
  136:3
possibility 103:22
possible 62:1 96:19
  103:18,21 106:3
  107:1,3 129:20
  146:11
post 5:23 6:4
  139:10 140:18,21
  146:16
posted 139:21,23
  140:7,23
postmortem 27:11
potentially 32:10
  75:15 102:13
pouch 61:2,5
power 82:15,20

137:10
powered 142:22
powerful 142:4
practice 50:1 61:19
  61:22
pray 34:18
precisely 65:17
prefer 125:20
  142:19 143:15
premise 143:1
prepare 117:4
prepared 10:19
  12:19
preparing 129:18
presence 87:17
  88:4
present 14:10
  116:11 134:18
  135:4 136:7
press 97:8
presumably 73:19
  101:21
pretty 28:1
prevents 132:5
previous 44:21
PRI 136:2,4
primarily 108:15
principal 33:6
  143:13
principle 88:6
prior 2:13 22:12
  29:19 33:2 41:18
  63:4 107:20
  128:19 143:7
probably 6:13 7:13
  36:21 37:2,4
  43:13 44:9 46:16
  68:1 78:10 112:1
  120:20 121:8,16
  127:17 139:21
  140:9
Procedure 5:4
proceedings 5:8
process 7:18,19
procurement 104:8
produce 105:8

professional 1:13
  26:8
proficiency 73:13
program 56:2
projectile 23:7 57:2
  58:22 114:5
  135:12 136:17
  137:6
projectiles 26:6
  114:10,13 124:21
  130:19,23 132:5,8
projective 130:19
projects 91:9,15
prolific 82:4
propelled 114:5,16
propensity 124:22
proper 57:2 124:15
  148:3
properly 69:13
  123:1,10
protect 80:7 86:15
  86:17 130:22
  133:2
protected 101:13
protective 34:12
  132:12,14 144:5
provide 14:21 19:5
provided 5:4 13:19
  14:5,12,17 17:22
  17:23 19:1 20:16
  110:3 116:23
  123:1,9 146:6
psychologist 76:16
public 1:14 94:15
  126:11,12
published 85:2
pull 41:5 59:10
  61:10 71:18
pulled 59:12,14
  64:14
punctuation 146:4
purchase 105:1
purpose 38:14
  95:19 100:16
  124:2,3
purposes 41:11

74:5 76:23 77:2
97:3 111:5
**pursuant** 144:5
**push** 64:12
**pushed** 30:21
**put** 11:8 33:19 35:5
35:15 61:6,12
62:8 117:19
123:22 125:2
135:19 140:1

**Q**

**qualification** 50:21
121:7,12,13 142:8
142:14,17
**qualifications**
12:11
**qualified** 50:8,9
121:18
**qualify** 50:10 73:20
73:21 143:6
**qualifying** 121:8
**Quantico** 33:1 51:6
**quantification**
79:12,16
**quarrel** 65:19,22
**quarter** 28:19
29:23 133:15
**question** 7:3 8:9,10
8:14,16 13:22
16:3,19 24:22,22
25:7,17 26:1 34:2
38:13 39:7 40:15
46:2 53:2 68:14
68:15 71:16,20
86:12,13,14,18,19
93:4 94:18 102:7
118:9,20 125:20
125:22 130:9
143:10
**questions** 2:9 7:12
8:1 102:21 115:20
117:12 118:3,15
120:4,7 122:10
125:10,17 126:15
127:7,19,21

143:23 144:1
145:7
**quick** 10:9 128:1
**quickly** 68:4,7,16
133:10
**quite** 10:23 60:10
78:5 136:22
**quote** 134:6,7,19,20
135:8 139:10,16
140:6
**quoted** 139:15
**quoting** 124:18

**R**

**R** 3:1
**raid** 52:21 53:20
54:6,18 55:9,12
87:9,14 88:2 92:1
106:7,11,20 107:2
107:5,9,14,22
**raids** 52:11 54:23
96:16
**raise** 32:18
**range** 6:15 32:11
50:3,6 59:21
73:19,22 133:3
**rapid** 65:12,14
128:5,7
**rapidly** 63:20 64:22
67:23 70:19 71:12
71:18
**rare** 95:18,22
**rarely** 68:1 106:8
**rate** 35:11 45:2
71:14
**rates** 59:21
**re-qualification**
72:8,11 121:14
**re-qualify** 72:14
**reach** 61:10
**read** 17:21,22
48:16 49:7 110:11
117:12,15,15,17
117:22 118:10
120:3 122:9,12,13
122:14 125:9,11

126:19 128:6
129:23 131:11,13
131:16,20 133:16
134:11 139:15
146:2,10 147:5
148:1
**readily** 104:7,21
**reading** 4:20 17:16
18:18 105:18
125:12 128:19
**real** 80:22 81:1,8
128:1 140:21
**realities** 111:18
**reality** 40:11
**really** 76:11 91:17
125:6
**reason** 32:13 50:20
65:18,22 67:5
68:1 87:20 93:10
100:9 110:9
115:18 128:10,20
135:16
**reasonable** 46:6
80:23
**reasons** 85:5,6
**recall** 14:16 17:15
17:16 18:3 22:11
29:12 32:4 33:20
43:12 44:7 45:11
52:4 74:23 78:8
80:17 89:1 107:11
107:19 109:11
127:17 129:15
138:20,23 139:2,3
**received** 50:15 60:2
**receivers** 33:23
**recess** 69:6 114:22
133:22
**reciprocates** 64:11
64:17
**recognize** 100:11
109:8 134:7
**recoil** 64:17 141:16
**recollection** 102:19
110:1
**recommend** 106:5

106:15
**recommended**
132:20
**record** 5:18 7:14
16:20 49:4,10
108:21 109:15
125:19,21 127:23
**recordings** 9:19
**reduced** 39:20
**reduced-capacity**
119:1
**refer** 17:12
**reference** 83:21
84:23
**referred** 56:8 77:5
77:9
**referring** 6:21 66:4
**reflect** 131:4 143:5
**reformed** 58:23
**refresh** 102:19
110:1
**regard** 9:21
**regarding** 15:7
83:9 111:17
**regardless** 38:6
40:22
**regards** 136:21
143:11
**Registered** 1:12
**regular** 72:15
121:14
**regularly** 81:5
140:19,20
**regulating** 15:4
**regulation** 67:21
**rejection** 39:13
**related** 43:4 134:22
**release** 88:16
**releasing** 89:1
**relevant** 18:5 22:15
103:13
**reload** 48:10
**remember** 15:9,12
17:21 29:13 41:19
41:22 70:1 115:13
116:10,13 135:3

136:3 139:19
140:7,22
**remind** 137:4
**Remington** 123:7
**replace** 100:17
**replaced** 29:16
**replacement** 29:19
29:22 141:8
**replete** 82:11
**report** 4:8 10:18
12:17,19 16:16,17
16:23 18:6,13,13
18:15,18,21,22,23
19:14,19 28:6
31:11 65:19 83:6
85:1,1 116:17,22
**reported** 69:12
99:16,18
**reporter** 1:13,13
5:2 49:8 53:11
**REPORTER'S**
4:19
**Reporting** 146:15
**reports** 9:19 19:13
65:23 66:8 80:2,4
84:15,19,21
**represent** 115:6
133:10 138:13
**representation**
45:18
**represented** 116:4
116:14
**representing** 7:11
**represents** 145:9
**require** 50:6 72:8
85:14 121:12,13
**required** 43:22
50:10,13 64:12
94:3 100:15
112:12 121:18
143:6
**requirement** 47:23
72:20
**requirements**
50:21 51:15,17,20
121:7

requires 85:17
requiring 103:9
rescue 54:9
rescues 54:11
research 21:16
  23:13 26:13 27:15
  28:11
resemble 74:22
respective 2:4
respond 83:13
response 53:23
  94:6 135:21
responses 113:15
responsive 115:20
restricted 91:6
  92:14
restriction 89:21
restrictions 17:3
  90:11 91:12
restrictive 51:14
restricts 67:16
result 85:7 145:15
results 84:16
  129:21 130:5
rethink 89:23 90:2
retire 30:1 32:16
retired 5:19 30:4
  139:12
retirement 29:20
  30:7
return 146:3 148:3
  148:4
review 17:5,8 18:4
  18:8 102:18 115:6
  115:15
reviewed 9:21
  18:13,15 19:14,14
  20:4,8,15
reviewing 13:15
  94:2
reviews 102:22
  110:8 118:1,12
  120:5 122:11,15
  126:22 128:8
  131:15,23 139:17
rifle 4:12 43:9

74:19 77:23 78:2
  98:13 107:10
  121:9 123:14
rifles 77:3,5,9,13
  77:17 97:2,5,17
  98:19 104:7,21
  105:19 108:1
  113:14
right 7:8,21 8:2
  9:14 12:7,11
  13:23 17:15 18:14
  22:1 24:10,13,16
  24:20 25:1,5,10
  26:15,16,23 27:4
  27:17 29:1,4
  35:23 37:17 40:13
  41:3 47:17 49:22
  50:3 51:19 53:17
  54:7,11,15 55:8
  59:10 60:17 61:7
  61:22 62:11 63:2
  69:18 72:12 75:23
  76:4,7,11,15,17
  77:10 78:13 82:2
  86:8,20 87:1
  90:16 94:12,16
  96:13,17 99:6
  101:4,23 102:11
  102:16 104:10,16
  108:3,7,10,13,16
  108:19 109:16
  110:16 114:14
  116:5,19 117:1,8
  119:4 120:21
  122:19,22 123:2
  123:15,19 124:2
  124:10,16 125:4
  127:5 130:23
  132:12,15,22
  133:8 138:5,7,19
  139:6 141:13
  142:23 143:20
rights 46:5,8,9,23
  47:2,4,6,7,10,12
  47:16
risk 52:19 54:15

