# EXHIBIT 59

## TO KAPLAN DECLARATION

An Advisory from the Attorney General's Fair Labor Division on
M.G.L. c. 149, s. 148B
2008/1[1]

The Office of the Attorney General (AGO) issues the following Advisory regarding M.G.L. c. 149, s. 148B, the Massachusetts Independent Contractor Law or the Massachusetts Misclassification Law (the "Law"). This Advisory provides guidance with respect to the Attorney General's understanding of and enforcement of the Law. This Advisory is not a formal opinion. Opinions of the Attorney General are formal documents rendered pursuant to specific statutory authority. M.G.L. c. 12, s. 3, 6, and 9. The Advisory is intended to provide guidance only and does not create any rights or remedies.

## I. INTRODUCTION

### A. The Need for Enforcement

The need for proper classification of individuals in the workplace is of paramount importance to the Commonwealth.[2] Entities that misclassify individuals are in many cases committing insurance fraud and deprive individuals of the many protections and benefits, both public and private, that employees enjoy. Misclassified individuals are often left without unemployment insurance and workers' compensation benefits. In addition, misclassified individuals do not have access to employer-provided health care and may be paid reduced wages or cash as wage payments.

Similarly, entities that misclassify individuals deprive the Commonwealth of tax revenue that the state would otherwise receive from payroll taxes. In addition, as a result of misclassification, the Commonwealth often incurs additional costs, such as providing health care coverage for uninsured workers. Other potential costs for the Commonwealth include providing workers' compensation benefits paid by the Workers' Compensation Trust Fund, and unemployment assistance without employer contribution into the Division of Unemployment Assistance fund, among other indirect costs.

Finally, businesses that properly classify employees and follow all of the relevant statutes regarding employment are likely to be at a distinct competitive disadvantage when vying for the same work, customers or contracts as those businesses that do not play by the rules. Further, by paying the proper taxes and insurance premiums, businesses following the Law are, in effect, subsidizing those businesses that do not. Misclassification undermines fair market competition and negatively impacts the business environment in the Commonwealth. The AGO expects businesses to contract only with businesses that properly classify their workers.

---

[1] This Advisory supersedes the Attorney General's prior Advisories regarding M.G.L. c. 149, s. 148B, including "An Advisory from the Attorney General, Amendments to Massachusetts Independent Contractor Law," Advisory 2004/2; and an "Advisory from the Attorney General's Fair Labor and Business Practices Division on the Issue of Employee Versus Independent Contractor," Advisory 94/3.

[2] The Commissioner of Revenue is charged with administering the Massachusetts wage withholding laws under M.G.L. c. 62B, which provides a different definition of employee than M.G.L. c. 149, s. 148B, for purposes of Massachusetts income tax withholding. See *Department of Revenue TIR 05-11: Effect of New Employee Classification under M.G.L. c. 149, s. 148B on Withholding of Tax on Wages under M.G.L. c. 62B*. In addition, a definition similar but not identical to M.G.L. c. 149, s. 148B, exists for unemployment insurance purposes. M.G.L. c. 151A, s. 2. The Massachusetts Workers' Compensation Law also provides a different definition of employee. M.G.L. c. 152, s. 1(4).

**B. The History of the Law**

The proper classification of employees has long been an issue of great concern in the Commonwealth. Under common law, a number of factors determined the existence of an employer/employee relationship based on the totality of the relationship. See, e.g., *Commonwealth v. Savage*, 31 Mass. App. Ct. 714 (1991). Those factors included the degree of control, the opportunity for profit and risk of loss, the employee's investment in the business facility, the permanency of the relationship, the skill required and the degree to which the employee's services were integral to the business.

In 1990, Massachusetts enacted the first version of the Law. By enacting the Law, the Legislature established that notwithstanding that a working relationship could be considered to be one of independent contractor under common law, the worker may still be deemed in employment for the purposes of the Law. *Boston Bicycle Couriers v. Deputy Director of the Division of Employment and Training*, 56 Mass. App. Ct. 473, 477 (2002).

Subsequent to its enactment in 1990, the Law has undergone several amendments including: Section 214 of Chapter 286 of the Acts of 1992; Section 165 of Chapter 110 of the Acts of 1993; Section 12 of Chapter 236 of the Acts of 1998; and Section 26 of Chapter 193 of the Acts of 2004. The 2004 amendment was part of legislation making broad changes to the laws governing the public construction industry. However, the Law, including the 2004 amendment, applies more broadly to a wide range of industries. The 2004 amendment kept intact, in large part, the standard for determining whether an individual is an employee, but made several changes from the earlier version of the statute. The amendment deleted the element "or is performed outside of all places of the business of the enterprise" as an alternative factor in prong two. In addition, the first element of prong two of the Law had read: "such service is performed … outside the usual course of business *for which the service is performed…*" After the 2004 amendment, the element reads: "the service is performed outside the usual course of business *of the employer*." Finally, the amendment added "trade" to the list of activities eligible for independent contractor status in prong three.


## II. THE LAW

M.G.L. c. 149, s. 148B, provides a three-part test which requires that all three elements (commonly referred to as prongs one, two and three or the A, B, C test) must exist in order for an individual to be classified other than as an employee. The burden of proof is on the employer, and the inability of an employer to prove any one of the prongs is sufficient to conclude that the individual in question is an employee. M.G.L. c. 149, s. 148B (using the term "unless"). See also *Scalli v. Citizens Financial Group*, 2006 WL 1581625, *14 (D. Mass. 2006); *Rainbow Development, LLC v. Com., Dept. of Industrial Accidents,* 2005 WL 3543770, *2 (Mass. Sup. Ct. 2005).

Courts have had a limited opportunity to interpret M.G.L. c. 149, s. 148B. In *College News Service v. Department of Industrial Accidents*, 21 Mass.L.Rptr. 464, 2006 WL 2830971, the Superior Court noted that M.G.L. c. 149, s. 148B is almost identical to M.G.L. c. 151A, s. 2, the statute used by the Division of Unemployment Assistance, and therefore relied on the case law analyzing M.G.L. c. 151A, s. 2, to interpret M.G.L. c. 149, s. 148B. See *4 ("If the Legislature uses the same language in several provisions concerning the same subject matter [e.g., the definition of an employee in distinction from an independent contractor], the courts will presume it to have given the language the same meaning in each provision.").

See also *Commonwealth v. Germano*, 379 Mass. 268, 275-76 (1979). Because prongs one and three of M.G.L. c. 149, s. 148B and M.G.L. c. 151A, s. 2 are nearly identical and because prong two of M.G.L. c. 149, s. 148B contains one of the two steps of prong two in M.G.L. c. 151A, s. 2, Massachusetts case law interpreting M.G.L. c. 151A, s. 2 provides a useful guide to interpreting M.G.L. c. 149, s. 148B.

## A. The Three Prong Test

### Prong One: Freedom from Control

The first prong of M.G.L. c. 149, s. 148B provides that the individual must be "free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact" in order for the individual to be an independent contractor. In *Commissioner of the Division of Unemployment Assistance v. Town Taxi of Cape Cod*, 68 Mass. App. Ct. 426, 434 (2007), the Court noted in interpreting the nearly identical language of prong one of M.G.L. c. 151A, s. 2 that:

> The first part of the test examines the degree of control and direction retained by the employing entity over the services performed. The burden is upon the employer to demonstrate that the services at issue are performed free from its control or direction. The test is not so narrow as to require that a worker be entirely free from direction and control from outside forces.

*Id.* (citations omitted).

The first prong of the test includes a determination of the employer's actual control and direction of the individual. See M.G.L. c. 149, s. 148B (using the phrase "in fact"). An employment contract or job description indicating that an individual is free from supervisory direction or control is insufficient by itself to classify an individual as an independent contractor under the Law. To be free from an employer's direction and control, a worker's activities and duties should actually be carried out with minimal instruction. For example, an independent contractor completes the job using his or her own approach with little direction and dictates the hours that he or she will work on the job.

### Prong Two: Service Outside the Usual Course of the Employer's Business

Prong two of M.G.L. c. 149, s. 148B(a)(2) provides that the service the individual performs must be "outside the usual course of business of the employer" in order for the individual to not be classified as an employee. Prior to the 2004 amendment, the employer could alternatively demonstrate that the work was performed "outside of all places of the business of the enterprise." The Law does not define "usual course of business" and Massachusetts courts have had limited opportunities to do so. In *Athol Daily News v. Division of Employment and Training*, 439 Mass. 171, 179 (2003)*,* the Court found that newspaper carriers were performing the "usual course of business" of the newspaper relying on the employer's own definition of its business. In *American Zurich v. Dept. of Industrial Accidents*, 2006 WL 2205085, *4 (Mass. Super. 2006), Judge Paul Troy noted that "a worker whose services form a regular and continuing part of the employer's business" and "whose method of operation is not such an independent business" through which workers' compensation costs can be channeled, "should be found to be an employee." *Id.* Yet, "if the worker is performing services that are part of an independent, separate, and distinct business from that of the employer," prong two is not implicated. *Id.*

**Prong Three: Independent Trade, Occupation, Profession or Business**

Prong three provides that the individual "is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed" in order for the individual to be classified other than as an employee. M.G.L. c. 149, s. 148B(a)(3). "Under the third prong, the court is to consider whether the service in question could be viewed as an independent trade or business because the worker is capable of performing the service to anyone wishing to avail themselves of the service or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services." *Coverall v. Division of Unemployment Assistance*, 447 Mass. 852, 857-58 (2006) (interpreting prong three of M.G.L. c. 151A, s. 2). The court went on to note in *Coverall*:

> Although the court can consider whether a worker is capable of performing the service to anyone wishing to avail themselves of the services, the court may also consider whether the nature of the business compels the worker to depend on a single employer for the continuation of the services [citation omitted]. In this regard, we determine whether the worker is wearing the hat of the employee of the employing company, or is wearing the hat of his own independent enterprise.

*Id.*

**B. Issues Deemed Irrelevant**

An employer's failure to withhold taxes, contribute to unemployment compensation, or provide worker's compensation is not considered when analyzing whether an employee has been appropriately classified as an employee. M.G.L. c. 149, s. 148B(b). Hence, an employer's belief that a worker should be an independent contractor has no relevance in determining whether there has been violation of the Law. Similarly, the Law deems irrelevant the status of a worker as a "sole proprietor or partnership," for the purpose of obtaining worker's compensation insurance. M.G.L. c. 149, s. 148B(c).

**C. Violation of the Law**

M.G.L. c. 149, s. 148B(d) provides that an employer violates the statute when two acts occur. First, the employer classifies or treats the individual other than as an employee although the worker does not meet each of the criteria in the three prong test. Second, in receiving services from the individual, the employer violates one or more of the following laws enumerated in the Law:

- The wage and hour laws set forth in M.G.L. c. 149.
- The minimum wage law set out in M.G.L. c. 151, s. 1A, 1B, and 19; 455 CMR 2.01, *et seq.*
- The overtime law set forth in M.G.L. c. 151, s. 1, 1A, 1B, and 19.
- The law requiring employers to keep true and accurate employee payroll records, and to furnish the records to the Attorney General upon request as required by M.G.L. c. 151, s. 15.
- Provisions requiring employers to take and pay over withholding taxes on employee wages. M.G.L. c. 62B.[3]
- The worker's compensation provisions punishing knowing misclassification of an employee. M.G.L. c. 152, s. 14.

---

[3] As noted in footnote 2, for purposes of income tax withholding, M.G.L. c. 62B provides a definition of employee that differs from the three prong test in M.G.L. c. 149, s. 148B.

The statute authorizes the Attorney General to impose substantial civil and criminal penalties, and in certain circumstances, to debar violators from public works contracts. M.G.L. c. 149, s. 27C(a)(3). The penalties and length of debarment depend upon the nature and number of violations. M.G.L. c. 149, s. 148B(d) also creates liability for both business entities and individuals, including corporate officers, and those with management authority over affected workers.


## III. ENFORCEMENT GUIDELINES


### A. General Enforcement Guidelines

The AGO recognizes that enforcement guidelines are useful to employers, entities and individuals who must determine whether a particular situation or individual has employee status. When enforcing the Law, the AGO attempts to protect workers, legitimate businesses and the Commonwealth, consistent with the goals of the Law outlined in the Introduction.

The Law is focused on the misclassification of individuals. In the event that all individuals performing a service are classified and legitimately treated as employees of an entity (paid W-2 income, received W-2 tax forms, subject to withholdings for federal and state taxes, covered by workers' compensation insurance, eligible for unemployment compensation benefits, etc.) and are performing the service as an employee, then there is no misclassification of those workers. Accordingly, in determining whether the Law has been violated, the initial question is whether an individual or individuals are classified other than an employee. For example, if painting company X cannot finish a painting job and hires painting company Y as a subcontractor to finish the painting job, provided that all of the individuals performing the painting are employees of company Y, then the Law does not apply. However, if painting company X hires individuals as independent contractors to finish the painting job, then this would be a violation of prong two and a misclassification under the Law.

The AGO is cognizant that there are legitimate independent contractors and business-to-business relationships in the Commonwealth. These business relationships are important to the economic wellbeing of the Commonwealth and, provided that they are legitimate and fulfill their legal requirements, they will not be adversely impacted by enforcement of the Law. The difficulty arises when businesses are created and maintained in order to avoid the Law. The AGO will enforce the Law against entities that allow, request or contract with corporate entities such as LLCs or S corporations that exist for the purpose of avoiding the Law. In these situations, the AGO will consider, among other factors, whether: the services of the alleged independent contractor are not actually available to entities beyond the contracting entity, even if they purport to be so; whether the business of the contracting entity is no different than the services performed by the alleged independent contractor; or the alleged independent contractor is only a business requested or required to be so by the contracting entity.

In reviewing situations for misclassification, the AGO considers certain factors to be strong indications of misclassification that warrant further investigation and may result in enforcement. These include:

- Individuals providing services for an employer that are not reflected on the employer's business records;
- Individuals providing services who are paid "off the books", "under the table", in cash or provided no documents reflecting payment;
- Insufficient or no workers' compensation coverage exists;
- Individuals providing services are not provided 1099s or W-2s by any entity;

- The contracting entity provides equipment, tools and supplies to individuals or requires the purchase of such materials directly from the contracting entity; and
- Alleged independent contractors do not pay income taxes or employer contributions to the Division of Unemployment Assistance.

Since it is not feasible to address in this Advisory every situation that could occur and since each case involves its own set of facts, it should be recognized that each potential enforcement action shall be reviewed by the AGO on a case-by-case basis, consistent with the Law.


## B. Prong Two Guidelines

Due to the nature of prong two and the lack of judicial precedent, the AGO recognizes the complexity that prong two presents and the concerns regarding legitimate independent contractors, particularly among certain segments of the workforce.

As discussed above, the AGO emphasizes that the initial question in determining whether the Law has been violated is whether an individual or individuals are classified other than as an employee. Only when an individual or individuals are classified other than as an employee will there be a determination of whether any of the prongs – including the complex prong two – are violated.

In *Athol Daily News*, the Court advised that no prong should be read so broadly as to render the other factors of the test superfluous. 439 Mass. at 180. Thus, prong two should not be construed to include all aspects of a business such that prongs one and three become unnecessary.

In its enforcement actions, the AGO will consider whether the service the individual is performing is necessary to the business of the employing unit or merely incidental in determining whether the individual may be properly classified as other than an employee under prong two.

Some examples of how the Attorney General will apply prong two[4]:
- A drywall company classifies an individual who is installing drywall as an independent contractor. This would be a violation of prong two because the individual installing the drywall is performing an essential part of the employer's business.
- A company in the business of providing motor vehicle appraisals classifies an individual appraiser as an independent contractor. This would be a violation of prong two because the appraiser is performing an essential part of the appraisal company's business.
- An accounting firm hires an individual to move office furniture. Prong two is not applicable (although prongs one and three may be) because the moving of furniture is incidental and not necessary to the accounting firm's business.

---

[4] In interpreting the Illinois independent contractor law, the Supreme Court of Illinois noted in *Carpetland U.S.A., Inc. v. IL Dept. of Employment Security*, 201 Ill.2d 351, 386-88 (2002):

> The washing of windows or mowing of grass for a business is incidental. But when one is in the business of selling a product, sales calls made by sales representatives are in the usual course of business because sales calls are necessary. When one is in the business of dispatching limousines, the services of chauffeurs are provided in the usual course of business because the act of driving is necessary to the business.

Although the Illinois statute is not the same as the Massachusetts statute, the court's analysis is useful for guidance on how the Attorney General will undertake prong two enforcement.

**IV. CONCLUSION**

As this Advisory reflects, the AGO will carry out its enforcement responsibilities to serve the goals of the Law as articulated in the Introduction. The Law has been passed and amended over time to address serious abuses by various entities, and the AGO's goal is to prevent and remedy those practices without disrupting legitimate business activity.

# EXHIBIT 60

## TO KAPLAN DECLARATION

**ADVISORY 98/1**

**An Advisory from the Attorney General's Fair Labor Division on
An Act Providing Employees Leave for Certain Family Obligations**

Pursuant to M.G.L. c. 23, s. 1(b), the Office of the Attorney General issues the following Advisory:

**An Act Providing Employees Leave for Certain Family Obligations**

A statute enacted on August 04, 1998, M.G.L. c. 149, s. 52D ("Act"), mandates that certain eligible employees be permitted to take a total of 24 hours of unpaid leave during any 12-month period. These 24 hours are in addition to the 12 weeks already allowed under the Federal Family and Medical Leave Act. The Office of the Attorney General has been entrusted with the enforcement of the Act.

The Act incorporates by reference sections 2611 through 2615 of the Federal Family and Medical Leave Act. (29 U.S.C. §§ 2601, et seq.) In order to fully understand the Act, and comply with its provisions, employers and employees must review the parallel federal statute. The purpose of this Advisory is to provide notice of the Attorney General's interpretation of the state statutory requirements.

**Eligible employees:**

Employees are eligible for the 24 hours of leave under the statute if their employer has 50 or more employees. 29 U.S.C. § 2611(B). For purposes of determining the number of employees, the statute includes all employees of the same employer working within 75 miles of the worksite of the employee requesting the leave. *Id.* In addition, the employee must (1) have been employed for at least 12 months by the employer from whom the leave is requested, and (2) provided at least 1,250 hours of service to the employer during the previous 12-month period. 29 U.S.C. § 2611 (A).

**Purposes for which the leave may be taken:**

The 24 hours of leave may be taken by an eligible employee for any of the following purposes:

> (1) to participate in school activities directly related to the educational advancement of a son or daughter of the employee, such as parent-teacher conferences or interviewing for a new school;

> (2) to accompany the son or daughter of the employee to routine medical or dental appointments, such as check-ups or vaccinations;

> (3) to accompany an elderly relative of the employee to routine medical or dental appointments or appointments for other professional services related to the elder's care, such as interviewing at nursing or group homes.

M.G.L. c. 149, s. 52D(b)

Given the breadth of the statute, employers are urged to give a liberal interpretation to the purposes for which the leave may be taken.

**Definitions:**

The term "son or daughter" is defined as a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing *in loco parentis*. The son or daughter must either be under 18 years of age or 18 years of age or older and incapable of self-care because of mental or physical disability. 29 U.S.C. § 2611(12).

The term "elderly relative" is defined as an individual of at least 60 years of age who is related by blood or marriage to the employee, including a parent. M.G.L. c. 149, s. 52D(a).

The term "school," is defined as a public or private elementary or secondary school; a Head Start program assisted under the Head Start Act, 42 U.S.C. §§ 9831 *et seq.*; or a children's day care facility licensed under M.G.L. c. 28A.

**Any 12-month period:**

Employers are permitted to choose any of the following methods for determining the "12-month period" in which the 24 hours of leave may be taken. Whatever method chosen must be applied consistently and uniformly to all employees.

- The calendar year;

- A fiscal year;

- The employee's anniversary date;

- The 12-month period measured forward from the date of the employee's first request for leave under the Act; or

- A "rolling" 12-month period measured backward from the date an employee uses any leave under the Act.

29 C.F.R. § 825.200 (b).

**Intermittent leave:**

Leave under the Act may be taken intermittently or on a reduced leave schedule. M.G.L c.149, s. 52D(c). An eligible employee need not take the entire 24 hour leave at once, but may take a few hours of time depending on the employee's needs, as long as the total leave does not exceed 24 hours during any 12-month period. Employers may require that employees take the leave in minimum increments of no less than one hour.

**Substitution of vacation/personal/sick leave:**

An eligible employee may elect, or the employer may require the employee to substitute any of the employee's accrued paid vacation leave, personal leave or sick leave for any of the leave provided under the Act. M.G.L. c. 149, s. 52D (c). While the 24 hours need not be paid, if the employee chooses to substitute it for paid leave that the employee has accrued, the 24 hours of the leave period would then also

be paid in the same manner as the paid leave.  The Act does not require employers to provide[1] paid sick leave or paid medical leave in any situation where the employer would not normally provide such paid leave. *Id.*

**Notice requirement:**

To be entitled to the leave period, employees must provide notice to their employer as follows:

- if the need for leave is foreseeable, the employee must request the leave not later than 7  days in advance;

- if the need is not foreseeable, the employee must notify the employer as soon as is  practicable.

M.G.L. c. 149, s. 52D(d).

Employers may require that, to the extent possible, the notice by the employee be in writing.  If not feasible, employees may request leave orally.  Employees need not make reference to the Act in order to assert their rights under the law.

**Certification:**

Employers may require that a request for leave be supported by a certification.  M.G.L. c. 149, s. 52D(e). Attached to this Advisory is a suggested form that may be used by employees to fulfill this obligation if so required.  A certification, if produced timely, may serve to comply with the Act's notice requirement. Certificates and/or requests for leave provided by employees must be kept in the employee's personnel record and must be maintained for three years.  M.G.L. c. 149, s. 52C.  Records and documents relating to medical certifications or medical histories of employees' family members must be maintained as confidential medical records and kept in files separate from the usual personnel files.

**Enforcement:**

The Act authorizes the Attorney General to initiate a criminal action against an employer who violates the Act and/or to seek injunctive or declaratory relief against such employer.  As noted earlier, the Act incorporates, among other sections, Sections 2614 and 2615 of the Federal Family and Medical Leave Act.  These sections specify the conduct prohibited by the Act.  The Act is violated if the employer:

- Fails to provide the leave properly requested by an eligible employee.  29 U.S.C. § 2615 (a)(1); or

- Fails to restore the employee to the position held by the employee when the leave commenced, or fails to restore the employee to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.  29 U.S.C. § 2614(1); or

- Discharges or in any manner discriminates against any individual for opposing any practice made unlawful by the Act.  29 U.S.C. § 2615 (a)(2); or

- In any other manner discriminates against any individual because the individual:

---

[1] Employers are urged to consult with the United States Department of Labor with respect to any wage deduction from employees who are exempt from the overtime requirements of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, as salaried executive, administrative, or professional employees.

- has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to the Act; or

- has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under the Act; or

- has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under the Act.  29 U.S.C § 2615(b).

In the absence of any relevant state case law interpreting the Act, the Attorney General intends to look for guidance to the federal interpretation of those provisions which are incorporated into the Act.

Any employer convicted of a criminal violation of the Act is subject to a fine of up to $500.  M.G.L. c. 149, s. 180.  In addition, any aggrieved employee may institute a civil action for injunctive relief and/or damages against his or her employer.  Should the employee prevail, he or she will be entitled to treble damages, costs of the litigation and reasonable attorney's fees.  M.G.L. c. 149, s. 150.

Employers are encouraged to notify employees of their eligibility to request leave under this Act by way of posting or issuing a memoranda to all employees.

**Employee's Certification**

I certify that on _____ I will/did take _____ hours of leave for the following purpose:

☐ "to participate in school activities directly related to the educational advancement of a  son or daughter

☐ "to accompany the son or daughter of the employee to routine medical or dental  appointments such as check-ups or vaccinations

☐ "to accompany an elderly relative to routine medical or dental appointments or appointments for other professional services related to the elder's care

Employee's Signature: _____     Date:_____

# EXHIBIT 61

## TO KAPLAN DECLARATION

Commonwealth of Massachusetts
**Executive Office of Public Safety and Security**


# <u>APPROVED FIREARMS ROSTER   11-2017</u>

### This Roster Supersedes All Previous Rosters


This roster has been compiled in accordance with M.G.L. c.140, § 131¾ and 501 CMR 7.00.  It contains weapons determined by Massachusetts approved independent testing laboratories to have satisfactorily completed the testing requirements of M.G.L. c. 140, § 123; clauses 18th; 19th; 20th; and 21st.  The reports resulting from said tests were reviewed by the Gun Control Advisory Board and those makes and models listed herein were subsequently approved by the Secretary of Public Safety and Security as having complied with the statutory handgun testing provisions of M.G.L. c. 140, § 123.

Modifications to this roster are likely to occur periodically, and licensees and law enforcement personnel should always utilize the most recent roster for purposes of determining statutory compliance.  The Approved Firearms Roster posted on the website of the Executive Office of Public Safety and Security (www.mass.gov/EOPS) will contain the most recently approved models.

Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's Handgun Sales Regulations, 940 CMR 16.00, et seq.  Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations.  Information about those regulations, as well as the Enforcement Notice may be obtained from the Office of the Attorney General and may be accessed on the website of the Attorney General (www.ago.state.ma.us)."


| Manufacturer | Model | Caliber |
|---|---|---|
| Armatix | iP1 | .22LR |
| Armscor Precision | Rock Island 1911 A-1 GI | .45 ACP |
| Armscor Precision | Rock Island 1911 A-1 GS CS Blue | .45 ACP |
| Armscor Precision | Rock Island 1911 A1-FS | .45 ACP |
| Armscor Precision | Rock Island 1911 A-2 GI FS Blue | .45 ACP |
| Armscor Precision | Rock Island 1911 A-2 GI MS Blue | .45 ACP |
| Auto Ordnance | 1911-A1 | .45 ACP |
| Beretta | 84FS Cheetah | .380 ACP |
| Beretta | 84FS Cheetah – Nickel | .380 ACP |
| Beretta | 85FS Cheetah | .380 ACP |
| Beretta | 85FS Cheetah – Nickel | .380 ACP |
| Beretta | 92FS | 9mm |

| Beretta | 92FS Brigadier Inox | 9mm |
|---|---|---|
| Beretta | 92FS Compact Inox | 9mm |
| Beretta | 92FS Compact Type M | 9mm |
| Beretta | 92FS Compact Type M Inox | 9mm |
| Beretta | 92FS Inox | 9mm |
| Beretta | 92FS Vertec | 9mm |
| Beretta | 92FS Vertec Inox | 9mm |
| Beretta | 9000S | 9mm |
| Beretta | 96 | .40 S&W |
| Beretta | 96 Brigadier | .40 S&W |
| Beretta | 96 Brigadier Inox | .40 S&W |
| Beretta | 96 Inox | .40 S&W |
| Beretta | 96 Vertec | .40 S&W |
| Beretta | 96 Vertec Inox | .40 S&W |
| Beretta | 9000S Type F | .40 S&W |
| Browning | Buck Mark Camper SS | .22 LR |
| Browning | Buck Mark SE MS Lt Splash 7.25 | .22 LR |
| Canik | TP9 SF Elite | 9mm |
| Canik | TP-9SA | 9mm |
| Canik | TP9SF (HG4071-N) | 9mm |
| Canik | TP-9SF-9 (HG3790-N) | 9mm |
| Charter Arms | 72242 Target Pathfinder | .22 LR |
| Charter Arms | Southpaw | .38 Spl |
| Charter Arms | Southpaw – Pink | .38 Spl |
| Charter Arms | 13811 Undercover | .38 Spl |
| Charter Arms | 13820 Undercover | .38 Spl |
| Charter Arms | 13825 Tiger | .38 Spl |
| Charter Arms | 23830 Gator | .38 Spl |
| Charter Arms | 23872 Old Glory | .38 Spl |
| Charter Arms | 53711 Off Duty (Black Anodize – Black Finish) | .38 Spl |
| Charter Arms | 53811 Off Duty | .38 Spl |
| Charter Arms | 53820 Under Cover Lite | .38 Spl |
| Charter Arms | 53823 Under Cover Lite | .38 Spl |
| Charter Arms | 53824 Under Cover Lite | .38 Spl |
| Charter Arms | 53830 Pink Lady | .38 Spl |
| Charter Arms | 53833 Cougar | .38 Spl |
| Charter Arms | 53834 Under Cover Lite | .38 Spl |
| Charter Arms | 53835 Pink Lady (with blued SS parts) | .38 Spl |
| Charter Arms | 53838 Gunblaster | .38 Spl |
| Charter Arms | 53839 Chic Lady | .38 Spl |
| Charter Arms | 53840 Lavender Lady | .38 Spl |

| | | |
|---|---|---|
| Charter Arms | 53844 Shamrock | .38 Spl |
| Charter Arms | 53849 Chic Lady (Lavender) | .38 Spl |
| Charter Arms | 53850 All American | .38 Spl |
| Charter Arms | 53851 Pink Lady (Pink Anodize – Matte Finish) | .38 Spl |
| Charter Arms | 53852 Chic Lady (Pink Anodize – High Polish Finish) | .38 Spl |
| Charter Arms | 53853 Chic Lady (Lavender Anodize – High Polish Finish) | .38 Spl |
| Charter Arms | 53859 Rosebud | .38 Spl |
| Charter Arms | 53860 Santa Fe Sky | .38 Spl |
| Charter Arms | 53863 Earthborn | .38 Spl |
| Charter Arms | 53864 Santa Fe Sky | .38 Spl |
| Charter Arms | 53870 Undercover Lite | .38 Spl |
| Charter Arms | 53871 Undercover | .38 Spl |
| Charter Arms | 53873 Panther | .38 Spl |
| Charter Arms | 53879 Blue Diamond | .38 Spl |
| Charter Arms | 53883 Under Cover Lite | .38 Spl |
| Charter Arms | 53889 The Leopard (with leopard tone frame) | .38 Spl |
| Charter Arms | 53890 Goldfinger | .38 Spl |
| Charter Arms | 53899 Gold Chic | .38 Spl |
| Charter Arms | 53911 Off Duty (Black Anodize – Matte Finish) | .38 Spl |
| Charter Arms | 53921 Undercover | .38 Spl |
| Charter Arms | 68320 Nitide | .38 Spl |
| Charter Arms | 73811 Undercover | .38 Spl |
| Charter Arms | 73820 Undercover, Stainless Std | .38 Spl |
| Charter Arms | 73824 Laser | .38 Spl |
| Charter Arms | 13520 Mag Pug (Black Finish) | .357 Mag |
| Charter Arms | 23520 Mag Pug (Tiger Stripe Finish) | .357 Mag |
| Charter Arms | 73520 Mag Pug | .357 Mag |
| Charter Arms | 14420 | .44 Spl |
| Charter Arms | 24420 Tiger | .44 Spl |
| Charter Arms | 74420 Bulldog | .44 Spl |
| FMK | 9C-1 | 9mm |
| FMK | 9C1 GEN II | 9mm |
| FN America | FN509 | 9mm |
| FN America | FN-9 MS BK/BK-FT-S | 9mm |
| FN America | FNX-9 | 9mm |
| FN America | FNX-9 MS BK/WT-FT-S | 9mm |
| FN America | FNX-40 | .40 S&W |
| FN America | FNX-40 MS BK/BK-FT-S | .40 S&W |
| FN America | FNX-40 MS BK/WT-FT-S | .40S&W |
| FN America | FNX-45 | .45 ACP |

| FN America | FNX-45 BK/BK DS | .45 ACP |
|---|---|---|
| FN America | FNX-45 BK/WT DS | .45 ACP |
| FN America | FNX-45 FDE/BK DS | .45 ACP |
| FN America | FNX-45 Tactical | .45 ACP |
| FN America | FNX-45 Tactical BK/BK | .45 ACP |
| FN America | FNX-45 Tactical FDE/FDE NS | .45 ACP |
| Glock | 42 | .380 ACP |
| Glock | 17 | 9mm |
| Glock | 17 Gen4 | 9mm |
| Glock | 17 Gen5 | 9mm |
| Glock | 17C | 9mm |
| Glock | 17RTF | 9mm |
| Glock | 19 | 9mm |
| Glock | 19 Gen4 | 9mm |
| Glock | 19 Gen5 | 9mm |
| Glock | 19C | 9mm |
| Glock | 19RTF2 | 9mm |
| Glock | 26 | 9mm |
| Glock | 26 Gen4 | 9mm |
| Glock | 34 | 9mm |
| Glock | 34 Gen4 | 9mm |
| Glock | 43 | 9mm |
| Glock | 31 | .357 Sig |
| Glock | 31 Gen4 | .357 Sig |
| Glock | 31C | .357 Sig |
| Glock | 32 | .357 Sig |
| Glock | 32 Gen4 | .357 Sig |
| Glock | 32C | .357 Sig |
| Glock | 33 | .357 Sig |
| Glock | 33 Gen4 | .357 Sig |
| Glock | 22 | .40 S&W |
| Glock | 22 Gen4 | .40 S&W |
| Glock | 22C | .40 S&W |
| Glock | 22RTF2 | .40 S&W |
| Glock | 23 | .40 S&W |
| Glock | 23 Gen4 | .40 S&W |
| Glock | 23C | .40 S&W |
| Glock | 23RTF | .40 S&W |
| Glock | 27 | .40 S&W |
| Glock | 27 Gen4 | .40 S&W |
| Glock | 35 | .40 S&W |

| | | |
|---|---|---|
| Glock | 35 Gen4 | .40 S&W |
| Glock | 20 | 10mm |
| Glock | 20 Gen4 | 10mm |
| Glock | 20C | 10mm |
| Glock | 20SF | 10mm |
| Glock | 29 | 10mm |
| Glock | 29 Gen4 | 10mm |
| Glock | 29SF | 10mm |
| Glock | 40  Gen4 | 10mm |
| Glock | 21 Gen4 | .45 ACP |
| Glock | 21C | .45 ACP |
| Glock | 21SF | .45 ACP |
| Glock | 30 | .45 ACP |
| Glock | 30 Gen4 | .45 ACP |
| Glock | 30S | .45 ACP |
| Glock | 30SF | .45 ACP |
| Glock | 36 | .45 ACP |
| Glock | 41 Gen4 | .45 ACP |
| Glock | 37 | .45 GAP |
| Glock | 37 Gen4 | .45 GAP |
| Glock | 38 | .45 GAP |
| Glock | 39 | .45 GAP |
| Heckler & Koch | P2000 | 9mm |
| Heckler & Koch | P2000 SK-V3 | 9mm |
| Heckler & Koch | P2000-V3 | 9mm |
| Heckler & Koch | P30LS-V3 | 9mm |
| Heckler & Koch | P30SKS-V3 | 9mm |
| Heckler & Koch | P30SK-V3 | 9mm |
| Heckler & Koch | P30S-V3 | 9mm |
| Heckler & Koch | USP | 9mm |
| Heckler & Koch | VP9 | 9mm |
| Heckler & Koch | P2000 SK-V3 | .357 Sig |
| Heckler & Koch | P2000SK | .357 Sig |
| Heckler & Koch | P2000 SK-V3 | .40 S&W |
| Heckler & Koch | P2000-V3 | .40 S&W |
| Heckler & Koch | P30LS-V3 | .40 S&W |
| Heckler & Koch | P30S-V3 | .40 S&W |
| Heckler & Koch | USP | .40 S&W |
| Heckler & Koch | USP Comp LEM | .40 S&W |
| Heckler & Koch | VP40 | .40 S&W |
| Heckler & Koch | HK45 | .45 ACP |

| Heckler & Koch | HK45 Compact | .45 ACP |
|---|---|---|
| ISSC | M22 | .22 LR |
| ISSC | M22BT | .22 LR |
| ISSC | M22D | .22 LR |
| ISSC | M22DC | .22 LR |
| ISSC | M22PT | .22 LR |
| Kahr Arms | CWP9 | 9mm |
| Kahr Arms | K9093 | 9mm |
| Kahr Arms | K9093A | 9mm |
| Kahr Arms | K9093NA | 9mm |
| Kahr Arms | K9096 | 9mm |
| Kahr Arms | K9096A | 9mm |
| Kahr Arms | K9096NA | 9mm |
| Kahr Arms | M9093 | 9mm |
| Kahr Arms | M9093A | 9mm |
| Kahr Arms | M9093NA | 9mm |
| Kahr Arms | M9096 | 9mm |
| Kahr Arms | M9096A | 9mm |
| Kahr Arms | M9096NA | 9mm |
| Kahr Arms | P9 | 9mm |
| Kahr Arms | PM9 | 9mm |
| Kahr Arms | K4043 | .40 S&W |
| Kahr Arms | K4043A | .40 S&W |
| Kahr Arms | K4043NA | .40 S&W |
| Kahr Arms | K4046 | .40 S&W |
| Kahr Arms | K4046A | .40 S&W |
| Kahr Arms | K4046NA | .40 S&W |
| Kahr Arms | M4043 | .40 S&W |
| Kahr Arms | M4043A | .40 S&W |
| Kahr Arms | M4043NA | .40 S&W |
| Kahr Arms | M4046 | .40 S&W |
| Kahr Arms | M4046A | .40 S&W |
| Kahr Arms | M4046NA | .40 S&W |
| Kahr Arms | P40 | .40 S&W |
| Kahr Arms | PM40 | .40 S&W |
| Kahr Arms | KP45 | .45 ACP |
| Mauser | M2 | .40 S&W |
| Mauser | M2 | .45 ACP |
| Para  Ordnance | 189 Steel | 9mm |
| Para  Ordnance | CTX189B | 9mm |
| Para  Ordnance | D189 Steel | 9mm |

| Para Ordnance | DX189E | 9mm |
|---|---|---|
| Para Ordnance | DX189S | 9mm |
| Para Ordnance | PX189S | 9mm |
| Para Ordnance | RHX129E | 9mm |
| Para Ordnance | RX189E | 9mm |
| Para Ordnance | RX189S | 9mm |
| Para Ordnance | TX189E | 9mm |
| Para Ordnance | TX189S | 9mm |
| Para Ordnance | PX938P | .38 Super |
| Para Ordnance | PX938S | .38 Super |
| Para Ordnance | 1440 Steel | .40 S&W |
| Para Ordnance | 1640 Stainless | .40 S&W |
| Para Ordnance | 1640 Steel | .40 S&W |
| Para Ordnance | 1640 Steel | .40 S&W |
| Para Ordnance | D1640 Stainless | .40 S&W |
| Para Ordnance | D1640 Steel | .40 S&W |
| Para Ordnance | L1440 Steel | .40 S&W |
| Para Ordnance | P1640 Steel | .40 S&W |
| Para Ordnance | RHX1640E | .40 S&W |
| Para Ordnance | RX1640S | .40 S&W |
| Para Ordnance | S1640 Stainless | .40 S&W |
| Para Ordnance | SX1640E | .40 S&W |
| Para Ordnance | SX1640S | .40 S&W |
| Para Ordnance | 1045 Alloy | .45 ACP |
| Para Ordnance | 1045 Stainless | .45 ACP |
| Para Ordnance | 1245 Alloy | .45 ACP |
| Para Ordnance | 1245 Stainless | .45 ACP |
| Para Ordnance | 1245 Steel | .45 ACP |
| Para Ordnance | 1345 Stainless | .45 ACP |
| Para Ordnance | 1345 Steel | .45 ACP |
| Para Ordnance | 1445 Alloy | .45 ACP |
| Para Ordnance | 1445 Stainless | .45 ACP |
| Para Ordnance | 1445 Steel | .45 ACP |
| Para Ordnance | 745 Stainless | .45 ACP |
| Para Ordnance | 745 Steel | .45 ACP |
| Para Ordnance | C6 Stainless | .45 ACP |
| Para Ordnance | C7 Stainless | .45 ACP |
| Para Ordnance | Carry Stainless | .45 ACP |
| Para Ordnance | CCWX745S | .45 ACP |
| Para Ordnance | CCWX745S | .45 ACP |
| Para Ordnance | Companion Stainless | .45 ACP |

| Para Ordnance | CT1345 Stainless | .45 ACP |
|---|---|---|
| Para Ordnance | CTX1245N Stainless | .45 ACP |
| Para Ordnance | CTX1345G Stainless | .45 ACP |
| Para Ordnance | CTX1345S Stainless | .45 ACP |
| Para Ordnance | CWX645B Stainless | .45 ACP |
| Para Ordnance | CWX645S Stainless | .45 ACP |
| Para Ordnance | CWX745S | .45 ACP |
| Para Ordnance | CWX745S | .45 ACP |
| Para Ordnance | CX745S | .45 ACP |
| Para Ordnance | D1445 Steel | .45 ACP |
| Para Ordnance | D1445ER | .45 ACP |
| Para Ordnance | D1445SR | .45 ACP |
| Para Ordnance | D745 Stainless | .45 ACP |
| Para Ordnance | D745 Steel | .45 ACP |
| Para Ordnance | DCX1445E | .45 ACP |
| Para Ordnance | DCX745E | .45 ACP |
| Para Ordnance | DX1445E | .45 ACP |
| Para Ordnance | DX1445S | .45 ACP |
| Para Ordnance | DX745S | .45 ACP |
| Para Ordnance | L1245 Steel | .45 ACP |
| Para Ordnance | NHX1045N | .45 ACP |
| Para Ordnance | P1045 Alloy | .45 ACP |
| Para Ordnance | P1045 Steel | .45 ACP |
| Para Ordnance | P1245 Alloy | .45 ACP |
| Para Ordnance | P1245 Steel | .45 ACP |
| Para Ordnance | P1345 Steel | .45 ACP |
| Para Ordnance | P1445 Alloy | .45 ACP |
| Para Ordnance | P1445 Steel | .45 ACP |
| Para Ordnance | P1445ER | .45 ACP |
| Para Ordnance | P1445RR | .45 ACP |
| Para Ordnance | P1445SR | .45 ACP |
| Para Ordnance | PCWX745E Steel | .45 ACP |
| Para Ordnance | PCWX745S Stainless | .45 ACP |
| Para Ordnance | PCX745R | .45 ACP |
| Para Ordnance | PCX745S | .45 ACP |
| Para Ordnance | PRX745B | .45 ACP |
| Para Ordnance | PRX745S | .45 ACP |
| Para Ordnance | PSHX645S | .45 ACP |
| Para Ordnance | PX1445S | .45 ACP |
| Para Ordnance | PX144EMB | .45 ACP |
| Para Ordnance | PX745E | .45 ACP |

| | | |
|---|---|---|
| Para Ordnance | PX745EM | .45 ACP |
| Para Ordnance | PX745EMB | .45 ACP |
| Para Ordnance | RHX1045E | .45 ACP |
| Para Ordnance | RX1445E | .45 ACP |
| Para Ordnance | RX1445S | .45 ACP |
| Para Ordnance | S1045 Stainless | .45 ACP |
| Para Ordnance | S1245 Stainless | .45 ACP |
| Para Ordnance | S1345 Stainless | .45 ACP |
| Para Ordnance | S1445 Stainless | .45 ACP |
| Para Ordnance | SX1245S | .45 ACP |
| Para Ordnance | SX1445S | .45 ACP |
| Para Ordnance | TX1640S | .45 ACP |
| Para Ordnance | TX745S Stainless | .45 ACP |
| Para Ordnance | WHX1045R Steel/Alloy | .45 ACP |
| Para Ordnance | WHX1045S | .45 ACP |
| Para Ordnance | WHX129R | .45 ACP |
| Remington Arms | 1911R1 | .45 ACP |
| Remington Arms | 1911R1 Chain Ramac 96325 | .45 ACP |
| Remington Arms | 1911R1 Centennial/Ramac 96340 | .45 ACP |
| Remington Arms | 1911R1 Limited/Ramac 96341 | .45 ACP |
| Remington Arms | 1911R1 OD Frame/Ramac 96350 | .45 ACP |
| Remington Arms | 1911R1 Stainless/Ramac 96324 | .45 ACP |
| Remington Arms | 1911R1 Talo/Ramac 96343 | .45 ACP |
| Remington Arms | 1911R1 Enhanced/Ramac 96328 | .45 ACP |
| Remington Arms | 1911R1 Enhanced Threaded Barrel/Ramac 96339 | .45 ACP |
| Seecamp | LWS32 | .32 ACP |
| Sig Arms | Mosquito | .22 LR |
| Sig Arms | P232 Stainless | .380 ACP |
| Sig Arms | P238 | .380 ACP |
| Sig Arms | 226RM-9-Legion | 9mm |
| Sig Arms | 226RM-9-Legion-SAO | 9mm |
| Sig Arms | 229RM-9-Legion | 9mm |
| Sig Arms | 250C-9-BSS-MA | 9mm |
| Sig Arms | 938M-9-SAS-AMBI | 9mm |
| Sig Arms | MK-25-MA | 9mm |
| Sig Arms | P225 | 9mm |
| Sig Arms | P226 | 9mm |
| Sig Arms | P226 Rail | 9mm |
| Sig Arms | P226 Stainless | 9mm |
| Sig Arms | P228 | 9mm |
| Sig Arms | P229 | 9mm |

| Sig Arms | P239 | 9mm |
|---|---|---|
| Sig Arms | P320 | 9mm |
| Sig Arms | P938 | 9mm |
| Sig Arms | P938 BRG | 9mm |
| Sig Arms | P938 EXTREME | 9mm |
| Sig Arms | P938 SCORPION | 9mm |
| Sig Arms | SP2009 | 9mm |
| Sig Arms | SP2022M-9-BSS | 9mm |
| Sig Arms | 250C-357-BSS-MA | .357 Sig |
| Sig Arms | P226 | .357 Sig |
| Sig Arms | P226 Rail | .357.Sig |
| Sig Arms | P226 Stainless | .357 Sig |
| Sig Arms | P229 | .357 Sig |
| Sig Arms | P239 | .357 Sig |
| Sig Arms | P320 | .357 Sig |
| Sig Arms | SP2340 | .357 Sig |
| Sig Arms | 250C-40-BSS-MA | .40 S&W |
| Sig Arms | P226 | .40 S&W |
| Sig Arms | P226 DAK | .40 S&W |
| Sig Arms | P226 Rail | .40 S&W |
| Sig Arms | P229 | .40 S&W |
| Sig Arms | P229 DAK | .40 S&W |
| Sig Arms | P239 | .40 S&W |
| Sig Arms | P239 DAK | .40 S&W |
| Sig Arms | P320 | .40 S&W |
| Sig Arms | SP2022 | .40 S&W |
| Sig Arms | SP2340 | .40 S&W |
| Sig Arms | 1911-45-S | .45 ACP |
| Sig Arms | 1911FCAM-45-NMR | .45 ACP |
| Sig Arms | 1911M-45-STX | .45 ACP |
| Sig Arms | 1911RM-45-ESCPN | .45 ACP |
| Sig Arms | 220RM-45-Legion | .45 ACP |
| Sig Arms | P220 | .45 ACP |
| Sig Arms | P220 Stainless | .45 ACP |
| Sig Arms | P245 | .45 ACP |
| Sig Arms | P250C | .45 ACP |
| Sig Arms | P250F | .45 ACP |
| Sig Arms | P320C | .45 ACP |
| Smith & Wesson | 647 | .17 Hornady |
| Smith & Wesson | 647-1 | .17 Hornady |
| Smith & Wesson | 648-2 | .22 MRF |

| Smith & Wesson | 17-9 | .22 LR |
|---|---|---|
| Smith & Wesson | 22A-1 | .22 LR |
| Smith & Wesson | 22S-1 | .22 LR |
| Smith & Wesson | 317-2 | .22 LR |
| Smith & Wesson | 317-3 | .22 LR |
| Smith & Wesson | 317LS | .22 LR |
| Smith & Wesson | 41 | .22 LR |
| Smith & Wesson | 617-5 | .22 LR |
| Smith & Wesson | 617-6 | .22 LR |
| Smith & Wesson | 63-4 | .22 LR |
| Smith & Wesson | 351 PD | .22 WMR |
| Smith & Wesson | 48-7 | .22 WMR |
| Smith & Wesson | 351C | .22 WMR |
| Smith & Wesson | 331-2 | .32 H&R Mag. |
| Smith & Wesson | 332-1 | .32 H&R Mag. |
| Smith & Wesson | 431 PD | .32 H&R Mag. |
| Smith & Wesson | 432 PD | .32 H&R Mag. |
| Smith & Wesson | 632-1 | .327 Mag. |
| Smith & Wesson | Bodyguard 380 | .380 ACP |
| Smith & Wesson | 1911 | 9mm |
| Smith & Wesson | 3913LS | 9mm |
| Smith & Wesson | 3913TSW | 9mm |
| Smith & Wesson | 5903TSW | 9mm |
| Smith & Wesson | 5906TSW | 9mm |
| Smith & Wesson | 908 | 9mm |
| Smith & Wesson | 908S | 9mm |
| Smith & Wesson | 910 | 9mm |
| Smith & Wesson | 910S | 9mm |
| Smith & Wesson | 929 | 9mm |
| Smith & Wesson | 952-1 | 9mm |
| Smith & Wesson | 952-2 | 9mm |
| Smith & Wesson | 986 | 9mm |
| Smith & Wesson | CS9 | 9mm |
| Smith & Wesson | M&P Shield (M2.0 MA Comp NTS) | 9mm |
| Smith & Wesson | M&P Shield (M2.0, MA Comp TS) | 9mm |
| Smith & Wesson | M&P9 | 9mm |
| Smith & Wesson | M&P9 (Mag Safety) | 9mm |
| Smith & Wesson | M&P9 (Mag Safety, Internal Lock) | 9mm |
| Smith & Wesson | M&P9 M2.0 | 9mm |
| Smith & Wesson | M&P9 Shield | 9mm |
| Smith & Wesson | M&P9 Shield (without manual thumb safety) | 9mm |

| Smith & Wesson | M&P9c | 9mm |
|---|---|---|
| Smith & Wesson | M&P9c (Mag Safety) | 9mm |
| Smith & Wesson | SD9 VE | 9mm |
| Smith & Wesson | SW99 | 9mm |
| Smith & Wesson | SW9E | 9mm |
| Smith & Wesson | SW9G | 9mm |
| Smith & Wesson | SW9GVE | 9mm |
| Smith & Wesson | SW9P | 9mm |
| Smith & Wesson | SW9VE | 9mm |
| Smith & Wesson | Bodyguard 38 | .38 Spl |
| Smith & Wesson | 14-8 | .38 Spl |
| Smith & Wesson | 14-Oct | .38 Spl |
| Smith & Wesson | 15-10 | .38 Spl |
| Smith & Wesson | 315 | .38 Spl |
| Smith & Wesson | 337-2 | .38 Spl |
| Smith & Wesson | 337-2PD | .38 Spl |
| Smith & Wesson | 342 | .38 Spl |
| Smith & Wesson | 342 PD | .38 Spl |
| Smith & Wesson | 342-1 PD | .38 Spl |
| Smith & Wesson | 360 | .38 Spl |
| Smith & Wesson | 36-10 | .38 Spl |
| Smith & Wesson | 36-10LS | .38 Spl |
| Smith & Wesson | 40-1 | .38 Spl |
| Smith & Wesson | 42-2 | .38 Spl |
| Smith & Wesson | 437 FDE Grip | .38 Spl |
| Smith & Wesson | 438 | .38 Spl |
| Smith & Wesson | 442-1 | .38 Spl |
| Smith & Wesson | 442-2 | .38 Spl |
| Smith & Wesson | 637-2 | .38 Spl |
| Smith & Wesson | 638-3 | .38 Spl |
| Smith & Wesson | 642-1 | .38 Spl |
| Smith & Wesson | 642-2 | .38 Spl |
| Smith & Wesson | 642-2 LS | .38 Spl |
| Smith & Wesson | 64-7 | .38 Spl |
| Smith & Wesson | 64-8 | .38 Spl |
| Smith & Wesson | 67-5 | .38 Spl |
| Smith & Wesson | 67-6 | .38 Spl |
| Smith & Wesson | 67-7 | .38 Spl |
| Smith & Wesson | 337-3 | .38 Spl +P |
| Smith & Wesson | 627-4 | .38 Super |
| Smith & Wesson | 686-7 | .38 Super |

| | | |
|---|---|---|
| Smith & Wesson | 1911-2 | .38 Super |
| Smith & Wesson | 27-9 | .357 Mag. |
| Smith & Wesson | 327 | .357 Mag. |
| Smith & Wesson | 327-1 | .357 Mag. |
| Smith & Wesson | 327PD | .357 Mag. |
| Smith & Wesson | 340 PD | .357 Mag. |
| Smith & Wesson | 340 SC | .357 Mag. |
| Smith & Wesson | 360 J | .357 Mag. |
| Smith & Wesson | 360 PD | .357 Mag. |
| Smith & Wesson | 360 SC | .357 Mag. |
| Smith & Wesson | 386 | .357 Mag. |
| Smith & Wesson | 386 XL Hunter | .357 Mag. |
| Smith & Wesson | 386NG | .357 Mag. |
| Smith & Wesson | 386PD | .357 Mag. |
| Smith & Wesson | 386SC | .357 Mag. |
| Smith & Wesson | 386Sc/S | .357 Mag. |
| Smith & Wesson | 520 | .357 Mag. |
| Smith & Wesson | 586-8 | .357 Mag. |
| Smith & Wesson | 60-14 | .357 Mag. |
| Smith & Wesson | 60-14LS | .357 Mag. |
| Smith & Wesson | 60-15 | .357 Mag. |
| Smith & Wesson | 60-18 | .357 Mag. |
| Smith & Wesson | 619 | .357 Mag. |
| Smith & Wesson | 620 | .357 Mag. |
| Smith & Wesson | 627-5 | .357 Mag. |
| Smith & Wesson | 640-1 | .357 Mag. |
| Smith & Wesson | 640-3 | .357 Mag. |
| Smith & Wesson | 649-5 | .357 Mag. |
| Smith & Wesson | 65-7 | .357 Mag. |
| Smith & Wesson | 65-7LS | .357 Mag. |
| Smith & Wesson | 65-8 | .357 Mag. |
| Smith & Wesson | 65-8 LS | .357 Mag. |
| Smith & Wesson | 66-6 | .357 Mag. |
| Smith & Wesson | 66-7 | .357 Mag. |
| Smith & Wesson | 66-8 | .357 Mag. |
| Smith & Wesson | 686-6 | .357 Mag. |
| Smith & Wesson | 686-6 Plus | .357 Mag. |
| Smith & Wesson | 686-6 Power Port | .357 Mag. |
| Smith & Wesson | 686-6 SSR | .357 Mag. |
| Smith & Wesson | M&P340 | .357 Mag. |
| Smith & Wesson | M&P340 (no internal lock) | .357 Mag. |

| Smith & Wesson | M&P360 | .357 Mag. |
|---|---|---|
| Smith & Wesson | M&P357 | .357 Sig |
| Smith & Wesson | 4003TSW | .40 S&W |
| Smith & Wesson | 4006TSW | .40 S&W |
| Smith & Wesson | 4013TSW | .40 S&W |
| Smith & Wesson | 4040 PD | .40 S&W |
| Smith & Wesson | 410 | .40 S&W |
| Smith & Wesson | 410S | .40 S&W |
| Smith & Wesson | 945-40 | .40 S&W |
| Smith & Wesson | CS40 | .40 S&W |
| Smith & Wesson | M&P Shield (M2.0 MA Comp NTS) | .40 S&W |
| Smith & Wesson | M&P Shield (M2.0 MA Comp TS) | .40 S&W |
| Smith & Wesson | M&P40 | .40 S&W |
| Smith & Wesson | M&P40 (Mag Safety) | .40 S&W |
| Smith & Wesson | M&P40 (Mag Safety, Internal Lock) | .40 S&W |
| Smith & Wesson | M&P40 M2.0 | .40 S&W |
| Smith & Wesson | M&P40 Shield | .40 S&W |
| Smith & Wesson | M&P40 Shield (without manual thumb safety) | .40 S&W |
| Smith & Wesson | M&P40c (Mag Safety) | .40 S&W |
| Smith & Wesson | SD40 VE | .40 S&W |
| Smith & Wesson | SW40E | .40 S&W |
| Smith & Wesson | SW40G | .40 S&W |
| Smith & Wesson | SW40GVE | .40 S&W |
| Smith & Wesson | SW40P | .40 S&W |
| Smith & Wesson | SW40VE | .40 S&W |
| Smith & Wesson | SW99 | .40 S&W |
| Smith & Wesson | SW990 | .40 S&W |
| Smith & Wesson | SW990L Compact | .40 S&W |
| Smith & Wesson | SW99QA | .40 S&W |
| Smith & Wesson | 610-3 | 10mm |
| Smith & Wesson | 357 NG | .41 Mag. |
| Smith & Wesson | 357 PD | .41 Mag. |
| Smith & Wesson | 57-5 | .41 Mag. |
| Smith & Wesson | 57-6 | .41 Mag. |
| Smith & Wesson | 58-1 | .41 Mag. |
| Smith & Wesson | 657-5 | .41 Mag. |
| Smith & Wesson | 21-4 | .44 Spl |
| Smith & Wesson | 24-6 | .44 Spl |
| Smith & Wesson | 396-1 | .44 Spl |
| Smith & Wesson | 396NG | .44 Spl |
| Smith & Wesson | 696 | .44 Spl |

| Smith & Wesson | 29-8 | .44 Mag. |
|---|---|---|
| Smith & Wesson | 29-10 | .44 Mag. |
| Smith & Wesson | 329-1 | .44 Mag. |
| Smith & Wesson | 329PD | .44 Mag. |
| Smith & Wesson | 629-6 | .44 Mag. |
| Smith & Wesson | 629-6 Classic | .44 Mag. |
| Smith & Wesson | 629-6 Classic DX | .44 Mag. |
| Smith & Wesson | 629-6 Power Port | .44 Mag. |
| Smith & Wesson | 629-7 | .44 Mag. |
| Smith & Wesson | 69 | .44 Mag. |
| Smith & Wesson | M&P45 | .45 ACP |
| Smith & Wesson | M&P45c | .45 ACP |
| Smith & Wesson | M&P45 Shield NTS | .45 ACP |
| Smith & Wesson | M&P45 Shield Comp | .45 ACP |
| Smith & Wesson | PC1911 | .45 ACP |
| Smith & Wesson | CS45 | .45 ACP |
| Smith & Wesson | SW99 | .45 ACP |
| Smith & Wesson | SW1911 | .45 ACP |
| Smith & Wesson | SW1911TA | .45 ACP |
| Smith & Wesson | SW1911CT | .45 ACP |
| Smith & Wesson | SW1911 Sub Compact | .45 ACP |
| Smith & Wesson | SW1911SC | .45 ACP |
| Smith & Wesson | 22-4 | .45 ACP |
| Smith & Wesson | 325 | .45 ACP |
| Smith & Wesson | 325PD | .45 ACP |
| Smith & Wesson | 457 | .45 ACP |
| Smith & Wesson | 457S | .45 ACP |
| Smith & Wesson | 625-10 | .45 ACP |
| Smith & Wesson | 625-8 | .45 ACP |
| Smith & Wesson | 625-8 JM | .45 ACP |
| Smith & Wesson | 945-1 | .45 ACP |
| Smith & Wesson | 1911 | .45 ACP |
| Smith & Wesson | 1911 (Steel) | .45 ACP |
| Smith & Wesson | 1911 DK | .45 ACP |
| Smith & Wesson | 1911 PD | .45 ACP |
| Smith & Wesson | 1911 Sc (Black) | .45 ACP |
| Smith & Wesson | 1911 SC | .45 ACP |
| Smith & Wesson | 1911 Pro Series | .45 ACP |
| Smith & Wesson | 1911 Compact ES | .45 ACP |
| Smith & Wesson | 1911 TFP | .45 ACP |
| Smith & Wesson | 4513TSW | .45 ACP |

| Smith & Wesson | 4563TSW | .45 ACP |
|---|---|---|
| Smith & Wesson | 4566TSW | .45 ACP |
| Smith & Wesson | M3 Schofield | .45 S&W Schofield |
| Smith & Wesson | Governor | .45 Long Colt |
| Smith & Wesson | 25-13 | .45 Long Colt |
| Smith & Wesson | 25-15 | .45 Long Colt |
| Smith & Wesson | 625-9 | .45 Long Colt |
| Smith & Wesson | 460 ES | 460 S&W Mag. |
| Smith & Wesson | 460V | 460 S&W Mag. |
| Smith & Wesson | 460XVR | 460 S&W Mag. |
| Smith & Wesson | 500 | 500 S&W |
| Smith & Wesson | 500 ES | 500 S&W |
| Springfield Armory | 9mm Range Officer (PI9129L) | 9mm |
| Springfield Armory | EMP 9mm Compact LW (PI9208L) | 9mm |
| Springfield Armory | XD Mod. 2 Subcompact 3" (XDG9801) | 9mm |
| Springfield Armory | XD Mod.2 (XDG9101) | 9mm |
| Springfield Armory | XDS 3.3" (XDS9339BE) | 9mm |
| Springfield Armory | 45 Mil-Spec (PB9108L) | .45 ACP |
| Springfield Armory | 45 Ranger Officer (PI9128L) | .45 ACP |
| Springfield Armory | XD Mod. 2 3.3" (XDG9845B) | .45 ACP |
| Springfield Armory | XD Mod. 2 4" (XDG9445B) | .45 ACP |
| Springfield Armory | XDS 3.3 (XDS93345BE) | .45 ACP |
| Steyr Arms | M9A1 | 9mm |
| Steyr Arms | M357-A1 | .357 Sig. |
| Steyr Arms | M40-A1 | .40 S&W |
| Steyr Arms | S-A1 | .40 S&W |
| Strayer Voigt | Infinity Traditional | .45 ACP |
| Strayer Voigt | Infinity Competition | .45 ACP |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0661) | 17 HMR |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0663) | 17 HMR |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0665) | 17 Mach 2 |
| Sturm, Ruger & Co. | 22/45  (Model # 0189) | .22 LR |
| Sturm, Ruger & Co. | 22/45  (Model # 0190) | .22 LR |
| Sturm, Ruger & Co. | 22/45  (Model # 0192) | .22 LR |
| Sturm, Ruger & Co. | 22/45  (Model # 0193) | .22 LR |
| Sturm, Ruger & Co. | 22/45 MKIII  (Model # 0197) | .22 LR |
| Sturm, Ruger & Co. | 22/45 MKIII  (Model # 10107) | .22 LR |
| Sturm, Ruger & Co. | 22/45 MKIII  (Model # 10109) | .22 LR |
| Sturm, Ruger & Co. | 22/45 MKIII  (Model # 10110) | .22 LR |
| Sturm, Ruger & Co. | 22/45 MKIII  (Model # 10119) | .22 LR |
| Sturm, Ruger & Co. | 22/45 MKIII  (Model # 10120) | .22 LR |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | 22/45 MKIII  (Model # 10121) | .22 LR |
| Sturm, Ruger & Co. | 22/45 MKIII (Model # 0196) | .22 LR |
| Sturm, Ruger & Co. | GP100 (Model #01757) | .22 LR |
| Sturm, Ruger & Co. | LCR  (Model # 5410) | .22 LR |
| Sturm, Ruger & Co. | LCR  (Model # 5413) | .22 LR |
| Sturm, Ruger & Co. | LCR  (Model # 5416) | .22 LR |
| Sturm, Ruger & Co. | LCR  (Model # 5417) | .22 LR |
| Sturm, Ruger & Co. | LCRx  (Model # 5435) | .22 LR |
| Sturm, Ruger & Co. | Mark IV Hunter (Model # 40160) | .22 LR |
| Sturm, Ruger & Co. | Mark IV Target (Model # 40159) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0136) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0144) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0154) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0168) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0170) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0172) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0173) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0174) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0175) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0180) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0182) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0183) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0184) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0185) | .22 LR |
| Sturm, Ruger & Co. | MKII    (Model # 0186) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10101) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10103) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10104) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10105) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10106) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10112) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10118) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10122) | .22 LR |
| Sturm, Ruger & Co. | MKIII    (Model # 10123) | .22 LR |
| Sturm, Ruger & Co. | New Bearcat  (Model # 0912) | .22 LR |
| Sturm, Ruger & Co. | New Bearcat  (Model # 0913) | .22 LR |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0623) | .22 LR |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0637) | .22 LR |
| Sturm, Ruger & Co. | Single-Ten  (Model # 8100) | .22 LR |
| Sturm, Ruger & Co. | Single-Ten  (Model # 8100) | .22 LR |
| Sturm, Ruger & Co. | SP101  (Model # 5745) | .22 LR |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | SP101  (Model # 5765) | .22 LR |
| Sturm, Ruger & Co. | SR22  (Model # 3600) | .22 LR |
| Sturm, Ruger & Co. | SR22  (Model # 3606) | .22 LR |
| Sturm, Ruger & Co. | SR22  (Model # 3607) | .22 LR |
| Sturm, Ruger & Co. | SR22  (Model # 3608) | .22 LR |
| Sturm, Ruger & Co. | SR22  (Model # 3611) | .22 LR |
| Sturm, Ruger & Co. | SR22  (Model # 3613) | .22 LR |
| Sturm, Ruger & Co. | SR22  (Model # 3620) | .22 LR |
| Sturm, Ruger & Co. | SR22  (Model # 3622) | .22 LR |
| Sturm, Ruger & Co. | SR22P-BT  (Model # 03621) | .22 LR |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 10646) | .22 Mag. |
| Sturm, Ruger & Co. | LCR  (Model # 5414) | .22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Nine  (Model # 8150) | .22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0621) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0622) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0624) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0625) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0626) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0629) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0646) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0660) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 0662) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 10621) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 10622) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 10623) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 10624) | .22 LR / 22 Mag |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 10629) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 8845) | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 6511) | .32 H&R |
| Sturm, Ruger & Co. | New Model Single-Six  (Model # 6512) | .32 H&R |
| Sturm, Ruger & Co. | SP101  (Model # 5746) | .32 Mag. |
| Sturm, Ruger & Co. | SP101  (Model # 5748) | .32 Mag. |
| Sturm, Ruger & Co. | 9E (Model 3341) | 9mm |
| Sturm, Ruger & Co. | BSR9c-BT )Model # 03344) | 9mm |
| Sturm, Ruger & Co. | LC9  (Model # 3200) | 9mm |
| Sturm, Ruger & Co. | LC9c-BT (Model # 03265) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3235) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3242) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3243) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3246) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3255) | 9mm |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | LC9s (Model # 3256) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3258) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3259) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3260) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3261) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3262) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3263) | 9mm |
| Sturm, Ruger & Co. | LC9s (Model # 3270) | 9mm |
| Sturm, Ruger & Co. | LCR (Model 5456) | 9mm |
| Sturm, Ruger & Co. | P89  (Model # 3042) | 9mm |
| Sturm, Ruger & Co. | P89  (Model # 3044) | 9mm |
| Sturm, Ruger & Co. | P89  (Model # 3064) | 9mm |
| Sturm, Ruger & Co. | P89  (Model # 3072) | 9mm |
| Sturm, Ruger & Co. | P94  (Model # 3010) | 9mm |
| Sturm, Ruger & Co. | P94  (Model # 3085) | 9mm |
| Sturm, Ruger & Co. | P95  (Model # 3075) | 9mm |
| Sturm, Ruger & Co. | P95  (Model # 3095) | 9mm |
| Sturm, Ruger & Co. | Ruger American Pistol (Model # 8661) | 9mm |
| Sturm, Ruger & Co. | Ruger American Pistol (Model # 8663) | 9mm |
| Sturm, Ruger & Co. | SR1911 (06722) | 9mm |
| Sturm, Ruger & Co. | SR9 (Model # 3309) | 9mm |
| Sturm, Ruger & Co. | SR9 (Model # 3310) | 9mm |
| Sturm, Ruger & Co. | SR9 (Model # 3311) | 9mm |
| Sturm, Ruger & Co. | SR9  (Model # 3312) | 9mm |
| Sturm, Ruger & Co. | SR9C  (Model # 3316) | 9mm |
| Sturm, Ruger & Co. | SR9C  (Model # 3317) | 9mm |
| Sturm, Ruger & Co. | SR9C  (Model # 3333) | 9mm |
| Sturm, Ruger & Co. | SR9C (Model # 3339) | 9mm |
| Sturm, Ruger & Co. | LCR   (Model # 5440) | .38 Spl |
| Sturm, Ruger & Co. | LCR  (Model # 5418) | .38 Spl |
| Sturm, Ruger & Co. | LCRx   (Model # 5441) | .38 Spl |
| Sturm, Ruger & Co. | GP100  (Model # 1727) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR   (Model # 5419) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR   (Model # 5430) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR   (Model # 5431) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR  (Model # 5401) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR  (Model # 5402) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR  (Model # 5403) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR  (Model # 5404) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR  (Model # 5405) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR  (Model # 5409) | .38 Spl +P |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | LCR  (Model # 5415) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR (Model # 5407) | .38 Spl +P |
| Sturm, Ruger & Co. | SP101  (Model # 5737) | .38 Spl +P |
| Sturm, Ruger & Co. | SP101  (Model # 5739) | .38 Spl +P |
| Sturm, Ruger & Co. | GP100  (Model # 1748) | .327 Federal Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0353) | .327 Federal Mag. |
| Sturm, Ruger & Co. | SP101  (Model #05759) | .327 Federal Mag. |
| Sturm, Ruger & Co. | SP101  (Model #05773) | .327 Federal Mag. |
| Sturm, Ruger & Co. | LCR (Model #05452) | .327 Federal Mag. |
| Sturm, Ruger & Co. | LCR  (Model # 5452) | .327 Fed. Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1702) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1703) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1704) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1705) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1706) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1707) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1711) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1712) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1715) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1718) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1719) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1720) | .357 Mag. |
| Sturm, Ruger & Co. | GP100  (Model # 1754) | .357 Mag. |
| Sturm, Ruger & Co. | GP100 (Model # 01758) | .357 Mag. |
| Sturm, Ruger & Co. | GP100 (Model # 1716) | .357 Mag. |
| Sturm, Ruger & Co. | GP100 Match Champion  (Model # 01755) | .357 Mag. |
| Sturm, Ruger & Co. | LCR  (Model # 5450) | .357 Mag. |
| Sturm, Ruger & Co. | LCR  (Model # 5451) | .357 Mag. |
| Sturm, Ruger & Co. | LCRx  (Model # 5460) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0306) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0308) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0309) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0316) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0318) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0319) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0331) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 10306) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 10308) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 10316) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 5201) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0521) | .357 Mag. |

| Sturm, Ruger & Co. | New Vaquero  (Model # 0523) | .357 Mag. |
|---|---|---|
| Sturm, Ruger & Co. | New Vaquero  (Model # 0575) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0576) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0577) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0579) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 10514) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5106) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5107) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5108) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5109) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5130) | .357 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5133) | .357 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 05033) | .357 Mag. |
| Sturm, Ruger & Co. | SP101  (Model # 5718) | .357 Mag. |
| Sturm, Ruger & Co. | SP101  (Model # 5719) | .357 Mag. |
| Sturm, Ruger & Co. | SP101  (Model # 5720) | .357 Mag. |
| Sturm, Ruger & Co. | SP101  (Model # 5766) | .357 Mag. |
| Sturm, Ruger & Co. | SP101  (Model # 5771) | .357 Mag. |
| Sturm, Ruger & Co. | SP101  (Model # 5773) | .357 Mag. |
| Sturm, Ruger & Co. | SP101 Match Champion (Model #05782) | .357 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0505) | .30 Carbine |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 10595) | .30 Carbine |
| Sturm, Ruger & Co. | P944  (Model # 3425) | .40 S&W |
| Sturm, Ruger & Co. | P944  (Model # 3426) | .40 S&W |
| Sturm, Ruger & Co. | P944  (Model # 3435) | .40 S&W |
| Sturm, Ruger & Co. | SR40  (Model # 3472) | .40 S&W |
| Sturm, Ruger & Co. | SR40  (Model # 3473) | .40 S&W |
| Sturm, Ruger & Co. | SR40C  (Model # 3478) | .40 S&W |
| Sturm, Ruger & Co. | SR40C  (Model # 3479) | .40 S&W |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0405) | .41 Mag. |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0406) | .41 Mag. |
| Sturm, Ruger & Co. | Blackhawk  (Model # 05233) | .44 Special |
| Sturm, Ruger & Co. | GP100  (Model # 01761) | .44 Special |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 5232) | .44 Special |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 5233) | .44 Special |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0540) | 44/40 |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0541) | 44/40 |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0542) | 44/40 |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0543) | 44/40 |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0544) | 44/40 |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0545) | 44/40 |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0802) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0804) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0806) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0807) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0810) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0811) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0813) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0814) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0831) | .44 Mag. |
| Sturm, Ruger & Co. | New Model Super Blackhawk  (Model # 0860) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0536) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0537) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0546) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0547) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0548) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0549) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0556) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0557) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0589) | .44 Mag. |
| Sturm, Ruger & Co. | New Vaquero  (Model # 0591) | .44 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 5001) | .44 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 5003) | .44 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 5004) | .44 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 5011) | .44 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 5013) | .44 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 5014) | .44 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 5026) | .44 Mag. |
| Sturm, Ruger & Co. | Redhawk  (Model # 5028) | .44 Mag. |
| Sturm, Ruger & Co. | Super Redhawk  (Model # 5501) | .44 Mag. |
| Sturm, Ruger & Co. | Super Redhawk  (Model # 5502) | .44 Mag. |
| Sturm, Ruger & Co. | Super Redhawk Alaskan  (Model # 5303) | .44 Mag. |
| Sturm, Ruger & Co. | SR1911  (Model # 6739) | 10mm |
| Sturm, Ruger & Co. | P345  (Model # 6644) | .45 ACP |
| Sturm, Ruger & Co. | P345  (Model # 6645) | .45 ACP |
| Sturm, Ruger & Co. | P345  (Model # 6647) | .45 ACP |
| Sturm, Ruger & Co. | P345  (Model # 6648) | .45 ACP |
| Sturm, Ruger & Co. | P90  (Model # 6602) | .45 ACP |
| Sturm, Ruger & Co. | P90  (Model # 6622) | .45 ACP |
| Sturm, Ruger & Co. | P90  (Model # 6624) | .45 ACP |
| Sturm, Ruger & Co. | P97  (Model # 6605) | .45 ACP |
| Sturm, Ruger & Co. | P97  (Model # 6640) | .45 ACP |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | Ruger American Pistol (Model # 8680) | .45 ACP |
| Sturm, Ruger & Co. | SR1911  (Model # 06700) | .45 ACP |
| Sturm, Ruger & Co. | SR1911  (Model # 6702) | .45 ACP |
| Sturm, Ruger & Co. | SR1911  (Model # 6708) | .45 ACP |
| Sturm, Ruger & Co. | SR1911  (Model # 6709) | .45 ACP |
| Sturm, Ruger & Co. | SR1911  (Model # 6720) | .45 ACP |
| Sturm, Ruger & Co. | SR1911  (Model # 6736) | .45 ACP |
| Sturm, Ruger & Co. | SR1911CMD-A  (Model # 6711) | .45 ACP |
| Sturm, Ruger & Co. | SR45  (Model # 3800) | .45 ACP |
| Sturm, Ruger & Co. | SR45  (Model # 3801) | .45 ACP |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 5242) | .45 Long Colt & .45 ACP |
| Sturm, Ruger & Co. | Redhawk  (Model # 05032) | .45 Long Colt & .45 ACP |
| Sturm, Ruger & Co. | New Model Blackhawk   (Model # 10455) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0445) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0446) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0447) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0455) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0459) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0460) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0463) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0465) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0467) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0510) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0511) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0551) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0552) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0553) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0554) | .45 Long Colt |
| Sturm, Ruger & Co. | New Model Blackhawk  (Model # 0555) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5101) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5102) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5103) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5104) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5105) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5112) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5113) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5122) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5123) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5129) | .45 Long Colt |
| Sturm, Ruger & Co. | New Vaquero  (Model # 5134) | .45 Long Colt |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | New Vaquero  (Model # 8863) | .45 Long Colt |
| Sturm, Ruger & Co. | Redhawk  (Model # 5023) | .45 Long Colt |
| Sturm, Ruger & Co. | Redhawk  (Model # 5024) | .45 Long Colt |
| Sturm, Ruger & Co. | Redhawk  (Model # 5025) | .45 Long Colt |
| Sturm, Ruger & Co. | Redhawk  (Model # 5027) | .45 Long Colt |
| Sturm, Ruger & Co. | Vaquero  (Model # 0538) | .45 Long Colt |
| Sturm, Ruger & Co. | Vaquero  (Model # 0539) | .45 Long Colt |
| Sturm, Ruger & Co. | Vaquero  (Model # 0590) | .45 Long Colt |
| Sturm, Ruger & Co. | Vaquero  (Model # 0592) | .45 Long Colt |
| Sturm, Ruger & Co. | Super Redhawk  (Model # 5505) | 454 Casull & 45 Long Colt |
| Sturm, Ruger & Co. | Super Redhawk  (Model # 5508) | 454 Casull & 45 Long Colt |
| Sturm, Ruger & Co. | Super Redhawk Alaskan  (Model # 5301) | 454 Casull |
| Sturm, Ruger & Co. | Super Redhawk  (Model # 5507) | 480 Ruger |
| Sturm, Ruger & Co. | Super Redhawk  (Model # 5510) | 480 Ruger |
| Sturm, Ruger & Co. | Super Redhawk Alaskan  (Model # 5302) | 480 Ruger |
| Sturm, Ruger & Co. | Super Redhawk Alaskan  (Model # 8851) | 480 Ruger |
| Sturm, Ruger & Co. | Super Redhawk Alaskan  (Model # 05302) | 480 Ruger |
| Thompson Center | PRO HTR SST/COMP | .308 Win |
| Walther | P22 | .22 LR |
| Walther | P22 (no internal lock / Q style grip) | .22 LR |
| Walther | P22 (no internal lock) | .22 LR |
| Walther | SP22 | .22 LR |
| Walther | PPK/S-1 | .32 ACP |
| Walther | PK380 | .380 ACP |
| Walther | PK380 (no internal lock) | .380 ACP |
| Walther | PPK | .380 ACP |
| Walther | PPK (Blue) | .380 ACP |
| Walther | PPK/S (Blue) | .380 ACP |
| Walther | PPK/S-1 | .380 ACP |
| Walther | PPK/S-1 Two Tone | .380 ACP |
| Walther | P99 | 9mm |
| Walther | P99 AS | 9mm |
| Walther | P99 c AS | 9mm |
| Walther | P99 QA | 9mm |
| Walther | P990 | 9mm |
| Walther | P99C AS | 9mm |
| Walther | P99C QA | 9mm |
| Walther | PPS | 9mm |
| Walther | P99 | .40 S&W |
| Walther | P99 AS | .40 S&W |

| Walther | P99 QA | .40 S&W |
|---------|--------|---------|
| Walther | P99C QA | .40 S&W |
| Walther | PPS | .40 S&W |

# EXHIBIT 62

## TO KAPLAN DECLARATION

# THE BASICS
# OF PERSONAL
# PROTECTION
# IN THE HOME

Produced by the Education & Training Division
A Publication of the National Rifle Association of America





First Edition—September 2000
©2000 The National Rifle Association of America

International Standard Book Number (ISBN): 0-935998-99-3

All rights reserved. Printed in the United States of America. This book may not be reprinted or reproduced in whole or in part by mechanical means, photocopying, electronic reproduction, scanning, or any other means without prior express written permission. For information, write: Training Department, Education & Training Division, National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

ES 26828 8/05

# WARNING

The NRA expressly disclaims any and all liabilities, losses, costs, claims, demands, suits or actions of any type or nature whatsoever, arising from or in any way related to: this manual; the use of this manual; any representation, drawing or statement made in this manual; or any claim that a particular action is in compliance or performed according or pursuant to this manual.

This manual is under no circumstances to be viewed as a restatement of the law in any jurisdiction or to assure compliance with any applicable federal, state or local laws, ordinances, rules or regulations. You must consult a local attorney to ascertain compliance with all applicable federal, state or local laws, ordinances, rules or regulations and to advise you of the applicable duty of care required of firearms owners in your jurisdiction.

Discharging firearms in poorly ventilated areas, cleaning firearms, or handling ammunition or lead-containing reloading components may result in exposure to lead, a substance known to cause birth defects, reproductive harm and other serious physical injury. Have adequate ventilation at all times. Wash hands after exposure.

Great pains have been taken to make this book as complete as possible; however, it is designed to be used in conjunction with the classroom and firing range instruction of the NRA Basic Personal Protection in the Home Course. Reading this guide is not, in itself, sufficient to confer proficiency in the many techniques of personal protection in the home. The reader of this guide is strongly advised to obtain additional knowledge and hands-on training. Contact the NRA Education & Training Division at (703) 267-1430 for a list of NRA Certified Instructors.

# PART VI:
# SELECTING FIREARMS, AMMUNITION AND ACCESSORIES FOR PERSONAL PROTECTION

# SELECTING A FIREARM FOR PERSONAL PROTECTION

Choosing to own a handgun for personal protection requires careful consideration of a number of factors. The selection of a specific firearm and ammunition for self-defense can be just as critical, and should entail the same comprehensive deliberation.

A firearm is a tool for delivering energy at a distance. This energy can be used to do various tasks—to harvest game, punch a hole through a paper target, or, in the case of a defensive arm, stop a criminal attack.

## GUN FIT

One of the most important factors contributing to a shooter's ability to shoot quickly and accurately is gun fit. *Gun fit* refers to how comfortably and naturally the firearm's grip fits the hand—how well the firearm's grip size, grip angle, location of controls, length, size and other characteristics fit a particular shooter. Related to gun fit is *gun ergonomics*, a term that relates to the convenience and efficiency of the positioning of controls and gripping surfaces. Gun fit is highly individual: for example, guns that are suited for those with large, fleshy hands may not fit those having small, bony hands, and vice versa.

Good gun fit allows you to



*Fig. 111. Good gun fit is critical to fast, accurate defensive shooting. Photos A and B show proper hand and trigger finger placement, made possible through proper gun fit, while C shows the gap between the trigger finger and frame that should exist when the gun fits the hand and fingers correctly.*

183

maintain a consistent grip, positions your trigger finger in the proper location on the trigger, and facilitates your assumption of a stable shooting position. Before you purchase a gun, you should test-fire a number of different models to determine which fits you best. Guidance on gun fit can be provided by NRA Certified Instructors.

Test-firing a variety of handguns also will give you the opportunity to experience different action mechanisms. While there are a variety of handgun types, including single- and double-action revolvers, single-action, double-action and double-action-only semi-automatics, derringers and even single-shots, the novice defensive shooter will be best served by either a double-action revolver or a double-action semi-automatic.

## REVOLVER OR SEMI-AUTOMATIC?

Among firearm instructors, gun writers and other authorities, both revolvers and semi-autos have their passionate adherents. Each type has strengths and limitations.

The *double-action revolver* often is recommended for new shooters because of its simplicity of operation and reliability. Once its cylinder is loaded, it is fired simply by pulling the trigger; no safety levers need be disengaged. Because the revolver does not depend upon the recoil generated by the cartridge for operation, it is capable of handling a wide variety of loadings in a particular chambering. Moreover,



*Fig. 112. A typical double-action revolver, showing some of the major features and components.*

the revolver's mechanism confers at least a theoretical reliability edge.

The main drawback to the revolver as a defensive arm is its limited ammunition capacity. Most defensive center-fire revolvers have a cylinder capacity of only 5 or 6 rounds—considerably less than the magazine capacity of most semi-automatic pistols. The revolver is also slow to reload, even with speedloaders (devices which allow the quick, simultaneous insertion of all the rounds into the cylinder). Additionally, each shot with the revolver must be fired using a long, relatively heavy trigger pull that some shooters find detrimental to accuracy.

The *semi-automatic pistol* (sometimes called a *self-loader*) has, in recent years, largely superseded the revolver as the handgun of choice for law enforcement officers and other armed professionals. Semi-autos have always had wide popularity among civilian shooters.

The popularity of semi-automatic arms stems from several factors. First, they generally have considerably greater cartridge capacity than revolvers of similar size, allowing more shots to be fired before reloading is necessary. When reloading is required, the semi-automatic can be reloaded with a full magazine much more quickly than a revolver's cylinder can be filled, even with speedloaders. Also, although the initial shot from a typical double-action semi-automatic is fired using a long and heavy trigger pull similar to that of a double-action revolver, each subsequent shot is fired by a short, light, single-action pull, which is generally considered to contribute to accuracy. (This advantage is negated on double-action-only semi-automatics, in which every shot is fired in double-action



*Fig. 113. A typical semi-automatic pistol, showing some of the major features and components.*

mode.) Lastly, the semi-auto generally is narrower in width than the revolver—a factor when concealment or cramped gun storage space is a concern.

Semi-automatics have several limitations, however. They are more ammunition-sensitive than revolvers, as they require cartridges within a certain power range to ensure that their recoil-operated mechanisms function properly. Also, their rapidly-moving parts make them somewhat more jam-prone than revolvers (although the reliability of today's semi-autos generally is excellent). Semi-automatic mechanisms usually include safety levers, decocking levers and/or slide release levers, making them initially less intuitive to operate. Furthermore, on virtually all semi-automatics, the slide must be manually retracted and released to chamber a round. The stiffness of the recoil springs on many semi-autos makes these pistols difficult to use by those with low hand and arm strength, arthritis or other physical limitations. Such individuals also may find it difficult to hold the semi-automatic pistol rigidly enough to ensure reliable operation.

## CARTRIDGE SELECTION

For either type of firearm, there is a wide range of cartridges to choose from. The effectiveness of a self-defense firearm is related, to some extent, to the amount of energy it can deliver. This energy is usually expressed in terms of a measure called *kinetic energy* or *muzzle energy*, which is calculated using both bullet weight and bullet velocity, and is expressed in foot-pounds. Different cartridges are capable of generating different levels of kinetic energy, and thus vary in their ability to stop an assailant.



*Fig. 114. These photographs reflect the difference between a cartridge generating a low level of recoil and flash (above) and a cartridge producing considerable recoil and flash. Note the height of muzzle flip in the photo at right; this would make fast, accurate follow-up shots difficult to perform.*

Cartridge characteristics also influence the ability of the shooter to place shots precisely and rapidly on the target and to handle recoil.

As a general rule, you should select the most powerful cartridge that you can handle effectively—that is, one that does not produce flinching or excessive recoil, and allows you to apply follow-up shots quickly and accurately. This is determined primarily by test-firing handguns chambered for different cartridges. If possible, try handguns of different weights and sizes in the same chambering. If you find it difficult to handle the recoil generated by the .38 Special cartridge in a small, lightweight revolver, you might more easily control a heavier, bigger gun chambered for the same cartridge.

As a broad generalization, most firearm authorities recommend a minimum of 9 mm Parabellum (also known as 9 mm Para, 9 mm Luger, or 9x19 mm) for semi-automatic pistols, and .38 Special for revolvers. However, there are some shooters whose recoil sensitivity or lack of hand strength do not permit them to handle even these rather moderate-power cartridges. Such individuals should not feel themselves hopelessly under-gunned with a pistol or revolver in .38 S&W, .380 Auto, .32 Auto, .25 Auto or even .22 Long Rifle. With proper bullet placement, even such low-powered rounds have proven effective for self-defense.

More detailed information on cartridge selection will be presented in Chapter 21: Selecting Ammunition for Personal Protection.

## ADDITIONAL FACTORS

In addition to gun fit and chambering, other factors may influence handgun selection. *Gun size* is significant if the firearm may also be used for concealed carry purposes or if firearm storage space is minimal. *Safety features* are always of concern, particularly when the gun is used or stored in an environment in which there are children or other persons unauthorized to handle firearms. *Manufacturer's reputation* and *price* usually also play a part in any gun's purchase. An NRA Certified Instructor can assist the prospective gun owner in evaluating these factors.

# CHAPTER 21

# SELECTING AMMUNITION FOR PERSONAL PROTECTION

After the caliber, type of firearm, and specific firearm model are selected, the defensive-oriented shooter must still choose a particular load (a specific combination of bullet weight, bullet design, and muzzle velocity) among the variety of loads commercially available in that gun's chambering.

Ammunition intended for defensive firearms can be evaluated in terms of five major criteria: *reliability, controllability, stopping power, accuracy* and *muzzle flash.*

## RELIABILITY

*Reliability* refers to the ability of a firearm to consistently chamber, fire, extract and eject a particular load without malfunctions. Reliability is the single most important factor in selecting defensive ammunition. Most loads are more reliable in some guns than in others, so the only way to determine ammunition reliability is to test-fire a number of rounds through the gun being used for self-defense. Ensure that the gun is clean and well-lubricated before performing reliability testing. There's no hard and fast rule for the number of rounds that should be fired without malfunctions for the gun/ammunition combination to be considered reliable. A single box of ammunition—50 rounds—is probably not quite enough; 500 rounds might be excessive to many. Many gunsmiths recommend a defensive handgun



*Fig. 115. A full-metal jacket (FMJ) cartridge (left) and a hollow-point cartridge. Many semi-automatic pistols are more reliable with FMJ ammunition than with hollow-point ammunition.*

be capable of firing at least 150-200 rounds with no stoppages. The greater the number of trouble-free shots fired during reliability testing, the smaller the chance the gun will become inoperable during a confrontation. The individual gun owner must be responsible for determining the reliability standard he or she is comfortable with. A firearm that doesn't achieve that standard with at least one of the appropriate ammunition choices may need gunsmith attention.

Often, however, reliability problems in semi-automatic pistols stem from the magazine, and have little or nothing to do with the ammunition being used. By using numbered magazines, you can identify problem magazines that can be set aside, or used only for practice. Magazine-related problems may also be cured simply by trying another brand of magazine, which may be made to different tolerances or a slightly different design than the troublesome unit.

The majority of semi-automatic pistols function best with full-metal-jacket (ball) ammunition; the round-nose jacketed bullets used in such loads, however, are not the best choice for a defensive encounter. As discussed below, hollow-point bullets are the best choice for use in personal protection handguns. Hollow-points having a profile similar to that of a full-metal-jacket bullet will feed best in a self-loading pistol.

## CONTROLLABILITY

*Controllability* is directly linked to the amount of recoil produced by a cartridge. As a general rule, the less recoil a load generates, the more controllable it will be. Controllability is important because, in defensive shooting situations, you may need more than one round to stop a violent con-



Fig. 116. Ammunition that is more controllable allows a shooter to fire quick, accurate shots. Note spent case above shooter's head and in ejection port.

frontation. This is particularly true in the case of multiple-assailant situations. The more rapidly you can make hits on an assailant, the more quickly he or she may cease the attack.

Controllability may be evaluated simply by firing several different loads and noting which one felt the softest. You may also use a shooting partner to observe the level of muzzle jump each ammunition type and brand produces; a video cam-

era will suffice in the absence of such an observer. Additionally, timed multiple-shot drills may reveal which load allows the fastest recovery time.

## STOPPING POWER

One of the most talked-about and hotly debated aspects of defensive loads, *stopping power* can be defined as the ability of a cartridge to quickly incapacitate an assailant, or otherwise cause that assailant to stop his attack. Comparisons of stopping power among different cartridges and bullet types are often made on the basis of the effects of a single well-placed shot—the often-cited "one shot stop." Despite the claims made for different bullet designs, there is a lack of complete consensus among gun authorities regarding the exact cartridge characteristics giving the best stopping power performance.



Nonetheless, some broad generalizations can be made. Hollow-point bullets usually are preferred over other types because they are designed to open up and expand in diameter upon impact. This expansion both transfers energy more efficiently to the target and also prevents overpenetration (complete penetration of the target) that could endanger the lives of others. Also, all other factors being equal, there is a rough correlation between the amount of energy the bullet has upon impact and its effectiveness in stopping an assailant.

*Fig. 117. The expansion of hollow-point bullets makes them more effective for defensive use than other bullet types.*

Fortunately, you need not become a firearms expert to pick the proper ammunition. Results derived from reports of police and civilian shootings in which a single shot stopped an attacker show that virtually all of today's premium hollow-point defensive loads are adequately effective. The proper selection strategy is to pick the most reliable, controllable and accurate brand from among the variety of premium hollow-point loadings available.

## ACCURACY

Although of primary importance in a gun used for target shooting or hunting, *accuracy* is only a moderately significant factor in the effectiveness of defensive handgun ammunition. This is so primarily because most defensive firearm uses take place at very close range (7 yards and under). Some authorities suggest that the ability to produce a 2-inch group at 7



*Fig. 118. Since most defensive encounters take place at relatively close range, extreme accuracy is not required. Adequate defensive accuracy is achieved when rapidly-fired shots at seven yards are reasonably centered on an 8½" by 11" piece of paper (right). The groups at left show the groups resulting from firing too slowly (top) and too quickly.*

yards is adequate for defensive purposes; the vast majority of gun and ammunition combinations will easily meet or exceed that standard. Note also that the dynamics typical of a defensive shooting situation—low light, moving targets, and a rapid firing rate—generally make any attempt at pinpoint accuracy impractical.

With fixed-sight guns, good accuracy implies more than just tight grouping; it also involves the ability of the gun and ammunition combination to shoot to the point of aim indicated by the sights. Fixed-sight arms often may be roughly adjusted for windage by drifting the rear sight laterally; elevation adjustments usually require gunsmith intervention. It is more important that defensive ammunition for such guns shoot to the point of aim; tight grouping is secondary.

## MUZZLE FLASH

The *muzzle flash* generated by a load upon firing can influence the outcome of a self-defense situation, particularly at night. Under conditions of darkness, excessive flash will temporarily rob you of your night vision—the accommodation the eye has made to the low light level. The muzzle flash may also illuminate your defensive position, giving an armed attacker something to aim at.



*Fig. 119. In darkness, the muzzle flash from a .357 Rem. Mag. cartridge fired from a 2"-barrel revolver would cause a loss of night vision.*

## SECONDARY FACTORS

In addition to the five major criteria described above, additional secondary factors should be considered in evaluating any defensive load, including its tendency to leave combustion residues, or fouling, in the barrel; whether its case can be reloaded to make a fresh cartridge (a factor of importance to reloaders); price; and availability. It is also worth noting that certain types of ammunition—particularly unusual or unconventional ammunition, or ammunition having an inflammatory or provocative brand name—have been mis-characterized by some prosecutors in an attempt to show that the person shooting in self-defense was actually eager to engage in combat and thus, inferentially, likely to shoot another person without sufficient cause.

An NRA Certified Instructor can assist you in selecting the proper defensive load for your needs.

## CLEANING KIT

For proper gun maintenance, a complete cleaning kit is essential. Such a kit should contain at least the following items:

- cloth patches;
- cleaning rod with cleaning rod attachments, including bore brush and an assortment of cleaning rod tips to hold patches;
- a small brush for cleaning tight spots and crevices;
- gun cleaning solvent (bore cleaner);
- gun oil;
- a soft cloth for wiping exterior gun surfaces; and
- eye protection.



*Fig. 121. The elements of a basic gun cleaning kit, including (clockwise from bottom center): (A) bronze bore brush and slotted tip for holding patches; (B) cleaning rod; (C) small brush; (D) cotton patches; (E) gun oil; (F) gun cleaning solvent; (G) soft cloth; and (H) eye protection. Also shown are thin rubber gloves, which may help protect the skin from prolonged exposure to dirt, oil and solvent.*

These items may be purchased separately, or together in a kit. See Appendix A: Firearm Maintenance for more information on the tools and techniques to keep your firearm clean.

## GUN STORAGE DEVICES

It is every gun owner's responsibility to ensure that his or her firearms are stored so that they are inaccessible to all persons unauthorized to han-





*Fig. 122. Gun storage devices, including (top l.) a steel gun box with a Simplex®-type lock, (l.) a plastic case secured with a padlock, and a gun safe.*



dle them. Each gun owner must make the individual choice of how that is best accomplished. In some jurisdictions, firearm storage methods are not determined by individual decision, but by local ordinance or state law. Consult a knowledgeable attorney for the legal requirements in your area.

Those gun owners who choose, or are compelled by law, to lock their firearms in gun safes or gun boxes can choose from a wide variety of sizes and types, from lightweight portable plastic cases to steel-sided gun safes that may be permanently attached to walls, cabinets and the like. Some cases have combination or keyed locks, while others, such as Simplex® locks, have numbered buttons that may be pressed in a specific sequence to allow access. This latter type of lock is often preferred for gun safes or lockboxes that are used to store personal protection firearms, because it is easier to open in the dark or under stress.

In addition to providing firearm security in a home or business, a lockable case may be required when a firearm is transported inside a vehicle, such as to a shooting range or gunsmith shop. Again, consult your attorney for the laws in your city, county or state.

## SPEEDLOADERS

Speedloaders—devices that hold a cylinder-full of cartridges in position to be quickly inserted in the cylinder's chamber—afford the fastest means

of recharging the chambers of a revolver cylinder. Revolver shooters should have several speedloaders to facilitate speedy reloading.

Several extra speedloaders will also permit you to practice reloading drills with one or two of the devices while retaining the remainder for an actual defensive situation. It is important to keep the practice speedloaders separate from those used for defensive purposes, because the practice units may become worn and thus less reliable from frequent use.



*Fig. 123. Speedloaders reduce the time required to reload a revolver. Knob (arrow) is turned to release the cartridges when they are aligned with the chambers.*

## SPARE MAGAZINES

If your defensive handgun is a semi-automatic, it is important to have several extra magazines for it. Additional magazines will allow you to speedily recharge your pistol with a fresh supply of ammunition, in the event the initial magazine is exhausted.

Furthermore, it is recognized that the magazine is the weak link in any semi-automatic handgun design, as it is easy for thin-walled magazine bodies to become dented, misshapen, or otherwise nonfunctional in normal use. A supply of extra magazines allows you to have several that are employed only in practice sessions, while others can be kept in reserve only for actual defensive use. As with speedloaders, it is important to keep the practice magazines separate from those reserved for defensive purposes, as the practice units may become worn or damaged, and thus less reliable, from frequent practice use.

## DUMMY ROUNDS/SNAP CAPS

Dummy rounds or snap caps (a type of dummy ammunition that uses a spring-loaded or soft plastic pad to cushion firing pin fall) are useful for dry-fire and gun-handling exercises. With certain gun designs, dry-firing can cause damage to action components; snap caps will prevent this. Consult the firearm owner's manual for more information on the recommended dry-fire procedure.

Snap caps can be used for certain live-fire exercises as well, such as the ball-and-dummy drill, in which dummy cartridges are mixed in with live rounds in a sequence not known to the shooter. The movement of the gun

when the trigger is pulled on the dummy round often reveals a tendency to flinch or otherwise anticipate the shot.

Dummy rounds and snap caps typically come in colors that clearly distinguish them from live ammunition. Plastic dummies are often in bright red or orange, and metal dummy rounds frequently feature a completely black cartridge case or a solid copper body.

Dummy rounds and snap caps can help improve the shooting fundamentals and are also useful in many gun-handling drills, such as speed reloading drills.



*Fig. 124. Above, snap caps and dummy rounds in different calibers. The inset at right shows the three major types of these devices: left, a plastic snap cap with a brass head containing a spring-loaded plunger to cushion firing pin impact; center, a solid plastic dummy round; and right, a metal dummy round approximating the weight and feel of a live cartridge.*

# EXHIBIT 63
## TO KAPLAN DECLARATION

# NRA GUIDE
## TO THE
# BASICS OF PERSONAL
# PROTECTION
# OUTSIDE THE HOME







Suggested Retail **$27.95**

# NRA GUIDE
# TO
# PERSONAL
# PROTECTION
# OUTSIDE
# THE HOME

Produced by the Education & Training Division
A Publication of the National Rifle Association of America



First Edition—April 2006
©2006 The National Rifle Association of America

International Standard Book Number (ISBN): 978-0-935998-25-2

All rights reserved. Printed in the United States of America. This book may not be reproduced in whole or in part by mechanical means, photo-copying, electronic reproduction, scanning, or any other means without written permission. For information, write: Training Department, Education & Training Division, National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

NR40830ES30000 07/08

# TABLE OF CONTENTS

Introduction..................................................................................................vii
Safety Note....................................................................................................ix

**PART I: SAFETY**
Chapter 1: Basic Firearm Safety...................................................................3
Chapter 2: Defensive Shooting Safety Outside the Home...............................7
Chapter 3: Safe Firearm Storage.................................................................13

**PART II: STRATEGIES FOR PERSONAL SAFETY
OUTSIDE THE HOME**
Chapter 4: Awareness.................................................................................29
Chapter 5: The Defensive Mindset..............................................................35
Chapter 6: Avoiding Confrontations Outside the Home.................................39
Chapter 7: Responding to an Attack Outside the Home.................................49
Chapter 8: If You Must Shoot.....................................................................63
Chapter 9: The Aftermath of a Defensive Shooting Outside
            the Home...................................................................................77

**PART III: CARRYING A CONCEALED HANDGUN AND
PRESENTING THE HANDGUN FROM CONCEALMENT**
Chapter 10: Handgun Carry: Holsters, Fanny Packs and
            Holster Purses...........................................................................87
Chapter 11: Principles of Concealed Carry...................................................105
Chapter 12: Presenting the Handgun from Concealment................................115
Chapter 13: Special Concealment Situations.................................................139

**PART IV: DEVELOPING BASIC DEFENSIVE
SHOOTING SKILLS**
Chapter 14: Defensive Shooting Concepts....................................................147
Chapter 15: Basic Defensive Shooting Skills................................................153
Chapter 16: Shooting Positions...................................................................159
Chapter 17: Aiming and Firing Techniques..................................................179

**PART V: DEVELOPING CONCEALED CARRY
SHOOTING SKILLS FOR USE OUTSIDE THE HOME**
Chapter 18: Utilizing Cover and Concealment Outside the
            Home.......................................................................................191
Chapter 19: Presentation and Fire from Different Positions..........................203
Chapter 20: Presentation, Movement and Fire from Different
            Positions..................................................................................213
Chapter 21: Handgun Retention...................................................................225

**PART VI: SPECIAL DEFENSIVE SHOOTING TECHNIQUES**

Chapter 22: Strong- and Weak-Hand Shooting............................................237
Chapter 23: Point Shooting..........................................................................241
Chapter 24: Instinctive Shooting..................................................................247
Chapter 25: Engaging Multiple Targets.........................................................253
Chapter 26: Engaging Targets at Extended Range.........................................263
Chapter 27: Engaging Targets in Low Light Conditions...............................269

**PART VII: CONCEALED CARRY, SELF-DEFENSE AND THE LAW**

Chapter 28: Firearms, Self-Defense and the Law...........................................281
Chapter 29: Legal Aspects of Concealed Carry.............................................291
Chapter 30: The Legal Aftermath of a Shooting Outside the Home.............297

**APPENDIXES**

Appendix A: Gun Handling...........................................................................305
Appendix B: Gun Cleaning............................................................................329
Appendix C: Opportunities for Skills Enhancement......................................339
Appendix D: Information and Training Resources.........................................345
Appendix E: Facts About the NRA...............................................................349

Index..............................................................................................................353

# INTRODUCTION

As of early 2006, 38 of the 50 United States permit law-abiding citizens the right to carry a concealed firearm. Millions of people have taken advantage of this right, creating a need for a comprehensive course that covers the full spectrum of issues and information relating to concealed carry and self-defense. This includes not only techniques for properly carrying, presenting and shooting a concealed firearm, but also strategies for preventing violent encounters, and the legal ramifications of using lethal force in self-defense outside the home. The NRA's Personal Protection Outside the Home Course was designed to meet this need.

For many, the term "personal protection" immediately evokes images of martial-arts techniques or a handgun in a nightstand. In truth, however, the use of force is only one of many methods that you can employ to defend life and limb, and is used only as a last resort, when other methods have failed. *For myriad ethical, legal and practical reasons, it is always preferable to escape, evade, deter or otherwise avoid an attack rather than be forced to counter it with force.* Even when planning and skill give you an overwhelming advantage over an assailant, sidestepping a violent confrontation is always the best course. This is especially true when you are legally carrying a concealed handgun in public. Not only is retreat or flight from a confrontation outside the home the most sensible alternative, it is required by statute in most states (as long as you can retreat safely).

There are times, however, when circumstances allow no other option but the use of force to save your life or the lives of others. When you are confronted with such circumstances outside the home, a concealed handgun is unquestionably the most effective defensive tool available, if it is used properly. The ability to draw a handgun from concealment and shoot accurately is not something you are born with; it must be developed through the mastery of a series of interlocking skills, and then must be reinforced through frequent practice.

Note that, in many defensive situations, merely presenting the firearm will deter the threat, without the need for the gun to be fired. The NRA Personal Protection Outside the Home course will help prepare you to make decisions regarding the level of firearm use that is necessary to protect your life or the lives of others.

The main focus of the *NRA Guide to Personal Protection Outside the Home* is on the effective use of a concealed handgun for self-defense outside the home. Included are chapters on concealment techniques and devices, presenting the handgun from concealment, utilizing cover and concealment outside the home, presentation and movement, point shooting, instinctive shooting, low-light shooting, engaging multiple targets, and one-hand shooting. These skills and others presented in this book form the core shooting skills used to counter a

life-threatening attack outside the home.

For those who do not wish to incorporate a handgun into their personal protection plans, or who may not always be able to carry a handgun outside the home, the book also presents techniques and strategies to help you avoid, deter, repel or escape an attack without the use of a firearm. Included are ways to make you seem like less of a target to potential attackers. Additionally, the NRA course, Refuse to Be a Victim®, can help you create a personal security plan that does not include firearms.

The *NRA Guide to Personal Protection Outside the Home* is divided into seven parts: Safety; Strategies for Personal Safety Outside the Home; Carrying a Concealed Handgun and Presenting the Handgun from Concealment; Developing Basic Defensive Shooting Skills; Developing Concealed Carry Defensive Shooting Skills for Use Outside the Home; Special Defensive Shooting Techniques; and Concealed Carry, Self-Defense and the Law. Also included are appendixes on resources for additional information, and facts about the NRA.

Although this book has a wealth of information on virtually every aspect of concealed carry and personal protection outside the home, it is meant to be used within the framework of the NRA Personal Protection Outside the Home Course, a hands-on program encompassing 14 hours of classroom and range instruction. (Mastery of the shooting skills taught in the NRA Basic Pistol Course and the NRA Basic Personal Protection in the Home Course are both prerequisites for this course.) You should understand that merely reading a book—any book—will not, in and of itself, make you proficient at the various skills involved in concealed handgun carry and armed self-defense outside the home. For more information on the NRA Personal Protection Outside the Home Course or any other NRA course, call (703) 267-1423.

---

### A Gun Owner's Responsibilities

Americans enjoy a right that citizens of many other countries do not--the right to own firearms. But with this right come responsibilities. It is the gun owner's responsibility to store, operate and maintain his or her firearms safely. It is the gun owner's responsibility to ensure that unauthorized or untrained individuals cannot gain access to his or her firearms. And it is the gun owner's responsibility to learn and obey all applicable laws that pertain to the purchase, possession and use of a firearm in his or her locale. Guns are neither safe nor unsafe by themselves. When gun owners learn and practice responsible gun ownership, guns are safe.

---

# EXHIBIT 64

## TO KAPLAN DECLARATION

# A Brief History of Firearms

## by Jim Supica

*Copyright, Jim Supica - used by permission. Opinions are those of the author and not necessarily those of NRA or the National Firearms Museum. Originally published in "Guns."*

As long as man has used tools, weapons have been among those of foremost importance. They have been used to provide food and protection since the formation of the earliest social units.

For centuries, and continuing through today, men and women have used firearms as the most effective weapons individuals can wield. Guns have been used to implement both the highest and basest goals of humanity - to put food on the table, to provide personal protection, to enforce or defy the law, to defend or acquire territory and treasure, and to liberate or to enslave.

Guns have also come to be used for a wide variety of recreational and competitive shooting, and millions of Americans exercise their constitutional right to own firearms simply for the pleasure of shooting or the enjoyment of ownership, in addition to more serious uses.

## EARLIEST FIREARMS

The origin of gunpowder is unknown, and may have occurred in China, Turkey, or Europe. The first record describing the combination of charcoal, sulphur, and saltpeter, to produce a rapidly burning or exploding powder is a coded writing by Franciscan monk Roger Bacon shortly before 1250 A.D.

Within 50 years, early cannon had been developed. A large thick metal tube with one closed end (the *breech*) and an open end (the *muzzle*) was loaded first with gunpowder and then with a projectile. The powder was ignited with a torch or smoldering ember through a small hole in the rear (the *touchhole*). The rapidly expanding gases from the exploding gunpowder would throw the projectile from the barrel. This basic principle still applies today.

It took another half-century for this concept to be applied to individual hand-held weapons. The first firearms, ca. 1350, called "hand cannons" or "hand gonnes," were essentially miniature cannons designed to be held by hand or attached to a pole for use by individual soldiers. They were loaded and fired in the same manner as the full-size cannons.

## EARLY IGNITION SYSTEMS

For the next four centuries, the greatest advances in the evolution of firearms would focus primarily on the search for more reliable methods of igniting the gunpowder, in addition to design advances for more rapid repeat shots and better accuracy.

The term **"lock, stock and barrel"** comes from firearms design, representing the three major components of early guns. The barrel is self explanatory, and the stock is of course the wooden holder in which the barrel is mounted

1

allowing the gun to be fired from the shoulder or from one hand. The lock is the mechanical contrivance that is used to ignite the charge of gunpowder in the chamber of the barrel.

The first gun to combine all three components was the **matchlock**, in the early 1400's. Many early hand cannons were ignited with a "*slow match*" - a length of slender rope or cord that had been chemically treated so that an end could be ignited and would continue to burn or smolder, much like a 4th of July punk used to shoot fireworks. Obviously it was awkward to hold both gun & slow match while trying to dip the match to the touch hole of the hand cannon.

The matchlock solved this problem by using an arm called a *serpentine* on the gun to hold the slow match. By mechanical linkage, a trigger on mounted on the bottom of the lock could be pressed to lower the match to the touch hole, which now included a small *pan* of fine gun powder that would be ignited first, transmitting the fire through the hole to fire the main charge in the barrel.

This simple system was followed by a much more complicated one, the **wheellock** in the early 1500's. It was the first to take advantage of the fact that sparks could be produced by striking flint or other substances against steel. The lock contained a wheel with a serrated edge, attached to a spring which could be wound with a separate key called a spanner, much like early clocks, and held under tension. A hammer like piece called the *dogshead* held a piece of pyrite rock. To fire a wheellock, the dogshead was lowered onto the edge of the wheel, which was released by a pull of the trigger causing a shower of sparks to fall into the pan igniting the charge. The principle is much the same as a cigarette lighter.

This was an improvement in reliability over the matchlock, primarily because the shooter did not have to constantly attend to the smoldering slow match to insure that it remained lit. It also avoided the problem of an enemy seeing or game smelling the smoke of the match before the gun was fired. However, it took highly skilled craftsmen to build the clock-like mechanism of the wheellock, making it an extremely expensive piece, primarily available to royalty and the like for hunting. Although wheellocks saw some military use, the matchlock remained the most common military firearm during the wheellock era.

## FLINTLOCKS

Improvements using flint against steel to provide the igniting spark continued in the second half of the 16th century, with two early examples being the **snaphaunce**, the first flint lock type gun ca. 1560, and the **Miquelet**, following a couple decades later.

The snaphaunce held a piece of flint in the hammer-like *cock,* with a pan of priming powder mounted on the outside of the barrel over the touchhole as with the matchlock system. When ready to fire, a steel striking plate (the "*battery*") would be manually swiveled into place above the pan, and the cock pulled back until it was caught by a sear. Pulling the trigger would release the cock to swing rapidly forward striking the battery, and showering sparks into the pan, hopefully firing the gun.

As with all flint lock type systems, sometimes the priming powder in the pan would ignite, but would fail to transmit the fire to the powder in the barrel resulting in a failure to fire, and giving us a colorful phrase still used today - "*a flash in the pan.*"

Of course, it was also vital to "*keep your powder dry,*" and accordingly many early firearms of this era had a sliding pan cover to hold the powder in place and give it some protection against the elements. The pan cover would have to be manually swiveled out of the way before firing.

Around 1580, the Miquelet system improved on and simplified the snaphaunce by combining the battery and pan cover into a single piece, called the *frizzen*. This L-shaped spring-loaded piece would be pivoted down to cover the pan after it had been primed with powder. When the cock was released by the trigger, it would swing forward striking the frizzen, producing sparks at the same time it pushed the frizzen up and forward to expose the powder in the pan to the igniting sparks.

In the early 1600's, the basic design of the **flintlock,** originally known as the French lock, was perfected. The major improvement over the Miquelet consisted of moving the mechanical components for the lock mechanism from their previous position on the outside of the lockplate, where they were exposed to elements and damage, to the interior of the lock.

One of today's premier gunmakers can trace its roots to this era. **Beretta** began operations in Brescia Italy in 1526, making it one of the oldest industrial companies in the world.

## IMPROVEMENTS IN ACCURACY

At around the time flint lock systems were first being developed, two improvements were introduced that dramatically increased the accuracy of firearms.

Archers had found that if the fletching feathers on the rear of their arrow were at a slight angle, causing the arrow to rotate in flight, their ability to hit the target was improved. This concept was applied to gun barrels by cutting slowly twisting grooves down the interior length of the barrel, imparting a spin to the bullet as it left the muzzle. These grooves were called **rifling,** and "*rifled muskets*" or "*rifles*" so equipped were found to be much better at hitting their mark over further distances than "*smooth-bore*" muskets.

With the improved accuracy offered by rifled firearms, a system of aiming them other than pointing became more important, and early forms of **sights** became more widely used. A common system, still used in many guns today, was a notch of some type at the rear of the barrel and a post on the front. With this type of open sight, the top of the front sight post is aligned with the target, and the post is centered by eye between the edges of the rear sight notch, with the top of the post level with the tops of the sides of the notch. When the sights themselves are properly physically aligned with the axis of the bore, this system still provides all the accuracy required for most practical shooting needs.

## EARLY GUNS IN AMERICA

Despite imaginative pictures of Pilgrims bearing flared-muzzle flintlock blunderbusses, the earliest firearms in American were doubtless matchlocks and the occasional wheellock.

However, during the Colonial years, a distinctly American type of gun would be developed, by first dozens and then hundreds of gunsmiths scattered through the new land. In the late 17th and 18th Centuries, colonists coming to America brought their indigenous European firearms and gun design concepts with them. The gun was a necessary and treasured tool when pioneering a frontier wilderness far from civilization, and gun makers were valued and essential members of the small settlements.

The **American long rifle,** variously known as the Kentucky, Pennsylvania, or Ohio rifle, is most likely the descendant of the German *Jaeger* (translated "hunter") type flintlock, a practical classic European hunting rifle. In the New World, it slowly evolved into a longer barreled firearm with wooden stock extending the full length of the barrel, while the rear of stock developed a graceful downward curve. Eventually, deluxe versions would come to be decorated with colorful brass or pewter inlays in the stock, with stars, hearts, and simple animal silhouettes being popular motifs. The brass covered patchbox in the rear of the stock would become more elaborate and decorative over time.

This is gun that fed and defended early pioneer families. Marksmanship was a valued, necessary, and common skill.

**European military doctrine** of the time called for the use of smoothbore muskets as the primary martial firearm. Although less accurate than rifled arms, the smoothbore allowed for faster reloading, since a lead ball slightly smaller than bore diameter could be rammed down the barrel with wadding quite quickly, even as the barrel became fouled from gunpowder residue from previous shots. By contrast, to be effective, the lead bullet for a rifled arm must fit the bore tightly to engage the rifling, and takes more time and effort to ram home.

European armies would meet on a field of battle in massed formations and exchange volleys of fire from their smoothbore muskets, more pointing the weapons at the clustered line of enemies across the field than precisely aiming, and relying on volleys of multiple lead balls to strike down some opponents before closing for combat with saber and bayonet. The classic **British Brown Bess** and **French Charleville Musket** were sturdy smoothbore flintlock designs, well suited for this type of combat.

The ways and rules were changing, however, and in the **French and Indian War,** the **Revolutionary War**, and the **War of 1812** American marksmen used their rifled "squirrel guns" and well-honed shooting skills to good effect on selected targets from longer distances and from behind cover in wilderness areas.

After securing independence, the new country rapidly sought its own means of mass producing military arms, establishing government arsenals for the manufacture of firearms at **Springfield** in 1795 and **Harpers Ferry** in 1800. Many of their early products were indeed smooth bore muskets, still a useful military arm. However, the age of the rifle as an essential weapon for the marksman in combat had arrived.

In addition to arsenal made firearms, the U.S. and some states contracted with numerous small individual gun making firms to produce military weapons or parts based on sample patterns provided by the government. America's oldest continuing gunmaker traces its lineage to this era, with **Eliphalet Remington** producing barrels as early as 1826. The **Remington** firm remains one of Amercia's premier gun manufacturers today. The famous **Henry**

**Deringer,** whose name later would become synonymous with small concealable handguns, produced flintlock rifles for the U.S. government as early as 1810; as did Eli Whitney's **Whitney Arms** nearly a decade earlier.

## THE PERCUSSION SYSTEM

Although the flintlock system predominated in firearms production for nearly two centuries, problems remained. A shooter often had to carry two types of powder - fine grained for priming and coarse for the main charge, and the system was unreliable in wet weather. It was difficult to store a gun loaded and ready for use.

In 1807 a Scottish clergyman, Rev. Forsyth, is credited with developing an ignition system based on the principle that certain chemicals would ignite with a spark when struck a sharp blow, a concept which can be observed in toy cap pistols or "pop rock" type fireworks today. Various methods to utilize this approach were tried, and in 1822 the **percussion cap** was invented.

The percussion cap contains a small charge of chemical in a small copper cuplike holder which can be quickly pressed onto to a *nipple* mounted in the rear of a gun barrel. When the trigger is pulled, the *hammer* strikes the cap, igniting the chemical which sparks through a hole in the nipple into the main charge in the barrel, firing the gun. This system offered such obvious advantages to the flintlock method that gunmakers around the world rapidly adapted their existing designs to percussion ignition, although within 50 years of accelerating firearms evolution it, too, would be obsolete.

## REPEATERS AND BREECHLOADERS

The introduction of the percussion system marks the beginning of a dramatically rapid era of firearms advancements, coinciding with the Industrial Revolution and including the era of the American Civil War, through the turn of the century. During this relatively brief time, guns would go from primitive flintlocks to the basic systems that still dominate firearms designs today.

Development of effective **breechloading** systems was one of these concepts. From the matchlock through the early percussion era, the vast majority of guns had been "**muzzle-loaders.**" That is, the powder & projectile had to be dropped down the muzzle at the front of the barrel, and rammed to the rear before firing. This made reloading awkward, especially if trying to shoot a long gun from a prone position or behind cover or concealment, and, as noted earlier, became more difficult after a few shots when barrel fouling made the job more strenuous. This led to many attempts to develop a gun that loaded from the rear of the barrel, although most early efforts were not effective due to weakness of materials and the leakage of hot gases from the breech seal when the gun was fired.

In the early 19th Century, various breechloading designs finally reached production in quantity. A notable example is the U.S. military **Hall North** system, which in 1833 marked both the first U.S. percussion arm, and the Army's first breechloader. In 1841, the breechloading **Dreyse needle gun,** which packed the projectile and powder together in a combustible cartridge, was adopted in Germany as the first military bolt action gun.

The Civil War saw the adoption of a wide variety of breechloading systems, including those made by **Sharps, Maynard, Burnside,** and many others.

An even more pressing concern was the relatively long time it took to reload a firearm, and the need for rapid follow-up shots. An archer could loose several arrows in the time it took a "musketeer" to reload after he had fired his weapon.

In even the earliest days of firearms design, this could be addressed in a limited manner by mounting multiple barrels (and usually multiple locks) onto the same stock. This basic concept is still in use today, in the **double barrel shotguns** produced by some of the finest gun makers in the world, including firms such as **Browning, Franchi, Beretta, Remington, Ruger,** and **Charles Daly,** and is a system preferred by many discriminating hunters and competitive shooters.

However, with more than two barrels, the system begins to become heavy and cumbersome. Other systems were tried, including manually rotated groups of barrels mounted to a single lock, multiple superposed charges within a single barrel, and cylindrical or rectangular clusters of chambers which could be manually repositioned to align with a firing mechanism and barrel.

The most successful solution was invented by **Samuel Colt.** He developed a handgun design with a rotating cylinder with multiple chambers, each of which could contain a charge of powder topped by the bullet, loaded from the front of the cylinder. The rear of the cylinder was closed, with a nipple for a percussion cap installed at the back of each chamber. When the hammer is cocked, a fresh chamber rotates into alignment with the rear of the barrel, and when the trigger is pulled the hammer drops, firing the load in that chamber. This is the basis of the mechanical system still used in all *revolvers* today.

Colt's first manufacturing venture was based in Paterson, N.J., and produced percussion revolvers with folding triggers and revolving shotguns and rifles. These are called Colt Paterson models by modern collectors. Relatively few were produced, and the firm folded, having been in business only from 1837 to 1841.

The idea was too good to die, and in 1847 Colt was back with a new, heavier, more powerful revolver, this time with a traditional bow type triggerguard. Prompted by an initial order from Captain Samuel Walker to equip his troops in the Mexican war, the new model tipped the scales at nearly five pounds, and remained the most powerful repeating handgun until the introduction of the .357 magnum nearly 90 years later. It was called the Walker Model, after the young captain. Colt's revolvers were initially manufactured by Eli Whitney, but Colt soon had his own plant in Hartford, Conn.

Colt had patented his revolving cylinder design, and so held a monopoly on revolver manufacture for a number of years. The only serious competition for a repeating handgun was the **pepperbox** design, in which a cluster of barrels, each with a percussion nipple on the rear, rotated around an axis by the pull of a ring trigger which also cocked the hammer and released it to fire the chamber which had rotated into position. Pepperboxes were made by a number of European and American firms, the foremost probably being the succession of companies founded by **Ethan Allen,** including Allen & Thurber and Allen & Wheelock.

The Colt pattern cap & ball revolver rapidly came to dominate the repeating firearms market however, with Colt offering revolving shotguns and rifles as well as handguns. Among his most successful designs were the little 1849 Pocket Model in .31 caliber, the mid-sized 1851 Navy Model in .36 caliber, and the 1860 Army Model, offering .44

caliber chambering in a much smaller and handier package than his earlier Walker and Dragoon models. After the expiration of Colt's patent in the mid-1850's, other firms jumped into the revolver business, with major manufacturers including **Remington, Starr, Whitney,** and **Manhattan.** From these and other makers, the percussion revolver was the major sidearm of the Civil War.

## THE SELF CONTAINED CARTRIDGE

The cap and ball revolver offered an effective repeating firearm, with five or six shots available as fast as the hammer could be cocked and the trigger pulled. After the gun was shot dry, however, re-loading was a slow & cumbersome process, involving loading each chamber with loose gun powder and a lead bullet, ramming the loads home, and placing a percussion cap on the nipple of each chamber. What was needed was a self-contained cartridge with the primer, powder & bullet all in one neat and weatherproof unit.

An early attempt at this was the *pinfire* system, first introduced around 1846, in which a firing pin was mounted on each copper cased cartridge, igniting an internal primer when struck by the gun's hammer. Although it gained a good deal of popularity in Europe, it never caught on much in the U.S., with the external pin on each round being a bit cumbersome and hazardous.

Among the firms eagerly waiting for the expiration of the Colt revolver patent was a partnership of an inventor named **Daniel Wesson** and an older businessman, **Horace Smith**. A few years earlier, in a previous partnership, they had entered the race for an effective repeating firearm shooting self-contained cartridges with a lever action pistol. This pistol had a tubular magazine mounted under and parallel to the barrel, and shot "rocket balls" - hollow based lead bullets, with the powder and primer mounted in the base of the projectile itself.

They pursued production of their lever action pistols only a few years, and the design was acquired by a shirt manufacturer, who carried it further. His name was **Oliver Winchester,** and his famous lever action rifles, based in large part on the design of the first Smith & Wesson partnership eventually became the most popular repeating rifles of the post-Civil War 19[th]Century, called by many "the gun that won the West."

The second **Smith and Wesson** partnership had designed a tiny .22 revolver. Perhaps more important than the revolver was the cartridge it fired. It consisted of a copper casing, with a hollow rim at the bottom which held a priming compound. The case was then filled with gunpowder, and capped with a lead bullet mounted into its mouth. When the firing pin of the revolver's hammer struck the rim of the cartridge, the priming ignited the powder, firing the bullet, leaving the empty copper casing in the chamber.

The cartridge was essentially identical to the modern.22 Short rimfire, and was the grand-daddy of all our traditional ammunition today.

As Colt had patented his revolver, so Smith & Wesson acquired the patent to their innovation, and held a fairly complete monopoly on the production of effective cartridge revolvers through its expiration in 1869, although there were a number of infringements and evasions of the patent as the market rapidly recognized the superiority of metallic cartridge ammunition.

# THE AMERICAN WEST

The military has sometimes been slow to embrace firearms innovation, preferring tried & true technology over the new and untested, and this was certainly true during the Civil War and Indian Wars era. Winchester had abandoned the rocket ball system in favor of a .44 Rimfire cartridge in it's famous brass framed **Henry rifle** in 1860, but only a few were purchased and used during the Civil War. The **Spencer Repeating Rifle Company** had also patented an effective lever action repeater firing metallic cartridges by the beginning of the Civil War, but its adoption by the Army was resisted until it was demonstrated to President Lincoln, who promptly personally championed it purchase.

Although the Spencer was the most widely used repeating long gun of the Civil War, and breechloading single-shot Sharps rifles in the hands of expert "*Sharps-shooter*" marksmen took a toll, the vast majority of the soldiers on both sides were armed with muzzle-loading percussion muskets.

With the post-war Westward expansion, the civilian demand was for the new repeating metallic cartridge firearms. **Winchester** responded, first with an improved brass frame rimfire **Model 1866** lever action, followed by a centerfire **Model 1873**, and then by **Models 1876** and **1886,** made strong enough to handle true big-game cartridges in the .45-70 class.

**Marlin** was Winchester's strongest competitor in the field, with **Whitney Kennedy** and **Evans** also producing lever action repeaters.

Despite the development of repeaters, **single shot rifles** remained a popular option, and in the early years of metallic cartridges, they could handle stronger rounds than the more complicated repeaters.

The tradition of powerful, big bore rifles for the large game of the American west such as bison, wapiti, and grizzly bear certainly pre-dates the Civil War. As first trappers and mountain men, and then settlers and farmers pushed into the great plains and Rocky Mountain west, a new type of American rifle was developed to meet the need.

The percussion **Plains Rifle** tended to be shorter than its long slender Kentucky rifle predecessor, to handle easier on horseback and in brush. It took a heavier, larger diameter ball appropriate to the larger game, which necessitated a heavier barrel, the weight of which was another factor dictating a shorter length. The Plains Rifle tended to have a half-stock, with the wood only cradling the rear half of the barrel, contrasted to the full stock Kentuckies. As befits a working gun, decoration tended to be minimal or non-existent.

In the years preceding the Civil War, Plains Rifles by prominent makers such as **Hawken** and **Gemmer**, both of St. Louis, were eagerly sought after by long hunters and pilgrims heeding Horace Greeley's advice of "Go West, young man."

After the war, **Sharps** began producing its well respected breechloading single shots for centerfire metallic cartridges, and with a half-inch diameter projectile, the "Sharps big 50" was perhaps the quintessential **"buffalo rifle."** Other popular single shots included the **Winchester Model 1885 High Wall** and **Low Wall** rifles; **Stevens Ideal** rifles, and the sturdy **Remington Rolling Block** rifles. Most were offered in a variety of frame sizes, barrel lengths and weights, and calibers ranging from .22 rimfire to the .40 to .50 caliber rounds favored by commercial hunters. Various types of sights were available, from simple through elaborate, and various stocking options could

be had, from fairly straight forward through the ornate buttplates and triggerguard configuration favored for **Scheutzen** style target competitions. The single shot was generally considered to be more accurate than early repeaters, and so was favored for target competition and other precision work.

The American West of 1865 to 1900 is perhaps one of the most popular and romanticized eras of American history, with the lore of cowboy and Indian, lawman and outlaw, figuring large in our collective imagination. The handguns of this era also have a special fascination.

The most famous is undoubtedly the **Colt Single Action Army**, introduced in 1873, and also known as the Peacemaker. Its sturdy reliable design and effective cartridges made it a favorite with Westerners on both sides of the law.

It is little recognized, however, that **Smith and Wesson** large frame top-break revolvers and their foreign copies represented the most prolific full size handgun pattern of the early cartridge era. All variations on the Model Three frame, the first was the American model in 1870, followed rapidly by the Russian model. The Schofield model was made for the American military in the 1870s, followed by the New Model Number Three and Double Action models.

The S&W design was much faster to load & unload than the Colt. When a latch in front of the hammer was released, the S&W barrel & cylinder pivoted forward, automatically ejecting empties and exposing all six chambers for reloading. To reload the Colt, each individual chamber had to be aligned with a barrel mounted ejector rod, and the single empty brass case punched out and replaced with a fresh cartridge before rotating the cylinder to the next chamber, repeating the operation a total of six times to fully load the revolver. Smiths were also generally held have an edge in accuracy, although the Colts were simpler, sturdier, and less liable to malfunction in extreme environments. A large portion of S&W's early production went to foreign military contracts.

Other revolvers of the era included the **Remington 1875,** similar to the Colt pattern, and the unusual but exceptionally well made twist-open **Merwin Hulbert** revolvers.

The military's resistance to new concepts continued into the Indian War years of the late 19[th]century. At a time when repeating rifles with 16 or more rounds available as fast as you could work the lever were available, the Army chose to stay with a single shot as its primary issue long arm. One concern cited was that soldiers armed with repeaters might expend ammunition too rapidly in the heat of battle.

Economic factors undoubtedly influenced the decision as well. Vast quantities of now-obsolete muzzle loaders remained in inventory from the Civil War. A method was developed to convert these to breech-loading cartridge rifles by cutting open the rear of the barrel & installing a breechblock that could be flipped open to load cartridges and remove empty brass like a trapdoor. When manufacture of new rifles resumed, they were based on the same system, and the "Trapdoor Springfield" single shot became the standard military rifle from 1873 through the beginning of the Spanish American War in the late 1890's. In defense of the Army's decision, the trapdoor's .45-70 cartridge was significantly more powerful, with longer effective range, than anything available in a repeater in the early 1870's.

A similar thought process led the military to initially select a Remington single shot in 50 caliber as its first cartridge handgun. By the mid 1870's, however, the Colt Single Action Army (SAA) and the Smith and Wesson Schofield six shot revolvers became the Army's primary sidearms for the Indian Wars era.

After the Custer rout at Little Big Horn, there was a vigorous debate over the military's choice of weapons. Some of the Indian victors had been using repeating rifles. One school of thought contended that if Custer's men had been armed with lever action rifles instead of trapdoors, and fast loading Schofields instead of SAA's, the outcome might have been different, although that conclusion is hard to support in light of the vastly outnumbered 7th Cavalry's forces and strategic choices.

Although the big sixguns of the Old West are those that capture the public fancy, their production quantities were significantly less than smaller frame revolvers. S&W offered tip-up spur-triggers and top-breaks in single or double action; Colt produced a series of single shot derringers and spur-trigger revolvers; and Remington offered spur-trigger revolvers and its famous double derringers, in addition to other designs.

The late 19th Century saw a proliferation of small manufacturers churning out cheap small single action spur-trigger revolvers, sometimes derisively referred to as "Suicide Specials." Other firms such as **Harrington and Richardson**, **Iver Johnson**, and **Hopkins and Allen** produced millions of inexpensive but generally serviceable small top-break and solid frame double action revolvers. These companies have been referred to as the "armorers to the nation's nightstands," accurately reflecting the fact that even persons of moderate means could afford their products as a handy means of home and personal protection.

## BIRTH OF THE MODERN REVOLVER

Just before the turn of the 20th Century, a new type of revolver was developed, first by Colt in 1889, followed by S&W in 1896. This revolver used a solid frame, like the SAA, but the cylinder swung to the side to load and unload. Empty cases were simultaneously ejected by pushing a plunger-like ejector rod at the front of the open cylinder. S&W called their versions **"Hand Ejectors"** (HE) to differentiate the method of operation from their top-break automatic ejecting products.

These swing-out cylinder revolvers were also **"double action"** (DA), a term describing the ways in which the gun could be fired. Early revolvers were usually "single action" - the hammer had to be manually cocked before the trigger pull performed the "single action" of dropping the hammer to fire the round. On the DA revolvers, the gun could be fired in the traditional single action (SA) mode. Alternatively, the DA could be fired by a longer heavier pull on the trigger, beginning with the hammer in the down, uncocked position. In this mode, the trigger would perform the "double action" of first cocking and then dropping the hammer to fire the weapon.

This type of revolver rapidly caught on, and would become the dominant handgun design for most of the 20th century in America.

In its early revolvers of this type, Colt offered revolver frame sizes from its massive **New Service**, through handy compact pocket sized revolvers with short 2" "snub nose" barrels. When the New York City Police got a brash new young Commissioner just before the close of the 19th Century, he selected the little .32 Colt New Police as that

department's first standard issue handgun. He also instituted the first formal police marksmanship training under the guidance of Sgt. William Petty, who happened to be a national shooting champion. The Commissioner's name was Theodore Roosevelt, and a few years later he carried another swing out cylinder Colt, a New Army model, when he led the First Volunteer Cavalry up San Juan Hill in1898.

The early S&W HE's ranged from the large N-frame, the first of which was the famous **Triple-Lock** which introduced the **.44 Special** cartridge, through the tiny .22 **Ladysmith**, which was far smaller than any swing-out revolver being made today.

Smith & Wesson found the workhorse of their product line in 1899 when it made its first medium sized K frame **"Military & Police"** (M&P) revolver, chambered for their new **.38 Special** cartridge. Although Colt & S&W shared the police market in the first half of the century, after WWII through the 1970's the S&W K frame in .38 Special was probably carried by a majority of law enforcement officers in America.

The same cartridge was also popular in the smaller short barrel 5-shot J frame **"Chiefs Special,"** serving both the police backup gun and the civilian concealed carry market. Colt's competing **Detective Special** packed six rounds in a package that was only slightly larger. The little J frame was also the platform for S&W's "Kit Gun," a handy .22 revolver that would easily fit in a hunter's, camper's, or fisherman's "kit."

Continuing through today, **the .38 Special in a well made double action revolver** such as those by S&W, Ruger, Colt, or Taurus is considered by many to be **the best choice for a first-time shooter's home defense handgun.** In the small J frame size, is also the first choice of many experienced shooters for their personal concealed carry. The combination of safety, reliability, simplicity, and effectiveness in a gun that is small enough to carry easily, yet large enough to be manageable is still hard to beat.

## MEANWHILE IN EUROPE …

The double action system for revolvers had caught on faster in Europe than in the U.S. In was used for early pinfires, and for military handguns such as Britain's ugly but reliable and hell-for-stout **Webley** top-breaks in .455 caliber.

While the U.S. market was well satisfied with lever action repeating rifles, a different repeating mechanism gained favor with the armies of Europe.

When the switch to metallic cartridges began, many of Europe's early single shot rifles used a **"bolt action"** breechloading system. In bolt action rifles, a bolt handle extending from the breechblock is lifted up, unlocking the breechblock, and pulled to the rear, sliding the block back to allow a cartridge to be loaded into the chamber in the rear of the barrel. The bolt handle is pushed forward and then down, engaging locking lugs to hold the breechblock in place while the rifle is fired. Single shot bolt action rifles adopted by militaries included the Chassepot (France 1866), Vetterli (Switzerland 1869), Berdan (Russia 1870), Beaumont (Netherlands 1871), and the Mauser (Germany 1871). Of these, the seeds of greatness lay in the last, the invention of **brothers Peter & Paul Mauser.**

The earliest military bolt action repeating rifles used tubular magazines under the barrel, similar to the system on most American lever actions. The Portuguese Kropatschek in 1878 was among the first of this type. Mauser's tube mag repeater was first produced in 1884 as the German Model 1871/84.

Most of these early military cartridge rifles chambered cartridges similar to the U.S. .45-70 - a large heavy round-nosed bullet in the half-inch diameter range (10 to 12 mm), in a metallic case filled with a healthy charge of blackpowder. In 1885, **smokeless powder** was invented, and would lead to dramatic changes in firearms and ammunition design.

## SMOKELESS POWDER

Smokeless powder, as the name implies, had the military advantage of not generating a cloud of smoke when fired. Blackpowder smoke would reveal a shooter's position visually and, after a few rounds, develop a haze that could begin to obscure his vision. Another advantage was that smokeless powder produced far less fouling after shots than blackpowder, meaning that more shots could be fired before cleaning, and that powder debris was less likely to clog an action.

Its most important quality, however, was that when ignited, its gases would expand more rapidly, creating higher pressures and driving the bullet to a higher velocity when it left the muzzle. As a bullet approaches 2000 feet per second (about twice the speed of sound), its wounding capacity increases dramatically, allowing a lighter, smaller diameter projectile to have the same **"stopping power"** as a larger heavier round at a slower speed.

The faster, smaller diameter, bullet will also have further range and a flatter trajectory. A bullet leaving the muzzle of the gun does not fly straight. From the instant it departs the barrel it is "falling" toward the ground due to the effect of gravity. A gun's sights are adjusted so the barrel is actually pointed very slightly up, giving a slight rainbow like curve to the bullet's path. A faster lighter bullet will travel further before gravity pulls it to earth, and a smaller diameter bullet has less wind resistance. The flatter trajectory means it will be on target over a longer distance.

In general terms, the **caliber** of a bullet refers to a rough measurement of its diameter, expressed either in decimal fractions of an inch or millimeters. For example, a .45 caliber cartridge takes a bullet approximately 45/100" in diameter, which would also be very roughly 11 mm in diameter.

Firearms designers took advantage of the new smokeless powder, using a smaller bullet closer to 1/3" diameter (8mm most popular, but ranging from under 7mm to 9mm). Heavy lead would still be used to form the core of the bullet, but it would be encased in a harder copper or brass metal jacket so it would not quickly foul the rifling in the bore with soft lead that rubbed off at the higher velocities.

The first such bolt action repeating rifle and smokeless smaller caliber ammunition combination to be adopted by a military was the 8mm French Lebel bolt action in 1886.

The pointed "*spitzer*" bullet design is much more aerodynamically efficient than a round nose design, offering better accuracy at longer ranges. However, when such cartridges are loaded nose to tail in a tube magazine, there is a danger that the pointed nose of one bullet will ignite the primer of the cartridge in front of it when the rifle recoils. Use of a box type magazine, where the cartridges are stacked parallel one on top of the other overcomes this

obstacle to spitzer bullets. The British Lee Metford bolt action, generally based on the Mauser concept, in .303 caliber used such a box mag in 1888, and in 1889 Mauser produced its own 8mm box magazine rifle.

Another early box magazine repeater was the Mauser & Mannlicher influenced **German 1888 Commission rifle** in 8mm, which rapidly became a staple design; while the Austrians adopted a straight-pull bolt action Steyr Mannlicher repeater in 8mm the same year. Mid-bore bolt action box magazine designs rapidly followed, such as the Danish Krag Jorgensen in 1889 (with the US adopting a Krag based design in 1892), and the Swiss straight pull Schmidt Rubin in the same year. The year 1891 saw the adoption of the Lebel pattern Mosin Nagant by Russia, the 6.5 mm Italian Carcano, and the 8mm French Berthier.

During this period, military bolt actions were often modified to incorporate the new advances, and numerous military rifles from the turn of the century or slightly later are bolt action single shots converted to magazine-fed repeaters, or had large bore barrels relined to smaller calibers.

The perfection of the bolt action design is believed by many to be the **Mauser 98**, introduced in 1898. Improvements include cocking on opening of the bolt rather than closing, an added safety lug, and a larger chamber ring. This basic design became the basis of many, if not all, subsequent bolt action military and sporting rifles, and variations served as primary rifles for many countries through World War II. The tried and true U.S. Model 1903 which served with distinction through two world wars, with its "thirty ought six" (.30-06) chambering is basically a modified Mauser 1898 design. Current production sporting rifles such as the classic Winchester Model 70, and bolt actions by Remington, Ruger and others can trace their lineage to the Gewehr 98.

## EARLY AUTO-LOADERS

Another firearms design trend in Europe given a boost by the introduction of smokeless powder was the attempt to make automatic loading firearms. In general, gun designs to this point had relied on some mechanical action by the shooter to load a fresh cartridge into the firing chamber after the initial round had been fired, whether it was swiveling a lever; lifting, pulling, & pushing a bolt; or cocking the hammer or pulling the trigger to advance a revolver cylinder to the next chamber. Inventors sought a method whereby the loading of the next round would be accomplished automatically.

The first auto-loading pistol designs to see limited production were the German made **Schoenberger** and **Borchardt** designs in 1893 & 94 respectively. A couple years later, in 1896, the **Mauser** firm began manufacture of the first auto pistol to gain widespread acceptance, the **Model 1896,** nicknamed the **Broomhandle** for its slender oval cross-sectioned grip.

Germany continued its dominance in European firearms design when **Georg Luger** introduced his classic pistol in 1900. Whereas early automatics had used fixed box magazines, the Luger magazine mounted in the pistol's grip frame, was quickly detachable and easily replaced with a fresh magazine for a quick reload. Originally manufactured in 7.63 mm (.30 cal.), in 1909 it was adapted to a new, larger diameter cartridge, and the **9 mm Luger** (or 9 mm Parabellum) round was destined to become possibly the most widely used centerfire pistol ammunition of the 20th Century. The Luger was widely adopted as a military pistol by many countries, including Germany where it was designated the "Pistole 08" (P-08) for the year it was first purchased, where

it served through both World Wars. Its distinctive profile is widely recognized, and may be identified as "graceful" or "sinister," depending on the eye of the beholder and how many Grade B "Ve haff vays of mekking you tokk" war movies he has seen.

# JOHN MOSES BROWNING

At this point the history of firearms, we must travel back across the Atlantic, and back a few years in time to track the career of probably the greatest firearms inventor of all time, John Moses Browning of Ogden, Utah.

We've already mentioned one of Browning's earliest designs, the Winchester 1885 Single Shot rifle. Others brought the Winchester lever action repeaters into the smokeless powder era, first with the slim and handy **Model 1892**; followed by the **Model 1894** which, with its "thutty-thutty" (.30-30) cartridge, became America's classic deer rifle; and the **Model 1895** whose box magazine allowed the chambering of true high-power smokeless rifle cartridges with spitzer bullets in a lever action repeater.

Browning was also responsible for some of the first repeating shotguns. Revolver based shotguns had been around since the Colt Paterson models of the 1840's, but had never caught on (probably because of he tendency of hot gases escaping from the cylinder gap to pepper the supporting hand with powder grains). **Spencer Arms** (of Civil War lever action rifle fame) had manufactured a moderately successful repeating pump or slide-action shotgun as early as 1882. As would befit the Winchester legacy, Browning's first design for that repeating shotgun for that firm was a lever action, the **Model 1887.** This was followed by a pump action **Model 1893**, which would be modified to become highly successful **Model 1897.**

With a pump or slide-action firearm, the shooter pulls back on the wooden forearm and then pushes it forward to eject the empty shell and replace it with a loaded one. Browning had earlier applied the principal to a handy little .22 rifle for Winchester, the classic **Model 1890**, which remained popular for decades, happily employed in shooting galleries, by squirrel & rabbit hunters, and for all around "plinking."

It was in the area of automatic firearms, however, that Browning probably made his greatest advances. Auto-loaders use the part of the force of the firing cartridge to eject the empty casing and load a fresh round into the chamber. This may occur by direct or delayed blowback of the breechblock, by utilizing the recoil of the gun, or by redirecting some of the expanding gases of the burning gunpowder from the barrel to operate the action.

In 1900, the same year as the Luger was introduced, Colt first offered a Browning designed auto-loading pistol, the .38 caliber **Model 1900 Automatic**. Variations and improvements followed in rapid succession, with a smaller Hammerless .32 Pocket model in 1903, and a tiny vest pocket-sized .25 caliber pistol in 1908. Colt introduced the **.45 ACP** (Automatic Colt Pistol) cartridge in the Browning designed Model 1905.

This is the cartridge that would be chambered in the famous **Model 1911**. The 1911 was rapidly adopted by the U.S. military, and, only slightly modified over time, remained the primary U.S. issue sidearm through the Vietnam War. Colt and many other firms continue production of 1911 pattern pistols today, and they still serve military, law enforcement, and personal protection duty on a regular basis. It is the handgun of choice for many shooting sports that seek to simulate combat type shooting, and in accurized forms is dominant in many traditional target shooting

sports. Its mastery requires effort, training, and practice, but in the right hands, many would argue that it is the finest combat handgun of all time.

While the 1911 may have been Browning's finest handgun design, his contributions did not end there. His final pistol design, the **Model 1935,** took advantage of the Luger's smaller diameter 9mm cartridge "double stacked" in two parallel columns in the detachable magazine for a total magazine capacity of 13 rounds (compared to 7 rounds in a 1911 mag). The 1935 is also known as the **Browning High Power.**

It's worth mentioning that most detachable magazine auto-loading pistols present a potential hazard for untrained individuals. It's easy to check whether most double action revolvers are loaded simply by swinging open the cylinder and looking. However, a person who is not familiar with firearms may assume that an auto-loading firearm is unloaded once the magazine has been removed. This is a potentially lethal mistake. **An auto-loading pistol may still have a live round in the chamber after the magazine has been taken out.** In most designs, this round will fire if the trigger is pulled, with the potential for tragic consequences.

Browning's auto-loading designs were not limited to handguns. His "humpback" Auto 5 shotgun was a tremendous success, popular still today, and has been made by Fabrique National, Remington, and Browning.

## FULL AUTO FIREARMS

Browning's inventiveness extended to military firearms as well, especially machine guns.

Today, the term **"semi-automatic"** or semi-auto is used to refer to the auto-loading guns that fire only one round for each pull of the trigger. Although Colt originally called the Browning pistols "automatic pistols," in modern usage the term **"automatic firearm"** is used to describe a gun that fires multiple rounds for a single pull of the trigger.

These **"full-auto"** firearms, popularly called "machine guns," will usually continue rapidly firing until the trigger is released or the magazine is empty. Those that will fire a set number of rounds, usually 3, with a single pull of the trigger are called "*burst fire*," and those which can be set to fire either a single shot per trigger pull, or to fire full-auto are called "*select fire*."

In most states, full-auto firearms can be legally owned by private citizens, although they must be registered with the government and are closely regulated. Based on the names of the laws that regulate them, they're sometimes called "*NFA*" (National Firearms Act) or "*Class III*" firearms. Their primary uses are military and specialized law enforcement applications, and they are not generally considered to be good choices as general personal defense firearms. However, they are enormous fun to shoot in a safe well-supervised recreational setting, and have a dedicated following of collectors.

The concept of a firearm that will spray stream of bullets is hardly a recent one. Most famous of the early rapid-fire guns was the **Gatling gun,** which fired steadily through a cluster of rotating barrels so long as the gunner was turning its crank and his assistant was feeding ammunition. It was first demonstrated in 1861, and was a successful military design.

The first successful true full-auto machine gun, which would fire continuously while the trigger was held back, was perfected by **Hiram Maxim** in the 1880's and adopted by several armies in the 1890's. John Moses Browning invented a number of successful machine gun designs, beginning in the 1890's. His most remarkable achievements were probably his water cooled **.30 caliber Model 1917**, and the .50 caliber M-2 **"Ma Deuce,"** which is still in use today.

The machine guns briefly described above fall in the category of fixed-position, crew-served weapons, and their continued evolution is outside the scope of this work. Browning's famous**BAR** (Browning Automatic Rifle) was a traditionally stocked box magazine full auto rifle in .30-06 caliber. While it served decades as an effective weapon, it would generally be fired from a bipod.

## SUB-MACHINE GUNS, BATTLE RIFLES, and ASSAULT RIFLES

While cartridges in the .30-06 class are readily aimed and controlled in single shot fire, including semi-automatic fire, they tend to be less controllable and thus less effective when fired full-auto offhand, due to the recoil and cumulative muzzle climb with each round to leave the barrel.

This limitation of full-auto fire from a personal weapon was first addressed by the development of **"sub-machine guns."** Generally these are full-auto capable weapons designed to be fired from the shoulder like a rifle, but chambered for a lower powered pistol cartridge instead of a full power rifle cartridge. The resulting weapon was controllable and could be effectively aimed in short range full-auto fire. The stubby pistol cartridges used could efficiently burn all their powder in a shorter barrel than required for a high powered rifle round, resulting in a lighter gun with a shorter & handier overall length. The trade-off was that their effective range is much shorter than a traditional rifle, and an individual round hits with less power. The sub-gun is considered more effective where encounters are likely to be fast and at short range, such as trench warfare, inside buildings, or in heavy jungle. They are less effective for precision shooting or over long ranges.

Probably the first was the **Bergmann Schmeisser MP18** of **WWI**. One of the best, and certainly the most famous, was the **Thompson Sub-machine gun** or *"Tommy Gun,"* introduced at the end of that conflict, in .45 acp. Used by both law enforcement and gangsters, it has been called *"the gun the made the 20's roar"* and the *"Chicago typewriter."* It went on to serve honorably in WWII and beyond. Other WWII sub-guns included the German MP38 & MP40, the British Sten gun, the Russian PPS series, and the U.S. M-3 "grease gun."

A milestone in post-war submachine gun design was the **9mm Uzi**, designed by Israeli officer Uziel Gal, and first produced in 1951. Although still popular, it has since probably been replaced as the first choice sub-machine gun for military & law enforcement by the **MP-5** in the same caliber, produced by the German firm of Heckler & Koch (H&K).

Most countries entered WWII with a bolt action as their primary **battle rifle.**

Germany had its latest Mauser, the 8mm **Kar 98**, Britain the **Short Magazine Lee Enfield** (SMLE) in .303 caliber, Japan the **Arisaka,** and so forth. The Springfield '03 was still widely issued to American forces, but in the decade

preceding the outbreak of hostilities, the U.S. army had been first testing competing designs of semi-auto rifles, and then proceeding with manufacture and issue of the pattern deemed best.

The U.S. **M-1 Garand** in .30-06 caliber was without question the finest full power rifle fielded in WWII. Instead of a fixed or detachable box magazine, it was loaded with 8 rounds held in a metal clip. When the last round was fired, the clip was automatically ejected with the action remaining open for quick insertion of another loaded clip. It was rugged, reliable, and powerful.

It was also heavy. The Army sought a weapon that was more accurate and powerful, and had a longer range than a pistol, but which was lighter and handier than the full size rifle, intended primarily as a secondary weapon for tankers, artillery crews, and personnel who were not in a primary combat role. This role was ably filled by the **M-1 Carbine**, a semi-auto accepting a 15 round detachable box magazine. It fired a new straight-wall cartridge, midway in power between the pistol and the full sized rifle.

Germany also was developing a mid-range shoulder weapon, but with a different intent. They sought a detachable magazine rifle that would fire a reduced power cartridge and would be controllable and effective in full-auto firing mode, with more range & power than a sub-machine gun. The resulting **MP-43** filled the bill, but was developed late in the war. The concept was one which would survive the conflict - the Germans called the weapon a **"Sturmgewehr,"** loosely translated as **"assault rifle."**

Most military establishments hesitated to downsize the power and range of their primary rifles in the early Cold War years. The semi-auto detachable magazine concept was an obvious success, and there was something to be said for full-auto capability. A series of full power "battle rifles" were introduced to meet this need - the **FN-FAL** and the **Heckler & Koch G3** being two patterns that were widely adopted. The U.S. developed a Garand look-alike with detachable magazine and full-auto capability, the **M-14.**

However, the assault rifle concept wouldn't go away. The Soviet Union accepted the lower-power round idea in its fixed magazine semi-auto chambered for an intermediate power **7.62 x 39 mm** round in 1945, the **SKS**, which saw wide distribution and production in Soviet client states, and enjoys popularity in the post-Cold War US as an inexpensive semi-auto military surplus rifle.

They followed two years later with what would become probably the most widely produced military long arm design in history, and the quintessential assault rifle - the **Kalashnikov**designed **AK-47,** in the same caliber.

The AK-47 is a select fire (semi-auto or full-auto) carbine size weapon with a detachable 30 round box magazine. It has a well-deserved reputation for relatively cheap production, and for reliability even in the most adverse environments, or when used by under-trained indigenous forces who may neglect maintenance. It makes extensive use of sheet metal stampings in its construction, with a simple wooden buttstock with pistol grip.

The U.S. version of the assault-weapon configuration was introduced in 1963, originally known as the AR-15 and XM-16 designed by **Eugene Stoner**. It was ultimately adopted as the **M-16**manufactured by **Colt**. It is chambered for the **5.56 Nato** round, a military twin of the .223 Remington cartridge, and takes a detachable box magazine of 20 or 30 rounds. The rear sight is mounted on a distinctive integral carrying handle, and the stock and handguard are made of black synthetic material.

Initial reviews of the M-16 were mixed. A combination of an improper type of powder used in cartridge manufacture and a mistaken belief that maintenance could be neglected resulted in some early failures in the field. Some in the military establishment resisted a .22 caliber round for combat, dismissing it as a "*poodle shooter*."

This concern may be understood by reviewing a statistic commonly used to summarize a cartridge's power level - the **muzzle energy**. Muzzle energy is a product of the weight of the bullet and its velocity at the moment it leaves the barrel, expressed in *foot pounds*. The WWII & early post-war battle rifles chambered for .30-06 and 8mm Mauser class cartridges typically develop 2000 to 2600 ft/lbs. of muzzle energy. By contrast, the .45 acp and 9 mm Luger rounds commonly used in military pistols and sub-machine guns run in the 300 to 400 ft/lb. range. That's nothing to sneeze at, by the way; the common .22 Long Rifle cartridge, which can certainly be lethal, runs in the 90 to 125 ft/lb. range.

The intermediate "assault rifle" cartridges, such as the 7.62x39 mm and 5.56 Nato, average in the 1200 to 1600 ft/lb. range. As you can see, the designers of these were effective in splitting the difference between the high power rifle and pistol cartridge power ranges, but many old soldiers were not sold on the compromise.

On the other hand, both M-16 rifle and ammunition were significantly lighter than either the old battle rifles, or the AK system, allowing an infantryman to carry more ammunition or other load, and with tuning & evolution, the M-16 pattern proved to be highly accurate out to distances reached by the earlier full sized battle rifles.

The evolutionary descendants of the AK-47 and M-16 have become the dominant military rifle patterns as the world enters the 21st Century. Both have proven to be effective in combat.

Semi-automatic versions of both designs have become highly popular with civilian shooters in recent decades, with the AR-15 (semi-auto version of the M-16) coming to dominate many types of target competition.

In the 1970's, anti-gun forces incorrectly applied the "assault rifle" terminology to these semi-auto sporting versions. The function of the sporters is identical to other semi-auto sporting guns - it takes a separate pull of the trigger to fire each round. They lack the full-auto capability that originally defined "assault rifles."

However, the terminology redefinition stuck, leading to ill-conceived legislation that temporarily banned the production of certain types of guns based solely on cosmetic appearances. Fortunately, the Clinton semi-auto ban has since sunset, making these popular semi-auto rifles again available in their original configuration at affordable prices.

## MODERN GUN MILESTONES

Recent decades have witnessed the continuing evolution and development of other types of sporting firearms, with several recurring trends.

Handguns, and revolvers in particular, have seen the development of more and more powerful ammunition. In 1935, Smith and Wesson rocked the handgun world with the introduction of the **.357 Magnum** cartridge and their prestigious **Registered Magnum** revolver to fire it. At a time when full power "big bore" handgun rounds ran in the 300 to 350 ft/lb. muzzle energy range, S&W upped the ante to over 500 ft/lbs. Results of actual law enforcement

shootings suggest that the .357 magnum round, with 125 grain hollowpoint loads, may be the most effective "stopper" still today. The fact that revolvers chambered for the .357 Mag. can also shoot the milder .38 Special has contributed to their continuing popularity.

S&W followed this with the **.44 Magnum** in 1955. With muzzle energy approaching 1,000 ft/lbs., the .44 Mag changed handgun big game hunting from a "stunt" to a serious and common sporting pursuit. When the Dirty Harry movies hit the theaters, lots of folks with more imagination than experience decided they needed "the world's most powerful handgun," not understanding how to manage the considerable recoil. It was not uncommon to find a S&W .44 Magnum advertised for sale in "as new" condition, with 6 cartridges missing from the 50 round box. Once around the cylinder was enough for many would-be Harry Callahans!

Just recently, Smith & Wesson raised the bar to a previously unimaginable level with the introduction of their X-frame **.500 Magnum** revolver. Developing an incredible 2,500 ft/lbs. of muzzle energy, the 500 readily surpasses the power level of many high power rifles.

Auto-pistol evolution took a leap forward in 1971 when the **Smith and Wesson Model 59** was the first combine the **Browning High Power** high capacity double stack magazine with the double action mechanism of the German WWII era **Walther P-38**. A number of firms followed suit, and the genre, known as **"wonder nines"** for their usual 9 mm chambering, began to make inroads into a police market that previously had been dominated by double action revolvers. The Swiss-based firm of **Sig Sauer** developed a strong reputation for quality and reliability in this type of pistol, and the **Beretta Model 92** in the wonder nine configuration replaced the old warhorse 1911A1 pistol as the U.S. Army standard issue.

In 1982, the semi-auto pistol market was turned upside down by a new Austrian manufacturer offering a radically different design with the frame made from plastic-like polymer, and a funny name. Traditionalists initially scoffed at the 17-round design with no external manual safeties other than a lever on the face of trigger, and an operating system that was neither SA nor DA, but instead called a "safe action" by the maker. Tupperware jokes abounded. At the other end of the spectrum, anti-gun fanatics ranted & frothed at the mouth over "plastic guns" that would be "invisible" to airport X-ray machines (not true).

However, beauty is as beauty does, and the **Glock** did nothing but perform, combining reliability, simplicity, affordability, and functional accuracy. Today, it is likely that more Glocks ride in police holsters than any other make.

The trend to **new materials** other than traditional blue steel and wood had begun years before. Smith and Wesson used **lightweight alloys** to make lightweight guns easier to carry, beginning with aluminum frame **Airweight Chiefs Specials** in 1952 and continuing through Scandium and Titanium alloys today that get .38 revolver weights down to the 10 ounce range.

Smith and Wesson and Charter Arms led the way in using rust-resistant **stainless steel** for small revolvers likely to be carried in sweaty environments close to the body, beginning in the mid-60's. Since then, stainless steel has nearly replaced blued carbon steel in revolver designs, and has made major inroads in long gun and semi-auto pistol production.

Many major handgun makers have followed Glock's lead in offering synthetic framed auto-pistols, and synthetic stock have been found to be more lightweight and less affected by environmental extremes than wood for long gun stocks. Rubber has replaced wood as the most likely handgun grip material.

In the repeating shotgun field, the **Winchester Model 12** became probably the standard for pump shotguns in the mid-20[th] Century, perhaps replaced by the **Remington Model 870** in more recent years. Semi-auto shotguns have overcome their reputation for finicky performance, first with **Remington 1100,** and then the **Benelli Model 90** enjoying an outstanding reputation for reliability in recent years.

Probably the last of the great firearms inventor / entrepreneurs in the tradition of Sam Colt and D.B. Wesson was **Bill Ruger.** His **Sturm Ruger** firm developed a reputation for improving classic sporting gun designs, and turning out a broad line of well-made and reasonably priced firearms, from revolvers and rifles through auto-pistols and over-under shotguns.

Other new firms sprang up to challenge the old line makers with improved or cheaper versions of the classic designs. **Springfield Armory** has become a major maker of military pattern sporting arms based on classic military designs such as the 1911 and the Garand patterns. **Taurus** began to offer serious competition to S&W in the revolver field. Firms such as **Bushmaster** and others began to develop a reputation for quality AR-15 semi-auto rifles, a market once belonging to Colt. Other makers such as **Uberti** and **Navy Arms** saw the strong nostalgia market for 19th century designs, and began to produce quality version of early percussion revolvers, Single Action Armies, Winchester lever guns, and other arms appealing to Old West buffs and participants in the fun new sport of Cowboy Action Shooting.

Options for aiming a firearm have expanded dramatically over the past 50 years. **Telescopic sights** for precision rifle shooting were used as early as the Civil War. However, it wasn't until after WWII that it became a standard practice to mount a scope on most serious hunting rifles, and the technology of these optics has continually evolved and improved. In the 70's and 80's, scopes came to be used on hunting handguns. New forms of sighting equipment such as electronic red dot sights, glow in the dark night sights, ultra-compact laser aiming systems, and even night vision scopes have come on the market and met with acceptance, and have been incorporated on firearms from concealed carry handguns through target competition arms, and military issue rifles.

# EXHIBIT 65

## TO KAPLAN DECLARATION



**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**WASHINGTON, D.C. 20226**

JUL 06 1989

MEMORANDUM T0:    Director

FROM:    Associate Director (Compliance Operations)

SUBJECT:    Report and Recommendation on the
Importability of Certain Semiautomatic Rifles

The working group has completed its evaluation of the semiautomatic rifles whose importation was suspended pending a determination as to whether these weapons are, as required by 18 U.S.C. § 925(d)(3), of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes".

Attached for your review and approval is the report and recommendation on the importability of these rifles.

*Daniel R. Black*

Daniel Black

Attachment

Approved: *Stephen E. Higgins 7/6/89*

Disapprove: _____

## REPORT AND RECOMMENDATION OF THE ATF WORKING GROUP ON THE IMPORTABILITY OF CERTAIN SEMIAUTOMATIC RIFLES

### SUSPENSION OF ASSAULT-TYPE RIFLE IMPORTATIONS

On March 14, 1989, ATF announced that it was suspending, effective immediately, the importation of several makes of assault-type rifles, pending a decision as to whether these weapons meet the statutory test that they are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The announcement stated that ATF would not approve, until further notice, the importation of AKS-type weapons, Uzi carbines, FN/FAL-type weapons, FN/FNC-type weapons and Steyr Aug semiautomatic weapons. On April 5, 1989, the suspension was expanded to include all similar assault-type rifles.

For purposes of this suspension, assault-type rifles were rifles which generally met the following criteria:

- a. military appearance

- b. large magazine capacity

- c. semiautomatic version of a machinegun

Based on these criteria, ATF suspended action on pending applications and suspended outstanding permits covering certain firearms listed in Attachment 1. These included both centerfire and .22 rimfire caliber firearms. At that time, ATF indicated that the reexamination of these weapons would take approximately 90 days.

This ATF working group was established to conduct the reevaluation of the importability of these semiautomatic rifles. This report represents the findings and recommendations of the working group.

### BACKGROUND

Section 925(d)(3) of Title 18, United States Code, as amended, provides in pertinent part that:

> The Secretary shall authorize a firearm. . .to be imported or brought into the United States . . if the firearm . .
>
> > (3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily

adaptable to sporting purposes, excluding surplus
military firearms. . .

This provision was originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, and was also contained in Title I of the Gun Control Act of 1968, which amended Title IV later that year. According to the Senate Report on Title IV, this provision was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167.

Moreover, there is legislative history which indicates that Congress intended the standard to allow the importation of traditional sporting rifles, while excluding military-type rifles. The Senate Report on the Gun Control Act observed that the importation standards ". . . are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms." S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968). Significantly, the rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.[1]

An explanation of the effect of this section by one of the sponsors of the bill specifically stated that military firearms would not meet the "sporting purposes" test for importation. The mere fact that a military firearm may be used in a sporting event does not make it importable as a sporting firearm[2].

There is a reference in the Senate Report on Title IV which notes that the importation prohibition ". . . would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes, or for personal protection." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167. However, this language is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting since firearms particularly suitable for those purposes can obviously be used for other purposes such as recreational shooting and personal protection.

The determination of a weapon's suitability for sporting purposes "rest[s] directly with the Secretary of the Treasury." 114 Cong. Rec. 27465 (1968) (Statement of Sen. Murphy). While the legislative history suggests that the term "sporting purposes" refers to the traditional sports of target shooting, trap and skeet shooting, and hunting, the statute itself provides no criteria beyond the "generally recognized" language of section 925(d)(3). S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2167. The Senate Report on the Gun Control Act stated:

> The difficulty of defining weapons characteristics to meet this target [of eliminating importation of weapons used in crime] without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Following enactment of the Gun Control Act in 1968, the Secretary established a Firearms Evaluation Panel to provide guidelines for implementation of the "sporting purposes" test of section 925(d)(3). This panel was composed of representatives from the military, law enforcement, and the firearms industry. The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction. An evaluation sheet (ATF Form 4590) was developed thereafter by ATF and put into use for evaluating handguns pursuant to section 925(d)(3). Attachment 2.

The 1968 Firearms Evaluation Panel did not propose criteria for evaluating rifles and shotguns under section 925(d)(3). Other than surplus military firearms which Congress addressed separately, long guns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes. Thus, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns. Until recently, all rifles and shotguns were approved for importation so long as they were not otherwise excluded by section 925(d)(3). Only rifles and shotguns covered by the National Firearms Act (NFA), 26 U.S.C. S 5845(a) (for example, machineguns and short-barreled rifles and short-barreled shotguns), and surplus military rifles and shotguns had been denied importation.

The Firearms Evaluation Panel did briefly comment on whether a model BM59 Beretta, 7.62mm NATO Caliber Sporter Version Rifle was suitable for sporting purposes. Minutes of the Firearms Advisory Panel, December 10, 1968. Attachment 3. It was the consensus of the Panel that this rifle did have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of the Beretta BM59, together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle, be authorized for importation. (The Beretta BM59 and the Cetme, the predecessor to the HK91, are two of the rifles whose importation has been suspended. The SIG-AMT is no longer being produced.) However, the Panel recommended that importation of these weapons should include the restriction that they not possess combination flash suppressors/grenade launchers.

The working group found the Panel's consideration of these rifles to be superficial and unpersuasive. The vast majority of the work of the 1968 Panel was devoted to handguns and the establishment of the factoring criteria for the importation of handguns. Indeed, we found compelling evidence that these rifles are not generally recognized as particularly suitable for sporting purposes.

The first time that ATF looked beyond the restrictions on NFA and surplus military rifles and shotguns and undertook a meaningful analysis under the "sporting purposes" test was in 1984. At that time, ATF was faced with a new breed of imported shotgun. It was clear that the historical assumption that all shotguns were sporting was no longer viable. Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes. This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to provide evidence of sporting purposes for the weapon, ATF was provided information that the weapon was suitable for police/combat style competitions. ATF determined that this type of competition did not constitute "sporting purposes" under the statute, and that this shotgun was not suitable for traditional sporting purposes, such as hunting, and trap and skeet shooting. Accordingly, importation was denied. Attachment 4.

Page 4

Thereafter, in 1986, the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). After examination and testing of the weapon, ATF found that it was a semiautomatic version of a selective fire military-type assault shotgun. In this case, ATF determined that, due to its weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS-12 was not particularly suitable for or readily adaptable to sporting purposes. Again, ATF refused to recognize police/combat competitions as a sporting purpose under section 925(d)(3). The shotgun was reviewed on the basis of its suitability for traditional shotgun sports of hunting, and trap and skeet shooting and its importation was denied. Attachment 5. This decision was upheld by the United States District Court in Gilbert Equipment Company, Inc. v. Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989). The case is currently on appeal to the Eleventh Circuit.

These two cases involving shotguns represent ATF's first thorough examination of the suitability of certain combat-type weapons for sporting purposes. In these cases ATF adopted an interpretation of sporting as being limited to certain traditional sports and not simply any lawful activity in which the weapons might be employed.

## ANALYSIS

A. Defining the type of weapon under review.

As noted above, section 925(d)(3) expressly provides that the Secretary shall authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, in its explanation of section 925(d)(3), the Senate Report on the Gun Control Act stated:

This subsection gives the Secretary authority to permit the importation of ammunition and certain types of firearms--(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machinegun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, et seq.) and suitable for sporting purposes (in the case of surplus military weapons this type is limited to shotguns and rifles) and those taken out of the United States. (Emphasis added.)

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

In light of the statutory mandate that types of firearms be scrutinized, the working group first attempted to determine whether the semiautomatic rifles suspended from importation fall within a type of firearm.

The working group determined that the semiautomatic rifles in question are generally semiautomatic versions of true selective fire military assault rifles.[3] As a class or type of firearm they are often referred to as "assault rifles," "assault-type rifles," "military style rifles," or "paramilitary rifles."[4] Since we are only concerned with semiautomatic rifles, it is somewhat of a misnomer to refer to these weapons as "assault rifles." True assault rifles are selective fire

Page 5

weapons that will fire in a fully automatic mode.[5] For the purposes of this paper, it was necessary to settle on one term that best describes the weapons under consideration, and we will refer to these weapons as "semiautomatic assault rifles." They represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle. The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK47, is a weapon designed for killing or disabling the enemy and, as described below, has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles.[6] These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. These features and characteristics are as follows:

1. Military Configuration.

    a.  Ability to accept a detachable magazine. Virtually allmodern military firearms are designed to accept large, detachable magazines.[7] This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less.[8] That a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

    b.  Folding/telescoping stocks. Many military firearms incorporate folding or telescoping stocks.[9] The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

    c.  Pistol grips. The vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon.[10] In most cases, the "straight line design" of themilitary weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions.

    d.  Ability to accept a bayonet. A bayonet has distinct military purposes.[11] First, it has a psychological affect on the enemy. Second, it enables soldiers to fight in close quarters

with a knife attached to their rifles. We know of no traditional sporting application for a bayonet.

e. Flash suppressor. A flash suppressor generally serves one or two functions. First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired fully automatic.[12] From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Those flash suppressors which also serve to dampen "muzzle climb" have a limited benefit in sporting uses by allowing the shooter to reacquire the target for a second shot. However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result. There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb. In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

f. Bipods. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.[13] The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired fully automatic. Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability. However, traditional sporting rifles do not come equipped with bipods, nor are they specifically designed to accommodate them. Instead, bipods for sporting firearms are generally designed to attach to a detachable "sling swivel mount" or simply clamp onto the firearm.

g. Grenade launcher. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.[14] Such launchers are generally of two types. The first type is a flash suppressor designed to function as a grenade launcher. The second type attaches to the barrel of the rifle either by screws or clamps. We are not aware of any particular sporting use for grenade launchers.

h. Night sights. Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.[15] Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally illegal to hunt at night.

2. Whether the weapon is a semiautomatic version of a machinegun.

The vast majority of modern military firearms are selective fire, i.e., they can shoot either fully automatic or semiautomatic. Since machineguns are prohibited from importation (except for law enforcement use) the manufacturers of such weapons have developed semiautomatic versions of these firearms.[16]

3. Whether the rifle is chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.

Modern military assault rifles and submachineguns are generally chambered to accept a centerfire cartridge case of 2.25 inches or less.[17] On the other hand, while many traditional sporting rifles will fire a cartridge of 2.25 inches or less, such firearms usually do not have the other military features outlined in Items 1a-h.

These features and characteristics are not usually found on traditional sporting firearms.[18] This is not to say that a particular rifle having one or more of the listed features should necessarily be classified as a semiautomatic assault rifle. Indeed, many traditional sporting firearms are . semiautomatic or have detachable magazines. Thus, the criteria must be viewed in total to determine whether the overall configuration places the rifle fairly within the semiautomatic assault rifle category.

Using these criteria, we determined that, on balance, all of the firearms on the original suspension list are properly included in the semiautomatic assault rifle category, with the exception of the .22 rimfire caliber rifles and the Valmet Hunter. While the .22 rimfire caliber rifles bear a striking resemblance to the true assault rifle, these rifles employ, by and large, conventional .22 rimfire caliber semiautomatic mechanisms.[19] Moreover, they are not semiautomatic versions of a machinegun and contain only a few of the other relevant characteristics. Further, the working group determined that, in general, .22 caliber rifles are generally recognized as suitable for small game hunting. The Valmet Hunter, while based on the operating mechanism of the AK47 assault rifle, has been substantially changed so that it is now akin to a traditional sporting rifle and does not properly fall within the semiautomatic assault rifle category. More specifically, its receiver has been modified and its pistol grips, bayonet, and flash suppressor have been removed. The trigger mechanism has been moved to the rear of the modified receiver to facilitate its use with a traditional sporting stock. Also, its military-style sights have been replaced with traditional sporting-style sights. See Attachment 6.

B. Scope of "Sporting Purposes".

The second step of our process was to determine the scope of "sporting purposes" as used in the statute. This is a critical aspect of the process. The broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test. A narrower interpretation which focuses on the traditional sports of hunting and organized marksmanship competition would result in a more selective importation process.[20]

To determine the proper interpretation, we consulted the statute itself, its legislative history, applicable case law, the work of the original Firearms Evaluation Panel, and prior interpretations by ATF. In terms of the statute itself, the structure of the importation provisions would suggest a somewhat narrow interpretation. In this regard, firearms are prohibited from importation (section 922(1)) with certain specific exceptions (section 925(d)(3)). A broad interpretation which permits virtually any firearm to be imported because someone may wish to use it in some lawful shooting activity would render the statute meaningless.

As discussed earlier, the legislative history suggests a narrow meaning and indicates that the term "sporting purposes" refers to the traditional sports of target shooting, skeet and trap shooting, and hunting. Moreover, the history discussed earlier strongly suggests that Congress intended the provision to allow the importation of traditional sporting type rifles while excluding military type rifles. There is nothing in its history to indicate that it was intended to recognize every conceivable

type of activity or competition which might employ a firearm. To the contrary, the history indicates that mere use in some competition would not make the rifle a sporting rifle.

Finally, the 1968 Firearms Evaluation Panel specifically addressed at least one informal shooting activity and determined that it was not a legitimate sporting purpose under the statute. The panel addressed what is commonly referred to as "plinking" (shooting at randomly selected targets such as bottles and cans). It was the Panel's view that "while many persons participated in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . ."
See Attachment 3.

Based on the above, the working group determined that the term "sporting purpose" should properly be given a narrow reading. It was determined that while hunting has been a recognized rifle sport for centuries, and competitive target shooting is a recognized rifle sport, the so-called activity of plinking is not a recognized sport. Moreover, we believe that reference to sporting purposes was intended also to stand in contrast to military and law enforcement applications. Consequently, the working group does not

believe that police/combat-type competitions should be treated as sporting activities. This position is supported by the court's decision in Gilbert Equipment Company, Inc., v Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989) and is consistent with prior interpretations of ATF as noted on pages 4 and 5 in discussing the Striker-12 shotgun and USAS-12 shotgun.

C. Suitability.

The final step in our review involved an evaluation of whether semiautomatic assault rifles are a type of rifle generally recognized as particularly suitable for or readily adaptable to the traditional sporting applications discussed above.

The criminal misuse of semiautomatic assault rifles is a matter of significant public concern and was an important factor in the decision to suspend their importation. Nevertheless, the working group did not consider criminal misuse as a factor in its analysis of the importability of this type of rifle. Instead, the working group confined its analysis to the question of whether this type of rifle meets the test provided in section 925(d)(3).

Rather than criminal misuse, our comprehensive examination of this issue focused on the legal analysis and technical assessment of these firearms discussed earlier. In addition, the working group used the information gathered under Items 1-7 outlined in the next section in determining whether this type of firearm is generally recognized as particularly suitable for sporting purposes. These items take into account technical and marketing data, expert opinions, the recommended uses of the firearms, and data on the actual uses for which the weapons are employed in this country.

In evaluating these firearms, we believe that all rifles which are fairly typed as semiautomatic assault rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability.[21] Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type.

This is consistent with the approach taken with respect to handguns since 1968. Although certain handguns may be used or recommended for sporting purposes, they may fall within the type of easily concealable handguns barred from importation by the administrative factoring criteria used by ATF to determine the importability of handguns. Furthermore, a pistol specifically designed for target shooting, but lacking a safety as required by the factoring criteria, would be a type of handgun prohibited from importation as not particularly suitable for sporting purposes for this reason. Finally, just as ATF allows handguns to be modified so as to meet the factoring criteria, a semiautomatic assault rifle could be modified into a sporting configuration and be importable, as was done in the case of the Valmet Hunter referred to earlier.

## D. Evaluation of Information from Outside Sources

As part of our comprehensive analysis as to whether semiautomatic assault rifles meet the statutory criteria for importation, the following sources of information were also considered:

1. How has the weapon been advertised, marketed and categorized by the manufacturer and/or importer?

2. How has the use of the rifle been described by firearms technical writers?

3. What is the rifle's reported use by importers?

4. Do hunting guides recommend the rifle?

5. Do editors of hunting magazines recommend the rifle?

6. Is the rifle used in target shooting competitions?

7. Do State game commissions allow the use of the rifle to hunt?

Items 1-6 focus upon how the rifles are marketed, advertised, and recommended for use. Item 7 addresses the legal restrictions pertaining to the use of the weapons for sporting purposes.

The working group reviewed the advertising and marketing literature concerning each of the weapons (Item 1) and reviewed evaluations of the firearms by technical writers (Item 2). In addition, the working group solicited information from the importers of the weapons and other knowledgeable sources (Items 3-6).

Questionnaires were drafted and sent out to licensed hunting guides, State game and fish commissions, local hunting associations, competitive shooting groups, and hunting/shooting magazine editors to determine the extent to which the weapons are used for sporting purposes or recommended for such use. The working group believed that the actual uses of the weapons for sporting purposes would be a factor to be considered in determining whether this type of rifle meets the sporting purposes test.

The review of advertising and marketing literature indicates that these rifles are not generally marketed for hunting or competitive shooting. The review of the technical evaluations revealed that these rifles are not regarded as suitable for these sporting activities.22

To the extent that the technical evaluations made recommendations with respect to the use of the rifles suspended from importation, the majority recommended them for law enforcement or military use or for activities such as collecting, plinking, home and self-defense, and combat target shooting. Only 5 of over 50 evaluations reviewed contained recommendations for the use of these firearms for hunting purposes.

The importers were asked to submit information concerning the sporting uses of the semiautomatic rifles they import. Thirty-nine importers were asked to submit this information and 19 responded. In general, their comments were conclusory and stated that their weapons could be used for sporting purposes. A small number of importers, e.g., Gun South, Inc., and Heckler & Koch, Inc., provided more specific data showing the sporting uses made of their firearms by their customers.

Of 3 hunting associations to whom questionnaires were sent, 2 responded. They stated that they place no restrictions on the use of semiautomatic rifles by their members, on the minimum caliber of ammunition used to hunt large game, or on the number of rounds allowed in semiautomatic rifle magazines. However, over 1,800 hunting guides were sent questionnaires and, of these, 706 responded. Over 73 percent of those responding indicated that their patrons used either bolt or lever action rifles for hunting. Only 10 of the 706 guides indicated that their patrons had used any of the rifles whose importation had been temporarily suspended.

Of the 20 hunting/shooting editors to whom questionnaires were sent, 14 responded. Nine of the fourteen editors recommended semiautomatic rifles for use in hunting large game, including 5 who recommended use of any of the rifles subject to the temporary suspension. Eleven of the fourteen editors recommended semiautomatic rifles for target competitions, including 7 who recommended semiautomatic assault rifles for such use.

The recommendations of editors were contradictory. One editor pointed out that what made the assault rifle successful as a military weapon made the semiautomatic version totally unfit for any other use. On the other hand, another editor stated that semiautomatic rifles had certain advantages over conventional sporting rifles especially for the physically disabled and left-handed shooters. While this may be true, there appears to be no advantage to using a semiautomatic assault rifle as opposed to a semiautomatic sporting rifle.

A total of 54 competitive shooting groups were sent a questionnaire and 53 groups responded (some of the responses were from unsolicited groups). Fifty of these groups indicated that they sponsor high power rifle competition events. While none of the groups prohibited the use of the semiautomatic assault rifles in their competitions, none stated that any of the rifles covered by the temporary suspension were used in a specific event.

Finally, the information gathered under Item 7 reveals that most of these weapons could legally be used in most States for most hunting purposes.

The working group reviewed all of the information gathered under Items 1-6 and determined that while these weapons may legally be used for sporting purposes in most States, the evidence was compelling that, as a type of firearm, the semiautomatic assault rifle is not generally recognized as particularly suitable for sporting purposes. The working group found persuasive the technical and expert evaluations of these firearms which generally did not recommend them as particularly suitable for sporting purposes. The group was also impressed by the comments of the hunting guides which showed that these rifles were not widely used for hunting purposes. The comments of the hunting guides are consistent with the opinion of the technical experts who generally do not recommend the rifles for hunting purposes.

The opinions of the editors were fairly divided with respect to the sporting uses of these rifles. The importers generally recommended their own weapons for such uses. The competitive shooting groups indicated that the rifles could be used in certain shooting events. Thus, while there was some evidence that these rifles could be used for hunting and target shooting, there was no evidence of any widespread use for such purposes. The mere fact that they are not generally prohibited from use for sporting purposes does not mean that the rifles meet the test for importation.

## CONCLUSIONS

The working group has dealt with a complex issue, the resolution of which has required the group to take into account interpretations of law, technical assessments of firearms and their physical characteristics, marketing data, the assessment of data compiled from responses to questionnaires and, finally, Bureau expertise with respect to firearms. We fully recognize that particular findings as well as the results will be controversial.

From the cross section of representation within ATF, we have brought to bear our technical, legal, and administrative expertise to resolve the issues in what we believe to be a fair manner, taking into consideration all points of view. While some of the issues were difficult to resolve, in the end we believe that the ultimate conclusion is clear and compelling. These semiautomatic assault rifles were designed and intended to be particularly suitable for combat rather than sporting applications. While these weapons can be used, and indeed may be used by some, for hunting and target shooting, we believe it is clear that they are not generally recognized as particularly suitable for these purposes.

The purpose of section 925(d)(3) was to make a limited exception to the general prohibition on the importation of firearms, to preserve the sportsman's right to sporting firearms. This decision will in no way preclude the importation of true sporting firearms. It will only prevent the importation of military-style firearms which, although popular among some gun owners for collection, self-defense, combat competitions, or plinking, simply cannot be fairly characterized as sporting rifles.

Therefore, it is the finding of the working group that the semiautomatic assault rifle is not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes and that importation of these rifles should not be authorized under 18 U.S.C. § 925(d)(3).

Based on our evaluation, we recommend that the firearms listed on Attachment 7 not be authorized for importation. For the reasons discussed in this report, we recommend that the firearms listed on Attachment 8 be authorized for importation. These are the .22 rimfire caliber rifles and the Valmet Hunter which we do not believe are properly included in the category of semiautomatic assault rifles. Attachment 9 is a compilation of the responses from the questionnaires. Attachment 10 combines the criteria for identifying semiautomatic assault rifles and the items considered in assessing suitability. Attachments 11 and 12 contain the data compiled for each of the criteria listed in Attachment 10. Finally, Attachment 13 contains the source materials used in locating persons and organizations who were sent questionnaires.

## NOTES

1. Paul Wahl, ed., Gun Trader's Guide, 13th Edition, (South Hackensack, NJ. 1987), 155-162.

2. Although a firearm might be recognized as "suitable" for use in traditional sports, it would not meet the statutory criteria unless it were recognized as particularly suitable for such use. Indeed, Senator Dodd made clear that the intent of the legislation was to" [regulate] the importation of firearms by excluding surplus military handguns; and rifles and shotguns that are not truly suitable for sporting purposes." 114 Cong. Rec. 13325 (1968) (Statement of Sen. Dodd) [emphasis added].

   Similarly, it is apparent that the drafters of the legislation did not intend for "sports" to include every conceivable type of activity or competition which might employ a firearm; otherwise a "sporting purpose" could be advanced for every firearm sought to be imported. For example, in response to Sen. Hansen's question concerning the meaning of "sporting purposes" in the bill which became section 925(d), Senators Dodd and Hansen engaged in the following colloquy:

   > Mr. HANSEN. Would the Olympic shooting competition be a "sporting purpose? "
   >
   > Mr. DODD. I would think so.
   >
   > Mr. HANSEN. What about trap and skeet shooting?
   >
   > Mr. DODD. I would think so. I would think trap and skeet shooting would certainly be a sporting activity.
   >
   > Mr. HANSEN. Would the Camp Perry national matches be considered a "sporting purpose?"
   >
   > Mr. DODD. Yes: that would not [sic] fall in that arena. It should be described as a sporting purpose.
   >
   > Mr. HANSEN. I understand the only difference is in the type of firearms used at Camp Perry which includes a wide variety of military types as well as commercial.

Would all of these firearms be classified as weapons constituting a "sporting purpose?"

Mr. DODD. No. I would not say so. I think when we get into that, we definitely get into military type of weapon for use in matches like these at Camp Perry; but I do not think it is generally described as a sporting weapon. It is a military weapon. I assume they have certain types of competition in which they use these military weapons as they would in an otherwise completely sporting event. I do not think that fact would change the nature of the weapon from a military to a sporting one.

Mr. HANSEN. Is it not true that military weapons are used in Olympic competition also?

Mr. DODD. I do not know. Perhaps the Senator can tell me. I am not well informed on that.

Mr. HANSEN. It is my understanding that they are. Would the Senator be inclined to modify his response if
I say that is true? (27461)

Mr. DODD. It is not that I doubt the Senator's word. Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event. I think the Senator would agree with that. I do not know how else we could describe it.

Mr. HANSEN. If I understand the Senator correctly, he said that despite the fact that a military weapon may be used in a sporting event it did not, by that action become a sporting rifle Is that correct?

Mr. DODD. That would seem right to me ..... As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons...... I think the Senator and I know what a genuine sporting gun is.

114 Cong. Rec. 27461-62 (1968).(Emphasis added.)

3. Ken Warner, ed., Gun Digest 1989, (Northbrook, I1. 1988), pp. 293-300; William S. Jarrett, ed., Shooter's Bible, No. 80, (Hackensack, NJ. 1988), pp. 345-363; Edward Clinton Ezell, Small Arms of the World, (Harrisburg, Pa. 1983), p. 844; Pete Dickey, "The Military Look-Alikes," American Rifleman, (April 1980), p. 31. Also, see generally, Ian V. Hogg, ed., Jane's Infantry Weapons, 1987-88, (New York 1987); Jack Lewis, ed., The Gun Digest Book of Assault Weapons, (Northbrook, I1. 1986).

4. Art Blatt, "Tomorrow's State-of-the-Art Sporting Rifle," Guns & Ammo, (July 1981), p. 48; Jarrett, pp. 345-363; Warner, pp. 293-300.

5. Daniel D. Musgrave and Thomas B.Nelson, The World's Assault Rifles, (Virginia, 1967), p. I.

6. See generally, Angus Laidlaw, ed., Paul Wahl's Big_ Gun Catalog/1, (Bogota, NJ. 1988); Musgrave and Nelson; Hogg; Jarrett; and Warner.

7. Ibid.

8. Arizona, 5 rounds; Colorado, 6 rounds; Michigan 6 rounds; New Hampshire, 5 rounds; New York, 6 rounds; North Carolina, 6 rounds; North Dakota, 8 rounds; Oregon, 5 rounds; Pennsylvania, semiautomatic rifles prohibited; Vermont, 6 rounds.

9. See generally, Hogg; Musgave and Nelson; Ezell; Warner; Jarrett; Laidlaw; and Lewis.

10. Ibid.

11. Ibid.

12. Ibid.

13. Ibid.

14. Ibid.

15. Ibid.

16. Ezell, p. 844; Dickey, p. 31.

17. Musgrave and Nelson, pp. 11-29; and, see generally, Hogg; and Ezell.

18. Ezell, pp.844-866; and, see generally, Warner; Jarrett; and Laidlaw.

19. See, for example, Walter Rickell, "The Plinker's AK GunsMagazine, (July 1986) p. 21; John Lachuk, "Bantam Battle Rifles," Guns & Ammo, (January 1987), p. 37; John Lachuk, ".22 Erma Carbine," Guns & Ammo, (May 1968), p. 58; JackLewis, "Something New: The AK in Twenty-Two," Gun World, (July 1985), p. 32; Roger Combs, "A Most Unique Carbine," Gun World, (December 1985), p. 28; Garry James, "Mitchell Arms AK-22," Guns & Ammo, (November 1985), p. 72.

20. See note 2, colloquy between Senators Dodd and Hansen.

21. Ibid.

22. See generally, bibliography.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

## BIBLIOGRAPHY

"Armalite AR-180 Rifle," <u>American Rifleman,</u> (February 1981), 65-66.

"Beretta AR. 70 Rifle," <u>American Rifleman,</u> (March 1988), 64-66.

Blatt, Art. "Beretta M-70/Sport Rifle," <u>Guns & Ammo,</u> (December 1983), 64-65.

Blatt, Art. "Tomorrow's Sporting Rifles," <u>Guns & Ammo,</u> (July 1981), 48-57, 78, 79.

Bruce, Robert. "The AUG Assault System," <u>Guns Magazine,</u> (September 1986), 37-39, 42,43, 57-61.

Clapp, Wiley. "Great To-Do With the Daewoo," <u>The Gun Digest Book of Assault Weapons,</u> (1986), 82-87.

Combs, Roger. "A Most Unique Carbine," <u>Gun World,</u> (December 1985), 28-31, 47.

Combs, Roger. "Galil 7.62mm Nato Rifle", <u>Gun World,</u> (October 1985), 32-36.

Combs, Roger. "The Avtomat Kalashnikov Goes .22," <u>The Gun Digest Book of Assault Weapons,</u> (1986), 182-195.

Combs, Roger. "The Uniquely Unique F-11," <u>The Gun Digest Book of Assault Weapons,</u> (1988), 188-195.

"Cooking and Heckling with H & K's HK94A3," <u>Gun World,</u> (August 1984), 18-20.

Davis, Russ. "Have Your AK and Shoot it, Too," <u>Guns Magazine,</u> (February 1987), 39, 62-64.

Dickey, Pete. "The Military Look-Alikes," <u>American Rifleman,</u> (April 1980), 30-31, 76.

Egolf, Dick. "Heckler & Koch's Super Semi-Auto," <u>American Rifleman,</u> (June 1985), 29-32, 65-67.

Ezell, Edward Clinton. <u>Small Arms of the World</u>. Harrisburg: Stackpole Books, 1983.

"FN FNC Rifle," <u>American Rifleman,</u>(January 1988), 58-60.

Ferguson, Tom. "A Hard Look at The AR-180", <u>The Gun Digest Book of Assault Weapons,</u> (1986), 121-127.

French, Howard. "H & K's 9mm Paracarbine," <u>Guns & Ammo,</u> (November 1983), 42-44.

Grennell, Dean A. "The Mitchell AK-47," <u>Gun World,</u> (September 1986), 40-41.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

"Heckler & Koch 91," American Rifleman, (October 1981), 56-58.

"Heckler & Koch Model 94 Carbine," American Rifleman, (February 1988), 46-48.

Hogg, Ian V., ed. Janes' Infantry Weapons. 1987-1988. New York: Jane's Publishing Company, 1987.

Hunnicutt, Robert W. "The Bullpups Have Arrived", American Rifleman, (March 1987), 30-35, 70-71.

James, Frank W. "The Springfield Armory SAR-3, " Special Weapons and Tactics, (July 1989), 42-46.

James, Garry. "Austrailian LlAlA Rifle," Guns & Ammo, (December 1987),

James, Garry. "Chinese AK-47 .223," Guns & Ammo, (August 1986), 84-86.

James, Garry. "Mitchell Arms AK-22," Guns & Ammo, (November 1985), 72-73, 97.

James, Garry. "Mitchell Heavy Barrel AK-47," Guns & Ammo, (November 1986), 83-84.

James, Garry. "PTK Chinese M-14S Rifle," American Rifleman, (July 1988), 81-82.

James, Garry. "The SAR-48 Rifle, Springfield Armory Reproduces a Classic," Guns & Ammo, (August 1985), 64-66.

Jarrett, William S., ed. Shooter's Bible. No. 80. Hackensack: Stoeger Publishing Company, 1988.

Kapelsohn, Emanuel. "Steyr's Space-Age AUG," The Gun Digest Book of Assault Weapons, (1986), 45-49.

Karwan, Chuck. "The Fetching Famas," Gun World, (October 1988), 18-21, 78.

Karwan, Chuck. "The Rugged Rifles of Springfield Armory," Gun World, (March 1989), 72-76.

Karwan, Chuck. "ilalmet's Assault Family," The Gun Digest Book of Assault Weapons, (1986), 70-75.

Lachuk, John. ".22 Erma Carbine," Guns & Ammo, (May 1968), 58-60.

Lachuk, John. "Bantam Battle Rifles," Guns & Ammo, (January 1987), 36-39, 75-76.

Laidlaw, Angus, ed. Paul Wahl's Big Gun Catalog/l. Bogatao Paul Wahl Corporation, 1988.

Lewis, Jack, ed. The Gun Digest Book of Assault Weapons. Northbrook: DBI Books, Inc., 1986.

Lewis, Jack. "A Family Affair," The Gun Digest Book of Assault Weapons, (1986), 76-81.

Lewis, Jack. "EMF's Look-Alike AP-74," The Gun Digest Book of Assault Weapons, (1986), 166-171.

Lewis, Jack. "Something New: The AK in Twenty-Two," Gun World, (July 1985), 32-35.

Lewis, Jack. "Springfield's S.A.R. 48," The Gun Digit Book of Assault Weapons, (1968), 88-93.

Lewis, Jack. "The Why and How of Rimfires," The Gun Digest Book of Assault Weapons, (1986), 160-171.

Mason, James D. "The Maadi in America," Guns Magazine, (January 1983), 33-35, 78.

Musgrave, Daniel D. and Nelson, Thomas B. The World's Assault Rifles. Washington, DC: Goetz Company, 1967.

O'Meara, Robert. "The Guns of Israel," Guns Magazine, (January 1989), 33-35, 51.

Paige, Alan. "The AK-47 As A Bullpup?" Firepower, (January 1989), 48-53.

Rees, Clair. "Valmet M71-S," Guns & Ammo, (October 1976), 86, 137.

Rickell, Walter. "The Plinker's AK," Guns Magazine, (July 1986), 21.

Roberts, J.B. "Bernosky Wins His Fourth," American Rifleman, (Oct. 1980), 49-51.

Sanow, Ed. "National Match AK-47/S," Firepower, (January 1989), 66-71.

Shults, Jim. "The Mean Machine," Gun World, (April 1982), 26-28.

"Springfield Armory S.A.R. 48," American Rifleman, (March 1986), 57-58.

Steele, Kevin E. "Beretta BM-59," Guns Magazine, (January 1983), 14.

Steele, Kevin E. "Sporting Firearms Update," Guns Magazine, (Feburary 1980), 52-55, 79, 84-85.

"Steyr-AUG: The Terrible Toy," Gun World, (December 1984), 32-35.

Swenson, Thomas J. "The Incredible Uzi," Guns & Ammo, (Jaunary 1982), 32-36, 76.Tappan, Mel. "Survive: Survival Rifles-Part 2, " Guns & Ammo, (August 1978), 68, 96-97.

Traister, John. "AK Rifle: Chinese AKS or Type 56S," American Rifleman, (May 1988), 50-51.

"UZI Semi-Automatic .45 Carbine," American Rifleman, (January 1986), 59.

"Uzi Semi-Automatic Carbine," American Rifleman, (August 1981), 55-57.

"Valmet M78 Rifle," American Rifleman, (April 1988), 64-66

Wahl, Paul, ed. Gun Trader's Guide, 13th Edition, South Hackensack: Stoeger Publishing Company, 1987.

Warner, Ken, ed. Gun Digest 1989. Northbrook: DBI Books, Inc., 1988.

Wood, J.B. "Beretta's AR70 Sporter," Guns Magazine, (March 1986), 38-39, 65-66.

Woods, Jim. "Firepower From the Far East-Daewoo," Guns Magazine, (February 1986), 28-29, 60-61.

Zwirz, Bob. "Valmet's Military Look," Gun World, (September 1988), 28-30.

---

NOTE: This information was extracted from the document titled, **"Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles"**, published in a memorandum to the Director, Stephen E. Higgins from the Associate Director, Daniel R. Black and approved on July 6, 1989.

# EXHIBIT 66

## TO KAPLAN DECLARATION




# DEPARTMENT OF THE TREASURY STUDY ON THE SPORTING SUITABILITY OF MODIFIED SEMIAUTOMATIC ASSAULT RIFLES

APRIL 1998

# TABLE OF CONTENTS

Page

1. Executive Summary………………………………………………………… 1

2. Background…………………………………………………………………. 4

3. Defining the Type of Weapon Under Review………………………………. 16

4. Scope of "Sporting Purposes"……………………………………………… 16

5. Method of Study………………………………………………………….. 19

6. Suitability for Sporting Purposes…………………………………………. 21

7. Determination…………………………………………………………….. 36

8. Exhibits:

   White House Memorandum:  Importation of Modified Semiautomatic Assault-type Rifles

   Study Rifle Models

   Study Rifles

   ATF Form 4590, Factoring Criteria for Weapons

   Military Configuration

   Memorandum to File From First Meeting of Firearms Advisory Panel

   State Fish and Game Commission Review

9. Appendix:  Summary of Externally Gathered Information

<u>EXECUTIVE SUMMARY</u>

On November 14, 1997, the President and the Secretary of the Treasury ordered a review of the importation of certain modified versions of semiautomatic assault rifles into the United States.[1] The decision to conduct this review stemmed in part from concerns expressed by members of Congress and others that the rifles being imported were essentially the same as semiautomatic assault rifles previously determined to be nonimportable in a 1989 decision by the Bureau of Alcohol, Tobacco and Firearms (ATF). The decision also stemmed from the fact that nearly 10 years had passed since the last comprehensive review of the importation of rifles, and many new rifles had been developed during this time.

Under 18 U.S.C. section 925(d)(3), the Secretary shall approve applications for importation only when the firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes (the "sporting purposes test"). In 1989, ATF denied applications to import a series of semiautomatic versions of automatic-fire military assault rifles. When ATF examined these semiautomatic assault rifles, it found that the rifles, while no longer machineguns, still had a military configuration that was designed for killing and disabling the enemy and that distinguished the rifles from traditional sporting rifles. This distinctively military configuration served as the basis for ATF's finding that the rifles were not considered sporting rifles under the statute.

The military configuration identified by ATF incorporated eight physical features: ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights. In 1989, ATF took the position that any of these military configuration features, other than the ability to accept a detachable magazine, would make a semiautomatic rifle not importable.

Subsequent to the 1989 decision, certain semiautomatic assault rifles that failed the 1989 sporting purposes test were modified to remove all of the military configuration features other than the ability to accept a detachable magazine. Significantly, most of these modified rifles not only still had the ability to accept a detachable magazine but, more specifically, still had the ability to accept a detachable large capacity magazine that

---

[1] The President and the Secretary directed that all pending and future applications for importation of these rifles not be acted upon until completion of the review. They also ordered that outstanding permits for importation of the rifles be suspended for the duration of the review period. The existence of applications to import 1 million new rifles and outstanding permits for nearly 600,000 other rifles threatened to defeat the purpose of the expedited review unless the Department of the Treasury deferred action on additional applications and temporarily suspended the outstanding permits. (See exhibit 1 for a copy of the November 14, 1997, memorandum directing this review.)

The rifles that are the subject of this review are referred to in this report as "study rifles."

was originally designed and produced for the military assault rifles from which they were derived. These magazines are referred to in this report as "large capacity military magazines." Study rifles with the ability to accept such magazines are referred to in this report as "large capacity military magazine rifles," or "LCMM rifles." It appears that only one study rifle, the VEPR caliber .308 (an AK47 variant), is not an LCMM rifle. Based on the standard developed in 1989, these modified rifles were found to meet the sporting purposes test. Accordingly, the study rifles were approved for import into the United States.

These modified rifles are the subject of the present review. Like the rifles banned in 1989, the study rifles are semiautomatic rifles based on AK47, FN-FAL, HK91 and 93, Uzi, and SIG SG550 military assault rifles. While there are at least 59 specific model designations of the study rifles, they all fall within the basic designs listed above. There are at least 39 models based on the AK47 design, 8 on the FN-FAL design, 7 on the HK91 and 93 designs, 3 on the Uzi design, and 2 on the SIG SG550 design (see exhibit 2 for a list of the models). Illustrations of some of the study rifles are included in exhibit 3 of this report.

This review takes another look at the entire matter to determine whether the modified rifles approved for importation since 1989 are generally recognized as particularly suitable for or readily adaptable to sporting purposes.[2] We have explored the statutory history of the sporting purposes test and prior administrative and judicial interpretations; reexamined the basic tenets of the 1989 decision; analyzed the physical features of the study rifles, as well as information from a wide variety of sources relating to the rifles' use and suitability for sporting purposes; and assessed changes in law that might have bearing on the treatment of the rifles.

This review has led us to conclude that the basic finding of the 1989 decision remains valid and that military-style semiautomatic rifles are not importable under the sporting purposes standard. Accordingly, we believe that the Department of the Treasury correctly has been denying the importation of rifles that had any of the distinctly military configuration features identified in 1989, other than the ability to accept a detachable magazine. Our review, however, did result in a finding that the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.

Several important changes have occurred since 1989 that have led us to reevaluate the importance of this feature in the sporting purposes test. Most significantly, by passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding

---

[2] The study was carried out by a working group composed of ATF and Treasury representatives. The working group's activities and findings were overseen by a steering committee composed of ATF and Treasury officials.

devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem. Specifically, Congress found that these magazines served "combat-functional ends" and were attractive to criminals because they "make it possible to fire a large number of rounds without reloading, then to reload quickly when those rounds are spent."[3] Moreover, we did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose. Accordingly, we found that the ability to accept such a magazine is a critical factor in the sporting purposes test, which must be given the same weight as the other military configuration features identified in 1989.

In addition, the information we collected on the use and suitability of LCMM rifles for hunting and organized competitive target shooting demonstrated that the rifles are not especially suitable for sporting purposes. Although our review of this information indicated that, with certain exceptions, the LCMM rifles sometimes are used for hunting, their actual use in hunting is limited. There are even some general restrictions and prohibitions on the use of semiautomatic rifles for hunting game. Similarly, although the LCMM rifles usually may be used, with certain exceptions, and sometimes are used for organized competitive target shooting, their suitability for this activity is limited. In fact, there are some restrictions and prohibitions on their use.

Furthermore, the information we gathered demonstrated that the LCMM rifles are attractive to certain criminals. We identified specific examples of the LCMM rifles' being used in violent crime and gun trafficking. In addition, we found some disturbing trends involving the LCMM rifles, including a rapid and continuing increase in crime gun trace requests after 1991 and a rapid "time to crime." Their ability to accept large capacity military magazines likely plays a role in their appeal to these criminals.

After weighing all the information collected, we found that the LCMM rifles are not generally recognized as particularly suitable for or readily adaptable to sporting purposes and are therefore not importable. However, this decision will in no way preclude the importation of true sporting firearms.

---

[3]    H. Rep. No. 103-489, at 18-19.

<u>BACKGROUND</u>

<u>Importation of Firearms Under the Gun Control Act</u>

The Gun Control Act of 1968 (GCA)[4] generally prohibits the importation of firearms into the United States.[5] However, the GCA creates four narrow categories of firearms that the Secretary of the Treasury shall authorize for importation. The category that is relevant to this study is found at 18 U.S.C. section 925(d)(3).

> The Secretary shall authorize a firearm . . . to be imported or brought into the United States . . . if the firearm . . .
>
>> (3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and **is generally recognized as particularly suitable for or readily adaptable to sporting purposes**, excluding surplus military firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled. (Emphasis added)

This provision originally was enacted, in a slightly different form, by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968[6] and also was contained in Title I of the GCA, which amended Title IV later that year.

The GCA was enacted in large part "to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States." However, the Senate Report to the act also made clear that Congress did not intend the GCA to place any undue or unnecessary restrictions or burdens on responsible, law-abiding citizens with respect to acquiring, possessing, transporting, or using firearms for lawful activities.[7]

---

[4]  Pub. L. No. 90-618.

[5]  18 U.S.C. section 922(l).

[6]  Pub. L. No. 90-351.

[7]  S. Rep. No. 1501, 90th Cong. 2d Sess. 22 (1968).

Consistent with this general approach, legislative history indicates that Congress intended the importation standard provided in section 925(d)(3) to exclude military-type weapons from importation to prevent such weapons from being used in crime, while allowing the importation of high-quality sporting rifles.  According to the Senate Report, section 925(d)(3) was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting."[8]  The report goes on to explain that "[t]he importation of certain foreign-made and military surplus nonsporting firearms has an important bearing on the problem which this title is designed to alleviate [crime].  Thus, the import provisions of this title seem entirely justified."[9]  Indeed, during debate on the bill, Senator Dodd, the sponsor of the legislation, stated that "Title IV prohibits importation of arms which the Secretary determines are not suitable for . . . sport . . . .  The entire intent of the importation section is to get those kinds of weapons that are used by criminals and have no sporting purpose."[10]

The Senate Report, however, also makes it clear that the importation standards "are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms."[11]  (The rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.)  Similarly, the report states that the importation prohibition "would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes."[12]  The reference to recreational purposes is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting, because firearms particularly suitable for these purposes also can be used for other purposes such as recreational shooting.

During debate on the bill, there was discussion about the meaning of the term "sporting purposes."  Senator Dodd stated:

> [h]ere again I would have to say that if a military weapon is used in a

---

[8]  S. Rep. No. 1501, 90th Cong. 2d Sess. 22 (1968).

[9]  S. Rep. No. 1501, 90th Cong. 2d Sess. 24 (1968).

[10]  114 Cong. Rec. S 5556, 5582, 5585 (1968).

[11]  S. Rep. No. 1501, 90th Cong. 2d. Sess. 38 (1968).

[12]  S. Rep. No. 1501, 90th Cong. 2d. Sess. 22 (1968).

> special sporting event, it does not become a sporting weapon. It is a
> military weapon used in a special sporting event . . . . As I said previously
> the language says no firearms will be admitted into this country unless they
> are genuine sporting weapons.[13]

Legislative history also shows that the determination of a weapon's suitability for sporting purposes is the direct responsibility of the Secretary of the Treasury. The Secretary was given this discretion largely because Congress recognized that section 925(d)(3) was a difficult provision to implement. Immediately after discussing the large role cheap imported .22 caliber revolvers were playing in crime, the Senate Report stated:

> [t]he difficulty of defining weapons characteristics to meet this target
> without discriminating against sporting quality firearms, was a major
> reason why the Secretary of the Treasury has been given fairly broad
> discretion in defining and administering the import prohibition.[14]

Indeed, Congress granted this discretion to the Secretary even though some expressed concern with its breadth:

> [t]he proposed import restrictions of Title IV would give the Secretary of
> the Treasury unusually broad discretion to decide whether a particular type
> of firearm is generally recognized as particularly suitable for, or readily
> adaptable to, sporting purposes. If this authority means anything, it
> permits Federal officials to differ with the judgment of sportsmen expressed
> through consumer preference in the marketplace . . . . [15]

Section 925(d)(3) provides that the Secretary shall authorize the importation of a firearm if it is of a "type" that is generally recognized as particularly suitable for or readily adaptable to sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, the Senate Report to the GCA states that section 925(d) "gives the

Secretary authority to permit the importation of ammunition and certain types of firearms."[16]

---

[13]   114 Cong. Rec. 27461-462 (1968).

[14]   S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

[15]   S. Rep. No. 1097, 90th Cong. 2d. Sess. 2155 (1968) (views of Senators Dirksen, Hruska, Thurmond, and
       Burdick). In Gun South, Inc. v. Brady, F.2d 858, 863 (11th Cir. 1989), the court, based on legislative
       history, found that the GCA gives the Secretary "unusually broad discretion in applying section 925(d)(3)."

[16]   S. Rep. No. 1501, 90th Cong. 2d. Sess. 38 (1968).

The Senate Report to the GCA also recommended that the Secretary establish a council that would provide him with guidance and assistance in determining which firearms meet the criteria for importation into the United States.[17]  Accordingly, following the enactment of the GCA, the Secretary established the Firearms Evaluation Panel (FEP) (also known as the Firearms Advisory Panel) to provide guidelines for implementation of the "sporting purposes" test.  This panel was composed of representatives from the military, the law enforcement community, and the firearms industry.  At the initial meeting of the FEP, it was understood that the panel's role would be advisory only.[18]  The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction.  ATF thereafter developed an evaluation sheet (ATF Form 4590) that was put into use for evaluating handguns pursuant to section 925(d)(3).  (See exhibit 4.)

The FEP did not propose criteria for evaluating rifles and shotguns under section 925(d)(3).  Other than surplus military firearms, which Congress addressed separately, the rifles and shotguns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes.  Therefore, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns.

<u>1984 Application of the Sporting Purposes Test</u>

The first time that ATF undertook a meaningful analysis of rifles or shotguns under the sporting purposes test was in 1984.  At that time, ATF was faced with a new breed of imported shotgun, and it became clear that the historical assumption that all shotguns were sporting was no longer viable.  Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes.  This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to submit evidence of the weapon's sporting purposes, it provided information that the weapon was suitable for police/combat-style competitions. ATF determined that this type of competition did not constitute a sporting purpose

under the statute, and that the shotgun was not suitable for the traditional shotgun sports of hunting, and trap and skeet shooting.

---

[17]  S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

[18]  <u>Gilbert Equipment Co. v. Higgins</u>, 709 F. Supp. 1071, 1083, n. 7 (S.D. Ala. 1989), <u>aff'd without op.</u>, 894 F.2d 412 (11th Cir. 1990).

<u>1986 Firearms Owners Protection Act</u>

On May 19, 1986, Congress passed the Firearms Owners Protection Act,[19] which amended section 925(d)(3) to provide that the Secretary "shall" (instead of "may") authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for or readily adaptable to sporting purposes.  The Senate Report to the law stated "it is anticipated that in the vast majority of cases, [the substitution of 'shall' for 'may' in the authorization section] will not result in any change in current practices."[20]  As the courts have found, "[r]egardless of the changes made [by the 1986 law], the firearm must meet the sporting purposes test and it remains the Secretary's obligation to determine whether specific firearms satisfy this test."[21]

<u>1986 Application of the Sporting Purposes Test</u>

In 1986, ATF again had to determine whether a shotgun met the sporting purposes test, when the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3).  Again, ATF refused to recognize police/combat-style competitions as a sporting purpose.  After examining and testing the weapon, ATF determined its weight, size, bulk, designed magazine capacity, configuration, and other factors prevented it from being classified as particularly suitable for or readily adaptable to the traditional shotgun sports of hunting, and trap and skeet shooting.  Accordingly, its importation was denied.

When this decision was challenged in Federal court, ATF argued, in part, that large magazine capacity and rapid reloading ability are military features.  The court accepted this argument, finding "the overall appearance and design of the weapon (especially the detachable box magazine . . . ) is that of a combat weapon and not a sporting weapon."[22]  In reaching this decision, the court was not persuaded by the importer's argument that box magazines can be lengthened or shortened depending on desired shell capacity.[23]  The court also agreed with ATF's conclusion that police/combat-style competitions were not considered sporting purposes.

---

[19]  Pub. L. No. 99-308.

[20]  S. Rep. No. 98-583, 98th Cong. 1st Sess. 27 (1984).

[21]  <u>Gilbert Equipment Co</u>., 709 F. Supp. at 1083.

[22]  <u>Id</u>. at 1089.

[23]  <u>Id</u>. at 1087, n. 20 and 1089.

<u>1989 Report on the Importability of Semiautomatic Assault Rifles</u>

In 1989, after five children were killed in a California schoolyard by a gunman with a semiautomatic copy of an AK47, ATF decided to reexamine whether certain semiautomatic assault-type rifles met the sporting purposes test. This decision was reached after consultation with the Director of the Office of National Drug Control Policy. In March and April 1989, ATF announced that it was suspending the importation of certain "assault-type rifles." For the purposes of this suspension, assault-type rifles were those rifles that generally met the following criteria: (1) military appearance; (2) large magazine capacity; and (3) semiautomatic version of a machinegun. An ATF working group was established to reevaluate the importability of these assault-type rifles. On July 6, 1989, the group issued its <u>Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles</u> (hereinafter 1989 report).

In the 1989 report, the working group first discussed whether the assault-type rifles under review fell within a "type" of firearm for the purposes of section 925(d)(3). The working group concluded that most of the assault-type rifles under review represented "a distinctive type of rifle [which it called the "semiautomatic assault rifle"] distinguished by certain general characteristics which are common to the modern military assault rifle."[24] The working group explained that the modern military assault rifle is a weapon designed for killing or disabling the enemy and has characteristics designed to accomplish this purpose. Moreover, it found that these characteristics distinguish modern military assault rifles from traditional sporting rifles.

The characteristics of the modern military assault rifle that the working group identified were as follows: (1) military configuration (which included: ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights) (see exhibit 5 for a thorough discussion of each of these features); (2) ability to fire automatically (i.e., as a machinegun); and (3) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.[25] In regards to the ability to accept a detachable magazine, the working group explained that:

> [v]irtually all modern military firearms are designed to accept large, detachable magazines. This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable

---

[24] 1989 report at 6.

[25] 1989 report at 6.

       magazines are not limited to military firearms, most traditional
       semiautomatic sporting firearms, designed to accommodate a detachable
       magazine, have a relatively small magazine capacity.[26]

The working group emphasized that these characteristics had to be looked at as a whole to determine whether the overall configuration of each of the assault-type rifles under review placed the rifle fairly within the semiautomatic assault rifle type. The semiautomatic assault rifles shared all the above military assault rifle characteristics other than being machineguns.[27]

The working group also addressed the scope of the term "sporting purposes." It concluded that the term should be given a narrow interpretation that focuses on the traditional sports of hunting and organized competitive target shooting. The working group made this determination by looking to the statute, its legislative history, applicable case law, the work of the FEP, and prior interpretations by ATF. In addition, the working group found that the reference to sporting purposes was intended to stand in contrast to military and law enforcement applications. Consequently, it determined that police/combat-type competitions should not be treated as sporting activities.[28]

The working group then evaluated whether the semiautomatic assault rifle type of firearm is generally recognized as particularly suitable for or readily adaptable to traditional sporting applications. This examination took into account technical and marketing data, expert opinions, the recommended uses of the firearms, and information on the actual uses for which the weapons are employed in this country. The working group, however, did not consider criminal use as a factor in its analysis of the importability of this type of firearm.

After analyzing this information, the working group concluded that semiautomatic assault rifles are not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes. Accordingly, the working group concluded that semi-automatic assault rifles should not be authorized for importation under section 925(d)(3). However, the working group found that some of the assault-type rifles under review (the Valmet Hunter and .22 rimfire caliber rifles), did not fall within the semiautomatic assault rifle type. In the case of the Valmet Hunter, the working group found that although it was based on the operating mechanism of the AK47 assault rifle, it had been substantially

---

[26]  1989 report at 6 (footnote omitted).

[27]  The semiautomatic assault rifles were semiautomatic versions of machineguns.

[28]  1989 report at 9-11.

changed so that it was similar to a traditional sporting rifle.[29]  Specifically, it did not have any of the military configuration features identified by the working group, except for the ability to accept a detachable magazine.

Following the 1989 study, ATF took the position that a semiautomatic rifle with any of the eight military configuration features identified in the 1989 report, other than the ability to accept a detachable magazine, failed the sporting purposes test and, therefore, was not importable.

Gun South, Inc. v. Brady

Concurrent with its work on the 1989 report, ATF was involved in litigation with Gun South, Inc. (GSI).  In October 1988 and February 1989, ATF had granted GSI permits to import AUG-SA rifles.  As mentioned previously, in March and April of 1989, ATF imposed a temporary suspension on the importation of rifles being reviewed in the 1989 study, which included the AUG-SA rifle.  GSI filed suit in Federal court, seeking to prohibit the Government from interfering with the delivery of firearms imported under permits issued prior to the temporary suspension.

The court of appeals found that the Government had the authority to suspend temporarily the importation of GSI's AUG-SA rifles because the GCA "impliedly authorizes" such action.[30]  In addition, the court rejected GSI's contention that the suspension was arbitrary and capricious because the AUG-SA rifle had not physically changed, explaining the argument "places too much emphasis on the rifle's structure for determining whether a firearm falls within the sporting purpose exception.  While the Bureau must consider the rifle's physical structure, the [GCA] requires the Bureau to equally consider the rifle's use."[31]  In addition, the court found that ATF adequately had considered sufficient evidence before imposing the temporary suspension, citing evidence ATF had considered

demonstrating that semiautomatic assault-type rifles were being used with increasing frequency in crime.[32]

---

[29]   This finding reflects the fact that the operating mechanism of the AK47 assault rifle is similar to the operating mechanism used in many traditional sporting rifles.

[30]   Gun South, Inc. v. Brady, 877 F.2d 858 (11th Cir. 1989). The court of appeals issued its ruling just days before the 1989 report was issued.  However, the report was complete before the ruling was issued.

[31]   Id.

[32]   Id.

Although GSI sued ATF on the temporary suspension of its import permits, once the 1989 report was issued, no one pursued a lawsuit challenging ATF's determination that the semiautomatic assault rifles banned from importation did not meet the sporting purposes test.[33]

Violent Crime Control and Law Enforcement Act of 1994

On September 13, 1994, Congress passed the Violent Crime Control and Law Enforcement Act of 1994,[34] which made it unlawful, with certain exceptions, to manufacture, transfer, or possess semiautomatic assault weapons as defined by the statute.[35] The statute defined semiautomatic assault weapons to include 19 named models of firearms (or copies or duplicates of the firearms in any caliber);[36] semiauto-matic rifles that have the ability to accept detachable magazines and have at least two of five features specified in the law; semiautomatic pistols that have the ability to accept detachable magazines and have at least two of five features specified in the law; and semiautomatic shotguns that have at least two of four features specified in the law.[37] However, Congress

---

[33] After the 1989 report was issued, Mitchell Arms, Inc. asserted takings claims against the Government based upon the suspension and revocation of four permits allowing for the importation of semiautomatic assault rifles and ATF's temporary moratorium on import permits for other rifles. The court found for the Government, holding the injury complained of was not redressable as a taking because Mitchell Arms did not hold a property interest within the meaning of the Just Compensation Clause of the Fifth Amendment. Mitchell Arms v. United States, 26 Cl. Ct. 1 (1992), aff'd, 7 F.3d 212 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994).

[34] Pub. L. No. 103-22. Title XI, Subtitle A of this act may be cited as the "Public Safety and Recreational Firearms Use Protection Act."

[35] 18 U.S.C. section 922(v).

[36] Chapter 18 U.S.C. section 921(a)(30)(A) states that the term "semiautomatic assault weapon" means "any of the firearms, or copies or duplicates of the firearms in any caliber, known as -," followed by a list of named firearms. Even though section 921(a)(3) defines "firearm" as used in chapter 18 to mean, in part, "the frame or receiver of any such weapon," the use of "firearm" in section 921(a)(30)(A) has not been interpreted to mean a frame or receiver of any of the named weapons, except when the frame or receiver actually is incorporated in one of the named weapons.

Any other interpretation would be contrary to Congress' intent in enacting the assault weapon ban. In the House Report to the assault weapon ban, Congress emphasized that the ban was to be interpreted narrowly. For example, the report explained that the present bill was more tightly focused than earlier drafts which gave ATF authority to ban any weapon which "embodies the same configuration" as the named list of guns in section 921(a)(30)(A); instead, the present bill "contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons [beyond the listed weapons]." H. Rep. 103-489 at 21.

[37] 18 U.S.C. section 921(a)(30).

exempted from the assault weapon ban any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition and any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.[38]

Although the 1994 law was not directly addressing the sporting purposes test in section 925(d)(3), section 925(d)(3) had a strong influence on the law's content. The technical work of ATF's 1989 report was, to a large extent, incorporated into the 1994 law. The House Report to the 1994 law explained that although the legal question of whether semiautomatic assault weapons met section 925(d)(3)'s sporting purposes test "is not directly posed by [the 1994 law], the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features."[39] As in the 1989 study, Congress focused on the external features of firearms, rather than on their semiautomatic operating mechanism.

The 1994 law also made it unlawful to possess and transfer large capacity ammunition feeding devices manufactured after September 13, 1994.[40] A large capacity ammunition feeding device was generally defined as a magazine, belt, drum, feed strip, or similar device that has the capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.[41]

Congress passed these provisions of the 1994 law in response to the use of semiautomatic assault weapons and large capacity ammunition feeding devices in crime. Congress had been presented with much evidence demonstrating that these weapons were "the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."[42] The House Report to the 1994 law recounts numerous crimes that had occurred involving semiautomatic assault weapons and large capacity magazines that were originally designed and produced for military assault rifles.[43]

---

[38]  18 U.S.C. sections 922(v)(3)(C)&(D).

[39]  H. Rep. No. 103-489, at 17, n. 19.

[40]  18 U.S.C. section 922(w).

[41]  18 U.S.C. section 921(a)(31).

[42]  H. Rep. No. 103-489, at 13.

[43]  H. Rep. No. 103-489, at 14-15.

In enacting the semiautomatic assault weapon and large capacity ammunition feeding device bans, Congress emphasized that it was not preventing the possession of sporting firearms. The House Report, for example, stated that the bill differed from earlier bills in that "it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns."[44] In addition, Congress specifically exempted 661 long guns from the assault weapon ban which are "most commonly used in hunting and recreational sports."[45]

Both the 1994 law and its legislative history demonstrate that Congress recognized that ammunition capacity is a factor in determining whether a firearm is a sporting firearm. For example, large capacity ammunition feeding devices were banned, while rifles and shotguns with small ammunition capacities were exempted from the assault weapon ban. Moreover, the House Report specifically states that the ability to accept a large capacity magazine was a military configuration feature which was not "merely cosmetic," but "serve[d] specific, combat-functional ends."[46] The House Report also explains that, while "[m]ost of the weapons covered by the [ban] come equipped with magazines that hold 30 rounds [and can be replaced with magazines that hold 50 or even 100 rounds], . . . [i]n contrast, hunting rifles and shotguns typically have much smaller magazine capabilities-- from 3-5."[47]

Finally, it must be emphasized that the semiautomatic assault weapon ban of section 922(v) is distinct from the sporting purposes test governing imports of section 925(d)(3). Clearly, any weapon banned under section 922(v) cannot be imported into the United States because its possession in the United States would be illegal. However, it is possible that a weapon not defined as a semiautomatic assault weapon under section 922(v) still would not be importable under section 925(d)(3). In order to be importable, the firearm must be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes regardless of its categorization under section 922(v). The

Secretary's discretion under section 925(d)(3) remains intact for all weapons not banned by the 1994 statute.

The Present Review

Prior to the November 14, 1997, decision to conduct this review, certain members of

---

[44] H. Rep. No. 103-489, at 21.

[45] H. Rep. No. 103-489, at 20. None of these 661 guns are study rifles.

[46] H. Rep. No. 103-489, at 18.

[47] H. Rep. No. 103-489, at 19 (footnote omitted).

Congress strongly urged that it was necessary to review the manner in which the Treasury Department is applying the sporting purposes test to the study rifles, in order to ensure that the present practice is consistent with section 925(d)(3) and current patterns of gun use.  The fact that it had been nearly 10 years since the last comprehensive review of the importation of rifles (with many new rifles being developed during this time) also contributed to the decision to conduct this review.

## DEFINING THE TYPE OF WEAPON UNDER REVIEW

Section 925 (d) (3) provides that the Secretary shall authorize the importation of a firearm if it is of a "type" that meets the sporting purposes test. Given this statutory mandate, we had to determine whether the study rifles suspended from importation fell within one type of firearm. Our review of the study rifles demonstrated that all were derived from semiautomatic assault rifles that failed to meet the sporting purposes test in 1989 but were later found to be importable when certain military features were removed.

Within this group, we determined that virtually all of the study rifles shared another important feature: The ability to accept a detachable large capacity magazine (e.g., more than 10 rounds) that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 or 93, SIG SG550, or Uzi. (This is the only military configuration feature cited in the 1989 study that remains with any of the study rifles).

We determined that all of the study rifles that shared both of these characteristics fell within a type of firearm which, for the purposes of this report, we call "large capacity military magazine rifles" or "LCMM rifles." It appears that only one study rifle, the VEPR caliber .308--which is based on the AK47 design--does not fall within this type because it does not have the ability to accept a large capacity military magazine.

## SCOPE OF "SPORTING PURPOSES"

As in the 1989 study, we had to determine the scope of "sporting purposes" as used in section 925(d)(3). Looking to the statute, its legislative history, the work of the Firearms Evaluation Panel (see exhibit 6), and prior ATF interpretations, we determined sporting purposes should be given a narrow reading, incorporating only the traditional sports of hunting and organized competitive target shooting (rather than a broader interpretation that could include virtually any lawful activity or competition.)

In terms of the statute itself, the structure of the importation provisions suggests a somewhat narrow interpretation. Firearms are prohibited from importation (section 922(l)), with four specific exceptions (section 925(d)). A broad interpretation permitting a firearm to be imported because someone may wish to use it in some lawful shooting activity would render the general prohibition of section 922(l) meaningless.

Similarly, as discussed in the "Background" section, the legislative history of the GCA indicates that the term sporting purposes narrowly refers to the traditional sports of hunting and organized competitive target shooting. There is nothing in the history to indicate that it was intended to recognize every conceivable type of activity or competition that might employ a firearm.

In addition, the FEP specifically addressed the informal shooting activity of "plinking" (shooting at randomly selected targets such as bottles and cans) and determined that it was not a legitimate sporting purpose under the statute. The panel found that, "while many persons participate in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . . ." (See exhibit 6.)

Finally, the 1989 report determined that the term sporting purposes should be given a narrow reading incorporating the traditional rifle sports of hunting and organized competitive target shooting. In addition, the report determined that the statute's reference to sporting purposes was intended to stand in contrast with military and law enforcement applications. This is consistent with ATF's interpretation in the context of the Striker-12 shotgun and the USAS-12 shotgun. It is also supported by the court's decision in <u>Gilbert Equipment Co. v. Higgins</u>.

We received some comments urging us to find "practical shooting" is a sport for the purposes of section 925(d)(3).[48] Further, we received information showing that practical shooting is gaining in popularity in the United States and is governed by an organization that has sponsored national events since 1989. It also has an international organization.

While some may consider practical shooting a sport, by its very nature it is closer to police/combat-style competition and is not comparable to the more traditional types of sports, such as hunting and organized competitive target shooting. Therefore, we are not convinced that practical shooting does, in fact, constitute a sporting purpose under section 925(d)(3).[49] However, even if we were to assume for the sake of argument that practical shooting is a sport for the purposes of the statute, we still would have to decide whether a firearm that could be used in practical shooting meets the sporting purposes test. In other words, it still would need to be determined whether the firearm is of a type that is generally recognized as particularly suitable for or readily adaptable to practical shooting and other sporting purposes.[50] Moreover, the legislative history makes clear that the use of a military weapon in a practical shooting competition would not make that weapon

---

[48]  Practical shooting involves moving, identifying, and engaging multiple targets and delivering a num ber of shots rapidly. In doing this, practical shooting participants test their defensive skills as they encounter props, including walls and barricades, with full or partial targets, "no-shoots," steel reaction targets, movers, and others to challenge them.

[49]  As noted earlier, ATF has taken the position that police/combat-style competitions do not constitute a "sporting purpose." This position was upheld in <u>Gilbert Equipment Co.</u>, 709 F. Supp. at 1077.

[50]  Our findings on the use and suitability of the LCMM rifles in practical shooting competitions are contained in the "Suitability for Sporting Purposes" section of this report.

sporting: "if a military weapon is used in a special sporting event, it does not become a sporting weapon.  It is a military weapon used in a special sporting event."[51]  While none of the LCMM rifles are military weapons, they still retain the military feature of the ability to accept a large capacity military magazine.

---

[51]    114 Cong. Rec. 27461-462 (1968) (Sen. Dodd).

METHOD OF STUDY

As explained in the "Executive Summary" section of this report, the purpose of this study is to review whether modified semiautomatic assault rifles are properly importable under 18 U.S.C. section 925(d)(3). More specifically, we reexamined the conclusions of the 1989 report as applied today to determine whether we are correct to allow importation of the study rifles that have been modified by having certain military features removed. To determine whether such rifles are generally recognized as particularly suitable for or readily adaptable to sporting purposes, the Secretary must consider both the physical features of the rifles and the actual uses of the rifles.[52] Because it appears that all of the study rifles that have been imported to date have the ability to accept a large capacity military magazine,[53] all of the information collected on the study rifles' physical features and actual uses applies only to the LCMM rifles.

**Physical features**:

The discussion of the LCMM rifles' physical features are contained in the "Suitability for Sporting Purposes" section of this report.

**Use**:

We collected relevant information on the use of the LCMM rifles. Although the 1989 study did not consider the criminal use of firearms in its importability analysis, legislative history demonstrates and the courts have found that criminal use is a factor that can be considered in determining whether a firearm meets the requirements of section 925(d)(3).[54] Accordingly, we decided to consider the criminal use of the LCMM rifles in the present analysis.

The term "generally recognized" in section 925(d)(3) indicates that the Secretary should base his evaluation of whether a firearm is of a type that is particularly suitable for or readily adaptable to sporting purposes, in part, on a "community standard" of the firearm's use.[55] The community standard "may change over time even though the firearm remains the same. Thus, a changing pattern of use may significantly affect whether a firearm is generally recognized as particularly suitable for or readily adaptable to a sporting purpose."[56] Therefore, to assist the Secretary in determining whether the LCMM rifles presently are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes, we gathered information from the relevant "community." The relevant community was defined as persons and groups who are

---

[52] Gun South, Inc., 877 F.2d at 866.

[53] The VEPR caliber .308 discussed on page 16 has not yet been imported.

[54] 114 Cong. Rec. S 5556, 5582, 5585 (1968)("[t]he entire intent of the importation section [of the sporting purposes test] is to get those kinds of weapons that are used by criminals and have no sporting purposes") (Sen. Dodd); Gun South, Inc., 877 F.2d at 866.

[55] Gun South, Inc., 877 F.2d at 866.

[56] Id.

knowledgeable about the uses of these firearms or have relevant information about whether these firearms are particularly suitable for sporting purposes. We identified more than 2,000 persons or groups we believed would be able to provide relevant, factual information on these issues. The individuals and groups were selected to obtain a broad range of perspectives on the issues. We conducted surveys to obtain specific information from hunting guides, editors of hunting and shooting magazines, organized competitive shooting groups, State game commissions, and law enforcement agencies and organizations. Additionally, we asked industry members, trade associations, and various interest and information groups to provide relevant information.[57] A detailed presentation of the surveys and responses is included as an appendix to this report.

We also reviewed numerous advertisements and publications, both those submitted by the editors of hunting and shooting magazines and those collected internally, in our search for material discussing the uses of the LCMM rifles. Further, we collected importation data, tracing data, and case studies.[58]

Our findings on use are contained in the "Suitability for Sporting Purposes" section of this report.

---

[57]    **Hunting guides**: Guides were asked about specific types of firearms used by their clients. The guides were an easily definable group, versus the entire universe of hunters. We obtained the names of the hunting guides surveyed from the States.

   **Editors of hunting and shooting magazines**: Editors were surveyed to determine whether they recommended the LCMM rifles for hunting or organized competitive target shooting and whether they had written any articles on the subject. The list of editors we surveyed was obtained from a directory of firearms-related organizations.

   **Organized competitive shooting groups**: Organized groups were asked whether they sponsored competitive events with high-power semiautomatic rifles and whether the LCMM rifles were allowed in those competitions. We felt it was significant to query those who are involved with organized events rather than unofficial activities with no specific rules or guidelines. As with the editors above, the list of groups was obtained from a directory of firearms-related organizations.

   **State game commissions**: State officials were surveyed to determine whether the use of the LCMM rifles was prohibited or restricted for hunting in each State.

   **Law enforcement agencies and organizations**: Specific national organizations and a sampling of 26 police departments across the country were contacted about their knowledge of the LCMM rifles' use in crime. The national organizations were surveyed with the intent that they would gather input from the wide range of law enforcement agencies that they represent or that they would have access to national studies on the subject.

   **Industry members and trade associations**: These groups were included because of their knowledge on the issue.

   **Interest and information groups**: These organizations were included because of their wide range of perspectives on the issue.

[58]    To assist us with our review of the crime-related information we collected, we obtained the services of Garen J. Wintemute, MD, M.P.H. Director of the Violence Prevention Research Program, University of California, Davis, and Anthony A. Braga, Ph.D., J.F.K. School of Government, Harvard University.

## SUITABILITY FOR SPORTING PURPOSES

The next step in our review was to evaluate whether the LCMM rifles, as a type, are generally recognized as particularly suitable for or readily adaptable to hunting and organized competitive target shooting.[59] The standard applied in making this determination is high. It requires more than a showing that the LCMM rifles may be used or even are sometimes used for hunting and organized competitive target shooting; if this were the standard, the statute would be meaningless. Rather, the standard requires a showing that the LCMM rifles are especially suitable for use in hunting and organized competitive target shooting.

As discussed in the "Method of Study" section, we considered both the physical features of the LCMM rifles and the actual uses of the LCMM rifles in making this determination.

Physical Features

**The ability to accept a detachable large capacity magazine that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 or 93, SIG SG550, or Uzi.**

Although the LCMM rifles have been stripped of many of their military features, they all still have the ability to accept a detachable large capacity magazine that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 and 93, SIG SG550, or Uzi; in other words, they still have a feature that was designed for killing or disabling an enemy. As the 1989 report explains:

> Virtually all modern military firearms are designed to accept large, detachable magazines. This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional

---

[59] One commenter suggests that the Secretary has been improperly applying the "readily adaptable to sporting purposes" provision of the statute. Historically, the Secretary has considered the "particularly suitable for or readily adaptable to" provisions as one standard. The broader interpretation urged by the commenter would make the standard virtually unenforceable. If the Secretary allowed the importation of a firearm which is readily adaptable to sporting purposes, without requiring it actually to be adapted prior to importation, the Secretary would have no control over whether the adaptation actually would occur following the importation.

semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.[60]

Thus, the 1989 report found the ability to accept a detachable large capacity magazine originally designed and produced for a military assault rifle was a military, not a sporting, feature. Nevertheless, in 1989 it was decided that the ability to accept such a large capacity magazine, in the absence of other military configuration features, would not be viewed as disqualifying for the purposes of the sporting purposes test. However, several important developments, which are discussed below, have led us to reevaluate the weight that should be given to the ability to accept a detachable large capacity military magazine in the sporting purposes test.

Most significantly, we must reevaluate the significance of this military feature because of a major amendment that was made to the GCA since the 1989 report was issued. In 1994, as discussed in the "Background" section of this report, Congress passed a ban on large capacity ammunition feeding devices and semiautomatic assault weapons.[61] In enacting these bans, Congress made it clear that it was not preventing the possession of sporting firearms.[62] Although the 1994 law was not directly addressing the sporting purposes test, section 925(d)(3) had a strong influence on the law's content. As discussed previously, the technical work of ATF's 1989 report was, to a large extent, incorporated into the 1994 law.

Both the 1994 law and its legislative history demonstrate that Congress found that ammunition capacity is a factor in whether a firearm is a sporting firearm. For example, large capacity ammunition feeding devices were banned, while rifles and shotguns with small ammunition capacities were exempted from the assault weapon ban. In other words, Congress found magazine capacity to be such an important factor that a semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition will not be banned, even if it contains all five of the assault

---

[60]  1989 report at 6 (footnote omitted). This was not the first time that ATF considered magazine capacity to be a relevant factor in deciding whether a firearm met the sporting purposes test. See Gilbert Equipment Co., 709 F. Supp. at 1089 ("the overall appearance and design of the weapon (especially the detachable box magazine . . .) is that of a combat weapon and not a sporting weapon."

[61]  The ban on large capacity ammunition feeding devices does not include any such device manufactured on or before September 13, 1994. Accordingly, there are vast numbers of large capacity magazines originally designed and produced for military assault weapons that are legal to transfer and possess ("grandfathered" large capacity military magazines). Presently these grandfathered large capacity military magazines fit the LCMM rifles.

[62]  See, for example, H. Rep. No. 103-489, at 21.

weapon features listed in the law. Moreover, unlike the assault weapon ban in which a detachable magazine and at least two physical features are required to ban a rifle, a large capacity magazine in and of itself is banned.

In addition, the House Report specifically states that the ability to accept a large capacity magazine is a military configuration characteristic that is not "merely cosmetic," but "serve[s] specific, combat-functional ends."[63]   The House Report also explains that large capacity magazines

> make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent.  Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds.  Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds.  Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. . . .  In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities--from 3-5.[64]

Congress specifically exempted 661 long guns from the assault weapon ban that are "most commonly used in hunting and recreational sports."[65]   The vast majority of these long guns do not use large capacity magazines.  Although a small number of the exempted long guns have the ability to accept large capacity magazines, only four of these exempted long guns were designed to accept large capacity military magazines.[66]

The 1994 law also demonstrates Congress' concern about the role large capacity magazines and firearms with the ability to accept these large capacity magazines play in

---

[63]   H. Rep. No. 103-489, at 18.

[64]   H. Rep. No. 103-489, at 19 (footnote omitted).  The fact that 12 States place a limit on the magazine capacity allowed for hunting, usually 5 or 6 rounds, is consistent with this analysis.  (See exhibit 7).

[65]   H. Rep. 103-489, at 20.

[66]   These four firearms are the Iver Johnson M-1 carbine, the Iver Johnson 50th Anniversary M-1 carbine, the Ruger Mini-14 autoloading rifle (without folding stock), and the Ruger Mini Thirty rifle.  All of these weapons are manufactured in the United States and are not the subject of this study.  In this regard, it should also be noted that Congress can distinguish between domestic firearms and foreign firearms and impose different requirements on the importation of firearms.  For example, Congress may ban the importation of certain firearms although similar firearms may be produced domestically.  See, for example, B-West Imports v. United States, 75 F.3d 633 (Fed. Cir. 1996).

crime. The House Report for the bill makes reference to numerous crimes involving these magazines and weapons, including the following:[67]

> The 1989 Stockton, California, schoolyard shooting in which a gunman with a semiautomatic copy of an AK47 and 75-round magazines fired 106 rounds in less than 2 minutes. Five children were killed and twenty-nine adults and children were injured.

> The 1993 shooting in a San Francisco, California, office building in which a gunman using 2 TEC DC9 assault pistols with 50-round magazines killed 8 people and wounded 6 others.

> A 1993 shooting on the Long Island Railroad that killed 6 people and wounded 19 others. The gunman had a Ruger semiautomatic pistol, which he reloaded several times with 15-round magazines, firing between 30 to 50 rounds before he was overpowered.

The House Report also includes testimony from a representative of a national police officers' organization, which reflects the congressional concern with criminals' access to firearms that can quickly expel large amounts of ammunition:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before [re]loading. Now it is not at all unusual for a cop to look down the barrel of a TEC-9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and preservation. The six-shot .38 caliber service revolver, standard law enforcement issue for years, is just no match against a criminal armed with a semiautomatic assault weapon.[68]

Accordingly, by passing the 1994 law, Congress signaled that firearms with the ability to accept detachable large capacity magazines are not particularly suitable for sporting purposes. Although in 1989 we found the ability to accept a detachable large capacity military magazine was a military configuration feature, we must give it more weight, given this clear signal from Congress.

The passage of the 1994 ban on large capacity magazines has had another effect. Under the 1994 ban, it generally is unlawful to transfer or possess a large capacity magazine

---

[67]   H. Rep. No. 103-489, at 15 (two of these examples involve handguns).

[68]   H. Rep. 103-489, at 13-14 (footnote omitted).

manufactured after September 13, 1994. Therefore, if we require the LCMM rifles to be modified so that they do not accept a large capacity military magazine in order to be importable, a person will not be able to acquire a newly manufactured large capacity magazine to fit the modified rifle. Thus, the modified rifle neither will be able to accept a grandfathered large capacity military magazine, nor can a new large capacity magazine be manufactured to fit it. Accordingly, today, making the ability to accept a large capacity military magazine disqualifying for importation will prevent the importation of firearms which have the ability to expel large amounts of ammunition quickly without reloading.

This was not the case in 1989 or prior to the 1994 ban.

It is important to note that even though Congress reduced the supply of large capacity military magazines by passing the 1994 ban, there are still vast numbers of grandfathered large capacity military magazines available that can be legally possessed and transferred. These magazines currently fit in the LCMM rifles. Therefore, the 1994 law did not eliminate the need to take further measures to prevent firearms imported into the United States from having the ability to accept large capacity military magazines, a nonsporting factor.

Another impetus for reevaluating the existing standard is the development of modified weapons. The 1989 report caused 43 different models of semiautomatic assault rifles to be banned from being imported into the United States. The effect of that determination was that nearly all semiautomatic rifles with the ability to accept detachable large capacity military magazines were denied importation. Accordingly, at the time, there was no need for the ability to accept such a magazine to be a determining factor in the sporting purposes test. This is no longer the case. As discussed earlier, manufacturers have modified the semiautomatic assault rifles disallowed from importation in 1989 by removing all of their military configuration features, except for the ability to accept a detachable magazine. As a result, semiautomatic rifles with the ability to accept detachable large capacity military magazines (and therefore quickly expel large amounts of ammunition) legally have been entering the United States in significant numbers. Accordingly, the development of these modified weapons necessitates reevaluating our existing standards.

Thus, in order to address Congress' concern with firearms that have the ability to expel large amounts of ammunition quickly, particularly in light of the resumption of these weapons coming into the United States, the ability to accept a detachable large capacity military magazine must be given greater weight in the sporting purposes analysis of the LCMM rifles than it presently receives.[69]

---

[69]   A firearm that can be easily modified to accept a detachable large capacity military magazine with only minor adjustments to the firearm or the magazine is considered to be a firearm with the ability to accept these magazines. The ROMAK4 is an example of such a firearm: With minor modifications to either the

**Derived from semiautomatic assault rifles that failed to meet the sporting purposes test in 1989 but were later found importable when certain military features were removed.**

All rifles that failed to meet the sporting purposes test in 1989 were found to represent a distinctive type of rifle distinguished by certain general characteristics that are common to the modern military assault rifle. Although the LCMM rifles are based on rifle designs excluded from importation under the 1989 standard, they all were approved for import when certain military features were removed. However, the LCMM rifles all still maintain some characteristics common to the modern military assault rifle. Because the outward appearance of most of the LCMM rifles continues to resemble the military assault rifles from which they are derived, we have examined the issue of outward appearance carefully. Some might prefer the rugged, utilitarian look of these rifles to more traditional sporting guns. Others might recoil from using these rifles for sport because of their nontraditional appearance. In the end, we concluded that appearance alone does not affect the LCMM rifles' suitability for sporting purposes. Available information leads us to believe that the determining factor for their use in crime is the ability to accept a detachable large capacity military magazine.

<u>Use</u>

In the 1989 study, ATF found that all rifles fairly typed as semiautomatic assault rifles should be treated the same. Accordingly, the report stated "[t]he fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability. Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type."[70] We adopt the same approach for the present study.

**Use for hunting:**

The information we collected on the actual use of the LCMM rifles for hunting medium or larger game suggests that, with certain exceptions, the LCMM rifles sometimes are used for hunting; however, their actual use in hunting is limited.[71] In fact, there are some

---

firearm or a large capacity magazine that was originally designed and produced for a semiautomatic assault rifle based on the AK47 design, the ROMAK4 has the ability to accept the magazine.

[70]    1989 report at 11.

[71]    We targeted the surveys toward the hunting of medium and larger game (e.g., turkey and deer) because the LCMM rifles chamber centerfire cartridges and therefore likely would be most suitable for hunting this type of game. We also learned that the LCMM rifles were used to shoot certain varmints (e.g., coyotes and groundhogs), which are generally considered to be pests, not game. Many commented that the LCMM

general restrictions and prohibitions on the use of any semiautomatic rifle for hunting game. Almost half of the States place restrictions on the use of semiautomatic rifles in hunting, mostly involving magazine capacity (5-6 rounds) and what can be hunted with the rifles (see exhibit 7).

Of the 198 hunting guides who responded to our survey, only 26 stated that they had clients who used the LCMM rifles on hunting trips during the past 2 hunting seasons and only 10 indicated that they recommend the LCMM rifles for hunting. In contrast, the vast majority of the guides (152) indicated that none of their clients used the LCMM rifles on hunting trips during the past 2 hunting seasons. In addition, the hunting guides indicated that the most common semiautomatic rifles used by their clients were those made by Browning and Remington.[72] We found significant the comments of the hunting guides indicating that the LCMM rifles were not widely used for hunting.

Of the 13 editors of hunting and shooting magazines who responded to our survey, only 2 stated that their publications recommend specific types of centerfire semiautomatic rifles for use in hunting medium or larger game. These two respondents stated that they recommend all rifles that are safe and of appropriate caliber for hunting, including the LCMM rifles. However, they did not recommend the LCMM rifles based on the Uzi design for hunting big game; these rifles use a 9mm cartridge, which is not an appropriate caliber for this type of game, according to the editors. It is important to note that the LCMM rifles use different cartridges. The LCMM rifles based on the FN-FAL, SIG SG550, and HK91 and 93 designs are chambered for either the .308 Winchester cartridge or the .223 Remington cartridge, depending on the specific model; the LCMM rifles based on the Uzi design are chambered for the 9mm Parabellum cartridge; and the majority of the LCMM rifles based on the AK47 design are chambered for the 7.62 x 39mm cartridge (some are chambered for the .223 Remington cartridge).

Of the five interest and information groups that responded to our survey, three supported the use of the LCMM rifles for hunting. However, one of these groups stated that the

---

rifles were particularly useful on farms and ranches because of their ruggedness, utilitarian design, and reliability.

[72] According to a 1996 study conducted for the Fish and Wildlife Service, only 2 percent of big game hunters surveyed used licensed hunting guides. Therefore, it should be noted that the information provided by the guides we surveyed may not be representative of all hunters. However, we believe that the hunting guides' information is reliable and instructive because of their high degree of experience with and knowledge of hunting.

ammunition used by the LCMM rifle models based on the Uzi design were inadequate for shooting at long distances (i.e., more than 100 yards).

Out of the 70 published articles reviewed from various shooting magazines, only 5 contained relevant information. One of these five articles stated that, in the appropriate calibers, the LCMM rifles could make "excellent" hunting rifles. Two of the articles stated that the 7.62 x 39mm cartridge (used in LCMM rifles based on the AK47 design) could be an effective hunting cartridge. One of the articles that recommended the rifles also recommended modifications needed to improve their performance in hunting. None of the articles suggested that LCMM rifles based on the Uzi design were good hunting rifles. Thus, although the LCMM rifles could be used in hunting, the articles provided limited recommendations for their use as hunting weapons.

In their usage guides, ammunition manufacturers recommend the .308 and the 7.62 x 39mm cartridges (used in LCMM rifles based on the FN-FAL and HK 91 designs, and the AK47 design respectively) for medium game hunting. However, the usage guides do not identify the 9mm cartridge (used in the Uzi design rifles) as being suitable for hunting.

A majority of the importers who provided information said that the LCMM rifles they import are used for hunting deer and similar animals. However, they provided little evidence that the rifles were especially suitable for hunting these animals. Two of the importers who responded also provided input from citizens in the form of letters supporting this position. The letters show a wide variety of uses for the LCMM rifles, including deer hunting, plinking, target shooting, home defense, and competitive shooting.

Our review of all of this information indicates that while these rifles are used for hunting medium and larger game, as well as for shooting varmints, the evidence was not persuasive that there was widespread use for hunting. We did not find any evidence that the ability to accept a large capacity military magazine serves any hunting purpose. Traditional hunting rifles have much smaller magazine capabilities. Furthermore, the mere fact that the LCMM rifles are used for hunting does not mean that they are particularly suitable for hunting or meet the test for importation.

**Use for organized competitive target shooting**:

Of the 31 competitive shooting groups we surveyed that stated they have events using high-power semiautomatic rifles, 18 groups stated that they permit the use of the LCMM rifles for all competitions. However, 13 respondents stated that they restrict or prohibit the LCMM rifles for some competitions, and one group stated that it prohibits the LCMM

rifles for all competitions.  These restrictions and prohibitions generally were enacted for the following reasons:

1.   High-power rifle competitions generally require accuracy at ranges beyond the capabilities of the 9mm cartridge, which is used by the LCMM rifles based on the Uzi design.

2.   The models based on the AK47 design are limited to competitions of 200 yards or less because the 7.62 x 39mm cartridge, which is used by these models, generally has an effective range only between 300 and 500 yards.

3.   Certain matches require U.S. military service rifles, and none of the LCMM rifles fall into this category.

The LCMM rifles are permitted in all United States Practical Shooting Association (USPSA) rifle competitions.  The USPSA Practical Shooting Handbook, Glossary of Terms, states that "[y]ou can use any safe firearm meeting the minimum caliber (9mm/.38) and power factor (125PF) requirements."  The USPSA has stated that "rifles with designs based on the AR15, AK47, FN-FAL, HK91, HK93, and others are allowed and must be used to be competitive."  Moreover, we received some information indicating that the LCMM rifles actually are used in practical shooting competitions.[73]  However, we did not receive any information demonstrating that an LCMM rifle's ability to accept large capacity military magazines was necessary for its use in practical shooting competitions.

A couple of the interest groups recommended the LCMM rifles for organized competitive target shooting.

None of the 70 published articles read mentioned the use of the LCMM rifles in organized competitive target shooting.

All of the major ammunition manufacturers produce .308 Winchester ammunition  (which is used in the LCMM rifle models based on the HK 91 and FN-FAL designs) and .223 Remington ammunition (which is used in the HK 93, the SIG SG550, and some of the study rifle models based on the AK47 design) specifically for competitive shooting for rifles.  The major manufacturers and advertisers of 9mm ammunition (which is used in the LCMM rifles based on the Uzi design) identify it as being suitable for pistol target shooting and self-defense.

---

[73]   Merely because a rifle is used in a sporting competition, the rifle does not become a sporting rifle.  114 Cong. Rec. 27461-462 (1968).

A majority of the importers who provided information stated that the LCMM rifles they import are permitted in and suitable for organized competitive target shooting. Two of the importers who responded also provided input from citizens in the form of letters and petitions supporting this position. However, the importers provided little evidence that the rifles were especially suitable for organized competitive target shooting.

The information collected on the actual use of the LCMM rifles for organized competitive target shooting suggests that, with certain exceptions, the LCMM rifles usually may be used and sometimes are used for organized competitive target shooting; however, their suitability for this activity is limited. In fact, there are some restrictions and prohibitions on their use. The use of the rifles in competitive target shooting appears more widespread than for hunting and their use for practical shooting was the most significant. Although we are not convinced that practical shooting does in fact constitute a sporting purpose under section 925(d), we note that there was no information demonstrating that rifles with the ability to accept detachable large capacity military magazines were necessary for use in practical shooting. Once again, the presence of this military feature on LCMM rifles suggests that they are not generally recognized as particularly suitable for or readily adaptable to sporting purposes.

**Use in crime:**

To fully understand how the LCMM rifles are used, we also examined information available to us on their use in crime. Some disturbing trends can be identified, and it is clear the LCMM rifles are attractive to criminals.

The use of LCMM rifles in violent crime and firearms trafficking is reflected in the cases cited below. It should be noted that the vast majority of LCMM rifles imported during the period 1991-1997 were AK47 variants, which explains their prevalence in the cited cases.

North Philadelphia, Pennsylvania

From April 1995 to November 1996, a convicted felon used a straw purchaser to acquire at least 55 rifles, including a number of MAK90s. The rifles were then trafficked by the prohibited subject to individuals in areas known for their high crime rates. In one case, the rifles were sold from the parking lot of a local elementary school.

Oakland, California

On July 8, 1995, a 32-year-old Oakland police officer assisted a fellow officer with a vehicle stop in a residential area. As the first officer searched the rear compartment of the stopped vehicle, a subject from a nearby residence used a Norinco model NMH 90 to shoot the 32-year old officer in the back. The officer later died from the wound.

El Paso, Texas

On April 15, 1996, after receiving information from the National Tracing Center, ATF initiated an undercover investigation of a suspected firearms trafficker who had purchased 326 MAK90 semiautomatic rifles during a 6-month period. The individual was found to be responsible for illegally diverting more than 1,000 firearms over the past several years. One of the MAK90 rifles that the subject had purchased was recovered from the scene of a 1996 shootout in Guadalajara, Mexico, between suspected drug traffickers and Mexican authorities. Another MAK90 was recovered in 1997 from the residence of a former Mexican drug kingpin following his arrest for drug-related activities.

Charlotte, North Carolina

On May 24, 1996, four armed subjects—one with a MAK90 rifle—carried out a home invasion robbery during which they killed the resident with a 9mm pistol. All four suspects were arrested.

Dallas, Texas

In September 1997, an investigation was initiated on individuals distributing crack cocaine from a federally subsidized housing community. During repeated undercover purchases of the narcotics, law enforcement officials noticed that the suspects had firearms in their possession. A search warrant resulted in the seizure of crack cocaine, a shotgun, and a North China Industries model 320 rifle.

Chesterfield, Virginia

In November 1997, a MAK90 rifle was used to kill two individuals and wound three others at a party in Chesterfield, Virginia.

Orange, California

In December 1997, a man armed with an AKS 762 rifle and two other guns drove to where he was previously employed and opened fire on former coworkers, killing four and injuring three, including a police officer.

Baltimore, Maryland

In December 1997, a search warrant was served on a homicide suspect who was armed at the time with three pistols and a MAK90 rifle.

We also studied import and trace information to learn whether the LCMM rifles are used in crime.

Between 1991 and 1997, there were 425,114 LCMM rifles imported into the United States. This represents 7.6 percent of the approximately 5 million rifles imported during this period. The breakdown of the specific variants of LCMM rifles imported follows:

AK-47 variants:     377,934
FN-FAL variants:   37,534
HK variants:           6,495
Uzi variants:          3,141
SIG SG550 variants:     10

During this same time period, ATF traced 632,802 firearms.[74] This included 81,842 rifles of which approximately 3,176 were LCMM rifles.[75] While this number is relatively low compared to the number of total traces, it must be viewed in light of the small number of LCMM rifles imported during this time period and the total number of rifles, both imported domestic, that were available in the United States. A more significant trend is reflected in figure 1.

---

[74] ATF traces crime guns recovered and submitted by law enforcement officials. A crime gun is defined, for purposes of firearms tracing, as any firearm that is illegally possessed, used in a crime, or suspected by law enforcement of being used in a crime. Trace information is used to establish links between criminals and firearms, to investigate illegal firearm trafficking, and to identify patterns of crime gun traces by jurisdiction. A substantial number of firearms used in crime are not recovered by law enforcement agencies and therefore not traced. In addition, not all recovered crime guns are traced. Therefore, trace requests substantially underestimate the number of firearms involved in crimes, and trace numbers contain unknown statistical biases. These problems are being reduced as more law enforcement agencies institute policies of comprehensive crime gun tracing.

[75] The vast majority of LCMM rifles traced during this time period were AK47 variants. Specifically, AK47 variants comprised 95.6 percent of the LCMM rifles traced. This must be viewed within the context that 88 percent of the LCMM rifles imported during this period were AK47 variants.

Firearms Traces 1991-1997

| Year | Total Firearms Traced | Total Rifles Traced | Total Assault[76] Rifles Traced | Total LCMM Rifles Traced |
|---|---|---|---|---|
| 1991 | 42,442 | 6,196 | 656 | 7 |
| 1992 | 45,134 | 6,659 | 663 | 39 |
| 1993 | 54,945 | 7,690 | 852 | 182 |
| 1994 | 83,137 | 9,201 | 735 | 596 |
| 1995 | 76,847 | 9,988 | 717 | 528 |
| 1996 | 136,062 | 17,475 | 1,075 | 800 |
| 1997 | 194,235 | 24,633 | 1,518 | 1,024 |
| Cumulative Total | 632,802 | 81,842 | 6,216 | 3,176 |

Figure 1

The figures in this table show that between 1991 and 1994, trace requests involving LCMM rifles increased rapidly, from 7 to 596. During the same period, trace requests for assault rifles increased at a slower rate, from 656 to 735. The years 1991 to 1994 are significant because they cover a period between when the ban on the importation of semiautomatic assault rifles was imposed and before the September 13, 1994, ban on semiautomatic assault weapons was enacted. Thus, during the years leading up to the 1994 ban, traces of LCMM rifles were increasing much more rapidly than the traces of the rifles that had been the focus of the 1989 ban, as well as the rifles that were the focus of the 1994 congressional action.

We also compared patterns of importation with trace requests to assess the association of LCMM rifles with criminal involvement. The comparison shows that importation of LCMM rifles in the early 1990s was followed immediately by a rapid rise in the number of trace requests involving LCMM rifles. This is shown in figures 2 and 3.

---

[76] For purposes of this table, assault rifles include (1) semiautomatic assault rifles banned from importation in 1989 but still available domestically because they had been imported into the United States prior to the ban, (2) domestically produced rifles that would not have qualified for importation after 1989, and (3) semiautomatic assault rifles that were banned in 1994.



Figure 2



Figure 3

Two aspects of the relationship between importation and trace request patterns are significant. First, the rapid rise in traces following importation indicates that, at least in some cases, very little time elapsed between a particular LCMM rifle's importation and its recovery by law enforcement. This time lapse is known as "time to crime." A short time to crime can be an indicator of illegal trafficking. Therefore, trace patterns suggest what the case examples show: LCMM rifles have been associated with illegal trafficking. Second, while LCMM rifles have not been imported in large numbers since 1994,[77] the number of trace requests for LCMM rifles continues to rise. This reflects a sustained and

---

[77]     One reason is that there has been an embargo on the importation of firearms from China since May 1994.

continuing pattern of criminal association for LCMM rifles despite the fact that there were fewer new LCMM rifles available.[78]  Moreover, it is reasonable to conclude that if the importation of LCMM rifles resumes, the new rifles would contribute to the continuing rise in trace requests for them.[79]

All of the LCMM rifles have the ability to accept a detachable large capacity military magazine.  Thus, they all have the ability to expend large amounts of ammunition quickly.  In passing the 1994 ban on semiautomatic assault rifles and large capacity ammunition feeding devices, Congress found that weapons with this ability are attractive to criminals.[80]  Thus, we can infer that the LCMM rifles may be attractive to criminals because in some ways they remain akin to military assault rifles, particularly in their ability to accept a detachable large capacity military magazine.

---

[78]    The increase in trace requests also reflects the fact that law enforcement officials were making trace requests for all types of firearms much more frequently beginning in 1996.  There were 76,847 trace requests in 1995, 136,062 trace requests in 1996, and 194,235 trace requests in 1997.  Traces for assault rifles were increasing by approximately the same percentage as traces for LCMM rifles during these years.

[79]   In addition to looking at case studies and tracing and import information, we attempted to get information on the use of the LCMM rifles in crime by surveying national law enforcement agencies and organizations, as well as metropolitan police departments.  Twenty-three national law enforcement agencies and organizations were surveyed and five responded.  Three of the respondents stated they had no information.  The other two provided information that was either outdated or not specific enough to identify the LCMM rifles.

The 26 metropolitan police departments surveyed provided the following information:

17 departments had no information to provide.
5 departments stated that the LCMM rifles were viewed as crime guns.
1 department stated that the LCMM rifles were nonsporting.
2 departments stated that the LCMM rifles were used to hunt coyotes in their areas.
1 department stated that the LCMM rifles were used for silhouette target shooting.

[80]   H. Rep. No. 103-489, at 13, 18, 19.

## DETERMINATION

In 1989, ATF determined that the type of rifle defined as a semiautomatic assault rifle was not generally recognized as particularly suitable for or readily adaptable to sporting purposes. Accordingly, ATF found that semiautomatic assault rifles were not importable into the United States. This finding was based, in large part, on ATF's determination that semiautomatic assault rifles contain certain general characteristics that are common to the modern military assault rifle. These characteristics were designed for killing and disabling the enemy and distinguish the rifles from traditional sporting rifles. One of these characteristics is a military configuration, which incorporates eight physical features: Ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights. In 1989, ATF decided that any of these military configuration features, other than the ability to accept a detachable magazine, would make a semiautomatic assault rifle not importable.

Certain semiautomatic assault rifles that failed the 1989 sporting purposes test were modified to remove all of the military configuration features, except for the ability to accept a detachable magazine. Significantly, most of these modified rifles not only still have the ability to accept a detachable magazine but, more specifically, still have the ability to accept a large capacity military magazine. It appears that only one of the current study rifles, the VEPR caliber .308 (an AK47 variant), does not have the ability to accept a large capacity military magazine and, therefore, is not an LCMM rifle. Based on the standard developed in 1989, these modified rifles were found not to fall within the semiautomatic assault rifle type and were found to meet the sporting purposes test. Accordingly, these rifles were approved for import into the United States.

Members of Congress and others have expressed concerns that these modified semiautomatic assault rifles are essentially the same as the semiautomatic assault rifles determined to be not importable in 1989. In response to such concerns, the present study reviewed the current application of the sporting purposes test to the study rifles to determine whether the statute is being applied correctly and to ensure that the current use of the study rifles is consistent with the statute's criteria for importability.

Our review took another look at the entire matter. We reexamined the basic tenets of the 1989 study, conducted a new analysis of the physical features of the rifles, surveyed a wide variety of sources to acquire updated information relating to use and suitability, and assessed changes in law that might have bearing on the treatment of the study rifles.

This review has led us to conclude that the basic finding of the 1989 decision remains valid and that military-style semiautomatic rifles are not importable under the sporting purposes standard. Accordingly, we believe that the Department of the Treasury correctly has been denying the importation of rifles that had any of the distinctly military

configuration features identified in 1989, other than the ability to accept a detachable magazine. Our review, however, did result in a finding that the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.

Several important changes have occurred since 1989 that have led us to reevaluate the importance of this feature in the sporting purposes test. Most significantly, by passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem. The House Report to the 1994 law emphasizes that the ability to accept a large capacity magazine "serve[s] specific, combat-functional ends."[81] Moreover, this ability plays a role in increasing a firearm's "capability for lethality," creating "more wounds, more serious, in more victims."[82] Furthermore, the House Report noted semiautomatic assault weapons with this ability are the "weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."[83]

Moreover, we did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose. The House Report to the 1994 law notes that, while most of the weapons covered by the assault weapon ban come equipped with detachable large capacity magazines, hunting rifles and shotguns typically have much smaller magazine capabilities, from 3 to 5 rounds.[84] Similarly, we found that a number of States limit magazine capacity for hunting to 5 to 6 rounds. We simply found no information showing that the ability to accept a detachable large capacity military magazine has any purpose in hunting or organized competitive target shooting.

Accordingly, we find that the ability to accept a detachable large capacity military magazine is a critical factor in the sporting purposes test that must be given the same weight as the other military configuration features identified in 1989.

The information we collected on the use and suitability of the LCMM rifles for hunting and organized competitive target shooting demonstrated that the rifles are not especially suitable for sporting purposes. Although our study found that the LCMM rifles, as a type, may sometimes be used for hunting, we found no evidence that they are commonly used for hunting. In fact, some of the rifles are unsuitable for certain types of hunting.

---

[81]  H. Rep. No. 103-489, at 18.

[82]  H. Rep. No. 103-489, at 19.

[83]  H. Rep. No. 103-489, at 13.

[84]  H. Rep. No. 103-489, at 19 (footnote omitted).

The information we collected also demonstrated that although the LCMM rifles, as a type, may be used for organized competitive target shooting, their suitability for these competitions is limited. There are even some restrictions or prohibitions on their use for certain types of competitions. In addition, we believe that all rifles which are fairly typed as LCMM rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability. Rather, all findings as to suitability of LCMM rifles as a whole should govern each rifle within this type. The findings as a whole simply did not satisfy the standard set forth in section 925(d)(3).

Finally, the information we gathered demonstrates that the LCMM rifles are attractive to certain criminals. We find that the LCMM rifles' ability to accept a detachable large capacity military magazine likely plays a role in their appeal to these criminals. In enacting the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress recognized the appeal large magazine capacity has to the criminal element.

Weighing all this information, the LCMM rifles, as a type, are not generally recognized as particularly suitable for or readily adaptable to sporting purposes. As ATF found in conducting its 1989 study, although some of the issues we confronted were difficult to resolve, in the end we believe the ultimate conclusion is clear and compelling. The ability of all of the LCMM rifles to accept a detachable large capacity military magazine gives them the capability to expel large amounts of ammunition quickly; this serves a function in combat and crime, but serves no sporting purpose. Given the high standard set forth in section 925(d)(3) and the Secretary's discretion in applying the sporting purposes test, this conclusion was clear.

This decision will in no way preclude the importation of true sporting firearms. It will prevent only the importation of firearms that cannot fairly be characterized as sporting rifles.

Individual importers with existing permits for, and applications to import involving, the LCMM rifles will be notified of this determination in writing. Each of these importers will be given an opportunity to respond and present additional information and arguments. Final action will be taken on permits and applications only after an affected importer has an opportunity to makes its case.

### THE WHITE HOUSE

#### WASHINGTON

November 14, 1997

MEMORANDUM FOR THE SECRETARY OF THE TREASURY

SUBJECT:        Importation of Modified Semiautomatic
                   Assault-Type Rifles

The Gun Control Act of 1968 restricts the importation of
firearms unless they are determined to be particularly suitable
for or readily adaptable to sporting purposes. In 1989, the
Department of the Treasury (the Department) conducted a review
of existing criteria for applying the statutory test based on
changing patterns of gun use. As a result of that review,
43 assault-type rifles were specifically banned from impor-
tation. However, manufacturers have modified many of those
weapons banned in 1989 to remove certain military features
without changing their essential operational mechanism.
Examples of such weapons are the Galil and the Uzi.

In recent weeks Members of Congress have strongly urged that it
is again necessary to review the manner in which the Department
is applying the sporting purposes test, in order to ensure that
the agency's practice is consistent with the statute and current
patterns of gun use. A letter signed by 30 Senators strongly
urged that modified assault-type weapons are not properly
importable under the statute and that I should use my authority
to suspend temporarily their importation while the Department
conducts an intensive, expedited review. A recent letter from
Senator Dianne Feinstein emphasized again that weapons of this
type are designed not for sporting purposes but for the com-
mission of crime. In addition, 34 Members of the House of
Representatives signed a letter to Israeli Prime Minister
Binyamin Netanyahu requesting that he intervene to stop all
sales of Galils and Uzis into the United States. These
concerns have caused the Government of Israel to announce
a temporary moratorium on the exportation of Galils and Uzis
so that the United States can review the importability of
these weapons under the Gun Control Act.

Exhibit 1

2

The number of weapons at issue underscores the potential threat to the public health and safety that necessitates immediate action. Firearms importers have obtained permits to import nearly 600,000 modified assault-type rifles. In addition, there are pending before the Department applications to import more than 1 million additional such weapons. The number of rifles covered by outstanding permits is comparable to that which existed in 1989 when the Bush Administration temporarily suspended import permits for assault-type rifles. The number of weapons for which permits for importation are being sought through pending applications is approximately 10 times greater than in 1989. The number of such firearms for which import applications have been filed has skyrocketed from 10,000 on October 9, 1997, to more than 1 million today.

My Administration is committed to enforcing the statutory restrictions on importation of firearms that do not meet the sporting purposes test. It is necessary that we ensure that the statute is being correctly applied and that the current use of these modified weapons is consistent with the statute's criteria for importability. This review should be conducted at once on an expedited basis. The review is directed to weapons such as the Uzi and Galil that failed to meet the sporting purposes test in 1989, but were later found importable when certain military features were removed. The results of this review should be applied to all pending and future applications.

The existence of outstanding permits for nearly 600,000 modified assault-type rifles threatens to defeat the purpose of the expedited review unless, as in 1989, the Department temporarily suspends such permits. Importers typically obtain authorization to import firearms in far greater numbers than are actually imported into the United States. However, gun importers could effectively negate the impact of any Department determination by simply importing weapons to the maximum amount allowed by their permits. The public health and safety require that the only firearms allowed into the United States are those that meet the criteria of the statute.

Accordingly, as we discussed, you will:

1) Conduct an immediate expedited review not to exceed 120 days in length to determine whether modified semiautomatic assault-type rifles are properly importable under the statutory sporting purposes test. The results of this review will govern action on pending and future applications for import permits, which shall not be acted upon until the completion of this review.

Exhibit 1

3

   2)  Suspend outstanding permits for importation of modified semiautomatic assault-type rifles for the duration of the 120-day review period.  The temporary suspension does not constitute a permanent revocation of any license.  Permits will be revoked only if and to the extent that you determine that a particular weapon does not satisfy the statutory test for importation, and only after an affected importer has an opportunity to make its case to the Department.

William J. Clinton

Exhibit 2

## STUDY RIFLE MODELS

**AK47 Variants:**

| | | | **FN-FAL Variants:** |
|---|---|---|---|
| MAK90* | SA2000 | Saiga rifle | L1A1 Sporter |
| 314* | ARM | Galil Sporter | FAL Sporter |
| 56V* | MISR | Haddar | FZSA |
| 89* | MISTR | Haddar II | SAR4800 |
| EXP56A* | SA85M | WUM 1 | X FAL |
| SLG74 | Mini PSL | WUM 2 | C3 |
| NHM90* | ROMAK 1 | SLR95 | C3A |
| NHM90-2* | ROMAK 2 | SLR96 | LAR Sporter |
| NHM91* | ROMAK 4 | SLR97 | |
| SA85M | Hunter rifle | SLG94 | |
| SA93 | 386S | SLG95 | |
| A93 | PS/K | SLG96 | |
| AKS 762 | VEPR caliber | | |
| VEPR | 7.62 x 39mm | | |
| caliber .308 | | | |

**HK Variants:**

| | **Uzi Variants:** | **SIG SG550 Variants:** |
|---|---|---|
| BT96 | Officers 9* | SG550-1 |
| Centurian 2000 | 320 carbine* | SG550-2 |
| SR9 | Uzi Sporter | |
| PSG1 | | |
| MSG90 | | |
| G3SA | | |
| SAR8 | | |

- These models were manufactured in China and have not been imported since the 1994 embargo on the importation of firearms from China.

Exhibit 3

## STUDY RIFLES

The study rifles are semiautomatic firearms based on the AK47, FN-FAL, HK 91 and 93, Uzi, and SIG SG550 designs.  Each of the study rifles is derived from a semiautomatic assault rifle. The following are some examples of specific study rifle models grouped by design type.  In each instance, a semiautomatic assault rifle is shown above the study rifles for comparison.

AK47 Variants



AK47 semiautomatic assault rifle

==================================================================



MISR                                    ARM

MAK90                                   WUM 1

Exhibit 3

## FN-FAL Variants



FN-FAL semiautomatic assault rifle

======================================================================



L1A1 Sporter                                        SAR 4800

## HK 91 and 93 Variants



HK91 semiautomatic assault rifle

======================================================================



SR9                                        SAR 8

Exhibit 3

<u>Uzi Variants</u>



Uzi semiautomatic assault rifle

=======================================================================



320 carbine

<u>SIG SG550 Variants</u>

The following illustration depicts the configuration of a semiautomatic assault rifle based on the SIG SG550 design. No illustrations of modified semiautomatic versions are available.



SIG SG550 semiautomatic assault rifle

Exhibit 4

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

# FACTORING CRITERIA FOR WEAPONS

NOTE: The Bureau of Alcohol, Tobacco and Firearms reserves the right to preclude importation of any revolver or pistol which achieves an apparent qualifying score but does not adhere to the provisions of section 925(d)(3) of Amended Chapter 44, Title 18, U.S.C.

| PISTOL | REVOLVER |
|---|---|
| MODEL: | MODEL: |

**PISTOL — PREREQUISITES**

1. The pistol must have a positive manually operated safety device.
2. The combined length and height must not be less than 10" with the height (right angle measurement to barrel without magazine or extension) being at least 4" and the length being at least 6"

**REVOLVER — PREREQUISITES**

1. Must pass safety test.
2. Must have overall frame (with conventional grips) length (not diagonal) of 4½" minimum.
3. Must have a barrel length of at least 3".

| INDIVIDUAL CHARACTERISTICS | POINT VALUE | POINT SUB-TOTAL | INDIVIDUAL CHARACTERISTICS | POINT VALUE | POINT SUB-TOTAL |
|---|---|---|---|---|---|
| **OVERALL LENGTH** | | | **BARREL LENGTH** *(Muzzle to Cylinder Face)* | | |
| FOR EACH 1/4" OVER 6" | 1 | | LESS THAN 4" | 0 | |
| **FRAME CONSTRUCTION** | | | FOR EACH 1/4" OVER 4" | 1/2 | |
| INVESTMENT CAST OR FORGED STEEL | 15 | | **FRAME CONSTRUCTION** | | |
| INVESTMENT CAST OR FORGED HTS ALLOY | 20 | | INVESTMENT CAST OR FORGED STEEL | 15 | |
| **WEAPON WEIGHT W/MAGAZINE** *(Unloaded)* | | | INVESTMENT CAST OR FORGED HTS ALLOY | 20 | |
| PER OUNCE | 1 | | **WEAPON WEIGHT** *(Unloaded)* | | |
| **CALIBER** | | | PER OUNCE | 1 | |
| .22 SHORT AND .25 AUTO | 0 | | **CALIBER** | | |
| .22 LR AND 7.65mm TO .380 AUTO | 3 | | .22 SHORT TO .25 ACP | 0 | |
| 9mm PARABELLUM AND OVER | 10 | | .22 LR AND .30 TO .38 S&W | 3 | |
| **SAFETY FEATURES** | | | .38 SPECIAL | 4 | |
| LOCKED BREECH MECHANISM | 5 | | .357 MAG AND OVER | 5 | |
| LOADED CHAMBER INDICATOR | 5 | | **MISCELLANEOUS EQUIPMENT** | | |
| GRIP SAFETY | 3 | | ADJUSTABLE TARGET SIGHTS *(Drift or Click)* | 5 | |
| MAGAZINE SAFETY | 5 | | TARGET GRIPS | 5 | |
| FIRING PIN BLOCK OR LOCK | 10 | | TARGET HAMMER AND TARGET TRIGGER | 5 | |
| **MISCELLANEOUS EQUIPMENT** | | | | | |
| EXTERNAL HAMMER | 2 | | | | |
| DOUBLE ACTION | 10 | | | | |
| DRIFT ADJUSTABLE TARGET SIGHT | 5 | | | | |
| CLICK ADJUSTABLE TARGET SIGHT | 10 | | | | |
| TARGET GRIPS | 5 | | | | |
| TARGET TRIGGER | 2 | | | | |

**SAFETY TEST**

A Double Action Revolver must have a safety feature which automatically (or in a Single Action Revolver by manual operation) causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge. The safety device must withstand the impact of a weight equal to the weight of the revolver dropping from a distance of 36" in a line parallel to the barrel upon the rear of the hammer spur, a total of 5 times.

| SCORE ACHIEVED *(Qualifying score is 75 points)* | | | SCORE ACHIEVED *(Qualifying score is 45 points)* | | |
|---|---|---|---|---|---|

Exhibit 5

## MILITARY CONFIGURATION

1.  <u>Ability to accept a detachable magazine</u>.  Virtually all modern military firearms are designed to accept large, detachable magazines.  This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload.  Thus, large capacity magazines are indicative of military firearms.  While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.  Additionally, some States have a limit on the magazine capacity allowed for hunting, usually five or six rounds.

2.  <u>Folding/telescoping stock</u>.  Many military firearms incorporate folding or telescoping stocks.  The main advantage of this item is portability, especially for airborne troops.  These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock.  With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking.  However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

3.  <u>Pistol grips</u>. The vast majority of military firearms employ a well-defined separate pistol grip that protrudes conspicuously beneath the action of the weapon. In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon.  Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation.  Further, such grips were designed to assist in controlling machineguns during automatic fire.  On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or organized competitive target competitions.

4.  <u>Ability to accept a bayonet</u>.  A bayonet has distinct military purposes.  First, it has a psychological effect on the enemy.  Second, it enables soldiers to fight in close quarters with a knife attached to their rifles.  No traditional sporting use could be identified for a bayonet.

5.  <u>Flash suppressor</u>.  A flash suppressor generally serves one or two functions.  First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night.  A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired as a fully automatic weapon.  From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash.  Flash suppressors that also serve to dampen muzzle climb have a limited benefit in sporting uses by allowing the shooter to reacquire

Exhibit 5

the target for a second shot.  However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result.  There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb.  In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

6.   <u>Bipods</u>. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.  The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired as a fully automatic weapon.  Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability.  However, traditional sporting rifles generally do not come equipped with bipods, nor are they specifically designed to accommodate them.  Instead, bipods for sporting firearms are generally designed to attach to a detachable "slingswivel mount" or simply clamp onto the firearm.

7.   <u>Grenade launcher</u>. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.  Such launchers are generally of two types.  The first type is a flash suppressor designed to function as a grenade launcher.  The second type attaches to the barrel of the rifle by either screws or clamps.  No traditional sporting application could be identified for a grenade launcher.

8.   <u>Night sights</u>.  Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.  Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally not legal to hunt at night.

Exhibit 6

**[This document has been retyped for clarity.]**

MEMORANDUM TO FILE

FIREARMS ADVISORY PANEL

The initial meeting of the Firearms Advisory Panel was held in Room 3313, Internal Revenue Building, on December 10, 1968, with all panel members present. Internal Revenue Service personnel in attendance at the meeting were the Director, Alcohol and Tobacco Tax Division, Harold Serr; Chief, Enforcement Branch, Thomas Casey; Chief, Operations Coordination Section, Cecil M. Wolfe, and Firearms Enforcement Officer, Paul Westenberger. Deputy Assistant Commissioner Compliance, Leon Green, visited the meeting several times during the day.

The Director convened the meeting at 10:00 a.m. by welcoming the members and outlining the need for such an advisory body. He then introduced the Commissioner of Internal Revenue, Mr. Sheldon Cohen, to each panel member.

Mr. Cohen spoke to the panel for approximately fifteen minutes. He thanked the members for their willingness to serve on the panel, explained the role of the panel and some of the background which led to the enactment of the Gun Control Act of 1968. Commissioner Cohen explained to the panel members the conflict of interest provisions of regulations pertaining to persons employed by the Federal Government and requested that if any member had any personal interest in any matter that came under discussion or consideration, he should make such interest known and request to be excused during consideration of the matter.

Mr. Seer then explained to the panel the areas in which the Division would seek the advice of the panel and emphasized that the role of the panel would be advisory only, and that it was the responsibility of the Service to make final decisions. He then turned the meeting over to the moderator, Mr. Wolfe.

Mr. Wolfe explained the responsibility of the Service under the import provisions of the Gun Control Act and under the Mutual Security Act. The import provisions were read and discussed.

The panel was asked to assist in defining Asporting purposes≅ as used in the Act. It was generally agreed that firearms designed and intended for hunting and all types of organized competitive target shooting would fall within the sporting purpose category. A discussion was held on the so-called sport of Aplinking≅. It was the consensus that, while many persons

Exhibit 6

participated in the type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation since any firearm that could expel a projectile could be used for this purpose without having any characteristics generally associated with target guns.

The point system that had been developed by the Division and another point system formula suggested and furnished by the Southern Gun Distributors through Attorney Michael Desalle, was explained and demonstrated to the panel by Paul Westenberger. Each panel member was given copies of the formulas and requested to study them and endeavor to develop a formula he believed would be equitable and could be applied to all firearms sought to be imported.

A model BM59 Beretta, 7.62 mm, NATO Caliber Sporter Version Rifle was presented to the panel and their advice sought as to their suitability for sporting purposes. It was the consensus that these rifles do have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of this rifle together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle be authorized for importation. Importation, however, should include the restriction that these weapons must not possess combination flash suppressors/grenade adaptors with outside diameters greater than 20mm (.22 mm is the universal grade adaptor size).

The subject of ammunition was next discussed. Panel members agreed that incendiary and tracer small arms ammunition have no use for sporting purposes. Accordingly, the Internal Revenue Service will not authorize these types of small arms ammunition importation. All other conventional small arms ammunition for pistols, revolvers, rifles and shotguns will be authorized.

The meeting was adjourned at 4:00 p.m.


C.M. Wolfe

Exhibit 7

**STATE FISH AND GAME COMMISSION REVIEW**

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Alabama | Not for turkey | |
| Alaska | | |
| Arizona | | Not more than five rounds |
| Arkansas | Not for turkey | |
| California | | |
| Colorado | | Not more than six rounds |
| Connecticut* | No rifles on public land | |
| Delaware | No rifles | |
| Florida | | Not more than five rounds |
| Georgia | Not for turkey | |
| Hawaii | | |
| Idaho | Not for turkey | |
| Illinois | Not for deer or turkey | |
| Indiana* | Not for deer or turkey | |
| Iowa | Not for deer or turkey No restrictions on coyote or fox | |
| Kansas | | |
| Kentucky | | |
| Louisiana | Not for turkey | |
| Maine* | Not for turkey | |
| Maryland* | | |

Exhibit 7

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Massachusetts | Not for deer or turkey | |
| Michigan | Not for turkey | Not more than six rounds |
| Minnesota | | |
| Mississippi | Not for turkey | |
| Missouri | Not for turkey | Chamber and magazine not more than 11 rounds |
| Montana | | |
| Nebraska | | Not more than six rounds |
| Nevada | Not for turkey | |
| New Hampshire* | Not for turkey | Not more than five rounds |
| New Jersey | No rifles | |
| New Mexico | Not for turkey | |
| New York* | | Not more than six rounds |
| North Carolina | Not for turkey | |
| North Dakota | Not for turkey | |
| Ohio | Not for deer or turkey | |
| Oklahoma | | Not more than seven rounds for .22 caliber |
| Oregon* | | Not more than five rounds |
| Pennsylvania* | No semiautomatics | |

Exhibit 7

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Rhode Island | Prohibited except for woodchuck in summer | |
| South Carolina | Not for turkey | |
| South Dakota | | Not more than five rounds |
| Tennessee | Not for turkey | |
| Texas | | |
| Utah | Not for turkey | |
| Vermont | | Not more than six rounds |
| Virginia* | | |
| Washington | Not for turkey | |
| West Virginia | | |
| Wisconsin | | |
| Wyoming | | |

*  Limited restrictions (e.g., specified areas, county restrictions, populated areas, time of day).



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

DIRECTOR

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary of the Treasury decided to conduct a review to determine whether modified semiautomatic assault rifles are properly importable under Federal law. Under 18 U.S.C. section 925(d)(3), firearms may be imported into the United States only if they are determined to be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The firearms in question are semiautomatic rifles based on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi designs.

As part of the review, the Bureau of Alcohol, Tobacco and Firearms (ATF) is interested in receiving information that shows whether any or all of the above types of semiautomatic rifles are particularly suitable for or readily adaptable to hunting or organized competitive target shooting. We are asking that you voluntarily complete the enclosed survey to assist us in gathering this information. We anticipate that the survey will take approximately 15 minutes to complete.

Responses must be received no later than January 9, 1998; those received after that date cannot be included in the review. Responses should be forwarded to the Bureau of Alcohol, Tobacco and Firearms, Department HG, P.O. Box 50860, Washington, DC 20091. We appreciate any information you care to provide.

Sincerely yours,

John W. Magaw
Director

Enclosure

# ATF SURVEY OF HUNTING GUIDES
## FOR RIFLE USAGE

*Please report only on those clients who **hunted medium game (for example, turkey) or larger game (for example, deer) with a rifle.***

*For the purposes of this survey, please count only individual clients and NOT the number of trips taken by a client. For example, if you took the same client on more than one trip, count the client only once.*

**1.** What is the approximate number of your clients who have ever used **manually operated rifles** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**2.** What is the approximate number of your clients who have ever used **semiautomatic rifles** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**3.** What is the approximate number of your clients who have ever used semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**4.** From your knowledge, for your clients who use **semiautomatic rifles**, please list the three most commonly used rifles.

| Make | Model | Caliber |
|------|-------|---------|
|      |       |         |
|      |       |         |
|      |       |         |

**5.** Do you **recommend** the use of any specific rifles by your clients?

_____Yes *(Continue to #6)*          _____No *(You are finished with the survey. Thank you.)*

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

# ATF SURVEY OF HUNTING GUIDES
## FOR RIFLE USAGE
### Page 2 of 2

**6.** If your answer to item 5 is "Yes", please identify the specific rifles you **recommend**.

| Make | Model | Caliber |
|------|-------|---------|
|      |       |         |
|      |       |         |
|      |       |         |

**7.** Do you **recommend** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi?**

_____Yes *(Continue to #8)*      _____No (*You are finished with the survey. Thank you.*)

**8.** If your answer to item 7 is "Yes", please identify the specific rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** that you recommend.

| Make | Model | Caliber |
|------|-------|---------|
|      |       |         |
|      |       |         |
|      |       |         |

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

## Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 1 | 28 | 0 | 0 | No | |
| A | 2 | 100 | 10 | 0 | Yes | No |
| A | 3 | 18 | 0 | 0 | No | |
| A | 4 | 120 | 40 | 0 | Yes | No |
| A | 5 | 12 | 0 | 0 | Yes | No |
| A | 6 | 80 | 40 | 0 | No | |
| A | 7 | 275 | 25 | 0 | No | |
| A | 8 | | | | | |
| A | 9 | 0 | 0 | 0 | | |
| A | 10 | 0 | | | | |
| A | 11 | 2 | 5 | 0 | Yes | Yes |
| A | 12 | 12 | 0 | 0 | Yes | No |
| A | 13 | 10 | 6 | 0 | No | No |
| A | 14 | 5 | 7 | 0 | No | |
| A | 15 | 0 | 0 | 0 | | |
| A | 16 | 20 | 0 | 0 | No | No |
| A | 17 | | | | | |
| A | 18 | 0 | 0 | 0 | No | |
| A | 19 | 17 | 6 | 0 | No | |
| A | 20 | 30 | 8 | 0 | No | |
| A | 21 | 117 | 7 | 0 | Yes | No |
| A | 22 | 160 | 0 | 0 | Yes | No |
| A | 23 | 23 | 1 | 0 | Yes | No |
| A | 24 | 100 | 5 | 0 | Yes | No |
| A | 25 | 210 | 10 | 0 | Yes | No |
| A | 26 | 12 | 4 | 1 | Yes | Yes |
| A | 27 | 24 | 3 | 0 | Yes | No |
| A | 28 | 20 | 15 | 0 | Yes | No |
| A | 29 | 4 | 0 | 0 | No | No |
| A | 30 | 4 | 0 | 0 | Yes | No |
| A | 31 | 100 | 5 | 0 | No | No |
| A | 32 | 1 | 0 | 0 | No | No |
| A | 33 | | | 0 | No | No |
| A | 34 | 142 | 1 | 0 | No | |
| A | 35 | 78 | 2 | 0 | Yes | No |
| A | 36 | 600 | 200 | | No | |
| A | 37 | 20 | 13 | 1 | No | |
| A | 38 | 45 | 15 | 0 | No | |
| A | 39 | 100 | 10 | 0 | No | |
| A | 40 | 80 | 6 | 2 | Yes | No |
| A | 41 | 250 | 25 | 0 | Yes | No |
| A | 42 | 4 | 0 | 0 | No | |
| A | 43 | 14 | 2 | 0 | No | No |
| A | 44 | 171 | 15 | 0 | Yes | No |
| A | 45 | 54 | 6 | 0 | Yes | No |
| A | 46 | 10 | 6 | 0 | No | |
| A | 47 | 0 | 0 | 0 | No | No |
| A | 48 | 24 | 0 | 0 | No | |
| A | 49 | 180 | 2 | 0 | Yes | No |
| A | 50 | | | | | |
| A | 51 | | | | | |

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 52 | 24 | 16 | 0 | No | |
| A | 53 | 600 | 100 | 12 | No | |
| A | 54 | 18 | 6 | 0 | No | |
| A | 55 | 0 | 0 | 0 | No | |
| A | 56 | 0 | 0 | 0 | No | |
| A | 57 | 40 | 4 | 0 | No | |
| A | 58 | | | | | |
| A | 59 | 40 | 10 | 0 | No | No |
| A | 60 | 60 | 2 | 0 | No | No |
| A | 61 | 63 | 4 | 0 | Yes | No |
| A | 62 | 40 | 4 | 0 | No | |
| A | 63 | 8 | 0 | 0 | Yes | No |
| A | 64 | 27 | 1 | 0 | Yes | No |
| A | 65 | 50 | 9 | 0 | Yes | No |
| A | 66 | 35 | 2 | 0 | No | |
| A | 67 | 6 | 0 | 0 | Yes | No |
| A | 68 | 6 | 3 | | No | |
| A | 69 | 50 | 20 | 0 | No | |
| A | 70 | | 0 | 0 | Yes | No |
| A | 71 | 27 | 1 | 0 | Yes | |
| A | 72 | 85 | 0 | 0 | Yes | No |
| A | 73 | 56 | 24 | 0 | Yes | No |
| A | 74 | 25 | 25 | 0 | Yes | No |
| A | 75 | 100 | 20 | 0 | No | |
| A | 76 | 50 | 15 | 3 | No | |
| A | 77 | 15 | 4 | 0 | No | |
| A | 78 | 12 | 0 | 0 | Yes | No |
| A | 79 | 75 | 0 | 0 | No | |
| A | 80 | | | | | |
| A | 81 | 0 | 0 | 0 | No | |
| A | 82 | 0 | 0 | 0 | No | |
| A | 83 | 12 | 4 | 0 | No | No |
| A | 84 | 40 | 0 | 0 | Yes | No |
| A | 85 | 24 | 0 | 0 | No | |
| A | 86 | 17 | 0 | 0 | No | No |
| A | 87 | 16 | 3 | 0 | Yes | No |
| A | 88 | 45 | 10 | 0 | No | |
| A | 89 | 11 | 7 | 7 | Yes | Yes |
| A | 90 | 35 | 1 | 0 | Yes | No |
| A | 91 | 25 | 2 | 0 | Yes | No |
| A | 92 | 0 | 0 | 0 | | |
| A | 93 | 75 | 40 | 0 | Yes | No |
| A | 94 | 60 | 2 | 0 | Yes | No |
| A | 95 | 26 | 0 | 0 | No | |
| A | 96 | 20 | 0 | | No | No |
| A | 97 | 65 | 11 | 0 | Yes | No |
| A | 98 | 40 | 5 | 0 | Yes | No |
| A | 99 | 26 | 5 | 0 | No | |
| A | 100 | 13 | 2 | 0 | No | |
| A | 101 | | | | | |
| A | 102 | 45 | 6 | 0 | No | No |

| | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| case | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 103 | 120 | 4 | 0 | No | |
| A | 104 | | | | Yes | |
| A | 105 | 150 | 50 | 0 | No | No |
| A | 106 | 80 | 20 | 0 | Yes | No |
| A | 107 | 40 | 0 | 0 | No | No |
| A | 108 | 10 | 0 | 0 | No | |
| A | 109 | 160 | 40 | 0 | Yes | No |
| A | 110 | 10 | 10 | 0 | No | No |
| A | 111 | 6 | 0 | 0 | No | |
| A | 112 | | | | | |
| A | 113 | 150 | 150 | 100 | Yes | Yes |
| A | 114 | 50 | 25 | 0 | No | No |
| A | 115 | 19 | 0 | 0 | Yes | No |
| A | 116 | 80 | 3 | 0 | No | |
| A | 117 | 40 | 10 | 0 | Yes | No |
| A | 118 | | | | | |
| A | 119 | 50 | 0 | 0 | Yes | No |
| A | 120 | 0 | 0 | 0 | No | |
| A | 121 | 0 | 0 | 0 | | |
| A | 122 | 120 | 15 | 0 | Yes | No |
| A | 123 | 10 | 0 | 0 | Yes | No |
| A | 124 | 22 | 0 | 0 | Yes | No |
| A | 125 | 40 | 40 | 20 | No | |
| A | 126 | 50 | 10 | 0 | Yes | No |
| A | 127 | 60 | 20 | 0 | Yes | No |
| A | 128 | 14 | 0 | 0 | No | No |
| A | 129 | 13 | 16 | 4 | No | |
| A | 130 | 80 | 4 | 0 | Yes | No |
| A | 131 | 12 | 2 | 0 | Yes | No |
| A | 132 | | 4 | 0 | Yes | No |
| A | 133 | 50 | 26 | 7 | No | No |
| A | 134 | 12 | 0 | 0 | No | |
| A | 135 | 2 | 10 | 3 | No | |
| A | 136 | 2 | 1 | 1 | Yes | No |
| A | 137 | 28 | 0 | 0 | Yes | No |
| A | 138 | 45 | 10 | | No | |
| A | 139 | 46 | 59 | 0 | Yes | No |
| A | 140 | | | 0 | Yes | No |
| A | 141 | 40 | 10 | 0 | No | No |
| A | 142 | 70 | 20 | 0 | Yes | No |
| A | 143 | 50 | 3 | 0 | No | No |
| A | 144 | 60 | 6 | 0 | Yes | No |
| A | 145 | 140 | 0 | 0 | Yes | No |
| A | 146 | 20 | 4 | 1 | Yes | No |
| A | 147 | 10 | 1 | 0 | Yes | No |
| A | 148 | 0 | 0 | 0 | No | No |
| A | 149 | 37 | 0 | 0 | Yes | No |
| A | 150 | | | 0 | Yes | No |
| A | 151 | 6 | 10 | 0 | No | No |
| A | 152 | 110 | 5 | 0 | No | |
| A | 153 | 15 | 17 | | Yes | No |

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 154 | 18 | 4 | 0 | No | |
| A | 155 | 25 | 3 | 0 | Yes | No |
| A | 156 | 60 | 6 | 3 | No | |
| A | 157 | 20 | 0 | 0 | No | |
| A | 158 | 88 | 46 | 0 | No | No |
| A | 159 | 68 | 19 | 3 | Yes | Yes |
| A | 160 | 25 | 5 | 0 | No | |
| A | 161 | 15 | 0 | 0 | No | |
| A | 162 | 75 | 10 | 0 | No | |
| B | 1 | | | | No | |
| C | 1 | 25 | 0 | 0 | Yes | No |
| C | 2 | 55 | 10 | 6 | Yes | Yes |
| C | 3 | 60 | 30 | 0 | No | |
| C | 4 | 80 | 20 | 0 | No | |
| C | 5 | 10 | 0 | 0 | No | No |
| C | 6 | 25 | 6 | 0 | No | |
| C | 7 | 66 | 10 | 1 | No | |
| C | 8 | 24 | 0 | 0 | Yes | No |
| C | 9 | 10 | 15 | 15 | No | |
| C | 10 | 35 | 15 | 9 | Yes | Yes |
| C | 11 | | | 0 | No | |
| C | 12 | | | | | No |
| C | 13 | 25 | 10 | 0 | No | |
| C | 14 | 60 | 20 | 0 | Yes | No |
| C | 15 | 20 | 0 | 0 | Yes | No |
| C | 16 | 14 | 0 | 0 | No | |
| C | 17 | | 0 | 0 | Yes | No |
| C | 18 | 18 | 25 | 5 | Yes | Yes |
| C | 19 | 125 | 50 | 5 | Yes | No |
| C | 20 | 20 | 5 | 2 | No | |
| C | 21 | | 0 | 0 | Yes | No |
| C | 22 | 30 | 0 | 0 | No | No |
| C | 23 | 150 | 20 | 0 | Yes | No |
| C | 24 | 60 | 0 | 0 | No | |
| C | 25 | 16 | 7 | 6 | Yes | Yes |
| C | 26 | 300 | 650 | 400 | No | |
| C | 27 | 20 | 15 | 8 | Yes | Yes |
| C | 28 | 3 | 5 | 2 | No | |
| C | 29 | 45 | 6 | 0 | Yes | No |
| C | 30 | | | | No | |
| C | 31 | 30 | 0 | 0 | Yes | No |
| C | 32 | | | 0 | Yes | No |
| C | 33 | 35 | 4 | 0 | Yes | No |
| C | 34 | 25 | 5 | 0 | Yes | No |
| C | 35 | | | | Yes | No |

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| case | | Make | Other Make | Model | Caliber |
| A | 1 | | | | |
| A | 2 | | | | |
| A | 3 | | | | |
| A | 4 | Browning | | BAR | 300 |
| A | 5 | | | | |
| A | 6 | Remington | | 742 | 30.06 |
| A | 7 | Browning | | BAR | 30.06, .270, 7MM, 300 Mag |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | Remington | | 740-7400 | 20, 30 |
| A | 12 | | | | |
| A | 13 | Remington | | 700 | 7 mm mag |
| A | 14 | Remington | | 7400 | 270 |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | Browning | | | 30.06 |
| A | 20 | Remington | | 742 | 30.06 |
| A | 21 | | | | |
| A | 22 | | | | |
| A | 23 | Browning | | ? | 300 mag |
| A | 24 | Remington | | | 30.06 |
| A | 25 | Remington | | | 30.06 |
| A | 26 | Browning | | BAR | 30.06 |
| A | 27 | Remington | | | 30.06 |
| A | 28 | | ? | ? | 06 |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | Browning | | automatics | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | Remington | | | .3006 |
| A | 35 | Browning | | | 7 mm |
| A | 36 | Browning | | | 30.06 |
| A | 37 | Browning | | BAR | 30.06 |
| A | 38 | Browning | | br | 7 mm, 300win, 30.06 |
| A | 39 | Remington | | 7600 | .270 win, .30-06, .280 rem |
| A | 40 | Browning | | Bar mark II | 300 win mag |
| A | 41 | Remington | | | |
| A | 42 | | | | |
| A | 43 | Remington | | 7600 | 243 - 7 mm mag |
| A | 44 | | | | 30.06, 300 winmag, .338, 270 |
| A | 45 | Browning | | BAR Automatic | 30.06 |

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 46 | Browning | | BAR | 7 mm, 30.06 |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | . | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | Browning | | BAR | 7 mm mag/30.06 |
| A | 53 | Browning | | BAR | 30.06, 300 wm |
| A | 54 | Browning | | BAR | 30.06 |
| A | 55 | | | | |
| A | 56 | | | | |
| A | 57 | Browning | | semi-auto | 300 mag |
| A | 58 | | | | |
| A | 59 | | | | |
| A | 60 | | | | |
| A | 61 | Browning | | | 30.06 |
| A | 62 | Browning | | | 7 mm |
| A | 63 | Browning | | BAR | .270 - 300 win mag |
| A | 64 | Browning | | BAR | 30.06 |
| A | 65 | Browning | | semi-auto | .308 |
| A | 66 | Browning | | | |
| A | 67 | | . | | |
| A | 68 | Remington | | 7400 | 30.06 |
| A | 69 | Browning | | | |
| A | 70 | | | | |
| A | 71 | Browning | | Not sure | |
| A | 72 | | | | |
| A | 73 | Browning | | BARR | 30.06 |
| A | 74 | Browning | | BAR | 300 |
| A | 75 | Remington | | 7400 old 752 | 270 and 30.06 |
| A | 76 | Browning | | BAR | 308, 30.06, 300win, 338 win |
| A | 77 | Remington | | | 308 |
| A | 78 | Browning | | | 300, 270, 30.06 |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | 30 caliber or bigger for elk |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | Browning | | | 30.06 and 7 mm |
| A | 88 | Browning | | BAR | 7 mm, .300, .270 |
| A | 89 | Other | Russian | SKS | 7.62 |
| A | 90 | Browning | | | 1 or 2 in over 50 years |
| A | 91 | Browning | | | 300 win mag |

| Q4. Three most commonly used rifles | | | | | |
|---|---|---|---|---|---|
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | Browning | | BAR | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | Browning | | BAR | 300-06-270 |
| A | 98 | Browning | | | 300, 30.06 |
| A | 99 | Other | Savage | | 7 mm |
| A | 100 | Browning | | ? | 7 mm mag |
| A | 101 | | | | |
| A | 102 | Browning | Only 1 I recall | BAR | 30.06 |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | Browning | | BAR | 300 win mag |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | Browning | | | 30.06 |
| A | 110 | Remington | | 700 | 30.06, 270, 7 mm |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | Other | Weatherby | | 300 mag |
| A | 114 | Browning | | | 7 m mag |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | Browning | | | |
| A | 118 | | | | |
| A | 119 | | | | |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | Browning | | U/K | .338 mag |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | Remington | | 742 | 243, 30.06 |
| A | 127 | Winchester | | ? | 30.06 |
| A | 128 | Winchester | | | 270, 306 |
| A | 129 | Browning | | BAR | 7 mm and 243 |
| A | 130 | Browning | | | 30.06 |
| A | 131 | Browning | | BAR | .7 mm mag |
| A | 132 | Remington | | | 30.06 |
| A | 133 | | | AK 47 | 223 |
| A | 134 | | | | |
| A | 135 | Remington | | | 270 |
| A | 136 | Browning | | BAR | |
| A | 137 | | | | |

| | | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|---|
| A | 138 | Winchester | | | 30.06 |
| A | 139 | Browning | | BAR | 270, 7 mm |
| A | 140 | Browning | | | 7 mm |
| A | 141 | | | | |
| A | 142 | Browning | | | 7 mm mag |
| A | 143 | | | | |
| A | 144 | Browning | | | 30.06 |
| A | 145 | | | | |
| A | 146 | Browning | | BDL | 7mg |
| A | 147 | Browning | | BAR | 308 |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Remington | | | |
| A | 151 | Browning | | BAR | 308 |
| A | 152 | Remington | | | various 270 - 338 |
| A | 153 | Browning | | | 30 |
| A | 154 | Browning | | BAR | 7 mm mag |
| A | 155 | | | | 30.06 |
| A | 156 | Other | BAR | | |
| A | 157 | | | | |
| A | 158 | Remington | | 280 | 280 |
| A | 159 | Browning | | | 7 mm mag |
| A | 160 | Remington | | Semiauto | 30.06 |
| A | 161 | | | | |
| A | 162 | Browning | | | 30.06 |
| B | 1 | | | | .308, 30-06, .270 |
| C | 1 | | | | |
| C | 2 | Other | AK-47 | Antelope Hunter | 30 |
| C | 3 | Browning | | Auto | 30.06 |
| C | 4 | Browning | | Bar | 7mm |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | Browning | | | 30.06 |
| C | 8 | | | | |
| C | 9 | Other | FN-FAL | | 308 |
| C | 10 | Remington | | 742 | 30.06 |
| C | 11 | Browning | | | 306 |
| C | 12 | | | | |
| C | 13 | Remington | | | .06 - 7mm |
| C | 14 | Browning | | BAR | 7mm |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | | | | |
| C | 18 | Ruger | | Ranch Rifle | 223 |
| C | 19 | Other | AK47 | | |
| C | 20 | Browning | | BAR | 300 win mag |

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| C | 21 | Other | Bolt-action or pump | | |
| C | 22 | | | | |
| C | 23 | Browning | | | 30.06 |
| C | 24 | | | | |
| C | 25 | Other | AK47 | | 7.62-39 |
| C | 26 | Other | HK | 93 | .308 |
| C | 27 | Browning | | BAR | 7mm |
| C | 28 | Other | Norinco | SKS Type 56 | 7.62X39 |
| C | 29 | Browning | | BAR | 30.06 -.300 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | Browning | | | 3.06 - 7mm |
| C | 33 | Remington | | | 30.06 |
| C | 34 | Remington | | 741 | .270 - 30.06 |
| C | 35 | Remington | | | .270 |
| A | 1 | | | | |
| A | 2 | | | | |
| A | 3 | | | | |
| A | 4 | Remington | | 7400 | 30.06 |
| A | 5 | | | | |
| A | 6 | Browning | | | 30.06 |
| A | 7 | Remington | | 700 | 30.03, 270, 7 mm |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | Winchester | | 100 | 30 |
| A | 12 | | | | |
| A | 13 | Winchester | | 70 | 300 mag |
| A | 14 | Remington | | 7400 | 30.06 |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | Remington | | 7400 | 30.06 |
| A | 20 | Browning | | | 7 mm mag |
| A | 21 | | | | |
| A | 22 | | | | |
| A | 23 | | | | |
| A | 24 | Browning | | | 30.06 |
| A | 25 | Browning | | | 30.03 to 300 mag |
| A | 26 | Remington | | Fieldmaster | 30.06 |
| A | 27 | | | | |
| A | 28 | | | | |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | Remington | | automatics | |

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| A | 32 | | | |
| A | 33 | | | |
| A | 34 | | | |
| A | 35 | | | |
| A | 36 | Remington | | 270 - 30.06 |
| A | 37 | Remington | 7400 | 30.06 |
| A | 38 | | | |
| A | 39 | Browning | BAR | .270 win, 7 mm mag |
| A | 40 | Remington | 7400 | 30.06 |
| A | 41 | Browning | | |
| A | 42 | | | |
| A | 43 | Browning | BAR | 243 - 7 mm mag |
| A | 44 | | | |
| A | 45 | | | |
| A | 46 | Remington | 1100 | 12 gauge |
| A | 47 | | | |
| A | 48 | | | |
| A | 49 | | | |
| A | 50 | | | |
| A | 51 | | | |
| A | 52 | Remington | 7400 | 30.06 |
| A | 53 | Remington | 7400/742 | 30.06 |
| A | 54 | | | |
| A | 55 | | | |
| A | 56 | | | |
| A | 57 | Remington | semi-auto | 30.06 |
| A | 58 | | | |
| A | 59 | | | |
| A | 60 | | | |
| A | 61 | Other | Savage | 7 mm mag |
| A | 62 | Remington | | 30.06 |
| A | 63 | Remington | 742 | .270 - 30.06 |
| A | 64 | | | |
| A | 65 | Winchester | semi-auto | .308 |
| A | 66 | Remington | | |
| A | 67 | | | |
| A | 68 | Remington | 7400 | .308 |
| A | 69 | Remington | | |
| A | 70 | | | |
| A | 71 | Remington | 742 | 30.06 |
| A | 72 | | | |
| A | 73 | Remington | | 30.06 |
| A | 74 | Remington | ?600 | 30.06 |
| A | 75 | Browning | BAR | 270/338 and 30.06 |
| A | 76 | Other | AK-47 | 30 |
| A | 77 | Remington | | 30.06 |

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 78 | Remington | | ? | 300, 270, 30.06 |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | . | | . |
| A | 82 | | | | |
| A | 83 | | | | |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | Remington | | | 30.06 |
| A | 88 | Remington | | 742, 7400 | 30.06. .270 |
| A | 89 | Other | Heckler-Koch | HK91 | 308 |
| A | 90 | Remington | | | |
| A | 91 | Remington | | | 30.06 |
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | | | | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | | | | |
| A | 98 | Remington | | 760 | .300, 30.06, 270 |
| A | 99 | Browning | | | 7 mm |
| A | 100 | Remington | | 742 | 30.06 |
| A | 101 | | | | |
| A | 102 | | | | |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | | | | |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | Winchester | | | 308 |
| A | 110 | | | | |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | Remington | | 700 | 7 mm mag |
| A | 114 | Remington | | 742 Wingmaster | 30.06 |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | Remington | | | |
| A | 118 | | | | |
| A | 119 | | | | |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 124 | | . | | |
| A | 125 | | | | |
| A | 126 | Ruger | | 22 | |
| A | 127 | Marlin | | ? | .308 |
| A | 128 | Remington | | | 7 m |
| A | 129 | | | | |
| A | 130 | | | | |
| A | 131 | Browning | | BAR | 30.06 |
| A | 132 | | | | |
| A | 133 | Ruger | | Mini 14 | 223 |
| A | 134 | | | | |
| A | 135 | Remington | | | 243 |
| A | 136 | Other | HK 91 | | |
| A | 137 | | | | |
| A | 138 | Browning | | | 308 |
| A | 139 | Remington | | 742 | 30.06 - 6 mm |
| A | 140 | Remington | | | 30.06 |
| A | 141 | | | | |
| A | 142 | Browning | | | 300 win mag |
| A | 143 | | | | |
| A | 144 | Browning | | | 7 mm mag |
| A | 145 | | | | |
| A | 146 | Browning | | BDL | 300 |
| A | 147 | | | | |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Winchester | | | |
| A | 151 | Remington | | 742 | 30.06 |
| A | 152 | Ruger | | | various 270 - 338 |
| A | 153 | Winchester | | | 30 |
| A | 154 | Browning | | BAR | 30.06 |
| A | 155 | | | | |
| A | 156 | Other | AK-47 | | |
| A | 157 | | | | |
| A | 158 | Winchester | | | 338 |
| A | 159 | Remington | | | 30.06 |
| A | 160 | | | | |
| A | 161 | | | | |
| A | 162 | Remington | | 742 | 30.06, 270 |
| B | 1 | | | | |
| C | 1 | | | | |
| C | 2 | | | | |
| C | 3 | Winchester | | Auto | 30.06 |
| C | 4 | Browning | | Bar | 338 |
| C | 5 | | | | |
| C | 6 | | | | |

| | | | | | |
|---|---|---|---|---|---|
|  | Q4. Three most commonly used rifles |
| C | 7 | Remington | | | 30.06 |
| C | 8 | | | | |
| C | 9 | Other | Uzi | | 9mm |
| C | 10 | Other | AK-47 | Hunter | 7.62x39 |
| C | 11 | Other | Weatherby | | 300 |
| C | 12 | | | | |
| C | 13 | Winchester | | | .06 - 7mm |
| C | 14 | Browning | | | 300 |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | | | | |
| C | 18 | Other | AK-47 | | |
| C | 19 | SigArms | | 550-1 | |
| C | 20 | Ruger | | Mini 14 | .223 |
| C | 21 | | | | |
| C | 22 | | | | |
| C | 23 | Remington | | 742 | 30.06 |
| C | 24 | | | | |
| C | 25 | Other | MAK-90 | | 7.62-39 |
| C | 26 | Other | HK | 91 | 0.223 |
| C | 27 | Remington | | 7400 Series | 30.06 |
| C | 28 | Remington | | 7600 | 30.06 |
| C | 29 | Remington | | 742 | .308 - 3.06 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | Remington | | | 30.06 - 7mm |
| C | 33 | Browning | | | 300 win |
| C | 34 | Browning | | | .270 - 30.06 |
| C | 35 | Browning | | | 300 |
| A | 1 | | | | |
| A | 2 | | | | |
| A | 3 | | | | |
| A | 4 | Ruger | | Mini  14 | 223 |
| A | 5 | | | | |
| A | 6 | Other | Savage | | 270 |
| A | 7 | | | | |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | | | | |
| A | 12 | | | | |
| A | 13 | Browning | | A-bolt | 270 |
| A | 14 | | | | |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 18 | | | | |
| A | 19 | | | | |
| A | 20 | | | | |
| A | 21 | | | | |
| A | 22 | | | | |
| A | 23 | | | | |
| A | 24 | | | | |
| A | 25 | | | | |
| A | 26 | Other | China | SKS | 7.62x37 |
| A | 27 | | | | |
| A | 28 | | | | |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | | | | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | | | | |
| A | 35 | | | | |
| A | 36 | Winchester | | | 270 - 30.06 |
| A | 37 | | | | |
| A | 38 | | | | |
| A | 39 | | | | |
| A | 40 | Ruger | | | 44 mag |
| A | 41 | | | | |
| A | 42 | | | | |
| A | 43 | Ruger | | | 223 - 30.06 |
| A | 44 | | | | |
| A | 45 | | | | |
| A | 46 | | | | |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | | | | |
| A | 53 | Ruger | | Mini-14 | .223 |
| A | 54 | | | | |
| A | 55 | | | | |
| A | 56 | | | | |
| A | 57 | Ruger | | semi-auto | 35 cal |
| A | 58 | | | | |
| A | 59 | | | | |
| A | 60 | | | | |
| A | 61 | | | | |
| A | 62 | Ruger | | Mini 14 | 223 |
| A | 63 | | | | |

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 64 | | | | |
| A | 65 | | | | |
| A | 66 | | | | |
| A | 67 | | | | |
| A | 68 | | | | |
| A | 69 | | | | |
| A | 70 | | | | |
| A | 71 | | | | |
| A | 72 | | | | |
| A | 73 | | | | |
| A | 74 | Browning | | BAR | 30.06 |
| A | 75 | | | | |
| A | 76 | Remington | | | 30.06, 270 |
| A | 77 | Browning | | | 300 |
| A | 78 | | | | |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | | | | |
| A | 88 | | | | |
| A | 89 | Other | Springfield Armory | FNG | 308 |
| A | 90 | | | | |
| A | 91 | | | | |
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | | | | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | | | | |
| A | 98 | | | | |
| A | 99 | | | | |
| A | 100 | | | | |
| A | 101 | | | | |
| A | 102 | | | | |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | | | | |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | | | | |

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 110 | | | | |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | Other | All | | 30.06 |
| A | 114 | Remington | | 721 | 270 |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | | | | |
| A | 118 | | | | |
| A | 119 | | | | |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | Browning | Remington | Shotguns | 12 gauge |
| A | 127 | Remington | | | .308 or 30.06 |
| A | 128 | Other | Savage | | 308 |
| A | 129 | | | | |
| A | 130 | | | | |
| A | 131 | | | | |
| A | 132 | | | | |
| A | 133 | Browning | | BAR | 7 mm |
| A | 134 | | | | |
| A | 135 | Browning | | 742 | 30.06 |
| A | 136 | Other | AK 47 | | |
| A | 137 | | | | |
| A | 138 | | | | |
| A | 139 | Other | Weatherby | | 300 m |
| A | 140 | | | | |
| A | 141 | | | | |
| A | 142 | | | | |
| A | 143 | | | | |
| A | 144 | | | | |
| A | 145 | | | | |
| A | 146 | Ruger | | #1 | 7 mag |
| A | 147 | | | | |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Browning | | | |
| A | 151 | | | | |
| A | 152 | Browning | | | various 270 - 338 |
| A | 153 | | | | |
| A | 154 | Browning | | BAR | 8 mm mag |
| A | 155 | | | | |

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 156 | Other | Uzi | | |
| A | 157 | | | | |
| A | 158 | Browning | | | 300 |
| A | 159 | | | | |
| A | 160 | | | | |
| A | 161 | | | | |
| A | 162 | | | | |
| B | 1 | | | | |
| C | 1 | | | | |
| C | 2 | | | | |
| C | 3 | Browning | | Auto | 270 |
| C | 4 | Browning | | Bar | 300 |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | | | | |
| C | 8 | | | | |
| C | 9 | Other | HK91 | | |
| C | 10 | Browning | | BAR | 30.06 |
| C | 11 | | | | |
| C | 12 | | | | |
| C | 13 | Browning | | | 300 |
| C | 14 | | | | |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | | | | |
| C | 18 | | | | |
| C | 19 | | | | |
| C | 20 | Other | AK47 | | 7.62 x 39 |
| C | 21 | | | | |
| C | 22 | | | | |
| C | 23 | Remington | | 742 | 308, 270 |
| C | 24 | | | | |
| C | 25 | | M1-A1 | | .223 |
| C | 26 | | | | |
| C | 27 | Winchester | Various | M1 Garand | 30.06 |
| C | 28 | | | | |
| C | 29 | | | M1A1 | 30.06 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | | | | |
| C | 33 | | | | |
| C | 34 | | | | |
| C | 35 | | | | |

| case | | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| | | | | Q 6. Rifles recommended for clients | |
| A | 1 | | | | |
| A | 2 | Ruger | | | 30.06 |
| A | 3 ' | | | | |
| A | 4 | Other | Weatherby | Mark V | 300 |
| A | 5 | | | | 30.06 |
| A | 6 | | | | |
| A | 7 | | | | |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | | | | |
| A | 12 | | | | |
| A | 13 | | | | |
| A | 14 | | | | |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | | | | |
| A | 20 | | | | |
| A | 21 | Winchester | | | 30.06, .270 |
| A | 22 | Remington | | 700 | 7 mm or larger |
| A | 23 | Winchester | | 70 | 25 to 30 |
| A | 24 | Remington | | 710 | 30.06 |
| A | 25 | | Any make | Bolt action | Does not recommend |
| A | 26 | Winchester | | 70 | 30.06 or larger |
| A | 27 | Other | Weatherby | | 300 |
| A | 28 | Other | bolt action | | 270 and up |
| A | 29 | | | | |
| A | 30 | | hunter's choice | | .270 |
| A | 31 | | | | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | | | | |
| A | 35 | Winchester | | 70 | 300 win mag |
| A | 36 | | | | |
| A | 37 | | | | |
| A | 38 | | | | |
| A | 39 | | | | |
| A | 40 | Remington | | | 30.06 - 300 win mag |
| A | 41 | | | | |
| A | 42 | | | | |
| A | 43 | | | | |
| A | 44 | | | | 30.06, 300winmag, 338, 270 |
| A | 45 | Browning | | Bolt Action | 25.06 - 328 |

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 46 | | | | |
| A 47 | | | | |
| A 48 | | | | |
| A 49 | Other | Weatherby | | 300 mag |
| A 50 | | | | |
| A 51 | | | | |
| A 52 | | | | |
| A 53 | | | | |
| A 54 | | | | |
| A 55 | | | | |
| A 56 | | | | |
| A 57 | | | | |
| A 58 | | | | |
| A 59 | | | | |
| A 60 | | | | |
| A 61 | Remington | | Bolt Action | 300 mag |
| A 62 | | | | |
| A 63 | Other | bolt action repeating rifles | | 30.06 to .338 winmag |
| A 64 | Winchester | | 70 | 338 |
| A 65 | Remington | | bolt action | 308,25-06,243,7 mm mag,30.06,22-250,300 mag all |
| A 66 | | | | |
| A 67 | Ruger | | #1 | 7 mm, 30.06, 7 mm mag |
| A 68 | | | | |
| A 69 | | | | |
| A 70 | Other | | Bolt Action | 30.06 |
| A 71 | | | | 300 mag |
| A 72 | Other | Any make | Any model | 7 mm, 270, 30.06, 25.06 |
| A 73 | | | | |
| A 74 | Browning | | BAR | 300 win mag |
| A 75 | | | | |
| A 76 | | | | |
| A 77 | | | | |
| A 78 | Browning | | Bolt action | |
| A 79 | | | | |
| A 80 | | | | |
| A 81 | | | | |
| A 82 | | | | |
| A 83 | | | | |
| A 84 | | | | |
| A 85 | | | | |
| A 86 | | | | |
| A 87 | Remington | | 700 | 30.06, 7 mm, 270 |
| A 88 | | | | |
| A 89 | Other | Russian | SKS | 7.62 |
| A 90 | Other | Weatherby | | 7 mm mag |

| | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 91 | Remington | | 700 | 7 mag |
| A 92 | | | | |
| A 93 | Winchester | . | 70 | 300 mag |
| A 94 | Other | Any bolt action | | 270 or larger |
| A 95 | | | | |
| A 96 | . | | | |
| A 97 | Other | Any bolt action | | 30 or larger, on semiauto same |
| A 98 | | | | |
| A 99 | | | | |
| A 100 | | | | |
| A 101 | | | | |
| A 102 | | | | |
| A 103 | | | | |
| A 104 | | | | |
| A 105 | | | | |
| A 106 | Other | Weatherby | | 300 magnum |
| A 107 | | | | |
| A 108 | | | | |
| A 109 | Remington | | 70 | 7 mm |
| A 110 | | | | |
| A 111 | | | | |
| A 112 | | | | |
| A 113 | | | | |
| A 114 | | | | |
| A 115 | | | | |
| A 116 | | | | |
| A 117 | | | | magnum |
| A 118 | | | | |
| A 119 | Remington | | 700 | 7 mm |
| A 120 | | | | |
| A 121 | | | | |
| A 122 | | | | |
| A 123 | | | | |
| A 124 | | | | |
| A 125 | | | | |
| A 126 | | | | 300 mag, 338 mag, 30.06 |
| A 127 | | | | |
| A 128 | | | | |
| A 129 | | | | |
| A 130 | Remington | | 700 | 7 mm magnum |
| A 131 | | | | |
| A 132 | Other | Weatherby | | 300 mag |
| A 133 | | | | |
| A 134 | | | | |
| A 135 | | | | |

| | | Q 6. Rifles recommended for clients | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A | 136 | | | |
| A | 137 | Remington | | 700 | 7 mm |
| A | 138 | | | |
| A | 139 | Browning | | BAR | 7 m or 270 |
| A | 140 | | | |
| A | 141 | | | |
| A | 142 | | | | 30.06 |
| A | 143 | | | |
| A | 144 | Browning | | | from 7 mm mag to 338 mag for deer and elk |
| A | 145 | Winchester | | 30.06 |
| A | 146 | Browning | | BDL | 7 mag |
| A | 147 | Remington | | 700 BDL | 7 mm |
| A | 148 | | | |
| A | 149 | | | |
| A | 150 | Browning | | Bolt action | |
| A | 151 | | | |
| A | 152 | | | |
| A | 153 | Remington | | 700 | 30 |
| A | 154 | | | |
| A | 155 | Other | Weatherby | | 300 |
| A | 156 | | | |
| A | 157 | | | |
| A | 158 | | | |
| A | 159 | Browning | Ruger | | 243, 30.06, 7 mm mag, 340 weather, .338 |
| A | 160 | | | |
| A | 161 | | | |
| A | 162 | | | |
| B | 1 | | | | 7.62 x 39 |
| C | 1 | Other | Manually operated | | |
| C | 2 | Ruger | | 77 | 300 |
| C | 3 | | | |
| C | 4 | | | |
| C | 5 | | | |
| C | 6 | | | |
| C | 7 | | | |
| C | 8 | Remington | | 700 | 270 |
| C | 9 | | | |
| C | 10 | Other | HK | 91 | .308 |
| C | 11 | | | |
| C | 12 | | | |
| C | 13 | | | |
| C | 14 | Other | Bolt-action w/ belted mag | | Calibers, make and model mean nothing |
| C | 15 | Other | Bolt-action | | 30.06-7mm |
| C | 16 | | | |
| C | 17 | Other | Bolt-action | | |

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| C 18 | Ruger | | Ranch Rifle | 223 |
| C 19 | | | | .243 and larger |
| C 20 | | | | |
| C 21 | | | | |
| C 22 | | | | |
| C 23 | Other | Bolt-action | | 7mm  mag |
| C 24 | | | | |
| C 25 | Other | Savage | | 7mm mag |
| C 26 | | | | |
| C 27 | Winchester | | 70 | 30.06 |
| C 28 | | | | |
| C 29 | Winchester | | 70 | 30.06 - .338 |
| C 30 | | | | |
| C 31 | Winchester | | Manual, bolt | 300 |
| C 32 | Remington | | All | 270 - 7mm |
| C 33 | Winchester | | 70 | 30.06 - .300 win |
| C 34 | Other | Bolt-action | | 270 or larger for elk and deer |
| C 35 | Other | Bolt-action or semiautos | | .270 or larger |
| A 1 | | | | |
| A 2 | Remington | | | 7 mm |
| A 3 | | | | |
| A 4 | Winchester | | 70 | 300 |
| A 5 | | | | |
| A 6 | | | | |
| A 7 | | | | |
| A 8 | | | | |
| A 9 | | | | |
| A 10 | | | | |
| A 11 | | | | |
| A 12 | | | | |
| A 13 | | | | |
| A 14 | | | | |
| A 15 | | | | |
| A 16 | | | | |
| A 17 | | | | |
| A 18 | | | | |
| A 19 | | | | |
| A 20 | | | | |
| A 21 | Remington | | 70 | 30.06 |
| A 22 | Winchester | | 70 | 7 mm or larger |
| A 23 | Remington | | 700 | 25 to 30 |
| A 24 | Remington | | | 300 Mag |
| A 25 | | | | |
| A 26 | Browning | | A bolt | 30.06 or larger |
| A 27 | | | | 300 win mag, 30.06 or 270 |

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 28 | | | | |
| A 29 | | | | |
| A 30 | | hunter's choice | | .308 |
| A 31 | | | | |
| A 32 | | | | |
| A 33 | | | | |
| A 34 | | | | |
| A 35 | Remington | | 700 BDL | 7 mm |
| A 36 | | | | |
| A 37 | | | | |
| A 38 | | | | |
| A 39 | | | | |
| A 40 | Winchester | | | 30.06 - 300 win mag |
| A 41 | | | | |
| A 42 | | | | |
| A 43 | | | | |
| A 44 | | | | |
| A 45 | Remington | | Bolt Action | 25.06 - 328 |
| A 46 | | | | |
| A 47 | | | | |
| A 48 | | | | |
| A 49 | | | | |
| A 50 | | | | |
| A 51 | | | | |
| A 52 | | | | |
| A 53 | | | | |
| A 54 | | | | |
| A 55 | | | | |
| A 56 | | | | |
| A 57 | | | | |
| A 58 | | | | |
| A 59 | | | | |
| A 60 | | | | |
| A 61 | Other | Savage | Bolt Action | 7 mm mag |
| A 62 | | | | |
| A 63 | | | | |
| A 64 | Remington | | 700 | 300 win mag |
| A 65 | Other | Weatherby | | |
| A 66 | | | | |
| A 67 | Remington | | Bolt Action | 7 mm, 30.06, 7 mm mag |
| A 68 | | | | |
| A 69 | | | | |
| A 70 | | | Pump | 30.06 |
| A 71 | | | | 7 mm mag |
| A 72 | | | | |

| | | Q 6. Rifles recommended for clients | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 73 | | | | |
| A 74 | Winchester | | 7C | 300 win mag |
| A 75 | | | | |
| A 76 | | | | |
| A 77 | | | | |
| A 78 | Remington | | Bolt Action | |
| A 79 | | | | |
| A 80 | | | | |
| A 81 | | | | |
| A 82 | | | | |
| A 83 | | | | |
| A 84 | | | | |
| A 85 | | | | |
| A 86 | | | | |
| A 87 | Browning | | | 308, 7 mm, 30.06 |
| A 88 | | | | |
| A 89 | Other | Heckler-Koch | HK-91 | 308 |
| A 90 | | | | |
| A 91 | Winchester | | 70 | 300 mag |
| A 92 | | | | |
| A 93 | Browning | | Mark II | 300 mag, 280-270-25.06 |
| A 94 | | | | |
| A 95 | | | | |
| A 96 | | | | |
| A 97 | Other | Semi-auto | | 30 cal or larger |
| A 98 | | | | |
| A 99 | | | | |
| A 100 | | | | |
| A 101 | | | | |
| A 102 | | | | |
| A 103 | | | | |
| A 104 | | | | |
| A 105 | | | | |
| A 106 | Remington | | 700 | 300 win mag |
| A 107 | | | | |
| A 108 | | | | |
| A 109 | Winchester | | | 300 mag, 30.06 |
| A 110 | | | | |
| A 111 | | | | |
| A 112 | | | | |
| A 113 | | | | |
| A 114 | | | | |
| A 115 | | | | |
| A 116 | | | | |
| A 117 | | | | |

| | | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|---|
| case | | Make | Other Make | Model | Caliber |
| A | 118 | | | | |
| A | 119 | Other | Weatherby | | 300 |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | | | | |
| A | 127 | | | | |
| A | 128 | | | | |
| A | 129 | | | | |
| A | 130 | | | | |
| A | 131 | | | | |
| A | 132 | Other | Weatherby | | 700 mag |
| A | 133 | | | | |
| A | 134 | | | | |
| A | 135 | | | | |
| A | 136 | | | | |
| A | 137 | Other | Weatherby | | 300 |
| A | 138 | | | | |
| A | 139 | Remington | | 742 | 30.06 or 6 mm |
| A | 140 | | | | |
| A | 141 | | | | |
| A | 142 | | | | 7 mm recommended for deer and elk |
| A | 143 | | | | |
| A | 144 | Other | Weatherby | | from 7 mm mag to 338 for deer |
| A | 145 | Other | Weatherby | | 300 |
| A | 146 | Browning | | BDC | 300 |
| A | 147 | | | | |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Winchester | | Bolt Action | |
| A | 151 | | | | |
| A | 152 | | | | |
| A | 153 | Remington | | 700 | 7 mm |
| A | 154 | | | | |
| A | 155 | Other | Weatherby | | 7 mm |
| A | 156 | | | | |
| A | 157 | | | | |
| A | 158 | | | | |
| A | 159 | Winchester | Remington | | 340 Weather - .338 mag |
| A | 160 | | | | |
| A | 161 | | | | |
| A | 162 | | | | |

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| B 1 | | | | |
| C 1 | | | | |
| C 2 | Browning | | | 300 |
| C 3 | | | | |
| C 4 | | | | |
| C 5 | | | | |
| C 6 | | | | |
| C 7 | | | | |
| C 8 | Remington | | 700 | 280 |
| C 9 | | | | |
| C 10 | Winchester | | 70 | .270 |
| C 11 | | | | |
| C 12 | | | | |
| C 13 | | | | |
| C 14 | | | | |
| C 15 | | | | |
| C 16 | | | | |
| C 17 | Other | Pump | | |
| C 18 | Other | AK-47 | | |
| C 19 | | | | 6mm |
| C 20 | | | | |
| C 21 | | | | |
| C 22 | | | | |
| C 23 | Other | Bolt-action | | .30 |
| C 24 | | | | |
| C 25 | Other | Bolt-action | | 30.06 |
| C 26 | | | | |
| C 27 | Ruger | | 77 | .300 win mag |
| C 28 | | | | |
| C 29 | Remington | | 700 | 30.06-.338 |
| C 30 | | | | |
| C 31 | Remington | | Manual bolt | 300 |
| C 32 | Browning | | All | .270 - 7mm |
| C 33 | Ruger | | 77 | 30.06 - .300 win |
| C 34 | | | | |
| C 35 | | | | |
| A 1 | | | | |
| A 2 | Winchester | | | 375 |
| A 3 | | | | |
| A 4 | Winchester | | 70 | 270 |
| A 5 | | | | |
| A 6 | | | | |
| A 7 | | | | |
| A 8 | | | | |
| A 9 | | | | |

| | | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber | |
| A | 10 | | | | |
| A | 11 | | | | |
| A | 12 | | | | |
| A | 13 | | | | |
| A | 14 | | | | |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | | | | |
| A | 20 | | | | |
| A | 21 | Remington | | 70 | .270 |
| A | 22 | | | | |
| A | 23 | Other | Any bolt action | 1-5 shotmag | 25 to 30 |
| A | 24 | Other | Weatherby | | 300 mag |
| A | 25 | | | | |
| A | 26 | | | | |
| A | 27 | | | | |
| A | 28 | | | | |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | | | | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | | | | |
| A | 35 | | | | |
| A | 36 | | | | |
| A | 37 | | | | |
| A | 38 | | | | |
| A | 39 | | | | |
| A | 40 | Ruger | | | 30.06 - 300 win mag |
| A | 41 | | | | |
| A | 42 | | | | |
| A | 43 | | | | |
| A | 44 | | | | |
| A | 45 | Winchester | | Bolt Action | 25.06 - 328 |
| A | 46 | | | | |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | | | | |
| A | 53 | | | | |
| A | 54 | | | | |

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 55 | | | | |
| A 56 | | | | |
| A 57 | | | | |
| A 58 | | | | |
| A 59 | | | | |
| A 60 | | | | |
| A 61 | Other | Weatherby | Bolt Action | 338 mag |
| A 62 | | | | |
| A 63 | | | | |
| A 64 | Other | Weatherby Mark V | | 300 Wea Mag |
| A 65 | Winchester | Browning | | |
| A 66 | | | | |
| A 67 | Winchester | Bolt Action | | |
| A 68 | | | | |
| A 69 | | | | |
| A 70 | | | Bolt Action | 7 mm |
| A 71 | | | | |
| A 72 | | | | |
| A 73 | | | | |
| A 74 | Browning | | A Bolt | 300 win mag |
| A 75 | | | | |
| A 76 | | | | |
| A 77 | | | | |
| A 78 | | | | |
| A 79 | | | | |
| A 80 | | | | |
| A 81 | | | | |
| A 82 | | | | |
| A 83 | | | | |
| A 84 | | | | |
| A 85 | | | | |
| A 86 | | | | |
| A 87 | Other | Weatherby | | 300, 7 mm, 338 |
| A 88 | | | | |
| A 89 | Other | Springfield Armory | FNG | 308 |
| A 90 | | | | |
| A 91 | Ruger | | 77 | 300 mag |
| A 92 | | | | |
| A 93 | Ruger | | M77 | 270, 26-06, 300 mag |
| A 94 | | | | |
| A 95 | | | | |
| A 96 | | | | |
| A 97 | | | | |
| A 98 | | | | |
| A 99 | | | | |

| | Q 6. Rifles recommended for clients | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 100 | | | | |
| A 101 | | | | |
| A 102 | | | | |
| A 103 | | | | |
| A 104 | | | | |
| A 105 | | | | |
| A 106 | Browning | | 1895 | 45-70 govt |
| A 107 | | | | |
| A 108 | | | | |
| A 109 | | | | |
| A 110 | | | | |
| A 111 | | | | |
| A 112 | | | | |
| A 113 | | | | |
| A 114 | | | | |
| A 115 | | | | |
| A 116 | | | | |
| A 117 | | | | |
| A 118 | | | | |
| A 119 | Other | Savage | | 270 or 30.06 |
| A 120 | | | | |
| A 121 | | | | |
| A 122 | | | | |
| A 123 | | | | |
| A 124 | | | | |
| A 125 | | | | |
| A 126 | | | | |
| A 127 | | | | |
| A 128 | | | | |
| A 129 | | | | |
| A 130 | | | | |
| A 131 | | | | |
| A 132 | | | | |
| A 133 | | | | |
| A 134 | | | | |
| A 135 | | | | |
| A 136 | | | | |
| A 137 | | | | |
| A 138 | | | | |
| A 139 | | | | |
| A 140 | | | | |
| A 141 | | | | |
| A 142 | | | | 300 winmag recommended |
| A 143 | | | | |
| A 144 | Remington | Weatherby | | from 270 to 338 for deer and elk |

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 145 | Remington | | | 270 |
| A 146 | Ruger | | #1 | 7 mag |
| A 147 | | | | |
| A 148 | | | | |
| A 149 | | | | |
| A 150 | | | | All bolt action with a round nose point |
| A 151 | | | | |
| A 152 | | | | |
| A 153 | | | | |
| A 154 | | | | |
| A 155 | | | | |
| A 156 | | | | |
| A 157 | | | | |
| A 158 | | | | |
| A 159 | | | | 300mag,416Rigby,375mag,270 mag,500 nitroxpress |
| A 160 | | | | |
| A 161 | | | | |
| A 162 | | | | |
| B 1 | | | | |
| C 1 | | | | |
| C 2 | Other | Sako | | 300 |
| C 3 | | | | |
| C 4 | | | | |
| C 5 | | | | |
| C 6 | | | | |
| C 7 | | | | |
| C 8 | | | | |
| C 9 | | | | |
| C 10 | Winchester | | 100 | .308 |
| C 11 | | | | |
| C 12 | | | | |
| C 13 | | | | |
| C 14 | | | | |
| C 15 | | | | |
| C 16 | | | | |
| C 17 | Other | Weatherby | | 243 to 300 |
| C 18 | | | | |
| C 19 | | | | |
| C 20 | | | | |
| C 21 | | | | |
| C 22 | | | | |
| C 23 | | | | |
| C 24 | | | | |
| C 25 | | | | |
| C 26 | | | | |

Hunting Guides

| case | | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| C | 27 | Springfield | | M Garard | 30.06 - 308 |
| C | 28 | | | | |
| C | 29 | Browning | | A bolt | 30.06 - .338 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | Ruger | | All | .270 - 7 mm |
| C | 33 | Browning | | A bolt | 30.06 - 300 win |
| C | 34 | | | | |
| C | 35 | | | | |

Table title: Q 6. Rifles recommended for clients

| Q 8. Recommended rifles based on AK47 et.al. | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A | 26 AK47 | | | 7.62x37 |
| A | 89 Other | Russian | SKS | 7.62 |
| A | 113 FN-FAL | | | |
| A | 159 AK47 | | | |
| C | 2 AK47 | | Antelope and Varmints and Target Shooters | 30 |
| C | 10 AK47 | | | 7.62x39 |
| C | 18 AK47 | | | |
| C | 25 AK47 | | | 7.62 |
| C | 27 FN-FAL | | | 308 |
| A | 26 | SKS | | 7.62x37 |
| A | 89 HK91 | | | 308 |
| A | 113 | HK 99 | | |
| C | 2 AK47 | | Antelope and Varmints and Target Shooters | 243 |
| C | 10 HK91 | | | 308 |
| C | 25 | MAK 90 | | 7.62 |
| C | 27 | Century | L1A1 | 308 |
| A | 89 Other | Springfield Armory | FNG | 308 |
| A | 113 HK93 | | | |
| C | 10 HK93 | | | 223 |
| C | 25 | M-15 | | 223 |
| C | 27 HK91 | And clones | | 308 |

## Additional Comments by Hunting Guides

Additional comments:

(8) The respondent answered questions 1, 2, 3, and 5 with "None of your business." He then stated in question 4: "It's none of your business what kind, make, model or how many guns law abiding citizens of the U.S. own, prefer to shoot."

(9) The respondent wrote that he was no longer in business but that he had owned a waterfowl operation and upland bird operation (shotguns only). He added that assault rifles were not true sporting rifles and that they should be limited to use by the military and law enforcement agencies. However, he felt that true sporting weapons that can be modified into some "quasi-assault weapons" should not be restricted. He stated that he supported the effort to get military weapons off the streets but did not want the rights of true sportsmen to be affected.

(10) Although licensed, the respondent did not guide anyone during the past year.

(11) The respondent stated in question 6 that he recommends any legal caliber rifle that client is comfortable with and that is capable of killing the desired game.

(12) For question 6, the respondent replied that he didn't recommend any specific make or model, other than whatever his clients are most comfortable using so long as the weapons are legal for the particular game.

(15) The respondent stated that his organization was solely recreational wildlife watching and photography.

(17) The respondent did not answer the questions but informed us that it is illegal in Hawaii to hunt turkey with a rifle.

(23) The respondent stated that the study rifles were more suitable for militants than sportsmen. He added, "If they want to use these weapons let them go back to the service and use them to defend our country, not against it."

(25) The respondent stated that, in his 35 years of conducting big game hunts, he had never seen any of the study rifles used for hunting. He suggested that the rifles are made to kill people, not big game.

(26) The respondent recommended bolt-action rifles for his clients but stated that he doesn't demand that they use such rifles. The respondent recommended the study rifles in close-range situations in which there are multiple targets that may pose a danger to the hunter (e.g., coyotes, foxes, mountain lions, and bears).

(27) The respondent stated that he recommended the study rifles for hunting but not any specific make.

(32)  The respondent said that most of his clients are bow or pistol hunters.
      He said that there is little if any use for the study rifles in his
      outfitting service because it focuses on hunts of mountain lions and
      bighorn sheep.  However, he did recommend the study rifles on target
      ranges and in competitive shooting situations and cited his right to bear
      arms.

(35)  The respondent recommended bolt-action rifles for his clients.

(40)  The respondent stated that semiautomatic rifles (such as the AK47) and
      others are useful for predator hunting.

(41)  The respondent said that he recommended only ranges of calibers deemed
      suitable but not makes and models of specific rifles.

(44)  The respondent recommended the following calibers for hunting without any
      specific makes or models: 30.06, 300 Win mag, 338, and 270.

(47)  The respondent stated: "You are asking questions about certain makes of
      assault rifles, but you are going to end up going after ALL semiautomatic
      guns.  I've spent about 21 years HUNTING with shotguns and I've used
      semiautomatic models.  If you go down the list of times that one new law
      didn't end up being a whole sloo [sic] of other laws I would be surprised.
      Maybe some face-to-face with these weapons would be a good thing for
      politicians.  If they see how they are used in 'the Real World' then they
      may make better amendments."

(49)  The respondent specifically recommended the study rifles only for grizzly
      bears or moose.

(50)  The respondent stated that his business involved waterfowl hunting, which
      uses only shotguns.

(51)  The respondent replied: "It is my opinion this is a one sided survey, and
      does not tell the real meaning and purpose of the survey.  And that is to
      ban all sporting arms in the future.  The way this survey is presented is
      out of line."

(53)  The respondent stated: "I recommend to all my hunters that they join the
      NRA, vote Republican, and buy a good semi-auto for personal defense."

(57)  The respondent stated that most of his clients use bolt-action rifles.  He
      suggested that semiautomatics are not as accurate as bolt-action rifles.

(58)  The respondent stated that the survey did not pertain to his waterfowl
      hunting business since only shotguns are used.  He added that he did not
      believe semiautomatics in general present any more threat to the public
      than other weapons or firearms.  However, he suggested that cheaply made
      assault-type rifles imported from China and other countries are inaccurate
      and not suitable for hunting.

(59)  The respondent stated that he had no knowledge of the semiautomatic rifles
      beyond 30.06 or similar calibers for hunting.  He added that he did not
      have a use for "automatic" weapons.

2

(64) The respondent stated: "We need to look at weapons and determine what the designer's intent was for the weapon. We really don't need combat weapons in the hunting environment. I personally would refuse to guide for anyone carrying such a weapon."

(65) The respondent recommended the following calibers for hunting: 7mm, 30.06, .308, .708, 25.06, .243, 22.250, and 300 mag. However, he stated that the study rifles are of no use to the sporting or hunting community whatsoever.

(71) The respondent stated that he mainly hunts elk but did not recommend any additional information about specific firearms except for using 300 mag and 7 mm mag calibers.

(73) The respondent recommended any bolt-action or semiautomatic in the 30 or 7mm calibers. However, he stated that he doesn't allow his clients to use any models based on assault rifles: "They are not needed for hunting. A good hunter does not have these."

(78) The respondent recommended bolt-action rifles for hunting, particularly Browning and Remington.

(80) Although the respondent stated that he does not conduct guides, he did not see a reason to allow any rifles other those manufactured specifically for hunting and sport shooting: "All assault rifles are for fighting war and killing humans."

(82) The respondent stated that he used shotguns only.

(84) The respondent said that he did not allow semiautomatic or automatic rifles in his business. He specifically recommended manually operated rifles.

(90) The respondent stated that all the semiautomatics like AK47s are absolutely worthless and that he found no redeeming hunting value in any AK47 type of rifle. He further explained that the purpose of hunting is to use the minimum number of shells, not the maximum: "I have only known 1 [person] in 50 years to use an AK47. He shot the deer about 30 times. That wasn't hunting, it was murder." He suggested that he would be willing to testify in Congress against such weapons.

(92) The respondent stated that he had been contacted in error, as he was not in the hunting guide business.

(98) The respondent recommended any rifle that a client can shoot the best.

(101) The respondent wrote a letter saying that his business was too new to provide us with useful information about client use; however, he stated that the Chinese AK47 does a proficient job on deer and similar sizes of game and may be the only rifle that some poor people could afford. He said that he is willing to testify to Congress about the outrageous price of certain weapons.

(102) The respondent did not recommend rifles but recommended calibers .270, 30.06, .300, and 7mm.

(103) The respondent stated that he had clients who used semiautomatic rifles, but he didn't know which makes or models.

(104) The respondent recommended any legal weapons capable of killing game, "including the types mentioned under the 2nd amendment."

(105) The respondent stated that the semiautomatic rifles used by his clients were Remingtons.

(112) The respondent stated that he could not provide any useful information because his business was too new.

(113) The respondent recommended whatever is available to knock down an elk. He recommended specific calibers: 30.06, 300, or 338.

(115) The respondent questioned why anyone would use a semiautomatic firearm to hunt game: "Anyone using such horrible arms should be shot with one themselves. Any big game animal does not have a chance with a rifle and now you say people can use semiautomatic rifles."

(116) The respondent had had three clients who used semiautomatics with 30.06 and 270-caliber ammunition; however, he didn't know the makes or models.

(118) The survey questions were not answered, but the respondent wrote: "This is a stupid survey. No one contends they hunt much for big game with an AK47. The debate is over the right to own one, which the 2nd amendment says we can."

(119) The respondent recommended bolt-action rifles for hunting.

(121) The respondent stated that he uses only shotguns in his operation.

(122) The respondent recommended rifles with the calibers of .270 - 30.06 or larger to the .300 mag or .338 mag. However, he said that anything other than a standard semiautomatic sporting rifle is illegal in Colorado, where his business is conducted.

(123) The respondent, who is a bighorn sheep outfitter, stated that the semiautomatic rifles have no place in big game hunting. He recommended basic hunting rifles with calibers of 270 or 30.06.

(124) The respondent, who hunts mainly deer and elk, recommended calibers 270, 30.06, 300 mag, 7mm, 8mm, or 338.

(125) The respondent said that his clients did use semiautomatics, but he didn't have any specific information about which ones.

(126) The respondent stated that the study rifles should remain in one's home or on private property. He would like to have some for personal use but would not recommend them for hunting. He further expressed his displeasure with the Brady bill and stated that criminals need to be held accountable for their actions.

(127) The respondent, who hunts mostly elk and deer, said that the AK47 is not powerful enough to hunt elk; however, it may be ideal for smaller game, like deer or antelope. He recommended any rifles of 30.06 caliber or larger for hunting.

(131) The respondent recommended bolt-action rifles for his clients with calibers .24, .25, 7 mm, or .30. He cited his preference because of fewer moving parts, their ease to fix, and their lack of sensitivity to weather conditions in the field. He added, however, that he had seen the study rifles used with good success.

(132) The respondent stated that the study rifles are not worth anything in cold weather.

(133) The respondent recommended handguns for hunting in calibers 41 or 44 mag.

(136) The respondent did not recommend any rifles by make, but he did recommend a caliber of .308 or larger for elk.

(140) The respondent recommended any good bolt or semiautomatic in 270 caliber and up. He added: "I feel the government is too involved in our lives and seek too much control over the people of our country. I am 65 yrs old and see more of our freedom lost every day. I believe in our country but I have little faith in [organizations] like the A.T.F."

(145) The responded stated: "Don't send these guns out west. Thanks!"

(148) The respondent did not hunt turkey or deer and had no additional information to provide.

(149) The respondent said that he recommends specific rifles to his clients if they ask, usually 270 to 7mm caliber big game rifles.

(150) The respondent recommended Winchester, Remington, or any other autoloading hunting rifle.

(152) The respondent said that he recommended caliber sizes but not specific rifles.

(159) The respondent recommended any gun with which a client can hit a target. He stated that the AK47 could be used for hunting and target shooting.

(174) The respondent recommended bolt-action rifles to his clients.

(175) The respondent said that most of his deer-hunting clients use bolt-action rifles, such as Rugers and Remingtons, in calibers of 30.06, 270, or 243. In his duck guide service, only shotguns are used.

(180) The respondent wrote: "We agree people should not be allowed to have semiautomatics and automatics. This does not mean that you silly bastards in Washington need to push complete or all gun control."

(182) The respondent felt that the survey is biased because it didn't ask about hunting varmints. He stated that many of the study rifles are suitable for such activity.

(184) The respondent did not recommend single shots or automatics and only allows bolt action or pumps for use by his clients.

(188)   The respondent wrote that the study guns are good for small game hunting:
        "I have very good luck with them as they are small, easy to handle, fast-
        shooting and flat firing guns."

(192)   The respondent submitted a letter with the survey: "I do not recommend
        the use of semiautomatic weapons for hunting in my area.  Most of these
        weapons are prone to be unreliable because the owner does not know how to
        properly care for them in adverse weather.  The FN-FAL, HK91, HK93, and
        SIG SG550-1 are excellent and expensive weapons very much suited to
        competition shooting.

        "Have you surveyed the criminal element on their choice of weapons?  I
        suspect the criminal use of the six weapons you mentioned do law-abiding
        citizens compare a very small percentage to the same weapon used.  I
        realize that even one wrongful death is too many but now can you justify
        the over 300,000 deaths per year from government supported tobacco?

        "Gun control does not work - it never has and it never will.  What we
        need are police that capture criminals and a court system with the
        fortitude to punish them for their crimes."

(198)   The respondent stated that this was his first year in and that it was
        mainly a bow-hunting business.



**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**WASHINGTON, D.C. 20226**

DIRECTOR

DEC 1 0 1997

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary of the Treasury decided to conduct a review to determine whether modified semiautomatic assault rifles are properly importable under Federal law. Under 18 U.S.C. section 925(d)(3), firearms may be imported into the United States only if they are determined to be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The firearms in question are semiautomatic rifles based on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi designs.

As part of the review, the Bureau of Alcohol, Tobacco and Firearms (ATF) is interested in receiving information that shows whether any or all of the above types of semiautomatic rifles are particularly suitable for or readily adaptable to hunting or organized competitive target shooting. We are asking that your organization voluntarily complete the enclosed survey to assist us in gathering this information. We anticipate that the survey will take approximately 15 minutes to complete.

Responses must be received no later than 30 days following the date of this letter; those received after that date cannot be included in the review. Responses should be forwarded to the Bureau of Alcohol, Tobacco and Firearms, Department HSE, P.O. Box 50860, Washington, DC 20091. We appreciate any information you care to provide.

Sincerely yours,

John W. Magaw
Director

Enclosure

# ATF SURVEY OF HUNTING/SHOOTING EDITORS
# FOR RIFLE USAGE
### Page 1 of 2

1.  Does your publication recommend specific types of centerfire semiautomatic rifles for use in **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)* _____No *(Skip to #3)*

2. If your answer to item 1 is "Yes", please identify the specific centerfire semiautomatic rifles you recommend.

Make                    Model                    Caliber

_____

_____

_____

3. Does your publication recommend **against** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** for use in **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)* _____No *(Skip to #5)*

_____Yes, in certain circumstances. Please explain _____

_____ *(Continue)*

4. If your answer to item 3 is "Yes" or "Yes, in certain circumstances", please identify the specific rifles that you recommend **against** using for **hunting medium game ( for example, turkey) or larger game (for example, deer)?**

Make                    Model                    Caliber

_____

_____

_____

5. Does your publication recommend specific types of centerfire semiautomatic rifles for use in **high-power rifle competition**?

_____Yes *(Continue)* _____No *(Skip to #7)*

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

# ATF SURVEY OF HUNTING/SHOOTING EDITORS
# FOR RIFLE USAGE

**6.** If your answer to item 5 is "Yes", please identify the specific centerfire semiautomatic rifles you recommend.

| Make | Model | Caliber |
|------|-------|---------|
|      |       |         |
|      |       |         |
|      |       |         |

**7.** Does your publication recommend **against** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** for use in **high-power rifle competition**?

\_\_\_\_\_Yes *(Continue)* \_\_\_\_\_No *(Skip to #9)*

\_\_\_\_\_Yes, in certain circumstances. Please explain _____

_____*(Continue)*

**8.** If your answer to item 7 is "Yes" or "Yes, in certain circumstances", please identify the specific rifles your publication recommends **against** using for **high-power rifle competition**.

| Make | Model | Caliber |
|------|-------|---------|
|      |       |         |
|      |       |         |
|      |       |         |

**9.** Have you or any other author who contributes to your publication written any articles since 1989 concerning the use of semiautomatic rifles and their suitability for use in hunting or organized competitive shooting? *(Exclude Letters to the Editor.)*

\_\_\_\_\_Yes *(Continue)* \_\_\_\_\_No *(You are finished with the survey. Thank you.)*

**10.** If your answer to item 9 is "Yes", please submit a copy of the applicable article(s). Any material you are able to provide will be very beneficial to our study. Please indicate the publication, issue date and page for each article.

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Comments:

2. If your answer to item 1 is "Yes," please identify the specific centerfire rifles you recommend:

    (8)   Anything except Uzis.

    (9)   All study rifles except Uzi.

    (12)  See attached articles.

3. Please explain circumstances to question 3: Does your publication recommend against the use of any semiautomatic rifles whose design is based on the AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi for use in hunting medium game (for example, turkey) or larger game (for example, deer)?

    (12)  When the caliber is inappropriate or illegal for the specific game species.

4. Other rifle make recommendations in response to question 4: If your answer to item 3 is "Yes" or "Yes, in certain circumstances," please identify the specific rifles that you recommend against using for hunting medium game (for example, turkey) or larger game (for example, deer)?

    (12) See attached articles.

The following two items are for the responses to question 6: If your answer to item 5 is "Yes," please identify the specific centerfire semiautomatic rifles you recommend:

Model

(5)  Springfield M1A and Colt AR-15.

Caliber

(5)   7.62m (M1A) and .223 (Colt).

The following items are for questions 9 and 10 on articles written and the submission of these articles with the survey.

Article 1

    (8)   No articles enclosed.

    (9)   Semiautomatic Takes Tubb to HP Title.

    (10)  No articles attached.

Article 2

    (9)   AR-15 Spaceguns Invading Match.



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

DIRECTOR

DEC 1 0 1997          O:F:S:DMS
                      3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary
of the Treasury decided to conduct a review to
determine whether modified semiautomatic assault rifles
are properly importable under Federal law.  Under
18 U.S.C. section 925(d)(3), firearms may be imported
into the United States only if they are determined to
be of a type generally recognized as particularly
suitable for or readily adaptable to sporting purposes.
The firearms in question are semiautomatic rifles based
on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi
designs.

As part of the review, the Bureau of Alcohol, Tobacco
and Firearms (ATF) is interested in receiving
information that shows whether any or all of the above
types of semiautomatic rifles are particularly suitable
for or readily adaptable to hunting or organized
competitive target shooting.  We are asking that your
organization voluntarily complete the enclosed survey
to assist us in gathering this information.  We
anticipate that the survey will take approximately
15 minutes to complete.

Responses must be received no later than 30 days
following the date of this letter; those received after
that date cannot be included in the review.  Responses
should be forwarded to the Bureau of Alcohol, Tobacco
and Firearms, Department FG, P.O. Box 50860,
Washington, DC 20091.  We appreciate any information
you care to provide.

                    Sincerely yours,

                    John W. Magaw

                    John W. Magaw
                    Director

Enclosure

OMB No. 1512-0542

# ATF SURVEY OF STATE FISH AND GAME COMMISSIONS
## FOR RIFLE USAGE

State:_____

**1.** Do the laws in your state place any prohibitions or restrictions (other than seasonal) on the use of **high-power rifles for hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*       _____No *(Skip to #2)*

**1a.** If "Yes", please cite law(s) and briefly describe the restrictions.

_____

_____

_____

_____

_____

_____

**2.** Do the laws in your state place any prohibitions or restrictions (other than seasonal) on the use of **semiautomatic** rifles for **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*       _____No *(Skip to #3)*

**2a.** If "Yes", please cite law(s) and briefly describe the restrictions.

_____

_____

_____

_____

_____

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

_____ *(Continue)*

**3.** What, if any, is the minimum caliber or cartridge dimensions that may be used for **hunting medium game (for example, turkey) or larger game (for example, deer)?**

Caliber: _____ **OR** Dimensions:_____

_____There is no minimum.

**4.** Does your commission or state collect any data on the types of rifles used in your state for **hunting medium game ( for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*          _____No *(You are finished with the survey. Thank you.)*

**4a.** If "Yes", please provide hard copies of any such available data for the past two hunting seasons of 1995 and 1996. Any data that you provide will be most beneficial to our study.

If you would like us to contact you regarding the data, please provide your name and phone number.

Name:_____Phone:_____

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

## Survey Fish and Game Commissions for Rifle Usage

| STATE | Restrictions | | Minimum Caliber or Cartridge | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q5 |
| | HiPwr | Semiauto | Minimum Caliber | Minimum Cartridge | Collect Data |
| Alabama | Yes | Yes | Any center fire rifle | None | No |
| Alaska | Yes | No | No Centerfire for big game | | No |
| Arizona | No | Yes | .22 mag or larger | | No |
| Arkansas | Yes | No | None | None | No |
| California | No | No | See Question 1a | See Question 1a | No |
| Colorado | Yes | Yes | 0.24 | | No |
| Connecticut | Yes | Yes | | | |
| Delaware | Yes | Yes | | | |
| Florida | Yes | Yes | No rimfire for deer | | No |
| Georgia | Yes | No | .22 Centerfire or larger | | No |
| Hawaii | No | No | | | |
| Idaho | Yes | Yes | .22 rimfire | | No |
| Illinois | Yes | Yes | None | None | No |
| Indiana | Yes | Yes | None | | No |
| Iowa | Yes | Yes | not provided | | No |
| Kansas | Yes | Yes | .23 caliber or larger | | No |
| Kentucky | No | No | | | |
| Louisiana | Yes | No | .22 Centerfire | | No |
| Maine | Yes | No | .22 mag or larger | | No |
| Maryland | Yes | Yes | | | |
| Massachusetts | Yes | No | None | None | Yes |
| Michigan | Yes | Yes | .23 or larger | | No |
| Minnesota | Yes | No | 0.23 | 1.285" | No |
| Mississippi | Yes | No | None | None | No |
| Missouri | Yes | Yes | None | None | No |
| Montana | No | No | None | | No |
| Nebraska | No | No | | | |
| Nevada | No | No | | | No |
| New Hampshire | Yes | Yes | | above .22 rimfire | No |
| New Jersey | Yes | Yes | None | None | No |
| New Mexico | Yes | No | .24 centerfire or larger | | No |
| New York | Yes | Yes | Must be centerfire | | No |
| North Carolina | Yes | No | None | None | No |
| North Dakota | Yes | Yes | .22 Centerfire or larger | | No |
| Ohio | Yes | No | None | None | No |
| Oklahoma | Yes | Yes | .22 magnum | | No |
| Oregon | Yes | Yes | .22 or .24 or larger | | No |
| Pennsylvania | Yes | Yes | None | None | No |
| Rhode Island | Yes | Yes | | .229 maximum | No |
| South Carolina | Yes | No | Must be larger than .22 | | No |
| South Dakota | Yes | No | None | None | No |
| Tennessee | Yes | Yes | .24 or larger caliber | | No |
| Texas | Yes | No | None | None | No |
| Utah | Yes | No | | None | No |
| Vermont | Yes | No | | | No |
| Virginia | Yes | Yes | .23 caliber for deer | | No |
| Washington | Yes | Yes | .240 or larger for coyote | | No |
| West Virginia | No | No | | Any centerfire | No |
| Wisconsin | Yes | No | .22 caliber or larger | | No |
| Wyoming | Yes | No | | 23/100 bullet dia. | No |

## State Fish and Game Commissions

Restrictions for High Powered Rifles

1a. Please cite law(s) and briefly describe the restrictions.

### Alabama
(19) No automatic weapons, no silenced weapons.

### Alaska
(23) Bison hunters must use a caliber capable of firing a 200-grain bullet having 2,000 pounds of energy at 100 yards.

### Arkansas
(11) No rifles for turkey.

### California
(22) Centerfire for big game, 10 gauge or smaller for resident small game.

### Colorado
(10) Semiautomatic rifle may not hold more than 6 rounds.

### Connecticut
(39) Shotgun only on public lands.  Can use any type of rifle on private land.

### Delaware
(40) No rifles - shotguns/muzzle loaders only.

### Florida
(25) Machine guns and silencers not permitted for any hunting.

### Georgia
(29) No hi-power rifles allowed for turkey hunting.

### Hawaii
(49) Must have discharge of 1200 foot pounds.

### Idaho
(30) No hi-power rifles allowed for hunting turkey.

### Illinois
(12) Turkey or deer may not be hunted with rifle.  Deer may not be hunted with muzzle loading rifle.  No restriction on rifles for coyote, fox, and woodchuck, etc.

### Indiana
(34) No hi-power rifles allowed for deer or turkey hunting.  Limited restrictions for specified areas.

### Iowa
(26) Cannot use rifles for turkey or deer, only shotgun or bow and arrow.  No difference if public or private lands.  For coyote or fox, there is no restriction on rifles, magazine size, or caliber.

### Kansas
(33) Must use ammunition specifically designed for hunting.

## Louisiana
(6)  No rifles for turkey hunting.  Rifles for deer hunting must be no smaller than .22 centerfire.

## Maine
(32) No hi-power rifles for turkey and water fowl.  Some limited restrictions for specific areas.

## Maryland
(42) Some restrictions based on county.  They are allowed in western and southern Maryland.  Shotguns only in and around Baltimore and Washington, D.C.

## Massachusetts
(14) Rifles not permitted for hunting deer and turkey.

## Michigan
(27) No turkey hunting with hi-power rifle.  No night hunting with hi-power rifle.  Deer hunting with hi-power rifle allowed only in lower southern peninsula.  Limited restrictions for specific areas.

## Minnesota
(13) Caliber must be at least .23.  Ammunition must have a case length of at least 1.285".  .30 caliber M1 carbine cartridge may not be used.

## Mississippi
(15) Restricts turkey hunting to shotguns.  However quadriplegics may hunt turkey with a rifle.

## Missouri
(5)  Rifles not permitted for turkey.  Self loading firearms for deer may not have a combined magazine + chamber capacity of more than 11 cartridges.

## Nebraska
(43) Allowed and frequently used, but magazine capacity maximum is six rounds.

## Nevada
(1)  Answer to #3 refers to NAS 501.150 and NAS 503.142.  Not for turkey.

## New Hampshire
(7)  Magazine capacity no more than 5 rounds.  Prohibits full metal jacket bullets for hunting.  Prohibits deer hunting with rifles in certain towns.

## New Jersey
(17) No rifles.

## New Mexico
(31) No hi-power rifles allowed for hunting turkey.

## New York
(24) No semiautomatics with a magazine capacity of greater than 6 rounds; machineguns and silencers not permitted for any hunting.  Limited restrictions for specific areas.

## North Carolina
(20) Centerfire rifles not permitted for turkey hunting.

## North Dakota
(28) No hi-power rifles for turkey hunting.

## Ohio
(3)  Prohibits high power rifles for turkey, deer and migratory birds.  High
     power rifles can be used on all other legal game animals.

## Oklahoma
(8)  Centerfire rifles only for large game.  Magazines for .22 centerfire rifles
     may not hold more than 7 rounds.

## Oregon
(2)  OAR 635-65-700(1) must be .24 caliber or larger center fire rifle, no full
     automatic; OAR 635-65-700(2) hunters shall only use centerfire rifle .22
     caliber; OAR-65-700(5) no military or full jacket bullets in original or
     altered form.  Limited restrictions for specific areas.

## Pennsylvania
(16) Rifles not permitted in Philadelphia & Pittsburgh areas.

## Rhode Island
(44) .22 center fire during the summer for woodchucks.

## South Carolina
(18) No rifle for turkey, rifle for deer must be larger than .22 caliber

## South Dakota
(50) Magazine not more than five rounds.

## Tennessee
(37) No hi-power rifles allowed for turkey hunting.

## Texas
(21) Rimfire ammunition not permitted for hunting deer, antelope, and bighorn
     sheep; machine guns and silencers not permitted for hunting any game
     animals.

## Utah
(9)  No rifles for turkey hunting.

## Vermont
(47) Turkey size less than 10 gauge.  Deer/moose/beer, no restriction on
     caliber.

## Virginia
(48) 23 caliber or larger for deer and bear.  No restrictions for turkey.  No
     magazine restrictions, shotgun limited to 3 shells.  Restrictions vary from
     county to county - approximately 90 different rifle restrictions in the
     State of Virginia based on the county restrictions.  Sawed-off firearms are
     illegal to own unless with a permit, if barrel less than 16 inches for
     rifle, and 18 inches for shotgun.

## Washington
(46) Hunting turkey limited to shotguns.  Small game limited to shotguns.

## Wisconsin
(36) No .22 rimfire rifles for deer hunting.

## Wyoming
(4)  Big game and trophy animals, firearm must have a bore diameter of at least 23/100 of an inch.


Restrictions for Semiautomatic Rifles

2a. Please cite law(s) and briefly describe the restrictions.

## Alabama
(19) Turkey may not be hunted with a centerfire rifle or rimfire rifle. Semiautomatic rifles of proper caliber are legal for all types of hunting. No restrictions on magazine capacity, except wildlife management areas where centerfire rifles are restricted to 10 round max.

## Arizona
(38) Magazine cannot hold more than 5 rounds.

## Colorado
(10) Semiautomatic rifle may not hold more than 6 rounds.

## Connecticut
(39) Shotgun only on public lands.  Any type of rifle can be used on private land.

## Delaware
(40) No rifles - shotguns/muzzle loaders only.

## Florida
(25) No semiautomatic centerfire rifles having a magazine capacity greater than 5 rounds.

## Idaho
(30) No hi-power rifles (including semiautomatic) allowed for turkey hunting.

## Illinois
(12) See #1.

## Indiana
(34) No hi-power rifles allowed for turkey hunting.

## Iowa
(26) Cannot use rifles for turkey or deer, only shotgun or bow and arrow.  No difference in public or private land.  For coyote or fox, there is no restriction on rifle, magazine size, or caliber.

## Kansas
(33) Must use ammunition specifically designed for hunting.

## Maryland
(42) Some restrictions.  Based on county.  Shotguns only in and around Baltimore and Washington, D.C.

## Michigan
(27) Unlawful to hunt with semiautomatic rifles capable of holding more than 6 rounds in magazine and barrel.  Rimfire (.22 cal) rifles excluded from restrictions.

## Missouri
(5)  Combined magazine + chamber capacity may not be more than 11 cartridges.

## New Hampshire
(7)  Turkey may not be hunted with rifles.  Rifles may not have magazine capacity of more than 5 cartridges.

## New Jersey
(17) No rifles.

## New York
(24) No semiautomatics with a magazine capacity of greater than 6 rounds.

## North Dakota
(28) No hi-power rifles (including semiautomatics) may be used for hunting turkey.

## Oklahoma
(8)  See #1.

## Oregon
(2)  OAR 635-65-700(1) and (2) limits magazine capacity to no more than 5 cartridges.

## Pennsylvania
(16) Semiautomatic rifles are not lawful for hunting in Pennsylvania.

## Rhode Island
(44) Cannot use semiautomatic during the winter, only during the summer months for woodchucks (during daylight from April 1 to September 30).

## Tennessee
(37) No hi-power rifles, including semiautomatics, allowed for turkey hunting.

## Vermont
(47) Semiautomatic 5 rounds or less.

## Virginia
(48) Semiautomatics are legal wherever rifles can be used.  23 caliber or larger for deer and bear.  No restrictions for turkey.  No magazine restrictions, shotgun limited to 3 shells.  Restrictions vary from county to county - approximately 90 different rifle restrictions in the State of Virginia based on the county restrictions.  Sawed-off firearms are illegal to own unless with a permit, if barrel less than 16 inches for rifle, and 18 inches for shotgun.  Striker 12 - drums holds 12 or more rounds and is illegal.

<u>Washington</u>
(46) Cannot use fully automatic for hunting.

<u>West Virginia</u>
(45) Cannot use fully automatic firearms for hunting.

## Comments Provided by Law Enforcement Agencies

(1)  No research.

(2)  No research.

(3)  NOBLE and others forwarded information to a U.S. Senator on circumstances concerning police officers killed or injured by these weapons.  No data was provided.

(4)  No research.

(7)  The organization stated: "Most of the data available on guns and crime does not provide the detail needed to identify the types of guns listed. . . .  We have conducted several surveys that refer to assault rifles generically, including the Survey of Inmates in State Correctional Facilities 1991, Survey of Inmates in Local Jails 1995, and the Survey of Adults on Probation 1995.  The data on assault weapons has not been analyzed in the recently released Survey of Adults on Probation 1995 or in the yet to be released Survey of Inmates in Local Jails 1995.

"Our report Guns Used in Crime includes the results of an analysis of the stolen data from the FBI's National Crime Information Center database.  Our analysis was limited to general categories of guns and calibers of handguns.  The recent evaluation of the assault weapons ban funded by the National Institute of Justice analyzed a more recent set of the same data with an emphasis on assault weapons.  The results of this evaluation were reported in Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994."

"BJS [Bureau of Justice Statistics] supports the Firearms Research Information System (FARIS). . . .  This database contains firearms-related information from surveys, research, evaluations, and statistical reports. . . .  We queried this database for any research on assault weapons.  The results of the query include both the reports listed above, as well as several others.  Please note that in BJS's report Guns Used in Crime refers to the report Assault Weapons and Homicide in New York City prepared by one of our grantees.  While the data are from 1993, the report provides interesting insights into the use of assault weapons and homicide.  Another source of data on assault weapons and crime is the FBI's Law Enforcement Officers Killed and Assaulted series, which records the type of gun used in killings of police officers.  Several of the reports listed in the FARIS query used these data, including Cop Killers: Assault Weapons Attacks on America's Police, and Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns with High Capacity Magazines."

(9)  Guns in America: National Survey on Private Ownership and Use of Firearms (May 1997) states: The 1994 NSPOF (National Survey of Private Ownership of Firearms) estimates for the total number of privately owned firearms is 192 million: 65 million handguns, 70 million rifles, 49 million shotguns, and 8 million other long guns.



DEC 1 0 1997

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary
of the Treasury decided to conduct a review to
determine whether modified semiautomatic assault rifles
are properly importable under Federal law.  Under
18 U.S.C. section 925(d)(3), firearms may be imported
into the United States only if they are determined to
be of a type generally recognized as particularly
suitable for or readily adaptable to sporting purposes.
The firearms in question are semiautomatic rifles based
on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi
designs.

As part of the review, the Bureau of Alcohol, Tobacco
and Firearms (ATF) is interested in receiving
information that shows whether any or all of the above
types of semiautomatic rifles are particularly suitable
for or readily adaptable to hunting or organized
competitive target shooting.

Although ATF is not required to seek public comment on
this study, the agency would appreciate any factual,
relevant information concerning the sporting use
suitability of the rifles in question.

Your voluntary response must be received no later than
30 days from the date of this letter; those received
after that date cannot be included in the review.
Please forward your responses to the Bureau of Alcohol,
Tobacco and Firearms, Department TA, P.O. Box 50860,
Washington, DC 20091.

Sincerely yours,

John W. Magaw
Director

## Comments Provided by Industry Members and Trade Associations

(12) The respondent felt that definitions and usage should be subject to rulemaking. The respondent stated that limits on "sporting" use do not take into account firearms technology and its derivative uses among millions of disparate consumers. Millions of gun owners currently engage in informal target competition.

The respondent stated that the firearms are suitable for sporting purposes and that ATF's practice of making "ad hoc" revisions to import criteria disrupts legitimate commerce. The respondent recommends that all changes to criteria should be subject to rulemaking.

(19) The respondent submitted a brochure and a statement supported by seven letters from FFL's who sell the SLR-95 and 97 and ROMAK 1 and 2. The respondent and all the supporting letters attest to the suitability of these guns for hunting because (1) they are excellent for deer or varmint hunting; (2) they are used by many for target shooting; (3) their ammunition is readily available and affordable; and (4) they are excellent for young/new hunters because of low recoil, an inexpensive purchase price, durability, and light weight, as well as being designed only for semiautomatic fire.

(20) One respondent submitted results of its independently conducted survey, which consisted of 30 questions. The results of the survey suggest that 36 percent of those queried actually use AK47-type rifles for hunting or competition, 38 percent use L1A1-type rifles for hunting or competition, and 38 percent use G3-type rifles for hunting or competition. Other uses include home defense, noncompetitive target shooting, and plinking. Of those queried who do not currently own these types of rifles, 35 percent would use AK-type rifles for hunting or competition, 36 percent would use L1A1-type rifles for hunting or competition, and 37 percent would use G3-type rifles for hunting or competition.

(22) The respondent claims that the majority of the study rifles' length and calibers can be used only for sporting purposes. The respondent asserts that the only technical detail remaining after the 1989 decision that is similar to a military rifle is the locking system. After 1989, the imported rifles have no physical features of military assault rifles. All have features which can be found on any semiautomatic sporting/hunting rifle.

However, the respondent writes that the Uzi-type carbines are "not suitable for any kind of sporting events other than law enforcement and military competitions because the caliber and locking system do not allow precise shooting over long distances."

(23) One respondent, who imports the SAR-8 and SAR-4800 that are chambered for .308 Winchester ammunition, states that neither rifle possesses any of the characteristics of either the 1989 determination or the 1994 law. The respondent states that both are permitted in match rifle and other competitions. The respondent states that only two questions should be considered to determine hunting suitability of a rifle: Whether the caliber is adequate to take one or more game species and whether the gun is safe and reliable. The respondent states that there is no factual or legal basis to conclude that the rifles are not "particularly suitable" for sporting purposes.

(24) The respondent writes: "The particular firearms differ from other guns that are universally acceptable only in cosmetic ways. There is no functional difference between semiautomatic firearms based on the external features that have been keyed on in an attempt to implement the import restrictions of the 1994 Crime Bill. As further attempts to differentiate functionally identical firearms by these features for the purposes of culling out those that might be politically suitable for an administrative import ban is wrong."

(25) The respondent writes that the SLG95 was developed exclusively for hunting and competitive shooting. The respondent points out that it is capable of single firing only and cannot be reassembled for use as an automatic weapon. It is made for endurance and accuracy to 300 meters.

(26) The respondent recommends AK47 variants specifically, but believes all study rifles are suitable or adaptable for sporting. The respondent states that a Galil-chambered .308/.223 with a two-position rear sight, adjustable front sight, or scope mount channel, are reliable, durable, accurate, and suitable for hunting and organized competitive shooting. The respondent states that the Uzi, which chambers 9mm and 40 S&W, two-position rear sight, and an adjustable front sight is suitable for organized competitive target shooting.

(27) The respondent states that the SIG-SG550-1, in its original configuration, never possessed assault rifle features. The respondent states that is was built as a semiautomatic, not a fully automatic that was converted or modified to semiautomatic. It does have protruding pistol grip, and its ergonomics are geared toward its original design of goal-precision shooting. The respondent says that the name "Sniper" was a marketing decision, and it is extremely popular in .223 competitions. Its price isolates the gun to the competitor/collector.

(28)  Letters from H&K users were submitted in support of their
      continued importation and use as sporting arms. Specifically,
      the SR9 and PSG1 were said to be clearly suitable and utilized
      daily for hunting and target shooting. The respondent states
      that sport is defined as "an active pastime, diversion,
      recreation" and that the use of these is all the justification
      needed to allow their importation. The PSG1 has been imported
      since 1974, and the SR9 since 1990. The semiautomatic feature
      dates to turn of the century.

      The respondent states that the cost would dissuade criminals from
      using them. The respondent refers to ATF's reports "Crime Gun
      Analysis (17 Communities)" and "Trace Reports 1993-1996" to show
      that the H&K SR9 and PSG1 are not used in crime. In the 4-year
      period covered by the reports, not one was traced.

(29)  The respondent faults the 1989 report both for not sufficiently
      addressing the issue of ready adaptability, as well as for the
      limited definition of sporting purposes. The respondent states
      that sport is defined as "that which diverts, and makes mirth;
      pastime, diversion." The respondent says that the NRA sponsors
      many matches, and personally attests to the FN-FAL and HK91 as
      being perfectly suitable for such matches. The respondent states
      that the rifles are also used for hunting deer, rabbits, and
      varmints. Further, the respondent remarks that the use of these
      rifles in crime is minuscule.


                        **Importer/Individual Letters**

On January 15, 1998, the study group received a second submission from
Heckler and Koch, dated January 14, 1998. It transmitted 69 letters
from individuals who appeared to be answering an advertisement placed
in Shotgun News by Heckler and Koch. The study group obtained a copy
of the advertisement, which requested that past and current owners of
certain H&K rifles provide written accounts of how they use or used
these firearms. The advertisement stated that the firearms in
question, the SR9 and the PSG1, were used for sporting purposes such as
hunting, target shooting, competition, collecting, and informal
plinking. The advertisement also referred to the 120-day study and the
temporary ban on importation, indicating that certain firearms may be
banned in the future.

Synopses of Letters:

1.    The writer used his SR9 to hunt deer (photo included).

2.    The writer used his SR9 to hunt deer (photo included).

3.    The writer used his SR9 for informal target shooting and plinking.

4.    The writer used his SR9 for target practice and recreation.

5.    The writer (a police officer) used SR9 to hunt. Said that it's too
      heavy and expensive for criminals.


                                    3

6.  The writer used his SR9 for competition.

7.  The writer used H&K rifles such as these around the farm to control wild dog packs.

8.  The writer used his SR9 to hunt deer.

9.  The writer used his SR9 to hunt, participate in target practice, and compete.

10. The writer used his H&K rifles for informal target shooting.

11. The writer used his SR9 to hunt elk because it's rugged, and to shoot targets.

12. The writer used his SR9 to target practice.

13. The writer used his HK91 to hunt varmints and compete in military rifle matches.

14. The writer does not use the firearms but is familiar with their use for target shooting, hunting, and competition.

15. The writer uses HK firearms for DCM marksmanship competition.

16. The writer used his HK93 for 100-yard club matches and NRA-high power rifle matches.

17. The writer does not own the firearms but enjoys shooting sports and collecting.

18. The writer used his HK91 to hunt deer, boar, and mountain goat and in high-power match competitions.

19. The writer used his SR9 to shoot targets and for competitions.

20. The writer used his HK91 to shoot varmints, hunt small and big game, and shoot long-range silhouettes.

21. The writer used his SR8 to hunt deer, target shoot, and plink.

22. The writer used his HK93 to shoot in club competitions.

23. The writer used his SR9 to shoot targets because the recoil does not impact his arthritis.

24. The writer (a police officer) does not own the firearm but never sees HKs used in crime.

25. The writer used his HKs for target shooting, competition, and collection.

26. The writer does not own the firearms but likes recreational target shooting.

27. Writer does not own the firearms but states, "Don't ban."

28. The writer used his SR9 for hunting deer, varmints, and groundhogs; for target shooting; and for occasional competitions.

29. The writer used his SR9 to hunt deer because it's accurate, rugged, and reliable.

30. The writer used his SR9 to hunt deer and elk.

31. The writer used his SR9 to target shoot.

32. The writer used his SR9 to hunt deer and target shoot.

33. The writer used his HK91 to shoot military rifle 100-yard competitions.

34. The writer used his SR9 for hunting varmints and coyotes, for target shooting, and for competitions.

35. The writer used his SR9 to hunt deer and target shoot.

36. The writer (a former FBI employee) used his SR9 for hunting varmints and for precision and target shooting.

37. The writer used his HK for target shooting and competition.

38. The writer used his SR9 for informal target shooting and plinking and his HK91 for bowling pin matches, high-power rifle competitions, informal target shooting, and plinking.

39. The writer used his SR9 to plink and shoot targets, saying it's too heavy for hunting.

40. The writer has an HK91 as part of his military collection and indicates it may be used for hunting.

41. The writer used his SR9 to target shoot.

42. The writer used his SR9 to hunt deer and target shoot.

43. The writer does not own the firearms but says, "Don't ban."

44. The writer used his SR9 and HK93 for hunting deer, for target shooting, and for home defense.

45. The writer states, "Don't ban."

46. Writer states, "Don't ban."

47. Writer states, "Don't ban."

48. The writer owns an SR9; no use was reported.

49. Writer used his SR9 to compete in club matches and "backyard competitions."

50. The writer used his HK to hunt boar and antelope.

51. The writer states, "Don't ban."

52. The writer (a police officer) does not own the firearms but states that the are not used by criminals.

53. The writer used his HK91 to hunt deer.

54. The writer (a police trainer) says that the PSG1 is used for police sniping and competitive shooting because it's accurate. He says that it's too heavy to hunt with and has attached an article on the PSG1.

55. The writer used her two PSG1s for target shooting and fun.

56. The writer used his SR9 and PSG1 to hunt and target shoot.

57. The writer used his two PSG1s to hunt and target shoot.

58. The writer provides an opinion that the SR9 is used to hunt and target shoot.

59. The writer used his PSG1 for hunting deer and informal target shooting.

60. The writer used his PSG1 to target shoot and plink.

61. The writer states, "Don't ban."

62. The writer used his HK91 to target shoot.

63. The writer used his HK91 to target shoot.

64. The writer (a U.S. deputy marshall) used his SR9 to shoot at the range.

65. The writer used his SR9 to hunt deer and coyotes.

66. The writer used his SR9 to competitively target shoot.

67. The writer used his SR9 to hunt deer and bear.

68. The writer uses military-type rifles like these for predator control on the farm.

69. The writer used his SR9 to target shoot, plink, and compete in DCM matches.

(7) Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994, Final Report. March 13, 1997.

(8) Identical comments were received from five members of the JPFO. They are against any form of gun control or restriction regardless of the type of firearm. References are made comparing gun control to Nazi Germany.

(9) The respondent contends that police/military-style competitions, "plinking," and informal target shooting should be considered sporting. Note: The narrative was provided in addition to survey that Century Arms put on the Internet.

The respondent questions ATF's definition of "sporting" purposes. The respondent contends that neither the Bill of Rights nor the Second Amendment places restrictions on firearms based on use.

(13) Citing the 1989 report, the respondent states that the drafters of the report determined what should be acceptable sports, thus excluding "plinking."

The respondent states that appearance (e.g., military looking) is not a factor in determining firearms' suitability for sporting purposes. It is their function or action that should determine a gun's suitability. Over 50 percent of those engaged in Practical Rifle Shooting use Kalashnikov variants. Further, citing U.S. vs. Smith (1973), the "readily adaptable" determination would fit all these firearms.

(14) The respondent states that the vast majority of competitive marksmen shoot either domestic or foreign service rifles. Only 2-3 participants at any of 12 matches fire bolt-action match rifles. If service rifles have been modified, they are permitted under NRA rule 3.3.1.

The respondent says that attempts to ban these rifles "is a joke."

(15) The respondent states that these firearms are used by men and women alike throughout Nebraska. All of the named firearms are used a lot all over the State for hunting. The AK47 has the same basic power of a 30/30 Winchester. All of these firearms function the same as a Browning BAR or a Remington 7400. Because of their design features, they provide excellent performance.

(16) The respondent states that the Bill of Rights does not show the second amendment connected to "sporting purposes." The respondent says that all of the firearms in question are "service rifles," all can be used in highpower rifle competition (some better than others), but under no circumstances should "sporting use" be used as a test to determine whether they can be sold to the American public. The respondent states that "sporting use" is a totally bogus question.

(17)   The respondent's basic concern is that the scope of our survey is
       significantly too narrow (i.e., not responsive to the Presidential
       directive, too narrow to address the problem, and inadequate to the
       task).  The respondent states, "We do not indicate that our
       determination will impact modifications made to skirt law.  We rely
       on the opinions of the 'gun press.'  At a minimum, the Bureau
       should deny importation of: any semiautomatic capable of accepting
       with a capacity of more than 10 rounds, and any semiautomatic rifle
       with a capacity to accept more rounds than permitted by the State
       with the lowest number of permitted rounds.  Deny any semiautomatic
       that incorporates cosmetically altered 'rule-beating'
       characteristics.  Deny any semiautomatic that can be converted by
       using parts available domestically to any of the 1994 banned
       guns/characteristics.  Deny any semiautomatic manufactured by any
       entity controlled by a foreign government.  OR manufactured by a
       foreign entity that also manufactures, assembles or exports
       assault-type weapons.  Deny any semiautomatic that contains a part
       that is a material component of any assault type weapon made,
       assembled, or exported by the foreign entity which is the source of
       the firearm proposed to be imported."

       "A material component of any assault type weapon, assembled or
       exported by the foreign entity, which is, the source of the
       firearms proposed to be imported.  The gun press has fabricated
       'sporting' events to justify these weapons.  The manner in which we
       are proceeding is a serious disservice to the American people."

       Attachments:  That Was Then, This is Now; Assault Weapons:
       Analysis, New Research, and Legislation; Assault Weapons and
       Accessories in America; and Cop Killers.  All authored by the
       Violence Policy Center.

(30)   The respondent states, "At least for handguns, and among young
       adult purchasers who have a prior criminal history, the purchase of
       an assault-type firearm is an independent risk factor for later
       criminal activity on the part of the purchaser."

       NOTE:  The above study was for assault-type handguns used in
       criminal activity versus other handguns.  The study involved only
       young adults, and caution should be used in extending these results
       to other adults and purchasers of rifles.  However, the respondent
       states, it is plausible that findings for one class of firearms may
       pertain to another closely related class.

(31)   The 1996 National Survey of Fishing, Hunting and Wildlife-
       Associated Recreation.  The publication outlines 1996 expenditures
       for guide use and percentage of hunters using guides for both big
       game and small game hunting.

(32) In a memo from the Center to Prevent Handgun Violence the sections are Legal Background, History of Bureau Application of the "Sporting Purposes" Test, The Modified Assault Rifles under Import Suspension Should Be Permanently Barred from Importation, [The Galils and Uzis Should Be Barred from Importation Because They Are Banned by the Federal Assault Weapon Statute, and All the Modified Assault Rifles Should Be Barred from Importation Because They Fail the Sporting Purposes Test]. The conclusion states: "The modified assault rifles currently under suspended permits should be permanently barred from importation because they do not meet the sporting purposes test for importation under the Gun Control Act of 1968 and because certain of the rifles [Galils and Uzis] also are banned by the 1994 Federal assault weapon law."

(10) The respondent does not recommend the Uzi, but he highly recommends the others for small game and varmints. He feels that the calibers of these are not the caliber of choice for medium or large game; however, he believes that the SIG and H&K are the best-built semiautomatics available.

He can not and will not defend the Uzi, referring to it as a "piece of junk."

The respondent feels that because of their expense and their being hard to find, the study rifles (excluding the Uzi) would not be weapons of choice for illegal activities.

(11) The respondent questions ATF's definition of "sporting" and "organized shooting." He feels that ATF's definition is too narrow and based on "political pressure."

The respondent feels that the firearms are especially suitable for competitive shooting and hunting and that the restrictions on caliber and number of cartridges should be left to the individual States. He has shot competitively for 25 years.

(18) The respondent specifically recommends the MAK90 for hunting because its shorter length makes for easier movement through covered areas, it allows for quicker follow-up shots, its open sights allow one to come up upon a target more quickly, and it provides a quicker determination of whether a clear shot exists through the brush than with telescopic sighting.

(21) The respondent states that the second amendment discusses "arms," not "sporting arms." The respondent further states that taxpayer money was spent on this survey and ATF has an agenda. A gun's original intent (military) has nothing to do with how it is used now. "The solution to today's crime is much the same as it always has been, proper enforcement of existing laws, not the imposition of new freedom-restricting laws on honest people."

# Information on Articles Reviewed

(1)  Describes limited availability of Uzi Model B sporter with thumbhole stock.

(2)  Describes rifle and makes political statement concerning 1989 ban.

(3)  Describes Chinese copy of Uzi with thumbhole stock.

(4)  Quality sporting firearms from Russia.

(5)  Short descriptions of rifles and shotguns available.  Lead-in paragraph mentions hunting.  Does not specifically recommend any of the listed weapons for hunting.

(6)  Geared to retail gun dealers, provides list of available products.  States L1A1 Sporter is pinpoint accurate and powerful enough for most North American big game hunting.

(7)  Discusses the use of the rifle for hunting bear, sheep, and coyotes.  Describes accuracy and ruggedness.  NOTE: The rifle is a pre-1989 ban assault rifle.

(8)  Deals primarily with performance of the cartridge.  Makes statement that AK 47-type rifle is adequate for deer hunting at woods ranges.

(9)  Discusses gun ownership in the United States.  Highlighted text (not by writers) includes the National Survey of Private Ownership of Firearms that was conducted by Chilton Research Services of Drexel Hill, Pennsylvania during November and December 1994: 70 million rifles are privately held, including 28 million semiautomatics.

(10)  Discusses pre-1989 ban configuration.  Describes use in hunting, and makes the statement that "in the appropriate calibers, the military style autoloaders can indeed make excellent rifles, and that their ugly configuration probably gives them better handling qualities than more conventional sporters as the military discovered a long time ago."

(15)  Not article - letter from Editor of Gun World magazine discussing "sport" and various competitions.  Note: Attached submitted by Century Arms.

(16)  Letter addressed to "To Whom It May Concern" indicating HK91 (not mentioned but illustrated in photos) is suitable for hunting and accurate enough for competition.  Note: Submitted by Century Arms.

(17)  Describes a competition developed to test a hunter's skill.  Does not mention any of the rifles at issue.

(18)  Not on point - deals with AR 15.

(19)  Describes function, makes political statement.

(20)  Discusses function and disassembly of rifle.

(21)  Not on point - deals with AR 15 rifle.

(22) Discusses competition started to show sporting use of rifles banned for sale in California.  Unknown if weapons in study were banned in California in 1990.

(23) Not on point - deals with national matches.

(24) Not on point - deals with various surplus military rifles.

(25) Deals with 7.62x39mm ammunition as suitable for deer hunting and mentions the use in SKS rifles, which is a military style semiautomatic but not a part of the study.

(26) Not on point - deals with reloading.

(27) Not on point - deals with reloading.

(28) Not on point - deals with AR15 rifles in competition.

(29) Not on point - deals with the SKS rifle.

(30) Not on point - deals with national matches.

(31) Not on point - deals with national matches.

(32) Not on point - deals with national matches.

(33) Not on point - deals with national matches at Camp Perry.

(34) Not on point - deals with national matches at Camp Perry.

(35) Not on point - deals with 1989 national matches at Camp Perry.

(36) Not on point - deals with Browning BAR sporting semiautomatic rifles.

(38) Not on point - deals with AR15, mentions rifle in caliber 7.62 x 39.

(39) Not on point - deals with bullet types.

(40) Not on point - deals with reloading.

(41) Discusses tracking in snow.  Rifles mentioned do not include any rifles in study.

(42) Deals with deer hunting in general.

(43) Deals with rifles for varmint hunting.  Does not mention rifles in study.

(44) Not on point - deals with hunting pronghorn antelope.

(45) Deals with various deer rifles.

(46) Not on point - deals with two Browning rifles' recoil reducing system.

(47) Not on point - deals with bolt-action rifles.

(48) Not on point - deals with ammunition.

(49) Deals with modifications to AR15 trigger for target shooting.

(50) Not on point - deals with M1 Garand as a target rifle.

(51) Not on point - deals with reloading.

(52) Deals with impact of banning semiautomatic rifles would have on competitors at Camp Perry.

(53) Deals with economic impact in areas near Camp Perry if semiautomatic rifles banned.  Reprint from <u>Akron Beacon Journal</u>.

(54) Deals with training new competitive shooters - mentions sporting use of assault rifles, i.e., AR15.

(55) Not on point - article about Nelson Shew.

(56) Not on point - deals with reloading.

(57) Not on point - deals with shooting the AR15.

(58) Not on point - article about AR15 as target rifle.

(59) Not on point - article about well known competitive shooter.

(67) Not on point - deals with reloading.

(68) Discusses semiautomatic versions of M14.

(69) Discusses gas operation.

(70) Discusses right adjustment on M1 and M1A rifles.

(71) Discusses M1A and AR15-type rifles modified to remove them from assault weapon definition, and their use in competition.

(72) Deals with AR15 type rifle.

(73) Not on point - deals with AR15.

(74) Not on point - deals with target rifle based on AR15/M16.

(75) Not on point - deals with SKS rifle.

(76) Not on point - deals with reloading 7.62x39mm cartridge.

(77) Not on point - deals with reloading.  Mentions 7.62x39mm.

(78) Not on point - deals with ammunition performance.

(79) Deals with .223 Remington caliber ammunition as a hunting cartridge.

(80) Describes M1A (semiautomatic copy of M14) as a target rifle.

(81) Not on point - deals with bullet design.

(82) Not on point - deals with ammunition performance.

# Information on Advertisements Reviewed

(11) Indicates rifles are rugged, reliable and accurate.

(12) Describes rifles, lists price.

(13) Sporting versions of AK 47 and FAL.

(14) Sporting version of AK 47, reliable, accurate.

(61) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(62) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(63) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(64) Catalog of ammunition - lists uses for 9mm ammunition.

(65) Catalog of ammunition - lists uses for 9mm ammunition.

(66) Catalog of ammunition - lists recommended uses for 9mm ammunition.

# EXHIBIT 67
## TO KAPLAN DECLARATION

# Assault Weapons Profile



## United States
## Department of the Treasury

### Bureau of Alcohol, Tobacco and Firearms

## April 1994

# AK's -- Norinco, Mitchell, Poly Technologies

## Background

These assault rifles are semi-automatic copies of machineguns designed in Communist block countries. They are variations of post-World War II military rifles.

## Production

These firearms have been imported as follows: Norinco from China, Mitchell from Yugoslavia, Poly Technologies from China. In 1989, these assault rifles were banned from importation into the United States, because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 100,000 of these firearms have been imported into the U.S., and are still in circulation.

## Ammunition Magazine

These assault rifles come equipped with a 30-round magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 2,061 of the firearms traced for law enforcement officials nationwide. The traces included 329 narcotics investigations and 272 murder cases.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In a Detroit, Michigan suburb, a Norinco AK-47 was recovered in a narcotics-related double homicide. The weapon had an obliterated serial number. The AK-47 was one of the weapons purchased by an individual who was diverting them to drug traffickers.

Federal, State and local officers recently raided the Kentucky Courts public housing complex in Washington, DC, following the fatal shooting of police officer Jason White. The seizure turned up six guns, including an AK-47 assault rifle. The Kentucky Court Crew gang is suspected of doling out guns, including assault weapons, and crack from an apartment within firing range of where Officer White was gunned down.



Shown is Norinco AK-47

1

# M-10, M-11, M-11/9, and M-12

## Background

These semi-automatic assault pistols are manufactured in the United States, and designed as semi-automatic copies of submachine guns. The M-11/9 weighs 3.25 pounds unloaded, 4.25 pounds when fully loaded, some of SWD's M-11/9 models were manufactured as rifles.

## Production

Approximately 100,000 of these firearms have been manufactured.

## Ammunition Magazine

These assault pistols come equipped with a 32-round magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 3,091 of the firearms traced for law enforcement officials nationwide. They were traced for 561 narcotics investigations, 313 murder cases, and 125 instances of assault.

According to ATF's Tracing Center, from 1991 through the present, the M11/9 has been in the top 10 firearms that were traced.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In October 1992, a bank in Sykesville, Maryland was robbed by two gunmen using a MAC firearm that had been purchased in West Virginia. Four tellers were taken hostage and shot. Two of the tellers subsequently died.

In Atlanta, Georgia, 11 individuals were indicted in a gun-trafficking scheme. For 2 years, nearly 1,000 guns were shipped illegally to New York, where many were recovered in crimes in New York City. The men had converted a number of semi-automatic Cobray 9mm pistols (MAC 10) into automatic operation.

A Houston, Texas police officer made a traffic stop and was critically wounded, shot four or five times by the driver. The suspect got away and later, the suspect attempted a robbery. A trooper approached the suspect's car and was met with assault weapon fire. After abandoning his car, the suspect continued shooting at the pursuing officers and a gun battle ensued. The suspect was clutching a MAC 11 when he was killed. A search of his vehicle disclosed an AK-47.



Shown is SWD M11/9

3

# Action Arms UZI and Galil

## Background

These assault rifles and pistols are semi-automatic copies of machineguns designed in Israel. They are variations of post-World War II military rifles.

## Production

In 1989, these assault rifles were banned from importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 10,000 of these firearms were imported into the U.S. prior to the ban and are in circulation today. The UZI assault pistol was banned from importation into the United States in 1993 by President Clinton because it did not meet the sporting purpose criteria under the Gun Control Act. The UZI assault rifle has the same appearance as the submachine gun, and was first imported in 1980. The Galil was introduced into U.S. commerce in 1982.

## Ammunition Magazine

The UZI Carbine chambers 9mm ammunition, and comes equipped with a 25-round magazine.

The Galil is a .308 caliber semi-automatic rifle and comes equipped with a 20-shot magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 755 of the firearms traced for law enforcement officials nationwide. Galils were traced for 9 narcotics investigations, 2 murder cases, and 2 instances of assault. UZIs were traced for 151 narcotics investigations, 47 murder cases, and 30 instances of assault.

* not all firearms used in crime are traced.

## Examples of Use in Crime

A Louisville, Kentucky police officer stopped a suspect in a shooting incident. The officer found, in the suspect's car, a 9mm UZI with an obliterated serial number and loaded with a magazine of 17 rounds.

In Boston, Massachusetts, an undercover agent infiltrated an Asian gang involved in illegal narcotics and gun sales. The undercover agent bought over a kilo of 91% pure heroin (street value of $1 million), and 29 guns. The purchased firearms included an Action Arms UZI, an SWD/Cobray M-11/9 pistol, an Intratec TEC-9 (converted to fire fully automatic), and an AK-47 assault rifle.



Shown is UZI Pistol

5

# Beretta AR-70

## Background

These assault rifles are semi-automatic copies of machineguns designed in Italy. They are variations of post-World War II military rifles.

## Production

In 1989, these assault rifles were banned from importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 1,000 of these firearms were imported into the U.S. prior to the ban, and remain in circulation.

## Ammunition Magazine

This gas-operated semi-automatic 5.56 x 45 mm assault rifle comes equipped with a 30-round ammunition magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 3 of the firearms traced for law enforcement officials nationwide.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In April 1992, ATF agents in Fargo, North Dakota recovered a Beretta AR-70, another long gun, 3 handguns and approximately 8,000 rounds of ammunition from a convicted illegal manufacturer of explosives.

In May 1993, the San Bernardino, California Sheriff's Office recovered a Beretta AR-70 and Intratec TEC 9 mm pistol and two pounds of methamphetamine from a suspected drug dealer. The suspect was convicted under California law of possessing an unregistered assault weapon and is awaiting trial on the drug charges.



Shown is Beretta AR70

7

# Colt AR-15

## Background

These assault rifles are semi-automatic copies of machineguns manufactured in the United States.   Semi-automatic versions of the M-16, they are variations of post-World War II military rifles.

## Production

Approximately 400,000 of these firearms have been manufactured.  In 1989, these assault rifles were banned from re-importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act.

## Ammunition Magazine

The Colt AR-15 comes equipped with a 5-round detachable box magazine.  However, this firearm is typically fitted with a 30-round magazine as shown below.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 1,802 of the firearms traced for law enforcement officials nationwide.  They were traced for 212 narcotics investigations, 106 murder cases, and 39 instances of assault.

   * not all firearms used in crime are traced.

## Examples of Use in Crime

In San Fernando Valley, California, a son shot and killed his father using an AR-15.  He then opened fire on the police as they arrived on the scene.  One police officer was killed.

Seven-year old Dantrell Davis and his mother were walking to school in the Chicago, Illinois housing project where they lived.  A sniper armed with an AR-15 fired into the area as part of a violent feud between gangs.  A shot hit the boy in the head and he was killed instantly.



Shown is AR-15

9

# Fabrique Nationale
# FN/FAL, FN/LAR, and FNC

## Background

These assault rifles are semi-automatic copies of machineguns designed in Belgium, and used by various NATO countries. They are variations of post-World War II military rifles.

## Production

In 1989, these assault rifles were banned from importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 30,000 of these firearms had been imported into the U.S., and are in circulation today.

## Ammunition Magazine

These semi-automatic assault rifles come equipped with a 30-round magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 39 of the firearms traced for law enforcement officials nationwide.

* not all firearms used in crime are traced.

## Examples of Use in Crime

Police in Las Vegas, Nevada recovered an FN rifle and silencer, RPB 9mm converted machinegun and 2,268 rounds of ammunition from a convicted burglar.

A suspect was arrested by ATF agents in St. Louis, Missouri for dealing in cocaine. The suspect was arrested at his residence with 30 firearms in his possession, the majority of which were assault weapons, including an FN FNC assault rifle.



Shown is FN FNC

11

# Steyr AUG

## Background

These assault rifles are semi-automatic copies of machineguns designed in Austria. They are used by military forces in Austria, Australia and various NATO countries, and are variations of post-World War II military rifles.

## Production

In 1989, these assault rifles were banned from importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 10,000 of these firearms were imported into the U.S. prior to the ban, and remain in circulation. They have subsequently been manufactured in the United States in limited quantities.

## Ammunition Magazine

This semi-automatic assault rifle comes equipped with either a 30 or 40-shot magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 18 of the firearms traced for law enforcement officials nationwide.

* not all firearms used in crime are traced.

## Examples of Use in Crime

A self-styled survivalist and weapons expert was arrested by ATF agents in Dallas, Texas for posession of a large quantity of cocaine. Police searched a storage unit owned by the suspect and seized 2 Steyr AUGs and parts to convert them to fully automatic operation (all of the work to convert had been completed on the guns), a grenade launcher on a Colt AR-15 with the parts to convert the firearm to fully automatic, another AR-15 and several other firearms. The suspect later was convicted on Federal firearms charges and received 27 months in prison.



Shown is Steyr AUG

13

# Intratec TEC-9, TEC-DC9, and TEC-22

## Background

The TEC-9 weighs 50 ounces unloaded, and 72 ounces when fully loaded.

## Production

This semi-automatic assault pistol is manufactured domestically by Intratec in Miami. Approximately 200,000 have been manufactured.

## Ammunition Magazine

The TEC-9 chambers 9mm ammunition and comes equipped with a 36-round magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 3,710 of the firearms traced for law enforcement officials nationwide. They were traced for 638 narcotics investigations, 319 murder cases, and 234 instances of assault.

According to ATF's Tracing Center, from 1991 through 1993, the TEC-9 has been in the top 10 firearms that were traced.

* not all firearms used in crime are traced.

## Examples of Use in Crime

An ATF undercover agent in Colorado Springs, Colorado attempted to buy illegally purchased firearms from members of a Los Angeles based street gang (in Colorado). The gang members critically wounded the agent with a TEC-9, 9mm semi-automatic pistol.

In Anchorage, Alaska, the police department investigated an armed robbery in which a TEC-9 semiautomatic assault pistol was used. The suspect was one of 17 defendants in an ATF drug/gun conspiracy investigation.

A convicted felon with gang affiliations was arrested after taking a TEC-22 into the Louisiana State University Medical Center.



Shown is TEC 9 (DC 9)

15

# Street Sweeper/Striker 12
# (also including the USAS 12)

## Background

On March 1, 1994, these assault shotguns were classified as destructive devices under the National Firearms Act. As such, they may still be manufactured, but must be registered with ATF.

## Production

In 1984 and 1988, these shotguns were denied for importation because they did not meet the sporting purpose criteria under the Gun Control Act. They have subsequently been manufactured in the United States. Approximately 18,000 have been manufactured domestically to date.

The Striker was originally designed in Rhodesia and manufactured in South Africa for the purposes of crowd control. The Street Sweeper is a domestic copy of the original Striker 12. The USAS-12 was originally produced in Korea and was based on an automatic version of the weapon used by the military.

## Ammunition Magazine

These shotguns come equipped with magazine capacities of 12 shotgun shell rounds.

## Numbers Traced *

During the years 1991 to 1993, these shotguns accounted for 176 of the firearms traced for law enforcement officials nationwide. They were traced for 42 narcotics investigations, 11 murder cases, and 6 instances of assault.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In New Orleans, Louisiana, a multiple conviction felon, with a conviction for drive-by shootings, was found in possession of a Street Sweeper and TEC-22. He was a known gang member and escaped from custody after an initial arrest. He has been recaptured and is a suspect in several California homicides.

A Street Sweeper was confiscated from a tax protester in Minneapolis, Minnesota during a DWI. The Street Sweeper was decorated with Nazi insignias -- the words "White Power" and swastikas.

A Street Sweeper was confiscated from a suspect who was believed to have participated in the recent Brooklyn Bridge attack on a group of Hasidic Jews in New York City.



Shown is Street Sweeper

17

# Questions and Answers About Semi-Automatic Assault Weapons

## What are semi-automatic assault weapons?

As defined in the Senate Crime Bill and in legislation pending in the House of Representatives, assault weapons are large capacity, semi-automatic firearms designed and configured for rapid fire, combat use (the Street Sweeper/Striker 12 shotguns have a wind-up drum). Most are patterned after machine guns used by military forces. They have distinct features which separate them from sporting firearms.

Many are banned from being imported into the United States, but all can be legally manufactured in this country. Passing assault weapons legislation removes these guns from circulation.

## Why ban semi-automatic assault weapons?

Assault weapons make up only 1% of the guns in circulation in the United States. They account for up to 8% of the guns traced by law enforcement officials in the investigation of criminal activity. They are preferred by criminals over law abiding citizens 8 to 1. A number of these guns rank in the top 10 of all guns traced in relation to crime.

The way to show that we are serious about violent crime is to ban assault weapons. We are not being tough on gangsters if we allow open access to gangster weapons. Passing assault weapons legislation puts an end to an arms race on our streets.

## Some people say semi-automatic assault weapons are just different looking versions of sporting firearms?

Some people might try to tell us that a diesel locomotive is like a family sedan because they have internal combustion engines. Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. They are mass produced mayhem.

## Can't conventional sporting firearms be fitted with large magazines?

The legislation now pending in Congress bans ammunition magazines with a capacity greater than 10 rounds.

If someone crafts an illegal magazine, we can prosecute that person. Right now factories legally turn out such magazines and distribute them by the truckload.

19

### Don't some gun owners say that this ban will lead to a ban of their semiautomatic sporting firearms?

The legislation pending in Congress specifically exempts nearly 700 conventional sporting firearms from its provisions. This legislation doesn't threaten the law abiding gun owners; it protects them and protects those who own no guns at all.

### Will banning these firearms have an impact on crime?

Yes, it will. These guns help the criminals who have them to commit their crimes, adding to the carnage. They embolden the crook. Access to them shifts the balance of power to the lawless.

It is also a matter of principle that we ban these semi-automatic assault weapons. For people who say they are serious about addressing violent crime, it is time to vote seriously about the firearms criminals prefer.

### The AR-15 comes equipped with a 5-round magazine. How can you classify this firearm as a rapid fire assault weapon?

Any weapon that takes a detachable magazine will hold a magazine of a larger capacity. Large capacity magazines of up to 150 rounds are available in unknown quantities for all of the firearms identified in this legislation, except the Street Sweeper. However, twenty and fifty-round magazines are readily available for use with these firearms.

# Firearms Exempted in Proposed Legislation as Hunting and Sporting Firearms

### Centerfire Rifles—Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle
Browning BAR Mark II Safari Magnum Rifle
Browning High-Power Rifle
Heckler & Koch Model 300 Rifle
Iver Johnson M-1 Carbine
Iver Johnson 50th Anniversary M-1 Carbine
Marlin Model 9 Camp Carbine
Marlin Model 45 Carbine
Remington Nylon 66 Auto-Loading Rifle
Remington Model 7400 Auto Rifle
Remington Model 7400 Rifle
Remington Model 7400 Special Purpose Auto Rifle
Ruger Mini-14 Autoloading Rifle (w/o folding stock)
Ruger Mini Thirty Rifle

### Centerfire Rifles—Lever & Slide

Browning Model 81 BLR Lever-Action Rifle
Browning Model 81 Long Action BLR
Browning Model 1886 Lever-Action Carbine
Browning Model 1886 High Grade Carbine
Cimarron 1860 Henry Replica
Cimarron 1866 Winchester Replicas
Cimarron 1873 Short Rifle
Cimarron 1873 Sporting Rifle
Cimarron 1873 30″ Express Rifle
Dixie Engraved 1873 Rifle
E.M.F. 1866 Yellowboy Lever Actions
E.M.F. 1860 Henry Rifle
E.M.F. Model 73 Lever-Action Rifle
Marlin Model 336CS Lever-Action Carbine
Marlin Model 30AS Lever-Action Carbine
Marlin Model 444SS Lever-Action Sporter
Marlin Model 1894S Lever-Action Carbine
Marlin Model 1894CS Carbine
Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action

21

Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rifle
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

### Centerfire Rifles—Bolt Action

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle
KDF K15 American Bolt-Action Rifle
Krico Model 600 Bolt-Action Rifle
Krico Model 700 Bolt-Action Rifles

22

Mauser Model 66 Bolt-Action Rifle
Mauser Model 99 Bolt-Action Rifle
McMillan Signature Classic Sporter
McMillan Signature Super Varminter
McMillan Signature Alaskan
McMillan Signature Titanium Mountain Rifle
McMillan Classic Stainless Sporter
McMillan Talon Safari Rifle
McMillan Talon Sporter Rifle
Midland 1500S Survivor Rifle
Navy Arms TU–33/40 Carbine
Parker-Hale Model 81 Classic Rifle
Parker-Hale Model 81 Classic African Rifle
Parker-Hale Model 1000 Rifle
Parker-Hale Model 1100M African Magnum
Parker-Hale Model 1100 Lightweight Rifle
Parker-Hale Model 1200 Super Rifle
Parker-Hale Model 1200 Super Clip Rifle
Parker-Hale Model 1300C Scout Rifle
Parker-Hale Model 2100 Midland Rifle
Parker-Hale Model 2700 Lightweight Rifle
Parker-Hale Model 2800 Midland Rifle
Remington Model Seven Bolt-Action Rifle
Remington Model Seven Youth Rifle
Remington Model Seven Custom KS
Remington Model Seven Custom MS Rifle
Remington 700 ADL Bolt-Action Rifle
Remington 700 BDL Bolt-Action Rifle
Remington 700 BDL Varmint Special
Remington 700 BDL European Bolt-Action Rifle
Remington 700 Varmint Synthetic Rifle
Remington 700 BDL SS Rifle
Remington 700 Stainless Synthetic Rifle
Remington 700 MTRSS Rifle
Remington 700 BDL Left Hand
Remington 700 Camo Synthetic Rifle
Remington 700 Safari
Remington 700 Mountain Rifle
Remington 700 Custom KS Mountain Rifle
Remington 700 Classic Rifle
Ruger M77 Mark II Rifle
Ruger M77 Mark II Magnum Rifle
Ruger M77RL Ultra Light
Ruger M77 Mark II All-Weather Stainless Rifle
Ruger M77 RSI International Carbine
Ruger M77 Mark II Express Rifle
Ruger M77VT Target Rifle
Sako Hunter Rifle
Sako Fiberclass Sporter
Sako Safari Grade Bolt Action
Sako Hunter Left-Hand Rifle
Sako Classic Bolt Action
Sake Hunter LS Rifle
Sako Deluxe Lightweight
Sako Super Deluxe Sporter
Sako Mannlicher-Style Carbine
Sako Varmint Heavy Barrel

23

Sako TRG–S Bolt-Action Rifle
Sauer 90 Bolt-Action Rifle
Savage 110G Bolt-Action Rifle
Savage 110CY Youth/Ladies Rifle
Savage 110WLE One of One Thousand Limited Edition Rifle
Savage 110GXP3 Bolt-Action Rifle
Savage 110F Bolt-Action Rifle
Savage 110FXP3 Bolt-Action Rifle
Savage 110GV Varmint Rifle
Savage 112FV Varmint Rifle
Savage Model 112FVS Varmint Rifle
Savage Model 112BV Heavy Barrel Varmint Rifle
Savage 116FSS Bolt-Action Rifle
Savage model 116FSK Kodiak Rifle
Savage 110FP Police Rifle
Steyr-Mannlicher Sporter Models SL, L, M, S, S/T
Steyr-Mannlicher Luxus Model L, M, S
Steyr-Mannlicher Model M Professional Rifle
Tikka Bolt-Action Rifle
Tikka Premium Grade Rifles
Tikka Varmint/Continental Rifle
Tikka Whitetail/Battue Rifle
Ultra Light Arms Model 20 Rifle
Ultra Light Arms Model 28, Model 40 Rifles
Voere VEC 91 Lightning Bolt-Action Rifle
Voere Model 2165 Bolt-Action Rifle
Voere Model 2155, 2150 Bolt-Action Rifles
Weatherby Mark V Deluxe Bolt-Action Rifle
Weatherby Lasermark V Rifle
Weatherby Mark V Crown Custom Rifles
Weatherby Mark V Sporter Rifle
Weatherby Mark V Safari Grade Custom Rifles
Weatherby Weathermark Rifle
Weatherby Weathermark Alaskan Rifle
Weatherby Classicmark No. 1 Rifle
Weatherby Weatherguard Alaskan Rifle
Weatherby Vanguard VGX Deluxe Rifle
Weatherby Vanguard Classic Rifle
Weatherby Vanguard Classic No. 1 Rifle
Weatherby Vanguard Weatherguard Rifle
Wichita Classic Rifle
Wichita Varmint Rifle
Winchester Model 70 Sporter
Winchester Model 70 Sporter WinTuff
Winchester Model 70 SM Sporter
Winchester Model 70 Stainless Rifle
Winchester Model 70 Varmint
Winchester Model 70 Synthetic Heavy Varmint Rifle
Winchester Model 70 DBM Rifle
Winchester Model 70 DBM–S Rifle
Winchester Model 70 Featherweight
Winchester Model 70 Featherweight WinTuff
Winchester Model 70 Featherweight Classic
Winchester Model 70 Lightweight Rifle
Winchester Ranger Rifle
Winchester Model 70 Super Express Magnum
Winchester Model 70 Super Grade

24

Winchester Model 70 Custom Sharpshooter
Winchester Model 70 Custom Sporting Sharpshooter Rifle

## Centerfire Rifles—Single Shot

Armsport 1866 Sharps Rifle, Carbine
Brown Model One Single Shot Rifle
Browning Model 1885 Single Shot Rifle
Dakota Single Shot Rifle
Desert Industries G–90 Single Shot Rifle
Harrington & Richardson Ultra Varmint Rifle
Model 1885 High Wall Rifle
Navy Arms Rolling Block Buffalo Rifle
Navy Arms #2 Creedmoor Rifle
Navy Arms Sharps Cavalry Carbine
Navy Arms Sharps Plains Rifle
New England Firearms Handi-Rifle
Red Willow Armory Ballard No. 5 Pacific
Red Willow Armory Ballard No. 1.5 Hunting Rifle
Red Willow Armory Ballard No. 8 Union Hill Rifle
Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable
C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

## Drillings, Combination Guns, Double Rifles

Baretta Express SSO O/U Double Rifles
Baretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifle
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling

Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

### Rimfire Rifles—Autoloaders

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle
Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle
Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR–7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

### Rimfire Rifles—Lever & Slide Action

Browning BL–22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM–321 Pump Rifle
Rossi Model 62 SA Pump Rifle
Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles—Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle

26

Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM–452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60–J–ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Espronceda IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT–22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU–KKW Training Rifle
Navy Arms TU–33/40 Carbine
Navy Arms TU–KKW Sniper Trainer
Norinco JW–27 Bolt-Action Rifle
Norinco JW–15 Bolt-Action Rifle
Remington 541–T
Remington 40–XR Rimfire Custom sporter
Remington 541–T HB Bolt-Action Rifle
Remington 581–S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

## Competition Rifles—Centerfire & Rimfire

Anschutz 64–MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Itermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle
Anschutz 1910 Super Match II
Anschutz 54.18MS Silhouette Rifle
Anschutz Super Match 54 Target Model 2013

27

Anschutz Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP–1 ISU Standard Rifle
E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86–SR Specialty Rifle
McMillan M–86 Sniper Rifle
McMillan Combo M–87/M–88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M–89 Sniper Rifle
McMillan National Match Rifle
McMillan Long Range Rifle
Parker-Hale M–87 Target Rifle
Parker-Hale M–85 Sniper Rifle
Remington 40–XB Rangemaster Target Centerfire
Remington 40–XR KS Rimfire Position Rifle
Remington 40–XBBR KS
Remington 40–XC KS National Match Course Rifle
Sako TRG–21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG–UIT Rifle
Steyr-Mannlicher SSG P–I Rifle
Steyr-Mannlicher SSG P–III Rifle
Steyr-Mannlicher SSG P–IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

## Shotguns—Autoloaders

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A–303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun
Browning BSA 10 Stalker Auto Shotgun
Browning A–500R Auto Shotgun

Browning A–500G Auto Shotgun
Browning A–500G Sporting Clays
Browning Auto-5 Light 12 and 20
Browning Auto-5 Stalker
Browning Auto-5 Magnum 20
Browning Auto-5 Magnum 12
Churchill Turkey Automatic Shotgun
Cosmi Automatic Shotgun
Maverick Model 60 Auto Shotgun
Mossberg Model 5500 Shotgun
Mossberg Model 9200 Regal Semi-Auto Shotgun
Mossberg Model 9200 USST Auto Shotgun
Mossberg Model 9200 Camo Shotgun
Mossberg Model 6000 Auto Shotgun
Remington Model 1100 Shotgun
Remington 11–87 Premier Shotgun
Remington 11–87 Sporting Clays
Remington 11–87 Premier Skeet
Remington 11–87 Premier Trap
Remington 11–87 Special Purpose Magnum
Remington 11–87 SPS–T Camo Auto Shotgun
Remington 11–87 Special Purpose Deer Gun
Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun
Remington 11–87 SPS-Deer Shotgun
Remington 11–87 Special Purpose Synthetic Camo
Remington SP–10 Magnum-Camo Auto Shotgun
Remington SP–10 Magnum Auto Shotgun
Remington SP–10 Magnum Turkey Combo
Remington 1100 LT–20 Auto
Remington 1100 Special Field
Remington 1100 20-Gauge Deer Gun
Remington 1100 LT–20 Tournament Skeet
Winchester Model 1400 Semi-Auto Shotgun

## Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS Pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586–VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun

29

Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS–BG-Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun
Remington 879 SPS Special Purpose Magnum
Remington 870 SPS–T Camo Pump Shotgun
Remington 870 Special Field
Remington 870 Express Turkey
Remington 870 High Grades
Remington 870 Express
Remington Model 870 Express Youth Gun
Winchester Model 12 Pump Shotgun
Winchester Model 42 High Grade Shotgun
Winchester Model 1300 Walnut Pump
Winchester Model 1300 Slug Hunter Deer Gun
Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun
Winchester Model 1300 Turkey Gun
Winchester Model 1300 Ranger Pump Gun

### Shotguns—Over/Unders

American Arms/Franchi Falconet 2000 O/U
American Arms Silver I O/U
American Arms Silver II Shotgun
American Arms Silver Skeet O/U
American Arms/Franchi Sporting 2000 O/U
American Arms Silver Sporting O/U
American Arms Silver Trap O/U
American Arms WS/OU 12, TS/OU 12 Shotguns
American Arms WT/OU 10 Shotgun
Armsport 2700 O/U Goose Gun
Armsport 2700 Series O/U
Armsport 2900 Tri-Barrel Shotgun
Baby Bretton Over/Under Shotgun
Beretta Model 686 Ultralight O/U
Beretta ASE 90 Competition O/U Shotgun
Beretta Over/Under Field Shotguns
Beretta Onyx Hunter Sport O/U Shotgun
Beretta Model SO5, SO6, SO9 Shotguns
Beretta Sporting Clay Shotguns
Beretta 687EL Sporting O/U
Beretta 682 Super Sporting O/U
Beretta Series 682 Competition Over/Unders
Browning Citori O/U Shotgun
Browning Superlight Citori Over/Under
Browning Lightning Sporting Clays
Browning Micro Citori Lightning
Browning Citori Plus Trap Combo
Browning Citori Plus Trap Gun
Browning Citori O/U Skeet Models
Browning Citori O/U Trap Models

30

Browning Special Sporting Clays
Browning Citori GTI Sporting Clays
Browning 325 Sporting Clays
Centurion Over/Under Shotgun
Chapuis Over/Under Shotgun
Connecticut Valley Classics Classic Sporter O/U
Connecticut Valley Classics Classic Field Waterfowler
Charles Daly Field Grade O/U
Charles Daly Lux Over/Under
E.A.A./Sabatti Sporting Clays Pro-Gold O/U
E.A.A./Sabatti Falcon-Mon Over/Under
Kassnar Grade I O/U Shotgun
Krieghoff K-80 Sporting Clays O/U
Krieghoff K-80 Skeet Shotgun
Krieghoff K-80 International Skeet
Krieghoff K-80 Four-Barrel Skeet Set
Krieghoff K-80/RT Shotguns
Krieghoff K-80 O/U Trap Shotgun
Laurona Silhouette 300 Sporting Clays
Laurona Silhouette 300 Trap
Laurona Super Model Over/Unders
Ljutic LM-6 Deluxe O/U Shotgun
Marocchi Conquista Over/Under Shotgun
Marocchi Avanza O/U Shotgun
Merkel Model 200E O/U Shotgun
Merkel Model 200E Skeet, Trap Over/Unders
Merkel Model 203E, 303E Over/Under Shotguns
Perazzi Mirage Special Sporting O/U
Perazzi Mirage Special Four-Gauge Skeet
Perazzi Sporting Classic O/U
Perazzi MX7 Over/Under Shotguns
Perazzi Mirage Special Skeet Over/Under
Perazzi MX8/MX8 Special Trap, Skeet
Perazzi MX8/20 Over/Under Shotgun
Perazzi MX9 Single Over/Under Shotguns
Perazzi MX12 Hunting Over/Under
Perazzi MX28, MX410 Game O/U Shotguns
Perazzi MX20 Hunting Over/Under
Piotti Boss Over/Under Shotgun
Remington Peerless Over/Under Shotgun
Ruger Red Label O/U Shotgun
Ruger Sporting Clays O/U Shotgun
San Marco 12-Ga. Wildflower Shotgun
San Marco Field Special O/U Shotgun
San Marco 10-Ga. O/U Shotgun
SKB Model 505 Deluxe Over/Under Shotgun
SKB Model 685 Over/Under Shotgun
SKB Model 885 Over/Under Trap, Skeet, Sporting Clays
Stoeger/IGA Condor I O/U Shotgun
Stoeger/IGA ERA 2000 Over/Under Shotgun
Techni-Mec Model 610 Over/Under
Tikka Model 412S Field Grade Over/Under
Weatherby Athena Grade IV O/U Shotguns
Weatherby Athena Grade V Classic Field O/U
Weatherby Orion O/U Shotguns
Weatherby II, III Classic Field O/Us
Weatherby Orion II Classic Sporting Clays O/U

31

Weatherby Orion II Sporting Clays O/U
Winchester Model 1001 O/U Shotgun
Winchester Model 1001 Sporting Clays O/U
Pietro Zanoletti Model 2000 Field O/U

## Shotguns—Side by Sides

American Arms Brittany Shotgun
American Arms Gentry Double Shotgun
American Arms Derby Side-by-Side
American Arms Grulla #2 Double Shotgun
American Arms WS/SS 10
American Arms TS/SS 10 Double Shotgun
American Arms TS/SS 12 Side-by-Side
Arrieta Sidelock Double Shotguns
Armsport 1050 Series Double Shotguns
Arizaga Model 31 Double Shotgun
AYA Boxlock Shotguns
AYA Sidelock Double Shotguns
Beretta Model 452 Sidelock Shotgun
Beretta Side-by-Side Field Shotguns
Crucelegui Hermanos Model 150 Double
Chapuis Side-by-Side Shotgun
E.A.A./Sabatti Saba-Mon Double Shotgun
Charles Daly Model Dss Double
Ferlib Model F VII Double Shotgun
Auguste Francotte Boxlock Shotgun
Auguste Francotte Sidelock Shotgun
Garbi Model 100 Double
Garbi Model 101 Side-by-Side
Garbi Model 103A, B Side-by-Side
Garbi Model 200 Side-by-Side
Bill Hanus Birdgun Doubles
Hatfield Uplander Shotgun
Merkell Model 8, 47E Side-by-Side Shotguns
Merkel Model 47LSC Sporting Clays Double
Merkel Model 47S, 147S Side-by-Sides
Parker Reproductions Side-by-Side
Piotti King No. 1 Side-by-Side
Piotti Lunik Side-by-Side
Piotti King Extra Side-by-Side
Piotti Piuma Side-by-Side
Precision Sports Model 600 Series Doubles
Rizzini Boxlock Side-by-Side
Rizzini Sidelock Side-by-Side
Stoeger/IGA Uplander Side-by-Side Shotgun
Ugartechea 10-Ga. Magnum Shotgun

## Shotguns—Bolt Actions & Single Shots

Armsport Single Barrel Shotgun
Browning BT–99 Competition Trap Special
Browning BT–99 Plus Trap Gun
Browning BT–99 Plus Micro
Browning Recoilless Trap Shotgun
Browning Micro Recoilless Trap Shotgun
Desert Industries Big Twenty Shotgun

32

Harrington & Richardson Topper Model 098
Harrington & Richardson Topper Classic Youth Shotgun
Harrington & Richardson N.W.T.F. Turkey Mag
Harrington & Richardson Topper Deluxe Model 098
Krieghoff KS-5 Trap Gun
Krieghoff KS-5 Special
Krieghoff K-80 Single Barrel Trap Gun
Ljutic Mono Gun Single Barrel
Ljutic LTX Super Deluxe Mono Gun
Ljutic Recoilless Space Gun Shotgun
Marlin Model 55 Goose Gun Bolt Action
New England Firearms Turkey and Goose Gun
New England Firearms N.W.T.F. Shotgun
New England Firearms Tracker Slug Gun
New England Firearms Standard Pardner
New England Firearms Survival Gun
Perazzi TM1 Special Single Trap
Remington 90–T Super Single Shotgun
Snake Charmer II Shotgun
Stoeger/IGA Reuna Single Barrel Shotgun
Thompson/Center TCR '87 Hunter Shotgun.''.

# EXHIBIT 68

## TO KAPLAN DECLARATION



LIVE



**FOX23 News newsletters**
DELIVERED TO YOUR INBOX

| Zip Code | Email* (required) |

# Tulsa gun expert breaks down weapons seen in photos of Las Vegas shooting investigation

**by: Rick Maranon** Updated: Oct 3, 2017 - 6:35 PM



VIDEO: Gun expert breaks down weapons from Las Vegas investigation pictures

0 second left

2 of 2



**TULSA, Okla.** - Quick facts:

- FOX23's sister station in Boston was able to obtain pictures of weapons from the Las Vegas gunman's hotel room.
- A Tulsa gun expert analyzed the photos.
- He broke down what he was able to tell from the pictures.

LIVE

**Related Headlines**



Above average temps going into the weekend



Gov. Fallin: No budget agreement despite minority leader reports



Police: Pedestrian hit by two vehicles in east Tulsa

A local Tulsa gun expert analyzed exclusive crime scene photos obtained by FOX23's sister station FOX25 Boston to explain what kind of weapons the gunman in the Las Vegas mass shooting Sunday was using.

Law enforcement sources gave FOX25 Boston two photos of what appear to be high-powered rifles that have been verified to be from the shooter's hotel room and taken during the investigation into the shooting.



Geoff Portman, assistant manager at 2A Shooting Center in Tulsa, said that the guns shown in the photos can be legally owned and sold in the U.S., and he believes that if the gunman had more than a dozen of the high powered rifles in his possession, Stephen Paddock, the shooter, likely spent thousands of dollars on the arsenal he brought with him to Mandalay Bay Hotel to carry out the massacre.

Portman said there were scopes on at least one of the weapons in the photos shown to him by FOX23, but he said with the high capacity rounds and the power of the guns being used, Paddock really didn't need to aim at a specific target to hit someone.

"When you have that many rounds and at that caliber, you don't really need to be an expert to hit something," Portman said.

Portman said one of the pictures appeared to suggest that Paddock had a magazine on one gun that could carry 100 rounds at a time.

Portman said the two weapons in the photos are a Daniel's Defense DD5VI and a Smith & Wesson AR-15.

He also noted that though those are not automatic weapons, one of the guns in the photos was equipped with a device to allow it to recoil in a way where the shooter can fire off multiple rounds quickly.

Survivors and police had initially reported they were taking on automatic gunfire, and the shooter's brother said he didn't know how Paddock obtained automatic weapons.

Upon analysis of the two photos FOX23 has, Portman said everything looked to be legal and nothing appeared to be unlawfully modified.

**Trending on FOX23:**

- Las Vegas shooting: At least 59 dead, live updates
- Tulsa County Sheriff's Office talks fair safety after Las Vegas shooting
- Las Vegas shooting: Remembering the victims
- Rocker Tom Petty dies at age 66, manager says

**Trending Video**

Police arrest teen accused of robbery, rape and deadly shooting in south Tulsa



VIDEO: Community remembers Broken Arrow teacher shot and killed in south Tulsa

© 2017 Cox Media Group.



**Promoted Stories**                    Sponsored Links by Taboola

**An Incredible Card Now Offering 0% Interest Until December 2018**

NextAdvisor

LIVE

**Why Americans Are Refinancing With Quicken Loans**

QuickenLoans, NMLS #3030

**You should never shop on Amazon without using this trick – here's why**

Honey

**This Is Why You Can't Get Rid of That Swollen Belly!**

ActivatedYou

**These Guys Are Putting Glasses Stores out of Business**

GlassesUSA.com

**Our Best Razor for Only $1? Yep, Dollar Shave Club Is Not Messing Around**

Dollar Shave Club

**Sleepovers, Camp-outs and Ghost Stories in Connecticut**

Connecticut Tourism

**How to Ease Ankylosing Spondylitis Stiffness and Pain**

Livestrong for Healthline

 **LIVE**

**News**

Local News

Nation & World

News Video

Traffic

**FOX23 Weather**

Weather

FOX23 Doppler Radar

**Advertisers & Sponsors**

Cars at Autotrader

Local Services at Kudzu

**About Us**

About FOX23

What's on FOX23

KOKI EEOC Statement

LIVE

KMYT EEOC Statement

KOKI Public File

KMYT Public File

KOKI and KMYT Public File Contact



© 2017 Cox Media Group.

By using this website, you accept the terms of our **Visitor Agreement** and **Privacy Policy**, and understand your options regarding **Ad Choices**.

This KOKI is part of Cox Media Group Television.

Learn about careers.

# EXHIBIT 69

## TO KAPLAN DECLARATION

**Checkpoint**

# The Las Vegas shooter modified a dozen rifles to shoot like automatic weapons

By **Alex Horton**  October 3

Law enforcement officials said Tuesday at least a dozen of the 23 firearms recovered in Las Vegas were semiautomatic rifles legally modified to fire like automatic weapons, using an alteration known as a bump fire stock.

Stephen Paddock killed 58 people and injured hundreds more at a country music concert, as he fired from the 32nd floor of the Mandalay Bay Resort and Casino Sunday night.

Photos obtained by local Boston affiliate Fox 25 and posted Tuesday offer a glimpse into the level of preparation by Paddock to carry out different styles of attacks in a frantic nine-minute window of intermittent gunfire.

One of the two images of rifles published by the station show an AR-15 type rifle with a bump or slide fire modification, said Cody Wilson, director of Defense Distributed, which primarily sells a gun milling machine.

Bump fire stocks, first made by the company Slide Fire, are legal modifications to the lower receiver of rifles that simulate automatic fire. The modified stock harnesses the energy from recoil, forcing the firing mechanism to move faster than originally designed, according to the Trace, a nonprofit website that examines gun violence in the United States. Numerous videos online, including from Slide Fire, demonstrate the mechanics.

The modified rifle with the bump fire mechanism includes a high-capacity magazine that can hold between 60 and 100 rounds, an EOTech holographic sight and a forward hand grip — a key accessory that allows a shooter to push the rifle away from the body in order to bounce, or bump, the weapon into the trigger finger.

Those components used together in a weapon suggest a desire to shoot large amounts of automatic-like fire into masses of people without much concern for accuracy, as the recoil from simulated automatic fire would make it difficult to hit specific targets at a long range. The stage was between 400 and 500 yards from the hotel.

"He obviously tried this out before he was in the hotel room," Wilson said. He added his initial conclusion from audio of the gunfire pointed to a bump modification on at least one weapon. The fire rate was inconsistent with a weapon originally designed to fire automatically, Wilson said.

Another photographed weapon, however, shows a meticulous collection of accessories that indicate Paddock also readied himself for precision fire.

An AR-15 type weapon is shown mounted with a magnification scope commonly used for hunting, which helps the shooter acquire individual targets for single shots. The bipod legs at the front of the weapon would be used to steady the rifle on most hard surfaces, like a table or other furniture, which could have also provided distance away from the window to help conceal some smoke and gunfire flashes.

That weapon does not appear to be modified beyond the accessories, Wilson said.

Law enforcement officials did not immediately return requests to confirm the photos were of weapons recovered from the incident.

A third weapon, identified as an AK-47 type rifle, was outfitted with a stand to steady it and improve accuracy, said people close to the ongoing probe. Clark County Sheriff Joseph Lombardo said the weapons that have been recovered range in caliber from .223, which is associated with AR-15 style rifles, to .308, which is a caliber commonly used in hunting rifles. Lombardo was unsure if any of the weapons were originally designed as automatic, or if any illegal modifications were used on other weapons.

There are other controversial albeit legal modifications to simulate automatic fire, like an attachable crank, a gunmetal version of a jack-in-the-box handle that attaches to the weapon and strikes the trigger faster than a finger. It can be bought online for as little as $40.

Modifications like the bump fire and cranks do not technically qualify adapted rifles as automatic weapons or machine guns, which are highly regulated in the United States. Those weapons are commonly found at gun shows and firing ranges, including one near Las Vegas that allows customers to shoot military-grade weapons.

Machine guns can be legally owned if made before May 1986 and registered with the federal government, or owned by licensed dealers.

Some states, such as California, regulate the size of high-capacity magazines like the one photographed at the scene in Las Vegas, but Nevada does not. A trained shooter can easily remove one magazine from the weapon, load another from a tactical vest or pocket, and continue firing within seconds.

The high number of firearms found at the hotel suggest a concern for overheating rifle barrels. The barrels can reach several hundred degrees, turning orange and even blue as rounds travel thousands of feet per second through them.

Automatic weapons used by the military have lever releases on the barrel, allowing one to be swapped for another using an oven-mitt-like glove.

The National Rifle Association says Nevada law allows the purchase of machine guns and silencers in compliance with federal law and regulations.

Devlin Barrett contributed to this report.

Read more:

Las Vegas shooter's father was a bank robber — and on the FBI's Most Wanted list

'Good guys with guns': The loaded legacy of the UT Tower shooting

The carnage when shooters take aim from above

Virginia Tech was not the worst school massacre in U.S. history. This was.

💬 **3032 Comments**

Alex Horton is a staff reporter and former Army infantryman. 🐦 Follow @AlexHortonTX

## Share news tips with us confidentially

Do you have information the public should know? Here are some ways you can securely send information and documents to Post journalists.

**Learn more**