# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DAVID SETH WORMAN, ANTHONY LINDEN, JASON WILLIAM SAWYER, PAUL NELSON CHAMBERLAIN, GUN OWNERS' ACTION LEAGUE, INC., ON TARGET TRAINING, INC., AND OVERWATCH OUTPOST,

*Plaintiffs*,

v.

MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts; DANIEL BENNETT, in his official capacity as the Secretary of the Executive Office of Public Safety and Security; and COLONEL KERRY GILPIN, in her official capacity as Superintendent of the Massachusetts State Police,

*Defendants*.

CIVIL ACTION
NO. 17-cv-10107-WGY

---

## MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

MAURA HEALEY
ATTORNEY GENERAL

William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108

Date: January 5, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

ARGUMENT ...................................................................................... 1

    I.      THE ASSAULT WEAPONS BAN COMPORTS WITH THE
           SECOND AMENDMENT ............................................................. 1

           A.     The Plaintiffs' Desired Framework for Analyzing Second
                    Amendment Claims Is Inconsistent with Heller, First Circuit
                    Precedent, and Precedent of This Court .............................. 1

           B.     The Commonwealth's Ban on Assault Weapons and
                    Large-Capacity Magazines Does Not Implicate the Second
                    Amendment Because Those Weapons Are Not
                    Constitutionally Protected ..................................................... 4

                  1.     Assault Weapons and LCMs are "Like" M16s and
                        Weapons Most Useful in Military Service .............. 5

                  2.     Assault Weapons and LCMs are Not In Common
                        Use Today for Self-Defense .................................... 6

                  3.     Assault Weapons and LCMs are Not Lineal
                        Descendants of Weapons in Common Use at the
                      Time of Ratification ................................................. 8

            C.     The Commonwealth's Ban on Assault Weapons and
                      Large-Capacity Magazines Satisfies Intermediate
                      Scrutiny ................................................................................ 9

    II.     THE ENFORCEMENT NOTICE COMPORTS WITH
           DUE PROCESS ......................................................................... 12

    III.    THE STATUTORY PHRASE "COPIES OR DUPLICATES"
           IS NOT VAGUE ON ITS FACE BECAUSE IT PROVIDES
           FAIR NOTICE OF WHICH WEAPONS ARE PROHIBITED
           AND HAS NOT BEEN ENFORCED IN AN ARBITRARY
           MANNER ................................................................................. 18

CONCLUSION .................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*81 Spooner Rd. LLC v. Town of Brookline*,
    891 N.E.2d 219 (Mass. 2008) ...................................................................13

*Batty v. Albertelli*,
    Case No. 15-cv-10238, 2017 WL 740989 (D. Mass Feb. 24, 2017) ...........3

*Boston Police Patrolmen's Ass'n, Inc. v. City of Boston*,
    761 N.E.2d 479 (Mass. 2002) ....................................................................13

*Bouie v. City of Columbia*
    378 U.S. 347 (1964)............................................................................12, 17

*Caetano v. Massachusetts*,
    136 S. Ct. 1027 (2016).............................................................................4, 8

*Commonwealth v. Magnus M.*,
    961 N.E.2d 581 (Mass. 2012) ....................................................................13

*Commonwealth v. O'Keefe*,
    723 N.E.2d 1000 (Mass. App. Ct. 2000) ...................................................14

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)........................................................................ *passim*

*D.C. v. John R. Thompson Co.*,
    346 U.S. 100 (1953).....................................................................................12

*Draper v. Healey*,
    827 F.3d 1 (1st Cir. 2016).........................................................................18

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ..................................................................7, 8

*Fyock v. City of Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) .................................................................9, 11

*Garner v. White*,
    726 F.2d 1274 (8th Cir. 1984) ..................................................................20

*Gould v. O'Leary*,
    Case No. 16-cv-10181, 2017 WL 6028342 (D. Mass. Dec. 5, 2017)........3

*Grayned v. City of Rockland*,
    408 U.S. 104 (1972)....................................................................19

*Halebian v. Berv*,
    931 N.E.2d 936 (Mass. 2010) ................................................13

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ....................................5, 9, 11

*Hightower v. City of Boston*,
    693 F.3d 61 (1st Cir. 2012) ......................................................2

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) (en banc) ............................ *passim*

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014) ............................................................11

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004) ....................................................19

*Metrish v. Lancaster*,
    569 U.S. 351 (2013)................................................................12

*New York State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015)....................................9, 11, 18

*Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgmt. Bd.*,
    656 N.E.2d 563 (Mass. 1995) ................................................14

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ................................................8

*Powell v. Tompkins*,
    783 F.3d 332 (1st Cir. 2015)................................................2, 3

*Powell v. Tompkins*,
    926 F. Supp. 2d 367 (D. Mass. 2013) ................................3, 4, 9

*Richmond Boro Gun Club, Inc. v. City of New York*,
    97 F.3d 681 (2d Cir. 1996)....................................................20

*Rideout v. Gardner*,
    838 F.3d 65 (1st Cir. 2016)....................................................11

*Rogers v. Tennessee*,
    532 U.S. 451 (2001)........................................................................12

*Staples v. United States*,
    511 U.S. 600 (1994).....................................................................5, 6

*United States v. Booker*,
    644 F.3d 12 (1st Cir. 2011)...................................................2, 3, 9, 11

*United States v. Miller*,
    307 U.S. 174 (1939)..........................................................................6

*United States v. Rene E.*,
    583 F.3d 8 (1st Cir. 2009)...................................................................2

*United States v. Sampson*,
    486 F.3d 13 (1st Cir. 2007).................................................................5

*United States v. Williams*,
    553 U.S. 285 (2008)........................................................................18

*URI Student Senate v. Town of Narragansett*,
    631 F.3d 1 (1st Cir. 2011)................................................................19

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)....................................................................19, 20

*Wilson v. Cnty. of Cook*,
    968 N.E.2d 641 (Ill. 2012)................................................................18

**Massachusetts Statutes**

108 Stat. 1997 ....................................................................................10

108 Stat. 2000-10 ...............................................................................10

G.L. c. 140, § 121 ......................................................................... *passim*

G.L. c. 140, § 131M ...................................................................... *passim*

