**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| DAVID SETH WORMAN, et al., | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No.: 1-17-CV-10107-WGY** |
| | ) | |
| MAURA HEALEY, et al., | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost (collectively, "Plaintiffs"), by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, submit their Opposition to Defendants' Motion for Summary Judgment ("Opposition"). Plaintiffs also are submitting their Response to Defendants' Statement of Undisputed Material Facts In Support of Their Motion for Summary Judgment ("Response"), together with Exhibits, which are incorporated by reference.

# TABLE OF CONTENTS

TABLE OF MAJOR AUTHORITIES................................................................................................iii

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.   The Challenged Laws Infringe Plaintiffs' Second Amendment Right to Keep and
       Bear Arms in the Home. ..................................................................................................... 2

       A.  The Second Amendment Prohibits the Ban of Firearms and Magazines
           Commonly Possessed for Lawful Purposes. .......................................................... 2

       1.   Defendants' Proposed "Like M16" Test Is an Outlier That Is Inconsistent with *Heller*
       and Ignores the Weight of Authority of Other Circuits. ...................................................... 3

       2.   The Second Amendment Right to Keep and Bear Arms Includes the Right to Possess
       Modern Firearms and Magazines Commonly Kept for Lawful Purposes. .......................... 6

       B.  The Banned Firearms and Magazines Are Protected By the Second
           Amendment Because They Are Commonly Possessed for Lawful Purposes,
           Including Self-Defense. .......................................................................................... 7

       C.  Even Under the Interest Balancing Analysis Rejected in *Heller*, No Fit Exists
           Between the Challenged Laws and the Asserted Government Interest To
           Justify Infringing Plaintiffs' Second Amendment Rights........................................... 9

       1.   The Challenged Laws Are Neither Narrowly Tailored Nor the Least Restrictive
       Alternative to Further the Government's Interest in Public Safety. ................................. 10

       2.   The Challenged Laws Lack Even a "Close" or "Substantial" Fit to the Government's
       Asserted Interest in Public Safety. .................................................................................. 11

   II.  The Challenged Laws Do Not Afford Plaintiffs Due Process of Law Under the
       Fourteenth Amendment. ................................................................................................... 13

       A.  Defendants' Conflicting Interpretations of the Term "Copies or Duplicates" in
           the Challenged Laws Have Denied Plaintiffs Their Right to Notice and Fair
           Warning................................................................................................................. 13

       B.  The Challenged Laws Are Unconstitutionally Vague Because They Chill
           Constitutionally Protected Activity, Impose Criminal Penalties, and Lack a
           Scienter Requirement............................................................................................ 17

CONCLUSION............................................................................................................................. 20

CERTIFICATE OF SERVICE ..................................................................................................... 21

# TABLE OF MAJOR AUTHORITIES

**Page(s)**

**Cases**

*Artway v. Attorney Gen of State of N.J.*,
    81 F. 3d 1235 (3d Cir. 1996)................................................................15

*Bouie v. Columbia*,
    378 U.S. 347 (1964).............................................................14, 15

*Caetano v. Massachusetts*,
    136 S.Ct. 1027 (2016)............................................................ *passim*

*Cheshire Hosp. v. New Hampshire-Vermont Hospitalization Servs.*,
    689 F.2d 1112 (1st Cir. 1982)................................................14

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)................................................................19

*Colautti v. Franklin*,
    439 U.S. 379 (1979)...........................................................18, 19

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................ *passim*

*Draper v. Healey*,
    827 F.3d 1 (1st Cir. 2016)........................................................18

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)................................................................14

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th 2015)..........................................................6

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) ....................................................4

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ..........................................4, 6, 11

*Kolbe v. Hogan*,
    849 F. 3d 114 (4th Cir. 2017) ...............................................3, 4, 6

*Kolender v. Lawson*,
    461 U.S. 352 (1983)................................................................18

*McDonald v. Chicago*,
    561 U.S. 742 (2010)............................................................ *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015)..........................................................................4

*Osborne v. Ohio*,
  495 U.S. 103 (1990)....................................................................................14

*People's Rights Org., Inc. v. City of Columbus*,
  152 F.3d 522 (6th Cir. 1998) ..............................................................19, 20

*Rideout v. Gardner*,
  838 F.3d 65 (1st Cir. 2016)......................................................11, 12, 13

*Springfield Armory, Inc. v. City of Columbus*,
  29 F.3d 250 (6th Cir. 1994) .......................................................................19

*Staples v. United States*,
  511 U.S. 600 (1994).....................................................................................5

*U.S. v. Lanier*,
  520 U.S. 259 (1997)....................................................................................14

*United States v. Booker*,
  644 F.3d 12 (1st Cir. 2011)........................................................................10

*United States v. Miller*,
  307 U.S. 174 (1939).................................................................................3, 4

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000)....................................................................................11

*Upton v. S.E.C.*,
  75 F.3d 92 .................................................................................................14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982)...................................................................17, 18, 19

**Statutes**

G.L. c. 140, § 123 .........................................................................................15

**Other Authorities**

Fed. R. Civ. P. 56............................................................................................ i

Local Rule 56.1 ................................................................................................ i

