**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**


| | | |
|---|---|---|
| **DAVID SETH WORMAN, et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1-17-CV-10107-WGY** |
| | ) | |
| **MAURA HEALEY, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |


**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiffs David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson

Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost

(collectively, "Plaintiffs"), by and through their undersigned counsel, and pursuant to Federal Rule

of Civil Procedure 56 and Local Rule 56.1, hereby submit this Response to Defendants' Statement

of Undisputed Facts in Support of Their Motion for Summary Judgment.[1]

---

[1] Many of the paragraphs in Defendants' Statement of Undisputed Facts are not material and are
mischaracterizations of the evidence. For example, paragraphs 61 through 90 offer incomplete and
immaterial information about the development of certain automatic firearms that are not at issue
in this case. Paragraphs 115 and 116 offer immaterial and inaccurate proportions regarding firearm
ownership. Paragraphs 133 through 138 contain immaterial descriptions of crimes (while clearly
horrific, the details of crimes committed are not relevant to any issues in this case). Paragraphs
149 through 151 offer immaterial, inaccurate, and unsubstantiated opinions about carrying long
guns outside the home, which is not an issue in this case.

To avoid unnecessarily burdening the Court with an excessively long response Plaintiffs reproduce
with responses only the paragraphs that are disputed and material and, therefore, preclude
summary judgment in favor of Defendants. Furthermore, wherever possible, Plaintiffs cite to
exhibits already filed in this action to avoid unnecessary duplication.

**I.    Defendants Statement of Undisputed Facts contains numerous paragraphs supported only by the inadmissible declarations of undisclosed witnesses.**

As made clear in Plaintiffs' Memorandum in Support of Motion to Strike (ECF No. 69), Defendants have improperly submitted and relied upon declarations from three witnesses who were never previously disclosed. Plaintiffs were significantly prejudiced by Defendants' disregard for this Court's Local Rules and the Federal Rules of Civil Procedure because they were never afforded an opportunity to discover the extent of the information held by these witnesses or to test their knowledge and/or opinions by deposition. Furthermore, these witnesses offer expert opinions for which Plaintiffs were given no notice, no report, no opportunity to engage rebuttal experts, and no opportunity to test their opinions through deposition questions. For these reasons, and as explained more fully in Plaintiffs' Motion to Strike, this Court should strike the declarations of Brian Kyes, Mark Leahy, and Kristen Rand and disregard the portions of Defendants' purported statements of undisputed fact relying upon these witnesses (¶¶ 18, 19, 48, 95, 102, 103, 105, 106, 107, 128, 145, 146, 147, 148, 151, 156, 157, 158, 159, 160, 161).

If this Court does not strike these declarations, the paragraphs for which these declarations are cited as support must be considered to be disputed. Defendants argue to this Court that the declarations of these witnesses should not be stricken because they are impeachment witnesses called only to refute facts. Defendants' Opposition to Plaintiffs' Motion to Strike, ECF No. 70, at 2. It is axiomatic that if a witness is called solely to impeach, than whatever testimony that witness has to offer is disputed. Thus, Defendants have admitted that all of the paragraphs for which the declarations of these undisclosed witnesses were offered are disputed, and this Court should not rely upon them in ruling on Defendants' motion for summary judgment.

**II.      Plaintiffs dispute the material facts upon which Defendants rely in moving for summary judgment.**

Plaintiffs also dispute the particular paragraphs of Defendants' Statement of Undisputed Facts as follows (Plaintiffs have reproduced the pertinent paragraphs in full with their original numbering for ease of reference):

14. Second, by referencing the federal statute, the state statute separately adopted the Features Test, which generally banned any semiautomatic rifle, pistol, or shotgun that had the ability to accept a detachable magazine and had two or more specified combat-style features. St. 1998, c. 180, § 8; G.L. c. 140, § 121; supra ¶ 4.

**Response:**      Plaintiffs dispute the facts contained in this paragraph because they are incomplete. The legislative history of the federal ban makes clear that the "Features Test" referenced by Defendants in this paragraph limited the definition of "copies and duplicates" under federal law. 139 Cong. Rec. S15459 (Doc 59-21) at p.1 ¶¶ 4-6 Thus, by adopting the federal ban's definition of "assault weapon," Massachusetts chose to limit the scope of "copies or duplicates" in the same way that phrase was limited under federal law. It was not until Defendant Healey introduced the Notice of Enforcement that Massachusetts adopted a definition of "copies or duplicates" that was not limited by the Features Test set forth in the repealed federal ban.

18. The Massachusetts Major City Police Chiefs Association ("MMCPCA") supports the Assault Weapon Ban. Kyes Decl. ¶ 20. According to the head of the association, Chief Kyes of Chelsea, Massachusetts, "[t]he Commonwealth's assault weapons ban and large-capacity magazine ban make Massachusetts safer by reducing the availability of particularly dangerous firearms and magazines being utilized by criminals with ill motives. These bans also help protect law enforcement officers from the dangers posed by individuals who utilize these types of weapons." *Id.* ¶ 18.

**Response:**  This paragraph, containing only unsubstantiated opinion testimony, is supported entirely by the inadmissible declaration of undisclosed witness Kyes and should be stricken.

19. According to retired chief Mark Leahy, the Executive Director of the Massachusetts Chiefs of Police Association ("MCOPA") (an officer of more than 35 years standing), the ban on assault weapons and LCFD's "is important to public safety." Leahy Decl. ¶ 12. He further states "[t]he weapons at issue in this case, banned Assault Weapons, are unreasonably dangerous because of their lethality." *Id*. ¶ 13.

**Response:**  This paragraph, containing only unsubstantiated opinion testimony, is supported entirely by the inadmissible declaration of undisclosed witness Leahy and should be stricken.

20. One of the plaintiffs in this matter, the Gun Owners' Action League ("GOAL"), previously challenged the state Assault Weapons Ban in court and lost, both in this Court and in the Court of Appeals. *Gun Owners' Action League v. Swift*, C.A. 98-cv-12125-GAO (D. Mass) (Unpublished Order Dated Sept. 28, 2000)), *aff'd*, 284 F.3d 198, 205 (1st Cir. 2002). A copy of the District Court Order is at Kaplan Decl. Ex. 19.

**Response**:  Plaintiffs dispute this paragraph because it misleadingly implies that a court has already ruled on the challenges presented in this case. *Gun Owners' Action League v. Swift* did not involve a Second Amendment challenge and none of the causes of action are replicated in this case. *See generally* Ex. 19 to Kaplan's Declaration (Doc. 65-3). Because that case involved distinct legal issues not presented in this case, it is irrelevant.

23. The AGO determined that, in 2015 alone, thousands of weapons had been sold by gun dealers in Massachusetts that appeared to be "copies or duplicates" of enumerated banned assault

weapons, in violation of the Assault Weapons Ban. *See* Bolcome Aff. ¶ 17. These weapons were virtually identical in function and design to some of the 19 banned Enumerated Weapons—in particular, the Colt AR-15 and the AK-47. *See id.*

      **Response:** Plaintiffs dispute this paragraph because the declaration upon which it is based is directly refuted by its own language. In paragraph 15 of Bolcome's declaration, he states that his review and investigations of unlawful transfers of firearms consisted of an examination of Firearms Records Bureau records. Bolcome Aff., Ex. 1 to Defendants' Statement of Undisputed Facts ("Defendants' SUF") (Doc. 61-1) at ¶ 15. In paragraph 19 of his declaration, however, Bolcome states that he "could not definitively determine the lawfulness of the sales of rifles that were likely copies or duplicates of the Colt AR-15 or AK47 using the [Firearms Records Bureau] data alone." *Id.* at ¶ 19; *accord* Defendants' SUF (Doc. 63) at ¶ 36 (stating that the data housed by the Firearms Records Bureau "does not contain all of the information necessary to evaluate whether any particular transferred weapon meets the requirements of Massachusetts law."). Accordingly, it was not possible, by Defendants' own admission, to make the determination underlying this paragraph. Furthermore, Plaintiffs dispute this paragraph because the alleged firearms sold were not "copies or duplicates" of enumerated firearms as that term was understood and applied by Massachusetts prior to the Enforcement Notice. *See* Deposition of Alan Zani, Ex. 20 to Plaintiffs' Statement of Undisputed Facts ("Plaintiffs' SUF") (Doc. 59-19) at 11:21-12:4 (confirming transfers of Massachusetts Compliant Firearms "were considered lawful").

      27. The Notice also explained that, in the exercise of the Attorney General's prosecutorial discretion, the Attorney General's understanding of "copies or duplicates" described in the Notice would be applied prospectively only. *Id.*; *see* Klein Dep. 162:5-10; 163:17-23. But nothing in the

Notice absolved any entity or person with respect to statutory violations that had occurred under the law prior to the date the Notice was issued. *Id.*

**Response:** The language of the Notice of Enforcement itself demonstrates that this paragraph is not factually accurate. Ex. 25 to Plaintiffs' SUF (Doc. 59-24) at 4. Specifically, the Notice of Enforcement states that it "will not be applied to *future* possession, ownership or transfer of Assault weapons by dealers . . .." *Id.* (emphasis added). There is nothing in the Notice of Enforcement that limits it to prospective application only. Even this paragraph makes clear that the interpretation is being applied retrospectively when it states that "nothing in the Notice absolved any entity or person with respect to statutory violations that had occurred under the law prior to the date the Notice was issued," as Defendants have taken the position that the Enforcement Notice did nothing to change the statutory interpretation of the Ban itself.

28. "Since approximately one month after the issuance of the Enforcement Notice, the unlawful sale of assault weapons has virtually stopped in Massachusetts." Bolcome Aff. ¶ 22.

**Response:** Plaintiffs dispute the facts contained in this paragraph for the same reason they dispute the facts in Paragraph 23. The supporting citation for this paragraph is to paragraph 22 of Bolcome's affidavit. In paragraph 22, Bolcome states that he has "continue[d] to review [Firearms Records Bureau] data" to determine whether sales of "copies and duplicates" continued to occur. Bolcome Aff., Ex. 1 to Defendants' SUF (Doc. 61-1) at ¶ 22. As made clear above, however, the Firearms Record Bureau data "does not contain all of the information necessary to evaluate whether any particular transferred weapon meets the requirements of Massachusetts law." Defendants' SUF (Doc. 63) at ¶ 36. Accordingly, by Defendants' own admission, there was not sufficient data for Bolcome to determine, based on the records he reviewed, whether particular firearms were "copies or duplicates." There is no uncontradicted evidence supporting this

paragraph, and Bolcome's quoted opinion should be disregarded. Plaintiffs further dispute this paragraph as Defendants have adduced no admissible evidence that any unlawful sales of banned firearms have ever occurred.

30. The AGO has also provided a hotline and a dedicated email address for gun sellers with questions about the ban. Bolcome Aff. ¶ 23.

**Response:**     Plaintiffs dispute the facts contained in this paragraph because they are incomplete. As the documents produced in discovery make clear, Defendants did not meaningfully respond to questions presented. *See* Responses to Public Inquires, attached as Exhibit 31,[2] at AGO012539-012543 and AGO016573-16595. Instead, they referred individuals to gun dealers or manufacturers, and referred gun dealers to manufacturers or told them to "use your judgment." *Id.* at AGO012467 ("we ask that you use your judgment and/or contact the manufacturer").

39. Registration of a transfer does not and could not constitute a determination that the transaction is legal or otherwise reviewed and approved by the Commonwealth. Bolcome Aff. ¶ 15; Dunne Decl. ¶¶ 5, 7-8; Klein Dep. 65:23-66:11.

**Response:**     Plaintiffs dispute the facts contained in this paragraph because they imply that Massachusetts did not approve the transfer of firearms. Massachusetts law requires law enforcement officers to inspect the firearms records of firearms dealers every year. *See* G. L. c. 140 § 123 ("The licensing authority shall enter . . . and inspect, in a reasonable manner, such records and inventory."); *see also* Complaint Ex. 29 at p. 17, ¶ 51. By annually inspecting the full transfer records of every firearms dealer without indicating that any transfers were illegal,

---

[2] For ease of reference, Plaintiffs continue their Exhibit numbering from their Statement of Undisputed Facts Exhibits, which ended with Exhibit 28.

Massachusetts has approved through its course of conduct the sale of firearms that fail the tests set forth in the Notice of Enforcement.

41. Automatic fire allows the gun to be fired as long as the trigger is held down until the gun's ammunition feeding device is empty. Yurgealitis Decl. ¶ 19. Semiautomatic fire requires a trigger pull for each round fired. After each shot, the gun automatically loads the next round into the chamber and arms the firing mechanism for the next shot, thereby permitting a faster rate of fire compared to manually operated guns. *Id.* Rifles that can switch back and forth between automatic and semi-automatic fire are typically called "select fire." *Id.* Some rifles can also fire in burst mode, meaning that the gun will fire a certain number of shots for each trigger pull. *Id.*

**Response:** Plaintiffs dispute the third sentence of this paragraph. Paragraph 19 of the Yurgealitis declaration does not contain any information supporting the statement that semiautomatic firing mechanisms "permit[] a faster rate of fire compared to manually operated guns." Instead, that paragraph contains only the definitions of Semiautomatic, Fully Automatic, and Select Fire. *See* Yurgealits Declaration, Ex. 6 to Defendants' SUF (Doc. 61-6) at ¶ 19.

43. The rifles enumerated as Assault Weapons in the Commonwealth's AWB are derived from weapons that were designed by or for national military organizations, during or after World War II. Yurgealitis Decl. ¶¶ 23, 46–59, 70.

**Response:** Plaintiffs dispute the facts contained in this paragraph because Defendants conflate the semiautomatic firearms at issue in this case with fully automatic military firearms. No military in the world uses the banned semiautomatic firearms because no military in the world uses semiautomatic rifles as their standard service rifle. Supica Decl. (Doc. 59-12) at pp. 4-5, ¶ 12.

44. The banned rifles are based on military weapons designed to be effective in combat. Supica Dep. 160:17 – 162:15. As discussed more fully below, various militaries created these

weapons to be easily portable by combatants, and to have features designed to put many rounds on target, quickly and at distances of a quarter mile or more. See Supica Rep. 14–15 (describing military development of the weapons at issue); Yurgealitis Decl. ¶¶ 27, 45.

**Response:** Plaintiffs dispute the facts contained in this paragraph because Defendants conflate the semiautomatic firearms at issue in this case with fully automatic military firearms. No military in the world uses the banned semiautomatic firearms because no military in the world uses semiautomatic rifles as their standard service rifle. Supica Decl. (Doc. 59-12) at pp. 4-5, ¶ 12.

45. The banned rifles can be fired semi-automatically at rates exceeding five rounds a second. Kleck Dep. 175:20 – 176:23. A shooter can easily empty a thirty-round magazine firing these weapons semi-automatically in five to six seconds. *Id.*

**Response:** The only support offered by Defendants for this point is the testimony of Dr. Gary Kleck, who is a criminologist, not a firearms expert. Kleck Decl. (Doc. 59-9) at pp.1-2, ¶ 3.Dr. Kleck was not offered as an expert in firearms, nor is he qualified to testify about firearms function. Rather, he is a social scientist called to offer his opinions about the effects of various firearms laws. *Id.* All semiautomatic firearms (handguns, shotguns, banned rifles, and unbanned rifles) fire at the same rate: one shot per pull of the trigger. Supica Decl. (Doc. 59-12) at p. 4, ¶ 11

46. As the recent mass shooting in Las Vegas demonstrates, the semiautomatic rate of fire can further be increased (to rates approximating automatic fire) by use of a mechanical device, such as a bump stock, that is readily available in the United States. Bolcome Aff. ¶ 25; Supica Dep. 147:15 – 150:8; Rossi Dep. 38:19 – 41:19; Boone Dep. 67:8-15.

**Response:** Plaintiffs dispute the facts in this paragraph because all semiautomatic firearms (handguns, shotguns, banned rifles, and unbanned rifles) fire at the same rate: one pull of the trigger per shot. Supica Decl. (Doc. 59-12) at p. 4, ¶ 11. Furthermore, mechanical devices such

as bump stocks will be regulated as machineguns under federal law, Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices, 82 Fed. Reg. 246 (proposed Dec. 26, 2017) (to be codified at 27 C.F.R. pts. 478, 479), Ex. 43, and are not at issue in any way in this litigation. Bump stocks are already prohibited in the Commonwealth of Massachusetts. G. L. c. 140 §121.

47. Other devices to increase the rate of fire exist and are advertised for purchase on the internet. Bolcome Aff. ¶¶ 26–27; Supica Dep. 154:4 – 157:8; Boone Dep. 69:20 – 71:9.

**Response:** Plaintiffs dispute the facts in this paragraph because all semiautomatic firearms (handguns, banned rifles, and unbanned rifles) fire at the same rate: one pull of the trigger per shot. Supica Decl. (Doc. 59-12) at p. 4, ¶ 11. Furthermore, mechanical devices such as bump stocks will be regulated as machineguns under federal law, Ex. 43, and are not at issue in any way in this litigation. Furthermore, these devices are already prohibited in the Commonwealth of Massachusetts. G. L. c. 140 §121.

48. The rifles at issue are effective and accurate, fired semi-automatically, at distances of 500 yards or more. Yurgealitis Decl. ¶ 79; Supica Dep. 87:16-88:16; Kyes Decl. ¶ 13.

**Response:** Plaintiffs dispute the facts in this paragraph to the extent they are supported by the inadmissible declaration of Kyes. Plaintiffs further dispute the facts contained in this paragraph because it is extraordinarily difficult to fire one of the banned rifles at a distance of "500 yards or more," Supica Dep. (Doc. 65-1) at 88:3-13, and no one without significant training could do so. The banned firearms are typically chambered in intermediate calibers and are far less powerful than many, if not most, readily available hunting rifle cartridges. Boone Decl. (Doc. 59-8) at ¶ 14.

49. In the recent mass shooting in Las Vegas, the shooter, Stephen Paddock, fired on a crowd at a distance of between 400 and 500 yards (about a quarter of a mile) using weapons that were identified as a Smith & Wesson AR-15 and a Daniel Defense DD5VI. Kaplan Decl. Exs. 68, 69. Based on the available information, it appears that these assault rifles are banned in Massachusetts as "copies" of a Colt AR-15. Kaplan Decl. Ex. 70. Fifty-nine people were killed and 527 others were injured in that incident. Kaplan Decl. Ex. 70, 72.

**Response:** Plaintiffs dispute the facts contained in the first sentence because the sources cited do not provide any information about the firearms used. Plaintiffs dispute the facts contained in the second sentence because the Boston Globe article cited in support contains no information about the firearms used other than there were "[a]n undisclosed number of AR-15 assault rifles." Without knowing the specific makes and models, and their internal components, it is impossible to apply the tests set forth in the Notice of Enforcement. *See* Notice of Enforcement, Ex. 25 to Plaintiffs' SUF (Doc. 59-24) at 3-4 (setting forth the tests to be applied in determining whether a firearm is a "copy or duplicate," both of which require an examination of the internal components of a firearm). Plaintiffs dispute the final sentence of this paragraph to the extent it implies that all of the injured individuals were shot. An unknown number were injured as a result of stampeding concertgoers. *See* Ex. 70 to Defendants' SUF (Doc. 65-17).

50. Assault rifles trace their origins to the German Sturmgewehr (StG44), designed in the late stages of World War II to combine the power, long-range accuracy, and penetrating ability of a rifle with the ability to fire multiple rounds quickly. Yurgealitis Decl. ¶¶ 27–29; Supica Dep. 203:12 – 205:4.

**Response:** Plaintiffs dispute the facts contained in this paragraph because it implies that the firearms banned in Massachusetts are based on the German Sturmgewehr. Assault rifles

are fully automatic firearms that do, indeed, trace their origins to the Sturmgewehr, Supica Dep. (Doc. 65-1) at 203:15-18, but the firearms banned in Massachusetts are semiautomatic and are, therefore, unlike the Sturmgewehr and operate on a distinct operating mechanism in existence before the Sturmgewehr. Supica Decl. (Doc. 59-12) at Att. A p. 11-14. Furthermore, Yurgealitis is not a firearms history expert, Yurgealitis Dep., Ex. 40 at 105:3-5, but admits that Plaintiffs' expert Supica is. Yurgealitis Decl. (Doc. 61-6) at p. 18, ¶ 28.

51. The United States Army directs that semiautomatic rather than automatic fire be used for virtually all purposes, because it is more effective and lethal. Kaplan Decl. Ex. 39 (Dept. of the Army, Rifle Marksmanship M16-/M4 Series Weapons, at 7-13 (August 2008)) (The M16 should "normally be employed in the semiautomatic fire mode."). The Army has concluded: "At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit." *Id*. at 7-10.

**Response:** Plaintiffs dispute the facts contained in this paragraph because they are disputed by the very source cited by Defendants. On page 7-13 of the Army Manual upon which Defendants rely, the Army provide seven conditions weighing in favor of using semiautomatic mode and seven conditions weighing in favor of using fully automatic mode. *See* Kaplan Declaration Ex. 39 (Doc. 65-10) at 7-13. While the Army Manual does state that the fully automatic military rifles used by soldiers "should normally by employed in the semiautomatic fire mode," it does not state that this is because it is "more effective and lethal" as Defendants claim. *See generally id.* at 7-13.

52. United States Marines are trained to use automatic fire only for suppression of the enemy ("to provide cover for other soldiers or to keep an enemy from firing back.") Bolcome Aff. ¶ 9; Rossi Dep. 127:1 – 128:16. Typically, effective use of automatic fire requires that individual

targets are close together or that the shooter is firing at an "area" rather than at an individual target. Kaplan Decl. Ex. 39, at 7-10.

**Response:** Plaintiffs disputed the facts contained in the first sentence of this paragraph because the record contains no evidence of current United States Marine Corps training policies (the only document being a five-year-old training policy that was never disclosed to Plaintiffs) and because Bolcome was never disclosed as a fact or expert witness on that subject. Plaintiffs dispute the facts contained in the second sentence of this paragraph because the cited source does not contain any information supporting this sentence. *See generally* Kaplan Declaration Ex. 39 (Doc. 65-10) at 7-10. Rather, on page 7-13 of this source, the Army Manual provides a list of seven facts that weigh in favor of using automatic fire that take into account ammunition availability, range, support, and leadership. *Id.* at 7-13.

54. When a select fire gun is fired semi-automatically, the ammunition fired attains the same muzzle velocity and muzzle energy and muzzle velocity and thus has the same penetrating power as it would if the gun were fired automatically. Bolcome Aff. ¶ 11; Supica Dep. 217:17 – 219:11 (referring to Kaplan Decl. Ex. 16, at 18 (chart)). *See also* Kaplan Decl. Ex. 39, at 2-1, Table 2-1 (muzzle velocity for various high powered army rifles, including M16).

**Response:** Plaintiffs dispute the characterization of .223/5/56 ammunition (which is fired from the M4, the M16, and the AR-15) as "high powered," because it is an intermediate power-cartridge. Supica Dep. (Doc. 65-1) 93:9 – 95:10.

55. The banned assault rifles are semiautomatic only. However, they retain all of the other capacities of the military weapons from which they were derived. See Supica Dep. 127:6-10, 217:14 – 219:11; Bolcome Aff. ¶¶ 11–12; Kaplan Decl. Ex. 66, at 1. As the ATF reported in 1998, "[w]hen ATF examined these semiautomatic assault rifles, it found that the rifles, while no longer

machineguns, still had a military configuration that was designed for killing and disabling the enemy and that distinguished the rifles from traditional sporting rifles." Kaplan Decl. Ex. 66, at 1. As one commentator noted: "Where the military design has wandered, the civilian market has followed." Kaplan Decl. Ex. 75, at 16.

**Response:** Plaintiffs dispute the facts contained in the second paragraph because it is unclear to which "capacities" the Defendants are referring. Some banned firearms have configurations similar to those used by the military in that certain stocks or grips may be used, but other firearms do not. Supica Decl. (Doc. 59-12) at p. 4, ¶ 11. Plaintiffs dispute the facts contained in the third sentence because the examination referenced in the quotation occurred in 1989, not 1998. Kaplan Decl. Ex. 66 (Doc. 65-16) at 1. In that same study, the ATF explicitly noted that self-defense was a purpose for which the banned firearms were kept. ATF 1989 (Doc. 59-27) at p.11 ¶ 2. Plaintiffs dispute the characterization of the quotation in the last sentence as somehow supporting the other statements in this paragraph. The context of the quotation makes clear that the author of that particular book was noting only that civilian firearms have a similar variety of features and operating mechanisms as military firearms have. Kaplan Decl. Ex. 75 (Doc. 65-17) at 16.

58. Assault weapons cause greater injuries and more extensive, complex wounds, which result in higher complications, than those caused by non-assault weapons. Colwell Dep. 109:2-13, 119:7-23, 147:16-22; Colwell Decl. at 2–4.

**Response:** Plaintiffs dispute the facts in this paragraph because it is the projectiles that cause wounds, not particular firearms. Colwell Dep., Ex. 36 at 43:16-24, 45:18-22, 56:5-9, 58:17-20, 108:6-10. It is not possible to determine from a wound whether a particular projectile was fired by a banned firearm or not. *Id.* at 62:6-18, 93:19-23, 94:18-22, 96:5-17. It is also not possible to

determine from a wound the caliber of a firearm used. *Id.* at 70:3-6, 77:21-23. There is no difference in wounds caused by projectiles from banned firearms and those fired from non-banned firearms, if the same cartridge is used to fire the same round in both instances. *Id.* at 79:24-81:23, 99:19-23, 104:16-105:1; Boone Decl. (Doc. 59-8) at p. 7, ¶ 13. Colwell's opinion is unsupported by any personal or published study. Colwell Dep., Ex. 36 at 69:6-18.

59. The velocity and power of assault weapons causes greater damage to the muscles, bones, joints and tissue, and result in more amputations and infection, than non-assault weapons. Colwell Dep.110:18 – 111:16, 146:2-15, 147:16 –148:3; Colwell Decl., at 2.

**Response:** Plaintiffs dispute the facts in this paragraph because it is the projectiles that cause wounds, not particular firearms. Colwell Dep., Ex. 36 at 43:16-24, 45:18-22, 56:5-9, 58:17-20, 108:6-10. It is not possible to determine from a wound whether a particular projectile was fired by a banned firearm or not. *Id.* at 62:6-18, 93:19-23, 94:18-22, 96:5-17. It is also not possible to determine from a wound the caliber of a firearm used. *Id.* at 70:3-6, 77:21-23. There is no difference in wounds caused by projectiles from banned firearms and those fired from non-banned firearms, if the same cartridge is used to fire the same round in both instances. *Id.* at 79:24-81:23, 99:19-23, 104:16-105:1; Boone Decl. (Doc. 59-8) at p. 7, ¶ 13. Colwell's opinion is unsupported by any personal or published study. Colwell Dep., Ex. 36 at 109: 2-25.

60. Because they can be fired rapidly, and are often used with large capacity magazines, assault weapons cause a higher number of wounds in a higher number of victims than non-assault weapons. Colwell Dep. 110:18-24.

**Response:** Plaintiffs dispute the facts in this paragraph because the use of an "assault weapon" has no bearing on the number of wounds caused in any particular shooting. Rather, this is a function of shot placement and quantity. Boone Decl. (Doc. 59-8) at p. 7, ¶ 13; Roberts Decl.

(Doc. 59-10) at pp. 4-5, ¶¶ 12-13. In fact, the testimony cited by Defendants makes clear, as Dr. Colwell states that use of banned rifles "h[as] been associated with" more wounds; not that "assault weapons cause a higher number of wounds in a higher number of victims." Colwell Dep., Ex. 36 110:18-24. Colwell's opinion is unsupported by any personal or published study. *See id.* at 109:2-25.

65. After military testing, Armalite implemented a number of changes suggested by the Army, including strengthening the AR-15's barrel and adding a flash suppressor. Kaplan Decl. Ex. 36, at 18. Armalite's design performed so well that the military concluded that a five-man squad armed with AR-15s was as good or better "in hit-and-kill potential in combat-style tests" than an 11-man squad armed with M14 rifles. Id. at 19. In field testing in Vietnam, troops were impressed, reporting that "[a]mputations of limbs, massive body wounds, and decapitations had all been caused by the very high velocity AR-15 projectiles." Kaplan Decl. Ex. 76, at 131.

**Response:** Plaintiffs dispute final sentence of this paragraph, because .223/5.56 projectiles cause very small wounds, not the types of wounds referenced in this paragraph. Roberts Decl. (Doc. 59-10) at pp. 4-5, ¶¶ 12-13.

66. The military ultimately adopted the AR-15 as its standard-issue service rifle, and renamed it the M16 in 1963. See Kaplan Decl. Ex. 36, at 26.

**Response:** Plaintiffs dispute the implication that the AR-15s at issue in this case are like those used by the military. There is no dispute that the military used fully automatic firearms and continues to use those firearms today. Supica Decl. (Doc. 59-12) at p. 4, ¶ 10.

67. After Air Force testing and in the midst of the Viet Nam war, the Air Force "reported the AR15 rifle to be an outstanding weapon with phenomenal lethality." Kaplan Decl. Ex. 58, at C-14.

**Response:** Plaintiffs dispute the facts in this paragraph because the context of this quotation makes clear that this was 1) not a quotation from the Air Force and 2) that this was a statement designed to rebut an article in the American Rifleman that was biased against the AR-15 rifle. *See id.* (Doc. 65-14) (stating that the report was published by the Advanced Research Project Agency, it was published before the Air Force received its rifles, and that the Air Force was requested to rebut the disparaging American Rifleman article).

68. Before the Army adopted the AR-15, Armalite sold its licensing rights to Colt. *See* Kaplan Decl. Ex. 36, at 23. In addition to fulfilling its military contracts, Colt also manufactured AR-15s for the civilian market. To comply with the National Firearms Act, which regulates the sale of fully-automatic firearms in the civilian market, Colt sold a "slightly modified" version of the AR-15 that was adjusted so that it could not fire in full automatic mode, but that otherwise retained all military features and capabilities. *See* Supica Dep. 92:2-93:14; Kaplan Decl. Ex. 77, at 235.

**Response:** Plaintiffs dispute the final sentence of this paragraph. The firearm sold by Colt did not retain "all military features and capabilities." As Defendants acknowledge in the same sentence, the civilian firearm did not retain the ability to fire automatically, the critical "feature" or "capability" that makes a firearm military in nature.

79. The difference between civilian AK-platform guns and the Russian military's AK47 is that the civilian versions do not provide for automatic fire. Supica Dep. 127:3-10. A person would have to look for a selector switch to distinguish between the civilian version and the military version. Supica Dep. 131:8 – 132:5. They shoot the same ammunition and accept the same magazines. Supica Dep. 132:6 – 133:10, 135:9-14. The muzzle velocity and rate of semiautomatic fire is also the same. Supica Dep. 133:11 – 134:9.

**Response:** Plaintiffs dispute the final sentence of this paragraph. All semiautomatic firearms fire at the same rate, *Id.* (Doc. 65-1) at 126:3-10, 134:3-9, and that rate of fire is significantly lower than military, fully-automatic fire. *Id.* at 107:6-108:18.

91. Assault weapons are vastly different from the muskets that were in common use at the time that the Second Amendment to the Constitution was written and ratified. It would take about two hours for a musket to fire the maximum number of rounds that can be fired by an assault weapons at issue in just one minute.

**Response:** Defendants cite no sources for the information contained in this paragraph. Accordingly, this Court should disregard it. Furthermore, this information is irrelevant, as the Supreme Court has already held that the Second Amendment protects modern firearms. *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

92. The banned assault weapons can fire as fast as a shooter can manipulate a finger to pull the trigger. Supica Dep. 101:8-14. This is as fast as 30 rounds in five seconds or 360 rounds in a minute. Kleck Dep. 175:20 – 176:23. With training, they can be fired accurately as fast as 45-60 rounds per minute. See Kaplan Decl. Ex. 39, at 2-1, Table 2-1 (listing maximum effective rate of semi-automatic fire for trained soldiers using M16 and related weapons); Supica Dep. 106:20 – 108:4.

**Response:** Plaintiffs dispute the first sentence because it implies that the banned firearms can be fired more quickly than other semiautomatic firearms. All semiautomatic firearms fire at the same rate. *Id.* (Doc. 65-1) at 126:3-10, 134:3-9. Plaintiffs dispute the facts contained in the second sentence because the only support offered by Defendants for this point is the testimony

of Dr. Gary Kleck, who is a criminologist, not a firearms expert. Kleck Decl. (Doc. 59-9) at ¶ 3. Dr. Kleck was not offered as an expert in firearms, nor is he qualified to testify about firearms function. Rather, he is a social scientist called to offer his opinions about the effects of various firearms laws. *Id.* at Att. A p. 2 ¶¶ 1-2.

98. A modern semiautomatic rifle, including an AR-15, would be much more effective at hitting multiple targets, and to cause seriously bodily injury or death in a shorter period of time, than a Revolutionary War era musket. Supica Dep. 159:17 – 160:16.

**Response:** Plaintiffs dispute that an AR-15 would "cause serious bodily injury or death in a shorter period of time" when compared to a musket. As the cited testimony makes clear, a single round from a musket may or may not be more likely to cause death or serious injury than a single round from an AR-15. *Id.* (Doc. 65-1) at 159:17-160:2. Furthermore, most civil-war era firearms and hunting rifles are significantly more powerful and likely to cause serious injury than AR-15 type firearms. Roberts Decl. (Doc. 59-10) at ¶12; Roberts Dep. Ex. 38 at 224:2-11.

99. LCFDs facilitate the rapid firing of large numbers of rounds without having to reload. Yurgealitis Decl. ¶ 45. They were originally designed for military use rather than for hunting. Yurgealitis Decl. ¶¶ 43–45; Kaplan Decl. Ex. 66, at 37.

**Response:** Plaintiffs dispute the facts in this paragraph because increased capacity to fire without reloading has been a constant goal of firearm development. Supica Dep. (Doc. 65-1) at 163:7-10; Supica Decl. (Doc. 59-12) at Att. A, p. 3, Report ¶ 1. In fact, firearms able to shoot more than 10 rounds without reloading have been in common use for centuries. One of the earliest examples was the Girondiri Air rifle used as a hunting gun by Lewis and Clark on their expedition. Supica Decl. (Doc. 59-12) at ¶ 7. Furthermore, Yurgealitis is not a firearms history expert,

Yurgealitis Dep., Ex. 40 at 105:3-5, but admits that Plaintiffs' expert Supica is. Yurgealitis Decl. (Doc. 61-6) at p. 18, ¶ 28.

102. LCFDs allow a shooter to inflict more casualties in a shorter period of time, and allow a shooter to lay down suppressing fire and more effectively hold-off an initial response by law enforcement or bystanders. Kyes Decl. ¶ 17.

**Response:** This paragraph, containing only unsubstantiated opinion testimony, is supported entirely by the inadmissible declaration of undisclosed witness Kyes and should be stricken.

103. The Violence Policy Center ("VPC") has searched news reports and has identified 59 mass shootings involving LCFDs in which 597 people were killed with 1,020 reported wounded. Kaplan Decl. Ex. 80; Rand Decl. ¶¶ 3–5. Because many news reports do not include information about the size of the magazine used by the shooter in the incident, VPC considers its conclusions a "significant undercount." Rand Decl. ¶¶ 15, 17.

**Response:** This paragraph contains unsubstantiated opinion testimony and is supported by the inadmissible declaration of undisclosed witness Rand and should be stricken.

105. Depriving a criminal of an LCM and thereby forcing him or her to stop firing to change out magazines can be critical to intervention efforts by law enforcement and bystanders seeking to end a criminal incident. Kyes Decl. ¶¶ 16–17 ("Large capacity magazines allow an assailant the ability to engage in a more continuous stream of gunfire without having to continually swap out magazines.").

**Response:** This paragraph, containing only unsubstantiated opinion testimony, is supported entirely by the inadmissible declaration of undisclosed witness Kyes and should be stricken.

107. When an assailant is using an LCFD, intervention by law enforcement is difficult and risky because of the number of rounds continuously being fired in the direction of the police. By contrast, when an assailant is force to reload multiple times with non-large capacity magazines, officers have more opportunity to return fire in the direction of the assailant without being fired upon. Kyes Decl. ¶ 17.

**Response:** This paragraph, containing only unsubstantiated opinion testimony, is supported entirely by the inadmissible declaration of undisclosed witness Kyes and should be stricken.

108. The owner of plaintiff Overwatch Outpost testified that it is "obvious" that "we can't sell AR-15s, and we know that we can't sell AK-47s." Ricko Dep. 47:23 – 48:1. The plaintiffs' expert acknowledged that "a large number of guns that are all the same general pattern as the original Colt AR-15 in terms of function and usually in terms of cosmetic appearance" exist. Supica Dep. 92:2-17.

**Response:** Plaintiffs dispute the facts contained in the first sentence to the extent Defendants are implying that Plaintiff Overwatch Outpost believes it is "obvious" what is and is not prohibited by Massachusetts. The discussion from which this quotation was taken makes clear that Overwatch Outpost does not know what firearms it can and cannot sell. *See* Ricko Dep. (Doc. 65-1) at 47:13-50:3.

110. FRB data demonstrates that after the Enforcement Notice was issued, sales of copies of statutorily enumerated weapons virtually ended in Massachusetts. Bolcome Aff. ¶ 22; Klein Dep. 148:12-16.

**Response:** Plaintiffs dispute the facts in this paragraph because Bolcome acknowledged that he "could not definitively determine the lawfulness of the sales of rifles that

were likely copies or duplicates of the Colt AR-15 or AK47 using the [Firearms Records Bureau] data alone." Bolcome Aff. (Doc. 61-1) at ¶ 19. Defendants' own Statement of Undisputed Facts confirms that the facts in this paragraph are not true. Defendants' SUF (Doc. 63) at ¶ 36 (stating that the data housed by the Firearms Records Bureau "does not contain all of the information necessary to evaluate whether any particular transferred weapon meets the requirements of Massachusetts law.") Accordingly, it was not possible, by Defendants' own admission, to make the determination underlying this paragraph. Furthermore, Plaintiffs dispute this paragraph because whether a firearm is a "copy" (or duplicate) or an enumerated firearm is a blended issue of law and fact, and could never properly be resolved by the mere *ipse dixit* of Defendants' attorney and its investigator.

115. As of 2015, there were an estimated 357 million civilian-owned guns in the United States. *See* Kaplan Decl. Ex. 45, at 8. By comparison, plaintiffs' expert estimated that from 1990 to 2015, U.S. manufacturers produced approximately 9.3 million AR platform rifles and imported approximately 4.4 million AK platform rifles for the U.S. civilian market, for a total of 13.7 million. Kaplan Decl. Ex. 15, at 8 (chart). More than half of these (7.4 million) were produced or imported between 2011 and 2015. *Id.*

**Response:** Plaintiffs dispute the first sentence of this paragraph. As the source relied upon by Defendants makes clear (Plaintiffs presume the exhibit citation is correct, but as the exhibit is only 4 pages long, it is impossible to know what material Defendants are relying upon), it is impossible to obtain an accurate number of firearms in the United States because firearms are lost, break down, or are exported out of the country. Kaplan Decl. Ex. 45 (Doc. 65-11) at 1-3.

118. That was at least twice as frequently—and perhaps more than eight times as frequently—as one would expect based on the presence of assault weapons in the civilian gun market. *See* Kaplan Decl. Ex. 47, at 10, 15.

**Response:** Plaintiffs dispute the facts in this paragraph because they are not supported by the cited source. The cited portions of Exhibit 47 contain only data, and do not demonstrate or even mention that the banned firearms are used twice to eight times more frequently as expected. *See id.* (Doc. 65-12). As the cited source makes clear "the most common AWs prohibited by the 1994 federal ban accounted for between 1% and 6% of guns used in crime according to most of several national and local data sources examined for this and our prior study." *Id.*at 15. As even the authors of that study acknowledge, the national data reported "likely overestimates the use of [assault weapons] in crime." *Id.* at 15 n. 11.

119. The disproportionate numbers were higher for some of the most serious types of crime: murders of police officers and mass shootings. *See* Kaplan Decl. Ex. 47, at 14–19, 87; Ex. 29, at 14–15; Ex. 49, at 3–9. One study showed that, as of 1994, assault weapons accounted for up to 6% of murders, up to 9% of killings of law enforcement officers, and up to 13% of mass shootings in which four or more people died. *See* Kaplan Decl. Ex. 47, at 15. The study also found that assault weapons and other semiautomatics with LCFDs have been involved in 40% of mass shooting incidents that occurred between 1984 and 1993 and that resulted in six or more fatalities or 12 or more people wounded. *Id.* at 14.

**Response:** Plaintiffs dispute the characterizations of the data presented in the referenced study. As the study makes clear, the sample sizes used were incredibly small, *id.* (Doc. 65-12) at 14-15, and small sample sizes are unreliable Koper Dep. Ex. 37 at 111:18-21.

Furthermore, the author of that study testified that he could not conclude to a reasonable degree of certainty that the ban had any impact on violent crime or mass shootings. *Id.* at 94:11-14; 96:3-11.

120. A more recent study placed the percentage of assault weapons used in killings of law enforcement at as high as 20%. *See* Kaplan Decl. Ex. 57, at 5.

**Response:** Plaintiffs first dispute that the cited report is "more recent." The report cited in the previous paragraph is from July 2004, while the report cited in this paragraph is from May 2003. *Compare id.* (Doc. 65-13) at 1 *with* Koper 2004 (Doc. 65-12) at 1. Plaintiffs further dispute the data as reported in the cited study. This study was published by an advocacy group that was campaigning for the extension of the federal assault weapons ban. Kaplan Decl. Ex. 57 at 3 of 30. The report contains no data and no methodology of how its authors calculated the purported 20% figure. *Id.* at 8 of 30.

121. A study concluded that although only about 21% of civilian-owned guns were equipped with LCFDs in 1994, they were used in between 31% and 41% of gun murders of police. *See* Kaplan Decl. Ex. 47, at 18. They were also involved in 40% of mass shooting incidents between 1984 and 1993 in in which six or more persons were killed or a total of 12 or more were wounded. *Id.* at 14.

**Response:** Plaintiffs dispute the facts in this paragraph because the cited source does not support them. As the cited source makes clear, the data it is reporting for murders of police officers include both crimes committed with assault weapons *and* crimes where a magazine with a capacity more than ten rounds was recovered. *Id.* (Doc. 65-12) at 18 n.17. The same is true for the reported data regarding mass murders. *Id.* at 14 ("[Assault weapons] or other semiautomatics with LCMs…").

125. Multiple studies have concluded that assault weapons are disproportionately represented in mass shootings and, in particular, in public mass shootings. See Kaplan Decl. Ex. 47, at 15. For example, CRS concluded that out of 317 mass shootings between 1999 and 2013, "offenders used firearms that could be characterized as 'assault weapons' in 31 incidents (9.78%), or roughly 1 out of 10 incidents"; among 66 "mass public shootings" that CRS identified during that time frame, shooters used assault weapons 27.3% of the time. See Kaplan Decl. Ex. 54, at 29.

**Response:**     Plaintiffs dispute that banned firearms are disproportionally represented in mass shootings. Koper 1997 Ex. 42 Appendix A at A-1. Plaintiffs further dispute the CRS data because it selectively limits the data set upon which it relies by excluding all domestic-related mass shootings. Spitzer Dep. Ex. 39 191:17-195:8. Domestic-related mass shootings almost never involve assault weapons. *Id.* at 191:17-22.

130. Research has shown that "both state and federal assault weapons bans had statistically significant and negative effects [i.e., reductions] on mass shooting fatalities." *See* Kaplan Decl. Ex. 41, at 282.

**Response:**     Plaintiffs dispute the facts in this paragraph because the government-funded study of the federal assault weapons ban concluded that it had no meaningful impact on criminal use of banned long guns and, that if the ban were to be continued, its effects would likely be statistically insignificant. Koper 2004 (Doc. 65-12) at p. 2, 91-93, 100.

140. One study on the impact of the Federal Assault Weapons Ban concluded that crimes committed with assault weapons declined between 17% and 72% across major cities in the years the Federal AWB was in effect, with Boston showing the greatest decline, possibly because of the combined effect of the state and Federal AWB. *See* Kaplan Decl. Ex. 47, at 46–62 & n. 55; Ex. 48, at 7–9; Ex. 49, at 19–20; Spitzer Aff. ¶¶ 22–23.

**Response:** Plaintiffs dispute the facts in this paragraph because the government-funded study of the federal assault weapons ban concluded that it had no meaningful impact on criminal use of banned long guns and, that if the ban were to be continued, its effects would likely be statistically insignificant. Koper 2004 (Doc. 65-12) at p. 121; *see also* Koper Dep. Ex. 37 96:3-11; 144:7-12; 151:15-153:19. Plaintiffs further dispute the facts in this paragraph because the use of the term "possibly" demonstrates the unreliability of the unsupported conclusions contained therein.

142. None of the plaintiffs, nor their experts, identified in their deposition testimony a self-defense situation in Massachusetts or anywhere in the country in which a civilian used in self-defense a weapon that is banned under the Commonwealth's Assault Weapons Ban. Worman Dep. 27:14-16; Sawyer Dep. 30:19-23; Chamberlain Dep. 27:7-9; Linden Dep. 26:21-22; Ricko Dep. 25:8 – 26:4; O'Leary Dep. 84:18-22; Supica Dep. 77:4 – 78:14; Kleck Dep. 177:3-21; Boone Dep. 80:9-19; Curcuruto Dep. 164:2-20; Roberts Dep. 65:8-12, 68:16 – 69:13; *see* Rossi Dep. 97:9 – 98:3 (he is not aware of any studies or reports on how commonly these weapons are used in self-defense).

**Response:** Plaintiffs object to the facts contained in this paragraph because, while the individuals could not name specific instances of self-defense use during their depositions, plaintiffs did provide in their initial disclosures multiple reports of citizens using banned firearms in self-defense. *See* Plaintiffs' Initial Disclosures (Attached as Exhibit 30). Regardless, it is indisputable that the banned firearms are used in self-defense. *See, e.g.,* Three teenage burglars shot dead in US, BBC News (2017), http://www.bbc.com/news/world-us-canada-39413376 (last visited Jan. 4, 2018); Jordan Michaels, Store Owner Uses AK-47 to Repel Burglars, GunsAmerica Digest (2017), https://www.gunsamerica.com/blog/store-owner-uses-ak-47-repel-burglars/ (last visited Jan. 4,

2018); Jason Howerton, No Shots Fired: Home Intruders Decide Not to Stick Around After Seeing their 'Victim' holding an AR-15, The Blaze (2013), http://www.theblaze.com/news/2013/01/24/no-shots-fired-home-intruders-decide-not-to-stick-around-after-seeing-their-victim-holding-an-ar-15 (last visited Jan. 4, 2018); Christina Palladino, Video Shows Bouchard's Owner Defending His Store, WISN (2017), http://www.wisn.com/article/video-shows-bouchard-s-owner-defending-his-store/6327763 (last visited Jan. 4, 2018); Gas station owner thwarts robber, The Daily News (2013), http://www.ironmountaindailynews.com/news/local-news/2013/04/gas-station-owner-thwarts-robbery/ (last visited Jan. 4, 2018); 15-Year-Old Defends Home Against Burglars, Shoots One of Them with Father's AR-15, Fox News (2013), http://nation.foxnews.com/crime/2013/01/10/15-year-old-defends-home-against-burglars-shoots-one-them-fathers-ar-15 (last visited Jan. 4, 2018); Dean Weingarten, AR15 Style Rifle Used in Defense; Did California Restrictions Handicap Defendant?, Gun Watch (2017), http://gunwatch.blogspot.com/2017/06/ar15-style-rifle-used-in-defense-did.html (last visited Jan. 4, 2018); Chris Meyers, Held at gunpoint, home invasion suspect hides in bathroom, The Journal Gazette (2014); Man Likely Justified in Shooting Intruder: DA, Associated Press/NBC 10 Philadelphia (2013), https://www.nbcphiladelphia.com/news/local/Man-Dead-in-Cheltenham-Shooting-203910641.html (last visited Jan. 4, 2018); Detroit Mom Fires Assault Rifle to Protect Family from Home Invaders, News One (2014), https://newsone.com/2905120/detroit-mother-fires-gun-at-home-intruders/ (last visited Jan. 4, 2018); Ron Savage, Shootout at Inkster Tax Preparation Business Caught on Camera, Fox 2 Detroit (2013), http://www.fox2detroit.com/news/shootout-at-inkster-tax-preparation-business-caught-on-camera (last visited Jan. 4, 2018); Homeowner Shoots Intruder in Vance County Break-in, WRAL (2014), http://www.wral.com/homeowner-shoots-

intruder-in-vance-county-break-in/13638825/ (last visited Jan. 4, 2018). True and exact copies of each are attached as Ex. 44

145. Defendants' expert James Yurgealitis has been asked on numerous occasions what gun he would recommend for home defense and has never recommended an assault weapon for this purpose. Yurgealitis Decl. ¶ 78. Similarly, when asked to recommend a weapon for home defense, retired Northborough Police Chief Mark Leahy has always suggested a handgun. Leahy Decl. ¶ 22.

**Response:** Defendants' expert Yurgealitis is not an expert on self-defense firearm choice and his opinion should be disregarded. Yurgealitis Dep. Ex. 40 84:12-17. The second sentence, containing only opinion testimony, is supported entirely by the inadmissible declaration of undisclosed witness Leahy and should be stricken. Furthermore, Plaintiffs dispute the facts in this paragraph to the extent that the personal opinions of a non-expert and an undisclosed, undeposed law enforcement officer could be deemed material, or imply that the banned firearms are somehow unsuitable to home defense, because Plaintiffs' own expert witnesses (who were in fact disclosed and produced for deposition) recommend banned firearms for home defense. Boone Decl. (Doc. 59-8) ¶¶ 5, 8; Roberts Decl. (Doc. 59-10) ¶¶ 8,

146. Assault rifles require more steps in order to make them operable than other guns do, making them difficult to use in stressful situations unless the user has had intensive training. Yurgealitis Decl. ¶¶ 80, 81; Leahy Decl. ¶ 21.

**Response:** The referenced paragraphs of the Yurgealitis declaration do not support this statement. Rather, they state only that there "may be" multiple steps required to ready a "weapon" for self-defense and that some ATF agents failed to adequately complete a qualifying course with an AR type firearm. Yurgealitis Decl. (Doc. 61-6) at ¶¶ 80, 81. Yurgealitis does not opine on the

defensive use of a banned firearm versus another firearm, and at no point does he opine that there are "more steps" required to ready a banned firearm than other firearms. The declaration of undisclosed witness Leahy cannot support this statement because it should be stricken. Furthermore, Plaintiffs dispute the facts in this paragraph because the banned firearms are actually quite easy to use and are safer, more dependable, more effective, and more accurate than other alternatives for home defense. Boone Decl. (Doc. 59-8) at ¶¶ 10, 11; Roberts Decl. (Doc. 59-10) at ¶ 8.

148. Additionally, assault weapons were designed to be effective at battlefield ranges of 500 yards or more. *See* Yurgealitis Decl. ¶ 79; Kyes Decl. ¶ 13; Supica Dep. 87:16-88:16 (skilled shooters could shoot an AR-15 close to 500 yards); *cf.* Kaplan Decl. Ex. 39, at 2-1, Table 2-1 (listing maximum effective range of M16 and other related weapons). Therefore, they have a particularly high muzzle velocity and carry a risk of penetrating home construction materials, endangering persons elsewhere in the home. See Yurgealitis Decl. ¶ 79; Kaplan Decl. Ex. 95; Kyes Decl. ¶ 24 (heavier body armor is recommended for police officers facing rounds from assault weapons).

**Response:**    Plaintiffs dispute the facts in the first sentence because all of the cited sources make clear that 500 yards is the maximum effective range. Plaintiffs dispute the facts contained in the second sentence because the projectiles fired by the banned firearms are largely medium-caliber, medium velocity projectiles that do not present a risk of overpenetration; in fact, they are far less likely to overpenetrate than the majority of other defensive cartridges, which is one reason they have been selected for defensive use by law enforcement throughout the United States.  Boone Decl. (Doc. 59-8) at ¶ 6; *Id.* at Att. A p. 6-8. Furthermore, Yurgealitis is not a

ballistics expert. Yurgealitis Dep., Ex. 40 at 100:8-9. Finally, Kyes was an undisclosed witness whose testimony should be disregarded.

151. Outside the home, assault weapons are difficult to make ready for use for self-defense under stressful situations and they present a risk of danger to bystanders. Yurgealitis Decl. ¶¶ 79, 80, 81; Leahy Decl. ¶ 21.

**Response:** Plaintiffs dispute the facts contained in this paragraph for the same reasons they dispute the nearly identical "facts" contained in paragraphs 145-146 and 148. Plaintiffs further dispute that the banned firearms present a risk of increased danger to bystanders; they are more accurate, and less prone to overpenetration, than most other defensive firearms, which is why they are selected for defensive purposes by law enforcement throughout the United States. Boone Decl. (Doc. 59-8) ¶¶ 6, 7, 9; Roberts Decl. (Doc. 59-10) ¶ 11, 14. Furthermore, Yurgealitis is not a ballistics or self-defense expert. *See, e.g.,* Yurgealitis Dep., Ex. 40 at 81:18-82:1; 100:8-9. Finally, Leahy was an undisclosed witness whose testimony should be disregarded.

154. A study conducted by Lucy P. Allen of National Economic Research Associates examined data from a publicly accessible database compiled by the NRA of stories of private citizens who had used guns for self-defense. Allen found that from 1997 to 2001, defenders fired an average of 2.2 shots per incident, and in 28 percent of incidents, defenders merely a displayed a weapon and fired no shots. *See* Kaplan Decl. Ex. 46 ¶ 10. Allen also found that from 2011 to 2013, the average number of shots per incident was 2.1, and no shots were fired in 16 percent of the incidents. *Id.* ¶¶ 11, 12. For this later time period, Allen found no examples in which the defender fired as many as ten shots or more. *Id.*

**Response:** Plaintiffs dispute the opinion testimony of Lucy Allen being introduced in this matter without her being called as a witness. She was never disclosed as a potential witness

with information and she was never subject to deposition. Plaintiffs further dispute the conclusions she has drawn because the data upon which she relied is neither complete nor a representative sample of defensive firearm use. Allen Dep., Ex. 35 at 31:9-32:10.

155. Defendants' expert James Yurgealitis also reviewed three years (2010 – 2013) of news clips posted on the NRA's database of armed citizens and found that none of them described a self-defense incident in which more than ten shots were fired or in which a LCFD was likely to have been necessary. Yurgealitis Decl. ¶ 84.

**Response:** Plaintiffs dispute conclusions Yurgealitis has drawn because the data upon which he relied is neither complete nor a representative sample of defensive firearm use. Allen Dep., Ex. 35 at 31:9-32:10.

156. Police in Massachusetts use handguns as their duty weapons and rarely fire them at individuals. Leahy Decl. ¶¶ 19, 20.

**Response:** This paragraph is supported entirely by the inadmissible declaration of undisclosed witness Leahy and should be stricken. Furthermore, the term "rarely" is both unquantified and unsubstantiated, which renders the statement it modifies essentially meaningless.

157. Police departments in Massachusetts restrict the use of assault weapons to encounters where a significant threat of violence is possible, such as hostage situations, apprehension of potentially well-armed criminals, and response to active shooting situations. Leahy Decl. ¶¶ 15, 16; Kyes Decl. ¶ 19. See Rossi Dep. 48:1 – 49:21. Some departments require specific authorization from a superior before such weapons are authorized for a particular situation. Leahy Decl. ¶ 18.

**Response:** This paragraph is supported by the inadmissible declarations of undisclosed witnesses Leahy and Kyes and should be stricken. Furthermore, Plaintiffs dispute the facts in this

paragraph to the extent they imply that being physically attacked in one's home without warning by an assailant is not a situation "where a significant threat of violence is possible."

158. Law enforcement training protocols on assault weapons include safety training, training on permitted circumstances use of assault weapons (as well as on the applicable department policy), and qualification with the weapon at a range. Most departments require periodic requalification as well. Leahy Decl. ¶ 17.

**Response:** This paragraph is supported entirely by the inadmissible declaration of undisclosed witness Leahy and should be stricken.

159. Law enforcement officers need an advantage over the criminals they seek to apprehend. It is dangerous for law enforcement officers when they face criminals with superior firepower. Leahy Decl. at ¶ 24; Kyes Decl. ¶ 12–17.

**Response:** This paragraph, containing only unsubstantiated opinion testimony, is supported entirely by the inadmissible declarations of undisclosed witnesses Leahy and Kyes and should be stricken. Plaintiffs further dispute the facts in this paragraph to the extent they imply that law enforcement officers need, or are otherwise entitled to, an advantage over criminals, but civilians in their home do not.

160. Many of the weapons and magazines involved in violent crimes have been stolen in residential break-ins from legal license holders. Kyes Decl. ¶ 21. Absent the Commonwealth's ban, an assault weapon or LCFD that is legally acquired can, if stolen, be used by a violent dangerous criminal. Kyes Decl. ¶ 22.

**Response:** This paragraph, containing only unsubstantiated opinion testimony, is supported entirely by the inadmissible declaration of undisclosed witness Kyes and should be

stricken. Additionally, the term "many" is neither quantified nor substantiated, rendering the remainder of the statement it modifies essentially meaningless.

161. The body armor that police must use when combatting criminals with assault weapons is heavier than soft body armor because it includes metal or ceramic plates. Boone Dep. 123:6-23, 130:15 – 133:7; Kyes Decl. ¶ 23. This is because of the penetrating power of bullets fired from these weapons. Body armor with metal or ceramic plates is beyond the normal, less restrictive, soft body armor that patrol officers typically use, because the heavier armor is too restrictive. Kyes Decl. ¶ 24.

**Response:** The second and third sentences of this paragraph, containing only unsubstantiated opinion testimony, are supported entirely by the inadmissible declaration of undisclosed witness Kyes and should be stricken. Plaintiffs further dispute the facts in this paragraph to the extent they imply that projectiles fired from banned firearms penetrate more readily through body armor than projectiles fired from readily-available rifles that are not banned (and may not even be semiautomatic), when the latter projectiles are far more capable of penetrating body armor than those fired from the banned firearms. Roberts Decl. (Doc. 59-10) at ¶ 11.

### III. Plaintiffs offer the following additional undisputed facts.

90.[3] Defendant Daniel Bennett, in his official capacity as the Secretary of the Executive Office of Public Safety and Security, admits that "[t]here is a great deal of uncertainty as to which weapons [the Office of the Attorney General] considers to be assault weapons." Letter from Secretary of Public Safety and Security Daniel Bennett to Attorney General Maura Healey at 1

---

[3] For ease of reference, Plaintiffs continue their numbering from their Statement of Undisputed Facts, which ended with paragraph 89.

(July 26, 2016) (Attached as Exhibit 32). Defendant Bennett admits that "[t]his uncertainty could easily lead to uneven application of the law across the Commonwealth." *Id.*

91.     Defendant Bennett admits that the tests set forth in the Notice of Enforcement may apply to "a large number of firearms, including pistols that have been sold here legally for decades" to make them illegal. *Id.* Defendant Bennet further admits that the Notice of Enforcement is so broad that "most modern weapons, including many if not all semi-automatic pistols and rifles" would meet the tests set forth in Notice of Enforcement and would be banned.

92.     Defendant Bennet admits that "[w]ithout access to and the ability to disassemble each of the weapons specifically listed as assault weapons, it may not be possible to determine how many operating components of a questioned weapon are interchangeable with corresponding components of one or more of the specifically listed weapons." *Id.* at 2.

93.     Defendant Bennett further admits that because of this, it is not possible for law-abiding citizens to know how to conform their behavior to the law. *Id.* ("As a result . . . how could Massachusetts citizens (who already own these weapons but are not experts in their design) understand the limits of your recently announced rule and appropriately conform their behavior?").

94.     Governor Baker echoed Defendant Bennett's concern when transmitting Defendant Bennett's letter to Defendant Healey, stating that "ambiguities in [the Attorney General's] notice require clarification for responsible gun owners who simply follow the rules and for the thousands of gun owners who were told they were following the rules for eighteen years." *See* Letter from Governor Baker to Attorney General Maura Healey at 1 (July 26, 2016) (Attached as Exhibit 33). As Governor Baker makes clear, individuals who purchased firearms that meet either of the tests set forth in the Notice of Enforcement before its issuance were "told they were following the rules." *Id.*

95. Defendant Maura Healey sent a letter, on December 22, 2015, to all firearms dealers in Massachusetts setting forth in detail nineteen separate "key legal requirements" for selling firearms in Massachusetts, "strong state laws and regulations to assist law enforcement and law-abiding gun dealers in keeping the public safe." *See* Letter from Maura Healey to Licensed Firearms Dealers (December 22, 2015) (attached as Exhibit 34). This document did not mention at all any of the tests set forth in the Notice of Enforcement. *Id.*

96. Defendants' witness Lt. Alan Zani testified that he was able to determine, prior to the issuance of the Notice of Enforcement, whether firearms that were being sold were banned under the law. *See* Deposition of Lt. Alan Zani at 8:8-18. (The relevant portion of Lt. Zani's deposition transcript is attached as Exhibit 41).

Dated: January 5, 2018                    Respectfully submitted,


                                          /s/ James M. Campbell
                                          James M. Campbell (BBO#541882)
                                          Richard P. Campbell (BBO # 071600)
                                          Campbell Campbell Edwards & Conroy
                                          One Constitution Center
                                          Boston, MA 02129
                                          (617) 241-3000
                                          jmcambpell@campbell-trial-lawyers.com

                                          /s/ John Parker Sweeney
                                          John Parker Sweeney (admitted *Pro Hac Vice*)
                                          T. Sky Woodward (admitted *Pro Hac Vice*)
                                          James W. Porter, III (admitted *Pro Hac Vice*)
                                          Marc A. Nardone (admitted *Pro Hac Vice*)
                                          Connor M. Blair (admitted *Pro Hac Vice*)
                                          BRADLEY ARANT BOULT CUMMINGS LLP
                                          1615 L Street N.W., Suite 1350
                                          Washington, D.C. 20036
                                          P (202) 719-8216
                                          F (202) 719-8316
                                          jsweeney@bradley.com

*Counsel for Plaintiffs, David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 5th day of January, 2018, that Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment was served on Defendants' counsel via CM/ECF system that will forward copies to Counsel of Record.

/s/ James M. Campbell
James M. Campbell (BBO#541882)
Richard P. Campbell (BBO # 071600)
Campbell Campbell Edwards & Conroy
One Constitution Center
Boston, MA 02129
(617) 241-3000
jmcambpell@campbell-trial-lawyers.com

/s/ John Parker Sweeney
John Parker Sweeney (admitted *Pro Hac Vice*)
T. Sky Woodward (admitted *Pro Hac Vice*)
James W. Porter, III (admitted *Pro Hac Vice*)
Marc A. Nardone (admitted *Pro Hac Vice*)
Connor M. Blair (admitted *Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs, David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost*