Page 1

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS


DAVID SETH WORMAN, et al.,  ) Case No. 1:17-cv-10107-WGY
                       )
                       )
         Plaintiffs,    )
                       )
vs.                   )
                       )
                       )
MAURA HEALEY, et al.,     )
                       )
                       )
         Defendants.    )
_____)


DEPOSITION OF CHRISTOPHER B. COLWELL, M.D.

Wednesday, November 8, 2017


REPORTED BY:

CELIA A. ZARATE, RPR, CSR NO. 10769

Job No. 352097


MAGNA LEGAL SERVICES

(866)624-6221

www.MagnaLS.com



1    on paying attention to visual cues when you're taking

2    care of trauma patients.

3        Q.  Understood.  I will show you what we have marked

4    as Exhibit 3 to your deposition, and ask you if you can

5    identify that as a copy of the document that you brought

6    with you today, and that you referred to as your paper in

7    this matter.

8        A.  Yes.

9        Q.  And on the fifth page of that document, is that

10   your signature?

11       A.  Yes.

12       Q.  And is this the entire report, along with the CV

13   that you've provided, that you have provided in this

14   case?

15       A.  Yes.

16       Q.  Would you agree there are no authorities cited

17   in your report?

18       A.  Yes.

19           MR. COLLINS:  Objection.

20       Q.  BY MR. SWEENEY:  And would you also agree there

21   is not a list of materials in your report upon which you

22   relied or consulted?

23           MR. COLLINS:  Objection.

24           THE WITNESS:  Yes.

25       Q.  BY MR. SWEENEY:  Are there any sources upon



1  which you've relied or consulted that you have not cited

2  in your report?

3       A.  For the purposes of this report, no.

4       Q.  All right.  You reference as the basis for your

5  experience for -- scratch that.

6           You referenced in your report as the basis for

7  your opinions, your experiences treating gunshot wounds

8  as well as your experience at Columbine and Aurora.  Am I

9  correct?

10      A.  Yes.

11      Q.  Am I correct that those experiences are the sum

12  total of the bases that you are providing to support your

13  opinions in this matter?

14      A.  Could you ask that question again?  I'm not sure

15  I understand.

16      Q.  Sure.  Sure.  You've -- you have just told me

17  that there are no other sources that you relied on, and

18  you mentioned in your report you have experiences in

19  treating gunshot wounds, and you had experiences in

20  connection with the shootings at Columbine and Aurora,

21  and I'm asking, is there anything else that support the

22  opinions in your report?

23           MR. COLLINS:  Objection.  Go ahead.

24           THE WITNESS:  So to answer that question I have

25  to explain that part of that experience involved not only



1    treating patients, but also multiple educational

2    opportunities that I both taught and been involved with

3    that build on the experience I've had over the last 25

4    years.

5         So I think it would be inaccurate to say that I

6    haven't relied on any other discussions or document that

7    I've read through that time, but if the question is:  Did

8    I rely on any documents to prepare this particular

9    statement, the answer is no.

10    Q.  BY MR. SWEENEY:  Did you grow up in La Jolla?

11    A.  I did.

12    Q.  And that's a suburban environment, small town?

13    A.  Relatively.  It seems like it's getting bigger

14   these days, but, yes, suburban San Diego I suppose would

15   be the best way to describe it.

16    Q.  While you were growing up in La Jolla were you

17   or anyone you knew a victim of violent crime?

18    A.  Other than fist to cuffs, that type of assault,

19   nobody that I knew was a victim of a gunshot wound.

20    Q.  Did you or anyone in your family own firearms

21   when you were growing up?

22    A.  No.  I should say, my grandfather and my father

23   had hunting rifles stored in our cabin at Michigan so we

24   didn't have them in the house.

25    Q.  All right.  Did you have any experience with



1    whether that was peer reviewed or non-peer reviewed, but

2    I did --

3         Q.  It's in your list as peer reviewed.

4         A.  Right.

5         Q.  And if that was reliably put together at the

6    time, I hope we can both rely upon it as having been in a

7    peer reviewed journal.  It appears in Emergency Medicine

8    Reports, the Practical Journal for Emergency Physicians.

9         A.  And which number are you referring to?

10        Q.  In your CV, it's number 25.

11        A.  Yes.  So, yes, it would be under Peer

12   reviewed.

13             MR. SWEENEY:  All right.  And let's mark this as

14   Exhibit 5 for this deposition, please.

15             (Exhibit 5 was marked for identification.)

16        Q.  BY MR. SWEENEY:  And you're the lead author of

17   this article, correct?

18        A.  Yes.

19        Q.  Unlike the bomb article we were just discussing?

20        A.  Correct.

21        Q.  And this is

22   a catalog of various less lethal force mechanisms

23   typically -- well, scratch typically -- used by law

24   enforcement, correct?

25        A.  Yes.



1    rifles.  It was at the Hague Peace Conference of 1899 in

2    which a treaty was signed which forbade the use of

3    bullets which deformed once they struck a target.

4          Can you see that?

5          A.   That's what that says, yes.

6          Q.   Is it your understanding that military assault

7    rifles fire primarily full metal jacket bullets?

8          A.   I don't know that.

9          Q.   You don't know.  And the next sentence says that

10   this was to decrease the amount of gross morbidity and

11   mortality during wartime.  Do you see that?

12         A.   I do.

13         Q.   Would you agree that the use of full

14   metal jacket bullets will decrease the amount of gross

15   morbidity and mortality from gunshot wounds compared to

16   other construction or design of bullets?

17         MR. COLLINS:  Objection.

18         THE WITNESS:  I don't know that.

19         Q.  BY MR. SWEENEY:  All right.  You do agree that

20   the full metal jacket will minimize the deformation of

21   the bullet at high velocities and when it strikes tissue,

22   correct?

23         A.   I understand that's what it was designed for.  I

24   wouldn't call myself a ballistics expert.  So I

25   wouldn't be able to answer that definitively.



1      Q.  And let me just -- while we're there, you're not

2  an expert in ballistics generally, correct?

3      A.  Correct.

4      Q.  And you're not an expert in wound ballistics

5  either, are you?

6          MR. COLLINS:  Objection.

7          THE WITNESS:  When you say "wound ballistics,"

8  what do you mean?

9      Q.  BY MR. SWEENEY:  Specifically the study

10  of wounds caused by bullets.

11     A.  Other than treating those wounds, no.

12     Q.  And have you done any special research on

13  gunshot wounds caused by bullets?

14         MR. COLLINS:  Objection.

15         THE WITNESS:  No.

16     Q.  BY MR. SWEENEY:  Have you performed any studies

17  on gunshot wounds caused by bullets?

18     A.  No.

19     Q.  On the next page the first full paragraph refers

20  to soft-nose and hollow point bullets.  Is it your

21  understanding that those are commonly used in handguns?

22     A.  I wouldn't argue with that statement, but I

23  wouldn't know specifically if it's more commonly used in

24  handguns versus other weapons.

25     Q.  All right.  And it goes on to say those bullets



1          MR. COLLINS:  Objection.

2          THE WITNESS:  Not specifically asked about the

3     type of wound, but asked to give my experience in

4     treating a wound where it was clear what type of weapon

5     was used.

6          Q.  BY MR. SWEENEY:  All right.  Have you ever given

7     an opinion as an expert or as a treating physician on

8     what type of firearm was used based upon your

9     observations from treating the wound?

10          MR. COLLINS:  Objection.

11          THE WITNESS:  No.  Not specifically on the type

12     based on wound.  No.

13          Q.  BY MR. SWEENEY:  All right.  And in every case

14     where you were able to identify what kind of firearm was

15     used, it's because someone told you what kind of firearm

16     was used, correct?

17          A.  I would say certainly for the large majority, as

18     with the case of Columbine I did see the weapon.

19     Although, in all honesty, when I saw the weapon I was not

20     able to say that was a TEC-DC9.

21          Q.  All right.  Other than your experience

22     in emergency medicine, do you have any special education

23     or training in treating gunshot wounds?

24          MR. COLLINS:  Objection.

25          THE WITNESS:  Outside of my role as an emergency



1   consider yourself an expert in?

2       A.   I'm not sure that that particular area has

3   expertise or non-expertise, other than in my world,

4   treating those, I would classify myself as an expert in

5   evaluating those wounds.   I'm not sure I would classify

6   myself as an expert in determining a trajectory.

7       Q.   All right.   Have you ever given an opinion in a

8   court proceeding, at deposition, or at trial with respect

9   to the trajectory of a bullet in any of the gunshot

10  wounds that you've treated?

11          MR. COLLINS:   Objection.

12          THE WITNESS:   I don't recall a specific event.

13  I will sometimes get a question of, did this wound

14  represent potentially serious bodily injury

15  and/or life-threatening issues, and so I will then be

16  asked to say if my answer is yes, why, and oftentimes

17  part of that explanation is this was in the vicinity or

18  directly impacting a significant organ vessel, something

19  that would represent a life threat.

20      Q.   BY MR. SWEENEY:   When you were able to

21  personally observe the bullet used to cause the gunshot

22  wound that you were treating, were you able to

23  identify it -- the type of bullet it was as full metal

24  jacketed, soft-point, hollow point, et cetera?

25      A.   I was not myself, no.



1        Q.  All right.  Is that something you're capable of

2   doing based on your expertise?

3        A.  No.

4        Q.  And have you treated -- in the thousands of

5   patients with gunshot wounds that you treated, how many

6   of them had multiple wounds from multiple bullets?

7        A.  I don't have an absolute number for you.  There

8   were more with single wounds than with multiple wounds,

9   but there were a number with multiple wounds.

10       Q.  And when they're multiple wounds, some of them

11  may be exit wounds as opposed to entrance wounds where

12  the bullet actually left the body as opposed to the wound

13  where the bullet entered the body, correct?

14       A.  That is true.  We have to be careful about that

15  from a medical perspective, because when we -- first of

16  all, we don't seem to be particularly good, according to

17  literature at determining what was an entering and exit

18  wound as a global profession; and, number 2, often my

19  message when teaching about these issues, if you assume

20  it's only one bullet you have the risk of missing

21  something, if you assume it was two, and treated it as

22  such, you're less likely to miss something.

23            So there are times when in retrospect it turns

24  out to be, as you've described, but we often need to when

25  we see two wounds assume that it's multiple areas.  Other



Page 69

1    that you have treated?

2         A.   Handed them immediately to law enforcement.

3         Q.   Right.   And you've never retained any of those

4    bullets, correct?

5         A.   No.

6         Q.   Have you made any study of the ballistics

7    analysis of any of the bullets that were removed from the

8    patients for which you've treated gunshot wounds?

9              MR. COLLINS:   Objection.

10             THE WITNESS:   I'm sorry.   I missed the first

11   part.

12        Q.   BY MR. SWEENEY:   Have you ever done a study of

13   the ballastic analysis of any bullets that were removed

14   from the patients who you treated with gunshot wounds?

15             MR. COLLINS:   Objection.

16             THE WITNESS:   So I haven't done a study of that.

17   I've read some of the analysis but, no, I have not done a

18   study of those.

19        Q.   BY MR. SWEENEY:   All right.   Do you have any

20   listing of the number of patients that you've treated

21   with gunshot wounds?

22        A.   No.

23        Q.   And have you made any notes and recorded the

24   different characteristics of the wounds for each of those

25   over a thousand patients that you've treated with gunshot



Page 70

1    wounds?

2        A.   No.

3        Q.   When you removed a bullet from a wound, and you

4    have on more than one occasion, were you able to identify

5    the caliber based upon your observation of it?

6        A.   No.

7        Q.   Recalling your time spent at St. Joseph's --

8        A.   (Nods head.)

9        Q.   -- can you estimate how many gunshot wounds you

10   treated there -- how many patients with gunshot wounds

11   you treated while you were at St. Joseph's?

12       A.   I was there for two years and probably saw

13   anywhere between 10 and 15 patients total.  We weren't

14   the designated level one trauma center there, so we were

15   less likely to get gunshot wounds but we did get them.

16       Q.   All right.  And do you recall any breakdown of

17   the types of firearms that you understood to have been

18   used in those 10 to 15 gunshot wounds that you treated at

19   St. Joseph's?

20       A.   Most of them were shotgun injuries and/or

21   hunting rifles with one exception.

22       Q.   And that's in New Hampshire, correct?

23       A.   No.  That was in Ann Arbor or actually

24   Ypsilanti, spelled with a Y.

25       Q.   All right.



1        Q.   BY MR. SWEENEY:  Have you ever provided a report

2    prior to this case as an expert on different kinds of

3    wounds caused by different kinds of firearms?

4        A.   No.

5        Q.   And you've never given a deposition or testified

6    in court on the different kinds of wounds caused by

7    different kinds of firearms differentiating one from the

8    other?

9        A.   No.

10       Q.   And you've never been qualified on that

11   particular subject as an expert by any court, correct?

12            MR. COLLINS:  Objection.

13            THE WITNESS:  And by the particular subject, you

14   mean different kinds of wounds from different kinds of

15   weapons?

16       Q.   BY MR. SWEENEY:  Yes.

17       A.   Not in that particular area.  No.

18       Q.   All right.  You're an expert in the delivery of

19   emergency medical services, correct?

20       A.   Yes.

21       Q.   And you're board certified in that area?

22       A.   I am, and to be clear, because sometimes they

23   use the word "interchangeably."  There's emergency

24   medicine and there's emergency medical services.

25   Emergency medical services typically refers to the



1     A.  Correct.

2     Q.  Because I'm not very good at what I do.

3     A.  But I would say that in some cases I

4  have experienced the psychologic effects in ways that

5  many others haven't.  I'm not a psychiatrist, but have

6  dealt with many of the psychologic issues that are

7  addressed in the emergency department.

8         So I would have trouble saying no if you say

9  that's the total extent of the expertise, but similar to

10  what your previous question had been, it would be related

11  to what I do in the emergency department.

12     Q.  All right.  And you say:  I've been retained by

13  the defendants in this case to provide expert testimony

14  on my experience treating victims of gunshot wounds; is

15  that correct?

16     A.  Yes.

17     Q.  Is that what you've been retained to do?

18     A.  Yes.

19     Q.  I think we covered it, but just to be clear, in

20  reviewing the peer reviewed journal articles, you haven't

21  done any on gunshot wounds due to assault weapons,

22  correct?

23     A.  I don't believe so.  No.

24     Q.  And, actually, you haven't done any peer

25  reviewed journal articles on gunshot wounds generally,



1    correct?

2         MR. COLLINS:   Objection.

3         THE WITNESS:   Correct.   We discussed a few areas

4    that touched on things, as you pointed out, but no

5    specific peer reviewed articles addressing gunshot

6    wounds.

7         Q.   BY MR. SWEENEY:   And while we have your CV in

8    front of you, if you turn to invited lectures,

9    presentations, and visiting professorships, those

10   are basically speaking opportunities that you've had over

11   the years, correct, Doctor?

12        A.   Yes.   In a variety of different settings.   Some

13   of them educational, big conferences, smaller

14   conferences, pre-hospital, emergency medicine, many

15   different venues, but yes.

16        Q.   And you haven't written any peer reviewed

17   journal articles or invited articles related to your

18   experiences at Columbine or Aurora, correct?

19        A.   I believe at some point in some of the invited

20   articles I've referenced that, but I haven't written

21   specific articles just about that issue.

22        Q.   All right.   And you haven't made any study by

23   systematically reviewing the firearms, the nature of the

24   wounds, or the bullets used at Columbine or Aurora, have

25   you?



MAGNA
LEGAL SERVICES

1     Q.  And of those eight or nine patients, how many of

2  them had gunshot wounds?

3     A.  All of those did.

4     Q.  All right.  So some patients arrived a day or

5  two later with gunshot wounds.  Is that --

6     A.  At least one did -- transferred from another

7  facility.  So they were seen initially at another

8  facility and then transferred -- we were the level one

9  trauma center -- to us as the regional level one trauma

10 center.

11    Q.  Did any of the eight or nine patients that you

12 saw at Denver Health from the Aurora shootings have

13 multiple gunshot wounds?

14    A.  Yes.

15    Q.  How many?

16    A.  At least one.

17    Q.  Okay.

18    A.  I don't recall exactly how many.

19    Q.  Were you able to tell from your treatment of

20 those individuals what type of firearm had caused their

21 gunshot wounds?

22         MR. COLLINS:  Objection.

23         THE WITNESS:  From that treatment, no.

24    Q.  BY MR. SWEENEY:  All right.  Did you remove any

25 bullet or bullet fragments from those eight or nine



1   patients?

2       A.   No.

3       Q.   And did you see any bullets or bullet fragments

4   removed from those patients?

5       A.   No.

6       Q.   And did you receive any information about the

7   type of firearms that were used in those shootings?

8       A.   From law enforcement, yes.

9       Q.   And what were you told?

10      A.   I was told that at least one of the weapons was

11  an AR victim.

12      Q.   Was it your understanding that there was more

13  than one weapon used?

14      A.   Yes.

15      Q.   And do you know what the other weapons were?

16      A.   No.  I was told at the same time, but I don't

17  recall.

18      Q.   All right.  And you don't know which of those

19  different weapons were used to make the gunshot wounds in

20  the patients you treated from the Aurora shootings,

21  correct?

22      A.   No.

23      Q.   If I could turn your attention to page 12 of

24  that report.

25      A.   Not Roman numeral 12, regular page?



Page 95

1      Q.  On page 12, Arabic 12, yeah.  This is a

2  reference to the --

3           MR. COLLINS:  I don't think we're on the same

4  page.

5      Q.  BY MR. SWEENEY:  -- facts surrounding the

6  attack.

7      A.  Attack starts?

8      Q.  Right.

9           MR. COLLINS:  Oh.

10     Q.  BY MR. SWEENEY:  At the bottom of the page it

11  says:  The shooter carried into the theater a shotgun,

12  AR-15 style semiautomatic rifle, and a .40 caliber

13  semiautomatic handgun, correct?

14     A.  Yes.

15     Q.  It then skipping a sentence, it says:  He first

16  opened fire with a shotgun firing six shells until he

17  exhausted its ammunition.  Do you see that?

18     A.  Yes.

19     Q.  How many shotgun pellets would have been shot

20  into the crowd by him firing six shotgun shells?

21     A.  I don't know.

22     Q.  Dozens, if not hundreds, of pellets?

23     A.  I would imagine.

24     Q.  All right.  And depending upon the size of shot,

25  they can be almost the same diameter as a .223 round


MAGNA
LEGAL SERVICES

1    typically used in an AR-15, correct?

2         A.   So my experience has been that the shotgun

3    pellets are far smaller, and that the AR-15 wounds have

4    been bigger and far more substantial.

5         Q.   But you don't know if you were treating shotgun

6    wounds or AR-15 wounds from the patients you saw from the

7    Aurora shootings?

8         A.   No.   I don't recall any of the wounds that

9    looked like shotgun wounds or pellets, but I can't tell

10   you specifically what weapon was used.

11        Q.   All right.   It also says he fired five rounds

12   from the handgun on the next page, correct?

13        A.   Yes.

14        Q.   So you don't know whether or not any of the

15   wounds you treated were caused by a .40 caliber handgun,

16   correct?

17        A.   I don't.

18        Q.   And he did fire it says .65 -- at

19   least .65 high-velocity rounds from a magazine that was

20   AR-15.   Do you see that?

21        A.   Yes.

22        Q.   So that may or may not have been more bullets

23   from the AR-15 than he fired in terms of total number of

24   shotgun pellets and handgun rounds, correct?

25        A.   It may or may not have been.



1   We transported ultimately 24 from the scene, and I

2   believe all of them had been gunshot wounds, but I don't

3   know for certain that those were the only ones

4   and/or that they weren't at least one of the patients

5   that we saw in triage may have been transported by

6   ambulance as well that had fallen and injured their ankle

7   very badly.

8       Q.  So of the 24 or so individuals that were

9   transported with what you believe to have been gunshot

10  wounds, could some of them have been shrapnel wounds?

11      A.  Some of those could have been shrapnel wounds.

12      Q.  And do you have any real way of quantifying

13  which one of those were shrapnel wounds and which were

14  gunshot wounds under the circumstances in your ability to

15  observe that day?

16      A.  No.  I remember specifically seeing some

17  injuries that we've ultimately designated to non-trauma

18  centers that could have been maybe a shotgun pellet or

19  shrapnel injuries.

20      Q.  All right.  And were you able to tell from your

21  observation of the wounds, on the 24 or so transported,

22  what type of firearm had caused their wounds, if in fact

23  they were gunshot wounds?

24      A.  No.  In 1999 my experience was far less.

25  Looking back on it now, there are wounds that we saw



1   there that were very consistent with wounds that I know

2   to have been from assault weapons, but at the time I

3   certainly wasn't able to and couldn't even now say this

4   was definitely a TEC-DC9 or other weapon, but some of

5   those wounds were consistent with what I have seen from

6   assault weapons.

7       Q.  What do you understand were being used by the

8   shooters in Columbine for firearms?

9       A.  I understood that they had TEC-DC9 and sawed-off

10  shotguns.  I don't know what other weapons they had.

11          MR. SWEENEY:  I think the sheriff can help us

12  there.  Let's mark this as Exhibit 16, please.

13          (Exhibit 16 was marked for identification.)

14      Q.  BY MR. SWEENEY:  Now, I've marked a four-page

15  document that I printed off the Jefferson County,

16  Colorado, Sheriff's website titled How They Were Equipped

17  That Day.  Have you seen this before?

18      A.  I have seen many of these pictures before,

19  certainly the one in the cafeteria, and I have seen this

20  picture before, yes.

21      Q.  This picture being the first page which shows a

22  sawed-off shotgun and a TEC-DC9 identified as Klebold

23  Weapons and a sawed-off shotgun and a high .9 millimeter

24  carbine identified as Harris Weapons.  That's the picture

25  you've seen before?



Page 133

1        A.  Yes.

2        Q.  And the narrative talks about the use of the

3   firearms over the course of the shootings, and the final

4   page is a chart that shows the rounds that were fired in

5   different locations by different shooters.  Are you

6   familiar with that chart?

7        A.  No.

8        Q.  All right.  Now, is it -- how many people were

9   killed that day?

10       A.  Fifteen, if you include the two shooters.

11       Q.  And of the 13 non-shooters, two were killed

12   outside the library -- I mean outside the cafeteria?

13       A.  Outside the building, yes.

14       Q.  Outside the building.  And so where it says

15   outside we see that there were two shotgun rounds shot

16   outside, but 50 .9 millimeter rounds shot outside,

17   correct?  Am I reading that chart correctly?

18       A.  Outside, 2 by Klebold is the 2 I see.

19       Q.  Right.  Two shotgun rounds, and then adding the

20   Harrison and Klebold .9 millimeter rounds outside

21   together, I had about 50 there.

22       A.  Oh, it's 47 plus 3, okay, yes, 50.

23       Q.  All right.  And the narrative talks

24   about the rifle as being a high .9 millimeter carbine

25   rifle, correct?



```
1        A.   I believe so, yes.

2        Q.   That was used by Harris?

3        A.   Harris.

4        Q.   And do you know if that's an assault weapon?

5             MR. COLLINS:   Objection.

6             THE WITNESS:   I don't know that.

7        Q.   BY MR. SWEENEY:   And do you know if it's banned

8    in Massachusetts?

9        A.   I don't.

10       Q.   You would agree with me it's not on the list of

11   enumerated firearms that are banned?

12       A.   You're referring to the enforcement notice that

13   I referred to earlier?

14       Q.   Yes, I am.

15       A.   And I don't see it listed on the enumerated

16   weapons.

17       Q.   All right.   And the TEC-DC9 is identified as a

18   .9 millimeter semiautomatic handgun, correct?   That's at

19   the top of the -- the second paragraph on page 3.

20       A.   TEC-DC9, .9 millimeter semiautomatic handgun,

21   yes.

22       Q.   Is that your information with respect to the

23   firearm that was used by Klebold in addition to his

24   sawed-off shotgun?

25       A.   Yes.   It didn't come from this document, but
```

