**<u>EXPERT REPORT OF ROBERT J. SPITZER</u>**

1.      I am a Distinguished Service Professor and Department Chair of the Political Science Department at the State University of New York, College at Cortland in Cortland, New York. A copy of my curriculum vitae is attached to this Declaration.

2.      I have been studying and writing on gun policy for over thirty years. My first publication on the subject appeared in 1985. Since then, I have published five books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun and ammunition laws, gun policy in American politics and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print since its year of initial publication, 1995. It encompasses all of the listed areas. The seventh edition of the book will be published in early 2018 by Routledge Publishers. My most recent book on gun policy is *Guns across America: Reconciling Gun Rules and Rights*, published by Oxford University Press in 2015. I am frequently interviewed and quoted in the national and international media on gun-related matters.

3.      For over twenty years, I have been a member of the National Rifle Association and of the Brady Campaign to Prevent Gun Violence.

## SUMMARY OF FINDINGS

4.      The United States has a robust and lengthy history of gun regulations of every sort, including regulation of semi-automatic weapons in the 1920s—six decades before the contemporary dispute over the regulation of semi-automatic assault weapons arose. Massachusetts was one of those states. State laws also regulated large capacity bullet feeding devices during the same early twentieth century period.

5.      Assault weapons available on the civilian market today were derived from military weapons designed specifically for combat use. Aside from assault weapons, thousands of other types of firearms of every sort are available for lawful civilian purchase today, amounting to hundreds of millions of weapons.

6.      Modern assault weapons have had disproportionately adverse effects on gun violence, and are particularly lethal because of their designs, firing characteristics, and appeal to segments of the criminal population and criminal activities, to wit: mass shootings, police killings, and gang activity.

7.      Assault weapons and high capacity magazines provide no value added function, purpose, or benefit if employed for personal self-defense.

## SPECIFIC FINDINGS AND CONCLUSIONS

### I.      Gun Law History

8.      While it is well known that gun ownership is as old as the nation, less well-known is the fact that gun laws are also as old as the nation. The very first colonial government, the Virginia colony House of Burgesses, first convened in 1619 to enact laws to govern the fledgling

2

Jamestown colony. One of the laws it enacted was a gun control measure criminalizing the selling, giving, or trading of guns to Native Americans.[1]

9.     From that time through the next three centuries, states, territories, and localities enacted literally thousands of gun laws of every conceivable category of regulation, from gun acquisition, sale, possession, transport, and use, including deprivation of use through outright confiscation, to hunting and recreational regulations, to registration and express gun bans.[2] Among those laws were measures regulating semi-automatic weapons and bullet magazines.[3]

A.     Semi-automatic Gun Regulation

10.    A spate of mass shootings in the late 1980s and early 1990s raised concerns among public officials about whether to regulate assault weapons, defined as military-derived weapons that had recently become available on the civilian market and that had been used in some mass shooting events. Central to this concern was the fact that, like many other common weapons not modeled after military weaponry, they fired semi-automatically – that is, firing one round with each pull of the trigger. Yet contrary to what most suppose, there is a long history of the regulation of semi-automatic weapons dating back over sixty years.

11.    According to a recently available database of thousands of gun laws compiling measures from the nation's beginnings up through 1934,[4] at least seven, and as many as ten states enacted laws to restrict or bar all semi-automatic weapons. These laws were enacted between 1927 and 1934. All of them also barred fully automatic weapons, often lumping semi-automatic and fully automatic (often referred to as "machine guns" and "submachine guns") under the same regulatory rubric.

12.    A Massachusetts law enacted in 1927 to regulate the sale and possession of the weapons listed said this:

> 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
> In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective

---

[1] *Laws Enacted By The First General Assembly of Virginia, in* COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION 283 (Donald S. Lutz, ed., 1998) (quoting 1 JOURNALS OF THE HOUSE OF BURGESSES OF VIRGINIA, 9–14 (H.R. McIlwaine & John P. Kennedy eds., 1905)).

[2] Robert J. Spitzer, *Guns across America* (New York: Oxford University Press, 2015), chap. 2; Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

[3] Strictly speaking, magazines hold "rounds" not "bullets" as the latter term actually references the projectiles that leave the barrel of a gun. But as the term "bullet" is widely used and understood as a synonym for "round," both terms are used here.

[4] https://law.duke.edu/gunlaws/ This database only includes laws up to 1934, so it is possible that other states enacted laws like the ones discussed here after 1934.

of the length of the barrel. *Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections*, and of sections one hundred and thirty–one and one hundred and thirty one B. . . § 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . . *(italics added)*[5]

13.     A 1927 Rhode Island measure defined the prohibited "machine gun" to include "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[6] Michigan's 1927 law prohibited machine guns or any other firearm if they fired more than sixteen times without reloading.[7] Minnesota's 1933 law outlawed "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure."[8] It went on to penalize the modification of weapons that were altered to accommodate such extra firing capacity.[9] Ohio restricted to permit holders both fully automatic and semi-automatic weapons in a 1933 law, incorporating under the named category any gun that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading."[10] The law defined semi-automatic weapons as those that fired one shot with each pull of the trigger.[11] South Dakota restricted access to machine guns by defining them as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine . . . ."[12] Virginia restricted weapons "of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading."[13]

14.     Aside from these seven states, another three included language that may also have extended regulations to semi-automatic weapons as well as to fully automatic weapons. Illinois enacted a 1931 law that prohibited "machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks,

---

[5] 1927 Mass. Acts 413, 413–14.

[6] 1927 R.I. Pub. Laws 256, 256.

[7] Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888.

[8] Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232.

[9] *Id.*

[10] Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189.

[11] *Id.*

[12] Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245.

[13] Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.

belts, or other separable mechanical devices."[14] Louisiana's 1932 anti-machine gun law[15] and South Carolina's 1934 law[16] both defined machine guns in the same way using identical language, including the eight cartridge standard. In the case of these three laws, the word "automatically" would seem to refer to fully automatic firing, but when that wording is married with "discharging more than eight cartridges successively without reloading" and with reference to bullet feeding devices, it would seem to encompass semi-automatic firing as well.

15.    The table below summarizes these laws. They establish historical precedent for the regulation of any and all semi-automatic firearms:

**State Laws Regulating or Barring Semi-Automatic Weapons, 1927–1934**

| STATE AND YEAR | PROVISION OF LAW |
| --- | --- |
| Massachusetts 1927 | "Any gun or small arm caliber designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired" |
| Michigan 1927 | "any machine gun or firearm which can be fired more than sixteen times without reloading" |
| Minnesota 1933 | "Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure." |
| Ohio 1933 | "any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading." |
| Rhode Island 1927 | "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading." |
| South Dakota 1933 | "a weapon of any description . . . from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine." |
| Virginia 1933 | "a weapon of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading." |
| OTHER STATE LAWS | |
| Illinois 1931 | "machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which |

---

[14] Act of July 2, 1931, 1931 Ill. Laws 452, 452.

[15] Act of July 7, 1932, no. 80, 1932 La. Acts 336

[16] Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288

| | ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices." |
|---|---|
| Louisiana 1932 | "machine rifles, machine guns and sub machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device." |
| South Carolina 1934 | "machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device." |

### B.    Regulation of Bullet Magazines or other Feeding Devices

16.    As an examination of these laws shows, restrictions on fully-automatic and semi-automatic firearms are closely tied to the regulation of bullet magazines or their equivalent (the term "magazine" was not in wide use at the time), as both firing mechanisms are predicated on some kind of reloading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired. As is the case with contemporary state regulations restricting bullet magazine capacity (often limited to ten, as did the federal assault weapons ban of 1994), eight of the state laws discussed above imposed regulations based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) to five up to a high of eighteen.

17.    Bullet magazine firing limits were imposed in three categories of state laws: those regulating semi-automatic and fully automatic weapons (the ten laws listed above: Illinois, Louisiana, Massachusetts, Michigan, Minnesota, Ohio, Rhode Island, South Carolina, South Dakota, and Virginia), those regulating fully automatic weapons only where the regulation was defined by the number of rounds that could be fired without reloading, and laws that barred all guns that could receive any type of bullet feeding mechanism and fire them continuously in a fully automatic manner.

18.    Three states had laws regulating fully automatic weapons where the barred weapons were defined as those that exceeded the number of rounds the weapons could fire without reloading (Michigan, fifteen rounds; Illinois, eight rounds; and Texas, five rounds).[17]

19.    Four states (California, Hawaii, Missouri, and Washington) barred fully automatic weapons as those which would be capable of receiving rounds through certain named round-feeding devices. A 1927 California law, for example, was titled this way:

An Act to Prohibit the Possession of Machine Rifles, Machine Guns and
Submachine guns Capable of Automatically and Continuously Discharging

---

[17] Mich. Pub. Acts 1929, Act No. 206, Section 3, Comp. Laws 1929; 1931 Ill. Laws 452; 1933 Tex. Gen. Laws 219.

> Loaded Ammunition of any Caliber in which Ammunition is Fed to such Guns from or by means of Clips, Disks, Drums, Belts or other Separable Mechanical Device. . . .[18]

The other three states utilized this same description.[19] In all, fifteen states enacted gun restrictions based on the regulation of bullet magazines or similar bullet feeding devices. Other states may have enacted similar regulations after 1934, but the dataset of state laws from which these laws were obtained does not extend beyond 1934.

20.     The regulation of ammunition feeding devices was common as early as the 1920s.

## II.     The History of Assault Weapons

21.     Modern guns available to civilians labeled assault weapons are derived from military weapons designed for use on the battlefield.

22.     The firearm known today as the assault weapon arose during World War II when the Germans developed the STG 44 or *Sturmgewehr.* That soldier-carried weapon was studied and modified by the Soviets, who produced the well-known Soviet AK-47 in 1947, which has been the most successful and prolific soldier-held battlefield weapon in modern times.[20] The AK-47 gave rise to the American AR-15, which then became the military M16. The AR-15 was eventually marketed to the civilian market, and that led in turn to many copycat variations.

23.     The AR-15 was first produced by the ArmaLite Company in the late 1950s (the basis for the "AR" name). According to one of its designers, Jim Sullivan, the weapon was "designed for full automatic military use. It wasn't really designed as a sporting rifle."[21] ArmaLite sold the rights to the gun to the Colt Company in 1959. A few years later, the weapon was adopted by the American military and produced as the M16, where it gradually came in to use during the Vietnam War in the 1960s.

24.     Colt received permission to market a semi-automatic version of the AR-15 to the civilian market, but these weapons did not catch on in the American market in a significant way until the late 1980s,[22] when the Chinese flooded the market with cheap weapons, including their own semi-automatic version of the AK-47.[23] Today, the AR-15-type weapon is manufactured and sold by over thirty companies, including Smith and Wesson, Bushmaster, and Sig Sauer.[24]

---

[18] 1927 Cal. Stat. 938.

[19] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[20] Larry Kahaner, *AK-47: The Weapon That Changed the Face of War* (New York: Wiley, 2007).

[21] "America's Gun – the Rise of the AR-15," *CNBC,* April 25, 2013, at http://www.youtube.com/watch?v=OCvjoFPD5Kg

[22] The first assault weapon marketed to civilians was the Colt AR-15, introduced in 1964. Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, WI: Gun Digest Books, 2008), 4. Peterson says that the poor sales of these weapons, along with imported versions, was attributable at least in part to the fact that they were "too expensive to appeal to the average shooter."

[23] Jay Mathews, "AK47 Rifles Flood Into U.S. from Chinese Sales War," *Washington Post,* February 2, 1989, A1.

[24] Tom Diaz, *Making a Killing* (New York: The New Press, 1999), 125.

25.     The terms "assault weapon" and "assault rifle" are neither a "public relations stunt"[25] nor ginned up labels invented by gun control organizations. In fact, these were the very terms used by the companies that first produced, marketed, and sold such weapons to the public. Industry use of the terms "assault weapons" and "assault rifles" appeared in the early 1980s, before political efforts to regulate them emerged in the late 1980s.[26]

26.     Tom Diaz, a specialist on, and critic of the gun industry, has chronicled the marketing strategies employed by gun manufacturers and gun publications from the time that such weapons were first introduced to the American civilian market in a significant way in the 1980s. He reports on, and quotes directly from gun company advertisements and gun magazines, like Heckler and Koch selling its "HK 91 Semi-Automatic Assault Rifle," the "Bushmaster assault rifle," the AKM "imported assault rifle," the Beretta M-70 that "resembles many other assault rifles," the AR 10 (made by Paragon S&S Inc.) advertised as a "famous assault rifle [that] is now available in a semi-auto form!", the "AMT 25/.22 Lightning Carbine" that was advertised as an "assault-type semi-auto," among many other examples. The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public.[27]

27.     As a standard buyer's guide on assault weapons noted, the "popularly-held idea that the term 'assault weapon' originated with anti-gun activists, media or politicians is wrong. The term was first adopted by the manufacturers, wholesalers, importers and dealers in the American firearms industry. . . ."[28] The more expansive phrase "assault weapon" is generally used over "assault rifle" because "weapon" also includes not only rifles but some shotguns and handguns that were also subject to regulation in the 1994 and subsequent laws.

28.     By the early 1990s, both the gun industry and the National Rifle Association abruptly changed course in their labeling of such weapons as pressure built on Congress and in some states to enact curbs (California enacted the first assault weapons ban in 1989 in the aftermath of a school shooting in Stockton, California committed with an AK-47), and that led to the remarketing and rebranding of such weapons as no different from typical, traditional hunting weapons that also fired in semi-automatic fashion. That effort has persisted to the present, with terms like "tactical rifles" and "modern sporting rifles" typically offered by gun organizations including the National Rifle Association (NRA) and the National Shooting Sports Foundation (NSSF) as preferred terms for such weapons.[29]

29.     Persistent efforts at rebranding – and parallel denials of assault weapons' past – accelerated through the 2012 and 2013 national concern about assault weapons, as seen, for example, in the NSSF web site and literature. A widely circulated "Modern Sporting Rifle

---

[25] Peter Ferrara, "'Assault Weapon' is Just a PR Stunt Meant to Fool the Gullible," *Forbes,* December 28, 2012, at http://www.forbes.com/sites/peterferrara/2012/12/28/assault-weapon-is-just-a-pr-stunt-meant-to-fool-the-gullible/
[26] Violence Policy Center, *The Militarization of the U.S. Civilian Arms Market,* June 2011, at http://www.vpc.org/studies/militarization.pdf#page=33; see also Violence Policy Center, *Assault Weapons and Accessories in America,* 1988, at http://www.vpc.org/studies/awacont.htm and http://www.vpc.org/studies/thatintr.htm
[27] Diaz, *Making a Killing*, 124-28, 230-31; Tom Diaz, *The Last Gun* (New York: The New Press, 2013), 142-43.
[28] Peterson, *Buyer's Guide to Assault Weapons*, 11.
[29] Tom Diaz, *The Last Gun* (New York: The New Press, 2013), 144.

Pocket Fact Card"[30] says that such weapons are "widely misunderstood" because of their cosmetic resemblance to military weapons (an intentional design feature). It urges gun owners to use the information on the card and web site "to correct misconceptions about these rifles." Among the "corrections" it offers: "AR-15-style rifles are NOT 'assault weapons' or 'assault rifles.' An assault rifle is fully automatic—a machine gun." It adds "Please correct them" if they use the term "assault weapon," claiming further that it "is a political term" created in the 1980s. (As noted above, this assertion is incorrect.)

30.     An article in *Outdoor Life* on this subject belies the claim that assault weapons are limited only to those that fire fully automatically. That article, too, urges its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons." In its account, it notes correctly that "the term 'assault weapon'. . . generally referred to a type of light infantry firearm initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47 and the M16/M4. These are selective-fire weapons that can shoot semi-auto, full-auto, or in three-round bursts. . . ."[31]

31.     The effort to rebrand "assault weapons" as something more benign and severed from its military origins was seen in the publication struggles of Phillip Peterson, whose book, titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons,*[32] is a well-known reference work on the subject. As Peterson explained, the gun industry "moved to shame or ridicule" those who used the phrase "assault weapons," insisting that the term should now only apply to fully automatic weapons. Peterson noted that the origin of the term "assault weapon" was the industry itself.[33] He found that the NRA refused to sell his book until he changed the title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles.*[34]

32.     Contemporary assault weapons available to civilians are a sub-category of the military-style weapons, with the modification that civilian weapons do not have fully automatic or "selective fire" options, but can only fire in semi-automatic mode.

## III.   The Criminological Consequences of Assault Weapons

### A.    The Assault Weapons Ban of 1994

33.     In 1994, Congress enacted a measure to make it "unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon."[35] It did this in Title XI of a larger bill, the Violent Crime Control and Law Enforcement Act. The law barred these weapons in two different ways.

34.     First, it listed nineteen named, specified assault weapons firearms, as well as "copies or duplicates of the [listed] firearms in any caliber. . . ." It specifically exempted 661

---

[30] http://www.nssf.org/msr/
[31] John Haughey, "Five Things You Need to Know About 'Assault Weapons'" *Outdoor Life,* March 19, 2013, at http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-know-about-assault-weapons
[32] Iola, WI: Gun Digest Books, 2008.
[33] Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times,* January 17, 2013, A1.
[34] Iola, WI: Gun Digest Books, 2010.
[35] 108 Stat. 1796, 1996-98.

sporting rifles. Pre-1994 assault weapons were exempted from the ban (around 1.5 million were then in circulation). It also limited bullet feeding devices (i.e. magazines) to those holding ten bullets or less. Pre-1994 magazines that could hold more than ten rounds were also exempted from the 1994 restriction (roughly 24 million pre-1994 magazines were in circulation).

35.    Second, assault weapons were also defined as those that have "an ability to accept a detachable magazine and has at least 2" stipulated characteristics of military weapons, including "a folding or telescoping stock; a pistol grip that protrudes conspicuously beneath the action of the weapon; a bayonet mount; a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and a grenade launcher. . ."[36] This has been referred to as the "features test." The two features test was also applied to certain semi-automatic pistols and semi-automatic shotguns.[37] These weapons are also generally more compact in design, having barrels less than twenty inches in length, take intermediate-sized cartridges, include extensive use of lightweight stampings and plastics, and are therefore lighter in weight (six to ten pounds).

36.    Some of these features are important because they bear directly on how the weapon is fired, like these weapons' more compact design, ability to receive large capacity bullet magazines, thumbhole grips, forward handgrips, collapsible or telescoping stocks, and extensive use of plastic stampings. These features make them more lightweight and concealable, and also facilitate a key trait for battlefield use: their ability to fire large numbers of rounds without reloading to lay down "spray fire," also referred to as "hosing down" an area.[38]

37.    The Massachusetts assault weapons ban, enacted in 1998 and made permanent in 2004, was modeled on the federal ban.

38.    The National Institute of Justice funded a series of studies of the effects of the law. Before the 1994 federal ban, between 2 and 8 percent of gun crimes were committed with assault weapons – a larger-than-proportionate percent of such weapons found nationwide, but still a fairly small number. Large capacity bullet magazines, however, were often used in gun crimes – about 20 percent.[39]

39.    The final study report noted that such weapons "account for a higher share of guns used in murders of police and mass public shootings." It noted the express purpose of the assault weapons ban: to "reduce gunshot victimizations" by limiting the availability of weapons and features that "enable shooters to discharge many shots rapidly" and other features "conducive to criminal use."[40] It also found that, in a study of crime in selected cities, the proportion of gun crimes using assault weapons declined an average of 45 percent during the

---

[36] 108 Stat. 1796.

[37] Robert J. Spitzer, *The Politics of Gun Control*, 6th ed. (Boulder, CO: Paradigm Publishers, 2015), 149-50.

[38] Diaz, *The Last Gun*, 156-57.

[39] Christopher S. Koper, et al., "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003," Report to the National Institute of Justice, U.S. Department of Justice, Jerry Lee Center of Criminology, University of Pennsylvania, June, 2004, 1.

[40] Koper, et al., "An Updated Assessment of the Federal Assault Weapons Ban," 1. An earlier version of this study from 1997 found similar, if tentative, trends. Jeffrey A. Roth, et al., "Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994," *Urban Institute,* March 13, 1997.

period of the ban.[41] The researchers concluded that the effects of the law lagged its enactment (partly because of the law's limitations), meaning that its effects took several years to yield results, and that while the ban apparently did have some effect, the "most important part of the semiautomatic assault weapons ban. . .is probably the restriction on large ammunition magazines. . . ."[42]

40.    The National Institute of Justice study included Boston as one of the cities studied; it was the city that reported the highest assault weapon crime drop:  72 percent. The study's authors noted that Boston's sharp drop could have been attributable to the fact that Massachusetts also had a pre-existing state ban in place during the period under study, and that ban was even stricter in that it imposed additional requirements for large capacity magazine possession and transfer, and for guns able to receive those magazines. Another city in the study, Baltimore, saw the second largest drop, a notable fact given that Maryland also had its own state ban in place during the period under study.[43]

41.    A study by the Virginia State Police regarding the impact of the 1994 law on high capacity magazines used in crime in that state found that the use of magazines holding more than ten rounds fell from 17 percent in 1997 to 10 percent in 2004, the year the law lapsed, but then rose progressively to 22 percent by 2010.[44]

42.    Based on these studies and information, the federal ban had a positive effect on reducing the use of assault weapons in crime, and a combination of the federal and state bans was even more effective in reducing assault weapons' use in crime.

## B.    Contemporary Assault Weapons Concerns

43.    No precise count of the number of assault weapons owned in America is maintained. Out of roughly 300 million guns in America, several estimates in 2012 pegged the number at about four million.[45] A 2016 estimate put the number at about five million.[46] When five million is divided by 300 million, it equals 1.7 percent of all guns in America as falling into the category of assault weapons.

44.    Assault weapons play a disproportionately large role (in relation to their numbers in the general population) in three types of criminal activity: mass shootings, police killings, and gang activity.

---

[41] Koper, et al., "An Updated Assessment of the Federal Assault Weapons Ban," 2-3.
[42] Christopher S. Koper, "Disassembling the Assault-Gun Ban," *Baltimore Sun,* September 13, 2004, at http://articles.baltimoresun.com/2004-09-13/news/0409130079_1_ban-guns-gun-crimes-magazines
[43] Koper et al., "An Updated Assessment of the Federal Assault Weapons Ban," 48, fn. 55.
[44] David S. Fallis and James V. Grimaldi, "Va. Data Show Drop in Criminal Firepower During Assault Gun Ban," *Washington Post,* January 23, 2011, at http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html
[45] Spitzer, *Guns across America,* 93.
[46] John W. Schoen, "Owned by Five Million Americans, AR-15 Under Renewed Fire After Orlando Massacre," *CNBC.com,* June 13, 2016, at https://www.cnbc.com/2016/06/13/owned-by-5-million-americans-ar-15-under-renewed-fire-after-orlando-massacre.html

### 1.  Mass Shootings

45.     Mass shootings are generally defined as those where four or more people are killed, excluding the perpetrator. Among mass shootings that have garnered significant national attention, such as the Stockton, California elementary school shooting in 1989, the Columbine High School shooting in 1999, the Aurora, Colorado movie theater shooting in 2012, the Sandy Hook elementary school shooting also in 2012, and the Orlando night club shooting in 2016, all involved the use of assault weapons. An intensive study of all mass shootings (defined as those where four or more persons were killed) from 1982-2012 identified 62 such events. Of the 143 firearms used in these events, 34 percent of them were assault weapons that would have been banned under the 2013 assault weapons ban proposed by Sen. Dianne Feinstein (D-Cal.; the Senate voted the measure down); 50 percent were semiautomatic handguns (another 14 percent were revolvers). In terms of the number of shooting incidents rather than number of guns, 75 percent of the 62 mass shootings involved semi-automatic handguns, 87 percent had handguns of some type, and over a third of mass shootings had assault weapons.[47]

46.     A Congressional Research Service study of mass shootings from 1999 to 2013 concluded that assault rifles were used in 27 percent of mass shootings; taking the data back to 1982, they were used in 24 percent of mass shootings.[48] Assault weapons thus play a disproportionately large role in these crimes, as compared with all gun crimes or as compared with all guns in society.

### 2.  Police Killings

47.     Using FBI data, the Violence Policy Center reported that from 1998-2001, 41 of 211 police officers (20 percent) killed in the line of duty with firearms were shot with assault weapons (in all, 224 police officers during this period were killed in the line of duty from all causes).[49] Data from 2009 found that of 45 officers killed by firearms nationwide, 8 (18 percent) were shot with assault weapons.[50] While this represents a minority of all police gun deaths, it is a far higher proportion than that of assault weapons in society.[51]

---

[47] Mark Follman, "Why Mass Shootings Deserve Deeper Investigation," *Mother Jones,* January 30, 2013, at http://www.motherjones.com/politics/2013/01/mass-shootings-james-alan-fox; Mark Follman, "More Guns, More Mass Shootings—Coincidence?" *Mother Jones,* December 15, 2012, at http://www.motherjones.com/politics/2012/09/mass-shootings-investigation.

[48] William J. Krouse and Daniel J. Richardson, "Mass Murder with Firearms," *CRS Report,* July 30, 2015, at https://fas.org/sgp/crs/misc/R44126.pdf; Michael S. Rosenwald, "Why Banning AR-15s and Other Assault Weapons Won't Stop Mass Shootings," *Washington Post,* June 16, 2016, at https://www.washingtonpost.com/news/local/wp/2016/06/16/why-banning-ar-15s-and-other-assault-weapons-wont-stop-mass-shootings/?utm_term=.7dffcadbb47b.

[49] "Officer Down," *Violence Policy Center,* May 2003.

[50] Lori Robertson, "Biden Wrong on Police Deaths," *FactCheck.org,* January 30, 2013, at http://www.factcheck.org/2013/01/biden-wrong-on-police-deaths/. The FBI data categorizes gun shootings by types of guns (handguns, rifles, shotguns) but does not have a separate category for assault weapons, meaning that the data must be reanalyzed or obtained in some other way.

[51] Koper, et al., "An Updated Assessment of the Federal Assault Weapons Ban."

### 3.    Gang/Criminal Activity

48.     A report by the International Association of Chiefs of Police recommended "Enacting an effective ban on military-style assault weapons . . . and other weapons that enable criminals to outgun law enforcement."[52] A report by the Police Executive Research Forum (PERF) noted "significant support for the proposition that the expiration of the law [the 1994 assault weapons ban] has caused problems for local police. Thirty-seven percent of the police agencies responding to PERF's survey reported that they had seen noticeable increases in criminals' use of assault weapons."[53] When New York State's tough new gun law, the New York SAFE Act of 2013, was challenged in court, the counsel for the New York State Police filed a brief on behalf of the law, defending in particular the strengthened assault weapons ban and magazine limit provisions. The 2013 law now included a provision that pre-ban magazines capable of holding more than ten rounds be destroyed, turned in to police, or sold out of state.[54]

49.     Widely noted prolific gun trafficking between the U.S. and Mexico has been motivated in large part by the appeal of assault weapons to Mexican drug gangs.[55]

50.     A study of gang members in the American Midwest by a team of researchers from the National Gang Crime Research Center of 1206 respondents, including 505 gang members, found that over 43 percent reported owning an assault rifle, as compared with 15 percent of non-gang member criminals. Gang members were also much more likely to report having used an assault rifle in a crime (28 percent) than non-gang members (4 percent).[56] Other analyses note the appeal of assault weapons to American crime gangs and extremist paramilitary militias.[57]

---

[52] International Association of Chiefs of Police, "Taking a Stand," 2007, at http://www.theiacp.org/Portals/0/pdfs/GVR_A-page-iii_IACP-Taking-A-Stand.pdf
[53] Police Executive Research Forum, "Guns and Crime," May 2010, 2, at http://www.policeforum.org/assets/docs/Critical_Issues_Series/guns%20and%20crime%20-%20breaking%20new%20ground%20by%20focusing%20on%20the%20local%20impact%202010.pdf
[54] Spitzer, *Guns across America,* 164. The law was upheld in *New York State Rifle and Pistol Association v. Cuomo,* 804 F.3d 242 (2nd Cir. 2015). The only substantive provision of the original law that did not survive challenge was the law's seven bullet magazine limit; the state's pre-existing ten bullet limit remains in place. The Supreme Court declined to hear an appeal of the ruling.
[55] Statement by John F. Walsh, U.S. Attorney for the District of Colorado, testimony before the U.S. Senate Committee on the Judiciary, Washington, DC, February 27, 2013, 3. See also Police Executive Research Forum, *Guns and Crime: Breaking New Ground By Focusing on the Local Impact,* May 2010; "Target: Law Enforcement," *Violence Policy Center,* February 2010; Statement of Kristen Rand, Legislative Director, Violence Policy Center Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Hearing on Firearms Trafficking on the U.S.—Mexico Border, June 30, 2011, at https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/migrated/images/user_images/gt/stories/MINORITY/630%20gun%20forum/VPC--Kristen%20Rand%20Testimony%206-30-11.pdf ; Arindrajit Dube, Oeindrila Dube, and Omar Garcia-Ponce, "Cross-Border Spillover: U.S. Gun Laws and Violence in Mexico," *American Political Science Review* 107(August 2013): 397-417.
[56] George W. Knox, et al., "Gangs and Guns," National Gang Crime Research Center, 2001, 35, 36, at https://cops.usdoj.gov/html/cd_rom/solution_gang_crime/pubs/gangsandgunsataskforcereport2001.pdf  According to the Report: "Four social contexts were used for the survey: eight county jails from the farmland to the urban central area (891 inmates), matched pair design samples from a Chicago public high school and an inner city program, and a sample of gang members in a private suburban probation program." (2)
[57] Diaz, *Making a Killing,* 131; Philip J. Cook and Kristin A. Goss, *The Gun Debate* (New York: Oxford University Press, 2014), 13.

### 4.      High Capacity Magazines

51.      A study of 62 mass shootings found that high-capacity magazines (those holding more than ten rounds) were used in at least 31 of these instances. The preference for magazines holding more rather than fewer rounds underscores the utility of less reloading for those seeking to kill multiple people.[58]

52.      A study of 133 mass shootings from 2009 to 2015 found that shooting incidents involving high-capacity magazines resulted in 155 percent more people shot, and 47 percent more deaths, than in those instances where the perpetrators did not use such magazines.[59]

53.      In 2011, then-Arizona Congresswoman Gabrielle Giffords was shot in the head by a deranged man at a public event. Giffords survived the attack. In 2013, Giffords' husband, Mark Kelly (a former Navy captain and astronaut) offered this account of his wife's shooting in congressional testimony, indicating how the shooter's larger capacity magazines resulted in more deaths and injuries:

> The shooter in Tucson showed up with two 33-round magazines, one of which was in his 9 millimeter. He unloaded the contents of that magazine in 15 seconds. Very quickly. It all happened very, very fast. The first bullet went into Gabby's head. Bullet number 13 went into a nine-year old girl named Christina Taylor Green, who was very interested in democracy and our government, and really deserved a full life committed to advancing those ideas. If he had a 10-round magazine -- well, let me back up. When he tried to reload one 33-round magazine with another 33-round magazine, he dropped it. And a woman named Patricia Maisch grabbed it, and it gave bystanders a time to tackle him. I contend if that same thing happened when he was trying to reload one 10-round magazine with another 10-round magazine, meaning he did not have access to a high-capacity magazine, and the same thing happened, Christina Taylor Green would be alive today.[60]

54.      In a live shooting situation, shooters often succumb to the tension and confusion of the moment and take extra time, fumble or drop a magazine (as did the man who shot Giffords), or commit other errors that open the door to intervention. Even some gun rights supporters draw the line at large capacity magazines. According to one gun rights supporter, otherwise critical of the assault weapons ban: "Can anyone think of a really good reason to have a magazine that holds more than 10 rounds?"[61]

---

[58] Mark Follman and Gavin Aronsen, "'A Killing Machine': Half of All Mass Shooters Used High-Capacity Magazines," *Mother Jones,* January 30, 2013, at http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings/; Ashley Cannon, "Mayhem Multiplied: Mass Shooters and Large-Capacity Magazines," Citizens Crime Commission of New York City, May 2014.

[59] Everytown for Gun Safety, "Analysis of Recent Mass Shootings," August 2015, 4, at https://everytownresearch.org/documents/2015/09/analysis-mass-shootings.pdf

[60] "Senate Judiciary Committee Hearing on Gun Violence," January 30, 2013, at http://articles.washingtonpost.com/2013-01-30/politics/36628109_1_gun-violence-gabby-giffords-senator-grassley

[61] Jim Barrett, "Assault Weapons Bans: Are You Ready?" *TheTruthAboutGuns.com,* June 8, 2012, at http://www.thetruthaboutguns.com/2012/06/jim-barrett/assault-weapons-bans-are-you-ready/

55. Assault weapons and large capacity magazines play a disproportionately large and therefore adverse role in mass shootings, police killings, and among gangs and gang activity.

## C.   Assault Weapons and Self-Defense

56. In theory, any firearm can be used for self-defense, including assault weapons. Yet even if all assault weapons disappeared, Americans would still have thousands of models and hundreds of millions of guns to choose from for self-defense purposes. Handguns are, however, the clear choice for those citizens seeking a gun for self-protection, and they were identified specifically by the Supreme Court as the self-defense firearm of choice for use in the home.[62]

57. Americans consistently report self-defense as the primary reason for obtaining a handgun. For self-defense purposes, an assault weapon has some obvious limitations. Its length, compared with a handgun, makes it more unwieldy to deploy in the often tight confines of a home. It requires two hands to handle and operate. The higher velocity of the smaller caliber bullets assault weapons fire means that it is more likely that rounds fired may enter nearby buildings, automobiles, and the like, resulting in unintended damage, injury, and even death. And within the confines of a person's home, long guns contribute nothing to accuracy of fire, which is largely determined by the ability of the shooter to deal successfully with the stress and surprise of an actual confrontation with an intruder. A handgun is also preferable in such situations because only one hand is necessary to train the weapon on a target, whereas an assault weapon or other long gun requires two hands, a fact noted by Justice Scalia in the majority opinion in the *Heller* case.[63]

58. Further, actual civilian gun self-defense situations do not involve anything resembling a protracted firefight necessitating the ability to fire many rounds without reloading. A study of self-defense shootings based on data cumulated by the National Rifle Association's Institute for Legislative Action conducted by Lucy P. Allen of National Economic Research Associates (NERA) examined data from the NRA's "armed citizen" stories—accounts compiled in a database of private citizens who use guns for self-defense. Data compiled from 1997-2001, and from 2011-2013, found that during the first time period defenders fired an average of 2.2 shots, and in 28 percent of these instances, defenders fired no shots (i.e. mere display of a weapon stopped or thwarted the incident). For the second time period, the average number of shots was 2.1, and no shots were fired in 16 percent of the instances. For this later time period, there were no instances in which the defender fired as many as ten shots or more.[64] Given the

---

[62] *D.C. v. Heller* (554 U.S. 570; 2008).

[63] ". . .the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason . . .handguns are the most popular weapon chosen by Americans for self-defense in the home. . . ." *Heller* at 629.

[64] Lucy P. Allen, Declaration submitted in the case of *Kolbe et al. v. O'Malley et al.,* Case No. 1:13-cv-02841-CCB, U.S. District Court for the District of Maryland, filed 2/14/14. The data reported in this Declaration did not include the maximum number of rounds fired in incidents reported and compiled from 1997-2001. It also did not report the

NRA's well known positions favoring gun ownership and use for self-defense and the non-random, self-selecting nature of the data, one may assume that it likely represents the most positive face of gun self-defense uses.

59.     Assault weapons offer, at best, no advantages for personal self-defense uses, and in certain respects are less useful for personal self-defense than handguns.

### D.     Assault Weapons' Firing Traits and Injury

60.     The ammunition fired by assault rifles is smaller caliber and exits the barrel at a very high velocity (often between 3000 and 3500 feet per second)—higher than do rounds fired by typical small-game hunting rifles or handguns.[65] A study by physicians who performed autopsies on soldiers killed by gunfire in Iraq reported that rounds fired at a speed greater than 2500 feet per second resulted in "a shock wave of compression" passing through the victim that caused catastrophic injuries even in locations distant from the direct bullet shot.[66] In the case of assault weapons' higher muzzle velocity combined with expanding bullets, the damage to the human body is magnified because once they enter the body, "they fragment and explode, pulverizing bones, tearing blood vessels and liquefying organs."[67]

61.     To cite a different comparison: "Compare the damage an AR-15 and a 9mm handgun can do to the human body: 'One looks like a grenade went off in there,' says Peter Rhee, a trauma surgeon at the University of Arizona. 'The other looks like a bad knife cut.'" Even though an assault rifle round is small, its greater speed increases its kinetic energy, which is "equal to one-half the mass of the bullet times its velocity squared." Even if the bullet does not fragment, its velocity causes "cavitation"—the shock wave previously described—that causes devastating injury away from the bullet's direct path.[68] The ability of assault weapons, especially with high capacity magazines, to deliver numerous rounds rapidly multiplies the prospect of even greater injury. Trauma surgeons and those who treat battlefield wounds are well aware of the greater destructive features of AR-15-type inflicted wounds.[69]

---

number of incidents on which the 1997-2001 study was based, but did report that the 2011-2013 study was based on 279 incidents.

[65] Yasser S. Selman, "Medico-legal Study of Shockwave Damage by High Velocity Missiles in Firearm Injuries," *Journal of the Faculty of Medicine, Baghdad* 53(October 2011): 401-5.

[66] Selman, "Medico-legal Study of Shockwave Damage by High Velocity Missiles in Firearm Injuries."

[67] Leana Wen, "What Bullets Do To Bodies," *New York Times,* June 15, 2017, at https://www.nytimes.com/2017/06/15/opinion/virginia-baseball-shooting-gun-shot-wounds.html?_r=0; Ryan Hodnick, "Penetrating Trauma Wounds Challenge EMS Providers," *Journal of Emergency Medical Services,* March 30, 2012, at http://www.jems.com/articles/print/volume-37/issue-4/patient-care/penetrating-trauma-wounds-challenge-ems.html

[68] Sarah Zhang, "What an AR-15 Can Do to the Human Body," *Wired,* June 17, 2016, at https://www.wired.com/2016/06/ar-15-can-human-body/

[69] Tom Avril, "Doctors: High-velocity Orlando Rifle Inflicts 'Devastating' Wounds," *Philadelphia Inquirer* June 16, 2016, at http://www.philly.com/philly/health/science/20160616_Doctors__High-velocity_Orlando_rifle_inflicts__quot_devastating_quot__wounds.html; Hodnick, "Penetrating Trauma Wounds."

62.     In sum, therefore, it is my considered opinion, based on my thirty years of studying the many elements of gun policy and the national gun issue, and based specifically on my research related to assault weapons, and the aforementioned information, that the Massachusetts law restricting assault weapons and large capacity magazines has the potential to limit and reduce shooting injuries and deaths in the state over the long run. In doing so, the law is likely to advance the state's abiding interest in reducing the harms caused by gun violence.

I am being compensated by the Massachusetts Attorney General's office at the rate of $200 per hour. I have not testified at trial or provided any deposition or declaration as an expert witness in the last four years.

DATE: 9/15/17

Robert J. Spitzer, Ph.D.

17

January 2017

## Curriculum Vitae

**Robert J. Spitzer**

**Distinguished Service Professor**

<u>Office</u>: Political Science Department     <u>Home</u>: 23 West Court St.
SUNY Cortland, Box 2000                Cortland, New York 13045
Cortland, New York 13045            (607) 756-6756
(607) 753-4106
Robert.spitzer@cortland.edu
FAX: 607-753-5760

<u>Education</u>:     A.B. (Political Science), <u>summa cum laude</u>, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.


<u>Positions Held</u>:

Department Chair, SUNY Cortland, 2008-present.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997 to present.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-
1990, 1992-present.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985,
1986, 1988.
Copy Editor, <u>Administrative Science Quarterly</u>, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.


<u>Honors</u>:

Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor
of the Year Award for 2013.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
Winner, State University of New York's Chancellor's Excellence in Scholarship and
    Creative Activities Award, 2003.
SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi
    Kappa Phi, 1994-95.
Winner, New York State/United University Professions Excellence Award, 1991, for
    "outstanding professional performance and superior service."
Member, New York State Commission on the Bicentennial of the U.S. Constitution,
    1986-1990.
Member, New York State Ratification Celebration Committee for U.S. Constitution
Bicentennial, 1987-88.
Member, National Bicentennial Competition on the Constitution and the Bill of Rights,
    1987-1991.
Who's Who in the World, 1996.
Dictionary of International Biography, 1995.
Who's Who in the East, 1995-96; 1997-98
Ex officio member, Cortland County Bicentennial Committee, 1987-89.
Chair, SUNY Cortland Bicentennial Committee, 1987-89.
Phi Eta Sigma, SUNY Cortland, 1994.
Phi Kappa Phi, SUNY Cortland, 1990.
Men of Achievement (1986)
Contemporary Authors, vol. 112 (1985) and subsequent updates.
International Authors and Writers Who's Who, 1985-present.
International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.


Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008,
2009, 2014.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the
Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents
and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton
L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and
New York State Politics, 1983.

SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.


Publications and Papers:

    Books:

    The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

    The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

    The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

    Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

    President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

    Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

    The Politics of Gun Control (New York: Chatham House, 1995; second edition, 1998; third edition, CQ Press, 2004; fourth ed. 2008; fifth ed., Paradigm Publishers 2012; sixth ed., Paradigm/Routledge, 2015; seventh ed., Routledge, 2017). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors,

interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:

Daniel Hoffman, Our Elusive Constitution, (1997)

Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)

Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)

Robert Spitzer, ed., Politics and Constitutionalism, (2000)

Laura Langer, Judicial Review in State Supreme Courts (2002)

Ian Brodie, Friends of the Court (2002)

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2002)

Artemus Ward, Deciding to Leave: The Politics of Retirement from the United States Supreme Court (2003)

James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)

Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).

Stephen Kershnar, Justice for the Past (2004).

Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).

Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform (2006).

Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).

Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).

David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).

Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).

Robert Blomquist, The Quotable Judge Posner (2010).

Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).

Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).

Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).

Stephen A. Simon, <u>Universal Rights and the Constitution</u> (2014).
Kirk A. Randazzo and Richard W. Waterman, <u>Checking the Courts</u> (2014).
Anthony Maniscalco, <u>Public Spaces, Marketplaces, and the Constitution</u> (2015).
Goirgi Areshidze et al., <u>Constitutionalism, Executive Power, and the Spirit of Moderation</u> (2016).
Peter J. Galie, et al., eds., <u>New York's Broken Constitution</u> (2016).

Book Series Editor, <u>Presidential Briefing Books</u>, Transaction Books, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)

Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.

<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006).  Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, <u>American Government: Freedom and Power</u> (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed.

"Executive Vetoes," in <u>Encyclopedia of the American Legislative System</u>, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in <u>The Presidency and the Persian Gulf War</u>, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in <u>The Presidency Reconsidered</u>, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in <u>Understanding the Presidency</u>, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the <u>Encyclopedia of the American Presidency</u>, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the <u>Encyclopedia of the United States Congress</u>, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in <u>The Constitution and the Conduct of American Foreign Policy</u>, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in <u>The Executive Office of the President</u>, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the <u>Oxford Historical Guide to American Government</u> (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in <u>Liberty Under Law</u>, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for

2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in <u>The Oxford Companion To United States History</u> ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in <u>The Presidency and the Law: The Clinton Legacy</u>, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois,

Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the Encyclopedia of the American Presidency, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for The Encyclopedia of New York State, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," Transformed By Crisis: The Presidency of George W. Bush and American Politics, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in Debating the Presidency, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in Thinking About the Presidency, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Executing the Constitution, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in Social Issues in America: An Encyclopedia, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," The Presidency and the Challenge of Democracy, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," Encyclopedia of American Civil Liberties, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in Leadership at the Crossroads, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

"Liberals and the Presidency," Contending Approaches to the American Presidency, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" The American Presidency in the 21st Century, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in Governing America, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for Issues: Understanding Controversy and Society, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," Encyclopedia of Applied Ethics, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" Winning the Presidency 2012, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." American Government. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" A True Third Way? Domestic Policy and the

<u>Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).


<u>Articles</u>:

"Jamestown:  Anatomy of an All-American City," <u>Sunday Buffalo Courier Express Magazine</u>, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, <u>The Journal of Politics</u>, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," <u>Presidential Studies Quarterly</u>, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," <u>Presidential Studies Quarterly</u>, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," <u>National Civic Review</u>, 73 (July/August, 1984): 321-328.

"More Parties Mean Better Parties," <u>Party Line</u>, 17 (September 1984).

"Shooting Down Gun Myths," <u>America</u>, June 8, 1985, pp. 468-69.  Reprinted in: the <u>Des Moines Register</u>, October 24, 1985;  <u>Criminal Justice</u>, ed. by Susan Bursell (St. Paul, MN:  Greenhaven Press, 1986); <u>U.S. News and World Report</u> educational study unit on Gun Control, April/May, 1987; <u>Gun Control</u>, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and <u>The Informed Argument</u>, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," <u>America</u>, June 15, 1985.

"The Item Veto Reconsidered," <u>Presidential Studies Quarterly</u> 15(Summer, 1985):

611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June, 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23 (December, 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March, 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2  (Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15.  Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the Emerson Case," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 101-139.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.


Op-Ed Articles

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," <u>Rochester Times Union</u>, September 14, 1987.

"The Great Gun Fallacy," <u>Syracuse Post-Standard</u>, March 30, 1989.

"Four Cases on Right to Bear Arms," <u>Syracuse Post-Standard</u>, April 22, 1989.

"Don't Start Line-Item Veto," <u>Syracuse Post-Standard</u>, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," <u>Syracuse Post-Standard</u>, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," <u>Los Angeles Times</u>, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," <u>Intellectual Capital</u>, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," <u>Intellectual Capital</u> 5(February 10-17, 2000).

"Gun Control After Columbine," <u>Intellectual Capital</u> 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," <u>The Catholic Review</u>, March 30, 2000.

"Why Would Anyone Want the Job Now?" <u>Chicago Tribune</u>, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," <u>Syracuse Post-Standard</u>, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," <u>Syracuse Post-Standard</u>, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard, June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington*

*Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7,

2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post online,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post, PostEverything,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Gun Rules and Rights: Where's the Problem?" CLOG,

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants To Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

<u>Testimony, Briefs, and Reports</u>:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, January, 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and <u>Sine Die</u> Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u>, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, amicus curiae brief in the case of *Nordyke v. King*, in the U.S. Court of Appeals, Ninth Circuit, filed June 6, 2003.

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago* (130 S.Ct. 3020), U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010.

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the

National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.


Papers and Presentations (not including those given on the Cortland campus):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24,

1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the <u>Washington Post</u>, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham

School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University,

Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22,

2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.


Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political

Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and

Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.


Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the

<u>American Political Science Review</u>, December, 1983.

<u>A Case of Third Party Activism</u>, by James Canfield, reviewed in <u>Perspective</u>, July-August, 1984.

<u>Winners and Losers:  Campaigns, Candidates and Congressional Elections</u>, by Stuart Rothenberg, reviewed in the <u>American Political Science Review</u>, December, 1984.

<u>The Political Presidency</u>, by Barbara Kellerman, reviewed in <u>Perspective</u>, January-February, 1985.

<u>Presidents and Promises</u>, by Jeff Fishel, reviewed in the <u>American Political Science Review</u>, December, 1985.

<u>The Elections of 1984</u>, ed. by Michael Nelson, reviewed in <u>Perspective</u>, May/June, 1985.

<u>Economic Conditions and Electoral Outcomes</u>, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in <u>Perspective</u>, May/June, 1986.

<u>Presidential Transitions:  Eisenhower Through Reagan</u>, by Carl M. Brauer, in <u>Perspective</u>, January/February, 1987.

<u>Religion and Politics in the United States</u>, by Kenneth D. Wald, in <u>Journal for the Scientific Study of Religion</u>, September, 1988.

<u>Abortion and Divorce in Western Law</u>, by Mary Ann Glendon, in <u>The Annals of the American Academy of Political and Social Science</u>, September, 1988.

<u>The American Political Economy</u>, by Douglas Hibbs, in <u>Perspective</u>, Spring, 1988.

<u>God in the White House</u>, by Richard G. Hutcheson, Jr., in <u>Perspective</u>, Fall, 1988.

<u>The Reagan Legacy</u>, Charles O. Jones, ed., in <u>Social Science Quarterly</u>, June, 1989.

<u>Dilemmas of Presidential Leadership From Washington Through Lincoln</u> by Richard Ellis and Aaron Wildavsky, in <u>Perspective</u>, September, 1989.

<u>Taming the Prince</u> by Harvey Mansfield, Jr., in <u>Governance</u>, April, 1990.

<u>Public Policy and Transit System Management</u>, ed. by George M. Guess, in <u>Perspective</u>, Spring, 1991.

<u>The Myth of Scientific Public Policy</u>, by Robert Formaini, in <u>Perspective</u>, Winter, 1992.

<u>The Bush Presidency: First Appraisals</u>, ed. by Colin Campbell and Bert Rockman in <u>Public Administration Review</u>, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour With Jim Lehrer"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann" and "All In With Chris Hayes," "Fresh Air With Terry Gross," "The Diane Rehm Show," NPR; NHK Television (Japan); documentary film "Guns and Mothers,"

broadcast nationwide on PBS in 2003. Quoted in or by the <u>New York Times</u>, the <u>Washington Post</u>, <u>Time Magazine</u>, <u>Newsweek</u>, <u>Der Spiegel</u> (Germany), <u>USA Today</u>, the <u>Los Angeles Times</u>, the <u>Wall Street Journal</u>, the <u>Christian Science Monitor</u>, the <u>Boston Globe</u>, the <u>Chicago Tribune</u>, the <u>Philadelphia Inquirer</u>, the <u>Miami Herald</u>, <u>Houston Chronicle</u>, the <u>St. Louis Post-Dispatch</u>, <u>San Francisco Chronicle</u>, the <u>Dallas Morning News</u>, the <u>Baltimore Sun</u>, the <u>Detroit Free Press</u>, the <u>Seattle Post-Intelligencer</u>, <u>Newsday</u>, the <u>Denver Post</u>, <u>Kansas City Star</u>, <u>Dallas News</u>, <u>Pittsburgh Post-Gazette</u>, <u>New Orleans Times Picayune</u>, <u>Orlando Sentinel</u>, <u>Columbus Dispatch</u>, <u>Buffalo News</u>, <u>San Jose Mercury News</u>, <u>Albany Times-Union</u>, <u>St. Petersburg Times</u>, <u>Arkansas Democrat-Gazette</u>, <u>Newark Star-Ledger</u>, <u>Bergen Record</u>, <u>Congress Daily</u>, <u>The Hill</u>, <u>CQ Report</u>, <u>Rolling Stone</u>, <u>The Nation</u>, <u>Ladies Home Journal</u>, the <u>National Journal</u>, <u>The Spectator</u>, <u>Legal Times</u>, <u>Financial Times</u>, <u>Toronto Globe</u>, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from September 2002-present. A half hour discussion of the week's events conducted by five academics from area colleges. Weekly political commentator on WHCU (Ithaca) and WSYR (Syracuse); invited regular guest blogger for *The Huffington Post*, 2009-present.


Professional Associations:

     Scholars Strategy Network.
     American Political Science Association.
     Center for the Study of the Presidency.
     Presidents and Executive Politics Section (formerly the Presidency Research Group),
          APSA; served on Governing Board of PRG, 1991 to 2003.
     New York Political Science Association.
     Pi Sigma Alpha.
     Phi Kappa Phi.


<u>Teaching Areas</u>:

     <u>American Government</u>:  courses taught include Introduction to American Government,
          The Legislative Process, Political Parties and Interest Groups, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

<u>Public Policy</u>:  courses taught include Introduction to Public Policy.  Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.


<u>Teaching-Related Awards</u>:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)


<u>Other Professional Activities</u>

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, <u>PRG Report</u>, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics,
     American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-
Hill, St. Martins, W.W. Norton, Cambridge University Press, Pearson Longman, Allyn & Bacon,
Palgrave/Macmillan, Princeton University Press, Texas A&M University Press, Chatham House,
CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press,
University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield,
University of Alabama Press, American Political Science Review, Comparative Politics,
American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political
Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science
Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative
Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal,
Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics
and Policy, and the National Science Foundation.


Selected Community Service

Member, City of Cortland Planning Commission, 2009-2012.

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present;
for Chenango County, 1997-present; for Tompkins County, 1997-present; for Madison County,
2006-present.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's Odyssey 2010
Project, 1996.