Confidential

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X
DAVID SETH WORMAN, et al.,       :
                                 :
            Plaintiffs           : Case No:
                                 : 1:17-cv-10107-WGX
            -vs-                 :
                                 : Pages 1 - 295
CHARLES D. BAKER, et al.,        :
                                 :
            Defendants           :
---------------------------------X

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Deposition of James E. Yurgealitis

Washington, D.C.

Monday, November 20, 2017

Reported by: Kathleen M. Vaglica, RPR, RMR
Job No: 353424

MAGNA LEGAL SERVICES

(866) 624-6221



Confidential

Page 26

1  countries where there's, the closest decent medical
2  facility would have been a Med-Evac flight to
3  Europe; and, secondly, my first wife at the time was
4  finishing up graduate school and wanted to get
5  started with her career.
6        And then, thirdly, I was becoming more
7  interested in criminal investigative work as opposed
8  to working so much protective, protective work.
9     Q.   While you were with the Secretary of
10 State's Protective Division, did you, personally,
11 conduct any studies relating to firearms, crime, or
12 self-defense?
13    A.   No.
14    Q.   Did you have any exposure to firearms
15 while you were growing up?
16    A.   Yes.
17    Q.   And what was your experience with firearms
18 prior to reaching adulthood?
19    A.   Either target shooting with my father,
20 with friends, with friends of, with parents of my
21 friends, and with friends.
22    Q.   Did you ever go hunting?



Confidential

Page 27

```
 1      A.   No.
 2      Q.   Did anyone in your family hunt?
 3      A.   My grandfather did.
 4      Q.   You never went with him?
 5      A.   No.
 6      Q.   Any of your friends growing up hunt?
 7      A.   Yes.
 8      Q.   You never went with them?
 9      A.   No.
10      Q.   What firearms did you target shoot with?
11      A.   Pistols, rifles, shotguns of various
12   calibers.
13      Q.   All right.  Did you -- the pistols were
14   semiautomatic?
15      A.   Semiautomatic, as well as revolvers.
16      Q.   All right.  And the semiautomatic pistols
17   that you used, do you recall what capacity magazines
18   they had?
19      A.   Whatever the standard capacity magazine
20   would have been in the 1970s and 1980s for those
21   particular firearms.
22      Q.   Do you recall the make and model of any of
```



Confidential

Page 81

1      THE WITNESS: I can't recall any specific
2  conversations.
3  BY MR. SWEENEY:
4      Q. And do you ever recall telling them about
5  any similarity test to determine whether or not a
6  firearm was a copy or duplicate of a named banned
7  firearm?
8      MR. KLEIN: Objection.
9      THE WITNESS: No.
10 BY MR. SWEENEY:
11     Q. And do you ever recall telling them about
12 using an interchangeability test to determine
13 whether or not any firearm was a copy or duplicate
14 of a named banned firearm?
15     MR. KLEIN: Objection.
16     THE WITNESS: No.
17 BY MR. SWEENEY:
18     Q. Have you ever published any articles on
19 firearms use in crime or self-defense?
20     A. No.
21     Q. Have you ever been asked to make a formal
22 presentation anywhere on firearms in self-defense?



Confidential

Page 82

```
1      A.    Specifically on that subject, no.
2      Q.    What is the Public Safety and Recreational
3    Firearms Use Protection Act?
4      A.    Are you referring to what -- which portion
5    of it?  Or the entire, the entire law?
6      Q.    What's your understanding of what that law
7    is?
8      A.    Well, it included, as far as my work was
9    concerned, the banning of rifles with certain
10   features or firearms with certain features.  I
11   shouldn't say just rifles.
12     Q.    And what were those features?
13     A.    Firearms with detachable magazines that
14   had either a provision to attach a grenade launcher,
15   a pistol grip, a collapsible stock, a bayonet lug, a
16   flash hider.  It also included restrictions on
17   magazine capacity for magazines manufactured after
18   the enactment of the law.
19     Q.    In your time at the ATF, did you make a
20   study of recovered crime guns to determine what
21   kinds of firearms were used in crimes?
22           MR. KLEIN:  I'm sorry.  Can you repeat
```



MAGNA
LEGAL SERVICES

Confidential

Page 85

```
1     A.    Perhaps ten.
2     Q.    Are any of those family members?
3     A.    Yes.
4     Q.    How many of them were family members?
5     A.    Two or three.
6     Q.    Were the others personal friends?
7     A.    Friends or relatives of friends.
8     Q.    And are you a certified instructor in
9  self-defense?
10    A.    No.
11    Q.    Other than whatever training you received
12 in your government service, have you received any
13 training in self-defense?
14    A.    Firearms self-defense or --
15    Q.    Firearms or without firearms.  Any
16 training other than what you received in government
17 service.
18    A.    Yes, just some physical non-firearm
19 self-defense training.  I've taken classes from time
20 to time.
21    Q.    Would you call yourself proficient in
22 non-firearms self-defense?
```



Confidential

Page 100

```
1    Q.   Are you a gunsmith?
2    A.   No.
3    Q.   Are you an expert in statistics?
4    A.   No.
5    Q.   Have you ever designed a firearm or an
6    accessory to a firearm?
7    A.   No.
8    Q.   Are you an expert in ballistics?
9    A.   No.
10   Q.   And am I correct in understanding that you
11   don't consider yourself an expert on the effects of
12   firearms laws that restrict whether firearms --
13   scratch that.
14        Let's take a break.
15        (Whereupon, a short recess was taken from
16   11:02 to 11:15 a.m.)
17   BY MR. KLEIN:
18   Q.   Have you ever performed any research on
19   the criminal use of assault weapons or the capacity
20   of magazines used in crime?
21        MR. KLEIN:  Objection.
22        THE WITNESS:  Yes.
```



Confidential

Page 105

1   of that which was posted.
2   BY MR. SWEENEY:
3       Q.  All right.  Are you an expert in firearms
4   history?
5       A.  I'm not an expert, no.  In other words,
6   I'm not a firearms historian.
7       Q.  Like Jim Supica, for example, you mention
8   in your report.  He's a firearms historian; correct?
9       A.  Yes.
10      Q.  Have you had any classroom training on
11  firearms history?
12      A.  Yes.
13      Q.  And what has that been?
14      A.  In numerous classes that are provided by
15  ATF during the National Firearms Examiner Academy.
16  Multiple times, actually, that I have sat in on the
17  same classes.
18          I've also been present during factory
19  tours conducted by either corporate historians or
20  engineering personnel for those manufacturing
21  companies where we were given a presentation of that
22  company's history and the development of their



Confidential

Page 106

1  firearms, whether it be from an engineering
2  perspective or from a purely historical perspective.
3      Q.   And have you had any experience teaching
4  or instructing on firearms history yourself?
5      A.   No.
6      Q.   Has anyone come to you for your opinions
7  on firearms history?
8      A.   In an academic sense, no.
9      Q.   In any sense?
10     A.   Questions relative to firearms as to
11 whether or not they were considered firearms or
12 curios and relics.  I've given people opinions
13 before.
14     Q.   Informally?
15     A.   Informally.
16     Q.   And that would be whether it is a firearm
17 which would be regulated under certain regulations
18 or exempt because it is a curio or antiquated?
19     A.   Correct.
20     Q.   And you haven't had an instruction --
21 scratch that.  You haven't had any experience
22 teaching or instructing in ballistics; am I correct?



Confidential

Page 116

```
 1   the definition of firearm.  Am I correct that the
 2   lower receiver of an AR style rifle is a firearm
 3   under federal law all by itself?
 4        A.   Yes.
 5        Q.   Is it also a firearm under Massachusetts
 6   law?
 7        A.   I presume so.  I don't know for a fact,
 8   but I'm not an expert in Massachusetts firearms
 9   legislation.
10        Q.   All right.  Turning to page five of your
11   report, you discuss in the cycle of fire various
12   mechanisms involved in the locking phase of the
13   cycle; am I correct?  On paragraph number three at
14   the top of that page.
15        A.   Yes.
16        Q.   And is that description generally
17   applicable to all kinds of firearms, regardless of
18   whether they are revolvers, bolt-action rifles, or
19   semiautomatic rifles or handguns?
20        A.   Generally.
21        Q.   Turning to page seven, you have a
22   definition of semiautomatic as a classification of
```



Confidential

Page 192

1          MR. KLEIN:  Objection.
2          THE WITNESS:  Well, it says that any of
3  the firearms or copies or duplicates of these
4  firearms, and then it goes on to list a number of
5  firearms that are named.
6  BY MR. SWEENEY:
7      Q.   Right.
8      A.   I don't know what the vernacular would
9  have been for that list, you know.  I think they
10 were just generally referred to as banned assault
11 weapons or weapons banned under the legislation or
12 under the law.
13     Q.   All right.  And under the federal ban
14 there's no definition of copies or duplicates; am I
15 correct?
16         MR. KLEIN:  Objection.
17         THE WITNESS:  Not that I'm aware of, no.
18 BY MR. SWEENEY:
19     Q.   And all your time working in the ATF, did
20 the ATF ever develop a definition of copies or
21 duplicates for the Federal Assault Weapons Ban?
22         MR. KLEIN:  Objection.



Confidential

Page 193

1      THE WITNESS:  I don't know.
2  BY MR. SWEENEY:
3      Q.  You've never seen one?
4      A.  I don't recall seeing a specific, a
5  specific list.
6      Q.  Any list at all?  Any effort by the ATF to
7  define the term "copies or duplicates" in the
8  Federal Assault Weapon Ban?  Are you aware of it at
9  all?
10     A.  As I just stated, if they did, I am
11  unaware of it.
12     Q.  And are you familiar with the legislative
13  history behind the copies and duplicate provision of
14  the Federal Assault Weapons Ban?
15     A.  What do you -- by the term "legislative
16  history," I don't follow you.  Do I know why or who
17  or whatever, why it was put together or who put it
18  together or who sponsored the legislation?
19     Q.  Do you know anything about the legislative
20  intent behind the language copies or duplicates?
21         MR. KLEIN:  Objection.
22  BY MR. SWEENEY:



```
1      Q.    Directing your attention to the bottom of
2   page 30, top of 31 of your report, paragraph number
3   66, you say "Since the passage of the Commonwealth's
4   AWB," and that's your shorthand for Assault Weapon
5   Ban; correct?
6      A.    Correct.
7      Q.    "Manufacturers have marketed cosmetically
8   reconfigured banned firearms."  What is the source
9   of your information for that statement?
10     A.    My training, knowledge, and experience.
11     Q.    In Massachusetts?
12     A.    No.  In looking at the features that are
13  banned in Massachusetts and looking or examining
14  rifles and firearms that are deemed
15  Massachusetts-compliant firearms or marketed as
16  Massachusetts-compliant firearms.
17     Q.    Right.  And what information do you have
18  about what firearms were marketed as Massachusetts
19  compliant?
20     A.    Well, I've seen firearms at the AR-15 type
21  rifles at the Smith & Wesson factory, MP15s that
22  were designated as Massachusetts compliant.
```



Confidential

Page 198

```
 1        Q.   You saw those words on the firearms that
 2   you inspected in those factories?
 3        A.   No.  I didn't say that I'd seen them on
 4   the firearms.  I have seen firearms that are
 5   marketed as Massachusetts-compliant firearms.
 6        Q.   And where have you seen the marketing of
 7   them as Massachusetts compliant?
 8        A.   Oh, on, you know, online firearms dealer
 9   websites, etc.
10        Q.   And since you were retained by the
11   Commonwealth of Massachusetts in July of 2016, have
12   you done any survey, report, or study with respect
13   to the firearms that are marketed as Massachusetts
14   compliant?
15        A.   No.
16        Q.   Can you tell me how many manufacturers
17   marketed firearms as Massachusetts compliant?
18        A.   I don't have a specific number for you,
19   no.
20        Q.   Do you have a general number?
21        A.   No.  I've seen numerous firearms marketed
22   as Massachusetts compliant AR-type rifles.
```



Confidential

Page 199

```
1      Q.   But you haven't conducted any study to
2   determine which manufacturers and how many and which
3   models and how many; correct?
4      A.   No.
5      Q.   And did you get any such information from
6   the Commonwealth of Massachusetts when they retained
7   you?
8      A.   No.
9      Q.   Did you ask for it?
10     A.   No.
11     Q.   Now, you go on to say "Removal" -- oh,
12  isn't it also in your report that manufacturers also
13  marketed cosmetically reconfigured firearms banned
14  under the federal ban?
15     A.   Yes.
16     Q.   And did you, while you were at the ATF,
17  arrest anyone, serve a search warrant on anyone, or
18  participate in the prosecution of anyone for doing
19  that in violation of the federal ban?
20          MR. KLEIN:  Objection.
21          THE WITNESS:  As I stated before when you
22  had asked the question about whether I had testified
```



Confidential

Page 205

1   Q.   From where were they derived?  What's the
2   source of them?  How did they come about?  How did
3   they come into being?  What's your understanding?
4        MR. KLEIN:  Objection.  One question at a
5   time.
6        MR. SWEENEY:  Sure.  Sure.  That's a fair
7   objection.  I'll even allow a speaking objection on
8   that one.  Let me ask you one question.  Go back.
9        THE WITNESS:  Let me answer what you asked
10  before.  No, I had not seen this before I was
11  contacted from Mr. Klein, and I do not know from
12  whence these guidelines came.
13  BY MR. SWEENEY:
14  Q.   All right.  Did you ask anyone where did
15  these tests come from?
16  A.   No.
17  Q.   Were you asked to provide any training for
18  law enforcement officers in Massachusetts
19  interpreting the two tests that are set forth in the
20  guidance for copies or duplicates in the Notice of
21  Enforcement?
22  A.   No.

