# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DAVID SETH WORMAN, ANTHONY LINDEN, JASON WILLIAM SAWYER, PAUL NELSON CHAMBERLAIN, GUN OWNERS' ACTION LEAGUE, INC., ON TARGET TRAINING, INC., AND OVERWATCH OUTPOST,

*Plaintiffs*,

v.

MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts; DANIEL BENNETT, in his official capacity as the Secretary of the Executive Office of Public Safety and Security; and COLONEL KERRY GILPIN, in her official capacity as Superintendent of the Massachusetts State Police,

*Defendants*.

CIVIL ACTION
NO. 17-cv-10107-WGY

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, the defendants respond below to the plaintiffs' statement of undisputed material facts.

**General Responses**

**Materiality**. Whether an asserted fact is "disputed" or "undisputed" is not an admission as to materiality. *See Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247-48 (1986)) ("As to materiality, the substantive law will identify which facts are material."); *Aponte-Santiago v. Lopez-*

*Rivera*, 957 F.2d 40 (1st Cir. 1992) ("Only those disputes over facts that might affect outcome of case under applicable law are considered 'material' for summary judgment purposes.").

**Legislative facts**. Many of the plaintiffs' assertions concern legislative facts, rather than adjudicative facts. See Fed. R. Evid. 201, Advisory Committee's note ("Legislative facts . . . are those which have relevance to legal reasoning and the lawmaking process . . . ."). In this challenge to the constitutionality of a state law, "the issues presented are . . . legal in character" but informed by legislative facts "bearing upon the rationality or adequacy of distinctions drawn by [the] statute[]." *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 7 (1st Cir. 2012). Unlike adjudicative facts, "'legislative facts,' which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs, the ordinary limits on judicial notice having no application to legislative facts." *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999). *See Mass. v. U.S. Dep't of Health & Human Servs.*, 682 F.3d at 7 (legislative facts are "normally noticed by courts with the assistance of briefs, records and common knowledge"). As this Court explained in another constitutional case, questions of legislative fact are not determined at trial. *Cotter v. City of Boston*, 193 F. Supp. 2d 323, 341 n. 8 (D. Mass. 2002) (Young, J.) (a determination that involves consideration of legislative facts "is one for the Court to make, not the jury"), *modified on other grounds* 323 F.3d 160 (1st Cir. 2003). Even though the defendants dispute much of the legislative-fact information that the plaintiffs have asserted in their Rule 56.1 Statement, summary judgment remains the appropriate vehicle for determination of the present case. Second Amendment challenges to the assault weapons bans in Maryland, New York, Connecticut, and the District of Columbia were all decided, and rejected, on motions for summary judgment, even though the parties made competing presentations of legislative fact. *See*, *e.g.*, *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc);

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*").

### Specific Responses

The defendants respond below to the plaintiffs' numbered statements of undisputed material facts, first setting forth the plaintiffs' statement and then providing the defendants' response.

    **A.    Massachusetts' 1998 Ban of "Assault Weapons" and "Large Capacity Feeding Devices" and the Attorney General's 2016 Notice of Enforcement.**

1.    Massachusetts' statutory ban prohibiting firearms, G. L. C. 140, §§ 121–131P, replicates the now-repealed federal prohibition against "assault weapons" and "large capacity feeding devices." *See* Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. § 921(a)(30) (1994) (the "Federal Ban").

<u>Defendants' Response</u>: Defendants dispute that Massachusetts has a statutory ban prohibiting "firearms." The Massachusetts law prohibiting possession and transfer of "assault weapons," G.L. c. 140, §§ 121, 131M, and the Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. § 921(a)(30) (1994), each speak for themselves.

2.    Massachusetts law defines the term "assault weapon" to have the same meaning as the term "semiautomatic assault weapon" as defined in the Federal Ban, and prohibits by name some of the most popular rifles and firearms in the country, including:

    (i)    Avtomat Kalashnikov (AK) (all models);
    (ii)    Action Arms Israeli Military Industries UZI and Galil;
    (iii)    Beretta Ar70 (SC-70);
    (iv)    Colt AR-15;
    (v)    Fabrique National FN/FAL, FN/LAR, and FNC;
    (vi)    SWD M-10, M-11, M-11/9, and M-12;
    (vii)    Steyr AUG;
    (viii)    INTATEC TEC-9, TEC-10, TEC-DC9, and TEC-22; and

<span style="padding-left: 2em;">(ix)</span>    revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12 .

(the "Enumerated Banned Firearms"), as well as their "copies or duplicates" that have two or more specified features (collectively, the "Banned Firearms"). G. L. C. 140 § 121; *see also* Klein Dep., Ex. 17 at 31:17–21.

<u>Defendants' Response:</u> Paragraph 2 does not require a response because it does not set forth an assertion of "fact" and the Massachusetts law defining "assault weapon," G.L. c. 140, § 121, speaks for itself.  Further, plaintiffs incorrectly paraphrase the law, which prohibits the enumerated firearms and their "copies or duplicates," and, independently, prohibits certain firearms with specified features. Defendants dispute the characterization of the enumerated weapons as "some of the most popular rifles and firearms in the country." The Plaintiffs have neither defined this characterization nor offered any citations in this paragraph to support it as required by Fed. R. Civ. P. 56(c).

3.    The phrase "copies or duplicates" is not defined in the Challenged Laws, nor is it defined elsewhere in Massachusetts law. *See* G. L. C. 140 § 121. The phrase also was included in the Federal Ban but was not defined under federal law either. *See* 18 U.S.C. § 921(a)(30) (1994).

<u>Defendants' Response:</u> Paragraph 3 does not set forth an assertion of "fact" but merely purports to characterize the cited statutes, which speak for themselves.

4.    As the Federal Ban was debated, however, Senator Joseph Biden of Delaware made clear that the term "copy" did not refer to any similarity of the firearm's operating system but to selling a named banned rifle under another name: "To avoid the so-called copycat problem – where manufacturers simply rename guns to avoid State assault weapon legislation – the amendment makes clear that replicas and duplicates of the listed firearms are covered as well."

139 Cong. Rec. S15459, Ex. 22. "Senator Biden stated further that 'to make clear that this ban applies only to military style assault weapons, this ban would apply only to semiautomatic rifles and pistols that can attach detachable magazines that have at least two of the following characteristics: A grenade launcher; a flash suppressor; a bayonet mount; a folding stock; or a pistol grip.'" *Id.* This "features test" thus qualified what was prohibited either as an Enumerated Banned Firearm or as a copy or duplicate of an Enumerated Banned Firearm.

Defendants' Response: Disputed. Paragraph 4 does not assert a "fact," but contains legal argument and incorrectly characterizes statements of Senator Biden. Senator Biden made these and other statements when the Senate was debating a proposed amendment that was the precursor to the federal Assault Weapons Ban. But the amendment was not adopted and its text does not mirror the final version of the federal ban: Rather than banning "*copies* or duplicates" of the Enumerated Weapons, it would have banned "types, replicas, or duplicates" of the Enumerated Weapons. *See* 139 Cong. Rec. S15475–01, 15479–01, 1993 WL 467099 (Nov. 9, 1993) (text of Amendment No. 1152). The amendment thus used the word "replicas" instead of "copies." *Id.* Senator Biden's statement, which refers to "replicas and duplicates," is inapposite because of this textual difference. *See* 139 Cong. Rec. S15411–01, 15459–01.

5.     A "large capacity feeding device" is defined by Massachusetts law as "a fixed or detachable magazine . . . capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition . . . ." G. L. C. 140 § 121 (the "Banned Magazines").

Defendants' Response: Paragraph 5 is not an assertion of "fact" but merely purports to quote from or paraphrase the cited statute, which speaks for itself.

6.     The Massachusetts law prohibits possession and transfer of the Banned Firearms and Magazines, and imposes severe penalties for any violation:

No person shall sell, offer for sale, transfer or possess an assault weapon or large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Whoever not being licensed under the provisions of section 122 violates the provisions of this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000, or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than five years nor more than 15 years, or by both such fine and imprisonment.

G. L. C. 140 § 131M. Collectively, Massachusetts General Laws, chapter 140, sections 121 and 131M, shall be referred to herein as the "Challenged Laws." The Challenged Laws do not ban the sale, transfer, or possession of Banned Firearms and Magazines lawfully possessed prior to September 13, 1994. *See* G. L. C. 140 § 131M.

Defendants' Response: Paragraph 6 does not set forth an assertion of "fact" but merely purports to quote from or paraphrase the cited statute, which speaks for itself. Further, Defendants dispute the characterization of these penalties as "severe."

7. After the enactment of the Challenged Laws, and for a period of 18 years, Defendants approved the transfer of tens of thousands of firearms as compliant under Massachusetts law ("Massachusetts Compliant Firearms"). *See* Press Release, AG Healey Announces Enforcement of Ban on Copycat Assault Weapons (July 20, 2016), available at http://www.mass.gov/ago/news-and-updates/press-releases/2016/2016-07-20-assault-weapons-enforcement.html, Ex. 23 at p. 1. ("Despite the law, an estimated 10,000 [Banned Firearms] were sold in Massachusetts last year alone."); *see also* Deposition of Alan Zani, Commander, Massachusetts State Police Crime Gun Unit, Ex. 20 at 11:10–14, 11:16–19 (defining the term "Massachusetts Compliant Firearm" as a "firearm that was compliant to the Massachusetts General Laws prior to July 20, 2016"), 11:21–24, 12:1–2, 4 (confirming transfers of Massachusetts Compliant Firearms "were considered lawful").

Defendants' Response: Disputed.  The term "Massachusetts Compliant Firearm," as used throughout the plaintiffs' Statement of Facts, is too vague, ambiguous and indeterminate to assert a "fact" under Rule 56(c). Further, the evidence cited in paragraph 7 does not support the asserted facts.   Rather, the undisputed evidence establishes that none of the defendants "approve" or "disapprove" of gun transfers in the Commonwealth.   Although specified information about firearm transfers in the Commonwealth must be electronically submitted by sellers to the Firearms Records Bureau, this submission does not constitute or imply approval of the transaction. *See* Defendants' Rule 56.1 Statement, ¶¶ 30-38; Klein Dep. 65:23-66:11 (attached hereto as Exhibit 1); Bolcome Aff. ¶ 15; Dunne Decl. ¶¶ 7, 8; *see* Dunne Dep. 35:2-37:18 (attached hereto as Ex. 2) (the Firearms Records Bureau ("FRB") maintains records of firearms transactions, but does not review them unless prompted). The database that passively records and stores firearms transaction records does not exist to approve or disapprove gun transfers and does not include all information necessary to determine whether a particular firearm transaction is lawful. Klein Dep. 65:23-66:11; Bolcome Aff. ¶ 19; Dunne Decl. ¶ 8; *see* Dunne Dep. 17:21-18:14 (for guns that are not among the enumerated weapons in the statute, it is impossible to tell whether they are assault weapons without physically inspecting them).

The Attorney General's investigation into potential unlawful sales of copycat assault weapons in 2015 did not constitute "approval" of any transaction.  The Attorney General was able to estimate that approximately 8,000 to 10,000 assault weapons were sold in Massachusetts in 2015 despite the ban by examining, in addition to the FRB's transaction data, gun owners' manuals, other gun manufacturers' materials, and publicly available videos about the guns that had been transferred. Bolcome Aff. ¶¶ 15-18. Even then, Defendants could not definitively determine the lawfulness of any specific gun transaction, because the FRB's data does not

include the manufacture date of the guns being transferred or consistent, reliable information as to the occupation of the transferee. Bolcome Aff. ¶ 19.

Further, the testimony of Alan Zani of the Massachusetts State Police ("MSP") does not support that the assertion that "Defendants approved the transfer of tens of thousands of firearms as compliant under Massachusetts law." Zani did not testify for the MSP under Rule 30(b)(6). During Zani's deposition, plaintiffs' counsel supplied Zani with the term "Massachusetts Compliant firearm" and asked him to offer a definition. Zani Dep. 11:10-12 (Doc. 59-19, Ex. 20). Zani's response is merely that it is a firearm that is compliant with Massachusetts law prior to July 20, 2016. *Id.* 11:13-17. Moreover, Zani testified that he was not examining the records available to him for sales of assault weapons. He was only reviewing for weapons that are not on the Massachusetts approved firearms roster (which applies only to handguns—*see* Kaplan Dec. Ex. 61) and for post-1998 Glocks. Zani Dep. 12:5–22.

8. Nearly twenty years after the enactment of the Challenged Laws, Defendant Attorney General Maura Healey issued the Notice of Enforcement, which became effective as of July 20, 2016. *See* Notice of Enforcement, available at http://www.mass.gov/ago/public-safety/assault-weapons-enforcement-notice.pdf (last visited Dec. 14, 2017), Ex. 25 at p. 1.

Defendants' Response: Undisputed.

9. The Notice of Enforcement purports to provide "guidance on the identification of weapons that are 'copies' or 'duplicates' of the enumerated Assault weapons that are banned under Massachusetts law." *Id.* at p. 1.

Defendants' Response: Paragraph 9 merely quotes from the Notice of Enforcement, which speaks for itself. Defendants dispute that the Notice of Enforcement only "purports" to provide guidance.

10.     The Notice of Enforcement expands the firearms prohibition established in the Challenged Laws to also forbid the ownership and transfer of Massachusetts Compliant Firearms, as well as other popular firearms commonly kept for lawful purposes. *See id.* at p. 1-4. Because nearly all semiautomatic firearms employ a similar operating system, *See* Declaration of James Supica, Director of the NRA Firearms Museum and firearms historian, Ex. 13 at p. 1, ¶ 2 Att. A at 24, there is a wholesale ban of nearly all semiautomatic firearms in the Commonwealth of Massachusetts.

Defendants' Response:  Disputed.  By its terms, the Notice of Enforcement provides guidance to the public on the state assault weapons statute; it does not "expand" a statutory prohibition. Further, paragraph 10 uses undefined and ambiguous terms (i.e. "Massachusetts Compliant Firearms" and "other popular firearms") that preclude defendant from discerning the facts asserted.  To the extent paragraph 10 challenges the Notice's interpretation of the statute, it presents a legal claim and not an assertion of fact.

Defendants further dispute that Massachusetts imposes "a wholesale ban of nearly all semiautomatic firearms in the Commonwealth of Massachusetts."  There are many semiautomatic firearms that are not affected by the Assault Weapons Ban, including firearms that are explicitly unaffected based on exemptions that track the federal statute.  G.L. c. 140, § 121. The state law does not apply to assault weapons that were possessed lawfully before September 13, 1994.  *Id*. In addition, all 661 rifles and shotguns listed on Appendix A to the federal statute were exempted from the state law, as were "any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition" and "any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine," among other exceptions. *Id.*  In addition, other specific semiautomatic rifles and semiautomatic handguns are not prohibited

and the Notice does not affect the hundreds of handguns on the Executive Office of Public Safety and Security's Approved Firearms Roster. *See* Kaplan Decl. Exs. 61, 93.

11.     To determine if a firearm is a "copy or duplicate," the Notice of Enforcement establishes two tests: a "Similarity Test" and an "Interchangeability Test." *See* Notice of Enforcement, Ex. 25 at pp. 3–4. These tests provide that a firearm is a copy or duplicate of a Banned Firearm if

    i.    "its internal functional components are substantially similar in construction and configuration to those of an [Enumerated Banned Firearm]. Under this test, a weapon is a Copy or Duplicate, for example, if the operating system and firing mechanism of the weapon are based on or otherwise substantially similar to one of the [Enumerated Banned Firearm]"; or

    ii.    "it has a receiver that is the same as or interchangeable with the receiver of an [Enumerated Banned Firearm.] A receiver will be treated as the same as or interchangeable with the receiver on an [Enumerated Banned Firearm] if it includes or accepts two or more operating components that are the same as or interchangeable with those of an [Enumerated Banned Firearm]. Such operating components may include, but are not limited to: 1) the trigger assembly; 2) the bolt carrier or bolt carrier group; (3) the charging handle; (4) the extractor or extractor assembly; or (5) the magazine port."

*See id.*

Defendants' Response: Paragraph 11 purports to paraphrase and quote from a portion of the Notice of Enforcement, which speaks for itself.

12.     The Notice of Enforcement also states that a firearm that qualifies as "copy or duplicate" under one of these two tests will remain a "copy or duplicate," even if it is altered to no longer meet those tests. *Id.* at p. 4.

Defendants' Response: Paragraph 12 purports to paraphrase and quote from a portion of the Notice of Enforcement, which speaks for itself.

13.     In addition, the Notice of Enforcement provides that a manufacturer's advertising of a firearm is "relevant" in determining whether a firearm is a "copy or duplicate" of an assault

weapon. *Id.*

Defendants' Response: Paragraph 13 purports to paraphrase and quote from a portion of the Notice of Enforcement, which speaks for itself.

14.     The Notice of Enforcement provides a prospective limitation for "dealers licensed under G. L. c. 140, § 122":

> The Guidance will not be applied to future possession, ownership or transfer of Assault weapons by dealers, provided that the dealer has written evidence that the weapons were transferred to the dealer in the Commonwealth prior to July 20, 2016, and provided further that a transfer made after July 20, 2016, if any, is made to persons or businesses in states where such weapons are legal.

*Id.*

Defendants' Response: The quoted provision of the Notice of Enforcement is accurately stated. The characterizations of it are legal conclusions to which no response is required.

15.     The Notice of Enforcement provides no exception to its application to dealers for transfers made *before* July 20, 2016. *See id.*

Defendants' Response: This is a legal conclusion to which no response is required. The Notice of Enforcement speaks for itself.

16.     For "individual gun owners," by contrast, the Notice of Enforcement provides both retroactive and prospective limitation: "The Guidance will not be applied to possession, ownership, or transfer of an Assault weapon obtained prior to July 20, 2016." *Id.*

Defendants' Response: Paragraph 16 purports to paraphrase and quote from a portion of the Notice of Enforcement, which speaks for itself.  The characterizations of the Notice are legal conclusions to which no response is required.

17.     The Notice of Enforcement explicitly states that "[t]he [Attorney General's Office] reserves the right to alter or amend this guidance," leaving open the scope of the

Challenged Laws as well as the resulting criminal liability. *Id.*

Defendants' Response:   Paragraph 13 purports to paraphrase and quote from a portion of the Notice of Enforcement, which speaks for itself.  The characterizations of the Notice are legal conclusions to which no response is required.  Defendants dispute that the Notice leaves "open" the scope of the state Assault Weapons law.

18.     Neither the Challenged Laws nor the Notice of Enforcement provides a safe harbor or exception for the transfer and possession of Banned Firearms and Magazines by responsible, law-abiding citizens for self-defense. *See id.*

Defendants' Response: This is a legal conclusion to which no response is required.

**B.      The Plaintiffs.**

19.      David Seth Worman, a licensed orthopedic surgeon, is a responsible, law-abiding citizen and resident of Massachusetts. *See* Worman Decl., Ex. 1 at p. 1, ¶ 2. After the enactment of the Challenged Laws but before the issuance of the Notice of Enforcement, Dr. Worman purchased firearms which may be classified as a "copy or duplicate" of an "assault weapon" under the tests set forth in the Notice of Enforcement. *Id.* at p. 1, ¶ 3. As such, his weapons may now be prohibited. *Id.* Dr. Worman also owns several pistols that are designed for, and come standard with, detachable magazines that hold in excess of ten rounds, and he lawfully owns multiple detachable magazines which hold in excess of ten rounds. *Id.* He primarily owns these firearms and magazines for defense of his home and family, and he also keeps them for recreational target shooting and as collector's items. *Id.* at pp. 1–2, ¶ 4. Dr. Worman is a responsible firearms owner, having taken numerous safety and training courses, including training focused on self-defense, and he secures his firearms in a locked safe in his home. *Id.* at p. 2, ¶ 6. Dr. Worman would like to purchase additional semiautomatic firearms

with standard detachable magazines holding in excess of ten rounds, if the law permitted him to do so. *Id*. at p. 2, ¶ 5. He cannot, however, currently determine if the firearms he wishes to purchase are "copies or duplicates" of an "assault weapon." *Id.* He cannot make this determination because of the vague and confusing manner in which "copies or duplicates" is defined in the Notice of Enforcement, and because of the uncertainty of how Defendants will interpret the phrase "copies or duplicates." *Id*. at p. 2, ¶¶ 5, 7. Because the Office of the Attorney General "reserves the right to amend th[e] guidance" in the Notice of Enforcement, Dr. Worman lives in fear that his possession of firearms will become criminalized. *Id*. at p. 2, ¶ 7. He believes that the Challenged Laws and Notice of Enforcement violate his civil rights. *Id*.

Defendants' Response: Defendants dispute that Dr. Worman cannot determine whether the "additional semiautomatic firearms with standard detachable magazines holding in excess of ten rounds" that he wishes to purchase are "copies or duplicates" of an enumerated assault weapon. *See* Worman Dep. 24:20-24, 25:7-9, 26:5-8, 26:15-16.[1] Defendants also dispute that Dr. Worman owns assault weapons "primarily" for defense of his home and family. Worman Dep. 20:15-21:5, 26:2-27:16. The Defendants also dispute that any weapon Worman owns became prohibited by virtue of the Enforcement Notice ("As such, his weapons may now be prohibited.") The Enforcement Notice did not and could not alter or amend the 1998 assault weapons statute.

20.     Jason William Sawyer served five years of active duty and an additional three

---

[1] Defendants dispute Dr. Worman's claims based on the deposition testimony cited in this response, which Dr. Worman designated as confidential pursuant to the Stipulated Protective Order; accordingly, the designated testimony was redacted from his deposition transcript. *See* ECF No. 42. Defendants filed an assented-to motion to file the redacted testimony under seal, which the Court denied on December 18, 2017. *See* ECF Nos. 64, 66. To support their position, Defendants again propose to file the deposition excerpt under seal or provide the Court with a copy of the relevant testimony for *in camera* review.

years of inactive reserves in the Marine Corps. *See* Sawyer Decl., Ex. 3 at p. 1, ¶ 2. He achieved the rank of Corporal (E-4) during his service. *Id.* He now works in the software industry as an engineer and is a responsible, law-abiding citizen and resident of Massachusetts. *Id.* at p. 2, ¶¶ 6–7. While serving, Mr. Sawyer was issued an M-16A2 and an M9 service pistol and received extensive training with various firearms. *Id.* at p. 1, ¶ 2. Since leaving the military, Mr. Sawyer has taken numerous firearms courses, has become a certified NRA instructor and a certified Massachusetts State Police instructor, and is well-versed on how to safely and properly own and use firearms. *Id.* at pp. 1–2, ¶¶ 2, 7. He keeps his firearms in a locked safe in his home. *Id.* at p. 2, ¶ 7. Mr. Sawyer, a nationally ranked competitive shooter, uses AR-15 platform rifles in competitive shooting events – firearms which may be banned as "copies or duplicates" under the tests set forth in the Notice of Enforcement. *Id.* at pp. 1–2, ¶ 4. Mr. Sawyer also possesses these firearms for self-defense and defense of his home. *Id.* at p. 2, ¶ 5. Mr. Sawyer purchased these firearms after the enactment of the Challenged Laws but before Defendant Healey issued the Notice of Enforcement. *Id.* at pp. 1– 2, ¶ 4. He also owns several pistols that are designed for, and come standard with, detachable magazines which hold in excess of ten rounds and lawfully owns several detachable magazines which hold in excess of ten rounds. *Id.* at p. 2, ¶ 4. Mr. Sawyer would like to purchase certain additional firearms that may be classified as "copies or duplicates" of Enumerated Banned Firearms but cannot do so because of the uncertainty of how Defendants will interpret the phrase "copies or duplicates." *Id.*

Defendants' Response: Defendants dispute the claim that Mr. Sawyer is uncertain as to whether guns that he wishes to purchase are "copies or duplicates" of an assault weapon. As set out in his statement above, Mr. Sawyer can identify his "AR 15 platform rifles." And, in his deposition, Sawyer acknowledged that, in general, AR 15 type rifles have interchangeable parts,

14

despite the fact that are not all made by the same manufacturer. Sawyer Dep. 27:8-28:11. Defendants also dispute Mr. Sawyer's claim that he possesses AR-15s for self-defense and defense of his home. Sawyer Dep. 28:14-15.[2] And, as set out above, he has other guns (pistols) at his disposal for self-defense.

21.     Anthony Linden has polyarthritis, a type of arthritis that involves five or more joints simultaneously. *See* Linden Decl., Ex. 2 at p. 1, ¶ 4. As a result of this disease, it is difficult for him to operate certain firearms quickly and effectively. *Id.* AR-15 platform rifles and full-capacity magazines allow him to fully utilize his firearms at the practice range and while hunting, and they ensure his ability to defend himself in his home, if necessary. *Id.* Accordingly, Mr. Linden owns an AR-15 platform firearm that he built himself. *Id.* at p. 1, ¶ 3. He purchased the parts for this firearm and assembled it after the enactment of the Challenged Laws but before Defendant Healey issued the Notice of Enforcement. *Id.* This firearm was designed for detachable magazines which hold in excess of ten rounds, and he in fact lawfully owns several detachable magazines which hold in excess of ten rounds. *Id.* Mr. Linden plans to purchase additional full-sized semiautomatic firearms with standard detachable magazines holding in excess of ten rounds in the future, if he is permitted to do so by law. *Id.* at p. 1, ¶ 5. Mr. Linden is a responsible, law-abiding citizen and resident of Massachusetts and has taken numerous safety and training courses; he also secures his firearms in locked safes in his home. *Id.* at pp. 1–2, ¶¶ 2, 7.

Defendants' Response: Defendants dispute that Mr. Linden needs his AR-15 platform

---

[2] The cited deposition testimony from Mr. Sawyer was redacted by plaintiffs as confidential pursuant to the Stipulated Protective Order. *See* ECF No. 42. Subsequently, the Court denied Defendants motion to file this testimony under seal. To support their position, Defendants again propose to file the deposition excerpt under seal or to provide the Court with a copy of the relevant testimony for *in camera* review.

rife for defense of himself in his home.[3]

22.    Paul Chamberlain, also a responsible, law-abiding citizen and resident of Massachusetts, does not currently own any Banned Firearms. *See* Chamberlain Decl., Ex. 4 at ¶¶ 2, 5. He does, however, lawfully own several detachable magazines which hold in excess of ten rounds, which he keeps, along with his firearms, in a safe in his home. *Id.* at ¶ 5. Mr. Chamberlain wishes to purchase firearms that are banned under the Challenged Laws and Notice of Enforcement for self-defense in his home, and would do so, but for the prohibition. *Id.* Even though Mr. Chamberlain has experience interpreting complex regulations due to his career as a safety manager, Mr. Chamberlain cannot determine whether the firearms he wishes to purchase are prohibited by the Notice of Enforcement. *Id.* at ¶¶ 3-4. He believes the Notice of Enforcement is vague and is uncertain how Defendants will interpret "copies or duplicates." *Id.* at ¶ 4.

Defendants' Response: Defendants dispute the claim that Mr. Chamberlain is unable to determine whether the firearms that he wishes to purchase are assault weapons, as the statute and Enforcement Notice are plain on their face and he can enlist assistance from a licensed gun dealer. Defendants further dispute that Mr. Chamberlain needs assault weapons for self-defense in his home, as he acknowledges already owning firearms that are available for this purpose.

23.    Gun Owners' Action League, Inc. ("GOAL") is a non-profit corporation dedicated to promoting safe and responsible firearms ownership, marksmanship competition, and hunter safety throughout Massachusetts. *See* Wallace Decl., Ex. 5 at p. 1, ¶ 3. For over 40

---

[3] Defendants' position is supported by deposition testimony from Mr. Linden that was redacted by plaintiffs as confidential pursuant to the Stipulated Protective Order. *See* ECF No. 42. Subsequently, the Court denied Defendants motion to file this testimony under seal. To support their position, Defendants again propose to file the deposition excerpt under seal or to provide the Court with a copy of the relevant testimony for *in camera* review.

years, GOAL has helped protect and preserve Massachusetts citizens' Second Amendment rights. *Id.* It is the leading advocate in Massachusetts for its more than 15,000 members, which include current and future gun owners, hunters, conservationists, as well as firearm and marksmanship clubs. *Id.* GOAL possesses a number of firearms-related licenses, including a federal firearms license and a Massachusetts License to Sell Ammunition. *Id.* at p. 1, ¶ 5. To aid in its firearms safety classes, GOAL keeps firearms, which may now be classified as a "copy or duplicate" of an "assault weapon" under the tests set forth in the Notice of Enforcement. *Id.* at p. 1, ¶ 4. GOAL also owns pistols that are designed for, and come standard with, detachable magazines which hold in excess of ten rounds, and in fact lawfully possesses multiple magazines holding in excess of ten rounds. *Id.* As a licensed dealer, GOAL lawfully owns and, after the enactment of the Challenged Laws but before the Notice of Enforcement was issued, sold firearms which may be classified as a "copy or duplicate" of an "assault weapon" under the tests set forth in the Notice of Enforcement. *Id.* at pp. 1–2, ¶ 5. GOAL and its membership are harmed by the combination of the Notice of Enforcement and the Challenged Laws because they cannot acquire the most popular semiautomatic rifles and standard capacity magazines sold today. *Id.* at p. 2, ¶ 6. Additionally, the Notice of Enforcement asserts that what had been accepted, lawful behavior was in fact illegal. *Id.*

Defendants' Response: Defendants dispute the characterization of assault weapons and large capacity magazines as "the most popular semiautomatic rifles and standard capacity magazines sold today." The cited evidence does not support this assertion. Defendants further dispute the claim that transfer, ownership or possession of assault weapons defined in G.L. c. 140, § 121 was "accepted, lawful" behavior prior to the issuance of the Notice of Enforcement; by its terms, the statute prohibited such behavior from and after its enactment in 1998.

24. On Target Training, Inc. ("On Target") is a family-owned retail gun store and training facility. *See* O'Leary Decl., Ex. 6 at p. 1, ¶ 3. On Target is a federal firearms licensed dealer, and is also licensed in Massachusetts to perform services as a gunsmith; to sell, rent or lease firearms, rifles, shotguns, or machine guns; and to sell ammunition. *Id.* Until the effective date of the Notice of Enforcement, On Target sold firearms that may now be banned under the tests set forth in the Notice of Enforcement. *Id.* at pp. 1–2, ¶ 4. Before Attorney General Healey issued the Notice of Enforcement, On Target was never informed that its transfers were or may have been illegal. *Id.* At no time was any action taken against it by any law enforcement agency to halt or prevent these transactions; Defendants instead approved them. *Id.* On Target relied upon this approval and believed it was engaging in legal activity. *Id.* On Target believes that these prior transactions made before the issuance of the Notice of Enforcement have been retroactively deemed illegal by Defendants, particularly given the fact that the Notice of Enforcement provides no guarantee that such transactions are in fact legal and Attorney General Healey's remarks make clear that she believes "these weapons are illegal." *Id.* at p. 2, ¶ 6; *see also* Remarks of Attorney General Maura Healey, available at http://www.mass.gov/ago/public-safety/remarks-from-assault-weapons-press-conference.pdf (July 20, 2016), Ex. 24 at p. 3. If these transactions are construed as illegal, On Target could be in violation of federal law and lose its federal firearms license and other firearm-related licenses. *See* O'Leary Decl., Ex. 6 at p. 2, ¶ 6. On Target is also being harmed because, as a result of the Notice of Enforcement, it is losing money. *Id.* at p. 2, ¶ 5. Rifle sales have almost completely ceased, sales of pre-1994 large capacity magazines are down about 50%, and ammunition sales are also down significantly. *Id.* On Target suffers ongoing economic harm because it can no longer sell the firearms and magazines banned under the Notice of Enforcement. *Id.* On Target

also suffers harm because of the vagueness of the Notice of Enforcement, which prevents it from knowing which firearms it can and cannot lawfully sell. *Id.* If not for the credible threat of prosecution under the Challenged Laws and Notice of Enforcement, On Target would continue to sell these firearms and magazines. *Id.* at pp. 1–2, ¶ 4.

<u>Defendants' Response:</u> Defendants dispute the assertion that they "approved" sales of assault weapons by On Target or any other dealer, for the reasons discussed in their response to Paragraph 7 above. The assertion that any of On Target's prior transactions were "retroactively deemed illegal" or that the Enforcement Notice has "banned" firearms that were previously lawful, is a conclusion of law that does not require a response; in any event, it is disputed by the Notice itself.

Defendants also dispute On Target's claim that it is unable to ascertain "which firearms it can and cannot lawfully sell." The deposition testimony of the owner of On Target demonstrates that he understands what guns are banned. After the Notice of Enforcement issued, On Target stopped selling AR-15s and AK-47s to civilians. O'Leary Dep. 64:10-13, 64:23-24, 67:13-16. On Target's owner identified specific copies of the Colt AR-15 that are banned, including "Smith & Wesson M&P 15s, Windham Weapons WW-15s," and AR-15s manufactured by Bushmaster, Daniel Defense, Stag Arms, Spike Tactical, and ATI. O'Leary Dep. 90:4-9, 93:22-94:10. "All of the modern sporting rifles, semiautomatic, gas operated that are similar in nature to the [Colt] AR-15," he explained, are banned. O'Leary Dep. 90:11-13. In an email, he advised that an AK-47 "variant" "can't be transferred except to an FFL who can sell it out of state," but that an M1 carbine and semiautomatic Thompson rifle "aren't banned" because they have a "[c]ompletely different operation system" than any Enumerated Weapon. Kaplan Decl. Ex. 24.

25.     Overwatch Outpost ("Overwatch") is a federal firearms licensed dealer, and is also licensed in Massachusetts to perform services as a gunsmith; to sell, rent, or lease firearms, rifles, shotguns, or machine guns; and to sell ammunition. *See* Ricko Decl., Ex. 7 at p. 1, ¶ 3. Approximately 70% of Overwatch's revenue comes from firearms sales. *Id*. Until the effective date of the Notice of Enforcement, Overwatch sold certain firearms that may now be banned under the Notice of Enforcement. *Id.* at pp. 1–2, ¶¶ 3, 4. Prior to the Notice of Enforcement, no law enforcement agency informed Overwatch that its transfers were or may be illegal. *Id*. Instead, Defendants approved them. *Id.* Overwatch Outpost relied upon this approval and believed it was engaging in legal activity. *Id.* at pp. 1–2, ¶¶ 3, 4. Overwatch fears that the hundreds if not thousands of presumptively-legal and then-accepted transactions have now been declared retroactively to be in violation of Massachusetts law at the time these transactions occurred. *Id.* If these transactions are construed as illegal, Overwatch could be in violation of federal law and lose its federal firearms license and other firearm-related licenses. *Id.* at p. 2, ¶ 4. Overwatch continues to suffer economic harm because it cannot sell these firearms and magazines, and also because of the vagueness of the Notice of Enforcement, which prevents Overwatch from what knowing which firearms it can and cannot lawfully sell. *Id.* at p. 2, ¶ 5. Overwatch would continue to sell these firearms and magazines, if not for the credible threat of prosecution under the Challenged Laws and Enforcement Notice. *Id.*

<u>Defendants' Response</u>: Defendants dispute the assertion that they "approved" or "accepted" sales of assault weapons by Overwatch or any other dealer, for the reasons discussed in their response to Paragraph 7 above. The assertion that Overwatch's prior transactions "have now been declared retroactively to be in violation of Massachusetts law." or that the Enforcement Notice has now "banned" firearms that were previously lawful, is a conclusion of

law that does not require a response; in any event, it is disputed by the Notice itself.

Defendants also dispute Overwatch's claim that it is unable to ascertain "which firearms it can and cannot lawfully sell."  The owner of Overwatch testified that it is "obvious" that "we can't sell AR-15s, and we know that we can't sell AK-47s." Ricko Dep. 47:23 – 48:1.

### C.    The Banned Firearms and Magazines Are Commonly Possessed.

26.    The Challenged Laws and Notice of Enforcement target firearms that are semiautomatic, meaning that they fire only once with each pull of the trigger, no matter how long the trigger is held. *See* Supica Decl. Ex. 13, at p. 4, ¶¶ 10–11; *see also* Deposition of Gary Klein, representative witness for the Office of the Attorney General, Ex. 17 at 31:17-21.

Defendants' Response:  Undisputed that semiautomatic fire requires a trigger pull for each round fired; and, after each shot, the gun automatically loads the next round in the chamber and arms the firing mechanism for the next shot.  Yurgealitis Decl. ¶ 19.

27.    The Banned Firearms and Magazines are commonly possessed. *See* Declaration of James Curcuruto, Director of Marketing and Research at the National Shooting Sports Foundation, Ex. 9 at pp. 2–4, ¶¶ 5–10.

Defendants' Response: Defendants dispute the plaintiffs' characterization of assault weapons and large capacity magazines as "commonly possessed."  This conclusory term is too vague and ambiguous to assert as a "fact" under Rule 56(c); plaintiffs do not state by whom the weapons are possessed or what constitutes "commonly."  The term is also not defined in the cited report. *See* Plaintiffs' Ex. 9 at pp. 2–4, ¶¶ 5–10; Kaplan Decl. Exhibit 15, Expert Report of James Curcuruto at p. 2-4; Curcuruto Dep. 68:7-70:14 (attached hereto as Ex. 3) (plaintiff's expert gave varying definitions of what he considers to be "common," including whether or not gun owners would be aware that a particular firearm is "common").

28.   Firearms with a capacity of more than 10 rounds have been owned by civilians for centuries. *See* Supica Decl., Ex. 13 at p. 2, ¶ 6. Throughout the 17th and 18th centuries, many commercially available firearms had a capacity of more than 10 rounds, including the Kalthoff repeater which had up to a 30 shot capacity and the Belton repeating flintlock which had a 16 or 20 shot capacity. *Id*. The Founders were familiar with multiple shot repeating firearms at the time the Second Amendment was drafted. *Id*. Semiautomatic firearms with detachable magazines have been used by the civilian population for over a century, and there is no evidence demonstrating a historic prohibition on their ownership. *Id.* at p. 3, ¶ 8.

Defendants' Response: Disputed. Plaintiffs mischaracterize their own expert's testimony and opinions. *See* Defendants' SOF (ECF No. 63) at ¶¶ 93-98.

29.   The Banned Firearms include some of the most popular and commonly owned firearms today: AR- and AK-platform rifles. *See* Curcuruto Decl., Ex. 9 at p. 2, ¶ 6.

Defendants' Response: Disputed.   Although defendants do not dispute plaintiffs' claim that many AR- and AK-platform rifles have been produced or imported for sale to the U.S. civilian market since 1990, such evidence, without comparison to other firearms available for sale, the statement and cited declaration do not establish that these are "some of the most popular and commonly owned firearms today." *See* Plaintiffs Ex. 9 at p. 2, ¶ 6. Further, Mr. Curcuruto attached a survey to his report that suggested that, in 2016, handguns, traditional (non-assault) rifles, and shotguns were all more frequently used for target shooting than AR- or AK-platform rifles, *see* Curcuruto Dep. at 75:1-12 (attached hereto as Ex. 3), and traditional rifles and shotguns were more frequently used for hunting rather than AR- or AK-platform rifles. *See id.* at 75:13-18. Curcuruto also relied on a survey that suggested that most owners of AR- or AK-platform rifles owned other guns prior to owning these rifles: 90% of owners purchased or owned a handgun prior

to owning an AR- or AK-platform rifle, 82% of owners purchased or owned a traditional rifle prior to owning an AR- or AK-platform rifle, and 82% of owners purchased or owned a shotgun prior to owning an AR- or AK-platform rifle. *See* Kaplan Decl. Exhibit 15, Curcuruto Expert Report (MSR Consumer Report at 15); Curcuruto Dep. 137:20-139:20.

30.    Between 1990 and 2015, approximately 13.7 million rifles based on these platforms were manufactured or imported into the United States. *See id*. at pp. 2–4, ¶¶ 6–9. Because AR- and AK-platform rifles have been sold to civilians in the U.S. since the late 1950s, even more of these rifles were manufactured in or imported to the U.S. before 1990. *See id.* at pp. 2–3, ¶ 6.

Defendants' Response: Defendants do not dispute that the firearms industry trade association (National Shooting Sports Foundation) has estimated that 13.7 million rifles based on AR and AK platforms were manufactured or imported into the United States between 1990-2015. Defendants dispute this number to the extent that other, lower estimates of the total of assault weapons in the United States have been made. Spitzer Aff., ¶ 26.

31.    Modern Sporting Rifles (a term used in the industry to describe modern semiautomatic rifles such as the AR-15, *see* Declaration of Buford Boone, former Director of the FBI Ballistics Laboratory, Ex. 8 at p. 1, ¶ 2 Att. A, p. 5; Curcuruto Decl., Ex. 9 at p. 1, ¶ 2 Att. A, p. 3; *see also* Supica Decl., Ex. 13 at p 1 ¶ 2 Att. A at p. 21) are growing in popularity. *See* Curcuruto Decl., Ex. 9 at p. 3, ¶ 7. As of 2013, more than 4,800,000 people, most of whom are married with some college education and a household income greater than $75,000, own at least one Modern Sporting Rifle. *Id.* at p. 3, ¶ 8. Even more people use these firearms: according to a 2016 report published by the National Shooting Sports Foundation (NSSF) about Sport Shooting Participation in the United States, approximately 14,000,000 people participated in

target shooting with a modern sporting rifle in 2016, a 57% increase from 2009. *Id.* at p. 4, ¶ 9.

Defendants' Response: Defendants dispute the use of the term "modern sporting rifle," as this is an imprecise and indeterminate term that the firearms industry trade association (NSSF) created to describe AR- and, possibly, AK-platform rifles capable of accepting detachable magazines. Curcuruto Dep. 49:19-50:3, 51:11-20, 52:12-53:9 (attached hereto as Ex. 3). Plaintiffs' purported expert, an employee of the trade association, was not able to state whether all of the enumerated weapons specifically banned under the challenged Massachusetts statutes are "modern sporting rifles." *Id.* at 16:12-17:8, 57:16-59:12. Further, defendants do not dispute that gun manufacturers and importers have made an increasing number of AR- and AK-platform rifles available for the U.S. civilian market in recent years. *See* Kaplan Decl. Ex. 15, at 8 (chart). However, defendants dispute plaintiffs' estimate that as of 2013, more than 4.8 million people owned an AR- or AK-platform rifle, as this estimate is based on a survey of AR- or AK-rifle owners that did not give respondents the option to indicate exactly how many such rifles they owned if that number was more than four. *See* Curcuruto Dep. 128:21-137:5; Kaplan Decl. Ex. 15, MSR Report at p. 13. As a result, when the survey later purported to estimate the number of people who own at least one of these rifles by means of a "weighted average" derived from the total rifles sold, it created an artificially high number of owners because it failed to account for the potentially large number of cases where single individuals owned large numbers of rifles. *See* Curcuruto Dep. 135:5-137:5.

32.    In 2015 alone, more than 1,500,000 Modern Sporting Rifles were manufactured in or imported into the United States. *Id.* at p. 3, ¶ 7. By way of comparison, in 2015, the number of Modern Sporting Rifles manufactured in or imported to the U.S. was nearly double the number of the most commonly sold vehicle in the United States (the Ford F-series pick-up trucks

(including F-150, F-250, F-350, F-450 and F-550), of which a total of 780,354 were sold). *Id.*

Defendants' Response: Defendants do not dispute that the NSSF estimated that in 2015, more than 1.5 million AR- or AK-platform rifles were manufactured or imported to the United States. Plaintiffs' comparison to the number of Ford F-series pick-up trucks is irrelevant.

33.    Modern Sporting Rifles – not shotguns, or traditionally styled rifles – are the most frequently-sold long gun in America. *Id.* at p. 3, ¶ 8. According to a 2017 survey of 324 firearm retailers across the United States, these firearms accounted for 17.9% of all firearm sales, whereas shotguns and traditionally-styled rifles accounted for only 11.5% and 11.3% of all firearm sales, respectively. *Id.*

Defendants' Response: Defendants dispute the reliability of this data, as it is based on estimates by NSSF members completing a voluntary, online survey with an incentive to participate, not on actual sales data or even a sampling of responses from randomly chosen firearms retailers. Curcuruto Dep. 141:6-8, 142:7-143:20, 144:20-146:16 (attached hereto as Ex. 3); *see also* Kleck Dep. at 189:9-190:18 (surveys administered to a self-selected group are unlikely to yield results that may be generalized to the larger population).

34.    The Banned Firearms include the most popular rifles in the United States. *Id.* at pp. 3–4, ¶¶ 7–9.

Defendants' Response: Disputed. This is a characterization rather than an assertion of fact under Rule 56(c). Moreover, the various statistics that the plaintiffs have presented do not support this assertion. *See* Defendants' response to ¶¶ 27, 29-33, above. *See also* Defendants' SOF, ¶ 115.

35.    Magazines capable of holding more than 10 rounds of ammunition are likewise commonly possessed. *Id.* at p. 4, ¶ 10. Tens of millions of people across the country possess magazines capable of holding more than 10 rounds of ammunition. *Id.* Between 1990 and 2015,

Americans owned approximately 114,700,000 of these magazines, accounting for approximately 50% of all magazines owned during this time (approximately 230,000,000). *Id.*

Defendants' Response: Disputed. Defendants dispute the reliability of the plaintiffs' data regarding magazine ownership. Plaintiffs' expert's calculations on this point are essentially back-of-the-envelope estimates of the number of magazines in existence per pistol and rifle, followed by estimates as to the percentage of those magazines holding more than 10 rounds. Curcuruto Dep. 156:5-157:17 (attached hereto as Ex. 3). These estimates are derived from the opinion of Steve Sanetti, the current President of NSSF and the former CEO of Sturm, Ruger & Co., Inc., a firearms manufacturer, as well as the opinion of other individuals in the firearms industry that plaintiffs' expert did not identify by name. *Id.* at 158:18-159:11.

36. It is reasonable to assume that many more such magazines were purchased in the United States prior to 1990 and that even more people possess a magazine capable of holding more than 10 rounds of ammunition. *Id.* This is particularly likely given the fact that these Banned Magazines are provided as standard equipment for many semiautomatic rifles and pistols sold in the United States. *Id*.

Defendants' Response: Disputed. Paragraphs 36 sets out characterizations or assumptions rather than assertion of facts. However, the various statistics that the plaintiffs have presented do not support these assertions. See Defendants' response to ¶ 35, above.

**D. The Banned Firearms and Magazines Are Possessed for Lawful Purposes and Are Rarely Used in Crime.**

37. The Banned Firearms and Magazines are owned and used for a variety of lawful purposes, including recreational and competitive target shooting, home defense, hunting, and collecting. *See* Curcuruto Decl., Ex. 9 at p. 2, ¶ 6.

Defendants' Response: Defendants do not dispute that individuals could own assault

weapons for lawful purposes that include recreational and competitive target shooting, hunting, and collecting. Defendants dispute that assault weapons are "used" for home defense. Defendants' SOF, ¶¶ 142-48.

38. Purchasers of the Banned Firearms report that one of the most important reasons for their purchase of such firearms is self-defense. *See id.* at p. 3, ¶ 8.

<u>Defendants' Response:</u> Defendants dispute the reliability of plaintiffs' data on this point. Plaintiffs' expert has drawn this conclusion based on responses to an online survey that was marketed to gun enthusiasts and for which there was an incentive (<u>i.e.</u> a chance to win a gift card) to complete the survey. Curcuruto Dep. 105:11-12, 107:5-108:21 (attached hereto as Ex. 3); Kaplan Decl. Ex. 15, MSR Report at p. 4; *see also* Kleck Dep. at 189:9-190:18 (surveys administered to a self-selected group are unlikely to yield results that may be generalized to the larger population). Further, even if the survey results are taken at face value, the survey does not appear to have asked AR- or AK-platform rifle owners why they personally purchased AR- or AK-rifles; rather, it appears to have asked respondents to "rank," in the abstract, on a scale from one to 10, seven potential reasons why someone might own an AR- or AK-rifle. Curcuruto Dep. 122:4-124:3; Kaplan Decl. Ex. 15, MSR Report at p. 34. Nor did the survey ask any questions as to whether the survey respondents had ever actually used an AR- or AK-platform rifle in self-defense. Curcuruto Dep. at 125:10-126:1. Plaintiffs' expert was unaware of any NSSF survey that asked respondents whether they had ever used an AR- or AK-platform rifle in self-defense. *Id.* at 126:3-9, 165:2-14.

39. The Bureau of Alcohol, Tobacco, and Firearms ("ATF") confirmed over twenty-five years ago that the Banned Firearms were useful in self-defense. *See* Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic

Rifles, at 11–12 (July 6, 1989), Ex. 28.

Defendants' Response: Defendants dispute the conclusion that plaintiffs have asserted based on the ATF's 1989 report. In 1989, the ATF evaluated various foreign-made semiautomatic rifles with military features to determine whether such weapons were suitable for sporting purposes. Kaplan Decl. Ex. 65 at 12. In concluding that they were not, the ATF acknowledged that there were some "technical evaluations" that recommended these rifles "for law enforcement or military use or for activities such as collecting, plinking, home and self-defense, and combat target shooting." *Id.* at 11. The report made no further findings as to the technical evaluations that mentioned the use of these rifles for self-defense or the ATF's assessment, if any, of that evidence, as this was not the focus of the report. *See id.* at 11-12.

40.     There are several reasons why an individual would choose a Banned Firearm for self-defense. *See* Declaration of Gary Roberts, dental surgeon and law enforcement Wound Ballistics Instructor, Ex. 11 at pp. 3–5, ¶¶ 8–14; Boone Decl., Ex. 8 at pp. 3–6, ¶¶ 5–11.

Defendants' Response:  Disputed. These witnesses' opinions are at odds with testimony offered by the Plaintiffs and their own experts that they are unaware of any situation in which any individual anywhere in the United States has used an assault weapon for self-defense. Defendants' SOF, ¶ 142. Not even the National Rifle Association recommends the use of assault weapon for self-defense, recommending handguns instead. Id. ¶¶144, 150.  Some of the reasons for this recommendation are described in Defendants' SOF, ¶¶ 144-151.  In addition, there are many non-banned weapons that are available for self-defense, including many semi-automatic handguns and rifles. Defendants' SOF, ¶¶ 143.  *See* Kaplan Decl. Exhibit 93, "Guns That Are Not Assault Weapons." *See also* Defendants' Response to paragraphs 19-22, above.

41.     First, Banned Firearms based on the AR-15 platform are the most ergonomic,

safe, readily available, and effective firearms for civilian defensive shooting. *See* Roberts Decl., Ex. 11 at p. 3, ¶ 8; *see also* Boone Decl., Ex. 8 at pp. 3–5, ¶¶ 5–8. Effective defensive shooting requires stopping the human aggressor as quickly as possible, *see* Boone Decl., Ex. 8 at p. 4, ¶ 6, and semiautomatic rifles like the Banned Firearms offer superior accuracy, less recoil, greater effective range, faster reloading, potentially reduced downrange hazard, better ergonomics, and a larger ammunition capacity than other types of firearms, such as handguns and shotguns, *see* Roberts Decl., Ex. 11 at p. 3, ¶ 8.

Defendants' Response: Disputed. *See* Defendants' Response to paragraph 40, above. Defendants note that this averment contains an admission that Banned Firearms include weapons that are defined by common characteristics based on their similarity to the AR-15, an enumerated Assault weapon.

42.     These firearms are also relatively lightweight, are available with a telescoping/adjustable stock, have a vertical pistol grip, can be fired with one hand, are chambered for .223/5.56 cartridges that can be effective while having relatively mild recoil, and utilize magazines with a standard capacity of 20 or 30 rounds. *See* Boone Decl., Ex. 8 at pp. 4–5, ¶¶ 7–8. These characteristics make Banned Firearms such as the AR-15 and its copies appropriate for close-quarter encounters, and are among the easiest to shoot accurately. *Id.* at p. 4, ¶ 7. They are also generally easier to operate one-handed, in case of injury, compared to other shoulder fired weapons. *See* Roberts Decl., Ex. 11 at p. 3, ¶ 8.

Defendants' Response:  Disputed. *See* Defendants' Response to paragraph 40, above. Furthermore, to the extent that the cited opinions contain comparisons to other weapons, such as "easiest to shoot accurately" or "easier to operate one handed," they are not based on comparative studies or testing of other weapons, including other shoulder-fired weapons. Nor

do Dr. Roberts or Agent Boone cite any research on these topics; their opinions are entirely based on isolated observations.  Roberts Report, p. 5; Boone Report, p. 4.

Moreover, Dr. Roberts is a dental surgeon who asserts in his report that he is an expert in wound ballistics.  Roberts Report, p. 1. He has no basis for offering any expert opinion about choice of weapons for self-defense.

Finally, Defendants note that this averment again constitutes an admission that Plaintiffs and their purported experts know and understand which weapons are banned and can define them by their characteristics.

43.    The ammunition typically used by the Banned Firearms, specifically the .223 Remington or the very similar 5.56mm, is also more effective and reliable at stopping human attackers, and is more humane to those attackers, than typical handgun ammunition. *Id.* at p. 4, ¶ 10; *see also* Boone Decl., Ex. 8 at p. 4, ¶ 6. .223 Remington rounds penetrate human tissue at the depth in which the FBI determined to be most desirable – between 12 and 18 inches. *See* Roberts Decl., Ex. 11 at p. 4, ¶¶ 9-10; Boone Decl., Ex. 8 at p. 4, ¶ 6. This is important because under- penetration or over-penetration of human tissue reduces the ammunition's effectiveness at stopping an attacking individual. *See* Roberts Decl., Ex. 11 at p. 4, ¶¶ 10–11. In comparison, effective shotgun ammunition's penetration range is unnecessarily deep, practically guaranteeing pass-thru shots that pose considerable danger to others in the area. *See* Boone Decl., Ex. 8 at p. 6, ¶ 11.

Defendants' Response: Disputed. Plaintiffs experts offer no scientific basis in comparative ammunition penetration studies or in other controlled to support their opinions in the citations contained in this averment or elsewhere in their reports.  Moreover, Agent Boone's expertise in wound ballistics is limited to review of human tissue on one occasion not involving a gunshot

wound together with field review of wounds to small game in hunting situations without scientific controls. Boone Dep. 23:5-24:11, 25:1-27:12. Dr. Roberts, a dentist, examines gunshot wounds to the face in non-emergency situations, but doesn't know what weapon caused the wounds he examines except when a law enforcement officer tells him after the fact, including whether it was a banned weapon. Roberts Dep. 110:3-120:16 (attached hereto as Ex. 4). This averment is also disputed on the basis of Defendants' SOF, ¶¶ 58-60 (Report of Dr. Colwell, one of the treating emergency room physicians after the Columbine and Aurora mass shootings). *See also* Defendants' SOF ¶¶ 64, 148, 161.

44.     Accurate and effective munitions also reduce the need for multiple shots, decreasing the chance of shots missing the intended hostile aggressor and striking innocent bystanders. *See* Roberts Decl., Ex. 11 at p. 4, ¶ 11. In addition, .223 Remington rounds cause smaller and fewer wounds as compared to ammunition fired from other less effective firearms, such as handguns or shotguns, reducing the scope of medical care needed. *Id.* at pp. 4–5, ¶¶ 12–13.

Defendants' Response: Disputed for the reasons stated in response to ¶¶ 42 and 43, s*upra*. In addition, the opinions being offered are not based on comparative studies or testing of other weapons or other ammunition. Plaintiffs offer no scientific basis to conclude that other available weapons are not equally accurate and effective.

45.     In contrast, handguns are much more difficult to fire accurately than semiautomatic rifles because they are more difficult to steady, absorb less recoil, and are more sensitive to shooter technique. *See* Boone Decl., Ex. 8 at p. 5, ¶10; Rossi Decl., Ex. 12 at p. 1, ¶ 2 Att. A at p. 12. These factors combine to make handguns substantially more difficult to fire accurately, especially under stress. *See* Declaration of Guy Rossi, self-defense instructor and

former law enforcement agent, Ex. 12 at p. 1, at ¶ 2 Att. A at p. 12.

Defendants' Response:  Disputed as opinion offered without a basis in scientific testing or reference to controlled studies.  Also, many semi-automatic rifles remain available for use in Massachusetts. *See* Kaplan Decl. Ex. 93, "Guns That Are Not Assault Weapons." *See also* Defendants' SOF ¶¶ 29, 143, 146-149.

46.    Shotguns also have significantly more recoil than semiautomatic rifles, and it is more difficult to fire repeat shots accurately with a shotgun. *See* Boone Decl., Ex. 8 at pp. 5–6, ¶ 11. A common misunderstanding is that the "spread" of shotgun pellets make accuracy less critical when using a shotgun. *Id.* This is not the case, as the most common defensive shotgun rounds, for instance a 00 buckshot used in a 2 3/4" 12 gauge shotgun, typically spread beyond the scoring area of the FBI target, which is based on the size of a human torso, even when fired from a distance of only 21 feet. *Id.* This means that the increase in hit probability is accompanied by the likelihood that some projectiles will miss. This only increases the risk to unintended targets (namely, innocent people). *Id.*

Defendants' Response: Disputed. *See* Defendants' Response to ¶ 45, *supra*.

47.    The suitability of the Banned Firearms for defensive use is highlighted by the fact that they are the most commonly used and recommended rifles by law enforcement, including the FBI, who may only discharge their firearms for defensive purposes. *See* Roberts Decl., Ex. 11 at p. 5, ¶ 14; Boone Decl., Ex. 8 at pp. 5–6, ¶¶ 9, 12; *see also* Klein Dep., Ex. 17 at 153:14-18 (noting that law enforcement officers "are armed with AR-15s in most cases"). Across the country, over one million law enforcement personnel have qualified on the AR-15. *See* Roberts Decl., Ex. 11 at p. 5, ¶ 14.

Defendants' Response: These averments are undisputed except to the extent of the

characterizations contained therein including, without limitation, the characterization that the weapons are the most "commonly used" and "recommended" by law enforcement. *See* Defendants' SOF ¶¶ 156-158 for a discussion of law enforcement use of banned weapons in Massachusetts. More specifically, ¶ 157 establishes that police use of banned weapons in Massachusetts is limited to hostage situations, apprehension of potentially well-armed criminals, response to active shooting incidents and other similar encounters. These are situations that even the plaintiffs' experts recognize the average citizen does not face. *See* Rossi Dep. 48:1 – 49:21 (attached hereto as Ex. 5); Boone Dep. 53:17-55:9.

48.     The Banned Firearms and Magazines, which Plaintiffs seek to own and use for defensive purposes, are used by Massachusetts law enforcement officers. *See* Klein Dep., Ex. 17 at 53:4-7, 53:8-10, 153:17-18, 173:9-10. As Dr. Gary Roberts explained, "private citizens who wish to own a firearm for self- and home defense should use a semiautomatic rifle – most likely the same firearm and ammunition chosen by police in their community." *See* Roberts Decl., Ex. 11 at p. 5, ¶ 14. This is because the degree of force required to stop a violent felon does not change whether confronted by a law enforcement officer or a private citizen. *Id.* The violent felon's anatomy, physiology, and incapacitation potential does not change depending on the intended victim's profession. *Id.*

Defendants' Response: *See* Defendants' Response to ¶ 47, *supra*. Also, many semi-automatic rifles remain available for use in Massachusetts. *See* Kaplan Decl. Exhibit 93, "Guns That Are Not Assault Weapons." *See also* Defendants' SOF ¶¶ 29, 143, 146-149.

49.     Many semiautomatic firearms, including the Banned Firearms that the Notice of Enforcement purports to criminalize, are manufactured to accept magazines with standard capacities greater than ten rounds. *See* Rossi Decl., Ex. 12 at p. 1, ¶ 2 Att. A, p. 3; Curcuruto Decl.,

Ex. 9 at p. 1, ¶ 2 Att. A; *id.* at pp. 4–5; ¶ 4; Roberts Decl., Ex. 11 at p. 6, ¶ 16; *id.* at p. 1, ¶ 2 Att. A, p. 4.

Defendants' Response: Disputed in part. Defendants dispute that the Notice of Enforcement "criminalizes" firearms, and to the extent of the characterizations contained in this averment, including use of the words "many" and "purports." The averment is also misleading because, as the Plaintiffs acknowledge, the same firearms will also accept and function properly using available magazines with a capacity of ten rounds or fewer. Supica Dep. 115:21-116:1; Boone Dep. 118:18-119:11.

50. These magazines are necessary for effective self-defense, particularly in situations where more than 10 shots are needed to stop a threat, which is often the case. See Rossi Decl., Ex. 12 at pp. 3–4, ¶ 8; Roberts Decl., Ex. 11 at pp. 3, 5–6, ¶¶ 7, 15; Supica Decl., Ex. 13 at p. 1, ¶ 2 Att. A, p. 19; Declaration of Gary Kleck, Professor of Criminology and researcher of firearms bans, Ex. 10 at p. 1, ¶ 2 Att. A, pp. 4–5. Very few, if any, instances in which the use of a firearm is necessary for self-defense afford the time necessary to reload. See Rossi Decl., Ex. 12 at p. 5, ¶ 10. For instance, in the well-known Tueller Drill used in police training, it is emphasized that an attacker who is 21 feet away can close the entire distance between himself and the victim in only 1.5 seconds. Id.

Defendants' Response: Disputed to the extent that Plaintiffs offer no evidence that large capacity magazines are or have actually been used by civilians in self-defense. Defendants' SOF, ¶¶ 152-155. Also to the contrary, the time necessary to reload has been used by law enforcement officers and mass shooting victims to disable a criminal shooter or to escape mass shooting situations. Defendants' SOF ¶¶ 104-107. It is not difficult, for example, for a potential shooting victim to exit a room in the 2-4 seconds that it takes for a shooter to reload. Kleck Dep. 165:15-

166:11. In general, magazine changes provide time for potential shooting victims to hide or flee. Kleck Dep. 173:1-22; Boone Dep. 100:10-102:17.

51.     The most recently released New York Police Department (NYPD) "Annual Firearms Discharge Report," which includes data from 2015, states that, in 35% of NYPD Intentional Discharge-Adversarial Conflict cases, officers needed to fire more than 5 shots to stop the threat, and in 17% of the cases, officers needed more than 10 shots to end the violent encounter- including one case where 84 shots were required. *See* Roberts Decl., Ex. 11 at p. 5–6, ¶ 15; *see also* Rossi Decl., Ex. 12 at pp. 3–4, ¶ 8.

Defendants' Response: Disputed on the basis that there is no evidence of how the NYPD defines "Adversarial Conflict" or anything to suggest that "Adversarial Conflict" is limited to the type of defensive situation that would qualify as "self- defense" under Massachusetts law. Nor are the NYPD's rules of engagement sufficiently defined. *See* Defendants' SOF ¶¶ 156-158 for a discussion of law enforcement use of banned weapons in Massachusetts. More specifically, Defendants' SOF, ¶ 157 establishes that police use of banned weapons in Massachusetts is limited to hostage situations, apprehension of potentially well-armed criminals, response to active shooting incidents and other similar encounters.  These are situations that the average citizen does not face.  *See* Rossi Dep. 48:1 – 49:21 (attached hereto as Ex. 5); Boone Dep. 53:17-55:9.

52.     Because trained law enforcement officers often require more than 10 rounds of ammunition for defensive shooting (*i.e.*, "shooting to stop"), *see* Roberts Decl., Ex. 11 at pp. 5-6, ¶ 15; *see also* Rossi Decl., Ex. 12 at pp. 3–4, ¶ 8; *see also* Boone Decl., Ex. 8 at pp. 6–7, ¶ 12, nearly all law enforcement agencies, including the FBI, issue their officers magazines capable of holding more than 10 rounds of ammunition, with 30 round magazines being the

norm for rifles. *See* Boone Decl., Ex. 8 at pp. 5, 6–7, ¶¶ 9, 12. Mr. Boone, a retired Supervisory Special Agent of the FBI, firearms instructor, and ballistic laboratory director, is unaware of any law enforcement agency that issues pistol magazines that are restricted below standard capacity "to some arbitrary limit like 10." *Id.* at pp. 1–3, 7, ¶¶ 3, 12.

Defendants' Response: Disputed. *See* Defendants' response to ¶¶ 50 and 51, *supra*.

53.    This is because reloading a semiautomatic firearm with a detachable magazine – a12-step process – is time-consuming, even under ideal circumstances. Rossi Decl., Ex. 12 at p. 4, ¶ 9. When considering factors such as distractions, noise, multiple assailants, lighting conditions, nervousness, and fatigue, the time to reload decelerates. *Id*. Reloading is especially time consuming if the victim is handicapped, disabled, or injured. *Id.* at pp. 3, 5–6, ¶¶ 7, 12.

Defendants' Response: Undisputed.  However, Defendants note that the same delays are attendant to reloading for criminal assailants and provide potential victims with an opportunity to disarm the criminal, to flee or to hide.  *See* Defendants' response to ¶ 50, *supra*.

54.    Reloading a firearm is also physically and mentally demanding. *Id.* at p. 5, ¶ 11. It requires two hands (one to hold the firearm and one to load the magazine), limiting a victim's ability to escape, fend off an attacker, call 911, or give physical aid or direction to others. *Id.* Reloading a firearm requires focus and therefore distracts the victim from the assailant and her surroundings. *Id.* This distraction increases the likelihood of a missed shot. *Id.*

Defendants' Response: *See* Defendants' Response to paragraphs 50 and 53, *supra*.

55.    Greater magazine capacity reduces the need to reload in situations requiring more than 10 rounds of ammunition to stop an attacker. *Id*. at p. 3, ¶ 7. As a result, higher capacity magazines allow individuals to better protect themselves. *Id*.

Defendants' Response:  *See* Defendants' Response to paragraphs 50 and 53, *supra*.

56.      A limit on a magazine's capacity may hinder law-abiding citizens' ability to defend themselves, others, and their homes. *See* Roberts Decl., Ex. 11 at pp. 5–6, ¶ 15; Kleck Decl., Ex. 10 at pp. 3–4, ¶ 8; Rossi Decl., Ex. 12 at pp. 3, 6, ¶¶ 7, 13.

Defendants' Response: *See* Defendants' Response to paragraphs 50 and 53, *supra*.

57.      The prohibition of the Banned Magazines can be the difference in surviving or not surviving a self-defense situation. *See* Roberts Decl., Ex. 11 at pp. 5–6, ¶ 15; *see also* Rossi Decl., Ex. 12 at pp. 4, 6, ¶¶ 8, 13. Civilians, unlike police officers, likely have no body armor, no radio, no partner, no cover units, and no duty belt with extra magazines. *See* Roberts Decl., Ex. 11 at pp. 5–6, ¶ 15. Yet, civilians can be targets of opportunity for criminals and are confronted by the same violent felons as are the police. *Id*. Because highly trained and experienced police officers require the use of at least 11 rounds in 17% of their close range encounters to subdue an aggressive assailant, it follows that an untrained civilian gun owner would need at least that many rounds. *See* Rossi Decl., Ex. 12 at pp. 3–4, 6, ¶¶ 8, 13.

Defendants' Response: *See* Defendants' response to ¶¶ 50 and 51, *supra*. None of the citations include even a single example of a situation in which a civilian self-defense incident required use of a large capacity magazine or in which more than 10 rounds were fired.

58.      The desire to have more rounds of ammunition available without reloading is not new; it has driven firearm design and development for centuries. *See* Supica Decl., Ex. 13 p. 1, ¶ 2 Att. A, p. 3. An early firearm with a capacity of more than 10 rounds was available around 1580, and throughout the 17th and 18th centuries, many commercially available firearms had a capacity of more than 10 rounds. Supica Decl., Ex. 13 at p. 2, ¶ 6. Commercially available firearms with a capacity of more than 10 rounds became even more widespread after the Second Amendment was ratified. *Id.* at pp. 2–3, ¶ 7.

<u>Defendants' Response</u>: Disputed. Plaintiffs mischaracterize their own expert's testimony and opinions. See Defendants' SOF at ¶¶ 93-98. At most there was limited production of some experimental firearms that could fire more than one round without reloading.

59. Likewise, semiautomatic firearms with detachable magazines have been available and in wide use for well over a century. *Id.* at p. 3, ¶ 8. The magazines most commonly possessed by civilians hold more than 10 rounds of ammunition. *See* Roberts Decl., Ex. 11 at p. 6, ¶ 16; Curcuruto Decl., Ex. 9 at p. 4, ¶ 10. By "limiting magazine capacity to 10 rounds or less," Plaintiffs are "denie[d] . . . the benefits of modern technology and force[d] . . . to use defensive tools from a bygone era." *See* Roberts Decl., Ex. 11 at p. 7, ¶ 16.

<u>Defendants' Response</u>: See Defendants' response to ¶¶ 50, *supra*. None of the citations include even a single example of a situation in which a civilian self-defense incident required use of a large capacity magazine or in which more than 10 rounds were fired.

60. The Banned Firearms, being semiautomatic, are distinct from military weapons, which are fully automatic. *See* Supica Decl., Ex. 13 at p. 4, ¶ 10; Roberts Decl., Ex. 11 at P. 1, ¶ 2 Att. A, pp. 6–8. The semiautomatic AR-15, for example, is acknowledged even by Defendants to be the "civilian version" of the military's M-16 rifle. *See* Klein Dep., Ex. 17 at 153:24-154:4.

<u>Defendants' Response</u>: Disputed. Defendants dispute the characterization of "military weapons" as being defined by the single characteristic "fully automatic," as well as the assertion that this distinguishes them from the banned firearms. The AR-15 was originally developed for use by the U.S. military. Kaplan Decl. Ex. 36, at 17–19, 23–25; Yurgealitis Decl. ¶¶ 35, 47. Although the M-16 includes a selector switch that allows the shooter to alternate between semiautomatic fire and automatic modes of fire, Yurgealitis Decl. ¶ 47, the United States Army recommends the use of semiautomatic for virtually all purposes because it is more effective and

lethal. Kaplan Decl. Ex. 39 (Dept. of the Army, *Rifle Marksmanship M16-/M4 Series Weapons*, at 7-13 (August 2008)) (The M16 should "normally be employed in the semiautomatic fire mode."). David Bolcome, a former U.S. Marine, was issued an M-16 service rifle that did not operate in fully automatic mode at all; rather it operated in semiautomatic mode or in three-round bursts, the latter of which was to be used only defensively for suppression of enemy fire. Bolcome Aff. ¶¶ 7-9, Exhibit A at 3-2. *See also* Defendants' SOF, at ¶¶ 55-90. Among other things, the banned weapons retain all of the capacities of the military weapons from which they were derived other than the capacity for automatic fire. *See* Supica Dep. 127:6- 10, 217:14 – 219:11; Bolcome Aff. ¶¶ 11–12; Kaplan Decl. Ex. 66, at 1. As the ATF reported in 1998, "[w]hen ATF examined these semiautomatic assault rifles, it found that the rifles, while no longer machineguns, still had a military configuration that was designed for killing and disabling the enemy and that distinguished the rifles from traditional sporting rifles." Kaplan Decl. Ex. 6, at 1. As one commentator noted: "Where the military design has wandered, the civilian market has followed." Kaplan Decl. Ex. 75, at 16.

61. Unlike automatic firearms, semiautomatic firearms will fire only one round with a single trigger pull, the same as a single shot, double barrel, bolt action, pump action, lever action, or revolving firearm. *See* Supica Decl., Ex. 13 at p. 4, ¶¶ 10–11. To fire a subsequent round, the trigger must be released and pulled again. *Id.* at p. 4, ¶ 11. Although many semiautomatic rifles may bear a cosmetic appearance to fully automatic rifles, they are dissimilar in their basic modes of operation. *Id.* Rather, the Banned Firearms are functionally identical to other, more traditional looking commercial semiautomatic rifles. *Id.* Assuming similar launch velocity and barrel twist rate, a projectile launched by an AR-15 rifle is no more or less injurious than if launched by a bolt, pump, lever action, or single-shot rifle. Boone Decl.,

Ex. 8 at p. 7, ¶ 13. Because semiautomatic firearms shoot only as quickly as the operator can pull the trigger, the Banned Firearms shoot no more quickly than any other semiautomatic firearm, including those explicitly exempted from the Challenged Laws. Some common firearms that are not prohibited by the Challenged Laws fire a greater number of lethal projectiles faster than the Banned Firearms. *See* Supica Decl., Ex. 13 at p. 1 ¶ 2, Att. A at p. 23.

<u>Defendants' Response:</u>  Disputed, in part. Defendants do not dispute that a semiautomatic firearm fires one round per pull of the trigger.  Defendants dispute that this makes the banned firearms "functionally identical to other, more traditional looking commercial semiautomatic rifles." The AR-15 is essentially the same as the M-16 in terms of its configuration, appearance, and internal gas operating system. Yurgealitis Decl. ¶¶ 47-50. In semiautomatic mode, AR-15s and M-16s achieve the same performance capacities, firing the same rounds, at the same rates of speed, and with the same muzzle velocity. Supica Dep. 101:18-102:7; Yurgealitis Decl. ¶ 48. *See* Defendants' SOF at ¶¶ 40-98. These performance capabilities cause wounds that are more destructive and lethal than those caused by traditional firearms. *See* Kaplan Decl. Ex. 52; Colwell Decl. at 3-4.  *See* Defendants' SOF at ¶¶ 58-60.

62.     Historical evidence shows that the Challenged Laws will have virtually no effect in combatting crime in Massachusetts. *See* Kleck Decl., Ex. 10 at p. 5, ¶ 10. Homicides committed using a rifle of any kind (much less a Banned Firearm) are extremely rare in Massachusetts and nationally. *See id.*

<u>Defendants' Response:</u> Disputed. The most comprehensive study on the impact of the Federal Assault Weapons Ban, on which the challenged laws were based, concluded that the Federal AWB was effective: crimes committed with assault weapons declined between 17% and 72% across major cities in the years the Federal AWB was in effect, with Boston showing the

greatest decline. See Kaplan Decl. Ex. 47, at 46–62 & n. 55; Ex. 48, at 7–9; Ex. 49, at 19–20; Spitzer Aff. ¶¶ 22–23. Another study concluded that in Virginia the share of gun crimes committed with LCMs ranged between 13% and 16% in the early years of the Federal AWB, decreased to 9% by the last year the Federal AWB was in effect, and then rose to 20% in 2010 after the Federal ban expired. *See* Kaplan Dec. Ex. 50. There is no reason to expect that the effect would be different in Massachusetts. In addition, research has shown that "both state and federal assault weapons bans had statistically significant and negative effects [i.e. reductions] on mass shooting fatalities." Kaplan Dec. Ex. 41 at 282.

63.     FBI Uniform Crime Reporting data indicates that no murders were committed using a rifle in Massachusetts in 2010, 2011, 2012, and 2014. *Id*. Only one murder was committed using a rifle of any kind in 2005, 2007, and 2015, and only two murders were committed using any rifle in 2006, 2008, and 2013. *Id*. In some years (2006, for instance) more than twice as many people were murdered with "hands and feet." *Id*. In sum, a total of eleven individuals were killed with a rifle of any kind from 2005 through 2015 in Massachusetts. *Id.*; *see also* Deposition of David Solet, representative of the Executive Office of Public Safety and Security, Ex. 18 at 51:9-57:7, Ex. 26 (FBI Uniform Crime Reporting data on homicides from 2005 to 2015); *see also* Klein Dep., Ex. 17 at 17:5-8, 49:3-24, 50:1-6, 170:19-21; *see also* Deposition of Michael Halpin, General Counsel for the Massachusetts State Police, Ex. 16 at 49:14-24, 45:24-47:8, Ex. 27 at 5 (Massachusetts State Police statistical data showing that, in 2016, Banned Firearms comprised only 1.5% of total crime guns seized; and in 2015, Banned Firearms comprised only .75% of total crime guns seized); Zani Dep., Ex. 20 at 21:17–22:12.

Defendants' Response: Disputed. *See generally* Defendants' Response to ¶ 64, *infra*. To the extent that assault weapons appear to make up only a small portion of the total crime guns

seized in Massachusetts, defendants note that this may be related to the fact that assault weapons are banned here. *See* Zani Dep. 21:17-24 (Doc. 59-19, Ex. 20). Further, it is unclear why Plaintiffs consider only data from Massachusetts, when data about use of these weapons in other jurisdictions is equally relevant.

64.  Defendants acknowledge that they have no comprehensive police data or records system that reflects a link between the Banned Firearms and Magazines and crime, s*ee* Halpin Dep., Ex. 16 at 12:20–13:10, nor do they have proof that the Banned Magazines are used to commit violent crimes in Massachusetts. *See* Klein Dep., Ex. 17 at 52:7-14. Defendants have not identified any reported incidents where Banned Firearms and Magazines have been used in assaults or shootings directed at law enforcement in Massachusetts. *See* Klein Dep., Ex. 17 at 86:23-24; 171:20–21.

Defendants' Response: Defendants do not dispute that Massachusetts does not maintain a database that specifically records the number of crimes committed with banned firearms and magazines. EOPSS Interrogatory Response at 7-8 (attached hereto as Ex. 6). This is due to a number of factors, including that for many crimes committed with firearms, law enforcement authorities never recover the particular firearm(s) used; further, even where a firearm used in a crime is recovered, prosecutors may or may or may not charge the perpetrator with an offense that reflects the specific type of firearm used. *See id.*; *see also* Solet Dep. 7:13-8:21 (attached hereto as Ex. 7). Defendants dispute the final sentence of paragraph 64 on the grounds that the question whether banned firearms and magazines have been used in shootings directed at law enforcement in Massachusetts is irrelevant. It is clear that banned firearms and magazines have been used in shootings of law enforcement elsewhere, *see* Kaplan Decl. Ex. 57 at 5, and in other kinds of crime in Massachusetts. *See* Kaplan Decl. Ex. 22, Ex. 90.

65.     A ban on standard capacity magazines holding more than ten rounds will not reduce the number of homicides and violent crimes committed in Massachusetts. *See* Kleck Decl., Ex. 10 at p. 2, ¶ 5 ("My research has found no link between a limit on magazine capacity and the number of homicides or violent crimes, and no such link can be found in the literature."). Nor will such a ban cause any significant reduction in the number of gun-violence victims. *Id.* at p. 2, ¶ 6.

<u>Defendants' Response:</u> Disputed. Further, whether or not the ban on large capacity magazines reduces the number of gun violence victims generally, studies have shown that large capacity magazines are a weapon of choice in mass shootings, *see* Kaplan Decl. Ex. 55, 56, 80, and that where they are used in mass shootings, the number of fatalities is higher. *See* Kaplan Decl. Ex. 82 at 3. *See generally* Defendants' SOF ¶¶ 117-141.  In addition, the opinions of Professor Kleck can fairly be discounted because he chooses to use an idiosyncratic and limiting definition of mass shootings -- more than six killed or injured.  *See* Kleck Dep. 139:1-12. Kleck's definition is at odds with the definitions employed by Congress and by the Gun Violence Archive (a/k/a shootingtracker.org), the very organization Kleck relies on for his data.  Congress's definition is three or more killed in single incident. 28 USC 530C(b)(1)(M)(i). The Gun Violence Archive defines mass shootings as four or more killed or injured. Kleck Dep. 80:9-83:7. This provides a reasonable basis to infer that Professor Kleck is biased in favor of minimizing the problems associated with use of assault weapons and large capacity magazines in mass shootings. *See also* Rand Decl. ¶¶ 3-17 (discussion of the data that Kleck claims to rely on).

66.     This is because criminals rarely actually discharge their firearm but rather use the gun only to threaten the victim. *Id.* When criminals do fire their weapons, they usually fire very few rounds. *Id.* at p. 3, ¶ 7. For instance, in a sample of Philadelphia gun homicides, the

average number of rounds fired was 2.7 for attacks committed with semiautomatic pistols, and 2.1 for those with revolvers. *Id.* Thus, in the vast majority of instances in which an attacker fires his weapon, the unavailability of magazines with capacities greater than ten rounds would be inconsequential to the number of shots fired by the attacker and also to the number of victims. *Id.*

Defendants' Response: Disputed. See Defendants' SOF, ¶ 121, 127-139. Defendants note as well that to the extent this data is accurate, it undermines the Plaintiffs' assertions (made without citing a single incident) that civilians typically need magazines of ten rounds or more to defend themselves,

67. As a result, "the Challenged Laws aim to fix a small (perhaps non-existent problem) by hindering the self-defense capabilities and endangering the lives of every law-abiding Massachusetts citizen." *Id.* at p. 5, ¶ 10.

Defendants' Response: Disputed. The Challenged Laws aim to address the disproportionate use of assault weapons and large capacity magazines in particularly serious crimes, such as mass shootings and shootings of law enforcement officers, as discussed in detail in Defendant's SOF, ¶¶ 117-141, 156-161.

**B. The Notice of Enforcement Broadens the Ban to Apply to Prior Transactions of Firearms That Were Lawful at the Time They Occurred.**

68. Massachusetts law requires Defendants to inspect records of all firearm transfers each year for violations of law. G. L. c. 140, § 123.

Defendants response: Disputed. The cited law speaks for itself and does not contain this requirement.

69. Until the issuance of the Notice of Enforcement, transfers of Massachusetts

Compliant Firearms, which were "compliant to the Massachusetts General Laws prior to July 20, 2016," were "considered lawful" by Defendants. *See* Zani Dep., Ex. 20 at 11:10–14, 16–19, 21–24, 12:1–4. Before the Notice of Enforcement was issued, neither Defendants nor any other law enforcement agency took action to halt the transfers of Massachusetts Compliant Firearms. *See* Zani Dep., Ex. 20 at 13:19–14:6; *see also* O'Leary Decl., Ex. 6 at pp. 1–2, ¶ 4; Ricko Decl., Ex. 7 at p. 1, ¶ 3. In fact, between 7,000 and 12,000 "copies or duplicates" were sold in Massachusetts in 2015, Klein Dep., Ex. 17 at 62:8–16, without legal repercussions, *see* Deposition of David Bolcome, Senior Investigatory for the Office of the Attorney General, Ex. 14 at 22:9–17. Similar sales occurred in 2013 and 2014. *Id.* at 25:7–9, 16–14; 37:14–17; 38:15–16. At the time, the Notice of Enforcement had not yet been issued. *See* Klein Dep., Ex. 17 at 72:3–9.

Defendants' Response: Disputed, except for the last sentence. *See* Response to Paragraph 7, which is incorporated here. In addition, the cited excerpts from the Zani deposition do not support the assertion in the statements in this paragraph. The defendants do not dispute that thousands of weapons (broadly estimated to be between 7,000 - 12,000) were sold in Massachusetts in 2015 that appeared to be banned copies or duplicates of assault weapons enumerated under G.L. c. 140, § 121, and that similar sales occurred in 2013 and 2014, but dispute that this was without "repercussion."

70.     Prior to issuance of the Notice of Enforcement, Plaintiffs were never informed that the purchase or sale of Massachusetts Compliant Firearms was illegal, and at no time was any action taken against Plaintiffs by Defendants or any law enforcement agency despite the mandated records inspection. *See* O'Leary Decl., Ex. 6 at pp. 1–2, ¶ 4; Ricko Decl., Ex. 7 at pp. 1–2, ¶ 3; Wallace Decl., Ex. 5 at p. 1–2, ¶ 5. Instead, Plaintiffs' transactions of Massachusetts Compliant Firearms were repeatedly approved. *See* O'Leary Decl., Ex. 6 at pp. 1–2, ¶ 4; Ricko

Decl., Ex. 7 at pp. 1–2, ¶ 3; Wallace Decl., Ex. 5 at pp. 1–2, ¶ 5.

<u>Defendants' Response</u>: Disputed. See responses to ¶¶ 7, 68 and 69.

71.     Plaintiffs relied upon Defendants' repeated confirmation to ensure that the firearms they bought and sold were compliant with Massachusetts law. *See* O'Leary Decl., Ex. 6 at pp. 1– 2, ¶ 4; Ricko Decl., Ex. 7 at pp. 1–2, ¶ 3; Wallace Decl., Ex. 5 at pp. 1–2, ¶ 5. Plaintiffs believed they were engaging in legal transactions. *See* O'Leary Decl., Ex. 6 at pp. 1–2, ¶ 4; Ricko Decl., Ex. 7 at pp. 1–2, ¶ 3; Wallace Decl., Ex. 5 at pp. 1–2, ¶ 5.

<u>Defendants' Response</u>: Disputed.  Defendants did not confirm that the firearms plaintiffs bought and sold were compliant with Massachusetts law. *See* Responses to ¶¶ 7 and 69.

72.     Plaintiffs' prior transactions of Massachusetts Compliant Firearms consummated before the effective date of the Notice of Enforcement were in good faith compliance with all Massachusetts laws and were processed with Defendants' approval at the time they occurred. Klein Dep., Ex. 17 at 161:16–162:4.

<u>Defendants' Response</u>: Disputed. *See* Response to ¶¶ 7 and 69.  In addition, the deposition excerpt cited in paragraph 72 does not support the assertion.

73.     The Notice of Enforcement provides no exception to its application to dealers for transfers made before July 20, 2016. *See* Notice of Enforcement, Ex. 25 at p. 4.

<u>Defendants' Response</u>: Paragraph 73 merely purports to characterize the Notice of Enforcement, which speaks for itself.

74.     As a result, all previous transactions consummated by GOAL, On Target, and Overwatch involving Massachusetts Compliant Firearms now banned under the Notice of Enforcement could be found to have been illegal sales of firearms under Massachusetts law, as well as federal law that criminalizes sales of firearms not in compliance with state law. *See* 18

U.S.C. § 922(b)(2).

Defendants' Response:  Paragraph 74 does not assert a "fact" but rather a hypothetical occurrence and a legal conclusion to which no response is required. Defendants dispute that the Notice of Enforcement "banned" firearms that were previously lawful.  *See* Response to ¶ 10, above.

75.    The Notice of Enforcement does not declare that individual owners or licensed dealers who engaged in these transactions were complying with the law at the time they sold Massachusetts Compliant Firearms, nor does it declare that dealers are immune from prosecution or loss of license for selling those firearms. *See* Notice of Enforcement, Ex. 25 at p.4 (stating only that "[t]he Guidance will not be applied to future possession, ownership, or transfer of Assault weapons by dealers, provided that the dealer has written evidence that the weapons were transferred to the dealer in the Commonwealth prior to July 20, 2016" and that "[t]he Guidance will not be applied to possession, ownership or transfer of an Assault weapon obtained prior to July 20, 2016.").

Defendants' Response: Paragraph 75 merely purports to characterize the Notice of Enforcement, which speaks for itself. To the extent any legal conclusions are asserted, no response is required.

76.    Plaintiffs fear they will be subject to criminal prosecution for their possession and transfer of the Massachusetts Compliant Firearms prior to issuance of the Notice of Enforcement, even though the transactions were legal when they occurred, because of the Notice of Enforcement's retroactive interpretation of the Challenged Laws. *See* Wallace Decl., Ex. 5 at pp. 1–2, ¶¶ 5–6; O'Leary Decl., Ex. 6 at pp. 1–3, ¶¶ 4, 6; *see also* Linden Decl., Ex. 2 at p. 2, ¶ 8; Worman Decl., Ex. 1 at p. 2, ¶ 7; Sawyer Decl., Ex. 3 at pp. 2–3, ¶ 8.

Defendants' Response: Disputed. Plaintiff has presented no evidence of a pending or threatened prosecution, nor does the Notice of Enforcement provide a reason for plaintiffs to fear prosecution for conduct occurring prior to July 20, 2016. *See also* Responses to ¶¶ 7 and 10, above. The assertion that prior transactions "were legal when they occurred" is a legal conclusion, and no response is required.

### C. The Phrase "Copies or Duplicates" As Used in the Ban Is Subject to Differing Interpretations.

77. The phrase "copies or duplicates" in the Challenged Laws is not defined in the law itself, nor is the phrase defined in the Federal Ban on which the statute is based or in any other state law or court decision. *See* Klein Dep., Ex. 17 at 123:8-11, 131:1–2.

Defendants' Response: Paragraph 77 does not set forth an assertion of "fact" but merely purports to characterize the referenced statutes, which speak for themselves. To the extent the paragraph assertions a legal conclusion, it does not require a response.

78. Massachusetts law requires Defendants to inspect records of all firearm transfers for violations. *See* G. L. c. 140, § 123. By continuously inspecting firearms records and processing tens of thousands of applications for Massachusetts Compliant Firearms from 1998 up until the issuance of the Notice of Enforcement – a period of 18 years – the scope of the phrase "copies or duplicates" in the Challenged Laws was interpreted by Defendants through practice and custom to exclude Massachusetts Compliant Firearms. *See* Remarks of Attorney Gen. Maura Healey, Assault Weapons Ban Press Conference as Prepared for Delivery (July 20, 2016), Ex. 24 at p. 3 (stating that over 10,000 Massachusetts Compliant Firearms were sold in 2015 alone).

Defendants' Response: Paragraph 78 asserts conclusions of law, which do not require a response. To the extent it is construed to assert "facts," it is disputed. The cited provision of Massachusetts law requires licensing authorities, usually local police, to inspect a licensed

dealer's records and inventory "one time per calendar year." *See* G.L. c. 140, § 123. Paragraph 78 cites no evidence that the defendants have "continuously inspect[ed]" firearm transaction records. Further, the defendants do not "process[]… applications" for firearms transactions. *See* Defendants' response to ¶ 7, above,

79.      The Notice of Enforcement provides two circumstances under which a firearm is a "copy or duplicate" of an Enumerated Banned Firearm. *See supra* at ¶ 11. Massachusetts has no written protocol for determining whether a weapon is a copy or duplicate, other than the Attorney General's Notice of Enforcement. Solet Dep., Ex. 18 at 73:7–12.

Defendants' Response: The first sentence of this paragraph does not assert a "fact," but merely characterizes the Notice of Enforcement, which speaks for itself. Defendants do not dispute that no state or local agency, other than the Attorney General, has a "written protocol" for determining whether a weapon is a "copy or duplicate." *See* Solet Dep. 73:7-12 (attached hereto as Ex. 7) (stating that the Executive Office of Public Safety and Security ("EOPSS") does not have its own protocols for determining whether a weapon is a copy or duplicate and deferring to the Notice of Enforcement for the definition of "copy or duplicate").

80.      No single government official has "primary responsibility" for determining when a weapon constitutes a copy or duplicate. *Id.* at 72:10–12. When asked for the identities of people involved in developing the Notice of Enforcement, Defendants could not pinpoint anyone affiliated with the Massachusetts State Police who was involved in determining whether particular firearms were copies or duplicates. Halpin Dep., Ex. 16 at 18:16–19:5 .

Defendants' Response: Defendants do not dispute the general premise that responsibility for enforcing Massachusetts' firearms laws lies with an array of parties, including prosecutors, police and parole officers in the field, as explained in the cited testimony. Solet Dep. 72:10-73:6

(attached hereto as Ex. 7). Defendants do not dispute that there were no employees of the Massachusetts State Police "who were responsible for development of the Attorney General's Enforcement Notice." Halpin Dep., Ex. 16 at 18:21–19:5 (attached hereto as Ex. 8).

81.     The Notice of Enforcement's proposed guidance on the definition of "copies or duplicates" does not clarify the statutory phrase. Political Science professor Robert Spitzer, Defendants' expert in firearms policy could not articulate what certain phrases in the guidance mean, nor could he identify whether one of his own firearms was a "copy or duplicate" under Massachusetts law. *See* Deposition of Robert Spitzer, Ex. 19 at 122:5–18.; 122:13–125:5 ("[T]hat depends on how that phrase is interpreted under the law."). Instead, he stated that he would contact the Massachusetts State Police to ask them whether a firearm was banned. *Id.* at 127:9–128:7. But, the Massachusetts State Police stated that it does not answer such questions. *See* Halpin Dep., Ex. 16 at 24:9–25:6.

Defendants' Response: The first sentence of this paragraph asserts a conclusion of law, and requires no response. To the extent this paragraph asserts "facts," they are disputed. Professor Spitzer stated the phrase "copy or duplicate" refers to a weapon that is "highly similar to the listed weapon, but that may be manufactured by a different company; for example, under a different name." Spitzer Dep. 122:11-18 (Doc. 59-18, Ex. 20). Spitzer's statement that he would seek guidance from the MSP is immaterial; EOPSS, which includes the MSP, has a policy of referring any public inquiries regarding the Notice of Enforcement to the Attorney General's Office. EOPSS Interrogatory Answers at 16 (attached hereto as Ex. 6); *see* Halpin Dep. 23:21-25:6 (attached hereto as Ex. 8) (MSP officers do not give out legal advice and will sometimes direct public inquiries to other agencies).

82.     Defendants' witnesses described procedures for determining when a firearm

qualifies as a copy or duplicate, ranging from a visual inspection coupled with extensive training to the examination of admittedly incomplete digital records. *Compare* Solet Dep., Ex. 18 at 76:1–9, Deposition of Michaela Dunne, Director of the Firearms Records Bureau, Ex. 15, 18:11–14 ("Any other firearm that could be considered an assault weapon under the Federal assault weapons definition we wouldn't be able to tell, because we'd have to physically inspect the firearm."), *with* Solet Dep., Ex. 18 at 22:19–23:7 ("[T]here's never been an entry made [in the state records] that says this is a copy or duplicate, this is not a copy or duplicate. There's no tab that you could click that would say give me all the copies or duplicates[.]").

Defendant's Response: Paragraph 82 does not assert a "fact," but merely purports to paraphrase certain deposition testimony, which speaks for itself,

83.     To make an accurate determination of whether a firearm is a "copy or duplicate," a person would need to inspect a weapon's inner workings and various parts, rendering a purely visual assessment incomplete. Bolcome Dep., Ex. 14 at 12:9–11, 49:5–9, 51:17–21; *see also* Halpin Dep., Ex. 16 at 61:21-62:8, 65:14-15, 65:18-66:3 (explaining that determining whether a weapon is "substantially similar" to an Enumerated Banned Firearm requires an analysis of "the internal structure and mechanism of the weapon"). Thus, a person would also need extensive knowledge of every Enumerated Banned Firearm to make an accurate determination.

Defendants' Response: Defendants do not dispute that a physical inspection of the firearm, with a focus on the firearm's internal components, would be one way to determine whether the firearm is likely a copy or duplicate of an assault weapon enumerated in G.L. c. 140, § 121. Bolcome Aff. ¶ 18. Defendants dispute that a person would need "extensive knowledge of every Enumerated Banned Firearm to make an accurate determination" as to whether a particular weapon is a copy or duplicate. The plaintiffs, for example, understand how

to identify a "copy or duplicate" based on their acquired knowledge of firearms, or on information obtained from manufacturers, gun dealers or other sources. *See* responses to ¶¶ 19, 20, 24 and 25, above. The dealer plaintiffs clearly are able to tell when a particular firearm is a copy or duplicate of an AR-15 or an AK-47. O'Leary Dep. 90:4-17 (On Target's owner is aware the he cannot sell "semiautomatic, gas operated [rifles] that are similar in nature to the Arma-Lite AR-15," nor can he sell AK-47s); Kaplan Decl. Ex. 24; Ricko Dep. 41:14-42:22, 44:23-45:8 (Overwatch's owner is familiar with AR-15s and AK-47s that are made by many different manufacturers; all are referred to as AR-15s or AK-47s). Likewise, plaintiffs' expert stated that he could tell whether a gun was a "modern sporting rifle" – i.e. built on an AR-15 or AK-47 platform – by looking at it, inspecting its workings, and determining what accessories it has. Curcuruto Dep. 56:6-54:17 (attached hereto as Ex. 3); Supica Rep. p. 15 ("The AR-15 has become the most popular civilian rifle design in America, and is made in many variations by many companies;" Boone Rep. p. 5 ("For purposes of this discussion, rifles similar to the AR-15, despite their manufacturer or model variation, will be referred to as "AR-15" rifles."). To the extent that individuals are unsure as to the lawfulness of semiautomatic guns that are not built on the AR-15 or AK-47 platform, the Attorney General's office directs those individuals to its website. *See* Kaplan Decl. Exhibit 93, "Guns That Are Not Assault Weapons"; *see also* Klein Dep. 115:22-117:22 (attached hereto as Ex. 1) (the Attorney General's Office has responded to telephone and email inquiries from the public concerning the Notice of Enforcement).

84. Most citizens' only resource for clarification is the Commonwealth's website. Klein Dep., Ex. 17 at 118:5–7. If the website cannot provide a clear answer (which happens "[i]n some cases," *see id.* at 178:12–16), Massachusetts requires the person to rely on the seller—or

even the manufacturer—to determine whether a particular gun is a copy or duplicate of a banned firearm. *Id.* at 147:10–20. (Q: How does the citizen wishing to purchase a semi-automatic rifle determine whether or not the internal functional components are substantially similar in construction and configuration to those of an enumerated weapon? A: We expect in the first instance that the gun seller is going to help them make that determination and that the gun seller knows whether the gun, for example, is effectively an AR-15 for all intents and purposes, but if there was any doubt, the manufacturer would know."). Yet, Defendant Healey has accused the gun industry of "openly def[ying]" Massachusetts laws "for nearly two decades." *See* Press Release, AG Healey Announces Enforcement of Ban on Copycat Assault Weapons (July 20, 2016), Ex. 23 at p. 1. Defendant Healey made clear in her remarks when issuing the Notice of Enforcement that the reason the Notice of Enforcement was necessary was because the Defendants do not agree with the determinations made by firearms sellers and manufacturers: "[T]he gun industry has taken it upon itself to interpret our assault weapons ban . . . . My office's action today will give us the full protection of the state assault weapons ban – and not leave it to gun manufacturers' self-appointed interpretation." *See* Remarks of Attorney Gen. Maura Healey, Assault Weapons Ban Press Conference as Prepared for Delivery (July 20, 2016), Ex. 24 at pp. 3–4.

Defendants' Response: Disputed. Defendants submit that most public inquiries concerning the Notice of Enforcement have been resolved by directing the inquiring party to the Attorney General's website. *See* Klein Dep. 117:15-118:7 (attached hereto as Ex. 1). In a case in which a member of the public inquires as to whether a particular firearm is a copy or duplicate, the Attorney General's Office will share its opinion with the inquiring party, but will also direct that person to discuss this issue with the gun dealer or manufacturer. *See id.* at 178:5-16. As discussed in the response to paragraph 83, above, the record shows that gun dealers and others

understand what is a copy or duplicate of an enumerated weapon (such as a Colt AR-15 or an AK-47), and what is not. Further, although thousands of apparent copies or duplicates of the enumerated weapons were sold in Massachusetts prior to the Notice of Enforcement, these sales stopped after the Notice issued – demonstrating that gun sellers understand what weapons may not be sold. Bolcome Dec. ¶¶ 17, 22.

85.     The Attorney General will not answer questions on the issue. *See* Bolcome Aff., Ex. 14 at 40:10–13 (confirming it is not the position of the Attorney General to answer questions about whether a Smith and Wesson MP-15 .22 would be considered a "copy or duplicate" under the Notice of Enforcement).

Defendants' Response: Disputed. The cited testimony refers to one specific question and not to a policy of the Attorney General. The Attorney General's office has published on its web site a list of frequently asked questions with responses, together with other information about enforcement of the assault weapons ban. http://www.mass.gov/ago/public-safety/awbe.html. In addition, the office maintains a hotline and has a dedicated email address for inquiries about the Notice of Enforcement. Bolcome Aff. ¶ 23. *See also* Defendants' Response to ¶ 84.

86.     Even Defendants and their witnesses have difficulty determining how to apply the above-cited tests. For example, in his deposition testimony, the Attorney General's Office was unable to say whether a semiautomatic rifle chambered in a different caliber would be banned under the similarity test. *Id.* at 18:21–22. And the Attorney General's Office was unable to answer whether a weapon would be banned if it was rendered incapable of semiautomatic fire. Klein Dep., Ex. 17 at 135:23–136:4. Furthermore, police departments in Massachusetts have no policy or written guidance for determining substantial similarity. Halpin Dep., Ex. 16 at 67:15–20, 68:9–15. Because not all officers are "trained on the internal components of the enumerated banned

firearms," individual officers without training on the Banned Firearms will be called upon to apply the Notice of Enforcement's technical "similarity" test to determine when probable cause for an arrest exists. *See id.* at 68:23–69:6, 69:8–11, 69:13–18.

Defendants' Response: Disputed. The cited deposition excerpts do not support the conclusory assertion in the first sentence and the hypothetical questions that were posed, and do not represent applications of the similarity or interchangeability tests to actual weapons. *See also* Defendants' Response to ¶ 83, *supra*. The fourth and fifth sentences are disputed because the cited Halpin deposition excerpts, in context, do not support the assertions.

87. The Notice of Enforcement provides that a manufacturer's advertising of a particular firearm will be "relevant" in determining whether it is a "copy or duplicate." *See* Notice of Enforcement, Ex. 25 at 4. But the Notice of Enforcement does not articulate what "relevant" means or how relevance will be used to determine if a firearm is a "copy or duplicate." *Id.* Most police officers do not receive training on the marketing of firearms. Halpin Dep., Ex. 16 at 72:3– 7.

Defendants' Response: The first two sentences of paragraph 87 do not assert a "fact," but merely purport to characterize the Notice of Enforcement, which speaks for itself.

88. The Notice of Enforcement also states that a firearm that qualifies as a "copy or duplicate" will remain a "copy or duplicate," even if it is altered to no longer meet these tests. *See* Notice of Enforcement, Ex. 25 at 4. Plaintiffs cannot even rely on the current configuration of the firearm when trying to determine if a firearm is a banned "copy or duplicate," but must also be aware of the firearm's historical configuration. *See id.* ("If a weapon, as manufactured or originally assembled, is a Copy or Duplicate under one or both of the applicable tests, it remains a prohibited Assault weapon even if it is altered by the seller.")

<u>Defendants' Response</u>:  The Notice of Enforcement speaks for itself.  The second sentence of this paragraph does not assert a "fact" under Rule 56(c) as it is hypothetical and argumentative.

89.     Plaintiffs are uncertain whether their firearms, or firearms they wish to purchase, constitute a "copy or duplicate" of an "assault weapon," because of the lack of clarity in the Challenged Laws and the Notice of Enforcement. *See* Ricko Decl., Ex. 7 at p. 2, ¶ 5; Chamberlain Decl., Ex. 4 at p. 1, ¶ 4; O'Leary Decl., Ex. 6 at p. 2, ¶ 5; Worman Decl., Ex. 1 at p. 2, ¶¶ 5, 7; Sawyer Decl., Ex. 3 at p. 2, ¶ 4.

<u>Defendants' Response</u>:  Disputed.  *See* Defendants' responses to ¶¶ 19-26 and 83-85, above.

Respectfully submitted,

MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts; DANIEL BENNETT, in his official capacity as Secretary of the Executive Office of Public Safety and Security; COLONEL KERRY GILPIN, in her official capacity as Superintendent of the Massachusetts State Police,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/  William W. Porter
William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2559

Date: January 5, 2017            bill.porter@state.ma.us

**<u>CERTIFICATE OF SERVICE</u>**

      I certify that this document, filed through the Court's ECF, system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants by first-class mail on January 5, 2018

<u>/s/ William W. Porter</u>
William W. Porter
Assistant Attorney General
