## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DAVID SETH WORMAN, et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1-17-CV-10107-WGY** |
| | ) | |
| **MAURA HEALEY, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' REPLY TO DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost (collectively, "Plaintiffs"), by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, submit their Reply to Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Reply"). Plaintiffs also are submitting their Reply to Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Reply SUF"), together with Exhibits, which are incorporated by reference.

# TABLE OF CONTENTS

**TABLE OF MAJOR AUTHORITIES** ........................................................................................ iii

**INTRODUCTION** ............................................................................................................... 1

**ARGUMENT** ...................................................................................................................... 2

    I.   The Challenged Laws Deny Plaintiffs Their Second Amendment Rights. ........................ 2

        A.  The Banned Firearms and Magazines Are Protected by the Second
            Amendment. ................................................................................................................. 2

        1.   The Banned Firearms and Magazines Are in Common Use and Typically Possessed
    for Lawful Purposes. ............................................................................................................ 2

        2.   Defendants' "'Like' M16s" Analysis Is Not Supported by *Heller*, and Regardless, the
    Banned Firearms and Magazines Are Unlike Military Weapons. ........................................ 4

        3.   Defendants' "Lineal Descendants" Argument Misreads *Heller* and *Parker*. ............. 6

        B.  The Challenged Laws Ban a Category of Constitutionally Protected Firearms,
            Requiring Analysis of the Text and History of the Second Amendment, Not
            Means-End Scrutiny. .................................................................................................... 8

        C.  Defendants' Two-Part Approach Has Not Been Adopted by the First Circuit
            or This Court to Evaluate a Ban Depriving Law-Abiding Citizens of Firearms
            Commonly Possessed for Self-Defense in the Home. ............................................... 11

        D.  Even Under the Two-Part Approach, the Challenged Laws Still Fail. ...................... 13

        1.   Strict Scrutiny Must Be Applied Because the Challenged Laws Infringe the Core
    Second Amendment Right, and Under Strict Scrutiny the Challenged Laws Fail. .......... 13

        2.   The Challenged Laws Cannot Even Withstand Intermediate Scrutiny Review. ...... 15

    II.  The Challenged Laws Deny Plaintiffs' Rights to Due Process. ....................................... 16

        A.  The Challenged Laws, as Interpreted by the Notice of Enforcement, Do Not
            Provide Plaintiffs with Fair Warning and Notice. ...................................................... 16

        B.  The Challenged Laws Do Not Inform the Public What Conduct Will Result in
            Penalties and Present Opportunity for Arbitrary Enforcement. ................................. 18

**CONCLUSION** ................................................................................................................ 20

**CERTIFICATE OF SERVICE** ............................................................................................ 21

**Cases**

*Andrews v. State,*
  50 Tenn. 165 (1871)...............................................................................................9

*Artway v. Attorney General of State of N.J.,*
  81 F.3d 1235 (3d Cir. 1996)...................................................................................19

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979)...............................................................................................19

*Batty v. Albertelli,*
  Case No. 15-10238-FDS, 2017 WL 740989 (D. Mass. Feb. 24, 2017)............................12, 15

*Bouie v. Columbia,*
  378 U.S. 347 (1964)...............................................................................................17

*Caetano v. Massachusetts,*
  136 S. Ct. 1027 (2016).....................................................................................1, 2, 7, 8

*Com. v. Caetano,*
  26 N.E.3d 688 (Mass. 2015) ....................................................................................7

*Culp v. Madigan,*
  840 F.3d 400 (7th Cir. 2016) .................................................................................16

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)........................................................................................ *passim*

*Duncan v. Becerra,*
   265 F. Supp. 3d 1106 (S.D. Cal. 2017)................................................................10

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ................................................................................16

*Gould v. O'Leary,*
  Case No. 16-10181-FDS, 2017 WL 6028342 (D. Mass. Dec. 5, 2017) ....................12, 13, 14

*Parker v. District of Columbia,*
  478 F.3d 370 (D.C. Cir. 2007) ............................................................................7, 8

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ....................................................................9, 10, 11

*Heller v. District of Columbia,*
  801 F. 3d 264 (D.C. Cir. 2015) .............................................................................15

*Hightower v. Boston*,
    693 F.3d 61 (1st Cir. 2012) ..............................................................11, 13, 14, 15

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014) .....................................................................................15, 16

*McDonald v. Chicago*,
    561 U.S. 742 (2010) .........................................................................................1, 3, 8

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004) ....................................................................................19

*Miranda v. Mendonsa*,
    Case No. 12-CV-11957-IT, 2017 WL 1362021 (D. Mass. Apr. 11, 2017) ............18

*Nunn v. State*,
    1 Ga. 243 (1846) ......................................................................................................9

*Powell v. Tompkins*,
    926 F. Supp. 2d 367 (D. Mass. 2013) .......................................................12, 13, 14

*Rogers v. Tennessee*,
    532 U.S. 451 (2001) ...............................................................................................18

*Springfield Armory, Inc. v. Columbus*,
    29 F.3d 250 (6th Cir. 1994) ...................................................................................20

*Staples v. United States*,
    511 U.S. 600 (1994) .............................................................................................5, 6

*State v. Reid*,
    1 Ala. 612 (1840) .....................................................................................................9

*Turner Broad. Sys., Inc. v. Federal Comm. Com'n*,
    520 U.S. 180 (1997) .........................................................................................10, 11

*United States. v. Booker*,
    644 F.3d 12 (1st Cir. 2011) ........................................................................12, 14, 15

*United States v. Lata*,
    415 F.3d 107 (1st Cir. 2005) .............................................................................17, 18

*United States v. Miller*,
    307 U.S. 174 (1939) .................................................................................................2

*United States v. Nieves-Castano*,
    480 F.3d 597 (1st Cir. 2007) .................................................................................5, 6

*United States. v. Rene E.*,
　583 F.3d 8 (1st Cir. 2009) ...................................................................................12

*Upton v. S.E.C.*,
　75 F.3d 92 (2d. Cir. 1996) ...................................................................................18

**Statutes**

G. L. c. 140 § 121 ...................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 56 .................................................................................................... i

Local Rule 56.1 ....................................................................................................... i

Ronstron, Allan, *Justice Breyer's Triumph in the Third Battle over the Second
　Amendment*, 80 Geo. Wash. L. Rev. 703, 706-07 (2012) .....................................10

Zimring, Franklin E., *Handgun Control, The Second Amendment, and Judicial
　Legislation in the D.C. Circuit: A Note on Parker v. District of Columbia*, 11
　New Crim. L. Rev. 312, 317 (2008) .......................................................................7

**INTRODUCTION**

The Banned Firearms and Magazines are commonly possessed for self-defense in the home. *See* Plaintiffs' Statement of Undisputed Material Facts ("SUF") (Doc. 59) at pp. 1-2, ¶¶ 2, 5, pp. 11-23, ¶¶ 26-67. Possession of these firearms by law-abiding, responsible citizens lies at the core of the Second Amendment right recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Defendants argue that the Second Amendment does not apply at all to the Banned Firearms and Magazines. *See* Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs. Opp.") (Doc. 72) at pp. 4-9. But Defendants' arguments rely upon novel interpretations that conflict not only with the plain reading of *Heller* and subsequent Supreme Court precedent, including *McDonald v. Chicago*, 561 U.S. 742 (2010), and *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), but with the undisputed facts as well.

In this case of first impression in this Circuit, this Court should apply to the Challenged Laws the text-and-history analysis applied by the Supreme Court to the handgun ban in *Heller*, which was a similar prohibition of firearms in common use. The two-part approach proposed by Defendants, *see* Defs. Opp. (Doc. 72) at pp. 1-4, cannot be followed because the Challenged Laws prohibit law-abiding, responsible citizens from possessing firearms commonly possessed for law purposes, including self-defense in the home, and are not regulations deemed "presumptively lawful." *See Heller*, 554 U.S. at 626-27, n. 26. Under either *Heller*'s analysis or Defendants' proposed two-part approach, the Challenged Laws fail to pass constitutional muster.

Moreover, Plaintiffs are not afforded due process because the Challenged Laws, both standing alone and as interpreted by the Notice of Enforcement, do not provide fair notice as to what conduct is lawful and subject Plaintiffs and others similarly situated to retroactive criminal penalties under a statutory term capable of inconsistent interpretations.

**ARGUMENT**

**I.    The Challenged Laws Deny Plaintiffs Their Second Amendment Rights.**

There is no dispute the Banned Firearms and Magazines are bearable arms. Because "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms," *see Heller*, 554 U.S. at 582; *Caetano*, 136 S. Ct. at 1027, Defendants bear the burden of proving that the Challenged Laws and Notice of Enforcement are constitutional.

**A.   The Banned Firearms and Magazines Are Protected by the Second Amendment.**

**1.   The Banned Firearms and Magazines Are in Common Use and Typically Possessed for Lawful Purposes.**

*Heller* affords constitutional protection to those firearms "in common use" – "the sorts of weapons protected [are] those 'in common use at the time'" for "lawful purposes like self-defense." 554 U.S. at 624, 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Defendants are plainly incorrect in attempting to dispute the Banned Firearms and Magazines are in common use. *See* Defs. Opp. (Doc. 72) at pp. 6-8. In the most recent 2017 NSSF Firearms Retailer Survey Report, it was determined that modern sporting rifles were the most popular long gun sold in 2016, accounting for 17.9% of the total firearms sold. *See* Curcuruto Decl. (Doc. 60) at p. 3, ¶ 8. As of 2013, more than 4,800,000 people own at least one modern sporting rifle. *Id.* Likewise, between 1990 and 2015, approximately 50% of all magazines owned were capable of holding more than 10 rounds of ammunition. *Id.* at p. 4, ¶ 10. Several Courts have acknowledged that the Banned Firearms and Magazines are commonly possessed. *See* Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("Plaintiffs Memo.") (Doc. 58) at p. 6. Defendants not only have failed to dispute these facts, they admit that the Banned Firearms are the most popular semiautomatic rifles in the country. *See, e.g.,* Defendants' Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried ("Defs. SUF") (Doc. 63) at pp. 18, ¶ 78.

Defendants then argue that, for Second Amendment protection to apply, firearms must actually be used, or necessary, for self-defense, s*ee* Defs. Opp. (Doc. 72) at pp. 6-8, but the plain reading of *Heller* shows Defendants are conflating the "in common use" and "typically possessed for lawful purposes" to twist *Heller* beyond recognition. Absent from *Heller*'s analysis is the requirement proposed by Defendants and upon which their argument depends. The Supreme Court focused on handguns as the choice of law-abiding citizens for lawful purposes including self-defense, not how often they were actually used or necessary for that specific purpose. 554 U.S. at 628-29. The Supreme Court in *McDonald* expressly rejected Justice Breyer's suggestion that a court would be required to determine what type of firearms are "necessary for self-defense." *See* 561 U.S. at 790-91; 922-23 (Breyer, J., dissenting).

Regardless, the evidence refutes Defendants' assertion that "assault weapons are virtually never used for self-defense." *See* Defs. Opp. (Doc. 72) at p. 7. There are numerous reported instances in the record where Banned Firearms have been used for defense of the self and home. *See* Plaintiffs' Initial Disclosures (Doc. 74-2) at p. 14, ¶¶ 28-31; Assorted News Articles (Doc. 74-16); *see also* Plaintiffs' Reply to Defendants' Response to Plaintiffs' Statement of Undisputed Facts ("Reply SUF") at p. 28, ¶ 37, pp. 30-31, ¶ 40.

The record also contains evidence that the Banned Firearms pose a lesser risk to bystanders, and prove to be safer, compared to other types of firearms, including handguns, shotguns, and other rifles commonly used for hunting. *See* Roberts Decl. (Doc. 59-10) at p. 4, ¶ 11; Boone Decl. (Doc. 59-8) at p. 6, ¶ 11. The Banned Firearms are also easier to maneuver and operate accurately. *See* Roberts Decl. (Doc. 59-10) at p. 3, ¶ 8; Boone Decl. (Doc. 59-8) at pp. 4-5, ¶¶ 7-8. The record evidence shows that 10 or more rounds are often necessary to effectively defend oneself or one's home. *See* Roberts Decl. (Doc. 59-10) at pp. 5-6, ¶¶ 15-16; Rossi Decl. (Doc. 59-11) at pp. 3-6, ¶¶

8-13; Boone Decl. (Doc. 59-8) at pp. 6-7, ¶ 12; Plaintiffs Memo. (Doc. 58) at p. 10. Defendants have failed to dispute these facts. *See* Reply SUF at pp. 31-36, ¶¶ 41-46, pp. 40-41, ¶¶ 50-52.

> **2. Defendants' "'Like' M16s" Analysis Is Not Supported by *Heller*, and Regardless, the Banned Firearms and Magazines Are Unlike Military Weapons.**

Defendants propose that this Court should analyze whether the Banned Firearms and Magazines are constitutionally protected by assessing whether the weapons are "'like' M16s and weapons most useful in military service." *See* Defs. Opp. (Doc. 72) at p. 5. Adopting Defendants' "'like' M16s" test would eviscerate the "in common use" test that *Heller* announced so clearly. *See Heller*, 554 U.S. at 624-25, 627. Defendants' proposed "'like' M16s" analysis has no limits: a firearm may be useful to the military, but also commonly possessed by law-abiding citizens for lawful purposes, including defense of the home. For example, handguns like the Colt Model 1911 have been in military service for over 100 years, have magazine capacities lower than ten rounds, and are in common civilian circulation and have always been. *See* Supica Decl. (Doc. 59-12) at Att. A, p. 13. Defendants' proposed exception would swallow the whole of *Heller*'s ruling.

Generally, advances in the development of firearms for military use and for civilian use have proceeded simultaneously, and firearm designers and manufacturers have historically marketed new developments for both military and civilian uses, such that it should be no surprise that many civilian firearms bear similarity to their military analogs, *see id.* at p. 3, ¶ 9, including many firearms exempted from the Massachusetts' assault weapons ban. *See* Defs. Opp. (Doc. 72) at p. 10 n. 5. Even so, the Banned Firearms are not "functionally identical to the M16 and other military weapons," as Defendants argue. *See* Defs. Opp. (Doc. 72) at p. 6; *see also* Reply SUF at pp. 43-46, ¶¶ 60-61. Nor does any military force in the world use semiautomatic rifles like the Banned Firearms as their standard service firearms, *see* Supica Decl. (Doc. 59-12) at pp. 4-5, ¶ 12

and Att. A, pp. 23-24, as Defendants incorrectly suggest. *See* Kaplan Decl. (Doc. 65-10) at pp.7-13.

No amount of obfuscation from Defendants can change the fact that semiautomatic rifles are not military firearms – they are civilian firearms. *See* Supica Decl., Ex 13 (Doc. 59-12) at p. 4, ¶ 11. Semiautomatic firearms were initially used in the commercial (that is, civilian) sector, and only later adopted by the military. *Id.* at p. 3, ¶ 9. Although many semiautomatic rifles may look like fully automatic rifles, they are functionally identical to other, more traditional looking commercial semiautomatic firearms – including those semiautomatic firearms expressly excluded from the ban created by the Challenged Laws. *Id.*; *see also* G. L. c. 140 § 121 and Office of Attorney General, *Guns That Are Not Assault Weapons* (Doc. 65-20) (excluding from definition of "assault weapon" certain semiautomatic rifles and shotguns); *see also Staples v. United States*, 511 U.S. 600, 615 (1994) (noting that a semiautomatic firearm illegally modified for automatic fire "may give no externally visible indication that it is fully automatic"); *United States v. Nieves-Castano*, 480 F.3d 597, 600–01 (1st Cir. 2007) (same).

The Supreme Court in *Staples* acknowledged this critical functional dividing line between civilian firearms and military firearms: "The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." 511 U.S. at 603. The Court distinguished arms that were "quasi-suspect" by their nature such as "machineguns, sawed-off shotguns, and artillery pieces" from other firearms including the AR-15 that "traditionally have been widely accepted as lawful possessions." *Id.* at 611-12. The First Circuit has recognized *Staples'* reasoning. *See Nieves-Castano*, 480 F.3d at 600-01. The firearm at issue in *Nieves-Castano* was "the commercial version of the AK-47 military weapon" which "comes only as a semi-automatic weapon." *Id.* at 600. The *Nieves-Castano* Court explained that, "[t]he commercial semi-automatic

AK-47 cannot be made into an automatic weapon without some modification or alteration to give it automatic firing capability," *see id.,* consistent with the pronouncement in *Staples* that semiautomatic weapons are "conventional," while fully automatic weapons are not. *See Staples*, 511 U.S. at 615.

Finally, Defendants' reliance on the existence of devices such as "bump stocks" to modify semiautomatic rifles to simulate automatic fire should not be given weight; there is no evidence that such arcane devices are actually bought, sold, or used in Massachusetts, and these devices are already prohibited in Massachusetts. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs Opp.") (Doc. 73) at p. 5. As discussed above, *Staples* considered this issue and rejected the government's argument that knowledge of the possession of a machinegun could be inferred from the very nature of the AR-15, as a "'semiautomatic weapon that [is] readily convertible into a machinegun.'" *Id.* at 612 n.6. The *Staples* Court did not consider the AR-15 to be "'like' M-16s."

Nor are magazines with a capacity greater than ten unprotected because they are "most useful in military service." *See* Defs. Opp. (Doc. 72) at p. 5. Magazines for multishot firearms were developed for civilian use. *See* Supica Decl. (Doc. 59-12) at p. 2, ¶ 6. The magazines most commonly-used by civilians hold more than 10 rounds of ammunition. *See* Roberts Decl. (Doc. 59-10) at p. 6, ¶ 16. Limiting citizens to ten rounds or less is arbitrary and unsupported by any evidence or reason, especially because undisputed evidence establishes that defensive shooting may require more than ten rounds to stop an attack. *See id.* at pp. 5-6, ¶ 15; Reply SUF at pp 40-41, ¶¶ 51-52.

### 3.   Defendants' "Lineal Descendants" Argument Misreads *Heller* and *Parker*.

Ignoring the Supreme Court's emphatic rejection of this argument in *Caetano,* 136 S. Ct. at 1027-28, Defendants attempt to restrict the reach of *Heller's* "in common use" test by grossly

misapplying the concept of "lineal descendants" of those "weapons commonly used for self-defense at the time the Second Amendment was ratified," *see* Defs. Opp. (Doc. 72) at p. 8, relying on the lower court opinion in *Heller*, *Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007). That reliance is misplaced because *Parker* only supports *Heller*'s central holding that arms "in common use" are protected by the Second Amendment and cannot be banned.

The *Parker* Court relied on *Miller* to conclude that the Second Amendment protects firearms "'of the kind in common use at the time,'" holding "[t]here can be no question that most handguns (those in common use) fit that description then and now." *Id.* at 397. In direct refutation of the gloss Defendants would put on *Parker*, the court there went on to hold "[t]he modern handgun-and for that matter the rifle and long-barreled shotgun-is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendent of that founding-era weapon, and it passes *Miller*'s standards." *Id.* at 398. As was the case with the handguns at issue in *Parker*, the Banned Firearms and Magazines are "lineal descendants" of those founding-era weapons precisely because they are in common use today. *Id.*

The Supreme Court did not adopt Defendants' flawed reading of *Parker* even though the dissent in *Heller* advanced it, *see Heller*, 554 U.S. at 715-16, and the lower court in *Caetano* relied upon it. *See Com. v. Caetano*, 26 N.E.3d 688, 693-94 (Mass. 2015), *judgment vacated*, 136 S. Ct. 1027 (2016); *see also* Zimring, Franklin E., *Handgun Control, The Second Amendment, and Judicial Legislation in the D.C. Circuit: A Note on Parker v. District of Columbia*, 11 NEW CRIM. L. REV. 312, 317 (2008) (criticizing "lineal descendants" approach due to "the lack of any clear criteria for establishing what constitutes a 'lineal descent' in the classification of modern guns"). Rather, the Supreme Court held that any argument suggesting that the only firearms protected under the Second Amendment are those that existed at the time of the founding to be "bordering

on the frivolous." *Heller*, 554 U.S. at 582; *Caetano*, 136 S. Ct. at 1029. Both *Heller* and *Parker* agreed that the modern firearms are afforded protection under the Second Amendment "[j]ust as the First Amendment protects modern forms of communications . . . and the Fourth Amendment applies to modern forms of speech." *See Heller*, 554 U.S. at 582; *cf. Parker*, 478 F.3d at 398-99.

At any rate, Defendant's misconstruction of the "lineal descendants" argument is beside the point, because record evidence demonstrates that repeating, multishot firearms were known to the founders at the time the Second Amendment was drafted. *See* Supica Decl. (Doc. 59-12) at p. 2, ¶ 6; *see also* Reply SUF at pp.21-22, ¶ 28. Firearms with a capacity of more than 10 rounds were commercially available throughout the 17th and 18th centuries, becoming even more widespread after ratification. *See* Supica Decl. (Doc. 59-12) at pp. 2-3, ¶¶ 6-7. Not long after the ratification of the Fourteenth Amendment to the Constitution, semiautomatic firearms and their magazines had become widely used. *Id.* at p. 3, ¶ 8. Even applying Defendants' erroneous "lineal descendants" standard, the Banned Firearms and Magazines are constitutionally protected.

## B. The Challenged Laws Ban a Category of Constitutionally Protected Firearms, Requiring Analysis of the Text and History of the Second Amendment, Not Means-End Scrutiny.

The Supreme Court in *Heller* and *McDonald* made clear that courts should review the text and history of the Second Amendment as it pertains to the firearms at issue and strike down a challenged law as unconstitutional if it amounts to a ban of firearms commonly possessed for self-defense in the home. *See Heller*, 554 U.S. at 628-30, 635-36; *McDonald*, 561 U.S. at 789-91. Simply put, the Supreme Court found means-end scrutiny analysis inapplicable to such a ban. *Heller*, 554 U.S. at 628-29 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster") (citation omitted).

Defendants implausibly suggest that *Heller* did not reject means-end scrutiny but actually required it, citing to *Heller*, 554 U.S. at 628-29. If that were the case, surely the Supreme Court would have cited to one of its many prior opinions where means-end scrutiny had been utilized. But it did not, and for good reason: a handgun ban, lacking any tailoring, would not survive any level of heightened scrutiny. The Court cited to historical opinions, all of which found that, where a statute infringes upon the core right to keep and bear arms, it is unconstitutional. *See id.* at 629 (citing *Nunn v. State*, 1 Ga. 243, 251 (1846); *Andrews v. State*, 50 Tenn. 165, 187 (1871); and *State v. Reid*, 1 Ala. 612, 616-17 (1840)); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1273 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("As to the ban on handguns, for example, the Supreme Court in *Heller* never asked whether the law was narrowly tailored to serve a compelling government interest (strict scrutiny) or substantially related to an important government interest (intermediate scrutiny). If the Supreme Court had meant to adopt one of those tests, it could have said so in *Heller* and measured D.C.'s handgun ban against the relevant standard. But the Court did not do so; it instead determined that handguns had not traditionally been banned and were in common use—and thus that D.C.'s handgun ban was unconstitutional.").

Defendants attempt to distinguish "tiers of scrutiny" analysis – which is encompassed in the two-part approach for which they advocate – and the "interest balancing" analysis discussed in Justice Breyer's dissenting opinion. Defendants assert that the *Heller* majority did not reject tiers of scrutiny analysis, and only rejected "interest balancing," an inquiry that "asks whether the statute burdens a protected interest in a way that is out of proportion to the statute's salutary effects upon other important government interests." *See* Defs. Opp. (Doc. 72) at p. 3 (quoting *Heller*, 554 U.S. at 634). This purported distinction demonstrates no actual difference.

The two-part approach, including application of some level of heightened scrutiny, is functionally a form of interest balancing. *See* Ronstron, Allan, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 706-07 (2012); *see also Heller II*, 670 F.3d at 1280 (Kavanaugh, J., dissenting) ("Strict and intermediate scrutiny are balancing tests and thus are necessarily encompassed by *Heller*'s more general rejection of balancing."). The two-part approach requires multiple layers of subjective judgments by the reviewing court, no different than the interest-balancing standard rejected in *Heller*. *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017) (describing the two-part test as "an overly complex analysis . . . [that] appear[s] to be at odds with the simple test used by the Supreme Court in *Heller*"). Under the two-part approach, the court first determines whether Second Amendment rights are implicated. *See Duncan*, 265 F. Supp. 3d at 1118-19. The court next determines the extent of the burden and whether the burdened right is a "core" right for purposes of selecting the level of scrutiny. *See id.* at 1119. The third layer of subjectivity requires the court to review the degree of fit and tailoring between the challenged law and asserted government objective. *See id.* at 1120. The two-part approach is thus an utterly subjective standard, albeit stated in a formula that cloaks it in the guise of objective precision.

Adoption of the two-part approach results in "most courts select[ing] intermediate scrutiny." *See Duncan*, 265 F. Supp. 3d at 1117. Likewise, in Justice Breyer's dissenting opinion in *Heller* where he advocated for an "interest balancing" approach, Justice Breyer expressly rejected review under rational or strict scrutiny, *see* 554 U.S. at 689-90, and advocated an approach based on *Turner Broad. Sys., Inc. v. Federal Comm. Com'n*, 520 U.S. 180, 189-225 (1997), which applied intermediate scrutiny. *See Heller*, 554 U.S. at 704-05 ("There is no cause here to depart from the standard set forth in *Turner*.") (Breyer, J., dissenting). Thus, Justice Breyer advocated a

form of intermediate scrutiny. *See id.* at 693 ("In determining whether this regulation violates the Second Amendment, I shall ask how the statute seeks to further the governmental interests that it serves, how the statute burdens the interests that the Second Amendment seeks to protect, and whether there are practical less burdensome ways of furthering those interests.") (Breyer, J., dissenting)*; cf. Turner*, 520 U.S. at 189 (in "applying the standards for intermediate scrutiny . . . [a] content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests . . . and does not burden substantially more speech than necessary to further those interests"); *see also Heller II*, 670 F.3d at 1277 ("It is thus evident that Justice Breyer's *Heller* dissent advocated a form of intermediate scrutiny.") (Kavanaugh, J., dissenting). Whether the two-part analysis is characterized as "interest balancing" or "levels of scrutiny" makes no difference: the *Heller* majority found that such analysis was not appropriate where core Second Amendment rights were infringed by a ban.

### C. Defendants' Two-Part Approach Has Not Been Adopted by the First Circuit or This Court to Evaluate a Ban Depriving Law-Abiding Citizens of Firearms Commonly Possessed for Self-Defense in the Home.

Defendants argue that the two-part approach is required here by prior holdings of this Court and the First Circuit. *See* Defs. Opp. (Doc. 72) at pp. 1-4. Neither this Court nor the First Circuit has evaluated a challenge to a statute banning responsible, law-abiding citizens from keeping protected firearms in the home, though, and none of Defendants' cited precedent support the proposed two-part approach in this case.

Defendants cite to cases that involve statutes merely *regulating* – and not banning – law-abiding, responsible citizens' possession and use of firearms *outside the home. See Hightower v. Boston*, 693 F.3d 61 (1st Cir. 2012) (review of concealed carry license statute that allowed for revocation of license based on suitability determination made by licensing officials); *Gould v. O'Leary*, Case No. 16-10181-FDS, 2017 WL 6028342 (D. Mass. Dec. 5, 2017), *appeal filed* (1st

Cir. Dec. 15, 2017) (review of licensing scheme and policy on obtaining unlimited license to carry firearms in public); *Batty v. Albertelli*, Case No. 15-10238-FDS, 2017 WL 740989 (D. Mass. Feb. 24, 2017) (same). Defendants also rely on cases that involve firearm prohibitions that restrict individuals in a traditionally lesser-protected category – including minors and criminal offenders – from possessing firearms, which *Heller* does not foreclose. *See Powell v. Tompkins,* 926 F. Supp. 2d 367 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015) (regulation disallowing firearm license to individuals under the age of 21); *United States. v. Booker*, 644 F.3d 12 (1st Cir. 2011) (statute prohibiting gun possession by domestic violence misdemeanants); *United States. v. Rene E.,* 583 F.3d 8 (1st Cir. 2009) (statute prohibiting most firearm possession by juveniles).

None of these cases involve a statute banning a firearm commonly possessed for self-defense in the home and none reach the "core" of the Second Amendment right that is involved here. *Heller*, 554 U.S. at 630. Rather, the cases upon which Defendants rely involve regulations that were deemed "presumptively lawful" under *Heller,* because they derive from historical, "longstanding restrictions" on possessing and carrying weapons, including laws prohibiting the carrying of concealed weapons, laws prohibiting the possession of firearms by felons and the mentally ill, and laws imposing conditions on the commercial sale of arms. *Id.* at 626-27; *see also Rene E.*, 583 F.3d at 12-13 (upholding statute based on the "longstanding tradition of prohibiting juveniles"); *Booker*, 644 F.3d at 22-25 (applying *Heller*'s analysis of "presumptively lawful regulatory measures" to statute banning gun possession by domestic violence misdemeanants); *Powell*, 926 F. Supp. 2d at 379 (upholding a comprehensive licensing scheme).

Many of the cases cited by Defendants in fact expressly acknowledge that the facts and challenged law before the court are distinguishable from *Heller*'s ban of possessing handguns in the home for self-defense. *See Powell*, 926 F. Supp. 2d at 389 n.18:

> Powell complains that, because [the challenged regulation] prohibits eighteen-to twenty-year-olds from receiving a license to carry a firearm, it constitutes a blanket ban on gun ownership for an entire class of persons. . . . A revisitation of *Heller* proves the absurdity of this allegation. In *Heller*, the Supreme Court found the law under consideration unconstitutional because it "totally ban[ned] handgun possession in the home . . . [and] require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times." 554 U.S. at 628. . . . Conversely, the particular age-based regulation at issue here is not nearly as pernicious, given that persons wishing to attain a license to carry in the Commonwealth are subject to the limitation . . . only until the age of twenty-one.

*See also Hightower*, 693 F.3d at 72 ("It is plain that the interest . . . in carrying concealed weapons outside the home is distinct from [the] core interest emphasized in *Heller*."); *Gould*, 2017 WL 6028342 at *12 ("The challenged restrictions allow for use of a firearm in defense of the home, and therefore only implicate an individual's ability to carry a firearm in public . . . [T]hat interest is not at the 'core' of the Second Amendment right recognized by *Heller*.").

This Court is faced for the first time with a case that fits squarely in the framework created by *Heller*: a ban of common, popular firearms kept in the home for self-defense. *See Powell*, 926 F. Supp. 2d at 378 (*Heller* held "an individual's right to maintain arms at her residence for the purpose of protecting herself, her family, or her property is wholly secured by the Second Amendment"). It would be error to apply the two-part approach where *Heller*'s text-and-history analysis controls. It is not within the purview of the courts to decide, "on a case-by-case basis, whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis in original).

**D.  Even Under the Two-Part Approach, the Challenged Laws Still Fail.**

**1.  Strict Scrutiny Must Be Applied Because the Challenged Laws Infringe the Core Second Amendment Right, and Under Strict Scrutiny the Challenged Laws Fail.**

Defendants argue that intermediate scrutiny must be applied across the board to any Second Amendment challenge, citing *Powell*, 926 F. Supp. 2d at 389, and *Booker*, 644 F. 3d at 25. *See* Defs. Opp. (Doc. 72) at pp. 9-11. This Court in *Powell* did not decide the appropriate level of

review to be applied to a ban prohibiting law-abiding citizens from keeping commonly possessed firearms in the home for self-defense. *See* 926 F. Supp. 2d at 389 n.18. Significantly, this Court found intermediate scrutiny to be appropriate because the age-base limit on licensure in *Powell* was a stark contrast to the ban on protected firearms in *Heller*. *Id*. Similarly, in applying intermediate scrutiny in *Booker*, the First Circuit reviewed a "categorical regulation of gun possession by domestic violence misdemeanants," which that court viewed as "consistent with *Heller*'s reference to certain presumptively lawful regulatory measures." 644 F.3d at 25. The *Booker* court did not "attempt to discern the 'core' Second Amendment right vindicated in *Heller*" but "question[ed] whether appellants, who manifestly are not 'law-abiding, responsible citizens,' fall within this zone of interest." *Id.* at 25 n.17.

Unlike the licensure regulation in *Powell* or the prohibition of firearms to misdemeanants in *Booker*, the Challenged Laws prohibit law-abiding, responsible citizens from keeping firearms commonly possessed for lawful purposes, including self-defense in the home, and thus implicate the core of the Second Amendment right. *See Hightower*, 693 F.3d at 72, and cases cited therein ("Courts have consistently recognized that *Heller* established that possession of operative firearms for use in defense of the home constitute the 'core' of the Second Amendment."). This requires strict scrutiny. *See, e.g., Gould*, 2017 WL 6028342 at *12 (suggesting that a level of scrutiny lower than strict scrutiny would be appropriate only where the interest "is not at the 'core' of the Second Amendment right recognized by Heller") (citing *Hightower*, 693 F.3d at 72); *Batty*, 2017 WL 740989 at *10 (same). Moreover, as in *Heller*, the Challenged Laws are applied to the law-abiding public at large, not just to individuals long subject to special restrictions. *Heller*, 554 U.S. at 626 ("Nothing in our opinion should be taken to cast doubt on the longstanding prohibition on the possession of firearms by felons and the mentally ill."); *see also Booker*, 644 F.3d at 23

(explaining that the Second Amendment permits categorical regulation of gun possession by certain classes of persons such as felons and the mentally ill.).

Finally, Defendants' suggestion that intermediate scrutiny as opposed to strict scrutiny should be applied because the Challenged Laws "leave[] plaintiffs with many options for armed defense," *see* Defs. Opp. (Doc. 72) at p. 10, was an argument explicitly rejected in *Heller*. *See* 554 U.S. at 629. The availability of other arms does not diminish the fact that the Challenged Laws reach the core of the Second Amendment by banning firearms commonly possessed in the home for self-defense. The only appropriate level of heightened scrutiny to apply is strict scrutiny.

### 2. The Challenged Laws Cannot Even Withstand Intermediate Scrutiny Review.

Defendants are wrong that "in the Second Amendment context, courts do not require narrow tailoring or the consideration of less restrictive alternatives when applying intermediate scrutiny." *See* Defs. Opp. (Doc. 72) at p. 11. The narrow tailoring requirement set forth in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), has been applied to firearms regulations analyzed under intermediate scrutiny. For instance, in *Heller III*, the court held that certain firearm re-registration requirements could not survive intermediate scrutiny, citing *McCullen* for its proposition that, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *See Heller v. District of Columbia (Heller III),* 801 F. 3d 264, 277-78 (D.C. Cir. 2015) (quoting *McCullen*, 134 S. Ct. at 2540) (striking down requirement that gun owner re-register firearm every three years).

Because the Challenged Laws curtail the fundamental Second Amendment rights of law-abiding citizens Defendants must show a "close fit" between the law and a strong public interest, a showing that is functionally equivalent to the "narrow tailoring" requirement for content-neutral speech restrictions. *See Culp v. Madigan*, 840 F.3d 400, 407 (7th Cir. 2016) (Manion, J.,

dissenting) (citing *McCullen*, 134 S. Ct. at 2534 and *Ezell v. City of Chicago*, 651 F.3d 684, 706-08 (7th Cir. 2011)). "As in First Amendment cases, the tailoring requirement prevents [the] government from striking the wrong balance between efficiency and the exercise of an enumerated constitutional right." *Id.* (citing *McCullen*, 134 S. Ct. at 2534); *see also Ezell*, 651 F.3d at 708-09 (finding that the City defending a firearm prohibition that "comes close[] to implicating the core of the Second Amendment right" must "establish a close fit between the . . . ban and the actual public interest it serves" to satisfy any heightened standard of judicial review).

Defendants further assert that "Plaintiffs do not, and cannot, demonstrate that the Legislature lacked substantial evidence to conclude that the ban would promote the safety of the public and of law enforcement officers." *See* Defs. Opp. (Doc. 72) at p. 10. But it is Defendants' burden, not Plaintiffs', to prove that the Challenged Laws pass constitutional muster, and they have put nothing in the record demonstrating what evidence the Massachusetts Legislature had before it when enacting the Challenged Laws. The record evidence demonstrates that prohibiting the Banned Firearms and Magazines would have no effect on the prevalence of crime, including mass shootings and murders of police officers. *See* Kleck Decl. (Doc. 59-9) at pp. 2-5, ¶¶ 5-10. Even under intermediate scrutiny, the Challenged Laws fail.

## II. The Challenged Laws Deny Plaintiffs' Rights to Due Process.

### A. The Challenged Laws, as Interpreted by the Notice of Enforcement, Do Not Provide Plaintiffs with Fair Warning and Notice.

Defendants attempt to convince this Court that *Bouie v. Columbia*, 378 U.S. 347, 354 (1964), and its fair notice principles are not applicable because this case presents an instance of agency, rather than judicial, construction of a statute. Defs. Opp. (Doc. 72) at pp. 19-20. Myriad cases prove otherwise. *See* Plaintiffs Memo. (Doc. 58) at pp. 15-16; Plaintiffs Opp. (Doc. 73) at p. 14.

Defendants also contend that the Notice of Enforcement's interpretation of the Challenged Laws is not "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *See* Defs. Opp. (Doc. 72) at p. 12. The First Circuit indicated *Bouie's* use of the term "indefensible" meant "surprising and troubling." *United States v. Lata,* 415 F.3d 107, 111 (1st Cir. 2005). Defendants' interpretation of the Challenged Laws in the Notice of Enforcement is inconsistent with the Challenged Laws' prior interpretation, held for a period of eighteen years. *See* SUF (Doc. 59) at pp. 3-4, ¶¶ 7-10. Defendants seek to gloss over how sharply the Notice of Enforcement diverged from 18 years of contrary interpretation by suggesting that the plain language of the Challenged Laws and the legislative history of the Federal Ban supports the Notice of Enforcement's new expansive reach. But they cannot overcome the fact that Plaintiffs' possession of certain firearms was considered lawful under both the Challenged Laws and Federal Ban, and now, under the Notice of Enforcement, such possession is no longer considered lawful. *See* SUF (Doc. 59) at pp. 23-25, ¶¶ 69-76. This is as surprising and troubling as it is indefensible.

For similar reasons, the Notice of Enforcement's interpretation is unexpected. *See id.* at pp. 23-24, ¶¶ 69-72, p. 25, ¶ 76. Defendant Daniel Bennett admits that the tests set forth in the Notice of Enforcement may apply to "a large number of firearms, including pistols that have been sold here legally for decades" to make them illegal. *See* Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ("Response") (Doc. 74) at p. 34, ¶ 91. Governor Charles Baker has noted that the ambiguities in the Notice of Enforcement "require clarification for responsible gun owners who simply want to follow the rules and for the thousands of gun owners who were told they were following the rules for eighteen years"). Baker Letter (Doc. 74-5) at p. 1. Defendants rely on a single news article indicating that the former Massachusetts Governor stated that the Bushmaster .223-caliber rifle is prohibited under the Challenged Laws, *see* Defs. Opp. (Doc. 72)

at p. 17. A single public statement involving one particular rifle is not fair warning and cannot make the Notice of Enforcement "expected" to the millions of citizens of the Commonwealth of Massachusetts.

The simple premise underlying the "unexpected and indefensible" standard is the concern for depriving citizens of "fair warning" in the construction of laws. *Lata*, 415 F.3d at 111; *Miranda v. Mendonsa*, Case No. 12-CV-11957-IT, 2017 WL 1362021, at *4 (D. Mass. Apr. 11, 2017) ("The Supreme Court grounded its 'check on retroactive judicial decisionmaking . . . in accordance with the more basic and general principle of fair warning. . . .'") (quoting *Rogers v. Tennessee*, 532 U.S. 451, 459 (2001)). Plaintiffs relied on Defendants' conduct for the eighteen years subsequent to the passage of the Challenged Laws and believed they were lawfully purchasing, selling, and possessing firearms. *See* SUF (Doc. 59) at pp. 9-11, ¶¶ 23-25, p. 24, ¶ 71. The Notice of Enforcement interprets the Challenged Laws such that these transactions are no longer lawful, and, thus, must be declared unconstitutional. *See Upton v. S.E.C.*, 75 F.3d 92, 98 (2d. Cir. 1996).

### B. The Challenged Laws Do Not Inform the Public What Conduct Will Result in Penalties and Present Opportunity for Arbitrary Enforcement.

Defendants have asserted a number of reasons why this Court cannot decide Plaintiffs' vagueness challenge. First, Defendants argue erroneously that Court has already decided Plaintiffs' vagueness challenge in 2000. *See* Defs. Opp. (Doc. 72) at p. 18. Defendants rely solely upon an order granting a motion to dismiss from 2000, *see* Kaplan Decl. (Doc. 65-3), which did not involve causes of action or legal issues present here. *See* Response (Doc. 74) at p. 4, ¶ 20. Defendants also attempt to rely on other courts' analyses of similar language in other cases involving entirely different statutes. Neither the First Circuit, nor any other appellate court, has reviewed the "copies or duplicates" language as it appears in the Challenged Laws to determine if it is vague as interpreted before and after the Notice of Enforcement.

Defendants suggest that *McGuire v. Reilly*, 386 F.3d 45, 58-59 (1st Cir. 2004), forecloses Plaintiffs' vagueness claim, arguing that an Attorney General enforcement notice interpreting a statute cannot make the statute suspect. *See* Defs. Opp. (Doc. 72) at p. 19. In *McGuire,* the underlying statute was "facially valid." *See McGuire*, 386 F.3d at 58. Here, the Challenged Laws themselves are fraught with ambiguity. The Notice of Enforcement does not itself make the Challenges Laws unconstitutionally vague, but merely demonstrates that the plain language of the Challenged Laws can and has in fact resulted in several, diverging interpretations, paving the way for arbitrary enforcement.

Finally, Defendants assert that Plaintiffs' vagueness challenge is premature. *See* Defs. Opp. (Doc. 72) at pp. 19-20. "'When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1247 (3d Cir. 1996) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Here, Plaintiffs face a credible threat of prosecution under the Challenged Laws and Notice of Enforcement simply for engaging in conduct protected by the Second Amendment. Plaintiffs should not have to wait to be prosecuted before obtaining relief.

Moreover, despite Defendants' suggestion that there is a "straightforward bar" to facial vagueness challenges outside the First Amendment, *see* Defs. Opp. (Doc. 72) at p. 18, firearm statutes can and have been declared unconstitutionally vague when challenged facially and before actual enforcement. *See, e.g. Springfield Armory, Inc. v. Columbus*, 29 F.3d 250, 254 (6th Cir. 1994) ("We conclude that the ordinance at issue is invalid on its face.")

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request this Court grant their Motion for Summary Judgment.

Dated: January 19, 2018                       Respectfully submitted,

/s/ James M. Campbell
James M. Campbell (BBO#541882)
Richard P. Campbell (BBO # 071600)
Campbell Edwards & Conroy
One Constitution Center
Boston, MA 02129
(617) 241-3000
jmcambpell@campbell-trial-lawyers.com

/s/ John Parker Sweeney
John Parker Sweeney (admitted *Pro Hac Vice*)
T. Sky Woodward (admitted *Pro Hac Vice*)
James W. Porter, III (admitted *Pro Hac Vice*)
Marc A. Nardone (admitted *Pro Hac Vice*)
Connor M. Blair (admitted *Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on this 19th day of January, 2018, that Plaintiffs' Opposition to Defendants' Motion for Summary Judgment was served on Defendants' counsel via CM/ECF system that will forward copies to Counsel of Record.

/s/ James M. Campbell
James M. Campbell (BBO#541882)
Richard P. Campbell (BBO # 071600)
Campbell Edwards & Conroy
One Constitution Center
Boston, MA 02129
(617) 241-3000
jmcambpell@campbell-trial-lawyers.com

/s/ John Parker Sweeney
John Parker Sweeney (admitted *Pro Hac Vice*)
T. Sky Woodward (admitted *Pro Hac Vice*)
James W. Porter, III (admitted *Pro Hac Vice*)
Marc A. Nardone (admitted *Pro Hac Vice*)
Connor M. Blair (admitted *Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs David Seth Worman, Anthony Linden, Jason William Sawyer, Paul Nelson Chamberlain, Gun Owners' Action League, Inc., On Target Training, Inc., and Overwatch Outpost*