1

>Volume I
>Pages 1-27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

>No. 1:17-cv-10107-WGY

DAVID SETH WORMAN, et al.,
   Plaintiffs,
vs.
CHARLES D. BAKER, et al.,
   Defendants.

DEPOSITION OF ALAN ZANI
Friday, September 15, 2017 at 12:10 p.m.
Campbell, Campbell, Edwards & Conroy
One Constitution Center
Boston, Massachusetts 02129

----------Jennifer A. Doherty, CSR--------------
Certified Shorthand Reporter

C. J. REPORTING
P.O. Box 1373
Andover, MA  01810
617.763.1725
www.cjreporting.com

```
 1  the Essex County Drug Task Force, and those would be
 2  my command positions.  I've also been assigned to
 3  the Essex County Drug Task Force.  I was there for
 4  about 15 years as a trooper and as a sergeant, and I
 5  was a uniformed trooper from '85 to '89 at the
 6  Andover barracks.
 7       Q.   Did you join the police force in '85?
 8       A.   Yes, I did.
 9       Q.   I'm going to hand you a copy of what will
10  be marked as Exhibit 1.
11            (Exhibit No. 1 marked for
12  identification.)
13       Q.   Lieutenant, have you seen these before?
14       A.   I've seen some interrogatories.
15       Q.   If you could turn your attention, please,
16  to Page No. 11.
17       A.   (Complies.)
18       Q.   And Interrogatory No. 11 asks to identify
19  any reviews of firearm transfers and sales conducted
20  between 1998 and July 20, 2016, and any violations
21  of law discovered through such review and any agency
22  to which it reported the violation was submitted.
23  And if you turn the page to Page 13 after a number
24  of objections and privileges -- if you go to the top
```

```
 1   of Page 13, the Colonel states:  "Beginning in late
 2   2015, Massachusetts State Police Lieutenant Alan
 3   Zani participated in reviews of firearms sales."  Is
 4   that accurate?
 5        A.   Let me read this one more time.  I
 6   participated in firearms reviews sales?  To a
 7   limited extent that's partially accurate.
 8        Q.   What was the extent of your review of
 9   firearms sales?
10        A.   There would be occasion that I would hear
11   of an FFL or a federal firearms licensed dealer
12   selling firearms that weren't on the approved roster
13   and/or glocks being sold to non-law enforcement
14   personnel.  From that I would be provided with a
15   sampling of their monthly sales report and could
16   either discern from that report that the report was
17   either accurate or inaccurate, and then I would
18   forward the information.
19        Q.   A number of questions about that.  When
20   you say "firearm," you're referring to the
21   Massachusetts definition which is a handgun; is that
22   correct?
23        A.   I'm not.  There would be long arms and
24   firearms.  Long arms and pistols would be
```

```
 1   firearms.
 2        Q.    You said it could come to your attention
 3   that there may be FFLs or other dealers that were
 4   selling firearms that were not permitted to be sold.
 5   How would it come to your attention?
 6        A.    I would receive source information.
 7        Q.    When you say "source information," what do
 8   you mean?
 9        A.    There may be a complaint, may be a
10   confidential -- this would be a generality -- and
11   the source information could be a complaint, an
12   anonymous complaint.  That will be about it.
13        Q.    About how often would that occur?
14        A.    During that time period, not very often.
15        Q.    And you said you reviewed samples of the
16   the sales reports from the FFL.  Where did you get
17   data from?
18        A.    From Ms. Michaela Dunne from DCJIS.
19        Q.    Are those reviews ongoing?
20             MR. PORTER:  Objection.  I mean, at a
21   level of generality it may not be objectionable, but
22   as we've asserted in our --
23             MR. NARDONE:  All I've done is asked
24   if the reviews are ongoing.
```

1        MR. PORTER:  I don't want to wait too
2    long.
3        MR. NARDONE:  Noted.
4    A.   Not by me.
5    Q.   Are they ongoing by others?
6    A.   I do not know.
7    Q.   Who would know?
8    A.   I suspect -- well, I don't know.  It will
9    be maybe the Attorney General's office.
10   Q.   Your 2015 review, the review that we were
11   discussing in this interrogatory, was that done at
12   the direction of the Attorney General's office?
13        MR. PORTER:  Objection.
14   Q.   You can answer.
15   A.   I would have a problem with you referring
16   to it as a review.
17   Q.   What would you refer to it?
18   A.   An investigation may come my way and I
19   would investigate it.  In no instance did I receive
20   an initial referral by the Attorney General's
21   office.
22   Q.   The reviews that we're discussing, these
23   were individualized?
24        MR. PORTER:  Objection to the form.

Alan Zani
September 15, 2017

11

```
 1      A.   Again, I would have questions about the
 2   dates, and I'm not positive on the dates, so it may
 3   or may not have been before July of 2016.  They
 4   would be individualized, yes.
 5      Q.   Were you ever asked to do a comprehensive
 6   review of all firearms transfers?
 7      A.   No.
 8      Q.   To your knowledge was anyone?
 9      A.   Not to my knowledge.
10      Q.   Have you ever heard the term
11   "Massachusetts-compliant firearm" before?
12      A.   Yes.
13      Q.   What is your understanding of what that
14   means?
15              MR. PORTER:  Objection to the form.
16      A.   It was a fireman that was compliant to the
17   Massachusetts General Laws prior to July 20, 2016.
18      Q.   In your reviews did you come across any
19   transfers of those firearms?
20              MR. PORTER:  Objection.
21      A.   You're talking about prior to July 20,
22   2016, if they were compliant I may have seen them or
23   I may not have.  They would have been compliant at
24   the time.
```

Alan Zani
September 15, 2017

12

1    Q.   So they were lawful transfers that
2 wouldn't have triggered any action by you?
3              MR. PORTER:  Objection to the form.
4    A.   They were considered lawful.
5    Q.   I want to make sure I have a good
6 understanding of what records you reviewed.  You
7 said they came from Ms. Dunne's office.  Would those
8 be the firearms records that are retained by the
9 Firearms Record Bureau, I believe it's called?
10   A.   Correct.
11   Q.   And when you were looking at them, what
12 exactly were you looking for?
13   A.   For firearms that were not on the approved
14 firearms roster approved by the Executive Office of
15 Public Safety and Security.
16   Q.   Specifically for whether or not they were
17 on or not on the approved roster itself?
18   A.   Yes, that and/or glocks -- or new glocks,
19 actually.
20   Q.   When you say "new glocks," what do you
21 mean?
22   A.   Produced prior to 1998.
23   Q.   Am I correct that those are not able to be
24 sold because of the consumer protection issues

1  around them?
2      A.   You're correct.
3      Q.   When you found a violation, what steps did
4  you take from the point that you found the
5  violation?
6      A.   I advised the Attorney General's office.
7      Q.   Were any of these cases referred to local
8  prosecutors?
9      A.   They were not.
10     Q.   Have you ever conducted a review of a
11 transaction that did result in a -- sending it to a
12 prosecutor for action?
13     A.   Define "prosecutor."
14     Q.   A local district attorney or a member of
15 the Attorney General's office that prosecutes
16 crimes.
17     A.   I have referred cases to the Attorney
18 General's office.
19     Q.   In the 2015 to 2016 investigation that you
20 were doing that we were speaking of earlier, do you
21 know if any of the transactions that you forwarded
22 resulted in prosecutions?
23     A.   I do not.
24     Q.   Were you ever called to testify in any

14

```
 1  cases that arose out of the review that you did?
 2       A.   I did not.
 3       Q.   Have you ever been called to testify in a
 4  case involving the transfer of a banned firearm or
 5  magazine?
 6       A.   I have not.
 7       Q.   Did anyone assist you in the investigation
 8  that you conducted from late 2015 through July
 9  2016?
10       A.   I'm sorry, are you referring to the
11  investigation or --
12                MR. PORTER:  Objection to the form.
13       Q.   What we had referred to as the review
14  earlier.
15       A.   I would communicate with Ms. Michaela
16  Dunne as to -- the substance would generally be --
17                MR. PORTER:  Objection -- okay.
18       A.   -- to produce the firearms that were
19  sold.
20       Q.   Were any other officers in the
21  Massachusetts State Police involved?
22       A.   Not that I believe.
23                (Exhibit No. 2 marked for
24  identification.)
```