## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DAVID SETH WORMAN, ANTHONY LINDEN,
JASON WILLIAM SAWYER, PAUL NELSON
CHAMBERLAIN, GUN OWNERS' ACTION
LEAGUE, INC., ON TARGET TRAINING, INC.,
AND OVERWATCH OUTPOST,

*Plaintiffs*,

v.

MAURA HEALEY, in her official capacity as
Attorney General of the Commonwealth of
Massachusetts; DANIEL BENNETT, in his official
capacity as the Secretary of the Executive Office of
Public Safety and Security; and COLONEL
KERRY GILPIN, in her official capacity as
Superintendent of the Massachusetts State Police,

*Defendants*.

CIVIL ACTION
NO. 17-cv-10107-WGY

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MAURA HEALEY
ATTORNEY GENERAL

William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, Massachusetts 02108

Date: January 19, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

ARGUMENT ....................................................................................... 1

    I.     THE COMMONWEALTH'S BAN ON ASSAULT WEAPONS
          AND LARGE-CAPACITY MAGAZINES COMPORTS WITH
          THE SECOND AMENDMENT ..................................................... 1

          A.     The Second Amendment Limitation Applied in
                 *Kolbe*—That "M-16 Rifles" and Other Weapons
                 "Most Useful in Military Service" Are Not Eligible for
                 Constitutional Protection—Is Consistent with Heller. ........ 1

          B.     Assault Weapons and LCMs Are "Like" M16s and
                 Weapons Most Useful in Military Service .......................... 4

          C.     In the Alternative, Assault Weapons and LCMs Are Not In
                 Common Use for Lawful Purposes Like Self-Defense ........ 6

          D.     The AWB Is Substantially Related to the Commonwealth's
                 Goal of Promoting the Safety of the Public and Law
                 Enforcement Officers .......................................................... 8

    II.    THE ASSAULT WEAPONS BAN AND ENFORCEMENT
          NOTICE COMPORT WITH DUE PROCESS. ........................... 12

    III.   THE PLAINTIFFS' VAGUENESS CLAIM IS NOT COGNIZABLE
          AND FAILS ON THE MERITS ................................................... 15

CONCLUSION .................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
490 F.3d 1 (1st Cir. 2007) .......................................................................12

*Broadrick v. Oklahoma*,
413 U.S. 601 (1970) ................................................................................11

*Caetano v. Massachusetts*,
136 S. Ct. 1027 (2016) ..............................................................................7

*Chapman v. United States*,
500 U.S. 453 (1991) ................................................................................15

*City of Erie v. Pap's A.M.*,
529 U.S. 277 (2000) ..................................................................................9

*Clark v. Jeter*,
486 U.S. 456 (1988) ................................................................................11

*Commonwealth v. Clint C.*,
715 N.E.2d 1032 (Mass. 1999) ..............................................................13

*Commonwealth v. Pellegrini*,
608 N.E.2d 717 (Mass. 1993) .................................................................14

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................................ *passim*

*Draper v. Healey*,
827 F.3d 1 (1st Cir. 2016) .......................................................................16

*Florida Bar v. Went for It, Inc.*,
515 U.S. 618 (1995) ..................................................................................9

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ................................................................3, 7

*Fyock v. City of Sunnyvale*,
779 F.3d 991 (9th Cir. 2015) ..............................................................9, 11

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ...................................................4, 7, 9, 11

*Hightower v. City of Boston*,
    693 F.3d 61 (1st Cir. 2012) ................................................................. 11–12

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ...................................................................................... 15

*Kachalsky v. Cnty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012)........................................................................ 9

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) (en banc) ........................................... *passim*

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014) ............................................................................ 11

*NAACP v. Button*,
    371 U.S. 415 (1963)................................................................................. 11

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ...........................................................7, 9, 11

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990)................................................................................. 14

*Osborne v. Ohio*,
    495 U.S. 103 (1990)................................................................................. 12

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) .............................................................6–7

*People's Rights Org., Inc. v. City of Columbus*,
    152 F.3d 522 (6th Cir. 1998) .................................................................. 16

*Powell v. Tompkins*,
    783 F.3d 332 (1st Cir. 2015)...................................................................... 1

*Powell v. Tompkins*,
    926 F. Supp. 2d 367 (D. Mass. 2013) ...................................................... 8

*Shafmaster v. United States*,
    707 F.3d 130 (1st Cir. 2013)................................................................... 14

*Shepard v. Attorney General*,
    567 N.E.2d 187 (Mass. 1991) ...........................................................13, 14

*Springfield Armory, Inc. v. City of Columbus*,
     29 F.3d 250 (6th Cir. 1994) ..................................................................... 16

*Staples v. United States*,
     511 U.S. 600 (1994)...........................................................................3, 4

*United States v. Booker*,
     644 F.3d 12 (1st Cir. 2011)................................................................8, 11

*United States v. Bunnell*,
     280 F.3d 46 (1st Cir. 2002) .....................................................................14

*United States v. Ellis*,
     168 F.3d 559 (1st Cir. 1991) ...................................................................14

*United States v. Mazurie*,
     419 U.S. 544 (1975)................................................................................16

*United States v. Miller*,
     307 U.S. 174 (1939)...........................................................................2, 6

*United States v. Pardue*,
     385 F.3d 101 (1st Cir. 2004) ...................................................................14

*United States v. Prosperi*,
     573 F. Supp. 2d 436 (D. Mass. 2008) .....................................................14

*United States v. Zhen Zhou Wu*,
     711 F.3d 1 (1st Cir. 2013) ................................................................15, 16

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
     455 U.S. 489 (1982)..........................................................................15–16

## Statutes

G.L. c. 140, § 121 ...................................................................1, 12, 13

G.L. c. 140, § 123 ...............................................................................13

G.L. c. 140, § 131M.........................................................................1, 12

Mass. St. 2017, c. 110, §§ 18–21, 53 ...................................................5

## Legislative History

H.R. Rep. No. 103–489...........................................................................3

iv

The Commonwealth's Assault Weapons Ban ("AWB"), G.L. c. 140, §§ 121, 131M, prohibits highly dangerous, military style weapons that are disproportionately used to commit mass shootings and murder police officers. It is wholly consistent with the Second Amendment to ban the assault weapons and large-capacity magazines ("LCMs") covered by the statute. Moreover, the AWB and Enforcement Notice on Assault Weapons comport with due process, and the phrase "copies or duplicates" in the AWB is not unconstitutionally vague. This Court should grant the Defendants' Motion for Summary Judgment and enter judgment for the defendants on all counts.

## ARGUMENT

I. **THE COMMONWEALTH'S BAN ON ASSAULT WEAPONS AND LARGE-CAPACITY MAGAZINES COMPORTS WITH THE SECOND AMENDMENT.**

The First Circuit has "hewed closely and cautiously to *Heller*'s circumscribed analysis and holding." *Powell v. Tompkins*, 783 F.3d 332, 347 n. 9 (1st Cir. 2015). Consistent with that approach, and with the Supreme Court's guidance in *District of Columbia v. Heller*, 554 U.S. 570 (2008), this Court should conclude that the Second Amendment does not protect assault weapons and LCMs or, in the alternative, that the AWB satisfies intermediate constitutional scrutiny.

A. **The Second Amendment Limitation Applied in *Kolbe*—That "M-16 Rifles" and Other Weapons "Most Useful in Military Service" Are Not Eligible for Constitutional Protection—Is Consistent with *Heller*.**

As the First Circuit recognizes, and as *Heller* made clear, the Second Amendment right is subject to many "limitation[s]." *Heller*, 554 U.S. at 627; *see also Powell*, 783 F.3d at 347 (*Heller* "firmly disavowed any notion that an individual has a constitutional right 'to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose'" (quoting *Heller*, 554 U.S. at 626)). The Fourth Circuit applied one of those limitations—namely, that "weapons that are most useful in military service—M-16 rifles and the like—may be banned," *Heller*, 554 U.S. at 627—in concluding that assault weapons and LCMs are not protected by the Second Amendment.

1

*Kolbe v. Hogan*, 849 F.3d 114, 136–37 (4th Cir. 2017) (en banc).

The plaintiffs contend that the Fourth Circuit misunderstood *Heller*, and they assert that they need only show that a weapon—no matter how dangerous—is "in common use today" to obtain near-absolute Second Amendment protection. *See* Pltfs.' Br. Opp. Summ. J., at 3–6 (Doc. 73) ("Pltfs.' Opp."). That argument is doubly flawed. First, the question addressed in *Kolbe*—whether assault weapons and LCMs are "like" "M-16 rifles and" "weapons that are the most useful in military service"—derives directly from *Heller*'s plain language, 554 U.S. at 627, and the Supreme Court denied certiorari in *Kolbe* without any dissent, *see* 138 S. Ct. 469 (2017). Second, *Heller* made clear that there is more than one "limitation" on weapons eligible for Second Amendment protection. *See* 554 U.S. at 627 (identifying "another important limitation" on the Second Amendment); Defts.' Br. Summ. J., at 5–6 (Doc. 62) ("Defts.' Br."). Thus, under one limitation, weapons that are "like" M16s and the other weapons most useful in the military are not constitutionally protected. *Heller*, 554 U.S. at 627. Under a second limitation, weapons that are not "'in common use at the time' for lawful purposes like self-defense" are not protected, either. *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). These limitations operate independently, and each is "dispositive." *See Kolbe*, 849 F.3d at 135–36.

The analysis in *Kolbe* does not lead to the absurd results the plaintiffs hypothesize. *See* Pltfs.' Opp. at 4. As the plaintiffs note, *Heller* explained that sawed-off shotguns are not eligible for Second Amendment protection. 554 U.S. at 625. But the Court reached that conclusion by applying yet a third limitation on weapons eligible for Second Amendment protection—namely, that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625. That conclusion provided an independent basis for excluding sawed-off shotguns from constitutional protection;

2

the Court did not need to address the separate question whether sawed-off shotguns are "like" weapons "most useful in military service." *Id.* at 625, 627.

The test applied in *Kolbe* is consistent with *Heller*'s conclusion that handguns are constitutionally protected. *Heller*'s own limiting principle in the test—namely, that "weapons *most* useful in military service" may be banned, *id.* at 627 (emphasis added)—keeps the focus on the weapons that were designed for the military or are substantially similar to weapons most often used in militaries worldwide. The plaintiffs have no evidentiary basis for claiming that handguns or semiautomatic hunting rifles exempted from the AWB are "most" useful in military service. *See* Pltfs.' Opp. at 4. There is a clear and obvious distinction between those weapons and banned assault weapons, which, Congress concluded, have "a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." H.R. Rep. No. 103–489, at 19–20 (Kaplan Decl. Ex. 29).

*Heller*'s exclusion of "weapons most useful in military service" may, in close cases, require a complete historical or functional review of a given weapon. But this is not a close case. As the Supreme Court explained and as the undisputed evidence in this case demonstrates, "[t]he AR-15 is the civilian version of the military's M-16 rifle," and "[m]any M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon." *Staples v. United States*, 511 U.S. 600, 603 (1994). And, in any event, the plaintiffs' favored limitation— whether a weapon is "in common use" today—is even more indeterminate, because "what line separates 'common' from 'uncommon' ownership is something the Court did not say." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). The test, moreover, depends on circular logic. If a weapon is legal in most States, it is more likely to be commonly owned, and therefore constitutionally protected under the test. Conversely, if a weapon is prohibited in most

States or nationwide, it is unlikely to be commonly owned, and therefore would not be entitled to constitutional protection. Yet "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Id.*

**B.** **Assault Weapons and LCMs Are "Like" M16s and Weapons Most Useful in Military Service.**

For all the reasons previously explained, assault weapons and LCMs are like M16s and weapons most useful in military service, and are therefore outside the scope of the Second Amendment. *See* Defts.' Br., at 6–8; Defts.' Br. Opp. Summ. J., at 5–6 (Doc. 72) ("Defts.' Opp."); *Kolbe*, 849 F.3d at 136–37. The plaintiffs do not deny the military origins of the assault weapons and LCMs banned in Massachusetts, or that the banned weapons retain the lethal capabilities of the military weapons from which they derive. *See* Kaplan Decl. Ex. 66 (ATF report concluding that "semiautomatic assault rifles" manufactured for civilians "still had a military configuration that was designed for killing and disabling the enemy").[1] And, as previously discussed, *Staples* supports that conclusion. *See supra*, at 3; Defts.' Opp., at 5–6.

The plaintiffs' only rejoinder is a claimed "critical distinction" between AR-15s, which are semiautomatic, and M16s, which have select fire capability but are otherwise indistinguishable from AR-15s. Pltfs.' Opp., at 5; *see* Bolcome Aff. ¶¶ 7, 11–12. This claimed distinction is both legally insignificant and factually weak. *See Kolbe*, 849 F.3d at 136 (rejecting as "baseless" the contention that "*Heller* drew a 'bright line' between fully automatic and semiautomatic firearms"); *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011) ("*Heller II*") ("semi-automatics still fire almost as rapidly as automatics"). First, AR-15s retain the firing mode—

---

[1] Indeed, the plaintiffs' experts and the defendants' experts agree on this point. *See* Defts.' Stmt. of Undisputed Facts ¶¶ 44, 48, 50, 55 (Doc. 63) (citing declarations, reports, and deposition testimony of both parties' experts).

semiautomatic—that the United States military considers most effective in engaging and killing the enemy. The U.S. Army's marksmanship manual instructs soldiers that, "[a]t ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit." Kaplan Decl. Ex. 39, at 7-9. For that reason, "M16 rifles . . . should normally be employed in the semiautomatic fire mode." *Id.* at 7-13. According to the manual, automatic fire is a "specialized technique of delivering suppressive fire [that] may not apply to most combat engagements." *Id.* at 7-12; *see also* Bolcome Aff. ¶¶ 8–9 (in Marine training, "I was instructed that if I need to use my M16 offensively, for example to kill someone, I should use the semiautomatic mode"). Thus, the United States military does not see a "critical distinction" between weapons with semiautomatic fire capability only and weapons with select fire capability; rather, it emphasizes that semiautomatic fire is most accurate and should be used as the default mode of firing M16s in combat engagements. *See* Kaplan Decl. Ex. 39, at 7-8, 7-9.

Second, as previously discussed, semiautomatic assault weapons can also be modified to simulate automatic fire, further undermining the plaintiffs' claimed "critical distinction." *See* Defts.' Br., at 7. The plaintiffs do not dispute this evidence, but instead respond that, in November 2017, in response to one of the most deadly mass shootings in U.S. history, the Massachusetts Legislature banned two such devices—bump stocks and trigger cranks—that facilitate automatic fire on semiautomatic weapons. *See* Mass. St. 2017, c. 110, §§ 18–21, 53 (statute effective February 1, 2018). But the scope of the Second Amendment does not turn on Massachusetts law; the plaintiffs' argument otherwise implies that semiautomatic assault weapons are not constitutionally protected now, but could become protected in Massachusetts when the bump stock ban becomes effective in February 2018, while remaining unprotected everywhere else in the United States, where bump stocks and trigger cranks are legal. That is nonsensical. Bump stocks

and trigger cranks—not to mention binary triggers, AutoGloves, and other similar devices not specifically addressed by Massachusetts law[2]—are relevant because they illustrate the ease of achieving automatic fire with a semiautomatic assault rifle. *See also* Kaplan Supp. Decl. Ex. 96 (explaining "that it doesn't take a bump-fire stock or a 'trigger crank' to induce rapid machine gun-style fire with a semi-automatic firearm" and demonstrating a technique for simulating automatic fire with a semiautomatic weapon with no devices attached). The existence of these devices shows that there is no meaningful distinction between weapons that are functionally identical except for select fire capability.

Semiautomatic assault weapons are, based on this and the other undisputed evidence, unquestionably "like" M16s and other weapons most useful in military service. Because, on this dispositive inquiry, assault weapons and LCMs are not entitled to Second Amendment protection, it is immaterial that the plaintiffs contend the weapons are in "common use." *See Kolbe*, 849 F.3d at 136 (declining to answer the "difficult questions" raised by the common use test because a "relatively easy inquiry" concluded the banned weapons are "like" "M-16 rifles").

### C. In the Alternative, Assault Weapons and LCMs Are Not In Common Use for Lawful Purposes Like Self-Defense.

Nevertheless, assault weapons and LCMs are also ineligible for Second Amendment protection because they are not "'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179). As discussed, courts have construed this limitation on the scope of the Second Amendment in two ways. *See* Defts.' Br., at 8. Some courts have asked whether a weapon is a "lineal descendant" or "modern-day equivalen[t]" of a weapon in common use at the time the Second Amendment was ratified. *Parker v. District of Columbia*,

---

[2] *See* Kaplan Decl. Ex. 11 (Supica Dep.) 154:4 – 155:9 (binary triggers), 157:14 – 158:4 (AutoGloves); Bolcome Aff. ¶ 27 (binary triggers).

478 F.3d 370, 398 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570 (2008); *see also Friedman*, 784 F.3d at 410. Other courts have applied a "popularity test," asking whether a weapon is in common use today for lawful purposes like self-defense. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255–56 (2d Cir. 2015) ("*NYSRPA*"); *Heller II*, 670 F.3d at 1261; *see also Kolbe*, 849 F.3d at 141 (discussing the "popularity test"). Under either interpretation, the Second Amendment does not protect assault weapons and LCMs.

The plaintiffs do not, and cannot, dispute that assault weapons and LCMs are not modern-day equivalents of weapons in common use for self-defense when the Second Amendment was ratified. Instead, they contend that *Heller* and *Caetano v. Massachusetts* foreclose *Friedman* and *Parker*'s interpretations of the "in common use" language. Pltfs.' Opp., at 6–7. But *Heller* merely explained, and *Caetano* confirmed, that the Second Amendment "extends . . . to . . . arms . . . that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1028 (2016). That proposition is perfectly consistent with a test that asks whether a weapon is a "lineal descendant" or "modern-day equivalent" of a Founding-era weapon. As the D.C. Circuit explained, "just as the First Amendment free speech clause covers modern communication devices unknown to the founding generation, e.g., radio and television, and the Fourth Amendment protects telephonic conversation from a 'search,' the Second Amendment protects the possession of the modern-day equivalents of the colonial pistol." *Parker*, 478 F.3d at 398; *accord Heller*, 554 U.S. at 582. Thus, the lineal descendants test looks to whether a weapon is a modern-day analogue of a Founding-era weapon; it does not limit the scope of the Second Amendment to weapons that were in existence at the time of the Founding.

Relying on the popularity test alone, the plaintiffs insist that assault weapons and LCMs are in common use today for self-defense and other lawful purposes. Pltfs.' Opp., at 7–9. But

whether or not individuals report that they want assault weapons and LCMs for self-defense, the evidence shows that assault weapons and LCMs are not suitable or actually used for that purpose. *See* Defts.' Br., at 9–10; Defts.' Opp., at 6–8; Defts.' Stmt. of Undisputed Facts ¶¶ 142–155 (Doc. 63) ("Defts.' Stmt."). As the words "in common use" indicate, it is not enough for the plaintiffs to identify a handful of instances in the last decade in which someone in the United States used an assault weapon in self-defense, particularly when other weapons are widely available that would have served the same purpose. *See* Pltfs.' Response to Defts.' Stmt. ¶ 142 (Doc. 74). Rather, the plaintiffs must show that the use of assault weapons and LCMs in self-defense is "common." *Heller*, 554 U.S. at 624. The plaintiffs have not presented such evidence, whether through expert testimony or empirical research on the percentage or frequency of self-defense episodes involving assault weapons or LCMs. Instead, the plaintiffs' experts testified that they were unaware of even a single use of an assault weapon or LCM in self-defense anywhere in the United States. *See* Defts.' Stmt. ¶ 142.

### D.  <u>The AWB Is Substantially Related to the Commonwealth's Goal of Promoting the Safety of the Public and Law Enforcement Officers.</u>

In the alternative, should this Court decide or assume that assault weapons and LCMs are constitutionally protected, the AWB must nevertheless be upheld under intermediate constitutional scrutiny. *See* Defts.' Br., at 10–13; Defts.' Opp., at 9–11; *Powell v. Tompkins*, 926 F. Supp. 2d 367, 389 (D. Mass. 2013) (Young, J.), *aff'd* 783 F.3d 332 (1st Cir. 2015) ("The First Circuit . . . , in line with the majority of its sister circuits, views challenged firearms regulations through the lens of intermediate scrutiny." (citing *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011))). In prior memoranda, the defendants have demonstrated that the AWB is substantially related to the Commonwealth's critical interests in promoting the safety of the public and police officers because (1) assault weapons and LCMs are used disproportionately in mass public shootings and

in shootings of law enforcement officers, (2) assault weapons and LCMs are disproportionately lethal, causing more severe wounds in more victims than other semiautomatic weapons or weapons with magazines that holds fewer than eleven rounds, and (3) banning assault weapons and LCMs decreases crime committed with those weapons, improving public safety. *See* Defts.' Br., at 11–13.

The plaintiffs do not meaningfully contest this evidence; they mainly contend that the evidence does not show that assault weapons and LCMs have been used in mass public shootings or shootings of police officers *in Massachusetts specifically*. *See* Pltfs.' Opp., at 11. But intermediate scrutiny does not require the defendants to cite empirical research that focuses exclusively on Massachusetts; the Commonwealth can justify the fit between the AWB and public safety "by reference to studies and anecdotes . . . or even . . . based solely on history, consensus, and simple common sense," and this evidence may be based on the experience of other jurisdictions or from evidentiary foundations in other cases. *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks and citations omitted); *see City of Erie v. Pap's A.M.*, 529 U.S. 277, 297 (2000) (city "could reasonably rely on the evidentiary foundation" set forth in other cases); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 98 (2d Cir. 2012) (noting, while applying intermediate scrutiny, that "[t]he connection between promoting public safety and regulating handgun possession in public is not just a conclusion reached by New York[,]" but "has served as the basis for other states' handgun regulations"). For that reason, in upholding bans on assault weapons and LCMs, courts of appeals have cited general research on the unique dangers posed by the weapons, not state-specific research. *See Kolbe*, 849 F.3d at 139–41; *NYSRPA*, 804 F.3d at 262–64; *Fyock v. City of Sunnyvale*, 779 F.3d 991, 1000–01 (9th Cir. 2015); *Heller II*, 670 F.3d at 1262–64.

Moreover, the plaintiffs ignore the evidence that Massachusetts, like so many other States, has endured mass public shootings with assault weapons and LCMs. In December 2000, a gunman used an AK-47 style rifle with a 60-round magazine in a mass shooting in Wakefield, Massachusetts, that took the lives of seven people. *See* Kaplan Decl. Exs. 80, 90; Defts.' Stmt. ¶ 138. And in December 1992, a gunman used an AK-47 style rifle in a shooting at Simon's Rock College in Great Barrington, Massachusetts, that took the lives of two people and injured four more. *See* Kaplan Decl. Ex. 22; Defts.' Stmt. ¶ 138. The Legislature does not have to wait until more mass shootings are committed with assault weapons and LCMs to ban these deadly weapons.

The plaintiffs' next contention—that researchers cannot determine whether the Federal Assault Weapons Ban caused the general reduction in gun homicides and gun violence while the ban was in effect—is beside the point. *See* Pltfs.' Opp., at 13–14. The Commonwealth does not need to show that the AWB causes all forms of crime to decrease in order to satisfy intermediate scrutiny, particularly because the AWB was specifically targeted at mass shootings and shootings of law enforcement officers. The evidence that the defendants have introduced, and that the plaintiffs have not disputed, shows that "state and federal assault weapons bans have statistically significant and negative effects on mass shooting fatalities," and that crimes committed with assault weapons in Boston declined by 72% while the federal ban was in effect. Kaplan Decl. Ex. 41, at 1; Ex. 47, at 46–62 & n. 55. The evidence also shows that assault weapons are disproportionately used in mass shootings and shootings of law enforcement officers. *See* Defts.' Br., at 11–12. Indeed, Dr. Christopher Koper, who authored the key study on the Federal Assault Weapons Ban, recently published updated research confirming these findings. *See* Kaplan Supp. Decl. Ex. 97. Specifically, he found that assault weapons "account for 13–16% of guns used in murder of police, while LCM weapons overall account for about 41% of these weapons"; and that

assault weapons "and other high-capacity semiautomatics are involved in as many at 57% of" firearms mass murders, and are "particularly prominent in public mass shootings and those resulting in the highest casualty counts." *See id.* at 5. That is consistent with prior research demonstrating that assault weapons "tend to produce more lethal and injurious outcomes when used in gun violence." *Id.* at 2; *accord* Colwell Decl. at 2–4.

Finally, as previously explained, intermediate scrutiny does not require a "narrow tailoring" analysis in the Second Amendment context. *See* Defts.' Opp., at 11. While the Supreme Court has applied a narrow tailoring analysis in some First Amendment cases, it has not applied that analysis in cases involving other rights subject to intermediate scrutiny. *Compare, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) (First Amendment speech rights), *with Clark v. Jeter*, 486 U.S. 456, 461 (1988) (discrimination based on parents' marital status). The distinction is rooted in the recognition that speech rights, more so than other rights, "nee[d] breathing space" to survive. *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1970). Speech rights have always been regarded as "delicate and vulnerable, as well as supremely precious in our society." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Accordingly, none of the courts that have subjected bans on assault weapons and LCMs to intermediate scrutiny have undertaken a narrow tailoring analysis. *See Kolbe*, 849 F.3d at 138–41; *NYSRPA*, 804 F.3d at 261–64; *Fyock*, 779 F.3d at 1000–01; *Heller II*, 670 F.3d at 1262–64. Neither did the First Circuit in *Booker*, when it rejected a Second Amendment challenge to a statute prohibiting domestic violence misdemeanants from possessing firearms. *See* 644 F.3d at 25–26. Indeed, the First Circuit has rejected efforts to import First Amendment doctrines, like the prior restraint and overbreadth doctrines, into the Second Amendment context. *See Hightower v. City of*

*Boston*, 693 F.3d 61, 80–83 (1st Cir. 2012).[3]

## II.   THE ASSAULT WEAPONS BAN AND ENFORCEMENT NOTICE COMPORT WITH DUE PROCESS.

Shifting gears on their due process claim, the plaintiffs contend that "[d]efendants misconstrue Plaintiffs' due process argument when they describe Plaintiffs' claim to be 'that the Enforcement Notice violates due process.'" Pltfs.' Opp., at 13 (quoting Defts.' Br., at 13). But the heading on Count 2 of the Complaint is "The Notice of Enforcement Violates Due Process Because It Retroactively Criminalizes Lawful Conduct." Compl. p. 24 (Doc. 1).

However the plaintiffs now wish to frame Count 2, two basic points remain, and foreclose the claim: The AWB has, since 1998, provided the public with notice that "copies or duplicates" of enumerated weapons, like the Colt AR-15 and the AK47, are banned in Massachusetts, G.L. c. 140, §§ 121 and 131M, and the Enforcement Notice is consistent with the plain meaning of that statutory phrase. *See* Defts.' Br., at 15–16, 19; Defts.' Opp., at 13–14. The plaintiffs have made no argument—none—that the plain language of the AWB excludes AR-15 and AK47 style weapons and other weapons that are similar to or imitations of the enumerated weapons. The plain text of the statute, then, gave the plaintiffs "fair warning" that imitations of Colt AR-15 and AK47 assault rifles are banned in Massachusetts. *Osborne v. Ohio*, 495 U.S. 103, 115–16 (1990). And even though some firearms manufacturers erroneously advertised their AR-15 style rifles as "Massachusetts compliant," *see* Bolcome Aff. ¶ 20 & Exs. B, C, those advertisements could not,

---

[3] Even if a narrow tailoring analysis were required, the plaintiffs have not proposed any other regulations on assault weapons and LCMs that would ensure the public the same level of protection against those dangerous weapons. And in light of the hundreds, if not thousands, of other weapons that remain available to the plaintiffs for self-defense, *see* Defts.' Opp., at 10 n. 5, a targeted ban on especially dangerous, military-style weapons is narrowly tailored to serve the Commonwealth's interest in promoting the safety of the public and of law enforcement officers. *See Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 16 (1st Cir. 2007) ("narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively without it, or if the means chosen are not substantially broader than necessary to achieve the government's interest" (internal citations and quotation marks omitted)).

and did not, trump the plain text of the statute.

The plaintiffs' principal response appears to be that the defendants have not vigorously enforced the AWB by conducting annual inspections of dealers or by bringing prosecutions for the sale of "copies or duplicates" of enumerated assault weapons. *See* Ptlfs.' Opp., at 15–17. On both points, the plaintiffs misunderstand the law. First, the defendants are not responsible for conducting inspections of firearms dealers. Under G.L. c. 140, § 123, a "licensing authority shall enter, one time per calendar year, . . . the commercial premises owned or leased by any" licensed gun dealer "and inspect, in a reasonable manner, [its] records and inventory for the purpose of enforcing the provisions of this section." The term "licensing authority" is defined as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them." G.L. c. 140, § 121. None of the defendants is a local police chief, responsible for conducting inspections of firearms dealers. In any event, Section 123 is a licensing statute; it does not criminalize conduct. And the dealer plaintiffs have acknowledged that no inspections of their businesses by local licensing authorities occurred, so they cannot even claim to have relied on inspections as a basis for any misunderstanding of the AWB. *See* Kaplan Decl. Ex 9 (O'Leary Dep.) 36:13-20; Ex. 10 (Ricko Dep.) 18:5-20.

Second, and more importantly, under-enforcement of the "copies or duplicates" provision of the AWB would not give rise to due process rights. Under Massachusetts law, prosecutors have wide discretion in choosing how and when to enforce criminal laws. *See, e.g.*, *Commonwealth v. Clint C.*, 715 N.E.2d 1032, 1038 (Mass. 1999) ("a prosecutor has wide discretion in determining whether to prosecute an individual" under any given criminal statute); *Shepard v. Attorney General*, 567 N.E.2d 187, 189–90 (Mass. 1991) (same). That discretion is rooted in Article 30 of the Massachusetts Declaration of Rights, which "creates a separation of power between the

branches of government essentially granting the prosecutor exclusive power to decide whether to prosecute a case." *Commonwealth v. Pellegrini*, 608 N.E.2d 717, 719 (Mass. 1993). As part of that discretion, a prosecutor may choose, for any number of reasons, not to enforce criminal laws. *See Shepard*, 567 N.E.2d at 189–90. For that reason, as the plaintiffs concede, criminal laws do not become unenforceable simply because they have historically been under-enforced. *See* Pltfs.' Opp., at 15. That under-enforcement cannot give rise to due process claims for defendants subsequently charged under those laws; as this Court has explained, "[t]he government should not be penalized for invoking a criminal statute sparingly (or judiciously)." *United States v. Prosperi*, 573 F. Supp. 2d 436, 445 (D. Mass. 2008).

Furthermore, a history of under-enforcement of the AWB would not constitute "tacit approval" of the sale of assault weapons, as the plaintiffs contend. Pltfs.' Opp., at 17. An analogy illustrates this point. When a criminal defendant is charged, courts have recognized a narrow defense known as "entrapment by estoppel," in which the defendant may "'show that he had been told by a government official that his behavior was legal and that he reasonably relied on that advice.'" *United States v. Pardue*, 385 F.3d 101, 108 (1st Cir. 2004) (quoting *United States v. Bunnell*, 280 F.3d 46, 49 (1st Cir. 2002)). But in order to make out the defense, the "defendant must put forth an affirmative representation by a government official that his conduct was or would be legal." *Id.*; *see also United States v. Ellis*, 168 F.3d 559, 561 (1st Cir. 1991) (the defendant "failed to show, as required, that anyone with official status made an affirmative representation that possession of the ammunition was legal").[4] Although the plaintiffs are not criminal defendants

---

[4] Outside of a criminal prosecution, the standard to equitably estop the government is even more demanding, requiring a showing "that the government engaged in affirmative misconduct," which must at least include "an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Shafmaster v. United States*, 707 F.3d 130, 136 (1st Cir. 2013) (citation and internal quotation omitted). *Cf. Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 414 (1990) (erroneous advice by a Government employee did not justify estoppel).

and have not been charged for the violation of any laws, their due process claim echoes this defense. *See* Pltfs.' Opp., at 17 ("Plaintiffs rightfully relied upon Defendants' inaction as tacit approval of their transfers and possession."). But for the same reason the entrapment by estoppel defense requires an affirmative representation by government officials, the plaintiffs' due process claim fails. The evidence contains no affirmative representation from any Massachusetts official that imitations of Colt AR-15s and AK47s were lawful. Instead, the undisputed evidence shows the opposite. Massachusetts officials affirmatively represented that the Bushmaster XM-15, an imitation of the Colt AR-15, "cannot be legally purchased in Massachusetts because it is prohibited under the state's assault weapons ban." Kaplan Decl. Ex. 17; *see also* Kaplan Decl. Ex. 36, at 141–44. This representation—together with the plain text of the statute, the legislative history, the interpretation of the phrase "copies or duplicates" by other courts, and Maryland's enforcement notice on assault weapons—afforded the public with fair notice that imitations of Colt AR-15s, AK47s, and other enumerated weapons are banned in Massachusetts.

III.   **THE PLAINTIFFS' VAGUENESS CLAIM IS NOT COGNIZABLE AND FAILS ON THE MERITS.**

The plaintiffs may not advance their claim challenging the statutory phrase "copies or duplicates" as unconstitutionally vague on its face, because ""[o]utside the First Amendment context," courts only "consider 'whether a statute is vague as applied to *the particular facts at issue*'"; courts do not entertain the claim that a statute is vague on its face. *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010)) (emphasis in original); *see also Chapman v. United States*, 500 U.S. 453, 467 (1991) ("First Amendment freedoms are not infringed by [the challenged statute], so the vagueness claim must be evaluated as the statute is applied to the facts of this case."); Defts.' Br., at 17–18.

The plaintiffs rely on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, for the

argument that facial vagueness claims may be asserted even when First Amendment conduct is not at issue. *See* Pltfs.' Opp., at 17–19. But *Hoffman Estates* states, in plain terms, that "'vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'" *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 7 (1982) (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)). Applying that rule, the Supreme Court did entertain a facial vagueness challenge in *Hoffman Estates* because that case involved First Amendment freedoms. *See id.* at 495–503. But when a case—even one involving a criminal statute—does not involve First Amendment freedoms, courts may only entertain as-applied vagueness claims. *See Zhen Zhou Wu*, 711 F.3d at 15.

Of course, the argument that a facial vagueness claim is not cognizable outside the First Amendment context can be waived or forfeited, and it appears the argument was not raised in the Sixth Circuit decisions relied upon by the plaintiffs. *See* Pltfs.' Opp., at 19 (citing *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250 (6th Cir. 1994), and *People's Rights Org., Inc. v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998)). But where the argument is raised, as here, the First Circuit has made clear that facial vagueness claims, including those challenging gun laws, are "eligible only for as-applied, not facial, review." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016).

Finally, even if this Court were to address the plaintiffs' facial vagueness claim on the merits, the claim fails for all the reasons previously discussed. *See* Defs.' Br., at 18–20; Defs.' Opp., at 18–20. The plain meaning of the phrase "copies or duplicates" gives ordinary people fair notice of which weapons are prohibited; the plaintiffs have demonstrated their understanding of the phrase in their deposition testimony; other courts have rejected identical challenges to the same phrase in other jurisdictions' assault weapons bans; and in 2000, this Court rejected an identical

16

challenge, likewise asserted by the Gun Owners' Action League, to the same phrase the Commonwealth's AWB. *See id.* The plaintiffs' vagueness claim is, once again, meritless.

## **CONCLUSION**

For the foregoing reasons, and for the reasons stated in the Memorandum in Support of the Defendants' Motion for Summary Judgment and the Defendants' Opposition to the Plaintiffs' Motion for Summary Judgment, this Court should grant the Defendants' Motion for Summary Judgment on all claims and enter judgment in favor of the defendants.

Respectfully submitted,

MAURA HEALEY, in her official capacity as
Attorney General of the Commonwealth of
Massachusetts; DANIEL BENNETT, in his official
capacity as Secretary of the Executive Office of
Public Safety and Security; COLONEL KERRY
GILPIN, in her official capacity as Superintendent
of the Massachusetts State Police,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Julia E. Kobick
William W. Porter, BBO # 542207
Gary Klein, BBO # 560769
Julia E. Kobick, BBO # 680194
Elizabeth Kaplan, BBO # 568911
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
(617) 963-2559

Date: January 19, 2018     julia.kobick@state.ma.us

17

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document, filed through the Court's ECF, system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants by first-class mail on January 19, 2018.

/s/ Julia E. Kobick
Julia E. Kobick
Assistant Attorney General