1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3                            No. 1:17-cv-10107-WGY

4

5    DAVID SETH WORMAN, et al,
                 Plaintiffs
6

7    vs.

8

9    CHARLES D. BAKER, et al,
                 Defendants
10

11                      * * * * * * * * *

12

13                     For Hearing Before:
                    Judge William G. Young
14             at Boston University School of Law

15

                        Summary Judgment
16

17                     United States District Court
                       District of Massachusetts (Boston)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Friday, February 9, 2018

20                       * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23                United States District Court
           One Courthouse Way, Room 5510, Boston, MA 02210
24                   bulldog@richromanow.com

25

```
 1                A P P E A R A N C E S

 2

 3    JOHN PARKER SWEENEY, ESQ.
      T. SKY WOODWARD, ESQ.
 4    MARC A. NARDONE, ESQ.
          Bradley Arant Boult Cummings, LLP
 5        1615 L. Street, N.W.
          Suite 1350
 6        Washington, DC 20036
          (202) 719-8216
 7        Email: Jsweeney@bradley.com
          For plaintiffs
 8

 9    JULIA E. KOBICK, ESQ.
      GARY E. KLEIN, ESQ.
10    ELIZABETH A. KAPLAN, ESQ.
          Office of the Attorney General
11        One Ashburton Place
          Boston, MA 02108
12        (617) 963-2559
          Email: Julia.kobick@state.ma.us
13        For defendants

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (Begins, 2:05 p.m.)
 3              THE CLERK:  Now hearing Civil Matter 17-10107,
 4    Worman versus Baker.
 5              THE COURT:  Now if you folks would introduce
 6    yourselves and whom you represent.
 7              MR. CAMPBELL:  Your Honor, my name is Richard
 8    Campbell, I represent the plaintiffs, and I'm really
 9    here for the purpose of introducing counsel from
10    Washington, D.C., John Sweeney, Sky Woodward, and Mark
11    Nardone, they will be arguing the matter, not me.
12              THE COURT:  Very well, and you folks are of
13    course welcome.
14         And the Commonwealth?
15              MS. KOBICK:  Good afternoon, your Honor,
16    Assistant Attorney General Julia Kobick and I'm here
17    with Assistant Attorney General Gary Klein and Assistant
18    Attorney General Elizabeth Kaplan.
19              THE COURT:  Thank you, and you're all welcome.
20    Feel free to be seated.  But I have a couple of initial
21    procedural questions and I'll jump back and forth, I
22    guess.
23         So we'll -- these are really to both of you.
24    These are cross-motions for summary judgment and I had
25    you inquire -- I had the Clerk inquire whether you
```

1    desired to have them treated as a case-stated and I was

2    informed that you did not, and I don't care which side

3    did not or if you both did not.  But since that time,

4    however, I've read a very interesting article in "United

5    States Law Week" which suggests that on cross-motions

6    for summary judgment the Court can go ahead and

7    adjudicate the case so long as the credibility of

8    witnesses is not at issue.  The article suggests that

9    the First Circuit is -- and no citation is supplied, but

10   the First Circuit is in that group of circuits, but a

11   number of other circuits are.

12       So let me just quickly ask you.  We'll start with

13   the plaintiffs.  Do you think I can do that on this

14   record?

15           MR. SWEENEY:  No, your Honor.

16           THE COURT:  All right.  And --

17           (Interruption by Court Reporter.)

18           MR. SWEENEY:  This is John Parker Sweeney for

19   the plaintiffs, your Honor.

20           THE COURT:  Yes, all right, Mr. Sweeney, you

21   think not, and you think I've got to hold the parties to

22   the strict summary judgment standard?

23           MR. SWEENEY:  That's correct, your Honor.  We

24   expect this case will go to the First Circuit and at

25   some point probably will be presented for review to the

1    United States Supreme Court.  We'd like to make sure we

2    have as complete a record as possible.

3              THE COURT:  I certainly can appreciate that,

4    but we're here today and that's my interest as well.

5        What's the Commonwealth think?

6              MS. KOBICK:  The Commonwealth believes this

7    case could be submitted as a case-stated --

8              THE COURT:  Well, no, that's not happening,

9    they refuse, as is obvious.

10             MS. KOBICK:  Yes, your Honor.

11             THE COURT:  I'm wondering whether, despite

12   their refusal, I can take this record and go ahead?

13             MS. KOBICK:  The defendants haven't moved to

14   strike any of the --

15             THE COURT:  But they have and that's

16   significant.

17             MS. KOBICK:  They have, right, and the

18   defendants have opposed that motion.  If this case were

19   to go to trial, perhaps the credibility of the witnesses

20   might be in dispute at that point, but at this point I

21   don't believe there's any dispute over the credibility

22   of the witnesses.

23             THE COURT:  No, but you see I guess that's the

24   question, and that feeds into my next question and my

25   next procedural question here.  But I think I should

1    start with the plaintiffs because I think I know the
2    Commonwealth's position.
3         If these weapons, if these firearms are military
4    weapons, primarily military-style weapons, then there's
5    no -- under **Heller** they fall outside the special
6    scrutiny and I defer to legislative factfinding and your
7    case is over.
8         That at least is an argument, isn't it?
9              MR. SWEENEY:  That's an argument, your Honor,
10   but one we dispute.
11             THE COURT:  I understand that.  But were I to
12   adopt that, I don't have to rule on the striking or
13   anything because I'm simply deferring to the legislative
14   choices made by the Commonwealth of Massachusetts?
15             MR. SWEENEY:  Oh, but the justification of
16   those choices is based upon adjudicative facts.
17             THE COURT:  Well, we'll get to that.  But I
18   think I understand you.  But I do want to ask the
19   Commonwealth.
20        You'd accept that?
21             MS. KOBICK:  Yes, your Honor.
22             THE COURT:  In fact that's your argument?
23             MS. KOBICK:  Yes.  But the vast majority of
24   the facts at issue are legislative facts.
25             THE COURT:  Well, so you say.

```
1              MS. KOBICK:  Yes.

2              THE COURT:  And I think now I'm ready.  And so

3     let me start with the defense and the defense's motion

4     for summary judgment.

5         If there is a burden here, you're making a facial

6     challenge to, um, regulatory matters of the Commonwealth

7     of Massachusetts, you bear the burden.

8         At least you'll concede that, isn't that so?

9              MR. SWEENEY:  No, your Honor, respectfully we

10    do not.

11             THE COURT:  All right.

12             MR. SWEENEY:  We start with *Heller* itself

13    which declares that bearable arms are prima facie

14    covered by the Second Amendment, that is a statement in

15    a Second Amendment case.

16             THE COURT:  Well, what about the fact that

17    it's not expected to apply to military-style weapons?

18             MR. SWEENEY:  Well, that is an argument and

19    the facts are disputed.

20             THE COURT:  Well, what facts are in issue as

21    to these?

22             MR. SWEENEY:  Well, let me start.  No military

23    in the world issues as standard equipment the banned

24    firearms that are at stake here.

25             THE COURT:  We're talking about military-
```

1  styled weapons, they don't have to be found in the TO &

2  E of someone's army, do they?

3          MR. SWEENEY:  The defendants have pointed to

4  not a single firearm that was not originally designed

5  for military use or has derived from a military weapon.

6  There is no line drawn.

7      Under their military weapons analysis, every

8  firearm -- a civilian firearm, a firearm, an AR-15

9  recognized by the United States Supreme Court as a

10  civilian firearm, under their analysis there would be no

11  Second Amendment protection.  Frankly there is no Second

12  Amendment protection for the handguns in **Heller** under

13  their approach.  The Colt 1911 has been in service as a

14  military sidearm since 1900, one of the proudest

15  sidearms carried by our military forces designed for the

16  military and it's in wide use by civilians today.  Under

17  their analysis, where do you draw the line?

18          THE COURT:  Well, their analysis finds support

19  in the Circuit opinions of various circuits, doesn't it?

20          MR. SWEENEY:  There is one circuit and only

21  one circuit that came out with that analysis, they

22  didn't believe in it so strongly that they didn't also

23  have an alternative analysis under the two-part approach

24  applying intermediate scrutiny.

25          THE COURT:  Now, if you are right and I should

1   apply intermediate scrutiny here, or the First Circuit

2   analog to intermediate scrutiny, you have the burden of

3   proof on that, don't you?

4            MR. SWEENEY:  Do not.  Under heightened

5   scrutiny the government bears the burden of justifying

6   the challenged law.

7            THE COURT:  Even as to intermediate scrutiny?

8            MR. SWEENEY:  Yes, your Honor.

9            THE COURT:  And what's your authority for

10  that?

11           MR. SWEENEY:  United States Supreme Court

12  cases.

13           THE COURT:  What?

14           MR. SWEENEY:  The *Playboy* case cited in our

15  brief.  Heightened scrutiny involves the burden on the

16  government to justify the statute, not the other way

17  around.

18       The only case cited by the defendants that we bear

19  the burden is the *Sampson* case, which is an Eighth

20  Amendment case involving that standard of cruel and

21  unusual -- not a Second Amendment case, not a First

22  Amendment case, involving tiered layers of scrutiny.

23           (Pause.)

24           THE COURT:  Go ahead.

25           MR. SWEENEY:  We do not, by the way, contend

1    that the two-part approach is the way this Court should

2    go in this case.  We contend that this Court should

3    apply the text, history, and tradition analysis that

4    *Heller* used for the prohibition on firearms in the home.

5          The *Powell* case, which your Honor was involved in

6    in the District Court decision, of course, went to the

7    Court of Appeals and the Court of Appeals made clear

8    what *Heller* and *McDonald* decided was the setting of

9    defense in the home, what firearms would be used for

10   defense of the home, and then in that context judicial

11   review had been what the Court used there, but it left

12   open -- it made very clear it left open what form of

13   review would be used in future cases not involving that

14   setting.

15         This case, your Honor, of course is a case of

16   first impression in this court and in the First Circuit.

17   But the closest case we have on point is the *Rene E*

18   case.

19         *Rene E* involved the possession in the home of a

20   handgun by a juvenile and in that case the Court

21   conducted an extensive text and history analysis of the

22   Second Amendment and the tradition of its implementation

23   and concluded that juveniles were not accorded

24   protection under the Second Amendment, and that case did

25   not mention a two-part approach, did not mention

1    intermediate scrutiny, but it's the closest we have to

2    possession in the home of firearms that this case

3    involves.

4         Moreover, to the extent that case might be

5    considered a two-part approach case, as the State

6    contends it is, that case stands for narrow tailoring

7    because in that case the Court twice emphasized that the

8    restriction on juvenile possession in the home was

9    narrowly tailored, narrowly tailored to exclude use for

10   self-defense and defense of others in the home.  In

11   other words the statute specifically said a juvenile can

12   take possession of a handgun for the purpose of self-

13   defense in the home.  Unfortunately for Rene E that was

14   not the case when he was caught in possession of a

15   handgun when a search warrant was executed in his home.

16   There was also an exception for hunting and employment-

17   related activities.

18        So the Court said, "Yes, juveniles have had a long

19   tradition of being excluded from rights to firearms

20   under the Second Amendment, but even so this statute was

21   narrowly tailored to allow them rights in certain

22   circumstances and we're going to prove it."  So there's

23   a case where the First Circuit used text and history

24   analysis, found that the prohibition in question was

25   appropriate, and demonstrated that there was narrow

1    tailoring of the legislation that protected it under the

2    Second Amendment.

3             THE COURT:  You don't -- what should I draw

4    from Judge Saylor's opinion in *Gould vs. O'Leary*?

5             MR. SWEENEY:  Like your own opinion in the

6    *Powell* case, your Honor, it involved licensure and

7    moreover outside-the-home possession of a firearm, these

8    are two very material circumstances not involved in the

9    *Heller* case.

10        What *Heller* did say about licensure and similar

11   longstanding regulations of firearms was that they're

12   entitled to some judicial deference where the two-part

13   approach that your Honor applied there is not an

14   inappropriate way to go for these longstanding

15   traditional prohibitions.  That's not the case here any

16   more than it's the case in *Heller* or *McDonald*.

17             (Pause.)

18             MR. SWEENEY:  This case is about who gets to

19   choose what firearms will be used in the homes of

20   law-abiding citizens, is it the legislature, the will of

21   the political majority, or is it the people?  And if it

22   wasn't for the Second Amendment, surely the answer would

23   be the legislature.  But here the Second Amendment says

24   the people choose and the popular choice of firearms in

25   the home happened to be handguns in *Heller* and they were

1    denied handguns.

2          But the Court didn't stop there and in a response

3    to the District's offer to say, "Well, we'll let them

4    have rifles and shotguns in the home," the Court said

5    "It's no answer that other firearms are available."  If

6    firearms that are popularly chosen cannot be used in the

7    home, that's an abridgment of the Second Amendment

8    right.  And here too if popular firearms, rifles that

9    are owned by millions of Americans and tens of thousands

10   of Massachusetts law-abiding citizens and are rarely

11   used in criminal acts, if they're not available in the

12   home, that is an abridgment of the Second Amendment

13   Right.  The people get to choose.

14             (Pause.)

15             THE COURT:  I have to tell you, I wish you

16   would develop a little more your, um, reason why these

17   aren't military-style weapons?

18             MR. SWEENEY:  Certainly.  Certainly.

19          All firearms evolve virtually simultaneously for

20   parallel military and civilian uses.  These are no

21   different.

22          Firearms over time evolved both for many lawful

23   civilian purposes, such as self-defense, hunting, and

24   the like, as well as for military purposes.  The

25   firearms that have been specifically covered by the bans

1    here are firearms that were developed either for the

2    military or for civilian uses in parallel tracks.  The

3    best example would be the AR-15.

4         There is evidence in the record that the AR-15 was

5    developed by ArmaLite.  Did they have hopes to sell it

6    into the military market?  Yes, they did, and their

7    first contract for it was to the Air Force.  But at the

8    same time they applied to the ATF for permission to sell

9    a civilian semiautomatic version to the -- to the

10   commercial market for use in hunting, the AR-15 Sporter,

11   which was put on the market in early 1964 before even it

12   was deployed by the U.S. Army as the M-16 fully-

13   automatic version.  It is a perfect example of firearms

14   being developed simultaneously for the military and for

15   the commercial uses.

16        This is not a considered distinction to draw among

17   firearms, there is no line in the sand, and when we see

18   that, as we see that, the breadth of the ban, as

19   articulated by the Attorney General in her notice of

20   enforcement, was such that they had to exempt many

21   firearms that were called within its broad terms and

22   these firearms that were exempted include, for instance,

23   the M-1 Carbine, the M-1 Carbine, one of the

24   quintessential standard-issue military sidearms of the

25   United States Army and other military forces.

```
 1              THE COURT:  Okay, no more than about 5 more
 2      minutes, if you wish.  Go ahead.
 3              MR. SWEENEY:  Your Honor, the facts that
 4      underlie the plaintiffs' motion to dismiss are not
 5      disputed, the critical facts are that the firearms are
 6      in common use.  The defendants themselves admit that the
 7      AR-15 and the AK-platform firearms are the most popular
 8      semiautomatic rifles.  Moreover, they do not dispute the
 9      trade association estimates of the millions of these
10      firearms that are in circulation.  So too the magazines
11      are owned by 10 million or more people and that there
12      are tens of millions of them in circulation.
13              THE COURT:  But when you talk about the
14      magazines, the cutoff here is, um, a magazine of more
15      than 10 rounds?
16              MR. SWEENEY:  Correct, and when I say more
17      than 10 -- magazines -- magazines with a capacity of
18      more than 10 rounds are owned by tens of millions of
19      people.
20              THE COURT:  Does that make any difference?
21      What's the --
22              MR. SWEENEY:  They're in common use.  It does
23      under *Heller*, that's the critical test.  They're
24      popular.
25              THE COURT:  Can it be -- can it be that
```

1  because something's in common use, it's beyond the

2  regulation of the state?

3          MR. SWEENEY:  That is exactly what the *Heller*

4  case stands for, your Honor.

5          THE COURT:  That's your view of *Heller*?

6          MR. SWEENEY:  That's exactly what the *Heller*

7  case stands for.

8          THE COURT:  All right.

9          MR. SWEENEY:  When you have a firearm that's

10  in common use typically possessed for lawful purposes by

11  law-abiding citizens --

12          THE COURT:  Well, what are the lawful purposes

13  that would require, even in a semiautomatic mode, the

14  firing of 15 shots to defend the home?

15          MR. SWEENEY:  We have evidence in the record,

16  your Honor, that the New York Police Department

17  incidents of defensive use of firearms by law

18  enforcement officers, fully 17 percent involve the

19  firing of more than 10 rounds in defense of the officer

20  or others in confrontations with criminals.

21          THE COURT:  We're not talking in those --

22  looking at that test, we're not talking about an AR-15,

23  are we, we're talking about their handguns?

24          MR. SWEENEY:  There is no difference in terms

25  of the bullets used and the impact between rifles and

1   handguns, we're talking capacity of magazines.  So

2   magazines, whether they're used in a rifle or used in a

3   pistol, you have more than 10 necessary to end an

4   encounter successfully with criminals and at least 17

5   percent are documented incidents by the New York Police.

6   That is evidence in the record that they're needed for

7   defense situations.

8               THE COURT:  Very well.

9        All right.  Thank you.  We'll hear the

10  Commonwealth.

11              MS. KOBICK:  Your Honor is absolutely correct

12  that the first question and the dispositive question in

13  this case is whether the assault weapons and large-

14  capacity magazines are like M-16s and weapons that are

15  most useful in military service, that was one of the

16  limitations that *Heller*, by its plain language, put on

17  the scope of weapons eligible for Second Amendment

18  protection, and there's no dispute on the facts that

19  bear on that question.  They're all legislative facts.

20  The parties agree --

21              THE COURT:  Well, let's not be too conclusive.

22  Now tell me specifically what *Heller* said in that

23  respect?

24              MS. KOBICK:  *Heller* said that M-16s and the

25  like, weapons that are most useful in military service,

1    may be banned, and the Fourth Circuit ruled in **Kolbe**

2    that under that test assault weapons and large-capacity

3    magazines are not protected by the Second Amendment.

4        Now everyone agrees that assault weapons like

5    AR-15s and M-16s are functionally equivalent with one

6    difference, so they have the same construction and

7    configuration, they have the same muzzle velocity,

8    within 3,000 feet per second, which is three times as

9    fast as handguns, they have the same range, 500 yards,

10   more than two football fields, they take the same

11   caliber ammunition, and their parts are interchangeable.

12   Everyone agrees that AR-15s were developed for military

13   use during the Vietnam war, they were renamed the M-16

14   when they were adopted by the Army, that they were

15   adopted because of their phenomenal lethality.  The

16   plaintiffs' experts have all --

17            THE COURT:  Their phenomenal what?

18            MS. KOBICK:  Lethality.

19       The plaintiffs' experts have put in evidence that

20   backs all that up, the defendants' experts have as well,

21   and all of the, um, exhibits that bear on the, you know,

22   the likeness between M-16s and AR-15s also support that.

23            THE COURT:  But aren't you undercutting your

24   own argument here?  I mean perhaps I ought to have a

25   trial here and then we'll -- then we'll have the record

1      that Mr. Sweeney is talking about.  If I understood your

2      argument, it is that based upon undisputed facts, the

3      weapons and magazines that are firearms, and magazines

4      that are at issue here, are not within the Second

5      Amendment under *Heller*, therefore I need go -- therefore

6      the analysis stops, I defer to the judgment made by the

7      people of Massachusetts through their elected

8      representatives in their statutes.  That's your

9      argument.

10          Now, he puts forth very carefully the

11     counterargument and he -- let's say I get there, let's

12     say I get to the First Circuit analog to, um,

13     intermediate scrutiny, I was too quick to say that they

14     bear the burden of proof, was I not?

15          MS. KOBICK:  So two responses, your Honor.

16     First, on the first point, um, there is no dispute about

17     the facts here, so I don't think this undercuts the

18     argument at all, everyone agrees about the, um,

19     underlying similarity between the function of the

20     weapons and the history, the only dispute that we have

21     is a legal question and that is whether the sole

22     difference between the AR-15s and M-16s, which is that

23     AR-15s fire in semiautomatic mode whereas M-16s can fire

24     in semiautomatic and 3-round burst mode, whether that

25     makes AR-15s unlike M-16s?  That's a legal question,

1    that's not a factual question, and the defendants say

2    absolutely not because the Army says their most-

3    effective mode is semiautomatic mode, it instructs its

4    soldiers to use semiautomatic mode.  You can simulate

5    automatic fire with AR-15s and other assault weapons

6    through bump stocks or trigger cranks or similar

7    devices, so there's no meaningful constitutional

8    distinction between these two weapons.  That is the

9    first question, and if your Honor agrees, then you're

10   right, the analysis ends, assault weapons are not

11   protected by the Second Amendment, and you don't need to

12   get to intermediate scrutiny.

13        On that question, whether assault weapons and

14   large-capacity magazines are constitutionally protected,

15   the plaintiffs do bear the burden.

16             THE COURT:  And what's your best authority for

17   that?

18             MS. KOBICK:  The *Sampson* case makes clear that

19   the plaintiffs bear the burden of proving a

20   constitutional violation.

21        I agree that if your Honor --

22             THE COURT:  He distinguishes *Sampson*.

23             MS. KOBICK:  Well, I think if your Honor were

24   to get to intermediate scrutiny, then the government

25   bears the burden, but as to the first question, whether

1    the weapons are protected --

2              THE COURT:  Oh, that was my question.  If I

3    get to intermediate scrutiny, you concede the government

4    bears the burden?

5              MS. KOBICK:  Yes.

6              THE COURT:  All right.

7              MS. KOBICK:  But the first question, the

8    plaintiffs bear the burden.

9              THE COURT:  Well, of course, they're attacking

10   the statute on its face.

11             MS. KOBICK:  Yes.

12             THE COURT:  So -- but I'm not clear what the

13   burden is, um, when you say "the burden"?

14        If the standard of review is deference to

15   legislative factfinding --

16             MS. KOBICK:  Yes.

17             THE COURT:  -- sometimes known as the

18   "presumption of constitutionality" --

19             MS. KOBICK:  Yes.

20             THE COURT:  -- I don't need an undisputed

21   factual record because it's not for me, it's for the

22   people's elected representatives in the Great and

23   General Court, if that's so, but we are talking about a

24   constitutional right of the individual to bear arms.

25   We're clear on that.  So don't you have to pin yourself

1     to this language in *Heller* about military-style weapons?

2              MS. KOBICK:  Well, that language goes to the

3     first question, whether the weapons are constitutionally

4     protected?  We say they're not, for that reason we've

5     made alternative arguments, there are several

6     limitations on the scope of the Second Amendment, and

7     the plaintiffs have focused on a different limitation

8     which is whether the weapons are in common use for self-

9     defense?  We think we win on that one too, but your

10    Honor doesn't need to get to that limitation if you

11    analyze the question of whether they're like M-16s and

12    what is most useful in military service?  But if your

13    Honor were to --

14             THE COURT:  Thank you, what you just said is

15    helpful.  So let me frame this question.

16             MS. KOBICK:  Sure.

17             THE COURT:  Let's say you don't win on the

18    military-style issue --

19             MS. KOBICK:  Yes.

20             THE COURT:  -- do I then apply intermediate

21    scrutiny?

22             MS. KOBICK:  No, because your Honor would also

23    have to analyze a different limitation under *Heller,*

24    which is whether --

25             THE COURT:  Develop that.

1          MS. KOBICK:  Right -- which is whether assault

2     weapons and large-capacity magazines are in common use

3     for self-defense?  And that limitation also comes from

4     *Heller's* language and we say "No, they're not in common

5     use for self-defense today, they weren't in common --

6     they're not analogs of weapons that were in common use

7     at the time of the Founding," um, there is ample

8     evidence to show that --

9          THE COURT:  But how am I going to know that?

10          MS. KOBICK:  There's evidence in the record

11     that shows that assault weapons are virtually never used

12     for self-defense.  The plaintiffs' experts couldn't

13     identify a single example of an assault weapon or a

14     large-capacity magazine ever being used for self-

15     defense, neither could the plaintiffs themselves.  And

16     for large-capacity magazines, there's evidence in the

17     record showing that, um -- from NRA armed-citizen

18     reports, these are reports of people using weapons in

19     self-defense, that, um, there are virtually never more

20     than 10 shots fired and the average number of shots

21     fired in self-defense is two rounds.  So that's --

22          THE COURT:  Evidently police fire considerably

23     more rounds considerably more frequently.

24          MS. KOBICK:  Well, it's self-evident that

25     civilian use of firearms is different than police use of

1    firearms, your Honor.

2         So I think even under that limitation, are these

3    weapons in common use for self-defense?  The defendants

4    win.  This is all before the Court would apply any level

5    of means and scrutiny, and intermediate scrutiny, so

6    that's a separate question.

7         If your Honor were to get to that question, I

8    fully agree that the cases say that this Court owes

9    deference to the judgment of the legislature, that the

10   test is not strict scrutiny, it's is there a substantial

11   --

12         THE COURT:  Oh, all right, I don't think

13   anyone's arguing for strict scrutiny, but let's -- and

14   I'm following your argument.  So there's your defenses

15   short of intermediate scrutiny.

16         On intermediate scrutiny the government bears the

17   burden of proof.  This -- I've got to pay attention to

18   this motion to strike, in which I have, I'm not ruling

19   on it today, and it becomes more a, um, fact-based

20   question, and it's somewhat conclusory to say that these

21   are legislative facts.  Perhaps we ought have a trial?

22         MS. KOBICK:  Again, your Honor, I don't think

23   there are disputed facts.  Whether you characterize them

24   as "legislative" or "adjudicative," there is ample

25   evidence that these weapons are disproportionally used

1    in mass public shootings and in murders of police

2    officers.  The plaintiffs haven't put in any evidence to

3    counter that.

4         There is ample evidence that these weapons inflict

5    more severe injuries in more people than other weapons

6    like handguns.  The plaintiffs don't have evidence to

7    counter that.  The plaintiffs focus on a different

8    question, which is whether this Court should only look

9    to research based on Massachusetts episodes or whether

10   you can look to, um, national research, empirical

11   research that takes account of the use of weapons

12   nationwide.  That's a legal question, that's not a

13   factual question.  So even under intermediate scrutiny,

14   there aren't disputed facts, so a trial's not necessary.

15              THE COURT:  About 4 more minutes.

16              MS. KOBICK:  Sure, your Honor.

17        I just want to flush out those, um, points a

18   little bit, which is that these weapons are

19   disproportionally used in mass public shootings and in

20   murders of police officers by huge magnitudes.  So, um,

21   at most assault weapons account for 3 percent of the

22   U.S. gun stock.  They're used in between 13 and 20

23   percent of the murders of police officers.  They're used

24   in between 22 percent and 37 percent of mass public

25   shootings.  And as we've seen over and over and over

1    again, in Sutherland Springs in Las Vegas --

2         THE COURT:  But you see -- you know when you

3    make an argument like that -- it's a Constitution that

4    we construe here, what you're doing is making a public

5    policy argument and that's not for this court, and it's

6    not because they threaten, "Oh, this case is going all

7    the way to the Supreme Court."  I'm a judge of the

8    United States, it's not for this court, it's not for any

9    of those courts.  The Supreme Court has explained that

10   individual right to bear arms, that right exists,

11   whatever the majority think.

12        And one of the problems, of course, Justice Scalia

13   ironically in many of his speeches recognized this, that

14   when the Court says that they're "constitutionalizes

15   something," as of course they did in the Second

16   Amendment, as they did in *Citizens United*, the views of

17   the majority don't bear on the issue as to policy unless

18   that majority can amend the Constitution as the justices

19   have construed it, and of course I'm bound by what the

20   justices said in *Heller* and I will carry that out.

21        So you're making a public policy argument.  If I

22   have to defer to the legislature, again I don't, um,

23   evaluate the policy, I simply say "There is a policy,

24   this is the legislature's policy, that's an end of it,"

25   if I do that.  We were talking about intermediate

1    scrutiny.  Maybe we ought to have a trial then?

2              MS. KOBICK:  So, your Honor, the question -- I

3    agree with your comments about a right enshrined in the

4    Constitution, but the question under intermediate

5    scrutiny is, is there a substantial relationship between

6    the public safety goal here and what the legislature has

7    done, which is banning assault weapons and large-

8    capacity magazines?  So the question for your Honor is,

9    was it reasonable for the legislature to think that it

10   could achieve its public safety goal?

11             THE COURT:  A matter on which you bear the

12   burden of proof?

13             MS. KOBICK:  Yes, and I mean --

14             THE COURT:  But if the answer is "Yes," you

15   see, if the answer is "Yes," under **_Reeves vs. Sanderson_**

16   **_Plumbing_**, then the whole concept of burden of proof is

17   that there are facts to be found, so I must treat this

18   as summary judgment, so I have to look at their record,

19   what they proffer, and give all reasonable intendments

20   their way, and nevertheless you win.

21        And you think that's so?

22             MS. KOBICK:  Yes, because again --

23             THE COURT:  2 minutes to tell me why, on their

24   record.

25             MS. KOBICK:  Well, I think your Honor has to

1    look at the entire record before you --

2              THE COURT:  Not yours because I could

3    disbelieve yours, if it's factfinding, only theirs, what

4    they admit.

5              MS. KOBICK:  That's true if there were a

6    dispute of material fact, but there's no -- there are

7    not disputes here.

8              THE COURT:  And so where there's no dispute, I

9    look to their record and say, "Well, they admit this and

10   that's not disputed."  All right.  I agree.

11       2 minutes why you win on their record?

12             MS. KOBICK:  Well, your Honor, I do want to

13   push back because if the government bears the burden of

14   proof, then the government has to put in evidence in to

15   satisfy its burden.

16             THE COURT:  No one says that you've lost, all

17   you have to show is that there's a dispute.  No one says

18   that I give them summary judgment today on the argument

19   you're making, what I say is, or I'm not saying it, I'm

20   just positing it, I say, "Well, the next thing to do is

21   set this down for trial and give me the final pretrial

22   memorandum and we'll see what witnesses we have and

23   we'll all sit here and we'll listen to these so-called

24   "experts" and I'll learn a lot about muzzle velocity and

25   I'll make my own determination about what the effect of

1    having so many of these weapons out in the hands of the

2    populist is.  Respectfully I do think I understand your

3    argument.  Thank you.  I don't know that we get there.

4    Maybe we do.

5         I'm much aided both by your written briefs -- and

6    I want to say this to all counsel, by your written

7    briefs and by your skillful and zealous oral advocacy.

8    I do welcome it.  I'll take the matter under advisement.

9              MR. SWEENEY:  Thank you, your Honor.

10             MS. KOBICK:  Thank you.

11             (Ends 2:30 p.m.)

```
1              C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5   do hereby certify that the foregoing record is a true

6   and accurate transcription of my stenographic notes

7   before Judge William G. Young, on Friday, February 9,

8   2018, to the best of my skill and ability.

9

10

11

12   /s/ Richard H. Romanow 02-14-18
     _____
13   RICHARD H. ROMANOW    Date

14

15

16

17

18

19

20

21

22

23

24

25
```