UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____
|                                          )
DAVID SETH WORMAN, ANTHONY LINDEN,        )
JASON WILLIAM SAWYER, PAUL NELSON         )
CHAMBERLAIN, GUN OWNERS' ACTION           )
LEAGUE, INC., ON TARGET TRAINING,         )
INC., and OVERWATCH OUTPOST,              )
                                          )
          Plaintiffs,                     )
                                          )
               v.                         )     CIVIL ACTION
                                          )     NO. 1:17-10107-WGY
MAURA HEALEY, in her official             )
capacity as Attorney General of           )
the Commonwealth of Massachusetts;        )
DANIEL BENNETT, in his official           )
capacity as the Secretary of the          )
Executive Office of Public Safety         )
and Security; and COLONEL KERRY           )
GILPIN, in her official capacity          )
as Superintendent of the                  )
Massachusetts State Police,               )
                                          )
          Defendants.                     )
_____           )

YOUNG, D.J.                                          April 5, 2018

## MEMORANDUM AND ORDER

### SECOND AMENDMENT, U.S CONSTITUTION

**A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.**

## I.   THE CONTROLLING LAW

For most of our history, mainstream scholarship considered the Second Amendment as nothing more than a guarantee that the several states can maintain "well regulated" militias.  See, e.g., Lawrence H. Tribe, American Constitutional Law 226 n.6 (1978); Peter Buck Feller & Karl L. Gotting, The Second Amendment: A Second Look, 61 Nw. U. L. Rev. 46, 62 (1966); John Levin, The Right to Bear Arms: The Development of the American Experience, 48 Chi.-Kent L. Rev. 148, 159 (1971).

Then, in 1999, a United States District Judge held that, in fact, the Second Amendment conferred upon our citizens an individual right to bear arms.  See United States v. Emerson, 46 F. Supp. 2d 598, 602 (N.D. Tex. 1999) (Cummings, J.), rev'd and remanded on other grounds, 270 F.3d 203 (5th Cir. 2001).  This determination was upheld.  See United States v. Emerson, 270 F.3d 203, 264 (5th Cir. 2001).

Eventually, the issue found its way to the Supreme Court. In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court struck down a District of Columbia provision that made it illegal to possess handguns in the home, holding that the core right guaranteed by the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  Id. at 635.  Justice Scalia wrote for the five-member majority and his opinion is a tour de force example

of his "original meaning" jurisprudence.[1]  The Second Amendment, he explained, is comprised of a prefatory clause, "[a] well regulated Militia, being necessary to the security of a free State, . . ." and an operative clause, ". . . the right of the people to keep and bear Arms, shall not be infringed."  Speaking for the Supreme Court, he went on to offer extensive historical grounding for this interpretation.  Id. at 579-600.

Well aware that he was writing more than two centuries after the words the Supreme Court was interpreting had been adopted as part of our Constitution, Justice Scalia carefully defined the words "bear" and "arms," giving them the meaning those words bore at the time of the Second Amendment's adoption. Id. at 581-92.

Speaking for the Supreme Court and focusing on the word "arms," he clarified that "the right secured by the Second Amendment is not unlimited."  Id. at 626.  It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id.  For example, it is constitutional to prohibit "the possession of firearms by felons and the mentally ill."  Id.  "[L]aws forbidding the carrying of

---

[1] Indeed, Brandon J. Murrill, the Legislative Attorney for the Congressional Research Service, cites Heller as the paradigmatic example of original meaning jurisprudence.  See Brandon J. Murrill, Modes of Constitutional Interpretation, Cong. Res. Service 8 (Mar. 15, 2018), https://fas.org/sgp/crs/misc/R45129.pdf.

firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are also presumptively proper under the Second Amendment.  Id. at 626-27 & n.26.  Another important limitation articulated by the Supreme Court is that the weapons protected under the Second Amendment "were those 'in common use at the time.'"  Id. at 627 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)).  More specifically, Justice Scalia explained that "weapons that are most useful in military service -- M-16 rifles and the like" are not protected under the Second Amendment and "may be banned."  Id.

Justice Scalia well recognized that interpreting the Second Amendment such that military style weapons fell beyond its sweep could lead to arguments that "the Second Amendment right is completely detached from the prefatory clause."  Id.  He explained, however, that the Supreme Court's interpretation did not belie the prefatory clause because the consonance of the two clauses must be assessed "at the time of the Second Amendment's ratification," when "the conception of the militia . . . was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty."  Id.  "Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks."  Id.  Yet the Supreme Court ruled that "the fact that

[4]

modern developments have limited the degree of fit between the prefatory clause and the protected right" could not "change [its] interpretation of the right." Id. at 627-28.

When looking at the prohibition against possession of handguns in the home in Heller, the Supreme Court ruled it unconstitutional because the ban extended "to the home, where the need for self, family, and property is most acute." Id. at 628. The ban also troubled the Supreme Court because "[t]he handgun ban amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." Id. Accordingly, "[u]nder any of the standards of scrutiny that [the Supreme Court has] applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster." Id. at 628-29 (quoting Parker v. District of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007)).

Following Heller, the Supreme Court decided two other landmark Second Amendment cases. In McDonald v. City of Chicago, 561 U.S. 742 (2010), the Supreme Court extended the reach of the Second Amendment and stated that "the Second Amendment right is fully applicable to the States" via the Due Process Clause of the Fourteenth Amendment. Id. at 744. In Caetano v. Massachusetts, 136 S. Ct. 1027 (2016) (per curiam),

[5]

the Supreme Court reaffirmed its holding in Heller, reiterating that the Second Amendment "extends . . . to . . . arms . . . that were not in existence at the time of the founding" and does not protect only "those weapons useful in warfare." Id. at 1028 (quoting Heller, 554 U.S. at 582, 624).

Since Heller, circuit courts have wrestled with the proper standard of review to apply to Second Amendment claims.  Most circuit courts apply a two-part approach.  See, e.g., Kolbe v. Hogan, 849 F.3d 114, 138-47 (4th Cir. 2017) (en banc); New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 254 (2d Cir. 2015); GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs, 788 F.3d 1318, 1322 (11th Cir. 2015); Jackson v. City and Cty. of San Francisco, 746 F.3d 953, 962-63 (9th Cir. 2014); United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013); Drake v. Filko, 724 F.3d 426, 429 (3d Cir. 2013); Woollard v. Gallagher, 712 F.3d 865, 874-75 (4th Cir. 2013); National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194 (5th Cir. 2012); United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012); Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011); Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir. 2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).

Under the two-part approach, courts first consider whether the law "imposes a burden on conduct that falls within the scope" of the Second Amendment.  Powell v. Tompkins, 783 F.3d 332, 347 n.9 (1st Cir. 2015); see Kolbe, 849 F.3d at 133.  If the answer is no, the analysis ends.  If the answer is yes, the next step is to "determine the appropriate form of judicial scrutiny to apply (typically, some form of either intermediate scrutiny or strict scrutiny)" to test the constitutionality of the law.  Powell, 783 F.3d at 347 n.9.  Under strict scrutiny, "the government must prove that the challenged law is 'narrowly tailored to achieve a compelling governmental interest.'" Kolbe, 849 F.3d at 133 (quoting Abrams v. Johnson, 521 U.S. 74, 82 (1997)).  Under intermediate scrutiny, the government must "show that the challenged law 'is reasonably adapted to a substantial governmental interest.'"  Id. (quoting United States v. Masciandaro, 638 F.3d 458, 471 (4th Cir. 2011)).

## II.  THE CASE AT BAR

In 1998, four years after the passage of the federal statute banning assault weapons, Massachusetts enacted "An Act Relative to Gun Control in the Commonwealth."  1998 Mass. Acts ch. 180, §§ 1-80 (codified in Mass. Gen. Laws ch. 140 et seq.) (the "Act").  Among other restrictions, the Act proscribes the transfer or possession of assault weapons and large capacity magazines ("LCMs").  Mass. Gen. Laws Ann. ch. 140, § 131M

(2018). Though the Act largely was styled after the federal assault weapons ban and initially echoed the federal ban's 2004 expiration date, the Massachusetts Legislature declined to let the Act expire and instead made it permanent in that year.

On January 23, 2017, a group comprised of Massachusetts firearm owners, prospective firearm owners, firearm dealers, and a firearm advocacy association (collectively, the "Plaintiffs") filed suit against Charles Baker, the Governor of the Commonwealth of Massachusetts; Maura Healey, the Attorney General of the Commonwealth of Massachusetts (the "Attorney General"); Daniel Bennett, the Secretary of the Executive Office of Public Safety and Security; Colonel Richard McKeon, the Superintendent of the Massachusetts State Police; and the Massachusetts State Police (collectively, the "Defendants").[2]

The Plaintiffs filed this action against the Defendants alleging violations of their constitutional rights and seeking declaratory and injunctive relief. Compl. Decl. & Inj. Relief ("Compl."), ECF No. 1. Specifically, the Plaintiffs claim that the Act infringes their Second Amendment rights and violates

---

[2] The parties have since stipulated to the dismissal of the defendants Charles Baker and the Massachusetts State Police. Stip. Dismissal, ECF No. 39. Per Rule 25(d) of the Federal Rules of Civil Procedure, Colonel Kerry Gilpin, who is the current Superintendent of the Massachusetts State Police, has been automatically substituted for Colonel Richard McKeon.

their rights to due process afforded to them through the
Fourteenth Amendment.  Id. ¶¶ 72-107.

On December 15, 2017, both parties cross-moved for summary
judgment on all counts.  Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF
No. 57; Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem."), ECF No.
58; Pls.' Statement of Undisputed Material Facts ("Pls.'
Statement of Facts"), ECF No. 59; Defs.' Mot. Summ. J. ("Defs.'
Mot."), ECF No. 61; Mem. Supp. Defs.' Mot. Summ. J. ("Defs.'
Mem."), ECF No. 62; Defs.' Statement Material Facts ("Defs.'
Statement of Facts"), ECF No. 63.  The Plaintiffs also moved to
strike certain witness declarations and expert opinions
proffered by the Defendants.  See Pls.' Mot. Strike Undisclosed
Witness Decls., ECF No. 68; Pls.' Mot. Strike Ops. Defs.'
Experts, ECF No. 75.  On January 22, 2017, the Court allowed in
part the motion to strike the witness declarations, ruling that
the Defendants cannot rely on them in pressing their motion for
summary judgment, but denied the motion as to all other
purposes.  See Elec. Order, ECF No. 85.  The Court denied the
motion to strike the challenged expert opinions "insofar as
[they] are proffered in opposition to the Plaintiffs' motion for
summary judgment," expressing no opinion on whether the
challenged affidavits may be considered in support of the
Defendants' motion for summary judgment.  Elec. Order, ECF No.
84.

[9]

On February 9, 2018, this Court heard oral argument on the cross-motions for summary judgment and took the matter under advisement. See ECF No. 89.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a movant to prevail, it "bears the initial responsibility" of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then "shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party." Id. at 4.

In evaluating a motion for summary judgment, the Court must consider "all of the record materials on file, including the pleadings, depositions, and affidavits," but it is not permitted to "evaluate the credibility of witnesses nor weigh the evidence." Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). All inferences, however, are to be drawn in favor of the

nonmoving party.  See Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133, 150 (2000).

## III. THE UNDISPUTED FACTS[3]

### A.  The Development of the AR-15 Rifle

In 1957, after the United States Army had adopted the M14,
a select fire full-auto military rifle, it "began searching for
a .22 (centerfire) caliber lightweight select fire rifle" to
best meet the needs of the military.  Pls.' Statement of Facts,
Ex. 13 at A-15, ECF No. 59-12.  "Since the mid-1950's Armalite
[a gun manufacturer] had been developing gas-operated rifles
that differed substantially from traditional wood stock designs
in the use of modern materials and ergonomics."  Id.  The
Armalite Rifle ("AR")-10 was developed in 1956 for a 7.62x51 mm
cartridge.  Id.  A smaller version designed for the military,
with its specifications in mind, was developed and named the AR-
15.  The AR-15 was a scaled down version of the AR-10, with a
.223 Remington (5.56x45mm) cartridge.  Id.  In 1964, the Army
adopted the AR-15 and renamed it the M16.  Id.  Colt
manufactured the M16 and also created a semi-automatic version
of the weapon and named it the AR-15.  Id.

### B.  The Federal Ban and the Act

---

[3] In light of the ultimate disposition, this Court relies
only on legislative materials that are undisputed and the
Plaintiffs' own recitation of facts.  All inferences are drawn
in the Plaintiffs' favor.

In 1994, Congress enacted the Public Safety and Recreational Firearms Use Protection Act to decrease the spread of assault weapons similar to military weapons. Pub. L. No. 103-322, §§ 110101-06, 108 Stat. 1796, 1996-2010 (1994). While in effect from 1994 to 2004, the federal statute banned the manufacture, transfer and possession of nineteen models of semiautomatic weapons, and copies or duplicates of those firearms. §§ 110102-06, 108 Stat. at 1996-2010. It also banned any semiautomatic rifle, pistol, or shot gun that had two or more combat-style features, and rifles and pistols that had the ability to accept a detachable magazine, as well as LCMs that could hold more than ten rounds of ammunition. Id. The ban exempted assault weapons that were possessed lawfully on September 13, 1994, the date of its enactment, as well as hundreds of rifles and shotguns commonly used for hunting and target practice. Id.

Four years later, Massachusetts enacted the Act, which tracked the language of the federal ban and adopted the same definition of "assault weapon." Mass. Gen. Laws ch. 140, § 121. The Act makes it a crime to sell or possess a number of assault weapons, including Colt AR-15s, and copies and duplicates of those weapons. Id. § 131M. It also makes it a crime to sell or possess a fixed or detachable large capacity magazine that is capable of holding more than ten rounds of ammunition. Id.; see

[12]

id. § 121.  The Act makes an exception for weapons otherwise
lawfully owned on September 13, 1994.  Id. § 131M.

On July 20, 2016, the Attorney General issued an
"Enforcement Notice" to the public to "provide a framework to
gun sellers and others for understanding the definition of
'Assault weapon' contained in [the Act]."  Pls.' Statement of
Facts, Ex. 25 ("Enforcement Notice") at 1.  The Enforcement
Notice explained that a weapon is a "copy" or "duplicate" of an
Enumerated Weapon if (i) the weapon's "internal functional
components are substantially similar in construction and
configuration to those of an Enumerated Weapon," or (ii) the
weapon "has a receiver that is the same as or interchangeable
with the receiver of an Enumerated Weapon."  Id. at 3-4.

The Enforcement Notice declared that with respect to
individuals, its guidance "will not be applied to possession,
ownership or transfer of an Assault weapon obtained prior to
July 20, 2016."  Id. at 4.  Proceeding to address firearms
dealers, it stated that its guidance "will not be applied to
future possession, ownership or transfer of Assault weapons by
dealers, provided that the dealer has written evidence that the
weapons were transferred to the dealer in the Commonwealth prior
to July 20, 2016, and provided further that a transfer made
after July 20, 2016, if any, is made to persons or businesses in
states where such weapons are legal."  Id.

[13]

## IV.  APPLYING THE LAW TO THE FACTS

This Court begins with a description of the Plaintiffs' claims, which provides helpful context for its analysis.  The Plaintiffs make three challenges to the Act.  In Count One, they bring a Second Amendment challenge to the Act.  Arguing that the Act "prohibits an entire class of firearms . . . commonly kept by law-abiding, responsible citizens for lawful purposes," Compl. ¶ 74, the Plaintiffs allege that this prohibition "extend[s] into the home[]," where Second Amendment protections are "at their zenith," id. ¶ 76, and that the Act thus unconstitutionally infringes on their Second Amendment right to bear arms, id. ¶ 77.

Count Two alleges that the Notice of Enforcement unforeseeably and "retroactively criminalizes the transfers of tens of thousands of Massachusetts Compliant Firearms," id. ¶ 4, "retroactively expos[ing] . . . Plaintiffs[] to criminal penalty" and violating their right to due process, id. ¶ 70. The Plaintiffs acknowledge the Enforcement Notice's limitation on retroactive application to individuals, but they maintain that it "provides no exception to its application to dealers for transfers made before July 20, 2016." Id. ¶ 64.  Consequently, they assert, the Enforcement Notice's novel interpretation of the Act constitutes an unconstitutional retroactive enlargement of the Act's scope, similar to "an Ex Post Facto law passed by a

legislature or a retroactive decision issued by a state supreme court." Id. ¶ 96.

Lastly, in Count Three, the Plaintiffs challenge the Act as unconstitutionally vague, thereby violating their right to due process of law.  Specifically, they allege that the phrase "copies or duplicates" is nowhere defined in the Act or in any Massachusetts law, and the Enforcement Notice's "unprecedented" definition of that phrase provides insufficient guidance as to what constitutes a "copy or duplicate."  Id. ¶¶ 99-104.  The term's resulting vagueness, the Plaintiffs allege, "chills exercise of Second Amendment rights" and fails to warn ordinary citizens of the conduct the Act prohibits.  Id. ¶¶ 106-07.

### A.   Ripeness

Though the Defendants have not raised the issue of ripeness, this Court sees fit to do so.  Ripeness "may be considered on a court's own motion." National Park Hosp. Ass'n v. Department of Interior, 538 U.S. 803, 808 (2003).  Because ripeness implicates "the question of whether this court has jurisdiction to hear the case," Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013), the Court addresses it first.

### 1.   Legal Standard

"[T]he doctrine of ripeness has roots in both the Article III case or controversy requirement and in prudential

considerations." Id. (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 59 (1st Cir. 2003)). It "seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)). "The requirement of ripeness is 'particularly relevant in the context of actions for preenforcement review of statutes,' because it 'focuses on the timing of the action.'" Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 205 (1st Cir. 2002) (quoting Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C. Cir. 1997)). In determining whether an issue is ripe, the Court ought consider "both the fitness of the issue[] for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). Typically, "both factors must be present." Doe v. Bush, 323 F.3d 133, 138 (1st Cir. 2003).

The fitness determination "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." Gun Owners' Action League, 284 F.3d at 206 (quoting Rhode Island Ass'n of Realtors, Inc., v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999)). "The critical

question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 70 (1st Cir. 2003) (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995)). Cases that are "largely hypothetical . . . are seldom fit for federal judicial review." Ernst & Young, 45 F.3d at 538.

The hardship inquiry asks "whether the challenged action creates a direct and immediate dilemma for the parties." Gun Owners' Action League, 284 F.3d at 206 (quoting Rhode Island Ass'n of Realtors, 199 F.3d at 33). To demonstrate that this hardship exists, a party must show that it is put "between a rock and a hard place" without pre-enforcement review, forced either to "forego possibly lawful activity because of her well-founded fear of prosecution" or intentionally to commit a violation, "thereby subjecting herself to criminal prosecution and punishment." Navegar, 103 F.3d at 998 (citing Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298-99 (1979)). "The greater the hardship, the more likely a court will be to find ripeness." McInnis-Misenor, 319 F.3d at 70.

### 2. Analysis

Whereas Counts One and Three challenge the constitutionality of the Act itself, Compl. ¶¶ 72-77, 97-107,

Count Two alleges that the **Enforcement Notice** is unconstitutional, Compl. ¶ 96.  It further alleges that the Plaintiffs' due process rights are violated from **retroactive application** of the Enforcement Notice, rather than through the possibility of prospective enforcement (Counts One and Three). These two distinctions underpin the conclusion that unlike Counts One and Three, Count Two is not ripe for adjudication.

Several factors weigh against the fitness of Count Two for judicial resolution.  To start, the Enforcement Notice lacks the binding effect and force of law and does not constitute a "final" agency action.  The First Circuit has explained that "[a]n agency action . . . is not 'final' or ripe for review if it makes no change in the status quo itself, but rather requires 'further administrative action other than the possible imposition of sanctions,' before rights, obligations or duties arise."  Roosevelt Campobello Int'l Park Comm'n v. EPA, 684 F.2d 1034, 1040 (1st Cir. 1982) (quoting Northeast Airlines, Inc. v. CAB, 345 F.2d 662, 664 (1st Cir. 1965)).  An action that "merely explains how the agency will enforce a statute or regulation" is not generally subject to pre-enforcement judicial review, National Min. Ass'n v. McCarthy, 758 F.3d 243, 252 (D.C. Cir. 2014); the agency must have "rendered its last word on the matter," Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d

38, 46 (1st Cir. 2009) (quoting Harrison v. PPG Indus., Inc., 446 U.S. 578, 586 (1980)).

Here, the agency action is, as the Defendants describe, "a prosecutor's advisory to the public of her interpretation of a criminal law committed to her enforcement."[4]  Defs.' Mem. 14. The mere existence of the Enforcement Notice, which was not directed at any particular individual or entity and contemplates that it may be "alter[ed] or amend[ed]," Enforcement Notice at 4, does not bring about a change in rights or obligations. Rather, it is the decision to initiate enforcement actions under this guidance that would constitute the Attorney General's "last word on the matter" and give rise to any real effect on the

---

[4] That the agency in question here is a prosecuting authority weighs against fitness more so than it might in the context of most other administrative agencies, because "the decision to prosecute is particularly ill-suited to judicial review." Wayte v. United States, 470 U.S. 598, 607 (1985). Rather than issue the Enforcement Notice, the Attorney General could have decided simply to initiate a prosecution under her interpretation of the Act.  Absent a showing of discriminatory or arbitrary enforcement, that exercise of prosecutorial discretion would be "shielded from intense judicial review" in both federal and Massachusetts courts. United States v. Bernal-Rojas, 933 F.2d 97, 99 (1st Cir. 1991); see Commonwealth v. Latimore, 423 Mass. 129, 136 (1996). Thus, reviewing a manifestation of that discretion here might well upset the traditional principle that "[i]n our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." Wayte, 470 U.S. at 607 (quoting United States v. Goodwin, 457 U.S. 368, 380 n.11 (1982)); see Commonwealth v. Taylor, 428 Mass. 623, 629 (1999) ("[O]ur decisions uniformly uphold a prosecutor's wide discretion in deciding whether to prosecute a particular defendant.").

Plaintiffs' rights and obligations.[5]  See Roosevelt Campobello
Int'l Park Comm'n, 684 F.2d at 1039-40 (holding that agency
actions were not "sufficiently 'final' to call for judicial
review" where they did not confer rights until another agency
action, which had been proposed but not executed, took place);
Kemler v. Poston, 108 F. Supp. 2d 529, 542 (E.D. Va. 2000)
(concluding that challenge to state ethics committee's advisory
opinion was not fit for review where the opinion could have
"[n]o concrete effect" until enforced by the appropriate state
commission or court); cf. Northeast Airlines, 345 F.2d at 664
(explaining that judicial review is appropriate where agency
"determination is not a mere advisory or interpretive opinion").
To conclude otherwise would be to exalt form over substance and
discourage a desirable practice: If any comment on a law's
interpretation by the Attorney General could be considered to
have binding effect just because citizens may accord it
considerable weight, the Attorney General would forever remain
silent, providing citizens with **less** notice and creating a
higher risk that their rights to due process may someday be
violated.

---

[5] This Court notes, however, that another Judge of this
Court, addressing a similar challenge, has recently disagreed,
ruling that the Enforcement Notice itself has the effect of a
regulation and is reviewable. See Pullman Arms Inc. v. Healey,
No. 16-CV-40136-TSH, 2018 WL 1319001, at *2 (D. Mass. Mar. 14,
2018) (Hillman, J.).

Further, the actual threat of an enforcement action to activate those rights is minimal.  In contrast to Counts One and Three, which anticipate the possibility of enforcement for prospective transactions, Count Two's alleged deprivation of due process rests on the notion that the Enforcement Notice "retroactively criminalizes" prior conduct.  Compl. ¶ 4.  Yet the Attorney General declared in the Enforcement Notice itself that her interpretation of the Act would **not** be enforced retroactively against individuals.  Enforcement Notice at 4. While her language concerning dealers is arguably more ambiguous, it implies that the same principle applies to dealers, and the Attorney General's office has since confirmed that it does.  See Defs.' Mem. 14; Dec. Supp. Defs.' Mot. Summ. J., Ex. 1 at 162:5-10, 163:17-23, ECF No. 65-1.  Thus, the Plaintiffs' claim of lack of due process due to retroactive enforcement of the Enforcement Notice is "largely hypothetical," weighing against a determination that the issue is fit for review.[6]  Ernst & Young, 45 F.3d at 538; see McInnis-Misenor, 319

---

[6] The Plaintiffs allege that in addition to the threat of state prosecution, because federal law criminalizes the sale of firearms in any state prohibiting the purchase or possession of such a firearm, the Enforcement Notice also causes them to face a credible threat of federal prosecution for these previous transactions.  Compl. ¶ 92.  While there has been no similar disavowal by federal prosecutors, the Plaintiffs have not pointed to the initiation of any such prosecutions and have failed to demonstrate beyond a hypothetical possibility that federal prosecutors will now bind themselves to the Enforcement

F.3d at 72 ("[T]hat the future event may never come to pass augurs against a finding of fitness.").

Even if the Attorney General were to decide to enforce the Act under the Enforcement Notice's interpretation with respect to transactions occurring prior to July 20, 2016, she may exercise her discretion to revise her understanding as laid out in the Enforcement Notice, or to bring prosecutions under a different theory of liability. Review at this point thus may deprive her "of the opportunity to refine, revise or clarify the particular rule or other matter at issue" or "of the opportunity to resolve the underlying controversy on other grounds." Roosevelt Campobello Int'l Park Comm'n, 684 F.2d at 1040. Alternatively, a court may choose not to give effect to the Enforcement Notice's interpretation. See Matamoros v. Starbucks Corp., 699 F.3d 129, 135 (1st Cir. 2012) (explaining that while the Massachusetts Attorney General's interpretation of a law that she is charged with enforcing is "entitled to 'substantial deference'" by a court interpreting that law, it also must be "reasonable" (quoting DiFiore v. American Airlines, Inc., 454 Mass. 486, 910 N.E.2d 889, 897 n.11 (2009))).  Consequently,

---

Notice's guidance, yet reject its limits on retroactive enforcement.  Further, as explained infra, this threat -- like the threat of state prosecution -- does not create a sufficiently "direct and immediate dilemma" to demonstrate hardship.  Gun Owners' Action League, 284 F.3d at 206 (quoting Rhode Island Ass'n of Realtors, 199 F.3d at 33).

allowing adjudication of Count Two at this time would "be setting in motion a constitutional adjudication that not only could have a thunderous impact on important state interests but that might well prove to be completely unnecessary." Ernst & Young, 45 F.3d at 538.

Nor have the Plaintiffs demonstrated sufficient hardship[7] with respect to Count Two.  Courts have consistently pointed to the government's express intent to prosecute or express disavowal of that intent as a major factor in the determination of whether a credible threat of prosecution exists.  See Poe v. Ullman, 367 U.S. 497, 507 (1961) (plurality opinion) ("If the prosecutor expressly agrees not to prosecute, a suit against him for declaratory and injunctive relief is not such an adversary case as will be reviewed here."); SOB, Inc. v. County of Benton, 317 F.3d 856, 865-66, (8th Cir. 2003) (determining fear of prosecution to be unrealistic where alleged fear was based on unreasonable interpretation of ordinance and county attorney had publicly declared that ordinance did not prohibit activity in question); cf. Babbitt, 442 U.S. at 302 (concluding that reasonable fear of prosecution was shown where statute's criminal prohibition was clear and the state had not "disavowed

---

[7] Even where a fitness showing is minimal, the Court considers whether the hardship is so great so as to compensate for lack of fitness.  See McInnis-Misenor, 319 F.3d at 73.

any intention" of invoking it against the plaintiffs);

Presbytery of N.J. of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1468 (3d Cir. 1994) (observing that state's pointed refusal to forswear future prosecution "indicates . . . a real threat of prosecution"). As discussed supra, the Attorney General expressly disavowed her intention to enforce the Enforcement Notice's interpretation as to transactions that took place before the Enforcement Notice was issued.[8] That fact, together with the Plaintiffs' failure to provide this Court with any other reason to believe that they face imminent prosecution

---

[8] By contrast, the Attorney General has not made any such promise with respect to prospective transactions prohibited by the statute. With respect to Counts One and Three, then, the Plaintiffs face the immediate dilemma of buying a prohibited firearm and risking prosecution, or forgoing such a transaction, resulting in a potential deprivation of rights. See, e.g., New York State Rifle & Pistol Ass'n, Inc. v. Cuomo, 990 F. Supp. 2d 349, 358-59 (W.D.N.Y. 2013) (holding credible threat to exist where plaintiffs testified that but for the statute, they would acquire weapons rendered illegal by the statute), rev'd in part on other grounds, 804 F.3d 242; Ezell v. City of Chicago, 651 F.3d 684, 695 (7th Cir. 2011) ("The very 'existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper . . . .'" quoting Bauer v. Shepard, 620 F.3d 704, 708 (7th Cir. 2010)); Peoples Rights Org., Inc. v. City of Columbus, 152 F.3d 522, 529 (6th Cir. 1998) (explaining that case is ripe where plaintiffs "face a clear Hobson's choice" between risking prosecution or depriving themselves of use of weapons, and the government "clearly state[d]" its intent to prosecute); cf. Gun Owners' Action League, 284 F.3d at 207 (concluding that there was no hardship where the statute's licensing scheme "provide[d] a process for resolving uncertainty about the scope of the regulation," but observing that the argument for hardship "might have some force if the Act banned [the weapons] outright instead of licensing them").

[24]

for these past transactions, weighs heavily against concluding
that there is a credible threat of prosecution.  See Fortuna
Enterprises, L.P. v. City of Los Angeles, 673 F. Supp. 2d 1000,
1015 (C.D. Cal. 2008) (dismissing as not ripe claim seeking
declaration that ordinance cannot be applied retroactively,
where there was "no reason to believe that the Ordinance will be
applied retroactively").

Further, the Plaintiffs do not face the same kind of
dilemma with respect to this retroactivity claim as they do with
respect to their other claims, because they cannot retroactively
forgo lawful activity.  Whereas the threat of prosecution for
future transactions may pressure them not to engage in those
future transactions, the threat of prosecution for past
transactions has no reasonable bearing on their future activity.
The Plaintiffs thus suffer from no coercive effect of the remote
threat of prosecution for these past transactions.  See Lake
Carriers' Ass'n v. MacMullan, 406 U.S. 498, 507 (1972) (noting
the Poe plurality's observation that "a justiciable controversy
does not exist where 'compliance with (challenged) statutes is
uncoerced by the risk of their enforcement'" (quoting Poe, 367
U.S. at 508)); Marine Equip. Mgmt. Co. v. United States, 4 F.3d
643, 647 (8th Cir. 1993) ("To present an actual controversy . .
. the threat of enforcement must have some sort of immediate
coercive consequences.").  The Plaintiffs may fear prosecution

for these past transactions, but given that this fear is unreasonable and does not produce a coercive effect, there is little "hardship to the parties of withholding court consideration," Abbott Labs., 387 U.S. at 149.

Because the potential deprivation of due process asserted in Count Two depends entirely on "uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all," W.R. Grace & Co. v. Environmental Protection Agency, 959 F.2d 360, 364 (1st Cir. 1992) (quoting Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990)), and the Plaintiffs do not face a "direct and immediate dilemma" with respect to Count Two, Count Two is not ripe for adjudication. The Court therefore DISMISSES that claim for lack of subject matter jurisdiction.

## B.   The Scope of the Second Amendment

In Count One, the Plaintiffs allege that the Act infringes their Second Amendment rights.  They claim that this Court ought grant summary judgment in their favor because the assault weapons and LCMs banned by the Act are within the scope of the Second Amendment right to bear arms.  This Court disagrees. Assault weapons and LCMs -- the types banned by the Act -- are not within the scope of the personal right to "bear Arms" under the Second Amendment.

The Act in this case makes it a crime to possess assault weapons or LCMs after September 13, 1994.  Mass. Gen. Laws ch. 140, § 131M.  Assault weapons include:

> (i) Avtomat Kalashnikov (AK) (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M-10, M-11, M-11/9 and M-12; (vi) Steyr AUG; (vii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (viii) revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12.

Id. § 121.

As noted supra, the Supreme Court explained in Caetano that "Heller rejected the proposition 'that only those weapons useful in warfare are protected.'"  Caetano, 136 S. Ct. at 1028 (quoting Heller, 554 U.S. at 624).  Heller did not make such a rejection, however, in order to conclude that **all** weapons useful in warfare are protected.  On the contrary, Heller rejected that premise because it would lead to the "startling" conclusion that "the National Firearms Act's restrictions on machineguns . . . might be unconstitutional, machine guns being useful in warfare in 1939."  Heller, 554 U.S. at 624.  Thus, as Heller concluded, it cannot be that "only those weapons useful in warfare are protected," because some of those weapons are not protected. Id.  Weapons that are most useful in military service, as Justice Scalia later observed, fall outside the scope of the Second Amendment and may be banned.  Id. at 627.

Consequently, "Heller . . . presents us with a dispositive and relatively easy inquiry: Are the banned assault weapons and large-capacity magazines 'like' 'M-16 rifles,' i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment?" Kolbe, 849 F.3d at 136 (quoting Heller, 554 U.S. at 627). The undisputed facts in this record convincingly demonstrate that the AR-15 and LCMs banned by the Act are "weapons that are most useful in military service."[9] As matter of law, these weapons and LCMs thus fall outside the scope of the Second Amendment and may be banned.

The Plaintiffs argue that the AR-15 is the civilian version of the M16 because it cannot fire in fully automatic mode like the M16 and therefore cannot be considered a military weapon. As the Plaintiffs also point out in their undisputed facts, however, "[i]mprovements in firearms technology tend to be adopted for both military and civilian use" and so "[f]irearms designers and manufacturers have historically marketed new developments for both military and civilian uses." Pls.' Statement of Facts Ex. 13, ¶ 9. As a result, the AR-15 design is versatile and adaptable "for **military**, law enforcement, civilian self-defense, hunting, target shooting,

---

[9] While the Act defines an array of weapons banned by the Act, both parties focus their analysis on the AR-15 and whether a ban of it is unconstitutional. This Court will do the same.

and other sporting purposes." Pls.' Statement of Facts, Ex. 11 at A-9 (emphasis added); see Ex. 13 at A-18. The AR-15 design is almost identical to the M16, except for the mode of firing.

By 1956, Armalite had designed the AR-10, a lightweight select fire rifle for the United States Army. Ex. 13 at A-15. "In response to the military specifications, a similar scaled down AR-15 select fire rifle for the .223 Remington (5.56x45mm) cartridge was developed." Id. The Air Force adopted the AR-15 in 1962. Id. The Army followed soon after in 1964, renaming it the M16. Id. Colt, the manufacturer of the Army's M16, reused the name "AR-15" for its semiautomatic version of the rifle. Id. The AR-15 became well known among civilians following the Vietnam War when veterans brought the "AR pattern rifles" home with them for civilian use. Id. at A-16. "Soldiers who become familiar with a particular type of handgun or rifle in the service tend to seek out similar type[s of] firearms for personal use after leaving the military." Id.

AR-15s are "weapons that are based on designs of weapons that were first manufactured for military purposes" and "ha[ve] most of the features[,] other than [the automatic mode], of the military weapon." Pls.' Statement of Facts, Ex. 17 at 153:20-154:4. Some characteristics of a military weapon include: (1) the "ability to accept a large detachable magazine," (2) "folding/telescoping stocks," advantageous for military

purposes, (3) pistol grips designed to allow the shooter to fire
and hold the weapon, or "aid in one-handed firing of the weapon
in a combat situation,"[10] (4) flash suppressors, (5) bipods, (6)
grenade launchers, (7) night sights, (8) the ability for
selective fire, and (9) the ability to accept a centerfire
cartridge case of 2.25 inches or less.  Pls.' Statement of
Facts, Ex. 28 at 6-8.  Like the M16, the AR-15 is "available
with a telescoping/adjustable stock," a "vertical pistol grip"
that allows for the weapon to be "fired with one hand," and
"utilize[s] magazines with a standard capacity of 20 or 30
rounds."  Pls.' Statement of Facts ¶ 42.  The AR-15 is also
lightweight, a characteristic important for the military.  See
Pls.' Statement of Facts Ex. 12, at A-10; Ex. 8, ¶¶ 7-8.  Other
similarities between the M16 and the AR-15 include "the
ammunition," "[t]he way in which it is fired and the
availability of sighting mechanisms, . . . [t]he penetrating
capacity, . . . [and] [t]he velocity of the ammunition as it
leaves the weapon."  Pls.' Statement of Facts, Ex. 17 at 154:17-
23.

---

[10] "[T]he vast majority of sporting firearms employ a more
traditional pistol grip built into the wrist of the stock of the
firearm since one-handed shooting is not usually employed in
hunting or competitive target competitions."  Pls.' Statement of
Facts, Ex. 28 at 6.

The design of the AR-15 is common and well known in the military. "[O]ver 25 million American veterans . . . have been taught how to properly use an AR-15 type rifle through their military training." Pls.' Statement of Facts, Ex. 11 at ¶ 8. The AR-15 offers "similar ergonomics and operating controls" as the M16s used in military service. Pls.' Statement of Facts, Ex. 11 at A-9.

LCMs are also "indicative of military firearms" and fall outside the scope of the Second Amendment. Pls.' Statement of Facts, Ex. 28 at 6. "That a firearm is designed and sold with a large capacity magazine, e.g., 20 or 30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle." Id.

"Simply put, AR-15-type rifles are 'like' M16 rifles," and fall outside the scope of the Second Amendment. Kolbe, 849 F.3d at 136. The features of a military style rifle are "designed and intended to be particularly suitable for combat rather than sporting applications." Pls.' Statement of Facts, Ex. 28 at 12. The AR-15 and the M16 were designed and manufactured simultaneously for the military and share very similar features and functions. Therefore, because the undisputed facts convincingly demonstrate that AR-15s and LCMs are most useful in military service, they are beyond the scope of the Second Amendment. But see New York State Rifle & Pistol Ass'n, Inc. v.

Cuomo, 804 F.3d 242, 257 (2nd Cir. 2015) (proceeding "on the
assumption" that laws banning the AR-15 are subject to scrutiny
under the Second Amendment); Friedman v. City of Highland Park,
784 F.3d 406, 416 (7th Cir. 2015) (concluding that because AR-
15s are "commonly used and are not unusual . . . they are
covered by the Second Amendment"); Fyock v. Sunnyvale, 779 F.3d
991, 998 (9th Cir. 2015) (holding that "a regulation restricting
possession of certain types of magazines burdens conduct falling
within the scope of the Second Amendment").  The Defendants are
entitled to summary judgment on Count One -- the Act is
constitutional on Second Amendment grounds.

But wait, argue the Plaintiffs, the AR-15 is an
extraordinarily popular firearm.  Indeed, the data they proffer
as to its popularity appears unchallenged by the Defendants.
Pls.' Mem. at 6-7, 10; Pls.' Statement of Facts ¶¶ 30-32, 35-37;
Defs.' Statement of Facts ¶ 61; see Ali Watkins, John Ismay, &
Thomas Gibbons-Neffmarch, Once Banned, Now Loved and Loathed:
How the AR-15 Became 'America's Rifle', N.Y. Times (Mar. 3,
2018), https://nyti.ms/2CWFS9m.  They thus argue that the Act
must fall as unconstitutional as it "amounts to a prohibition of
an entire class of 'arms' that is overwhelmingly chosen by
American society for [a] lawful purpose." Heller, 554 U.S. at
628.

Yet the AR-15's present day popularity is not constitutionally material.  See Kolbe, 849 F.3d at 141-42.  But see Friedman, 784 F.3d at 416.  This is because the words of our Constitution are not mutable.  They mean the same today as they did 227 years ago when the Second Amendment was adopted.  The test is not the AR-15's present day popularity but whether it is a weapon "most useful in military service."  Heller, 554 U.S. at 627.  Indeed as Justice Scalia was most fond of reminding his audiences:

> Our attitude today is that if something *ought* to be so, why then the Constitution, that embodiment of all that is good and true and beautiful, *requires* it.  And we fight out these battles about what ought to be . . . not in the democratic forum but in the law courts.  The major issues that shape our society are to be decided for the whole nation by a committee of nine lawyers. . . . There is a certain irony in the fact that the society which takes all these issues out of the democratic process, and require them to be decided as constitutional absolutes, prides itself upon (of all things) its *toleration*.  It is willing to tolerate anything, apparently, except disagreement and divergence and hence the need for continuing democratic debate and democratic decision-making, on an ever-increasing list of social issues.

Antonin Scalia, Interpreting the Constitution, in Scalia Speaks: Reflections on Law, Faith, and Life Well Lived 188, 199 (Christopher J. Scalia & Edward Whelan eds., 2017).

> I urge you not to embrace the living Constitution — for a number of reasons.  The most important one is that only the traditional view that the meaning of the Constitution does not change places any real constraints upon the decisions of future members of Congress or future judges.  Since I accept that view, I am hand-cuffed.  Show me what the original understanding was, and you got me. . .

. There is no other criterion that is not infinitely manipulable.  Unless you conduct a national opinion poll, the "evolving standards of decency . . . of a maturing society" tend to be whatever you (or I) care passionately about. . . . To leave that visceral call to the unelected Supreme Court is to frustrate democratic self-government; and to leave it to the current Congress is to make the Constitution superfluous.  We do not need a Constitution to change according to the desires of current society; all we need is a legislature and a ballot box.  The whole function of a Constitution is to prevent future majorities from doing certain things, and if you turn over the identification of those things to the future majorities themselves, you have accomplished nothing.

Antonin Scalia, Congressional Power, in Scalia Speaks, supra, 213, 221-22.

C.  **Vagueness**

The Plaintiffs next challenge the phrase "copies or duplicates" within the Act's definition of "assault weapon" as rendering the Act unconstitutionally vague, violating their right to fair notice and denying them due process of law. Compl. ¶¶ 97-107.  The Court first considers the propriety of such a claim.

"[F]acial challenges are typically disfavored because they 'often rest on speculation,' which lead to the risk of premature interpretation of statutes and regulations." Draper v. Healey, 98 F. Supp. 3d 77, 82 (D. Mass. 2015) (Gorton, J.) (quoting Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008)).  Even more unfortunate for the Plaintiffs here, however, are the Supreme Court's suggestions

that facial vagueness challenges to statutes not implicating
First Amendment rights are **never** appropriate.  See Maynard v.
Cartwright, 486 U.S. 356, 361 (1988) ("Vagueness challenges to
statutes not threatening First Amendment interests are examined
in light of the facts of the case at hand; the statute is judged
on an as-applied basis."); United States v. Mazurie, 419 U.S.
544, 550 (1975) (observing that vagueness challenges that "do
not involve First Amendment freedoms must be examined in the
light of the facts of the case at hand").

The First Circuit has similarly recognized that even "where
an enactment is alleged to be 'impermissibly vague in all of its
applications,' . . . it is clear that such an allegation must
first be considered in light of the facts of the case -- i.e.,
on an as-applied basis." Love v. Butler, 952 F.2d 10, 13 (1st
Cir. 1991) (quoting Village of Hoffman Estates v. The Flipside,
Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)); Draper v.
Healey, 827 F.3d 1, 3 (1st Cir. 2016) ("We now turn to the
dealers' claim that the load indicator requirement is vague in
violation of due process, a constitutional claim eligible only
for as-applied, not facial, review."). In Love, the First
Circuit noted that "a facial challenge was inappropriate" where
the petitioner, who was convicted under the challenged statute,
conceded that the statute was not vague as applied to him but

"instead insist[ed] only that it is facially vague." <u>Love</u>, 952 F.2d at 13.

At the same time, it appears that the First Circuit has tended not to dismiss these challenges out of hand, instead opting to base its ruling on an as-applied analysis. <u>See, e.g.,</u> <u>id.</u> (noting that facial challenge was "inappropriate" yet needed not be addressed because the statute was not unconstitutionally vague as applied); <u>Draper</u>, 827 F.3d at 3 (addressing only the plaintiffs' as-applied challenge). In both of these cases, however, there was reason to conduct an as-applied analysis: in <u>Love</u>, the petitioner had been convicted under the statute, and in <u>Draper</u>, the plaintiffs challenged the regulation on both a facial and as-applied basis. Here, the Plaintiffs do not claim that the Act is unconstitutionally vague as applied, and because this is a pre-enforcement challenge, such a claim would indeed be inappropriate.[11]

Two courts faced with circumstances more similar to these, where the plaintiffs have not made any as-applied challenge, have, however, addressed a facial vagueness challenge on the merits. In <u>Kolbe</u> v. <u>Hogan</u>, the <u>en banc</u> Fourth Circuit addressed

---

[11] Though <u>Draper</u> was also a pre-enforcement action, the plaintiffs in that case had received letters from the Attorney General responding to their specific inquiries regarding violations of the regulation at issue. <u>Draper</u>, 98 F. Supp. 3d at 79-80.

a challenge to Maryland's assault weapons ban on the basis of unconstitutional vagueness (among other grounds). Kolbe, 849 F.3d at 148. The plaintiffs in that case brought only a facial challenge to the statute, and the district court had noted that whether such a challenge was available was unclear. See Kolbe v. O'Malley, 42 F. Supp. 3d 768, 799 n.40 (D. Md. 2014) (Blake, J.), aff'd en banc sub nom. Kolbe v. Hogan, 849 F.3d 114 (4th Cir. 2017). The district court concluded that it need not decide whether such a challenge was appropriate because in any event the statute was not unconstitutionally vague, and both the Fourth Circuit panel and the Fourth Circuit en banc seemed to endorse that approach, analyzing the claim on the merits and affirming the district court's holding that the statute in question was not unconstitutionally vague.[12] See id. at 148-149.

The Second Circuit also allowed a facial challenge to laws banning assault weapons in New York State Rifle & Pistol Ass'n, Inc. v. Cuomo. It noted that "[b]ecause plaintiffs pursue this 'pre-enforcement' appeal before they have been charged with any violation of law, it constitutes a 'facial,' rather than 'as-

---

[12] The Fourth Circuit panel did note, however, that the statute had not been enforced against the plaintiffs, and that the plaintiffs had not claimed that they were "forced to forego their Second Amendment rights because they were uncertain whether weapons they wished to acquire were prohibited." Kolbe v. Hogan, 813 F.3d 160, 190 (4th Cir. 2016). Despite this implication that the challenge may not have been proper, the panel continued on to the merits of the vagueness inquiry.

applied,' challenge," but it nevertheless went on to address the challenge on the merits, ultimately concluding that the laws were not unconstitutionally vague.  New York State Rifle & Pistol Ass'n, 804 F.3d at 265.

Though neither precedent is binding on this Court, the approach taken by Judge Blake in the District of Maryland commends itself to this Court.  Accordingly, the Court declines to determine whether this facial vagueness claim is allowable because, even if it is, the claim fails on its merits.

"The prohibition of vagueness in criminal statutes 'is a well-recognized requirement . . .' and a statute that flouts it 'violates the first essential of due process.'"  Johnson v. United States, 135 S. Ct. 2551, 2556-57 (2015) (quoting Connally v. General Constr. Co., 269 U.S. 385, 391 (1926)).  For a long time, it appeared to be settled that to succeed in a facial challenge to a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987).  Recently, however, in Johnson, the Supreme Court clarified that a vague law is not constitutional "merely because there is some conduct that clearly falls within the provision's grasp."  Johnson, 135 S. Ct. at 2561.  Nonetheless, the "threshold for declaring a law void for vagueness is high."  Id. at 2576.  A statute will be held unconstitutionally vague "only if it wholly 'fails to

provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" Id. (quoting United States v. Williams, 553 U.S. 285, 304 (2008)).

As the Defendants point out, another session of this Court has already rejected a vagueness challenge to the Act's definition of "assault weapon" (within which the phrase "copies or duplicates" is found).[13] See Defs.' Mem. 18-19; Decl. Supp. Defs.' Mot. Summ. J., Exs. 19-20.  In an order granting the defendants' motion to dismiss, Judge O'Toole concluded that "it is patently apparent that the definitions, even if they might be unclear at the margins, are not impermissibly vague in all applications, especially in light of the amendments to the Act which addressed some of the potential uncertainty." Mem. & Order, Gun Owner's Action League, Inc. v. Cellucci, No. 98-12125-GAO, slip op. at 2  (D. Mass. Sept. 28, 2000) (O'Toole, J.).  Though Judge O'Toole's assessment employed the higher pre-Johnson standard, this Court agrees with his reasoning and

_____

[13] In a footnote, the Defendants note that because one of the Plaintiffs here was a plaintiff in that prior case, the vagueness claim as asserted by that plaintiff is "plainly barred by claim and issue preclusion." Defs.' Mem. 19 n.52.  Because the Defendants have not pursued this as a formal defense, however, and because in any event the Court rules that the phrase is not impermissibly vague, the Court need not address this assertion.

concludes that the phrase "copies or duplicates" is not impermissibly vague even by the lower Johnson standard.

Though the Act does not define "copies or duplicates," the phrase's plain meaning provides a person of ordinary intelligence fair notice as to what is prohibited under the Act. The commonly understood meaning of "copy," as described by the Merriam-Webster dictionary, is "an imitation, transcript, or reproduction of an original work." Copy, Merriam-Webster, https://www.merriam-webster.com/dictionary/copy (last updated Mar. 21, 2018). A "duplicate" is "either of two things exactly alike and usually produced at the same time or by the same process." Duplicate, Merriam-Webster, https://www.merriam-webster.com/dictionary/duplicate (last updated Mar. 17, 2018). The combined term "copies and duplicates," in the context of the list of enumerated firearms, thus plainly refers to exact replicas of the enumerated firearms as well as firearms that may not be identical to the enumerated firearms but are nevertheless "imitations." While citizens may need to apply their own interpretation of this language "at the margins," this obligation does not render the language impermissibly vague because "'[f]air' notice is understood as notice short of semantic certainty." Draper, 827 F.3d at 4.

Further, both the Second and Fourth Circuits have rejected vagueness challenges to similar or identical language. In New

York State Rifle & Pistol Ass'n, the Second Circuit held the phrase "copies or duplicates" within the context of an assault weapons ban not to be unconstitutionally vague because the statute "provided not only an itemized list of prohibited models but also [a] military-style features test," therefore providing citizens with another reference point for what may constitute a "copy or duplicate." New York State Rifle & Pistol Ass'n, 804 F.3d at 267. The Fourth Circuit upheld a statute's ban on "copies" of enumerated assault weapons in Maryland's assault weapons ban, relying heavily on the fact that notices issued by the Maryland Attorney General and the Maryland State Police "explain how to determine whether a particular firearm is a copy of an identified assault weapon." Kolbe, 849 F.3d at 149. The Sixth Circuit sustained a vagueness challenge to an ordinance banning certain firearms, but emphasized that the ordinance "outlaws assault weapons only by outlawing certain brand names without including within the prohibition similar assault weapons of the same type, function or capability," "permits the sale and possession of weapons which are virtually identical to those listed if they are produced by a manufacturer that is not listed," and defines "assault weapon" by naming various individual models and then adding "other models . . . that have slight modifications or enhancements of firearms listed." Springfield Armory, Inc. v. City of Columbus, 29 F.3d 250, 252

(6th Cir. 1994).  In reasoning that the statute could easily be corrected, the Sixth Circuit noted that "[o]ther gun control laws which seek to outlaw assault weapons provide a general definition of the type of weapon banned." Id. at 253.

Though the Second, Fourth, and Sixth Circuits do not set controlling precedent for this Court, this Court is persuaded by their analyses, all of which bolster the conclusion that the phrase "copies or duplicates" is sufficiently clear.  Here, the Act lists certain individual models that qualify as "assault weapons" but also incorporates the now-expired federal ban's general definition of "semiautomatic assault weapon." See Mass. Gen. Laws ch. 140, § 121; 18 U.S.C. § 921(a)(30) (1994) repealed by Pub. L. No. 103-322, § 110105(2), 108 Stat. 1796, 2000 (1994).  This general definition contains both a list of enumerated weapons and several features-style tests that citizens may use as a second data point if they are uncertain as to what constitutes a "copy or duplicate." See 18 U.S.C. § 921(a)(30).  The Attorney General also issued a notice to the public (the Enforcement Notice) providing further guidance on how to determine whether a firearm is a "copy or duplicate" and thus prohibited.  All of these characteristics conform with those of the statutes upheld in New York State Rifle & Pistol Ass'n and Kolbe, and with the characteristics that the Sixth

[42]

Circuit indicated would have saved the ordinance in <u>Springfield Armory</u>.

The Plaintiffs argue that the Act is nevertheless vague because the Enforcement Notice does not articulate every test that may be applied to determine whether a weapon is a copy or duplicate, and because the two tests it does set forth are not sufficiently clear to permit citizens to determine which weapons are prohibited. Pls.' Mem. at 18. While the Enforcement Notice states that a manufacturer's advertising of a weapon is "relevant" to whether that weapon is a "copy or duplicate," the Plaintiffs contend that it "provides no explanation as to how to apply such a standard." <u>Id.</u> They further claim that because the Enforcement Notice provides that a firearm meeting either test remains a "copy or duplicate" even if it is altered to look like it does not meet the test, unknowing citizens could be subject to criminal liability. <u>Id.</u>

These arguments, which center on the Enforcement Notice, have no merit. As the Defendants note, the First Circuit "has already rejected an attempt to invoke a prosecutor's interpretation of a criminal statute in support of a facial attack on that statute." Mem. Opp'n Pls.' Mot. Summ. J. 19, ECF No. 72. In <u>McGuire</u> v. <u>Reilly</u>, 386 F.3d 45 (1st Cir. 2004), the First Circuit addressed an argument that an interpretation of law issued by the Massachusetts Attorney General (then Thomas

Reilly) "set up a new ground for facial unconstitutionality."
Id. at 58.  The First Circuit roundly rejected this argument,
explaining that while a federal court evaluating a challenge to
state law must "consider any limiting construction that a state
court or enforcement agency has proffered," this rule is
intended to help "save a statute that would otherwise be
facially unconstitutional." Id. (first quoting Ward v. Rock
Against Racism, 491 U.S. 781, 796 (1989)).  The court concluded
that "[l]ogically, there is no way . . . that an authority's
non-binding and non-authoritative interpretation of a facially
valid statute can make it more facially constitutionally
vulnerable than it would be otherwise." Id. (footnote omitted).
Though this statement is dicta, its reasoning is persuasive.
Here too, the Act is facially valid, and the Enforcement
Notice's interpretation -- even if it were construed as
expanding the Act's scope -- cannot render it unconstitutionally
vague. See McCullen v. Coakley, 571 F.3d 167, 183 (1st Cir.
2009) ("It is difficult to understand . . . how or why a
challenger can mount a facial attack on a statute that is itself
not vague simply because an enforcement official has offered an
interpretation of the statute that may pose problems down the
road.  As a matter of logic, we do not believe that an
official's interpretation can render clear statutory language
vague so as to make the statute vulnerable to a facial (as

opposed to an as-applied) attack." (citations omitted)),

overruled on other grounds, 134 S. Ct. 2518 (2014); Cutting v.

City of Portland, Maine, 802 F.3d 79, 84 (1st Cir. 2015).

Finally, the Plaintiffs argue that the phrase "copies or

duplicates" is unconstitutionally vague because it allows for

the possibility of "arbitrary and subjective enforcement."

Pls.' Mem. 19.  The Plaintiffs provide no further detail or

evidence as to how the Act has been or can be enforced on a

discriminatory basis.  Courts consistently reject pre-

enforcement, facial vagueness challenges where "no evidence has

been, or could be, introduced to indicate whether the ordinance

has been enforced in a discriminatory manner."  Village of

Hoffman Estates, 455 U.S. at 503 (1982); see also Gonzales v.

Carhart, 550 U.S. 124, 150 (2007) (rejecting pre-enforcement

challenge based on claim of arbitrary or discriminatory

enforcement, noting that the arguments "are somewhat

speculative"); Richmond Boro Gun Club, Inc. v. City of New York,

97 F.3d 681, 686 (2d Cir. 1996) (declining to entertain

"premature" pre-enforcement vagueness challenge based on

"speculative threat of arbitrary enforcement," in part because

the government "may choose to limit enforcement . . . to weapons

clearly proscribed by the law"); cf. New York State Rifle &

Pistol Ass'n, 804 F.3d at 266 ("Should such [an unfair]

prosecution ever occur, the defendant could bring an 'as

applied' vagueness challenge . . . . That improbable scenario
cannot, however, adequately support the facial challenge
plaintiffs attempt to bring here."). The Plaintiffs offer no
reason to believe that the threat of arbitrary enforcement is
not purely speculative. As a result, the Court remains
convinced that the phrase "copies or duplicates" as used in the
Act is not impermissibly vague.

## V.    CONCLUSION

For the foregoing reasons, the Court DISMISSES Count Two
of the Plaintiffs' complaint and GRANTS summary judgment for the
Defendants on Counts One and Three. The Plaintiffs' motion for
summary judgment on those counts is DENIED.

**SO ORDERED.**

The AR-15 and its analogs, along with large capacity
magazines, are simply not weapons within the original meaning of
the individual constitutional right to "bear Arms."

Both their general acceptance and their regulation, if any,
are policy matters not for courts, but left to the people
directly through their elected representatives. In the absence
of federal legislation, Massachusetts is free to ban these
weapons and large capacity magazines. Other states are equally
free to leave them unregulated and available to their law-
abiding citizens. These policy matters are simply not of
constitutional moment. Americans are not afraid of bumptious,

raucous, and robust debate about these matters.  We call it democracy.

Justice Scalia would be proud.

William B. Young
WILLIAM G. YOUNG
DISTRICT JUDGE