


THE
PUBLIC
DEFENDER
SERVICE
for the District of Columbia



CHAMPIONS OF LIBERTY

Avis E. Buchanan
*Director*

Rudy Acree
*Deputy Director*

*CONFIDENTIAL LEGAL CORRESPONDENCE*
*OPEN ONLY IN PRESENCE OF ADDRESSEE*

June 27, 2018

Mr. James Murray
Fed. Reg. No. #09548-007
USP Florence ADMAX
P.O. Box 8500
Florence, CO 81226

Dear Mr. Murray,

    Thank you for writing to The Public Defender Service for the District of Columbia's Prisoner & Reentry Legal Services Program. I hope that my letter reaches you in good spirits. I am writing in response to your letter received in our office on May 23, 2018, in which you requested case law and other resources to assist you in the filing of an *amicus curiae* brief.

    It is incredible and inspiring that you are writing a brief to the court that can hopefully better not only your situation, but the lives of others that also find themselves involved in our criminal justice system. I hope that these materials can provide you the information you need to successfully write this brief, but please do not hesitate to reach out to us if you need more cases or other resources.

    In your letter, you asked for several cases: *Worman v. Baker*, 1:17-CV-10107 (D. Mass. 2018); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002); and *Strasser v. Doorley*, 432 F.2d 567 (1st Cir. 1970). I have provided you these cases within this correspondence, although it should be noted that the *Giovani* case may be invalid in part based on subsequent case proceedings. I have included the Fourth Circuit's 2002 decision that you requested in your letter, but I have also included the subsequent case history, including the case citations and their summaries. Please let us know if after going over these materials, you think you would benefit from having these other decisions. I have also provided you the docket for the *Worman* case, as you requested.

    Besides these materials to help you in the writing of your *amicus* brief, you also asked for five (5) copies of page 35 from Vol. 103, No. 2 of the Criminal Law Reporter. Through my search, the copy I located only came to a total of 23 pages. I read through the volume you requested, and I believe I have pinpointed and highlighted the information you were seeking in asking for page 35 – please let us know if that is not the case. In addition, you requested: the ABA's and U.S. Citizenship and Immigration Services's Council Statements; information about

the American Association of University Professors (AAUP); and information about the National Association for Law Placement (NALP). I have provided you these materials within this correspondence, and hope that these are the materials you were looking for.

To summarize, within this letter, you should find the following materials:

- A print-out of the *Worman v. Baker*, 1:17-CV-10107 (D. Mass. 2018) case docket *(20 pages, back-and-front)*
- A print-out of *Worman v. Baker*, 1:17-CV-10107 (D. Mass. 2018) *(47 pages, back-and-front)*
- Five (5) copies of requested material in Criminal Law Reporter, Vol. 103, No. 2 *(five copies, each 1 page, back-and-front)*
- A print-out of *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002), including subsequent case history (citations and summaries) *(20 pages, back-and-front)*
- A print-out of *Strasser v. Doorley*, 432 F.2d 567 (1st Cir. 1970) *(4 pages, back-and-front)*
- U.S. Citizenship and Immigration Services's Memo on Exemptions for Aliens Holding Graduate Degrees *(3 pages)*
- ABA's Council Statement on JD/PhD Equivalency *(7 pages)*
- Document stating the Purpose and Mission of the AAUP *(1 page)*
- The AAUP's Constitution *(9 pages)*
- The AAUP's New Membership Application *(1 page)*
- The NALP's Principles and Standards *(9 pages)*
- The NALP's New Member Application Form *(1 page)*

Please do not hesitate to reach out to us if you have any other questions or concerns, and I wish you the best of luck in the writing of your *amicus* brief. From one legal scholar to another – keep researching, keep writing, keep thinking, keep advocating!

Best regards,

K. Hubschmann
Paralegal Specialist
Prisoner & Reentry Legal Services Program

Criminal Law Reporter (BNA), 103 CRL Issue No. 2

who represents the office of the presidency, not Trump personally, in the Mueller probe.

Trump has struggled to find another lawyer because many firms already represent clients involved in the Mueller investigation, creating potential conflicts. Former Solicitor General Ted Olson and former federal prosecutors Tom Buchanan and Dan Webb also turned down offers because of conflicts.

**Risk to Reputation**

Lawyers also have been concerned about damage to their reputation that could come from representing Trump, said a person familiar with the search. Not only could they and their firm be tainted by Trump's controversial politics, but they fear they could be publicly humiliated by Trump the way he has taken to Twitter to belittle Attorney General Jeff Sessions, his former Secretary of State Rex Tillerson and former Deputy FBI Director Andrew McCabe and his wife.

One key skill an experienced defense lawyer could bring to Trump is preparing him for an interview to make sure he has an answer ready for any likely question. That type of preparation could take dozens of hours, a challenge for a president with a short attention span, and require Trump to internalize and buy into the message his lawyers craft for him. Trump and Sekulow have a good rapport, but it's unclear whether Sekulow has the influence over Trump to persuade him to stay on message during an interview, said one person familiar with the pair.

"There has to be recognition that there is skill and artistry that goes into adequate preparation," said Jacob Frenkel, chairman of government investigations and securities enforcement at Dickinson Wright. "These are skills that aren't developed merely by going to law school or by being a member of the profession. You can teach art, but that doesn't make you are great artist."

A criminal defense lawyer would be able to help Trump navigate the parameters of an interview and field unexpected questions or downright curve balls, Eliason said.

"The difficulty for the witness is that you have no idea what the prosecutors know," Eliason said. "It's not something you want to walk into with somebody who's doing this for the first time."

--With assistance from Greg Farrell.

©2018 Bloomberg L.P. All rights reserved. Used with permission

To contact the reporters on this story: Shannon Pettypiece in Washington at spettypiece@bloomberg.net; Chris Strohm in Washington at cstrohm1@bloomberg.net

To contact the editors responsible for this story: Kevin Whitelaw at kwhitelaw@bloomberg.net; Alex Wayne at a wayne3@bloomberg.net Larry Liebert

**Court Decisions**

**Civil Rights:** Juvenile Inmates May Challenge Solitary Policies as Class

### BNA Snapshot

- Prison officials routinely put juveniles in solitary confinement, deny them educational opportunities, inmates say
- Inmates may sue as class because prison officials engaged in common course of conduct

By Perry Cooper

Juvenile inmates may sue New York prison officials as a class over the prison's overuse of solitary confinement, a federal court held April 4.

Class certification is appropriate because the inmates allege the officials' conduct was common to all juveniles in custody, Judge David N. Hurd wrote for the U.S. District Court for the Northern District of New York.

The court also barred the prison from imposing 23-hour disciplinary isolation on juveniles while the case is pending.

The 110 juveniles who spent time at the facility during the two year class period and future detainees are members of the class.

Two juvenile inmates sued on behalf of other 16- and 17-year-olds who have been or will be held in solitary confinement at the Broome County Correctional Facility in New York. They seek a stop to prison officials' pattern of placing juveniles in solitary confinement and denying them access to educational opportunities.

Legal Services of Central New York represented the inmates.

The Broome County Attorney's Office represented the prison officials.

The case is *A.T. v. Harder*, 2018 BL 118958, N.D.N.Y., No. 17-817, 4/4/18.

To contact the reporter on this story: Perry Cooper in Washington at pcooper@bloomberglaw.com

continues on back

To contact the editor responsible for this story: Steven Patrick at spatrick@bloomberglaw.com

**Constitutional Law:** Massachusetts's Ban on Assault Weapons Upheld by U.S. Judge (2).

### BNA Snapshot

- Suit was filed over state's response to Pulse club shooting
- Gun-rights group claimed the 1998 ban was unconstitutional

By Erik Larson

Criminal Law Reporter (BNA), 103 CRL Issue No. 2

Massachusetts's beefed-up ban on assault weapons doesn't violate the Second Amendment of the Constitution, a U.S. judge ruled, handing a victory to gun-control advocates seeking to pass such a law nationwide following a spate of deadly mass shootings.

"The AR-15 and its analogs, along with large capacity magazines, are simply not weapons within the original meaning of the individual constitutional rights to 'bear arms,'" U.S. District Judge William Young wrote in a decision Thursday in Boston, dismissing a lawsuit over the state law.

Massachusetts Attorney General Maura Healey was sued by a gun-rights group in response to her July 2016 enforcement notice that broadened the definition of "copies or duplicates" of AR-15 and AK-47 models that are prohibited under the state's 1998 assault-weapon bans.

"These are weapons of war that belong on the battlefield, and we were pleased today to see yet another court agree with that stance," Kris Brown, co-president of the Brady Campaign to Prevent Gun Violence, said in a statement.

Gun litigation has taken on a new urgency following the Feb. 14 shooting at a high school in Parkland, Florida, where 17 people were left dead. Survivors mobilized on social media and successfully pushed for a new gun-control law in Florida, which triggered a lawsuit by the National Rifle Association. The law raised the age to purchase a gun to 21 from 18. The U.S. Supreme Court in November left intact a ruling that upheld Maryland's ban on assault weapons.

Healey's review was in response to the June 2016 shooting at the Pulse nightclub in Orlando, Florida, where 49 people were killed by a gunman brandishing a semi-automatic rifle and a semi-automatic pistol. Healey said the decision vindicates the right of people to protect themselves.

"Strong gun laws save lives, and we will not be intimidated by the gun lobby in our efforts to end the sale of assault weapons and protect our communities and schools," Healey said in a statement. "Families across the country should take heart in this victory."

James Campbell, the lawyer for plaintiffs including the Gun Owners' Action League Inc., didn't immediately return a call for comment on the ruling. The NRA's press office didn't immediately return a call for comment.

The term "assault weapons" is non-technical and "entirely fabricated" to politicize the most popular types of guns in the U.S., according to the gun owners' complaint.

"Healey unilaterally decreed that thousands of Massachusetts residents are suddenly criminals simply for having exercised their Second Amendment rights," the plaintiffs said.

**Scalia Ruling**

Young, nominated by former President Ronald Reagan, backed his decision by quoting the late conservative Supreme Court Justice Antonin Scalia, who wrote the majority opinion in a landmark 2008 decision that overturned Washington's ban on hand guns. The ruling expanded individual gun rights but said the right isn't unlimited.

"Weapons that are most useful in military service -- M-16 rifles and the like" aren't protected by the Second Amendment and "may be banned," Young quoted Scalia as saying.

Young also rejected attempts by the gun-rights group to challenge the ban on the grounds that AR-15s are extremely popular in the U.S.

"The AR-15's present day popularity is not constitutionally material," Young said. "This is because the words of our Constitution are not mutable. They mean the same today as they did 227 years ago when the Second Amendment was adopted."

©2018 Bloomberg L.P. All rights reserved. Used with permission

The case is *Worman v. Baker*, The case is Worman v. Baker, D. Mass., 1:17-cv-10107.

To contact the reporter on this story: Erik Larson in New York at elarson4@bloomberg.net

To contact the editors responsible for this story: David Glovin at dglovin@bloomberg.net Joe Schneider

**Criminal Law:** No Liability for Holding Witness to Police Shooting Too Long

**BNA Snapshot**

- Police unreasonably held compliant witness to police shooting for over four hours
- Police immune to witness's civil rights suit because right not clearly established at time

By Bernie Pazanowski

Police officers acted unreasonably when they held a compliant witness to a police shooting for over four hours, the U.S. Court of Appeals for the Fifth Circuit said April 5.

Nevertheless, the officers won't be held liable, the opinion by Judge Edith B. Clement said.

The Colleyville, Texas, Police Department received a call that John Lincoln was armed and intended to shoot his mother. When they arrived on the scene, only John and his daughter, Erin, were in the house.

John was shot by the SWAT team and died. Erin rushed to him but officers handcuffed her and dragged her from the scene kicking and screaming.

Erin was placed in a police car and the cuffs were removed. Various officers checked to make sure was okay and after two hours she was taken to the police station to be interviewed. Erin never told the officers she wanted to leave.

Erin claimed she was unreasonably seized in violation of the Fourth Amendment.