River 33:22 35:4
  104:13 105:7
rock 33:22 35:4
  104:13 105:7
  134:16 136:13
  138:2
rocks 134:15
role 22:5
ROM 85:2
room 60:15
round 114:19
  142:23
rounds 39:7,19
  40:2,6 100:18
  112:7,12 113:1,6
  120:12 123:18,22
  124:10,17 125:2
routinely 105:17,19
RPR 145:17 146:14
Rucker 3:5
rule 54:13
rules 5:4 8:4
run 100:19
running 21:16
  100:12
runs 31:2
rural 58:8

─────────
S
─────────

S 2:1 3:1
s/ 145:17
SAAMI 58:23
safe 85:4,6 99:5
safely 51:2 107:15
  107:18
safety 78:19 79:3
  79:21 80:2 94:16
San 15:6
satisfactory 144:14
Sauer 104:13,17
  105:1
saw 38:3
saying 65:19 86:9
  97:19
says 9:15 28:10,15
  77:2,8 78:16

80:21 83:8 85:13
  94:21 97:1,5,20
  104:6,12 110:20
  112:4 113:12
  128:6,21 139:11
  142:10
scene 106:6,16,20
school 21:9 42:4,16
science 21:10
scientific 21:14
  26:18 27:7
score 142:14,17,20
  142:21
Scott 31:3,4
second 6:18 7:15
  28:15 46:8,12
  47:16 86:19,23
  89:10,11,14,18,20
  90:9 97:20 101:10
  108:22 128:1
seconds 60:3 61:12
  62:5,14 102:1,4
  102:11
section 20:12 77:19
  102:20 103:2
  128:5
securing 55:5
security 66:6 80:7
see 9:22 11:3 21:21
  26:5 28:12 44:23
  66:3 71:14 76:23
  77:5 78:20 81:4,8
  81:9 83:10,21,22
  84:23 85:19 89:20
  95:3 97:11 111:5
  112:13 127:20
  135:22 138:15
  139:13 142:8
seen 9:6,8 59:23
  64:3,4 71:1 81:6,6
  127:15 129:16
select 48:11 83:18
selection 4:13 23:4
  57:2 83:16 135:12
selector 99:7
self 51:22

self- 98:19
self-defense 19:11
  20:1,3,5 57:21
  59:8 76:22 78:16
  80:11 98:10,11,14
Self-taught 21:17
semi- 65:12 99:5
  128:13
semi-automatic
  59:2 64:23 74:18
  77:21 99:2,8,11
  104:19 108:18
  128:5,7 129:3
semi-automatically
  128:18
Senior 3:13
sense 42:23 43:3
  45:17,20
sentence 78:15
  79:11 85:12 94:20
  142:13
separate 25:18 26:8
Sergeant 42:15
serve 87:8
Service 146:15
serving 14:10
set 22:12 98:20
  99:5,7,10
SETH 1:4
setting 43:3 99:4,5
shakes 106:4
share 19:21
sheet 129:15 146:6
  148:3
shelf 64:9,11
shoot 26:10 41:20
  49:19 50:7,13,14
  56:23 57:1 73:18
  75:20 96:2 137:17
  137:20 143:16
shooter 64:20
  65:20 66:14,22
  99:14,20 100:15
shooting 26:4 49:22
  50:1 66:8 82:20
  100:19 103:20

137:22
**short** 32:20 103:16
  114:8,11
**shot** 27:3 41:6
  56:21 64:19 66:7
  114:19 134:13
  137:3,23 143:4
**shots** 65:16 97:7
  112:21,22 113:2
  114:7 120:21
**shoulder** 64:14
  75:3
**show** 63:15,16 65:1
  73:13 109:4 115:4
  127:14 134:4
  138:11
**showed** 30:7
  111:16
**shown** 65:23 129:7
**side** 134:23 135:2
**Sig** 104:13,17 105:1
**sign** 148:2,4
**signature** 10:21
  11:3 109:19 147:2
**significant** 35:14
  35:17
**significantly** 66:11
**SIGNING** 4:20
**similar** 12:21,22
  13:16,23 35:3
  75:2 77:3 105:4,5
  108:16 116:23
**similarly** 112:10
  113:1
**simplifying** 52:1
**Simplistically**
  51:22
**simply** 75:19
**single** 112:11
**sir** 9:9,23 10:3,17
  10:20 11:2,5,14
  12:2,5,8,12,16
  15:11 19:17 20:14
  20:21 21:4,6,12
  27:6 28:8,13 29:2
  30:10 31:8 32:12

35:3,13 36:8 37:8
  37:11 38:2,5
  41:14 42:12 43:5
  44:4,15,22 46:5
  46:10,19,22 47:11
  47:18,22 48:3,6
  49:13,19,23 50:2
  50:4,18 54:20
  55:20 56:11,21
  58:21 59:3 66:11
  66:18 67:4,15
  69:12,15 71:1
  72:3,6,10 77:1,7
  77:11,15,20 78:21
  79:18 80:5,19
  81:23 82:8,17
  83:11,23 84:5,14
  85:20 86:5,9 87:2
  87:23 88:3,12,14
  90:14,20 95:4
  97:12 102:23
  103:5,12 104:11
  105:10,15 106:2
  107:6,12 108:4,6
  108:8,14,17,20
  109:8,17,21,23
  110:4,10,13,17
  111:6,8 112:14,18
  113:10 114:15
  115:14,22 116:2,6
  116:9,12,15,20
  117:2,6,9 118:6
  118:17 119:11
  120:18,22 122:1,3
  122:7 123:3,11,17
  123:20,23 124:13
  126:8 127:4,6
  130:4,7,11,14
  131:2,6,9,19,22
  132:10,13,23
  133:5 136:6,9
  138:16 139:14,22
  140:2,17 141:2,14
  142:9,15,18 143:1
  143:19
**sit** 93:23 118:3

**site** 138:14
**sites** 36:23
**situation** 56:17,20
  83:14 112:22
**situations** 23:2
  55:22 105:20
**size** 37:20 59:4
  99:17 101:15
  102:12
**sizes** 37:14,15,19
  40:13
**skip** 51:9
**slam** 64:15
**sleep** 58:6
**sleeping** 58:4
**slide** 124:12
**slightly** 37:16
  122:18
**slings** 37:1
**small** 112:12
**soft** 123:5,19
  124:14 130:20
**soldiers** 128:12,23
**somebody** 137:19
**soon** 146:10
**sorry** 7:4 9:13 53:3
  85:5 106:13
  126:20 132:18
  135:1
**sort** 6:17 72:15
  124:1
**sought** 135:11
**sound** 18:14 65:16
  69:3 92:10
**sounded** 65:14
**sounds** 19:17 31:19
  65:7,11
**source** 23:9
**SPC** 136:1
**speaking** 76:1
  88:21
**special** 22:15 23:12
  31:3,10 41:17
**specific** 35:20
  48:23 84:11
**specifically** 13:4

16:9 30:17 56:6
  66:5 143:11
**specifications**
  104:16
**specificity** 124:18
**specifics** 80:18
**specified** 126:5
**specify** 125:6
**speculation** 37:22
**speed** 52:15 69:17
**spell** 31:16
**spelling** 31:20
  146:9
**spend** 32:15,20
  121:8
**spent** 23:11
**spontaneous**
  107:21
**sporting** 77:9,13,17
  77:23 78:2
**spreadsheets** 9:20
**SSA** 139:11
**standard** 39:21
  42:14,18 131:10
  132:2
**standards** 73:15
  130:21 131:1,5,6
  131:7
**start** 12:14 16:19
  64:13 117:20
  118:9 120:2 122:9
**started** 21:20 28:2
  43:5 88:16 100:11
  134:15
**starting** 13:12
  27:23 117:11,21
  131:9
**starts** 13:3 76:22
**state** 1:14 5:2 15:4
  17:14 42:5 73:10
  73:10 97:4 120:19
  138:2 145:3
**stated** 103:8
**statement** 81:3
  93:10 94:2 97:15
  97:16 98:4 102:9

109:10,14 113:22
  135:9 136:11
  137:4 141:1
  143:18
**statements** 113:13
**States** 1:1 47:3,5
  71:4,8 79:6
**stating** 5:17 12:10
**stay** 32:19 107:13
**steal** 127:2
**stenotype** 145:7
**steps** 101:11,12,17
**stick** 40:9
**STIPULATED** 2:3
  2:7,14
**stipulations** 5:5
**stock** 62:16 64:1,3
  64:10,21 65:20
  69:9
**stock's** 64:8
**stocks** 62:20 63:6
  63:13 67:10,17,21
  68:10 69:11 75:3
**stop** 11:18 52:6
  100:8 117:20
  124:10 125:1,6
  137:19,21,21,22
  143:2
**stopped** 100:5,9,19
  101:8
**stopping** 82:15,19
  137:9
**storage** 48:22
  144:12
**stored** 60:17
  144:13,13
**storming** 54:5
**strictly** 95:1
**strike** 73:4 96:19
  105:17 110:18
  132:18
**structure** 106:13
  106:15
**structures** 24:8
  105:21,22,23
**studied** 98:15

**studies** 9:19
**study** 26:18
**style** 127:3
**subject** 13:23 66:7
  96:7 137:15
  140:13
**submitted** 45:7
**Subpoena** 4:7
**subsequent** 64:19
**substances** 124:5
**success** 112:9
**Suffice** 34:5
**suitability** 74:5
**suitable** 73:23
**sum** 122:6
**superior** 57:3
**supervision** 27:10
**supervisor** 31:12
  139:12
**Supervisory** 23:12
  31:3,10
**support** 28:16 29:7
  32:6 46:12,16,18
  46:21 64:13,15
  141:9
**Suppose** 75:13
**supposed** 72:13
**suppression** 129:2
**sure** 7:6 11:11
  25:11,18 37:21
  44:2 45:9 48:17
  50:21 51:1 53:1
  68:14 70:10 87:13
  89:16 91:5 92:19
  98:17 109:12
  121:12 122:13
  128:2 133:13,15
**surprise** 52:15
**surprised** 111:16
**surrender** 96:5,7
**suspect** 22:11 40:17
  55:2 79:14 81:7
  135:19
**suspects** 95:12,14
  95:18,23 96:2,3
  96:10

**swapping** 60:12
**SWAT** 91:18
**Sweeney** 16:12
  116:7 117:7
**switch** 68:2
**switching** 141:4,12
**swore** 47:13
**sworn** 5:11
**system** 35:21,23
**Systems** 31:15,23
  32:2

---

**T**

**T** 2:1,1
**TABLE** 4:1
**tactical** 91:21,22
**tactics** 51:5
**take** 8:19 9:2 10:9
  10:15 27:3 35:8
  35:10 36:12 52:13
  59:22 60:1,2,15
  60:19 61:11 62:4
  62:10,13 69:5
  73:21 78:12
  100:15,16 109:5
  114:21 133:9,14
  136:5
**takedown** 37:12,20
**taken** 1:12 2:5 55:3
  69:6 114:22 115:8
  115:11,13 116:4
  122:6 133:22
  136:1 145:6
**takes** 10:23
**talk** 11:7,12 27:13
  51:7 53:18 56:12
  134:12 137:5,6
**talked** 15:20 87:7
  96:16 105:14
  122:17
**talking** 8:6 12:18
  26:22 49:21 69:8
  70:4 80:4 81:13
  82:13,23 84:16
  88:22 93:17 99:12
  101:16 122:21

123:6 141:11
**target** 67:23 68:4,5
  68:6,8,18 73:22
  73:23 143:4
**targets** 68:11,16
**taught** 21:18
**teams** 91:18
**technical** 131:14
**technician** 28:18
  29:9
**television** 81:5
  82:10
**televisions** 81:19
**tell** 10:4 19:23
  31:21 46:15 58:19
  63:18 76:1 109:9
  139:16 141:3
**telling** 136:16
**ten** 6:15,16 38:17
  38:23 39:7,8,11
  40:2 100:17 112:7
  112:12 113:1,3,6
**tenure** 141:15
**term** 77:13 78:2
  79:11,13,17
  137:11
**terminal** 22:18
  48:11 57:3 125:13
  136:19 137:6,8,12
  141:18
**terms** 88:10,13
**terrible** 68:21
**test** 84:6,10 85:18
  130:5
**tested** 35:12 84:8,8
  84:11,13 85:8
  125:6
**testified** 5:12 7:7
  116:21
**testimony** 18:9,11
  122:22 145:10
**testing** 4:16 129:21
  130:10,12 134:22
**thank** 8:18 10:10
  12:17 15:20 20:22
  21:22 28:21 32:13

47:19 49:9 55:21
  59:13,16 102:14
  114:20 126:16
  144:16 146:13
  148:4
**thankfully** 81:9
**Thanks** 6:6
**thereto** 2:13 145:7
**thing** 68:21 110:12
**things** 6:22 13:1
  18:6 48:13 97:23
**think** 9:12 15:2
  20:14 36:4 37:11
  37:18 42:1 44:1
  45:11 56:7 68:21
  70:3,11 72:11
  74:17 76:14,20
  84:10,22 86:14
  87:7 88:7 89:14
  95:20,21 99:22
  101:5,8 109:13
  116:21 125:11
  132:14 133:18,19
**thinking** 69:1
**third** 9:13
**thorough** 22:21
  62:22
**thought** 52:13
  92:15
**thousand** 34:6
**thousands** 44:8
**thread** 138:17
  140:1
**threat** 52:6 130:17
  132:21
**threatened** 52:23
**threats** 133:3
**three** 60:5,6,8,23
  61:12 62:5,13
  101:10,12,17
  102:1,4 104:5,14
**three-second**
  100:16
**thrown** 92:3,6,22
**till** 45:5
**time** 2:11,12 8:19

23:11 26:21 27:14
  27:15,19 30:3,7
  32:15 48:18 57:5
  57:5 58:15 61:1
  73:12 78:6 84:9
  87:5,5 88:2,2,18
  96:10,10 100:17
  100:23 101:3,6
  103:16 107:23
  108:10,12 110:16
  114:8,11 115:9,10
  116:3 121:8
  130:13,13 133:20
  139:2
**times** 6:12,14 23:22
  43:14 50:5,8,9,14
  56:22 72:12 74:1
  81:7 95:14 98:18
  135:9
**timing** 66:6
**tissue** 23:8,16,19,21
  23:23 24:10 26:6
  26:19 137:14
**titled** 4:12,13
**today** 10:2 45:1
  57:9 118:3 125:18
**today's** 38:14 41:11
  119:8
**told** 63:14 118:23
  119:8
**top** 110:20 120:2
  126:7 138:15
**Total** 44:9
**town** 58:8,9
**traffic** 133:21
**tragedy** 66:19
**train** 48:1 74:4,8
**trained** 21:13 47:19
  55:6 64:21 72:5,9
  73:2 75:13 78:9
  121:4
**training** 21:15,20
  22:23 23:2 26:3
  30:20 33:7 42:8
  42:11,13,14,15,18
  42:19,22 43:1,2,4
  43:5 48:7,9,10,14

48:21,23 49:12,17
49:22 50:6,15,16
51:3,4,5,5,8,10
55:21,22 56:2,4,5
56:9,10,12 60:2
61:17,21 73:7
75:9,12,17,19
129:6 137:1,2,5
trains 128:12
transcribed 145:8
transcript 115:7,16
145:10 146:2,6
147:5
transcription 145:9
147:8
transferred 28:10
trial 2:11 3:13
tried 141:9
trigger 37:10 41:6
59:10,12,14 64:10
64:16,16,18 69:21
69:23 70:1,9,12
70:13,14,15 71:18
97:8
triggers 36:1,19
37:9
Trooper 42:5
true 20:2 38:6
71:11 77:12,16
81:11 86:11 87:3
88:15 110:7
120:23 121:6
145:10 147:7
trusted 37:5
truthful 115:19
truthfully 8:2
116:1
try 52:14 100:20
106:9 107:7
trying 137:20
tuck 61:8
turn 70:18 83:5
104:3 112:2
117:10 118:7
125:8 126:17
130:3 139:5,7

Tuscaloosa 6:1,8
42:1
TV 81:10,19,22
twice 50:11,13
two 25:19 28:3
29:10 30:8,10
58:7 72:12 97:7
101:11,16 102:1
102:10
two-sided 135:1
type 6:22 33:13,14
40:17 47:2 67:3
78:18 79:22 81:16
83:12,17 84:1,7
91:20 93:17,19
96:16 105:6 129:6
130:22 131:11,18
131:21 132:2,4,6
132:8,12,15,15,17
132:19,19,22,23
133:2,4,6
types 130:23
typical 59:17,19,20
typically 7:10
64:22 65:12 95:13
96:13,15 111:2
113:3 114:14,17
132:20 133:3,5
138:3
typo 120:10 127:5
127:9

U

U 2:1
Uh-huh 94:6
135:21
unable 141:10
uncontrolled 26:15
understand 7:6,18
7:23 8:14 25:11
39:2 42:20 53:7
68:14 69:10 70:8
80:1 89:16
understanding
16:15,21 19:10,23
20:2 21:22 23:10

44:13 51:14 62:22
63:21 64:7 65:10
66:21 70:17 71:2
71:7 73:4 74:18
78:1 91:7 99:14
100:3 107:23
111:3,21 115:11
125:12 127:21
131:17 132:1
understood 8:16
Unfortunately
72:16
unit 30:8,20 31:12
31:14,15,21,23
32:2
United 1:1 47:3,5
71:3,8 79:6
University 21:2,8
unreasonably
93:18,20
untrained 121:1
unusual 113:14
121:18
updates 12:23
upgrade 43:15
upgraded 43:14
upsetting 68:22
Urgealitis 18:14
use 13:19 14:4 23:1
23:3 26:7 38:21
41:13 42:11,20,23
43:2 47:20 48:1,4
50:22 51:17,21
52:5,17,18 53:22
55:11,23 59:7,9
67:9 68:10 69:16
70:6 71:11 73:8
74:8,11,13 75:6
75:22 76:3,7,9
77:12,16 79:11
87:4,12,15 95:19
95:22 96:1 99:10
103:20 105:17,19
110:22 123:21
128:12,17 129:3
137:11 143:8

uses 92:8 95:6,17
105:21 112:6,16
utilize 51:13

V

variable 119:15
variant 77:15
variation 77:4
varies 73:9
various 23:4
vast 112:20
vault 32:5
Vegas 63:1,5,23
65:5,20 66:22
68:3,12 99:13
100:12
velocities 130:19
velocity 131:12
141:17
versions 77:21
versus 12:20 15:21
109:15 115:8
veterinarian 27:10
30:12,15,17
video 9:18 64:6
65:2,4,8,11 81:6
81:12 82:6,10
view 91:11 103:13
viewed 141:6
views 46:12,15,17
violate 126:4
violence 52:15
78:17 80:22 81:2
81:4,8,16 82:22
violent 82:6
Virginia 33:1
vs 1:6

W

W 3:4
wait 8:7,10
waiting 45:8
waived 2:15
walking 57:16
want 5:21 8:7 9:10
27:13 37:4 48:17

51:8 53:4,15 65:2
75:16,18 96:22
103:15,19 117:16
117:20 127:19
133:10,15 134:11
135:20 136:10,20
137:19
wanted 32:15 63:15
123:21 138:11
141:7
wanting 136:23
warn 106:19
wasn't 100:7,21
watch 65:4 81:19
81:19,21 82:2
watched 64:6
way 7:18 10:22
12:3 22:23 35:18
35:19 54:23 57:4
66:13 68:23 83:16
87:11 117:13
118:6,16 120:8
122:5 125:18
127:8 136:18
ways 87:4
we'll 6:16 44:23
133:20
we're 8:5 26:22
93:17 123:6 133:9
133:18 137:5,5
141:19,23 142:1
we've 9:3 12:15
28:5 94:2 115:9
121:15 137:23
weapon 38:7 48:1
64:23 65:13,21
80:10 87:21 99:1
99:2,5 132:22
133:4
weaponry 89:12
weapons 14:23
15:4 35:9 41:21
47:20 50:22 75:22
76:3,9 82:16
88:16,20,21 98:2
108:16,17 128:17

wear 61:4
weed-burning
  91:14
weeks 99:13
welcome 117:19
weren't 60:20
  105:2 108:5,9
wethearmed.com
  4:17 138:15,20
white 135:18
whited 135:14
William 31:13
wise 101:19
witness 5:6 6:19
  7:4 11:17,21
  14:10 21:1 31:20
  34:18 53:3 81:1
  81:16 83:7 85:11
  96:21 102:22
  104:4 106:4 110:8
  112:3 118:1,8,12
  120:1,5 122:11,15
  122:20 126:22
  128:8 131:15,23
  139:17 144:15
  145:11 148:7
wonder 68:23
word 146:8
words 89:20 96:3
  100:5 118:15
work 15:23 16:9,12
  29:14 30:6 117:3
  119:4 130:16
  142:11
worked 16:5 27:9
  29:15 30:12,19
  32:1,22 45:13
working 16:1 27:14
  30:5
works 7:18
world 143:15,20
WORMAN 1:4
worth 53:10
wouldn't 6:4 34:19
  55:18 56:18 62:7
  76:6 87:10 101:9

101:12,14 106:5
  106:13,19
wound 4:15 22:17
  23:6,10 25:14
  26:5,18 80:21
  104:2 111:3,22
  134:22 135:11
wounding 27:12
wounds 24:6,10
  27:4,5,8
Wow 50:8
writing 139:19
written 84:19
  108:10,13 110:10
wrong 9:12,15
  138:18
wrote 102:20
  139:20 140:4
  142:4

_____

X

_____

Y

_____
yards 101:17
  120:13,15
Yeah 7:1 33:17
  34:13 135:1
year 15:14 50:8,9
  50:11,13,15 72:12
  79:9
years 78:11,12 79:7
YouTube 64:6

_____

Z

_____
zip 6:2

_____

0

_____
01/03/2014 4:11
02108 3:16
03/06/2014 4:10
09/14/2017 4:8

_____

1

_____
1 4:7 8:22 9:4 11:15
  11:23 16:18 120:3
1:17 133:23
1:17-CV-10107-...

1:6
1:31 144:17
10 40:22 120:4
10-round 39:19
  99:22 118:22
  119:20
10,000 45:12
10/26/2017 145:18
10:11 69:7
10:22 69:7
100 99:19 142:11
  142:13
100-round 99:21
101 117:13,22
11 4:8 104:3,6
  113:12 118:10
11:18 114:23
11:29 114:23
110 4:9
115 83:22
116 4:11
118 125:8,9
119 126:7
12 13:3,12
12:04 133:23
120 125:9,15
121 20:12 77:19
123 6:7
128 4:12
13 112:19,20
130 4:13
132 118:7,10
133 118:11
135 4:15
139 4:17
14 13:5
140 20:12 77:18
145 4:19
146 4:20
15 11:19,23 12:1,15
  12:18 13:5 39:19
  40:22 78:10,12
  118:22
15-round 39:20
  40:1
15th 28:12

162 119:23
163 120:3
17 125:9
170 126:17,20
172 126:21 127:2
18 127:2
1819 1:17 3:8
18th 3:15
1900 108:5
1960s 108:3
1988 28:19
1997 27:20 28:12
  30:4
1998 28:19

_____

2

_____
2 4:8 10:11,15
  16:18,23 28:6,10
  76:19
2/20/2018 145:22
20 32:9,11 40:6
  59:6
20-round 39:22
  40:8,23
200 120:12,12,15
2000 78:13
2002 78:13
2003 104:14
2011 29:23
2012 30:2,4
2014 115:12
2017 1:15
2116 146:16
22 126:21
221 58:22
223 120:11 123:7
2370 6:1
24th 1:15
256)737-9770
  146:18
27 57:8 58:11

_____

3

_____
3 4:9 28:6 109:1,5
  126:20
3/16/2014 109:22

30 58:21 59:6 146:3
  148:4
300 58:15,19 59:1
308 58:17
31 30:2
34 131:3
35 131:3
35056 146:17
35203 1:18 3:9
35403 6:2
36 12:7
37 130:3
3rd 115:12

_____

4

_____
4 4:11 115:1,5
  125:10,15
4-14 139:7
40 141:12,14,20
  142:12,22
400 101:17
45 142:13

_____

5

_____
5 4:3,12 12:14,18
  110:18,19 122:10
  127:11,15
5.56 58:17 123:7
586 1:14 145:20
59 122:8
5th 1:17 3:8

_____

6

_____
6 4:13 83:5 122:9
  129:9,13
6.8 136:1
60 99:19,21 122:10
60s 108:2

_____

7

_____
7 4:15 85:10 103:8
  112:2 130:5 134:1
  134:4
7-8 128:4
7-9 128:6
7.62 123:8,13
7.62x39 123:15

DANIEL COURT REPORTING, INC.

**700** 45:4,16

**8**

**8** 4:17 96:20 109:20
  117:12,21 118:11
  120:11 138:8,12
**80** 142:12,16
**80s** 22:11 43:13

**9**

**9** 4:7 117:14,22
  141:20 142:12
**9-millimeter**
  120:11 141:5,12
  141:21 142:20
**9/30/2018** 145:20
**9:09** 1:15
**95** 117:10,12,21
**98** 27:21 142:11,13

DANIEL COURT REPORTING, INC.

Page 147

1

2                          SIGNATURE

3

4          I, J. BUFORD BOONE, III, hereby

5    certify that I have read the transcript of my

6    deposition, and except for the corrections

7    listed below, certify that it is a true and

8    correct transcription.

9

10

11

12    _____

13          J. BUFORD BOONE, III

14

15

16

17

18

19

20

21

22

23

DANIEL COURT REPORTING, INC.

Page 148

1

    As you read your deposition, if you have any
2 corrections to make, please itemize them below.
Upon completion, please sign on this errata
3 sheet so that I can return it to the proper
court.  However, if you do not have any
4 corrections to make, sign this form and return
it to me within 30 days.  Thank you.

5

6

7            CHANGES MADE BY THE WITNESS:

8   PAGE   LINE    FROM                TO

| PAGE | LINE | FROM | TO |
|------|------|------|-----|
| 31 | 18 | K-O-C-H-Z-E-K | K-O-Z-A-C-E-K |
| 36 | 23 | sites | sights |
| 121 | 18 | qualified | qualify |
| 130 | 19 | Don't think I said "projective" sentence is cogent without it |

13

14

15

16

17

18

19

20

21

22

23 DEPONENT _J. Rayford Stone III_      DATE _11/15/2017_

205-250-7765      danielreporting@aol.com      877-250-7779

# EXHIBIT 14

## TO KAPLAN DECLARATION

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   DAVID SETH WORMAN, et al.

 5              Plaintiffs          Case No.

 6   vs.                           1:17-cv-10107-WYG

 7   CHARLES D. BAKER, et al.

 8              Defendants

 9   _____/

10

11

12           The deposition of GUY ROSSI was held on

13   Monday, November 6, 2017, commencing at 9:05 a.m., at

14   Bradley Arant Boult Cummings, LLP, 1615 L Street, N.W.,

15   Suite 1350, Washington, D.C. 20036, before Melinda

16   Johnson, CSR, Notary Public.

17

18

19

20

21   REPORTED BY:  Melinda Johnson, CSR
```

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi -  Vol. 1
November 6, 2017

Page 2

```
 1   APPEARANCES:

 2

 3             ON BEHALF OF THE PLAINTIFFS:

 4     JOHN PARKER SWEENEY, ESQUIRE

 5             Bradley Arant Boult Cummings, LLP

 6             1615 L Street, N.W.

 7             Suite 1350

 8             Washington, D.C. 20036

 9             Telephone:  202.719.8216

10             Email:  jsweeney@bradley.com

11

12             ON BEHALF OF THE DEFENDANTS:

13     JAMES SWEENEY, ESQUIRE

14             Office of the Attorney General

15             The Commonwealth of Massachusetts

16             One Ashburton Place

17             Boston, Massachusetts 02108

18             Telephone:  617.963.2567

19             Email:  jim.sweeney@state.ma.us

20

21
```

Page 3

```
 1                    INDEX

 2             Deposition of GUY ROSSI

 3                November 6, 2017

 4

 5   Examination By:                       Page

 6   Mr. Sweeney                              4

 7

 8

 9   Exhibit No:                          Marked

10   Exhibit 1    Subpoena and Notice of Deposition     6

11   Exhibit 2    Expert Witness Report and CV         10

12   Exhibit 3    Testimony List                       17

13   Exhibit 4    Expert Witness Report               156

14   Exhibit 5    Deposition Transcript               158

15   Exhibit 6    Excerpt of Transcript               159

16   Exhibit 7    Excerpt of Transcript               160

17   Exhibit 8    Excerpt of Transcript               161

18   Exhibit 9    Excerpt of Transcript               162

19   Exhibit 10   Excerpt of Transcript               163

20   Exhibit 11   Excerpt of Transcript               164

21             (Exhibits attached to transcript.)
```

Page 4

```
 1     PROCEEDINGS

 2   Whereupon,

 3     GUY ROSSI

 4   called as a witness, having been first duly sworn to

 5   tell the truth, the whole truth, and nothing but the

 6   truth, was examined and testified as follows:

 7     EXAMINATION BY MR. JAMES SWEENEY:

 8   Q.  Good morning.  My name is Jim Sweeney.  I'm

 9   with the Massachusetts Attorney General's Office State

10   Trial Counsel; and in this case we represent the

11   defendants Attorney General Maura Healey and others.

12     And I'll ask you to identify yourself for

13   the record.

14   A.  Yes.  My name is Guy Rossi.

15   Q.  And will you give us your home and business

16   address.

17   A.  Redacted Personal Information

18

19                                  Rochester, New York.

20   Q.  And do you have a business address as well?

21   A.  It's the same.
```

Page 5

```
 1   Q.  The same.  Okay.

 2     Now, I take it you've been deposed before?

 3   A.  Yes.

 4   Q.  So I'm just going to go over a few of the

 5   ground rules for the deposition just to make sure that

 6   we're clear.

 7     If any of my questions are unclear, please

 8   ask me to clarify them.  They can easily get

 9   convoluted, so please just ask me.  If you don't seek

10   clarification and you answer the question, I'll assume

11   that you understood the question.

12     Please wait for me to finish asking the

13   question before you start to answer so that our

14   stenographer, Melinda, can take it down; and please

15   answer orally as she cannot take down nods of the head

16   and other nonverbal gestures.

17     If you need a break at any time, just let

18   me know.  We can always break as long as there is no

19   question pending.

20     And please understand that as you just --

21   that you're under oath.  You're obligated to answer
```

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi -  Vol. 1
November 6, 2017

Page 30

1  case, and is that case related to the federal court
2  case?
3  A.  It's the second -- it's one in the same
4  case.  Part of it was criminal, and part of it was
5  civil.
6  Q.  Okay.  And you testified for the County of
7  Monroe in that case.
8      Do you recall what your testimony was?
9  A.  Yes.  It was that the officer's actions
10 were within the policies of the Monroe County Sheriff's
11 Department within the confines and the guidance of
12 New York State Article Penal Law 35, which is
13 justification of use of force, and that their actions
14 were not unreasonable.
15 Q.  And there was no firearm --
16 A.  No firearm in that case --
17 Q.  -- used in that case, correct?
18 A.  -- no.
19 Q.  Do you recall whether you gave depositions
20 in any of the cases that we've talked about so far?
21 A.  Whether I gave --

Page 31

1  Q.  Depositions.
2  A.  -- depositions?  I gave depositions --
3  honestly, I can't say for certain off the top of my
4  head.
5  Q.  Have you ever given expert testimony in a
6  case in which your opinion has been that either an
7  officer or an individual party has used more force than
8  necessary in the circumstances?
9  A.  No.  I don't think so.
10 Q.  Let's turn to the last category on
11 Exhibit 3, Recent Depositions.
12 A.  Yes.
13 Q.  First one is a New York State Rifle and
14 Pistol Association versus Andrew Cuomo.
15    What was your -- what was the -- strike
16 that.
17    Can you tell me the -- what that case was
18 about.
19 A.  That case was similar in nature to the case
20 that we're presently on.  It was an -- it's a case that
21 restricted certain firearms, possession by law-abiding

Page 32

1  citizens, magazine capacities, issues with certain
2  weapons being considered illegal.  Basically, that was
3  about it.
4  Q.  And you were an expert in that case?
5  A.  Yes.
6  Q.  Did you do an expert report?
7  A.  I did.
8  Q.  And what were your -- in general, what were
9  your opinions in that case?
10 A.  My opinions were that the State of New York
11 basically arbitrarily decided that certain firearms
12 were to be banned and that it restricted the ability of
13 law-abiding citizens to be able to protect themselves
14 in their homes.  That was about it.
15 Q.  Were your opinions in that case similar to
16 those in the report in this case, the Worman case?
17 A.  Yes.
18 Q.  Check the next one.  Shew versus Malloy in
19 Connecticut.
20    Can you just tell me the circumstances of
21 that case.

Page 33

1  A.  They're fairly similar.  With the exception
2  of Huellett that you see here, all of them are fairly
3  similar cases.
4  Q.  So let's -- so Shew, Kolbe, and Flanagan
5  are all similar?
6  A.  Yes.
7  Q.  And you did both the report and had a
8  deposition taken in each one of those?
9  A.  Yes, I believe so.
10 Q.  And they each involved challenges or
11 restrictions on use of certain firearms and magazines?
12 A.  That's correct.
13 Q.  And, in general, what was your opinion in
14 each of those cases?  Was your opinion substantially
15 the same in each of those cases?
16 A.  It was, yes.
17 Q.  Okay.  And that was what?
18 A.  Yes.
19 Q.  Same as in the New York State Rifle
20 Association versus Cuomo?
21 A.  Yes.

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 1252 of 1262

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi -  Vol. 1
November 6, 2017

Page 34

1  Q.   Huellett versus Syracuse, what were the
2  circumstances in that case?
3  A.   That was a police officer.  Again, it's a
4  use of force on an individual that was handicapped on a
5  bus that was tasered to gain control of him when he
6  refused to get off the bus.
7  Q.   And you were retained as an expert in that
8  case?
9  A.   Yes.
10  Q.   By whom?
11  A.   By the City of Syracuse.
12  Q.   And was a firearm used in that case?
13  A.   No.
14  Q.   I presume you don't consider a taser a
15  firearm?
16  A.   No, I don't.
17  Q.   And what was your opinion in that case?
18  A.   That the officers acted reasonably based on
19  the totality of the circumstances.
20  Q.   Now, just turning your attention back to
21  the other four cases in your "Recent Deposition"

Page 35

1  category involving restrictions of the use of firearms
2  and magazines -- and you said that you testified in each
3  of those that -- against the restrictions in each
4  particular state provision.
5     Have you ever testified that a restriction
6  on firearms in any way is reasonable and appropriate?
7  A.   I believe so if we're talking about
8  fully-automatic firearms.
9  Q.   So in what circumstance did you testify as
10  to that?
11  A.   It basically was a generality in my
12  depositions at some point.  I discussed that, for the
13  common citizen, a fully-automatic firearm really isn't
14  reasonable.  That's more of a military weapon or a
15  special police-type service-type weapon.
16  Q.   And so can you explain why you draw that
17  distinction.
18  A.   Based on my training and experience, a
19  fully-automatic firearm is more difficult to control,
20  more difficult to aim, greater chances of hitting an
21  unintended target.  It's also more likely to

Page 36

1  mis-function when needed.
2  Q.   And so what is your opinion in terms of
3  what restrictions are appropriate on the use of
4  fully-automatic weapons?
5  A.   Well, I personally don't believe that they
6  should be used by citizens unless there is a specific
7  reason; for example, a collector of firearms that may
8  be interested in World War II type of weapons, you
9  know, sporting type of events.
10     For the most part, I don't see a
11  fully-automatic weapon being something that the average
12  citizen would want to have to protect themselves.  I'm
13  sure, when they're at the other end of a gun fight,
14  they probably all wish they had one.  But the reality
15  is that they're very hard to control, and they're very
16  hard to be accurate with.
17  Q.   So you think they should only be available
18  to citizens for a collection or for sporting?  What do
19  you mean by -- is that right?
20  A.   Sporting.  Yeah, what I mean by that is
21  that there is definitely, I think, a historical basis

Page 37

1  that some of these weapons, just like our -- some of
2  our old war planes and -- you know, that we still
3  maintain just to be able to see what it looked like --
4  I'll say World War II -- how they fired.
5     Like, I'm sure there is a nostalgia about,
6  for instance, you know, the gangs in Chicago -- they
7  used a Tommy gun -- what a Tommy gun was actually like
8  in comparison to our current machine guns.  You know,
9  you can look at it from a historical point of view, the
10  rate of fire, what it was able to do.
11     I mean, things like that the Tommy gun was
12  extremely heavy.  You know, you wouldn't have an
13  appreciation until you had one of those things in your
14  hand and realized it was about 25 pounds fully loaded
15  in comparison to the weapons that are carried today.
16  Q.   So, for collectible purposes, you think
17  it's a good thing that when -- strike that.
18     So you think that fully-automatic weapons
19  should still be able to be used by collectors?
20  A.   For legitimate collectors and historians,
21  yes.

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi - Vol. 1
November 6, 2017

Page 38

1  Q.   And you also mentioned for sporting
2  purposes.
3      What do you mean by that?
4  A.   Well, I know that certain states have
5  different laws, right?  And in Nevada, for instance, I
6  believe you can have a fully-automatic weapon if you
7  purchase the license for that.  It's very expensive.
8      They do have tournaments with some of these
9  weapons, different types of weapons, you know; and so,
10  in that case, it would be sporting.  Whether it's to
11  knock down bowling pins or punch holes in paper, there
12  are sporting events.
13  Q.   And so is it your opinion that, outside of
14  sporting events and collectibles, that fully-automatic
15  weapons are appropriately restricted or should be
16  appropriately restricted?
17  A.   Other than military and police, that's
18  correct.
19  Q.   Are you familiar with the term "bump
20  stock"?
21  A.   Yes.

Page 39

1  Q.   And what is a bump stock?
2  A.   It's a gadget.  It's a device that cycles a
3  trigger based upon the recoil of the rifle.  Kind of
4  reminds me of a sewing needle on a sewing machine.  You
5  press your foot on the pedal.  And it is not
6  necessarily fully-automatic, but it is a simulation at
7  a low level of what a fully-automatic rifle could be.
8  Q.   When you say "simulation at a low level,"
9  what do you mean by that?
10  A.   Well, a fully-automatic weapon is you pull
11  the trigger and the weapon continues to fire until it
12  either runs out of ammunition or you take your finger
13  off the trigger.
14      In the instance of a bump stock,
15  technically the trigger is pulled each time.  It's just
16  that the relationship of the speed that that occurs is
17  faster than most people could pull the trigger
18  manually.
19  Q.   Because it continually shoots then?
20  A.   It pulls the trigger, but it doesn't hold
21  the trigger down.  If you held the trigger down, it

Page 40

1  wouldn't shoot another round in a semi-automatic.
2  Q.   But it continues to pull the trigger?
3  A.   Yeah.  By that device, yes.
4  Q.   All right.  Again, I mean by the device.
5  A.   Yes.
6  Q.   And so is the effect then of a bump stock
7  to make a semi-automatic weapon similar in the way that
8  it fires to a fully-automatic weapon?
9      MR. JOHN SWEENEY: Objection.
10      THE WITNESS: One more time with the
11  question, please.
12      MR. JAMES SWEENEY: Will you repeat that.
13      (Record read.)
14      THE WITNESS: No.
15      BY MR. JAMES SWEENEY:
16  Q.   Why not?
17  A.   A bump stock, it's a gadget.  It's not ---
18  it's designed outside of the manufacturer's design for
19  that weapon.  It's kind of like putting a hot muffler
20  on a car, you know.  It's an accessory, but it does not
21  actually make the weapon fully-automatic.  It also is

Page 41

1  very hard to control and site, so I don't think that
2  they are one in the same.
3  Q.   Could be the ammunition fires much more
4  rapidly with a bump stock than it does from a -- strike
5  that.
6      The ammunition, the bullets, fire much more
7  rapidly from a semi-automatic weapon with a bump stock
8  than without a bump stock; is that fair to say?
9  A.   Generally, that would be true; however,
10  there are some individuals that could fire a weapon
11  without the bump stock just as quick, especially those
12  in the military and police.
13  Q.   But, generally, that's true for -- and that
14  would be generally true for civilians?
15  A.   Yes.
16  Q.   And one of the features of a
17  fully-automatic weapon is that it fires its rounds
18  rapidly in rapid succession?
19  A.   Yes.
20  Q.   Other than the testimony that you say
21  you've had throughout some of the depositions you've

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 1254 of 1262

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi - Vol. 1
November 6, 2017

Page 46

1  appropriate to use certain levels of force?
2  A. Oh, yes.
3  Q. Let's take a look at your employment
4  history --
5  A. Okay.
6  Q. -- and starting from the earlier times and
7  going forward.
8  A. Okay.
9  Q. We're not going to be looking for every
10  last little bit since it's been a long career, but you
11  had several positions in the early -- in the first 10
12  or more years -- 10 to 15 years with police
13  departments. And that would be with Monroe County,
14  Village of Fairport -- I'm not going to say it right.
15  Irondequoit?
16  A. Irondequoit.
17  Q. Irondequoit. Not so bad -- City of
18  Rochester.
19     What type of training did you receive as
20  part of those positions on the -- in terms of weapons?
21  What types of weapons were you trained to use?

Page 47

1  A. I was trained to use handguns, shotguns.
2  I was trained in a rifle. I was trained in less lethal
3  weapons and chemical agents.
4  Q. So you were not trained in those -- so
5  those are all -- so those are -- strike that.
6     You weren't trained on any weapons other
7  than the ones you just mentioned?
8  A. Yes.
9  Q. Okay. So you weren't trained how to use an
10  AK-57 or any of those types of weapons?
11  A. No. I fired some of those in training, but
12  I wasn't trained specifically in those weapons.
13  Q. The police departments didn't provide you
14  training on use of those weapons?
15  A. That's correct.
16  Q. And you didn't generally have those weapons
17  available to you to use in that police department?
18  A. No. They're more of a type of just -- I
19  forgot the word. It skips me. But it was just
20  something to be able to fire, let's say, a grease gun
21  from World War II or to be able to fire an AK or an FN

Page 48

1  just to be able to show and become familiar with the
2  type of weapons that you might deal with on the street
3  if it was confiscated from, say, a civilian or found.
4  Q. Okay. But in those communities, you
5  weren't trained to use them in your daily police work?
6  A. Oh, no, no.
7  Q. Is that because there wasn't a need to use
8  those kinds of weapons in the police work in those
9  particular towns?
10  A. Well, there wasn't a need for the
11  assignment that I was in to have an automatic or a
12  select fire weapon because I was not a SWAT member. So
13  there wasn't a need for me. So if I was assigned to a
14  school to go learn how to use one of those weapons,
15  I would probably be part of a SWAT team or a
16  specialized unit.
17  Q. So the SWAT unit or specialized unit would
18  be trained in those more assault type weapons, as
19  they're called.
20  A. They would be trained in weapons that would
21  be semi-automatic or controlled burst type of weapons.

Page 49

1  Q. Okay. But, since you were not a member of
2  those units, you weren't trained in those?
3  A. I was not trained in those weapons.
4  Q. And is that -- so is it fair to say, for
5  those types of weapons, the semi-automatic and the
6  burst weapons, that those are weapons that require more
7  training in order to be able to use them effectively or
8  well?
9     MR. JOHN SWEENEY: Objection.
10     THE WITNESS: The weapons that are multiple
11  burst type weapons do take more training, in my
12  experience, to be able to control.
13     BY MR. JAMES SWEENEY:
14  Q. And, in your day-to-day police work in
15  those communities, you didn't have the -- you didn't
16  have the need to use those weapons?
17  A. There were days when I wish I had them,
18  but, no, I didn't. No.
19  Q. And different communities have different
20  law enforcement needs; is that fair to say?
21  A. That's correct.

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 1255 of 1262

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi -  Vol. 1
November 6, 2017

Page 82

1 Q.  So Exhibit 2 is your report as an expert in
2 this case.
3    Can you identify what you consider your
4 areas of expertise to be in this case.
5 A.  My area of expertise involves justifiable
6 use of force training specifically in response to
7 threat awareness levels, firearms as far as the use of,
8 not as far as the armature type of areas.  I'm not a
9 gunsmith by any means or anything like that.
10    My area is use of less than lethal force
11 and deadly physical force if needed, policies of police
12 departments, training of police departments, and
13 training in simulational environments with weapons
14 designed to use for instructional purposes that are
15 similar to real world weapons.
16 Q.  Okay.  You're not a lawyer?
17 A.  I am not a lawyer.
18    MR. JOHN SWEENEY: Would this be a good
19 time to take a break?
20    MR. JAMES SWEENEY: Yes.
21    (A brief recess was taken.)

Page 83

1    BY MR. JAMES SWEENEY:
2 Q.  Back on the record.  Turning your attention
3 back to Exhibit 2, your report.
4 A.  Okay.
5 Q.  Just going to direct your attention to
6 particular parts of the report and ask you some
7 questions about them.
8    So if you can take a look at Page 3,
9 subsection Roman numeral II, you state in the second
10 paragraph, second sentence:
11    "On a nationwide basis, most pistols are
12 manufactured with magazines holding 10 to 17 rounds."
13    The magazines, to the best your knowledge,
14 aren't actually manufactured into the gun or the
15 firearm; is that right?
16    MR. JOHN SWEENEY: Objection.
17    THE WITNESS: Generally, the magazines I'm
18 talking about are external magazines that are loaded
19 into the weapon.
20    BY MR. JAMES SWEENEY:
21 Q.  Is it possible to get magazines of ten

Page 84

1 rounds or less that fit any firearm?
2 A.  It is possible; however, some of those
3 magazines may not function correctly because, when the
4 weapons are designed by the manufacturer, the magazines
5 are a vital component to its ability to function.
6 Q.  And so there are magazines of ten rounds or
7 less, and they may or may not function properly in the
8 particular --
9 A.  They're after market, yes.
10 Q.  And these magazines of ten or less, are
11 they available for sale to the general public?
12 A.  I believe so, yes.
13 Q.  And those would be for handguns?
14 A.  Handguns and rifles.
15 Q.  And rifles.  ARs?
16 A.  Yes.
17 Q.  Now, do you have any information based on
18 studies or reports on the number of rounds an
19 average -- citizens in average have fired when using a
20 weapon in self-defense in their home?
21 A.  No, I do not.

Page 85

1 Q.  Now, you answered in the series of previous
2 questions that, when a civilian or a homeowner has a
3 weapon, that's generally used in self-defense; is that
4 right?
5    MR. JOHN SWEENEY: Objection.
6    THE WITNESS: Used in self-defense or
7 recreational use.
8    BY MR. JAMES SWEENEY:
9 Q.  Or recreational use.  That's right.
10    But that's different than a police officer
11 who in addition to trying to defend themselves also
12 have the goal of trying to apprehend an assailant,
13 suspect, or criminal, correct?
14 A.  I can't agree with that statement.
15 Q.  And why not?
16 A.  Because it's making the assumption that a
17 civilian may not use deadly force and hold an
18 individual at bay after they use deadly force for the
19 police or even pursue an individual on their own
20 property to stop the commission of a crime.  So, I
21 mean, that's an assumption that I can't make.

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Page 94

1  capability of controlling to the point where it would
2  injure others that are not involved, that would be
3  correct.
4  Q.  So by your reference to "short of weapons
5  that they have trouble controlling," do you mean in
6  terms of their training?
7  A.  Training, type of weapon, you know,
8  explosive versus a bullet.  You know, somebody may be
9  not well-trained in the use of a shotgun having a
10 shotgun with double odd buck in it, you know; and not
11 realizing that there is several pellets, they're going
12 in opposite directions.  You know, if you don't know
13 how to use it, you shouldn't be having it.
14 Q.  Okay.  Turn back, though, just to law
15 enforcement officers.  And you said that they would
16 want to make sure they have sufficient weapons for the
17 situation.
18     But wouldn't they prefer to have the
19 assailant, the suspect, whoever they're trying to
20 apprehend, have the least -- less deadly force rather
21 than more deadly force?

Page 95

1  A.  I think that would be applicable to any
2  situation where an individual is facing a threat, not
3  just law enforcement.
4  Q.  Okay.  Anyone, though?
5  A.  Yes.
6  Q.  And a smaller magazine capacity has less
7  deadly force than a larger magazine capacity?
8     MR. JOHN SWEENEY: Objection.
9     THE WITNESS: I don't agree with that
10 comment at all.
11    BY MR. JAMES SWEENEY:
12 Q.  And why is that?
13 A.  One bullet could be just as deadly as ten.
14 Q.  True.
15    But more bullets have a better chance of
16 hitting someone; isn't that right?
17 A.  I could not generalize that statement.
18 Q.  If there's more bullets -- well, strike
19 that.
20    If there's more rounds being shot, then --
21 strike that.

Page 96

1     A law enforcement officer or any individual
2  would prefer to have less rounds shot at them rather
3  than more rounds; is that fair to say?
4  A.  No rounds would be best.
5  Q.  No rounds would be best.
6     Fewer rounds would be better?
7  A.  Right.
8  Q.  More rounds would be worse --
9  A.  Correct.
10 Q.  -- is that fair?
11 A.  Yes.
12 Q.  All right.  Turn back to your report,
13 Exhibit 2, Section 2, Page 3, first sentence of that
14 first paragraph in Section 2.
15 A.  Okay.
16 Q.  You state that:
17    "The Massachusetts law bans standard
18 magazines that are in common use..."
19    Do you have any -- what do you base your
20 statement that those are in common use on?
21 A.  Basically, it's what is being used by the

Page 97

1  majority of individuals around the country and which
2  can be purchased or that have been inherited in time
3  from one generation to another.
4  Q.  Do you have any -- do you know of any
5  studies based on data on how common the use of those
6  magazines are?
7  A.  My only study is my own personal
8  experience.
9  Q.  And how about the reference in the next
10 paragraph to -- about halfway down in the second
11 paragraph:
12    "These pistols, rifles, and shotguns are
13 sold to civilians and are in common use for
14 self-defense, hunting, and nationally-established
15 sporting competitions."
16    Is that an -- are there any studies or
17 reports that you based that statement that "they are in
18 common use" on?
19 A.  Just watching what people bring to the
20 range and what people buy at gun shops, what people
21 show up to training with.  So that's how I base my

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

Guy Rossi -  Vol. 1
November 6, 2017

Page 98

1  perception and opinion on that part.
2  Q.   So it's based on your personal experience?
3  A.   Based on my personal experience, yes.
4  Q.   Just below that, Section Roman numeral III,
5  first sentence, references the Massachusetts law using
6  the term "assault weapon" to criminalize commonly used
7  firearms.
8      Same response in terms of how you
9  determined the basis of your statement that these are
10  commonly used firearms?
11  A.   Yes.
12  Q.   Based on your experience, your personal
13  observations and experience, not on any studies or
14  reports?
15  A.   Yes.
16  Q.   Over on the next page, Page 4, still in
17  Roman numeral III, first full paragraph says that:
18      "Restricting pistols, rifles, and shotguns
19  arbitrarily placed on an enumerated list..."
20      What's the basis -- all right.  Well, what
21  do you know about how the list of weapons was

Page 99

1  developed?
2  A.   I believe they took it from federal law,
3  and that's the basis of it.
4  Q.   So what's the basis of your statement that
5  they were arbitrarily placed on the list?
6  A.   They took common weapons that are -- that
7  function that appear like military weapons and kind of
8  group them all as part of the same threat -- part of
9  the same danger to society as a result of their
10  functioning.
11  Q.   Did you review any of the reasons as to how
12  that list was developed in the legislative history in
13  the testimony from the hearings about how that list was
14  developed and why certain guns were placed on there --
15  certain firearms were and other ones may not have been?
16  A.   My perception is that many of these laws
17  and lists are developed by one state copying another
18  state's laws to the point where they're almost
19  identical with the exception of one or two small
20  things.  I don't have any knowledge of the research as
21  to why they are on that list.

Page 100

1  Q.   You haven't looked into --
2  A.   Other than -- and most of those weapons
3  are -- had a foundation as a military or a law
4  enforcement type weapon to begin with.
5  Q.   So other than that, you haven't done any
6  research into how those weapons were put into those
7  lists?
8  A.   No.
9  Q.   Second part of that same sentence, you say
10  that placing these or restricting these on the above
11  features is -- strike that.
12      In that same sentence you say:
13      "Restricting pistols, rifles, and shotguns
14  arbitrarily placed on an enumerated list or on the
15  basis of the above features is not rationally related
16  to the safety and goals that the Attorney General
17  purports to achieve."
18      What's the basis for the statement that
19  it's not rationally related?
20  A.   Well, some of the restrictions are based on
21  cosmetic issues that really have nothing to do with the

Page 101

1  lethality of the firearm.  You know, I'll give you an
2  example.  A barrel shroud, almost every rifle or
3  shotgun made has some sort of stock-type device
4  underneath the barrel so you don't burn your hand on
5  it.
6      But because it may be metal and have holes
7  in it to air that barrel, it is now considered more
8  deadly than that rifle or shotgun that has a wooden
9  stock because of the way it looks or because of the
10  color that it's painted.  So those are some of the
11  things that I look at when I make that statement.
12  Q.   Okay.  Other than that example, what other
13  aspects do you consider are not rationally related to
14  the safety and goals?
15  A.   Well, I would think that if a municipality
16  or a government wanted their civilians to be -- feel
17  safe in their homes and society, that they would want
18  them to be following the law, be somewhat trained in
19  that device, feel comfortable using that device or tool
20  to the best of their ability.
21      So if they allowed them to have that weapon

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

Guy Rossi -  Vol. 1
November 6, 2017

Page 110

1 A.  Right.

2 Q.  Okay.  So your statement that it was a

3 common occurrence -- 30 to 40 percent occurrence

4 rate -- is that based on your experience in training

5 police officers?

6 A.  Not just my experience.  I trained firearms

7 instructors at our academy, advanced firearms

8 instructors school at our academy.

9     And I can tell you that every instructor

10 that I've ever talked to has agreed that that is a

11 common event and almost every day that they do training

12 and simulations somebody is getting a shot in the hand.

13 Q.  Is the 30 to 40 percent your estimate?

14 A.  That is my estimate, yes.

15 Q.  Is that based on any studies of actual

16 attacks in terms of how often police officers engaged

17 in a gun fight are struck in the hand by an attacker?

18 A.  It's not based on any specific study but on

19 my experience.

20 Q.  And do you know, from your experience as a

21 police officer, how many instances did a homeowner get

Page 111

1 struck in the hand by an assailant, someone intruding

2 into the home?

3 A.  I don't know of anyone.

4 Q.  Are you aware of any published studies in

5 which how often a homeowner is struck in the hand by a

6 home intruder or assailant?

7 A.  No.

8 Q.  In your personal experience as a police

9 officer, are you aware of any instances in which a

10 civilian had to fire more than ten rounds because of an

11 assailant in a home?

12 A.  That's really hard for me to answer.  I

13 don't recall any, but it's not that it couldn't have

14 happened in my time on the job.  I didn't keep track of

15 some of those things.

16 Q.  But you don't recall any?

17 A.  I don't recall any, no.

18 Q.  Are you generally aware of instances in

19 which a homeowner had to fire more that ten rounds

20 against a home intruder or an assailant?

21 A.  I make that statement -- or, it's mentioned

Page 112

1 because I'm transferring what I've learned in law

2 enforcement as far as the ability to hit a target under

3 stress to the civilian world.

4     And how I make that assessment is that, if

5 you have an individual that's a police officer that's

6 supposedly better trained than your average civilian

7 that goes to the gun range once or twice a year, right,

8 that is only hitting their target in a close range

9 encounter maybe 20 or 30 percent of the time if they're

10 lucky, all right...

11     If they're having that difficulty under

12 stress, I think it's safe to assume -- and, again, when

13 you make an assumption, you know what it does -- but

14 the bottom line is it does transfer over, I think, to

15 the civilian world as well; that they're not going to

16 be even as capable as an officer who's had more

17 training.

18 Q.  So the homeowner situations where there is

19 an intruder, it's generally closer encounters as you

20 indicate in your answer -- closer range encounters?

21 A.  That's not necessarily true.  Law

Page 113

1 enforcement encounters, shooting encounters, are --

2 actually, seem to be closer to me in my perception than

3 those where a citizen encounters an individual with a

4 gun.

5 Q.  In their home?

6 A.  In or around their home.  Once they're

7 outside their house, yes.

8 Q.  So are you aware of any circumstances in

9 which a homeowner had to fire more than ten rounds to

10 deal with an intruder?

11 A.  Not that I'm aware of off the top of my

12 head.

13 Q.  Turn your attention to Page 7 of your

14 report.  The second full paragraph, you reference a

15 2015 report in which you say there were 33 instances of

16 police discharging firearms.

17     And this is in regard to the New York City

18 Police Department?

19 A.  Yes.

20 Q.  And, in 17 percent of those, more than ten

21 rounds were fired?

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi -   Vol. 1
November 6, 2017

Page 114

1  A.  Uh-huh.

2  Q.  And that's a report involving the New York

3  City Police Department, correct?

4  A.  New York City Police Department, yes.

5  Q.  And those all involved on-duty incidents;

6  is that right?

7  A.  I believe that they -- when you say

8  "on-duty," police departments consider, when an officer

9  is involved in an incident where they've fired their

10  weapon, generally, that the moment that they engaged

11  that they're on duty for the most part.  It may not be

12  uniform.  It may be in plainclothes as well, so it's

13  hard to say specifically.

14  Q.  But they would involve on-duty to the

15  extent of that rather than incidents in the officer's

16  home?

17  A.  Yes.

18  Q.  Is that fair?

19  A.  Yeah.

20  Q.  Do you know if any of those involved the

21  pursuit of assailants?

Page 115

1  A.  They did.  They did.

2  Q.  The ones in which more than ten rounds were

3  fired?

4  A.  They did.

5  Q.  Okay.

6  A.  Some of them did involve pursuit, yes.

7  Q.  Okay.  Do you know how many?

8  A.  No.

9  Q.  And the pursuit we're talking about is the

10  pursuit of assailants or suspects or --

11  A.  Yeah, somebody running away or shooting --

12  a gunfight back and forth.

13  Q.  Do you know whether any of those officers

14  were disciplined in any way for discharging more rounds

15  than were necessary under the circumstances?

16  A.  No.

17  Q.  Do you know whether any of those incidents

18  involved more than one suspect or assailant?

19  A.  I don't recall.  I haven't read it in a

20  while.

21  Q.  Do you know whether any of those incidents

Page 116

1  involved an assault by a suspect against the police

2  officer?

3  A.  Yes.

4  Q.  Okay.  How many involved that?

5  A.  There were close-range encounters --

6  subdued and aggressive behavior.  Eventually, every

7  police officer has to approach an individual that

8  they're trying to control, so there is a component

9  where they have to close the distance in order to take

10  the person into custody.

11  Q.  So can you tell me about any -- for any of

12  these instances, what the circumstances were in which

13  the suspect or assailant attempted to assault the

14  police officer?  Do you know the specifics?

15  A.  I don't know the specifics without reading

16  it again.

17  Q.  Okay.  So we know that generally, once they

18  close in on the suspect, then they're going to be in

19  closer range?

20  A.  You're going to be in closer range, but

21  that doesn't necessarily mean they're going to hit

Page 117

1  their target.

2  Q.  It doesn't necessarily mean that the

3  suspect assaulted a police officer?

4  A.  We don't know.  I don't know.  I can't say

5  "yes" or "no" to that.

6  Q.  Okay.  In the next section of your

7  report --

8  MR. JOHN SWEENEY: Would this be a good

9  time to take a break?

10  MR. JAMES SWEENEY: Sure.

11  (A brief recess was taken.)

12  BY MR. JAMES SWEENEY:

13  Q.  Back on the record.  Turn your attention to

14  the next page of your report, which is "The Effective

15  of Time Delay Caused By Loading."

16  Are you aware of any particular instances

17  with a lack of the use of a reloading hand caused a

18  problem for a homeowner defending against an intruder?

19  A.  Where a -- why don't you clarify that?

20  Q.  Sure.  Your section here -- this section of

21  the report talks about the effect of the loss of use of

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 1260 of 1262

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi -  Vol. 1
November 6, 2017

Page 126

1  I mean, in the military, you have more need to actually
2  shoot through cover at an adversary that may be hiding
3  behind cover than...
4  Q.   What kind of cover do you have in mind?
5  A.   Well, I mean, you're talking about an
6  average two by four, you know.  And if you've got a
7  drywall and somebody is standing behind drywall,
8  obviously, the .223 will go through drywall.
9     But if it hits that stud, that two by four
10  stud, it may or may not go through depending on the
11  pressure of the round that's coming out.  The military
12  round is a little hot.
13  Q.   So it's more likely to go through the two
14  by four?
15  A.   Yeah, more likely to go through the two by
16  four.  Also, they have an ability to be able to make it
17  armor piercing as well as a result of that, so it's
18  designed slightly differently.  And the primers of
19  those rounds are harder as well for heavy duty use.
20  Let's see.
21  Q.   Any other differences between the AR-15 and

Page 127

1  the M-16 and M-4?
2  A.   Well, I mean, the barrels can be longer or
3  shorter depending on the circumstances.  There are
4  AR-15s that are designed to be rifles for hunting that
5  have longer barrels, heavier duty barrels.
6     The AR-15 for the most part has been a .223
7  round; but, however, recently, that has changed to
8  several calibers.  So the actual model, the type of
9  weapon itself, is now manufactured in anything from a
10  9 millimeter to .22s.  The sighting systems can be
11  different.
12  Q.   In what way?
13  A.   In that they're more easily customizable
14  military weapons.
15  Q.   More easily customizable in which ones?
16  A.   Sighting platforms.  You could have night
17  sights on it.  You could have lasers on it.  You could
18  have optical devices that would see in the dark.
19  Q.   Is that on the M-16 and M-4?
20  A.   M-16, yes.  Let's see what else.
21  Q.   Any other differences?

Page 128

1  A.   I mean, the biggest difference as I stated
2  in the report is that M-16 and M-4 are designed
3  specifically to be able to perform what's called
4  "suppressive fire."
5  Q.   What do you mean by "suppressive fire"?
6  A.   Basically, it's a situation in combat where
7  you hope that your person that's your opponent or your
8  assailant at one point puts their head down behind
9  cover and you are able to keep their head down behind
10  cover to the point where you can either move to a safer
11  position or you can violate their cover and get around
12  it while they're holding their head down and be able
13  to, you know, use force to control them -- kill them if
14  that's the case.
15  Q.   And fully-automatic fire usually does that?
16  A.   Oh, definitely.
17  Q.   Any other differences that you haven't
18  mentioned?
19  A.   I know the bolt carrier is slightly
20  different.  That's about it off the top of my head.
21  Q.   Okay.  Over on Page 10 of your report, last

Page 129

1  paragraph of Section Roman numeral VI.  Just before the
2  beginning of Roman numeral VII, you state that certain
3  firearms are widely sought after by civilians for
4  hunting, sporting competitions, and self-defense.
5     What do you base that statement on that
6  they are widely sought after by civilians for these
7  purposes?
8  A.   I think it is exactly what it says there.
9  I mean, civilians use these weapons for hunting.  They
10  compete with these weapons, and they have those weapons
11  for defense in their homes.
12     And, as a result, most civilians want to
13  purchase a weapon that is not only functional, but
14  something that is going to work every time.  And the
15  best proving ground for that has traditionally been the
16  military from the days we started making weapons.
17  Q.   So do you have any studies or reports on
18  how many people seek these weapons?
19  A.   I can only tell you based on my experience
20  that civilians gravitate towards what police and the
21  military tend to believe are reliable.

David Seth Worman, et al. vs.
Charles D. Baker, et al.

Guy Rossi - Vol. 1
November 6, 2017

Page 150

1  Q.   -- it's certainly a bigger gun than a

2  handgun?

3  A.   Right.

4  Q.   Next paragraph, in terms of accuracy, are

5  handguns less accurate at short range?

6  A.   Handguns are less accurate period than a --

7  you're asking me than a rifle, I'm assuming, right?

8  Q.   Yeah.

9  A.   Yes.  In general, yes, they're less

10  accurate than a rifle.

11  Q.   Even at short range?

12  A.   Even at short range because of the fact

13  that the barrel being longer, it's more precise, you

14  know.  I mean, if you're talking about accuracy, the

15  rifle is more accurate regardless.

16      If you're talking about distance as far as

17  the ability to retain the weapon, it may be a different

18  issue, so...

19  Q.   And what do you mean by that?

20  A.   What I'm talking about -- you're talking

21  about accuracy here.  So accuracy is the ability to be

Page 151

1  able to place that object within a certain tolerance

2  spot, let's say, okay?  And, regardless, the handgun,

3  having a shorter barrel, is less accurate consistently

4  than a rifle.

5  Q.   And does it make a difference, though, at

6  all over what range?

7  A.   Oh, it certainly makes a difference over

8  range.  To say that I haven't seen anybody that could

9  shoot a handgun as well as a rifle would be a lie.

10  There is some crack shots that I've seen be able to do

11  things at a hundred yards with a handgun.

12      But you really wouldn't want to be shooting

13  a hundred yards with a handgun because it's really

14  futile for most people.

15  Q.   All right.  But in a shorter distance, a

16  handgun is going to be much more accurate?

17  A.   Not more accurate.  More convenient and

18  more ergonomically easy to be in that environment with.

19  Accuracy is totally different.

20  Q.   But there are some benefits to a handgun at

21  shorter distances?

Page 152

1  A.   Certainly, there are some benefits to a

2  handgun.

3  Q.   Okay.  And what are those?

4  A.   Conceal ability, the ability to be able to

5  pull it out and be able to use it sometimes more

6  quickly depending on if it's underneath clothing.  I

7  mean, those are just some of the things.

8  Q.   You also state here that:

9      "Most crimes are committed with handguns."

10      Do you have any reports or studies that you

11  base that on?  How often -- do you have any reports or

12  studies of data that show how often the banned weapons

13  are used in crimes of the home?

14  A.   I could only -- no, no studies.  Just based

15  on my experience.

16  Q.   Okay.  And, as you said before, you're

17  not -- you don't -- you're not a lawyer?  You're not an

18  expert in statutory interpretation?

19  A.   No.

20  Q.   All right.  Let's turn to Page 14.  Roman

21  numeral XX, "THE RIGHT AND ABILITY TO DEFEND ONE SELF,"

Page 153

1  that section.  The last paragraph of that section you

2  state:

3      "Civilians need an advantage over the

4  criminals against whom they must defend themselves,

5  especially in the home, and should not be required or

6  expected to defend themselves against dangerous

7  criminals without superior, or at the very least

8  comparable, firearms."

9      Since criminals can theoretically get any

10  type of weapon, does that mean you think that citizens

11  should also be able to be entitled to have any type of

12  weapon?

13  A.   When you say "any type of weapon," I have

14  never known of a criminal walking in with a machine gun

15  into somebody's home.

16  Q.   So apart from machine guns then?

17  A.   Apart from machine guns, I would say they

18  should at least be on equal foundation than the

19  criminal.

20  Q.   So it's your view that, if criminals can

21  get the banned weapons, then citizens shouldn't be

Case 1:17-cv-10107-WGY   Document 65-1   Filed 12/15/17   Page 1262 of 1262

David Seth Worman, et al.  vs.
Charles D. Baker, et al.

Guy Rossi -  Vol. 1
November 6, 2017

Page 166

1    CERTIFICATE OF DEPONENT

2

3    I hereby certify that I have read and

4  examined the foregoing transcript, and the same is a

5  true and accurate record of the testimony given by me.

6    Any additions or corrections that I feel

7  are necessary will be made on the Errata Sheet.

8

9

10

11  _____

12  GUY ROSSI

13

14

15  _____

16  Date

17

18  (If needed, make additional copies of the Errata Sheet

19  on the next page or use a blank piece of paper.)

20

21

---

Page 167

1              ERRATA SHEET

2  Case:  Worman, et al. vs. Baker, et al.

3  Witness: GUY ROSSI          Date: 11/06/2017

4  PAGE/LINE        SHOULD READ       REASON FOR CHANGE

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

---

Page 168

1  District of Columbia, to wit:

2        I, Melinda Johnson, CSR, a Notary Public of

3  the District of Columbia, do hereby certify that the

4  within-named witness personally appeared before me at

5  the time and place herein set out, and after having

6  been duly sworn by me, according to law, was examined

7  by counsel.

8        I further certify that the examination was

9  recorded stenographically by me and this transcript is

10  a true record of the proceedings.

11        I further certify that I am not of counsel

12  to any of the parties, nor in any way interested in the

13  outcome of this action.

14        As witness my hand this 17th day of

15  November, 2017.

16                    _Melinda Johnson_  _____

17                    Melinda Johnson, CSR

18                    Notary Public

19

20  My Commission Expires:

21  February 14, 2022

---