**Legislative History**

139 Cong. Rec. 15459 (Nov. 2, 1993)..................................................14

139 Cong. Rec. 15479 (Nov. 9, 1993)..................................................14

140 Cong. Rec. E887 (May 5, 1994) (Rep. Vento) ...............................................15

140 Cong. Rec. H3079 (May 5, 1994) (Rep. Lazio)...........................................15

140 Cong. Rec. H3080 (May 5, 1994) (Rep. Andrews) .......................................16

140 Cong. Rec. H3087 (May 5, 1994) (Rep. Clement) ........................................16

140 Cong. Rec. H7934 (Aug. 4, 1994) (Rep. Derrick)........................................15

140 Cong. Rec. H9000 (Aug. 21, 1994) (Rep. Mfume) .......................................15

140 Cong. Rec. S1793 (Feb. 24, 1994).............................................................15

140 Cong. Rec. S4388 (May 5, 1994) ..............................................................15

140 Cong. Rec. S10007 (July 28, 1994) (Sen. Craig).........................................15

140 Cong. Rec. S12138 (Aug. 19, 1994) (Sen. DeConcini)................................15

140 Cong. Rec. S12244 (Aug. 22, 1994) (Sen. Feinstein)...................................16

140 Cong. Rec. S12413 (Aug. 24, 1994) (Sen. Feinstein)............................. 15-16

142 Cong. Rec. E456 (March 26, 1996) ...........................................................16

## Miscellaneous

Case C–331/88 *R. v. Minister of Agric., Fisheries & Food & the Sec'y of State for Health ex parte Fedesa* [1990] E.C.R. 1–4023 ...................................4

*Concise Oxford English Dictionary* (12th ed. 2011) ...........................................13

HCJ 2056/04 *Beit Sourik Village Council v. Gov't of Israel* [2004] IsrSC ............4

*R. v. Morgentaler*, [1988] 1 S.C.R. 30, 1988 CanLII 90 (Can.) ............................4

S. Breyer, THE COURT AND THE WORLD: AMERICAN LAW AND THE NEW GLOBAL REALITIES (2015) .......................................................................4

*Webster's II New College Dictionary* (1995) ......................................................13

The Massachusetts statute banning assault weapons and large-capacity magazines ("LCMs"), G.L. c. 140, §§ 121 and 131M (hereinafter "assault weapons ban" or "AWB"), comports with the Second Amendment and is not impermissibly vague under the Due Process Clause of the Fourteenth Amendment. In addition, Attorney General Healey's Enforcement Notice did not violate due process by providing guidance to the public as to her interpretation of the AWB. For the following reasons and the reasons discussed in the Memorandum in Support of the Defendants' Motion for Summary Judgment, this Court should deny the Plaintiffs' Motion for Summary Judgment (Doc. No. 57), and enter judgment in favor of the defendants.

## ARGUMENT

### I.     THE ASSAULT WEAPONS BAN COMPORTS WITH THE SECOND AMENDMENT.

#### A.  The Plaintiffs' Desired Framework for Analyzing Second Amendment Claims Is Inconsistent with *Heller*, First Circuit Precedent, and Precedent of This Court.

In support of their Second Amendment claim, the plaintiffs principally argue that all weapons commonly possessed by Americans today are protected by the Second Amendment, and that courts must invalidate all laws banning those weapons without testing the laws under any level of constitutional scrutiny. *See* Pls.' Br. Summ. J., at 4–10. The plaintiffs urge this Court to reject the two-part inquiry used by virtually every court in the country to assess Second Amendment claims, and to instead employ a "text-and-history" analysis that does not subject gun regulations to means-ends constitutional scrutiny. *Id.* at 7–10.

The plaintiffs' approach is foreclosed by *District of Columbia v. Heller*, 554 U.S. 570 (2008), binding First Circuit precedent, and the precedent of this Court. In *Heller*, the Supreme Court made clear that guns laws that burden Second Amendment rights must be tested under some form of constitutional scrutiny. 554 U.S. at 628–29. It ruled that the District of Columbia's

challenged gun laws—which prohibited the possession of operable handguns, the "quintessential self-defense weapon," inside the home and therefore burdened the core protection of the Second Amendment—"would fail constitutional muster" "[u]nder any of the *standards of scrutiny* that [the Court] ha[s] applied to enumerated constitutional rights." *Id.* (emphasis added). It then rejected application of "rational basis scrutiny" to laws that implicate the Second Amendment. *Id.* at 628 n. 27. Thus, *Heller* made clear that if gun regulations burden Second Amendment rights, they must only be invalidated if they "fail" the other "standards of scrutiny" used in constitutional analysis—that is, intermediate scrutiny or strict scrutiny. *Id.* at 628–29.

Following *Heller*, the Courts of Appeals first examine whether a challenged law burdens conduct protected by the Second Amendment, and if so, test the law under an appropriate level of means-ends constitutional scrutiny. *See Powell v. Tompkins*, 783 F.3d 332, 347 n. 9 (1st Cir. 2015) (collecting cases). Although the First Circuit has not formally adopted this two-part test, *see id.*, it functionally takes the same approach. Thus, in *United States v. Booker*, the court upheld a law banning persons with domestic violence misdemeanor convictions from possessing firearms after reviewing the law under intermediate scrutiny. 644 F.3d 12, 25–26 (1st Cir. 2011). In *Hightower v. City of Boston*, the court upheld the suitable person standard in Massachusetts' firearms licensing statute, concluding that the plaintiff's claim "fail[ed] whatever standard of scrutiny is used, even assuming there is some Second Amendment interest in carrying the concealed weapons at issue." 693 F.3d 61, 74 (1st Cir. 2012). And in *United States v. Rene E.*, the court concluded that a law prohibiting handgun possession by juveniles did *not* burden Second Amendment rights, so it did not need to test the law under constitutional scrutiny. 583 F.3d 8, 12–16 (1st Cir. 2009). Contrary to the plaintiffs' approach, the First Circuit has never simply invalidated gun safety laws after concluding or assuming that those laws implicate the Second Amendment.

This Court has likewise "adopt[ed] the aforementioned two-pronged approach" for analyzing Second Amendment claims. *Powell v. Tompkins*, 926 F. Supp. 2d 367, 385 (D. Mass. 2013) (Young, J.), *aff'd* 783 F.3d 332 (1st Cir. 2015). The Court explained that "[t]he First Circuit . . . , in line with the majority of its sister circuits, views challenged firearms regulations through the lens of intermediate scrutiny." *Id.* at 389 (citing *Booker*, 644 F.3d at 25). Other judges in this District have likewise embraced the two-part inquiry, first examining whether a gun law burdens conduct protected by the Second Amendment, and then, if it does, analyzing that law under intermediate scrutiny. *See, e.g.*, *Gould v. O'Leary*, Case No. 16-cv-10181, 2017 WL 6028342, at *9–*15 (D. Mass. Dec. 5, 2017); *Batty v. Albertelli*, Case No. 15-cv-10238, 2017 WL 740989, at *8–*13 (D. Mass Feb. 24, 2017).

The plaintiffs contend that the two-part test applied by Courts of Appeals and by this Court is inconsistent with *Heller* because *Heller* rejected the "interest balancing" advocated by Justice Breyer's dissent. Pls.' Br. Summ. J., at 8 (quoting *Heller*, 554 U.S. at 635). But the *Heller* majority understood that Justice Breyer's interest-balancing approach is distinct from the tiers of scrutiny typically employed in constitutional analysis. The majority directly juxtaposed "the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis)" with the dissent's "judge empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller*, 554 U.S. at 634 (quoting *id.* at 689–90 (Breyer, J., dissenting)). In so doing, it accurately perceived that Justice Breyer's approach drew from proportionality review, a form of constitutional analysis used by European, Canadian, Israeli, and other foreign courts that is distinct from the tiers of scrutiny typically used by the American judiciary. *See id.* at 689–90 (Breyer, J.,

dissenting) (referring to his approach as a "'proportionality' approach").[1] Had the *Heller* majority

equated proportionality review with tiers of scrutiny, it would not have concluded that the District

of Columbia's handgun ban failed under "any of the standards of scrutiny that [the Court] ha[s]

applied to enumerated constitutional rights." 554 U.S. at 628–29; *see also Powell*, 926 F. Supp. 2d

at 385, 389 (because "*Heller* foreclosed the use of either rational basis scrutiny or interest

balancing in the analysis of firearms regulations," gun regulations that burden Second Amendment

rights are evaluated under intermediate scrutiny (citing *Heller*, 554 U.S. at 628 n. 27, 634–35)).[2]

### B. The Commonwealth's Ban on Assault Weapons and Large-Capacity Magazines Does Not Implicate the Second Amendment Because Those Weapons Are Not Constitutionally Protected.

For all the reasons discussed in the Memorandum in Support of the Defendants' Motion

for Summary Judgment, the plaintiffs' Second Amendment claim fails at the outset because assault

weapons and LCMs are not protected by the Second Amendment. The plaintiffs downplay *Heller*'s

several "limitation[s]" on weapons eligible for Second Amendment protection. 554 U.S. at 624,

627; *see* Defts.' Br. Summ. J, at 5–10. Each limitation, however, delimits the scope of the Second

Amendment, and each constitutes a basis on which to conclude that assault weapons and LCMs

---

[1] *See, e.g.*, HCJ 2056/04 *Beit Sourik Village Council v. Gov't of Israel* [2004] IsrSC ¶¶ 36–61, *available at* http://elyon1.court.gov.il/Files_ENG/04/560/020/A28/04020560.A28.pdf; Case C–331/88 *R. v. Minister of Agric., Fisheries & Food & the Sec'y of State for Health ex parte Fedesa* [1990] E.C.R. 1–4023, ¶ 2, *available at* http://curia.europa.eu/juris/showPdf.jsf?docid=96407&doclang=EN; *R. v. Morgentaler*, [1988] 1 S.C.R. 30, 1988 CanLII 90 (Can.), pp. 73–76, *available at* https://scc-csc.lexum.com/scc-csc/scc-csc/en/288/1/document.do. *See also* S. Breyer, THE COURT AND THE WORLD: AMERICAN LAW AND THE NEW GLOBAL REALITIES 254–62 (2015) (explaining how proportionality review differs from the tiers of scrutiny used by the American judiciary, and arguing that "it is preferable to organize the balancing through a doctrine such as proportionality").

[2] The plaintiffs separately argue that the Supreme Court's decision in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (*per curiam*), "sent a clear message" that "Massachusetts' categorical prohibition on the Banned firearms and Magazines should be found unconstitutional, without resorting to any interest balancing." Pls.' Br. Summ. J., at 8. *Caetano* was a five-paragraph, per curiam opinion that vacated a decision by the Supreme Judicial Court that used reasoning inconsistent with *Heller* and remanded for further proceedings without ruling on the constitutionality of the law. In *Caetano*, the Court only corrected the portions of the Supreme Judicial Court's analysis that were at odds with *Heller*; it made no pronouncements about interest balancing or assault weapons and LCMs. *See Caetano*, 136 S. Ct. at 1027–28. The plaintiffs, in contrast, rely on Justice Alito's concurrence in the judgment in *Caetano*, which garnered only two votes and did not express the views of the other six justices then on the Court. *See* Pls.' Br. Summ. J., at 7–8.

are not constitutionally protected.[3]

### 1. Assault Weapons and LCMs are "Like" M16s and Weapons Most Useful in Military Service.

First, as the plaintiffs acknowledge, "*Heller* recognizes that 'weapons that are most useful in military service—M-16 rifles and the like—may be banned.'" Pls.' Br. Summ. J., at 11 (quoting *Heller*, 554 U.S. at 627). The plaintiffs do not, however, dispute that LCMs are "like" "weapons that are most useful in military service." *See id.* LCMs are not, therefore, constitutionally protected, and the Commonwealth's ban on LCMs comports with the Second Amendment.

As for assault weapons, the plaintiffs make no serious effort to dispute that assault weapons are "like" "weapons that are most useful in military service." *See* Pls.' Br. Summ. J., at 11. Indeed, plaintiffs' expert witnesses do not deny the military origins of the Colt AR-15, the AK-47, and other banned assault rifles, and their close similarity to military-issue weapons. *See* Defts.' Br. Summ. J., at 6–7. The plaintiffs rely only on *Staples v. United States*, but that case explained that "[t]he AR-15 is the civilian version of the military's M-16 rifle," and that "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon." 511 U.S. 600, 603 (1994). Far from supporting the plaintiffs, these observations underscore the likeness between M16s and AR-15s and the interchangeability of the weapons' component parts. *See Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011) ("*Heller II*") (citing *Staples* in finding it "difficult to draw meaningful distinctions between the AR-15 and the M-16").

The plaintiffs contend that *Staples* distinguished AR-15s and M16s when it observed that

---

[3] Contrary to the plaintiffs' argument, *see* Pls.' Br. Summ. J., at 4, there is a strong presumption that "[s]tatutes duly enacted by [the Legislature] are . . . constitutional," and the "burden of proving that the [statute] is unconstitutional is on the challenger." *United States v. Sampson*, 486 F.3d 13, 20 (1st Cir. 2007). Thus, the plaintiffs bear the burden to establish that assault weapons and LCMs are constitutionally protected.

"guns generally" have "traditionally have been widely accepted as lawful possessions." 511 U.S. at 611–12; Pls.' Br. Summ. J., at 11. But that observation has no bearing on the question whether AR-15s and other assault weapons are like M16s and weapons most useful in military service. *Staples* made that observation while concluding that the federal law banning unregistered machine guns is not a strict liability statute. 511 U.S. at 606–18. In its analysis, the Court rejected a comparison between "guns generally," which have "traditionally have been widely accepted as lawful possessions," and other harmful devices that are not as "commonplace and generally available" so would not "alert individuals to the likelihood of strict regulation." *Id.* at 611–12. This general observation, made in a statutory construction analysis addressing *mens rea*, is unrelated to the scope of the Second Amendment and does nothing to undermine the evidence that assault weapons are "like" M16s and other weapons most useful in military service.

At bottom, the plaintiffs do not dispute that assault weapons are derived from military weapons and are functionally identical to the M16 and other military weapons, with the exception of select-fire capability. Nor do they contest that the military directs soldiers to use semiautomatic fire as the default, and most lethal, mode on the M16; or that semiautomatic assault weapons can easily be converted into weapons that simulate automatic fire. For these reasons and the others discussed in the defendants' brief, assault weapons are unquestionably "like" M16s and other "weapons that are most useful in military service," *Heller*, 554 U.S. at 627, and therefore are not constitutionally protected. *See Kolbe v. Hogan*, 849 F.3d 114, 136–37 (4th Cir. 2017) (en banc).

### 2. Assault Weapons and LCMs are Not In Common Use Today for Self-Defense.

Second, assault weapons and LCMs are not protected by the Second Amendment because they are not "'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). The plaintiffs contend that the

weapons are "in common use" today because manufacturers have produced millions of them since the 1980s. *See* Pls.' Br. Summ. J. at 6–7. This argument, however, omits a key qualification of *Heller*'s inquiry, which focuses on whether a weapon in common use is used "for lawful purposes like self-defense." 554 U.S. at 624. Aside from the conclusory assertion that "the Banned Firearms and Magazines are typically possessed for lawful purposes," Pls.' Br. Summ. J., at 6, the plaintiffs do not argue that assault weapons and LCMs are commonly used today for self-defense. For good reason—the undisputed evidence demonstrates that assault weapons are virtually never used for self-defense. *See* Defts.' Stmt. of Undisputed Facts (Doc. No. 65) ("Defts.' Stmt.") ¶ 133. Nor are they suitable for that purpose. *See* Defts.' Br. Summ. J., at 9–10. In particular, because of their high muzzle velocity, assault weapons can penetrate typical building materials, posing a serious risk to bystanders; they are difficult to maneuver and make operable; and even the National Rifle Association's guides to self-defense do not mention assault weapons. *See id.* Nor is there any evidence that people who use firearms in self-defense fire more than 10 rounds, thus necessitating a LCM; instead, the evidence shows that people overwhelmingly use fewer than 10 rounds in self-defense. *See id.* at 10.

In any event, even if this Court were to focus only on whether assault weapons are in common use today, the plaintiffs have not established that the weapons are sufficiently popular to merit constitutional protection. The Supreme Court did not specify how popular a weapon must be in order to qualify for Second Amendment protection, or how a court should measure popularity. *See Kolbe*, 849 F.3d at 135 ("How many assault weapons and large-capacity magazines must there be to consider them 'in common use at the time'"?); *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("what line separates 'common' from 'uncommon' ownership is something the Court did not say"). The plaintiffs have introduced evidence that, at most, 3% of

guns in the United States are AR-15 or AK47 style weapons. *See* Defs.' Stmt. ¶ 115; Kaplan Decl. Ex. 45, at 1; Ex. 15, at 8 (chart). But those weapons are highly concentrated in the hands of a small number of individuals, such that, at most, 1% of the United States population owns assault weapons. *See* Defs.' Stmt. ¶ 116; Kaplan Decl. Ex. 15, MSR Report, at p. 13. The plaintiffs have not explained why a weapon owned by 1% of Americans should be deemed "in common use today." *See Kolbe*, 849 F.3d at 135–36 (reviewing whether assault weapons and LCMs are like M16s and "weapons that are most useful in military service" because of lack of clarity in *Heller* as to any "in common use" test).

### 3. Assault Weapons and LCMs are Not Lineal Descendants of Weapons in Common Use at the Time of Ratification.

Alternatively, if this Court construes "'in common use at the time' for lawful purposes like self-defense" to refer to modern-day equivalents or lineal descendants of weapons commonly used for self-defense at the time the Second Amendment was ratified, *Heller*, 554 U.S. at 624, assault weapons and LCMs are likewise not constitutionally protected. *See Friedman*, 784 F.3d at 410 (concluding that the features of assault weapons and LCMs were "not common in 1791"); *cf. Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570 (asking whether the handgun is a "lineal descendant" of the colonial era pistol); Tr. of Oral Arg. at 77, *Heller*, 554 U.S. 570 (Roberts, C.J.) ("[W]e are talking about lineal descendants of the arms.").[4] The plaintiffs have introduced no evidence, and made no argument, that assault weapons and LCMs are the modern-day equivalent of any weapon commonly used for self-defense

---

[4] This test is distinct from the analysis that was vacated by the Supreme Court in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (*per curiam*). Contrary to *Heller*'s admonition that the Second Amendment "extends . . . to . . . arms . . . that were not in existence at the time of the founding," 554 U.S. at 582, the Supreme Judicial Court had examined whether stun guns were "in common use at the time of the Second Amendment's enactment." *Caetano v. Massachusetts*, 26 N.E. 3d 688, 691 (Mass. 2015). The lineal descendants test, in contrast, looks to whether a weapon is a modern-day equivalent or lineal descendant of a weapon in common use at the time of ratification. *See Parker*, 478 F.3d at 398.

in 1791. Nor could they, as detachable magazines that hold multiple rounds were not invented then, and assault weapons bear scant likeness to the smoothbore, single-shot, muzzle-loading, flintlock muskets commonly used for self-defense at the time the Second Amendment was ratified. *See* Defts.' Br. Summ. J., at 8–9.

For all of these reasons, the Second Amendment does not protect assault weapons and LCMs. Judgment should be granted to the defendants.

C. **The Commonwealth's Ban on Assault Weapons and Large-Capacity Magazines Satisfies Intermediate Scrutiny.**

Should this Court nevertheless assume, in the alternative, that the Commonwealth's ban on assault weapons and LCMs implicates the Second Amendment, it should review the statute under intermediate scrutiny. The plaintiffs' contrary argument—that this Court should apply strict scrutiny—is inconsistent with the reasoning of every appellate court to consider a ban on assault weapons and LCMs. *See, e.g.*, *See Kolbe*, 849 F.3d at 138; *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 259–61 (2d Cir. 2015) ("*NYSRPA*"); *Fyock v. City of Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015); *Heller II*, 670 F.3d at 1261–62. It is also inconsistent with this Court's conclusion that "[t]he First Circuit . . . , in line with the majority of its sister circuits, views challenged firearms regulations through the lens of intermediate scrutiny." *Powell*, 926 F. Supp. 2d at 389 (citing *Booker*, 644 F.3d at 25).

The plaintiffs contend that strict scrutiny is appropriate because the AWB prohibits them from possessing assault weapons and LCMs for self-defense in their homes. Pls.' Br. Summ. J., at 12–13. But laws prohibiting felons and the mentally ill from possessing firearms likewise bar possession of firearms in the home for self-defense, and *Heller* deemed those laws "presumptively lawful." 554 U.S. at 626–27 & n. 26. Application of strict scrutiny would threaten to invalidate those laws, so it is inconsistent with *Heller* to argue that any law that prevents someone from using

any particular weapon for self-defense in the home is reviewed under strict scrutiny. Instead, this Court should look to the nature of the burden on core Second Amendment rights. *See* Defts.' Br. Summ. J., at 10–11. The AWB does not severely burden core Second Amendment rights because it does not ban handguns, the quintessential self-defense weapon, but rather is limited to exceptionally lethal, military-style weapons; it only affects weapons that are not commonly used or suitable for self-defense; and it leaves the plaintiffs with many options for armed defense of their homes, including the pistols each plaintiff already owns. *See id.* at 9–11.[5] Should this Court review the AWB under any constitutional scrutiny, then, it should apply intermediate scrutiny.

For all the reasons explained in the Memorandum in Support of the Defendants' Motion for Summary Judgment, the Commonwealth's ban on assault weapons and LCMs must be upheld under intermediate scrutiny. The plaintiffs do not, and cannot, demonstrate that the Legislature lacked substantial evidence to conclude that the ban would promote the safety of the public and of law enforcement officers. *See Kolbe*, 849 F.3d at 140 (court need only assure itself that legislature drew "reasonable inferences based on substantial evidence") (citation omitted). In particular, they do not and cannot dispute that assault weapons and LCMs are disproportionately used to commit mass shootings and murders of police officers; that assault weapons and LCMs cause more severe wounds in more victims than other semiautomatic weapons or weapons with magazines that holds

---

[5] The plaintiffs claim that the AWB prohibits "nearly all semiautomatic firearms." Pls.' Br. Summ. J, at 1. That is highly inaccurate. The plain text of the AWB itself exempts, among other categories, (1) 661 rifles and shotguns listed on Appendix A to the federal assault weapons ban, many of which are semiautomatic; (2) "any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition," (3) "any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine," and (4) any firearm, rifle, or shotgun—semiautomatic or not—manufactured before September 13, 1994. G.L. c. 140, § 121; *see also* 108 Stat. at 1997, 2000–10 (Kaplan Decl. Ex. 30). In addition, the AWB does not affect any of the hundreds of firearms listed on the Executive Office of Public Safety and Security's Approved Firearms Roster, including many semiautomatic firearms. *See* Kaplan Decl. Exs. 61, 93. It only bars civilians from possessing 19 especially dangerous, military-style semiautomatic weapons; copies or duplicates of those listed weapons; and semiautomatic weapons with two or more specified combat features that accept detachable magazines. *See* G.L. c. 140, §§ 121, 131M. That leaves numerous alternative weapons for self-defense in one's home.

fewer than eleven rounds; or that banning assault weapons and LCMs decreases the prevalence of crimes committed with those weapons. *See* Pls.' Br. Summ. J., at 14–15. That evidence is more than sufficient to demonstrate that the AWB is substantially related to the Commonwealth's important governmental objectives of promoting the safety of the public and law enforcement officers.

Instead, relying on *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), the plaintiffs contend that the AWB does not survive intermediate scrutiny because it is not narrowly tailored. *See* Pls.' Br. Summ. J., at 14. That argument misapprehends the standard of scrutiny this Court must apply. *McCullen* was a First Amendment case involving a content-neutral regulation on speech, and in that context, intermediate scrutiny required narrow tailoring. *See* 134 S. Ct. at 2534; *Rideout v. Gardner*, 838 F.3d 65, 72–73 (1st Cir. 2016). But in the Second Amendment context, courts do not require narrow tailoring or the consideration of less restrictive alternatives when applying intermediate scrutiny. *See, e.g.*, *Booker*, 644 F.3d at 25–26 (upholding law banning domestic violence misdemeanants from possessing firearms under intermediate scrutiny without mentioning narrow tailoring or less restrictive alternatives). In fact, none of the cases upholding bans on assault weapons and LCMs under intermediate scrutiny undertook a narrow tailoring analysis or considered less restrictive alternatives. *See Kolbe*, 849 F.3d at 138–41; *NYSRPA*, 804 F.3d at 261–64; *Fyock*, 779 F.3d at 1000–01; *Heller II*, 670 F.3d at 1262–64. The cases instead emphasized that courts owe "'substantial deference'. . . to 'predictive judgments of the legislature' on matters of public safety." *NYSRPA*, 804 F.3d at 263. In the domain of public safety, "[i]t is the legislature's job . . . to weigh conflicting evidence and make policy judgments." *Kolbe*, 849 F.3d at 140. Legislatures "are allowed" to make those judgments "without second-guessing by a court." *Id.*

## II.     THE ENFORCEMENT NOTICE COMPORTS WITH DUE PROCESS.

The plaintiffs' second claim, a due process challenge to the Attorney General's Enforcement Notice, fares no better. The holding in *Bouie v. City of Columbia*—that due process prevents state courts from retroactively applying to a criminal defendant an interpretation of a criminal law that was unexpected and indefensible by reference to existing law—has no application to this case because the Enforcement Notice has not been retroactively applied to any criminal defendant, and it is not a judicial interpretation of state law that is unexpected and indefensible by reference to existing law. *See* 378 U.S. 347, 352–55 (1964); Defts.' Br. Summ. J., at 13–15. For the reasons previously explained, relying on *Bouie* to constrain a prosecutor's ability to enforce longstanding criminal laws would be an enormous and unprecedented expansion of the narrow holdings in *Bouie*, *Metrish v. Lancaster*, 569 U.S. 351 (2013), and *Rogers v. Tennessee*, 532 U.S. 451 (2001). *See* Defts.' Br. Summ. J., at 14–15. It would, effectively, overturn the precedent establishing that a prosecutor's decision to enforce criminal laws that have historically been under-enforced does not offend due process. *See, e.g.*, *D.C. v. John R. Thompson Co.*, 346 U.S. 100, 117 (1953). In short, *Bouie* cannot constrain the Attorney General's ability to notify the public how she interprets a criminal law that she intends to enforce.

In any event, the Attorney General's interpretation of the AWB is not "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie*, 378 U.S. at 354; *see Rogers*, 532 U.S. at 461 ("*Bouie* restricted due process limitations on the retroactive application of judicial interpretations of criminal statutes to those that are 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'"). Recognizing this, the plaintiffs make no argument that the Enforcement Notice is "indefensible"; they only contend that it is "unexpected." Pls.' Br. Summ. J., at 15. But far from "indefensible,"

the Attorney General's interpretation of the phrase "copies or duplicates" in the AWB aligns with the plain meaning and legislative history of the text, with prior judicial interpretations of the text, and with an enforcement notice interpreting the term "copies" in Maryland's Assault Weapons Ban. *See* Defts.' Br. Summ. J., at 15–16.

The interpretation in the Enforcement Notice is consistent with the plain meaning of the phrase "copies or duplicates," and the plaintiffs do not argue otherwise. *See* Pls.' Br. Summ. J., at 15–17. As discussed, a "copy" is "a thing made to be similar or identical to another" or "a reproduction or imitation of an original," while a "duplicate" is "one of two or more identical things." *Concise Oxford English Dictionary*, at 316, 444 (12th ed. 2011); *Webster's II New College Dictionary*, at 249 (1995); Defts.' Br. Summ. J., at 15–16. Under Massachusetts law, courts must "interpret statutes so as to avoid rendering any part of the legislation meaningless." *Boston Police Patrolmen's Ass'n, Inc. v. City of Boston*, 761 N.E.2d 479, 481 (Mass. 2002); *see also Commonwealth v. Magnus M.*, 961 N.E.2d 581, 586 (Mass. 2012). Thus, "[w]here the Legislature employs two similar terms or phrases in the same statutory series, [courts] are required to construe them differently if each is to have meaning." *Halebian v. Berv*, 931 N.E.2d 936, 993 n. 12 (Mass. 2010); *accord 81 Spooner Rd. LLC v. Town of Brookline*, 891 N.E.2d 219, 223 (Mass. 2008) ("Although these two terms are often used synonymously, their appearance in the same statutory series requires us to construe them differently if each is to have meaning.").

Consistent with these canons, the term "copy" must be interpreted more broadly than the term "duplicate," such that "copies" encompasses weapons that are similar to or imitations of the Enumerated Weapons, while "duplicates" encompasses weapons that are identical to or exact replicas of the Enumerated Weapons. The Legislature's use of the word "or," which is "given a disjunctive meaning unless the context and the main purpose of all the words demand otherwise,"

confirms this construction. *Commonwealth v. O'Keefe*, 723 N.E.2d 1000, 1002 (Mass. App. Ct. 2000); *accord Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgmt. Bd.*, 656 N.E.2d 563, 573 (Mass. 1995). So, too, does the Legislature's direction that the definition of "[a]ssault weapon . . . *shall* include, *but not be limited to*, any of the [Enumerated] [W]eapons, or copies or duplicates" of those weapons, words of emphasis that are not included in the Federal AWB. G.L. c. 140, § 121 (emphasis added); *see* Kaplan Decl. Ex. 30. As discussed, the Attorney General's interpretation of the phrase "copies or duplicates" aligns with this construction by providing functional inquiries for determining if a weapon is similar to, an imitation of, or identical to an Enumerated Weapon like a Colt AR-15 or AK47.

Rather than focusing on the plain meaning of the phrase "copies or duplicates," the plaintiffs, citing one statement from then-Senator Biden, contend that the legislative history of the Federal Assault Weapons Ban ("Federal AWB") undermines the Notice. *See id.* at 16–17. In fact, that statement supports the Notice. In November 1993, when the Senate was debating a proposed amendment that was a precursor to the federal ban, Senator Biden said: "To avoid the so-called copycat problem—where manufacturers simply rename guns to avoid State assault weapons legislation—the amendment makes clear that replicas and duplicates of the listed firearms are covered as well." *See* Pls.' Stmt. of Undisputed Facts (Doc. No. 59) ¶ 4; 139 Cong. Rec. 15459, 1993 WL 467078 (Nov. 2, 1993). But text of the amendment Senator Biden referenced does not mirror the final version of the Federal AWB: Rather than banning "*copies* or duplicates" of the Enumerated Weapons, it would have banned "types, *replicas*, or duplicates" of the Enumerated Weapons. *See* 139 Cong. Rec. 15479, 1993 WL 467099 (Nov. 9, 1993) (text of Amendment No. 1152). The amendment thus used the word "replicas" instead of "copies." *Id.* Senator Biden's statement reflects this difference. *See* 139 Cong. Rec. 15459. Congress's subsequent decision to

replace the word "replicas" with "copies" suggests that it intended the phrase "copies or duplicates" to encompass more than just replicas of the Enumerated Weapons, and that it did not intend for "copies or duplicates" to be limited to weapons that failed the Features Test.[6]

Indeed, the legislative history of the Federal AWB demonstrates that Congress intended "copies or duplicates" to encompass any weapon that is similar to or an imitation of the Enumerated Weapons. The Congressional Record is replete with legislators' references to the "19 specified assault weapons and their copycat models" that would be banned. *See, e.g.*, 140 Cong. Rec. H9000, 1994 WL 461399 (Aug. 21, 1994) (Rep. Mfume).[7] Senator Feinstein, the sponsor of the legislation that served as the model for the Federal AWB, understood the bill to encompass "19 semiautomatic assault weapons and their copycat versions." *See* 140 Cong. Rec. S4388, 1994 WL 137546 (May 5, 1994); 140 Cong. Rec. S1793, 1994 WL 56153 (Feb. 24, 1994). And when legislators spoke of the 19 banned weapons, they often referred to the generic form of the weapon, rather than a particular model listed in the statute. For example, legislators referred to "AR-15s" rather than "Colt AR-15s," indicating that they expected all AR-15s to be banned under the "copies or duplicates" language. *See* 140 Cong. Rec. S12413, 1994 WL 460054 (Aug. 24, 1994) (Sen.

---

[6] To the extent the plaintiffs contend that "copies or duplicates" can only include weapons separately banned by the Features Test, *see* Pls.' 56.1 Statement, ¶ 4, that reading of the statute is refuted by the structure of the statute, which lists each of the tests separately, *see* G.L. c. 140, § 121, and Massachusetts' legislative history. The Governor's File on the bill that became the AWB addresses what constitutes an "assault weapon" under the bill: "1) a list of different types of high-powered, military-style rifles, firearms, and shotguns, specifically identified by manufacturer and model, such as the Avtomat Kalashnikov (AK), the INTRATEC TEC-9, and the Streetsweeper; 2) copies of such identified weapons; and 3) rifles, firearms and shotguns that have a certain combination of characteristics (e.g., a pistol capable of accepting a detachable magazine outside of the pistol grip and having a threaded barrel)." Kaplan Decl. Ex. 81, at 4. This reflects the Legislature's and Governor's understanding that the AWB has three separate tests for determining whether a weapon is an assault weapon, and that the "copies or duplicates" test cannot be read out of the definition of "assault weapon" by the Features Test.

[7] *See also* 140 Cong. Rec. S12138, 1994 WL 449789 (Aug. 19, 1994) (Sen. DeConcini) ("19 assault weapons and copycat models"); 140 Cong. Rec. H7934, 1994 WL 422560 (Aug. 4, 1994) (Rep. Derrick) ("19 listed weapons, copycats, and other clearly defined semiautomatic guns"); 140 Cong. Rec. S10007, 1994 WL 393151 (July 28, 1994) (Sen. Craig) ("19 specified assault weapon models and any copycat versions"); 140 Cong. Rec. E887, 1994 WL 181496 (May 5, 1994) (Rep. Vento) ("19 specific semiautomatic weapons and their copycats"); 140 Cong. Rec. H3079, 1994 WL 170996 (May 5, 1994) (Rep. Lazio) ("this bill includes provisions to control the spread of so-called copycat weapons").

Feinstein) ("[W]e want the free flow of AR-15's to the streets stopped.").[8]

A statement from Congressman Gunderson is illustrative. The Congressman opposed the Federal AWB when it was enacted in 1994, and in 1996, sought to persuade his colleagues that it should be repealed. *See* 142 Cong. Rec. E456, 1996 WL 136715 (March 26, 1996). "When the House considered the assault ban in 1994," he said, "the real issue was not whether Congress could ban a short, designated list of firearms. Rather, the issue was whether, in addition to a short list, the people wanted to entrust the Federal bureaucracy with the power to decide which firearms were copies or duplicates of the firearms banned in the law or that met the additional banned firearm criteria." *Id.* "Supporters," he continued, "claimed that language prohibiting copies or duplicates is necessary to be effective and that the additional banned modifications are narrowly tailored. Opponents disagreed, noting that the effect would likely be to ban dozens of weapons. By a narrow vote of 216 to 214, the House decided that [ATF] should have that power." *Id.*

This passage makes clear that when Congress enacted the ban, it believed that the "copies or duplicates" language was necessary for the law to be effective. *Id.* Moreover, opponents of the ban believed that the "copies or duplicates" language would encompass "dozens" of additional weapons, aside from those listed as Enumerated Weapons or outlawed by the Features Test. *Id.* As one of those opponents argued before enactment of the Federal AWB, "the bill clearly allows the ATF to stop copycat models, but allows open-ended definitions of copycatting." 140 Cong. Rec. H3087, 1994 WL 170996 (May 5, 1994) (Rep. Clement). Thus, it is plain that Congress, like the Massachusetts Legislature soon after, viewed the "copies or duplicates" language as a critical

---

[8] *See also, e.g.*, 140 Cong. Rec. S12244, 1994 WL 455043 (Aug. 22, 1994) (Sen. Feinstein) (referring to a "rookie police officer in Los Angeles—and mother of two—[who] was killed with an AR-15"); 140 Cong. Rec. H3080, 1994 WL 170996 (May 5, 1994) (Rep. Andrews) ("The bill . . . specifically targets high-velocity, rapid-fire weapons—like Uzi's, AK-47's, TEC-9's, MAC-10's, and AR-15's—that have become the weapons of choice for drug dealers, street gangs, and hate groups.").

component of the ban, one designed to keep weapons that were similar to or imitations of the Enumerated Weapons off the streets.

In light of the plain text of the statute, the legislative history, and prior judicial interpretations of the phrase "copies or duplicates," the Attorney General's interpretation in the Enforcement Notice was not "indefensible" by reference to existing law; indeed, it honored existing law. *Bouie*, 378 U.S. at 354. Nor was it "unexpected," as the plaintiffs contend. As discussed, Massachusetts officials previously made clear that the Bushmaster XM-15 used to massacre 26 children and teachers at Sandy Hook Elementary School, a copy of the Colt AR-15,[9] "cannot be legally purchased in Massachusetts because it is prohibited under the state's assault weapons ban." Kaplan Decl. Ex. 17; *see also* Ex. 18; Defts.' Br. Summ. J., at 17. The plaintiffs have no response to this evidence; at most, they contend that the Firearms Records Bureau's ("FRB") collection and storage of data on firearms transactions amounted to "approval" of the sales of copies or duplicates of Enumerated Weapons liked the Colt AR-15 and AK47. Undisputed evidence shows that this argument is mistaken; the Director of the FRB confirms that collection of the transaction data does not constitute approval of each transfer. *See* Defts.' Br. Summ. J., at 17; Dunne Decl. ¶¶ 2, 7–8. The data is not reviewed by FRB employees when it is collected, it does not include all the information necessary to determine whether a particular transaction comports with Massachusetts law, and mere collection and storage of the data cannot, therefore, imply approval. *See id.* Were it otherwise, the FRB might be compelled to begin reviewing the tens of thousands of annual firearms transactions and referring each potentially unlawful transfer to prosecutorial authorities, a step that would overburden the agency, overburden prosecutors, and

---

[9] *See* Kaplan Decl. Ex. 36, at 141–44 (explaining the similarity between the Bushmaster XM-15 series (Bushmaster's AR-15 style rifles) and the Colt AR-15, and the interchangeability of the component parts, and including pictures of the rifles).

impose responsibilities not intended by the Legislature.

## III. THE STATUTORY PHRASE "COPIES OR DUPLICATES" IS NOT VAGUE ON ITS FACE BECAUSE IT PROVIDES FAIR NOTICE OF WHICH WEAPONS ARE PROHIBITED AND HAS NOT BEEN ENFORCED IN AN ARBITRARY MANNER.

Finally, this Court should reject the plaintiffs' claim that the statutory phrase "copies or duplicates" in the AWB is unconstitutionally vague on its face. *See NYSRPA*, 804 F.3d at 265 ("Because plaintiffs pursue this 'pre-enforcement' appeal before they have been charged with any violation of law, it constitutes a 'facial,' rather than 'as-applied,' challenge."). As discussed, outside the First Amendment context, facial vagueness challenges to statutes are not cognizable. *See* Defts.' Br. Summ. J., at 17–18. The plaintiffs have no argument as to why, despite that straightforward bar, they should nevertheless be able to advance their claim here. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (holding, in a case involving asserted Second Amendment rights, that a vagueness claim was "eligible only for as-applied, not facial, review").

Even if the plaintiffs' facial vagueness claim were cognizable, it fails on the merits. A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). The plaintiffs do not dispute that this Court, like several other courts, has already rejected a vagueness challenge to the phrase "copies or duplicates" in the AWB. *See* Kaplan Decl. Ex. 19, at 2; Ex. 20, ¶ 121; *see also NYSRPA*, 804 F.3d at 267; *Wilson v. Cnty. of Cook*, 968 N.E.2d 641, 652–53 (Ill. 2012); *cf. Kolbe*, 849 F.3d at 148–49 ("copies"). Nor can they dispute their own testimony, which demonstrates their comprehension of the phrase "copies or duplicates." *See* Defts.' Br. Summ. J., at 19–20. Nor do they make any argument, based on the plain text of the statute, that persons of ordinary intelligence lack fair notice of what conduct is prohibited. Even though "copies or duplicates" is not defined in the AWB, the absence of a definition does not render the statute unconstitutionally

vague; "'reasonable breadth' in the terms employed by [a statute] does not require that it be invalidated on vagueness grounds," and "some degree of inexactitude is acceptable in statutory language." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011) (quoting *Grayned v. City of Rockland*, 408 U.S. 104, 110 (1972)).

 The plaintiffs' only basis for claiming a lack of fair notice as to the meaning of the statute is the purported confusion engendered by the Enforcement Notice. But by detailing how the Attorney General interprets the phrase "copies or duplicates" and by providing concrete examples of her application of that interpretation, the Notice provides more clarity, not less. *See* Kaplan Decl. Ex. 35. And in any event, the First Circuit has already rejected an attempt to invoke a prosecutor's interpretation of a criminal statute in support of a facial attack on the statute. *See McGuire v. Reilly*, 386 F.3d 45, 58-59 (1st Cir. 2004). In *McGuire v. Reilly*, the First Circuit considered a different enforcement notice issued by Attorney General Reilly announcing his interpretation of a criminal law setting buffer zones around abortion clinics; the court explained that, "[l]ogically, there is no way" that the Attorney General's interpretation could make the statute "more facially constitutionally vulnerable than it would be otherwise." *Id.* at 58. To make out their claim here, the plaintiffs would have had to train their argument on the alleged vagueness of the statutory phrase "copies or duplicates," but they have failed to present any argument at all that the plain terms of the statute provide insufficient notice of what conduct is prohibited.

 Finally, to the extent the plaintiffs claim that the phrase "copies or duplicates" is vague because it gives rise to a risk of arbitrary enforcement, that claim fails as a matter of law. When, as here, a plaintiff has asserted a pre-enforcement facial challenge to a statute, courts invariably decline to address any allegation that the law is likely to be enforced in an arbitrary manner. *See, e.g.*, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 503–04 (1982)

(rejecting pre-enforcement challenge premised on risk of arbitrary enforcement because there "will be time enough to consider any such problems when they arise"); *Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 686 (2d Cir. 1996) ("It would be premature to entertain this vagueness challenge based on a speculative threat of arbitrary enforcement until a broader use of the ordinance is actually initiated." (internal quotation marks omitted)). Because such claims are "especially speculative," *Garner v. White*, 726 F.2d 1274, 1278 (8th Cir. 1984), the "principal inquiry" in pre-enforcement vagueness challenges "is whether the law affords fair warning of what is proscribed," *Hoffman Estates*, 455 U.S. at 503. For that reason, this Court should decline to consider whether the phrase "copies or duplicates" might be enforced in an arbitrary manner.

In addition to being premature, any claim of arbitrary enforcement of the phrase "copies or duplicates" in the AWB is wholly unfounded. The complaint failed to allege, and the plaintiffs failed to adduce evidence, that the Attorney General or any other prosecutor has brought enforcement actions against persons who have sold or possessed "copies or duplicates" of Enumerated Weapons at all, much less in an arbitrary manner. Indeed, the plaintiffs' argument in support of their other due process claim relies on the history of *non*-enforcement of the AWB. *See* Pls.' Br. Summ. J., at 16. Absent any evidence whatsoever of arbitrary enforcement, the claim must fail.

## CONCLUSION

For the foregoing reasons, and for the reason stated in the Memorandum in Support of Defendants' Motion for Summary Judgment, the Plaintiffs' Motion for Summary Judgment should be denied and judgment should enter for the Defendants.

Respectfully submitted,

MAURA HEALEY, in her official capacity as
Attorney General of the Commonwealth of
Massachusetts; DANIEL BENNETT, in his official
capacity as Secretary of the Executive Office of
Public Safety and Security; COLONEL KERRY
GILPIN, in her official capacity as Superintendent
of the Massachusetts State Police,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Julia E. Kobick
William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2559
Date: January 5, 2018          julia.kobick@state.ma.us

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF, system will be sent
electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and
that paper copies will be sent to those indicated as non-registered participants by first-class mail
on January 5, 2018.

/s/ Julia E. Kobick
Julia E. Kobick
Assistant Attorney General