**INTRODUCTION**

Defendants invite this Court to take extraordinary measures to uphold the Challenged Laws, all of which require abandoning controlling United States Supreme Court precedent and either ignoring undisputed facts or resting judgment on disputed facts. First, Defendants implore the Court to abandon the "in common use" test established by the Supreme Court and applied across most United States Circuit Courts of Appeal, which provides constitutional protection to firearms commonly possessed for lawful purposes*, see, e.g., District of Columbia v. Heller*, 554 U.S. 570, 627 (2008), urging instead the adoption of an outlier test from the Fourth Circuit that would exclude the Banned Firearms and Magazines from any constitutional protection because of their asserted usefulness in military service. Defendants further contend this Court should disregard *Heller* here because the banned Firearms and Magazines are not lineal descendants of weapons in common use in the late eighteenth century – an overly narrow reading previously adopted by the Supreme Judicial Court of Massachusetts but subsequently rejected by the United States Supreme Court in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016). Defendants then urge this Court to ignore undisputed evidence that Massachusetts citizens choose to keep the Banned Firearms and Magazines for lawful purposes including defending themselves in their homes, a position not followed by any other Circuit Court reviewing similar bans.

Finally, contrary to the United States Supreme Court's holding that a ban of firearms that are commonly kept for lawful purposes should be stricken without resorting to any balancing of interests, *see Heller*, 554 U.S. at 634-35, *McDonald v. Chicago*, 561 U.S. 742, 785 (2010), *Caetano*, 136 S. Ct. at 1028, Defendants urge the application of just such a balancing test. But even applying their test, Defendants have not met their burden under any level of heightened scrutiny. While public safety is often a plausible, and in some cases even compelling reason, to enact a law, its invocation does not insulate a law from review where it infringes fundamental

1

rights. Defendants have not shown, with the record evidence in this case, a "close" or "substantial" fit between the Challenged Laws, which deprive law-abiding, responsible citizens of their right to keep firearms commonly possessed for lawful purposes including self-defense in the home, and Defendants' stated interest of protecting public safety against mass shootings and law-enforcement shootings in Massachusetts. Nor have Defendants proven that the Challenged Laws have been narrowly tailored to recognize the constitutionally protected rights that are implicated.

Similarly, Defendants encourage this Court to adopt an overly narrow and incomplete due process of law analysis of the Challenged Laws, which eviscerates Plaintiffs' right to fair notice under the Fourteenth Amendment. Lastly, Defendants suggest that the clear meaning of the statute defeats a vagueness challenge notwithstanding their own diametrically conflicting interpretations of that same language.

For these reasons, Defendants' motion for summary judgment should fail.

## ARGUMENT

I. **The Challenged Laws Infringe Plaintiffs' Second Amendment Right to Keep and Bear Arms in the Home.**

A. **The Second Amendment Prohibits the Ban of Firearms and Magazines Commonly Possessed for Lawful Purposes.**

The United States Supreme Court in *Heller* held that an individual has the right to keep and bear arms that are "typically possessed" for "lawful purposes like self-defense." 554 U.S. at 624-25. The Supreme Court also held that a law banning an entire category of firearms that are commonly possessed by law-abiding citizens is so clearly unconstitutional that the Supreme Court need not resort to applying any standard of review in such a case. *Id.* at 636. The Supreme Court's subsequent holdings in *McDonald*, 561 U.S. 742, and *Caetano*, 136 S. Ct. 1027, also involving complete bans of particular firearms, only confirm *Heller*'s unequivocal holding that the Second Amendment prohibits the ban of firearms and magazines commonly possessed for lawful purposes.

Defendants invite this Court to reject that precedent. For the following reasons, that invitation should be declined.

> 1. **Defendants' Proposed "Like M16" Test Is an Outlier That Is Inconsistent with *Heller* and Ignores the Weight of Authority of Other Circuits.**

Defendants attempt to persuade this Court to follow the novel test promulgated in *Kolbe v. Hogan*, 849 F. 3d 114 (4th Cir. 2017), to strip the Banned Firearms and Magazines of Second Amendment protection, even though that test misconstrues the holding in *Heller* and has not been adopted by any other court. The *Kolbe* majority rejected the "in common use" test set forth by the Supreme Court and adopted by most of the Circuit Courts reviewing such bans, and instead "conclude[d] that the Second Amendment does not even apply," *id*. at 150 (Traxler, J., dissenting), to similarly banned semi-automatic rifles and magazines because "there is no constitutional protection for weapons that are 'like' 'M-16 rifles' and [other weapons] 'most useful in military service.'" *Id.* at 136 n. 10 (quoting *Heller*, 554 U.S. at 627). That language from *Heller*, however, referred back to the discussion of fully automatic machineguns like the M-16, mentioned just four paragraphs previously*, see Heller*, 554 U.S. at 624-25, not to semiautomatic civilian rifles like the popular AR-15, which *Heller* did not even discuss.

A plain reading of *Heller* demonstrates the flaws of the *Kolbe* opinion. The Supreme Court made clear that the Second Amendment applies "'prima facie,' to all instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, and reiterated the test in *United States v. Miller*, 307 U.S. 174 (1939), that the only "bearable arms" to which the Second Amendment does not apply are those that are not typically possessed by law abiding citizens. *Heller,* 554 U.S. at 625. Based on this clear language in *Heller*, most Circuit Courts reviewing similar bans have utilized the "in common use" test to determine whether a firearm is protected by the Second Amendment by assessing whether the firearms and magazines are "typically possessed by law-abiding citizens for

lawful purposes." *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("*Heller II*") (firearms and magazines); *see also New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255-57 (2d Cir. 2015) (firearms and magazines); *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (magazines).

Applying *Kolbe's* "like M-16" test to the facts of established Supreme Court precedent proves the test is fundamentally flawed. In *Miller*, the Supreme Court determined that the sawed-off shotgun at issue was outside Second Amendment protection. *See* 307 U.S. at 178. Under *Kolbe's* test, however, *Miller's* sawed-off shotgun would be protected because it is not "useful in military service." 849 F.3d at 136 n.10. Conversely, applying *Kolbe*, *Heller's* handgun and standard capacity magazines, *see* 554 U.S. at 574, would lose protection because they are used as military sidearms.

The fact that a particular firearm was designed after, or bears some articulable similarity to, a military weapon, as alleged by Defendants, *see* Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment ("Defs. Memo.") (Doc. 62) at p. 6, would, under the *Kolbe* test, amount to an outright ban of some of the most common firearms kept for lawful purposes today. *See* Defendants' Statement of Material Facts As to Which There is No Genuine Issue to be Tried ("Defs. SUF") (Doc. 63) at p. 25, ¶ 114. Nor does that test provide any sensible limits because it includes within its sweep most if not all of the firearms specifically exempted from the Massachusetts bans, such as the iconic M-1 rifle. *Id.* There are no limits to what a court could determine to be unprotected under Defendants' subjective test, just as there are no principled distinctions between the firearms banned by Massachusetts and those exempted.

Furthermore, the Banned Firearms are not "like" fully automatic military rifles. *See* Plaintiffs' Statement of Undisputed Material Facts In Support of Their Motion for Summary

Judgment ("SUF") (Doc. 59) at pp. 20-21, ¶¶ 60-61. The Supreme Court has previously held that AR-15s are not "like" M-16s because, unlike the fully automatic M-16, semiautomatic rifles such as the AR-15 have been understood to be lawful civilian firearms. *Staples v. United States*, 511 U.S. 600, 612 (1994). The limitation of AR-15 rifles to semiautomatic fire is the critical distinction that makes them the "civilian version of the military's M-16." *Id.* at 603. Defendants argue that AR-15s are virtually identical to M-16s and that the semi-automatic/automatic distinction stressed by the Supreme Court is trivial, even going so far as to suggest that semiautomatic fire is more lethal than automatic fire. *See* Defs. Memo. (Doc. 62) at p. 7. Defendants' position that the Banned Firearms and Magazines are most useful in military service is unsupported by any military expert or document or other evidence. They cannot even point to a single organized military force in the world that relies upon semiautomatic rifles rather than fully automatic rifles as standard issue for its troops.

Defendants also argue that a semiautomatic firearm can be modified to simulate a more dangerous weapon by attaching devices to the weapon. *See Id.* "Bump stocks" and other such devices already are prohibited in the state of Massachusetts, *see* Response at pp. 9-10, ¶¶ 46-47, and there is no evidence that such arcane devices are actually bought, sold, or used in Massachusetts. Defendants' argument simply underscores the critical dividing line between semiautomatic and automatic firearms long recognized by the United States Congress and the Supreme Court. *See Staples*, 511 U.S. at 612.

The subjectivity of the "like M-16" test and its propensity to exclude otherwise protected arms from the Second Amendment is further highlighted by Defendants' argument that magazines in excess of ten rounds are "particularly designed and most suitable for military and law enforcement application." *See* Defs. Memo. (Doc. 62) at p. 8. Defendants fail to demonstrate why

magazines with a capacity of ten rounds are not most useful in military service as a matter of law, but those with eleven are. This is an entirely arbitrary number unsupported by evidence or reason. Defendants offer no limiting principles for determining what magazine capacity must be excluded from the Second Amendment because of purported military utility. In contrast, *Heller*'s "in common use" test is easy to apply in this context. As the D.C. Circuit found, "[t]here may well be some capacity above which magazines are not in common use but . . . that capacity surely is not ten." *Heller II*, 670 F.3d at 1261.

2. **The Second Amendment Right to Keep and Bear Arms Includes the Right to Possess Modern Firearms and Magazines Commonly Kept for Lawful Purposes.**

In a further attempt to exclude the Banned Firearms and Magazines from any Second Amendment protection, Defendants suggest that only firearms that are "lineal descendants" of a weapon that was in common use when the Second Amendment was ratified is afforded protection, s*ee* Defs. Memo. (Doc. 62) at p. 8, citing to the Seventh Circuit Court of Appeals decision, *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th 2015). Like *Kolbe*, *Friedman* is an anomaly decision that rejects the "in common use" test and cannot be reconciled with *Heller*. *See id.* But *Friedman* does not limit Second Amendment protection to "lineal descendants" of weapons in common use at the time of the founding; this appears to be Defendants' own extension of *Friedman*.

Regardless of its derivation, the crux of their argument – that only those firearms that were traditionally in common use and permitted under the Second Amendment at the time of its founding are afforded protection – has been rejected by *Heller* as an argument "bordering on the frivolous." *See Heller*, 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way.").

6

When Massachusetts recently relied on this rationale to affirm a conviction under its stun gun ban, the United States Supreme Court summarily reversed in *Caetano*. The Massachusetts Supreme Judicial Court had held that a stun gun "'is not the type of weapon that is eligible for Second Amendment protection'" because "it was 'not in common use at the time of [the Second Amendment's] enactment,'" 136 S. Ct. at 1029 (Alito, J., concurring), and is "unusual" because it is "a thoroughly modern invention." *Id.* at 1028. The United States Supreme Court declared that such reasoning "is inconsistent with *Heller's* clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding.' 554 U. S. at 582." *Id.*

Application of Defendants' *Friedman*-based test to the facts of *Caetano* demonstrates just how inconsistent the standard is with the Supreme Court's jurisprudence: a stun gun would not be afforded Second Amendment protection simply because it is a modern weapon not related to any traditional firearm, despite it being "in common use." *Caetano* forecloses Defendants' argument, making clear that commonly possessed modern firearms and magazines are afforded constitutional protection just like any commonly possessed traditional firearm.

**B. The Banned Firearms and Magazines Are Protected By the Second Amendment Because They Are Commonly Possessed for Lawful Purposes, Including Self-Defense.**

Defendants argue that the Banned Firearms and Magazines are not protected by the Second Amendment because they are not "commonly used, or necessary for self-defense." *See* Defs. Memo. (Doc. 62) at p. 9. This argument both distorts the *Heller* standard and ignores the evidence before this Court.

The Supreme Court in *Heller* acknowledged the connection between firearm ownership and self-defense, but chose not to condition Second Amendment protection of a firearm on its actual use or necessity in self-defense. Instead, the Supreme Court conditioned Second Amendment protection on whether or not the firearm was *kept for lawful purposes*. This is made

clear by the Court's opinion in *McDonald*, which expressly rejected Justice Breyer's contention that courts would have to find "answers to complex empirically based questions," including "[w]hat sort of guns are necessary for self-defense." *Id.* at 790-91; 922-23 (Breyer, J., dissenting). Clearly, "necessity" for self-defense is not the correct standard for determining Second Amendment protection; the *Heller* Court rejected the District's argument that its handgun prohibition was constitutional because the District permitted the use of other firearms in self-defense and, therefore, handguns were not necessary. *See Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.").

Defendants' argument that Plaintiffs have failed to prove that the Banned Firearms and Magazines are actually used for self-defense, *see* Defs. Memo. (Doc. 62) at pp. 9-10, confuses purpose with use because one can keep a firearm for self-defense for years and never have to use it. That a particular firearm is never actually used in self-defense does not negate the firearm owner's self-defense purpose for keeping that firearm. There is abundant evidence before this Court that the Banned Firearms and Magazines are commonly possessed for lawful purposes, including self-defense, *see* SUF (Doc. 59) at pp. 11-22, ¶¶ 26-67, including instances of actual self-defense use, *see* Response at pp. 26-27, ¶ 142.

Even if Defendants were correct that there must be evidence of use for self-defense, the record contains expert testimony, from Buford Boone (ballistics expert and former FBI Special Supervisory Agent, FBI Firearms Instructor, and head of the FBI's Ballistic Research Facility in Quantico, Virginia), Dr. Gary Roberts (wound ballistics expert and former Navy doctor and

sheriff's deputy), and Guy Rossi (self-defense/use-of-force expert and instructor and former municipal police sergeant) that the Banned Firearms are ideal for self-defense because they are easy to control, highly accurate, have limited penetration capability with respect to missed shots, and are effective at deterring aggressors. *See* SUF (Doc. 59) at pp. 14-16, ¶¶ 40-44. Expert witness James Curcuruto (market research director with the National Shooting Sports Foundation) testified that a market survey of 21,942 owners of semiautomatic rifles showed that one of the primary reasons for their purchase of a Banned Firearm was home defense. *See* Curcuruto Decl. (Doc. 60), at p. 9 of 22. Plaintiffs David Worman, Jason Sawyer, and Anthony Linden keep Banned Firearms and Magazines to ensure their ability to defend their home. *See* SUF (Doc. 59) at p. 6, ¶ 19, p. 7, ¶ 20, p. 8, ¶ 21. The Bureau of Alcohol, Tobacco, Firearms, and Explosives also has confirmed that the Banned Firearms and Magazines are suitable for and are actually kept for self-defense in the home. S*ee* SUF (Doc. 59) at p. 14, ¶ 39, Ex. 28 (Doc. 59-27) at p. 11.

Finally, the evidence further shows that the Banned Firearms and Magazines are widely possessed by millions of law-abiding citizens for other lawful purposes, including hunting, recreational and competitive target shooting, and collecting. *See* SUF (Doc. 59) at p. 14, ¶ 37. Defendants cannot and have not disputed these facts.

### C. Even Under the Interest Balancing Analysis Rejected in *Heller*, No Fit Exists Between the Challenged Laws and the Asserted Government Interest To Justify Infringing Plaintiffs' Second Amendment Rights.

In analyzing a ban of a category of firearms commonly possessed for lawful purposes, including self-defense, the Supreme Court in *Heller* examined the historical tradition of firearm ownership in the United States, and the text and meaning of the Second Amendment, before holding the ban unconstitutional. *See generally, Heller*, 554 U.S. at 576-628. The Court in *Heller,* and again in *McDonald,* declined to apply any standard of review to a ban of such protected firearms. *Heller*, 554 U.S. at 634-35; *McDonald*, 561 U.S. at 791. This Court should not apply

interest balancing in analyzing the Challenged Laws. Even if the Court does so, however, Defendants have failed to meet their burden of proving that the Challenged Laws fit their stated interest in public safety – reducing mass shootings and law-enforcement shootings – to justify a complete ban on protected firearms and magazines by law-abiding citizens in their homes.

1. **The Challenged Laws Are Neither Narrowly Tailored Nor the Least Restrictive Alternative to Further the Government's Interest in Public Safety.**

Defendants advance a number of grounds why intermediate rather than strict scrutiny should apply. First, Defendants assert that the Challenged Laws do not severely burden the right of self-defense in the home because the ban does not prohibit handguns. This narrowest of all possible readings of *Heller* was rejected by the Supreme Court in *Caetano*, which applied *Heller* to reverse Massachusetts' highest court's approval of a stun gun ban notwithstanding the Massachusetts Attorney General's argument that the ban nonetheless permitted handguns. *Caetano*, 126 S. Ct. at 1028.

Defendants also argue that the Legislature could reasonably conclude that the Banned Firearms and Magazines are not "frequently used for self-defense," even though the Legislature's judgment cannot substitute for a judicial determination of the extent of burden on the exercise of the right. *See Heller,* 554 U.S. at 629 (rejecting the District's judgment that long guns were adequate for self-defense). In any event, "actual use" in self-defense is not the correct test for assessing whether a firearm is afforded Second Amendment protection. *See supra* at p. 8.

Finally, Defendants suggest that *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011), supports the application of intermediate scrutiny here. *Booker* dealt with a regulation that "fit comfortably among the categories of regulations that *Heller* suggested would be 'presumptively lawful'" – namely, the longstanding prohibition of criminal offenders possessing firearms. *Id.* at

24 (*citing Heller*, 554 U.S. at 627 n.26). *Booker* clearly is inapposite to this case, where the Second Amendment rights of the general, law-abiding public are at stake.

Strict scrutiny must be applied here because the Plaintiffs are law-abiding, responsible citizens and the Challenged Laws prevent Plaintiffs from keeping commonly possessed firearms and magazines for self-defense in the home, infringing the core of their Second Amendment right. Defendants bear the burden of establishing that the Challenged Laws are "the least restrictive means" of achieving their stated interest – to protect the safety of the public and law-enforcement officers in the Commonwealth of Massachusetts – and to rebut the presumption that the law is invalid. *See United States v. Playboy Ent. Grp., Inc.,* 529 U.S. 803, 813 (2000); *see also* Defs. Memo. (Doc. 62) at p. 11. Defendants fail to carry their burden because they do not even address how the Challenged Laws are the least restrictive means of accomplishing their stated interest.

**2.  The Challenged Laws Lack Even a "Close" or "Substantial" Fit to the Government's Asserted Interest in Public Safety.**

Even if intermediate scrutiny were to apply, Defendants have failed to present any facts to show *any* fit to their asserted interest, much less the "close" or "substantial fit" required under an intermediate scrutiny analysis. *See Rideout v. Gardner*, 838 F.3d 65, 74 (1st Cir. 2016); *see also Heller II*, 670 F.3d at 1258. Defendants describe the Banned Firearms and Magazines as being used disproportionately in public mass shootings and police officer murders. *See* Defs. Memo. (Doc. 62) at pp. 11-12. Defendants also state that prohibiting the Banned Firearms and Magazines "has a significant impact on crime and public safety." *See* Defs. Memo. (Doc. 62) at p. 12. Defendants offer little support for demonstrating that the Banned Firearms and Magazines were used with any frequency in, or made any difference in the outcome of, mass shootings or shootings of police officers, or any other crime, *in the Commonwealth of Massachusetts*. Defendants instead largely rely on generalized national data or reports from other states, which does not carry their

burden of persuasion. Moreover, their disproportionality argument is based solely upon a formula that under-counts the Banned Firearms and over-counts the total firearms to include an estimate of every firearm ever placed in circulation. *See* Defs. SUF (Doc. 63) at pp. 25-30. "But intermediate scrutiny is not satisfied by the assertion of abstract interests. Broad prophylactic prohibitions that fail to 'respond[] precisely to the substantive problem which legitimately concerns' the State cannot withstand intermediate scrutiny." *Rideout*, 838 F.3d at 72-73 (citations omitted). Nor will invocation of a "few recent instances … in other states" substantiate the necessary fit with Defendants' interest in public safety in Massachusetts. *Id*. at 73.

The Challenged Laws' restriction on magazine capacity is also unlikely to have any detectable effect on the number of homicides and violent crimes committed in Massachusetts. *See* Kleck Decl. (Doc. 59-9) at Att. A, p. 6. Criminals who wish to commit a mass shooting can easily obtain large capacity magazines out of state and illegally bring them into the Commonwealth. *Id.* Moreover, the evidence shows that virtually all criminals committing mass shootings bring multiple guns with them to accomplish their crime, or use multiple, smaller capacity magazines, and quickly reload their weapons or substitute another weapon. *Id.* Because the so-called "assault weapons" banned by the Challenged Laws are rarely used by criminals, prohibiting these weapons would not serve as a crime deterrent. *Id.* at p. 9. Instead, law-abiding citizens, who will be deprived of sufficient ammunition capacity to assure themselves of being able to fend off attackers, will be significantly adversely impacted by the restriction. *Id.* at p. 3.

In this regard, Defendants incorrectly assert that the Federal Ban on which the Challenged Laws are based resulted in fewer crimes being committed with "assault weapons" and fewer fatalities in mass shootings. *See* Defs. Memo. (Doc. 62) at p. 13; Defs. SUF (Doc. 63) at p. 30, ¶¶ 140-141. Studies on the effectiveness of the Federal Ban, however, do not establish that the rate

of homicides involving "assault weapons" declined during the Federal Ban, and refute Defendants'

theory that a reduction in gun homicides was a result of the Federal Ban. *See* Kleck Decl. (Doc.

59-9), at Att. A, p. 10. In fact, Dr. Christopher S. Koper, who authored one of the studies on which

Defendants rely, stated that "[a]attributing the decline in gun murders and shootings to the [Federal

Ban] is problematic." *See* Doc. 65-12 at p. 113. Dr. Koper further opined that the Federal Ban

could not be clearly credited with the nation's drop in gun violence during the Federal Ban, and

moreover, that any "effects on gun violence are likely to be small at best" if the Federal Ban were

renewed. *Id.* at pp. 24, 117. Subsequent to the publication of Dr. Koper's report in June 2004,

Congress allowed the Federal Ban to sunset.

Even if Defendants offered sufficient justification for the Challenged Laws to prevent

actual crimes being committed with banned Firearms and Magazines in Massachusetts, they have

failed to demonstrate the narrow tailoring necessary to ensure they encroach no more than is

necessary on the rights of Massachusetts law-abiding citizens. *See Rideout,* 838 F.3d at 74. A ban

of protected arms cannot meet tailoring requirements. Nor have Defendants made any effort to

show other existing laws are inadequate to protect the public. *See id.*; *see also* Response pp. 34-

35, at ¶ 95 (Defendant Healey touting the many "strong state laws and regulations" pertaining to

firearms"). Defendants have not met their burden even under intermediate scrutiny.

## II. The Challenged Laws Do Not Afford Plaintiffs Due Process of Law Under the Fourteenth Amendment.

### A. Defendants' Conflicting Interpretations of the Term "Copies or Duplicates" in the Challenged Laws Have Denied Plaintiffs Their Right to Notice and Fair Warning.

Defendants misconstrue Plaintiffs' due process argument when they describe Plaintiffs'

claim to be "that the Enforcement Notice violates due process." *See* Defs. Memo. (Doc. 62) at p.

13. Plaintiffs have demonstrated that the Challenged Laws, as interpreted by the Notice of

Enforcement, did not provide fair notice to Plaintiffs that their prior conduct of buying and selling

firearms was unlawful. Defendants' subsequent novel and unforeseeable construction of the Challenged Laws, 18 years after their initial passage, resulted in Plaintiffs' transactions being retroactively criminalized, depriving Plaintiffs of due process. *See U.S. v. Lanier*, 520 U.S. 259, 266 (1997) ("[T]he touchstone is whether the statute, either standing alone *or as construed*, made it reasonably clear at the relevant time that the defendant's conduct was criminal.") (emphasis added). Defendants' assertion that Plaintiffs' claim fails because the Notice of Enforcement is not a regulation, *see* Defs. Memo. (Doc. 62) at p. 14, or a state court's construction of a statute, *see id.* at pp. 13-14, misses the point and misstates the law.

Defendants urge the Court to limit the reach of *Bouie v. Columbia*, 378 U.S. 347 (1964*),* but *Bouie* and other Supreme Court authorities on fair notice principles have been applied to analyze due process challenges based on lack of constitutionally-sufficient notice as to the unlawfulness of conduct, in contexts far beyond a state court's construction of state law to agency interpretations of law. *See Upton v. S.E.C.*, 75 F.3d 92, 97-98 (Securities and Exchange Commission's interpretation of its regulations); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254-55 (2012) (Federal Communications Commission's interpretation of federal statute); *Cheshire Hosp. v. New Hampshire-Vermont Hospitalization Servs.*, 689 F.2d 1112, 1121-22 (1st Cir. 1982) (Secretary of Department of Health and Human Services' interpretation of its regulations).

Defendants also place undue emphasis on the fact that *Bouie* involved an as-applied constitutional challenge, whereas here, Plaintiffs challenge the constitutionally of the Challenged Laws on their face, as interpreted by the Notice of Enforcement. *See* Defs. Memo. (Doc. 62) at pp. 13-14. It is well-settled that "a statute as construed may be applied to conduct occurring prior to the construction" only if "such application affords fair warning;" otherwise, the statute and its

construction is subject to facial attack. *See Osborne v. Ohio*, 495 U.S. 103, 115-16 (1990).

Moreover, "[w]hen [a] plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder" as is the case with Plaintiffs in this case, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *See Artway v. Attorney Gen of State of N.J.*, 81 F. 3d 1235, 1247 (3d Cir. 1996). There is no logical reason to avoid applying *Bouie* in this case simply because Plaintiffs have not yet been charged and prosecuted.

Defendants argue that this Court cannot prevent a prosecutor from enforcing a criminal law for lack of due process. *See* Defs. Memo. (Doc. 62) at p. 22. Their cited cases only support the continued validity of a law that is seldom invoked. But Plaintiffs do not challenge the enforceability of the Challenged Laws because they have been invoked rarely. Rather, the Challenged Laws, as construed by the Notice of Enforcement, are now applied to criminalize possession and transfer of firearms that were not considered banned prior to the Notice of Enforcement. Alan C. Zani, Massachusetts State Police Lieutenant, acknowledged in his deposition that "Massachusetts-Compliant Firearms" were "compliant" with the Challenged Laws and "were considered lawful" until July 20, 2016, the effective date of the Notice of Enforcement. *See* SUF (Doc. 59) at p. 23, ¶ 69. Tens of thousands of Massachusetts Compliant Firearms were lawfully sold in the eighteen years prior to the Notice of Enforcement. *See* SUF (Doc. 59) at pp. 3-4, ¶ 7.

Defendants direct attention away from their own inaction by asserting the Firearms Record Bureau ("FRB") did not review or approve those transactions. *See* Defs. SUF (Doc. 63) at pp. 10-11, ¶¶ 31-39. Massachusetts law requires Defendants to inspect records of all firearm transfers,

each year, for violations of law. *See* G.L. c. 140, § 123; *see also* SUF (Doc. 59) at p. 23, ¶ 68. While Defendants argue in their Motion that they do not have access to the information necessary to make a determination as to whether a firearm falls within the ban, *see* Defs. SUF (Doc. 63) at pp. 10-11, ¶ 36, their employees' sworn testimony in the case suggests otherwise. Lieutenant Zani testified that, prior to the Notice of Enforcement, he would learn from sources of reports of unapproved sales, be provided with a sampling of the dealer's monthly sales report, "and could . . . discern from that report that the report was either accurate or inaccurate." *See* Response at p. 35, ¶ 96. David Bolcome, Senior Investigator for the Office of the Attorney General, testified that he "routinely received FRB data which had firearm transactions in Massachusetts" and "reviewed those documents to determine what was being sold in Massachusetts and to gain estimates on assault weapon copies that were being sold in Massachusetts and which weapons those were." *See* Bolcome Dep. (Doc. 59-13) at 22:9-17. The records "in the very least" had "the make of the weapon, the model of the weapon . . . who sold the weapon, and who is buying the weapon." *Id.* at 22:18-24.; *see also* Bolcome Aff. (Doc. 61-1) at p. 3, ¶ 15.

The July 20, 2016 press release issued by Attorney General Maura Healey announced that her office had determined that an "estimated 10,000 copycat assault weapons were sold in Massachusetts in [2015] alone." *See* SUF at p. 26, ¶ 78. To arrive at that figure, Mr. Bolcome "reviewed all rifle sales to get an estimate of copies [of Enumerated Banned Firearms] being sold in Massachusetts." *See* Bolcome Dep. (Doc. 59-13) at 25:1-20; *see also* Bolcome Aff. (Doc. 61-1) at p. 3, ¶¶ 14-17. If Defendants had the resources to estimate an amount of Banned Firearms sold in 2015, they had access to the same information in each of the seventeen prior years since the enactment of the Challenged Laws. *See* Bolcome Aff. (Doc. 61-1) at p. 3, ¶ 15 ("I reviewed select transaction data from 2013 to 2017, which included records of sales of tens of thousands of

semiautomatic rifles."). With this information, Defendants could have enforced the Challenged Laws consistent with the Notice of Enforcement, but they did not. Plaintiffs rightfully relied upon Defendants' inaction as tacit approval of their transfers and possession and Defendants' long inaction reinforces that the Notice of Enforcement is a new and different interpretation of the Challenged Laws

Finally, Defendants argue that the Notice of Enforcement's interpretation of the Challenged Laws is not "unexpected and indefensible by reference to the law which has been expressed prior to the conduct in issue." *See* Defs. Memo. (Doc. 62) at p. 15 (citing *Bouie*, 378 U.S. at 354). Defendants then articulate various reasons why the Notice of Enforcement's guidance as to the meaning of "copies or duplicates" aligns with other courts' construction of the phrase. *See* Defs. Memo. (Doc. 62) at p. 16. All of this misdirection misses point. The Challenged Laws undisputedly track the language of the Federal Ban, and in the years in which both the Challenged Laws and the Federal Ban were effective – 1998 through 2004 – the Massachusetts Compliant Firearms were lawfully sold and transferred. *See* SUF (Doc. 59) at p. 1, ¶ 1; *see also* Zani Dep. (Doc. 59-19) at 11:10-12:4. Now, under the Challenged Laws as interpreted by the Notice of Enforcement, the Massachusetts Compliant Firearms are illegal. *See* SUF (Doc. 59) at p. 4, ¶ 10. As Governor Baker admonished the Attorney General, ambiguities in the Notice of Enforcement exposed to "prosecution responsible gun owners who followed the rules in the past . . . ." *See* Response at p. 34, ¶ 94. This is certainly "unexpected and indefensible."

### B. The Challenged Laws Are Unconstitutionally Vague Because They Chill Constitutionally Protected Activity, Impose Criminal Penalties, and Lack a Scienter Requirement.

Despite Defendants' argument to the contrary, criminal statutes implicating constitutional freedoms outside of the First Amendment context can and have been challenged and found unconstitutionally vague on their face. In *Village of Hoffman Estates v. Flipside, Hoffman Estates,*

*Inc.*, 455 U.S. 489 (1982), cited by Defendants, the Court explained that the first step in analyzing a facial challenge to the vagueness of a law is to determine "whether the enactment reaches a substantial amount of constitutionally protected conduct." *Id.* at 494. Second, "assuming the enactment implicates no constitutionally protected conduct," the challenged law should be upheld "only if the enactment is impermissibly vague in all of its applications." *Id.* at 494-95. The obvious implication of *Hoffman Estates* is that the Court may "permit a facial challenge if a law reaches 'a substantial amount of constitutionally protected conduct.'" *Kolender v. Lawson*, 461 U.S. 352, 258-59 n. 8 (1983) (quoting *Hoffman Estates*, 455 U.S. at 494).

Nowhere in *Hoffman Estates* does the Supreme Court limit "constitutionally protected conduct" to "conduct protected by the First Amendment." The facts of the case simply dealt with that enumerated right. *See Hoffman Estates*, 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, *for example*, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."). Defendants advance no reason to put the First Amendment on higher footing than any other constitutional right, including especially the Second Amendment. *See McDonald*, 561 U.S. at 780 (refusing to treat the Second Amendment "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

Moreover, *Hoffman Estates* recognized that requiring a statute be "vague in all applications" would not rigorously apply where the challenged statute is a criminal one. *See Hoffm*an *Estates*, 455 U.S. at 498-99. *Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016), cited by Defendants, involves a civil handgun regulation unlike the Challenged Laws, which impose criminal penalties. A criminal statute may be facially invalid as vague even if it has some

conceivably valid application. *See Kolender*, 461 U.S. at 358-59 n. 8; *Colautti v. Franklin*, 439 U.S. 379, 394-401 (1979).

The Supreme Court also has "long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*" because "the absence of a scienter requirement" in a criminal statute causes the statute to be "little more than a trap for those who act in good faith." *See Colautti*, 439 U.S. at 395 (internal quotations omitted); *accord Hoffman Estates*, 455 U.S. at 498-99. Accordingly, "[w]hen vagueness permeates the text" of a criminal statute that contains no scienter requirement and implicates constitutionally protected activity," heightened review of the challenged laws are warranted. *See City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (plurality).

Courts since *Hoffman Estates* have invalidated firearm regulations on their face under these principles. *See Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 253-54 (6th Cir. 1994) (holding that "[n]othing in the [assault weapon ban] ordinance provide[d] sufficient information to enable a person of average intelligence to determine whether a weapon they wish to purchase has a design history of the sort which would bring it within this ordinance's coverage."); *People's Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 533–38 (6th Cir. 1998) (finding alternative definitions of "assault weapon" unconstitutionally vague under a "stringent review," which was applied because the statute imposed criminal penalties and lacked a scienter requirement).

The Challenged Laws should be held to the same heightened standard of review as the assault weapon bans in *Springfield* and *People's Rights* because they threaten the exercise of constitutionally protected rights, impose criminal penalties, and lack a scienter requirement. As a result, the Challenged Laws chill Plaintiffs' Second Amendment rights. Sales of Massachusetts Compliant Firearms have ceased because citizens are uncertain which firearms are lawful and

whether they will face prosecution for purchasing particular firearms. *See* SUF (Doc. 59) at pp. 29-30, ¶ 89. Plaintiffs can either "possess their firearms in [Massachusetts] and risk prosecution . . . or, alternatively, they can . . . depriv[e] themselves of the use and possession" of these constitutionally protected firearms. *See People's Rights*, 152 F.3d at 529. As Defendant Bennett questioned Defendant Healey, "how could Massachusetts citizens … understand the limits of your recently announced rule and appropriately conform their behavior?" *See* Response at p. 34, ¶ 93. "Due process demands more than this." *People's Rights*, 152 F.3d at 536.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to deny Defendants' Motion for Summary Judgment.

Dated: January 5, 2018                              Respectfully submitted,

<u>/s/ James M. Campbell</u>
James M. Campbell (BBO#541882)
Richard P. Campbell (BBO # 071600)
Campbell Edwards & Conroy
One Constitution Center
Boston, MA 02129
(617) 241-3000
jmcambpell@campbell-trial-lawyers.com

<u>/s/ John Parker Sweeney</u>
John Parker Sweeney (admitted *Pro Hac Vice*)
T. Sky Woodward (admitted *Pro Hac Vice*)
James W. Porter, III (admitted *Pro Hac Vice*)
Marc A. Nardone (admitted *Pro Hac Vice*)
Connor M. Blair (admitted *Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 5th day of January, 2018, that Plaintiffs' Opposition to Defendants' Motion for Summary Judgment was served on Defendants' counsel via CM/ECF system that will forward copies to Counsel of Record.

/s/ James M. Campbell
James M. Campbell (BBO#541882)
Richard P. Campbell (BBO # 071600)
Campbell Edwards & Conroy
One Constitution Center
Boston, MA 02129
(617) 241-3000
jmcambpell@campbell-trial-lawyers.com

/s/ John Parker Sweeney
John Parker Sweeney (admitted *Pro Hac Vice*)
T. Sky Woodward (admitted *Pro Hac Vice*)
James W. Porter, III (admitted *Pro Hac Vice*)
Marc A. Nardone (admitted *Pro Hac Vice*)
Connor M. Blair (admitted *Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
jsweeney@bradley.com


*Counsel for Plaintiffs David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost*